## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, :
DANIEL A. SMITH, JEFFREY GOLDHAGEN, TERESA :
J. REID, and KENNETH B. NUNN, :

         : **21-cv-184-MW-GRJ**

          Plaintiffs :

     v. : **AMENDED COMPLAINT**

         :

UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, :
the public body corporate acting for and on behalf of the :
University of Florida, W. KENT FUCHS, in his official :
capacity as President of the University Florida, JOSEPH :
GLOVER, in his official capacity as Provost of the :
University of Florida, and LAURA ROSENBURY, in her :
official capacity as Dean of the Fredric G. Levin College of :
Law, :

         Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

      Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A. Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn (collectively, "Plaintiffs"), by and through the undersigned attorneys, file this Amended Complaint for injunctive and declaratory relief against Defendants University of Florida Board of Trustees, W. Kent Fuchs, in his official capacity as President of the University of Florida, Joseph Glover, in his official capacity as Provost of the University of Florida, and Laura Rosenbury, in her official capacity as Dean of the Fredric G. Levin College of Law (collectively, "Defendants").

### NATURE OF THE CASE

      1.      The University of Florida is a public research institution with a mission "to share the benefits of its research and knowledge for the public good."  Contrary to that goal—and to foundational principles of academic freedom and free speech—it has

adopted a policy of censoring faculty members who participate in lawsuits against the State of Florida's policies.

2.     Plaintiffs are six full-time professors at the University who were asked and sought the University's permission to participate in litigation challenging laws on voting rights and COVID-19 public health measures.  The University denied Plaintiffs' requests for one reason:  Plaintiffs wanted to use their experience and expertise to support Florida citizens who challenged the State of Florida, rather than backing the State's position.

3.     Plaintiffs' job as public university professors and researchers is not to be mouthpieces for the government's point of view.  It is to develop and share their academic knowledge and expertise with the people of Florida while upholding the University's values and fulfilling their oath—taken by all public employees in the State— to "support the Constitution of the United States and of the State of Florida."

4.     Nor did Plaintiffs surrender their constitutional rights when they became public employees.  By discriminating against Plaintiffs based on the viewpoints they wish to express and by seeking to prevent them from speaking on issues of overwhelming public importance, the University of Florida violated Plaintiffs' rights under the First Amendment.

5.     The University will continue to do so if it is not stopped.  Facing a firestorm of nationwide criticism, the University agreed to let Plaintiffs proceed with their already-planned testimony in pending cases.  But the University's unconstitutional conflict-of-interest policy remains in place, giving the University unfettered discretion to stifle speech that it deems "adverse" to the State's political interests.

6.      Unless and until the University's unconstitutional policy is rescinded, Plaintiffs' First Amendment rights and academic freedom—and those of every University of Florida faculty member—remain at stake.

## PARTIES

7.      Plaintiff Sharon Wright Austin is a Professor of Political Science at the University of Florida.  Professor Austin has been a member of the University faculty since 2001.  Her scholarship and research focuses on African American mayoral elections, African American and Caribbean American political relationships, rural African American political activism, and African American political behavior.  Professor Austin has authored books on African American political participation and published numerous articles on related topics.  In addition, she was until recently the Director of the University's African American Studies program.

8.      Plaintiff Michael McDonald is a Professor of Political Science at the University.  Professor McDonald has been a member of the University faculty since 2014.  His research focuses on elections, including voter turnout and eligibility.  He has consulted on redistricting measures and served as an expert witness in lawsuits concerning elections in states around the country.  Professor McDonald is also a co-principal investigator on the Public Mapping Project, which encourages public participation in redistricting.

9.      Plaintiff Daniel A. Smith is a Professor of Political Science and Chair of the University's Political Science Department.  Professor Smith has been a member of the University faculty since 2003.  His research examines the effects of ballot measures, campaign financing, redistricting, and electoral laws on voting and political participation in the United States.  Professor Smith has served as an expert witness in a number of

lawsuits concerning voting rights, ballot measures, campaign finance laws, and redistricting.  He has also testified before Congress and the state legislatures of Colorado and Florida on elections issues.

10.    Plaintiff Jeffrey Goldhagen is a Professor of Pediatrics and the Chief of the Division of Community and Societal Pediatrics at the University of Florida College of Medicine.  Professor Goldhagen has been a member of the University faculty since 1993. He focuses on community-based pediatrics and public health services.  He serves as the Medical Director for the Partnership for Child Health, the President of the International Society for Social Pediatrics and Child Health, and is the co-founder of the Population Health Consortium of Northeast Florida, which was formed in 2020 to respond to the COVID-19 pandemic.  Professor Goldhagen has served as an expert witness in litigation relating to lead poisoning of children.  He has also served as the Director of the Duval County Health Department and the Medical Director of Cleveland, Ohio's Department of Public Health.

11.    Plaintiff Teresa J. Reid is a Professor at the University of Florida Fredric G. Levin College of Law (the "Law School").  Professor Reid has been a member of the University faculty since 1987.  Her areas of expertise and teaching include the death penalty, legal writing, appellate advocacy, legal ethics, legal professionalism, evidence, and mediation.  She has presented numerous lectures and performed pro bono work on these topics, including by signing on to amicus curiae briefs (otherwise known as friend-of-the-court briefs).

12.    Plaintiff Kenneth B. Nunn is a Professor at the Law School.  Professor Nunn has been a member of the University faculty since 1990.  His areas of teaching and

expertise include criminal law, criminal procedure, African American history and the law, race and the justice system, and law and cultural studies.  Professor Nunn has served as a member of the Innocence Commission of the State of Florida, which was charged with identifying causes of wrongful convictions in the State and recommending changes in legislation, court rules, and law enforcement practices to reduce the incidence of wrongful convictions.  He has also authored numerous academic articles, given scholarly presentations, and signed amicus briefs on issues related to his fields of study.

13.     Defendant University of Florida Board of Trustees is the public body corporate of the University.  It sets policy for the institution and serves as the institution's legal owner and governing board.

14.     Defendant W. Kent Fuchs is the President of the University.  As President, Defendant Fuchs is responsible for the general administration of all University activities.  Defendant Fuchs is being sued only in his official capacity.

15.     Defendant Joseph Glover is the Provost of the University.  As Provost, Defendant Glover is the chief academic officer and the second highest-ranking officer of the University, acting for the President in his absence.  Defendant Glover is responsible for: supervising the allocation of academic resources; improving instruction and coordinating instructional activities; developing and improving research activities; evaluating University academic activity; establishing the University's policy with respect to employment, promotion, and tenure of academic faculty; overseeing the University's Conflicts of Interest Office; and implementing the University's Affirmative Action/Equal Opportunity Program.  Defendant Glover is being sued only in his official capacity.

16.     Defendant Laura Rosenbury is the Dean of the Law School.   In that position, Dean Rosenbury has been tasked with enforcing the University's Conflict of Interest Policy as it applies to Law School professors.   Defendant Rosenbury is being sued only in her official capacity.

## JURISDICTION AND VENUE

17.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress deprivation under color of state law of their rights secured by the First Amendment of the United States Constitution.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claim arises under the Constitution and laws of the United States.

19.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities as officers of the State of Florida or its political subdivisions.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants perform their official duties in this judicial district at the University's campus in Gainesville, Florida.   Venue also is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiffs' claim occurred in this judicial district.

21.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

## FACTUAL BACKGROUND

**The University Adopts a Policy Giving It Unbridled Discretion to Prohibit Faculty from Speaking Out Against the State.**

22.     The University requires its faculty members to get its permission before engaging in certain activities.  The current version of the University's Conflicts of Commitment and Conflicts of Interest Policy ("the Policy"), which took effect on July 1, 2020, requires faculty to file a request for permission on the University's online conflicts system ("UFOLIO") each time they seek to participate in an "Outside Activity," which it defines as "any paid or unpaid activity . . . which could create an actual or apparent Conflict of Commitment or Conflict of Interest."

23.     The Policy provides little clarity as to what constitutes a "Conflict of Commitment" or a "Conflict of Interest."  It defines a "Conflict of Commitment" as "an Outside Activity, either paid or unpaid, that could interfere with the[] [employees'] professional obligations to the University."  It defines a "Conflict of Interest" as something that "occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgement or obligations to the University."

24.     Significantly, the Policy gives the University "sole discretion" to "determine[]" whether a Conflict of Interest or a Conflict of Commitment "may exist" and to determine what sanctions should be imposed on a faculty member with such a conflict.  As set forth below, the University has used its discretion to define those terms in a manner that discriminates on the basis of faculty members' viewpoints and has offered shifting and inconsistent explanations for its interpretation of the Policy.

25.     The penalties for an employee's failure to comply with the Policy can be severe.  The Policy provides that any violation of its requirements—including failure to disclose an outside activity or proceeding with an outside activity without first obtaining approval—can result in "administrative or disciplinary action . . . up to and including termination of employment."

**The University Prevents Law School Professors From Signing an Amicus Curiae Brief with Their Institutional Affiliation.**

26.     On January 31, 2020, Gary Wimsett, Jr., Assistant Vice President for Conflicts of Interest, gave a presentation to the Law School faculty on the Policy.

27.     On February 10, 2020, Dean Rosenbury emailed the Law School faculty to provide "some clarification" on the Policy's scope.  She told the Law School faculty: "Writing or *signing on* to an amicus brief in your capacity as an individual law professor" was not an "Outside Activity" that required prior approval under the Policy because it was "[c]onsidered [p]art of [y]our UF [a]ssignment."  (emphasis added.)  Only "[a]micus briefs *written for another individual or entity*" were considered "Outside Activities" under the Policy.  (emphasis added.)

28.     In or around July 2020, Professor Nunn was contacted by attorneys for the plaintiffs in *Jones, et al. v. DeSantis, et al.*, No. 20-12003 (11th Cir.).   That case challenged Florida Senate Bill 7066, which requires Florida citizens who have completed their sentence for felony convictions to pay any financial obligations included in their sentence before they can exercise their right to vote.  The attorneys wanted to know whether Professor Nunn would be interested in signing an amicus brief in opposition to Florida Senate Bill 7066 along with other law professors from around the country and across the State of Florida.

29.     On July 1, 2020, Professor Nunn emailed over two dozen Law School colleagues who had expertise in constitutional law, voting rights law, civil rights law, or criminal procedure to ask whether they would be interested in joining the amicus brief in *Jones v. DeSantis*.  Professor Nunn requested that they respond by July 8, 2020.

30.     Professor Reid was among the faculty members who Professor Nunn contacted, and she agreed to join the amicus brief.  Eight other Law School professors also agreed to sign on, in addition to the Law School's Center for the Study of Race and Race Relations.

31.     In light of Dean Rosenbury's February 10, 2020 guidance, Professors Nunn and Reid did not think that they needed to seek the University's permission merely to sign the amicus brief in *Jones v. DeSantis*.  It made sense to them that signing on to the amicus brief would not be considered an "Outside Activity" because it was consistent with their job responsibilities at the Law School, where each taught courses implicating the rights of criminal defendants and those convicted of felonies.  Moreover, both Professors Nunn and Reid had previously signed numerous amicus briefs on issues relevant to their areas of expertise with no opposition from the University.

32.     But on July 9, 2020, just one day after the deadline that Professor Nunn had set for agreeing to sign on to the amicus brief, the law school abruptly changed its position on signing amicus briefs.  Dean Rosenbury emailed the Law School faculty, stating for the first time that faculty were required to seek permission before signing onto an amicus brief—but only if the brief was filed in a case opposing the State of Florida:

> [F]aculty participation in litigation against the state of
> Florida or any agency thereof, including through amicus
> briefs, is considered a potential conflict of interest.  If you
> seek to participate in such litigation or to write or sign on to

an amicus brief in support of a party suing the state of Florida, you must fill out a disclosure form through UFOLIO and receive approval before participating. . . .

33.    In an apparent reference to the Center for the Study of Race and Race Relations' plan to sign the amicus brief in *Jones v. DeSantis*, Dean Rosenbury added an additional requirement specific to entities like the Center:  "Entities of the College of Law, such as centers, clinics, or other classes, seeking to participate in such litigation or amicus briefs must separately receive approval from me, the General Counsel, and President Fuchs."

34.    Confused by this sudden change, Professor Nunn asked Dean Rosenbury to clarify the Policy as it applied to signing the amicus brief in *Jones v. DeSantis*. Contrary to her February 10, 2020 guidance that only outside activities were required to be disclosed, Dean Rosenbury responded:  "You are correct that this is not an outside activity, but it is a potential conflict of interest because the amicus brief will be filed in an action against the state.  You, and others, must therefore disclose on that basis."

35.    On July 13, 2020, Dean Rosenbury wrote to Professor Nunn and other Law School faculty members:

> I have confirmed that the university will approve this activity so long as you participate solely in your individual capacity. You may not participate in your capacity as an employee of the University of Florida or on behalf of the Levin College of Law or the University of Florida. Please ensure that the amicus brief clearly indicates that any law school or university affiliation is included for identification purposes only.

36.    Consistent with Dean Rosenbury's advice, Professor Nunn completed his UFOLIO disclosure for his participation in the litigation and included the following language:

[Signing on to the amicus brief] will not put me in a position adverse to the interests of the University of Florida.  I simply wish to sign on to an amicus brief, as one of more than 100 professors at law, to express an opinion about the proper interpretation of the law in regards to not infringing on the voting rights of ex-felons as provided by citizen initiative in the State of Florida.  I understand that I may not participate in my capacity as an employee of the University of Florida or on behalf of the Levin College of Law or the University of Florida.  I will ensure that the amicus brief clearly indicates that any law school or university affiliation is included for identification purposes only.

37.    Professor Nunn's UFOLIO request was unconditionally approved on July 14, 2020.

38.    Professor Reid also submitted a UFOLIO request to sign on to the *Jones v. DeSantis* amicus brief.  On July 12, 2020, Professor Reid's UFOLIO request was approved with the condition that she "participate in this outside relationship in [her] individual capacity only."  But, unlike Professor Nunn, her approval also stated that she was "*not permitted to use any UF* marks, logos or other *identifiers* in [her] outside activity/interest, and [could] not otherwise imply or suggest any official affiliation with UF."  (emphasis added.)

39.    Following the controversy surrounding the University's shifting positions, most of the 10 professors who had expressed interest in signing the amicus brief in *Jones v. DeSantis* ultimately did not do so.  When the amicus brief was filed, only four Law School professors, including Professors Nunn and Reid, were listed among the 109 signatories.[1]  The Center for the Study of Race and Race Relations was not listed.

---

[1] *See* Appearance of Counsel Form filed by Jennifer Altman for 109 Professors of Law, *Jones et al. v. DeSantis et al.*, No. 20-12003 (11th Cir. Aug. 6, 2020).

40.     In addition, as a result of the University's conditions, the Law School professors' institutional affiliations were omitted from the brief.  Of the 28 law professors from Florida schools, Professors Nunn, Reid, and two additional Law School professors were the only ones who did not have their institutional affiliations listed alongside their signatures. All of the other 24 law professors from other Florida schools—including Florida State University College of Law and Florida International University College of Law—who signed the amicus brief listed their institutional affiliations alongside their signatures.[2]

41.     Although Professors Nunn and Reid agreed to join the amicus brief in *Jones v. DeSantis* in their personal capacities, listing their institutional affiliations was an important part of the message that they had wanted to convey.  Their professional association with the Law School—Florida's top-ranked law school—reflected their years of practice and scholarship and would have given greater weight and credibility to their signatures on the amicus brief.

**The University Blocks Professor Goldhagen from Testifying as an Expert Witness in Support of a Challenge to the Ban on Mask Mandates in Public Schools.**

42.     On July 30, 2021, Governor Ron DeSantis entered Executive Order Number 21-175 entitled "Ensuring Parents' Freedom to Choose—Masks in Schools" (the "Executive Order").  The Executive Order precluded school districts from enacting mask mandates and threatened to withhold state funds for any school district that chose to require masks in schools.

43.     Florida parents quickly sued to enjoin the Executive Order, arguing that it impaired the safe operation of schools in the State.  The lawsuit was filed in the Circuit

---

[2]         *See id.*

Court in Leon County under the caption *McCarthy, et al. v. DeSantis, et al.* ("*McCarthy*"), No. 2021-CA-001382 (Fla. Cir. Ct.).

44.     An attorney for the plaintiffs in the *McCarthy* litigation asked Professor Goldhagen to serve as an expert witness in support of the challenge to the Executive Order, including testifying at trial, to which Professor Goldhagen readily agreed.  As an expert in pediatric public health, Professor Goldhagen was asked to testify on the impact of COVID-19 on the pediatric population and the health benefits of requiring students to wear masks in schools to prevent the spread of COVID-19.

45.     Although expert witnesses are typically compensated for their time and expenses in preparing expert reports and giving expert testimony, Professor Goldhagen did not request compensation for his work on the *McCarthy* case.  Instead, he chose to donate his time pro bono to what he considered to be a crucial matter of public health.

46.     In accordance with the Policy, on or about August 11, 2021, Professor Goldhagen duly submitted a request through UFOLIO disclosing his engagement as  an expert witness in the *McCarthy* case.

47.     Professor Goldhagen had served as an expert witness multiple times before with the University's approval, and he did not expect to meet any opposition from the University this time.  After all, he believed, testifying on behalf of parents who wanted to protect their children's health and safety in school was entirely consistent with the University of Florida College of Medicine's "goal of improving individual and community health" and his oath as a medical doctor.

48.     So Professor Goldhagen was astonished when, on August 12, 2021, Gary Wimsett marked his application "denied."  In explaining the basis for the decision, Mr.

Wimsett made no attempt to hide that the University was denying Professor Goldhagen's application because Professor Goldhagen sought to testify on behalf of Florida parents and not the State, stating:  "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."

49.     Professor Goldhagen subsequently inquired to "learn about the appeal process/procedure for decisions related to Disclosure for outside activities" and was informed by Mr. Wimsett that "[t]here is no mechanism for appealing disapprovals in UFOLIO."

50.     Professor Goldhagen informed the lawyer who had asked him to serve as an expert witness that the University did not approve his request.  Though he encouraged the lawyer to subpoena him for his testimony—in which case he would be required to testify—the case moved too quickly, and the lawyer instead sought other expert witnesses who were not prevented from participating.

51.     As a result of the Policy, Professor Goldhagen was not able to serve the people of Florida by sharing his expertise, experience, and medical knowledge on one of the most critical public health matters of our time.

**The University Tries to Stop Professors Austin, McDonald, and Smith from Testifying as Expert Witnesses in Support of a Challenge to Voting Restrictions.**

52.     On May 6, 2021, Governor DeSantis signed Senate Bill 90 ("SB 90") into law.  Among other things, SB 90 imposes obstacles on Florida voters' ability to cast ballots through in-person voting, mail-in voting, and the use of secure drop-boxes for early voting.  It also places new restrictions on third-party voter-registration drives and prohibits certain organizations, including churches, from providing assistance to voters waiting in line to vote.

53.     Voting rights advocates sued to enjoin SB 90, arguing that it disproportionately harms Black and Latino voters and poor voters.  The lawsuits were consolidated before this Court under the caption *League of Women Voters of Florida, Inc., et al., v. Laurel M. Lee* ("*League of Women Voters*"), No. 4:21-cv-00186-MW-MAF (N.D. Fla.).

54.     Attorneys for the plaintiffs in the *League of Women Voters* litigation asked Professors Austin, McDonald, and Smith (the "Political Science Professors") to act as expert witnesses in support of their challenge to SB 90 and ultimately to testify at trial, to which the Political Science Professors readily agreed.  Those attorneys asked the Political Science Professors to testify on topics including the history of voting discrimination against minority groups, the use of mail balloting and in-person early voting in Florida, and the impact of vote-by-mail measures on minority groups.

55.     Two of the Political Science Professors had undertaken similar work before.  In particular, Professors McDonald and Smith previously served as expert witnesses in a number of lawsuits opposing voting regulations in states around the country, including lawsuits challenging Florida legislation and naming officers of the State of Florida as defendants.[3]  Professor Austin began serving as an expert witness this year.

---

[3]     Professor Smith has served as an expert witness in a number of cases, including: *Gruver, et al. v. Barton, et al.*, No. 1:19-cv-00121-MW-GRJ (N.D. Fla. 2019); *Rivera v. Detzner*, No. 1:18-cv-00152-MW-GRJ (N.D. Fla. 2018); *League of Women Voters of Florida, Inc. v. Detzner*, No. 4:18-cv-00251-MW-CAS (N.D. Fla. 2018); *Florida Democratic Party v. Scott*, No. 4:16-cv-00626-MW-CAS (N.D. Fla. 2016); *Arcia v. Detzner*, 1:12-cv-22282-WJZ (S.D. Fla. 2012); and *Romo v. Scott*, No. 2012-CA-000412 (Fla. Cir. Ct. 2012).

56.     As is typical and expected in expert witness engagements, Professors McDonald and Smith received fair compensation for their time and expenses in preparing their expert testimony in prior cases.  Plaintiffs' engagement in the *League of Women Voters* litigation was no different in this respect.

57.     The University did not object to Professor Smith and McDonald's prior work as expert witnesses.  If anything, it commended them.  For example, in Professor Smith's annual performance reviews, the University praised his research and advocacy on voting rights as "impactful and important for our colleagues, students, and the citizens of Florida."  And it celebrated both his considerable scholarly writings as well as his role as an advocate on voting issues, calling his work "important both as a scholar and as a contribution to the people of Florida."

58.     In accordance with the Policy, each of the Political Science Professors submitted requests through UFOLIO disclosing their engagement as expert witnesses in connection with the *League of Women Voters* litigation.

59.     The University refused to approve each of the Political Science Professors' applications, offering a series of shifting and inconsistent explanations that laid bare the University's real goal:  to prevent the Political Science Professors from testifying in support of a challenge to the State's policies.

60.     On July 7, 2021 and again on October 11, 2021, the University sent Professor Smith a disapproval notice.  As with Professor Goldhagen, the University told Professor Smith:  "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."

61.    On October 13, 2021, the University sent Professor McDonald a disapproval notice, which once again equated the interests of the University—a public research institution—with those of the State.  It stated:  "UF [w]ill deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests."

62.    Also on October 13, 2021, the American Civil Liberties Union's ("ACLU") Florida chapter sent a letter to Gary Wimsett, Assistant Vice President for Conflicts of Interest, and Brian Powers, Director, Conflicts of Interest, which stated that there "is no question that Dr. Smith would be speaking in his capacity as a private citizen, not as an employee of the University," that "he would obviously be speaking on a matter of public concern," and that his "interest in sharing his important perspective, and the public's interest in better understanding the operation of their government, far outweigh any purported contrary interest that UF might have."  The ACLU requested that the University "immediately rescind the denial" of Professor Smith's participation as an expert witness.  The University did not respond to this letter.

63.    On October 15, 2021, the University sent Professor Austin a disapproval notice containing the same language as was sent to Professor McDonald, but adding:  "As UF is a state actor, litigation against the [S]tate is adverse to UF's interests."

64.    Following Professor Austin's and Professor McDonald's disapprovals, the ACLU sent letters on their behalf similar to the letter sent on behalf of Professor Smith.  The ACLU, again, received no reply.

65.    On October 29, 2021, Plaintiffs' counsel sent a letter to Ryan Fuller, Associate Vice President and Deputy General Counsel for the University, which noted

17

that the University's Policy violated the Political Science Professors' constitutional rights and asked the University to reverse its disapproval decisions.

66.     In response, the University adopted an all-new justification for its actions. In a statement posted on its website on October 30, 2021, the University suggested that the reason for the disapprovals was not only that the Political Science Professors' testimony was expected to be "adverse to the [U]niversity's interests as a state of Florida institution" but also that the Political Science Professors would be "paid" for their time and expenses.

67.     On November 1, 2021, when Plaintiffs' counsel sent another letter to the University asking for clarity, the University retreated to yet a new position.  In a letter replying to Plaintiffs' counsel, Fuller reiterated that the Political Science Professors' testimony "involved activities that are adverse to the State of Florida."  But, he asserted, "pursuant to the University's policy related to outside activities," the Political Science Professors could testify as long as it was "in their personal capacit[ies], without the use of any University resources and without compensation."

68.     Apparently recognizing the inconsistencies in its shifting positions, in a November 1, 2021 letter from President Fuchs to the "campus community," the University announced it was "immediately appointing a task force to review the [U]niversity's conflict of interest policy and examine it for consistency and fidelity," but provided no other details.  As to the Political Science Professors, President Fuchs' letter stated:  "[I]f the professors wish to testify pro bono on their own time without using [U]niversity resources, they are free to do so."

69.    But, as President Fuchs and Mr. Fuller surely knew, the Political Science Professors' work as expert witnesses would be performed solely in their personal capacities, and it would not impinge on the time that they are expected to devote to their work for the University or use University resources.

70.    As for the University's suggestion that its real problem with the Political Science Professors' testimony was that they would be compensated for it, that rationale is at odds with the University's position regarding the Law School professors' unpaid participation in the *Jones v. DeSantis* amicus brief and Professor Goldhagen's unpaid participation in the *McCarthy* case.

71.    Moreover, the State seemingly had no problem with the faculty of a public university testifying and receiving compensation for expert witness work that favors the State's viewpoint.  Florida International University, like the University of Florida, has adopted a policy that limits faculty's outside activities that pose a conflict of interest with the "university, the Board of Governors, and/or the State of Florida."  Upon information and belief, pursuant to that policy, Florida International University permitted Professor Dario Moreno to receive compensation for being an expert witness for the Republican National Committee and the National Republican Senatorial Committee as intervenors in the very same litigation in which the University forbade the Political Science Professors from doing the same for voting rights groups.

**Facing a Public Outcry, the University Rescinds Specific UFOLIO Denials But the Policy Remains in Place.**

72.    The University's refusal to allow the Political Science Professors to testify was made public in late October 2021, igniting a firestorm of public criticism.

73.    Florida's Democratic congressional delegation sent a letter to President Fuchs lambasting the school's attempt to block professors from serving as expert witnesses, and the American Association of University Professors released a statement condemning "in the strongest possible terms" the University's "infringement of [its professors'] academic freedom rights."[4]

74.    Nationally recognized academics condemned the University's Policy, as well.  Keith Whittington, a Princeton professor and Chair of the Academic Committee of the Academic Freedom Alliance, wrote in an October 31, 2021 letter to President Fuchs and other University leaders:  "The University is mistaken in thinking that this decision is consistent with the principles of free speech and academic freedom."[5]  Similarly, Robert George, a Professor of Jurisprudence and Director of the James Madison Program in American Ideals and Institutions at Princeton University, told University administrators at a meeting of the Florida Board of Governors that the Policy infringed professors' First Amendment rights.[6]

75.    The University's actions brought about a threat to its own accreditation status.  On or about November 1, 2021, the Southern Association of Colleges and

---

[4]    *See* Statement from AAUP President Irene Mulvey
 on University of Florida's Blatant Violation of Academic Freedom, University of Florida's Politically Motivated Violation of Academic Freedom Undermines the Common Good, Am. Assoc. of Univ. Professors (Nov. 1, 2021), https://www.aaup.org/news/university-floridas-politically-motivated-violation-academic-freedom-undermines-common-good#.
[5]    *See* Letter from Keith Whittington to President Kent Fuchs (Oct. 31, 2021), https://academicfreedom.org/wp-content/uploads/2021/11/AFA-letter-to-UF-on-expert-testimony-prohibition.pdf.
[6]    *See* Jimena Tavel, *Princeton Legal Scholar Advises UF to Back Off Restricting Professors in Suit Against State*, MIAMI HERALD (Nov. 3, 2021), https://www.miamiherald.com/news/local/education/article255522016.html#storylink=cpy.

Schools, the University's accreditor, asked for clarification on the Policy and stated that it might launch an investigation to determine if the University's actions violated its rules.[7]

76.    On November 5, 2021, the University reversed its denials of the Political Science Professors' UFOLIO applications, apparently as a matter of discretion.  On or about that date, Professor Goldhagen's UFOLIO denial for the *McCarthy* case and for at least one other case concerning the ban on mask mandates were changed to "approved."

77.    President Fuchs also announced that the newly appointed task force would "make a recommendation to [him] on how [the University] should respond when employees request approval to serve as expert witnesses in litigation in which their employer, the state of Florida, is a party," and would be asked to deliver "a preliminary recommendation by Monday, November 29."

**The Policy Remains in Place, Continuing to Violate Plaintiffs' Free Speech Rights.**

78.    The University's unconstitutional Policy remains in place, and the University's hastily appointed task force is unlikely to remedy the problem.  Public statements by President Fuchs, Provost Glover, and Dean Rosenbury—the latter two of whom serve on the task force—all indicate that the task force's mandate is limited to expert witness work and will not address other forms of participation in litigation or advocacy against State policies.  President Fuch's November 5, 2021 announcement stated only that the task force's preliminary recommendation would address expert witness work by faculty members.  Likewise, Dean Rosenbury, while inviting her

---

[7]    *See* Lindsay Ellis, *U. of Florida's Accreditor Will Investigate Denial of Professors' Voting-Rights Testimony*, THE CHRONICLE OF HIGHER EDUCATION (Nov. 1, 2021); *Accreditation Firm Investigating UF Professors Testimony Incident*, WCJB (Nov. 2, 2021), https://www.chronicle.com/article/u-of-floridas-accreditor-will-investigate-denial-of-professors-voting-rights-testimony;
https://www.wcjb.com/2021/11/02/accreditation-firm-investigating-uf-professors-testimony-incident/.

colleagues' input into the Policy, asked only for advice about the policies and procedures "as they relate to the issue of serving as an expert witness." Provost Glover stated during the task force's first meeting that it was focusing solely on the issue of expert witness testimony because "[President Fuchs] feels that this is one of the issues that is most pressing[.]"

79.     Moreover, there is no set timeline for the University to make revisions—if any—to the Policy. President Fuchs asked only that the task force give him a "preliminary recommendation" by November 29, 2021. It remains unclear when, if ever, the University will reach a final decision as to the Policy's terms and scope.

80.     Finally, the composition of the task force highlights its inadequacy. The group excludes any representation from the Faculty of the College of Liberal Arts and Sciences or the College of Medicine. And it includes at least two members—Dean Rosenbury and Terra DuBois, Chief Compliance, Ethics, & Privacy Officer—who are conflicted because they have both been engaged in the development and unconstitutional execution of the existing conflict of interest policies. Neither can fairly or objectively judge the permissibility or constitutionality of their own actions.

81.     In the meantime, the Policy continues to violate Plaintiffs' rights. Plaintiffs frequently are asked to participate in lawsuits concerning their areas of research and teaching. Many of these cases challenge legislation or government action related to elections or criminal procedure. Many seek emergent relief, including emergency motions in death penalty cases or motions for temporary restraining orders regarding voting procedures. Plaintiffs may be required to provide research or analysis on a highly expedited basis—sometimes in a matter of hours and sometimes without knowing

whether the State is a party to the litigation and, if so, whether their testimony will be for or against the State's position.

82.    The Policy's vaguely worded terms and the discretion that it vests in the University to define them—seemingly at whim—leaves Plaintiffs unable to determine whether they are required to seek the University's approval under the Policy and, if so, whether the activity likely would be approved.  As a result, Plaintiffs are likely to lose out on opportunities to participate as amici curiae or expert consultants or witnesses, particularly in fast-paced litigation.

83.    As a matter of principle and commitment to academic freedom and integrity, Plaintiffs intend to continue to participate in litigation challenging State policies that are within their areas of expertise whenever possible.

84.    Plaintiffs face serious risks in doing so.  If Plaintiffs were to accept an expert engagement or sign an amicus brief without first receiving the University's permission, they would invite significant professional consequences.  These could include, for example, withholding of institutional support or funding for projects that are important to their career advancement or denial of promotions.  The Policy even states that faculty who violate its terms can be terminated.

85.    The University's inconsistent and discriminatory application of the Policy has already left some Plaintiffs hesitant to participate in litigation at all.  For example, on November 3, 2021, Professor Nunn received an invitation to join an amicus brief in support of Terrence Andrus's request for resentencing for a crime committed as a juvenile in *Andrus v. Texas*, No. 21-6001.  Ordinarily, Professor Nunn would not hesitate to lend his name and prominence as a criminal law scholar to an amicus brief on such an

important issue. Nevertheless, on November 7, 2021, he declined the invitation, explaining that, "with all the turmoil going on down here with university oversight of our amicus signons, [he had] decided to wait until there is more clarity" on the Policy's scope. The Policy was the sole reason Professor Nunn decided not to sign the amicus brief in *Andrus*.

86.     Unless and until the Policy is rescinded or declared unconstitutional to the extent it equates the University's "interest" with that of the State and allows the University unlimited discretion to block speech that it dislikes, it will continue to impede Plaintiffs from participating in litigation or other forms of advocacy that challenge State policies, in violation of the First Amendment and Plaintiffs' academic freedom.

### FIRST CLAIM FOR RELIEF
### FIRST AMENDMENT
### U.S. Const. amends. I, XIV; 42 U.S.C. § 1983
### (Against All Defendants)

87.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

88.     The First Amendment declares that "Congress shall make no law . . . abridging the freedom of speech." The First Amendment applies to the States under the Fourteenth Amendment.

89.     42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

90.   Pursuant to the Policy, Defendants have unbridled discretion over whether to permit or deny Plaintiffs' expressive activity based on viewpoint or content and to suppress disfavored speech, in violation of Plaintiffs' First Amendment rights.

91.   Defendants also violated Plaintiffs' rights under the First Amendment by restricting Plaintiffs from participating in litigation on the basis of their viewpoint and by imposing a prior restraint on their speech, namely by requiring the University's permission to participate in litigation against the State.

92.   Discrimination and prior restraint on the basis of viewpoint or content are presumptively unconstitutional.  Thus, the University's restrictions must be struck down unless they are narrowly tailored to serve a compelling interest of the State.

93.   The State has no compelling interest in silencing University faculty and preventing them from speaking on a topic of such significant public importance as voting rights and public health.  And Plaintiffs' interest in speaking freely on a matter of public concern far outweighs any interest that the State may have in censoring their testimony. "The notion that the State may silence the testimony of state employees simply because that testimony is contrary to the interests of the State in litigation or otherwise, is antithetical to the protection extended by the First Amendment." *Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998).

94.   The Policy further violates Plaintiffs' First Amendment rights because its vague terms give Plaintiffs no notice of what conduct is prohibited and lead to arbitrary and viewpoint discriminatory enforcement.

95.   Finally, the Policy's terms are overbroad because they capture a substantial amount of protected speech.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.  Preliminary and permanent injunctive relief preventing Defendants from enforcing any policy or practice that provides the University discretion to limit Plaintiffs' ability to undertake outside activities, on a paid or unpaid basis, on the ground that the proposed activity is not aligned with the "interests" of the State of Florida or any of its entities or instrumentalities;

2.  Declaratory relief declaring unlawful Defendants' policy or practice that provides the University discretion to limit Plaintiffs' ability to undertake outside activities, on a paid or unpaid basis, on the ground that the proposed activity is not aligned with the "interests" of the State of Florida or any of its entities or instrumentalities;

3.  Reasonable attorneys' fees and costs; and

4.  Such other and further relief as this Court may deem just and proper.

Dated: November 15, 2021
Washington, D.C.

By:_____
DAVID A. O'NEIL (*pro hac vice*)
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W., Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

MORGAN A. DAVIS (*pro hac vice*)
ALEXANDRA P. SWAIN*
JAIME FREILICH-FRIED (*pro hac vice*)
SAMUEL ROSH (*pro hac vice*)

PAUL DONNELLY
Florida Bar No. 813613
LAURA GROSS
Florida Bar No. 858242
CONOR P. FLYNN
Florida Bar No. 1010091
Donnelly + Gross LLP
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001
paul@donnellygross.com

26

SOREN SCHWAB (*pro hac vice*)           laura@donnellygross.com
KATHARINE WITTEMAN (*pro hac vice*)     conor@donnellygross.com
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
mdavis@debevoise.com
apswain@debevoise.com
jmfried@debevoise.com
sjrosh@debevoise.com
sschwab@debevoise.com
kwitteman@debevoise.com

*Application for admission pro hac vice
forthcoming*

*Counsel for Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A.
Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn*