## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHARON WRIGHT AUSTIN, MICHAEL    :
MCDONALD, DANIEL A. SMITH, JEFFREY  :
GOLDHAGEN, TERESA J. REID, and    :
KENNETH B. NUNN,          :   1:21-cv-00184-MW-GRJ
                         :
       Plaintiffs,       :   **ORAL ARGUMENT**
                         :   **REQUESTED**
  v.                    :
                         :
UNIVERSITY OF FLORIDA BOARD OF    :
TRUSTEES, the public body corporate acting for :
and on behalf of the University of Florida; W. :
KENT FUCHS, in his official capacity as   :
President of the University Florida; JOSEPH :
GLOVER, in his official capacity as Provost of :
the University of Florida; and LAURA    :
ROSENBURY, in her official capacity as Dean of :
the Fredric G. Levin College of Law,    :
                         :
       Defendants.      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## AND MEMORANDUM OF LAW

**TABLE OF CONTENTS**

MOTION FOR PRELIMINARY INJUNCTION ....................................................1

PRELIMINARY STATEMENT ........................................................................1

STATEMENT OF FACTS ...............................................................................4

I.     The University Adopted a Policy Giving It Discretion to Prohibit
       Faculty from Speaking Out Against the State. ...................................4

II.    The University Applied the Policy to Interfere with the Professors'
       Participation in Litigation Against the State. ...................................6

       A.     The University Prevented Law School Professors From Signing
              an Amicus Brief with Their Institutional Affiliation. .........................6

       B.     The University Blocked Professor Goldhagen from Testifying
              as an Expert Witness. .............................................................8

       C.     The University Tried to Stop Professors Austin, McDonald, and
              Smith from Testifying as Expert Witnesses. ....................................9

III.   Facing Public Outcry, the University Rescinded Specific UFOLIO
       Denials. ..................................................................................11

ARGUMENT .............................................................................................16

I.     Plaintiffs Will Likely Succeed on the Merits of Their Claim. .....................17

       A.     The Policy Violates the First Amendment by Vesting the
              University with Unbridled Discretion to Restrict and Punish
              Speech..................................................................................17

       B.     The Policy Imposes a Viewpoint-Based Prior Restraint....................20

       C.     The Policy Is Overbroad Because It Punishes a Substantial
              Amount of Protected Speech..................................................22

       D.     The University Task Force's Amendments Fail to Remedy the
              Policy's Constitutional Infirmities. .......................................25

II.    Plaintiffs Will Suffer Irreparable Injury if the Policy Is Not Enjoined.........32

III.   The Balance of Equities and Public Interest Favor Plaintiffs' Right to Speak on Matters of Public Importance. .......................................................33

IV.   Plaintiffs Should Be Excused from Posting Security. ...................................34

CONCLUSION .......................................................................................................34

# TABLE OF AUTHORITIES

## CASES

*Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*,
  322 F.3d 1298 (11th Cir. 2003) ........................................................................18

*Barrett v. Walker Cnty. Sch. Dist.*,
  872 F.3d 1209 (11th Cir. 2017) ...............................................17, 20, 31, 32

*Bd. of Trs. v. Fox*,
  492 U.S. 469 (1989)..........................................................................................24

*Bell v. City of Winter Park*,
  745 F.3d 1318 (11th Cir. 2014) .....................................................................20

*Bourgeois v. Peters*,
  387 F.3d 1303 (11th Cir. 2004) .....................................................................32

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988)....................................................................17, 18, 20

*Connick v. Myers*,
  461 U.S. 138 (1983).............................................................................................2

*Dimmitt v. City of Clearwater*,
  985 F.2d 1565 (11th Cir. 1993) ..............................................................22, 23

*Dream Defenders v. DeSantis*,
  --- F. Supp. 3d ---, 2021 WL 4099437 (N.D. Fla. Sept. 9, 2021)................16, 34

*FF Cosmetics FL, Inc. v. City of Miami Beach*,
  866 F.3d 1290 (11th Cir. 2017) ...........................................................23, 25, 33

*Forsyth Cnty. v. Nationalist Movement*,
  505 U.S. 123 (1992)..........................................................................................17

*Hoover v. Morales*,
  164 F.3d 221 (5th Cir. 1998) .........................................................3, 20, 21, 22

*Iancu v. Brunetti*,
  139 S. Ct. 2294 (2019)......................................................................................21

*Lane v. Franks*,
    573 U.S. 228 (2014)............................................................ 1, 2, 3, 23, 24, 28, 34

*League of Women Voters of Fla., Inc. v. Lee*,
    4:18-cv-251-MW-CAS, 2019 WL 11541284 (N.D. Fla. Apr. 22, 2019)..........31

*Mahanoy Area Sch. Dist. v. B.L.*,
    141 S. Ct. 2038 (2021)......................................................................33

*McMahon v. City of Panama City Beach*,
    180 F. Supp. 3d 1076 (N.D. Fla. 2016) ............................................34

*Otto v. City of Boca Raton*,
    981 F.3d 854 (11th Cir. 2020) ............................................ 16, 17, 27, 30, 31, 33

*Pickering v. Bd. of Educ.*,
    391 U.S. 563 (1968)...................................................................24, 29

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)...........................................................................22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995)..................................................................2, 21, 27

*Scott v. Roberts*,
    612 F.3d 1279 (11th Cir. 2010) ........................................................32

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)...........................................................................22

*Solantic, LLC v. City of Neptune Beach*,
    410 F.3d 1250 (11th Cir. 2005) ........................................................20

*Suntrust Bank v. Houghton Mifflin Co.*,
    268 F.3d 1257 (11th Cir. 2001) ........................................................34

*Sweezy v. New Hampshire*,
    354 U.S. 234 (1957)..........................................................................2

*Tinker v. Des Moines Independent School District*,
    393 U.S. 503 (1969)..........................................................................29

iv

*Tracy v. Fla. Atl. Univ. Bd. of Trs.*,
   980 F.3d 799 (11th Cir. 2020) ....................................................19, 27

*United States v. Nat'l Treasury Emps. Union*,
   513 U.S. 454 (1995) ...................................................................24, 28

*United States v. O'Brien*,
   391 U.S. 367 (1988) ..........................................................................30

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(c) ...................................................................................34

U.S. Const., amend. I. ......................................................................*passim.*

Clay Calvert, *Escaping Doctrinal Lockboxes in First Amendment*
   *Jurisprudence: Workarounds for Strict Scrutiny for Low-Value Speech in*
   *the Face of Stevens and Reed*, 73 SMU L. REV. 727 (2020) ..............................30

Danielle Ivanov & Jeffrey Schweers, *Florida Surgeon General Ladapo was*
   *Rushed into UF College of Medicine Job, Emails Show* GAINESVILLE SUN
   (Oct. 27, 2021) .....................................................................................12

Emma Pettit, '*It Just Felt Wrong': U. of Florida Faculty Say Political Fears*
   *Stalled an Initiative on Race*, CHRON. OF HIGHER EDUC. (Nov. 30, 2021) ........12

## MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiffs hereby move for a preliminary injunction enjoining Defendants from enforcing their unconstitutional conflicts-of-interest policy.

## PRELIMINARY STATEMENT

This case concerns the repeated, overt, and ongoing suppression of faculty speech at the University of Florida (the "University"). Plaintiffs, six professors in the fields of law, medicine, and political science, wish to provide their views on subjects within their expertise in court cases presenting disputes of profound public importance. Defendants, University administrators and trustees, have suppressed that speech through blatant viewpoint discrimination and overbroad prior restraints. Plaintiffs seek a preliminary injunction against this unconstitutional conduct so that they and their colleagues can further the University's stated mission: "to share the benefits of its research and knowledge for the public good." Ex. 33.[1]

Plaintiffs' speech lies at the very core of the First Amendment and deserves its highest protection. Because Plaintiffs wish to speak on the most consequential "matters of public concern," *Lane v. Franks*, 573 U.S. 228, 240 (2014), their

---

[1] "Ex. X" refers to the exhibits attached to the declaration of Morgan A. Davis, submitted herewith.

1

speech "occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983).[2] Plaintiffs "are uniquely qualified to comment" on those matters "precisely because" of their expertise in their fields of study. *Lane,* 573 U.S. at 240 ("speech by public employees on subject matter related to their employment holds special value"). Their speech is all the more significant because it is proffered for use in judicial proceedings, where the search for truth is most critical. *Id.* at 238, 240 ("Sworn testimony in judicial proceedings is a quintessential example of speech as a citizen for a simple reason: Anyone who testifies in court bears an obligation, to the court and society at large, to tell the truth."). And the setting in which this dispute arises warrants special First Amendment concern because of the "vital role in a democracy" that public research universities play. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

The Constitution's prohibition against censorship of such core First Amendment speech is clear. The State may never restrain, prohibit or disadvantage speech because of a disagreement with the speaker's viewpoint. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). When it acts as an employer, the government can limit its employees' speech only if such

---

[2]   Internal quotation marks, brackets, and citations are omitted unless otherwise noted.

speech will undermine the ability to maintain "efficiency and integrity in the discharge of [the employees'] official duties" and "discipline in public service." *Lane*, 573 U.S. at 242.

In clear violation of this prohibition, Defendants have suppressed Plaintiffs' speech through the University's unconstitutional Conflicts of Commitment and Conflicts of Interest Policy (the "Policy"), which requires that faculty obtain express permission before speaking in litigation against the State of Florida. That extraordinarily broad Policy provides the University unbridled discretion to restrict faculty speech on public issues based on impermissible considerations that have nothing to do with faculty integrity or discipline. And, in fact, the University has applied the policy to discriminate against each Plaintiff's speech based entirely on disagreement with the viewpoint they wished to express. The Policy, and Defendants' application of it, are plainly unconstitutional. Indeed, the Fifth Circuit has affirmed a preliminary injunction of a near-identical policy, explaining that "[t]he notion that the State may silence the testimony of state employees simply because that testimony is contrary to the interests of the State in litigation or otherwise, is antithetical to the protection extended by the First Amendment." *Hoover v. Morales*, 164 F.3d 221, 226–27 (5th Cir. 1998).

Defendants' suppression of faculty speech ignited a firestorm of criticism about the state of academic freedom at the University and even prompted a threat

3

to its accreditation.  Rather than addressing the fundamental issues at stake, the University tried (and failed) to moot this genuine First Amendment crisis and then promised to make superficial changes to the Policy.  Those actions do nothing to cure—and in key respects, actually compound—the constitutional violations that continue to restrain and chill Plaintiffs' speech.

Plaintiffs are entitled to injunctive relief prohibiting application of the Policy in its entirety, which causes irreparable injury every day it remains in effect.  At a minimum, this Court should enjoin the Policy to the extent it applies to faculty members' participation, whether by providing expert testimony or otherwise, in litigation involving the State of Florida.

## STATEMENT OF FACTS

### I.     The University Adopted a Policy Giving It Discretion to Prohibit Faculty from Speaking Out Against the State.

The University requires faculty to obtain permission before engaging in certain activities.  The Policy requires faculty to file a request for permission on the University's online conflicts system ("UFOLIO") each time they seek to participate in an "Outside Activity," which is defined as "any paid or unpaid activity . . . which could create an actual or apparent Conflict of Commitment or Conflict of Interest."  Ex. 2 at 4, 6.

The Policy provides little clarity about what constitutes a "Conflict of Interest."  It defines a "Conflict of Commitment" as "an Outside Activity, either

paid or unpaid, that could interfere with the[] [employees'] professional obligations to the University." *Id.* at 3. "Conflict of Interest" is defined as something other than a Conflict of Commitment that "occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgement or obligations to the University." *Id.*

The Policy gives the University broad discretion to prohibit faculty speech. It provides that "[w]hen the University determines a Conflict of Interest may exist with an Employee, the University may, *in its sole discretion*, prohibit the individual from engaging in the activity presenting a potential conflict; take actions to limit the individual's activity; or implement other measures *the University deems reasonably necessary* to eliminate the potential conflict." *Id.* at 5–6 (emphasis added). A professor must disclose and obtain approval for a covered activity "prior to engaging in" it, and such approval must be explicit. *Id.* at 6–7 ("The absence of express disapproval . . . does not constitute approval."). There is no time period within which the University must respond.

There are potentially severe penalties for an employee's failure to comply with the Policy. Any violation of its requirements—including failure to disclose an Outside Activity or proceeding without first obtaining express approval—can

result in "administrative or disciplinary action . . . up to and including termination of employment." *Id.* at 10.

## II.    The University Applied the Policy to Interfere with the Professors' Participation in Litigation Against the State.

### A.    The University Prevented Law School Professors From Signing an Amicus Brief with Their Institutional Affiliation.

In July 2020, a group of Florida citizens sued to challenge the State's law conditioning the right to vote on the payment of all fines by those Floridians convicted of felonies ("S.B. 7066"). The attorneys in that case asked Professor Kenneth Nunn to sign an amicus brief opposing the law. Declaration of Kenneth Nunn ("Nunn Declaration") ¶8. Professor Nunn agreed to sign his name and contacted Professor Teresa Reid, who also chose to join the amicus brief. Ex. 3; Declaration of Teresa Reid ("Reid Declaration") ¶6.

Until that month, Law School policy provided that writing or signing an amicus brief was not an "Outside Activity" requiring prior approval under the Policy. Ex. 1 at 3. On July 9, 2020, however, Dean Rosenbury abruptly changed that policy. She emailed the Law School faculty, stating for the first time that—in cases opposing the State of Florida—faculty were required to seek and obtain permission before signing onto an amicus brief, because "faculty participation in litigation against the [S]tate of Florida or any agency thereof, including through amicus briefs, is considered a potential conflict of interest." Ex. 4 at 6. Dean

Rosenbury further announced that clinics or other entities wishing to speak in any litigation against (but not for) the State first "must separately receive approval from me, the General Counsel [of the University], and President Fuchs." *Id.*

When asked to clarify the new Policy as it applied to signing the amicus brief opposing S.B. 7066, Dean Rosenbury, equating the interests of the University with those of the State, responded:  "[T]his is not an outside activity, but it is a potential conflict of interest because the amicus brief will be filed in an action against the state.  You, and others, must therefore disclose on that basis." *Id.* at 2.

In an attempt to follow Dean Rosenbury's advice, Professors Nunn and Reid completed their UFOLIO requests to sign the amicus brief.  Exs. 5, 6.  Professor Nunn's request was approved on July 14, 2020.  Ex. 7.  On July 12, 2020, Professor Reid's UFOLIO request was approved on the condition that she "participate in this outside relationship in [her] individual capacity only"— meaning that she was "not permitted to use any UF marks, logos or other identifiers in [her] outside activity/interest, and [could] not otherwise imply or suggest any official affiliation with UF."  Ex. 5.

Only four University of Florida Law School professors, including Professors Nunn and Reid, were listed as signatories (the "Law School Professors").  Ex. 8 at 8–13.  Of the 93 law professors who signed the amicus brief, the Law School

Professors were the only signatories without their institutional affiliations listed alongside their signatures. *Id.*

Listing their institutional affiliations was an important part of the message that they had wanted to convey. Nunn Declaration ¶21; Reid Declaration ¶11. Their professional association with Florida's top-ranked law school reflected their years of practice and scholarship, would have given greater weight and credibility to their signatures on the amicus brief, and would have aided the court in weighing a matter of fundamental significance to the people of Florida. Nunn Declaration ¶21; Reid Declaration ¶11.

## B. The University Blocked Professor Goldhagen from Testifying as an Expert Witness.

In August 2021, an attorney for plaintiffs challenging an executive order prohibiting school districts from enacting mask mandates asked Professor Jeffrey Goldhagen (the "Medical School Professor") to serve as an expert witness, including testifying at trial. Declaration of Jeffrey Goldhagen ¶4 ("Goldhagen Declaration"). Professor Goldhagen—the Chief of the Division of Community and Societal Pediatrics at the University's College of Medicine—agreed to provide his services *pro bono*. *Id.* ¶¶4–5. On August 11, 2021, he submitted a request through UFOLIO to serve as an expert witness. Ex. 26. On August 12, 2021, a University official denied his application, stating: "Outside activities that may pose a conflict

of interest to the executive branch of the State of Florida create a conflict for the University of Florida."  Ex. 11.

Although he wished to testify, the proceedings moved quickly—as litigation about pressing issues of public importance typically does—and the lawyer instead sought other expert witnesses who were not prevented from speaking.  Goldhagen Declaration ¶9.  Because of the Policy and the prior restraint it imposed, Professor Goldhagen was not able to serve the people of Florida by sharing his expertise, experience, and medical knowledge on one of the most critical public health matters of our time.

### C.    The University Tried to Stop Professors Austin, McDonald, and Smith from Testifying as Expert Witnesses.

Throughout the late summer and early fall of 2021, attorneys for the plaintiffs in litigation challenging Florida Senate Bill 90 ("S.B. 90") asked Professors Sharon Austin, Michael McDonald, and Daniel Smith (the "Political Science Professors") to act as expert witnesses.  Declaration of Michael McDonald ("McDonald Declaration") ¶¶3–5; Declaration of Sharon Austin ("Austin Declaration") ¶¶4–6; Declaration of Daniel Smith ("Smith Declaration") ¶¶5–6.  S.B. 90 imposes obstacles on Florida voters' ability to cast ballots through in-person voting, mail-in voting, and the use of secure drop-boxes for early voting.

*Id.*  The Political Science Professors agreed to testify on the effects of the law.[3]

*Id.*.

Each of the Political Science Professors submitted requests through UFOLIO disclosing their engagement as expert witnesses in connection with the litigation.  Exs. 9, 12, 20; Austin Declaration ¶8.

On July 7, 2021 and again on October 11, 2021, the University sent Professor Smith a disapproval notice.  Ex. 10; Ex. 13 at 1.  As with the Medical School Professor, the University told Professor Smith:  "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."  Ex. 10.  On October 13, 2021, the University sent Professor McDonald a disapproval notice, which once again equated the interests of the University—a public research institution—with those of the State.  It stated:  "UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests. As UF is a state actor, litigation against the [S]tate is adverse to UF's interests."  Ex. 14.  On October 15, 2021, the University sent Professor Austin a disapproval notice containing the same language.  Ex. 15.  The University's denials exposed the

---

[3]   As is typical and expected in expert witness engagements, Professors McDonald and Smith received fair compensation for their time and expenses in preparing their expert testimony in prior cases.  McDonald Declaration ¶6; Smith Declaration ¶3.

University's real goal:  to prevent the Political Science Professors from expressing a viewpoint opposed to the State, just as the University had done with the Law School Professors and the Medical School Professor.

In a statement posted on its website on October 30, 2021, the University suggested that the reason for the disapprovals was not only that the Political Science Professors' testimony was expected to be "adverse to the [U]niversity's interests as a [S]tate of Florida institution" but also that the Political Science Professors would be paid for their time and expenses.  Ex. 16.  On November 1, 2021, in a letter to Plaintiffs' counsel and in a public statement by President Fuchs, the University walked back its total prohibition on the Political Science Professors' testimony but nevertheless insisted that they could not receive any "compensation" for their time.  Ex. 18 at 1; Ex. 17.

## III.    Facing Public Outcry, the University Rescinded Specific UFOLIO Denials.

The University's refusal to allow the Political Science Professors to testify was made public in late October 2021, prompting a wave of public criticism, a pointed inquiry from the Florida congressional delegation, and even a threat to the University's accreditation status.   Ex. 31 at 3; Ex. 34.   The University has maintained that these decisions were not subject to outside influence despite

11

indications that, as any observer of the University is well aware, the State's political priorities have swayed the University's decisions on multiple occasions.[4]

In response to this public pressure, the University executed a carefully choreographed two-step media rollout designed to deflect scrutiny. In the first step of that public relations campaign, on November 5, 2021, the University exercised the broad discretion provided by the Policy and reversed its denials of the Political Science Professors' requests, without further explanation or justification. Exs. 20–23. The University did not acknowledge that the previous denials had been illegal or even erroneous. The University merely stated that President Fuchs "exercised his authority to resolve the request by the three faculty members in a manner consistent with the University's policies." Ex. 31 at 5. At the same time, and again without explanation, the University changed the Medical School Professor's UFOLIO denial to "approved" for his request to testify in mask-mandate litigation—notwithstanding that the opportunity for him to speak had long since

---

[4]   To cite just two prominent examples, the University reportedly fast-tracked the hiring of Florida's surgeon general, Joseph Ladapo—who holds controversial views about the effectiveness of mask wearing and vaccination to combat COVID-19—at the State's behest. *See* Danielle Ivanov & Jeffrey Schweers, *Florida Surgeon General Ladapo was Rushed into UF College of Medicine Job, Emails Show*, GAINESVILLE SUN (Oct. 27, 2021). And an associate professor at the University's College of Education filed a grievance this week alleging that the University refused to approve a doctoral concentration using the words "critical" and "race" in its title out of fear of angering the State. *See* Emma Pettit, '*It Just Felt Wrong': U. of Florida Faculty Say Political Fears Stalled an Initiative on Race*, CHRON. OF HIGHER EDUC. (Nov. 30, 2021).

been lost because of the University's actions.   Ex. 26.   And President Fuchs simultaneously announced a task force, hand-selected by the Administration, that was to "make a recommendation to [him] on how [the University] should respond when employees request approval to serve as expert witnesses in litigation in which their employer, the state of Florida, is a party."   Ex. 21.   The task force included two administrators who had themselves either formulated or applied the policy in an unconstitutional manner, including Law School Dean Rosenbury.   *Id.*

The University launched the second step in its coordinated media strategy on November 22, 2021.   The task force, a week ahead of schedule, and after studying its mandate for all of 13 days, provided "narrowly constructed" recommendations concerning only the application of the Policy to expert witness testimony.[5]   Ex. 29 at 1.   The proposed amendments purport to adopt a "strong presumption" that faculty may testify as experts, but the University retains discretion to prohibit speech based on a perceived conflict with undefined and unspecified "interests" of the University.   *Id.* at 2.   One of the task members attempted to summarize the recommendation:   "A conflict of viewpoint is not *necessarily* a conflict of interest."   Ex. 32 at 4.   The amendments also propose a cumbersome appeal process lacking any timeline for resolution.   Ex. 29 at 4.

---

[5]   These amendments were previewed a week earlier—further truncating the period in which the task force members deliberated to fix the University's deficient Policy.   Ex. 28 at 2.

President Fuchs "accepted" the amendments the day they were issued without explaining how the Policy would change in response, and without stating that the previous applications of the Policy were incorrect.  Ex. 30.

There is no indication the University intends any further concrete changes on these issues.  To the contrary, upon releasing its "final report," the task force canceled its remaining public meetings and declared its mission accomplished.  Ex. 32 at 4.  And earlier this week, as if to wrap a tidy bow around the controversy, President Fuchs declared: "I think we're in a good spot now."[6]  Ex. 35.

While the University may hope that the immediate crisis has passed, the Policy remains in place and continues to violate Plaintiffs' rights.  Plaintiffs frequently are asked to participate in lawsuits concerning their areas of research and teaching.  McDonald Declaration ¶2; Smith Declaration ¶2; Nunn Declaration ¶23; Reid Declaration ¶¶2, 13; Goldhagen Declaration ¶¶3, 6.  Many of these cases challenge legislation or government action related to elections, voting rights, public health measures, or criminal proceedings.  McDonald Declaration ¶2; Nunn Declaration ¶23; Reid Declaration ¶13.  Many seek emergent relief, including emergency motions in death penalty cases or motions for temporary restraining

---

[6]   Predictably, the University then filed a motion to dismiss declaring that "[t]he public controversy involving the three UF professors who were denied permission to act as paid expert witnesses in litigation against the State of Florida is now over."  Motion to Dismiss at 1 (Doc. 23).

orders regarding voting procedures or election-related disputes.  Reid Declaration ¶13; McDonald Declaration ¶13; Smith Declaration ¶13.  Plaintiffs may be required to provide research or analysis on a highly expedited basis—sometimes in less than a single day.  *Id.*

The Policy's vague terms—and the discretion it vests in the University to apply them—leave Plaintiffs unable to determine whether they are required to seek the University's approval under the Policy and, if so, whether the activity would be approved.   Nunn Declaration ¶23; Reid Declaration ¶¶12–15.   As a result, Plaintiffs are likely to be unable to speak in the context of amicus briefs or as expert consultants or witnesses, particularly in fast-paced litigation.   Smith Declaration ¶13; Reid Declaration ¶12.

Plaintiffs wish to continue to participate in litigation challenging State policies that are within their areas of expertise, but they face serious consequences if they were to accept an expert engagement or sign an amicus brief without first receiving the University's express permission or testify as an expert after the University's denial.  Nunn Declaration ¶25; Goldhagen Declaration ¶¶3, 12.

The existence of the vague Policy and the University's inconsistent and discriminatory application of it have left some Plaintiffs hesitant to participate in litigation at all.  For example, on November 3, 2021, Professor Nunn was invited to join a Supreme Court amicus brief supporting a request for resentencing for

juvenile offense in *Andrus v. Texas*, No. 21-6001.  Ex. 19.  Ordinarily, Professor Nunn would not hesitate to lend his name and prominence as a criminal law scholar to an amicus brief on such an important issue, Nunn Declaration ¶24, but on November 7, 2021, he declined the invitation, explaining that, "with all the turmoil going on down here with university oversight of our amicus signons, [he had] decided to wait until there is more clarity" on the Policy's scope.  Ex. 27.  The Policy was the only reason Professor Nunn decided not to sign the amicus brief in *Andrus*.  Nunn Declaration ¶24.  His speech was chilled.

## ARGUMENT

This Court should preliminarily enjoin the University's enforcement of the Policy because the Plaintiffs satisfy each requirement for obtaining such relief. They are likely to succeed on the merits of their claims because the Policy and its application by the University are a clear violation of the First Amendment. Plaintiffs' speech is chilled as long as the Policy remains in effect, so they will suffer irreparable injury unless the injunction issues.  The ongoing restraint on Plaintiffs' speech outweighs whatever damage the proposed injunction may cause the University, and for the same reason, the injunction "would not be adverse to the public interest."  *Dream Defenders v. DeSantis*, --- F. Supp. 3d ---, 2021 WL 4099437, at *17 (N.D. Fla. Sept. 9, 2021); *see Otto v. City of Boca Raton*, 981 F.3d

854, 870 (11th Cir. 2020) (noting that when, as here, a preliminary injunction is sought against the government, the final two factors "can be consolidated").

I.   **Plaintiffs Will Likely Succeed on the Merits of Their Claim.**

Plaintiffs have a strong likelihood of succeeding on the merits of their First Amendment claim.  Among its many infirmities, the Policy (*i*) vests the University with unbridled discretion to restrict Plaintiffs' speech based on content or viewpoint, (*ii*) has been weaponized as a prior restraint to discriminate on the basis of viewpoint, and (*iii*) is unconstitutionally overbroad.

A.   **The Policy Violates the First Amendment by Vesting the University with Unbridled Discretion to Restrict and Punish Speech.**

The Policy violates Plaintiffs' First Amendment rights because it vests University officials with "unbridled discretion" to approve or deny requests to engage in outside activities.  The Supreme Court and Eleventh Circuit have long held that such a policy is unconstitutional when it provides "no standards by which the official's decision must be guided."  *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1221 (11th Cir. 2017); *see City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755–57 (1988).  The unbridled discretion doctrine prevents the government from using its discretion to "encourag[e] some views and discourag[e] others" at the "whim of the administrator."  *Forsyth Cnty. v. Nationalist*

17

*Movement*, 505 U.S. 123, 133 (1992); *see also Atlanta Journal & Constitution v. City of Atlanta Dep't of Aviation*, 322 F.3d 1298, 1310 (11th Cir. 2003) (en banc).

Because its terms provide administrators with unbridled discretion, granting administrators "sole discretion" to "prohibit" University faculty from engaging in activities "presenting a potential conflict" and to take disciplinary measures that "the University deems reasonably necessary to eliminate the potential conflict," Ex. 2 at 5–6, the Policy violates the First Amendment. There is no objective standard to judge whether a faculty member's proposed Outside Activity constitutes a conflict under the Policy. The University can always exercise its "sole discretion" to approve or deny requests, as it did here first in denying, then in limiting, and finally in approving the Political Science Professors' requests to testify in voting rights litigation. Nor are there any standards limiting the University's decision of what punishments to impose on those who violate the Policy, up to and including termination. *Id.* at 5–6, 10. The Policy's terms allow University administrators to make arbitrary decisions about faculty members' expressive activities in violation of the First Amendment. *See City of Lakewood*, 486 U.S. at 769–72 (declaring unconstitutional statute giving officials "unfettered discretion" to approve or deny permit application).

Not only does the Policy violate the unbridled discretion doctrine on its face, but the University also has repeatedly used that discretion in an unconstitutional

manner.  The Eleventh Circuit has indicated that a university's conflict-of-interest policy violates the First Amendment when it forbids activities that conflict with "the public interests of the University" if there is evidence that "the University has prohibited any professor from engaging in any speech activity" on that basis in a viewpoint-discriminatory manner.  *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 809 (11th Cir. 2020).  There is ample evidence that the University has done exactly that.  It repeatedly used the Policy to prohibit Plaintiffs' speech simply because that speech challenged the viewpoint of the State's Executive Branch. Indeed, the University *admitted* that it denied Plaintiffs' requests to testify or to sign amicus briefs with their institutional affiliation solely because their positions conflicted with those of the State of Florida.  Exs. 10–11, 14–15; Ex. 4 at 2.

The unbridled discretion claim in this case is both ripe and likely to prevail.[7] In *Tracy*, the court rejected such a claim as "speculative" only because the plaintiff had failed to "identify even a single instance in which the University has determined that an outside speech activity constitutes a prohibited 'conflict of interest.'"  980 F.3d at 809–10.  Here, in stark contrast, Plaintiffs have more than

---

[7]  The collective bargaining agreement applicable to the Political Science Professors explicitly preserves their right to vindicate their constitutional rights in court rather than through arbitration.  *See* Declaration of Ryan Fuller, Ex. 1, Art. 23 (Doc. 23-1); *accord Tracy*, 980 F.3d at 805–07 (holding collective bargaining agreement barred professor's contract claim but reaching merits of constitutional claim).

met their burden to show "a realistic danger" that the University has construed the Policy in an unconstitutional manner.  *Id.*  Because the Policy unconstitutionally vests unbridled discretion in University administrators, it is facially unconstitutional.  *See id.*; *Barrett*, 872 F.3d at 1221–23; *Bell v. City of Winter Park*, 745 F.3d 1318, 1324–25 (11th Cir. 2014); *City of Lakewood*, 486 U.S. at 759–61.  Plaintiffs may challenge the Policy now because they are "subject to or imminently will be subject to" it; it is "the existence, not [just] the imposition, of standardless requirements that [are] caus[ing] the plaintiff's injury."  *Barrett*, 872 F.3d at 1220.  Indeed, a basic purpose of the unbridled discretion doctrine is to "combat[] the *risk* of unconstitutional viewpoint discrimination."  *Id.* at 1226 (emphasis added).

## B.   The Policy Imposes a Viewpoint-Based Prior Restraint.

The Policy also violates the First Amendment because it is a prior restraint based on the speaker's viewpoint.  Requiring faculty to obtain preapproval before engaging in outside activities "is a prior restraint . . . because it *prevents*" them from speaking or testifying "unless they comply with the Policy[]."  *Barrett*, 872 F.3d at 1223 (emphasis in original).  Prior restraints are unconstitutional where, as here, they discriminate based on viewpoint.  *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1258–59 (11th Cir. 2005).  Thus, in *Hoover*, the Fifth Circuit affirmed a preliminary injunction against a policy that prohibited professors

from testifying against the State of Texas as expert witnesses or consultants, holding that such a policy impermissibly discriminated based on viewpoint. 164 F.3d at 227.

The Policy allows for viewpoint discrimination. The University has admitted that it denied Plaintiffs the opportunity to testify or sign amicus briefs for the sole reason that they sought to participate in litigation against "the executive branch of the State of Florida." Ex. 11; Exs. 10, 14–15; *see also* Ex. 4 at 2, 6. The University's statements make clear that there would be no "conflict of interest"— and thus no prior restraint—if Plaintiffs sought to testify or sign amicus briefs *in support of* the State of Florida's litigation position. Yet the "core postulate of free speech law" is that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). The University "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829. The University lacks any legitimate interest in preventing Plaintiffs from testifying as experts against the State and may not do so simply because it disfavors their viewpoint.

The University's efforts to walk back its unconstitutional actions, including by claiming that professors will be denied permission to testify only when they seek to be paid for their work, *see* Ex. 16–18, only highlight the Policy's

21

unconstitutionality.  As an initial matter, that distinction appears to have been manufactured as a messaging strategy.  It finds no support in the Policy, which does not differentiate between paid and unpaid outside activities.  It has also been arbitrarily and inconsistently applied.  The University restrained the Medical School Professor and the Law School Professors from *unpaid* speech in litigation against the State.  Goldhagen Declaration ¶5.  The University's attempt to cast about for a justification reflects the unacceptable degree of discretion the Policy provides.

In any event, the compensation rationale fails even on its own terms.  A government policy "is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991); *see also Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 801 (1988).  That some plaintiffs were offered compensation is therefore no defense to the First Amendment violation, *see Hoover*, 164 F.3d at 225, but the University's attempt to rely on that distinction illustrates the Policy's unconstitutionality.

### C. The Policy Is Overbroad Because It Punishes a Substantial Amount of Protected Speech.

The Policy is also facially overbroad because it reaches substantially beyond the "legitimate sweep" of the University's conflicts of interest policy.  *Dimmitt v.*

*City of Clearwater*, 985 F.2d 1565, 1571 (11th Cir. 1993) (holding city ordinance was overbroad); *see also FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290 (11th Cir. 2017) (same).   Although the Policy's purported purpose is to ensure that professors "maintain the highest ethical and professional standards" in their teaching and research, Ex. 2 at 2, its restrictions go far beyond what is necessary to achieve that goal.

Specifically, the Policy's definition of a "Conflict of Interest" encompasses any instance in which "a University [e]mployee's . . . interests or activities outside of the University affects, or appears to affect, their professional judgement or obligations to the University."   *Id.* at 3.   The Policy provides no definition of "obligation to the university," no examples of when an employee's interests or activities would implicate a perceived conflict, and no exceptions for protected speech.   To the contrary, it explicitly covers protected speech on public issues in the context of litigation even where there is no financial conflict of interest.

The Policy thus fails on its face.   The First Amendment protects exactly the type of speech that is listed as a potential target of the Policy, namely "[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties."   *Lane*, 573 U.S. at 235–36, 238 (holding retaliatory firing of a public employee testifying under oath violated the First Amendment).   Moreover, the government may restrain speech on issues of public concern only to the extent

necessary to "promot[e] efficiency and integrity in the discharge of official duties," and "maintain[] proper discipline in public service." *Lane*, 573 U.S. at 242; *Pickering v. Bd. of Educ.*, 391 U.S. 563, 570 (1968) (rejecting restriction on employee speech because "no question of maintaining either discipline by immediate superiors or harmony among coworkers [wa]s presented"). When a restriction bans public employee speech before it happens, the government's burden is greater as it "must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's necessary impact on the actual operation of the Government." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995). The Policy in no way complies with those limitations. And the only justification the University has offered for a denial is disagreement with the viewpoint of the speaker.

The University's reversal with respect to the Political Science Professors does not alleviate the violation because the Policy that allowed the University to prohibit the Professors' protected speech remains in effect. Plaintiffs' claim is not moot and they may challenge the Policy now. *See Bd. of Trs. v. Fox*, 492 U.S. 469, 484 (1989) (The effect of the overbreadth doctrine is "to enable persons who are themselves unharmed by the defect in a statute . . . to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other

24

situations not before the Court."); *accord FF Cosmetics*, 866 F.3d at 1301.  While the Policy remains in effect, the University may prohibit faculty from engaging in protected speech in litigation because of a disagreement with their viewpoint.  That is an ongoing First Amendment violation that the University has failed to moot through its tactical retreat in the specific circumstances of the SB 90 litigation.

### D.   The University Task Force's Amendments Fail to Remedy the Policy's Constitutional Infirmities.

The amendments proposed by the "task force" formed to address the fallout from the University's conduct do not cure the Policy's constitutional defects.  The amendments largely consist of aspirational statements and expressions of commitment to academic freedom, but their substance fails to remedy the fundamental flaws that render the Policy an overbroad prior restraint and a tool for viewpoint discrimination.  It remains unclear how or when the amendments will take effect.  But even if those amendments are fully and faithfully implemented, the Policy would still infringe Plaintiffs' and other faculty members' rights.

The amendments purport only to address the narrow issue of expert testimony in litigation.  *See* Ex. 29 at 1.  They do nothing to address other circumstances in which the Policy acts as a prior restraint, such as when faculty wish to join amicus briefs.  Ex. 4 at 6.  Rosenbury's direction to law faculty on that point, which applies only in litigation *against* the State, remains in place and is overtly justified on the basis of viewpoint discrimination.

Even on the expert witness issue, the amendments fall far short of what the Constitution requires.   They continue to require the University's express permission in advance, on pain of punishment up to termination, whenever a Professor wishes to speak as an expert against the State.   They impose no time limit for when the University must respond.   And the University may still deny the request on the ground that the proposed testimony presents a "conflict of interest," a term that the amendments do not attempt further to define.   Ex. 29 at 2-3.

The amendments offer only three additional clues about the meaning of that concept.   First, they indicate that a "conflict of interest" is something other than a "conflict of commitment," because the proposals make clear that the latter remains an independent basis on which to deny a speech request.   *Id.* at 3.   In that respect, the task force simply confirmed the broad sweep of the "conflict of interest" construct in the Policy.   Second, the amendments state that a conflict justifying a denial must implicate "an important and particularized interest of the university." *Id* at 2–3.   But that tautological statement sheds no new light; professors are left to guess about—and the University has the discretion to decide—what constitutes such an interest.   Requiring that the interest be "important and particularized," moreover, adds little to what existed before, since the University presumably did not deny faculty speech requests on the basis of interests it regarded as unimportant or irrelevant.   Indeed, the task force formulation bears a striking resemblance to its

analogue in *Tracy*—"the public interests of the University"—which the Eleventh Circuit observed would be subject to challenge if, as is the case here, there were evidence of viewpoint discrimination in the Policy's application.  980 F.3d at 809–10.

The key substantive amendments are the imposition of a "strong presumption" in favor of faculty speech and a burden on the University to "rebut" that presumption.  Ex. 29 at 2–3.  But far from curing the Policy's constitutional deficiencies, those additions aptly illustrate how the University continues to flout the free speech rights of its faculty.  In four key respects, the "presumption" and "rebuttal" construct replaces the Constitution's requirements with less protective standards.

First, the Constitution prohibits viewpoint discrimination.  Said differently, "the First Amendment *forbids* the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."  *Otto*, 981 F.3d. at 864 (emphasis in original); *id.* at 862; *Rosenberger*, 515 U.S. at 829.  The task force proposal substitutes that total prohibition with a "strong presumption" against viewpoint discrimination.  Thus, while the Constitution prescribes that a conflict of viewpoint can *never* be a conflict of interest justifying denial of speech, under the amendments, "[a] conflict of viewpoint is not *necessarily* a conflict of interest." Ex. 32 at 4.

In a stark acknowledgment both that viewpoint discrimination remains a live risk under the revisions and the obvious reality that politics has driven decisions at the University, one task force member expressed the "hope when these decisions are made under these policies, that they're grounded neither in fear of possible financial repercussions to the University of Florida, nor in any efforts to curry favor to those powerful few who may control or influence the purse strings that effect the University of Florida." *Id*. But the whole point of the First Amendment's prohibition on prior restraints is that speakers must not be left to rely on the "hope" that government officials will refrain from exercising their discretion to silence certain viewpoints because those viewpoints challenge the ruling party.

Second, the Constitution specifies what type of interest a government employer can cite as justification for prohibiting its employees from speaking on matters of public concern. Even in cases addressing the speech of public employees outside the heightened context of a research university, the Supreme Court has recognized as valid only those justifications grounded in "promot[ing] efficiency and integrity in the discharge of official duties" and "maintain[ing] proper discipline in public service." *Lane*, 573 U.S. at 242. No such rationale has been, or credibly could be, proffered as a justification for prohibiting faculty from appearing as expert witnesses or signing amicus briefs in litigation. Nor can the University meet its heightened burden under *Nat'l Treasury Emps. Union*. 513

28

U.S. at 468.  As in the seminal case on public employee speech, "no question of maintaining either discipline by immediate superiors or harmony among coworkers is presented here." *Pickering*, 391 U.S. at 570.

The task force revisions contemplate denial for reasons having nothing to do with such concerns and, instead, adopt a standard that is egregiously inappropriate for this context.  In particular, the amendments provide that the University must justify a denial on something more than "an undifferentiated fear or apprehension of harm resulting from a conflict."  Ex. 29 at 3.  That standard is drawn from *Tinker v. Des Moines Independent School District*, which concerned the authority of high school administrators to regulate the dress code of students protesting the Vietnam War.  393 U.S. 503, 508 (1969) (stating that an "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression").  It is not clear that this standard applies even to *students* in the post-secondary education context, and it certainly does not apply to professors.  The University cannot equate the free speech rights of tenured faculty members at one of the Nation's preeminent public universities with that of rebellious teenagers in high school.

Third, the Constitution imposes strict scrutiny on the government when it seeks to restrict core First Amendment speech.  Speech restrictions can prevail "only if the government proves that they are narrowly tailored to serve *compelling*

state interests." *Otto*, 981 F.3d at 868 (emphasis added).  The Policy, as amended by the task force, requires no such showing.  Instead, the University can "rebut" the presumption in favor of faculty speech by showing that the restriction furthers an "*important* and particularized interest."  Ex. 29 at 2–3.  To the extent that standard is decipherable, it amounts to a watered-down form of intermediate scrutiny applicable to restrictions that impose only an incidental burden on speech, not to the regulation of core speech at issue here.  *See, e.g., United States v. O'Brien*, 391 U.S. 367, 377 (1988) (upholding a restriction under intermediate scrutiny because it served a "sufficiently important government interest").

This is no mere matter of semantics; the task force was well aware of the distinctions in standards of review.  As one task force member recently wrote, the difference between strict and intermediate scrutiny is "highly significant" because strict scrutiny "typically tolls the death knell for" speech restrictions.  Clay Calvert, *Escaping Doctrinal Lockboxes in First Amendment Jurisprudence: Workarounds for Strict Scrutiny for Low-Value Speech in the Face of Stevens and Reed*, 73 SMU L. REV. 727, 729 (2020).  "Intermediate scrutiny," in contrast, is "in practice a highly deferential form of review" that "present[s] the government with only minor impediments—mere speed bumps along the path to suppression of even core political speech."  *Id.* at 729 nn.5 & 12.

Finally, the amendments—like the Policy—have no timeframe in which to render a decision.  Nor is there an opportunity to submit a request for expedited approval to participate in fast-moving litigation.  The task force compounds that problem by adding an appeals process which itself lacks any date by which the appeal must be resolved.   Ex. 29 at 4.   The amendments only add additional bureaucratic layers to the prior restraint imposed by the Policy, and because that Policy lacks "adequate standards to guide the licensing official's discretion," it remains unconstitutional.  *Barrett*, 872 F.3d at 1222 (striking down restriction on speech because the "lack of a time limit" to render decision violated the First Amendment).

The amendments thus leave "breathing room for viewpoint discrimination" in a setting where it is uniquely pernicious, *Otto*, 981 F.3d at 864, permit the University to suppress speech for impermissible reasons, substantially weaken the showing necessary for the University to sustain such a restriction, and grant the University the ability to "time out" a request through inaction.  Accordingly, the Policy remains unconstitutional with or without the task force revisions, and those revisions do not moot Plaintiffs' request for a preliminary injunction.  *See League of Women Voters of Fla., Inc. v. Lee*, 4:18-cv-251-MW-CAS, 2019 WL 11541284, at *3 (N.D. Fla. Apr. 22, 2019) (concluding that case was not moot because aspects of policy were ongoing and defendant had merely engaged in a "failed attempt to

moot this case").  As Plaintiffs' experience has already demonstrated, they often receive time-sensitive requests to participate in important and publicly significant litigation that they will be unable to accept before a court can vindicate their First Amendment rights on a case-by-case basis.   Reid Declaration ¶13; McDonald Declaration ¶13; Smith Declaration ¶13.   This case is accordingly not moot because the issue is capable of repetition yet may otherwise evade federal-court review.  *See Bourgeois v. Peters*, 387 F.3d 1303, 1308–10 (11th Cir. 2004).

For all these reasons, Plaintiffs have a strong likelihood of succeeding on the merits of their First Amendment claim.

## II.   Plaintiffs Will Suffer Irreparable Injury if the Policy Is Not Enjoined.

Plaintiffs will suffer irreparable harm from Defendants' ongoing violation of their First Amendment rights if the Policy is not enjoined.  The Eleventh Circuit has "repeatedly held that harms to speech rights for even minimal periods of time unquestionably constitute irreparable injury supporting preliminary relief." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010).  It has also held that the continued existence of a policy granting the government "unbridled discretion" to limit free speech itself causes irreparable injury where the plaintiffs' First Amendment rights were previously violated and their right to speak in the future "was chilled and could be prevented altogether under" such a policy.   *Barrett*, 872 F.3d at 1229. The same is true of a policy that is facially overbroad or that discriminates on the

basis of viewpoint. *FF Cosmetics*, 866 F.3d at 1298; *Otto*, 981 F.3d at 870. Plaintiffs face an ongoing and irreparable injury from the continued existence of the Policy, which has already been applied to stifle their speech and testimony. The University has already done incalculable harm to the cause of free expression for "future generations"—its own students—by teaching them that their professors can be silenced for engaging in "unpopular expression." *Mahanoy Area Sch. Dist. v. B.L.*, 141 S. Ct. 2038, 2046 (2021). It should not be permitted to inflict further injury while this litigation proceeds.

## III.   The Balance of Equities and Public Interest Favor Plaintiffs' Right to Speak on Matters of Public Importance.

The balance of equities and the public interest require an injunction to protect Plaintiffs' First Amendment rights. "It is clear that neither the government nor the public has any legitimate interest in enforcing [the] unconstitutional" Policy. *Otto*, 981 F.3d at 870. Even if the University had a private interest in enforcing the Policy, that interest is clearly outweighed by Plaintiffs' right to speak on matters of significant public interest. Professors at the University of Florida are leaders in their academic fields who are asked to provide expert testimony in cases that are at the center of the public debate on key issues impacting people in the State of Florida and across the country. Allowing the Policy to remain in place stifles the free flow of those vital debates and tips the litigation in favor of the State. "The public interest is always served in promoting First Amendment

values." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001).  Indeed, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it."  *Lane*, 573 U.S. at 236.

## IV.    Plaintiffs Should Be Excused from Posting Security.

Plaintiffs respectfully request that, if the Court issues a preliminary injunction, it not require the posting of security pursuant to Federal Rule of Civil Procedure 65(c).  This Court has previously dispensed with the need to provide security in First Amendment cases and should do the same here.  *See Dream Defenders*, 2021 WL 4099437, at *34; *McMahon v. City of Panama City Beach*, 180 F. Supp. 3d 1076, 1112 (N.D. Fla. 2016).  Defendants will not suffer "any costs or damages" if Plaintiffs are permitted to testify or otherwise speak freely against the State.  *McMahon*, 180 F. Supp. 3d at 1112.

## CONCLUSION

Plaintiffs respectfully request that the Court preliminarily enjoin defendants from enforcing the University's unconstitutional Policy.  At a minimum, the Court should enjoin the Policy to the extent it applies to any faculty member's participation, whether by providing expert testimony or otherwise, in litigation involving the State of Florida.

Dated: December 3, 2021
Washington, D.C.


/s/ David A. O'Neil
DAVID A. O'NEIL (*pro hac vice*)
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

MORGAN A. DAVIS (*pro hac vice*)
JAIME FREILICH-FRIED (*pro hac vice*)
SAMUEL ROSH (*pro hac vice*)
SOREN SCHWAB (*pro hac vice*)
KATHARINE WITTEMAN (*pro hac vice*)
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
mdavis@debevoise.com
jmfried@debevoise.com
sjrosh@debevoise.com
sschwab@debevoise.com
kwitteman@debevoise.com

PAUL DONNELLY
Florida Bar No. 813613
LAURA GROSS
Florida Bar No. 858242
CONOR P. FLYNN
Florida Bar No. 1010091
Donnelly + Gross LLP
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001
paul@donnellygross.com
laura@donnellygross.com
conor@donnellygross.com

ALEXANDRA P. SWAIN (*pro hac vice*)
Debevoise & Plimpton LLP
650 California Street
San Francisco, CA 94108
(415) 738-5700
apswain@debevoise.com

*Counsel for Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A. Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)**

On December 2, 2021, counsel for the Plaintiffs contacted the Defendants'
counsel to inform them of Plaintiffs' intent to file a motion for preliminary
injunction.  Defendants confirmed their intent to oppose Plaintiffs' motion.

/s/ David A. O'Neil
David A. O'Neil

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I hereby certify that this motion and memorandum of law contains 7,940 words.

/s/ David A. O'Neil
David A. O'Neil

## CERTIFICATE OF SERVICE

I hereby certify that on this third day of December, 2021, a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

/s/ David A. O'Neil
David A. O'Neil
