# Exhibit 8

No. 20-12003

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

---

Kelvin Leon Jones, et al.,

Plaintiffs-Appellees,

v.

Ron DeSantis, in his official capacity as Governor of the State of Florida, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court for the
Northern District of Florida, Case No. 4:19-cv-300-RH/MJF

---

## AMICUS BRIEF OF 93 PROFESSORS OF LAW IN SUPPORT OF PLAINTIFFS-APPELLEES

---

JENNIFER ALTMAN, #881384
SHANI RIVAUX, #42095
MARKENZY LAPOINTE #172601
PILLSBURY WINTHROP SHAW
PITTMAN LLP
600 Brickell Avenue, Suite 3100
Miami, FL 33131
Telephone:  786.913.4880
Facsimile:   786.913.4901

CHRISTOPHER E. STRETCH, #166752
STACIE O. KINSER, #300529
DEREK M. MAYOR, #307171
PILLSBURY WINTHROP SHAW
PITTMAN LLP
Four Embarcadero Center, 22nd Floor
San Francisco, CA 94111-5998
Telephone:  415.983.1000
Facsimile:   415.983.1200


Counsel for Amicus Curiae

# TABLE OF CONTENTS

TABLE OF CITATIONS ................................................................ iv

INTEREST OF AMICUS CURIAE, STATEMENT OF INDEPENDENCE, AND AUTHORITY TO FILE ............................................................ 1

SUMMARY OF ARGUMENT .......................................................... 7

I.   The District Court Has Broad Discretion to Fashion an Equitable Remedy. ................................................................................ 9

    A.   The District Court Has the Authority to Issue a Fair, Necessary and Workable Remedy. .......................................................... 9

    B.   The District Court did not Abuse its Discretion. ..................... 11

II.  The District Court Exercised its Discretion to Fashion a Remedy that is Necessary, Fair, Workable, and Tailored to the Scope of the Constitutional Violation. ............................................................................ 12

    A.   The State's Demonstrated Failure to Administer the Pay-To-Vote System in a Constitutionally Permissible Manner Necessitated Judge Hinkle's Order. ................................................................. 14

    B.   The Relief Ordered by the District Court is Fair and Workable. ...... 16

    C.   The Relief is Precisely Tailored to the Constitutional Violation. ...... 18

III. Even if the District Court Exceeded its Authority, Amendment 4, is a Self-Executing Constitutional Amendment, and Must be Upheld to Effectuate the will of Florida's Voters. ........................................... 20

    A.   The Unconstitutional Application of the LFO Requirements are Severable from Amendment 4. ............................................. 21

        1.   The Unconstitutional Application of the LFO Requirements meets Florida's Severability Test. ................................................ 22

        2.   The State did not Meet its Burden to Show that Amendment 4 would not have been Adopted Absent the Application of the LFO Requirements. ............................................................... 24

    B.   Amendment 4 Automatically Restored Voting Rights and may be Implemented without the "Advisory Opinion" Process. ............... 27

    C.   Alternately, this Court may Fashion a Narrower Injunction that Upholds the Will of the Voters in a Constitutionally Permissible Manner. ...................................................................... 31

IV. CONCLUSION ............................................................................................. 33

CERTIFICATE OF COMPLIANCE ........................................................................ 34

# TABLE OF CITATIONS

<u>Page</u>

<u>Cases</u>

*Barr v. American Assn. of Political Consultants, Inc.*,
   140 S.Ct. 2335 (2020)..........................................................................22

*Barrett v. Walker County School District*,
   872 F.3d 1209 (11th Cir. 2017) ........................................................11

*Bell v. Hood*,
   327 U.S. 678 (1946)..........................................................................10

*Brakebill v. Jaeger*,
   932 F.3d 671 (2019)..........................................................................32

*Brown v. Board of Education*,
   349 U.S. 294 (1955)..........................................................................10

*City Council of City of N. Miami Beach v. Trebor Constr. Corp.*,
   254 So. 2d 51 (Fla. Dist. Ct. App. 1971) ...........................................26

*Connor v. Finch*,
   431 U.S. 407 (1977)..........................................................................11

*Davis v. Passman*,
   442 U.S. 228 (1979)............................................................................9

*Democratic Executive Committee of Florida v. Detzner*,
   347 F.Supp.3d 1017 (N.D. Fla. 2018) ........................................ 17, 18

*Disabled in Action v. Board of Elections in City of New York*,
   752 F.3d 189 (2nd Cir. 2014) ............................................................15

*Doe v. Walker*,
   746 F.Supp.2d 667 (D. Md. 2010)....................................................19

*Fish v. Kobach*,
   840 F.3d 710 (10th Cir. 2016) ..................................................... 15, 18

*Florida Democratic Party v. Scott*,
   215 F. Supp. 3d 1250 (N.D. Fla. 2016) .............................................13

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.*,
     561 U.S. 477 (2010)............................................................22

*Gjersten v. Board of Election Com'rs for City of Chicago*,
     791 F.2d 472 (7th Cir. 1986) .............................................31

*Gray v. Bryant*,
     125 So.2d 846 (Fla. 1960) ......................................... 28, 30

*Haskins v. City of Boaz*,
     822 F.2d 1014 (11th Cir. 1987) ..........................................9

*Jones v. DeSantis*,
     4:19-cv-00300-RH-MJF (N.D. Fla. Oct. 18, 2019)............................14

*Jones v. DeSantis*,
     No. 4:19cv300-RH/MJF, 2020 WL 2618062 (N.D. Fla. May 24, 2020)... passim

*Jones v. DeSantis*,
     No. 20-12003, 3-4 (11th Cir. June 5, 2020) ......................................17

*Jones v. DeSantis*,
     4:19-cv-00300-RH-MJF (N.D. Fla. June 14, 2020) ................................. 14, 20

*Jones v. DeSantis*,
     410 F.Supp. 3d 1284, aff'd sub nom. *Jones v. Governor of Florida*,  950 F.3d
     795 (11th Cir. 2020)..........................................................29

*Jones v. Governor of Florida*,
     950 F.3d 795 (11th Cir. 2020) ................................................ passim

*Jones v. Smith*,
     474 F. Supp. 1160 (S.D. Fla. 1979) ....................................................26

*Lemon v. Kurtzman*,
     411 U.S. 192 (1973).......................................................... 10, 11

*Madera v. Detzner*,
     325 F.Supp.3d 1269 (N.D. Fla. 2018) .............................................18

*North Carolina v. Covington*,
     137 S. Ct. 1624 (2017).......................................................10

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006)..................................................................................13

*Ray v. Mortham*,
    742 So. 2d 1276 (Fla. 1999) ........................................................ 22, 23

*Republican Party of Ark. v. Faulkner County*,
    49 F.3d 1289 (8th Cir. 1995) ..............................................................31

*Sangmeister v. Woodard*,
    565 F. 2d 460 (7th Cir. 1977) .............................................................32

*Smith v. Dep't of Ins.*,
    507 So. 2d 1080 (Fla. 1987) ...............................................................22

*South Carolina v. Katzenbach*,
    383 U.S. 101 (1966)..............................................................................28

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*,
    402 U.S. 1 (1971)........................................................................... 10, 11

*Veasey v. Abbott*,
    888 F.3d 792 (5th Cir. 2018) ..............................................................11

*Williams v. City of Dothan, Ala.*,
    818 F.2d 755 opinion modified on denial of reh'g (11th Cir. 1987).................11

*Women's Emergency Network v. Bush*,
    323 F.3d 937 (11th Cir. 2003) ............................................................24

## Constitutions

Florida Constitution
    Amendment 4............................................................................... passim

## Rules and Regulations

Federal Rules of Appellate Procedure
    Rule 29(a)(2)........................................................................................7

## Other Authorities

Senate Bill 7066 (May 2019).......................................................7, 12, 29

vi

## INTEREST OF AMICUS CURIAE, STATEMENT OF INDEPENDENCE, AND AUTHORITY TO FILE

Amicus curiae are professors at law schools across the country who research, teach, and write on issues of constitutional and criminal law relevant to this case.  Amicus curiae present this brief to provide analysis regarding concerns raised by the government's unconstitutional application of the statutory provision at issue in this case and regarding the authority of the district court to fashion a permanent injunction to remedy the government's constitutional violations.  Their interest in this case stems from their professional academic interest in guiding the development of law in the way that most benefits society.  To the best of their knowledge, no amicus has any financial interest in the outcome of this case. A complete list of amici's names, titles, and affiliations is as follows:

1. Professor David Abraham, University of Miami School of Law

2. Professor Andrea Armstrong, Loyola University New Orleans, College of Law

3. Professor Hadar Aviram, University of California Hastings College of the Law

4. Professor David Ball, Santa Clara University School of Law

5. Professor Valena Beety, Arizona State University Sandra Day O'Connor College of Law

6. Professor Mark Brown, Capital University Law School

7. Professor John Burkoff, University of Pittsburgh School of Law

8.    Professor Bennett Capers, Fordham Law School

9.    Professor Gilbert Paul Carrasco, Willamette University College of Law

10.   Professor Kami Chavis, Wake Forest University School of Law

11.   Professor Alan Chen, University of Denver Sturm College of Law

12.   Professor Gabriel J. Chin, University of California, Davis School of Law

13.   Professor Wilfred U. Codrington III, Brooklyn Law School

14.   Professor David Cohen, Drexel University, Thomas R. Kline School of Law

15.   Professor Donna Kay Coker, University of Miami School of Law

16.   Professor Frank Rudy Cooper, University of Nevada, Las Vegas, School of Law

17.   Professor John Copacino, Georgetown University Law Center

18.   Professor Charlton Copeland, University of Miami School of Law

19.   Professor Caroline Mala Corbin, University of Miami School of Law

20.   Professor Michael Louis Corrado, University of North Carolina Law School

21.   Professor Benjamin Plener Cover, University of Idaho College of Law

22.   Professor andré douglas pond cummings, University of Arkansas at Little Rock, William H. Bowen School of Law

23.   Professor Perry Dane, Rutgers Law School

24.   Professor Joshua Paul Davis, University of San Francisco School of Law

25.   Professor Peggy Cooper Davis, New York University School of Law

2

26.     Professor Frank Deale, City University of New York School of Law

27.     Professor Nora V. Demleitner, Washington and Lee University School of Law

28.     Professor Peter Edelman, Georgetown University Law Center

29.     Professor Jules M. Epstein, Temple University Beasley School of Law

30.     Professor Malcolm M. Feeley, University of California Berkeley School of Law

31.     Professor Mark Fenster[1]

32.     Professor James Fox, Stetson University College of Law

33.     Professor Nicole Godfrey, University of Denver College of Law

34.     Professor Cynthia Godsoe, Brooklyn Law School

35.     Professor Phyllis Goldfarb, George Washington University Law School

36.     Professor Stephen Gottlieb, Albany Law School

37.     Professor Mark Graber, University of Maryland Carey Law School

38.     Professor Catherine M. Grosso, Michigan State University College of Law

39.     Professor Patrick Gudridge, University of Miami School of Law

40.     Professor Karen McDonald Henning, University of Detroit Mercy School of Law

41.     Professor Susan Herman, Brooklyn Law School

42.     Professor Frances R. Hill, University of Miami School of Law

43.     Professor Janet C. Hoeffel, Tulane Law School

---

[1] Professor Mark Fenster is signing in his personal capacity and any law school or university affiliation is for identification purposes only.

44.  Professor William Hollingsworth, University of Tulsa School of Law

45.  Professor Tonja Jacobi, Northwestern Pritzker School of Law

46.  Professor Osamudia James, University of Miami School of Law

47.  Professor Eric Janus, Mitchell Hamline School of Law

48.  Professor Danielle C. Jefferis, California Western School of Law

49.  Professor Sheri Lynn Johnson, Cornell University Law School

50.  Professor Lewis Katz, Case Western Reserve University School of Law

51.  Professor Shara Kobetz-Pelz, University of Miami School of Law

52.  Professor Harold Krent, Chicago-Kent College of Law, Illinois Institute of Technology

53.  Professor Tamara Lave, University of Miami School of Law

54.  Professor Charles R. Lawrence III, University of Hawaii - Manoa, William S. Richardson School of Law

55.  Professor Arthur S. Leonard, New York Law School

56.  Professor Martin Levine, University of Southern California, Gould School of law

57.  Professor Raleigh Levine, Mitchell Hamline School of Law

58.  Professor Peter Linzer, University of Houston Law Center

59.  Professor Jonathan Lipson, Temple University-Beasley School of Law

60.  Professor Cortney E. Lollar, University of Kentucky J. David Rosenberg College of Law

61.  Professor Deborah Merritt, Ohio State University Moritz College of Law

62.  Professor Bernadette Meyler, Stanford University Law School

63. Professor Michael Millemann, University of Maryland-Carey School of Law

64. Professor Martha Minow, Harvard Law School

65. Professor Kenneth B. Nunn[2]

66. Professor Jessica Owley, University of Miami School of Law

67. Professor Brian Owsley, University of North Texas Dallas School of Law

68. Professor Ellen S. Podgor, Stetson University College of Law

69. Professor Intisar Rabb, Harvard Law School

70. Professor Carlos E. Ramos-González, Interamerican University of Puerto Rico - Law School

71. Professor Teresa Jean Reid[3]

72. Professor L. Song Richardson, University of California, Irvine, School of Law

73. Professor Ira P. Robbins, American University, Washington College of Law

74. Professor Jon Romberg, Seton Hall University School of Law, Center for Social Justice

75. Professor Mark R. Schlakman, Florida State University College of Law

76. Professor Judith A.M. Scully, Stetson University College of Law

77. Professor Michael Seng, University of Illinois, Chicago, John Marshall Law School

---

[2] Professor Kenneth B. Nunn is signing in his personal capacity and any law school or university affiliation is for identification purposes only.

[3] Professor Teresa Jean Reid is signing in her personal capacity and any law school or university affiliation is for identification purposes only.

78.   Professor Allen Shoenberger, Loyola Chicago School of Law

79.   Professor Jonathan Simon, University of California Berkeley School of Law

80.   Professor Scott Skinner-Thompson, University of Colorado Law School

81.   Professor Abbe Smith, Georgetown University Law Center

82.   Professor Neil Sobol, Texas A&M School of Law

83.   Professor David A. Sonenshein, Temple University Beasley School of Law

84.   Professor Irwin Stotzky, University of Miami School of Law

85.   Professor J. Kelly Strader, Southwestern Law School

86.   Professor John Teeter, St. Mary's University School of Law

87.   Professor Joseph Tomain, University of Cincinnati College of Law

88.   Professor Craig Trocino, University of Miami School of Law

89.   Professor Kimberly Wehle, University of Baltimore School of Law

90.   Professor Steven L. Winter, Wayne State University Law School

91.   Professor Sarah H. Wolking[4]

92.   Professor Steve Zeidman, City University of New York School of Law

93.   Professor Adnan A. Zulfiqar, Rutgers Law School

No party's counsel authored this brief, in whole or in part.  No party's

counsel contributed money intended to fund the preparation or submission of the

---

[4] Professor Sarah H. Wolking is signing in her personal capacity and any law school or university affiliation is for identification purposes only.

brief. Further, no person—other than Amicus curiae, their members, or their counsel—contributed money intended to fund preparing or submitting the brief.

Pursuant to Rule 29(a)(2) of the Federal Rules of Appellate Procedure, all parties have consented to the filing of this brief.

## SUMMARY OF ARGUMENT

On November 6, 2018, the people of Florida voted by an emphatic 64.55% to enact Amendment 4 of the state constitution, automatically restoring the voting rights of certain felons upon completion of all terms of sentence including parole or probation.  The State has done almost nothing to implement Amendment 4, and instead, through the passage of SB 7066 in May 2019, made it more difficult – if not impossible – for those reenfranchised by Amendment 4 to exercise their right to vote.  Particularly hard hit are those who are unable to determine or pay legal financial obligations ("LFOs") imposed as part of the felony sentence.  Of the over 85,000 voter registrations submitted by impacted individuals since Amendment 4 became effective, the State has not completed its review for a single proposed registrant.  The import of this failure is that there are tens of thousands of Florida citizens who are being denied their right to vote due to the State's unreasonable delay.

This appeal represents yet another tactic by the State to evade the constitutional imperative of Amendment 4; the State's position rests entirely on a

false premise: that the restoration of voting rights is provided to convicted felons by the State of Florida as a matter of ***grace***.  In actuality, the re-enfranchisement is the result of a mandatory constitutional amendment enacted by the will of the Florida electorate, who resoundingly determined that voting rights of certain felons "***shall*** be restored."

Unfortunately, the State's lack of proper administration of Amendment 4 required the beneficiaries of Amendment 4 to resort to the courts.  After first entering a preliminary injunction (affirmed by this Court) that Amendment 4 could not be applied to prohibit voting on the basis of failure to pay LFOs for those genuinely unable to pay, and then conducting a full trial on the merits, the District Court entered a permanent injunction ordering the State to do what the people of Florida mandated nearly two years ago: develop a constitutionally sound system that enables felons who have completed their sentences to rejoin the electorate.

The State now objects claiming the permanent injunction ordered to achieve this imperative exceeds the District Court's authority.  The State suggests that rather than follow the advisory opinion process set forth in the permanent injunction, the appropriate remedy—since the State has not implemented Amendment 4 in a constitutionally permissible manner—is for this Court to strike Amendment 4 in its entirety.  Given the facts developed at trial, the District Court was well within its discretion to fashion the remedy that it did, however.  Even if

8

this Court were to find the advisory opinion process goes too far, the appropriate

solution is not to strike down Amendment 4.  Rather, at worst, any unconstitutional

application of Amendment 4 can and should be severed leaving the remainder of

the statute in place, giving effect to the will of Florida voters, and allowing the

restoration of voting rights for certain felons upon completion of all terms of

sentence including parole or probation.

I.      **The District Court Has Broad Discretion to Fashion an Equitable Remedy.**

A.      **The District Court Has the Authority to Issue a Fair, Necessary and Workable Remedy.**

As detailed below, the District Court was well within its authority to issue

the remedy to allow Amendment 4 to be implemented.  The Supreme Court has

unflaggingly exercised its equitable power to remedy unconstitutional government

action, holding that courts have the authority to devise remedies adequate to

redress violations of constitutional rights. *See Davis v. Passman*, 442 U.S. 228, 242

(1979) ("[W]e presume that justiciable constitutional rights are to be enforced

through the courts.  And, unless such rights are to become merely precatory, the

class of those litigants who allege that their own constitutional rights have been

violated, and who at the same time have no effective means other than the judiciary

to enforce these rights, must be able to invoke the existing jurisdiction of the courts

for the protection of their justiciable constitutional rights."); *Haskins v. City of*

*Boaz*, 822 F.2d 1014 (11th Cir. 1987) (citing *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[W]hen federal rights are violated, 'it has been the rule from the beginning that courts will be alert to adjust their remedies so as to grant the necessary relief.'")).

District courts have broad, flexible discretion when shaping equitable remedies for constitutional violations. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.").  "[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973) (plurality opinion); *North Carolina v. Covington*, 137 S. Ct. 1624, 1624-25 (2017) (per curiam) (reaffirming that courts must balance "what is necessary, what is fair, and what is workable" in assessing equitable remedies).

In application, "courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots." *Lemon*, 411 U.S. at 201; *see also Brown v. Board of Education*, 349 U.S. 294, 300 (1955). ("equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs").

10

This requires courts to adequately balance the interests of those affected by the constitutional violation with the democratic and administrative interests of the state and local governments. *See Veasey v. Abbott*, 888 F.3d 792, 800 (5th Cir. 2018) ("[r]elief must be tailored to avoid undue interference with a legislature's judgment") (internal citation omitted).  One "essential" element of this inquiry "is whether the District Court properly exercised its equitable discretion in reconciling the requirements of the Constitution with the goals of state political policy." *Connor v. Finch*, 431 U.S. 407, 414 (1977).

### B.    The District Court did not Abuse its Discretion.

Because the trial courts necessarily require flexibility in tailoring remedies to match the constitutional violation, they have "broad discretionary power in shaping equity decrees; subsequent appellate review is correspondingly narrow." *Lemon*, 411 U.S. at 200 (1973) (citing *Swann*, 402 U.S. at 15, 27 n. 10 (1971)); *Williams v. City of Dothan, Ala.*, 818 F.2d 755, 760 opinion modified on denial of reh'g (11th Cir. 1987) ("A district court has the inherent equitable power to fashion a remedy appropriate to the wrong committed.").

Accordingly, the appellants' burden is to show the District Court abused its discretion in crafting its remedy.  *See Barrett v. Walker County School District*, 872 F.3d 1209, 1221 (11th Cir. 2017).  Appellants have not and cannot meet their burden.

11

## II.   The District Court Exercised its Discretion to Fashion a Remedy that is Necessary, Fair, Workable, and Tailored to the Scope of the Constitutional Violation.

After an eight-day trial, thousands of pages of evidence, witnesses and experts, the District Court recognized the extent of the disenfranchisement worked by the adoption of SB 7066:

> [t]he State of Florida has adopted a system under which nearly a million otherwise-eligible citizens will be allowed to vote only if they pay an amount of money. Most of the citizens lack the financial resources to make the required payment. Many do not know, and some will not be able to find out, how much they must pay. For most, the required payment will consist only of charges the State imposed to fund government operations—taxes in substance though not in name.
>
> The State is on pace to complete its initial screening of the citizens by 2026, or perhaps later, and only then will have an initial opinion about which citizens must pay, and how much they must pay, to be allowed to vote. In the meantime, year after year, federal and state elections will pass. The uncertainty will cause some citizens who are eligible to vote, even on the State's own view of the law, not to vote, lest they risk criminal prosecution.

*Jones v. DeSantis*, No. 4:19cv300-RH/MJF, 2020 WL 2618062 (N.D. Fla. May 24, 2020) ("*Jones II*").

After finding that eligible voters would likely not vote because of SB 7066 ("[i]t is likely that if the State's pay-to-vote system remains in place, some citizens who are eligible to vote, based on the Constitution or even the state's own view of the law, will choose not to risk prosecution and thus will not vote"), the District Court issued an injunction that: prohibited Appellants from taking any action to enforce the LFO requirement to the extent that it (i) applies to individuals who are

12

otherwise eligible to vote but are genuinely unable to pay the required amount; (ii) requires payment, as a condition of voting, of amounts that are unknown and cannot be determined with diligence; and (iii) requires payment of fees and costs as a condition of voting, because they are, in substance, taxes.  Further, the District Court required the Division of Elections to provide a functional process by which returning citizens unsure of their eligibility to vote could request an advisory opinion from the State verifying the amount of LFO payments required; and allowed citizens with outstanding LFOs to register to vote upon affirming their inability to pay.

This relief was necessary because the State refused to fix the problems itself for over two years, and the denial of the right to vote in even a single election is irreparable.  *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam); *See Jones v. Governor of Florida*,  950 F.3d 795, 828 (11th Cir. 2020) ("*Jones I*") ("The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast— even once—is an irreparable harm"); *Florida Democratic Party v. Scott*, 215 F. Supp. 3d 1250, 1256 (N.D. Fla. 2016) ("The right to vote is a 'precious' and 'fundamental' right.") (internal quotation omitted).

**A.   The State's Demonstrated Failure to Administer the Pay-To-Vote System in a Constitutionally Permissible Manner Necessitated Judge Hinkle's Order.**

This Court in *Jones I*, and the District Court in its Order Denying Motion to Dismiss and Granting Preliminary Injunction, *Jones v. DeSantis*, 4:19-cv-00300-RH-MJF (N.D. Fla. Oct. 18, 2019), gave the State 18 months to rectify its administrative violations in implementing Amendment 4. After the State failed to do so, the District Court properly preserved the plaintiffs' fundamental right to vote by issuing its permanent injunction in *Jones II*. The District Court opined:

> In the 18 months since Amendment 4 was adopted, the Division has had some false starts but has completed its review of not a single registration…. The takeaway: 18 months after Amendment 4 was adopted, the Division is not reasonably administering the pay-to-vote system and has not been given the resources needed to do so.

*Jones II*, 2020 WL 2618062 at *24-25.

The state had an opportunity to offer procedures and remedies to address the *de facto* poll tax but simply refused. *See, e.g.*, Order Denying Motion for Stay Pending Appeal, *Jones v. DeSantis*, 4:19-cv-00300-RH-MJF, 13 (N.D. Fla. June 14, 2020) ("[t]he State had more than six months after entry of the preliminary injunction, and more than three months after the Eleventh Circuit's definitive ruling in *Jones I,* to come up with its own process for determining inability to pay. The State chose to do nothing").

14

The District Court was left to exercise its inherent authority to devise a remedy to protect hundreds of thousands of voters – now two years after they gained that right under Amendment 4. *Disabled in Action v. Board of Elections in City of New York*, 752 F.3d 189, 205 (2nd Cir. 2014) ("[t]he district court, however, gave BOE multiple opportunities to submit a written plan, to offer suggestions, to test its proposed accommodations, and to modify DOJ's proposal based on its concerns. The district court issued a plan only after BOE failed to provide written suggestions or demonstrate the efficacy of its accommodations").

The District Court's remedy is particularly appropriate given that the State says it "is on pace to complete its initial screening" of the 85,000 felons who had registered as of the time of trial by 2026, a date that may be pushed back into the 2030s with the expected increase of voter registrations before the November 2020 election. *Jones II*, 2020 WL 2618062 at *1.

Former felons who are eligible to vote but are unable to because of the State's administrative failures suffer irreparable harm with each passing election. Two years after the passage of Amendment 4, this class of citizens has suffered numerous irreparable harms because of the State's delay. The only way to mitigate this unfairness is to uphold the District Court's remedy. *See Jones I* at 828 ("The denial of the opportunity to cast a vote that a person may otherwise be entitled to cast— even once—is an irreparable harm"); *Fish v. Kobach*, 840 F.3d 710, 755

15

(10th Cir. 2016) ("There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [the Secretary of State's] office and other state and local offices involved in elections.").

## B.    The Relief Ordered by the District Court is Fair and Workable.

The remedy ordered by the District Court allows for the prospective voter to seek an advisory opinion from the Division of Elections ("DOE") defining the amount owed, a procedure that the State itself has offered as its preferred means of satisfying due process.   *See Jones II*, 2020 WL 2618062 at *37 (citing Trial Tr., ECF No. 408 at 91-94, 100-03, 197-98).

While no deadline is set for the opinion to be issued by the DOE, each individual is permitted to register 21 days after seeking an advisory opinion.  This remedy appropriately balances deference to the State's preferred process with the due process concern of implementing the procedure "in a timely manner with adequate, intelligible notice." *Jones II*, 2020 WL 2618062 at *37.

The District Court found that the time saved by the remedy will be substantial because most felony sentences do not include a fine or restitution. *Id.* at 44.  So, in most cases, the DOE will need to do nothing more on LFOs than review the judgment to confirm there is no fine or restitution.  *Id.* In the remaining cases—those with a fine or restitution—the majority of those affected will be unable to

16

pay. *Id*. This process allows the DOE to quickly determine whether an adequate showing of inability to pay was made; certainly, the DOE will have an opportunity to challenge that showing, but it seems likely that it will rarely have a basis to do so. *Id*. This tailored remedy will substantially reduce the workload, allowing the DOE to focus its review on disqualifying factors such as convictions for murder or felony sexual offense.

The Court's Order streamlines the process for determining voter eligibility and reduces the burden on the state by substantially shrinking the pool of voters for whom an LFO determination is required. The State's proposed system, in contrast, requires a manual review of each registration application, which it acknowledges would take the Secretary until 2026, at the earliest. *Id*. at 16 fn. 11; *see also* Plaintiffs' Response to Motion to Expedite Appeal, *Jones v. DeSantis*, No. 20-12003, 3-4 (11th Cir. June 5, 2020).

The approach taken by the District Court has been taken by other district courts in Florida. In *Democratic Executive Committee of Florida v. Detzner*, 347 F.Supp.3d 1017 (N.D. Fla. 2018), the court directed county supervisors of elections to allow absentee voters with mismatched signatures who should have had an opportunity to cure their uncounted ballots to cure those ballots to be counted for in the next iteration of official election results. In balancing the voters' and government's hardships, the court opined that "any potential hardship imposed by

17

providing an actual opportunity to challenge the determination that a signature does not match, and thus, a vote does not count, is out-weighed by the risk of unconstitutionally depriving eligible voters of their right to vote." *Id*. at 1032.

Similarly, in *Madera v. Detzner*, 325 F.Supp.3d 1269 (N.D. Fla. 2018), despite an upcoming election only two months away, the court ordered the state to provide facsimile sample ballots in Spanish regardless of the accompanying "logistical, financial, and technological hurdles" because those concerns were far out-weighed by the interest in "guaranteeing Puerto Ricans a right to a meaningful vote." *Id*. at 1283; *Fish*, 840 F.3d at 755 (10th Cir. 2016) ("There is no contest between the mass denial of a fundamental constitutional right and the modest administrative burdens to be borne by [the Secretary of State's] office and other state and local offices involved in elections.").

### C. The Relief is Precisely Tailored to the Constitutional Violation.

Although Amendment 4 granted hundreds of thousands of former felons the right to vote, the State unconstitutionally denied that class of eligible voters the ability to register, even after a preliminary injunction upheld by this Court ordered the State to implement appropriate procedures. While the State claims it did not adopt new administrative procedures following the preliminary injunction because it only applied to the seventeen plaintiffs, the scope of this Court's remedial injunction is broader. *See Jones I*, 950 F.3d at 813 ("[t]he district court's

preliminary injunction leaves the State ample discretion in designing the procedure to be used to provide an opportunity for these plaintiffs (and others) to demonstrate their indigency and inability to pay for reasons beyond their control").

After the State failed to satisfy its constitutional responsibilities under Amendment 4, the District Court was compelled to intervene to preserve this class of eligible voters' right to register and vote. *See, e.g., Doe v. Walker*, 746 F.Supp.2d 667, 683 (D. Md. 2010) (extending the deadline for receipt of absentee ballots from uniformed services and overseas voters because even though the court was "reluctant to interfere with Maryland's election machinery," "the risk of disenfranchisement of a group of voters" was so "great" that "narrowly tailored injunctive relief" was warranted).  It did so by issuing an order that tailored the remedies to the scope of the violations, gave credence to the State's preferred mechanisms, and minimized the requisite administrative burdens on the state. The order established a process with ascertainable standards that allows former felons to register while at the same time preserving the State's ability to review eligibility. The standards provide a definition of the unconstitutional burdens, and the specific conditions facilitate the State's avoidance of unconstitutional pay-to-vote requirements.  As importantly, it honored the will of Florida voters who supported Amendment 4.

This carefully crafted relief also reduced the State's administrative burdens. The State retains the ultimate authority to remove ineligible voters from its voter pool in a constitutionally acceptable manner of its own discretion.  As the Appellees suggested below: "[t]he only difference is that the Order creates a mechanism for returning citizens to obtain an eligibility determination from the Department of State, without forcing them to risk prosecution in order to exercise their right to vote, and establishes clear and uniform criteria for identifying potentially ineligible voters for the purpose of list maintenance."  Plaintiffs' Opposition to Motion for Stay Pending Appeal, *Jones v. DeSantis*, 4:19-cv-00300-RH-MJF (N.D. Fla. June 14, 2020) at 3.

In sum, the remedy allows prospective voters to determine whether they have LFOs, allows them to vote, reduces the risk of unfounded prosecutions, and allows for timely administration of the process.

## III.   Even if the District Court Exceeded its Authority, Amendment 4, is a Self-Executing Constitutional Amendment, and Must be Upheld to Effectuate the will of Florida's Voters.

As set forth above, the District Court was well within its discretion to fashion the Permanent Injunction and the State makes no compelling argument to the contrary.  Instead, the State takes the radical position that "if Plaintiffs and the district court were correct on the merits, the appropriate remedy under Florida's severability principles would be to invalidate Amendment 4 in its entirety."  Brief

*En Banc* Opening Brief of Defendants-Appellants for Initial Hearing, No. 20-12003, 14 (11th Cir. June 19, 2020) ("Appellants' Initial Hearing *En Banc* Br.").

The State is wrong for three related reasons: (1) the unconstitutional application of the LFO requirements is severable from Amendment 4 and the State has not shown voters would not have passed Amendment 4 without the unconstitutional application; (2) Amendment 4 is self-executing and may be implemented without the "advisory opinion" process described by the Permanent Injunction; and (3) *if* the District Court exceeded its authority in fashioning the Permanent Injunction, the appropriate remedy is not to invalidate the entirety of Amendment 4, but to remand with instructions for a narrower injunction that upholds the will of the voters in a constitutionally permissible manner.

## A. The Unconstitutional Application of the LFO Requirements are Severable from Amendment 4.

If this Court agrees with Plaintiffs and determines that the State's application of the LFO requirements is unconstitutional, the State's solution is to strike down Amendment 4 in its entirety. *See* Appellants' Initial Hearing *En Banc* Br., at 49-50. This deleterious proposition rests on two related assumptions: (1) that the unconstitutional application of the LFO requirement cannot be severed from Amendment 4; and (2) Florida's voters would not have voted for Amendment 4 if they knew felons who were unable to pay for or determine LFOs would still be permitted to register and vote. The State is wrong about both.

21

### 1.   The Unconstitutional Application of the LFO Requirements meets Florida's Severability Test.

Florida law adopts a strong presumption of severability, "recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions," and places the burden on the party challenging severability. *Ray v. Mortham*, 742 So. 2d 1276, 1280-81 (Fla. 1999). This presumption accords with U.S. Supreme Court precedent on severability, as Justice Kavanaugh recently articulated in *Barr v. American Assn. of Political Consultants, Inc.*, 140 S.Ct. 2335, 2350 (2020): "The Court's cases have . . . developed a strong presumption of severability. The Court presumes that an unconstitutional provision in a law is severable from the remainder of the law or statute." (citing *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010)). In Florida, when a part of a statute is declared unconstitutional the remainder of the act will stand where: (1) the unconstitutional provisions can be separated from the remaining valid provisions; (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void; (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and; (4) an act complete in itself remains after the invalid provisions are stricken. *Smith v. Dep't of Ins*., 507 So. 2d

22

1080, 1089 (Fla. 1987).  This same test applies to constitutional amendments adopted by Florida voters.  *See Ray*, 742 So. 2d at 1281.

The State contends that "[t]he district court's injunction fails every prong of this test," and protests that "the critical requirement that felons repay their debt to society in full before returning to the electorate has been gutted" by the Permanent Injunction.  Appellants' Initial Hearing *En Banc* Br., at 2, 50.  The State both grossly overstates the scope of the Permanent Injunction and oversimplifies the severability analysis.

*First*, the Permanent Injunction does not wholesale enjoin the requirement that felons "complete all terms of sentence."  It "still requires felons to complete their carceral sentences and parole or probation before becoming eligible to vote." *Jones I*, 950 F.3d at 832.  More importantly, the Permanent Injunction narrowly prohibits only the unconstitutional application of the LFO requirements to those *genuinely unable* to pay or determine the amounts owed.  *Id.*, ("to the extent a felon can [determine and] pay LFOs, he or she must").  Hardly a "gutting" of the intent of Amendment 4, which was to end the permanent disenfranchisement for felons other than those convicted of murder and sexual offenses.

*Second*, despite its claims that the Permanent Injunction "fails every prong of [the severability] test," the State makes no attempt to analyze the four factors. As to the first and fourth factors, the unconstitutional application of the LFO

requirements can easily be separated from the rest of Amendment 4, leaving a
complete act. *See Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th
Cir. 2003) (noting that the first and fourth elements are presumed to be satisfied "in
almost any case"). As the *Jones I* Panel pointed out, "the application of the phrase
'all terms of sentence' to require payment of legal financial obligations to those
genuinely unable to pay them . . . can obviously be excised, leaving Amendment 4
as a complete act. Indeed, we know that this is true because before the Florida
Supreme Court issued an advisory opinion . . . there was a plausible textual
argument that this application did not fall within the Amendment's language at
all." *Jones I*, 950 F.3d at 832.

Indeed, the State's sole argument seems to be focused on the second and
third factors—that is, whether the intent of the electorate in passing Amendment 4
may still be accomplished absent the unconstitutional application of the LFO
requirements. If it can, the unconstitutional portion may properly be severed. As
discussed in section III.A.2., the factual question of the electorate's intent in this
regard was presented at trial and decided on the merits.

> **2.     The State did not Meet its Burden to Show that Amendment
>           4 would not have been Adopted Absent the Application of
>           the LFO Requirements.**

As the *Jones I* Panel explained, "[i]t is the State's burden to show that
Amendment 4 would not have been adopted absent the unconstitutional application

of the LFO requirement to those who cannot pay. Florida law is clear that a party that does no more than 'cast doubt on whether the amendment would have passed' without its unconstitutional application has not carried its burden." *Jones I*, 950 F.3d at 832 [internal citations omitted]. The *Jones I* Panel found that the State failed to present any "concrete evidence or even a persuasive argument to that effect" at the preliminary injunction phase. *Id.* The *Jones I* Panel also noted that "the district court may be better situated to decide this question in the first instance on a full record. While it seems to us obvious on this preliminary record that the application in question is severable, nothing in this opinion precludes the district court from reaching a different conclusion after a full trial on the merits." *Id.*, at n. 15; internal citations omitted.

At trial, the State only presented expert testimony claiming that focus groups and polling showed that payment of LFOs, including by those unable to pay, was critical to the passage of the amendment. The District Court rejected that testimony, and found that "[t]he State's assertion that voters understood 'completion of all terms of sentence' to mean payment of fines, fees, costs, and restitution by those unable to pay and that this was critical to passage of the amendment is fanciful."[5] *Jones II*, 2020 WL 2618062 at *41.

---

[5] The State also ignored that SB 7066 implemented a major change in that LFOs converted to civil liens would still be considered part of the criminal sentence

The State now contends that "[t]he court's finding that 'voters would have approved Amendment 4 by more than the required 60% had they known it would be applied in the manner required by [its] order,' . . . is owed no deference because severability is a question of law rather than fact." Appellants' Initial Hearing En Banc Br., at 51. This contention ignores settled Florida law, as noted by *Jones I*, 950 F.3d that "the question of severability appears to be a mixed question of law and fact under Florida law." (*Jones I*, 950 F.3d at 832, citing to *Jones v. Smith*, 474 F. Supp. 1160, 1169 (S.D. Fla. 1979) ("The severability of any particular portion of a statute is a mixed question of law and fact to be determined by the trial court with appropriate review of the conclusion in the appellate court." (citing *City Council of City of N. Miami Beach v. Trebor Constr. Corp.*, 254 So. 2d 51 (Fla. Dist. Ct. App. 1971))).

Over five million Floridians voted to enact Amendment 4 to end the permanent disenfranchisement of felons. The District Court found that the State's expert testimony did not demonstrate Amendment 4 would not have been adopted by these voters absent the unconstitutional application of the LFO requirements because the State's proffered focus groups and polling were conducted years

---

under Amendment 4. The voters would have had no reason to expect that converted civil liens would be legal financial obligations included as a term of sentence within the meaning of Amendment 4 because that was contrary to practice at the time Amendment 4 was enacted. *See Jones II*, 2020 WL 2618062 at n. 9.

before Amendment 4 was on the ballot, were not conducted in a scientifically
reliable manner, and did not make any references to inability to pay LFOs. *Jones
II*, at *41. Relying on the plain language of Amendment 4—which evidenced the
intent of 64.55% of the electorate to re-enfranchise certain felons at the appropriate
time, excluding those convicted of murder or sexual offenses and requiring the
completion of all terms of sentence including probation and parole—the District
Court stated, "I find as a fact that voters would have approved Amendment 4 by
more than the required 60% had they known it would be applied in the manner
required by this order. I would make this same finding regardless of which side has
the burden of proof." *Id*., at *41. The District Court's factual finding on this issue
should not be disturbed on appeal, and the "obvious" severability of the
unconstitutional application (*Jones I*, 950 F.3d at n. 15) should be upheld rather
than "[s]triking the entirety of Amendment 4, [which] would be a dramatic
departure from what the voters intended." *Id*., at *42.

### B.   Amendment 4 Automatically Restored Voting Rights and may be Implemented without the "Advisory Opinion" Process.

The effective date of Amendment 4 was January 8, 2019. It was operative
and being administrated well before the May 2019 enactment of SB 7066 and the
January 2020 Florida Supreme Court Advisory Opinion interpreting "all terms of
sentence" to include the payment of LFOs. *See Jones I*, 950 F.3d at 803-04.
Indeed, the record shows that felons began registering immediately after

27

Amendment 4's enactment, and the State began processing those registrations pursuant to its normal application processes. *See Jones II*, at *4. Throughout the preliminary injunction and trial phases, registrations have continued uninterrupted—over 85,000 voter registrations for individuals with felony convictions were pending at the time of trial. *Id*., at *24.

Regardless of whether this Court finds that the District Court exceeded its authority with respect to the specific provisions of the Permanent Injunction, Amendment 4 is self-executing—that is, capable of being implemented without the specific provisions included in the Permanent Injunction's "advisory opinion" process. A constitutional provision is self-executing when it provides "a sufficient rule by means of which the right or purpose which it gives or is intended to accomplish may be determined, enjoyed, or protected without the aid of legislative enactment." *Gray v. Bryant*, 125 So.2d 846, 851 (Fla. 1960).[6] The clear intent of Amendment 4 was to automatically re-enfranchise certain felons that completed the terms of sentence, including probation and parole; the will of the voters must be respected in this regard. *See id*. ("The will of the people is paramount in

---

[6] *See also South Carolina v. Katzenbach*, 383 U.S. 101 (1966) ("Section 1 of the Fifteenth Amendment declares that '[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.' This declaration has always been treated as self-executing, and has repeatedly been construed, without further legislative specification, to invalidate state voting qualifications or procedures which are discriminatory on their face or in practice.")

determining whether a constitutional provision is self-executing and the modern

doctrine favors the presumption that constitutional provisions are intended to be

self-operating. This is so because in the absence of such presumption the

legislature would have the power to nullify the will of the people expressed in their

constitution, the most sacrosanct of all expressions of the people.").

The issue addressed by the plaintiffs' complaints was never whether the

State knew how to implement Amendment 4 in the absence of SB 7066 or the

Florida Supreme Court Advisory Opinion, but whether it was doing so in a

constitutionally permissible manner.  At the preliminary injunction phase, both the

District Court and the *Jones I* Panel initially expressed confidence that the State

could continue to administer Amendment 4 and the LFO requirements using its

normal voter registration processes.  *Jones v. DeSantis*, 410 F.Supp. 3d 1284,

1301, aff'd sub nom. *Jones v. Governor of Florida*,  950 F.3d 795 (11th Cir. 2020)

("The State meets its constitutional obligation—that is, its obligation not to deny

restoration of the right to vote based on lack of financial resources—if the State

allows the lack of financial resources to be addressed as part of the same process

through which other felons may obtain restoration of the right to vote. Further, . . .

the State can satisfy its duty by another method of its choosing, so long as the

method is equally accessible to the felon or otherwise comports with constitutional

requirements."); *see also, Jones I*, 950 F.3d at 829-30 ("To comply with the legal

principle behind the injunction, the State need make only a good faith effort to ensure that no felon otherwise eligible to vote under Amendment 4 is prevented from doing so because of his or her genuine inability to pay LFOs.").

Unfortunately, the State's conduct between the preliminary injunction and trial demonstrated a "staggering inability" to implement the LFO requirements. *Jones II*, at *24. Accordingly, the District Court found it necessary after a trial on the merits to fashion its own "advisory opinion" process with respect to the LFO requirements that the State must follow. The State's position is that the District Court's "chosen remedy—imposing an intricate advisory-opinion process, specifying the exact content of the form that felons must be provided to request the opinion . . . exceeds its judicial authority." Appellants' Initial Hearing *En Banc* Br., at 47. As set forth above in sections I and II, the District Court was well within its discretion to fashion the Permanent Injunction as it did. But if this Court disagrees, it does not change the "sacrosanct" expression of Florida's voters to adopt a "self-operating" constitutional amendment that automatically re-enfranchised certain felons upon certain conditions. *Gray*, 125 So.2d at 851-52. Thus, even if this Court does not uphold the advisory opinion process, it should not undermine the will of the Florida electorate in fashioning the appropriate administration of Amendment 4.

**C.     Alternately, this Court may Fashion a Narrower Injunction that
Upholds the Will of the Voters in a Constitutionally Permissible
Manner.**

Assuming this Court affirms the unconstitutionality of the LFO requirements
as applied to those genuinely unable to determine or pay the specified amounts
owed, but finds that the District Court exceeded its authority with respect to the
"advisory opinion" portion of the Permanent Injunction, this Court has several
available options.

*First*, after affirming the finding of unconstitutionality and upholding the
injunction to the extent of the unconstitutionality, this Court may vacate only the
portion of the Permanent Injunction constituting overreach. *See Gjersten v. Board
of Election Com'rs for City of Chicago*, 791 F.2d 472, 479-80 (7th Cir. 1986).
Here, that could entail vacating the "advisory opinion" process, but affirming all
other aspects of the Permanent Injunction, such that the State is simply enjoined
from prohibiting those individuals genuinely unable to pay or determine LFOs to
vote.

*Second*, this Court may remand, directing the District Court to order the
State to fashion its own constitutionally permissible procedure. *See Republican
Party of Ark. v. Faulkner County*, 49 F.3d 1289, 1301 (8th Cir. 1995).  Given the
State's demonstrated inability or unwillingness to do so within the constitutional

31

imperatives of the injunction[7], this Court may also set forth specified guidelines for the State to follow in fashioning its procedure. *See Sangmeister v. Woodard*, 565 F. 2d 460, 468 (7th Cir. 1977) ("As a general rule, courts of equity need not impose specific requirements absent some reasons to believe that a less restrictive approach will fail to remedy the constitutional violation," but where there is "evidence that state officials will continue to violate the constitution," allowing for judicial authority to impose specific remedies.).

**Third**, this Court may fashion its own, narrower injunction including one that abandons the "advisory opinion" process for determining the ability to pay LFOs, but still prohibits the State from taking certain actions or requires the State to adopt certain procedures. *See Brakebill v. Jaeger*, 932 F.3d 671, 680-81. Indeed, the State appears to have invited this outcome. The State does not dispute that the District Court was at least within its discretion to enjoin the State from preventing felons from voting when LFOs cannot be determined with diligence, and the "need for . . . procedures" for those felons who genuinely do not know if

---

[7] The State has taken the position that the reason it has not devised a constitutionally permissible procedure is that the preliminary injunction only applied to the 17 named plaintiffs, and it "was under no obligation to voluntarily implement an entirely new system while simultaneously challenging the court's order." Even as to the 17 named plaintiffs, however, in the 18 months since the complaint was filed and the four months between *Jones I* and the trial, none of the 17 named plaintiffs' registrations had been fully processed. *See Jones II,* 2020 WL 2618062 at *24.

they owe anything on their sentence.  Appellants' Initial Hearing *En Banc* Br., at 46-47.  The *Jones I* Panel also suggested several other "options" for the State to administer the LFO requirements that "do not appear unduly burdensome in light of the significance of the plaintiffs' interests."  *Jones I*, 950 F.3d at 832.  These included individualized determinations of eligibility by a Supervisor of Elections or Secretary of State after review of voter rolls for disqualifying felony convictions or reliance on the same financial attestation procedure used to determine whether defendants qualify for a public defender or other public benefits.  *See Jones I*, 950 F.3d at 830.

## IV.   CONCLUSION

The Court should uphold the permanent injunction entered by the District Court, but if it does not, should in any event not disturb the will of the Florida electorate to end the permanent disenfranchisement of felons.

DATED:  August 3, 2020

/s/ *Jennifer G. Altman*
Jennifer G. Altman
Pillsbury Winthrop Shaw Pittman LLP
Counsel for Amicus Curiae

## CERTIFICATE OF COMPLIANCE

I certify that this Brief complies with the type-volume limitations of Fed. R. App. P. 29 because it contains 6,491 words.

This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office in 14-point Times New Roman font.

DATED:  August 3, 2020                    /s/ Jennifer G. Altman
                                          Jennifer G. Altman
                                          Pillsbury Winthrop Shaw Pittman LLP
                                          Counsel for Amicus Curiae

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of

Court for the United States Court of Appeals for the Eleventh Circuit by using the

appellate CM/ECF system on August 3, 2020. I certify that all participants in the

case are registered CM/ECF users and that service will be accomplished by the

appellate CM/ECF system.


DATED:  August 3, 2020                    */s/ Jennifer G. Altman*
                                          Jennifer G. Altman
                                          Pillsbury Winthrop Shaw Pittman LLP
                                          Counsel for Amicus Curiae

35