**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHARON WRIGHT AUSTIN, MICHAEL           :
MCDONALD, DANIEL A. SMITH, JEFFREY      :
GOLDHAGEN, TERESA J. REID, and          :
KENNETH B. NUNN,                        :          1:21-cv-00184-MW-GRJ
                                        :
                Plaintiffs,             :
                                        :
     v.                                 :
                                        :
UNIVERSITY OF FLORIDA BOARD OF          :
TRUSTEES, the public body corporate acting for :
and on behalf of the University of Florida; W.  :
KENT FUCHS, in his official capacity as  :
President of the University of Florida; JOSEPH :
GLOVER, in his official capacity as Provost of :
the University of Florida; and LAURA     :
ROSENBURY, in her official capacity as Dean of :
the Fredric G. Levin College of Law,     :
                                        :
                Defendants.             :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFFS' BRIEF IN OPPOSITION TO
<u>DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...............................................................1

STATEMENT OF FACTS .....................................................................4

I.    Defendants Adopted a Policy Giving Them Discretion to Prohibit
      Faculty from Speaking Out Against the State. .................................4

II.   Defendants Applied the Policy to Suppress Faculty Speech..........................6

III.  Defendants Attempted to Backtrack in the Wake of a Public Outcry............9

IV.   Defendants Reaffirmed Their Intent to Suppress Outside Faculty
      Speech and Threatened Consequences for Dissent. ......................................11

V.    The Policy and the University's Actions Have Chilled the Professors'
      Speech...............................................................................13

ARGUMENT ..........................................................................15

I.    Defendants' Unconstitutional Policy Presents a Justiciable
      Controversy..........................................................................15

      A.    Plaintiffs Have Standing........................................................15

      B.    Plaintiffs' Claim Is Ripe.....................................................22

      C.    Plaintiffs' Claim Is Not Moot..................................................23

II.   The CBA Does Not Bar the Political Science Professors' Claim. ...............27

      A.    The CBA Does Not Require Arbitration of Constitutional
            Claims..........................................................................28

      B.    The CBA Does Not Waive Plaintiffs' First Amendment Claim.........30

CONCLUSION .......................................................................34

# <u>TABLE OF AUTHORITIES</u>

**CASES**

*31 Foster Children v. Bush,*
   329 F.3d 1255 (11th Cir. 2003) ......................................................... 18

*Abbott v. Pastides,*
   900 F.3d 160 (4th Cir. 2018) ............................................................. 20

*Amalgamated Transit Union Loc. 1593 v. Hillsborough Area Reg'l Transit,*
   2019 WL 2524909 (M.D. Fla. June 19, 2019) .................................... 25

*Barrett v. Walker Cnty. School Dist.,*
   872 F.3d 1209 (11th Cir. 2017) ......................................................... 16

*Beaulieu v. City of Alabaster,*
   454 F.3d 1219 (11th Cir. 2006) .................................................... 22, 30

*Beta Upsilon Chi Upsilon Chapter at Univ. of Fla. v. Machen,*
   586 F.3d 908 (11th Cir. 2009) ........................................................... 25

*Bloedorn v. Grube,*
   631 F.3d 1218 (11th Cir. 2011) ......................................................... 18

*Bourgeois v. Peters,*
   387 F.3d 1303 (11th Cir. 2004) .................................................... 26, 27

*CAMP Legal Def. Fund, Inc. v. City of Atlanta,*
   451 F.3d 1257 (11th Cir. 2006) ......................................................... 16

*Campbell-Ewald Co. v. Gomez,*
   577 U.S. 153 (2016) ........................................................................... 23

*Carmichael v. Kellogg, Brown & Root Servs., Inc.,*
   572 F.3d 1271 (11th Cir. 2009) ........................................................... 1

*City of Los Angeles v. Lyons,*
   461 U.S. 95 (1983) ............................................................................. 18

*Clapper v. Amnesty Int'l,*
   568 U.S. 398 (2013) ........................................................................... 18

*Club Madonna, Inc. v. City of Miami Beach*,
   924 F.3d 1370 (11th Cir. 2019) ........................................................23

*Connick v. Myers*,
   461 U.S. 138 (1983)...........................................................................19

*Dimmitt v. City of Clearwater*,
   985 F.2d 1565 (11th Cir. 1993) ........................................................17

*Dream Defenders v. DeSantis*,
   2021 WL 3491751 (N.D. Fla. Aug. 9, 2021).............................20, 23

*Dream Defenders v. DeSantis*,
   2021 WL 4099437 (N.D. Fla. Sept. 9, 2021) .............................20, 21

*FF Cosm. FL, Inc. v. City of Miami Beach*,
   866 F.3d 1290 (11th Cir. 2017) ........................................................17

*First Nat'l Bank v. Bellotti*,
   435 U.S. 765 (1978)...........................................................................26

*Harrell v. Fla. Bar*,
   608 F.3d 1241 (11th Cir.2010) ..................................................18, 20

*Hoover v. Morales*,
   164 F.3d 221 (5th Cir. 1998) ............................................................32

*Keyishian v. Bd. of Regents*,
   385 U.S. 589 (1967)......................................................................2, 19

*Lane v. Franks*,
   573 U.S. 228 (2014).....................................................................19, 28

*Leonard v. Clark*,
   12 F.3d 885 (9th Cir. 1993) ..............................................................33

*Rich v. Sec'y, Fla. Dep't of Corr.*,
   716 F.3d 525 (11th Cir. 2013) ....................................................24, 25

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995).............................................................................3

iii

*S.D. v. St. Johns Cnty. Sch. Dist.*,
 632 F. Supp. 2d 1085 (M.D. Fla. 2009)...............................................................24

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014)...................................................................................................18

*Tracy v. Fla. Atl. Univ. Bd. of Trs.*,
 980 F.3d 799 (11th Cir. 2020) ...............................................4, 29, 30, 33

*Troiano v. Supervisor of Elections in Palm Beach Cnty*,
 382 F.3d 1276 (11th Cir. 2004) .........................................................................25

*Virginia v. Am. Booksellers Ass'n, Inc.*,
 484 U.S. 383 (1988)...................................................................................................17

*Wollschlaeger v. Governor*,
 848 F.3d 1293 (11th Cir. 2017) (en banc) ...............................3, 18, 23

*Wright v. Universal Mar. Serv. Corp.*,
 525 U.S. 70 (1998).............................................................................................28, 31

*Wygant v. Jackson Bd. of Educ.*,
 476 U.S. 267 (1986)...................................................................................30, 33

## PRELIMINARY STATEMENT

Defendants' conduct underscores that this case is not only properly before this Court but also in pressing need of its review.  On December 3, 2021, two days after Defendants declared this controversy "over," the Chair of the University's Board of Trustees publicly attacked Plaintiffs and other faculty for "us[ing] their positions of authority to improperly advocate personal political viewpoints," Ex. D at 11, and issued a threat that is chilling in every sense.  Emphasizing that "[o]ur legislators will not put up with the wasting of state money and resources," the Board Chair announced that this faculty activity "must stop and it WILL stop."  *Id.* at 13.  He also stated that, when making decisions about suppression of faculty speech, the University must and does "take everything into consideration," including the wishes of "the legislature, the taxpayers of Florida, the people that are funding us."  Ex. C at 6.[1]

Three days later, the Faculty Senate issued a report documenting the obvious reality that pressure from the State infuses the University's decision-making about

---

[1]  Exhibits with numerical ordering refer to exhibits attached to the Declaration in Support of Motion (Doc. 31) filed with the Motion for Preliminary Injunction (Doc. 30).  Exhibits with alphabetical ordering refer to exhibits attached to the Declaration of Morgan A. Davis, submitted herewith.  *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) ("[W]here a defendant raises a factual attack on subject matter jurisdiction, the district court may consider extrinsic evidence such as deposition testimony and affidavits.").

faculty speech.  Ex. E at 1.  After recounting a number of manifestations of that political pressure, including the events underlying this case, the report observed a "palpable reticence and even fear on the part of faculty to speak up" about violations of their rights.  *Id.*  Faculty members, the report found, were engaged in "self-censorship" because of their "grave concern about retaliation and a sense that anyone who objected to the state of affairs might lose his or her job or be punished."  *Id.*

Against this backdrop, Plaintiffs' challenge to the University's Conflicts of Commitment and Conflicts of Interest Policy (the "Policy") is a quintessential example of a justiciable controversy.  Plaintiffs are suing to block a policy that expressly covers core First Amendment speech on public issues, that prohibits them and others from engaging in such speech without written preapproval from the State, that provides the State discretion to discriminate among viewpoints, and that has been repeatedly applied in order to silence certain viewpoints.  The highest authority within the University's governance structure has declared the University's intention to continue enforcing the Policy, threatened consequences for future violations, and indicated that political reactions to the proposed speech will inform the University's approval decisions.  And all of this takes place at the intersection of the First Amendment's highest protections.  *See Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967) ("[A]cademic freedom . . . is a special concern

of the First Amendment"); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 835 (1995) ("The . . . danger . . . to speech from the chilling of individual thought and expression . . . is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition.").[2]

Under established Eleventh Circuit precedent, Plaintiffs satisfy all of the Article III requirements.  They have standing because they are suffering ongoing injury as a result of the existence and threatened enforcement of the unconstitutional Policy.  The suit is ripe for the same reason.  *See Wollschlaeger v. Governor*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) ("This is one of those cases where the Article III standing and ripeness issues boil down to the same question," namely whether Plaintiffs "are threatened with injury fairly traceable to the challenged" Policy).  Defendants have failed to moot the case by withdrawing specific gag orders or by proposing to amend the Policy in ways that do not cure its constitutional deficiencies.

There is no merit to Defendants' exhaustion or waiver arguments based on the Collective Bargaining Agreement ("CBA") between the University and certain faculty.  The CBA specifically exempts constitutional suits like this one from any

---

[2]   Internal quotation marks, brackets, and citations are omitted unless otherwise noted.

grievance requirement, Declaration of Ryan Fuller ("Fuller Decl."), Ex. 1, Art. 23.1 (Doc. 23-1), and Eleventh Circuit law would provide the same result even in the absence of an explicit carveout. *See Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 805–06 (11th Cir. 2020) (collecting cases holding that exhaustion is not required before filing constitutional claims, including under a CBA). The CBA itself specifically provides that faculty who sign it do not waive their constitutional rights, and the University promised as a condition of the agreement not to apply any of its provisions in a way that violates such rights. Fuller Decl., Ex. 1, Art. 10.1(b)(1), 23.1.

The motion to dismiss should be denied.

## STATEMENT OF FACTS

I. **Defendants Adopted a Policy Giving Them Discretion to Prohibit Faculty from Speaking Out Against the State.**

The University has adopted a prior restraint on outside faculty speech in the form of the Policy, which requires faculty to file a request for permission on the University's online conflicts system ("UFOLIO") "prior to engaging" in any "Outside Activity." Ex. 2 at 6–7. An "Outside Activity" is defined as "any paid or unpaid activity . . . which could create an actual or apparent Conflict of Commitment or Conflict of Interest." *Id.* at 4; Am. Compl. ¶22 (Doc. 19).

The Policy provides little clarity about what constitutes either type of conflict. A "Conflict of Commitment" is "an Outside Activity, either paid or

unpaid, that could interfere with the[] [employees'] professional obligations to the University."  Ex. 2 at 3; Am. Compl. ¶23.  A "Conflict of Interest" is something other than a Conflict of Commitment that "occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgement or obligations to the University." *Id.*

In determining whether a Conflict exists, the University's Conflicts of Interest Program identifies as a potential "risk factor" subject to a "heightened level of scrutiny" "[w]hether the activity may adversely impact [the University's] interests."  Ex. A.  The Policy nowhere defines or limits what type of "interests" could qualify.

If the University finds a conflict, it may "*in its sole discretion*" take any actions it deems "reasonably necessary" to prevent the conflict, including prohibiting the faculty member's speech.  Ex. 2 at 4–6 (emphasis added).  The Policy gives the University unlimited time to make that decision.

The potential penalties for an employee's noncompliance with the Policy are severe.  A violation—including failure to disclose an Outside Activity or proceeding without express approval—can result in "administrative or disciplinary action . . . up to and including termination of employment."  Ex. 2 at 11; Am. Compl. ¶25.

**II.    Defendants Applied the Policy to Suppress Faculty Speech.**

The University has repeatedly applied the Policy to block faculty speech in the context of litigation against the State of Florida.[3]

In July 2020, Professors Kenneth Nunn and Teresa Reid (the "Law School Professors") agreed to join an amicus brief in support of a challenge to a Florida law restricting the voting rights of Floridians convicted of felonies ("S.B. 7066"). Declaration of Kenneth Nunn ("Nunn Decl.") ¶8; Declaration of Teresa Reid ("Reid Decl.") ¶6; Am. Compl. ¶¶28–30.  Although the Law School had previously interpreted the Policy to mean that merely signing an amicus brief would not require permission, the Law School suddenly changed its position—but only for briefs *opposing* the State of Florida.   Am. Compl. ¶¶27, 32.   Dean Rosenbury informed the Law School faculty that if they wanted to sign amicus briefs opposing the State, they were required to obtain approval beforehand because "faculty participation in litigation against the [S]tate of Florida or any agency thereof . . . is considered a potential conflict of interest."  Ex. 4 at 6; Am. Compl. ¶32.

---

[3]   Defendants' reference to the conflict-of-interest provisions in the CBA is a red herring.   It is the Policy—not the CBA—that the University applied in restricting Plaintiffs' ability to participate in litigation, and it is the Policy that the Professors challenge here.   As explained below, the CBA provisions are materially different from the Policy and bear on this case only because they demonstrate the Policy's unconstitutionality.   *See infra* at 28–32.

The Law School Professors completed UFOLIO requests and both were allowed to sign on to the amicus brief.  Exs. 5–7; Am. Compl. ¶¶37–38.  The University directed Professor Reid, however, that she was "not permitted to use any UF marks, logos or other identifiers in [her] outside activity/interest, and [could] not otherwise imply or suggest any official affiliation with UF."  Ex. 5; Am. Compl. ¶38.  Thus, neither of the Law School Professors' institutional affiliation was listed alongside their signatures on the amicus brief.  Ex. 8 at 5; Am. Compl. ¶40.  They and their Law School colleagues were the only signatories who were listed with no institutional affiliation.  Ex. 8 at 3–6.  The Law School Professors' association with Florida's top-ranked law school would have given greater weight and credibility to their signatures on the amicus brief and was an important part of the speech they had wanted to convey.  Nunn Decl. ¶21; Reid Decl. ¶11; Am. Compl. ¶41.  They were prohibited from including it only because of the viewpoint they expressed.

In August 2021, Professor Jeffrey Goldhagen agreed to serve as an expert witness, pro bono, in a case challenging an executive order prohibiting school districts from enacting mask mandates.  Declaration of Jeffrey Goldhagen ("Goldhagen Decl.") ¶¶4–5; Am. Compl. ¶44.  His UFOLIO request was denied with the explanation that "[o]utside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of

Florida." Ex. 11; Am. Compl. ¶48.  Because of the University's denial, the lawyer who had requested Professor Goldhagen's services instead sought other expert witnesses who were not prevented from speaking, and Professor Goldhagen was therefore unable to participate in that case.  Goldhagen Decl. ¶9; Am. Compl. ¶50.[4]

Throughout the late summer and early fall of 2021, Professors Austin, McDonald and Smith (the "Political Science Professors") submitted UFOLIO requests to act as expert witnesses in litigation challenging Florida Senate Bill 90, which imposes various obstacles on Florida voters' ability to cast ballots. Declaration of Michael McDonald ("McDonald Decl.") ¶¶3–5; Declaration of Sharon Austin ("Austin Decl.") ¶¶4–6, 8; Declaration of Daniel Smith ("Smith Decl.") ¶¶5–6; Am. Compl. ¶¶54, 58.  The University denied them all.  Professor Smith's denial stated, "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida," Ex. 10; Am. Compl. ¶60, while Professors McDonald's and Austin's denials stated, "UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests.  As UF is a state actor, litigation against the [S]tate is adverse to UF's interests."  Exs. 14, 15.  After the Professors' counsel objected to the denials, Am. Compl. ¶65, the University

---

[4]   Professor Goldhagen participated as a declarant in two different cases involving Florida's mask mandate policy.  Ex. B at 4.

suddenly switched course.  It suggested for the first time that the real problem with the proposed testimony was that the Political Science Professors would be paid, *see* Exs. 16–18; Am. Compl. ¶¶66–68, despite the fact that the Policy makes no distinction between paid and unpaid outside activities, Ex. 2; Am. Compl. ¶23. "University full-time faculty are paid with taxpayer dollars to work for UF," a representative of the University explained, and "UF has a responsibility to deny outside activities" that "conflict" with "that commitment."  Ex. 18; Am. Compl. ¶67.

### III.   Defendants Attempted to Backtrack in the Wake of a Public Outcry.

The University's refusal to allow the Political Science Professors to testify generated a wave of public criticism, an inquiry from Congress, and even a threat to the University's accreditation status.  Ex. 31 at 2; Ex. 34; Am. Compl. ¶¶72–75. Confronted with this intense pressure, the University reversed the Political Science and Medical School Professors' denials in the UFOLIO system on November 5, 2021, without stating the reason for the change or explaining which decision was consistent with the Policy.  Exs. 20, 22, 23, 26; Am. Compl. ¶76.  The same day, President Fuchs announced a task force, hand-selected by the Administration, that was to "make a recommendation to [him]" within 24 days "on how [the University] should respond when employees request approval to serve as expert witnesses in litigation in which their employer, the state of Florida, is a party."  Ex.

21; Am. Compl. ¶77.   The task force included two administrators who had themselves either formulated or applied the Policy in an unconstitutional manner. Ex. 21; Am. Compl. ¶80.

After studying its mandate for only 13 days, and after Plaintiffs filed their Amended Complaint, the task force on November 22, 2021 provided "narrowly constructed" recommendations concerning only the application of the Policy to expert witness testimony.   Ex. 29 at 1.[5]  Those recommendations are silent as to other litigation-related activities, such as signing amicus briefs.   In place of the constitutional prohibition on viewpoint discrimination, the task force recommended a presumption against it, which can be overcome by an undefined "important and particularized interest."   *Id.* at 2–3. The recommendations do not define or limit what "interests" the University may invoke as the basis for a purported conflict.   They do nothing to prevent the University from interpreting a "conflict of interest" as a conflict with the State's or the University's political interests.   Thus, as one task force member noted, under the new recommendations, "[a] conflict of viewpoint is not *necessarily* a conflict of interest," depending on what "interest" the University in its discretion deems sufficiently important.   Ex. 32 at 4.   The amendments also proposed a cumbersome, non-binding appeal

---

[5]   These amendments were previewed verbatim a week earlier—further truncating the period in which the task force members deliberated to address the University's deficient Policy.  Ex. 28 at 2.

process that lacks any timeline for resolution and leaves ultimate discretion for application of the Policy in the hands of University administrators.  Ex. 29 at 4.[6]

President Fuchs "accepted" the amendments without explaining the timeline for implementing any amendments to the Policy or how the Policy would change, and without admitting that the previous applications of the Policy were unlawful. Ex. 30.

## IV.    Defendants Reaffirmed Their Intent to Suppress Outside Faculty Speech and Threatened Consequences for Dissent.

Despite professions of commitment to academic freedom in the task-force media rollout, Defendants have made clear they intend to continue aggressively enforcing the Policy with an eye toward how the proposed speech will be received in Tallahassee.  At a Board of Trustees meeting in December 2021, after the University announced it would change the Policy, Board Chairman Mori Hosseini delivered a statement focused on "the issue of conflicts of interest and outside activities."  Ex. D at 2.  Hosseini first addressed the origins of the Policy and denied any involvement in its application.[7]  Hosseini then launched an attack on

---

[6]   Depictions of Defendants' conception for the multistep process are attached in Exhibits H and I.

[7]   Hosseini falsely stated that the "faculty union voted to approve and ratify" the policy in the CBA.  Ex. D at 9.  In fact, the relevant provisions of the CBA differ from the Policy in numerous respects.  For example, the CBA provisions employ a far narrower definition of "impermissible conflict of interest" that could not be construed to encompass Plaintiffs' proposed speech.  Unlike the

Plaintiffs and other faculty who had spoken out against the University.  He declared that while "the overwhelming majority of our faculty are here for the reasons we are," others "have taken advantage of their positions."  *Id.* at 11.  In particular, Hosseini referred to "faculty members taking second jobs using the [U]niversity's [S]tate resources for their own personal gain" and "faculty members who use their position of authority to improperly advocate personal political viewpoints to the exclusion of others."  *Id.*  Resurrecting the same false taxpayer-protection rationale that the University earlier invoked and then abandoned to deny Plaintiffs' requests, Hosseini promised retribution:  "This. Will. Not. Stand. It must stop, and it WILL stop. . . . Enough.  Let me tell you, our legislators are not going to put up with the wasting of state money and resources, and neither is this board."  *Id.* at 12–13.  When asked after the meeting whether political considerations informed decisions under the Policy, Hosseini said that the University must "take . . . into consideration" the preferences of "the legislature, the taxpayers of Florida, the people that are funding us."  Ex. C at 6.

---

Policy, the CBA does not explicitly apply to litigation activities, and the CBA also makes clear that none of its provisions can be applied to abridge the faculty's First Amendment rights.  *See infra* at 28–33.

**V.     The Policy and the University's Actions Have Chilled the Professors' Speech.**

Plaintiffs frequently are asked to participate in lawsuits—including against the State—concerning their areas of research and teaching.  McDonald Decl. ¶2; Smith Decl. ¶2; Nunn Decl. ¶23; Reid Decl. ¶¶2, 13; Goldhagen Decl. ¶¶3, 6; Am. Compl. ¶81.  Many cases seek emergent relief, including injunctions in death penalty cases or motions for temporary restraining orders regarding voting procedures or election-related disputes.  Plaintiffs therefore may be required to provide research or analysis on a highly expedited basis.  Reid Decl. ¶13; McDonald Decl. ¶13; Smith Decl. ¶13; Am. Compl. ¶81.

Plaintiffs wish to participate in litigation against the State concerning their areas of expertise.  Am. Compl. ¶83.  Yet the Policy's vague terms leave Plaintiffs unable to determine whether they are required to seek the University's approval under the Policy and, if so, whether the activity would be approved.  Nunn Decl. ¶23; Reid Decl. ¶¶12–13; Am. Compl. ¶82.  And, even if they would be permitted to speak, the University is unlikely to make that decision within the necessary timeframe.  Plaintiffs face serious consequences if they were to accept an expert engagement or sign an amicus brief without first receiving the University's express permission.  Nunn Decl. ¶25; Reid Decl. ¶14; Am. Compl. ¶84.  As a result, Plaintiffs are likely to be unable to speak in the context of amicus briefs or as

13

expert consultants or witnesses, particularly in fast-paced litigation.  Smith Decl. ¶13; Reid Decl. ¶13; Am. Compl. ¶82.

Indeed, the Policy and the University's actions have already had a chilling effect.  For example, on November 3, 2021, Professor Nunn was invited to join an amicus brief supporting a request for resentencing for a juvenile offense in *Andrus v. Texas*, No. 21-6001.  Ex. 19; Am. Compl. ¶85.  Ordinarily, Professor Nunn would not hesitate to lend his name and prominence as a criminal law scholar to an amicus brief on such an important issue.  Nunn Decl. ¶24; Am. Compl. ¶85.  But on November 7, 2021, he declined the invitation, explaining that, "with all the turmoil going on down here with university oversight of our amicus signons, [he had] decided to wait until there is more clarity" on the Policy's meaning and scope. Ex. 27; Am. Compl. ¶85.  The Policy was the only reason Professor Nunn decided not to speak.  Nunn Decl. ¶24; Am. Compl. ¶85.

This kind of self-censorship has become all too common at the University. According to the University Faculty Senate Ad Hoc Committee on Academic Freedom, which released a report on December 6 that reviewed "[University] practices that reportedly have restricted the ability of [University] faculty to engage in outside activities that are normally accepted as appropriate scholarly activities of university faculty," the Policy and the University's actions have engendered an atmosphere of silence among the faculty.  The Committee's investigation found:

14

> [There was] palpable reticence and even fear on the part of faculty to speak up . . . There was grave concern about retaliation and a sense that anyone who objected to the state of affairs might lose his or her job or be punished in some way. To a certain extent, faculty often engaged in self-censorship and chose not to "rock the boat" for fear of retaliation.

Ex. E at 1.

**ARGUMENT**

This Court should deny the motion to dismiss because Plaintiffs' claims are justiciable, because Plaintiffs were not required to file grievances under the CBA, and because the CBA does not diminish Plaintiffs' constitutional rights.

## I. Defendants' Unconstitutional Policy Presents a Justiciable Controversy.

Plaintiffs easily satisfy each of the Article III requirements for justiciability. Contrary to Defendants' contentions, Plaintiffs have standing, the suit is ripe, and the controversy remains live.

### A. Plaintiffs Have Standing.

Plaintiffs have standing to seek injunctive relief for two independent reasons. First, they bring a facial challenge to the Policy on the grounds that it both gives the University an unacceptable degree of discretion to discriminate based on viewpoint and is unconstitutionally overbroad. Second, the Policy violates Plaintiffs' First Amendment rights because it chills their protected speech and there is a credible threat that the Policy will be enforced against them to prohibit that speech.

1.    **Plaintiffs Have Standing to Pursue a Facial Challenge to the Policy.**

Plaintiffs have standing to bring a facial challenge to the Policy on their theories of unbridled discretion and overbreadth regardless of whether they have pending requests to speak.

*First*, Plaintiffs have standing to facially challenge the Policy because Plaintiffs allege that it "grants unbridled discretion" to the University and they are "subject to or imminently will be subject to" the Policy's strictures.  *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1220 (11th Cir. 2017).  Defendants contend that any injury will arise only if and when the University illegally denies another request.  Mot. at 22 (Doc. 23).  That is incorrect.  It is "the existence, not the imposition, of [the Policy's] standardless requirements" that causes Plaintiffs' injury and establishes standing.  *Barrett*, 872 F.3d at 1220 (holding plaintiff had standing to pursue injunctive relief because it was clear his requests to speak at board of education meetings would be subject to the policy he challenged); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006) (holding it was "immaterial" that city officials had "not yet exercised their discretion to refuse" the plaintiff's permit application because the plaintiff had previously applied for permits and intended to do so in the future).  The chilling effect of the Policy is causing the Plaintiffs concrete injury now, and Plaintiffs have standing to assert their claim now.

*Second*, Plaintiffs have standing to challenge the Policy's overbreadth.  *See* Am. Compl. ¶95.  The overbreadth doctrine "enable[s] persons who are themselves unharmed by the defect in a statute nevertheless to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."  *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1571 (11th Cir. 1993); *see also FF Cosm. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1303 (11th Cir. 2017) (explaining that the traditional standing analysis is "altered" in this context in order "to remedy the chilling effects of overbroad statutes").  Here, Plaintiffs themselves have "an actual and well-founded fear that the [Policy] will be enforced against them" and infringe their protected speech when they seek to participate in litigation against the State, because the overbroad Policy explicitly applies to that activity.  *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988) (holding plaintiffs could bring pre-enforcement overbreadth challenge);  Nunn Decl. ¶¶22, 25; Reid Decl. ¶¶12, 14; Austin Decl. ¶14; McDonald Decl. ¶13; Smith Decl. ¶13.

   **2.    Plaintiffs Have Standing Because There Is a Credible Threat That the Policy Will Applied in the Future to Prohibit Their Protected Speech.**

Plaintiffs also may sue now because of the real threat that the Defendants will invoke the Policy to prohibit Plaintiffs' protected speech.  The injury requirement for standing purposes is "most loosely applied" in First Amendment

cases "because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced." *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011); *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) ("[I]t is well-established that an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.").[8]

To establish standing to bring a pre-enforcement challenge to the Policy, Plaintiffs need only allege (*i*) "an intention to engage in a course of conduct . . . [that is] affected with a constitutional interest" and (*ii*) "at least arguably proscribed by" the Policy, and that (*iii*) they face a "credible threat" of punishment under the Policy. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 161–62 (2014); *Wollschlaeger*, 848 F.3d at 1304 (same). Plaintiffs easily satisfy this test.

---

[8]  Ignoring this principle, Defendants rely mostly on cases that do not even involve First Amendment claims. *See* Mot. at 22–23 (citing *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003) (substantive due process rights of foster children); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (legality of chokeholds)). Those cases that do involve the First Amendment are inapplicable. In *Clapper v. Amnesty Int'l*, the Supreme Court concluded that respondents' standing was speculative because it "relie[d] on a highly attenuated chain of possibilities." 568 U.S. 398, 410 (2013) (Mot. at 21). No such speculation is required here.

*First*, Plaintiffs intend to continue participating in litigation against the State on matters of public concern.[9]  Plaintiffs are frequently asked to participate in such litigation, including on an expedited basis, and there is every reason to believe such requests will continue as issues of intense public controversy increasingly fill the courts.[10]  That intended course of conduct is not merely "affected with a constitutional interest"; it is at the very core of the First Amendment.  *See Lane v. Franks*, 573 U.S. 228, 240 (2014) ("[S]peech by public employees on subject matter related to their employment holds special value[.]"); *Connick v. Myers*, 461 U.S. 138, 145 (1983) (speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection"); *Keyishian*, 385 U.S. at 603 ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us, and not merely to the teachers concerned.  That freedom is therefore a special concern of the First Amendment[.]").

*Second*, there is no dispute that the speech in which Plaintiffs intend to engage is "arguably proscribed" by the Policy.  Defendants concede that, as the

---

[9]   *See* Nunn Decl. ¶¶13, 21; Reid Decl. ¶¶7, 9–11; Goldhagen Decl. ¶¶4–10; Austin Decl. ¶¶4–12; McDonald Decl. ¶¶3–10; Smith Decl. ¶¶5–11.

[10]  *See* Nunn Decl. ¶23; Reid Decl. ¶13; Goldhagen Decl. ¶¶3; Austin Decl. ¶14; McDonald Decl. ¶13; Smith Decl. ¶2, 13.

task force amendments make explicit, the Policy would require preapproval of any such request to speak in court.

*Third*, there is a "credible threat" that the University will enforce the Policy to punish Plaintiffs in the future.  "The Eleventh Circuit has described the analysis for determining whether a credible threat of enforcement exists as 'quite forgiving.'" *Dream Defenders v. DeSantis*, 2021 WL 3491751, at *9 (N.D. Fla. Aug. 9, 2021); *see Harrell*, 608 F.3d at 1257 (to establish standing, Plaintiff must show that "there is at least some minimal probability that the challenged rules will be enforced if violated").  Where, as here, "a challenged law or rule was recently enacted," or "the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred."  *Harrell*, 608 F.3d at 1257.

The evidence of an enforcement threat in this case is overwhelming.  "The most obvious way to demonstrate a credible threat of enforcement in the future, of course, is an enforcement action in the past."  *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018) (cited in Mot. at 20).  Defendants' previous attempts to deny Plaintiffs' speech against the State therefore "constitute evidence bearing on whether there is a real and immediate threat of repeated injury."  *Dream Defenders v. DeSantis*, 2021 WL 4099437, at *8 (N.D. Fla. Sept. 9, 2021).

But there is no need to rely only on past practice; the threat in this case could not be clearer.  Specifically addressing faculty speech in the context of the Policy,

the Chair of the University's Board of Trustees has declared that the University and the political actors to whom it answers are "not going to put up with" faculty activity deemed contrary to its interests and "disrespectful to the taxpayers of Florida." *See* Ex. D. at 12.  Such activity "must stop, and it WILL stop," the Chair declared. *Id.* "This. Will. Not. Stand." *Id.*

That the University belatedly rescinded one round of denials in the wake of overwhelming public pressure and convened a task force to quell the outrage does not change this calculus.  The University has never said whether its repeated and overt viewpoint discrimination was unlawful or inconsistent with the Policy.  It has since reaffirmed its intent to continue applying the Policy.  Even if the University were to fully implement the task force's proposed amendments, the Policy would remain unconstitutional for reasons explained at length in Plaintiffs' Motion for a Preliminary Injunction.  Mot. for Prelim. Inj. at 25–32 (Doc. 30).  Among other things, nothing in the amendments stops the Defendants from suppressing faculty speech based on considerations that stray far beyond the narrow grounds that are constitutionally permissible.  A member of the task force has even conceded that the proposed amendments would not preclude the University from interpreting the Policy in a manner that conflates a "conflict of interest" with a "conflict of viewpoint." *See supra* at 10; Ex. 32 at 4.  The Conflicts of Interest Program still has in place a policy of singling out activities that "may adversely impact UF's

21

interests" for special scrutiny.  *See* Ex. A.  As noted by the University's Faculty Senate Ad Hoc Committee on Academic Freedom, "this amorphous factor could easily swallow everything else and be interpreted to allow the institution to stifle speech and research of professors whenever a professor's activities might be perceived to negatively affect [the University's] reputation, financial interests, or political support."  Ex. E. at 11.

Chairman Hosseini's recent statements simply confirm that the University continues to view its own interests as intertwined with and dependent upon the prevailing political views.  He stated clearly that, when deciding whether to suppress faculty speech under the Policy, administrators "have to take everything into consideration," including the reactions of "the legislature, the taxpayers of Florida, the people that are funding us."  President Fuchs has also stressed that in making decisions, the University must be careful not to "fracture the relationship" with the state legislature and other political officials.  Ex. F at 5.

B.     **Plaintiffs' Claim Is Ripe.**

"Because this case involves an alleged violation of the First Amendment, [this court's] review of this suit's ripeness is at its most permissive."  *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006).  "This is one of those cases where the Article III standing and ripeness issues boil down to the same question"—whether Plaintiffs "are threatened with injury fairly traceable to the

challenged" Policy.  *Wollschlaeger*, 848 F.3d at 1304; *see also Dream Defenders*, 2021 WL 3491751, at *8 ("Plaintiffs sufficiently allege a credible threat of enforcement to establish both injury and ripeness").  As explained above, Plaintiffs have demonstrated such a credible threat, and their facial challenges present a "purely legal argument" that is "presumptively ripe for judicial review[.]"  *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019).

### C.    Plaintiffs' Claim Is Not Moot.

The University's belated approval of Plaintiffs' prior UFOLIO requests and the task force's recommended changes to the Policy do not moot this case.  A case becomes moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016).  An order from this court enjoining enforcement of the Policy and declaring it illegal would provide critically important relief for Plaintiffs and other University faculty members.   Plaintiffs are living under a prohibition against speaking about matters of public concern absent written permission from the State.  That prior restraint has already been applied illegally to them and the University has threatened to apply it again if the State deems the proposed speech "disrespectful" or "unacceptable."  Ex. D at 12.  As Plaintiffs explained at length in the Motion for a Preliminary Injunction, nothing the University has done—or

signaled a willingness to do—cures this unconstitutional state of affairs.[11] Mot. For Prelim. Inj. At 25-32. This controversy is live.

Even if that were not the case, both exceptions to the mootness doctrine would apply here. The voluntary cessation doctrine would apply because Defendants have not met their "formidable and heavy burden" of making "absolutely clear" to the Court that the violation of Plaintiffs' free-speech rights could not reasonably be expected to recur. *See S.D. v. St. Johns Cnty. Sch. Dist.*, 632 F. Supp. 2d 1085, 1099 (M.D. Fla. 2009) (holding that school's voluntary cessation of practices and performances of a religious song did not render a First Amendment challenge moot). While government actors may be granted a rebuttable presumption that conduct that has been ceased will not recur, *see* Mot. at 18, that presumption applies only if a government "unambiguously" terminates the policy. *Rich v. Sec'y, Fla. Dep't of Corr.*, 716 F.3d 525, 531–32 (11th Cir. 2013);

---

[11] Defendants congratulate themselves for winning "plaudits" on the reversal of their gag order against the Political Science Professors. Mot. at 10. An expression of relief by a free-speech organization that the University lifted a particularly egregious prior restraint is not an endorsement of the Policy that permitted the censorship. The University will presumably also trumpet a purported "agreement" between the University and one member of the Faculty Senate, who was speaking only for himself and who, as a member of the Board of Trustees, is also a defendant in this case. Ex. G at 1. That faculty senate member expressed his own view that a meeting with President Fuchs was an "important first step in addressing the concerns that have been raised." *Id.* at 2. Plaintiffs need not wait to see whether that optimism in a "shared governance process" is warranted before exercising their federal constitutional rights. *Id.*

*Troiano v. Supervisor of Elections in Palm Beach Cnty*, 382 F.3d 1276, 1283–85 (11th Cir. 2004).

Here, the Policy has not been terminated at all, much less unambiguously. The Policy continues to apply to Plaintiffs, and the proposed amendments do not cure its deficiencies.   Mot. for Prelim. Inj. at 25–32.[12]   Chairman Hosseini's statements, moreover, show that the University will continue to apply the Policy based on perceived reactions to the speaker's viewpoint. *See* Ex. D. at 16–17.

"The timing and content" of the University's decisions to rescind the denials and amend the Policy further undermine any presumption of non-recurrence. *Rich*, 716 F.3d at 531–32.  That retreat came only after the University received multiple letters from Plaintiffs' counsel protesting the UFOLIO denials, not to mention objections from Congress and the University's accreditors. *See* Am. Compl. ¶¶65, 67, 72-75; *Amalgamated Transit Union Loc. 1593 v. Hillsborough Area Reg'l Transit*, 2019 WL 2524909, at *2–3 (M.D. Fla. June 19, 2019) (noting that a rescission that occurs "late in the game" after the defendant receives notice of litigation might be designed to avoid litigation).  And in rescinding the denials and

---

[12]   Because the Policy will be repeatedly applied to Plaintiffs, *see supra* 20–22, Defendant's reliance on *Beta Upsilon Chi*, which involved a one-time, non-recurring decision to recognize a student group, is misplaced. *See* Mot. at 16–18 (citing 586 F.3d 908, 916 (11th Cir. 2009)).

appointing the task force, the University did not admit that its prior actions were wrong.[13]

Plaintiffs' claims are also capable of repetition, yet evading review because (*i*) Plaintiffs' applications to participate in litigation against the State cannot be "fully litigated prior to [their] cessation or expiration," and (*ii*) Plaintiffs have "a reasonable expectation that [they would] be subjected to the same" denial of their requests to participate in such litigation again. *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 774 (1978).

While Plaintiffs agree that this Court is "nimble when it comes to TRO and PI motions," Mot. at 20, a decision on those non-dispositive motions does not make a case "fully litigated," *see Bourgeois v. Peters*, 387 F.3d 1303, 1308 (11th Cir. 2004) (finding that duration of challenged conduct was too short to "allow full consideration" by the courts). Moreover, it is not unusual for Plaintiffs to be asked to provide expert testimony or sign an amicus brief in a matter of days or even hours. Am. Compl. ¶81; Nunn Decl. ¶23; Reid Decl. ¶13; McDonald Decl. ¶13. If Plaintiffs are not able to meet that deadline, the litigants will engage new experts—

---

[13]   The University continues to make policy on the fly in the course of this litigation. An affidavit attached to the Motion to Dismiss states for the first time that the University will apply the task force burden-shifting to amicus brief requests. Fuller Decl. ¶17. That change in position, which conflicts with the standing instructions from the Law School Dean, *see* Ex. 4 at 6, is emblematic of the University's reactive and opportunistic approach.

as happened in Professor Goldhagen's case, Goldhagen Decl. ¶9—or file an amicus brief without Plaintiffs' signatures.  It is doubtful that the University would render a final decision on Plaintiffs' applications in such a short time span, Exs. H, I, much less that the matter could be litigated to a final judgment before the opportunity to participate in the underlying litigation has expired.

To defeat application of the capable-of-repetition doctrine, moreover, Defendants must satisfy a "heavy burden" of demonstrating that Plaintiffs' expectation that the unconstitutional application of the Policy will continue is "fanciful or unreasonable." *Bourgeois*, 387 F.3d at 1309.  Defendants cannot meet that burden because, as explained above, Plaintiffs have ample reason to fear that the Policy will be applied to them again in an unconstitutional manner.  Given the demonstrated pattern of unconstitutional conduct and the documented fear of retribution among faculty, the proper course is not to require professors to hire a lawyer and file for emergency relief every time the University seeks illegally to block (or takes too long to approve) their speech.  The legality of the Policy is squarely and properly presented in this case, and the court may address it on the merits.

## II.   The CBA Does Not Bar the Political Science Professors' Claim.

Defendants' arguments based on the CBA are squarely foreclosed by the plain terms of that agreement.  Mot. at 26–33.  The CBA explicitly permits

professors to assert their federal constitutional rights in court without first filing a grievance.[14]   The CBA also specifically states, contrary to Defendants' argument, that the agreement does not waive or diminish the professors' constitutional rights.

### A.   The CBA Does Not Require Arbitration of Constitutional Claims.

The "right to a federal judicial forum is of sufficient importance" to require that a mandatory arbitration requirement be made "clear and unmistakable." *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 80 (1998) (explaining that a "less-than-explicit union waiver [of the right to file suit in federal court] in a CBA" will not be upheld).   Here, the CBA clearly and unmistakably *preserves* the Political Science Professors' right to vindicate their constitutional rights in this Court rather than through arbitration:

> Constitutional Rights of Faculty.  Nothing in this Agreement shall be understood to diminish the constitutional rights faculty members have as citizens of the United States or the State of Florida, or to diminish the right of such faculty member to exercise those rights.  *Any alleged violation of such rights shall not be subject to the grievance and arbitration procedure of this Agreement, but shall be subject to vindication only by a court of competent jurisdiction.*

Fuller Decl., Ex. 1, Art. 23.1 (emphasis added).  Plaintiffs' First Amendment rights to testify and speak freely are rights they hold as citizens of the United States, and the CBA expressly permits them to assert those rights in court.  *See Lane*, 573 U.S.

---

[14]   Defendants make these arguments solely as to the Political Science Professors. Mot. at 26–33.

at 238 ("Truthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes.").

There is no merit to Defendants' effort to read this clear provision out of the agreement by arguing that it is superseded by CBA provisions governing outside activities and conflicts of interest. *See* Mot. at 29–30. Article 26 of the CBA, which addresses conflicts, does not purport to require that faculty bring constitutional claims through the grievance process. And Article 28, entitled "Grievance Procedure and Arbitration," provides that the grievance and arbitration process applies "*except where explicitly specified elsewhere* in this Agreement." *Id.* Art. 28.1(a) (emphasis added). That is a clear reference to Article 23.1's reservation of rights to bring constitutional claims in court.

Plaintiffs would have the right to bring this suit even if the CBA did not specifically allow it. *Tracy* makes clear that Plaintiffs need not pursue their constitutional claims through a grievance. 980 F.3d at 806. Tracy was a faculty member who challenged the conflict-of-interest policy in his CBA. *Tracy*, 980 F.3d at 803–04. He argued that he was disciplined in violation of that agreement and, alternatively, that the conflict policy was unconstitutional under the First Amendment.

The Eleventh Circuit held that Tracy's failure to exhaust the agreement's mandatory grievance policy barred Tracy's *contract claim*, but it declined to apply

29

the same reasoning to his First Amendment claim. *Id.* at 805–07. Rather, it explained that "there are reasons to doubt the validity of [out-of-circuit cases enforcing mandatory grievance mechanisms for constitutional claims] given the existence of case law indicating that § 1983 claims generally need not be [administratively] exhausted and that collective bargaining agreements are not immune to constitutional challenges[.]" *Id.* at 806. The Court therefore evaluated Tracy's First Amendment arguments on the merits. *Id.* at 806–10.[15] It did so even though, unlike here, (1) the CBA did not expressly reserve Tracy's right to proceed directly to federal court on constitutional claims, and (2) Tracy was challenging the CBA itself and not a separate university policy. *See also id.* (citing, *inter alia*, *Beaulieu*, 454 F.3d at 1226–27 ("The Supreme Court and this Court have held that there is no requirement that a plaintiff exhaust his administrative remedies before filing suit under § 1983"); *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273–74 (1986) (holding that a contractual provision in a collective bargaining agreement violated the Equal Protection Clause)).

### B.    The CBA Does Not Waive Plaintiffs' First Amendment Claim.

There is no merit to Defendants' argument that the Political Science Professors waived their First Amendment right to testify by entering into the CBA.

---

[15]   As Plaintiffs explained in their preliminary injunction motion, *Tracy* also supports their position on the merits. Mot. for Prelim. Inj. at 19–20.

The CBA does not purport to restrict Plaintiffs' right to testify or otherwise participate in litigation against the State, let alone waive such rights "explicitly." *Wright*, 525 U.S. at 79–81 (holding that waivers of rights in a CBA must be explicit).

Indeed, the CBA says exactly the opposite.  It provides: "Nothing in this Agreement shall be understood to diminish the constitutional rights faculty members have as citizens of the United States or the State of Florida, or to diminish the right of such faculty member to exercise those rights."  *See* Fuller Decl., Ex. 1, Art. 23.1.  It also states: "The University shall not apply any provision in this Agreement to violate a faculty member's academic freedom or constitutional rights, nor shall a faculty member be punished for exercising such freedom or rights, either in the performance of University duties or activities outside the University."  *Id.* Art. 10.1(b)(1).  Thus, if there were any conflict between the CBA and Plaintiffs' constitutional rights, the former, not the latter, would give way.

The CBA, however, is not at issue in this case, and it neither permits nor purports to impose the unconstitutional prior restraint contained in the separate Policy Plaintiffs challenge here.  Article 26 of the CBA limits an outside activity only to the extent that activity constitutes an "Impermissible Conflict of Commitment" or an "Impermissible Conflict of Interest" as those terms are defined

31

in the CBA.  *Id.* Art. 26.4(c).  Defendants do not argue that Plaintiffs' activities meet either definition.  Nor could they.  There is no indication that Plaintiffs' participation in litigation would be so time consuming that it "would hinder the faculty member from carrying out" their teaching responsibilities.  *Id.* Art. 26.2(h).  Nor would it pose an "unlawful conflict with [Plaintiffs'] position[s] as . . . public employee[s], as decreed by state or federal law[.]"  *Id.* Art. 26.2(g).[16]

Instead, the University denied Plaintiffs' UFOLIO requests based on additional restrictions—not contained in the CBA—on the theory that Plaintiffs' speech against the State "create[s] a conflict for the University of Florida" under the Policy.  Am. Compl. ¶60.  That denial exceeds the plain language of the CBA because Plaintiffs' speech creates no "unlawful conflict" with state or federal law.  *See Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998) ("The notion that the State may silence the testimony of state employees simply because that testimony is contrary to the interests of the State in litigation or otherwise, is antithetical to the protection extended by the First Amendment.").

The cases on which Defendants rely do not support their position.  In *Barnard v. Lackawana Cnty.*, the Third Circuit dismissed the plaintiff's First

---

[16]   The CBA alternatively defines a conflict of interest as a private interest—such as a financial interest—that would reasonably appear to influence a faculty member's actions, judgment, or decisions as it relates to their official duties.  Fuller Decl., Ex. 1, Art. 26.2(g).  Defendants have never claimed this definition applies to Plaintiffs' litigation activities.

Amendment challenge to her suspension for supporting union members in a so-called "sympathy strike."  696 F. App'x 59, 60 (3d Cir. 2017) (unpublished).  The court held that she had waived that right only because the collective bargaining agreement "unequivocal[ly]" waived Barnard's constitutional rights by *expressly stating* that no employee "shall directly or indirectly cause, engage in, authorize, instigate, aid, encourage, ratify or condone any strike or sympathy strike."  *Id.* at 61–62.  There is no comparable waiver here.

Likewise, in *Leonard v. Clark*, the Ninth Circuit held that the union had waived its challenge to a provision of the collective bargaining agreement by signing the agreement.  12 F.3d 885, 889–90 (9th Cir. 1993).  Plaintiffs are not challenging a provision of the CBA; they are challenging a University policy that is separate from, and materially more restrictive than, the CBA.  In light of the University's agreement not to apply any CBA provision in violation of Plaintiffs' constitutional rights, along with the faculty's express reservation of those rights, any constitutional deficiency in the CBA would render that provision invalid.[17]

---

[17]   In *Tracy*, the Eleventh Circuit reiterated that contractual provisions in a collective bargaining agreement can themselves be subject to constitutional attack.  980 F.3d at 806 (citing *Wygant*, 476 U.S. at 273–74 (holding that a contractual provision in a CBA violated the Equal Protection Clause)).

## CONCLUSION

For the reasons set forth above, Defendants' motion should be denied.

Dated: December 17, 2021
Washington, D.C.


<u>/s/ David A. O'Neil</u>
DAVID A. O'NEIL (*pro hac vice*)
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

MORGAN A. DAVIS (*pro hac vice*)
JAIME FREILICH-FRIED (*pro hac vice*)
SAMUEL ROSH (*pro hac vice*)
SOREN SCHWAB (*pro hac vice*)
KATHARINE WITTEMAN (*pro hac vice*)
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
mdavis@debevoise.com
jmfried@debevoise.com
sjrosh@debevoise.com
sschwab@debevoise.com
kwitteman@debevoise.com

PAUL DONNELLY
Florida Bar No. 813613
LAURA GROSS
Florida Bar No. 858242
CONOR P. FLYNN
Florida Bar No. 1010091
Donnelly + Gross LLP
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001
paul@donnellygross.com
laura@donnellygross.com
conor@donnellygross.com


ALEXANDRA P. SWAIN (*pro hac vice*)
Debevoise & Plimpton LLP
650 California Street
San Francisco, CA 94108
(415) 738-5700
apswain@debevoise.com


*Counsel for Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A. Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn*

34

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I hereby certify that this memorandum of law contains 7,996 words.

/s/ David A. O'Neil
David A. O'Neil