# EXHIBIT 5

97-50734

No. 97-50734

IN THE UNITED STATES COURT
OF APPEALS FOR THE FIFTH CIRCUIT

DR. ROBERT HOOVER, *et al.*,

*Plaintiffs-Appellants,*

vs.

DAN MORALES, *etc., et al.*,

*Defendants-Appellees.*

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION*

**BRIEF OF APPELLEES**
**DR. HOOVER AND TEXAS FACULTY ASSOCIATION**

ɔ. COURT OF APPEₐₗₛ
FILED
DEC 1 5 1997
CHARLES R. FULBRUGE III
CLERK

R. James George, Jr.
Renea Hicks
E. Scott Polikov
GEORGE, DONALDSON & FORD, L.L.P.
1100 Norwood Tower
·114 West Seventh Street
Austin, Texas  78701
(512) 495-1400
(512) 499-0094 (fax)

December 10, 1997

ATTORNEYS FOR APPELLEES

No. 97-50734

---

IN THE UNITED STATES COURT
OF APPEALS FOR THE FIFTH CIRCUIT

---

DR. ROBERT HOOVER, *et al.*,

*Plaintiffs-Appellants,*

vs.

DAN MORALES, *etc., et al.*,

*Defendants-Appellees.*

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT*
*WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION*

---

## BRIEF OF APPELLEES
## DR. HOOVER AND TEXAS FACULTY ASSOCIATION

---

R. James George, Jr.
Renea Hicks
E. Scott Polikov
GEORGE, DONALDSON & FORD, L.L.P.
1100 Norwood Tower
114 West Seventh Street
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 (fax)

December 10, 1997                ATTORNEYS FOR APPELLEES

*Hoover, et al. v. Morales, etc., et al.*, No. 97-50734

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case.  These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| Person | Connection | Interest |
|---|---|---|
| Texas Faculty Association | appellee | free speech claim |
| Prof. Frank Skillern<br>Texas Tech Law School | intervenor plaintiff | free speech claim |
| All Neighbors United, Inc.<br>Lubbock, Texas | pro bono client of<br>Frank Skillern | consulting services of<br>Frank Skillern |
| Dr. Robert Hoover<br>Texas A&M University | appellee | free speech claim |
| Dr. Cecil Reynolds<br>Texas A&M University | intervenor plaintiff | free speech claim |
| Dr. Finis Welch<br>Texas A&M University | witness – preliminary<br>injunction hearing | free speech rights |
| The American Tobacco Co. | retained A&M Profs.<br>Hoover, Reynolds, and<br>Welch | consulting services of<br>Hoover, Reynolds, and<br>Welch |
| R.J. Reynolds Tobacco Co. | retained A&M Profs.<br>Hoover, Reynolds, and<br>Welch | consulting services of<br>Hoover, Reynolds, and<br>Welch |

| | | |
|---|---|---|
| Brown & Williamson Tobacco Corp. | retained A&M Profs. Hoover, Reynolds, and Welch | consulting services of Hoover, Reynolds, and Welch |
| B.A.T. Industries, P.L.C. | retained A&M Profs. Hoover, Reynolds, and Welch | consulting services of Hoover, Reynolds, and Welch |
| Philip Morris, Inc. | retained A&M Profs. Hoover, Reynolds, and Welch | consulting services of Hoover, Reynolds, and Welch |
| Liggett Group, Inc. | retained A&M Profs. Hoover, Reynolds and Welch | consulting services of Hoover, Reynolds, and Welch |
| Lorillard Tobacco Co., Inc. | retained A&M Profs. Hoover, Reynolds, and Welch | consulting services of Hoover, Reynolds, and Welch |
| United States Tobacco Co. | retained A&M Profs. Hoover, Reynolds, and Welch | consulting services of Hoover, Reynolds, and Welch |
| Dan Morales Texas Attorney General | appellant | |
| Harry Potter Special Asst. Attorney General | defendant – case below | |
| John Sharp Texas Comptroller | defendant – case below | |
| Dr. Barry Thompson, Texas A&M University | appellant | |
| Dr. William Cunningham The Univ. of Texas System | defendant – case below | |

Dr. Lamar Urbanovsky                   defendant – case below
Texas State Univ. System

Dr. Alfred Hurley                           defendant – case below
The University of North Texas

Dr. Carol Surles                             defendant – case below
Texas Woman's University

Dr. Dan Angel                               defendant – case below
Stephen F. Austin State Univ.

James Douglas                              defendant – case below
Texas Southern University

John Montford                              defendant – case below
Texas Tech University

R. James George, Jr.                      attorney for appellees
George, Donaldson & Ford

Renea Hicks                                  attorney for appellees
George, Donaldson & Ford

E. Scott Polikov                            attorney for appellees
George, Donaldson & Ford

James Todd                                   attorney for appellants
Asst. Attorney General

Attorney of Record for Appellees,
Dr. Robert Hoover and
Texas Faculty Association

iii

## STATEMENT REGARDING ORAL ARGUMENT

Through state legislation and formal university policy, the State has sought to bar state university professors from serving with or without pay as expert witnesses, but only if they are doing so for a party adverse to the State in litigation. The bar does not reach outside employment by a faculty member as an expert witness if it is on behalf of the State itself or in litigation in which the State is not involved. The only justification offered by the State is that being an expert witness against the State is an "inherent conflict of interest."

This Court has not yet addressed the application of the First Amendment principles of *United States v. National Treasury Employees Union*, 115 S.Ct. 1003 (1995) (striking down congressional legislation barring all federal employee honoraria), to statutory bans of outside employment by state employees. Oral argument could aid the Court in exploring whether the *Treasury Employees* analysis is the same for state employees as it is for federal employees. Therefore, Dr. Hoover and the Texas Faculty Association suggest oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ......................................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................................. iv

TABLE OF CONTENTS ......................................................................................... v

TABLE OF AUTHORITIES ................................................................................. vii

STATEMENT OF JURISDICTION ......................................................................... 1

STATEMENT OF ISSUES ...................................................................................... 1

**Issue No. I:**

> Was the district court correct in issuing a preliminary injunction against interim enforcement of the expert witness appropriations rider and the TAMUS outside employment policy on the ground that they violate the First Amendment rights of university professors, including three who were scheduled to testify opposite the State at an impending trial? ............ 2

**Issue No. II:**

> Did the district court abuse its discretion by not abstaining? .............. 2

STATEMENT OF THE CASE ................................................................................... 2

    (i)    Course of Proceedings and Disposition in the Court Below ............... 2

    (ii)   Statement of Facts ............................................................................... 4

SUMMARY OF ARGUMENT ................................................................................. 8

ARGUMENT .......................................................................................................... 10

Standard of review ........................................................................ 10

I.     Use of the appropriations rider and the TAMUS outside
       employment policy to prevent university professors from being
       expert witnesses opposite the State in litigation violates the
       First Amendment rights of the professors .......................................... 11

II.    *Pullman* abstention is inapplicable to a First Amendment
       challenge such as this one to the facial validity of state
       legislation and policies ........................................................ 24

CONCLUSION .......................................................................... 29

CERTIFICATE OF SERVICE ......................................................... 30

## <u>TABLE OF AUTHORITIES</u>

*Carey v. Brown,*
  447 U.S. 455 (1980) ........................................................................ 23

*City of Houston v. Hill,*
  482 U.S. 451 (1987) .................................................................. 24, 28

*Connick v. Myers,*
  461 U.S. 138 (1983) .................................................................. 14, 21

*Duncan v. Poythress,*
  657 F.2d 691 (5th Cir. 1981),
  *cert. dism'd,* 459 U.S. 1012 (1982) ............................................. 26

*Elrod v. Burns,*
  427 U.S. 347 (1976) ........................................................................ 23

*Gulfstream Aerospace Corp. v. Mayacamas Corp.,*
  485 U.S. 271 (1988) ........................................................................ 24

*Healy v. James,*
  408 U.S. 169 (1972). ...................................................................... 12

*Johnston v. Harris County Flood Control District,*
  869 F.2d 1565 (5th Cir. 1989) ....................................................... 21

*Lakedreams v. Taylor,*
  932 F.2d 1103 (5th Cir. 1991) ................................................. 11, 24

*Langley v. Adams County,*
  987 F.2d 1473 (10th Cir. 1993) ..................................................... 21

*Louisiana Debating and Literary Association v. City of New Orleans,*
  42 F.3d 1483 (5th Cir.),
  *cert. denied,* 115 S.Ct. 2583 (1995) ......................................... 11, 26

*New York Times v. Sullivan,*
    376 U.S. 254 (1964) ................................................................. 20

*Pickering v. Board of Education of Township High School District 205,*
    391 U.S. 563 (1968) ..................................................... 12, *passim*

*Police Department of the City of Chicago v. Mosley,*
    408 U.S. 92 (1972) ................................................................... 23

*Pro v. Donatucci,*
    81 F.3d 1283 (3d Cir. 1996) ................................................... 21

*Railroad Commission v. Pullman Co.,*
    312 U.S. 496 (1941) ..................................................... 24, *passim*

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ............................................................... 19

*Reeves v. Claiborne County Board of Education,*
    828 F.2d 1096 (5th Cir. 1987) ............................................... 21

*Riley v. National Federation of the Blind of North Carolina,*
    487 U.S. 781 (1988) ............................................................... 20

*Rodriguez v. Percell,*
    391 F.Supp.38 (S.D.N.Y. 1975) ............................................. 20

*Sierra Club v. City of San Antonio,*
    112 F.3d 789 (5th Cir. 1997) ................................................. 24

*Simon & Schuster, Inc. v. Members of the New York State Crime
Victims Board,* 502 U.S. 105 (1991) ............................................. 22

*Smith v. Hightower,*
    693 F.2d 359 (5th Cir. 1982) ................................................. 21

*State of Texas v. American Tobacco Co., et al.,*
    C.A. No. 5:96-CV-91 (E.D. Tex. – Texarkana) .............................. 6

*Sweezy v. New Hampshire,*
     354 U.S. 234 (1957) .................................................................... 10

*Trister v. University of Mississippi,*
     420 F.2d 499 (5th Cir. 1969) .......................................................... 23

*United States v. National Treasury Employees Union,*
     115 S.Ct. 1003 (1995).................................................... 12, *passim*

*Waters v. Churchill,*
     114 S.Ct. 1878 (1994).................................................................. 19

*Zwickler v. Koota,*
     389 U.S. 241 (1967) ..................................................................... 28

## CONSTITUTIONAL PROVISION AND STATUTES

U. S. CONST., AMEND. 1 ................................................................. *passim*

U. S. CONST., AMEND. 14 ....................................................................... 23

28 U.S.C. § 1292(a)(1)............................................................................... 1

42 U.S.C. § 1983 ....................................................................................... 2

Appropriations Act 1997-99, Article IX, § 2(5),
     TEX. SESS. LAW SERV. 6352 .......................................................... 5

## BRIEF OF APPELLEES

Dr. Robert Hoover and the Texas Faculty Association, the appellees herein, respond to the Brief of Appellants, filed on behalf of Dan Morales, in both his personal capacity and his official capacity as Attorney General of Texas, and Dr. Barry Thompson, in his official capacity as Chancellor of the Texas A&M University System (collectively, "the State"):

### STATEMENT OF JURISDICTION

Under 28 U.S.C. § 1292(a)(1), the Court has jurisdiction over the State's appeal from the district court's preliminary injunction order of August 7, 1997.

### STATEMENT OF ISSUES

**Issue No. I**

A legislative rider to the 1997-99 appropriations bill for the State of Texas prohibits payment of salary and benefits to any state employee, including a university professor, "who is retained as or serves as an expert witness or consultant" in litigation against the state. In addition, the Texas A&M University System ("TAMUS") has enforced a policy that requires prior approval for outside employment that might bring a member of its faculty or staff into "conflict with the interests of the State of Texas." Following consultation with the Texas Attorney General's Office, TAMUS modified its policy to permit initial

determination by the Attorney General's Office of whether to disapprove the
faculty member serving as an expert witness opposite the State in litigation.

> **Was the district court correct in issuing a preliminary injunction
> against interim enforcement of the expert witness appropriations
> rider and the TAMUS outside employment policy on the ground
> that they violate the First Amendment rights of university
> professors, including three who were scheduled to testify opposite
> the State at an impending trial?**

## Issue No. II

Invoking the *Pullman* abstention doctrine, the State argued that the district
court should refuse to decide the constitutional validity of the expert witness rider
because the rider was ambiguous on whether it covered political subdivisions and
uncompensated expert witness activity against the state. The district court reached
the constitutional issues.

> **Did the district court abuse its discretion by not abstaining?**

### STATEMENT OF THE CASE

**(i)      Course of Proceedings and Disposition in the Court Below.** In the
summer of 1997,[1] the Texas Faculty Association and Dr. Robert Hoover, a
professor at Texas A&M, filed suit under 42 U.S.C. § 1983 against the Texas

---

[1] All the relevant events occurred in 1997. Textual references to dates will be to that year unless
otherwise indicated. Appellate record references are as follows: "R" refers to the one-volume
record of district court filings; "Tr." refers to the transcript of the August 7th preliminary
injunction hearing; and referenced exhibits are those admitted at the August 7th hearing.

Attorney General and the TAMUS Chancellor, seeking to enjoin enforcement of a state appropriations rider and a TAMUS policy on expert witness consultation and testimony by university professors.  The professor and faculty association claimed the rider and policy violated the First Amendment, as well as the Equal Protection Clause of the Fourteenth Amendment.

State enforcement of the rider and policy threatened to block three Texas A&M professors from acting as expert witnesses in major litigation brought by the State against the tobacco industry, whose trial was to start in only two months.  Tr. 59.[2]  Therefore, the plaintiffs sought a temporary restraining order and preliminary injunction against enforcement pending final trial on the merits. R. 1-17.

After initially granting a temporary restraining order against enforcement of the rider and policy, R. 26-28, the district court conducted an evidentiary hearing on the preliminary injunction application and granted a preliminary injunction at the conclusion of the hearing.  Later the same day, the court issued a written order on its ruling, preliminarily enjoining the State as follows:

- "from enforcing Texas A&M University System Policy 31.05 and Regulation 31.05.01 as they relate to the subject matter of this cause of action;" and

---

[2] The tobacco trial since has been rescheduled, according to published news reports.

3

- "from enforcing the 'Expert Witness' Rider attached to the Appropriations Act 1997-99, Article IX, Section 2(5)."

R. 90.[3]

The State has interlocutorily appealed.[4]

**(ii)     Statement of Facts**

*The rider*

Tacked onto the Texas Legislature's massive 1997 state appropriations bill at the conference committee stage was a rider that has come to be called the "expert witness rider." P. Exh. 3; Tr. 97. It bars pay to state university professors if they act as expert witnesses or consultants in litigation opposite the State, but not if they are on the State's side or if the State is not involved at all. In full, the rider provides:

> Because of an inherent conflict of interest, none of the funds appropriated by this Act shall be expended in payment of salary, benefits, or expenses of *any state employee who is retained as or serves as an expert witness or consultant in litigation against the*

---

[3] The district court qualified the TAMUS policy injunction with the phrase "as they relate to the subject matter of this cause of action" to limit its reach just to expert testimony. Tr. 112.

[4] Since the appeal, two more parties have been granted intervenor-plaintiff status: Dr. Cecil Reynolds of Texas A&M (who testified at the preliminary injunction hearing); and Professor Frank Skillern of the Texas Tech University School of Law. Defendants have been added, too: the Texas Comptroller in his official capacity; the heads of the University of Texas System, the Texas State University System, the University of North Texas, Texas Woman's University, Stephen F. Austin University, Texas Southern University, and Texas Tech Universities in their official capacities; and Harry Potter, Special Assistant Attorney General, in his personal and official capacities.

> *state*, unless the state employee serves in that capacity on behalf of a
> state agency on a case in which the state agency is in litigation
> against another state agency.

Appropriations Act 1997-99, art. IX, § 2(5); TEX. SESS. LAW SERV. at 6352

(emphasis added).

## *The TAMUS policy*

Faculty and staff in the Texas A&M system also were subject to a

preexisting, system-wide policy that required them to obtain university

administrator approval for outside employment.   One of the conditions for

approval was that the outside employment "not bring an employee into conflict

with the interests of the State of Texas."  P. Exh. 1 (TAMUS Policy 31.05, ¶ 1,

subpart (iv)).  The Texas A&M University System had explained specifically in

May of 1997 that "expert witness activity on the part of a Texas A&M University

System employee for a party in litigation with the State" would place the

employee in "conflict with the interests of the State" as prohibited by TAMUS

Policy 31.05. P. Exh. 5 (second page, 1st para.).

## *The First Amendment damage*

At least three Texas A&M professors were faced with a bar to testifying

truthfully in court; they were in precisely the situation proscribed by the

legislative rider and the A&M policy as explained in the May memo.  Dr. Robert

Hoover, a professor of marketing at Texas A&M's Corpus Christi campus, had been hired by defendant tobacco companies to provide expert testimony in the litigation brought by the State of Texas against tobacco companies.[5]  Tr. 63-65, 70.  Although Dr. Hoover had first obtained approval for this expert witness work, Tr. 65, 72, things changed after the State's counsel in the tobacco litigation contacted the A&M general counsel's office to let it know that Dr. Hoover had been designated as an expert witness. Tr. 51-52.  Implementing a change in policy procedures from a few months earlier, whereby A&M would turn initially to the Attorney General's Office to ask whether being a witness opposite the State was a conflict, Tr. 53, 56, 103-04, 107-08, TAMUS informed Dr. Hoover that his employment as an expert witness for the tobacco companies would violate both TAMUS Policy 31.05 and the expert witness rider.  P. Exh. 4 (July 18, 1997, letter from TAMUS counsel).

Dr. Finis Welch, an economics professor at Texas A&M's College Station campus, also had been retained as an expert witness for the tobacco companies in the tobacco litigation.  Tr. 73, 75.  Professor Welch had learned even earlier than Dr. Hoover of the university's official disapproval of his expert witness status.  In the latter part of May, the Dean's office of Texas A&M University had written the

---

[5] The tobacco litigation is *State of Texas v. American Tobacco Co., et al.*, C.A. No. 5:96-CV-91 (E.D. Tex. – Texarkana).

head of the Economics Department, informing him that Dr. Welch's employment as an expert witness for those not aligned with the State in the tobacco litigation was a conflict under TAMUS Policy 31.05. P. Exh. 5 (first page). This A&M communication traced the conflict determination in the tobacco litigation context to the Texas Attorney General supposedly having told the faculty of the University of Texas Law School that "they cannot become involved with the tobacco companies [in the tobacco litigation] because it would constitute a conflict with state interests." Id.[6] Dr. Welch disregarded this threat to his university salary, choosing to testify anyway, regardless of whether an injunction issued (as it ultimately did). Tr. 77.

Yet another Texas A&M professor, who previously had served both for pay and free as an expert witness for the defense in state criminal cases, fell within the prohibitions of the rider and policy. Tr. 83-84, 89. Dr. Cecil Reynolds, a professor of educational psychology and of neuroscience (and a member of the Texas Faculty Association, Tr. 85), also had been approached to be an expert witness for the tobacco companies in the Texas tobacco litigation. Tr. 82, 84. Although he had obtained A&M's approval in the past to testify against the State, Tr. 84, that approval was denied this time. Tr. 87. In fact, A&M withheld

---

[6] The Attorney General disagrees with the A&M memo's characterization of his activities in this regard. Tr. 44.

approval even after he offered to consult for free as an expert witness in the case. Tr. 87-88.

*The excuse*

The State never has proffered a rationale for the one-way bar against university professors other than the rider's introductory phrase: a professor's opposition to the State's position would be "an inherent conflict of interest." In fact, at trial, the State's attorney stressed that the State is "*not* saying . . . this restriction on speech is justified by specific work place disruption or by impairment of an employee's specific job performance." Tr. 26 (emphasis added).

## SUMMARY OF ARGUMENT

This is an unusually easy First Amendment case. The State has established a rule – through the legislative rider and the TAMUS policy – that punishes the truthful speech of state employees who disagree with it and rewards the speech of those who agree with it. By the State's own concession, this blatantly content-based rule is not tethered to factual reality. The State agrees that, if the challenged rider and policy were put on the shelf, a state university professor who testified as an expert witness for a party in litigation against the State would not cause any workplace disruption or affect the actual operation of government. Instead, the State rests its entire defense of this blanket smothering of opposition voices in the

8

academy, insofar as expert testimony is concerned, on the rejected proposition that the State can simply deem a conflict between truthful but unwanted testimony and the State's interest.

This oppressive approach to the acknowledged First Amendment rights of state employees fails the long-established *Pickering* balancing test for determining whether the state as employer may punish its employees' speech as citizens of the State and Nation on matters of public concern.   Less ploddingly and more obviously, the State's punishment of professors' speech violates the First Amendment test laid down by the Supreme Court in its 1995 *Treasury Employees* decision.   There, the Court recalibrated the *Pickering* balancing test (typically applied to post-hoc adverse actions against employee-speakers) so that it could measure the constitutionality of *prospective* governmental prohibitions on large classes of government employee speakers.

*Treasury Employees* raised the threshold for prospective government bans of the sort undertaken by the State in this case, placing a heavy burden on the government to justify blanket punishment of employee speech that has not yet even occurred.  Among other things, *Treasury Employees* rejected a "government-knows-best" rule, refusing to simply and quietly acquiesce in the punishment of protected First Amendment activity on the basis of no more substantial

justification than that the legislative body enacting the ban had simply deemed the speech a problem. The challenged rider and TAMUS policy cannot withstand the strong rule of *Treasury Employees*. Therefore, the preliminary injunction should be upheld.

The State's invocation of the *Pullman* abstention doctrine to try to avoid adjudication of the rider issue fails in light of the Supreme Court rule, announced in such decisions as the 1987 opinion in *City of Houston v. Hill*, that *Pullman* abstention – already a rarely applicable principle to be applied only in extraordinary situations – is not to be used in First Amendment, facial challenges to legislation. This case is such a challenge, and abstention is not appropriate.

Furthermore, the "ambiguities" manufactured by the State in an effort to wedge this case into the *Pullman* mold are both irrelevant to the preliminary injunction issue and, upon examination, non-existent. These additional shortcomings in the State's evasive action further cement the fact that the district court acted well within its discretion in reaching the First Amendment issue and not abstaining.

## ARGUMENT

**Standard of review.** The district court's grant of the preliminary injunction is subject to reversal only for an abuse of discretion by the district court. *See, e.g.,*

10

*Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991). This standard applies to Part I of the argument below.

District court refusals to abstain on *Pullman* or other grounds are reviewed on appeal only for an abuse of discretion. *See, e.g., Louisiana Debating and Literary Association v. City of New Orleans*, 42 F.3d 1483, 1489 (5th Cir.), *cert. denied*, 115 S.Ct. 2583 (1995). This standard applies to Part II of the argument below.

**I.    Use of the appropriations rider and the TAMUS outside employment policy to prevent university professors from being expert witnesses opposite the State in litigation violates the First Amendment rights of the professors.**

The legislative rider and TAMUS policy cannot survive First Amendment scrutiny because the rider and policy amount to an attempt to censor speech in court by professors based on the content of the professors' speech and nothing more. Stated another way, if the Attorney General or university administrator agree with the expert's testimony, the expert can testify; and if the Attorney General or university administrator do not agree what the expert will say, the expert will be stopped from testifying by the rider and the TAMUS policy.

*The State's impossible hurdles:*  Pickering *and* Treasury Employees

*Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and *United States v. National Treasury Employees Union*, 115 S.Ct. 1003 (1995), provide the constitutional framework for protection from such censorship. A university academic's basic job is to fully explore the truth, both in the classroom and elsewhere. The relationship of truthful expert witness testimony to a state university professor's job is the same regardless of whether that testimony is offered for or against the State. Testimony for the State's position and testimony against the State's position are equally consistent with the truth-seeking that is the core of a university professor's job.

*Academic freedom:  the truth-seeking job of a professor*

Judicial treatment of academic freedom and the First Amendment teaches the same lesson. The academic freedom of university professors – *state* university professors included – rests on the principle that the "ardor and fearlessness of scholars" is "indispensable for fruitful academic labor." *Sweezy v. New Hampshire*, 354 U.S. 234, 262 (1957) (J. Frankfurter, concurring). The Court frequently has reaffirmed a national "dedication to safeguarding academic freedom" in the college classroom. *Healy v. James*, 408 U.S. 169, 180-81 (1972).

*The* Pickering *balancing test*

The special truth-seeking role of universities and their professors is critical

to the analytic framework governing the First Amendment claim in this case.

*Pickering* recognized that, while state employees do not relinquish their First

Amendment rights as citizens merely because they work for the state, the state

retains interests in regulating its employees' speech that do not apply to the

general citizenry.  391 U.S. at 568.  *Pickering*, therefore, adopted a balancing test:

> The problem in any case is to arrive at a balance between the interests
> of the teacher, as a citizen, in commenting upon matters of public
> concern and the interest of the State, as an employer, in promoting the
> efficiency of the public services it performs through its employees.

*Id.*  When government censorship or punishment of speech is at issue, *Pickering*

and its progeny delineate the limits of the State's interest as an employer.   In

determining whether an infringement of First Amendment rights is warranted, the

courts evaluate whether the speech involves "the subject matter of government

employment" or "workplace disruption" or "the actual operation of the

government." *Pickering*, 391 U.S. at 568, 571; *Treasury Employees*, 115 S.Ct. at

1014, 1015.

If it comes into play at all, the balancing part of the *Pickering* test is only

technically implicated in the circumstances of this case because the State's

asserted interest in blocking testimony unfavorable to it rests on nothing more

palpable than an "inherent conflict of interest." The State, in fact, has eschewed any argument or suggestion that truthful expert testimony in opposition to the State in litigation violates its valid interest in the "efficiency of public service it performs through its [public university professors]." *Connick v. Myers*, 461 U.S. 138, 142 (1983). It repeatedly stipulated at the district court hearing to the fact that its justification rested on the "inherent conflict" concept and nothing more. Tr. 20 ("legislature . . . has just said it's an inherent conflict of interest. . . . So, it's not the content of the opinion."); Tr. 21 ("a conflict of interest can be precluded without a showing of harm"); Tr. 26 ("not saying . . . this restriction on speech is justified by specific work place disruption or by impairment of an employee's specific job performance"); Tr. 109 ("[a]s a matter of law, it's an inherent conflict of interest").

The State actually has encouraged outside employment by university professors. *See, e.g.,* P. Exh. 2 at 5 (Texas A&M's academic freedom statement);[7] Tr. 35; Tr. 74 (when recruiting Dr. Welch, A&M informed him that outside consulting work was a plus not a minus). There is not a whiff of evidence in the record in this case that faculty outside employment as an expert witness for a party

---

[7] "Faculty members also are citizens of the nation, state, and community; therefore, when speaking, writing, or acting outside the classroom, they must be free from institutional censorship or discipline." The expert witness rider and TAMUS policy, of course, run directly counter to this sentiment.

adverse to the State threatens the efficiency of public service as a professor; further, there certainly is nothing indicating any such conceivable threat would be greater from an expert opposite the State than from an expert on the same side as the State.

Application of *Pickering*, therefore, means that the professor's strong interest in the free expression of his or her views on the matters of public concern that have found their way into the courtroom are to be balanced against the insubstantial, and unsubstantiated, concept of an "inherent conflict of interest" placed on the side of the balance for the State's interest as employer of the professor.

Treasury Employees *raises* Pickering's *hurdle for prospectively punishing speech*

In a sense, the *Pickering* balancing test is not even applicable to the prospective government censorship of employee speech involved here. The Supreme Court recently has applied a modified version of the *Pickering* test to strike down a legislative bar to compensation for outside employment by government employees in a context remarkably similar to the one here.

In the *Treasury Employees* case, the Court employed the First Amendment to strike down a congressionally-enacted ban on the receipt of honoraria by federal government employees. *Treasury Employees* cannot be distinguished from this

15

case. If anything this case is even more securely within the protective embrace of the First Amendment because, unlike *Treasury Employees*, it involves government employees whose very job is *not* to hew to the party line and espouse government policy.

### The close parallels between Treasury Employees *and this case*

In *Treasury Employees*, as here, the government employees claiming a First Amendment violation sought outside compensation for their expressive activities as citizens not as government employees. 115 S.Ct. at 1012. In *Treasury Employees*, as here, the government employees' expressive activity was on matters of public concern instead of the largely unprotected "employee comment on matters related to personal status in the workplace." 115 S.Ct. at 1013. And, in *Treasury Employees*, as here, there was a "prohibition on compensation" that burdened expressive activity no less than if compensation had not been involved. 115 S.Ct. at 1014.

The Court distinguished the "widespread impact" of the "wholesale deterrent" of the legislative honoraria ban from the more limited "single supervisory decision" typically involved in a *Pickering*-based case. 115 S.Ct. at 1013-14. As the Court explained, the First Amendment implications of the former are especially troubling:

16

> The honoraria ban . . . burdens speech far more than our past
> applications of *Pickering* because the ban deters an enormous
> quantity of speech *before it is uttered, based only on speculation* that
> the speech might threaten the Government's interests.

115 S.Ct. at 1013 n. 12 (emphasis added).  Accordingly, the Court observed that

the burden to justify the proscription in *Treasury Employees* was greater than for

the post-hoc analysis in *Pickering* of "one employee's speech and its impact on

that employee's public responsibilities."  *Id.*  Here, too, the State faces a higher

burden of justification because of the rider's broad proscription.

The State's legislative expert witness rider imposes the same prospective

punishment of speech imposed by the disapproved honoraria ban in *Treasury

Employees*.[8]  Eerily, the proffered government justification for the prospective

punishment of speech here echoes the vague justification offered in *Treasury

Employees*.  There, the Court quickly cast aside any justification based on the kind

of "immediate workplace disruption" claimed in *Pickering*.  115 S.Ct. at 1015.  It

then turned to, and disposed of, the government's claim that the statutory

prohibition could be justified because Congress "reasonably deemed" the targeted

speech to interfere with government workplace efficiency.  115 S.Ct. at 1015.  The

Court observed that both the "blanket burden" of the statutory restriction and the

---

[8] It also potentially affects a large number of speakers.  There are an estimated 20,000 public
university teachers in Texas.  Tr. 94.

fact that it singled out expressive activity for special regulation required the government to have a "much stronger justification" than simple administrative convenience. 115 S.Ct. at 1017. The State concedes here that neither "workplace disruption" nor "specific job performance" are implicated in any fashion. Tr. 26.

Ultimately, the Court found the government's wispy justification to be an unreasonable assumption based only on "speculative benefits" from the honoraria ban. 115 S.Ct. at 1018. It therefore struck down the ban as imposing an unconstitutional "crudely crafted burden" on the government employees' freedom to engage in expressive activities. 115 S.Ct. at 1018.

The parallels of the *Treasury Employees* rationale to this case are unavoidable. The blanket burdens on speech imposed by the expert witness rider and the TAMUS policy have been justified on nothing more than speculation about some indiscernible "inherent conflict of interest." *Treasury Employees* determined that the government could not put its thumb on the *Pickering* scale by simply "deeming" a conflict.

### *The State's "because we said so" defense*

That is all the State has done here through both the rider and the TAMUS policy (which, like the rider, simply *deems* a conflict of interest with the State). It asks that its justification be accepted as a matter of blind faith.

18

"Because we're the government, and we said so" is no match for the dignity of the First Amendment. If there is a constant in this constitutional realm, it is that blind faith in government's good intentions will not rescue infringements on First Amendment freedoms. The government instead must make a "substantial showing" that the speech it seeks to punish is "likely to be disruptive." *Waters v. Churchill*, 114 S.Ct. 1878, 1887 (1994) (J. O'Connor's plurality opinion) (also explaining that the government employer's view of the facts must be objectively reasonable, *id.* at 1889). The State falls well short of this high standard when it can summon nothing more than the sentiment that "[t]he conflict itself *is* the harm." State's Br. at 17 (emphasis in original).

A deputy constable's expressed hope that a Presidential assassination attempt will be successful next time received First Amendment protection in *Rankin v. McPherson*, 483 U.S. 378 (1987). Surely, truthful courtroom testimony by a professor whose government job it is to explore the truth is entitled to at least as much constitutional protection.

*The "commercial speech" red herring*

In a relatively brazen stab at misdirection, the State's brief suggests that the First Amendment is less implicated in this case because the speech it seeks to

19

punish is compensated with money.[9]   First Amendment law firmly rejects the suggestion:

> It is well settled that a speaker's rights are not lost merely because compensation is received; a speaker is no less a speaker because he or she is paid to speak.

*Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 801 (1988).  This principle has been applied in the context of a testifying expert, where the fundamental protections of scholarly expression were held not to waiver even if "the speaker received a fee."  *Rodriguez v. Percell*, 391 F.Supp. 38, 42 n. 4 (S.D.N.Y. 1975), citing *New York Times v. Sullivan*, 376 U.S. 254, 265-66 (1964). That the expert witness rider and TAMUS outside employment policy may reach those who are paid for their expert consultancies is a constitutional irrelevancy.

*Courtroom testimony:  protected and matters of "public concern"*

Finally, it must be understood that the forum targeted by the challenged State legislation and policies is well-recognized as a protected forum where matters of "public concern" are openly debated.   This circumstance further heightens the First Amendment sensitivity of the State's speech restrictions for its

---

[9] Uncompensated expert assistance also has been punished by the rider, as currently alleged in the pending case below.  After the instant appeal was taken, Professor Frank Skillern intervened as a plaintiff because officials at Texas Tech University told him that his salary may be at risk under the rider if he does not cease pro bono activities on behalf of a Lubbock neighborhood organization opposing state permitting of an incinerator near the neighborhood.

employees. *See, e.g., Connick v. Myers*, 461 U.S. at 146 (matters addressed by employee must be of "public concern" to weigh heavily on the *Pickering* scale).

This Court has held that the First Amendment "protects the right to testify truthfully at trial." *Smith v. Hightower*, 693 F.2d 359, 368 (5th Cir. 1982); *see also Reeves v. Claiborne County Board of Education*, 828 F.2d 1096, 1100 (5th Cir. 1987). In *Johnston v. Harris County Flood Control District*, 869 F.2d 1565 (5th Cir. 1989), the Court explained in words that unfortunately went unheeded by the State in this case:

> We would compromise the integrity of the judicial process if we tolerated state retaliation for testimony that is damaging to the state.

869 F.2d at 1578. The State's tolerance of a one-way inhibition on its employees' courtroom speech, punishing only what damages the State, is not shared by the First Amendment and the courts.[10] The courtroom expert testimony the State blocks is speech within the reach of the First Amendment, and it is on matters of public concern.

*The content-based regulation of speech:  either for us or against us*

At bottom, the State's censorship of adverse expert witness testimony if it comes from state employees whose government job is definitely not to press

---

[10] Other circuits follow this one in treating courtroom testimony as protected, expressive speech on matters of public concern. *See, e.g., Pro v. Donatucci*, 81 F.3d 1283, 1290 (3d Cir. 1996); *Langley v. Adams County*, 987 F.2d 1473, 1478-79 (10th Cir. 1993).

government-sanctioned policies on their students is content-based.   Words

opposed to the State are forbidden; those supportive are welcomed.

This content-based approach to government employee speech on matters of

high public concern – the State's tobacco litigation is regularly depicted as raising

some of the most important public policy concerns on the current political scene –

is blatantly unconstitutional.  If a professor at the University of Texas in the

1950's had been called to testify as an expert that the separate law facilities the

university had established for Hemann Sweatt, the black law student admitted to

the university upon Supreme Court decree, was in fact not equal to the rest of the

law school, it is inconceivable that the university could have withheld the

professor's salary because the testimony was inherently in conflict with what the

people then in control of the State government believe was in the state's interest.[11]

The challenged rider and policy are nothing more than a current equivalent of this

plainly illegal scenario.

The Supreme Court has held that a statute is presumptively inconsistent

with the First Amendment if it imposes a financial burden on speakers because of

the content of their speech.  *Simon & Schuster, Inc. v. Members of the New York*

*State Crime Victims Board*, 502 U.S. 105, 108 (1991) (striking down "Son of

---

[11] A more current analogue of the 1950's example would be a state professor who testified in
opposition to, for example, his university's affirmative action admissions program.

Sam" statute that forced disgorgement of profits from certain kinds of books). That is precisely what the legislative rider, and the TAMUS policy, do here, and they are just as violative of the First Amendment as the statutes held to be so in *Simon & Schuster* and *Treasury Employees*.

### *Satisfaction of the four elements for a preliminary injunction*

Because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), the district court's issuance of a preliminary injunction was not an abuse of discretion. It should be affirmed.[12]

The district court specifically found that the traditional four elements necessary to issuance of a preliminary injunction – likelihood of success on the merits, irreparable injury, threatened harm from enforcement outweighs potential damage from barring enforcement, and no disservice to the public interest, *see*

---

[12] Although the express basis for the preliminary injunction was the First Amendment, the injunction also is justified under the Equal Protection Clause. "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views its finds acceptable, but deny use to those wishing to express less favored or more controversial views. .. . Selective exclusions from a public forum may not be based on content alone[.]" *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972); *see also Carey v. Brown*, 447 U.S. 455 (1980) (finding equal protection violation in exempting labor picketing from ban on picketing). In a particularly pertinent application of this Equal Protection principle, this Court invalidated a university rule barring law professors from working for the legal services program but not from other work. *Trister v. University of Mississippi*, 420 F.2d 499 (5th Cir. 1969). The challenged rider and policy here should come to a similar equal protection fate.

*e.g., Lakedreams*, 932 F.2d at 1107 – had been satisfied. Tr. 109-12. On appeal, the State has disputed the district court on none of these findings other than the likelihood of success element. It has rested its entire appeal on being right on the First Amendment issue. The State is a discouragingly far cry from being right on the First Amendment issue here, and the district court did not abuse its discretion in preliminarily holding that way.

**II.   *Pullman* abstention is inapplicable to a First Amendment challenge such as this one to the facial validity of state legislation and policies.**

<u>*First Amendment facial challenge trumps* Pullman</u>

The district court did not abuse its discretion by failing to abstain under the doctrine of *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941).[13]  The *Pullman* doctrine is especially unwarranted in cases such as this one involving facial challenges based on the First Amendment. *City of Houston v. Hill*, 482 U.S. 451, 467-69 (1987).

---

[13] Although *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988), held that denials of abstention are not interlocutorily appealable, this Court has held that district court denials of abstention may be reviewed interlocutorily as part of the likelihood of success element of an interlocutory appeal of the grant of a preliminary injunction. *Sierra Club v. City of San Antonio*, 112 F.3d 789, 793 (5th Cir. 1997). Thus, the Court appears to have jurisdiction over the *Pullman* issue.

24

## *The State's "ambiguity" argument as to the rider*

The State's abstention argument pertains only to the legislative rider; it does not argue for abstention as to the TAMUS policy. State Br. at 23-28. Further, even as to the rider, the State's abstention claim is limited to a surmise that the district court ruling "may" have been based on reading the legislation to reach uncompensated expert testimony or expert witness work for local government entities. State Br. at 23. The State suggests that the rider might be ambiguous as to these two points and that its perceived ambiguity warrants requiring the district court to step aside from deciding the constitutional issue so that state courts can have an opportunity to resolve the supposed uncertainties in the statute. The State's ambiguity argument simply fails to take into account Dr. Reynolds, who offered to provide consulting services for free, only to be told by A&M that he could not do so, compensation or no compensation. Tr. 87-88.

The posited ambiguities have nothing to do with whether the district court should have decided the First Amendment issues raised by those challenging the rider; they do not exist under a fair reading of the statute; and the facial First Amendment nature of the challenge makes them irrelevant and the abstention argument inapplicable in any event. Furthermore, the district court cannot be said

to have abused its discretion by not abstaining in the preliminary phase of this case.

It is familiar law that the kind of abstention sought by the State is the exception, not the rule. *Louisiana Debating*, 42 F.3d at 1491. State law ambiguity and the possibility or likelihood of avoiding constitutional adjudication – which is all the State has offered in this case – are insufficient to justify abstention (much less to warrant reversal for not abstaining). *Id.*, quoting *Duncan v. Poythress*, 657 F.2d 691, 697 (5th Cir. 1981), *cert. dismissed*, 459 U.S. 1012 (1982). A broader inquiry is necessary, into such matters as the rights at stake and the costs of delay pending state court action. *Id.*

## *Irrelevance of the ambiguity discussion*

Contrary to the suggestion in the State's brief, the district court specifically found the rider unconstitutional because it reached compensated expert witness testimony. Tr. 111-12. Further, the court construed the rider as reaching uncompensated expert witness work, too. *Id.* Its injunction found it illegal on both fronts. R. 90.

As to the local government issue, that played no role in the decision below. The enjoined parties are the Attorney General of Texas and the Chancellor of TAMUS. Thus, the State's discussion about ambiguity on either matter is beside

the point – which the State specifically conceded at the hearing, observing then that the local government matter it raises now was "not really posed by this preliminary injunction." Tr. 22.

*The absence of real ambiguity*

Besides, even strenuous effort fails to yield a real ambiguity when the rider is fairly read. The rider's prohibition reaches two categories of state-employed expert witnesses: one who "serves" as such a witness; and one who is "retained" as such as witness. "Retained" signifies a compensated expert, and "serves" signifies an uncompensated expert. There is no real ambiguity there.

The red-herring question of whether the rider reaches local government is easily resolved. The rider only deals with "funds appropriated" by the appropriations act and "state employees." The State cannot seriously suggest that there is some yawning uncertainty as to what funds and people are covered by these terms, which appear every biennium in the state appropriations bill and which heretofore have gone unquestioned in their reach.

*The overriding principle of* City of Houston v. Hill

Finally, as indicated at the outset of this part of the brief, the already-extraordinary nature of *Pullman* abstention is made even more extraordinary in the legal context of this case. First Amendment facial challenges to legislation are

well-nigh invulnerable to state avoidance through abstention.   As the Supreme

Court explained in the governing *City of Houston v. Hill* decision:

> In such [First Amendment facial challenge] case[s] to force the
> plaintiff who has commenced a federal action to suffer the delay of
> state-court proceedings might itself effect the impermissible chilling
> of the very constitutional right he seeks to protect.

482 U.S. at 467-68, quoting *Zwickler v. Koota*, 389 U.S. 241, 252 (1967).

The State's abstention argument is baseless and ultimately must be seen as

nothing more than a delaying tactic designed to give it the victory through delay

that it cannot obtain on the merits of this case.  Forcing the plaintiff-appellees, and

the new intervenor-plaintiffs below, to repair to the state courts to resolve these

chimerical and irrelevant ambiguities would leave them unprotected in the interim

by the First Amendment.  This in turn would expose them and their speech to the

not-so-gentle intrusion of the expert witness rider as the litigation in which they

have been asked to serve as expert witnesses came and went.  Under governing

principles, abstention cannot be employed to this end.  There was no abuse of

discretion in the district court's failure to abstain.

<u>CONCLUSION</u>

Based upon the foregoing matters, the district court's grant of a preliminary injunction against enforcement of the expert witness rider and the TAMUS policy on expert witnesses should be affirmed.

Respectfully submitted,

R. James George, Jr.
Renea Hicks
E. Scott Polikov

GEORGE, DONALDSON & FORD, L.L.P.
1100 Norwood Tower
114 West 7th Street
Austin, Texas 78701
(512) 495-1400
(512) 499-0094 (fax)

ATTORNEYS FOR APPELLEES

29

## CERTIFICATE OF SERVICE

I hereby certify that two copies of the foregoing **BRIEF OF APPELLEES DR. HOOVER AND TEXAS FACULTY ASSOCIATION** have been forwarded by first class U.S. mail, postage prepaid, on the 10th day of December, 1997, to:

James C. Todd
Assistant Attorney General
Texas Attorney General's Office
General Litigation Division
P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548

Renea Hicks