# Exhibit E

# Report of the Faculty Senate Ad Hoc Committee on Academic Freedom

**Raymond Issa, Chair** (Distinguished Professor, School of Construction Management)
**Michael Bernhard** (Raymond and Miriam Ehrlich Eminent Scholar Chair, Dept of Political Science, CLAS)
**Robert J. Cousins** (Boston Family Professor and Eminent Scholar, Food Science & Human Nutrition Department, IFAS)
**Angela Kohnen** (Associate Professor, School of Teaching and Learning, College of Education)
**Sarah Lynne** (Associate Professor, Department of Family, Youth and Community Sciences, IFAS)
**Danaya Wright** (T. Terrell Sessums & Gerald Sohn Professor of Constitutional Law, College of Law and former faculty senate chair)

**Executive Summary**

The charge of this ad hoc committee was to gather information and report back to the Faculty Senate on UF practices that reportedly have restricted the ability of UF faculty to engage in outside activities that are normally accepted as appropriate scholarly activities of university faculty. During the three week period of time that this ad hoc committee completed its fact-finding mission, information was gathered on the Conflict of Interest (COI) office's denial of approval to three professors to provide expert testimony in lawsuits challenging the constitutionality of Senate Bill 90, three more professors joined the lawsuit alleging different restraints imposed by the University, a grievance was filed by a College of Education professor, and reports were collected from faculty members throughout the University of examples of incursions on academic freedom. The most significant issues reported to this committee involve

- barriers to faculty research and publication,
- restrictions related to participating in outside activities that allegedly challenge the political priorities of the executive branch of the State, and
- pressure to alter syllabi and course content to avoid viewpoints unpopular among current elected state leaders.

There were specific challenges reported that were related to research on Covid-19, a topic of study across a wide-range of academic units at the University of Florida. Some examples of challenges reported to the ad hoc committee include external pressure to destroy deidentified data, barriers to accessing and analyzing deidentified data in a timely manner, and barriers to publication of scientific research which, taken together, inhibited the ability of faculty to contribute scientific findings during a world-wide pandemic.  These reports are summarized in Section 2.0.

More problematic than the individual examples of pressure to stifle unpopular viewpoints or restrict research was the palpable reticence and even fear on the part of faculty to speak up on these issues.  There was grave concern about retaliation and a sense that anyone who objected to the state of affairs might lose his or her job or be punished in some way.  To a certain extent, faculty often engaged in self-censorship and chose not to "rock the boat" for fear of retaliation.[1] To protect those faculty who have spoken out, this committee has tried to maintain confidentiality as best we could.

Section 1 reviews regulations and laws on conflicts, summarizes policies from peer institutions, and summarizes ongoing legal complaints. Section 2 describes incidents reported during the period of fact-finding. Section 3 reviews news coverage in the academic and regular press. Section 4 summarizes outside investigations on the issue of academic freedom.  Section 5 notes recent response to the publicity by Board of Trustees Chair, Mori Hosseini.  Appendices for each section provide more complete documentation.

---

[1] This fear of retribution was documented more fully in a report on Race Scholarship at UF that interviewed dozens of race scholars about institutional support for minority faculty.  See Katheryn Russell-Brown and Ryan Morini, A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement, especially pp. 13, 19, 20, 26.

**Charge**

"The charge of this special ad hoc committee is to gather information and report back to the Faculty Senate on UF practices that reportedly have restricted the ability of UF faculty to engage in outside activities that are normally accepted as appropriate scholarly activities of university faculty. This includes, but is not limited to, expert witness engagement, writing of op ed pieces, and consulting.  I [Faculty Chair David Bloom] would like our committee to consider outside activities of faculty in a broader context to reflect the range of concerns I am hearing from faculty across the campus. The overall goal would be to collect data on the scope of the problem and to establish a view of any problems or inconsistencies that exist."

## 1.1 Rules Governing Conflicts of Interest

The subject of Conflicts of Interests is complicated, murky, and often difficult to articulate.  The subject also overlaps with important federal and state laws, like First Amendment speech protections and government employee ethics rules.  Although University of Florida faculty are considered state employees in certain contexts, they are technically the employees of the University of Florida Board of Trustees.[2]  They are not considered by state law to be public officials subject to Fl. St. §112.311 et. seq., although the University Trustees, Chancellors, Presidents, Vice Presidents, provosts, and deans are such public employees.[3]  UF Faculty are subject to the Conflicts of Commitment and Interest policy promulgated by the Board of Trustees and, according to that policy, are subject to the Florida Code of Ethics for Public Officers and Employees.[4]  Unlike private institutions, UF is a state institution that may not violate free speech rights of employees protected by the federal and state constitutions.[5]

The University recognizes and protects academic freedom and its corresponding responsibilities, as set forth in UF Regulation 7.018 - Academic Affairs; Academic Freedom and Responsibility. That regulation states, in relevant part:

> The University believes that academic freedom and responsibility are essential to
> the full development of a true university and apply to teaching, research, and creativity.
> In the development of knowledge, research endeavors, and creative activities, the faculty
> and student body must be free to cultivate a spirit of inquiry and scholarly criticism and

---

[2]BOG Regulation 1.001, section (5) Personnel, provides that:

(a)Each board of trustees shall provide for the establishment of the personnel program for all the employees of the university, including the president, which may include but is not limited to: compensation and other conditions of employment, recruitment and selection, nonreappointment, standards for performance and conduct, evaluation, benefits and hours of work, leave policies, recognition and awards, inventions and works, travel, learning opportunities, exchange programs, academic freedom and responsibility, promotion, assignment, demotion, transfer, tenure, and permanent status, ethical obligations and conflicts of interest, restrictive covenants, disciplinary actions, complaints, appeals and grievance procedures, and separation and termination from employment. To the extent allowed by law, university employees shall continue to be able to participate in the state group insurance programs and the state retirement systems.

(b)Each board of trustees shall act as the sole public employer with regard to all public employees of its university for the purposes of collective bargaining, and shall serve as the legislative body for the resolution of impasses with regard to collective bargaining matters.  See https://www.flbog.edu/wp-content/uploads/1_001-PowersandDuties.pdf

[3] Fl. St. § 112.313(9)(a)(2)(a)(V)

[4] Fl. St. § 112.311 et. seq.  See UF Regulation 1.011(2).

[5] Rachel Levinson, Academic Freedom and the First Amendment, AAUP Summer Institute, July 2007, available at https://www.aaup.org/NR/rdonlyres/57BFFE5E-900F-4A2A-B399-033ECE9ECB34/0/AcademicfreedomandFirstAmenoutline0907doc.pdf.

to examine ideas in an atmosphere of freedom and confidence. The faculty must be free to engage in scholarly and creative activity and publish the results in a manner consistent with professional obligations. . . . The established policy of the University continues to be that the faculty member must fulfill his/her responsibility to society and to his/her profession by manifesting academic competence, scholarly discretion, and good citizenship. . . .

(2) Academic freedom is accompanied by the corresponding responsibility to:

a. Be forthright and honest in the pursuit and communication of scientific and scholarly knowledge;

. . .

d. Indicate when appropriate that one is not an institutional representative unless specifically authorized as such; . . .[6]

The University's Regulation on Disclosure and Regulation of Outside Activities and Financial Interests affirms the rights of faculty to academic freedom and to participate in outside activities so long as doing so does not hamper the faculty member's duties to UF:

(1) The University of Florida encourages its Faculty and Staff to engage in activities supporting their professional growth, creating new knowledge and ideas, and furthering the University's mission of excellence in education, research, and service. University employees, however, have an obligation to commit their primary professional time and intellectual energy to the University and maintain the highest ethical and professional standards. Further, personal gain from Outside Activities or Financial Interests, as defined in the University of Florida Policy on Conflicts of Commitment and Interest, must not influence—or create the appearance of influencing—the decisions or actions of the University.

(2) Accordingly, all Faculty and Staff shall adhere to the University of Florida Policy on Conflicts of Commitment and Interest (the "Policy on Conflicts") and the Code of Ethics for Public Officers and Employees (Chapter 112, Part III, Fla. Stat.)1.

(3) The Policy on Conflicts sets forth the Faculty and Staff members' obligations to disclose certain Financial Interests, potential Conflicts of Commitment or Interest and the potential consequences for violating the Policy on Conflicts.

(4) The University may take administrative or disciplinary action concerning violations of this Regulation up to and including termination of employment.[7]

In 2020, the Florida Legislature passed Fl. St. § 1012.977 that requires the disclosure of contracts that affect the integrity of state universities and establishes penalties for failure to disclose.[8]  That statute provides the state universities must establish policies that require "employees engaged in the design, conduct, or reporting of research to disclose and receive a determination that the outside activity or financial interest does not affect the integrity of the state university or entity."  The statute also declares that any employee of a state university

---

[6] See UF Regulation 7.018

[7] UF Reg. 1.011 available at https://regulations.ufl.edu/wp-content/uploads/2021/11/1011DisclosureandRegulationofOutsideActivitiesandFinancialInterests.pdf

[8] http://www.leg.state.fl.us/Statutes/index.cfm?App_mode=Display_Statute&Search_String=&URL=1000-1099/1012/Sections/1012.977.html

"consents to the policies of the university, … the regulations of the Board of Governors, and the laws of this state."  While declarations of this sort may provide a chilling effect on employees who disagree with educational and state policies, they cannot supersede or nullify the federal or state constitutional rights of employees.  It is unclear what is meant by "affect[ing] the integrity of the state university."

Pursuant to these laws and regulations, UF established the following Conflicts of Commitment and Conflicts of Interest Policy, available at: https://policy.ufl.edu/policy/conflicts-of-commitment-and-conflicts-of-interest/, which states, in relevant part, that:

> Employees must avoid situations which interfere with—or reasonably appear to interfere with—their professional obligations to the University. Such situations might create an appearance of impropriety and, therefore, must be disclosed. As discussed below, Employees will use the UFOLIO system to disclose Outside Activities in which they wish to engage. When the University determines a Conflict of Interest may exist with an Employee, the University may, in its sole discretion, prohibit the individual from engaging in the activity presenting a potential conflict; take actions to limit the individual's activity; or implement other measures the University deems reasonably necessary to eliminate the potential conflict.

This policy became effective on July 1, 2020, and was revised on November 10, 2020.

University faculty are well situated to help guide public discourse in all matters of interest.  And they are encouraged to do so by the University, professional organizations, and state law.  Laws, regulations, and policies exist in a hierarchy, under which certain rules prevail over others.  In regard to this issue, that hierarchy begins with the U.S. Constitution, particularly the first amendment, which provides that "Congress shall make no law . . . abridging the freedom of speech."[9]  Federal speech protections have been applied to prevent state entities from abridging free speech as well.[10]  The Florida Constitution also contains free speech protections.[11]  Federal and State laws that are passed pursuant to and consistent with the respective constitutions also operate, including the Florida Ethics Code (Fl. St. § 112.311 et seq).  Pursuant to state law, the Florida Board of Governors and the University of Florida Board of Trustees have been given the authority to make rules and regulations governing institutions of higher learning in the state.  Pursuant to that authority, the University Board of Trustees has promulgated regulations, such as the regulation on academic freedom (6C1-7.018) and the regulation of disclosure of outside activities (6C1-1.011) cited above.  Pursuant to BOT regulations, the University of Florida has promulgated policies which may not violate any law or regulation that is further up the hierarchy.  Thus, the Conflicts of Commitment and Interest Policy may not violate any BOT regulation, BOG regulation, state law, federal law, or state or federal constitutional provision.

Furthermore, enforcement of a policy, or the procedures for carrying it out, may not violate laws or regulations further up the hierarchy.  In particular, a perfectly legal and

---

[9] U.S. Const. Amend. 1.
[10] Gitlow v. N.Y.,  268 U.S. 652 (1925).
[11] Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for defamation the truth may be given in evidence. If the matter charged as defamatory is true and was published with good motives, the party shall be acquitted or exonerated.  Fl. Const. Art. I, §4.

appropriate policy may not be enforced in an arbitrary or discriminatory manner without running afoul of a variety of state and federal laws.

It is clear that these regulations and policies overlap and cover a wide array of activities normally undertaken by UF faculty and staff in their professional and personal lives. Academic freedom is the bedrock principle of institutes of higher education, and is the norm under which university employees do their jobs. Academic freedom may be infringed in certain limited circumstances, where a true conflict of interest or conflict of commitment threatens to undermine the employee's duty of loyalty to the university. The following schematic may assist with understanding the complex relations between these duties.



This ad hoc committee has been asked to "gather information and report back to the Faculty Senate on UF practices that reportedly have restricted the ability of UF faculty to engage in outside activities that are normally accepted as appropriate scholarly activities of university faculty. This includes, but is not limited to, expert witness engagement, writing of op ed pieces, and consulting." Because of the narrow scope of the charge, this report will focus on the narrow topic of non-financial conflicts of interest that may interfere with the employee's duties to the university. We are not directly considering issues of academic freedom within the university, such as restrictions on teaching certain subjects, on website information, on syllabi, research interests, and the like. Although we have collected information from faculty concerning such restrictions, and a grievance has been filed regarding a doctoral concentration on critical race studies in the College of Education, they are outside the scope of our charge. Consequently, we have listed those concerns in Section 2.1 below, and have included corresponding material in

Appendix 2.1.  We leave it to the UF Faculty Senate leadership, or the UF Faculty Senate itself, to decide how to proceed with that information.

We were not charged specifically with considering financial conflicts of interest, such as royalty rights, intellectual property, business interests, and the payment for outside activities. Certainly there are instances where outside activities may be compensated, thus raising both financial and non-financial conflicts issues.  But in the charge given, our focus is on substantive and viewpoint restrictions on the activities themselves, and not on the issue of compensation. Although compensation at one time was offered as an excuse for a denial of permission to engage in outside testimony, the University has retreated from that position.  Nonetheless, we are concerned at any attempts to muddy the issues by focusing on compensation rather than viewpoint discrimination and leave it to the UF Faculty Senate leadership, or the UF Faculty Senate itself, to decide how to proceed with questions involving financial conflicts.  Information we gathered involving financial conflicts is available in Appendix 2.1 and 2.2.

We were not charged specifically with questions of conflicts of commitment, which generally concern cases in which a UF employee devotes too much time or energy to an outside activity to the extent that it interferes with that employee's duties to UF.  There seems to be fairly little controversy around conflicts of commitment policies.  Our UF policy defines conflict of commitment generally to occur "when an employee's professional time or energy is devoted to outside activities adversely affecting their capacity to satisfy their obligations to the University of Florida." The UFOLIO process, and most university policies, permit outside activities to occupy up to 8 hours per week of the employee's time, on average.  Since this rule does not appear to be at issue, this committee will take no further notice of conflicts of commitment.

Our sole focus in this report, therefore, will be on *outside* activities that are *non-financial* and do not raise issues of time conflicts.  Furthermore, we will not opine on the legality of the University's outside activities policy, such as whether it generally, or as it was applied in recent situations, violates the free speech rights of any employees.  The AAUP has promulgated a report on the interplay of academic freedom and freedom of speech that may offer some guidance for those interested in pursuing that issue.[12]  Instead, we will turn to the sole question of outside activities, both as to substance and process.

**What is a Conflict of Interest?**

The UF policy defines a conflict of interest as a situation in which an employee's outside activities interfere with, or reasonably appear to interfere with, their professional obligations to the University.  This policy has two parts: 1) identifying the employee's professional obligation to the University, and then 2) identifying if the outside activity interferes with that obligation. To begin with the first task, we can turn to University Regulation 7.003 which defines academic personnel as persons holding positions "having the principal responsibility of teaching and/or research, extension and/or providing administrative functions directly related to the academic mission and accomplishment of the University goals."[13]  Additional personnel, such as curators, librarians, scientists, lecturers, extension agents, P.K. Yonge faculty, postdoctoral associates, fellows, clinical faculty, medical residents, graduate researchers and teaching assistants, among others, also have specific duties to the institution that are defined in the regulation.  Faculty

---

[12] AAUP Report on Academic Freedom of Individual Professors and Higher Education Institutions: https://www.aaup.org/sites/default/files/files/Academic%20Freedom%20-%20Whose%20Right%20(WEBSITE%20COPY)_6-26-02.pdf
[13] 7.003 (1)(b)

members are evaluated annually with regard to fulfilling their assigned duties and responsibilities in the "functions of teaching, including extension work, research, service, and any other duties that may be assigned with the resulting enhancement of learning, cultural advancement, and production of new knowledge."[14]

University faculty have a responsibility to fully and competently perform all duties pertinent to their employment with the University. For simplicity's sake, we shall refer to these duties as teaching, research, extension, and service (including clinical and professional service). The University acknowledges that its policies "shall not violate the faculty member's academic freedom or constitutional rights, nor shall a faculty member be punished for exercising such freedom or rights, either in the performance of University duties or duties outside the University."[15] University Regulation 7.010(1)(d) defines a faculty member's code of professional ethics, and it is provided in full in Appendix 1.1. In simple terms, the University's statement on professional ethics imposes on faculty a duty and responsibility to seek to advance knowledge, to state the truth as he or she sees it, to develop scholarly competence, and to refrain from hampering anyone else's freedom of inquiry. First and foremost, a professor seeks to be an effective teacher and scholar. The critical issue involving outside activities is that "the professor determines the amount and character of the work he or she does outside the University with due regard to his or her paramount responsibilities within it, provided such amount and character of outside employment is in compliance with State law and University and State University System's policies on outside employment."[16]

It seems beyond cavil that the conflict of interest policy clearly identifies conflicts in outside activities as those in which a professor's outside activities conflict with *the professor's* duties to the University, duties defined as teaching, research, service, and extension. The conflict of interest policy does not expressly prohibit a professor from engaging in activities that conflict with the interests of the University, the State, the legislature or executive branch, or other individuals or businesses. In other words, the conflict of interest analysis requires a consideration of whether a professor's outside activities will conflict, either in time or substance or financial interest, with the professor's own duties to the institution. An outside activity that interferes with a professor's ability to meet his or her classes, that interrupts a professor's time and commitment to research, that may induce a professor to alter his or her research, or that pressures a professor to give up the search for truth and instead pursue a position that benefits an outside employer would be examples of such a conflict.

The fact that a professor's research differs from or is opposed to a policy position taken by the State or the University is not directly relevant to the conflict of interest analysis as reflected in university regulations and state law. The only relevant question, as far as the ad hoc committee on academic freedom can determine it, is whether the professor's outside activity conflicts with the professor's own duty to the institution. And since the professor's duty to the institution is defined as searching for truth, acquiring knowledge, and imparting that knowledge to students, so long as the professor is doing so, an outside activity that conflicts with other perceived interests is not a conflict under University regulations.

Of course, the University has a mission that should not be undermined by a professor, but that mission, as stated in the faculty handbook, is teaching, research and scholarship, and

---

[14] 7.010(1)(a).
[15] 7.010(1)(c).
[16] 7.010(1)(d)(4).

service.[17]  That mission includes "enabling students to lead and influence the next generation and beyond for economic, cultural and societal benefit."  Nothing in this statement suggests that a professor's loyalty to the University requires that the professor stifle his or her speech rights to protect the interests of political factions within the State's government.  A professor's duty to the University is a fiduciary duty to the people of the State of Florida to promote truth, acquire and promulgate knowledge, and help shape a better future for Florida, the nation and the world.

To the extent a professor's duty of loyalty to the University might be thought to include a duty not to engage in activities that might jeopardize the University's interest, either because they might cause harm to the University's reputation, might result in the withdrawing of grant funding, or might result in punitive measures taken by political entities, those considerations are not expressly mentioned in any of UF's regulations.  If the professor is appropriately performing his or her duty to the University to pursue knowledge and promulgate the truth, and doing so conflicts with the reputational or political interests of the institution, it would seem that the professor is not in a conflict situation.  The express duties of the professor is to seek truth and acquire knowledge; it is not to forego that search in fear of political reprisal.  In fact, doing so would be a violation of the professor's duty to the institution and to the state which expressly mandates the search for truth and promulgation of knowledge.

Moreover, the decision to punish the University over a professor's work, or to think more critically of the University because of a position taken by a professor in his or her professional judgment, are decisions made by outsiders, decisions that are influenced by countless other factors unrelated to the academic issue propounded by a professor and is not an appropriate element of the conflicts of interest determination.  A fundamental principle of free speech jurisprudence was articulated by Justice Brandeis, who wrote: "If there be time to expose through discussion, the falsehoods and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence."[18]  Because the expressly articulated duty of the professor is the search for and promulgation of knowledge, and that is the core mission of a university, it would seem unreasonable to silence the professor on the basis of amorphous or abstract opinions as to how others might react to that knowledge.

---

[17] *The University of Florida is a comprehensive learning institution built on a land-grant foundation. We are The Gator Nation, a diverse community dedicated to excellence in education and research and shaping a better future for Florida, the nation and the world. Our mission is to enable our students to lead and influence the next generation and beyond for economic, cultural and societal benefit.* The university welcomes the full exploration of its intellectual boundaries and supports its faculty and students in the creation of new knowledge and the pursuit of new ideas.

- **Teaching** is a fundamental purpose of this university at both the undergraduate and graduate levels.
- **Research and scholarship** are integral to the educational process and to the expansion of our understanding of the natural world, the intellect and the senses.
- **Service** reflects the university's obligation to share the benefits of its research and knowledge for the public good. The university serves the nation's and the state's critical needs by contributing to a well-qualified and broadly diverse citizenry, leadership and workforce.

The University of Florida must create the broadly diverse environment necessary to foster multi-cultural skills and perspectives in its teaching and research for its students to contribute and succeed in the world of the 21st century. These three interlocking elements — teaching, research and scholarship, and service — span all the university's academic disciplines and represent the university's commitment to lead and serve the state of Florida, the nation and the world by pursuing and disseminating new knowledge while building upon the experiences of the past. The university aspires to advance by strengthening the human condition and improving the quality of life. (http://handbook.aa.ufl.edu/about-uf/mission-and-plans/).
[18] Whitney v. California, 274 U.S. 357 (1927).

The second phase of the conflicts of interest analysis asks whether a professor's outside activity conflicts with the professor's duty to the University.  So long as a professor's outside activity does not interfere with the professor's time commitments, does not undermine the professor's objective search to acquire knowledge, and represents an honest commitment to professional integrity, there would not seem to be a conflict.  UF's COI website identifies three factors in considering outside activities conflicts: 1) must not compete with or do business with UF, 2) must not interfere with the performance of responsibilities to UF, and 3) must avoid use of UF resources.[19]  None of these factors appear to involve taking a position that is contrary to the politicians of the state or that might even damage the University's reputation or funding stream.  Moreover, determining a professor's commitment to professional integrity is an inquiry that would likely benefit from an examination of that professor's professional organization's mission statement, conflicts policy, and professional code of ethics.  These professional standards cannot be reduced to a simple aphorism that UF is an arm of the state.

UF's Conflicts policy expressly provides that "Employees must avoid situations which interfere with—or reasonably appear to interfere with—their professional obligations to the University."  So long as faculty are able to thoroughly and competently perform their professional obligations to the University, and their outside activities do not undermine their professional duty to acquire and promulgate knowledge, it would seem that view-point-based restraints on their outside activities pose a direct threat to their academic freedom.

**How is a Conflict of Interest Determined?**

The procedure for disclosing and identifying conflicts of interest has changed over the past few years.  For years, professors were expected to disclose outside activities that might present a conflict, or might present an appearance of a conflict, to their immediate supervisors.  If necessary, those disclosure documents would be forwarded to the offices of the relevant deans for record keeping, and the decision to permit the outside activity was usually pro forma and permissive.  There was no centralized office that kept track of disclosures, and decisions about whether a professor's outside activities created a conflict were made by immediate supervisors who were knowledgeable about the professor's work, the professor's duties and responsibilities to the University, and the subject of the outside activity.  The immediate supervisor was generally deemed to be the best judge whether the outside activity hampered the professor's duties to UF.

The UF Conflicts of Interest Program was established to centralize the conflicts of interest determination.  According to the COI website:

The UF Conflicts of Interest (COI) Program is an office established under the purview of the Provost and Senior Vice President for Academic Affairs. The UF COI Program administers UFOLIO (UF Online Interest Organizer), UF's new online reporting system that streamlines, modernizes, and standardizes the way UF employees disclose their reportable outside activities and financial interests. In collaboration with our campus partners, the UF COI Program seeks to identify and manage conflicts of interest that could undermine institutional integrity.[20]

---

[19] https://coi.ufl.edu/wordpress/files/2020/03/UFHR_UFOLIO_ExternalActivities-Legacy.pdf

[20] https://coi.ufl.edu/about/.  Although Florida law was amended to require disclosure of contracts that affect the integrity of state universities in 2020 (Fl. St. § 1012.977), the UF COI procedure was instituted prior to that date.  It

Under the new online disclosure procedure, outside activities must be disclosed and approved in advance under a new, 2-level review.  Level 1 review is done by immediate supervisors such as chairs, directors, and department heads who have direct knowledge of the employee's job duties, understand the nature of the outside activity, and are familiar with the standards of the professional organizations governing that discipline.  For instance, an appropriate level 1 reviewer for a law professor would be the dean of the College of Law who is familiar with American Bar Association standards of conduct and the professor's duties within the institution.  The checklist for the Level 1 Reviewer is available at https://coi.ufl.edu/wordpress/files/2020/05/Level-1-Review-Checklist.pdf and concerns precisely the issues discussed above regarding conflicts of interest, such as time commitment, job performance, whether the activity would inappropriately influence the discloser in their UF role, and whether it would be more appropriate for the faculty member to undertake the activity as part of the faculty member's inside role.

Once a Level 1 review has been undertaken, the request may be forwarded for "ancillary review" if it involves certain issues, such as expert witnessing, intellectual property, research proposals, research/licensing, activities with foreign entities, or legal issues that might require UF attorney review.[21]  There are no guidelines provided on the UFOLIO website for how this ancillary review is to be undertaken or the criteria by which a decision is to be made. Nor is it clear who will undertake the ancillary review, although senior vice presidents and the general counsels office seem to be likely reviewers.

Assuming the disclosure passes the ancillary review, it then proceeds to the Level 2 review, which is undertaken by the COI administrative team.  The Level 2 review consists of identifying risk factors and then identifying the level of scrutiny based on the importance of the risk factors.  The risk factors identified by UFOLIO are:

- Discloser's authority level at UF.
- Discloser's authority level at the outside entity.
- Compensation amount or financial interest involved.
- Level of time commitment involved.
- Whether UF resources or students will be involved.
- Whether entity does business with UF.
- Whether the entity or activity will compete with UF programs or services.
- Whether the activity may adversely impact UF's interests.
- Whether the activity relates to outside research that should be coordinated through UF.
- Whether the entity sponsors discloser's UF research.
- Whether the entity may license UF technology invented by the discloser.
- Whether the activity may result in the discloser creating intellectual property.
- Whether the activity/interest may impair the discloser's ability to faithfully fulfill UF responsibilities.[22]

---

is unclear if the reference to "institutional integrity" in UF's COI policy predated the Florida statute or if it was amended to reflect the new law.
[21] https://coi.ufl.edu/wordpress/files/2020/12/Ancillary-Reviews-Infographic.pdf
[22] https://coi.ufl.edu/wordpress/files/2020/05/UFOLIO-Review-Level-Examples.pdf

Although expert witnessing and legal consulting is identified as a low-scrutiny activity, the UFOLIO guidelines create an exception in cases that might "adversely impact UF's interests." This is the only activity identified on the Level 2 examples worksheet as implicating the amorphous factor of "Whether the activity may adversely impact UF's interests." As one can imagine, however, this amorphous factor could easily swallow everything else and be interpreted to allow the institution to stifle speech and research of professors whenever a professor's activities might be perceived to negatively affect UF's reputation, financial interests, or political support. There is no indication where these thirteen factors came from. Furthermore, decisions to deny an outside activity appear to be final, with Level 2 review appearing to be the last word.[23] There is no appeals process identified.

It is difficult to determine who has responsibility for ancillary and level 2 reviews and, for a faculty member whose outside activity request has been denied, to whom one should lodge an appeal. The Presidential Task Force on Outside Activities released recommendations related to the COI process on November 23, 2021, one of which is the establishment of an appeals process. Requests from members of this ad hoc committee for information on who made the various decisions to deny the outside activities of numerous faculty went unanswered.

**Summary**

Summarizing the foregoing discussion of the relevant laws, policies, and procedures, indicates that the regulations and policies of UF do not define a conflict of interest to be taking a stand that might oppose the interests of the executive branch. In fact, UF regulations and policies clearly define conflict of interest quite narrowly and consistently to be a conflict of time or interest created by an outside activity that threatens to undermine the professor's own duties to the institution. However, the language of Fl. St. § 1012.977, passed in 2020, adds to the conflicts calculation the more amorphous factor of "undermining the integrity of the institution." A major goal of the University's mission is to promote its university faculty as experts.[24] To the extent the COI analysis focuses on balancing the faculty member's inside and outside activities, consideration of the viewpoint or political interests of the University are not warranted.

**1.2 Collective Bargaining Agreement**

Article 10 of the Collective Bargaining Agreement provides for the protection of faculty members' academic freedom. It provides, in relevant part, that

Academic freedom and responsibility are essential to the integrity of the University. The principles of academic freedom are integral to the conception of the University as a community of scholars engaged in the pursuit of truth and the communication of knowledge in an atmosphere of tolerance and freedom. The University serves the common good through teaching, research, scholarship/creative activities, and service. The fulfillment of these functions rests upon the preservation of the intellectual freedoms

---

[23] https://coi.ufl.edu/wordpress/files/2020/04/Visio-DOI-Process-Flow-Chart.pdf
[24] The State University System and the Board of Governors has promulgated a clearinghouse of Florida faculty as experts to promote university-based research activities and opportunities and provide Florida-based expertise and resources to the public sector, business, and industry. See https://expertnet.org/

of teaching, expression, research, and debate. The University and UFF affirm that academic freedom is a right protected by this Agreement in addition to a faculty member's constitutionally protected freedom of expression and is fundamental to the faculty member's responsibility to seek and to state truth as he/she sees it.[25]

To fulfill its responsibilities to faculty to protect academic freedom, the University has agreed that it shall not violate a faculty member's academic freedom, and it will affirmatively protect faculty from external forces aimed at restricting academic freedom.[26]  The rights to academic freedom and responsibilities of the University and the faculty spelled out in the collective bargaining agreement are generally consistent with the University regulations detailed above. However, the University's obligation to protect faculty from external pressures does not appear to be an element in the Regulations that would be binding on the University in cases involving faculty outside the Collective Bargaining Unit.  Article 10.4 details the University's affirmative obligations to protect the academic freedom of faculty.  This includes the obligation to "Maintain, encourage, protect and promote academic freedom so that it is not compromised by harassment, censorship, reprisals, or prohibited discrimination as defined in Article 11, Nondiscrimination. Recognize the right of faculty members to enjoy, without fear of institutional censorship or discipline, the same constitutional rights and freedoms as other individuals."[27]   It is conceivable that the University's initial decision to deny the professors' opportunity to provide expert testimony, or to remove the word "critical" from a program, is a violation of this provision of the Collective Bargaining Agreement to the extent the University participated in the censorship and did not protect the faculty from outside censorship or reprisal.

### 1.3 State Laws

As noted earlier, there are at least two Florida statutes that might have an impact on conflict of interest determinations.  The first is the Florida Code of Ethics, Fl. St. § 112.311 et seq., which requires full and public disclosure of financial interests by public officers and certain designated employees (Fl. St. § 112.3144), prohibits taking gifts and requires disclosure of financial interests by procurement employees (Fl. St. § 112.3148), disclosure of honoraria (Fl. St. § 112.3149), as well as other disclosure requirements.  Specifically, this statute does not apply to UF employees except trustees, the president, vice-presidents, provost, general counsel, and deans.  However, the UF Regulation on Disclosure affirmatively imposes the obligations of the Florida Ethics code onto all UF faculty and staff.[28]  It is unclear how applicable the Ethics Code would be to individual faculty since it speaks primarily of public officers, regulatory agency employees, and the like.

---

[25] Article 10.1, Collective Bargaining Agreement between the University of Florida Board of Trustees and the United Faculty of Florida, 2021-2024, available at: https://hr.ufl.edu/wp-content/uploads/2021/08/2021-2024-UFF-UF-Collective-Bargaining-Agreement.pdf
[26] In order to ensure within the University an atmosphere of academic freedom,
(1) The University shall not apply any provision in this Agreement to violate a faculty member's academic freedom or constitutional rights, nor shall a faculty member be punished for exercising such freedom or rights, either in the performance of University duties or activities outside the University.
(2) The University recognizes that internal and external forces may seek at times to restrict academic freedom, and the University shall maintain, encourage, protect and promote academic freedom. Id. at Art. 10.1(b)
[27] Article 10 is reproduced in Appendix 1.2.
[28] See UF Regulation 1.011(2) https://regulations.ufl.edu/wp-content/uploads/2021/11/1011DisclosureandRegulationofOutsideActivitiesandFinancialInterests.pdf

The second statute is newly enacted § 1012.977 (2020) that requires disclosure of contracts by employees of public universities and that a determination be made that the outside activity does not "affect the integrity of the state university." It is currently unclear how this law can be applied or how it will be interpreted or even whether it can be applied if it stifles the free speech rights of government employees. To the extent this statute enlarges the definition of conflict of interest from that articulated in UF regulations, to include any activity that affects the integrity of the university, this new statute would reflect a significant change to existing law. Moreover, it is unclear how restricting academic freedom does not, in fact, affect the integrity of the state university since academic freedom is the bedrock of institutions of higher learning.

The UF COI policy requires disclosure of contracts for books, for expert witnessing arrangements, and other activities. It is impossible to submit a disclosure form under UFOLIO without uploading documentation regarding outside activities like expert witnessing. In many situations, those contracts are required to remain confidential, and being forced to disclose them to UF, where such documents are likely to be made public, may in fact breach the faculty member's contract. This requirement appears to be a new aspect of the COI policy and might also breach the faculty member's free speech and academic freedom rights. This is a matter that would benefit from further research and consideration by this or another committee.

The Constitution of the State of Florida includes protections for freedom of speech. The relevant language of Article 1, Section 4, provides that "Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." At this time, it is unclear whether the newly enacted § 1012.977 would be interpreted to abridge the liberty of speech of individual faculty members. These are unanswered legal questions that are likely to require litigation before we can answer with any certainty the extent to which speech protections and academic freedom can be restricted by the Legislature or the University pursuant to a conflicts of interest law.

## 1.4 Federal Laws

The First Amendment of the U.S. Constitution provides for freedom of speech. The Amendment prohibits state institutions from restricting protected speech rights of individuals. As an arm of the State, the University of Florida is certainly a state actor and therefore subject to the requirements of the First Amendment. The Supreme Court has generally taken the position that speech should not be restricted unless there is a clear and present danger of violence or harm to others, and that more speech is the antidote to speech with which the state disagrees. Whether the UF conflict-of-interest policy, or its application to the faculty who were denied the ability to engage in outside activities, violates their First Amendment rights is a matter under litigation at this time. This ad hoc committee will not speculate on the complicated legal issue involved in the lawsuit filed by six UF faculty members on November 15, 2021. A somewhat dated but thorough treatment of the legal aspects of the speech and academic freedom issues is provided by the American Association of University Professors (AAUP) in a report authored by Donna Euben, dated May, 2002 and is available at https://www.aaup.org/issues/academic-freedom/professors-and-institutions

The AAUP also has numerous other reports and resources on the interplay between academic speech and the First Amendment at https://www.aaup.org/our-programs/academic-freedom/resources-academic-freedom. A summary of federal cases on the subject is available at https://www.aaup.org/get-involved/issue-campaigns/speak-speak-out-protect-faculty-voice/legal-

cases-affecting-academic. And a report explaining the interplay between academic freedom and the First Amendment is available at: https://www.aaup.org/NR/rdonlyres/57BFFE5E-900F-4A2A-B399-033ECE9ECB34/0/AcademicfreedomandFirstAmenoutline0907doc.pdf.

## 1.5 Policies of Peer Institutions

The range of Conflict of Interest (COI), Conflict of Commitment and outside activities rules and regulations among UF peer and AAU institutions varied and ran the gamut. Appendix 1.5 provides an excerpt of these rules and regulations.  The majority of these policies were collected for the Presidential Task Force on Outside Activities and supplemented by this committee to include AAU and Land Grant institutions.

## 1.6 Legal Complaints - Austin et al. vs. the University of Florida

The filing of a lawsuit in the United States District Court for the Northern District of Florida on November 5, 2021 by three faculty members in the Department of Political Science rocketed the University of Florida into a storm of controversy in the national press concerning academic freedom.[29]  Sharon Austin, Michael McDonald, and Daniel Smith took this step after their requests to serve as expert witnesses in voting rights lawsuits were denied by UF as a conflict of interest.

On July 7, 2021, Smith's UFOLIO request to perform legal consulting for Demos & Perkins Coie was the first to be denied.  The denial indicates that "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."[30] Smith received a second disapproval for "Legal Consulting" on October 11, 2021 with the same rationale.[31]  Smith was to be called as an expert witness in litigation that challenged "SB 90," new legislation regulating voting in  Florida (https://www.flsenate.gov/Session/Bill/2021/90).  The bill was passed by the legislature and signed into law by Governor Ron DeSantis in May 2021.[32]

Professor McDonald's request to provide expert testimony for the law firm of Arnold and Porter was denied on October 13, 2021. This was followed two days later by a denial of a request by Professor Austin to consult for the Advancement Project, a national civil rights organization (https://advancementproject.org/home/).  Both McDonald and Austin sought approval to serve as experts on voting in the state.[33] The denials used identical language -- "UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests. As UF is a state actor, litigation against the state is adverse to UF's interests."[34]

Subsequent to the disapprovals, the suits in which all three were invited to consult were consolidated into one led by the League of Women Voters. All three colleagues are experts in

---

[29] SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, AND DANIEL A. SMITH, v. UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, Plaintiffs, v. the public body corporate acting for and behalf of the University of Florida, W. KENT FUCHS, in his official capacity as President of the University Florida, and JOSEPH GLOVER, in his official capacity as Provost of the University of Florida, Defendants.  UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, GAINESVILLE DIVISION. Case 1:21-cv-00184-MW-GRJ, Document 1. November 5, 2021.  (See exhibit Wright et al. original).
[30] See exhibit DOI00013593.
[31] See exhibit DOI00019899.
[32] See exhibit ACLU Letter Smith Expert Testimony.
[33] WRIGHT et al. v. UNIVERSITY (original)… op cit., p. 2.
[34] See exhibits DOI0019897 and DOI0020370.

voting rights and have consulted on such issues both nationally and in Florida in the past. This is the first time that UF has raised an objection to their outside activity in this regard. In fact, Smith's previous outside work in this area was positively evaluated in his annual reviews.[35]

Austin, McDonald and Smith were joined in their lawsuit by three additional faculty on November 15, 2021.[36]  The added plaintiffs were Jeffrey Goldhagen, a Professor of Pediatrics in the UF College of Medicine, and Professors Teresa J. Reid and Kenneth B. Nunn, of the UF Levin School of Law. Professor Goldhagen had sought permission to serve as an expert witness in *McCarthy et al. vs. DeSantis et al.*, a lawsuit that challenged the Governor's Executive Order 21-175 "Ensuring Parents' Freedom to Choose – Masks in Schools."  Goldhagen is considered an expert in pediatric health and volunteered to testify on a pro bono basis. His request was turned down on August 12, 2021 by Gary Wimsett, head of the UF COI Program, after he filed for permission on UFOLIO. Here the language given for the refusal was similar to that received by Professor Smith  -- "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida." When professor Goldhagen wrote to Mr. Wimsett about appealing the decision the response stated, "[t]here is no mechanism for appealing disapprovals in UFOLIO."[37]

Professors Nunn and Reid were among a number of UF Faculty who expressed a willingness to sign onto an *Amicus Curiae* brief that challenged Florida Senate Bill 7066 which requires those convicted of felonies in the state to pay all financial obligations accruing from their conviction before their voting rights would be restored. Until the new COI policy was adopted in 2020, signing onto *Amicus Curiae* briefs was not subject to approval or UFOLIO review; however, the policy was changed to encompass all briefs which opposed the position of the state of Florida.[38]  Additionally, the Dean of the Law School issued an additional layer of approval for certain entities within the college:

> Entities of the College of Law, such as centers, clinics, or other classes, seeking to participate in such litigation or amicus briefs must separately receive approval from me, the General Counsel, and President Fuchs.[39]

Professors Nunn and Reid were ultimately allowed to sign onto the brief but were not allowed to reveal their affiliation with the UF Levin College of Law. The signatories included 28 faculty from Florida law schools. Only the affiliation of the four UF signatories was omitted.[40]

All six plaintiffs in the lawsuit had carried out similar work without any objection from the UF administration in the past. UF put in place its new Conflict of Interest Policy in July 2020. The policy defines conflict of interest in the following fashion:

---

[35] Ibid, p. 4-5, 8-9.
[36] SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, AND DANIEL A. SMITH, JEFFREY GOLDHAGEN, TERESA J. REID, and KENNETH B. NUNN, v. UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, Plaintiffs, v. the public body corporate acting for and behalf of the University of Florida, W. KENT FUCHS, in his official capacity as President of the University Florida, JOSEPH GLOVER, in his official capacity as Provost of the University of Florida, and LAURA ROSENBURY, in her official capacity as Dean of the Fredric G. Levin College of Law, Defendants.  UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA, GAINESVILLE DIVISION.  Case 1:21-cv-00184-MW-GRJ. Document 19.  November 15, 2021. (See exhibit Wright et al. amended).
[37] Ibid, 13-14.
[38] Ibid, 8-9.
[39] Ibid, 10.
[40] Ibid, 12.

> Conflict of Interest: occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgment or obligations to the University.[41]

From the rationales provided on the rejections, it is unclear how the actions for which the faculty applied for permission were either unprofessional or prevented them from meeting their obligations to the university. Despite the definition above, the policy rejects the idea that there are any definitive rules for determining whether a conflict of interest exists:

> Employees of the University of Florida must adhere to the highest ethical and professional standards. Good judgment is essential and no set of rules can adequately address the myriad of potential conflicts.[42]

The University's new UFOLIO system, that has centralized the decision-making process, authorizes the University to take punitive steps to limit or prevent individual employees from engaging in activities that the University, in its sole discretion, views as a potential conflict of interest.

> Employees must avoid situations which interfere with—or reasonably appear to interfere with—their professional obligations to the University. Such situations might create an appearance of impropriety and, therefore, must be disclosed. As discussed below, Employees will use the UFOLIO system to disclose Outside Activities in which they wish to engage. When the University determines a Conflict of Interest may exist with an Employee, the University may, in its sole discretion, prohibit the individual from engaging in the activity presenting a potential conflict; take actions to limit the individual's activity; or implement other measures the University deems reasonably necessary to eliminate the potential conflict.[43]

Given the wording of the policy it is hard to reconcile the explicit rationale behind the individual decisions. There is no explicit set of rules to guide decision-makers, and the decisions are made at the discretion of the administration. On the face of it, based on the limited sample in this lawsuit, the only consistent factor is that in all these cases faculty were prevented or limited in their ability to participate in lawsuits in which the policies of the current executive administration were challenged in the courts.

Conflict of Interest filings in UFOLIO follow one of two procedures depending on the position of the reporter. In cases of faculty, two determinations are made as to whether a potential conflict of interest may exist. The first is performed by the faculty member's direct supervisor and the second by the Conflict of Interest (COI) Program. So, for instance in the case of Professors Austin and McDonald we assume that Professor Smith, in his role as Chair of

---

[41] "Conflicts of Commitment and Conflicts of Interest," https://policy.ufl.edu/policy/conflicts-of-commitment-and-conflicts-of-interest/
[42] Ibid.
[43] Ibid.

Political Science, approved their requests, but that the negative determination was made by the COI program and was thus communicated by its head Gary Wimsett. Again, the lack of documented rules and procedures make understanding this outcome difficult. We do not know the decision tree here, whether a COI determination overrules that of the supervisor or whether a finding by either leads to disapproval. In the case of Professor Goldhagen, we do not know what position his supervisor took, but we assume that since the disapproval came from Gary Wimsett, that this was the determination made by the COI program.

In the disapproval of Professor Smith and the constraints placed on Professors Reid and Nunn, we know their direct supervisors, Dean David Richardson of the College of Liberal Arts and Sciences and Dean Laura Rosenbury of the Law School, communicated the decisions. The procedure at the level of Deans overseeing Chairs or Directors involves a consultation procedure with other administrative offices at higher levels. It is clear from the amended lawsuit that the restraints put on Professors Reid and Nunn involved imperfect coordination between Dean Rosenbury and Gary Wimsett, and ultimately the invocation of the authority of both Executive Vice President and General Counsel Amy Hass and President Kent Fuchs. No other documents have yet been filed in the lawsuit, including the University's answer, responses to demands to produce documents, or other evidentiary materials.

In order to further understand how and why these decisions were made we contacted members of the central administration. That inquiry did not yield much new information. We started with Assistant Vice President Wimsett in his role as head of the COI program to provide the rationale for why the proposed activities of Austin and McDonald may have been a breach of "their professional judgement or obligations to the University" and for a range of documents relevant to the policy and these specific decisions. He informed us that after consulting with the General Counsel's Office, due to the pending lawsuit, that he could not discuss these issues with the ad hoc committee.

In Wimsett's reply email to the committee he cc'd Associate Vice President and Deputy General Counsel Ryan R. Fuller. As we knew the General Counsel's Office was involved in Smith's decision (more on this below), we asked Associate VP Fuller about all three cases, and requested the same set of documents. He responded in a similar fashion to Assistant VP Wimsett, demurring to participate because of the pending lawsuit. We followed up with a reminder that the documents we requested should be available due to Florida's Sunshine Law. He referred our email to the University of Florida Public Records Request Center and cc'ed Provost and Executive Vice President Joseph Glover. We were not able to obtain further information.

The Smith decision provides the most comprehensive information that we have on a UFOLIO denial. This is also the earliest denial of which we have knowledge, so it is possible that was one of the first cases adjudicated under the new policy. As noted above, the refusal in this case was conveyed by the Dean of the College of Liberal Arts and Sciences, David Richardson. Before making his decision on Smith's request, he communicated with the Office of the General Council which provided him with language for the denial. The General Counsel's Office also directed him to contact the Office of the Executive Vice President for Governmental and Community Relations, Mark Kaplan, to confirm the language.[44] From this it is clear that these two offices and the Conflict of Interest Program were intrinsic to implementing the policy change. Who formulated it and to what end was not made clear by our inquiry. It is possible that the policy change was the product of one or both of these offices. Both the General Counsel and

---

[44] Fall 2021 CLAS Assembly - November 15 2021. https://www.youtube.com/watch?v=968Ch4G7uHw&t=3s

Government and Community Relations Offices report to the Office of the President and the Board of Trustees. We were not able to document the involvement of either of these higher authorities in the decision-making on the cases or what their role was in the reformulation of the Conflict of Interest Policy.

Ultimately, the Office of the President did overturn the Smith, Austin and McDonald denials and created a taskforce to study the policy and reform it. The results of that taskforce's deliberations were made public on November 23, 2021.[45] Given the deadline on our charge, this is where our factfinding on these cases ends.

## 1.7 Grievance filed by Chris Busey

On November 28, Associate Professor Chris Busey filed a grievance through the faculty union alleging that the university violated his academic freedom. The grievance referenced a meeting held between College of Education administrators, Associate Provost Chris Hass, and multiple faculty members from the College of Education. The meeting was held to discuss new College of Education curricular initiatives around race and education that were in the curricular approval process, including a doctoral concentration titled "Critical Studies of Race, Ethnicity, and Culture in Education." Multiple faculty members in attendance reported that Chris Hass stated that University administration was under pressure to avoid doing anything that might provoke the legislature or governor to take a dim view of the University. Specifically, Hass suggested that the jobs of top administrators, including President Fuchs and Provost Glover, were at risk if the university moved forward with any activities out of favor with the current state governing party; should President Fuchs be removed, a political appointee could replace him, such as Richard Corcoran, former speaker of the Florida House and current commissioner of the Florida Department of Education. Furthermore, Hass stated that Mark Kaplan recommended the College of Education not do anything to harm a positive relationship with the state, a relationship that had resulted in funding for the college. After this meeting, college administrators suggested that the concentration be retitled to remove the word "critical."

This grievance suggests that there was implicit but direct influence from the Board of Trustees and political outsiders on internal curricular decisions. In press coverage of the grievance, two state legislators confirmed that university courses and programs about critical race theory are a direct target of pending legislation. According to the Miami Herald:

> "I am heartened to see universities act proactively to get this garbage out of our state," said Sen. Joe Gruters, a Sarasota Republican who is sponsoring legislation that would prohibit the teaching or promotion of "divisive concepts, race or sex scapegoating, or race or sex stereotyping" in state institutions.

> "If I were the University of Florida I would not want to become the example that Randy Fine uses when he is pitching his bill," [Randy] Fine [a Palm Bay Republican] said. "Part of the way that I sell my bills is through stories that prove the point that they are needed."[46]

Press coverage of the grievance filed by Chris Busey through the faculty union suggests that President Fuchs and Provost Glover were under pressure from the Board Trustees to keep

---

[45] Task Force on Outside Activities. Final Report (11/22/2021). https://fora.aa.ufl.edu/docs/147/Final%20Report.pdf
[46] https://www.miamiherald.com/news/politics-government/state-politics/article256260062.html)

faculty from using language or engaging in activities that might provoke the legislature to take a dim view of the University and thus threaten state funding or the jobs of top administrators. UF has responded to press inquiries by saying "the documents you provided contain a number of inaccuracies, and we will address them through the appropriate processes." Which aspects of the reports were inaccurate in UF's view were not specified.[47]

## 2. Reported Incidents

This committee solicited comments and information from faculty across the University, and individual members made themselves available to colleagues as much as possible.  Because many faculty expressed concern about retaliation, we have made efforts to maintain confidentiality by providing summaries of the reported incidents with as little identifying information as possible.

## 2.1 Incidents Reported to the ad hoc committee

Multiple concerns and incidents were reported to members of the ad hoc committee from faculty across the University of Florida.  These can be classified under the different categories of non-financial outside activities, financial outside activities, and inside constraints on academic freedom.  Faculty members reported numerous issues of restriction of activities along all three of these axes. Ad hoc committee members received the following comments:

a. Non-financial outside activities
- Concern that denials for outside activities were tied to questions of race and ethnicity.
- UF and the State of Florida are not one and the same, and that UF serves the people of Florida, not the politicians who happen to be in power during any given administration. "The mission of UF is to develop and disseminate knowledge."
- I'm sure it comes as no surprise, but I think UF should dump the task force and refer this to Committee A of the AAUP: https://www.aaup.org/our-programs/academic-freedom/committee-procedures.  The university administration has lost all credibility on my side of campus, and given the perception they are too frightened to lead I think only doing something that demonstrates they realized how serious this is would help right the ship. Otherwise, I'm guessing we'll see lots of retirements and job hunting and rejections from applicants we're recruiting.
- In partnerships between the University of Florida and a State of Florida government entity, there are reported inconsistencies in procedures related to access to deidentified data, disposition of deidentified data, destruction of deidentified data, and publication of deidentified data, specifically related to Covid-19 compared to prior partnerships. One illustrative example relates to reports that the government entity created barriers to and delayed publication of Covid-19 data which were collected collaboratively.
- Reports that University of Florida employees were told verbally not to criticize the Governor of Florida or UF policies related to Covid-19 in media interactions.

---

[47]Divya Kumar, "At UF, someone used 'critical' and 'race' in a sentence. Trouble ensued." Tampa Bay Times, https://www.tampabay.com/news/education/2021/11/30/at-uf-someone-used-critical-and-race-in-a-sentence-trouble-ensued/ (December 1, 2021) and Emma Pettit, "'It Just Felt Wrong': U. of Florida Faculty Say Political Fears Stalled an Initiative on Race." The Chronicle of Higher Education, https://www.chronicle.com/article/it-just-felt-wrong-u-of-florida-faculty-say-political-fears-stalled-an-initiative-on-race (November 30, 2021)."

- Since early 2020, the College of Medicine and UF Heath has been in the spotlight because of the Covid19 pandemic. The desire of many UF faculty with very relevant expertise to provide guidance was and still is high. It was clear from early in the pandemic that non-medical staff UF Health Shands were principle spokesmen for the University on pandemic-related issues. Restrictions to speak out and provide op-ed pieces and commentary were individually imposed as specific instructions from the Office of the SVP and staff. Restrictions included not using their UF titles and UF affiliation in written commentary. Oral presentations were discouraged or not authorized. There is a palpable feeling of fear among tenured and non-tenured COM faculty of reprisal if they speak out on these issues.
- The hiring of Dr. Joseph Ladapo has also had a demoralizing effect on some faculty, particularly junior faculty, but there is fear of speaking out. For this particular hiring, faculty had a 48-hour turnaround time for comments.
- Concern was expressed by some faculty interviewed that COM/UF Health facility expansion funding in the state would be in jeopardy if the state administrative branch policy on pandemic regulations were not followed in opinion articles by medical faculty.
- IFAS Regulations, 6.015 Outside Activity Guidelines (5) states that IFAS faculty are not able to give expert testimony in their field in the State of Florida. There is support within the current IFAS administration to remove that restriction and to have IFAS in-line with the rest of UF. This restriction has been troublesome for some faculty who have been asked to give expert testimony.
- IFAS has had one widely publicized situation related to restrictions on speaking by a faculty member with internationally recognized expertise in biotechnology. It was claimed that a former SVP in response to a UF administrative directive requested this limitation on speaking activities.
- Veterinary Medicine: Limited interviews were conducted. These did not provide evidence of restrictions on outside activity. There were concerns about restrictions on intellectual property issues and commercialization of research

b. financial outside activities
- Comments that the view-point discrimination of the professors' denial to participate in lawsuits was not a question of pay or pro bono, and that payment for outside activities is a red herring and "truly outrageous."
- Concerns were expressed about disclosure of potentially confidential contracts covering books or other activities.
- Comments that UF was unreasonably claiming Intellectual Property rights.

c. Inside constraints on academic freedom
- Grievance filed by Professor Chris Busey to remove the term "critical" from a doctoral concentration in the College of Education is indicative of the fear that many feel when teaching or researching about race or ethnicity.
- Comments were provided that websites were required to be changed, that course syllabi had to be restructured, and that use of the terms "critical" and "race" could not appear together in the same sentence or document.

**2.2 Incidents Reported to the Faculty Senate**

      The Faculty Senate Chair received emails from faculty members reporting incidents affecting their ability to participate in outside activities. Several of these emails were outside the scope of the committee's charge and are summarized in Appendix 2.2.

      Relevant to the committee's charge, faculty raised concerns about the university's policy on communicating with the legislature in a personal capacity. Numerous faculty reported concerns with the university policy that lobbying the legislature in a personal capacity requires approval from a supervisor. The legality of this policy was questioned although we could not confirm where the policy exists or if this continues to be the policy. Similarly, faculty expressed concerns about possible repercussions if they speak in opposition to the views of UF or the state government on social media platforms or even in the workplace. Finally, faculty reported that approval to participate in Speaker's Bureaus was difficult to obtain. Speaker's Bureaus provide an opportunity for clinicians to disseminate information and collaborate with industry. The rationale behind UF's restriction on this practice was questioned.

**a. Concerns over academic freedom within the university**

      Although issues of academic freedom within the university, such as restrictions on teaching certain subjects, on website information, on syllabi, research interests, and the like, were outside the scope of this committee's charge, we received reports from faculty members about such issues. Issues reported included:

- Content from college, program, or center websites asked to be removed
- Curricular proposals asked to be delayed or altered

In reported cases, the reason for such requests appeared to be that such content conflicted with a position taken by political actors or factions within the State government.

      In addition, we received reports from faculty who had not been specifically asked to alter their research agendas or curricular content but who were concerned that their work may put them at odds with political actors and were unsure how to proceed. Such a climate of self-censorship is chilling at an institution that strives to be considered among the nation's most elite.

**b. Concerns over the treatment of financial conflicts**

      Financial conflicts of interest were outside the scope of the committee's charge, yet the committee received reports from faculty members about UFOLIO issues related to financial conflicts of interest that UF Faculty Senate leadership or UF Faculty Senate itself may wish to address. Specifically, faculty reported:

- UF's policy on intellectual property is not aligned with peer institutions. UF claims a right to all intellectual property (IP) within a researcher's discipline or area of expertise that is created by a UF faculty member while employed at UF. UF's position is that this right includes IP generated during paid outside consulting work. Many peer institutions only claim a right to IP when the invention was developed using university facilities, resources, or funds, as part of employment. UF's IP policy may preclude faculty from engaging in some outside consulting work because companies hiring an outside consultant will not sign over IP rights.
- UF's policy that the identities of all potential clients be revealed through the UFOLIO process has prevented faculty from doing some consulting work, including reviewing

patents. Faculty expressed interest in a process by which potential clients could be vetted for possible conflicts while retaining confidentiality.

- IFAS's policy that prevents faculty from providing any in-state consulting or expert witness for pay as a condition of employment may be out of date.


### 3. Perspectives of the Press

When news of the denial of the three political science professors hit the press in mid-October 2021, the local and national press have been regularly reporting on the state of academic freedom at UF.  The issue was quickly picked up in the academic press such as the Chronicle of Higher Education and Inside Higher Education.  The ad hoc committee has collected many of these articles and some of those are reproduced in **Appendix 3.1 (Academic Press)** and in **Appendix 3.2 (Regular Press).**  This issue has gripped the academic community with as many as fifteen articles appearing just in the Chronicle of Higher Education in the past six weeks. Dozens of articles have appeared in the New York Times, the Washington Post, the Los Angeles Times, the Miami Herald, the Tampa Bay Times, and the Gainesville Sun.  The professors involved in the lawsuit have appeared on CNN and other national broadcast news.

The press coverage has been predominantly, if not entirely, negative, from simply reporting on the events as unusual and serious incursions on academic freedom to insinuating that the University of Florida has become an arm of the DeSantis administration.  Press coverage has suggested that the situation is serious enough to warrant outside investigations by accrediting organizations and the United States House of Representatives, and has spurred letters from the American Association of University Professors (AAUP) among others.  It is not an exaggeration to state that the firestorm of negative press prompted senior administration officials at UF to reverse its denial of permission to the professors to testify, to appoint a presidential administrative task force to make policy recommendations to revise UF's COI policy, and to convince faculty that protecting academic freedom is a priority.  None of the administration's response, however, addresses the deeper questions raised by this report of incursions inside the institution involving program names, course materials, syllabi, and the like, and the filing of the grievance by Professor Chris Busey reflects the fact that the administration's hasty and limited response does not address the systemic problems identified here.  More significantly, the administration's revision of the COI policy does not address the serious reports of efforts to stifle the scientific and medical community's research into and professional duty to report the developing scientific information on Covid-19.

### 4. Outside Investigations

On November 2, 2021, the Southern Association of Colleges and Schools' Commission on Colleges (SACSCC) announced that it would investigate UF's alleged infringement of the academic freedom rights of its faculty.[45] That investigation is ongoing, UF has filed a response and this ad hoc committee has no further information on its activity and is awaiting the SACSCC response. The SACSCC letter requesting information and UF's response are provided in Appendix 4.

On November 18, 2021 the U.S. House Subcommittee on Civil Rights and Civil Liberties launched an investigation into whether UF had violated the first amendment rights of its

faculty.[48]  Representatives Debbie Wasserman Schultz and Jamie Raskin expressed deep concern that UF was censoring its faculty based on viewpoint.  In their 10-page letter, Representatives Wasserman Schultz and Raskin stated:

> We are concerned that UF is censoring its faculty based on viewpoint, which would set a dangerous precedent that flies in the face of its own commitment to freedom of expression.  We are also concerned that, possibly due to pressure from trustees, politicians, or others, UF has adopted and enforced a conflicts policy that undermines the academic and free speech values that are essential to American higher education. As one of the top five public research universities in the nation, UF must ensure that it is not creating the appearance of anticipatory obedience or that it is responding to political pressure in deciding which speech activities it will permit.

Further, the letter stated:

> The Subcommittee is investigating the extent to which your university's actions have undermined the integrity of academic freedom and interfered with employees' constitutional right to speak freely as private citizens on matters of great public concern. In addition, we seek to understand the extent to which federally funded universities use conflicts-of-interest policies to censor employees who oppose the interests of the political party in power.

The Congressional investigation demanded that UF produce numerous documents involved in the amendments to UF's COI policy and the actions that led to the denial to testify or participate in amicus briefs set forth in the professors' lawsuit.  The Congressional Letter is reproduced in Appendix 4. This ad hoc committee requested the same information be provided to it, but our requests were denied.

## 5. Response of the Board of Trustees

At the December Board meeting of the UF Board of Trustees, Board Chair Morteza "Mori" Hosseini commented on the negative press that UF has been receiving around this issue of outside activities.  His comments are provided in full in Appendix 5.  Chair Hosseini stated that the motivation for the revised COI policy was " faculty members taking second jobs using the university's state resources for their own personal gain. . . [and] faculty members who use their positions of authority to improperly advocate personal political viewpoints to the exclusion of others."[49] It is unclear how either of those supposed improprieties are implicated in any of the events that spurred this committee's report.

## 6. Summary

As noted numerous times above, the charge of this task force was to do as much fact-finding as we could do in the limited time allowed. Consistent with our charge, we have collected extensive information on UF regulations and its COI policy, the lawsuits and outside investigations, state and federal laws, the policies of some peer institutions, the contract rights of

---

[48] https://www.miamiherald.com/news/local/education/article255928881.html

[49] Hosseini comments, p. 11.

those within the collective bargaining unit, and articles in the academic and regular news around the most recent events.  Perhaps most importantly, we have solicited input from our faculty colleagues and collected anecdotal reports of censorship and/or denials of faculty rights to do their job to search out and promulgate knowledge.  As the integral element of an institution of higher learning, UF faculty must be free to do their job unhampered by political pressure or fear of reprisals.  The professional organizations that govern most of our disciplines clearly demand academic freedom and a workplace free of censorship.  It is evident that faculty throughout UF are feeling greater and greater pressure to conform to political pressures and to stifle or modify their speech and research to avoid retaliation.  It is also clear that this pressure is coming from the senior UF administration and not just from the COI office.  The charge of this ad hoc committee was to look primarily at outside activities, but it was evident from faculty comments that there have been incursions on academic freedom within the institution, such as pressure to alter one's research, change websites or course names, and even to change course content.  There were also extensive comments provided about the University's IP policy and attacks on the academic freedom of faculty doing research in foreign countries.

This task force simply did not have the resources or the time to fully investigate these reports or their legal and policy implications.  Faculty did express discontent about political interference with our mission, that academic freedom is under attack, and that we will likely lose faculty as a result.  We hope this report provides an opportunity to ultimately address these concerns and contribute to enhancing the integrity and mission of UF as a respected institution of higher learning so that the people of Florida will benefit from a world-class institution that they have paid so much to create and support and to which they are so deserving.

# Appendices

**Appendix 1.1**

**UF Regulation 7.018 Academic Affairs; Academic Freedom and Responsibility.**

(1) Academic Freedom and Responsibility.

(a) The University believes that academic freedom and responsibility are essential to the full development of a true university and apply to teaching, research, and creativity. In the development of knowledge, research endeavors, and creative activities, the faculty and student body must be free to cultivate a spirit of inquiry and scholarly criticism and to examine ideas in an atmosphere of freedom and confidence. The faculty must be free to engage in scholarly and creative activity and publish the results in a manner consistent with professional obligations. A similar atmosphere is required for university teaching. Consistent with the exercise of academic responsibility, a teacher must have freedom in the classroom in discussing academic subjects selecting instructional materials and determining grades. The university student must likewise have the opportunity to study a full spectrum of ideas, opinions, and beliefs, so that the student may acquire maturity for analysis and judgment. Objective and skillful exposition of such matters is the duty of every instructor.

(b) The established policy of the University continues to be that the faculty member must fulfill his/her responsibility to society and to his/her profession by manifesting academic competence, scholarly discretion, and good citizenship. The university instructor is a citizen, a member of a learned profession, and an academic officer of the University. The instructor should be constantly mindful that these roles may be inseparable in the public view, and should therefore at all times exercise appropriate restraint and good judgment.

(2) Academic freedom is accompanied by the corresponding responsibility to:

a. Be forthright and honest in the pursuit and communication of scientific and scholarly knowledge;

b. Respect students, staff and colleagues as individuals and avoid any exploitation of such persons for private advantage;

c. Respect the integrity of the evaluation process with regard to students, staff and colleagues, so that it reflects their true merit;

d. Indicate when appropriate that one is not an institutional representative unless specifically authorized as such; and

e. Recognize the responsibilities arising from the nature of the educational process, including such responsibilities, but not limited to, observing and upholding the ethical standards of their discipline; participating, as appropriate, in the shared system of collegial governance, especially at the department/unit level; respecting the confidential nature of the relationship between professor and student; and adhering to one's proper role as teacher, researcher, intellectual mentor and counselor.

**UF Regulation 7.010(1)(d) – Statement on Professional Ethics**

1. The professor, guided by a deep conviction of the worth and dignity of the advancement of knowledge, recognizes the special responsibilities devolving upon members of the profession. The professor's primary responsibility to his or her field is to seek and to state the truth as he or she sees it. To this end, the professor devotes himself or herself to developing and improving his or her scholarly competence. The professor accepts the obligation to exercise critical self-discipline and judgment in using, extending and transmitting knowledge. The professor must never seriously hamper or compromise anyone's freedom of inquiry.

2. As an instructor, the professor encourages the free pursuit of learning in students. The professor maintains and represents the best scholarly standards of his or her discipline. The professor demonstrates respect for the student as an individual, and adheres to the proper role of intellectual guide and counselor. The professor makes every reasonable effort to foster honest academic conduct and to assure that evaluation of students reflects their true merit. The professor respects the confidential nature of the relationship between professor and student. The professor avoids any exploitation of students for private advantage and acknowledges significant assistance from them. The professor protects their academic freedom.

3. As a colleague, the professor has obligations that derive from common membership in the community of scholars. The professor respects and defends the free inquiry of associates. In the exchange of criticism and ideas the professor shows due respect for the opinions of others. The professor acknowledges academic responsibilities and strives to be objective in professional judgment of colleagues. The professor accepts his or her share of faculty responsibility for the governance of the University.

4. As a member of the University, the professor seeks above-all to be an effective teacher and scholar. The professor observes the stated regulations of the institution, provided they do not contravene academic freedom, but nonetheless maintains the right to criticize and seek revision. The professor determines the amount and character of the work he or she does outside the University with due regard to his or her paramount responsibilities within it, provided such amount and character of outside employment is in compliance with State law and University and State University System's policies on outside employment. When considering the interruption or termination of employment, the professor recognizes the effect of this decision
upon the programs of the University and gives due notice of his or her intentions.

5. As a member of the community, the professor has the rights and obligations of any citizen. The professor measures the urgency of these obligations in light of responsibilities to his or her field, to students, to the profession, and to the University. The professor, when speaking or acting as a private person shall avoid creating the impression that he or she speaks or acts for the college or the University. As an individual engaged in a profession that depends upon freedom for its health and integrity the professor has a particular obligation to promote conditions of free inquiry and to further public understanding of academic freedom.[50]

---

[50] 7.010(1)(d)

**UF Conflicts of Interest Policy – available at https://policy.ufl.edu/policy/conflicts-of-commitment-and-conflicts-of-interest/**

**1. Policy Statement and Purpose**

The University of Florida encourages its Employees to engage in activities supporting their professional growth, creating new knowledge and ideas, and furthering the University's mission of excellence in education, research, and service. University Employees' primary professional obligation, however, is to act in the best interest of the University and to maintain the highest ethical and professional standards. A University Employee's Outside Activities or interests must not conflict, or appear to conflict, with their professional obligations to the University of Florida. Accordingly, this Policy establishes standards and requirements to protect the University's financial wellbeing, reputation, and legal obligations and provides a system for identifying, reporting, and managing real or apparent conflicts.

**2. Applicability**

All University Employees as defined below. To the extent this Policy conflicts with other University policies or procedures, this Policy shall control.

**3. Definitions**

*Conflict of Commitment:* occurs when a University Employee engages in an Outside Activity, either paid or unpaid, that could interfere with their professional obligations to the University.

*Conflict of Interest:* occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgement or obligations to the University.

*Employee:* University Faculty or Staff as defined herein.

*Entity:* any business, company, or other organization, whether public or private, including without limitation any partnership, corporation, limited liability corporation, unincorporated association, or other institution or organization, whether for-profit or not-for-profit.

*Faculty:* all positions identified as Academic Personnel in the University of Florida Regulation 7.003 Academic Personnel Employment Plan.

*Financial Interest:* Any monetary or equity interest held by or inuring to an Employee or their Immediate Family Member which would create an actual or apparent Conflict of Interest.

*Immediate Family Member:* an Employee's spouse, domestic partner, child or stepchild, parent, parent-in-law, sibling, and anyone sharing the employee's household (other than a tenant or employee).

*Outside Activity:* any paid or unpaid activity undertaken by an Employee outside of the University which could create an actual or apparent Conflict of Commitment or Conflict of

Interest. Outside Activities may include consulting, participating in civic or charitable organizations, working as a technical or professional advisor or practitioner, or holding a parttime job with another employer.

*Reportable Outside Activity:* any Outside Activity that is required to be disclosed to the University through the UFOLIO system.

*Staff:* any regular, non-exempt or exempt employee in research, academic, or administrative positions, including Technical, Executive, Administrative and Managerial Support (TEAMS) staff; University Support Personnel System (USPS) staff; and Other Support Personnel (OSP) as defined in University of Florida Regulation 1.100.

## 4. Conflicts

### A. Guiding Principles

Employees of the University of Florida must adhere to the highest ethical and professional standards. Good judgment is essential and no set of rules can adequately address the myriad of potential conflicts. If Employees have questions concerning a potential conflict of commitment or conflict of interest, they must first discuss these concerns with their supervisor[1]. Real or apparent conflicts must be managed or disclosed as set forth in section 5 below.

### B. Conflicts of Commitment

University Employees must commit their primary professional and intellectual energy towards supporting the University's mission of excellence in education, research and service. A Conflict of Commitment occurs when an Employee's professional time or energy is devoted to Outside Activities adversely affecting their capacity to satisfy their obligations to the University of Florida.

Conflicts of Commitment usually involve time allocation. For instance, when an Employee attempts to balance their University responsibilities with Outside Activities such as consulting or volunteering, they may be left with inadequate time to fulfil their University responsibilities adequately.

Employees wishing to engage in an Outside Activity that may present a Conflict of Commitment—however insignificant it may seem to the Employee—must disclose the Outside Activity to their supervisor and receive approval for before engaging in the outside activity. Irrespective of disclosures, it is the responsibility of University supervisors (in the case of Faculty, their department chairs and deans) to identify and manage any Conflicts of Commitment undertaken by their direct reports.

If the University determines an Outside Activity will result in a Conflict of Commitment, the University may, in its sole discretion, prohibit the individual from engaging in the activity; require the individual take personal time off or a leave of absence to participate in the activity; or implement other measures the University deems reasonably necessary.

## C. Conflict of Interest

Employees must avoid situations which interfere with—or reasonably appear to interfere with—their professional obligations to the University. Such situations might create an appearance of impropriety and, therefore, must be disclosed. As discussed below, Employees will use the UFOLIO system to disclose Outside
Activities in which they wish to engage. When the University determines a Conflict of Interest may exist with an Employee, the University may, in its sole discretion, prohibit the individual from engaging in the activity presenting a potential conflict; take actions to limit the individual's activity; or implement other measures the University deems reasonably necessary to eliminate the potential conflict.

## D. Intellectual Property

The University's mission includes fostering invention and the development of new patentable and non-patentable ideas, technologies, methodologies, copyrights and other creations of the human mind. The University attempts to license many of these innovations to commercial entities so the fruits of this innovation may reach the marketplace for the public good and provide resources for further innovation. The University, therefore, must be protected from both real and perceived disclosure of intellectual property with entities in which University inventors have personal or financial interests or are adverse to the University's interest. More information, including applicable definitions, the University's ownership rights to inventions and works can be found in the University's Intellectual Property Policy located here: http://generalcounsel.ufl.edu/media/generalcounselufledu/documents/IntellectualProperty-Policy.pdf

## 5. Disclosure Requirements

## A. When to Disclose

1.
   1. Conflict of Interest:
      Regardless of whether an Outside Activity occurs during a University assignment or appointment, Employees must disclose certain Outside Activities and Financial Interests through the UFOLIO system (and receive approval through the UFOLIO System prior to commencing such activities or pursuing such interests), which may lead to a Conflict of Interest under the following circumstances:
      1. Upon initial hiring or engagement with the University;
      2. Prior to acquiring a new Financial Interest;
      3. Prior to engaging in, or committing to engage in, an Outside Activity;
      4. Prior to accepting a position or role which could reasonably be perceived as creating a Conflict of Interest;
      5. Prior to entering a relationship, including a familial relationship, which could reasonably be perceived as creating a Conflict of Interest; and
      6. At least annually, even if attesting to no change from previous disclosures.

Employees failing to receive approval through the UFOLIO system prior to commencing an Outside Activity as required herein may be subject to administrative or disciplinary action as set forth in section 7 below. The absence of express disapproval of an outside activity does not constitute approval by the University.

Regarding the annual reporting obligation in section 5(A)7 above, Employees must annually disclose their Financial Interests and Outside Activities existing at that time or which existed in the previous calendar year. The University will make efforts to provide courtesy notice to Employees at least 30 days prior to their annual disclosure date. However, the failure to provide such notice or the failure of an Employee to receive such notice does not relieve an Employee of the obligation to make a timely annual disclosure.

**2. Conflict of Commitment:**

Employees must disclose to their supervisor any Outside Activity that may create a Conflict of Commitment, either alone or together with other Outside Activities, before engaging in the Outside Activity. Irrespective of whether an Outside Activity is disclosed, however, it is the responsibility of all supervisors to identify any Conflicts of Commitment undertaken by their direct reports and manage it appropriately. If a supervisor is unsure whether a given activity poses a Conflict of Commitment or how to manage it, the supervisor should consult with the dean or vice president to whom they report.

**B. What to Disclose**

**The following potential Conflicts of Interest and Outside Activities must be disclosed as provided below:**

1.
    1. Management or Material Interest: You, your spouse, dependent children, or relatives have a management position (e.g., officer, director, partner, proprietor), or a material (more that 5% ownership interest in the entity) financial interest in an entity that enters into any agreements or contracts with UF (e.g., service agreements, leases, sales agreements).
    2. Publicly-Traded Entity Payments/Ownership: You, your spouse, or dependent children receive payments or have an ownership interest of $5,000 or more (including shares, partnership stake, or derivative interests such as stock options) in a publicly-traded entity where the ownership interest reasonably appears to be related to your institutional responsibilities. [Note: This does not include if the ownership interest is managed by a third party such as a mutual or retirement fund.]
    3. Privately-Held Entity Ownership: You, your spouse, or dependent children have any ownership interest in a privately held entity where the ownership interest reasonably appears to be related to your institutional responsibilities.
    4. Public Office/Candidate: You are a candidate for public office or you hold public office.

5. Outside Teaching Appointments: You have or you are seeking approval to hold a teaching appointment with any entity other than UF.

6. Outside Research: You conduct or you are seeking approval to conduct any research at, or receive any research funding from or through, any entity other than UF. [Note: Research conducted at outside entities as part of a UF sponsored project or research funding received by UF does not need to be disclosed.]

7. Classroom Works: You require or you are seeking approval to require students to purchase works used in your classroom you or your spouse created, authored or co-authored (e.g., textbook(s), computer software, electronic or digital media) and for which you or your spouse will receive, or anticipate receiving payment, loan, subscription, advance, deposit of money, service, or anything of value.

8. Royalties/Licensing/Copyright Income: You receive royalties, licensing fees and/or copyright income in excess of $5000 annually from an entity other than UF.

9. Expert Witness/Legal Consulting: You serve or you are seeking approval to serve as an expert witness and/or engage in consulting in a legal matter like a lawsuit or a potential lawsuit.

10. Professional Services Related to UF Expertise: You provide or you are seeking approval to provide paid or unpaid professional services to an outside entity and the professional services relate to your UF expertise.

11. Leadership Roles: You have a senior management, administrative, or leadership role, whether paid or unpaid, with an outside entity related to your UF expertise where you make executive business and/or financial decisions on behalf of the outside entity.

## C. How to Disclose

1.

1. Conflict of Interest. Outside Activities and Financial Interests required to be disclosed under this Policy can be found at, and shall be made through, the University's online reporting system, UFOLIO or as otherwise directed by the Office of the Provost for non-faculty employees. UFOLIO, including disclosure instructions, FAQ and other information, can be accessed here: https://compliance.ufl.edu/ufolio/

2. Conflict of Commitment. Disclosure of a potential Conflict of Commitment shall be made to the University Employee's supervisor in the manner specified by the respective Employee's department. In the absence of a specified manner for approval of a Conflict of Commitment, the Employee must at least obtain approval from the Employee's supervisor in writing and in a form that demonstrates the supervisor was informed of the full extent of the Outside Activity and commitment prior to approval. Outside Activities presenting a potential Conflict of Commitment must be disclosed and approved before the Employee undertakes the activity.

## D. Failure to Disclose

1. Failure to disclose a Reportable Outside Activity by a respective deadline shall result in a written notification from the University, with copies to the Employee's supervisor, department chair and dean, directing the Employee to complete their disclosure within 10 business days.

2. Failure to disclose more than 10 business days following the receipt of a delinquency notification shall result in a written reprimand from the University, with copies to the Employee's supervisor, department chair and dean, as applicable, indicating the Employee must complete their disclosure within 10 business days.

3. If an Employee fails to disclose more than 10 business days following receipt of a written reprimand, the University may take administrative or disciplinary action against the Employee up to and including  termination of employment.

4. Failure to make truthful and complete disclosure of all Reportable Outside Activities or Conflicts of Commitment may subject the Employee to administrative or disciplinary action as set forth in section 7 below.

## 6. Review and Adjudication

For activities and interests disclosed through UFOLIO, the Assistant Vice President for Conflicts of Interest and, depending upon the type of activity or interest, other applicable designated University officials, will determine whether a disclosed activity, interest or circumstance presents a Conflict of Interest. In addition to an Employee's obligation to report a potential Conflict of Commitment to the Employee's supervisor, University supervisors shall be responsible for identifying any Conflict of Commitment of their direct reports and managing the conflict appropriately.

## 7. Policy Violations

The University may take administrative or disciplinary action concerning violations of this Policy up to and including termination of employment.

11/22/2021

# Task Force on Outside Activities

Final Report



Submitted to University of Florida President Kent Fuchs

**Introduction.**

On November 5, 2021, President Kent Fuchs announced to the university community the formation of a task force to "review UF's practice regarding requests for approval of outside activities involving potential conflicts of interest and conflicts of commitment."  He continued, "In particular, the task force will make a recommendation to me on how UF should respond when employees request approval to serve as expert witnesses in litigation in which their employer, the state of Florida, is a party.  I'm asking the task force to provide me with a preliminary recommendation by Monday, November 29."

In the same memo, he announced the members of the task force:

- Joe Glover – Provost and Chief Academic Officer, Task Force Chair
- Katie Vogel Anderson – Clinical Associate Professor, College of Pharmacy (former Faculty Senate Chair)
- Hub Brown – Dean, College of Journalism and Communications
- Clay Calvert – Professor of Law and Professor of Journalism and Communications, Brechner Eminent Scholar and Director, Marion B. Brechner First Amendment Project
- Terra DuBois – Chief Compliance, Ethics & Privacy Officer, UF
- John Kraft – Professor and Susan Cameron Chair of International Business, Warrington College of Business
- Laura Rosenbury – Dean, Levin College of Law

To preserve the historical record, we note that in the same November 5 memo, President Fuchs also announced: "Without prejudice regarding the task force recommendations, I have also asked UF's Conflicts of Interest Office to reverse the decisions on recent requests by UF employees to serve as expert witnesses in litigation in which the state of Florida is a party and to approve the requests regardless of person compensation, assuming the activity is on their own time without using university resources."

**The Task Force Charge.**

The Task Force understood its charge to recommend "how UF should respond when employees request approval to serve as expert witnesses in litigation in which their employer, the state of Florida, is a party."  Task Force members have focused considerable attention and effort on this charge.  In general, the recommendations contained in this report are narrowly constructed to address the charge as stated.  There are some recommendations that stray beyond the charge, but these arose from recommendations developed to address the charge that seem to have more general applicability.

In the course of their work, Task Force members became aware that some members of the university community believe the Task Force was charged with investigating the circumstances that led to its formation.  At no time was this Task Force asked to do any sort of investigation.

When a faculty member wishes to serve as an expert witness in litigation in which their employer, the State of Florida, is a party, the faculty member is required to disclose that activity to the university.  The disclosure in the UFOLIO system initiates an internal analysis to determine whether the activity poses a conflict of interest.  The Task Force asked two questions about this analysis.  First, does the university policy that underlies and informs this analysis need revision?  Thanks largely to the participation of two legal scholars on the Task Force, we were able to have a nuanced discussion of First Amendment

principles and how they can and should apply in this context.  The Policy Recommendations section below contains the fruits of that discussion.  There was unanimous agreement among the members of the Task Force to forward these recommendations.

The second question the Task Force asked is the following.  Does the university process that underlies and informs the analysis need revision?  The Process Recommendations section below contains several suggestions for improving the transparency of the process, faculty participation in the process, and the opportunity to appeal decisions.  There was unanimous agreement among the members of the Task Force to make these recommendations.

**Policy Recommendations.**

The Task Force recommends adopting a policy that does the following:

- Publicly affirms the academic freedom of faculty when performing their duties as teachers and scholars;

- Publicly affirms the free speech rights of faculty and staff to comment on matters of public concern set forth by the First Amendment to the U.S. Constitution and Article I, Section 4 of the Florida Constitution;

- Clarifies that such comments, including those to the media, are not reportable as outside activities when made by faculty and staff in their capacities as individual citizens and not on behalf of another person or entity;

- Emphasizes that comments on matters of public concern become reportable outside activities, subject to university review for potential conflicts of interest or conflicts of commitment, as defined in UF policy and the Collective Bargaining Agreement between the UF Board of Trustees and the United Faculty of Florida, when faculty and staff seek to testify as expert witnesses on behalf of a party in litigation;

- Establishes a strong presumption that the university will approve faculty or staff requests to testify as expert witnesses, in their capacities as private citizens, in all litigation in which the State of Florida is a party, regardless of the viewpoint of the faculty or staff member's testimony and regardless of whether the faculty or staff member is compensated for such testimony.  This presumption is particularly important in cases that challenge the constitutionality, legality, or application of a Florida law;

- Imposes a heavy burden on the university to overcome the strong presumption set forth above, such that requests to serve as expert witnesses in litigation in which the State of Florida is a

party may be denied only when clear and convincing evidence establishes that such testimony would conflict with an important and particularized interest of the university, which the university must set forth and explain in writing.  A general assertion that such testimony is a conflict of interest is insufficient to rebut the strong presumption in favor of such testimony. Additionally, an undifferentiated fear or apprehension of harm resulting from a conflict is insufficient to rebut the strong presumption in favor of such testimony; and

- Preserves the university's ability to deny requests to serve as expert witnesses when those requests, along with other outside activities, would cumulatively amount to a conflict of commitment.

**Process Recommendations.**

The Task Force recommends the following steps to increase transparency in the decision-making process and to include faculty perspectives.

- Create a Provost's Advisory Committee charged with reviewing proposed denials of requests to serve as expert witnesses in litigation in which the State of Florida is a party, as well as any other proposed denials submitted at the discretion of the COI Program staff.  The Committee will provide a documented recommendation to the Provost, who will make the final determination. (While the university COI review process may be further served by *requiring* the Provost's Advisory Committee to review *all* proposed denials of outside activity disclosures, consideration of that expanded scope is beyond the task force's charge and is not necessary to implement the proposed policy revisions within the scope of the task force's charge.)
    o **Standing vs. ad hoc committee** – The task force recommends that a standing committee be created, as it provides stability through regular meetings, consistent membership with voting rights, and established structure.
    o **Composition** – The task force recommends a balanced committee including both faculty and UF administrators from across the university enterprise. Faculty members shall be nominated by the Faculty Senate and appointed by the Provost. Administrators shall be appointed by the President.  In making the appointments, the President, the Provost, and the Faculty Senate shall seek to ensure a diversity of voices drawn from among the tenured and non-tenured ranks of the faculty, including representation from UF Health, IFAS, and E&G units.
    o **Terms** – Faculty committee members shall serve three-year terms with staggered term expiration dates. Administrative committee members shall serve in an ex officio capacity.
    o **Scope** – The task force recommends the committee be charged with reviewing proposed denials of requests to serve as expert witnesses in litigation in which the State of Florida is a party, as well as any other proposed denials submitted at the discretion of the COI Program staff.  The committee will provide a documented recommendation to the Provost, who will make the final determination.

- o **Required Consultations** - The Dean of each college shall designate a faculty representative to serve as a dedicated COI consultant. In reviewing matters before it, the Provost's Advisory Committee must confer with the COI consultant representing the requester's college.
- o **Staff** – The task force recommends the committee be staffed by representatives from the COI Program office.

- **Appeal Process.**  Revise the COI regulation and policies to include an appeal process for all denials of requests to engage in an outside activity. The task force offers the following appeal process as an example:
  - o Within 30 calendar days of a denial of any request to engage in an outside activity, the requester may appeal in writing to an appeals panel. Such a panel may include the Faculty Senate Chair, Provost, Senior Vice President for Health Affairs, Senior Vice President for IFAS, and the Vice President for Research.
  - o The panel's decision will be final and may be grieved in accordance with an applicable grievance procedure.

- Revise the operating procedures of the COI Program office to increase transparency in its process. Specifically, the COI Program should:
  - o Revise procedures to include a requirement that all consultations with university subject matter experts that significantly contribute to the COI Program office's determination about an outside activities disclosure are documented within the UFOLIO system.
  - o Require that all disapprovals of disclosures reviewed by supervisors, the COI Program, and ancillary reviewers, include specific reasoning for the disapproval with sufficient detail.

**Appendix 1.2**

The Collective Bargaining Agreement is available here at https://hr.ufl.edu/wp-content/uploads/2021/08/2021-2024-UFF-UF-Collective-Bargaining-Agreement.pdf

Article 10 of the CBA is as follows:

ARTICLE 10
ACADEMIC FREEDOM AND RESPONSIBILITY

10.1 Policy. Academic freedom and responsibility are essential to the integrity of the University. The principles of academic freedom are integral to the conception of the University as a community of scholars engaged in the pursuit of truth and the communication of knowledge in an atmosphere of tolerance and freedom. The University serves the common good through teaching, research, scholarship/creative activities, and service. The fulfillment of these functions rests upon the preservation of the intellectual freedoms of teaching, expression, research, and debate. The University and UFF affirm that academic freedom is a right protected by this Agreement in addition to a faculty member's constitutionally protected freedom of expression and is fundamental to the faculty member's responsibility to seek and to state truth as he/she sees it.

(a) The University and UFF shall maintain, encourage, protect, and promote the faculty's full academic freedom in teaching, research/creative activities, and professional, university, and employment-related public service, consistent with the exercise of academic responsibility described in Sections 10.3 and 10.4, below.
(b) In order to ensure within the University an atmosphere of academic freedom,
(1) The University shall not apply any provision in this Agreement to violate a faculty member's academic freedom or constitutional rights, nor shall a faculty member be punished for exercising such freedom or rights, either in the performance of University duties or activities outside the University.
(2) The University recognizes that internal and external forces may seek at times to restrict academic freedom, and the University shall maintain, encourage, protect and promote academic freedom.

10.2 Academic Freedom. Consistent with the exercise of academic responsibility described in Sections 10.3 and 10.4 below, a faculty member shall be free to discuss all relevant matters in the classroom, to explore all avenues of scholarship, research, and creative expression, to speak freely on all matters of university governance, and to speak, write, or act in an atmosphere of freedom and confidence.
(a) Teaching and Research/Creative Activities. Faculty members shall have the freedom to:
(1) Freely engage in scholarly and creative activity and publish the results.
(2) Present and discuss, frankly and forthrightly, academic subjects, including controversial material relevant to the academic subject being taught.
(3) Select instructional materials, define course content, and determine grades within general department guidelines. Consistent with the principle that the faculty member should be the sole

judge of a student's performance in a course, the grade a faculty member determines for a student's performance shall not be changed without the faculty member's consent, except as the result of an official investigation. In the case of an official investigation, the chair shall appoint a panel of faculty members with expertise in the course material. Such panel shall conduct the investigation and shall report its findings to the chair.

The chair of the department shall then take appropriate action. The factors to be considered include if:
a. there was discrimination against a student in determining the grade or the grade was imposed without proper authority; or
b. the faculty member's assessment of the student's performance was not supportable by an accepted pedagogical practice or was substantially inconsistent with the basis for evaluation that the faculty member specified for the course.

(b) Service. Service includes, but is not limited to, participation in governance processes of the University. Faculty members shall have freedom to present and discuss, frankly and forthrightly, academic subjects and policy, university governance, or other matters pertaining to the health of the University.

(c) All rights provided in this Article shall extend to all bargaining unit members, regardless of whether their primary assignments include teaching and research.

10.3 Academic Responsibility of the Faculty. Academic responsibility implies the competent performance of duties and obligations and the commitment to support the responsible exercise of academic freedom by others. Members of the faculty have a responsibility to:
(a) Observe and uphold the ethical standards of their disciplines in the pursuit and communication of scientific and scholarly knowledge;
(b) Treat students, staff, and colleagues fairly and civilly in discharging one's duties as teacher, researcher, and intellectual mentor. Avoid any exploitation of such persons for private advantage and treat them in a manner consistent with the provisions of the article on NONDISCRIMINATION;
(c) Respect the integrity of the evaluation process, evaluating students, staff, and colleagues fairly according to the criteria and procedures specified in the evaluation process;
(d) Represent one self as speaking for the University only when specifically authorized to do so;
(e) Participate, as appropriate, in the system of shared academic governance, especially at the department level, and seek to contribute to the civil and effective functioning of the faculty member's academic unit (program, department, school and/or college) and the University;
(f) Perform appropriate duties assigned by the University and observe applicable state and federal law and applicable published College, University, and Board of Governors regulations, policies, and procedures, provided that the assigned duty or the regulation, policy, or procedure at issue does not contravene the provisions of the Agreement or the faculty member's right to criticize or seek revision of those duties, laws, regulations, policies, or procedures. Faculty members seeking change must not do so in ways that unreasonably obstruct the functions of the University.

10.4 Academic Responsibility of the University. Academic responsibility implies the competent performance of duties and obligations and a commitment to foster within the University a climate favorable to the responsible exercise of academic freedom. Therefore, it is the responsibility of the University to:

(a) Maintain, encourage, protect and promote academic freedom so that it is not compromised by harassment, censorship, reprisals, or prohibited discrimination as defined in ARTICLE 11, NONDISCRIMINATION. Recognize the right of faculty members to enjoy, without fear of institutional censorship or discipline, the same constitutional rights and freedoms as other individuals.

(b) Treat faculty members fairly and civilly in discharging the duties in managing the University.

(c) Respect the integrity of the evaluation process, evaluating faculty fairly and accurately according to the criteria and procedures specified in the evaluation process.

(d) Sustain principles of the system of shared governance, which recognizes that in the development of academic policies and processes the professional judgments of faculty members are of crucial importance.

(e) Prohibit persons who are not authorized students, authorized instructional staff, or authorized officials of the University from entering or interrupting faculty classrooms or laboratories during instructional time, except with prior permission from the responsible administration representative, faculty member or during emergencies. The University shall support the authority of each faculty member to have unauthorized persons removed from the faculty member's classroom/laboratory.

(f) Prohibit disruptive student behavior, including behavior that involves violence against faculty, staff or students, threat(s) of violence, instigation of violence, malicious vandalism, possession of weapons of any type, willful disregard of a faculty member's legitimate directions, continued use of abusive language or gestures, or other behavior that is so unruly, disruptive, harassing, or abusive that it seriously interferes with the faculty member's ability to effectively communicate with other students in the class or with the ability of the student's classmates to learn. The University shall support the authority of each faculty member to have disruptive persons removed from the faculty member's classroom/laboratory.

(1) Upon receiving a report of disruptive student behavior, the Dean of Students shall act promptly to investigate and resolve the matter. Faculty may request that a disruptive student be barred from returning to the classroom. If the Dean of Students declines such a request, the Dean shall take appropriate alternative action that ensures against a recurrence of the disruptive behavior and shall inform the faculty member.

(2) A faculty member shall not be disciplined for taking reasonable action in self-defense or in defense of others.

**Appendix 1.3**
**Florida Statutes § 1012.977**

(1) Any person employed by a state university or entity engaging in research which was created or authorized pursuant to part II of chapter 1004 consents to the policies of the university or entity, the regulations of the Board of Governors, and the laws of this state. At a minimum, such policies shall require employees engaged in the design, conduct, or reporting of research to disclose and receive a determination that the outside activity or financial interest does not affect the integrity of the state university or entity.

(2)(a) "Financial interest" includes anything of value other than that provided directly by the university or entity.

(b) "Outside activity" includes anything an employee does for an organization or an individual, other than the university or entity, that is related to the employee's expertise.

(3) An employee who has failed to disclose any outside activity or financial interest as required by subsection (1) shall be suspended without pay pending the outcome of an investigation which shall not exceed 60 days. Upon conclusion of the investigation, the university or entity may terminate the contract of the employee.

**Appendix 1.5 Peer Institution Conflict of Interests Policies**

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| UCLA (UC-Berkley, UC-Santa Barbara, UC-San Diego, UC-Irvine & UC-Davis same) | Employee members of the University community are expected to devote primary professional allegiance to the University and to the mission of teaching, research, and public service. Outside employment must not interfere with University duties. Outside professional activities, personal financial interests, or acceptance of benefits from third parties can create actual or perceived conflicts between the University's mission and an individual's private interests. University community members who have certain professional or financial interests are expected to disclose them in compliance with applicable conflict of interest/conflict of commitment policies. In all matters, community members are expected to take appropriate steps, including consultation if issues are unclear, to avoid both conflicts of interest and the appearance of such conflicts. https://policy.ucop.edu/doc/1200679/CompendiumCOIPoliciesGuidance |
| University of Michigan | A potential conflict of interest exists whenever personal, professional, commercial, or financial interests or activities outside of the University have the possibility (either in actuality or in appearance) of (1) compromising a faculty or staff member's judgment; (2) biasing the nature or direction of scholarly research; (3) influencing a faculty or staff member's decision or behavior with respect to teaching and student affairs, appointments and promotions, uses of University resources, interactions with human subjects, or other matters of interest to the University; or (4) resulting in a personal or family member's gain or advancement at the expense of the University. For purposes of subsection (4), family members include spouse, domestic partners and dependents. https://spg.umich.edu/policy/201.65-1 |
| University of Virginia | Real or apparent interference of one person's interests with the interests of another person, where potential bias may occur due to prior or existing personal or professional relationships. https://uvapolicy.virginia.edu/policy/FIN-054 |
| University of Florida | Employees must avoid situations which interfere with—or reasonably appear to interfere with—their professional obligations to the University. Such situations might create an appearance of impropriety and, therefore, must be disclosed. As discussed below, Employees will use the UFOLIO system to disclose Outside Activities in which they wish to engage. When the University determines a Conflict of Interest may exist with an Employee, the University may, in its sole discretion, prohibit the individual from engaging in the activity presenting a potential conflict; take actions to limit the individual's activity; or implement other measures the University deems reasonably necessary to eliminate the potential conflict. https://policy.ufl.edu/policy/conflicts-of-commitment-and-conflicts-of-interest/ |
| University of North Carolina | "Conflict of Interest" (COI) relates to situations in which financial or other personal considerations, circumstances, or relationships may compromise, may involve the potential for compromising, or may have the appearance of compromising a Covered Individual's objectivity in fulfilling their University |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | duties or responsibilities, including research, teaching activities, and administrative duties. The bias that such conflicts may impart can affect many University responsibilities, including decisions about personnel, the purchase of equipment and other supplies, the selection of instructional materials for classroom use, the collection, analysis and interpretation of data, the sharing of research results, the choice of research protocols, the use of statistical methods, and the mentoring and judgment of student work. The University of North Carolina at Chapel Hill utilizes the definition of conflict of interest specified in the University of North Carolina Board of Governor's Policy on Conflict of Interest and Commitment (300.2.2). https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=131873 |
| Georgia Institute of Technology (University of Georgia same) | 8.2.18.2.1 Conflicts of Interest and Apparent Conflicts of Interest Each University System of Georgia (USG) employee shall make every reasonable effort to avoid actual or apparent conflicts of interests. An apparent conflict exists when a reasonable person would conclude from the circumstances that the employee's ability to protect the public interest, or perform public duties, is compromised by a personal, financial, or business interest. An apparent conflict can exist even in the absence of a legal conflict of interest. USG employees are referred to State Conflict of Interest Statutes O.C.G.A. § 45-10-20 through § 45-10-70 and institutional policies governing professional and outside activities. https://www.usg.edu/policymanual/section8/C224/#p8.2.18_personnel_conduct

Each USG employee has an ongoing responsibility to report and fully disclose any personal, professional, or financial interest, relationship, or activity that has the potential to create an actual or apparent conflict of interest with respect to the employee's USG duties. Institutions shall adopt guidelines governing conflicts of interest and may further define methods of reporting conflicts of interest, how to manage said conflicts, and terms used within this policy section, so long as such guidelines and definitions are not inconsistent with this policy.

**Conflicts of Interest – Research and Institutional** The USG recognizes the benefits of collaboration and commercialization with the private sector and other third-party entities that supports the USG mission. The resulting relationships and agreements, however, must not undermine the public's trust, compromise the integrity of the USG mission, or inappropriately influence teaching, research, and service activities. Under no circumstances should a grant, gift, contract or other funding be accepted that limits the ability of USG employees to conduct or report the results of research in accordance with applicable scientific, medical, professional, and ethical standards. Institutions shall incorporate policy and review procedures within its institutional guidelines consistent with this policy. |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| University of Texas-Austin | A significant outside interest of a University employee or one of the employee's immediate family members that could directly or significantly affect the employee's performance of the employee's institutional responsibilities. The proper discharge of an employee's University responsibilities could be directly or significantly affected if the employment, service, activity or interest: (1) might tend to influence the way the employee performs his or her University responsibilities, or the employee knows or should know the interest is or has been offered with the intent to influence the employee's conduct or decisions; (2) could reasonably be expected to impair the employee's judgment in performing his or her University responsibilities; or (3) might require or induce the employee to disclose confidential or proprietary information acquired through the performance of University responsibilities. https://policies.utexas.edu/policies/conflict-interest-conflict-commitment-and-outside-activities |
| University of Wisconsin- -Madison | Doesn't define but provides: Conflicts of interest represent a state of affairs, not behavior, frequently involve perceptions, and are judged by others, not by those directly involved. Significant financial gains are considered to be of ultimate relevance in the current context for understanding conflicts of interest because money is recognized by the general public to be a potent motivator -- one that is easily understood, easily quantified, and discretionary. While the focus of conflict of interest considerations is financial gain, other relevant interests inherent in academia, including prestige, promotion, grants, and publications, can also potentially exert influence over research activities. https://policy.wisc.edu/library/UW-4001 |
| University of Illinois - Urbana/ Champaign | A conflict of interest arises when: (a) an academic staff member is in a position to influence either directly or indirectly University business, research, or other decisions in ways that could lead to gain for the academic staff member or his/her immediate family to the detriment of the University, or (b) an academic staff member or a member of his/her immediate family is or seeks to be in a vendor relationship with the University, whether directly or by having a financial or ownership interest in a vendor doing business with the University. https://www.vpaa.uillinois.edu/rnua/coci_policy |
| Ohio State University | A conflict of interest exists if financial interests or other opportunities for tangible personal benefit may exert a substantial and improper influence on an employee's professional judgment in exercising any university duty or responsibility, including designing, conducting, or reporting research. "Employees" include faculty, staff, administrators, and others. A conflict of interest is not an accusation and does not imply that an employee's judgment has been compromised. https://compliance.osu.edu/compliance-focus-areas/conflicts-of-interest/university-conflicts-of-interest-policies-rules-and-related-forms.html |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| Purdue University | In the Individual Financial Conflicts of Interest As part of fulfilling their responsibilities, and to assist the University in avoiding or managing Financial Conflicts of Interest, all Employees and Investigators must disclose any known Financial Interests that they or a Dependent have in any of the following: Any University purchase or procurement of goods or services (whether or not pursuant to a formal contract) or in any investment or loan made by the University. Proposals submitted to external sponsors for funding. In the case of proposals to Public Health Services (PHS) agencies, Investigators must also disclose Significant Financial Interests held by them and/or their Dependent(s) that are associated with their Institutional Responsibilities. Protocols for research that are submitted for review and approval by a Regulatory Committee (or to a subcommittee). Any agreement relating to University technology or other intellectual property that is or will be subject to negotiations between the Office of Technology Commercialization (OTC) and any third person or entity. A donor that contributes a monetary gift or gift-in-kind designated to be in support of the Employee's scholarly activities. This includes a gift to support a faculty member that is given by the faculty member, the faculty member's Dependent or parent, and/or an entity in which the faculty member (or Dependent or parent) has a financial interest. Any research protocol submitted to a Regulatory Committee on which the Employee is a member (with the Employees also recusing themselves from the review process regarding such protocol). For Employees who are Investigators, any Significant Financial Interest that they have not already disclosed as a Financial Interest. https://www.purdue.edu/research/regulatory-affairs/conflict-of-interest/policies-and-regulations.php |
| University of Maryland - College Park | Among other things, State Ethics Law generally prohibits University Employees from having financial interests in or employment relationships (including consulting) with entities under the authority of the University or entities that have or are negotiating contracts or subcontracts with the University. Other employment relationships (including consulting) prohibited under State Ethics Law include those which would impair the impartiality or independent judgment of the Employee and those involving an entity which is a party to a State contract (greater than $1000) if the Employee's duties include matters which substantially relate to the subject matter of the contract. State Ethics Law also prohibits State Employees from: participating in matters in which they (or certain family members or business entities) have an interest; soliciting and accepting gifts, including payment of travel and lodging expenses; using the prestige of their office or confidential information for private gain; and representing parties in State matters for contingent compensation. https://policies.umd.edu/assets/section-ii/II-310B.pdf |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| University of Washington | In conformity with the Ethics in Public Service Act (Chapter 42.52 RCW), this policy sets forth basic principles of that act for reference for all University employees.<br> A. No employee shall have an interest, financial or otherwise, direct or indirect, that is in conflict with the proper discharge of his or her official duties. No officer or employee shall incur an obligation, of any nature, or engage in a business, transaction, or professional activity that is in conflict with the proper discharge of his or her official duties.<br> B. No employee, except as provided by law, shall have a beneficial interest in a contract, sale, lease, purchase, or grant that may be made by, through, or is under the supervision of the employee, in whole or in part. No employee may accept, directly or indirectly, any compensation, gratuity, or reward from any other person beneficially interested in the contract, sale, lease, purchase, or grant; except such prohibition shall not apply to University officers and employees who have, with respect to that beneficial interest, complied fully with the provisions of Executive Order No. 57, Section 6, "Involvement with Commercial Enterprise, Deeper than Consulting," University of Washington Grants Information Memorandum 10, and, as applicable, National Science Foundation (GPM 510) 1995, and Public Health Service Regulations, 42 C.F.R., Part 50 and 45 C.F.R. Subtitle A.<br>C. No employee shall, except in the course of official duties or incident to official duties, assist another person, directly or indirectly, whether or not for compensation, in a transaction involving the University:<br>1) In which the employee has participated, or<br>2) If the transaction has been under the official responsibility of the employee within a period of two years preceding such assistance.<br>No officer or employee may share in compensation received by another for assistance that the officer or employee is prohibited from providing by law.<br>D. A business entity of which an employee is a partner, managing officer, or employee shall not assist another person in a transaction involving the University if the employee is prohibited from doing so by Subsection C.<br> E. No employee shall, directly or indirectly, ask for, give, receive, or agree to receive any compensation, gift, reward, or gratuity for performing, omitting, or deferring the performance of any official duty, unless otherwise authorized by law. See Board of Regents Governance, Standing Orders, Chapter 1, Section 8; Executive Order No. 62, and Executive Order No. 41.<br>F. No employee shall employ or use any person, money, or property under the employee's official control or direction, or in his or her custody, for the private benefit or gain of the employee or another.<br> G. After termination of employment with the University, no former employee shall, within a period of one year from the date of termination of such employment, accept employment or receive compensation from an employer if the former employee, during the two years immediately preceding termination of University employment: |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | 1) Was engaged in a substantial and significant way in the negotiation or administration on behalf of the University of one or more contracts with a total value of at least $10,000 with that employer;<br>2) Was, as a consequence of such substantial and significant involvement in such negotiation or administration, in a position to make discretionary decisions affecting the outcome of such negotiation or the nature of such administration; and<br>3) Will have duties of employment with the employer or the activities for which the compensation would be received that include fulfilling or implementing, in whole or in part, the provisions of such contract(s) or include the executive supervision or high-level managerial control of actions taken to fulfill or implement such contract(s).<br>H. No employee may accept an offer of employment or receive compensation from an employer if:<br>1) The employee knows,<br>2) The employee has reason to believe, or<br>3) The circumstances would lead a reasonable person to believe that the offer of employment or offer of compensation was intended, in whole or in part, to influence the performance or nonperformance of duties by the employee during the course of University employment.<br>I. No former employee may subsequent to his or her University employment assist another person outside the University, whether or not for compensation, in any particular transaction involving the University in which the former employee participated during University employment.<br>The above statements summarize provisions of the Ethics in Public Service Act and are provided for descriptive purposes only. In matters where the possibility exists of conflicts, reference should be made to one's supervisor, to the text of the Ethics in Public Service Act, and to the applicable federal regulations, particularly NSF Investigator Financial Disclosure Policy (GPM 510) 1995 and the PHSR, 42 C.F.R. Part 50 and 45 C.F.R. Subtitle A, and University of Washington Grants Information Memorandum 10.<br>https://www.washington.edu/admin/rules/policies/PO/EO32.html |
| Texas A&M University | **31.05.01.M1 Faculty Consulting and/or External Professional Employment**<br>*Approved April 17, 2018; Revised December 15, 2020; Next scheduled review December 15, 2025*<br>**Rule Statement**<br>Faculty wishing to engage in consulting and/or external professional employment directly related to their academic and professional discipline must obtain appropriate approval prior to initiation of the external activity. Employment by faculty members not directly related to their professional discipline is governed by System Regulation *31.05.02, External Employment*.<br>**Reason for Rule** |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | This rule is required by System Regulation *31.05.01, Faculty Consulting and/or External Professional Employment,* and establishes guidelines for the approval process for consulting and/or external professional employment activities for all faculty members employed by Texas A&M University.<br>**Procedures and Responsibilities**<br>1. GENERAL<br>1.1 In accordance with System Regulation *31.05.01, Faculty Consulting and/or External Professional Employment,* consulting and external professional employment may be authorized only if approved in advance according to appropriate procedures and all other conditions listed in System Policy *31.05, External Employment and Expert Witness*, and related System regulations are met, using the System Faculty Consulting and/or External Professional Employment Application and Approval form.<br>1.2 In addition, this rule requires the disclosure of any potential or actual conflict of interest or commitment arising from, but not limited to, consulting and/or external professional employment as directed in System Regulation *15.01.03, Financial Conflicts of Interest in Sponsored Research,* and University Rule *15.01.03.M1, Financial Conflicts of Interest in Sponsored Research, SAP 15.99.99.M0.02, Conflict of Commitment.*<br>Therefore, it is important for the faculty member to disclose all actual or potential conflicts of interest that are applicable to their external consulting and/or external professional employment request.<br>2. STANDARDS OF CONDUCT<br>2.1 Texas A&M University faculty members engaged in external employment and/or consulting shall comply with the principles of ethical conduct in System Policy *07.01, Ethics.*<br>2.2 Standards of conduct of Texas A&M University officers and employees are established by law, by The Texas A&M University System policies and regulations, and by Texas A&M University rules and procedures. Any employee who violates such standards through a consulting and/or external professional employment engagement may be subject to appropriate disciplinary action, regardless of approval status of the application for external employment.<br>3. CONSULTING AND/OR EXTERNAL PROFESSIONAL EMPLOYMENT<br>3.1 Consulting and/or external professional employment activities of faculty are considered secondary activities that may be engaged in only after duties and responsibilities to Texas A&M University are fulfilled. Texas A&M University faculty members may enter into an employment and/or consultation relationship provided that:<br>3.1.1 it does not interfere with the regular work of the faculty member;<br>3.1.2 it is reasonable in amount;<br>3.1.3 it is directly related to the faculty member's academic and professional discipline;<br>3.1.4 it avoids unfair competition with private business and those in private |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | professional practice. Faculty members are responsible for the disclosure of any potential conflict of interest and conflict of commitment that may arise from consulting and/or external professional employment; <br> 3.1.5 it complies with section 2.6 of System Regulation *31.05.01* regarding restriction on the grant to third parties of intellectual property rights; and <br> 3.1.6 it does not involve the use of any resources (facilities, equipment, or personnel) of The Texas A&M University System (System), unless permitted by System Policy *33.04, Use of System Resources*, and System Regulation *33.04.01, Use of System Resources for External Employment*. However, if a collaboration with a foreign entity is part of the faculty member's normal scholarly work, and the collaboration has been approved pursuant to Section 4.2 of this regulation, System resources may be used. <br> 4. APPROVAL PROCESS <br> 4.1 Full time faculty members must complete and route for approval the External Employment and/or Consulting Application and Approval form that can be found in the Appendix to System Regulation *31.05.01* prior to initiating the external activity including, specifically, engagements that may affect System intellectual property. The college dean, in consultation with the faculty member's department head, is authorized to approve these activities. Part-time faculty are not required to request approval for external employment under this section, but are required to submit the required conflict of interest and conflict of commitment disclosures under section 4.3 and 4.4 below. <br> 4.2 If a faculty member proposes to engage in faculty consulting and/or external <br> professional employment with a foreign entity whether compensated or not, the faculty member will submit the proposed engagement for review to the University export controls Empowered Official, as per University Rule 15.02.99.M1, *Export Controls*, prior to submission to the department head for approval. A copy of the faculty member's application and approval form and supporting documentation will also be provided to the System Research Security Office. <br> 4.3 All faculty members, full-time and part-time, must disclosure all actual and potential conflicts of interest, regardless of their nature, in a memorandum addressed to the department head and the college dean. Full-time faculty members must submit the disclosure memorandum with the Approval Form required in section 4.1 above. The department head and dean will review the disclosed conflicts of interest and determine if a management plan is necessary. If a management plan is necessary, it will be developed by the faculty member, department head, and dean and documented. <br> 4.4 Conflict of Commitment disclosures should be routed for approval according to the process specified in *SAP 15.99.99.M0.02*. <br> 4.5 Faculty members are required to disclose to their department head and dean any conflict of interest that may arise after the external employment is |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | approved. The disclosure will take the form of a memorandum and approval process as per section 4.3 above. |
| | 4.6 Faculty members sponsored for employment under a nonimmigrant status to work for Texas A&M University may not consult or be employed by a third-party entity unless such third party entity sponsors them for employment. |
| | 4.7 Faculty members may not engage in external consulting or external professional employment activities unless prior written approval is obtained. |
| | 4.8 Authorizations for consulting and/or external professional employment will expire August 31st each year. |
| | 4.9 Approved requests will be maintained within the faculty's personnel file in the academic department in accordance with System records retention policy; retained for the fiscal year plus three years. |
| | 5. RELEASE TIME |
| | 5.1 The use of "release time" as defined in System Regulation *31.05.01* for consulting will be evaluated on a case-by-case basis. |
| | **Related Statutes, Policies, or Requirements** |
| | Supplements |
| | System Regulation *31.05.01, Faculty Consulting and/or External Professional Employment* |
| | University Rule 15.01.03.M1, *Financial Conflicts of Interest in Sponsored Research* |
| | University Rule 15.02.99.M1, *Export Controls* |
| | University SAP 15.99.99.M0.02, *Conflict of Commitment* |
| | **https://rules-saps.tamu.edu/PDFs/31.05.01.M1.pdf** |
| Michigan State University | **Faculty Handbook - Outside Work For Pay** |
| | Last updated: 5/5/2006 |
| | **IV. ACADEMIC HUMAN RESOURCES POLICIES (Cont.)** |
| | The following policy was approved by the Board of Trustees on August 9, 1951 and revised on May 5, 2006. |
| | **I. Policy Overview** |
| | Full time faculty members are compensated for full time professional effort for the University. Faculty may have duties in instruction, research, or outreach, or in a combination of these areas. Regardless of the character of the faculty member's duties, the University expects that each full-time faculty member will carry a reasonable and full-time load, assuming a proper share of the total functions and responsibilities of the department/school, college, and University. Within this framework, the University recognizes that, through consulting and other relationships with government, industry, not-for-profit organizations, and others outside the University, its faculty members can make valuable contributions off campus while enhancing their expertise in their discipline. |
| | This Policy is intended to protect the integrity of the faculty-University professional relationship, to ensure that approved outside work for pay is |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | consistent with the University's mission, and to provide that faculty members remain accessible to students, colleagues, and the public.<br><br>**II. Applicability[1]**<br>This Policy applies to all faculty members (tenure system and fixed term) at the rank of instructor through professor who hold appointments of at least 50% time.[2]  Faculty appointed less than full-time are not eligible to perform outside work for pay during regular University duty periods. With the exception of the approval process, outside work for pay performed during non-duty periods is subject to the remaining provisions of this Policy.<br><br>Certain activities are expected of faculty members as part of their normal scholarly activities and are not regulated by this Policy (even if a faculty member is paid to do them by a person or entity other than the University). These include, but are not limited to[3]:<br><br>• presentations at professional meetings and other similar gatherings<br>• peer review of articles and grant proposals<br>• leadership positions in professional societies<br>• preparation of scholarly publications<br>• editorial services for educational or professional organizations<br>• service on advisory committees or evaluation panels for government funding agencies, nonprofit foundations, or educational organizations<br>• musical and other creative performances and exhibitions, if there is an expectation in the faculty member's discipline that he/she will engage in such performances or exhibitions.<br><br>**III. Limitations on Performing Outside Work for Pay During Duty Periods**<br>Faculty members may request approval to engage in outside work for pay during duty periods if all of the following conditions exist:<br>1. All approved outside work for pay and overload pay assignments for the faculty member will not exceed a total average of four (4) days a month.<br>2. The work in question will enhance the faculty member's expertise as a teacher and scholar in his/her discipline.<br>3. The work will not interfere with the performance of the faculty member's University duties, including those non classroom responsibilities expected of all faculty members.<br>4. The work will not adversely affect the University's interests or violate University policies or regulations.<br>5. The work will be of a professional nature.<br><br>**IV. Definitions**<br>1. "Outside work" is any work performed for a person or entity other than Michigan State University.<br>2. "Work" is any service or activity in the general area of expertise for which the faculty member is employed by the University. Examples of work include, but are not limited to, consulting, advising, research, |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | demonstrating, performing, outreach, or teaching in the faculty member's discipline.<br><br>3. "Pay" is anything of value received in consideration for work (except reimbursement of expenses, indemnification, or insurance coverage for claims arising out of or occurring in connection with the work). Examples of pay include, but are not limited to, any salary, fee, honorarium, stock, stock option, monetary gift or contribution beyond actual expense, or the promise of any of these in the future. Work for any business or other for-profit enterprise owned or operated by a faculty member or by his/her relative(s), shall be considered "pay" (whether or not the faculty member receives anything of value in consideration for the work) because of the likelihood that the faculty member's work will increase the value of the business or enterprise to the faculty member's direct or indirect financial benefit.<br><br>**V. Required Approval**<br>1. A faculty member must request and obtain the written approval of his/her unit administrator and dean/separately reporting director before engaging in outside work for pay.<br>2. University administrators to whom the Authorization Form is submitted may seek additional information or clarification from the faculty member regarding the proposed outside work for pay.<br>3. University administrators shall process completed Authorization Forms in a timely fashion.<br>4. If a request to engage in outside work for pay is denied, the unit administrator shall provide the faculty member with written reasons for the denial. A faculty member may not challenge a decision to deny approval for outside work for pay through the Faculty Grievance Policy unless the faculty member alleges that the denial is contrary to University policy or established practice.<br>5. Each dean/separately reporting director shall keep Authorization Forms submitted by faculty on file for at least three years.<br>6. Each dean/separately reporting director shall submit annual reports to the Office of the Provost concerning the outside work for pay performed by faculty in that college/administrative unit. The reports shall not identify individual faculty by name.<br><br>**VI. Non-Duty Periods**<br>Faculty who hold academic year appointments or part-time appointments of at least 50% time may engage in outside work for pay during non-duty periods if the work does not adversely affect the University's interests, violate University policies or regulations, or circumvent University policies or regulations that would apply if the work was performed during the duty period. The University does not limit the amount of time faculty may spend on outside work for pay at times other than their duty periods. |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | A faculty member must provide written notice to his/her unit administrator prior to engaging in outside work for pay during non-duty periods by submitting an Outside Work for Pay Authorization form. |
| | Footnotes:<br>[1]This Policy does not apply to unrenumerated outside activities, whether of a charitable or professional nature. However, faculty members are expected to arrange their outside activities so as to avoid conflicts of commitment. A "conflict of commitment" occurs when the time and attention a faculty member devotes to outside activities interferes with the performance of his/her responsibilities to the University.<br>[2]Executive managers (senior level University administrators, including associate and assistant vice presidents and specified directors) and academic administrators (e.g., deans, department chairs, and school directors) are also subject to this Policy and must obtain prior written approval from their direct supervisor before engaging in outside work for pay.<br>[3]A faculty member or unit administrator may (1) request an individual or group exemption from specific provisions of this Policy, or (2) request that a particular activity or type of activity be exempt from this Policy. Such requests must be approved in writing by the applicable department chair/director and dean/separately reporting director and by the Provost or his/her designee. Failure to request or receive exemption approval in writing results in coverage of the activity under this Policy.<br>[4]Faculty using University facilities, supplies and materials, services, or equipment for outside work for pay do not need to reimburse the University for the fair market value of the use if it is a de minimis, incidental use which imposes no, or little, additional cost or expense on the University.<br>https://hr.msu.edu/policies-procedures/faculty-academic-staff/faculty-handbook/outside_work_for_pay.html |
| University of Minnesota | **Individual Conflicts of Interest and Standards Governing Relationships with Business Entities**<br>This policy, which applies to all University faculty and staff, provides the framework to effectively identify and manage conflicts of interest, and establishes standards that enable faculty and staff to collaborate with business entities while ensuring that students, faculty, and staff of the University, as well as the general public have confidence in the integrity and objectivity of the University's research and discovery, teaching and learning, and outreach and public service activities.<br>Faculty and staff are encouraged to engage in relationships with business entities to further the University's mission while acknowledging that inherent in these relationships is the risk that professional judgment may be improperly influenced by the existence of such relationships. Faculty and staff are held to a shared ethical standard of ensuring that their relationships with business entities are transparent, grounded in objectivity, and do not improperly |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | influence their professional judgment, exercise of University responsibilities, or performance of University-related activities. |

influence their professional judgment, exercise of University responsibilities, or performance of University-related activities.

Some relationships with business entities require greater vigilance than others. For example, when a relationship with a business entity could influence decisions made in the provision of clinical health care or conduct of research involving human participants, ensuring the safety of patients and research participants is paramount.

Campuses, colleges, departments, and administrative units may adopt standards that are more, but not less, restrictive than those set forth in this policy.

**Section I.  Reporting, Review & Management Of Relationships With Business Entities**

**Report of External Professional Activities (REPA).** All paid faculty, Professional and Academic Administrative employees (P&A), and other individuals designated by a senior leader or their designate, or the Conflict of Interest (COI) Program staff ["covered individuals"], must comply with the following requirements to report financial interests and business interests they or their family members hold that relate to the covered individual's University expertise and responsibilities:

**Annual reporting.** Covered individuals must complete an annual Report of External Professional Activities (REPA), even if they have no reportable external activities, financial interests, or business interests.

**Change in circumstances reporting.** In addition to the annual reporting requirement, covered individuals must file a REPA within 30 days of:

- acquiring a significant financial interest or acquiring a business interest that relates to their University expertise and responsibilities;
- assuming a new University responsibility that relates to an existing business or significant financial interest; or
- for Public Health Service (PHS) funded investigators, travel that is related to one's University responsibilities valued in excess of $5000 paid for or reimbursed by a business entity.
  - Travel paid for or reimbursed by a governmental agency, an institution of higher education, an academic teaching hospital, a medical center, or a research institute that is affiliated with an institution of higher education does not need to be reported.
  - The covered individual must disclose the purpose of the trip, the identity of the sponsor/organizer, the destination, and the duration.

Supervisors or designees within the covered individual's department, administrative unit, college, or campus are responsible for reviewing the REPA. Conflict of Interest (COI) Program staff review REPAs that reflect a significant financial or business interest, and refer potential conflict of interest matters to a Conflict Review Panel (CRP). A CRP determines whether a conflict of interest exists and, if so, whether the conflict can be managed under the terms of a conflict management plan.

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | When a conflict management plan is established, the Conflict of Interest Program will conduct a compliance review 90 days after the plan is executed, and then annually until the conflict no longer exists and the management plan is retired by Conflict of Interest Program Staff. Compliance review results are reported to the CRP.<br><br>**Institutional Review Board (IRB) Applications.** Investigators, and individuals who enroll or consent participants, must disclose relevant financial interests and business interests when completing IRB applications for human participant studies.<br><br>**Educational Requirements**<br>Covered individuals must complete the University's conflict of interest course when filing the REPA for the first time, and every four years thereafter.<br>In addition, investigators engaged in PHS-funded research, to include sub-recipient investigators, must complete the University's conflict of interest course prior to engaging in research related to any PHS-funded grant, and must take the course immediately when:<br><ul><li>there is a revision to this conflict of interest policy or procedures in any manner that affects the requirements imposed on investigators;</li><li>an Investigator is new to the University; or</li><li>the investigator is found to be out of compliance with this policy or a conflict management plan.</li></ul>**Disclosing Business And Significant Financial Interests**<br>All employees must disclose relevant business and significant financial interests in certain circumstances, whether or not required under the terms of a conflict management plan. For specific disclosure requirements, see Appendix: Required Disclosures<br><br>**Disclosing Conflict of Interest Information Associated With PHS-Funded Research**<br>The Conflict of Interest Program will provide the following information in a written response within five business days of a request involving a financial conflict of interest related to a PHS-funded research project:<br><ul><li>the investigator's name, title, and role on the research;</li><li>the name of the business entity in which the significant financial interest is held;</li><li>the nature of the significant financial interest; and</li><li>the approximate value of the significant financial interest in dollar ranges or a statement that the value cannot be readily determined.</li></ul>For at least three years from the date on which the information was most recently updated, information concerning the significant financial interests of an investigator will remain available in order to respond to written requests for this information.<br><br>**Section II. Standards Governing Relationships With Business Entities** |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | Employees are prohibited from engaging in the following activities with business entities (see Appendix: Prohibited Activities with Business Entities for more details.)<br>• Having a financial or personal beneficial interest in a University contract or purchase order in which the employee has direct or indirect influence (see Minnesota Statute, Section 15.43)<br>• Receiving personal gain from the use of instructional materials without proper administrative approval<br>• Ghostwriting<br>• Endorsing a product or service related to one's University responsibilities and expertise<br>• Accepting payment for the selection, use or promotion of products or services for University purposes<br>• Accepting payment for the referral of students to prospective employers<br>• Accepting payment for the recruitment of patients for clinical research studies<br>• Accepting payment for participating in surveys intended to promote, market or sell a drug or medical device directly to the practitioner<br>• Using or disclosing nonpublic research information in violation of insider trading laws<br>• Making professional referrals to a business entity in which they have a business or financial interest.<br>**Receiving Personal Remuneration from a Company While Participating in a Human Participant Study Sponsored by that Company**<br>Investigators who participate in an open human participant research study requiring IRB approval and oversight that is sponsored by a company, or involves the development or evaluation of a company's product, device, or other technology, may provide consulting or speaking services ("services") for the company during the period of the research study if all of the following conditions are met:<br>• Any payments made in exchange for the services are directed to the University under the terms of a University External Sales Agreement.<br>• The funds are not used to support the salary of the investigator.<br>• The arrangement is preapproved by a Conflict Review Panel.<br>For purposes of this provision, a human participant research study is open from the time the study is approved by the IRB until participant enrollment is closed and the primary outcome from the study has been published.<br>Investigators may receive study-related expenses as approved in the University budget for the study, including salary support and travel expenses.<br>An investigator may request that the Conflict Review Panel approve an exception to this provision (Section IIB) in order to receive personal remuneration or equity from the company while participating in the study. Compelling circumstances must be present to warrant approval of the exception. |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | **D. Consulting with Business Entities**<br>**1. Written Agreement.** Employees who plan to provide compensated consulting services  for one year or longer relating to their University expertise and responsibilities should enter into a signed, written agreement with the business entity prior to providing the consulting services. The written agreement should:<br>• state the timeframe covered by the agreement;<br>• describe the services and any deliverables to be provided by the employee;<br>• state the amount of compensation and expenses to be paid; and<br>• make clear that the employee is acting solely in their individual capacity and not on behalf of the University.<br>Compensation should fall within fair market value parameters for the services provided.<br>Payment of travel, food, and lodging expenses should be consistent with the standards set forth in Administrative Policy: Traveling on University Business.<br>**2. Additional Compliance Obligations**<br>a.   Unless an exception is approved by a Conflict Review Panel, employees may not receive personal remuneration or equity from a company while serving as an investigator on an open human participant study requiring IRB approval and oversight that is sponsored by that company, or involves the development or evaluation of that company's product, device, or other technology.<br>b.   Employees must also comply with the requirements of Board of Regents Policy: Outside Consulting and Other Commitments, Administrative Policy: Outside Consulting and Other Commitments, and related administrative procedures.<br>**Non-Compliance**<br>Non-compliance with the provisions of this policy includes, but is not limited to, failing to timely disclose a significant financial or business interest, failing to complete educational requirements, intentionally filing an incomplete, erroneous, or misleading report of external activities, failing to provide additional information as required by the REPA approving authority, or failing to follow an approved plan for managing, reducing or eliminating a conflict of interest.<br>Non-compliance with this policy may result in disciplinary action, up to and including termination of employment, as well as ineligibility of employees to submit grant applications, seek approval from the Human Research Protection Program, or supervise graduate students.<br>Failure to timely disclose a significant financial interest may result in a retrospective review to determine whether any PHS-funded research or portion of the research conducted during the period of noncompliance was biased. The retrospective review, reporting, and submission of a mitigation report if bias is found, will be conducted in accordance with PHS procedures established in 42 |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | CFR 50.605(a)(3).  See Administrative Procedure: Retrospective Reviews and Mitigation Plans.<br>**Reason for Policy**<br>To implement Board of Regents Policy: Individual Conflicts of Interest and to comply with federal and state law. This policy is intended to ensure that covered individuals report and fully disclose financial and business interests that relate to their University expertise and responsibilities so that potential conflicts of interest can be reviewed and, where conflicts of interest are found to exist, eliminated, reduced, or effectively managed. To gain and maintain the public's trust, the University must demonstrate that the work that is conducted here is free from improper influence and bias that might otherwise result from external interests and relationships.<br>Procedures<br><ul><li>Reporting External Relationships and Business and Financial Interests</li><li>Evaluating Reports of Business and Financial Interests and Managing Individual Conflicts of Interest</li><li>Retrospective Reviews and Mitigation Plans</li></ul>**https://policy.umn.edu/operations/conflictinterest** |
| Pennsylvania State University | **Human Resources Policies**<br>**HR91 Conflict of Interest**<br>**Policy Status:**  Active<br>**Policy Steward:**  Vice President for Human Resources<br>**POLICY'S INITIAL DATE:** June 23, 1983<br>**THIS VERSION EFFECTIVE:** March 12, 1993<br>**PURPOSE:**<br>To avoid the possibility of any misunderstandings concerning the appropriate conduct of faculty and staff members in regard to all transactions touching upon their University duties and the property of the University.<br>**POLICY:**<br>Faculty and staff members of the University shall exercise the utmost good faith in all transactions touching upon their duties to the University and its property. In their dealings with and on behalf of the University, they shall be held to a strict rule of honest and fair dealings between themselves and the University. They shall not use their positions, or knowledge gained there from, in such a way that a conflict of interest might arise between the interest of the University and that of the individual. Faculty and staff members shall disclose to the administrative head of the college or other unit in which they are employed, or other appropriate administrative officer, any potential conflict of interest of which they are aware before a contract or transaction is consummated.<br>University tangible assets, equipment, supplies and services may not be used by employees for personal gain, or for purposes outside the scope of their employment.<br>**RESPONSIBILITY:** |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | The first responsibility for adherence to this policy lies with the faculty or staff member(s) directly involved. If there is reason to believe that this policy is not being adhered to, the matter should be reported to the faculty or staff member's administrative head for investigation and resolution. If the matter cannot be resolved at that level, it should be referred to the next higher administrative level for resolution.<br>**CROSS REFERENCES:**<br>Other Policies in this Manual should also be referenced, especially:<br>RA12 - Technology Transfer and Entrepreneurial Activity (Faculty Research),<br>AD47 - General Standards of Professional Ethics,<br>RP02 - Handling Inquiries/Investigations into Questions of Ethics in Research and in Other Scholarly Activities,<br>FN14 - Use of University Tangible Assets, Equipment, Supplies and Services,<br>RP06 - Disclosure and Management of Significant Financial Interests<br>Date Approved:  March 12, 1993<br>Date Published:  March 12, 1993<br>Effective Date:  March 12, 1993 |
| University of Arizona | **Conflict of Commitment Policy**<br>**Purpose and Summary**<br>The University of Arizona (the "University") encourages its faculty and appointed professionals to use their professional expertise to advance and communicate knowledge through interaction with the public, the community, and external entities. The University feels that such activities enhance performance of University teaching, advance University research and public service missions, and bring credit to the University.<br>At the same time, the University has a fiduciary responsibility to ensure that inappropriate external influences outside the course and scope of one's University employment do not affect the performance of one's primary duties to the University. Outside Employment and Outside Professional Commitments[1] raise important questions related to time and energy allocation, University resource allocation, intellectual property protection and potential for financial conflicts of interest.<br>As used in this Policy, "Conflict of Commitment" relates to an individual's distribution of time and effort between his/her full-time duties as a University Employee, and his/her responsibilities resulting from Outside Employment and Outside Professional Commitments.<br>The purpose of this Policy is to<br>• provide guidance on the University's requirements related to possible Conflicts of Commitment resulting from Outside Employment and Outside Professional Commitments;<br>• outline Conflict of Commitment disclosure requirements; and<br>• provide guidance to assist Supervisors, Department Heads and Deans in their review of such disclosures for approval or rejection. |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | While every full-time University employee is considered to have a primary commitment of time and intellectual energies to his/her work for the University, this Policy is not intended to deter the cultivation of outside interest in University expertise. Both the individual employee and the University may benefit from approved interactions with external scholars and organizations and from commitments to professional societies, journals, etc. Administrative Departments and individual colleges may establish their own Conflict of Commitment conventions within the parameters outlined in this Policy and based upon the Department Head or Dean's determination of the unit's and University's best interests.<br> 1. All capitalized terms used in this Policy that are not otherwise defined in the text have the meanings set forth in the "Definitions" below.<br>Scope<br>This Policy applies to all Covered Individuals (as defined below). Covered Individuals have a primary commitment of time and intellectual energies to their work for the University. Outside Employment and Outside Professional Commitments must not detract in time or content from their obligations to these responsibilities.<br>Definitions<br>**Conflict of Commitment** relates to an individual's distribution of time and effort between his/her full-time duties as a University Employee, and his/her responsibilities resulting from Outside Employment and Outside Professional Commitments.<br>**Covered Individual** refers to Full-time University Employees (as each of those terms is defined below), including faculty members, administrators, and academic and service professionals who are appointed to serve in the area of teaching, research, and administrative services pursuant to notices of appointment issued by the University's Human Resources Department.<br>**Full-time** is a status determined by the University's Division of Human Resources. For tenured/tenure-eligible faculty, full-time is generally defined as 50% or more full-time equivalent, which employment is expected to continue for six (6) months or more. Please consult with your department's hiring manager or business office if you are unsure whether you have full-time status.<br>**Institutional Responsibilities** means activities in the course and scope of an individual's performance as a University employee related to the individual's professional expertise, such as teaching, administrative duties, clinical activities, research (sponsored or unsponsored), service on University committees, professional participation on panels and review boards, creation and presentation of scholarly work, and duties and responsibilities outlined in an individual's University employment agreement, etc., regardless of when and where the activities occur.<br>**Outside Employment** refers to any employment relationship of a Covered Individual outside of the University. For purposes of this Policy, Outside Employment or Outside Professional Commitments may or may not be a |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
|  | professional activity and may or may not be compensated but does require a time commitment from the Covered Individual.<br><br>**Outside Professional Commitments** are professional activities undertaken by a Covered Individual that are related to the individual's professional expertise, outside of the individual's Institutional Responsibilities, for the benefit of an external entity or individual and/or not covered by a fully executed written agreement between the University and the external entity.<br><br>**Significant Use of University Resources** has the meaning set forth in the ABOR Intellectual Property Policy, No. 6-908, Section F(9). By way of example only, Significant Use of University Resources may include<br><br>• Use of University research funding;<br>• Use of funding allocated for asynchronous or distance learning programs;<br>• Use of University-paid time within the employment period (other than during sabbaticals, under approved consulting arrangements, or otherwise as permitted under ABOR and University policies);<br>• Assistance of University-employed support staff;<br>• Use of University telecommunication services (beyond ordinary telephone services);<br>• Use of University central computing resources;<br>• Use of University instructional design or media production services; and<br>• Access to and use of University research equipment and facilities, or production facilities.<br><br>Any inconsistency between this Policy and the ABOR IP Policy definition of "Significant Use of University Resources" shall be resolved by reference to the ABOR IP Policy definition.<br><br>**Supervisor,** in relation to an Appointed Professional, refers to the individual who is directly responsible for day-to-day oversight, performance evaluations, and promotion recommendations related to such Appointed Professional.<br><br>**University Employee**, for the purposes of this Policy, refers to all University Appointed Personnel, as defined by the University Division of Human Resources in the University Handbook for Appointed Personnel (UHAP) Definitions Section. Such appointments may be tenure eligible, tenured, career-track, adjunct, or visiting, and are subject to ABOR Personnel Policies as follows:<br><br>• 6-101. Conditions of Administrative Service<br>• 6-201. Conditions of Faculty Service<br>• 6-301. Conditions of Service for Academic and Service Professionals<br><br>## Policy<br>**A. Request and Approval Responsibilities**<br><br>1. **Covered Individuals' Responsibilities:** Covered Individuals must request written approval as provided in this Policy prior to engaging in Outside Employment or Outside Professional Commitments that occur at any time during the calendar year while the individual's status is that of a Full-time University Employee. Prior approval is not required to participate in |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | professional commitments that are (a) required as a condition of employment or tenure eligibility, (b) are a part of a Covered Individual's duties on behalf the University, or (c) are encouraged by the University as part of the Covered Individual's academic or professional development (such as professional societies, committee memberships, journal editorships, service to the discipline, service to the University, routine scholarly collaboration, etc.).<br><br>The requestor must complete a Request for Approval of External Professional Commitment or Outside Employment form ("Request form"), available on the Conflict of Interest Program Office website, and submit it for written approval as follows:<br><ul><li>For Faculty Members: the Request form must be submitted to and approved by the requestor's Department Head and Dean.</li><li>For all other University Employees, including Deans, Vice Presidents, Assistant and Associate Vice Presidents, Senior Vice Presidents and above (but excluding the University President[2]: the Request form must be submitted to and approved by the requestor's Supervisor.</li></ul><br>    It is recommended that the Request form be submitted four (4) weeks prior to beginning the outside activity to allow a reasonable time for consideration of the Request.<br><br>2. **Responsibility for Review and Approval or Denial:** The Covered Individual's Department Head and Dean (with respect to faculty members), or Supervisor (with respect to all other University Employees), are responsible for reviewing the requestor's Request form and providing approval or denial. Approval or denial will be based upon the information provided in the Request form and an assessment of the requestor's time commitments relative to the request. To avoid denial and facilitate approval, the individual(s) responsible for reviewing the requestor's Request form (as provided in paragraph A(1) of this section, above) may make recommendations for adjustment of commitments to allow appropriate time allocation.<br><br>3. **Responsibility for Maintaining Request Form Records:** The primary administrative unit, department, or college of the individual is responsible for the review and approval or denial of a Request form (see paragraphs A(1–2) of this section) is the "Office of Record" and is responsible for maintaining the original documentation of the Request form and response as a personnel record in accord with the University's Records Retention Policy for personnel records. The Office of Record is responsible for providing a copy of each approved Request form to the Conflict of Interest Program Office.<br><br>**B. Contracts, Liabilities, etc.** |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | 1. When a Covered Individual enters into a personal consulting, non-disclosure, fee-for-service, or other type of agreement with an external entity relative to an approved Outside Employment or Outside Professional Commitment, the University shall not be a party to the agreement, and shall have no obligations whatsoever under such agreement.<br><br>2. Covered Individuals who enter into a personal consulting, non-disclosure, fee-for-service, or other type of agreements relative to an approved Outside Employment or Outside Professional Commitment are solely responsible for the negotiation of such agreements and for ensuring that the terms and conditions are consistent with this Policy and all other applicable ABOR and University policies, including but not limited to Intellectual Property Policies (see Section F below).<br><br>3. The University will not provide indemnity nor any other form of guarantee or insurance coverage for activities or obligations pursuant to Outside Employment or Outside Professional Commitment agreements executed between any Covered Individuals and external third parties.<br><br>4. Use of the University's name, logo, or other identifiers for the promotion or endorsement of an outside entity generally is not permitted.<br><br>**C. External Faculty, Administrative, Managerial, and Operational Responsibilities**<br><br>1. **Outside Employment with Postsecondary Institutions:** Covered Individuals may not be employed as faculty members, professional staff, or administrators at any other postsecondary educational institution while they are Full-time University Employees unless approved under this Policy; however, consulting and collaborative research relationships with other postsecondary institutions may be permitted, subject to the review and approval process set forth in paragraph A(1) under "Compliance and Responsibilities."<br><br>2. **External Managerial Responsibilities:**<br>    a. Covered Individuals, including individuals on approved sabbatical leave, must file a Request form and obtain prior written approval (as described in paragraphs A(1–2) under "Compliance and Responsibilities") prior to assuming significant managerial responsibilities with an outside entity (e.g. as an officer or director). If a Covered Individual believes it to be essential for the success of an outside entity that he/she provide significant managerial responsibilities to the entity, he or she may be required to take a full or partial leave of absence from the University, or a revised appointment at the University, for a specified period of time, consistent with relevant leave of absence policies. The Covered Individual in such case should work with the individual responsible for reviewing his/her Request form (i.e., Supervisor, Department Head or Dean) to explore the best course of action, and must also |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | fulfill the disclosure and other obligations under the University's applicable Conflict of Interest policies.[3]<br><br>    b.  It is not unusual for Covered Individuals to be asked to serve on the boards of commercial enterprises or nonprofit entities. The following guidelines apply to board memberships (excluding those situations where prior approval is not required as outlined in paragraph A(1) under "Compliance and Responsibilities"). Before joining any board of a for-profit or nonprofit entity related to one's professional expertise, and regardless of whether the board membership is paid or unpaid, a Covered Individual must receive advance written approval in addition to fulfilling the disclosure and other obligations under the University's applicable Conflict of Interest policies.<br><br>  3.  **Involvement in Certain Sponsored Projects:** Faculty Members are normally prohibited from serving as Principal Investigator at the University on sponsored projects that are funded by an organization in which the Faculty Member has an Outside Employment or Outside Professional Commitment arrangement. In such cases, the Faculty Member must fulfill the disclosure and other obligations under the University's applicable Conflict of Interest policies. Exceptions may be approved by the Senior Vice President for Research in special circumstances such as (but not limited to) an SBIR/STTR arrangement or for ongoing research of a Faculty Member newly arriving at the University from another research institution. This stipulation is not intended to limit Faculty Members from participating in multi-site training or research programs, nor is it intended to apply to circumstances in which the Faculty Member's research requires access to facilities not available at the University.<br><br>D. Faculty and the Protection of University Students, Postdoctoral Scholars, and Trainees<br><br>  1.  The academic activities of students, graduate students, postdoctoral researchers, and other University trainees (together referred to as "Trainees"), including but not limited to those activities described in Section F, below) must be directed in accord with the best interests of the academic progress of these individuals and without regard for the external interests of a Covered Individual. While Covered Individuals who have external interests in companies often see opportunities for Trainees to obtain valuable practical experience through those companies, issues can arise when the Covered Individual has an interest in a successful outcome that is related to his/her Outside Employment or Outside Professional Commitment with the company involved. A Trainee may not feel that he/she is in a position to decline the opportunity when it is offered by a Covered Individual on whom the Trainee is dependent for academic guidance or recommendations. Additionally, after becoming involved with a project supported by the entity with which the Covered Individual has an |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | Outside Employment or Outside Professional Commitment, the Trainee may become concerned about the effects on his or her academic career caused by unanticipated issues in the external relationship. <br><br> 2. Certain steps are necessary to ensure that Trainees are informed and properly advised in these situations: <br><br>     a. Where the matter relates to research or research-related activities, the University requires that such activities adhere to the Policy on Individual Conflict of Interest in Research. <br><br>     b. For non-research-related matters, the Covered Individual's Outside Employment or Outside Professional Commitment arrangements must be presented to the Trainee in a context that (a) protects the Trainee from feeling any potential coercion in accepting an offer of employment, internship, or project experience; and (b) includes a mechanism for handling any issues that may emerge in the employment, internship, or project experience separately and independently from evaluation and guidance on academic progress. The Conflict of Interest Officer, in coordination with the Faculty Member's Department Head and Dean (or Administrative Professional's Supervisor) is available to assist and provide guidance in such arrangements. <br><br> **E. Requirements for Significant Use of University Resources and Proprietary Confidential Information** <br><br> 1. Significant Use of University Resources or the University's proprietary confidential information may not occur in connection with a Covered Individual's Outside Employment or Outside Professional Commitments unless <br><br>     a. Such use is approved by the head(s) of all unit(s) with authority over the resources and by the Dean and the relevant Vice President; and <br><br>     b. The use does not interfere with the University's performance of its missions; and <br><br>     c. The use is covered by a fully executed written agreement signed by a duly authorized signatory on behalf of the University in which all such uses of University resources are compensated in accord with fair market value or actual costs, pursuant to the relevant University research, business, and finance policies; and <br><br>     d. The Office of Record provides a copy of the Facilities Use Agreement Form or other agreement authorizing the use of University resources to the University's Conflict of Interest Officer, along with the approved Outside Employment or Outside Professional Commitment form. <br><br> 2. Resources purchased by the University through sponsored project grants or other contractual arrangements may be used only in accordance with the terms and conditions of the grant or contract and may not be used to fulfill |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | an individual's Outside Employment or Outside Professional Commitments.<br><br>3.  Covered Individuals may not provide, as part of any approved Outside Employment or Outside Professional Commitment, access to or use of research results, patentable inventions, copyright-protected materials, confidential information, materials or products, or other intellectual property in which ABOR claims an ownership interest under ABOR Intellectual Property Policy No. 6-908, without first obtaining a University license agreement, nondisclosure agreement, material transfer agreement or other appropriate contract authorizing such access and use, signed by a duly authorized signatory on behalf of the University.<br><br>4.  The University's or any University Sponsor's confidential Information may not be used as part of an Outside Employment or Outside Professional Commitment, without first obtaining the written consent of the owner of such confidential information (i.e., the University or University Sponsor) for such use, signed by a duly authorized signatory. (See also the University's policy on Misuse of University Assets.)<br><br>F. Publication Rights and Protection of Open Exchange of Scholarship<br><br>Free and open exchange of ideas and the results of scholarly activities are of the utmost importance to the University. As such, University scholars, including Faculty and Trainees, must be able to pursue topics of interest, have access to available information and facilities, and be able to communicate the results of their work to other scholars and the public. Therefore, Covered Individuals must ensure that their Outside Employment or Outside Professional Commitment arrangements do not restrict the rights of the University and University scholars to undertake research and scholarly work, and to publish, present, and disseminate the results of University research and scholarship in an open and timely manner to the broader scholarly community and public in keeping with University and ABOR policies.<br><br>**G. Ownership of Intellectual Property**<br><br>Covered Individuals do not have the authority to license, assign, or otherwise transfer rights in any intellectual property in which ABOR and/or University claims ownership under ABOR Intellectual Property Policy, and should not enter into any agreements in connection with an approved Outside Employment or Outside Professional Commitment that purport to confer rights to such intellectual property in conflict with the ABOR and University Intellectual Property Policies. Information related to the ABOR and University Intellectual Property Policies and assistance in obtaining a license or other grant of rights to ABOR-owned intellectual property rights are available through Tech Launch Arizona or the Office of the General Counsel.<br><br>**H. Authorship, Speaking, and Marketing/Promotional Activities** |

| Academic Institution | Conflict of Interest (COI) Definition |
|---|---|
| | 1. Where a Covered Individual is listed as an author on any publication or presentation that is based on his/her performance of an Outside Employment or Outside Professional Commitment (and not as the result of work performed under a University agreement with the external entity), the Covered Individual should clearly identify the entity under which the performance occurred. In such cases, the Covered Individual may list the University in his or her affiliation, but each such publication or presentation should include a disclosure of funding and must not state or imply that project funding was provided by the University, nor that the Covered Individual's contribution to such publication or presentation was part of his/her Institutional Responsibilities.<br>2. Covered Individuals are prohibited from publishing under their own names articles related to their professional activities or Institutional Responsibilities that are written in whole or in part by employees of external entities who are not identified as authors and project collaborators (i.e., "Ghost Written"). This is intended to address situations such as those in which articles essentially are drafted by employees of an external commercial entity (such as, but not limited to, a pharmaceutical company) for publication under the Covered Individual's name. This section does not apply to publications from multi-site programs, including training, clinical trial, and other research programs that are drafted on behalf of the group by a subset of the multi-site collaborators.<br>**I. Noncompliance**<br><br>In cases of noncompliance with this Policy, the University, the Faculty Member's Department Head and/or Dean, or the Appointed Professional's Supervisor may apply personnel sanctions or administrative actions in accordance with relevant University administrative, academic, and employment policies.<br>2. The University President's accountability relative to Conflict of Commitment is to ABOR and is not addressed in this Policy.<br>3. See the Office for the Responsible Conduct of Research Conflict of Interest web page for further guidance.<br>**https://policy.arizona.edu/research/conflict-commitment-policy** |

**Appendix 1.6**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, :
DANIEL A. SMITH, JEFFREY GOLDHAGEN, TERESA :
J. REID, and KENNETH B. NUNN, :

                                   :   **21-cv-184-MW-GRJ**

            Plaintiffs            :

     v.                              :   **AMENDED COMPLAINT**

                                            :

UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, :
the public body corporate acting for and on behalf of the :
University of Florida, W. KENT FUCHS, in his official :
capacity as President of the University Florida, JOSEPH :
GLOVER, in his official capacity as Provost of the :
University of Florida, and LAURA ROSENBURY, in her :
official capacity as Dean of the Fredric G. Levin College of :
Law, :

                    Defendants.           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A. Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn (collectively, "Plaintiffs"), by and through the undersigned attorneys, file this Amended Complaint for injunctive and declaratory relief against Defendants University of Florida Board of Trustees, W. Kent Fuchs, in his official capacity as President of the University of Florida, Joseph Glover, in his official capacity as Provost of the University of Florida, and Laura Rosenbury, in her official capacity as Dean of the Fredric G. Levin College of Law (collectively, "Defendants").

## NATURE OF THE CASE

1.       The University of Florida is a public research institution with a mission "to share the benefits of its research and knowledge for the public good." Contrary to that goal—and to foundational principles of academic freedom and free speech—it has

adopted a policy of censoring faculty members who participate in lawsuits against the State of Florida's policies.

2.      Plaintiffs are six full-time professors at the University who were asked and sought the University's permission to participate in litigation challenging laws on voting rights and COVID-19 public health measures.  The University denied Plaintiffs' requests for one reason:  Plaintiffs wanted to use their experience and expertise to support Florida citizens who challenged the State of Florida, rather than backing the State's position.

3.      Plaintiffs' job as public university professors and researchers is not to be mouthpieces for the government's point of view.  It is to develop and share their academic knowledge and expertise with the people of Florida while upholding the University's values and fulfilling their oath—taken by all public employees in the State—to "support the Constitution of the United States and of the State of Florida."

4.      Nor did Plaintiffs surrender their constitutional rights when they became public employees.  By discriminating against Plaintiffs based on the viewpoints they wish to express and by seeking to prevent them from speaking on issues of overwhelming public importance, the University of Florida violated Plaintiffs' rights under the First Amendment.

5.      The University will continue to do so if it is not stopped.  Facing a firestorm of nationwide criticism, the University agreed to let Plaintiffs proceed with their already-planned testimony in pending cases.  But the University's unconstitutional conflict-of-interest policy remains in place, giving the University unfettered discretion to stifle speech that it deems "adverse" to the State's political interests.

6. Unless and until the University's unconstitutional policy is rescinded, Plaintiffs' First Amendment rights and academic freedom—and those of every University of Florida faculty member—remain at stake.

## PARTIES

7. Plaintiff Sharon Wright Austin is a Professor of Political Science at the University of Florida. Professor Austin has been a member of the University faculty since 2001. Her scholarship and research focuses on African American mayoral elections, African American and Caribbean American political relationships, rural African American political activism, and African American political behavior. Professor Austin has authored books on African American political participation and published numerous articles on related topics. In addition, she was until recently the Director of the University's African American Studies program.

8. Plaintiff Michael McDonald is a Professor of Political Science at the University. Professor McDonald has been a member of the University faculty since 2014. His research focuses on elections, including voter turnout and eligibility. He has consulted on redistricting measures and served as an expert witness in lawsuits concerning elections in states around the country. Professor McDonald is also a co-principal investigator on the Public Mapping Project, which encourages public participation in redistricting.

9. Plaintiff Daniel A. Smith is a Professor of Political Science and Chair of the University's Political Science Department. Professor Smith has been a member of the University faculty since 2003. His research examines the effects of ballot measures, campaign financing, redistricting, and electoral laws on voting and political participation in the United States. Professor Smith has served as an expert witness in a number of

lawsuits concerning voting rights, ballot measures, campaign finance laws, and redistricting.  He has also testified before Congress and the state legislatures of Colorado and Florida on elections issues.

10.  Plaintiff Jeffrey Goldhagen is a Professor of Pediatrics and the Chief of the Division of Community and Societal Pediatrics at the University of Florida College of Medicine.  Professor Goldhagen has been a member of the University faculty since 1993. He focuses on community-based pediatrics and public health services.  He serves as the Medical Director for the Partnership for Child Health, the President of the International Society for Social Pediatrics and Child Health, and is the co-founder of the Population Health Consortium of Northeast Florida, which was formed in 2020 to respond to the COVID-19 pandemic.  Professor Goldhagen has served as an expert witness in litigation relating to lead poisoning of children.  He has also served as the Director of the Duval County Health Department and the Medical Director of Cleveland, Ohio's Department of Public Health.

11.  Plaintiff Teresa J. Reid is a Professor at the University of Florida Fredric G. Levin College of Law (the "Law School").  Professor Reid has been a member of the University faculty since 1987.  Her areas of expertise and teaching include the death penalty, legal writing, appellate advocacy, legal ethics, legal professionalism, evidence, and mediation.  She has presented numerous lectures and performed pro bono work on these topics, including by signing on to amicus curiae briefs (otherwise known as friend-of-the-court briefs).

12.  Plaintiff Kenneth B. Nunn is a Professor at the Law School.  Professor Nunn has been a member of the University faculty since 1990.  His areas of teaching and

expertise include criminal law, criminal procedure, African American history and the law, race and the justice system, and law and cultural studies. Professor Nunn has served as a member of the Innocence Commission of the State of Florida, which was charged with identifying causes of wrongful convictions in the State and recommending changes in legislation, court rules, and law enforcement practices to reduce the incidence of wrongful convictions. He has also authored numerous academic articles, given scholarly presentations, and signed amicus briefs on issues related to his fields of study.

13.     Defendant University of Florida Board of Trustees is the public body corporate of the University. It sets policy for the institution and serves as the institution's legal owner and governing board.

14.     Defendant W. Kent Fuchs is the President of the University. As President, Defendant Fuchs is responsible for the general administration of all University activities. Defendant Fuchs is being sued only in his official capacity.

15.     Defendant Joseph Glover is the Provost of the University. As Provost, Defendant Glover is the chief academic officer and the second highest-ranking officer of the University, acting for the President in his absence. Defendant Glover is responsible for: supervising the allocation of academic resources; improving instruction and coordinating instructional activities; developing and improving research activities; evaluating University academic activity; establishing the University's policy with respect to employment, promotion, and tenure of academic faculty; overseeing the University's Conflicts of Interest Office; and implementing the University's Affirmative Action/Equal Opportunity Program. Defendant Glover is being sued only in his official capacity.

16.     Defendant Laura Rosenbury is the Dean of the Law School.  In that position, Dean Rosenbury has been tasked with enforcing the University's Conflict of Interest Policy as it applies to Law School professors.  Defendant Rosenbury is being sued only in her official capacity.

## JURISDICTION AND VENUE

17.     Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988 to redress deprivation under color of state law of their rights secured by the First Amendment of the United States Constitution.

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claim arises under the Constitution and laws of the United States.

19.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities as officers of the State of Florida or its political subdivisions.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendants perform their official duties in this judicial district at the University's campus in Gainesville, Florida.  Venue also is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events that give rise to Plaintiffs' claim occurred in this judicial district.

21.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201–2202.

# FACTUAL BACKGROUND

**The University Adopts a Policy Giving It Unbridled Discretion to Prohibit Faculty from Speaking Out Against the State.**

22.     The University requires its faculty members to get its permission before engaging in certain activities.  The current version of the University's Conflicts of Commitment and Conflicts of Interest Policy ("the Policy"), which took effect on July 1, 2020, requires faculty to file a request for permission on the University's online conflicts system ("UFOLIO") each time they seek to participate in an "Outside Activity," which it defines as "any paid or unpaid activity . . . which could create an actual or apparent Conflict of Commitment or Conflict of Interest."

23.     The Policy provides little clarity as to what constitutes a "Conflict of Commitment" or a "Conflict of Interest."  It defines a "Conflict of Commitment" as "an Outside Activity, either paid or unpaid, that could interfere with the[] [employees'] professional obligations to the University."   It defines a "Conflict of Interest" as something that "occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgement or obligations to the University."

24.     Significantly, the Policy gives the University "sole discretion" to "determine[]" whether a Conflict of Interest or a Conflict of Commitment "may exist" and to determine what sanctions should be imposed on a faculty member with such a conflict.  As set forth below, the University has used its discretion to define those terms in a manner that discriminates on the basis of faculty members' viewpoints and has offered shifting and inconsistent explanations for its interpretation of the Policy.

7

25. The penalties for an employee's failure to comply with the Policy can be severe. The Policy provides that any violation of its requirements—including failure to disclose an outside activity or proceeding with an outside activity without first obtaining approval—can result in "administrative or disciplinary action . . . up to and including termination of employment."

**The University Prevents Law School Professors From Signing an Amicus Curiae Brief with Their Institutional Affiliation.**

26. On January 31, 2020, Gary Wimsett, Jr., Assistant Vice President for Conflicts of Interest, gave a presentation to the Law School faculty on the Policy.

27. On February 10, 2020, Dean Rosenbury emailed the Law School faculty to provide "some clarification" on the Policy's scope. She told the Law School faculty: "Writing or *signing on* to an amicus brief in your capacity as an individual law professor" was not an "Outside Activity" that required prior approval under the Policy because it was "[c]onsidered [p]art of [y]our UF [a]ssignment." (emphasis added.) Only "[a]micus briefs *written for another individual or entity*" were considered "Outside Activities" under the Policy. (emphasis added.)

28. In or around July 2020, Professor Nunn was contacted by attorneys for the plaintiffs in *Jones, et al. v. DeSantis, et al.*, No. 20-12003 (11th Cir.). That case challenged Florida Senate Bill 7066, which requires Florida citizens who have completed their sentence for felony convictions to pay any financial obligations included in their sentence before they can exercise their right to vote. The attorneys wanted to know whether Professor Nunn would be interested in signing an amicus brief in opposition to Florida Senate Bill 7066 along with other law professors from around the country and across the State of Florida.

8

29.    On July 1, 2020, Professor Nunn emailed over two dozen Law School colleagues who had expertise in constitutional law, voting rights law, civil rights law, or criminal procedure to ask whether they would be interested in joining the amicus brief in *Jones v. DeSantis*.  Professor Nunn requested that they respond by July 8, 2020.

30.    Professor Reid was among the faculty members who Professor Nunn contacted, and she agreed to join the amicus brief.  Eight other Law School professors also agreed to sign on, in addition to the Law School's Center for the Study of Race and Race Relations.

31.    In light of Dean Rosenbury's February 10, 2020 guidance, Professors Nunn and Reid did not think that they needed to seek the University's permission merely to sign the amicus brief in *Jones v. DeSantis*.  It made sense to them that signing on to the amicus brief would not be considered an "Outside Activity" because it was consistent with their job responsibilities at the Law School, where each taught courses implicating the rights of criminal defendants and those convicted of felonies.  Moreover, both Professors Nunn and Reid had previously signed numerous amicus briefs on issues relevant to their areas of expertise with no opposition from the University.

32.    But on July 9, 2020, just one day after the deadline that Professor Nunn had set for agreeing to sign on to the amicus brief, the law school abruptly changed its position on signing amicus briefs.  Dean Rosenbury emailed the Law School faculty, stating for the first time that faculty were required to seek permission before signing onto an amicus brief—but only if the brief was filed in a case opposing the State of Florida:

> [F]aculty participation in litigation against the state of Florida or any agency thereof, including through amicus briefs, is considered a potential conflict of interest.  If you seek to participate in such litigation or to write or sign on to

> an amicus brief in support of a party suing the state of
> Florida, you must fill out a disclosure form through
> UFOLIO and receive approval before participating. . . .

33. In an apparent reference to the Center for the Study of Race and Race Relations' plan to sign the amicus brief in *Jones v. DeSantis*, Dean Rosenbury added an additional requirement specific to entities like the Center: "Entities of the College of Law, such as centers, clinics, or other classes, seeking to participate in such litigation or amicus briefs must separately receive approval from me, the General Counsel, and President Fuchs."

34. Confused by this sudden change, Professor Nunn asked Dean Rosenbury to clarify the Policy as it applied to signing the amicus brief in *Jones v. DeSantis*. Contrary to her February 10, 2020 guidance that only outside activities were required to be disclosed, Dean Rosenbury responded: "You are correct that this is not an outside activity, but it is a potential conflict of interest because the amicus brief will be filed in an action against the state. You, and others, must therefore disclose on that basis."

35. On July 13, 2020, Dean Rosenbury wrote to Professor Nunn and other Law School faculty members:

> I have confirmed that the university will approve this
> activity so long as you participate solely in your individual
> capacity. You may not participate in your capacity as an
> employee of the University of Florida or on behalf of the
> Levin College of Law or the University of Florida. Please
> ensure that the amicus brief clearly indicates that any law
> school or university affiliation is included for identification
> purposes only.

36. Consistent with Dean Rosenbury's advice, Professor Nunn completed his UFOLIO disclosure for his participation in the litigation and included the following language:

10

> [Signing on to the amicus brief] will not put me in a
> position adverse to the interests of the University of
> Florida. I simply wish to sign on to an amicus brief, as one
> of more than 100 professors at law, to express an opinion
> about the proper interpretation of the law in regards to not
> infringing on the voting rights of ex-felons as provided by
> citizen initiative in the State of Florida. I understand that I
> may not participate in my capacity as an employee of the
> University of Florida or on behalf of the Levin College of
> Law or the University of Florida. I will ensure that the
> amicus brief clearly indicates that any law school or
> university affiliation is included for identification purposes
> only.

37.     Professor Nunn's UFOLIO request was unconditionally approved on July 14, 2020.

38.     Professor Reid also submitted a UFOLIO request to sign on to the *Jones v. DeSantis* amicus brief. On July 12, 2020, Professor Reid's UFOLIO request was approved with the condition that she "participate in this outside relationship in [her] individual capacity only." But, unlike Professor Nunn, her approval also stated that she was "*not permitted to use any UF* marks, logos or other *identifiers* in [her] outside activity/interest, and [could] not otherwise imply or suggest any official affiliation with UF." (emphasis added.)

39.     Following the controversy surrounding the University's shifting positions, most of the 10 professors who had expressed interest in signing the amicus brief in *Jones v. DeSantis* ultimately did not do so. When the amicus brief was filed, only four Law School professors, including Professors Nunn and Reid, were listed among the 109 signatories.[1] The Center for the Study of Race and Race Relations was not listed.

---

[1] *See* Appearance of Counsel Form filed by Jennifer Altman for 109 Professors of Law, *Jones et al. v. DeSantis et al.*, No. 20-12003 (11th Cir. Aug. 6, 2020).

11

40.     In addition, as a result of the University's conditions, the Law School professors' institutional affiliations were omitted from the brief.  Of the 28 law professors from Florida schools, Professors Nunn, Reid, and two additional Law School professors were the only ones who did not have their institutional affiliations listed alongside their signatures. All of the other 24 law professors from other Florida schools—including Florida State University College of Law and Florida International University College of Law—who signed the amicus brief listed their institutional affiliations alongside their signatures.[2]

41.     Although Professors Nunn and Reid agreed to join the amicus brief in *Jones v. DeSantis* in their personal capacities, listing their institutional affiliations was an important part of the message that they had wanted to convey.  Their professional association with the Law School—Florida's top-ranked law school—reflected their years of practice and scholarship and would have given greater weight and credibility to their signatures on the amicus brief.

**The University Blocks Professor Goldhagen from Testifying as an Expert Witness in Support of a Challenge to the Ban on Mask Mandates in Public Schools.**

42.     On July 30, 2021, Governor Ron DeSantis entered Executive Order Number 21-175 entitled "Ensuring Parents' Freedom to Choose—Masks in Schools" (the "Executive Order").  The Executive Order precluded school districts from enacting mask mandates and threatened to withhold state funds for any school district that chose to require masks in schools.

43.     Florida parents quickly sued to enjoin the Executive Order, arguing that it impaired the safe operation of schools in the State.  The lawsuit was filed in the Circuit

---

[2]     *See id*.

Court in Leon County under the caption *McCarthy, et al. v. DeSantis, et al.* ("*McCarthy*"), No. 2021-CA-001382 (Fla. Cir. Ct.).

44.     An attorney for the plaintiffs in the *McCarthy* litigation asked Professor Goldhagen to serve as an expert witness in support of the challenge to the Executive Order, including testifying at trial, to which Professor Goldhagen readily agreed.  As an expert in pediatric public health, Professor Goldhagen was asked to testify on the impact of COVID-19 on the pediatric population and the health benefits of requiring students to wear masks in schools to prevent the spread of COVID-19.

45.     Although expert witnesses are typically compensated for their time and expenses in preparing expert reports and giving expert testimony, Professor Goldhagen did not request compensation for his work on the *McCarthy* case.  Instead, he chose to donate his time pro bono to what he considered to be a crucial matter of public health.

46.     In accordance with the Policy, on or about August 11, 2021, Professor Goldhagen duly submitted a request through UFOLIO disclosing his engagement as  an expert witness in the *McCarthy* case.

47.     Professor Goldhagen had served as an expert witness multiple times before with the University's approval, and he did not expect to meet any opposition from the University this time.  After all, he believed, testifying on behalf of parents who wanted to protect their children's health and safety in school was entirely consistent with the University of Florida College of Medicine's "goal of improving individual and community health" and his oath as a medical doctor.

48.     So Professor Goldhagen was astonished when, on August 12, 2021, Gary Wimsett marked his application "denied."  In explaining the basis for the decision, Mr.

13

Wimsett made no attempt to hide that the University was denying Professor Goldhagen's application because Professor Goldhagen sought to testify on behalf of Florida parents and not the State, stating: "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."

49.     Professor Goldhagen subsequently inquired to "learn about the appeal process/procedure for decisions related to Disclosure for outside activities" and was informed by Mr. Wimsett that "[t]here is no mechanism for appealing disapprovals in UFOLIO."

50.     Professor Goldhagen informed the lawyer who had asked him to serve as an expert witness that the University did not approve his request. Though he encouraged the lawyer to subpoena him for his testimony—in which case he would be required to testify—the case moved too quickly, and the lawyer instead sought other expert witnesses who were not prevented from participating.

51.     As a result of the Policy, Professor Goldhagen was not able to serve the people of Florida by sharing his expertise, experience, and medical knowledge on one of the most critical public health matters of our time.

**The University Tries to Stop Professors Austin, McDonald, and Smith from Testifying as Expert Witnesses in Support of a Challenge to Voting Restrictions.**

52.     On May 6, 2021, Governor DeSantis signed Senate Bill 90 ("SB 90") into law. Among other things, SB 90 imposes obstacles on Florida voters' ability to cast ballots through in-person voting, mail-in voting, and the use of secure drop-boxes for early voting. It also places new restrictions on third-party voter-registration drives and prohibits certain organizations, including churches, from providing assistance to voters waiting in line to vote.

14

53.     Voting rights advocates sued to enjoin SB 90, arguing that it disproportionately harms Black and Latino voters and poor voters.  The lawsuits were consolidated before this Court under the caption *League of Women Voters of Florida, Inc., et al., v. Laurel M. Lee* ("*League of Women Voters*"), No. 4:21-cv-00186-MW-MAF (N.D. Fla.).

54.     Attorneys for the plaintiffs in the *League of Women Voters* litigation asked Professors Austin, McDonald, and Smith (the "Political Science Professors") to act as expert witnesses in support of their challenge to SB 90 and ultimately to testify at trial, to which the Political Science Professors readily agreed.  Those attorneys asked the Political Science Professors to testify on topics including the history of voting discrimination against minority groups, the use of mail balloting and in-person early voting in Florida, and the impact of vote-by-mail measures on minority groups.

55.     Two of the Political Science Professors had undertaken similar work before.  In particular, Professors McDonald and Smith previously served as expert witnesses in a number of lawsuits opposing voting regulations in states around the country, including lawsuits challenging Florida legislation and naming officers of the State of Florida as defendants.[3]  Professor Austin began serving as an expert witness this year.

---

[3]     Professor Smith has served as an expert witness in a number of cases, including: *Gruver, et al. v. Barton, et al.*, No. 1:19-cv-00121-MW-GRJ (N.D. Fla. 2019); *Rivera v. Detzner*, No. 1:18-cv-00152-MW-GRJ (N.D. Fla. 2018); *League of Women Voters of Florida, Inc. v. Detzner*, No. 4:18-cv-00251-MW-CAS (N.D. Fla. 2018); *Florida Democratic Party v. Scott*, No. 4:16-cv-00626-MW-CAS (N.D. Fla. 2016); *Arcia v. Detzner*, 1:12-cv-22282-WJZ (S.D. Fla. 2012); and *Romo v. Scott*, No. 2012-CA-000412 (Fla. Cir. Ct. 2012).

15

56.     As is typical and expected in expert witness engagements, Professors McDonald and Smith received fair compensation for their time and expenses in preparing their expert testimony in prior cases.  Plaintiffs' engagement in the *League of Women Voters* litigation was no different in this respect.

57.     The University did not object to Professor Smith and McDonald's prior work as expert witnesses.  If anything, it commended them.  For example, in Professor Smith's annual performance reviews, the University praised his research and advocacy on voting rights as "impactful and important for our colleagues, students, and the citizens of Florida."  And it celebrated both his considerable scholarly writings as well as his role as an advocate on voting issues, calling his work "important both as a scholar and as a contribution to the people of Florida."

58.     In accordance with the Policy, each of the Political Science Professors submitted requests through UFOLIO disclosing their engagement as expert witnesses in connection with the *League of Women Voters* litigation.

59.     The University refused to approve each of the Political Science Professors' applications, offering a series of shifting and inconsistent explanations that laid bare the University's real goal:  to prevent the Political Science Professors from testifying in support of a challenge to the State's policies.

60.     On July 7, 2021 and again on October 11, 2021, the University sent Professor Smith a disapproval notice.  As with Professor Goldhagen, the University told Professor Smith:  "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."

16

61.     On October 13, 2021, the University sent Professor McDonald a disapproval notice, which once again equated the interests of the University—a public research institution—with those of the State.  It stated:  "UF [w]ill deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests."

62.     Also on October 13, 2021, the American Civil Liberties Union's ("ACLU") Florida chapter sent a letter to Gary Wimsett, Assistant Vice President for Conflicts of Interest, and Brian Powers, Director, Conflicts of Interest, which stated that there "is no question that Dr. Smith would be speaking in his capacity as a private citizen, not as an employee of the University," that "he would obviously be speaking on a matter of public concern," and that his "interest in sharing his important perspective, and the public's interest in better understanding the operation of their government, far outweigh any purported contrary interest that UF might have."  The ACLU requested that the University "<u>immediately</u> rescind the denial" of Professor Smith's participation as an expert witness.  The University did not respond to this letter.

63.     On October 15, 2021, the University sent Professor Austin a disapproval notice containing the same language as was sent to Professor McDonald, but adding:  "As UF is a state actor, litigation against the [S]tate is adverse to UF's interests."

64.     Following Professor Austin's and Professor McDonald's disapprovals, the ACLU sent letters on their behalf similar to the letter sent on behalf of Professor Smith.  The ACLU, again, received no reply.

65.     On October 29, 2021, Plaintiffs' counsel sent a letter to Ryan Fuller, Associate Vice President and Deputy General Counsel for the University, which noted

that the University's Policy violated the Political Science Professors' constitutional rights and asked the University to reverse its disapproval decisions.

66. In response, the University adopted an all-new justification for its actions. In a statement posted on its website on October 30, 2021, the University suggested that the reason for the disapprovals was not only that the Political Science Professors' testimony was expected to be "adverse to the [U]niversity's interests as a state of Florida institution" but also that the Political Science Professors would be "paid" for their time and expenses.

67. On November 1, 2021, when Plaintiffs' counsel sent another letter to the University asking for clarity, the University retreated to yet a new position. In a letter replying to Plaintiffs' counsel, Fuller reiterated that the Political Science Professors' testimony "involved activities that are adverse to the State of Florida." But, he asserted, "pursuant to the University's policy related to outside activities," the Political Science Professors could testify as long as it was "in their personal capacit[ies], without the use of any University resources and without compensation."

68. Apparently recognizing the inconsistencies in its shifting positions, in a November 1, 2021 letter from President Fuchs to the "campus community," the University announced it was "immediately appointing a task force to review the [U]niversity's conflict of interest policy and examine it for consistency and fidelity," but provided no other details. As to the Political Science Professors, President Fuchs' letter stated: "[I]f the professors wish to testify pro bono on their own time without using [U]niversity resources, they are free to do so."

Faculty Senate Ad Hoc Committee on Academic Freedom

69.     But, as President Fuchs and Mr. Fuller surely knew, the Political Science Professors' work as expert witnesses would be performed solely in their personal capacities, and it would not impinge on the time that they are expected to devote to their work for the University or use University resources.

70.     As for the University's suggestion that its real problem with the Political Science Professors' testimony was that they would be compensated for it, that rationale is at odds with the University's position regarding the Law School professors' unpaid participation in the *Jones v. DeSantis* amicus brief and Professor Goldhagen's unpaid participation in the *McCarthy* case.

71.     Moreover, the State seemingly had no problem with the faculty of a public university testifying and receiving compensation for expert witness work that favors the State's viewpoint. Florida International University, like the University of Florida, has adopted a policy that limits faculty's outside activities that pose a conflict of interest with the "university, the Board of Governors, and/or the State of Florida." Upon information and belief, pursuant to that policy, Florida International University permitted Professor Dario Moreno to receive compensation for being an expert witness for the Republican National Committee and the National Republican Senatorial Committee as intervenors in the very same litigation in which the University forbade the Political Science Professors from doing the same for voting rights groups.

**Facing a Public Outcry, the University Rescinds Specific UFOLIO Denials But the Policy Remains in Place.**

72.     The University's refusal to allow the Political Science Professors to testify was made public in late October 2021, igniting a firestorm of public criticism.

73.    Florida's Democratic congressional delegation sent a letter to President Fuchs lambasting the school's attempt to block professors from serving as expert witnesses, and the American Association of University Professors released a statement condemning "in the strongest possible terms" the University's "infringement of [its professors'] academic freedom rights."[4]

74.    Nationally recognized academics condemned the University's Policy, as well.  Keith Whittington, a Princeton professor and Chair of the Academic Committee of the Academic Freedom Alliance, wrote in an October 31, 2021 letter to President Fuchs and other University leaders:  "The University is mistaken in thinking that this decision is consistent with the principles of free speech and academic freedom."[5]  Similarly, Robert George, a Professor of Jurisprudence and Director of the James Madison Program in American Ideals and Institutions at Princeton University, told University administrators at a meeting of the Florida Board of Governors that the Policy infringed professors' First Amendment rights.[6]

75.    The University's actions brought about a threat to its own accreditation status.  On or about November 1, 2021, the Southern Association of Colleges and

---

[4]    *See* Statement from AAUP President Irene Mulvey
 on University of Florida's Blatant Violation of Academic Freedom, University of Florida's Politically Motivated Violation of Academic Freedom Undermines the Common Good, Am. Assoc. of Univ. Professors (Nov. 1, 2021), https://www.aaup.org/news/university-floridas-politically-motivated-violation-academic-freedom-undermines-common-good#.

[5]    *See* Letter from Keith Whittington to President Kent Fuchs (Oct. 31, 2021), https://academicfreedom.org/wp-content/uploads/2021/11/AFA-letter-to-UF-on-expert-testimony-prohibition.pdf.

[6]    *See* Jimena Tavel, *Princeton Legal Scholar Advises UF to Back Off Restricting Professors in Suit Against State*, Miami Herald (Nov. 3, 2021), https://www.miamiherald.com/news/local/education/article255522016.html#storylink=cpy.

Schools, the University's accreditor, asked for clarification on the Policy and stated that it might launch an investigation to determine if the University's actions violated its rules.[7]

76. On November 5, 2021, the University reversed its denials of the Political Science Professors' UFOLIO applications, apparently as a matter of discretion. On or about that date, Professor Goldhagen's UFOLIO denial for the *McCarthy* case and for at least one other case concerning the ban on mask mandates were changed to "approved."

77. President Fuchs also announced that the newly appointed task force would "make a recommendation to [him] on how [the University] should respond when employees request approval to serve as expert witnesses in litigation in which their employer, the state of Florida, is a party," and would be asked to deliver "a preliminary recommendation by Monday, November 29."

**The Policy Remains in Place, Continuing to Violate Plaintiffs' Free Speech Rights.**

78. The University's unconstitutional Policy remains in place, and the University's hastily appointed task force is unlikely to remedy the problem. Public statements by President Fuchs, Provost Glover, and Dean Rosenbury—the latter two of whom serve on the task force—all indicate that the task force's mandate is limited to expert witness work and will not address other forms of participation in litigation or advocacy against State policies. President Fuch's November 5, 2021 announcement stated only that the task force's preliminary recommendation would address expert witness work by faculty members. Likewise, Dean Rosenbury, while inviting her

---

[7]     *See* Lindsay Ellis, *U. of Florida's Accreditor Will Investigate Denial of Professors' Voting-Rights Testimony*, THE CHRONICLE OF HIGHER EDUCATION (Nov. 1, 2021); *Accreditation Firm Investigating UF Professors Testimony Incident*, WCJB (Nov. 2, 2021), https://www.chronicle.com/article/u-of-floridas-accreditor-will-investigate-denial-of-professors-voting-rights-testimony; https://www.wcjb.com/2021/11/02/accreditation-firm-investigating-uf-professors-testimony-incident/.

colleagues' input into the Policy, asked only for advice about the policies and procedures "as they relate to the issue of serving as an expert witness." Provost Glover stated during the task force's first meeting that it was focusing solely on the issue of expert witness testimony because "[President Fuchs] feels that this is one of the issues that is most pressing[.]"

79. Moreover, there is no set timeline for the University to make revisions—if any—to the Policy. President Fuchs asked only that the task force give him a "preliminary recommendation" by November 29, 2021. It remains unclear when, if ever, the University will reach a final decision as to the Policy's terms and scope.

80. Finally, the composition of the task force highlights its inadequacy. The group excludes any representation from the Faculty of the College of Liberal Arts and Sciences or the College of Medicine. And it includes at least two members—Dean Rosenbury and Terra DuBois, Chief Compliance, Ethics, & Privacy Officer—who are conflicted because they have both been engaged in the development and unconstitutional execution of the existing conflict of interest policies. Neither can fairly or objectively judge the permissibility or constitutionality of their own actions.

81. In the meantime, the Policy continues to violate Plaintiffs' rights. Plaintiffs frequently are asked to participate in lawsuits concerning their areas of research and teaching. Many of these cases challenge legislation or government action related to elections or criminal procedure. Many seek emergent relief, including emergency motions in death penalty cases or motions for temporary restraining orders regarding voting procedures. Plaintiffs may be required to provide research or analysis on a highly expedited basis—sometimes in a matter of hours and sometimes without knowing

whether the State is a party to the litigation and, if so, whether their testimony will be for or against the State's position.

82.     The Policy's vaguely worded terms and the discretion that it vests in the University to define them—seemingly at whim—leaves Plaintiffs unable to determine whether they are required to seek the University's approval under the Policy and, if so, whether the activity likely would be approved.  As a result, Plaintiffs are likely to lose out on opportunities to participate as amici curiae or expert consultants or witnesses, particularly in fast-paced litigation.

83.     As a matter of principle and commitment to academic freedom and integrity, Plaintiffs intend to continue to participate in litigation challenging State policies that are within their areas of expertise whenever possible.

84.     Plaintiffs face serious risks in doing so.  If Plaintiffs were to accept an expert engagement or sign an amicus brief without first receiving the University's permission, they would invite significant professional consequences.  These could include, for example, withholding of institutional support or funding for projects that are important to their career advancement or denial of promotions.  The Policy even states that faculty who violate its terms can be terminated.

85.     The University's inconsistent and discriminatory application of the Policy has already left some Plaintiffs hesitant to participate in litigation at all.  For example, on November 3, 2021, Professor Nunn received an invitation to join an amicus brief in support of Terrence Andrus's request for resentencing for a crime committed as a juvenile in *Andrus v. Texas*, No. 21-6001.  Ordinarily, Professor Nunn would not hesitate to lend his name and prominence as a criminal law scholar to an amicus brief on such an

important issue. Nevertheless, on November 7, 2021, he declined the invitation, explaining that, "with all the turmoil going on down here with university oversight of our amicus signons, [he had] decided to wait until there is more clarity" on the Policy's scope. The Policy was the sole reason Professor Nunn decided not to sign the amicus brief in *Andrus*.

86. Unless and until the Policy is rescinded or declared unconstitutional to the extent it equates the University's "interest" with that of the State and allows the University unlimited discretion to block speech that it dislikes, it will continue to impede Plaintiffs from participating in litigation or other forms of advocacy that challenge State policies, in violation of the First Amendment and Plaintiffs' academic freedom.

**FIRST CLAIM FOR RELIEF**
**FIRST AMENDMENT**
**U.S. Const. amends. I, XIV; 42 U.S.C. § 1983**
**(Against All Defendants)**

87. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint as though fully set forth herein.

88. The First Amendment declares that "Congress shall make no law . . . abridging the freedom of speech." The First Amendment applies to the States under the Fourteenth Amendment.

89. 42 U.S.C. § 1983 provides a cause of action, including for declaratory or injunctive relief, against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States.

24

90.     Pursuant to the Policy, Defendants have unbridled discretion over whether to permit or deny Plaintiffs' expressive activity based on viewpoint or content and to suppress disfavored speech, in violation of Plaintiffs' First Amendment rights.

91.     Defendants also violated Plaintiffs' rights under the First Amendment by restricting Plaintiffs from participating in litigation on the basis of their viewpoint and by imposing a prior restraint on their speech, namely by requiring the University's permission to participate in litigation against the State.

92.     Discrimination and prior restraint on the basis of viewpoint or content are presumptively unconstitutional.  Thus, the University's restrictions must be struck down unless they are narrowly tailored to serve a compelling interest of the State.

93.     The State has no compelling interest in silencing University faculty and preventing them from speaking on a topic of such significant public importance as voting rights and public health.  And Plaintiffs' interest in speaking freely on a matter of public concern far outweighs any interest that the State may have in censoring their testimony. "The notion that the State may silence the testimony of state employees simply because that testimony is contrary to the interests of the State in litigation or otherwise, is antithetical to the protection extended by the First Amendment."  *Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998).

94.     The Policy further violates Plaintiffs' First Amendment rights because its vague terms give Plaintiffs no notice of what conduct is prohibited and lead to arbitrary and viewpoint discriminatory enforcement.

95.     Finally, the Policy's terms are overbroad because they capture a substantial amount of protected speech.

25

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.      Preliminary and permanent injunctive relief preventing Defendants from enforcing any policy or practice that provides the University discretion to limit Plaintiffs' ability to undertake outside activities, on a paid or unpaid basis, on the ground that the proposed activity is not aligned with the "interests" of the State of Florida or any of its entities or instrumentalities;

2.      Declaratory relief declaring unlawful Defendants' policy or practice that provides the University discretion to limit Plaintiffs' ability to undertake outside activities, on a paid or unpaid basis, on the ground that the proposed activity is not aligned with the "interests" of the State of Florida or any of its entities or instrumentalities;

3.      Reasonable attorneys' fees and costs; and

4.      Such other and further relief as this Court may deem just and proper.

Dated: November 15, 2021
Washington, D.C.

By:_____

DAVID A. O'NEIL (*pro hac vice*)          PAUL DONNELLY
Debevoise & Plimpton LLP                 Florida Bar No. 813613
801 Pennsylvania Avenue N.W., Suite 500  LAURA GROSS
Washington, D.C. 20004                   Florida Bar No. 858242
(202) 383-8000                           CONOR P. FLYNN
daoneil@debevoise.com                    Florida Bar No. 1010091
                                         Donnelly + Gross LLP
MORGAN A. DAVIS (*pro hac vice*)          2421 NW 41st Street, Suite A-1
ALEXANDRA P. SWAIN*                      Gainesville, FL 32606
JAIME FREILICH-FRIED (*pro hac vice*)     (352) 374-4001
SAMUEL ROSH (*pro hac vice*)              paul@donnellygross.com

SOREN SCHWAB (*pro hac vice*)           laura@donnellygross.com
KATHARINE WITTEMAN (*pro hac vice*)     conor@donnellygross.com
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
mdavis@debevoise.com
apswain@debevoise.com
jmfried@debevoise.com
sjrosh@debevoise.com
sschwab@debevoise.com
kwitteman@debevoise.com

*Application for admission pro hac vice
forthcoming*

*Counsel for Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A. Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn*

27

**Smith,Daniel A**

| | |
|---|---|
| **From:** | please-do-not-reply@ufl.edu |
| **Sent:** | Friday, October 15, 2021 10:51 AM |
| **To:** | Smith,Daniel A; AUSTIN,SHARON D |
| **Subject:** | DOI00020370 UFOLIO Disapproved |



**This is an automated notification. Please do not reply to this email.**

**UFOLIO Disclosure Disapproved**

| | |
|---|---|
| **Disclosure:** | DOI00020370 |
| **Discloser:** | Sharon Austin |
| **Department:** | LS-POLITICAL SCIENCE |
| **Entity:** | Advancement Project |
| **Disclosure Type:** | Legal Consulting |

Gary Wimsett reviewed the above referenced disclosure and **disapproved** this request.

**Comments:** Reasons:

Impermissible Conflict of Interest

UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests. As UF is a state actor, litigation against the state is adverse to UF's interests.

Gary Wimsett
Assistant Vice President, Conflicts of Interest

Click here  to access the disclosure.

---

*NOTE: This communication may contain information that is legally protected from unauthorized disclosure.  If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this message in error, you should notify the sender immediately by telephone or by return email and delete this message from your computer.*

**Smith,Daniel A**

**From:**        please-do-not-reply@ufl.edu
**Sent:**        Wednesday, July 7, 2021 3:29 PM
**To:**          Smith,Daniel A
**Subject:**     DOI00013593 UFOLIO Disapproved



**This is an automated notification. Please do not reply to this email.**

**UFOLIO Disclosure Disapproved**

**Disclosure:**          DOI00013593

**Discloser:**           Daniel Smith

**Department:**          LS-POLITICAL SCIENCE

**Entity:**              Demos & Perkins Coie

**Disclosure Type:**     Legal Consulting

David Richardson reviewed the above referenced disclosure and **disapproved** this request for the following reasons:

**Comments:** Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida.

Click here  to access the disclosure.

_____

*NOTE: This communication may contain information that is legally protected from unauthorized disclosure.  If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this message in error, you should notify the sender immediately by telephone or by return email and delete this message from your computer.*

**Smith,Daniel A**

| | |
|---|---|
| **From:** | please-do-not-reply@ufl.edu |
| **Sent:** | Monday, October 11, 2021 1:49 PM |
| **To:** | Smith,Daniel A |
| **Subject:** | DOI00019899 UFOLIO Disapproved |



**This is an automated notification. Please do not reply to this email.**

**UFOLIO Disclosure Disapproved**

| | |
|---|---|
| **Disclosure:** | DOI00019899 |
| **Discloser:** | Daniel Smith |
| **Department:** | LS-POLITICAL SCIENCE |
| **Entity:** | Demos |
| **Disclosure Type:** | Legal Consulting |

David Richardson reviewed the above referenced disclosure and **disapproved** this request for the following reasons:

**Comments:** Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida.

Click here  to access the disclosure.

---

*NOTE: This communication may contain information that is legally protected from unauthorized disclosure.  If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this message in error, you should notify the sender immediately by telephone or by return email and delete this message from your computer.*

**Smith,Daniel A**

| | |
|---|---|
| **From:** | please-do-not-reply@ufl.edu |
| **Sent:** | Wednesday, October 13, 2021 3:16 PM |
| **To:** | Smith,Daniel A; McDonald,Michael |
| **Subject:** | DOI00019897 UFOLIO Disapproved |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |



**This is an automated notification. Please do not reply to this email.**

**UFOLIO Disclosure Disapproved**

**Disclosure:**        DOI00019897

**Discloser:**        Michael McDonald

**Department:**        LS-POLITICAL SCIENCE

**Entity:**        Arnold and Porter

**Disclosure Type:**        Legal Consulting

Gary Wimsett reviewed the above referenced disclosure and **disapproved** this request.

**Comments:** Reasons:

Impermissible Conflict of Interest

UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests. As UF is a state actor, litigation against the state is adverse to UF's interests.

Gary Wimsett
Assistant Vice President, Conflicts of Interest

Click here  to access the disclosure.

---

*NOTE: This communication may contain information that is legally protected from unauthorized disclosure.  If you are not the intended recipient, please note that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this message in error, you should notify the sender immediately by telephone or by return email and delete this message from your computer.*

1

October 13, 2021

Gary D. Wimsett
Brian J. Power
University of Florida
Conflicts of Interest Program
720 SW 2nd Avenue, Suite 202
Gainesville, FL 32601

Via email:   gwimsett@ufl.edu
             brian.power@ufl.edu
             panders@ufl.edu



**AMERICAN CIVIL LIBERTIES UNION FOUNDATION**

Florida

4343 West Flagler Street
Suite 400
Miami, FL 33134
(786) 363-2714 (Direct)
dtilley@aclufl.org
aclufl.org

Daniel Tilley
*Legal Director*

Re:   **Professor Smith's ability to serve as an expert witness in litigation concerning SB90**

Dear Assistant Vice President Wimsett and Director Powers,

I write concerning a time-sensitive and important matter of academic freedom. One of the University's professors, Dr. Daniel A. Smith, informed me that he was recently denied the ability to serve as an expert witness in litigation challenging a voter-restriction law sometimes referred to as SB90. Specifically, his request was disapproved on the grounds that "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida." This is a breathtaking admission that not only contravenes the most basic principles of academic freedom but also violates Dr. Smith's First Amendment freedom to speak.[1]

The First Amendment prohibits the government from burdening public-employee speech so long as: (1) the employee is speaking in their capacity as a private citizen; (2) on a matter of public concern; and (3) the employee's interest in speaking, and the public's interest in receiving the employee's speech, outweigh the government's legitimate interests as an employer. *See, e.g.*, *Lane v. Franks*, 573 U.S. 228 (2014);

---

[1] Dr. Smith reserves all rights with respect to other grounds for overturning the denial—for example, any violation of the collective bargaining agreement or University policy on conflicts of interest).

*Garcetti v. Ceballos*, 547 U.S. 410 (2006). I will address each element in turn.

First, there is no question that Dr. Smith would be speaking in his capacity as a private citizen, not as an employee of the University.

[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.



*Lane*, 573 U.S. at 240. In other words, although Dr. Smith's testimony may relate to matters that he also teaches, he would still be testifying as a citizen because testifying in court as an expert witness is not part of his employment duties. *Compare Bott v. Bradshaw*, 791 F. App'x 41, 45 (11th Cir. 2019) ("Unlike the employee in *Lane v. Franks* whose 'ordinary job responsibilities did not include testifying in court proceedings,' one of [Deputy Sheriff] Bott's essential job duties entailed providing testimony regarding her investigation of and interaction with criminal defendants. And the Sheriff's Office paid Bott for the time she expended testifying in the defendant's bond revocation proceedings. Because Bott made her statements pursuant to her official duties, she was not speaking as a citizen for First Amendment purposes.") (cleaned up). Dr. Smith would be speaking as a citizen, not as an employee of UF.

Second, he would obviously be speaking on a matter of public concern. Indeed, UF's cited reason for denying the request almost concedes as much. Governor DeSantis was a champion of SB90, among other voter-restriction measures. The fact that these measures have been highly controversial does not weigh against Dr. Smith's participation—quite the opposite, the sociopolitical controversy around such measures merely confirms that these are matters of the upmost public concern.

Third, Dr. Smith's interest in sharing his important perspective, and the public's interest in better understanding the

operation of their own government, far outweigh any purported contrary interest that UF might have. Even assuming a different public employer would have any significant interest in preventing employees from testifying as an expert in their personal capacity, principles of academic freedom significantly reduce the scope of the government's legitimate prerogative to police professors' speech on matters of public concern. Universities are places for open and vigorous debate, not muzzling professors and students out of fear that a vindictive governor may retaliate. Moreover, it is hardly clear that Dr. Smith's act of testifying would even conflict with the purported principles of the executive branch. To the contrary, beyond championing SB90 and being a prominent opponent of so-called "cancel culture," Governor DeSantis also championed multiple pieces of legislation that he claimed were needed to protect the principles of freedom of expression in the State of Florida. Specifically, he secured the passage of an anti-"deplatforming" bill and a bill that, in the Governor's office's own words, "requires state colleges and universities to conduct annual assessments of the viewpoint diversity and intellectual freedom at their institutions to ensure that Florida's postsecondary students will be shown diverse ideas and opinions, including those that they may disagree with or find uncomfortable."[2] In other words (and while both of those laws suffer from their own problems), it is actually by *prohibiting* Dr. Smith's speech that the University is contravening the repeatedly expressed free-speech values of the State of Florida and its Governor. But perhaps most importantly, UF simply should not be looking to Governor DeSantis to decide which speech activities it will permits its employees and students to engage in. That is precisely the opposite of the values that universities are thought to stand for.



     Dr. Smith's expert testimony would be given in his capacity as a private citizen and would be on a matter of great public concern. Moreover, his testimony would be crucial to the public's understanding of one of their most valuable rights—the right to vote. I request that you <u>immediately</u> rescind the denial of

---

[2] https://www.flgov.com/2021/06/22/governor-ron-desantis-signs-legislation-to-set-the-pace-for-civics-education-in-america/

Dr. Smith's participation as an expert witness in the SB90 litigation and that you let me know by 8pm ET that you have done so.

Sincerely,

Daniel Tilley



Notes: Angela Kohnen                    **Appendix 1.7**
Meeting date: 9/28
3:30-5:00

Attendees: Glenn Good (COE Dean), Tom Dana (COE Associate Dean), Tina Smith-Bonahue (COE Associate Dean), Chris Hass (Associate Provost for Academic and Faculty Affairs), Ester de Jong (STL director), Erica McCray (SESPECS director), Alyson Adams (STL associate director), Chris Busey (Associate Professor, STL), Angela Kohnen (Associate Professor, STL; FPC chair); Taryrn Brown (Clinical Assistant Professor, STL); Travis Smith (Clincial Assistant Professor, HDOSE); Elayne Colon (Director of Assessment and Accreditation)

This meeting was called to discuss curricular initiatives around race and antiracism that have drawn the attention of university officials, specifically the proposed concentration "Critical Study of Race, Ethnicity, and Culture in Education" (approved by the college, waiting at the university) and the in-process master's certificate on Anti-Black Racism in Education (the first course of this proposed certificate has been held up at the college level)

**Chris Hass began by making the following points:**

- Mark Kaplan (UF Vice president, government and community relations) says that the UF COE is being viewed favorably by the state and has been receiving lots of money—COE is a "solution" to education in the state. He recommends that COE not raise any issues that might jeopardize this relationship

- President Fuchs is serving at the pleasure of the board of trustees. He can be removed at any time for any reason. Other state universities have been threatened with the replacement of their president with a political appointment. Richard Corcoran (former speaker of the FL house, current commissioner of the FLDOE) has been mentioned as a replacement for removed presidents. Provost Glover also could be removed for political reasons.

- Fuchs has not done what people want in terms of Covid—i.e., mask or vaccine mandates—because of threats to his job. He is jeopardizing his legacy at UF so he can remain in place. Neither Glover nor Fuchs are willing to be fired if the COE decides to press the issue of anti black racism curriculum. All the consequences will be on Dean Good or the college

- There is a fear if we push too hard that we will get a "Trump-style ban" in Florida

- Someone [who—this was unclear to me] has asked for all courses that have the word "race" in the title to be examined. Students are weaponizing syllabi by sending them to their representatives. A syllabus in computer science [is this right?] was mentioned as having been the subject of attack for asking students to consider race, gender, and inclusivity

- At least we now know that Florida is racist. We may have suspected it before but now it is known. Grew up here, knew it was the south, but is surprised by this

- Many departments/colleges are moving anything controversial out of the fall calendar while the legislature is in session. There is a feeling that after budget allocations are finished, it may be possible to move on other things. One center that wants to become a department has delayed this request until the spring, in hopes of not drawing controversy

- The specific combination of the words "critical" and "race" is a problem. The comparison institutions we listed as having similar programs do not use those specific words in combination. These words together are drawing attention. People are googling them. "We" know that the legislature and these people don't know what critical race theory is, but they are looking for these words

- Recommended that we either 1) change the name of the concentration to remove the word "critical"; and/or 2) not put the concentration forward until the spring; and/or 3) not put the concentration or courses forward at all and continue doing the work to "change the hearts and minds" of students without these specific courses or concentrations

Questions/points raised by other attendees :

Kohnen: the students reached out and asked for this certificate and concentration. Students are googling these things because they want to take these courses and have this concentration on their transcripts. They are getting jobs to study these issues. These aren't people who need their hearts and minds changed. They are seeking out these topics

Hass: Not all programs use these terms, even the ones we list on the form

Busey: Why would we remove the word "critical"? all courses with "race" are being examined. If we take out the word "critical" it will just be a new word later. The institutions who are ahead of us in the rankings have these programs. Our students are getting jobs in these institutions. UC-Berkley

Hass: they do not care about California. California was given as an example about covid policies and the governor laughed. They want to be compared to California and to be doing the opposite of California. They point to our state university system as being ranked number 1 in the country by US News and World Report and say we don't need to look at California

Adams: how do we expect to attract and retain faculty of color if this work is not valued? Why would faculty in this meeting want to stay here

Hass: They don't want these issues studied. "I don't know how I can look at you and say you shouldn't look for another job." The work is not valued here

Hass: something about teaching these things without the course titles. Do it without drawing attention to it. Do you need to have the certificate or concentration for students to study these issues?

De Jong: asks if we can teach the courses under special topics and not have the titles

Busey: Critical Race Theory in Education has already been approved, has a course number

Conversation turned to the certificate. The tenor of the conversation was that this was a certificate that some faculty were pushing (although in reality this was a college-wide collective initiative). Brown was mentioned repeatedly as if she was the one spearheading the efforts

[someone]: the point of the certificate was to draw from all three schools and to package the courses together. Students asked for this. The college worked on this in response to George Floyd. There was a sense that these would be marketable and would draw students. We spent last year trying to make things more visible. We already have been doing these things at the doctoral level, as it says in the proposal, but the concentration would give it visibility purposefully. Now we are being asked to make them less visible

Hass: yes, this was also true last year in our meetings--we focused on diversity and inclusivity in every meeting but that isn't happening anymore

Smith-Bonahue: the first certificate course was held up at the college level because of this issue

Hass: made several comments where he used the pronoun "we"

Smith: I keep hearing "we" but right now there is no "we." Was hired to be a critical scholar, uses critical methodologies. Unless the administration will support this work, there is no "we"

Hass: something about feeling dirty for having to have this conversation

Hass leaves, COE faculty and administrators stay on

Agreement to schedule another meeting

Race and Crime Center
for Justice
*Levin College of Law*
UNIVERSITY *of* FLORIDA

Appendix 2.0



# A WAY FORWARD

## UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement

**Dr. Katheryn Russell-Brown**
Levin, Mabie & Levin Professor of Law &
Director, Race and Crime Center for Justice
Levin College of Law, University of Florida

**Dr. Ryan Morini**
Research Director
Center for the Study of Race and Race Relations
Levin College of Law, University of Florida

Fall 2021

# A WAY FORWARD

## UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement

**Dr. Katheryn Russell-Brown**
**Levin, Mabie & Levin Professor of Law &**
**Director, Race and Crime Center for Justice**
**Levin College of Law, University of Florida**

**Dr. Ryan Morini**
**Research Director**
**Center for the Study of Race and Race Relations**
**Levin College of Law, University of Florida**

**Fall 2021**

## TABLE OF CONTENTS

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
Review of UF Race Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5
Review of the Literature . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
Research Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
Findings and Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13
      Questionnaires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .16
      Wish List For Race Scholars and Race Scholarship . . . . . . . .22
Emergent Themes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24
Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29
      7 Recommendations For UF Race Scholars . . . . . . . . . . . . . 30
      16 Recommendations For UF Administration . . . . . . . . . . . . .32
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36
References . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37
Acknowledgments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .39

Cover image: May Picture (1925) by Paul Klee. Original from the MET Museum, made available in the public domain through a Creative Commons CC0 1.0 Universal Public Domain Dedication License, at https://www.rawpixel.com/image/2989115/free-illustration-image-paul-klee-color-abstract.

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 1 ·

Page 107

## EXECUTIVE SUMMARY

This research project was designed to identify strategies and steps the University of Florida (UF) can take to more effectively support faculty whose work focuses on race or anti-racism. These steps can considerably strengthen UF's foundations for scholarship on race, an imperative for a top-five public university that is also the state's flagship academic institution. This report is based on interviews with and survey responses from UF faculty members whose scholarship focuses on issues of race or anti-racism. The 39 faculty members who participated in the study represent a broad range of disciplines and colleges, spanning arts, humanities, social sciences, and STEM. Their responses draw on a wide range of experiences that represent the complexities of a large institution. After identifying and highlighting the concerns, perceptions, and thematic suggestions raised by UF race scholars, the researchers identify 23 recommendations for UF race scholars and campus administrators. This study received funding from the UF Grant, "Advancing Racial Justice through Inclusion, Diversity, Equity and Access at the University of Florida," established by the Office of UF Research and the Office of the Chief Diversity Officer.

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 2 ·

Page 108

# INTRODUCTION

In June 2020, in the wake of George Floyd's killing by Minneapolis police officer Derek Chauvin, there were national and international civil rights protests around the globe. In one response, University of Florida president Kent Fuchs announced that he had directed the UF Office of Research to make competitive grants available to faculty on topics including race, equity, justice, and reconciliation.[1]  UF faculty members were invited to submit proposals to the UF Racial Justice Research Fund for grants ranging from $15,000 to $75,000. Forty-five grants were submitted, and following a peer review process, 16 were funded. UF had initially set $400,000 as the amount of available grant funds. After the positive responses to the solicitation, the Office of Research increased the grant funds to $970,000, more than double the initial amount. This grant funding opportunity is one of UF's strongest recent statements about the value of race-related scholarship and programming at the university.

*Which paradigms and strategies should the University of Florida implement to support and amplify faculty engagement on racial justice and the Black experience?*

Dr. Katheryn Russell-Brown, director of the Center for the Study of Race and Race Relations (CSRRR)[2] and Dr. Diedre Houchen, the CSRRR postdoctoral associate,[3] submitted a proposal, "Building Faculty Capacity to Develop Curriculum on Racial Justice Related to the Black Experience: A Mixed-Methods Study." The question at the core of the proposal was, "Which paradigms and strategies should the University of Florida implement to support and amplify faculty engagement on racial justice and the Black experience?"[4] This research question aligns with UF's mission statement, which states that the "university welcomes the full exploration of its intellectual boundaries and supports its faculty and students in the creation of new knowledge and the pursuit of new ideas."[5] The proposal was awarded $60,000 from the UF Racial Justice Research Fund.

In recent years, there has been a growing literature on how to build an anti-racist university.  Little of that research, however, has focused on

---

1   https://research.ufl.edu/wp-content/uploads/2020-RJcallFinal.pdf.

2   Dr. Russell-Brown was the CSRRR director from 2003 to 2021 and in Fall 2021 became the director of the Race and Crime Center for Justice (RCCJ) at UF's Levin College of Law.

3   Dr. Houchen was the CSRRR postdoctoral associate from 2016 to Spring 2021.

4   Earlier reports have addressed UF's racial climate, usually focusing on student experiences. See Rankin and Associates Consulting (2016); Baker et al. (2001); and Gonzalez et al. (1990).

5   https://catalog.ufl.edu/UGRD/administration/#missionstatementtext.

the strategies for ensuring that a university can actively and structurally support race scholarship. In this study, the term "race scholarship" encompasses research, teaching, and curriculum development. In examining the question of what UF can do to support its race scholars and race research, some people may wonder why this would be necessary. Why would a university need to do something more or different for race scholars than it would for scholars in other research areas?

Research addressing race, racism, and Blackness has long been a fraught area of inquiry. This is especially true for scholarship that forthrightly focuses on race and challenges common understandings of race, history, and institutions. Research in these areas is bountiful yet largely unseen. It has thrived at the margins of mainstream analyses of race. In contrast, some race issues are never far from the center. This is true on college campuses. For instance, in the aftermath of local or national racial incidents or campus invitations to controversial speakers. At these times, race scholarship can become a national focal point. Thus, issues of race and racism often occupy dual spaces in the academy: They are both muted and hypervisible. Centering the work of race scholars and their scholarship is necessary to overcome this visibility/invisibility paradox.

This report, written by Dr. Katheryn Russell-Brown and Dr. Ryan Morini[6], provides a detailed examination and analysis of the research findings. The researchers have attempted to present and discuss these findings in ways that are thoughtful, informative, and instructive for future application. The researchers also offer context for interpreting and applying the findings. Ideally, this report will foster dialogue and action among race scholars and expand the lines of communication and support between race scholars and the UF administration. Where possible, the report cites material that may be of particular interest to race scholars and university administrators. The report includes the following sections: Executive Summary; Introduction; Review of UF Race Data; Review of the Literature; Research Methods; Findings and Discussion; Emergent Themes; Recommendations; Conclusion; References; and Acknowledgments.

---

6   Research Director for the CSRRR (April to December 2021).

Faculty Senate Ad Hoc Committee on Academic Freedom                                                                                      Page 110
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 4 ·

## REVIEW OF UF RACE DATA

To provide some context for assessing UF race statistics, it is helpful to consider the racial demographics of the state of Florida. As seen in Figure 1, U.S. Census data for 2020 indicate the following racial breakdown for Florida's population of 23 million people: 53 percent White (but not Hispanic/Latinx), 26 percent Hispanic/Latinx, 17 percent Black, 3 percent Asian, 0.6 percent Indigenous (including American Indian, Native Alaskan, and Native Hawaiian) and Pacific Islander.[7] Of this 0.6 percent, 0.5 percent is American Indian and Native Alaskan, and 0.1 percent is Native Hawaiian and Pacific Islander.

**FIGURE 1: FLORIDA POPULATION BY RACE, 2020 (23 MILLION)**



The most current statistics on race and UF faculty members are from Fall 2020. The numbers in Figure 2 include information for 6,384 full and part-time faculty members.[8] The data cover all faculty at UF, of all ranks, including lecturers, professors, librarians, and extension agents.

---

7   https://www.census.gov/quickfacts/FL. It is noted that 2.2 percent of the population reported having more than one race.

8   https://ir.aa.ufl.edu/uffacts/workforce/. This number does not include faculty members who are identified as belonging to more than one racial group, those whose race was not reported, or those categorized as "Nonresident alien."

Faculty Senate Ad Hoc Committee on Academic Freedom                                    Page 111
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 5 ·

**FIGURE 2: UF FACULTY BY RACE, 2020 (6,384 FULL AND PART-TIME)**



67.6% White    8.1% Hispanic/Latinx    4.4% Black/African American    12.7% Asian    0.19% Indigenous/Pacific Islander

Using state population as the baseline, the data show that Black, Hispanic/Latinx, and Indigenous/Pacific Islander faculty members are statistically underrepresented at UF. For instance, Black people comprise 17 percent of Florida's population, but only 4.4 percent of UF faculty members. In other words, the percentage of Blacks in the state is almost four times higher than the percentage of Blacks on the UF faculty. This underrepresentation also exists for Hispanic/Latinx people, who comprise 26 percent of the state's population, but make up only 8 percent of UF faculty members. The percentage of Hispanic/Latinx people in the state is over three times higher than the percentage of Hispanic/Latinx UF faculty. Likewise, the percentage of American Indians and Native Alaskans in Florida (0.5 percent) is more than three times greater than their percentage on UF's faculty (0.16 percent). The situation is similar for Native Hawaiians and other Pacific Islanders, who comprise 0.1 percent of the population of Florida, but only 0.03 percent of UF faculty.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 6 ·
Page 112

Figure 3 offers a more nuanced look at race and UF faculty status.[9] The table lists each racial group's percentage for each faculty rank, which includes lecturer, assistant professor, associate professor, full professor, and distinguished professor.

**FIGURE 3: UF FACULTY BY RACE AND RANK (2020)[10]**

| | Lecturer (all ranks) | Assistant Professor | Associate Professor | Full Professor | Distinguished Professor |
|---|---|---|---|---|---|
| White | 69.4% | 51.1% | 67.4% | 77.1% | 71.1% |
| Hispanic/ Latinx | 9.5% | 7.6% | 7.6% | 6% | 3.8% |
| Black/African American | 6.6% | 4.0% | 4.3% | 2.5% | 0% |
| Asian | 6.4% | 16.4% | 17.9% | 12.2% | 25% |
| Indigenous/ Pacific Islander | 0.6% | 0.3% | 0.3% | 0% | 0% |

These data show that except for Asian faculty members, faculty of color comprise a higher percentage of lower-tier faculty such as lecturers, and a much lower percentage of senior-ranked faculty. Strikingly, there has not been a Black/African American, Indigenous, or Pacific Islander faculty member at the distinguished professor rank since at least 2011. Further, UF has no full professors who identify as Indigenous or as Pacific Islander. These data provide a snapshot of the demographic milieu within which UF race scholars operate.

A look at race statistics for UF students allows for a more detailed understanding of the university environment for race scholars and scholarship. In Fall 2020, 57,841 students were enrolled at UF, either part-time or

---

9   Column percentages do not add up to 100 percent because categories such as "Nonresident alien" and "Two or more races" are not included here.

10  The National Center for Education Statistics reports that in Fall 2018, out of 832,119 full-time faculty at US higher education institutions, 68.8 percent were White, 10.2 percent Asian, 5.5 percent Black or African American, 5 percent Hispanic or Latinx, while American Indian, Alaska Native, Native Hawaiian, and Pacific Islander combined accounted for approximately 0.5 percent. While UF's Hispanic/Latinx faculty representation is higher than the national average, UF's Black faculty representation falls below the national average (13.5 percent) and far below the population percentage in Florida (17 percent). See https://nces.ed.gov /programs/digest/d19/tables/dt19_315.20.asp.

Faculty Senate Ad Hoc Committee on Academic Freedom                                                          Page 113
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 7 ·

fulltime—including professional, graduate, and undergraduate students. Figure 4 provides the racial demographics for UF students.

---

**FIGURE 4: UF STUDENT POPULATION BY RACE, 2020 (57,841)**



51.8% White    20.4% Hispanic/Latinx    5.9% Black/African American    8.1% Asian    0.25% Indigenous/Pacific Islander

Black, Indigenous and Pacific Islander students have the lowest representation in proportion to the state population. In recent years a decline in Black student enrollment has been a particular point of tension at UF.[11] Race scholarship of the type that this study considers can help to address why such a decline has occurred, further underscoring the importance of supporting faculty who do this work as well as generating solutions for stemming or reversing such declines.

The racial makeup of top-level university administrators offers another contextual point of reference. The UF president's cabinet, the Provost's Office, and the roster of UF deans include few people of color.[12] Analysis of the available information appears to indicate that upward of 80 percent

---

11  See https://www.tampabay.com/news/education/college/At-UF-black-students-feel-a-reckoning-on-race-is-long-overdue_171057831/and https://www.gainesville.com/opinion/20200527/where-are-all-black-students-at-uf.

12  University of Florida, president's cabinet https://president.ufl.edu/cabinet/; University of Florida, Provost's Office, http://aa.ufl.edu/about-the-office/staff/.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 8 ·
Page 114

of upper-level positions are held by White people.[13] A more comprehensive assessment would include race data for all UF associate and assistant provosts, as well as members of the UF Board of Trustees.

Factors that operate beyond the campus walls also affect race-related academic inquiry. One recent example has been the national backlash against race-focused curriculum and inquiry. This movement seeks to ban the reading, teaching, and discussing of Critical Race Theory (CRT) in particular, and analyses based on systemic racism more broadly. While the primary focus of these attacks has been the curriculum in K-12 public education, race studies and race scholars at postsecondary institutions, such as the University of Florida, have been placed in the bull's eye of anti-CRT protests.[14] Florida has sanctioned restrictions on instructors who discuss or assign readings that address the histories of people of color and U.S. colonialism. In 2021, the Florida State Board of Education passed a "Required Instruction Planning and Reporting" rule, which includes the following language:

> Instruction… must be factual and objective, and may not suppress or distort significant historical events… Examples of theories that distort historical events and are inconsistent with State Board approved standards include the denial or minimization of the Holocaust, and the teaching of Critical Race Theory, meaning the theory that racism is not merely the product of prejudice, but that racism is embedded in American society and its legal systems in order to uphold the supremacy of white persons. Instruction may not utilize material from the 1619 Project and may not define American history as something other than the creation of a new nation based largely on universal principles stated in the Declaration of Independence.[15]

---

13  This is an estimate based upon the available online information. The researchers were not able to locate reported race data for UF administrators.

14  See https://www.wcjb.com/2020/08/20/uf-law-students-defend-online-critical-race-theory-class-after-the-college-cancelled-it-for-the-fall-semester/.

15  See Required Instruction Planning and Reporting, 6A-1.094124, 3(b), https://www.flrules.org/gateway/ruleNo.asp?id=6A-1.094124/. Additionally, Florida legislation proposed in September 2021, would expand the reach of anti-CRT legislation. The ban would make it unlawful to teach CRT in public schools, colleges, and universities. It would also extend the prohibition of CRT to municipal, county, and state agencies, as well as private contractors who work for the state of Florida. Fla. HB 57 (2021): https://www.flsenate.gov/Session/Bill/2022/57/BillText/Filed/PDF.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 9 ·
Page 115

Nationally, twenty-six states have introduced anti-CRT bills. Twelve states have bans that have already taken effect.[16] These rules consign race scholarship to a kind of academic purgatory, based on an overly broad definition of CRT that potentially encompasses all race scholarship.

In the current climate, faculty members who conduct race-related research face additional burdens. They must consistently evaluate whether their teaching and scholarship run afoul of CRT legislation. Ultimately, UF race scholars must engage in an existential inquiry: What are the values and costs of studying and teaching about race and racism and are they worth the risk?

*These rules consign race scholarship to a kind of academic purgatory, based on an overly broad definition of CRT that potentially encompasses all race scholarship.*

A review of race data for UF faculty, students, and administrators, and the state of Florida, provides context for evaluating the university's support of race scholars and their research. An assessment of the current social climate for this research also helps to situate the work of race scholars. This backdrop frames the comments and perspectives made by the faculty participants in this study.

## REVIEW OF THE LITERATURE

A robust and growing body of literature investigates how universities can become anti-racist institutions. Research on this topic typically centers on one or more of the following six interrelated questions. One, where and how does structural racism operate within institutions of higher learning?[17] Two, what are the barriers to creating an anti-racist institution?[18] Three, what practices and processes are necessary to create an anti-racist university?[19] Four, what are some strategies for adopting an anti-racist curriculum at a predominantly White university?[20] Five, what role should institutional leaders play in initiating a culture of racial change at their universities?[21] Last, how can universities disrupt institutional practices

---

16  https://www.edweek.org/policy-politics/map-where-critical-race-theory-is-under-attack/2021/06.

17  See Law (2017); Tate and Bagguley (2017); Welton, Owens, and Zamani-Gallaher (2018).

18  See Tate and Page (2018) and Tate and Bagguley (2017) (article argues that universities operate in ways that legitimize "epistemologies of ignorance," at 146).

19  See Gaudion (2021); Law (2017); Tate and Bagguley (2017).

20  See Brunsma, Brown, and Placier (2012); Gaudion (2021).

21  See Conway, Saidman-Krauss, and Schreiber (2021); Portugal (2006); Welton et al. (2018: 11-12).

Faculty Senate Ad Hoc Committee on Academic Freedom                                                                Page 116
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 10 ·

that reinforce and perpetuate longstanding racial disparities or points of contention on campus?[22]

The existing studies meet at the intersection of two distinct literatures: anti-racism and organizational change.[23] This research is instructive, seminal in fact, because it identifies the infrastructures that universities must build to uphold race scholarship. However, deep voids are present in the existing studies. Specifically, they do not fully investigate how universities can support faculty members who engage with race-related subject matter in their teaching or in their research. The scholarship does not investigate the key role of college and university administrations and how they can support faculty members who write and teach on racial topics, such as African American studies, Indigenous studies, immigration, mass incarceration, Critical Race Theory, and Whiteness. The research does, however, offer a framework within which to think about the individual and structural needs of faculty whose scholarship and instruction involve race.[24]

## RESEARCH METHODS

Participants were required to meet two eligibility requirements for the research project. One, they had to be current members of the UF faculty. For purposes of this study, "faculty" includes the following titles: adjunct, lecturer, assistant professor, associate professor, and professor.  Second,

---

22  See Grande (2018) and Leong (2013).

23  See Welton et al. (2018:2).

24  In the wake of George Floyd's killing, scores of universities, in the United States and abroad, issued statements expressing their commitment to racial justice, diversity, and inclusion. Some of these statements included action plans and curriculum guides. See e.g., John Jay College of Criminal Justice (2021) "Culturally Responsive, Inclusive and Anti-Racist Curriculum." (2020). http://www.jjay.cuny.edu/sites/default/files/u1862/principles_for_a_culturally_responsive_inclusive_and_antiracist_curriculum_adopted_by_college_council_april8_2021.pdf; Select Penn State Presidential Commission on Racism, Bias, and Community Safety—Recommendations (2020), http://perma.cc/7497-U4LH, https://dickinsonlaw.psu.edu/important-university-report-dean-conway-co-authored-released-comment. For a discussion of campus statements following Floyd's killing, see Wesley, Dunlap, and Russell. (2021).

Several universities have adopted faculty-directed initiatives as part of a larger anti-racism action plan. For instance, U.C. Berkeley's $2.8 million Mellon Foundation grant provides for research grants to researchers in African Americans Studies. (See https://news.berkeley.edu/2021/01/15/berkeley-african-american-studies-awarded-2-8-million-grant-to-expand-community-impact/.) Some colleges have identified the need to hire more professors who teach race-related subjects. For instance, the University of Michigan has stated that it will hire twenty additional faculty members, "who focus on anti-racism and justice scholarship." It has also created research seed grants for faculty members, to incentivize scholarship on anti-racism. See https://lsa.umich.edu/ncid/antiracism-collaborative/funding.html.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 11 ·
Page 117

they had to be currently engaged in either research or instruction that focuses on race-related subjects, such as anti-racism or Blackness. All participants were required to sign an informed consent form.

Data collection for this project took place during May and June 2021. The two-tiered research design included interviews and questionnaires.[25] The researchers generated a list of UF faculty members known to be engaged in race-related scholarship and/or curriculum. The list included a racially-diverse group of faculty who represent more than a dozen academic departments and several colleges. These faculty members varied widely in their teaching positions,  academic ranks, and time of employment at UF. Participants included faculty members across a wide age spectrum, different genders, and different sexual orientations.

After reviewing the list of faculty members, the researchers identified nine people to invite for a discussion—an individual meeting or a small group conversation. Small group interviews were scheduled for sixty minutes, and individual interviews were arranged for thirty minutes. The interviews were conducted using an online video recording platform. A professional transcription service was used to prepare a written document of the interview conversations. Interviewees were eligible to receive $50 electronic debit cards for their time and participation.

At the conclusion of each interview session, the researchers asked interviewees to share the names of other UF faculty members who are engaged in research or curriculum that addresses race, racism, anti-racism, and/or Blackness. This inquiry was very helpful and yielded the names of several faculty members who were not on the initial list drafted by the researchers.

Questionnaires were sent via email to forty-eight faculty members who were identified as meeting the criteria for participation.[26] Participants were given approximately three weeks to complete the survey and received weekly email reminders. Qualtrics was used to create the web-based five-item survey. The estimated time for completion of the open-ended questionnaire was fifteen minutes. Participants were given

---

25  The initial research plan was to conduct a series of focus group discussions. However, attempts to schedule six or more faculty members for a focus group meeting were unsuccessful.

26  To avoid redundancy, questionnaires were not sent to faculty members who took part in individual or group interviews.

information about the particulars of the survey and the grant. Each person was offered a $25 electronic debit card as compensation for their time and participation.

The individual and small group interviews were completed prior to dissemination of the questionnaires. These discussions aided the researchers in preparing the questionnaire and interpreting the responses. A total of thirty-nine people participated in this study (nine were interviewed and thirty completed questionnaires). Of the faculty participants, eighteen were Black, twelve were White, and nine were Latinx.

---

*Response Rates and Confidentiality Concerns*
As noted, 48 faculty members were invited to take the survey. Of that number, 30 completed the questionnaire—a response rate of 62 percent. Some faculty members informed the researchers that they were hesitant to complete the survey for fear of being identified and possibly retaliated against for any perceived criticisms of the University of Florida. Notably, only 53 percent of the faculty members who took the survey completed the form required to receive the $25 gift card. Completion of the form required name and contact information.[27] To reduce the chances of compromising anyone's confidentiality in this report, when quotes are used or references made to faculty members' comments, no information about the participant's demographic background or affiliation is included.

---

## FINDINGS AND DISCUSSION

## A. Individual and Small Group Interviews

The conversations with faculty race scholars offer layered reflections and insightful strategies for UF to use to support these scholars and race-related scholarship. Over the course of these discussions, common concerns

---

27  It was necessary to gather this information so that the researchers could keep track of grant spending. Participants were informed that the contact information was separated from the survey responses so that completing the form would not compromise the anonymity of the survey responses.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 13 ·
Page 119

and understandings emerged. The stories, information, and observations coalesced around two focal points, discussed below.

## INADEQUATE FOCUS ON RACE SCHOLARSHIP

Several faculty members commented that research on race is not a recognized strength or an apparent interest by UF's administration. One person stated, "My fear is that our work [is going to be] ephemeral... that we do our work and we just vanish." Several participants said that their scholarship does not appear to register on the UF radar. Some concluded that race scholarship at UF does not have institutional heft or longevity. This work is not considered part of the larger, important work that UF produces as an R1 university. One participant stated, "We need to talk about the long term." To do this, UF will need to create a structure that treats race-related research and instruction as viable and integral to UF's institutional mission.

*"My fear is that our work [is going to be] ephemeral... that we do our work and we just vanish."*

The responses indicate that UF's apparent disinterest in race manifests in other ways. An example is the commissioning of surveys that measure faculty climate, but then not applying the findings. Some faculty members noted that over the years, the results from UF surveys have not translated into substantive or lasting changes. Some wondered how, for instance, UF uses reports from university committees, such as the UF Faculty and Staff Climate Report.[28] One faculty member asked, "[Do these committees] really have an impact on campus or is this just a showcase thing and we'll forget about it next year?"

One participant said it is important for UF to signal that race scholarship and race scholars have institutional value, beyond discussions about national rankings or current events. This is particularly important in view of the 2021 challenges to race-related research and curriculum, such as Critical Race Theory.[29] The research silos discussed next may be exacerbated by the fact that UF does not appear to treat race-related scholarship as one of its research strengths or areas of emphasis.

## DISCONNECTEDNESS, ACADEMIC SILOS, AND UNIVERSITY STRUCTURES

Several interviewees emphasized a need to establish a physical, collaborative workspace for scholars who study and teach on race. Various names were used to name this space, including a "Black Politics Institute," an

---

28  Rankin and Associates Consulting (2016).
29  See discussion in "Review of UF Race Data."

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 14 ·

Page 120

"Anti-Racism Center," and an "Ethnic Studies department." Respondents commented that this workspace should not be limited to a particular college or department but serve the entire university. One faculty member said, "It can't belong to any one college, it has to cut across [UF] colleges in the same way that racism cuts across all institutions of our society." The respondent continued, "UF needs to invest in a center, a meeting place, a physical structure, staff, resources, so that there's a clear intellectual hub. I think that is key."

Faculty respondents noted that UF has had institutional supports for race-related teaching and research. The Samuel Proctor Oral History Program and the Center for the Study of Race and Race Relations were referenced by several faculty members as having provided key support for race-related curriculum and programming. Faculty members also observed that due to a variety of factors—including inadequate funding, sparse staffing, lack of faculty lines, and targeted or circumscribed program missions—existing centers and programs cannot address the gaps in support for race-related faculty scholarship. The Institute for Black Culture (IBC), the Institute of Hispanic-Latino Cultures (La Casita), and the cluster hires in the African American Studies Program were also mentioned as forms of institutional support for race-related scholarship.

An overview of UF structures would address how the university could highlight race scholarship and curriculum. For instance, the discussions pointed to a disconnect between UF's existing online race/anti-racism content and content that would be particularly useful to race scholars. UF has webpages that address its recent anti-racism efforts.[30] However, most faculty respondents indicated that they were not aware of these webpages and had no input in their creation or content.

*"UF needs to invest in a center, a meeting place, a physical structure, staff, resources, so that there's a clear intellectual hub. I think that is key."*

Overall, the concerns raised in the interviews urge UF to be more proactive, more transparent, and bolder in its support of race scholarship. The recurring themes indicate that UF race scholars believe their work is marginalized and is not treated as part of UF's core research.

The observations that emerged in the interviews offer useful organizing principles for assessing which steps UF should take to build an institution that fully supports race-related faculty scholarship and curriculum. The

---

30  See https://antiracism.ufl.edu/central-initiatives/history/.

responses to the questionnaires, discussed in the next section, echo and illuminate these observations. Those responses detail why greater administrative engagement and support are essential, and the responses identify specific forms of administrative support that would be beneficial.

## B. Questionnaires

Five questions appeared on the online survey. What follows is a summary of the responses to each question.

**QUESTION 1   PLEASE DESCRIBE YOUR WORK ON RACE AND/OR ANTI-RACISM.  WHAT ARE YOUR AREAS OF EXPERTISE?**

UF has a deep well of faculty expertise on race-related topics. Faculty members cited numerous research topic areas for their work on race, including gender, class, technology, ability, slavery, sexuality, art, language, law, sports, immigration, media, social movements, and religion. Most respondents noted that their research and courses exist at multiple intersections.

While this list is inclusive of topic areas referenced by survey participants, it does not adequately capture the breadth and depth of race-related work that UF scholars are doing. They are engaging in research that involves analyses of institutional structures (e.g., educational systems, courts, and political units); they are conducting studies that involve people from various racial backgrounds; they are assessing how laws and practices impact girls, women, and mothers; they are engaged in historical and contemporary critiques of how systems work; and in some instances, they are conducting cross-continent analyses of select behaviors. Faculty also report various modes of research engagement, including qualitative research, quantitative research, legal analysis, and theoretical development and critique.

**QUESTION 2   WHAT STRUCTURES OR FORMS OF SUPPORT EXIST AT UF THAT HELP YOU WITH YOUR WORK ON RACE AND/OR ANTI-RACISM?**

### Formal Support

Most faculty respondents said that UF provides inadequate institutional support for race-related research and curriculum. One person responded, "I have not received any direct support from UF for this research." Another answered, there are "no structures."

Faculty Senate Ad Hoc Committee on Academic Freedom                                                                 Page 122

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 16 ·

Many participants said that there is scattered and limited support for their work. This includes forms of assistance that have been made available at the department, college, or university level. As one faculty member commented, "In my areas of research, there is little to no research support that exists beyond the general [college] support for UF faculty." Several people described receiving support from the university that was not specifically geared toward race scholarship.  Examples include general faculty grants made available from their department or college, summer stipends, research assistance, and travel allowances for conferences. One respondent said that allowing faculty members to have flexibility in their course schedules is another form of general faculty support, which allows them to prioritize their research on race.

Faculty members also referred to the efforts of several interdisciplinary UF centers and programs that, though located within particular colleges, also provide support or programming that is available to individuals or units across campus. This includes the Samuel Proctor Oral History Program, the Center for the Study of Race and Race Relations,[31] the Center for Latin American Studies, the Center for Humanities and the Public Sphere, and the African American Studies Program. Additionally, a few people said that they used resources from one of the special collections within UF's library system.

*"In my areas of research, there is little to no research support that exists beyond the general [college] support for UF faculty."*

Examples of campus-wide support include faculty-led workshops and other forms of training, knowledge-sharing, and mentorship. Numerous comments reveal that faculty have worked to create the forms of community and support they need. To the degree that these activities took place within the university, they may technically qualify as "university support." However, because these activities are not embedded within existing UF structures, they could justifiably be called "ephemeral"—the term a faculty respondent used to describe temporary, non-institutionalized practices.[32] An example of this would be a one-time event or program that does not impact the university's long-term approach to race.

---

31  Several faculty members referred specifically to the CSRRR Course Development Grants. These grants were designed to encourage and support the teaching of race-related courses at UF. Funding was available to professors and doctoral students to teach upper-division undergraduate courses on race. From 2008 to 2020, the CSRRR awarded more than twenty-five course development grants. The grant recipients represented a wide range of disciplines, including psychology, education, health services research, English, political science, African American Studies, history, anthropology, and sociology.

32  See "Individual and Small Group Interviews," in "Findings and Discussion."

Faculty Senate Ad Hoc Committee on Academic Freedom                                        Page 123
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 17 ·

## Informal Support

In their comments about the types of support that are available at UF, faculty members often compared the availability of formal and informal assistance. Most faculty respondents stated that formal supports were few and far between. One said, "I do not find UF to be genuinely supportive of race issues." Most scholars, however, referenced informal supports. One person commented, "There is little structure at UF that helps support my work. Fortunately, there is a small pool of faculty and graduate students that share an interest in work on race and racism." Another said, "Network[ing] and supports from colleagues with similar expertise have functioned as the primary support in my work on race/anti-racism."

In the absence of strong and identifiable institutional aids for race-focused scholarship and curriculum, race scholars have adopted numerous strategies to engage in and bolster their work. As noted, many have initiated successful informal supports to build community, such as workshops and informal gatherings. Some have developed informal structures for peer collaborations and mentorship. In the absence of systemic structures at UF that support their work, faculty members (and each faculty cohort) who do research on race or anti-racism are left to figure out their own academic support structure. These makeshift adaptations, borne of necessity, have been successful for many. However, they impose added layers of academic labor and usually no additional compensation. On this point, one respondent shared:

> I have not found structural supports for the kind of work that challenges and seeks to transform institutional inequalities (pay equity, disproportionate teaching and service loads, and compensation for cognitive and emotional labor involved with doing anti-racist work).

This comment underscores the observation that the university's primary assistance for race scholarship is in the form of generic support for traditional scholarship. At best, this approach provides superficial support for race research. The absence of more substantive race-related resources exacts a toll. For instance, the fact that there is no campus resource or repository for race-related curriculum reduces the likelihood that UF faculty can easily engage with cutting-edge theoretical and pedagogical research on race. As one respondent said, "My department… provides moral support, but I do not have structural support for teaching about race." Pedagogical preparedness is particularly important for faculty

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 18 ·

Page 124

members who address fraught subject matter in the classroom. Faculty responses make clear that it would be beneficial to students and faculty if UF provided greater curriculum support for those who teach race-related course content.[33]

## QUESTION 3  DO ANY STRUCTURAL FEATURES AT UF HINDER OR IMPEDE YOUR WORK ON RACE AND/OR ANTI-RACISM?

With notably few exceptions, the thirty respondents stated that there are existing structural features that hinder, impede, or do not support their research. This question drew strong and detailed responses. The answers point to a range of inter-related factors and processes at UF that impose roadblocks to faculty scholarship and courses on race.

*"To be free to do something is not the same as being encouraged, supported, and honored for doing particular work."*

A number of respondents raised concerns about the administration's approach to issues involving race. Several suggested that UF sends clear messages that it does not value race scholarship. One person said UF shows "general neglect" toward race issues, while another described UF as "basically indifferent" to race matters. Respondents detailed the impact of what might be called "institutional malaise" toward race. A few faculty members noted their academic freedom in pursuing race-related research. However, as one person stated, "To be free to do something is not the same as being encouraged, supported, and honored for doing particular work." Another faculty member said that the university's climate sets the tone for race scholarship:

> As a non-tenured faculty member, I am hesitant to share certain views and perspectives regarding race and structural racism due to prevailing political tendencies that are evident at UF. I do not feel open to share those perspectives… because of fear of retribution during evaluation periods. This dynamic ultimately impedes my work on race and anti-racism because I knowingly hold back out of concern for my job security. In other words, I often feel my freedom of expression and academic inquiry is suppressed.

---

33  See Race, Education, and Pedagogy (REAP) Guide, compiled by the Center for the Study of Race and Race Relations (2021), https://guides.law.ufl.edu/reap/positionality#s-lg-box-25998174.

Faculty Senate Ad Hoc Committee on Academic Freedom                                         Page 125
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 19 ·

More than one person said that as a group, UF faculty members have limited knowledge about race, anti-racism, or Blackness scholarship. This dearth of knowledge means that those with expertise in these areas pull the laboring oar in terms of educating colleagues and assisting the administration when it must respond to campus race issues. One faculty member commented, "Structurally the lift for those few who have expertise is exhausting."

Further, assessing the institutional climate includes evaluating how the university treats its current and past race scholars, and its commitment to build a team of race scholars. One respondent, referencing the departure of race scholars Dr. Ibram Kendi and Dr. Faye Harrison, said that UF has "an inability or refusal to hire and maintain faculty [who] can build a critical mass for teaching, research, and publishing in the fields of race and anti-racism."

*"Structurally the lift for those few who have expertise is exhausting."*

Several people noted that external factors also impact the viability of their scholarship and instruction. The attacks on Critical Race Theory were cited by several respondents as having an impact on their academic work. One faculty member commented, "Politics in the state of Florida—and the university's acquiescence to such politics—may soon make any scholarship  and teaching about race and racism impossible if not illegal." Another said UF has shown "public cowardice" in pushing back against assaults on race scholarship which "impedes our ability to recruit, retain and do this work. Thank goodness for tenure. But not everyone has tenure."

Many faculty members expressed concern about the vulnerability of faculty who are engaged in race scholarship. One person said, "Scholars conducting work on racism are being heavily surveilled and I do not get the sense that the school will protect them." Another person stated, "UF does not have the backs of those they rely on to burnish their image."

*"Politics in the state of Florida—and the university's acquiescence to such politics—may soon make any scholarship and teaching about race and racism impossible if not illegal."*

Overall, the comments strongly suggest that race scholarship is neither celebrated nor protected—simply tolerated. Further, administrative silence mutes race research and curriculum. There is no clear structure within which the university assigns credit to faculty conducting anti-racism work (such as service, scholarship, or curriculum develop-

Faculty Senate Ad Hoc Committee on Academic Freedom                                    Page 126
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 20 ·

ment). This is particularly notable in a socio-political climate in which race scholarship is under a national microscope. The comments of race faculty point to the irony of the university being silent about attacks on research that was created within university walls.

### QUESTION 4  IF YOU COULD CREATE A WISH LIST OF THINGS THAT UF COULD DO OR CREATE TO SUPPORT RACE AND/OR ANTI-RACISM SCHOLARSHIP, WHAT WOULD BE ON THE LIST (E.G., SPECIFIC STRUCTURES, INCENTIVES, RESOURCES, ORGANIZATIONS, POLICIES, PROGRAMS, OR OTHER FORMS OF SUPPORT)?

Faculty members provided their most extensive responses to this question, and most offered several items for the Wish List, which they often framed as interrelated and cumulative.[34] The list as presented on pages 22 and 23 is pared down from more than 125 suggestions and ideas. Many of the items on the list were mentioned by multiple participants. Overall, the Wish List items are a detailed portrait of the labor, time, and energy expended by race scholars. The vast majority appear to be directed toward UF's upper administration and college deans, and they are all framed specifically around race scholars, race scholarship, and anti-racism. Entries that refer to "faculty" should be understood to refer to faculty race scholars.

The Wish List includes a broad range of items, some of which were mentioned multiple times. This includes the need for more support and recognition of race scholarship, the need for UF to demonstrate a clear and unequivocal commitment to race scholarship and anti-racism, and the need for dedicated university physical space to support race scholarship for the entire UF community. The list includes some actions that race scholars themselves can engage in as well as steps UF can take to engage with and bolster race-related scholarship. One of the most unifying threads that faculty expressed in their responses, both in the survey and the interviews, is the need for campus-wide resources and units designed to support faculty and race scholarship across UF colleges.

---

34  In addition to inclusion on the questionnaire, faculty members who were interviewed were also asked to identify items for the Wish List. The interview responses are incorporated into the Wish List items in Figure 5.

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 21 ·

Page 127

**FIGURE 5:**
# WISH LIST FOR RACE SCHOLARS AND RACE SCHOLARSHIP

**General Institutional Principles and Imperatives**

- Involve UF faculty of color and race scholars in creating support structures
- Audit colleges and departments on tenure and promotion statistics regarding race scholars
- Protect and support faculty and race scholarship vis-à-vis state politics
- Recognize that investing in diversity deans is not a substitute for investing in faculty race scholars
- Identify and address race-related structural inequities
- Allow race experts to guide requisite administrative changes on race
- Generate a long-term plan emphasizing people (not just their work) and a transformation of institutional culture
- Create a directory of race scholars, scholarship, and campus resources
- Staff a centralized hub to highlight new race scholarship by UF faculty and advertise events
- Use what UF has done with artificial intelligence as a model for supporting race scholarship
- Redesign policies to be proactive rather than reactive in relation to race and anti-racism
- Actively review the successes of racial justice projects and identify meaningful next steps

**Recruitment and Retention of Race Scholars**

- Prioritize pay equity for UF faculty, do not underpay Black faculty
- Commit to a recruitment plan to increase faculty lines for race scholars
- Create an endowed chair on race, which could rotate through different departments
- Improve access to databases and archives crucial to race-related scholarship
- Fund research grants, conference travel, and curriculum development

**Material Recognition and Support of Race Scholarship**

- Identify incentives for additional mentoring and service work tied to race scholarship (e.g., course releases, leaves, pay increases)
- Create incentives and operating budgets for faculty who spearhead university-level initiatives
- Add specific language in tenure/promotion evaluations that credits extra work (e.g., community engagement) required in race scholarship
- Offer awards for outstanding race-related scholarship (with funding)
- Support race faculty, especially women of color, against unfair or retaliatory course evaluations
- Recognize that qualitative research is as valuable as quantitative research

**Curriculum and Teaching**

- Provide time and resources for instructors to learn anti-racist pedagogies
- Assess current curriculum and teaching through an anti-racist lens
- Require specific language on syllabi regarding race and anti-racism
- Fund ongoing course development grants; encourage team teaching with full funding
- Require that all students have coursework that addresses race and anti-racism

Faculty Senate Ad Hoc Committee on Academic Freedom                                    Page 128

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 22 ·

---

**Funding or Strengthening Support Units—Centers and Departments**

➲ Increase faculty lines, postdocs, graduate assistantships, fellowships, and undergraduate research support

➲ Establish faculty funds for competitive grants for research or travel

➲ Make funds available for visiting scholars, conferences, and lecture series with global analysis of race

➲ Continue building up African American Studies and other units with race scholars

➲ Provide more support for Latinx Studies

➲ Create a center for race scholarship, with a dedicated building and campus-wide mission

➲ Support organizations or resources that help UF race scholars network and collaborate

➲ Create an organization for anti-racist faculty

➲ Support faculty colloquia, forums, dialogues, or other gatherings that rotate among colleges

**Professional Development**

➲ Provide mentors from outside race scholars' department

➲ Establish more programs that build on the success of "Academics for Black Lives"[35]

➲ Have annual workshop series on race and racism with campus-wide call for proposals

➲ Mandate anti-racist workshops for all instructors

➲ Make more counseling and related support programs available for instructors of color

➲ Support programs on contemporary race topics, such as state-sponsored education bills

➲ Acknowledge mental health toll of engaging in race scholarship

➲ Support annual retreats that allow faculty to share and evaluate ongoing work and plan collaborations

**Addressing UF's Ongoing Legacies of Racism and Inequity**

➲ Have serious deliberation on renaming buildings

➲ Investigate UF's historic ties to slavery and prisons

➲ Abolish campus police

➲ Join the Universities Studying Slavery Initiative[36]

**Campus and Community Engagement**

➲ Support research projects in Gainesville designed to benefit communities of color

➲ Fund studies of Black and Indigenous histories in Gainesville

➲ Improve town-gown relations, via off-campus presentations and dialogues

➲ Support outreach to area high schools

➲ Establish funds to compensate community experts for speaking on campus (in classes or at events)

---

35  See Academics for Black Survival and Wellness Program, co-founded by Dr. Della Mosley, former UF faculty member, and Pearis Bellamy, UF graduate student. https://www.academics4blacklives.com/.

36  https://slavery.virginia.edu/universities-studying-slavery/.

**QUESTION 5**  **HAVE YOU INTERACTED OR COLLABORATED WITH OTHER RACE AND/OR ANTI-RACISM SCHOLAR(S) AT UF? IF SO, WHICH DEPARTMENT(S) OR COLLEGE(S) WERE THEY FROM?**

Almost all respondents indicated that they had communicated or collaborated with scholars outside of their department or college. One faculty member observed that opportunities for collaboration are "difficult to find, establish and maintain." In total, faculty members referenced seven of UF's sixteen colleges as academic spaces for interaction or collaboration with peers. The colleges named were Agricultural and Life Sciences, Arts, Education, Engineering, Journalism and Communication, Law, and Liberal Arts and Sciences. Respondents also referenced their collaborations with the Smathers Libraries and the Institute of Food and Agricultural Sciences. In some instances, faculty indicated that they worked with colleagues from more than one college or department on campus.

## EMERGENT THEMES

This section identifies the five key themes that emerged from the faculty interviews and survey responses. These topics demonstrate the connectedness of university structures, priorities, and practices and how they affect UF race scholars. Unpacking the themes provides a skeletal outline for next steps the race scholars and the UF administration might undertake to advance race scholarship.

## 5 KEY THEMES THAT EMERGED FROM THE FACULTY INTERVIEWS AND SURVEY RESPONSES

### 1 Insufficient Engagement with Race

One of the most salient themes to emerge from the research is the concern that UF is neither interested in nor concerned with race scholarship. As an example, some respondents noted that research on race, anti-racism, or Blackness has not been the focus of high-level fundraising at the university. Further, while the topic of race intersects with a vast number of other subject areas, it has not been chosen as the focal point of a well-funded campus-wide project, such as UF's 2020 initiative on artificial intelligence.[37] The concern is that race scholars (and their work) are more

---

37  https://ai.ufl.edu/.

Faculty Senate Ad Hoc Committee on Academic Freedom          Page 130
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 24 ·

likely to receive attention in response to external events, rather than being viewed as part of the university's core research mission. One interpretation of how this reality impacts race scholars is that it creates a largely sub rosa existence for their research. This is ironic given that race-related matters command a sizeable share of the public discourse—including policing, eviction moratoriums, incarceration, and access to healthcare during the COVID-19 pandemic. As well, UF often relies on faculty race scholars for the university's ongoing work on diversity, equity, and inclusion.

*Faculty members were surprised to learn that more than fifty scholars are engaged in race research at UF.*

## 2  Absence of Connectedness

Respondents consistently brought up the need for academic connection. A few people said they do not have direct contact with other researchers engaged in race or anti-racism work. In the interviews, several faculty members were surprised to learn that more than fifty scholars are engaged in race research at UF.

Responses also emphasized a need for greater institutional emphasis on collaboration between units and across colleges, in place of what can seem like competition between them. Several study participants brought up policies and other structural impediments that disincentivize or otherwise make it difficult to team-teach, cross-list courses, or develop new courses. This concern is heightened when funding structures encourage departments or other units to be territorial about subject areas in curriculum. Faculty members would like to move beyond silos and develop a larger intellectual community. Some are interested in more opportunities for cross-disciplinary collaborations, such as an annual symposium on race scholarship at UF, a retreat for race scholars, and informal gatherings. The comments make clear that race scholars would welcome greater administrative aid in connecting with other race scholars and their work.

*"I am wondering what institutional capacities we have to respond to the recent attacks on academic freedom but also on our very identities as educators."*

## 3  Lack of Institutional Protection

Many faculty members said they are concerned about the heightened tensions around race-related scholarship in the academy. One person commented:

> This is a very difficult time to be an educator in the state of Florida. I am wondering what institutional capacities we have to respond to the recent attacks on academic freedom but also on

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 25 ·
Page 131

our very identities as educators. If we cannot teach about race in relation to American and global politics, what can we teach?

Several people noted that faculty who focus on race have become increasingly vulnerable. There was general agreement that UF should do more to provide active and vocal support for race scholarship. More pointedly, several of the comments centered on the need for protection. There is a general sense that UF faculty members who study race do so at their own peril. UF's silence in the face of attacks on race scholarship has caused many of the faculty members who took part in the study to question the university's commitment to this work. For instance, some said, the university has not provided any public or private assurances to race scholars—either that their jobs are safe or that the university will stand up for them if their scholarship is subject to a challenge. This issue poses acute concerns for untenured faculty members.

### 4   Need for Greater Institutional Supports

Numerous participants indicated that UF should do more to support and bolster race-focused research. Faculty feedback included a range of ways that the administration could signal that research on race, anti-racism, and Blackness matters. Some referenced making more funds available for conducting research, hosting an annual race symposium, and bringing renowned race scholars to campus.

Others identified structural changes, such as fostering and embedding lines of communication between campus race scholars. One suggestion made by several faculty members is that UF should have an upper-level administration point person who is knowledgeable about race scholarship and who would be charged with addressing the concerns identified by race scholars. Another shared idea is to establish substantial dedicated physical space to foster collaborations across departments and colleges, such as publications, workshops, and lectures. This work would enhance and amplify ongoing race scholarship. The conversations on this topic again raised the issue of ephemerality. As noted earlier, one faculty member expressed worry that once race scholarship is completed, it disappears. Based on the comments, the ideal forms of institutional support would allow UF race scholarship to "live"—by ensuring that support is long term and baked into UF's academic structure.

Respondents referenced several successful programs at UF that have enhanced race scholarship and teaching. This includes the Samuel Proctor

Oral History Program's annual trips to the Mississippi Delta and the Course Development Grants, sponsored by the Center for the Study of Race and Race Relations. A faculty respondent observed that amplifying research and teaching on race could be a powerful recruiting tool for attracting students and faculty to UF.

*Ideally, UF will invest in more programs that support race scholarship so that it becomes a recognized strength—not a problem—at the university.*

## 5  Reactive Responses to Race Issues

This theme cuts across the others discussed earlier. It is listed separately to underscore its importance. The faculty comments suggest that UF's lack of rigorous engagement with race, its largely non-vocal support of race-related scholarship, and the lack of sufficient structural supports for race and anti-racism work indicate that UF mostly reacts to race issues and problems (such as the reactions after the killing of George Floyd). Ideally, one commenter notes, UF will invest in more programs that support race scholarship so that it becomes a recognized strength—not a problem—at the university.

The next chart offers a visual synopsis of the interview comments, questionnaire responses, and emergent themes. The graphic shows the interplay between the suggestions and observations that UF faculty shared in this study. The center of the graphic highlights three key institutional investments. The outer edges of the circle describe the mutual benefits—for race scholars and UF at large—that may result from these investments.

Faculty Senate Ad Hoc Committee on Academic Freedom   Page 133

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 27 ·

**FIGURE 6: POTENTIAL IMPACT OF WISH LIST ITEMS ON UF COMMUNITY**



Now that the faculty responses have been described and assessed, the next section addresses what should be done. The answer is presented in the form of recommendations. These recommendations engage both UF faculty and the UF administration in addressing the identified concerns.

## RECOMMENDATIONS

The recommendations are drawn from the comments, insights, requests, and realities described by 39 UF race scholars who participated in this study. These items incorporate and highlight the recurring themes that emerged from the interview discussions and questionnaire responses. There was broad overlap and convergence among the faculty members regarding the steps UF should take to support race scholars and scholarship. Notably, the suggestions cohere with UF's mission "to welcome the full exploration of its intellectual boundaries,"[38] and in doing so, may enhance both faculty and student recruitment efforts. The recommendations offer nascent blueprints for UF to build a powerhouse of race scholars and scholarship. Implementing these suggestions could position UF as a strong academic leader in race and anti-racism scholarship and instruction. This would be a powerful mantle for UF, a flagship university in the American South.

*Implementing these suggestions could position UF as a strong academic leader in race and anti-racism scholarship and instruction.*

Two lists of recommendations appear here. The first offers action items for UF faculty whose scholarship or teaching focuses on race. The second list offers concrete steps that UF can take as an institution to facilitate, embed, and protect race scholarship. These dual and complementary lists acknowledge that the work required to enhance and amplify race scholars and scholarship involves the faculty members themselves and a greater investment by the university. Developing and sustaining synergy between the faculty and the university are essential to achieve these transformative changes.

---

38 https://catalog.ufl.edu/UGRD/administration/#missionstatementtext.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 29 ·
Page 135

# 7 RECOMMENDATIONS FOR UF RACE SCHOLARS

## 1 Form a Working Group of Race Scholars

The group would be open to all UF faculty who engage in research or teaching on race-related subjects. The group would include scholars whose work examines one or more racial groups; the impact of systems and practices on particular racial groups; race-related theories; those who use varied methods of inquiry, such as qualitative, quantitative, or legal analysis; and those focused on pedagogical issues. The objective of a working group would be to create a forum for race scholars interested in discussion, collaboration, and research. Through this collaborative process, the group might also develop a network, directory, and e-mail list of race scholars, or another well-considered and appropriate means of facilitating networking and collaboration.

## 2 Identify Race-Related Courses

A list of UF courses that focus on race, by department and frequency of course offering, would provide insight into how race is utilized and embedded across the UF curriculum. This information would provide a baseline and guidance on how and where race issues and race-related subjects could be integrated in courses.

## 3 Identify Potential Race-Related Courses

Once information is gathered on existing race-focused courses, race scholars and others can determine other courses that UF can offer to strengthen its curricular base on race-related subjects. A useful list would specify which college(s) would offer the course, the course level (e.g., undergraduate or graduate), and how often the course should be offered. Discussions about this list might also address whether UF should either mandate a course on race or propose an optional race curriculum for students.[39]

---

39  See CSRRR webinar, June 25, 2020, "Should Colleges Mandate a Race/Anti-Racism Course?" https://www.law.ufl.edu/csrrr-events/should-colleges-mandate-a-course-on-race-anti-racism.

Faculty Senate Ad Hoc Committee on Academic Freedom          Page 136
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 30 ·

## 4  Draft Model Syllabus Language on Race

Recommendations for syllabus language would help faculty members set ground rules in anticipation of potentially charged classroom conversations on race and anti-racism. Adding language to course syllabi that addresses race and classroom dynamics sends a strong message that even though talking about race may be difficult, it is important and encouraged in academic settings.

## 5  Create a Faculty Mentoring Program

This program would match junior faculty with senior faculty. A peer mentoring program would create another opportunity for collaboration and connection. Faculty pairings could be made within and across departments and colleges.

## 6  Create an Anti-Racism Faculty Organization

Some faculty members expressed interest in meeting and working with other faculty members interested in anti-racism teaching and scholarship. Faculty members who do not conduct research or teach about race might also be interested in such an organization.

## 7  Host an Annual Conference on Race Scholarship

An annual symposium on UF race scholarship would encourage cross-campus collaborations. It would also amplify the research of UF race scholars.

# 16 RECOMMENDATIONS FOR UF ADMINISTRATION

## 1 Enhance the Sustainability of Race Scholarship

Identify strategies to bolster and support race-related scholarship and teaching. This can be done by developing a multi-year strategic plan that addresses the specifics of how UF will encourage, promote, and advance race scholarship. Ideally this would include a timeline for goals, intermittent review, and assessment of strategies.

## 2 Use the Expertise of UF Race Scholars

UF has more than fifty faculty members who research or teach on race-related subjects. These faculty members have a wealth of knowledge and expertise on race-related subject matter and curriculum. The university is encouraged to partner with these faculty members as decisions are made that impact the growth and development of race scholarship on campus, including faculty recruitment and retention.

## 3 Offer More Resources to Race Scholars

The specific demands of race scholarship are sometimes difficult to meet under existing funding structures at UF. This is particularly true for qualitative research methods, and community-engaged research. Types of support the university could offer include competitive grant funding, stipends, research assistance, conference travel funds, and course releases. Faculty who are asked to lead large-scale committees, projects, or initiatives about race at UF should receive compensation of some kind.

## 4 Revive the Course Development Grants

Provide incentives for faculty and graduate students to develop new (or revitalize) upper-division undergraduate race-focused courses. Encourage departments to regularly offer courses on race at graduate and undergraduate level.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 32 ·
Page 138

**5** **Continue the UF Racial Justice Research Fund**
Allotting university funding for race-related scholarship sends a message that UF values this research. Further, such funding amplifies the research of UF race scholars and encourages synergies across departments and colleges.

**6** **Incentivize Faculty Incorporation of Race in Course Curriculum**
UF can implement incentives that will encourage faculty members who do not have race-related expertise to incorporate race issues into their curriculum. Stipends, service credit, and academic recognition are some examples. Ideally, campus resources, such as the Center for Teaching Excellence, would have staff members with expertise on race and pedagogy who can advise and work with faculty as they design and redesign courses.

**7** **Increase Racial Diversity in UF Administration**
Faculty respondents consistently noted that few people of color hold top positions at UF. There is a concern that the racial homogeneity in UF's upper administration reflects a lack of diverse viewpoints about the types of scholarship that are important. Ideally UF would always have at least one top-level administrator (e.g., associate provost, vice provost, or above) who is a race scholar.[40] To be effective, this person should have administrative and financial authority to institute needed changes.

**8** **Implement Targeted Resources for Race Scholars and Scholarship**
In some instances, discussions about race-related scholarship overlap with conversations about diversity, equity, and inclusion (DEI). While there are some areas of convergence, funding and supporting scholarship on race are distinct from programs and initiatives designed to address DEI issues. Faculty comments make clear that UF's investment in diversity deans, for instance, is not a substitute for investment in faculty race scholars.

---

40  This is different from the chief diversity officer position.

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 33 ·

Page 139

**9** **Increase the Pipeline for Race Scholars and Scholarship**
The university can take additional steps to integrate race scholars and scholarship. More can be done to facilitate, support, and highlight race scholarship across UF's colleges, departments, and units. For instance, creating more race-related post-doctorates, graduate assistantships, and fellowships will increase the number of campus scholars engaged in race-related studies and bolster their work.

**10** **Broaden Access to Race-Related Databases**
Faculty members discussed a range of ways the university could provide stronger support for their scholarship. One idea is to have the university subscribe to more digital archival databases that would be useful to race scholars. Faculty members and administrators can work together to identify a list.

**11** **Create Webspace for UF Race-Based Scholarship**
Expand and prioritize university webspace and social media promotion for race-related scholarship and activities on campus. One option is to expand UF's anti-racism webpages to include this material. Ideally this information, including upcoming events (e.g., lectures and symposia) and recently published research would be accessible from the UF homepage.

**12** **Dedicate a Building for Race Research and Collaboration**
There was wide-ranging support for establishing a campus hub for race research. Primarily this space is envisioned as a set location for race scholars to gather, share, collaborate, discuss, and critique works in progress.

**13** **Establish an Endowed Chair on Race**
One idea is to institute an endowed chair on race, racism, and anti-racism. This would be the first of its kind at UF and would signal that race scholarship is an essential area of research expertise for a top-five U.S. public university. Establishing this position would present a major fund-raising opportunity for the university.

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 34 ·

Page 140

## 14 Protect Race Scholars

Numerous faculty members said their race-related research and teaching are under attack. As a result, many are concerned about the viability of their work in the current academic climate. For instance, statements of public support that the university recognizes race as an area of serious academic inquiry would send a strong message to UF race scholars, the campus community, and beyond. Further, the university should ensure that researchers who examine race are not penalized (e.g., during the promotion and tenure process or annual reviews) for their research and teaching. This includes offering protection against retaliatory or unfair course evaluations.

## 15 Initiate an Annual Award for Race Scholarship

An annual award for race scholarship would underscore the importance of this area of academic research. For instance, the award could honor a publication, project, or other initiative. Ideally the award would include a stipend or other resource to aid further research.

## 16 Enhance Town-Gown Relationships

Many faculty members support an expanded investment in town-gown relationships. This includes support for research that encourages campus engagement with local communities, particularly communities that have historically been denied access to UF. Community experts should be invited to campus to share their knowledge directly with the UF community—and they should be fairly compensated for their time and energy. Additionally, addressing UF's contemporary and historical relationships to the surrounding community should be a significant ongoing priority for research, teaching, and community engagement.

Faculty Senate Ad Hoc Committee on Academic Freedom          Page 141

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 35 ·

## CONCLUSION

This report highlights the experiences, perceptions, and insights of UF faculty members whose research or teaching focuses on race. The faculty respondents detail why UF should make a targeted, foundational investment in race scholarship. Most strikingly, members of this group spoke with one voice, offering variations on the themes of collaboration, support, and protection. The researchers have distilled these findings into twenty-three recommendations that set forth the necessary steps for UF to take to meet this moment. UF has a strong, committed, and enviable core of faculty who have wide and deep expertise on race-related subject matters. A renewed investment in race scholarship by UF has the potential to bear rich academic fruit for the UF community—including increased scholarly production, greater success with student and faculty recruitment, and an improved campus climate. In the words of one faculty member, "Hopefully UF will find ways to bring together an intellectual community so that [race] scholars who have allied interests don't feel a sense of isolation but rather connection." UF is one of the nation's top public universities. It has the talent and the resources, and with this report, a roadmap for change. Hopefully UF will demonstrate that it has the will to make a way forward.

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 36 ·

Page 142

# REFERENCES

Baker, Gail F., Brian Dassler, Carlton Davis, Ed Delgado-Romero, Sheila Dickison, Lisa Diekow, Javier Ley-Soto, Bob Miller, and Mike Powell. (2001). "Committed to Community: University of Florida Campus Climate Committee Report." Administrative Policy Records of the University of Florida Office of the President, Special and Area Studies Collections, George A. Smathers Libraries, University of Florida, Gainesville, Florida.

Brunsma, David, Eric S. Brown, and Peggy Placier. (2012, September 11). "Teaching Race at Historically White Colleges and Universities: Identifying and Dismantling the Walls of Whiteness." *Critical Sociology*, https://journals.sagepub.com/doi/abs/10.1177/0896920512446759.

Conway, Danielle M., Bekah Saidman-Krauss, and Rebecca Schreiber. (2021, March 13). "Building an Antiracist Law School: Inclusivity in Admissions and Retention of Diverse Students—Leadership Determines DEI Success," *Rutgers Race and the Law Review*, forthcoming (see https://ssrn.com/abstract=3804022 or http://dx.doi.org/10.2139/ssrn.3804022).

Fuchs, Kent. (2020, June 18). "Another Step toward Positive Change Against Racism." UF Statement, http://statements.ufl.edu/statements/2020/june/another-step-toward-positive-change-against-racism.html.

Gaudion, Amy C. (2021, March 15). "Exploring Race and Racism in the Law School Curriculum: An Administrator's View on Adopting an Antiracist Curriculum." *Rutgers Race and the Law Review*, forthcoming (see https://ssrn.com/abstract=3805994).

Gonzalez, Gerardo, Simon Johnson, Andrea Toles, Bobby Baker, Saidy Barinaga, Joel Buchanan, Isis Carbajal de Garcia, Betty Cortina, Patrick Chelsey, Vivian Correa, Erney Cox III, Dovie Gamble, Betsy Gardner, Antoinette Jones, Rosiana Oliver, Randall Shanafelt, Alexandria Stewart, and Juan Vitali. (1990). *Report of the Quality of Life Task Force on African-American and Hispanic Students*. Administrative Policy Records of the University of Florida Office of the President (John V. Lombardi), George A. Smathers Libraries, University of Florida, Gainesville, Florida.

Grande, Sandy. (2018). "Refusing the University." In Eve Tuck and K. Wayne Yang, eds., *Toward What Justice?: Describing Diverse Dreams of Justice in Education*, 47–65. New York: Routledge.

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 37 ·

Page 143

Ivanov, Danielle. (2021, July 4). "It's Been a Year since UF's President Announced 15 Anti-Racism Goals. How Has Work Gone?" *Gainesville Sun*, https://www.gainesville.com/story/news/education/campus/2021/07/04/uf-students-president-kent-fuchs-reflect-anti-racism-goals/7779974002/.

Law, Ian. (2017). "Building the Anti-Racist University: Action and New Agendas." *Race Ethnicity and Education* 20, no. 3: 332–43.

Leong, Nancy. (2013). "Racial Capitalism." *Harvard Law Review* 126, no. 8: 2153, https://harvardlawreview.org/wp-content/uploads/pdfs/vol126_leong.pdf.

Portugal, Lisa. (2006). "Diversity Leadership in Higher Education." *Academic Leadership Online Journal* 4, no. 3: https://scholars.fhsu.edu/alj/vol4/iss3/2/.

Rankin and Associates Consulting. (2016). *University of Florida Faculty and Staff Climate Survey*, https://apps.ir.ufl.edu/HrClimateSurvey/Reports.

Tate, Shirley, and Paul Bagguley. (2017). "Building the Anti-Racist University: Next Steps." *Race Ethnicity and Education* 20, no. 3: 289–99.

Tate, Shirley, and Damien Page. (2018). "Whiteliness and Institutional Racism: Hiding behind (Un)Conscious Bias." *Ethics and Education* 13, no. 1: 141–55.

University of Florida News. (2021, January 12). "UF Awards Faculty Nearly $1Million to Study Racial Disparities," https://news.ufl.edu/2021/01/racial-disparities-studies-funding/.

Welton, Anjale, Devean Owens, and Eboni Zamani-Gallaher. (2018). "Anti-Racist Change: A Conceptual Framework for Educational Institutions to Take Systemic Action." *Teachers College Record* 120, no. 14: https://www.tcrecord.org/Content.asp?ContentId=22371.

Wesley, Alexa, Jill Dunlap, and Paulette Granberry Russell. (2021). NASPA—Student Affairs Administrators in Higher Education, "Moving from Words to Action: The Influence of Racial Justice Statements on Campus Equity Efforts," https://www.naspa.org/report/moving-from-words-to-action-the-influence-of-racial-justice-statements-on-campus-equity-efforts.

Faculty Senate Ad Hoc Committee on Academic Freedom
A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 38 ·
Page 144

## ACKNOWLEDGMENTS

A number of people were instrumental in getting this grant and report across the finish line. We thank Dr. Diedre Houchen, who had the initial research idea for this grant and helped to write the proposal that resulted in funding; Dr. Henry Frierson, Dr. Clarence Gravlee, and Dr. Paul Ortiz, for guidance and insights; Professor Gail Mathapo, UF Law Librarian, who helped tremendously with locating hard-to-find articles and documents; UF Law students Madison Pinkney and Kyla George for their research assistance; Sherrice Smith, UF Law Director of Faculty and Academic Support, who was instrumental in helping to create a seamless plan for data collection, meeting schedules, and keeping track of numerous documents and emails; Dianna Brook, UF Accounting Coordinator, for her assistance; Lynn Stuart, for her expert graphic design work; Whitney Smith, UF Law Assistant Dean for Messaging and Outreach, for her guidance; and finally we thank the UF Office of Research, with a special nod to Dr. Sobha Jaishankar, Assistant Vice President for Research, for her patience in responding to our many questions.

# A WAY FORWARD

## UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement

**Dr. Katheryn Russell-Brown**
Levin, Mabie & Levin Professor of Law &
Director, Race and Crime Center for Justice
Levin College of Law, University of Florida

**Dr. Ryan Morini**
Research Director
Center for the Study of Race and Race Relations
Levin College of Law, University of Florida

**Fall 2021**

Faculty Senate Ad Hoc Committee on Academic Freedom

A Way Forward: UF Race Scholars on Support, Obstacles, and the Need for Institutional Engagement
Race and Crime Center for Justice · Levin College of Law · University of Florida
· 39 ·

Page 145

**Appendix 2.2**
[Note: An analysis of IP policies of peer institutions, done by an outside law firm, was provided to the Faculty Senate Chair, and we reprint this analysis here for your information.  We have not confirmed these findings]

We reviewed the provisions governing ownership of IP in the IP policies of University of California, University of Illinois, University of Michigan, University of Minnesota, University of Texas and the University of Wisconsin/WARF.  Each of these universities require that for the university to claim ownership of an invention that was developed during a researcher's employment with the university, the researcher must have (a) used university facilities, university resources or funds administered by the university or (b) done the work that lead to the invention within the scope of the researcher's employment or university responsibilities or on the university's time. None of these universities have a provision that give the university ownership merely because the research or invention is within the researcher's field or discipline or area of expertise. In fact, per below, the University of Texas formerly claimed ownership of inventions within the researcher's "area of expertise," but changed that policy because of faculty objection and to align with peer institutions.

University IP Ownership Policies
1. California
a. Patent Acknowledgment: "I acknowledge my obligation to assign, and do hereby assign, inventions and patents that I conceive or develop 1) within the course and scope of my University employment while employed by University, 2) during the course of my utilization of any University research facilities, or 3) through any connection with my use of gift, grant, or contract research funds received through the University."
b. Patent Policy III-A: "An agreement to assign inventions and patents to the University, except those resulting from permissible consulting activities without use of University facilities, shall be mandatory for all employees, for persons not employed by the University but who use University research facilities, and for those who receive gift, grant, or contract funds through the University."

2. Illinois
a. Sec. B - "The University is the owner of all software, copyrightable works and inventions (intellectual property [IP]) created by employees in the performance of employment with the University, or created with University resources or funds controlled by the University, with the exception of copyrights in traditional academic works such as scholarly publications and course notes."

3. Michigan
a. Section II-1: "Intellectual Property made (e.g., conceived or first reduced to practice) by any person, regardless of employment status, with the direct or indirect support of funds administered by the University (regardless of the source of such funds) shall be the property of the University, except as provided by this or other University policy. Funds administered by the University include University resources, and funds for employee compensation, materials, or facilities."

4. Minnesota

a. Sec. V-1: "The University shall be the sole owner of all rights, titles, and interests (including intellectual property rights) in and to technology: (a) created by University employees in the course of their employment; (b) created by individuals, including employees, students, or post-doctoral or other fellows, using substantial University resources."

5. Texas
a. "Sec. 4 - Intellectual Property Subject to this Rule. Intellectual property (a) developed within the course and scope of employment of the individual, (b) resulting from activities performed on U. T. System time or with support of state funds, or (c) resulting from using facilities or resources owned by the U. T. System or any U. T. System institution (other than incidental use) is owned by the Board of Regents.
b. Sec. 5 - Intellectual Property Not Subject to this Rule. Intellectual property developed or created by a U. T. System employee outside the course and scope of employment of the individual that is developed or created on his/her own time and without the support of the U. T. System or any U. T. System institution or use of U. T. System facilities or resources, is the exclusive property of the creator."
c. Texas Policy Pre-2005: "Intellectual property either related to the area of expertise for which an individual was hired or resulting from activities performed on U. T. System time, or with support by State funds, or from using facilities owned by the U. T. System or any of its institutions is subject to ownership by the Board of Regents."

6. Wisconsin/WARF
a. Patent Policy Sec. 6A – "All inventions discovered by faculty, staff, or students on appointment while pursuing their university duties, or on university premises, or with university supplies or equipment must be reported to the chancellor or designee or the appropriate IPMO on the Invention Disclosure Report Form associated with this policy or a form that is substantially similar."
b. IP Policy
i. Sec. II - "Except as required by funding agreements or other University policies, the University does not claim ownership rights in the intellectual property generated during research by its faculty, staff, or students."
ii. Sec III-A – "Federal law and regulations provide that the University has the right to retain title to any inventions conceived or made in whole or in part during federally funded grants and contracts."

Appendix 3.1

## THE CHRONICLE OF HIGHER EDUCATION



**ACADEMIC FREEDOM**

# U. of Florida Stops 3 Professors From Taking Part in Voting-Rights Suit, Raising Cries of Censorship

*By Andy Thomason*

**OCTOBER 31, 2021**



BRAD MCCLENNY, THE GAINESVILLE SUN, IMAGN

**W. Kent Fuchs, president of the University of Florida**

The University of Florida has denied requests by three professors to serve as expert witnesses for the plaintiffs in a lawsuit that challenges a new Florida law limiting the ways in which state residents can vote. The news, first reported by *The New York Times* on Friday, prompted fierce criticism from observers nationwide, who said the move was an extraordinary breach of academic freedom. The executive director of the American Association of University Professors tweeted that the university's "attempt to muzzle these faculty members violates their academic freedom."

In a statement, the University of Florida acknowledged that it had forbidden the three professors to participate in the lawsuit, saying that such work was "adverse to the university's interests as a state of Florida institution."

The lawsuit in question challenges a law, signed this year, that restricts the use of drop boxes for absentee ballots, makes it more difficult to vote absentee, and adds new restrictions for political activity around polling places, among other things. Critics have said the law will affect voters of color the most.

---

**FROM THE CHRONICLE STORE**



ARTICLE COLLECTION
### Leading Through Crisis
Strategies for handling the pressures of the pandemic, racial-justice movement, and economy

**Visit the Store**

---

In its statement, the university denied it had suppressed the First Amendment rights or academic freedom of the three professors, and said it "has a long track record of supporting free speech and our faculty's academic freedom, and we will continue to do so."

The development is part of a broader story at Florida's flagship and nationwide. In states where they hold political power, Republican lawmakers are seeking a greater say in the affairs of public colleges.

In Gainesville, Fla., President W. Kent Fuchs of the University of Florida has twice alluded publicly to the influence the state's Republican government has had on university policy. Last year Fuchs said at a faculty meeting that if the university did not move more of its classes from virtual to in person for the spring semester, it risked a cut in state funding from the Legislature. (Ron DeSantis, the state's Republican governor, has been an outspoken opponent of Covid-related restrictions. Republicans control both chambers of the Legislature.)

Fuchs was more explicit this year. In explaining why the university was not mandating masks indoors — despite clear evidence that widespread masking inhibits the spread of Covid — Fuchs said, "I literally don't have that power." The president added that if he were to send out a message mandating masks indoors, "within hours, another message would go out from someone to everyone, again saying we've been informed that there will be no such mandate. We're part of the state government."

The three faculty members who have been barred from serving as expert witnesses in the voting-rights lawsuit are Michael McDonald, Daniel A. Smith, and Sharon Wright Austin, all professors in Florida's political-science department, according to the *Times*. The university has twice allowed Smith, the department's chair, to participate in lawsuits challenging voting measures passed by Florida's government, including as recently as 2018.

According to the *Times,* it was David E. Richardson, dean of the college of arts and sciences, who rejected Smith's request to participate in the lawsuit, while a university vice president issued the other two rejections.

*We welcome your thoughts and questions about this article. Please* [email the editors](#) *or* [submit a letter](#) *for publication.*

| LEADERSHIP | POLITICS | ADMINISTRATION | FACULTY LIFE | SERVICE AND OUTREACH |

### Andy Thomason

Andy Thomason is an assistant managing editor at *The Chronicle* and the author of the book *[Discredited: The UNC Scandal and College Athletics' Amateur Ideal.](#)*

## IN THE CHRONICLE STORE



**The Future of Enrollment**



**Sustaining the College Business Model**



**Reforming Gen Ed**



Case 1:21-cv-00184-MW-HTC   Document 45-5   Filed 12/17/21   Page 153 of 275

# THE CHRONICLE OF HIGHER EDUCATION



NATE KITCH FOR THE CHRONICLE REVIEW

**THE REVIEW**

*By Jeffrey C. Isaac*

**OCTOBER 31, 2021**

Two days ago, *The New York Times* and *The Washington Post* broke a story that identifies the largest and most dangerous threat to academic freedom in recent history: the prospect of statehouse Republicans using their influence to pressure state universities to restrain the academic freedom of faculty members who speak up for democracy. The University of Florida, whose state funding and Board of Trustees are under the thumb of Gov. Ron DeSantis of Florida, a Republican, has prohibited three political scientists on its faculty from offering expert-witness testimony in a civil lawsuit that challenges the state's new and highly restrictive voting law.

The facts are straightforward: The university's administrators — all of whom are ultimately accountable to the trustees — maintain that since the university is a state institution, it would be a conflict of interest for its employees to offer testimony against the state government.

---

**FROM THE CHRONICLE STORE**



ARTICLE COLLECTION

### Leading Through Crisis

Strategies for handling the pressures of the pandemic, racial-justice movement, and economy

[ Visit the Store ]

---

This is an obvious, and unprecedented, violation of basic principles of academic freedom. If this policy is allowed to stand, it will mean that all professors on the payroll of the University of Florida might be barred from public testimony, professional activity, or perhaps even public advocacy that challenges the governor and his cronies on the Board of Trustees.

The words "chilling effect" hardly suffice. Carrying out this policy would entail a complete freezing of academic freedom, and the potential destruction of those disciplines that foster forms of knowledge that run afoul of Republican dogma.

This is terrible.

But even more terrible is the fact that this policy is being pioneered in one of the two states — the other is Texas — where statehouse Republicans are working with particular cynicism to undermine democracy, and where Republican governors are doing their damnedest to out-Trump Trump in preparation for a possible presidential run.

DeSantis's law restricting voting rights is a frontal assault on democracy in his state, and his lackeys at the University of Florida are saying to the political scientists on the faculty that whatever they claim to know about voting rights, election administration, racial justice, or anything else, they had better keep their mouths shut in public settings where their knowledge creates problems for Ron DeSantis and his Republican allies in the statehouse.

This is an attack on political science, on the social sciences and humanities more generally, and on the very principles of academic freedom and professional autonomy.

T he same week that political science was being quashed in Florida, *The Gainesville Sun* was reporting on another instance of shocking political interference by Governor DeSantis. As the *Times* summarized it later, DeSantis and his handpicked head of the Board of Trustees "had arranged this fall for the University of Florida to hire and grant tenure to a controversial UCLA professor, Joseph Ladapo, in only two weeks, DeSantis

quickly named Ladapo as the state's surgeon general. This gives new meaning to the term "fast-tracked."

Ladapo infamously appeared in the summer of 2020 at a news conference for a group called America's Frontline Doctors, denouncing Covid safety measures and touting the virtues of hydroxychloroquine. Now he does DeSantis's bidding as the state's chief culture warrior against masking and vaccination mandates — while also serving as a professor at the University of Florida's medical school.

DeSantis, who makes no bones about his hostility toward medical science, public health, and free and fair elections, is now having his way with the University of Florida, and he has placed its political-science department in the cross hairs.

What will come next in Florida? Or Texas? Or Arizona? Or any of the 20 other states where Republicans have complete control of state government?

To the Republicans working to undermine constitutional democracy, even the most basic academic knowledge about voting is dangerous knowledge. And so their fight against democracy has become a fight against scholarship itself. Faculty members, both as individuals and as members of their various disciplines, have no choice but to fight back — in the name not only of academic freedom, but of democracy itself.

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

FACULTY LIFE     LEADERSHIP     POLITICS

Jeffrey C. Isaac

Jeffrey C. Isaac is a professor of political science at Indiana University at Bloomington.

**IN THE CHRONICLE STORE**





# THE CHRONICLE OF HIGHER EDUCATION



**THE REVIEW**

*By Holden Thorp*

**NOVEMBER 1, 2021**

The assault on academic freedom and autonomy by right-wing political forces has been escalating in recent months. At the University of North Carolina, the governing boards and a major donor interfered in the tenure case of Nikole Hannah-Jones. Vaccination and mask mandates have been suppressed at colleges in red states around the country. Presidential searches at the University of South Carolina, Fayetteville State University, and elsewhere were hijacked to insert political allies of governing boards. Recent events at the University of Florida have raised those problems to a new level. The time for strategizing and threading needles is over. This is an all-out assault, and faculty members are now being enlisted in the effort to dismantle our representative democracy.

Three professors of political science at Florida were blocked from serving as expert witnesses in a lawsuit to combat a restrictive anti-voting law in the state. The move is not just an unacceptable assault on academic freedom; it is also an attempt to redefine professors as mandated proponents of the political views of their state

governments. It is outrageous for the president and provost of the University of Florida to permit this incursion on the autonomy of the university and its faculty members. W. Kent Fuchs and Joseph Glover need to put their jobs on the line immediately. Furthermore, the reasoning they've put forward to defend this indefensible decision — which requires a foray into administrative policy to understand — is deeply flawed.

One of the professors, Michael McDonald, tweeted a screenshot of an email — worthy of the @ass_deans Twitter feed — that he got from an administrator who is responsible for upholding the conflicts-of-interest policy at the university:



That is a very tight knot of administrative gibberish. I was and still am subject to these policies as a faculty member, and administered them as a chancellor and provost. Normally, when there is a conflict of interest, the conflict would be mediated by disclosure and monitoring. So even if there were a conflict in this case (and I don't believe there is), the procedures to address it would not involve an abrupt denial of the professors' ability to serve

as expert witnesses. Rather, simply disclosing the conflict would generally be sufficient. In rare instances, a committee would be set up to monitor the conflict. In this case, neither action is warranted.

But whether the right procedure was followed is irrelevant. Here is the university's statement on conflicts of interest:

**"Conflict of Interest:** occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional *judgement or obligations* to the University." (Italics are mine.)

**FROM THE CHRONICLE STORE**



REPORT
### The Innovation Imperative
The Buzz, the Barriers, and What Real Change Looks Like

**Visit the Store**

So the university thinks that testifying in this case will alter either the professors' judgment or their obligations to the university. It is hard to see how the university could claim that testimony would alter their judgment, and there's nothing about that in the notice of denial. The university therefore seems to be saying that serving as expert witnesses interferes with the obligations that the professors have to the university. Is it the obligation of faculty members to support all of the political goals of the university and the State of Florida? Are they obligated, for instance, to support the governor's anti-science stance on masks, vaccines, and the safety of cruise ships? Maybe that's how Fuchs and Glover see it. After all, they were just strong-armed into appointing to the medical faculty a surgeon general who is spreading misinformation all over the state. When Fuchs was challenged about his failure to stand up on vaccination mandates, he said, "I literally don't have that power."

Here's another literal truth: Politicians and political donors are *literally* running the University of Florida — not academic administrators who understand the sacred principles of academic freedom and free inquiry.



Faculty Senate Ad Hoc Committee on Academic Freedom        Page 156



ILLUSTRATION BY THE CHRONICLE; PHOTOS FROM ZUMAPRESS/NEWSCOM AND ALAMY

**The U. of Florida's president, W. Kent Fuchs**

In a public-relations scramble over the weekend, the university put out a statement that tried to suggest it still supports academic freedom, arguing that the three professors were free to *say* anything, but were not permitted to receive compensation for it. That is a meaningless distinction. McDonald tweeted that the initial denial had said nothing about compensation (indeed, there isn't), so they are therefore not permitted to testify pro bono, either. President Fuchs and Provost Glover know this is a dishonest attempt at administrative sleight-of-hand.

The implications of this scandal are profound. All professors require academic freedom to seek the truth and share it with the world. Without it, our ability to publish and curate research findings goes out the window. The enemies of academic freedom have already come for our ability to describe and combat infectious diseases. They're coming for our ability to teach an honest version of the history of the United States. Now they want to enlist us in their effort to destroy the opportunity to vote and, hence, democracy itself.

President Fuchs is missing his cue to stand up for what he believes in. I know something about this, having missed my cue once in Chapel Hill. Come on, Kent. The time is now.

*A version of this article appeared in the November 12, 2021, issue.*

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

| OPINION | COMMENTARY |

### Holden Thorp

Holden Thorp is editor in chief of the Science family of journals. He was previously the provost of Washington University in St. Louis and the chancellor of the University of North Carolina at Chapel Hill.

# THE CHRONICLE OF HIGHER EDUCATION



**THE REVIEW**

*By Silke-Maria Weineck*

NOVEMBER 1, 2021

It's rarely a good sign if you find yourself wondering how to translate certain German words: *Gleichschaltung*, for instance, or *vorauseilender Gehorsam*. But reading the news out of the University of Florida, where two administrators informed three faculty members that they were not permitted to testify as expert witnesses in a court challenge to Florida's voter-suppression laws, will send you down that road.

*Gleichschaltung* is the process by which institutions are brought under the control of totalitarian ideology. It is frequently rendered as "coordination" or "synchronization," but those terms lack the terrifying connotation of switches flipped, one by one, until the same ideological current flows through every previously independent institution.

*Vorauseilender Gehorsam* means "obedience ahead of the command." The Yale historian Timothy Snyder translates it as "anticipatory obedience," and that is close enough, but it doesn't quite capture the scurrying

servility implied in "vorauseilen," to hurry ahead.

---

**FROM THE CHRONICLE STORE**



**ARTICLE COLLECTION**

## Rethinking Tenure

Abolish, strengthen, or replace it?

**Visit the Store**

---

We don't know on whose orders David E. Richardson, dean of the university's college of arts and sciences, rejected the request of Daniel A. Smith, chair of its political-science department, to testify as an expert witness in the voting-rights case; or on whose orders Gary Wimsett, UF's assistant vice president for conflicts of interest, rejected the requests of Michael McDonald, who studies national elections, and Sharon Wright Austin, who studies the political behavior of African Americans, to do the same. All three faculty members had previously testified as expert witnesses against the state in other cases, and the university had never declared them to be subject to conflicts of interest.



BRAD MCCLENNY, THE GAINESVILLE SUN, IMAGN

**A sculpture on the roof line of Thomas Hall, at the University of Florida**

Unless we want to believe that two different administrators independently invented the same policy from scratch and presented it in near-identical terms, we have to conclude that Richardson and Wimsett acted on orders from above. The notion that they simply anticipated such orders is, in some regards, even worse. Whatever the truth of the matter, we do know that Richardson wrote that "outside activities that may pose a conflict of interest to the executive branch of the state of Florida create a conflict for the University of Florida." And Wimsett wrote in an email filed with court documents: "UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests. As UF is a state actor, litigation against the state is adverse to UF's interests."

Whether they got their orders from the trustees, the president, the provost, or from Gov. Ron DeSantis or one of his minions will emerge in due course. But no matter where the directive originated, both men should have refused to carry it out. They should instead have offered their resignations. You do not obey such commands, you do not hurry ahead to destroy your university's reputation at the bidding of an authoritarian regime.

Those who have objected to the denials have overwhelmingly invoked the professors' freedom of speech in general and their academic freedom in particular, and rightly so. But there is something here even more sinister than the by-now familiar spectacle — in the concerted attacks on critical race theory, the firing of professors questioning a college's lax Covid policies, or the failure to offer tenure protections to Nikole Hannah-Jones — of the American right's seeking to strangle the speech of its opponents.

The most deeply troubling aspect of this episode is the explicit conflation of the interest of a state government with the interest of a state university. A public university is beholden to truth-seeking and truth-speaking, and neither can possibly be subject to direct political control. A university that bars its faculty from criticizing the government in court has abandoned its core mission and tossed what should be its most fundamental values to a foul-smelling wind.

## A university that bars its faculty from criticizing the government in court has abandoned its core mission and tossed what should be its most fundamental values to a foul-smelling wind.

The implications of the assertion that the faculty must not act in a manner adverse to the regime's interest — "activities that may pose a conflict of interest to the executive branch of the state of Florida create a conflict for the University of Florida" — are staggering. If you are not allowed to bear witness against voter suppression in court, why would you be allowed to study the effects of voter suppression in the first place, or to teach your students about them? Such research and such teaching are not in Ron DeSantis's interest, either, and by the logic of Richardson's denial, any activity that is not in Ron DeSantis's interest is not in the interest of the University of Florida. Neither, one assumes, is research into the environmental toll of his climate policies, the human toll of his welfare policies, or the death toll of his Covid policies. A university declared an arm not simply of the state but of its partisan government ceases to be a university.

To be sure, UF is in a tough spot here: It heavily depends on state funding, and you'd expect there to be strings attached, seeing Republicans' general opposition to the core principles of any form of higher education that cannot be monetized, but to see those strings used as garrotes should be profoundly troubling to any academic at any public university.

If the denials are not overturned, the legal team that sought to hire Austin, McDonald, and Smith can find other experts. But the university's decision to declare itself an arm of DeSantis's government rather than an independent institution beholden to the production and dissemination of knowledge and expertise represents an instance of *Gleichschaltung* that will be more difficult to reverse. It will only get worse. That it is the democratic franchise itself that is at stake in the court case in question only highlights how deep the threat is. Access to the vote is to democracy as freedom of speech is to the university: fundamental, constitutive. Democracies go bankrupt the same way everybody else does: very slowly, then all of a sudden. We are still at "slowly." All of a sudden is scheduled for Tuesday, November 8, 2022. If Florida's administrators have ever asked themselves how they would have acted in 1932, now they know.

*We welcome your thoughts and questions about this article. Please [email the editors](#) or [submit a letter](#) for publication.*

POLITICS     LEADERSHIP     THE WORK FORCE

Silke-Maria Weineck

Silke-Maria Weineck is a professor of German and comparative literature at the University of Michigan at Ann Arbor.

## IN THE CHRONICLE STORE



**The Future of Enrollment**



**Sustaining the College**



**Reforming Gen Ed**

# THE CHRONICLE OF HIGHER EDUCATION



**ACADEMIC FREEDOM**

# U. of Florida's Accreditor Will Investigate Denial of Professors' Voting-Rights Testimony

*By Lindsay Ellis*

**NOVEMBER 1, 2021**



DOUG ENGLE, OCALA STAR-BANNER, IMAGN

**President Kent Fuchs of the U. of Florida**

Faculty Senate Ad Hoc Committee on Academic Freedom                    Page 162

The University of Florida's accreditor plans to investigate the flagship campus over the revelation that administrators denied three professors' requests to serve as paid experts in a voting-rights lawsuit.

Belle S. Wheelan, president of the Southern Association of Colleges and Schools' Commission on Colleges, told *The Chronicle* on Monday that the accreditor would follow its policy on investigating unsolicited information. Under those rules, accreditors can dig into campus happenings between review cycles if they learn of potential "significant issues of compliance." Accreditation is needed for colleges to receive federal student aid.

Wheelan said the accreditor would send a letter to Florida's president, W. Kent Fuchs, on Monday or early Tuesday "asking for information to verify or clarify the news media's account of what happened," she wrote in an email. "From there, we will decide if there are any noncompliance issues." She declined to comment further.

**FROM THE CHRONICLE STORE**



ARTICLE COLLECTION
## Rethinking Tenure
Abolish, strengthen, or replace it?

**Visit the Store**

Many accreditors, including Florida's, demand that governing boards be independent and free from influence from external sources.

In a federal-court filing on Friday, plaintiffs' lawyers in the case wrote that university administrators had told the three faculty members that "they were not authorized to serve as experts" in a lawsuit that challenges a new Florida law limiting the ways in which state residents can vote. In a statement, the university acknowledged that it had barred the three professors from taking part in the lawsuit, saying that such paid work was "adverse to the university's interests as a state of Florida institution."

The state enacted a law this year that restricts the use of drop boxes for absentee ballots and adds requirements on voter identification, among other things. The lawsuit in question challenges the legislation as racially discriminatory.

The plaintiffs planned to lean on experts to explain what they say is the racially disparate impact of the law, according to the Friday filing. The three professors serve in the political-science department, and their lawyers wrote that they had been approved to serve as experts in "numerous" prior cases.

Hessy Fernandez, a campus official, told *The Chronicle* that the university had taken issue with the fact that the professors would be paid for their testimony — a practice that is common at colleges across the country — in litigation against the state.

"The university, as a public institution, is part of the state — therefore, that would be adverse to the university's interests," Fernandez wrote in an email. "However, to be clear, if the professors wish to do so pro bono, on their own time without using university resources, they would be free to do so**."**

A professor named in the filing, Michael McDonald, wrote on Twitter that the university had not initially used that rationale in its denial.

Daniel A. Smith, another of the professors, testified in a lawsuit against Florida in 2018 with the university's permission, *The New York Times* reported.

---

*Update (Nov. 1, 2021, 1:35 p.m.): This article has been updated to include a response from the university to the accreditor's announcement.*

---

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

| LEADERSHIP | ADMINISTRATION | FACULTY LIFE | POLITICS |

Lindsay Ellis

Lindsay Ellis is a senior reporter covering research universities. Follow her on Twitter @lindsayaellis, or email her at lindsay.ellis@chronicle.com.

## IN THE CHRONICLE STORE



**The Future of Enrollment**



**The Future of Work**



**The Next Enrollment Challenge**

Faculty Senate Ad Hoc Committee on Academic Freedom                    Page 164

# THE CHRONICLE OF HIGHER EDUCATION



**LEGAL**

# Academics' Work on Court Cases Is Common and Often Uncontroversial. Now It's Under the Microscope.

*By Francie Diep*

**NOVEMBER 2, 2021**



ALEX BRANDON, AP

Law-school professors (from left) Noah Feldman, Pamela Karlan, Michael Gerhardt, and Jonathan Turley are sworn in before testifying at a hearing considering impeachment charges in December 2019.

Faculty Senate Ad Hoc Committee on Academic Freedom                    Page 165

As of Tuesday, administrators at the University of Florida continue to face criticism over reports that they denied the requests of three faculty members to act as expert witnesses in a lawsuit over new voting restrictions in Florida. "As UF is a state actor, litigation against the state is adverse to UF's interests," the university's assistant vice president for conflicts of interest wrote to two of the faculty members, according to a legal filing.

The Florida case brings attention to a common side gig for professors: legal and other consulting, sometimes in the form of expert testimony. In one high-profile recent example, a House of Representatives committee considering impeachment charges against former President Donald Trump heard testimony from four law-school professors.

At its best, paid and unpaid consulting helps bring cutting-edge scholarship to bear on real-life cases, scholars say. Such outside work can bring up questions of conflict of interest, and there are gaps in academics' understanding of this facet of scholarly life. However, testifying against the state isn't a legitimate conflict, *The Chronicle*'s interviewees said.

---

**FROM THE CHRONICLE STORE**



**REPORT**

### The Innovation Imperative

The Buzz, the Barriers, and What Real Change Looks Like

**Visit the Store**

---

"If academic freedom means anything, it grants faculty the right to stand up and share their expertise, even when that's uncomfortable to those in power," said Thomas P. Lyon, an economist at the University of Michigan who was part of a conference on undue influence in his field in 2019. "The whole point of academic freedom is to prevent those in power from squelching academic research and expression thereof."

Nor is the mere fact of payment necessarily a problem. In later statements, leaders at the University of Florida have said the three political-science professors, Sharon D. Wright Austin, Michael P. McDonald, and Daniel A. Smith, are free to testify, but can't take payment. However, earning fairly high fees for outside legal work is not an uncommon practice in academe, and the money doesn't appear to be a genuine conflict in the Florida case, two scholars said.

Elizabeth Oldmixon is a professor of political science at the University of North Texas who has worked and trained people on the university's outside-activity policy. At UNT, she said: "A conflict of interest occurs when you have a relationship that affects the way you're going to do your job, so like a financial relationship that affects the decisions you make." She gave the example of owning a business that sells to the university. "It has nothing to do with creating a conflict of interest for the university vis-à-vis elected officials."

"There isn't a single well-funded interest that stands to make a lot of money by having a lot of people vote," Lyon said, "so I wouldn't be very worried about having those folks pay an expert."

There doesn't appear to be much data on how frequently professors are paid to be experts in legal trials. Neither Oldmixon, who is vice president of the Southern Political Science Association, nor Steven R. Smith, executive director of the American Political Science Association, knew of any numbers about academic political scientists. Both said the practice isn't uncommon in their field.

In March 2020, two economists published a survey in the journal *Economic Inquiry* about outside legal work among academic economists. About two-thirds of surveyed economics professors have done some legal consulting in their careers. Forty percent had done so in the last five years. Their median pay was $200 an hour.

Someone working on a high-profile antitrust case might earn even more than that, on the order of $1,000 an hour, said Joni Hersch, one of the co-authors and a professor of law and economics at Vanderbilt University. She wasn't bothered by these high rates, which, on an hourly basis, exceed most professors' university salaries. They are on par with what the lawyers in the cases earn, she said.

Almost no one *The Chronicle* spoke with had heard of a public university restricting faculty members from speaking against the state. But there was one similar case from two decades ago, which *The Chronicle* covered. A rider on Texas's 1998-99 appropriations bill withheld the salary and benefits of any state employee who "is retained or serves as an expert witness or consultant in litigation against the state."

At the time, Robert Hoover was a marketing professor at Texas A&M University at Corpus Christi. He had been retained by tobacco companies in a suit that the state was bringing against them. They wanted him to speak on his research about how much advertising can make people smoke. ("We are not all Silly Putty in the hands of Madison Avenue," is how Hoover summarized it.)

When he got a call from the Texas A&M University System's general counsel saying Hoover was in violation of the new law, he decided to fight back. He sued. Mainstream academe is generally anti-tobacco — many schools of public health refuse to take tobacco money, and the thrust of much research on the industry is negative. But the principles of academic freedom apply regardless of politics and content, experts like Lyon and Oldmixon said, when told about Hoover's case.

Hoover remembers attending a hearing that took about 20 minutes, it was that straightforward. The initial court decision, in Hoover's favor, would eventually be upheld and then expanded on.

Stuart M. Benjamin, a First Amendment scholar at Duke Law, thought that the University of Florida would be similarly hard-pressed to make a case for its policy. "I would not want to be the lawyer for the University of Florida writing the brief defending this," he said.

When considering the situation in Florida, Hoover said: "It is an attempt on the part of somebody to prevent people, who have studied in significant depth an issue, to not be allowed to discuss that, and that is patently wrong."   Faculty Senate Ad Hoc Committee on Academic Freedom                    Page 167

*Kate Hidalgo Bellows contributed reporting.*

*We welcome your thoughts and questions about this article. Please [email the editors](#) or [submit a letter](#) for publication.*

POLICY    SCHOLARSHIP AND RESEARCH    POLITICS

Francie Diep

Francie Diep is a senior reporter covering money in higher education. Email her at [francie.diep@chronicle.com](mailto:francie.diep@chronicle.com).

## IN THE CHRONICLE STORE



**The Future of Enrollment**



**The Future of Gen Z**



**Preparing for Tough Conversations**



**Recruiting and Retaining**

# THE CHRONICLE OF HIGHER EDUCATION



'I'm Speechless'
What prompted the U. of Florida to tell professors not to testify?

ACADEMIC FREEDOM

*By Lindsay Ellis and Emma Pettit*

**NOVEMBER 2, 2021**

It's not just three professors.

An effort by the University of Florida to deny professors the ability to testify in litigation against the state extends beyond the previously known political-science faculty members, whose restrictions were revealed in a court filing on Friday. Administrators denied requests from a fourth professor who had asked to participate in litigation supporting mask mandates against Florida in August, too, *The Chronicle* first reported Tuesday. He said he would not have been compensated for this participation.

## "This was a fundamental violation of the roles and responsibilities of universities, in particular, public universities."

The professor, the pediatrician Jeffrey L. Goldhagen, was asked to testify and serve as a declarant in litigation that

followed Gov. Ron DeSantis's executive order that forbade mask mandates in schools as the Delta variant of Covid-19 tore through the state. Goldhagen is chief of the division of community and societal pediatrics at the University of Florida's College of Medicine, in Jacksonville, and a professor in pediatric palliative care. Goldhagen said he would have spoken about why masks work and why children need protection from the virus.

Goldhagen served as a declarant — someone who files a statement that they declare to be true — in the two lawsuits anyway, he said. He asked a lawyer in the third lawsuit to subpoena him for his testimony, but the lawyer, Charles Gallagher, did not, citing a lack of time. Gallagher confirmed Goldhagen would not have been paid for his testimony. The case is now in appellate court.

---

**FROM THE CHRONICLE STORE**



REPORT

## The Innovation Imperative

The Buzz, the Barriers, and What Real Change Looks Like

[ Visit the Store ]

---

A spokeswoman for the University of Florida did not respond to questions on Tuesday on how the decisions about Goldhagen's testimony had been reached, and whether other faculty members had also received rejections. The *Miami Herald* on Tuesday identified four University of Florida law professors who "did not have their name affiliated with their university" as they signed a "friend of the court" brief challenging state law. They did so after an administrator had said they would need to indicate they were signing in their "individual capacity."

Goldhagen's case appears to contradict the university's earlier explanation for why the political-science professors' testimony was blocked. The campus's president, W. Kent Fuchs, and provost, Joe Glover, wrote on Monday night that the political-science professors would be "free" to testify "pro bono on their own time without using university resources." Goldhagen wrote in the disclosure he submitted to the university that he would not be using university resources and indicated, when asked if he would be paid more than $5,000 annually, that he would not. He told *The Chronicle* that administrators never separately asked him if he would be paid at all.

In an interview on Tuesday, Goldhagen said the denials had hurt on a personal and professional level. "This was a fundamental violation of the roles and responsibilities of universities, in particular, public universities," he said. "It was frankly the first time in my 40-year career where I was forced into a situation to disregard a moral and ethical standard that I'd always maintained for myself. … It caused me more internal turmoil than I have ever experienced."

He said he was speaking out now because "it is not hyperbole how much is at stake here."

At the foundation of American universities is the idea that faculty members have the freedom to study what they want and share that knowledge without constraint. In Gainesville, this appears to come with a caveat: not when it

challenges the politicians in power.

And the institution is now feeling the pressure. First, scores of political-science faculty signed a sharp rebuke of the decision. Then, Florida's accreditor, the Southern Association of Colleges and Schools Commission on Colleges, said it would investigate whether UF had violated accreditation standards. On Tuesday, calls escalated to Washington: Democrats representing Florida in Congress demanded answers from Fuchs, too. The university has said it would review its conflict-of-interest policy.



ILLUSTRATION BY THE CHRONICLE; PHOTOS FROM AP IMAGES, GAINESVILLE SUN/IMAGN

**Florida Gov. Ron DeSantis and U. of Florida president Kent Fuchs**

The university's response to the controversy suggests the professors' requests violated the campus's new conflict-of-interest procedures. But that's not entirely clear.

The university piloted a new system for reporting outside activities and financial interests in 2019, a critical time for campus research. The Trump administration, national-security experts, and members of Congress had expressed concerns about research collaborations with China. Many campuses responded by calling for more reporting of outside work. At the University of Florida, an explanation of a new conflicts-of-interest program to oversee the new system — called the UF OIO, short for UF Online Interest Organizer — notes that research

institutions have faced "increased scrutiny and concern from federal agencies over the threat of foreign influence in taxpayer-funded research" since 2018.

In March 2020, Florida lawmakers passed a higher-education law that carried harsh penalties for employees who failed to report outside activities and interests. The next month, the university released guidelines on what types of activities might present scrutiny. "High risk international issues" and business with the university, for example, would be subject to the most scrutiny and could be rejected, according to the guidelines. Serving as an expert witness "for a case that is not likely to adversely impact UF's interests" is a "low-scrutiny" activity and would be "generally approved, absent unusual circumstances."

To Meera Sitharam, a vice president of UF's faculty union and a chief negotiator, UFOLIO was not a welcome development. It seemed like a way for the university to "police" faculty members' outside activities, she said, and the extent to which professors were expected to report their endeavors became a major fight during negotiations for the collective-bargaining agreement, which was eventually ratified in June 2021.

# "The political pressures coming at higher ed right now are formidable, they're intense, and they're very different."

Eventually, they ended up with a process that the union could live with. (The union covers professors in some but not all divisions.) Generally, faculty members must report via UFOLIO activities they undertake for an outside entity or person that is not part of their assigned UF duties but is related to their expertise, like being an expert witness. They also have to report other things, like if they have any financial interest in an entity that could create a conflict of interest and if they're a candidate for public office.

Under the new bargaining agreement, disclosures must be approved or denied within 30 days. If denied, the faculty member will receive a written explanation. That explanation should indicate if the denial is based on an "insufficient disclosure" of information, an "impermissible conflict of interest," or an "impermissible conflict of commitment," the agreement says. During negotiations, the bargaining team pushed to make "conflict of interest" and "conflict of commitment" more precise than they'd been in the previous agreement.

"We put a lot of effort into carefully defining those things and limiting potential damage to faculty," Sitharam said.

In October, the political-science professors Michael McDonald, Daniel A. Smith, and Sharon Austin were all denied their requests to be expert witnesses, according to emails included in a court filing. David E. Richardson, dean of the College of Liberal Arts and Sciences, reviewed Smith's UFOLIO submission and rejected it, reasoning that, "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida." Days later, McDonald and Austin were both told that their requests constituted an "impermissible conflict of interest."

Faculty Senate Ad Hoc Committee on Academic Freedom                                                                    Page 172

"UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests," wrote Gary Wimsett, assistant vice president for conflicts of interest. "As UF is a state actor, litigation against the state is adverse to UF's interests."

The denials provoked a tidal wave of outrage from professors and higher-ed observers across the country who condemned the university for what they considered an abandonment of academic-freedom and free-speech principles.

And, Sitharam said, the denials contradict the collective-bargaining agreement. Per the agreement, a conflict of interest is defined as:

- A "private interest," meaning a concrete financial or material interest, or relationship to a relative that would reasonably appear to "adversely influence a faculty member's actions, judgment or decisions" required to carry out the faculty member's assigned duties, like teaching or research.
- Or, a "private interest" or relationship to a relative that would reasonably appear to "create an unlawful conflict with the faculty member's position as a public employee … which includes a situation in which regard for a private interest leads to disregard of a public duty or interest."

Essentially, Sitharam said, your outside activities can't affect the way you perform your work for the university, and you can't use your position as a public employee to do favors for other people or disregard your public duty.

The university's conflict-of-interest policy defines the term similarly, as something that "occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgment or obligations to the University."

Sitharam said she doesn't see any grounds on which the professors' requests should have been denied for being a conflict of interest. The union, she said, will be filing a grievance. (The university did not respond to a question asking if the denials conflict with the collective-bargaining agreement.)

In its denials, the university seemed to emphasize something separate from a traditional conflict of interest: how expertise might harm the university. So where did that "adverse to its interests" language come from?

Variations on the phrase show up in a few places in university materials. The conflicts-of-interest program has noted that providing expert testimony, with or without compensation, may "compromise sensitive UF research data or otherwise adversely impact UF interests." Supervisors who review disclosures are told to consider, among other factors, whether the activity "would adversely impact UF," according to an online UFOLIO training. When reporting an outside activity, faculty members who want to engage in legal consulting are asked to "please explain whether you think this activity/case could in any way place you in a position that is adverse to the interests of the University of Florida," according to the new faculty bargaining agreement.

That and other questions were agreed to during the bargaining process. According to Sitharam, the university's representatives argued that such a query is necessary because faculty members might not think ahead and may realize too late the unintended consequences of their outside activities.

The union was OK with that language, said Sitharam, in part because there are situations in which a faculty member might undertake an activity that is adverse to UF's interests that could present a conflict of interest. Just not in this "weird, roundabout way" in which anything a faculty member does against the prevailing political ideology in Florida is considered against UF's interests, she said.

Goldhagen, a member of the medical-school faculty and therefore not subject to the union contract, had a similar experience to the three political-science professors'. He learned in August that Wimsett, the assistant vice president, had rejected his requests to participate in the litigation.

"I am not able to approve this activity," Wimsett wrote. "Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."

He later elaborated, saying the university denies requests to engage in outside activities when those actions are "adverse to its interests." Wimsett wrote, "As UF is an extension of the state as a state agency, litigation against the state is adverse to UF's interests."

But Goldhagen had addressed this very issue in his previously submitted disclosure, reviewed by *The Chronicle*. He was asked whether he thought the case could place him in a position that is adverse to the university's interests.

"This activity is consistent with the mission of the University of Florida and University of Florida College of Medicine," he wrote. "The College of Medicine strives to improve health care in Florida, our nation, and the world through excellence and consistently superior leadership in education, clinical care, discovery, and service." And then he quoted from the University of Florida's mission: "Service reflects the university's obligation to share the benefits of its research and knowledge for the public good."

The university did not respond to *The Chronicle*'s questions about the cases or how it defines its interests.

To experts in higher education, the move to bar faculty members from testifying and participating in litigation is the latest signal that policy making at Florida, including on classroom management and instruction, is enmeshed with the interests of state politicians.

Fuchs, the university's president, told colleagues last year that holding more virtual classes could lead to state budget cuts, and he has said he "literally" did not have the power to mandate masks on campus.

That the denial of faculty testimony has happened in another instance struck Barrett Taylor, an associate professor of counseling and higher education at the University of North Texas, as significant, even after a decade of examples

of politicization seeping into public university governance.

"That really suggests that this might be a more aggressive, more invasive strategy than I had anticipated," he said. "The political pressures coming at higher ed right now are formidable, they're intense, and they're very different."

The very idea that there is one "interest" of the university struck Taylor as an important escalation. "To assert that there is only one interest, and that something might be antithetical to it, is a question at the heart of self governance."

What stands out to many observers in this case is the extension of political interests into research and speech, an undermining of the norms that have long governed the activities of professors.

"I see it as a threat to an independent university, an independent academic system," said Brendan Cantwell, an associate professor of higher, adult, and lifelong education at Michigan State University. "The idea that a state government through a state university determines the research and public-engagement activities of a professor is… is… I'm speechless that it's happened."

To Cantwell, the fact that there was a fourth professor establishes a "pattern" of "suppressing faculty engagement in areas of their expertise when it comes to issues that matter to the governor and the Republican Legislature."

Goldhagen, the pediatrician, said the erosion of this independence is a "substantial" development that marks a "profoundly critical point in time."

"It's not just me being denied the ability to testify," he said. "It's about the role and responsibility of the university, it's about truth, it's about ethics, it's about morality, it's about the capacity of a single person or a small group of people to basically discount and dismantle the mission of a university."

*A version of this article appeared in the* [November 12, 2021, issue](#).

*We welcome your thoughts and questions about this article. Please* [email the editors](#) *or* [submit a letter](#) *for publication.*

| SERVICE AND OUTREACH | POLICY | ADMINISTRATION | FACULTY LIFE | POLITICS |

| SCHOLARSHIP AND RESEARCH |

Lindsay Ellis

Lindsay Ellis is a senior reporter covering research universities. Follow her on Twitter [@lindsayaellis](#), or email her at [lindsay.ellis@chronicle.com](#).

Emma Pettit

Emma Pettit is a senior reporter at *The Chronicle* who covers all things faculty. She writes mostly about professors and the strange, funny, sometimes harmful and sometimes hopeful ways they work and live. Follow her on Twitter at @EmmaJanePettit, or email her at emma.pettit@chronicle.com.

## IN THE CHRONICLE STORE



**The Truth About Student Success**



**The Future of Enrollment**



**The Future of Gen Z**



**The Future of Work**



1255 23rd Street, N.W. Washington, D.C. 20037
© 2021 The Chronicle of Higher Education

Faculty Senate Ad Hoc Committee on Academic Freedom                                          Page 176

# THE CHRONICLE OF HIGHER EDUCATION



ACADEMIC FREEDOM

# 'It Just Felt Wrong': U. of Florida Faculty Say Political Fears Stalled an Initiative on Race

*By Emma Pettit*

**NOVEMBER 30, 2021**



PHOTO ILLUSTRATION BY THE CHRONICLE; PHOTO BY CHRIS O'MEARA, AP

nother University of Florida professor has accused the institution of violating his academic freedom to ward off

A possible action by state lawmakers. In this instance, the scholar says, administrators intruded upon curricular matters, recommending, for one, that faculty members avoid the word "critical" in the title of a new doctoral concentration related to race.

## A new grievance paints administrators as willing to compromise faculty autonomy to avoid riling Republican lawmakers.

The episode — as laid out in a grievance submitted on Sunday by the faculty union — paints a portrait of university administrators who are hesitant to rile a potentially hostile Republican Legislature, and who are willing to compromise faculty autonomy to avoid essentially poking the bear. The actions described are at odds with stated academic-freedom principles and could "tarnish" the university's reputation, reads the grievance.

The complaint comes on the heels of news that UF had barred scholars from testifying in litigation against the state, which provoked outcry that the institution was buckling to partisan pressure. The university quickly reversed course and has said there was no undue external influence.

---

**FROM THE CHRONICLE STORE**



ARTICLE COLLECTION
### Student Diversity
What colleges need to do now

[ Visit the Store ]

---

Chris Busey, who filed the grievance, told *The Chronicle* that the episode has been destabilizing and demoralizing. "I've never hid my identity as a race scholar. It was in my job talk. It was in my cover letter. It's who I am as a scholar." In other words, "You knew who I was when you hired me," Busey said. "Don't expect for me to change because Ron DeSantis said so."

Steve Orlando, a university spokesman, said in an email that, pursuant to state law, any grievance matter would be confidential, and the university is therefore "unable to publicly acknowledge whether a grievance has been filed." However, he said that the grievance, which *The Chronicle* sent to Orlando, contains "a number of inaccuracies, and we will address them through the appropriate processes." Orlando declined to elaborate on what the inaccuracies are.

L ast year, after the murder of George Floyd, colleges across the country voiced their opposition to systemic racism and said they would put renewed energy into diversity and equity. The University of Florida was no different. Graduate students within UF's College of Education pressed their leaders to do more to support Black students and faculty, to live up to those stated values. From that effort arose the Collective for Black Student Advancement, a group of faculty and staff members, students, and administrators, among others, who met

regularly to discuss these issues.

Busey is on the collective's curriculum committee, which focused on how to understand racism and anti-racism in education. Eventually, the committee came up with a couple of proposals, including a doctoral concentration titled "Critical Study of Race, Ethnicity, and Culture in Education," which would formalize a degree focus that'd been operating informally for years, Busey said.

The concentration "was designed, in part, to recruit new students, but also to allow us to give our existing students an opportunity to show what they had expertise in, which is helpful on the job market," said Angela Kohnen, an associate professor in the College of Education. In part because the courses already exist, it seemed like relatively "low-hanging fruit," she said. The committee also came up with another idea for a master's-level certificate in anti-Black racism in education that could act as a "welcome mat," of sorts, to the field, Kohnen said.

At the time, there was institutional excitement and momentum around these types of initiatives, Kohnen said. Then came roadblocks.

## "'Critical' actually has meaning in academia. It's not just a word."

Over the spring and summer of 2021, critical race theory became a fixation among conservatives — including Gov. Ron DeSantis, who said that "the woke class wants to teach kids to hate each other, rather than teaching them how to read." In late August, a state representative filed a bill that would ban critical race theory in government entities in Florida, including public universities. (The legislative session begins in January.)

By fall, Kohnen said, it was clear something was up. The concentration had been approved by the college's curriculum committee and seemed to be languishing in the system. In late September, she, Busey, and other faculty members met with college administrators and Chris J. Hass, the associate provost for academic and faculty affairs. According to Busey, Kohnen, and Alyson Adams, a clinical professor in the College of Education, the meeting was unsettling. (Hass did not reply to an email or a voice-mail message.)

According to Busey's notes from the meeting, Hass said that using the words "critical" and "race" together was an issue, and that they should consider renaming the concentration and/or delay putting it forward until the legislative session has ended. If it was moved forward now, it'd be flagged and stopped, he said. Busey's notes state that Hass also invoked someone who was not present: Mark Kaplan, the university's vice president for government and community relations. Hass said Kaplan has said the college is viewed favorably by the state, which is financially beneficial, and has advised that the college should avoid doing anything that could jeopardize that relationship, according to Busey's notes.

Hass talked about the political realities of Florida and noted that W. Kent Fuchs, the president, and Joseph Glover, the provost, are "not in a position to protect the college," according to Busey's notes. For one thing, there have

been "discussions" of removing Fuchs and replacing him with Richard Corcoran, former speaker of the Florida House of Representatives and Florida's current education commissioner. So should they move forward with their curricular efforts, any consequences would be felt by the dean and the college, Hass said, according to Busey.

Hass also reportedly said that in the next legislative session, state legislators will seek to get rid of critical race theory, and that "we want to prevent a Trump-style ban."

Kohnen and Adams remember the meeting similarly. According to Kohnen's notes from the meeting, which were submitted as part of the grievance, Hass told the attendees that Fuchs is serving at the pleasure of the Board of Trustees, and that other state universities have been threatened with the replacement of their president by a political appointee like Corcoran. Hass also said — according to Kohnen — that Fuchs has not enacted mask or vaccine mandates because of threats to his job. Neither he nor Glover were willing to be fired if the college pressed the curriculum issue, the notes state.

According to Kohnen's notes, Hass recommended that the education professors either remove "critical" from the name of the doctoral concentration, table it until the spring, or put it on ice and continue doing the work to "change the hearts and minds" of students. Though the conversation mostly focused on the concentration, Adams said, "we knew that they also meant there were implications for the certificate."

## "I remember writing that down on paper. That the president and the provost do not have your backs."

Throughout the meeting, "many of us felt just really kind of stunned," Kohnen said. Adams said she was "mouth open" surprised that altering the name of the concentration was being posed as "no big deal." Adams said she was also struck by the notion that "people above us did not have our backs."

"I remember writing that down on paper," she said. "That the president and the provost do not have your backs."

At one point during the meeting, Adams asked how the university could expect to attract and retain faculty of color if this work is not valued. According to Kohnen's notes, Hass replied by saying something like, "I don't know how I can look at you and say you shouldn't look for another job." Adams remembers Hass saying something like, "I understand, and I'm not sure I could tell them a reason to come or stay either." Busey recalls it as being along the lines of: "How can I look you in the face and tell you that this is the best place that you should do your work? That you shouldn't look for another job?"

When Busey, who is Black and studies critical race theory, logged off from the meeting, he felt like he needed to start looking for jobs elsewhere.

n mid-October, faculty members met with Glenn E. Good, dean of the College of Education, during which Good

I echoed some of Hass's concerns, albeit in a more muted fashion. (When reached by email, Good directed *The Chronicle* to the UF spokesman, Orlando.)

According to Busey's notes, Good began the meeting by encouraging everyone to read House Bill 57, the anti-critical race theory legislation. Kaplan, the vice president, had relayed to Good and to the provost that "the people in Tallahassee want solutions, not critiques of them," the dean told the group, according to Busey's notes. The dean noted that "of all the flagships in the country, UF is the most vulnerable to state politics" because of the significant proportion of funding it receives from the state level. He indicated that he wanted things to move forward with the doctoral concentration but that the name would need to change, according to the notes.

Good's message was "more gentle and I think diplomatic" than Hass's, said Busey, but the bottom line was the same.

Good also said that Glover, the provost, would support a concentration that says "studies of race" but not critical studies of race, according to Busey. Glover did not respond to a message left with his assistant.

Good "was trying to communicate that he was in support of the concepts being brought up and taught and the ideas behind the concentration," said Adams. Like, "I'm 100 percent behind you." But also, "Change the words." Those things seemed incongruent to Adams. "It just felt wrong."

Kohnen also remembers the message of the October meeting being: "There's no problem here. You can put everything forward. Just take off the word 'critical' and it's fine." They left unsatisfied. Busey met with Good again later in October. At that meeting, according to Busey's notes, Good said that Hass may have "gotten ahead of himself." Leadership is OK with a certificate including the phrase "anti-Black racism," but he reiterated that the concentration cannot have the words "critical" and "race" be together, according to his notes from that meeting.

According to Busey, Good said: "We do not want to inflame Tallahassee. Everything else is a go and the leadership is behind our work if we just make those minor adjustments."

But to Busey, that change isn't minor. The suggestion feels like an insult to the scholarship that he and his colleagues do. "'Critical' actually has meaning in academia, you know," said Kohnen. "It's not just a word.*"*

"I do think our administration thinks they're doing the right thing, and thinks that the curriculum content can still be taught and still be impacting our students in really powerful ways, if we could just slide it under the radar," said Adams. "But that's not acceptable. It's not fair to my colleagues whose scholarship this is, whose courses this affects, whose students it affects. Are we supposed to be embarrassed of teaching critical race theory? Are we supposed to pretend we're not doing it?"

Eventually Busey decided to file a grievance, arguing that the "intrusions into curricular matters represent an egregious and unprecedented violation of academic freedom." Overall, he's disheartened and discouraged. He's

not eager to consider the prospect of leaving Florida. He completed his undergraduate degree at UF and holds season tickets for football. "I'm a Gator."

But "am I looking for other jobs?"

"I kind of have to."

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

| ADMINISTRATION | POLICY | EQUITY & DIVERSITY | FACULTY LIFE | LEADERSHIP | POLITICS |

**Emma Pettit**

Emma Pettit is a senior reporter at *The Chronicle* who covers all things faculty. She writes mostly about professors and the strange, funny, sometimes harmful and sometimes hopeful ways they work and live. Follow her on Twitter at @EmmaJanePettit, or email her at emma.pettit@chronicle.com.

## IN THE CHRONICLE STORE



**The Successful President of Tomorrow**



**Preparing for Tough Conversations**



**Rethinking Campus Spaces**



# THE CHRONICLE OF HIGHER EDUCATION



**ACADEMIC FREEDOM**

# 3 U. of Florida Experts Couldn't Testify on a Voting-Rights Law. This Professor Had No Trouble.

*By Michael Vasquez*

**NOVEMBER 3, 2021**



CHARLES OMMANNEY, THE WASHINGTON POST, GETTY IMAGES

**Dario Moreno (left) and U.S. Sen. Marco Rubio (right) taught a political-science class together at Florida International U. in 2015. Moreno has since been hired by Republican groups to testify in support of a controversial voting law.**

Page 183

The University of Florida is embroiled in controversy this week following revelations that, in at least four cases, it denied professors' requests to testify in lawsuits that challenged policy set by Gov. Ron DeSantis and the GOP-controlled Florida Legislature.

University leaders said offering testimony as part of a legal challenge to the state poses a conflict for the flagship institution because it is an extension of the state government. One such denial came in response to three professors' bids to testify in a suit against a new Florida law that makes it harder for residents to vote. For now, the three professors have been sidelined.

But one public-college professor in Florida had no trouble getting a green light to testify on behalf of parties *defending* Florida's controversial voting law.

**FROM THE CHRONICLE STORE**



REPORT

## The Innovation Imperative

The Buzz, the Barriers, and What Real Change Looks Like

**Visit the Store**

Court records show that the Republican National Committee and the National Republican Senatorial Committee hired a Florida International University professor, Dario Moreno, as an "expert witness" in *League of Women Voters of Florida v. Lee,* which challenges the restrictive voting law.

At Florida International, a public university, administrators signed off on Moreno's outside-employment request with little fanfare. The "Outside Activity/Conflict of Interest Form" includes no comments or feedback to Moreno — just a couple of sign-offs by his superiors. Though the filled-out form does not specify the lawsuit, it names a law firm — Shutts & Bowen — listed on the same court documents that name Moreno as an expert witness for the Republican committees.

Florida International's conflict-of-interest policy is similar, though not identical, to the University of Florida's. It forbids professors to take outside jobs that could interfere with their primary academic duties, affect the university's integrity, or create a conflict "between the private interests of the employee and the public interests of the University, the Board of Governors, and/or the State of Florida."

Moreno, who could not be reached for comment, is an associate professor in the politics and international-relations department. He has previously been paid by the Florida Legislature to defend Republican-drawn redistricting maps in court. According to a 2015 article in the *Tampa Bay Times,* Moreno had been "hired by the Florida Legislature to be an expert witness in defense of every GOP-drawn redistricting map since 1994."

Several years ago, Moreno taught a politics class at the university with U.S. Sen. Marco Rubio, a Republican, who is

a longtime friend, according to *Politico*.

Neither of the Republican committees responded to *Chronicle* requests for comment about Moreno's "expert witness" role in the voting case.

The two Republican groups intervened in the voting-rights lawsuit in support of the state in hopes of preserving the new rules, which restrict voting by mail and reduce the availability of ballot-drop boxes. The new law was enacted after an election in which Democrats outvoted Republicans by mail.

## A 'Fundamental Violation'

The three University of Florida professors applied for similar approval to testify in a different case — *Florida Rising Together et al. v. Lee et al.* — that challenges the same law, but were rejected. It's not clear how the three requests violated the university's conflict-of-interest policy, *The Chronicle* has reported. (The faculty members have demanded that the university reverse its decision.)

The unusual muzzling of the professors became public last week. Since then, other University of Florida faculty members have come forward to say that they, too, had been subject to similar bans. A pediatrician told *The Chronicle* that university administrators had denied him a chance to testify in a court case filed by parents who support mask mandates in schools. That pediatrician, Jeffrey L. Goldhagen, called the administration's decision a "fundamental violation" of the role of public universities in society.

Moreno's hiring as an expert witness illustrates the implications of a policy in which public-college professors can offer paid testimony only on the side of the state. "The motives have been unmasked," said Richard Chait, a professor emeritus of higher education at the Harvard Graduate School of Education. Chait said the situation suggests that only expert faculty members who agree with the state are welcome to share their opinions in court and be paid for it.

Faculty members who dare to challenge the status quo are not.

But Chait said that professors, while technically state employees, also serve the public as a whole. And the public has a right to know when a state law or state policy is wrong.

"If you're an expert and you think something is amiss," he said, "it is in the public interest for that point of view or that information to have public exposure, especially at a public university."

In the face of nationwide criticism, the University of Florida said this week that the three faculty members could testify in the voting-rights case, but only if they were not paid.

"If the professors wish to testify pro bono, on their own time without using university resources, they are free to do

so," the university's president and provost said in a joint statement.

Lawyers for the three professors countered that the "pro bono" option had never been offered to the faculty members initially, and Goldhagen said his request had been denied even though he wouldn't have been paid.

When Moreno takes the witness stand for the Republican committees, he will be paid, university records show. Moreno's outside-employment form doesn't disclose his hourly rate, but it states he will be working with the Shutts & Bowen law firm a few hours each week, on nights and weekends. The work will continue for more than six months.

Total hours of compensation: 112.

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

| POLITICS | FACULTY LIFE | SCHOLARSHIP AND RESEARCH | SERVICE AND OUTREACH | ADMINISTRATION |

### Michael Vasquez

Michael Vasquez is a senior investigative reporter for *The Chronicle*. Before joining *The Chronicle*, he led a team of reporters as education editor for *Politico*, where he spearheaded the team's 2016 Campaign coverage of education issues. Mr. Vasquez began his reporting career at *The Miami Herald*, where he worked for 14 years, covering both politics and education.

## IN THE CHRONICLE STORE



**The Future of Enrollment**



**The Future of Gen Z**



**Sustaining the College Business Model**

Faculty Senate Ad Hoc Committee on Academic Freedom

Page 186

# THE CHRONICLE OF HIGHER EDUCATION



**FACULTY AUTONOMY**

# After Scathing Criticism, U. of Florida Will Let Professors Testify Against the State

*By Lindsay Ellis*

NOVEMBER 5, 2021



DOUG FINGER, AP

**W. Kent Fuchs, president of the U. of Florida**

Faculty Senate Ad Hoc Committee on Academic Freedom                                    Page 187

The University of Florida will now allow professors who recently asked to serve as expert witnesses in litigation against the state to do so, President W. Kent Fuchs said on Friday.

The reversal followed a week of turmoil on the campus spurred by administrators' decisions to bar faculty members in political science and medicine from testifying against state agencies in litigation this year.

Fuchs wrote in a letter on Friday that he had asked the campus's conflict-of-interest office to reverse those decisions, "regardless of personal compensation, assuming the activity is on their own time without using university resources."

---

**FROM THE CHRONICLE STORE**



REPORT

## The Future of Enrollment

Where Colleges Will Find Their Next Students

[ Visit the Store ]

---

A task force will review the conflict-of-interest policy — and how the university should respond if professors seek to testify against the state — and issue recommendations by November 29, the president wrote.

Fuchs had previously said political-science faculty members would be able to participate in litigation if they were not compensated for the activity. But a pediatrician at the university, Jeffrey L. Goldhagen, told *The Chronicle* that he would not have been paid for his testimony — advocating for mask mandates in schools — and his requests had been rejected nonetheless.

Goldhagen said that changing the outcome in his case would not erase other university steps that he characterized as politically motivated, including Florida's refusal to enact a campus mask mandate and its hiring of Joseph Ladapo, a skeptic of mask and vaccination mandates, as a professor of medicine.

"This is not about a few faculty members," Goldhagen said. "This is fundamentally about academic freedom, First Amendment rights, the sanctity of institutions in the state, and the sanctity of institutions in the country. If in fact that sanctity of academic institutions is violated, we're in the process of dismantling a critical institution that has always been a bulwark of democracy."

Lawyers representing three political-science professors whose requests to testify had been denied said they were evaluating their future options. "While the University of Florida reversed course and allowed our clients to testify in this particular case, the fact remains that the university curtailed their First Amendment rights and academic freedoms, and as long as the university's policy remains, those rights and freedoms are at risk," the lawyers said in a written statement.

Fuchs's announcement followed fierce criticism of his administration from entities on and off campus. Florida's accreditor said on Monday it would investigate the decision about the faculty testimony. The faculty union urged alumni to stop donating and peer campuses to downgrade their assessment of the university on surveys circulated by *U.S. News & World Report* for its college rankings.

Democrats in Florida's congressional delegation had previously urged reversal, too. On Friday, Rep. Debbie Wasserman Schultz, a Democrat, praised Fuchs for his change in policy. "The governor's incessant hostility to facts and science, combined with nonstop bullying and threats directed at education leaders who just want to protect children, created this chilling climate of fear and suppression that, sadly, found its way onto one of the nation's premier public university campuses," she said in a written statement.

Hours after the university announced it would allow them to testify, the three political-science faculty members — Sharon Wright Austin, Michael McDonald, and Daniel A. Smith — filed a lawsuit against the university in federal court. "Despite reversing the immediate decision prohibiting the professors from testifying, the university has made no commitment to abandon its policy preventing academics from serving as expert witnesses when the university thinks that their speech may be adverse to the state and whatever political agenda politicians want to promote," says a statement from the professors' lawyers. "It is time for this matter to be rightfully adjudicated, not by press release, but in a court of law."

---

*Update (Nov. 5, 2021, 2:00 p.m.): This article has been updated to add reaction, from the professors' lawyers and a Florida congresswoman, and to note that the professors filed a lawsuit against the university.*

---

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

| ADMINISTRATION | FACULTY LIFE | LEADERSHIP | POLITICS |

### Lindsay Ellis

Lindsay Ellis is a senior reporter covering research universities. Follow her on Twitter @lindsayaellis, or email her at lindsay.ellis@chronicle.com.

## IN THE CHRONICLE STORE




# THE CHRONICLE OF HIGHER EDUCATION



**ACADEMIC FREEDOM**

# Florida Looks at Raising the Stakes on Post-Tenure Review

*By Emma Pettit*

**NOVEMBER 5, 2021**



WILFREDO LEE, AP

**Some lawmakers in Florida have raised questions about "continuing performance accountability" among tenured professors in the state, one provost told his faculty.**

Amid "renewed interest" from Florida lawmakers into how tenured professors' performance is judged, a post-tenure review proposal is circulating at state universities. The draft set off alarm bells for some faculty leaders, who say in its current form, it would hobble tenure protections by giving too much power to administrators.

Florida professors were already on edge about academic freedom. News broke a week ago that three political-science professors at the University of Florida had been barred from offering paid testimony in a voting-rights lawsuit against the state. A reason given was that, because the university is a state actor, litigation against the state is "adverse to UF's interests." The university used the same reasoning when it barred a pediatrician who supported mask mandates in Florida schools from participating in lawsuits against state agencies, *The Chronicle* previously reported.

W. Kent Fuchs, president of the University of Florida, said on Friday that he had asked the campus's conflicts-of-interest office to reverse its decisions on recent expert-witness requests.

---

**FROM THE CHRONICLE STORE**



REPORT

### The Future of Enrollment

Where Colleges Will Find Their Next Students

**Visit the Store**

---

News of the post-tenure review proposal — first reported by the *Tampa Bay Times* — also comes shortly after a revised post-tenure review policy sparked strong dissent at Georgia's public universities. University System of Georgia regents approved the revisions over the objections of faculty members who said the changes would severely weaken tenured professors' job security.

Now, some Florida professors are making similar arguments about the draft proposal. Early in October, Ralph C. Wilcox, provost at the University of South Florida, explained its origins. "There appears to be renewed interest in tenure on the part of some of our elected officials as we approach the 2022 State Legislative Session," he wrote in an October 3 email to the president of the Faculty Senate. "Specifically, questions have been raised about continuing performance accountability among State University System (SUS) faculty members who have earned tenure."

The system's provosts have "recognized the importance of fully and regularly informing our boards of trustees, members of the Florida [Board] of Governors, and elected officials of the nature, importance and rigor of process associated with granting tenure in assuring the national competitiveness of Florida's public higher education institutions," Wilcox wrote. "We have also discussed the essential need of framing a systematic and rigorous periodic review of faculty members who have successfully earned tenure at our universities."

To that email, he attached a draft document that he said had been "developed by colleagues at the University of

Florida," guided, in part, by policies and practices developed by the University of Texas System. "The expectation is that the attached document, perhaps in modified format, will be considered for drafting as a bill for consideration by members of the Florida State Legislature," he wrote. He sought feedback from Timothy Boaz, South Florida's Faculty Senate president, because the State University System of Florida's Council of Academic Vice Presidents would be evaluating this course of action soon.

To Boaz, the proposal seems unnecessary. Tenured faculty are already amply reviewed under existing procedures, he said in an interview. A group of South Florida faculty leaders looked over the draft, and they wrote up their feedback for Wilcox.

"What," they asked, "is the problem that is being solved?"

If legislators think that tenure itself is a bad idea," they wrote, "then offering to spend a lot of time, effort and money doing more evaluation of all tenured faculty seems unlikely to change that view."

## Provosts Would Hold Final Authority

The Microsoft Word file, sent to *The Chronicle* by two faculty members, lists its "author" as Joseph Glover, provost at the University of Florida. (Glover did not respond to an interview request on Thursday.)

Under the draft policy, tenured faculty would undergo a "comprehensive periodic review" every five years. The review's purpose is to, among other things, "encourage faculty professional development and realign expectations as the university's mission and strategic goals change and stature and ambitions rise" and to "refocus academic and professional efforts, when appropriate."

Here's how the proposed process would work: Professors would assemble and submit a dossier. The chair would review it and add a "brief letter" assessing the professor's performance. The professor's dean would then apply one of four ratings: "exceeds expectations," "meets expectations," "does not meet expectations," or "unsatisfactory." That package would then go to the provost, who could accept, change, or reject the dean's assessment.

Faculty members who exceed or meet expectations would be eligible for some kind of merit pay increase. For anyone who lands in one of the bottom tiers, the document states, the dean "shall propose further action to the provost." That could mean counseling, a change of assignment, a performance-improvement plan, and "any disciplinary actions that are available under university policies and procedures." Final decisions, the draft policy says, would fall to the provost.

To Jorg Peters, a University of Florida faculty senator and professor in the department of computer and information science and engineering, the proposal "removes checks and balances that are in place" and instead cedes judgment to administrators who "are usually somewhat removed from what is going on" at the department level.

Under the existing collective-bargaining agreement for faculty at the University of Florida, which covers professors in some but not all divisions, faculty members are reviewed each year. Tenured faculty members also undergo a "sustained performance evaluation" every seven years based on their evaluation file.

If a professor's performance is deemed consistently unsatisfactory in one or more areas via the sustained-performance evaluation, that person is put on a performance-improvement plan developed by the professor and the chair. Should the faculty member fail to meet deadlines outlined by the plan, the department or unit "has the responsibility to take appropriate actions." The bargaining agreement contains established procedures for how and why a tenured faculty member can be disciplined or fired.

University regulations outline a similar process. For tenured faculty members outside the bargaining agreement who fail to meet the marks set by their performance-improvement plan, any "appropriate actions" taken are governed by the university's regulation on suspension, termination, and disciplinary action.

Among faculty members' concerns is that the proposal does not require peer input. The chair "may ask the assistance of a department advisory committee," the dean "may ask the assistance of a college advisory committee," and the provost "may ask the assistance of a university advisory committee," but none of those options are compulsory. And repercussions are in the hands of deans and provosts.

"It cuts out our ability to have a say in these decisions and leaves it up to people who, for instance, might be politically motivated, right? We've seen that happen recently," said Jack Stenner, an associate professor in the art and technology program at Florida. If every five years, faculty members have to worry about potentially losing their jobs through this process, the effect is akin to removing academic freedom entirely, Stenner said.

According to the draft, any appeal to the provost's final determination "shall be limited to procedural deficiencies." Allowing the provost "complete discretion" to categorize the faculty member's performance and determine the outcome "is tantamount to eliminating tenure," the South Florida faculty group wrote to Wilcox. "Tenure is about protecting faculty from arbitrary or unjustifiable dismissal. This proposal as written effectively eliminates such protection."

There's still a lot to be hammered out. Should this proposal or a version of it become state law, Wilcox wrote in October, "the expectation is that each university will be expected to develop its own implementation policies and procedures (likely within parameters set by the Florida Board of Governors), as is true with many other statutes."

Wilcox and other provosts within the state university system did not directly respond to *The Chronicle*'s interview requests except for Mark Rieger at Florida Gulf Coast University, which does not grant tenure. Renee' Fargason, a spokesperson for the State University System of Florida, said in an email that Florida's public universities "at their initiative" have "undertaken a review of national best practices surrounding tenure of university faculty to ensure we remain focused on student success and accountability."

David C. Bloom, chair of the University of Florida's Faculty Senate, told the *Tampa Bay Times* he believes that university leaders understand the importance of tenure to the institution's national stature.

But the proposal seems to be part of a "general attempt to control academics from outside the university," said Eric Chicken, Faculty Senate president at Florida State University. Which is not how it should be.

"We truly feel," he said, "that we are the best qualified ... to gauge when somebody is doing well as a professor versus when somebody is not."

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

| ADMINISTRATION | POLICY | FACULTY LIFE | POLITICS | SCHOLARSHIP AND RESEARCH |

**Emma Pettit**

Emma Pettit is a senior reporter at *The Chronicle* who covers all things faculty. She writes mostly about professors and the strange, funny, sometimes harmful and sometimes hopeful ways they work and live. Follow her on Twitter at @EmmaJanePettit, or email her at emma.pettit@chronicle.com.

**IN THE CHRONICLE STORE**



**The Truth About Student Success**



**The Future of Enrollment**



**The Future of Gen Z**



# THE CHRONICLE OF HIGHER EDUCATION



ACADEMIC FREEDOM

# U. of Florida Dean Says He Was Directed to Reject Professor's Request to Testify Against the State

*By Emma Pettit*

NOVEMBER 16, 2021



JEFF GREENBERG, UNIVERSAL IMAGES GROUP, GETTY

**The University of Florida, in Gainesville**

The University of Florida dean who rejected a political scientist's request to offer expert testimony because it may "pose a conflict of interest to the executive branch of the State of Florida" said this week that his decision was made at the direction of senior administrators.

Daniel A. Smith, Michael McDonald, and Sharon Wright Austin, all UF scholars, were each told in October that they would not be allowed to be expert witnesses in a voting-rights lawsuit against the state. News of the rejections provoked international outcry, and a week later the university reversed course.

David E. Richardson, dean of the College of Liberal Arts and Sciences, handled Smith's request, and on Monday, he shed new light about his involvement in the controversy at the fall meeting of the CLAS Assembly, a shared-governance group.

His remarks suggest that the decision to bar professors from testifying against the state may have come from the top of UF. And it comes amid persistent questions about how the campus thrust itself into the center of a fiery debate about the limits of academic freedom.

**FROM THE CHRONICLE STORE**



ARTICLE COLLECTION

## Burned Out and Overburdened

How to support the faculty

**Visit the Store**

At the meeting, which was recorded, Richardson showed faculty members a chart outlining how outside activities are reviewed for approval at the university. Sometimes, according to the chart, the president's cabinet is consulted.

Because Smith is chair of the political-science department, his request was sent to Richardson, his dean. Richardson told faculty members that after he got Smith's request, he "inquired" with central administration, because in the case for which Smith's testimony was sought, the defendant was an "officer or an official of the state government." Richardson sent along the information, which was "subsequently reviewed," said the dean, and he was informed that "UF policy on this had been formulated, and it was passed to me to implement." Richardson was "effectively informed that the UF policy would be for me to disapprove" Smith's request, the dean said.

Richardson said he asked for "further discussion, negotiation, or understanding of the background of the policy" but that he "did not receive that opportunity to have that discussion." The language sent to Smith explaining the disapproval — that "outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida" — was provided by the general counsel's office, the dean said. That office, Richardson said, told him to talk to Mark Kaplan, vice president for government and community relations. They spoke, Richardson said, and he got the same language from Kaplan.

In the end, Richardson said, he could choose to reject Smith's request, thereby carrying out UF policy, or approve Smith's request and be in conflict with UF policy. "Either decision," he noted, could've had "negative consequences for the college and the university — that was clear." A dean being in conflict with central administration, and "potentially the Board of Trustees, would not have good consequences for the college." (Smith, McDonald, and Austin filed a lawsuit against UF, arguing the university violated their free speech rights. Richardson said on Monday that because of the pending litigation, he needed to be careful about what he said.)

When news broke about the rejections, Richardson said he heard from colleagues who "are far more knowledgeable about conflict of interest than I," and it became clear to him he needed to learn more about conflicts of interest and public-employee issues. After educating himself, "I concluded that I would reverse my decision." On November 3, he told the president and the provost he'd be doing just that. Two days later, W. Kent Fuchs, president of the University of Florida, announced that he had reversed the rejections. (Richardson said he was not implying his decision contributed to Fuchs's.) Fuchs also appointed a task force to consider changes in the university's conflicts-of-interest practices.

"I'm very comfortable with the decision ultimately made, both by myself and by the president," Richardson said.

But he was "extremely disappointed that I could not avert the recent outcomes regarding the conflict-of-interest matter," Richardson said. "They have had an impact on you, on our faculty, and on our university. And I only wish that in the early stages, I'd had the insight and persuasiveness to change the university's direction in this matter.

Going forward," Richardson continued, "I will, of course, be far more circumspect in reviewing conflict of interest, insofar as I continue to do that, and will always endeavor to protect the rights … and privileges of our faculty." He emphasized the importance of safeguarding academic freedom.

He also expressed remorse. "I really regret the fact that this episode has shaken the trust that you have in me." If the time comes that he can "no longer guide the college due to its internal or external realities," he will "step aside for new leadership."

*We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

ADMINISTRATION        FACULTY LIFE        LEADERSHIP        POLITICS

Emma Pettit

Emma Pettit is a senior reporter at *The Chronicle* who covers all things faculty. She writes mostly about professors and the strange, funny, sometimes harmful and sometimes hopeful ways they work and live. Follow her on Twitter at @EmmaJanePettit, or email her at emma.pettit@chronicle.com.

Faculty Senate Ad Hoc Committee on Academic Freedom                                Page 197

# THE CHRONICLE OF HIGHER EDUCATION



**ACADEMIC FREEDOM**

# After Controversy, U. of Florida Has a New Policy on Faculty Testimony. Here's What It Says.

*By Lindsay Ellis*

NOVEMBER 23, 2021



BRAD MCCLENNY, THE GAINESVILLE SUN, IMAGN

**W. Kent Fuchs, president of the U. of Florida**

Faculty Senate Ad Hoc Committee on Academic Freedom                                 Page 198

Professors at the University of Florida will most likely see approvals when they ask to testify as expert witnesses in cases that involve the State of Florida, following President W. Kent Fuchs's approval of a task force's recommendations on Tuesday.

The new policy represents a retreat from a practice this year in which four professors — three political scientists and one medical doctor — were rejected in their requests to testify in litigation involving state entities. Fuchs reversed those decisions after a query from Florida's accreditor and national backlash from academic-freedom advocates. He called a seven-member task force to evaluate the campus's policies on testifying in litigation involving the state.

The resulting recommendations create "a strong presumption" that the university will approve requests among professors and staff to testify as private citizens, "regardless of the viewpoint of the faculty or staff member's testimony and regardless of whether the faculty or staff member is compensated for such testimony."

**FROM THE CHRONICLE STORE**



**REPORT**

### Fixing the College Fundraising Crunch

The Latest Trends and Strategies to Broaden Your Base of Support and Achieve Long-Term Prosperity

**Visit the Store**

If the university wants to reject a request, it needs "clear and convincing evidence" that such testimony would conflict with a specific interest of UF. A campus official must explain that conflict in writing, according to the recommendations.

The policy is narrow. Lawyers for six professors who have sued the university after news of the rejected testimony went public said in a statement that the policy still allows for faculty speech to be restrained at "the university's discretion" and said they were "disappointed" by the task force's results, which "address only the narrow issue of expert testimony."

One of the task force's members, Clay Calvert, a journalism and law professor, said at its Monday meeting that those who enforce the policy must remember key principles. (The task-force meetings were available for the public to view.)

"A conflict of viewpoint is not necessarily a conflict of interest," he said. "I hope when these decisions are made under these policies, that they're grounded neither in fear of possible financial repercussions to the University of Florida, nor in any efforts to curry favor to those powerful few who may control or influence the purse strings that effect the University of Florida."

The task force also recommended that the university create a committee that reviews proposed denials of requests,

including those to serve as expert witnesses when the state is a party. The committee would need to include faculty and administrators and must consult with a requestor's college for local context, the task force said.

Previous policy said that faculty members at UF must report outside activities that could pose a real or apparent conflict of interest through a system called UFOLIO, short for UF Online Interest Organizer. Generally, professors had to disclose pursuits that were not part of their assigned UF duties but were related to their expertise, like legal consulting or teaching at another institution.

Campus leaders on Tuesday also responded to the inquiry of the university's accreditor, which was first reported by *The Chronicle* this month. The accreditor, the Southern Association of Colleges and Schools Commission on Colleges, had asked whether external entities were involved in the decision and to what extent Florida's governing board played a role. The university denied each charge.

Sacscoc also asked the university whether its actions aligned with its definition of academic freedom. Administrators said that the task force's recommendations affirmed Florida's commitment to the principle.

*Emma Pettit contributed reporting for this article.*

> *We welcome your thoughts and questions about this article. Please email the editors or submit a letter for publication.*

**ADMINISTRATION**   **LEADERSHIP**   **POLITICS**

Lindsay Ellis

Lindsay Ellis is a senior reporter covering research universities. Follow her on Twitter @lindsayaellis, or email her at lindsay.ellis@chronicle.com.

## IN THE CHRONICLE STORE





Page 200

**The Washington Post** *Democracy Dies in Darkness*                    Appendiox 3.2

# University of Florida bars faculty members from testifying in voting rights lawsuit against DeSantis administration

By Andrew Jeong

October 30, 2021 at 4:25 a.m. EDT

The University of Florida barred three faculty members from testifying for plaintiffs in a lawsuit challenging a voting-restrictions law enthusiastically embraced by Gov. Ron DeSantis (R), which activists say makes it harder for racial minorities to vote. The school's move raises sharp concerns about academic freedom and free speech in the state.

The public university said the three faculty members — political scientists Daniel A. Smith, Michael McDonald and Sharon Wright Austin — could present "a conflict of interest to the executive branch" and harm the school's interests by testifying against the law signed by DeSantis in May.

"As UF is a state actor, litigation against the state is adverse to UF's interests," school officials said, according to documents reviewed by The Washington Post.

Lawyers trying to reverse the Florida law, also known as Senate Bill 90, have sought to question DeSantis on whether he was involved in the decision to prevent the academics from testifying, according to the New York Times, which first reported on the university's move.

The move to bar professors from being expert witnesses in public trials is highly unusual. In a letter to the university, lawyers representing the professors said that faculty members retain their First Amendment rights to free speech even if their remarks may "make a University's relationship with funding sources more difficult."

The attorneys cited U.S. Supreme Court rulings that protect the rights of individuals to disclose information acquired "by virtue of their public employment."

The academics will file a legal challenge against the university if it does not change its stance, said Paul Donnelly, a lawyer representing Smith, McDonald, and Austin.

As Florida's governor, DeSantis has influence over the funding of the state's public institutions of higher education. He also has the authority to name six of the 13 members of the university's board of trustees. All appointed trustees are subject to state Senate confirmation.

In a statement provided to The Post on Saturday, the university denied it had violated the First Amendment rights of its faculty members. Representatives for DeSantis could not be reached for comment.

After the 2020 presidential election, DeSantis and Florida's Republican-controlled state legislature passed a law whose provisions include restricting voting by mail and barring everyone except election officials from providing food or water to voters waiting in long lines. In Florida, particularly during early voting in October, waiting to cast a ballot can mean standing in line in the hot sun.

This law was enacted despite a virtually flawless election in Florida last year. Former president Donald Trump, who has baselessly alleged electoral fraud elsewhere, won the state's 29 electoral votes.

About 40 percent of all votes cast by Black Americans in last year's presidential election were submitted by mail, or double the percentage for 2016, according to Demos, a think tank that is among the groups suing to reverse the new voting restrictions.

Multiple studies show that precincts with larger Black populations tend to endure longer lines on Election Day. Restricting mail voting will mean longer voting lines at more crowded polling stations, Demos said.

**The Washington Post** *Democracy Dies in Darkness*

# University of Florida prohibits professors from testifying

By Mike Schneider | AP

October 30, 2021 at 3:33 p.m. EDT



ORLANDO, Fla. — The University of Florida is prohibiting three professors from providing expert testimony in a lawsuit challenging a new law that critics claim restricts voting rights, saying it goes against the school's interest by conflicting with the administration of Florida Gov. Ron DeSantis.

Though the decision is being criticized as threat to academic freedom and free speech, the university said in a statement Saturday that allowing professors Dan Smith, Michael McDonald and Sharon Austin to serve as paid experts for plaintiffs challenging the law would be "adverse to the university's interests as a state of Florida institution."

"The University of Florida has a long track record of supporting free speech and our faculty's academic freedom, and we will continue to do so," the statement said.

Lawyers for a coalition of civic groups challenging the law said in court papers Friday that the professors were told by the university that their expert testimony would dissent from the administration of Florida Gov. Ron DeSantis, creating a conflict for the school.

"UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests. As UF is a state actor, litigation against the state is adverse to UF's interests," according to an email from an assistant vice president at the university to McDonald that was filed with the court documents.

Another university official said in an email to Smith that "outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."

Attorneys for the professors said Saturday that they would take legal action claiming violations of the First Amendment and academic freedom if the school doesn't reverse the decision.

"The university cannot silence the professors on matters of great public importance. These professors are citizens entitled to participate in the marketplace of ideas," attorneys Paul Donnelly and Conor Flynn said in a letter to a university lawyer. "These unlawful restrictions are shameful, and could very well deter top scholars from joining UF's ranks."

The legal director of the ACLU of Florida, writing on behalf of Smith, said the professor was acting as a private citizen and his testimony would be crucial to the public in understanding "one of their most valuable rights."

"But perhaps most importantly, UF simply should not be looking to Governor DeSantis to decide which speech activities it will permit its employees and students to engage in," the ACLU's Daniel Tilley wrote to university officials.

Like universities elsewhere, the University of Florida routinely allows its professors to testify in cases in which they can provide expertise, and Smith has previously testified in voting rights cases in Florida.

In its statement, the University of Florida said the decision not to let the professors perform outside paid work wasn't denying them their First Amendment rights or academic freedom.

Lawyers for the coalition of civic groups are trying to get testimony from the governor about his role in the formation of the new law, but administration attorneys are fighting the attempt. The new law limits how vote-by-mail drop boxes can be used, requires voters to ask for a vote-by-mail ballot and prohibits non-poll workers from giving food or drink to voters waiting in line.

Two weeks ago, on the day he found out he wouldn't be able to provide testimony, Smith tweeted an image of Hannah Arendt's classic book "The Origins of Totalitarianism."

"Dusting this classic off the bookshelf for some light weekend reading," Smith wrote.

For his part, McDonald on Friday night tweeted a video of Tom Petty singing, "I won't back down." He and his colleagues "are the faculty being denied our constitutional right to free speech by the university," he wrote.

—————

Faculty Senate Ad Hoc Committee on Academic Freedom                                           Page 202

**The Washington Post** *Democracy Dies in Darkness*

# Opinion: Why did Florida ban state professors from challenging Ron DeSantis's voting law?

By Greg Sargent
Columnist

November 1, 2021 at 10:46 a.m. EDT

Last spring, Gov. Ron DeSantis of Florida took the reprehensible step of signing the state's new voter suppression law on Fox News. In so doing, the Republican acted out an ugly truism: Restricting voting as governor in a high-profile way is bound to have great appeal to the national GOP base, possibly boosting future presidential aspirations.

Now this story has taken another ugly turn: The University of Florida has barred three professors from serving as expert witnesses in a lawsuit against the voter suppression measure.

This story is about to get worse for the university: The Democratic members of Congress from Florida are set to come out sharply against the decision, I'm told, and depending on how things go, this could result in congressional hearings.

This will ratchet up the stakes in this battle and draw more national scrutiny to a move that experts have denounced as a startling and inexplicable attack on academic freedom.

This blowup began when the New York Times reported that the university had informed the professors that they could not participate in a lawsuit against the law. The rationale was that assisting a lawsuit against the state is "adverse to U.F.'s interests."

The lawsuit argues that the voting law's provisions, such as the ones restricting drop boxes and making it harder to get absentee ballots in various ways, will impose disproportionate burdens on nonwhite voters. The professors — Daniel A. Smith, Michael McDonald and Sharon Wright Austin — were hired by the plaintiffs to testify to this and other matters.

The DeSantis angle here is potentially very troubling. DeSantis, it turns out, has top allies at the university, such as Morteza Hosseini, who is both head of the university's board of trustees and a big GOP donor and close DeSantis adviser.

It's not clear whether those allies — or DeSantis himself — are behind this decision. But the lawyers for the plaintiffs are seeking to question DeSantis about his potential involvement as part of their litigation, and the Times reports that DeSantis has "resisted questioning."

The university's rationale is strange and opaque. It's not immediately clear why testifying in this lawsuit would be contrary to the university's "interests."

When I asked a university spokesman to clarify, he emailed me this:

> To your question, the university views the professors' request as a request to be paid to testify against the state, and the university, as a public institution, is part of the state — therefore, that would be adverse to the university's interests. However, to be clear, if the professors wish to do so pro bono on their own time without using university resources, they would be free to do so.

But this raises more questions than it answers. First, one of the professors — Smith — has repeatedly testified in previous voting rights cases against the state of Florida. And Smith tells me these were approved by the university *and* that he was paid for his work on them.

"Quite the contrary, UF has celebrated my involvement in these high-profile cases, as it brings national recognition to the university," Smith told me. So it's not clear why getting paid is problematic this time.

What's more, a lawyer for the three professors told me that at no point did the university indicate to them that working on the lawsuit pro bono was an option. This raises more questions about the integrity of the process here.

Smith's point about the university celebrating previous cases raises still more questions. In what sense would the university's role as part of the state mean the professors' participation in the lawsuit is contrary to their interests? And even if you accept that absurd notion, why would doing it pro bono somehow mitigate that?

These and other questions are already being raised. Wasserman Schultz tells me she's circulating a letter among the congressional delegation condemning the decision and asking for an accounting of how it was arrived at.

"We'll be asking a series of questions, and we expect answers," Wasserman Schultz tells me, adding that it's likely that all 10 Democrats will sign it. Republicans will be invited to sign as well, but it seems inevitable that they will decline.

Wasserman Schultz noted that such activity by professors was routinely approved in the past, adding that the only difference now is "who is governor." She noted that she had a private conversation with university president Kent Fuchs, in which she was "quite critical," and found his answers "unsatisfactory."

Wasserman Schultz, who attended the university herself, pointed out that it's far more likely that it's damaging its own interests with this stance. "This is activity that enhances the reputation of the university," she told me, in that it showcases its "nationally renowned professors using their expertise."

The big unknown here is *how* this is supposed to be harming the university's interests. Regardless, it will soon be pressed to account for this: Wasserman Schultz says she and Democrats will pursue "every possible way to ensure that these professors can participate in this case."

When I asked whether this might include congressional hearings, she said: "When I say 'every,' it includes *every*."

With conservatives regularly railing against allegedly rampant liberal censoriousness on college campuses, how Republicans and their media allies approach this should prove instructive. Fox News will be all over this, right?

# Opinions Newsletters

**Opinions A.M.:** <u>The best of The Post's commentary, in your inbox six days a week.</u>

**Opinions P.M.:** <u>A companion to Opinions A.M., sent weekday afternoons.</u>

**The Checkup With Dr. Wen:** <u>Guidance on navigating the pandemic and other public health challenges.</u>

**The Week In Ideas:** <u>Thought-provoking opinions you may have missed.</u>

**The Opinions Essay:** <u>The latest special features from the Opinions section.</u>

**Post Opinión:** <u>Opinión y análisis sobre los temas políticos y sociales más relevantes en los Estados Unidos, América Latina, España y el resto del mundo, ahora en español.</u>

**Follow Alerts:** Sign up to receive email notifications from <u>Eugene Robinson</u>, <u>Henry Olsen</u>, <u>Alexandra Petri</u> and more of your favorite columnists on <u>our newsletters page.</u>

---

**OPINIONS ON SPEECH AND SCHOOLS**                                          **HAND CURATED**

The danger of critical race theory

Opinion • November 11, 2021

The Democrats need to go back to school

Opinion • November 10, 2021

Democrats are lying about critical race theory

Opinion • November 9, 2021

**View 3 more stories** ⌄

Faculty Senate Ad Hoc Committee on Academic Freedom                      Page 204

# The Washington Post
*Democracy Dies in Darkness*

## Opinion: We work for the people of Florida. That's why we can't let the University of Florida silence us on a voting rights law.

By Sharon Austin, Michael McDonald and Daniel Smith

November 3, 2021 at 9:00 a.m. EDT



*This article has been updated.*

*Sharon Austin, Michael McDonald and Daniel Smith are political science professors at the University of Florida. Smith is also the chair of the university's Department of Political Science.*

As political science professors, each of us teaches, writes and speaks every day on issues of voting and democracy. For years, our expertise has been valued by our employer, the University of Florida.

So we were stunned to learn last month that the university was barring us from testifying in an upcoming legal challenge to Florida's new voting law, S.B. 90. The university's move is a gross violation of academic freedom; more importantly, though, it's an undermining of our mission to serve the people of Florida — all of them — as employees of a state research university.

We should be permitted to testify and will fight for our right to do so.

Because of our experience and knowledge, we were hired as expert witnesses on a major voting rights case brought by the NAACP and numerous other nonprofit organizations against the Florida secretary of state and 67 elections supervisors over the new voting law, which the Brennan Center for Justice calls "an omnibus voter suppression bill that will make it harder for Floridians to vote." Voting rights groups maintain that the law is bad on many levels, but, most importantly, it will harm poor and minority voters by making voting by mail much more difficult.

We have worked on cases like this before without objection from university officials. But with S.B. 90, a piece of legislation that Gov. Ron DeSantis (R) signed into law live on Fox News, the university has offered a series of shifting rationales to justify blocking us from testifying. In our view, all the rationales reveal a fear of retribution from political actors for our testimony.

First, the university tried to block our participation by claiming our testimony would be "adverse" to Florida's interests. We do not understand how identifying racial and ethnic discrimination in voting laws could possibly harm the state. As an institution that "strives to foster a diverse, equitable, and inclusive environment for all students, employees, partners, and visitors," shouldn't the university be pleased with our efforts to examine whether voting discrimination exists in Florida?

As public employees, each of us has sworn an oath to "support the Constitution of the United States and of the State of Florida." Our oath binds us to the people of Florida, not the politicians in the government. Regardless of the merits of the case, the public is entitled to have a full airing, with competing expert views, on an issue so central to the health of our democracy. That is how we fulfill the university's stated goal of sharing the benefits of our research and knowledge for the public good. Our job as public university professors and researchers is not to be mouthpieces for a particular administration's — or any administration's — point of view.

When we pointed this out, the university retreated to a new rationale — that the problem with our testimony is that we would be compensated for it. Again, this is an embarrassingly weak excuse and more likely just a way of punishing viewpoints that threaten politicians. The arrangements surrounding our testimony are irrelevant.

And if, as the university has more recently claimed, its concern is the fact that "University full-time faculty are paid with taxpayer dollars," the university has chosen a particularly odd way of advancing that interest. With the university's encouragement, we can spread our views in our official capacities as professors whose activities are funded by the taxpayers. Why would it be a problem for the university if we said exactly the same things when our compensation does not come from the state?

Further, this argument suggests that the university will favor certain viewpoints over others by making clear that if a professor supports the politicians, she may receive just compensation, but if she opposes the politicians, she must pay her own way. This is antithetical to the most basic principles of academic freedom.

Faculty Senate Ad Hoc Committee on Academic Freedom                                  Page 205

We would have hoped that our powerful political bosses would work to rise to our independence and get behind its guiding mission. Instead, it has caved — and in the process, it has forgotten whom we work for. As public employees, we serve all Floridians, not the politicians who control the state government.

That's why we should be permitted to testify and intend to fight the university's order. The court should hear evidence without censorship by politicians or the University of Florida. Doing so, after all, is our job — and the cornerstone of the university's own mission statement: "to share the benefits of its research and knowledge for the public good."

---

**OPINIONS ON SPEECH AND SCHOOLS**                                                    🔘 **HAND CURATED**

The danger of critical race theory

Opinion • November 11, 2021

The Democrats need to go back to school

Opinion • November 10, 2021

Democrats are lying about critical race theory

Opinion • November 9, 2021

**View 3 more stories** ∨



*Democracy Dies in Darkness*

# Opinion: The University of Florida's decision to silence its professors is an assault on academic freedom

By Editorial Board

November 4, 2021 at 1:47 p.m. EDT

Daniel A. Smith has been on the faculty at the University of Florida for nearly 20 years and is recognized for his scholarship on voting rights, ballot issues and political participation. He has provided testimony to Congress and state legislatures, advised numerous outside groups, and served as an expert witness in many voting rights cases. In the past, the university not only approved all of those outside activities but also celebrated his involvement in high-profile cases, which brought national recognition to the university and created opportunities for students.

Now the university has barred Mr. Smith and two other professors, Michael McDonald and Sharon Wright Austin, from testifying in a major voting rights case against Florida. The unprecedented decision is an infringement — likely unconstitutional — on academic freedom that raises troubling questions about whether Florida's flagship university bowed to political pressure to muzzle faculty voices on a matter of critical public interest.

A coalition of advocacy and voting rights groups wanted to hire the three professors, who all specialize in voting rights and behavior and election law, as expert witnesses in their challenge of Florida's new law restricting voting rights. Faculty are required to "report any outside activities and interests" and file requests for approval through the university's conflict-of-interest office. Such requests are routinely approved, but this time the activities were adjudged to be "adverse to the university's interests." Mr. Smith was told in an email that "outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida."

The American Association of University Professors, condemning the decision "in the strongest possible terms," noted that among the stated missions of the university is its obligation "to share the benefits of its research and knowledge for the public good." Silencing academic experts who can provide testimony in a lawsuit aimed at strengthening voting rights is not consistent with that mission. Equally troubling is how the university seems to have conflated its interests with those of the state's executive branch, i.e., Gov. Ron DeSantis (R), who has made legislation restricting voters a signature issue. He signed the bill into law before a crowd of supporters of former president Donald Trump in a ceremony that was broadcast by Fox News but excluded local reporters.

Lawyers for the groups challenging Florida's Senate Bill 90 want to question Mr. DeSantis about whether he was involved in the university's decision to silence the professors. He initially, the New York Times reported, resisted on the grounds that all of his communications about the law are privileged against disclosure, and he did not respond to media inquiries. The head of the university's board of trustees, Morteza Hosseini, is a major Republican donor and an adviser to Mr. DeSantis.

Though a spokeswoman for Mr. DeSantis subsequently denied that the governor had any direct involvement in the university's move, she implied he endorses it, saying the Constitution "guarantees the right to free speech, but there is no right to profit from speech." What would actually profit most from allowing the professors' testimony, however, is the public interest.

## The Post's View | About the Washington Post Editorial Board

Editorials represent the views of The Washington Post as an institution, as determined through debate among members of the Editorial Board, based in the Opinions section and separate from the newsroom.

**Members of the Editorial Board and areas of focus:** Editorial Page Editor Fred Hiatt; Deputy Editorial Page Editor Karen Tumulty; Deputy Editorial Page Editor Ruth Marcus; Associate Editorial Page Editor Jo-Ann Armao (education, D.C. affairs); Jonathan Capehart (national politics); Lee Hockstader (immigration; issues affecting Virginia and Maryland); Charles Lane (foreign affairs, national security, international economics); Stephen Stromberg (elections, the White House, Congress, legal affairs, energy, the environment, health care); David E. Hoffman (global public health, human rights and democracy issues); and Molly Roberts (technology and society).

# The Washington Post
*Democracy Dies in Darkness*

# Professors sue University of Florida, claiming free speech restraints

The state flagship school had reversed course earlier Friday, saying professors could testify against the DeSantis administration

🎧 **Listen to article** 4 min

By Lori Rozsa and Susan Svrluga

November 5, 2021 | Updated November 5, 2021 at 7:26 p.m. EDT

Three professors filed a lawsuit against the University of Florida on Friday, claiming school officials violated their right to free speech by trying to prevent them from offering testimony in a voting rights case.

The case further inflames a heated debate over academic freedom, one that has brought national attention and criticism to the state flagship university.

It was filed on the same day school officials reversed course: After a week of controversy and pushback from faculty, alumni and academics across the country, the University of Florida on Friday said the three political science professors should not be barred from testifying in a voting rights lawsuit against the administration of Gov. Ron DeSantis (R).

The complaint by the professors contends the university is discriminating against them based on viewpoints they wish to express, and by trying to prevent them from offering expert testimony on issues of overwhelming public importance, UF violated their First Amendment rights.

Seeking to restrict the professors from testifying is contrary to UF's stated mission as a public research institution — "to share the benefits of its research and knowledge for the public good," and to the principles of academic freedom and free speech, the complaint says.

The lawsuit asks the court to declare unlawful the policy of "stifling faculty speech against the State."

Hessy Fernandez, a UF spokeswoman, said the university does not comment on pending litigation.

UF president Kent Fuchs wrote in a campuswide email earlier Friday that he was asking the school's Conflicts of Interest office to allow the professors, all of whom are experts in their fields, to testify in a federal lawsuit.

The lawsuit by voting rights groups challenges a new state law, championed by DeSantis, that puts new limitations on ballot drop boxes and vote-by-mail practices.

David A. O'Neil and Paul Donnelly, attorneys for the professors, said in an email that despite reversing the decision prohibiting the professors from testifying, the school had "made no commitment to abandon its policy preventing academics from serving as expert witnesses when the University thinks that their speech may be adverse to the State and whatever political agenda politicians want to promote."

After Fuchs's announcement Friday, Kenneth Nunn, a law professor at the university, who, along with several colleagues at the law school, has raised concerns about academic freedom at the university, called it a welcome development. "I think it's great that the president saw the university's reputation was being damaged by their unfortunate decision to restrict those three faculty members from testifying in their case."

But Nunn said the decision doesn't do anything about the many faculty who have been restricted from testifying and those who probably feel a chilling effect.

Fuchs said in an email to students and faculty earlier this week that he was appointing a task force to review the university's conflict of interest policy, which was created last year.

"First, we would like to be abundantly clear that the University of Florida stands firmly behind its commitment to uphold our most sacred right as Americans — the right to free speech — and to faculty members' right to academic freedom," Fuchs wrote. "Nothing is more fundamental to our existence as an institution of higher learning than these two bedrock principles. Vigorous intellectual discussions are at the heart of the marketplace of ideas we celebrate and hold so dear."

But that did not quell the firestorm among faculty and others who saw the prohibition against professors Michael McDonald, Sharon D. Wright Austin and Daniel A. Smith

"It appears as though this is a University that is caving," said Irene Mulvey, president of the American Association of University Professors and professor and chair of the Mathematics Department at Fairfield University.

"He's managing a PR crisis by making an exception. But the policy still stands — which is deeply troubling. It never should have happened in the first place," Mulvey said.

In September, UF touted its rise to No. 5 on the U.S. News and World Report's 2022 list of best public schools. Fuchs wrote in the UF Alumni Association magazine that it was "very welcome and historic news" to achieve "a milestone decades in the making."

But the controversy over barring professors from testifying as experts prompted UF's accrediting agency, the Southern Association of Colleges and Schools Commission on Colleges, to say it was looking into the matter to see if an investigation is called for, a move that could threaten the school's coveted ranking.

The organization sent a letter to Fuchs on Nov. 2, asking him to prepare a report that "explains and documents" UF's compliance with issues of academic freedom and external influence. Fuchs has until Dec. 7 to respond.

"We're just going to let the investigation play itself out," said Belle Wheelan, president of the accrediting organization. "I can only imagine he will do everything he can to turn this around."

By Lori Rozsa

Lori Rozsa is a reporter based in Florida who covers the state for The Washington Post. She is a former correspondent for People magazine and a former reporter and bureau chief for the Miami Herald. 🐦 Twitter

By Susan Svrluga

Susan Svrluga is a reporter covering higher education for The Washington Post. Before that, she covered education and local news at The Post. 🐦 Twitter

---



### Today's Headlines

The most important news stories of the day, curated by Post editors and delivered every morning.


Sign up

---







We would like to send you news alerts

Notifications can be turned off anytime from browser settings.

**Dismiss**    **Allow**

# Congressional subcommittee launches investigation into free speech violations at UF

**BY JIMENA TAVEL**

UPDATED NOVEMBER 18, 2021 4:19 PM





A House subcommittee sent a letter, dated Nov. 18, 2021, to University of Florida President Kent Fuchs, demanding the university produce documents related to its conflicts-of-interest policy. This comes after UF initially barred three political science professors from testifying as expert witnesses in a lawsuit against the state related to Florida's new voting law, which restricts access to voting. DOUG FINGER *AP*



**Only have a** 

We would like to send you news alerts

Notifications can be turned off anytime from browser settings.

-04:19

**Dismiss**  Allow

A House subcom??? ??? ) whether the
University of Flo??? ights and their
academic freedom, sending a letter demanding records related to the
university's conflicts-of-interest policy.

In the 10-page letter dated Nov. 18 and addressed to UF President Kent Fuchs,
two Democrats — South Florida Rep. Debbie Wasserman Schultz and Maryland
Rep. Jamie Raskin — expressed "deep concern" that UF is "censoring its faculty
based on viewpoint." Raskin is chair of the U.S House Subcommittee on Civil
Rights and Civil Liberties, which will direct the inquiry.

"We are also concerned that, possibly due to pressure from trustees, politicians,
or others, UF has adopted and enforced a conflicts policy that undermines the
academic and free speech values that are essential to American higher
education," the letter reads.

**TOP VIDEOS**



WATCH MORE

Faculty Senate Ad Hoc Committee on Academic Freedom                    Page 211



We would like to send you news alerts

Notifications can be turned off anytime from browser settings.

Dismiss    

Homeless people in downtown Miami wait anxiously after notice of "cleaning"

## NAMES OF THOSE WHO CREATED UF CONFLICTS POLICY

The subcommittee is requesting that UF identify all individuals who were involved in developing its conflict-of-interest policy, and to identify the names and titles of every professor that UF has barred from engaging in outside activities under the conflicts-of-interest policy.

# Today's top headlines

Sign up for the Afternoon Update and get the day's biggest stories in your inbox.

Enter Email Address



This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

It also is seeking all documents, including minutes of meetings and emails, from Fuchs, Provost Joe Glover, other administrators and the board of trustees regarding the creation of the new policy.

In July 2020, UF amended its conflicts-of-interest policy to "require all employees to seek approval from the university before engaging in outside activities," according to the letter. Before that date, professors needed only to

notify UF of outsi



We would like to send you news alerts

UF spokeswoman                                                            y is working to
fulfill the subcon

Notifications can be turned off anytime from browser settings.

"We have receive                                          **Dismiss**   **Allow**   the committee,"
she wrote in an e                                                                  uidelines we
received."

The congressional investigation, along with an investigation by UF's accrediting body, Southern Association of Colleges and Schools' Commission on Colleges, were launched after UF in October initially denied three political science professors from serving as paid expert witnesses in litigation against the state over a new Florida law that restricts voting access.

# $2 for 2 months

Subscribe for unlimited access to our website, app, eEdition and more

### CLAIM OFFER

"Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida," wrote David Richardson, dean of UF's College of Arts and Sciences, in response to the request of one of the scholars, Daniel Smith, to testify in the case.

As a UF alumna, Wasserman Schultz said she wants to protect her alma mater.

"I bleed Gator Orange and Blue, and I will not condone repressive political actors trying to strong arm or silence UF's leaders or its brilliant professors," she said.

The subcommittee set a Dec. 3 deadline for UF to produce its requested information.

## UF BACKLASH

UF, which as a public university receives state funding, has faced intense



backlash after it ~~~~~~~~                         ~~~~~ pert witnesses in
the case. To quell                                 n to testify as
long as they didn    We would like to send you news   wn time.
University admir     alerts                          ert witnesses.

                     Notifications can be turned off
                     anytime from browser settings.

But the incident l                                 l concerns about
undue political ir              Dismiss    Allow

Earlier this month, the three political science professors sued UF, alleging the
university violated their First Amendment rights. They asked the court to strike
down the conflicts-of-interest policy, saying it has led to "stifling of faculty
speech against the state."

On Monday, three other UF professors joined the suit, saying the university
prevented them from lending their expertise in two other lawsuits against the
state — one relating to a felon voting rights case and another related to
COVID-19 mask mandates.

UF has said it doesn't comment on pending litigation.

Faculty Senate Ad Hoc Committee on Academic Freedom                          Page 214



We would like to send you news alerts

Notifications can be turned off anytime from browser settings.

**Dismiss**    **Allow**

U.S. Congress

investigation

House of

COMMITTEE ON

2157 RAYBURN

WASHINGTO

Noven

Original Document (PDF) »

Contributed by Jimena Tavel (Miami Herald)

Dr. Wesley Kent Fuchs
President
University of Florida
226 Tigert Hall
P.O. Box 113150
Gainesville, FL 32611

Dear President Fuchs:

We write with deep concern about re
prevent professors from providing testimony
the constitutionality of actions taken by the s
and in contravention of long-established prin

According to reports, in July 2020, U
all employees to seek approval from the univ
to this change, employees only needed to no
financial interests as they arose.[2] UF profes
concerns that the policy would be "used as a
were confirmed when UF subsequently prev
litigation raising legal and constitutional con
suppression laws, and the state's ban on mas

_____

[1] University of Florida, *Conflicts of Commit*
policy.ufl.edu/policy/conflicts-of-commitment-and-c
activities" are defined as "any paid or unpaid activity
could create an actual or apparent Conflict of Commit
consulting, participating in civic or charitable organiz
or practitioner, or holding a parttime job with another

[2] Memorandum from Joseph Glover, Provost
Gentry, Vice President for Human Resource Services
*Potential Conflicts of Interest* (Nov. 6, 2018) (online
outside-activities-and-potential-conflicts-of-interest/

Document    ◀    1    of 10    ▶    +  −    100%    ⛶



Gov. Ron DeSantis joined University of Florida President Kent Fuchs and Board of Trustees Chair Mori Hosseini to celebrate UF's No. 5 national ranking among public universities. BY THE FLORIDA CHANNEL

This story was originally published November 18, 2021 2:08 PM.



**JIMENA TAVEL**

 786-442-8014

Jimena Tavel covers higher education for the Miami Herald and el Nuevo Herald. She's a bilingual reporter with triple nationality: Honduran, Cuban and Costa Rican. Born and raised in Tegucigalpa, Honduras, she moved to Florida at age 17. She earned her journalism degree from the University of Florida in 2018, and joined the Herald soon after.

# Take Us With You

Real-time updates and all local stories you want right in the palm of your hand.



**MIAMI HERAL**

**VIEW NEWSLE**

We would like to send you news alerts

Notifications can be turned off anytime from browser settings.

**Dismiss**    **Allow**

**SUBSCRIPTIONS**

Start a Subscription

Customer Service

eEdition

Vacation Hold

Pay Your Bill

**LEARN MORE**

About Us

Contact Us

Newsletters

Archives

**ADVERTISING**

Place a Classified

Media Kit

Public Notices

**COPYRIGHT**    **COMMENTING POLICY**    **PRIVACY POLICY**    **TERMS OF SERVICE**

# The Gainesville Sun | Gainesville.com

STATE

# How a Florida university system 'stacked' with mega-donors became 'blatantly political'

*'Guardrails for democracy (are) being broken down' in academia, one former dean says*

**Jeffrey Schweers** Capital Bureau | USA TODAY NETWORK – FLORIDA
Published 9:33 a.m. ET Nov. 5, 2021 | **Updated 3:04 p.m. ET Nov. 5, 2021**

Eight years ago, then-Gov. Rick Scott convinced Bernie Machen to stay on as president of the University of Florida in the midst of the search for his replacement.

In return Machen got the Legislature to approve a preeminence program and millions in state tax dollars to finance UF's rise to top 10 status.

Now, almost a decade later, UF has achieved Machen's goal of being among the top five public universities in the nation, largely due to the efforts of new president Kent Fuchs and UF Board of Trustees Chairman Mori Hosseini, one of the most powerful unelected people in Florida.

But the prestige that came with climbing the mountain of U.S. News and World Report college rankings is in jeopardy over the decision to bar several professors from lending their expertise in court cases challenging key policies of Gov. Ron DeSantis and the Republican-controlled Florida Legislature.

**Previous coverage:**

Accreditor: Did University of Florida violate academic freedom standards by blocking professors' testimony?
University of Florida president responds as objections mount over academic freedom, political meddling
UF professors could testify in voting rights case if they are unpaid, spokeswoman says

These decisions out of the administrative suite at Tigert Hall also threaten the university's accreditation, which could affect its eligibility for millions in federal grants, its ability to recruit and hold onto highly sought after professors of national standing, and to pull in huge contributions from alumni, critics say.

"It's a terrible policy and a disgrace to UF and the state, and they need to do something to resolve it quickly or lose their status," said Darryl Paulson, a retired University of South Florida political science professor and former member of the conservative Heritage Foundation think tank.

"It creates a permanent stain that lasts for decades," Paulson added.

The move to muzzle professors testifying against the government in voting rights and mask mandate cases is "blatantly political," said Irene Mulvey, president of the American Association of University Professors.

"All signs point to the governor and executive branch based on their stated justification," said Mulvey, a department chair at Fairfield University in Connecticut.

However, the governor's press secretary, Christina Pushaw, says DeSantis was not involved in any decision or policy to keep the professors from testifying.

"Neither the governor nor anyone in our office communicated directly or indirectly with UF regarding their professors' requests to testify for pay in a lawsuit against the state," Pushaw said Thursday. "This is an internal UF issue and not the sort of thing that the executive branch would be involved in."

Furthermore, she said, DeSantis supports academic freedom.

"Per UF's public statements, those professors are free to testify in the lawsuit against the state, but pursuant to the institution's policy on conflicts of interest, they cannot receive financial compensation for their testimony against the state," she said.

Fuchs told the Palm Beach Post that while academic freedom is bedrock, the policy "is very simply about participating in litigation against your employer." Still, he said a newly convened task force would review the policy.

"We have a tradition here recently of not approving any employee that is an employee of the state of Florida then serving as an expert witness in litigation against the state of Florida," Fuchs said. "That's been our practice. They can do it if they don't use university resources, do it not on university time and not compensated. But we're re-thinking that practice because most of the universities in the nation indeed have a practice of letting their employees participate as expert witnesses in litigation against their employer."

A day later, Fuchs sent an email out to the campus community that he asked the Conflicts of Interest Office to "reverse the decisions on recent requests by UF employees to serve as expert witnesses in litigation in which the state of Florida is a party and to approve the requests regardless of personal compensation, assuming the activity is on their own time without using university resources."

Lawyers for the three political science professors denied permission to appear as experts in a case challenging new state election laws replied that while UF reversed its course, "the fact remains that the University curtailed their First Amendment rights and academic freedoms, and as long as the University's policy remains, those rights and freedoms are at risk. We are continuing to assess our options."

**More:** UF president: Task force to evaluate policy barring testimony to be announced soon

## University of Florida: Don't 'fracture our relationship with state government'

This year, top administrators have made clear that bucking the governor can create problems for UF.

Fuchs, for instance, repeatedly said he had no power to require students and faculty to wear masks.

In September, he told the UF Faculty Senate, which was considering a statement critical of the governor's COVID policies, that anyone who represents UF shouldn't do anything to "rupture or fracture our relationship with our state government and our elected officials."

If he or any other person who represents the university "becomes an adversary of state government and our elected officials, we'll lose that ability to influence those decisions that affect us," he said.

That message was reiterated in emails denying political science professors Daniel E. Smith, Michael McDonald and Sharon Austin permission to be expert witnesses for plaintiffs fighting the government's newly approved election laws, which limit drop boxes and change vote-by-mail rules.

**More:** A tale of two election laws: While Georgia saw a corporate backlash, response is muted in Florida

Such "outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict

for the University of Florida," David Richardson, Dean of the College of Liberal Arts and Sciences, told Smith.

Before their complete reversal, UF administrators backed off an outright ban, letting the political science professors provide expert testimony without pay.

Their decision to let faculty testify as expert witnesses without compensation was also met with criticism from several academic institutions and professors, and seemed weak in light of the discovery that five other professors were also denied permission to be expert witnesses, including one who said he was doing it for free.

"Their requests were denied because they were adverse to the university's interests,  conflating university interests with those of the executive branch," Mulvey said. "It's a complete violation of the principles of higher education to support the common good."

The administration should instead build a firewall protecting faculty from undue political interference, she added, instead of making decisions on what is best for the governor.

"When Tigert Hall (UF's administration building) looks at Tallahassee, they are trying to anticipate how Tallahassee is going to feel about my syllabus," said Paul Ortiz, president of the UF faculty union.

"Full professors and deans walking through campus are saying they wonder what DeSantis will think about this program, that syllabus, this diversity training," he continued. "We have an administration that believes their job is to adhere to DeSantis' worldview."

## How Florida politicized its academia

The political ties that bind become more apparent when you look at the Board of Trustees that oversees policy and finances as the university's legal overseer and final authority.

Eleven of the 13 board members are Republican donors who have contributed millions to the Republican Party and GOP candidates over the past two decades, records show. The other two members are the faculty senate chair and the student body president.

The governor appoints six of its members, and the State University System — made up of 14 political appointees — appoints the other five.

A November 2020 editorial by the Independent Florida Alligator, using data from Followthemoney.org, showed that 11 trustees donated $2.3 million to Republican candidates, conservative political action committees and funds.

They also gave $350,000 since 2015 to Scott, now a U.S. Senator, and $235,000 to Donald Trump.

Hosseini, a Daytona Beach housing developer, gave $447,000 to Republican candidates in the last 18 years. In the last three years, he gave $106,000 to DeSantis through two of his construction companies, lent DeSantis the use of his private jet for campaigning and has served as an adviser to the governor.

Hosseini is also the one who forwarded the resume of Dr. Joseph Ladapo to the president of UF Health, kicking off a fast-track hiring process to coincide with the governor's announcement that he was appointing the UCLA professor as his new surgeon general.

**More:** DeSantis mega-donor, UF Board of Trustees chair supplied Ladapo's resume, fast-tracking surgeon general's hire

Because of Hosseini's strong and steady support for UF, especially in getting funding for its preeminence initiative, faulty and administrators see him as the true president of UF, and Fuchs as his factotum, Ortiz said.

"Think about how this must look to Mori right now, sitting on top of the world," Ortiz said. "He took three nationally renowned professors out of the elections case. Politically speaking, this is a real victory for DeSantis."

Having someone as powerful as Hosseini going to bat for UF and gaining the support of the governor and the legislature is great, said Noah Fineberg, a UF junior and president pro tempore of the Student Senate.

"But it's concerning when that tradeoff results in negative press for the university," he said.

There's also the concern that what the legislature gives, it can also take away.

"If they do something embarrassing to the administration or the legislature, the governor and legislature have been known to retaliate by withholding funds," Paulson said.

## Political influence: A statewide trend throughout Florida higher education

UF is not the only state university facing political pressure, said Candi Churchill, executive director of the statewide United Faculty of Florida.

"All the university boards are stacked with political appointees and mega-donors," Churchill said. "I would say that the denial of professors to be expert witnesses for the public is part of a larger trend of trying to control higher education and the public school system."

A board member at Florida Atlantic University, Barbara Feingold, said she wasn't speaking just for herself at a board meeting in May when she suggested a tenure review of faculty include information about professors' political views.

"I speak not just for myself but for the governor," she said. "I can't think of any other position out there where people have a job for life."

Feingold was appointed by DeSantis to replace her husband, Dr. Jeffrey Feingold, after his second term expired. Feingold, who died in October, was a huge DeSantis supporter and GOP megadonor.

Meantime, the governor and legislature have signed off on laws requiring an annual political bias survey of faculty and allowing students to record their professors with the goal of filing a complaint against them.

"While claiming to be champions of free speech, they are denying the rights of professors pushing political and ideological views contrary to those of the administration," Churchill said.

The administration's latest actions are hypocritical given its long history of letting faculty members lend their expertise to court cases, Fineberg said, especially since just two years ago the administration was praising Smith's involvement in an almost similar case.

"This is of grave concern to myself and other students who see this as an overreach by the governor," Fineberg said. "It's an issue when partisan politics encroach (on) your ability to do your job."

The legislative and executive "micromanagement of public universities is happening all around the U.S., and is not unique to Florida," said Robert Jerry, former dean of the UF Levin College of Law.

"We are seeing guardrails for democracy being broken down in many aspects of our lives," Jerry said. "Universities are caught up in these powerful movements, and this is the most recent episode of what's happening around the country."

*Jeffrey Schweers is a capital bureau reporter for USA TODAY NETWORK-Florida. Contact Schweers at jschweers@gannett.com and follow him on Twitter @jeffschweers.*

**Subscribe today using the link at the top of the page and never miss a story.**

# The Gainesville Sun | Gainesville.com

**OPINION**  *This piece expresses the views of its author(s), separate from those of this publication.*

# What would former UF presidents have done in controversy over censored professors?

**Ron Cunningham** Columnist
Published 6:00 a.m. ET Nov. 11, 2021 | **Updated 10:22 a.m. ET Nov. 11, 2021**

Wow! Talk about igniting a firestorm.

For a while there, Tigert Hall's ham-handed attempts to censor professors caught more flack than Dan Mullen's flailing football fortunes.

Realizing he'd gotten a tiger by the tail (sly LSU reference) University of Florida President Ken Fuchs did an about-face, told the suppressed professors to go ahead and testify and announced he'd appoint a task force to review UF's conflict of interest policies.

Hopefully, Fuchs will do some soul searching of his own while awaiting the work of the task force.

In that regard I suggest he ask himself three questions:

1. WWJHMD?

J. Hillis Miller was UF's first post-World War II president. He oversaw a major campus expansion, and ended up getting UF's health center named after him.

But Miller was no champion of his faculty's right to get involved in the larger world beyond campus. The so-called Miller Memo prohibited faculty from running for office. It was insulting and blatantly unconstitutional, but Miller had been dead for more than a decade before economics professor Jim Richardson finally defied his edict and ran for City Commission.

Don't be a J. Hillis Miller, Dr. Fuchs.

2. WWJWRD?

J. Wayne Reitz has been dead for almost 30 years, but students are still agitating to get his name taken off the Student Union. And rightly so.

When the Johns Committee came to town in 1958, to root out homosexuality on campus, Reitz played the stooge while careers were ruined and students expelled.

Reitz called homosexuality "a complete aberration," and he thanked the Johns Committee for its work.

Don't be a J. Wayne Reitz, Dr. Fuchs.

3. WWJLD?

While he's mulling all this over, Fuchs ought to invite law school Dean Emeritus Jon Mills in for a cup of tea and a little chat about academic freedom.

Mills is former speaker of the Florida House (a position he could not have aspired to while Miller was in charge).

He is also co-director of UF's Center For Governmental Responsibility, which was founded after Dick Nixon impounded funds earmarked for social and civil rights programs. The center's work helped support successful litigation challenging the impoundments.

In the decades since, the Center has been elbow deep in matters of environmental law, poverty, health and education policies, gender and race bias and much more.

Needless to say, that work has not always been greeted with enthusiasm in Tallahassee. ("Governmental responsibility? We don't need no stinkin' governmental responsibility!")

**More from Ron Cunningham:**

New use for school district's headquarters would help revitalize downtown

Gainesville will regret it if we don't two-lane University Avenue

City Commission speakers relentlessly cast doubt, assign bad motives

In 1998 the Legislature tried to strip its funding on the trumped-up excuse that the Center was somehow encouraging people to sue the government. The horror!

It took then-President John Lombardi about five minutes to decide: No, we're not going to do that.

"Lombardi basically said that the Center for Governmental Responsibility would continue to be funded separately under a different line," Mills recalled.

In other words, Lombardi ignored the Legislature. And, Mills recalls, "there was no further reaction" from Tallahassee to his defiance.

Lombardi called Tallahassee's bluff.

"It's fair to say this was an attempt by somebody to send UF a message," Mills reflected. Nonetheless, UF defended "the ability of academics to talk about public policy."

Let the record show that when it counted, Lombardi stood firmly in defense of academic freedom at UF

Which leaves one last question.

WWKFD?

Be a John Lombardi, President Fuchs. Else what is The Academy for?

*Ron Cunningham is former higher education reporter for The Sun. He has known and written about every UF president since J. Wayne Reitz. Read his blog at www.floridavelocipede.com. Email him at ron@freegnv.com.*

## Join the conversation

Send a letter to the editor (up to 200 words) to letters@gainesville.com. Letters must include the writer's full name and city of residence. Additional guidelines for submitting letters and longer guest columns can be found at bit.ly/sunopinionguidelines.

## Journalism matters. Your support matters.

Get a digital subscription to the Gainesville Sun. Includes must-see content on Gainesville.com and Gatorsports.com, breaking news and updates on all your devices, and access to the Gainesville.com ePaper. Visit www.gainesville.com/subscribenow to sign up.

## The Gainesville Sun | Gainesville.com

**NEWS**

# Protest on the street and in writing show continued concern at UF over academic freedom

**John Henderson** The Gainesville Sun
Published 5:32 p.m. ET Nov. 12, 2021 | **Updated 5:53 p.m. ET Nov. 12, 2021**

University of Florida students and faculty held a protest on Friday, saying their battle with university administration over "academic freedom and free speech" is far from over.

The university has come under intense criticism after its initial decision to block three professors from providing expert testimony against the state in a lawsuit over voting rights.

On Nov. 5, UF President Kent Fuchs reversed his administration's decision that had blocked the professors from providing expert testimony in a federal court challenge involving an elections law that was a top priority of Gov. Ron DeSantis.

**State influence:** How a Florida university system 'stacked' with mega-donors became 'blatantly political'

**Abrupt change of course:** University of Florida President Fuchs reverses decision blocking professors' testimony against state

**List of demands:** UF faculty union sticks by its list of demands on academic freedom

But the protesters argued that there are still serious unresolved issues of whether the university administration will allow professors to exercise their First Amendment rights in other types of cases, such as in the classroom.

And the professors involved in the case — Dan Smith, Michael McDonald and Sharon Austin — said in a letter sent to Fuchs on Friday that they have no confidence in the objectivity of the task force he put together to review UF's conflicts of interest policies.

The protesters said they want independent academic associations to formally investigate the treatment of professors, as well as the university's broader policies of both academic freedom and outside activities.

"The present moment provides the university with an opportunity to demonstrate its commitment to academic freedom," the professors wrote in the letter to Fuchs. "This is a crisis of academic sovereignty. We respectfully submit that the best qualified experts to fix this problem are those who had no hand in its development, implementation, or administration. It is unfortunate that this matter will have to be adjudicated in a court of law and not between peers."

The professors tell Fuchs that assigning this issue to a task force of his choosing "appears simply to be a cynical tactic to defuse press attention and stem the reputational damage" to the university.

"The 'task force' concept appears to have originated not with the faculty itself, but with the administration's government relations and public relations team," the professors said in their letter.

Cynthia Roldan, a spokeswoman for UF, said Friday that the university is not commenting on the matter.

# UF students protesting say concerns go well past recent case

Students late Friday afternoon protested at the southwest corner of University Avenue and 13th Street.

They said their concerns over the censorship of professors goes well beyond this recent case.

"Originally, when this came out, it was just three professors, but we found out it was eight over the past year," said Rachel Wolfrey, the public relations director for UF College Democrats. "This one specific (incident) has gotten a lot of public attention, which is why they backed down. But who's to say it's not going to happen again?"

Wolfrey said they are hoping that something like this never happens again, not only at UF but at other campuses nationwide.

"This is unacceptable behavior, but especially for a Top 5 acclaimed university," she said.

Student Brian Marra, the political director for the UF College Democrats, said at the protest that the censorship concerns go well beyond the controversy involving the three professors.

"The goal is to make sure that the university is actually academically free, because if we can't trust the university to allow these professors to testify – and it took immense pressure for them to do that – how do we know that the university isn't telling our professors what to say in the classroom?" Marra asked.

In fact, he said, some professors have said they are hesitant to talk about certain subjects in the classroom because of fear of new legislation coming out in the Florida Legislature.

Marra said they were concerned that students would get them in trouble by recording what they are saying in class about sensitive political topics even though they were speaking the truth.

"There is a lot more at stake here," he said.

# Two groups calling for UF donors to withhold contributions until demands met

The announcement of the protest came through a press release put out by the UF College Democrats and United Faculty of Florida at the University of Florida, the faculty union.

The groups are calling for donors to withhold contributions to UF and agencies to revisit UF's accreditation until their first four demands are met.

Those are:

> The university must allow the professors  -- as well as other faculty affected by similar prohibitions -- to provide paid expert testimony related to Florida state legislation that restricts voting access or on any other topic related to their expertise. And the university must also issue a formal apology.
> University administration must affirm that it will not interfere with the right of any employee "to exercise their conscience, academic freedom, free speech rights, and expertise in an expert witness context, regardless of whether they receive payment for their expertise."
> UF must affirm its support for voting rights and commit "to opposing ongoing efforts to suppress voting rights in the state of Florida."
> UF must formally declare that the university's mission to serve the public good is independent of the transitory political interests of state officeholders.

Stan Kaye, the government relations chair for United Faculty of Florida at the University of Florida, the faculty union, said in the press release that they are calling upon the American Association of Universities, the American Association of University Professors, "or a comparable, independent body with no formal ties to the state of Florida to immediately initiate the investigations."

Elizabeth Dale, a UF professor of history and law, said that Fuchs' statement did not contain a broader affirmation of academic freedom, and the newly announced task force members consist "almost exclusively of current or former University of Florida administrators who were responsible for violating the constitutional rights of faculty."

On Nov. 5, Fuchs announced that he had asked UF's Conflicts of Interest Office to reverse the decisions on recent requests by UF employees to serve as expert witnesses in litigation in which the state of Florida is a party.

It was an abrupt change of course following blistering criticism across the university community, from noted academics across the nation and amid a probe by the accreditation authority essential for student aid.

The university had denied permission to the professors to serve as paid experts on the basis that challenging a law would be "adverse to the university's interests as a state of Florida institution."

The lawsuit was by Florida Rising Together and other voting rights organizations, who contend that Senate Bill 90, passed earlier this year, violates federal voting protections.

## The Gainesville Sun | Gainesville.com

NEWS

# Six professors take free-speech battle with University of Florida administrators to court

**John Henderson** The Gainesville Sun
Published 10:34 p.m. ET Nov. 15, 2021

Six professors are suing the University of Florida administration, alleging their First Amendment rights have been violated when they were blocked from testifying as expert witnesses in cases challenging state laws.

The suit against UF was initially filed by three professors who had been sought as experts in a separate lawsuit challenging a state voting law supported by Gov. Ron DeSantis.

On Monday, three more professors — two in the Levin College of Law and one in the College of Medicine — joined the suit. They had been blocked in cases involving state bans on local mask mandates and felons' voting rights, issues that put them at odds with DeSantis.

The university has come under intense criticism after its initial decision to block the three professors from providing expert testimony against the state in the lawsuit over voting rights.

On Nov. 5 — the same day three professors filed the suit — UF President Kent Fuchs reversed his administration's decision that had blocked the professors from providing expert testimony in the federal court challenge of the state law.

UF spokesman Steve Orlando said in a text message on Monday that the university does not comment about pending lawsuits.

**Background:** UF professors could testify in voting rights case if they are unpaid, spokeswoman says

**UF response and pushback:** University of Florida president responds as objections mount over academic freedom, political meddling

**More UF news:** Florida Surgeon General Ladapo was rushed into UF College of Medicine job, emails show

Attorneys David A. O'Neil and Paul Donnelly, representing the professors, said in an emailed statement that the lawsuit "fires back at the brazen violation by the University of Florida of their First Amendment rights and academic freedom."

"Despite reversing the immediate decision prohibiting the professors from testifying, the university has made no commitment to abandon its policy preventing academics from serving as expert witnesses when the university thinks that their speech may be adverse to the state and whatever political agenda politicians want to promote," they said.

They added that: 'It is time for this matter to be rightfully adjudicated, not by press release, but in a court of law."

Monday afternoon, the attorneys said the three law professors had joined in as well. They are medical Professor Jeffrey Goldhagen and law Professors Teresa J. Reid and Kenneth B. Nunn.

Goldhagen submitted written statements in lawsuits challenging the state's ban on mask mandes. The law professors, Reid and Nunn, were barred from testifying in a felons' voting rights case.

"Given the University of Florida's pervasive and deferential adherence to the State Government's political whims, it is unsurprising that three more Professors have joined this lawsuit. When the University hired the Plaintiffs, they swore an oath to serve the people of Florida – not its Government," O'Neil and Donnelly said in a press release.

"As the State faces matters of great public importance, the University is unconstitutionally curtailing their free speech and academic freedom, and coercing them into violating this oath for blatantly political reasons. We are confident that the court of law will see through the University's motives. And we will fight until the conflicts-of-interest policy is abandoned once and for all," they said.

## Lawsuit seeks broader limits on blocking outside work

Professors Sharon Austin, Michael McDonald and Daniel Smith filed the lawsuit in the U.S. District Court in Gainesville against the university's Board of Trustees, President Kent Fuchs, and Provost Joseph Glover.

The lawsuit asks the court to issue injunctive relief preventing the university "from enforcing any policy or practice that provides the university discretion to limit plaintiffs' ability to undertake outside activities, on a paid or unpaid basis, on the ground that the proposed activity is not aligned with the 'interests' of the State of Florida or any of its entities."

The lawsuit also asks for "reasonable" attorneys' fees and another other relief the court may deem "just and proper."

The lawsuit states that the university violated the professors' First Amendment rights by restricting them from testifying as expert witnesses or serving as expert consultants for fair compensation on the basis of their viewpoints.

"Defendants also violated plaintiffs' rights under the First Amendment by imposing a prior restraint on their speech, namely by requiring the university's permission to testify," the lawsuit states. "Discrimination and prior restraint on the basis of viewpoint or content are presumptively unconstitutional."

It adds the university's restrictions "must be struck down unless they are narrowly tailored to serve a compelling interest of the state."

"The state has no compelling interest in silencing university faculty and preventing them from speaking on a topic of such significant public importance as elections," the lawsuit said. "And plaintiffs' interest in speaking freely on a matter of public concern far outweighs any interest that the state may have in censoring their testimony."

In letters sent to Fuchs on Friday, they ask him to change the makeup of the task force he created to address the issues of conflicts of interest involving professors testifying in lawsuits against the state. It is not clear the task force will take up the broader issue of conflicts of interest, such doing other research or sharing expertise in areas perceived as contesting state policy or law.

"We write to express our grave concern about the formation, composition, and scope of the purported 'task force' that you appointed in an attempt to respond to the threat to the university's accreditation," the professors write in the letter.

Through a press release issued by UF on Nov. 5, Fuchs says that will review UF's practice regarding requests for approval of outside activities involving potential conflicts of interest and conflicts of commitment.

"In particular, the task force will make a recommendation to me on how UF should respond when employees request approval to serve as expert witnesses in litigation in which their employer, the state of Florida, is a party."

He asks for a preliminary recommendation by Nov. 29.

He said the members of the task force will include:

Provost Glover, who will serve as chair.

Katie Vogel Anderson, clinical associate professor at the College of Pharmacy and former Faculty Senate Chair.

Hub Brown, dean of the College of Journalism and Communications.

Clay Calvert, professor of law and professor of journalism and communications and a Brechner Eminent Scholar and Director.

Terra DuBois, chief compliance and ethics and privacy officer at UF

John Kraft, professor and Susan Cameron Chair of International Business at Warrington College of Business

Laura Rosenbury, the dean of the Levin College of Law

"Without prejudice regarding the task force recommendations, I have also asked UF's Conflicts of Interest Office to reverse the decisions on recent requests by UF employees to serve as expert witnesses in litigation in which the state of Florida is a party and to approve the requests, regardless of personal compensation, assuming the activity is on their own time without using university resources," Fuchs said in the release.

# The Gainesville Sun | Gainesville.com

**CAMPUS**

# Congressional subcommittee investigating UF over free speech, academic freedom concerns

**Danielle Ivanov** The Gainesville Sun
Published 5:18 p.m. ET Nov. 18, 2021 | **Updated 5:40 p.m. ET Nov. 18, 2021**

A U.S. House of Representatives oversight subcommittee is investigating the University of Florida after several professors were prevented from participating in legislation against the State of Florida, a move many have since said calls into question the university's commitment to academic freedom and free speech.

In a letter sent to UF President Kent Fuchs on Thursday, Subcommittee on Civil Rights and Civil Liberties members wrote they were "concerned that UF is censoring its faculty based on viewpoint, which would set a dangerous precedent that flies in the face of its own commitment to freedom of expression ... As one of the top five public research universities in the nation, UF must ensure that it is not creating the appearance of anticipatory obedience or that it is responding to political pressure in deciding which speech activities it will permit."

The letter continued to say, "The Subcommittee is investigating the extent to which your university's actions have undermined the integrity of academic freedom and interfered with employees' constitutional right to speak freely as private citizens on matters of great public concern. In addition, we seek to understand the extent to which federally funded universities use conflicts-of-interest policies to censor employees who oppose the interests of the political party in power."

With a deadline of Dec. 2, the letter to Fuchs also requested a long list of documentation and information from UF, including records like communications from top university officials and the state regarding UF's Conflicts of Commitment and Conflicts of Interest policy and detailed explanations for denials of professors' requests to engage in outside activities.

The letter follows a lawsuit from six professors against UF alleging First Amendment violations, an inquiry by the university's accreditor, action from UF's faculty union and senate and multiple local protests.

See The Sun's past coverage on the unfolding situation here:

- **Background:** UF professors could testify in voting rights case if they are unpaid, spokeswoman says
- **Fuchs responds:** University of Florida president responds as objections mount over academic freedom, political meddling
- **Accreditor inquires:** Accreditor: Did University of Florida violate academic freedom standards by blocking professors' testimony?
- **More professors speak out:** University of Florida professor told not to give legal counsel participated in lawsuit anyway
- **UF reverses course, forms task force:** University of Florida President Fuchs reverses decision blocking professors' testimony against state
- **Union response:** UF faculty union sticks by its list of demands on academic freedom
- **Pushback continues:** Protest on the street and in writing show continued concern at UF over academic freedom
- **Professors file suit:** Six professors take free-speech battle with University of Florida administrators to court

It was signed by Rep. Jamie Raskin, D-Maryland, subcommittee chairperson, and UF alumna Rep. Debbie Wasserman-Schultz, D-Weston, who previously led Florida's entire Democratic congressional delegation in sending its own letter to Fuchs.

## Wasserman-Schultz: 'I will not condone' strongarm tactics against UF professors

In a separate written statement Thursday, Wasserman-Schultz explained some of her reasoning behind the new committee message.

"I bleed Gator orange and blue, and I will not condone repressive political actors trying to strongarm or silence UF's leaders or its brilliant professors," her statement read. "This letter will stream sunshine and bring out of the shadows any suppressive forces who seek to tarnish the sterling reputation of my alma mater."

UF spokeswoman Hessy Fernandez wrote in an email to the Gainesville Sun on Thursday afternoon that the university has confirmed to the committee receipt of the letter.

"We are working to respond within the guidelines we received," she stated.

A task force of UF administrators and faculty assigned by Fuchs is in the process of reviewing UF's conflict of interest policy. Its seven members have been asked to give him a recommendation by Nov. 29 on how UF should respond to employees' requests to serve as expert witnesses in litigation where the state of Florida is a party.

The Gainesville Sun | Gainesville.com

---

**OPINION**  *This piece expresses the views of its author(s), separate from those of this publication.*

# The University of Florida needs to do more to protect academic freedom

**The Gainesville Sun Editorial Board**
Published 6:02 a.m. ET Dec. 2, 2021

A new University of Florida policy focused on professors providing expert testimony doesn't do enough to protect the academic freedom of faculty, as a controversy over critical race theory is showing.

UF has faced criticism following revelations that administrators had barred professors from testifying in court cases challenging laws backed by Gov. Ron DeSantis and the Republican-controlled Legislature. UF President Kent Fuchs formed a task force that recommended new guidelines on faculty testimony, which Fuchs approved last week.

A grievance filed this week by a College of Education faculty member adds to evidence that much more need to be done to protect academic freedom and prevent political interference at UF. Associate professor Chris Busey claimed in the grievance that he was pushed to drop the words "critical" and "race" from the title of a planned course due to concerns that state officials would object.

**More Sun editorials:**

Passing over Certain as School Board chair sent the wrong message

East Gainesville shouldn't be afterthought when it comes to safety improvements

Release full footage, conduct real review of SWAT raid on real estate office

Busey has been working on a proposed concentration called "Critical Study of Race, Ethnicity, and Culture in Education" at the request of interested students. But faculty were told courses with titles including "critical" and "race" would not be approved by the university unless the wording was changed, according to documents filed in the grievance by the faculty union that were obtained by The Sun.

College of Education Dean Glenn Good reportedly said UF is particularly vulnerable to politics because of the "substantial amount of funding" it gets from the state and that they did "not want to inflame Tallahassee," according to the grievance. The grievance claims that Busey was threatened with discipline if he used "critical race" in his curriculum.

Critical race theory is a decades-old academic concept that examines the way that racism is embedded in U.S. institutions. Republicans such as DeSantis have attacked critical race theory in recent months as a way to gin up outrage among their base, causing misunderstanding of what it means and where it is taught.

The Florida Board of Education in June banned the state's public schools from teaching critical race theory, without any evidence it was even being taught in any K-12 classrooms. State Rep. Randy Fine, R-Palm Bay, has filed legislation that would outlaw critical race theory in training for public schools, universities and other government institutions.

Clearly these efforts have had a chilling effect on UF. Administrators had already been marching in lockstep with Republican state officials in recent actions, including barring at least six UF professors from testifying in cases challenging state laws and regulations on mask mandates and voting rights.

Page 234

The task force recommendations accepted by Fuchs establish a "strong presumption" that UF faculty be allowed to testify in these kinds of cases moving forward. They also call for UF to publicly affirm the academic freedom and free speech rights of faculty, but such affirmations mean little if administrators are altering courses due to political fears.

UF faces probes from its accrediting agency and a congressional subcommittee into professors being prevented from testifying. Now the faculty union is demanding an independent, external investigation into the state of academic freedom at the university. The grievance gives more evidence such an investigation is warranted.

If Fuchs wants to prevent UF's reputation from being further tattered, giving lip service to academic freedom doesn't cut it. He needs to go beyond the task force's recommendations and take additional steps to shield faculty from political interference.

## Join the conversation

Send a letter to the editor (up to 200 words) to letters@gainesville.com. Letters must include the writer's full name and city of residence. Additional guidelines for submitting letters and longer guest columns can be found at bit.ly/sunopinionguidelines.

## Journalism Matters. Your Support Matters.

Get a digital subscription to the Gainesville Sun. Includes must-see content on Gainesville.com and Gatorsports.com, breaking news and updates on all your devices, and access to the Gainesville.com ePaper. Visit www.gainesville.com/subscribenow to sign up.

Faculty Senate Ad Hoc Committee on Academic Freedom       Page 235

2 of 2                   12/2/2021, 9:40 PM

CAROLYN B. MALONEY, NEW YORK
CHAIRWOMAN

ONE HUNDRED SEVENTEENTH CONGRESS

JAMES COMER, KENTUCKY
RANKING MINORITY MEMBER

# Congress of the United States

## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM

2157 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6143

MAJORITY  (202) 225–5051
MINORITY  (202) 225–5074

https://oversight.house.gov

**Appendix 4**

November 18, 2021

Dr. Wesley Kent Fuchs
President
University of Florida
226 Tigert Hall
P.O. Box 113150
Gainesville, FL 32611

Dear President Fuchs:

We write with deep concern about recent actions by the University of Florida (UF) to prevent professors from providing testimony and written submissions in litigation challenging the constitutionality of actions taken by the state of Florida, in violation of the First Amendment and in contravention of long-established principles of academic freedom.

According to reports, in July 2020, UF revised its conflicts-of-interest policy to require all employees to seek approval from the university before engaging in outside activities.[1]  Prior to this change, employees only needed to notify the university of their outside activities and financial interests as they arose.[2]  UF professors reportedly objected to this change, expressing concerns that the policy would be "used as a prior restraint on speech."[3]  The professors' fears were confirmed when UF subsequently prevented multiple faculty members from participating in litigation raising legal and constitutional concerns related to criminal justice reform, voter suppression laws, and the state's ban on mask mandates.[4]

---

[1] University of Florida, *Conflicts of Commitment and Conflicts of Interest* (Nov. 10, 2020) (online at policy.ufl.edu/policy/conflicts-of-commitment-and-conflicts-of-interest/).  According to this policy, "outside activities" are defined as "any paid or unpaid activity undertaken by an Employee outside of the University which could create an actual or apparent Conflict of Commitment or Conflict of Interest.  Outside Activities may include consulting, participating in civic or charitable organizations, working as a technical or professional advisor or practitioner, or holding a parttime job with another employer."

[2] Memorandum from Joseph Glover, Provost and Senior Vice President for Academic Affairs, and Jodi Gentry, Vice President for Human Resource Services, University of Florida, *Reporting Outside Activities and Potential Conflicts of Interest* (Nov. 6, 2018) (online at hr.ufl.edu/memoranda/uf-administrative-memo-reporting-outside-activities-and-potential-conflicts-of-interest/).

[3] *President Fuchs Asks University to Reverse Decision Barring Professors from Testifying*, Independent Florida Alligator (Nov. 5, 2021) (online at www.alligator.org/article/2021/11/faculty-senate-meeting).

[4] *UF Restricted Five Other Professors' Participation in Legal Cases Against the State*, Miami Herald (Nov. 2, 2021) (online at www.miamiherald.com/news/politics-government/article255487301.html).

We are concerned that UF is censoring its faculty based on viewpoint, which would set a dangerous precedent that flies in the face of its own commitment to freedom of expression.[5]  We are also concerned that, possibly due to pressure from trustees, politicians, or others, UF has adopted and enforced a conflicts policy that undermines the academic and free speech values that are essential to American higher education.  As one of the top five public research universities in the nation, UF must ensure that it is not creating the appearance of anticipatory obedience or that it is responding to political pressure in deciding which speech activities it will permit.

In July 2020, under its new policy, UF prevented four law professors—Kenneth Nunn, Sarah K. Wolking, Teresa Jean Reid, and Mark Fenster—from referencing their university affiliation in an amicus brief submitted in support of challenges to the state legislature's changes to a constitutional amendment restoring the voting rights of felons in Florida—the same litigation in which UF political science professor Daniel Smith participated as an expert witness in 2019.[6]  According to reports, UF subsequently denied three requests from Dr. Jeffrey L. Goldhagen, a pediatrician and UF medical school professor, to testify in lawsuits challenging Governor Ron DeSantis's July 2021 ban on school districts' mask mandates, even though he would not have received any compensation.[7]

In October 2021, UF initially blocked three more professors—Daniel Smith, Sharon Austin, and Michael McDonald—from testifying as experts in a lawsuit challenging Florida's new restrictive voting law, S.B. 90.[8]  In denying the professors' requests to testify, UF officials explained that because the school is a state institution, testifying in litigation that conflicts with Governor Ron DeSantis's administration "is adverse to U.F.'s interests."[9]  UF's decision came approximately one week after two of the professors published an October 7, 2021, op-ed in the *Tampa Bay Times* accusing the state legislature of violating Florida's 2010 anti-gerrymandering Fair Districts constitutional amendments.[10]

Until last year, UF had a longstanding practice of allowing professors to participate in administrative and judicial proceedings even when seemingly "adverse to the university's interests as a state of Florida institution."[11]  For example, prior to July 2020, Professor Smith

---

[5] University of Florida, *Freedom of Expression Statement* (Apr. 12, 2019) (online at http://statements.ufl.edu/statements/2019/april/freedom-of-expression-statement.html).

[6] *Id.*

[7] *U. of Florida Doctor Says Administrators Blocked Him from Participating in Lawsuits About Masking*, Chronicle of Higher Education (Nov. 2, 2021) (online at www.chronicle.com/article/u-of-florida-doctor-says-administrators-blocked-him-from-participating-in-lawsuits-about-masking).  Despite UF's denial, Dr. Goldhagen provided written declarations in at least two cases and requested to be subpoenaed in a third case.

[8] *Florida Bars State Professors from Testifying in Voting Rights Cases*, New York Times (Nov. 4, 2021) (online at www.nytimes.com/2021/11/04/us/florida-professors-lawsuit.html).

[9] *In "Chilling" Decision, UF Professors Have Been Barred from Testifying Against Florida*, Miami Herald (Oct. 31, 2021) (online at www.miamiherald.com/article255409716.html).

[10] *Id.*; *see also What Is the Florida Legislature Hiding*, Tampa Bay Times (Oct. 7, 2021) (online at www.tampabay.com/opinion/2021/10/07/what-is-the-florida-legislature-hiding-on-redistricting-column/).

[11] *Florida Bars State Professors from Testifying in Voting Rights Cases*, New York Times (Nov. 4, 2021) (online at www.nytimes.com/2021/11/04/us/florida-professors-lawsuit.html).  For example, Professor Smith, one of

served as an expert witness in numerous voting rights lawsuits in which the state was named as a defendant.  According to Professor Smith, in the past, UF "celebrated" professors' involvement in activities that brought "national recognition to UF."[12]  Smith was even allowed to serve as a consulting expert in lawsuits against the university involving early voting on college campuses in Florida.[13]

After significant backlash, on November 5, 2021, you indicated plans to reverse course regarding Professors Smith, Austin, and McDonald's participation in the S.B. 90 litigation, requesting that UF officials "approve the requests regardless of personal compensation, assuming the activity is on their own time without using university resources."  You also ordered a task force to "review UF's practice regarding requests for approval of outside activities involving potential conflicts of interest and conflicts of commitment."[14]  This was an important reversal, but many questions remain about whether UF's conflicts-of-interest policy is still in effect and, if so, whether the university will continue to implement the policy in a manner inconsistent with the First Amendment.

The Subcommittee is investigating the extent to which your university's actions have undermined the integrity of academic freedom and interfered with employees' constitutional right to speak freely as private citizens on matters of great public concern.  In addition, we seek to understand the extent to which federally funded universities use conflicts-of-interest policies to censor employees who oppose the interests of the political party in power.

Protecting First Amendment rights is a priority for the Subcommittee on Civil Rights and Civil Liberties and falls squarely within Congress's constitutional oversight authority.[15]  The Oversight Committee, under the leadership of both Democratic and Republican chairs, has previously investigated potential deprivations of First Amendment rights by government actors—including public universities.[16]

the academics who was blocked from testifying against the state of Florida in the S.B. 90 litigation, has served as an expert witness in numerous voting rights lawsuits in which the governor and secretary of state were named as defendants over the past decade.

[12] *UF Professors Could Testify in Voting Rights Case if They Were Unpaid, Spokeswoman Says*, Gainesville Sun (Oct. 31, 2021) (online at www.gainesville.com/story/news/education/campus/2021/10/31/university-of-florida-spokeswoman-three-professors-could-testify-if-unpaid/6223947001/).

[13] *Id.*

[14] President Kent Fuchs, University of Florida, *Message from President Fuchs—Outside Activities by UF Employees Involving Litigation in Which the State of Florida Is a Party* (Nov. 5, 2021) (online at statements.ufl.edu/statements/2021/november/message-from-president-fuchs---outside-activities-by-uf-employees-involving-litigation-in-which-the-state-of-florida-is-a-party.html).

[15] *See, e.g.*, *Barenblatt v. U.S.*, 360 U.S. 109, 111 ("The scope of the power of inquiry, in short, is as penetrating and far-reaching as the potential power to enact and appropriate under the Constitution.").

[16] *See, e.g.*, Subcommittee on Healthcare, Benefits, and Administrative Rules and Subcommittee on Intergovernmental Affairs, Committee on Oversight and Reform, *Hearing on Challenges to Freedom of Speech on Campus*, 116th Cong. (July 27, 2017) (online at republicans-oversight.house.gov/hearing/challenges-freedom-speech-college-campuses/); Subcommittee on Healthcare, Benefits, and Administrative Rules and Subcommittee on Intergovernmental Affairs, Committee on Oversight and Reform, *Hearing on Challenges to Freedom of Speech on*

For these reasons, we request that you produce the following information by December 3, 2021:

1.     Identify all individuals who were consulted or otherwise involved in the creation, revision, or development of UF's 2020 Conflicts of Commitment and Conflicts of Interest policy and any other policies related to requests to participate in outside activities; and

2.     For each request by a UF professor to engage in outside activities that was denied under UF's Conflicts of Commitment and Conflicts of Interest policy or a related policy from January 1, 2015, to the present, provide:

   a.     the name, title, and department of the professor;

   b.     the nature of the request;

   c.     a detailed explanation for the denial;

   d.     the name, title, and role of each individual involved in reviewing or denying the request; and

   e.     whether President Fuchs, Provost Glover, or any member of the board of trustees were made aware of any request prior to denial, or were involved in the decision making process;

In addition, we request that you produce the following documents by December 3, 2021:

1.     All conflicts of interest policies in effect from January 1, 2015, to the present;

2.     All documents, including but not limited to board of trustees meeting minutes, and communications sent, received, or created by President Fuchs, Provost Glover, Assistant Vice President Wimsett or a member of his team, or any member of the board of trustees, related to the creation, revision, or development of UF's 2020 Conflicts of Commitment and Conflicts of Interest policy, including any communications with the Executive Office of the Governor or any members of the Florida legislature;

_Campus Part II_, 116th Cong. (May 22, 2018) (online at republicans-oversight.house.gov/hearing/challenges-to-the-freedom-of-speech-on-college-campuses-part-ii/); Subcommittee on Civil Rights and Civil Liberties, _Briefing on First Amendment Violations at Black Lives Matter Protests_, 116th Cong. (June 29, 2020) (online at oversight.house.gov/legislation/briefings/select-subcommittee-briefing-on-first-amendment-violations-at-black-lives). At the 2017 joint subcommittee hearing, Rep. Jim Jordan, then-Chairman of the Subcommittee on Healthcare, Benefits, and Administration, stated, "This committee is committed to help colleges reinstate the freedom of speech as an important protection. After all, it is no coincidence that the Constitution's Framers prioritized the freedom of speech in the First, the First Amendment."

3.      All documents and communications related to concerns, complaints, or objections raised or submitted by UF faculty or third parties in response to UF's July 2020 Conflicts of Commitment and Conflicts of Interest policy;

4.      All documents and communications sent, received, or created by President Fuchs, Provost Glover, Assistant Vice President Wimsett or a member of his team, or any member of the board of trustees, related to Professors Daniel Smith and Michael McDonald's October 7, 2021, op-ed in the *Tampa Bay Times*;

5.      For requests by Professors Daniel Smith, Michael McDonald, and Sharon Austin to serve as expert witnesses in *Florida Rising Together, et al. v. Lee, et al.* (Case No. 4:21-cv-00201-MW/MJF) (N.D. Fl.); by Dr. Jeffrey L. Goldhagen to participate in litigation involving Florida's mask mandates in schools; and by any UF Levin College of Law Professor, including Professors Kenneth Nunn, Sarah K. Wolking, Teresa Jean Reid, and Mark Fenster, to participate in the amicus brief filed in *Jones, et al. v. Florida, et al.* (Case No. 4:19-cv-00300) (N.D. Fl.):

   a.      Documents sufficient to show the identity of any individual with whom Assistant Vice President Wimsett, Dean David E. Richardson, Dean Laura Ann Rosenbury, or any members of their team, communicated about the requests; and

   b.      All documents and communications sent, received, or created by Assistant Vice President Wimsett, Dean David E. Richardson, Dean Laura Ann Rosenbury, or a member of their teams, related to the requests;

6.      All documents and communications sent, received, or created by President Fuchs, Provost Glover, or any member of the board of trustees regarding any request to engage in outside activities responsive to Request for Information 2, above;

7.      All documents and communications related to President Fuchs's task force examining outside activities by UF employees involving litigation in which the state of Florida is a party, including all preliminary and final recommendations; and

8.      All communications from January 1, 2017, to present involving President Fuchs, Provost Glover, or any member of the board of trustees and anyone in the Executive Office of the Governor, the Florida Department of Education, or the Florida legislature regarding UF faculty participating in administrative or judicial proceedings related to the state.

The Committee on Oversight and Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X.  An attachment to this letter provides additional instructions for responding to the Committee's request.  If you have any questions regarding these requests, please contact Subcommittee staff at (202) 225-5051.

We look forward to your prompt reply.

Sincerely,

Jamie Raskin
Chairman
Subcommittee on Civil Rights and
  Civil Liberties

Debbie Wasserman Schultz
Member of Congress

Enclosure

cc:    The Honorable Nancy Mace, Ranking Member
       Subcommittee on Civil Rights and Civil Liberties

       Mr. Joseph Glover, Provost
       University of Florida

       Mr. Gary Wimsett, Assistant Vice President for Conflicts of Interest
       University of Florida

       Ms. Laura Ann Rosenbury, Dean
       University of Florida Levin College of Law

       Mr. David E. Richardson, Dean
       University of Florida College of Liberal Arts and Sciences

### **Responding to Oversight Committee Document Requests**

1.     In complying with this request, produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf.  Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2.     Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committee.

3.     In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4.     The Committee's preference is to receive documents in electronic form (i.e., CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions.

5.     Documents produced in electronic format should be organized, identified, and indexed electronically.

6.     Electronic document productions should be prepared according to the following standards:

   a.     The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

   b.     Document numbers in the load file should match document Bates numbers and TIF file names.

   c.     If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

   d.     All electronic documents produced to the Committee should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

   BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD,

INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

7. Documents produced to the Committee should include an index describing the contents of the production.  To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

8. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

9. When you produce documents, you should identify the paragraph(s) or request(s) in the Committee's letter to which the documents respond.

10. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

11. The pendency of or potential for litigation shall not be a basis to withhold any information.

12. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

13. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

14. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date.  An explanation of why full compliance is not possible shall be provided along with any partial production.

15. In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document:  (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted.

16. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17. If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

18.     This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

19.     All documents shall be Bates-stamped sequentially and produced sequentially.

20.     Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff.  When documents are produced to the Committee, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2105 of the Rayburn House Office Building.

21.     Upon completion of the production, submit a written certification, signed by you or your counsel, stating that:  (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1.     The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following:  memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise.  A document bearing any notation not a part of the original text is to be considered a separate document.  A draft or non-identical copy is a separate document within the meaning of this term.

2.     The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases,  electronic

message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, or otherwise.

3.   The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope.   The singular includes plural number, and vice versa.   The masculine includes the feminine and neutral genders.

4.   The term "including" shall be construed broadly to mean "including, but not limited to."

5.   The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments,  branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6.   The term "identify," when used in a question about individuals, means to provide the following information:  (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7.   The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8.   The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9.   The term "individual" means all natural persons and all persons or entities acting on their behalf.



November 2, 2021

Dr. W. Kent Fuchs
President
University of Florida
P.O. Box 113150
226 Tigert Hall
Gainesville, FL 32611

Dear Dr. Fuchs:

The Southern Association of Colleges and Schools Commission on Colleges' policy, "Standing Rules: SACSCOC Board of Trustees, Executive Council, and the College Delegate Assembly" (available at https://sacscoc.org/app/uploads/2019/07/standingrules.pdf), stipulates that the Commission give appropriate consideration to significant accreditation-related unsolicited information revealed about an institution between periods of scheduled review. This policy provides that an institution be afforded the opportunity to respond to concerns raised during the review of the unsolicited information.

I am writing here to seek an institutional response to reports recently published by various news outlets (see accompanying Appendix for citations of specific news reports) which may raise questions about the institution's ongoing compliance with certain SACSCOC *Principles of Accreditation*.  In light of these reports, and in accordance with the Commission's policy and procedures, I am requesting that the institution prepare a report that explains and documents the extent of its current compliance with the following standards of the *Principles of Accreditation*:

- Comprehensive Standard 4.2.f (*External influence*)
- Comprehensive Standard 6.4 (*Academic freedom*)

The request for this report does not indicate that the Commission has determined that the institution is out of compliance with any standards; rather, the Commission recognizes that it needs additional information before making any such determination.  In providing an overview of the reported recent institutional action and in addressing the specific listed standards, the submitted report should focus on the specific recent institutional action described in the cited published reports, not on the institution's overall compliance with the listed standards.  In sections which directly address each of the listed standards (or in an overview discussion), the report should include attention to the following questions:

- To what extent was the recently reported institutional action affected by entities and/or individuals outside the institution's established governing system?

- To what extent, if any, was the institution's established governing board involved in the decision-making process prior to the reported action?

- To what extent and in what ways is the recently reported institutional action consistent with the institution's published policy on academic freedom?

In addressing these questions in the context of documenting the institution's ongoing compliance with the listed standards, the submitted report should include the following supporting information as well as any



SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS
COMMISSION ON COLLEGES

Dr. W. Kent Fuchs
November 2, 2021
Page Two

other documents which you consider relevant to the institution's case for compliance:  1) minutes of any governing board meetings at which the recently reported action was discussed (and any prior information or reports which were provided to, or prepared by, the Board in advance of its discussion); 2) the institution's published policy on academic freedom.

Please submit to my office <u>three</u> copies of the institution's response to this letter (in either electronic [preferred] or hard copy format) by no later than **Tuesday, December 7, 2021**.

In accord with Commission policy, the institution's response to the unsolicited information will be reviewed upon receipt.  If Commission staff determines that the unsolicited information is of factual substance and is accreditation related, the information and documentation, along with the institution's response report, will be forwarded to the SACSCOC Board of Trustees for formal review.  Or, it is possible that the President of the SACSCOC could authorize a Special Committee to review the institution.

If you or those preparing the report have any questions, please feel free to contact me at 404-994-6574 or at jhardt@sacscoc.org.

Sincerely,

*John S Hardt*

John S. Hardt
Vice President

JSH:sm

cc:     Dr. Timothy S. Brophy, Institutional Accreditation Liaison, University of Florida
        Dr. Belle S. Wheelan, President, SACSCOC



## Appendix

1.  Andrew Jeong, "University of Florida bars faculty members from testifying in voting rights lawsuit against DeSantis administration," *Washington Post*, October 30, 2021, https://www.washingtonpost.com/nation/2021/10/30/florida-voting-rights-desantis-lawsuit/

2.  Michael Wines, "Florida Bars Professors From Testifying As Expert Witnesses in Voting Case," *New York Times*, October 30, 2021, Page A17.

3.  Andy Thomason, "U. of Florida Stops 3 Professors From Taking Part in Voting-Rights Suit, Raising Cries of Censorship," *Chronicle of Higher Education*, October 31, 2021, https://www.chronicle.com/article/u-of-florida-stops-professors-from-participating-in-voting-rights-suit-raising-cries-of-censorship

4.  Scott Jaschik, "U of Florida Bars Professors From Helping Lawsuit Against the State," *Inside Higher Education*, November 1, 2021, https://www.insidehighered.com/news/2021/11/01/u-florida-bars-professors-helping-lawsuit-against-state

# Special Report

**Comprehensive Standards
4.2.f External Influence
6.4 Academic Freedom**





W. Kent Fuchs, President
P.O. Box 113150
University of Florida
Gainesville, FL 32611
Phone:(352)392-1311

Timothy S. Brophy
Institutional Liaison
P.O.Box 113175
University of Florida
Gainesville, FL 32611
Phone: (352) 273-4476

Faculty Senate Ad Hoc Committee on Academic Freedom

UF | UNIVERSITY of FLORIDA

# Table of Contents

Introduction ........................................................................................................................ 2

Comprehensive Standard 4.2.f. - External Influence .......................................................... 3

Comprehensive Standard 6.4. - Academic Freedom ........................................................... 4

Conclusion .......................................................................................................................... 6

# Special Report on Comprehensive

# Standards 4.2.f (External Influence) and 6.4 (Academic Freedom)

## Introduction

This report is our official response to the Commission's letter of November 2, 2021 in which Dr. John Hardt requested a special report in response to media coverage regarding the University of Florida's preservation and protection of academic freedom.  Dr. Hardt's letter presents the following requests:

*I am requesting that the institution prepare a report that explains and documents the extent of its current compliance with the following standards of the Principles of Accreditation:*

- *Comprehensive Standard 4.2.f. The governing board protects the institution from undue influence by external persons or bodies. (External influence)*
- *Comprehensive Standard 6.4. The institution publishes and implements appropriate policies and procedures for preserving and protecting academic freedom. (Academic freedom)*

*The report should include attention to the following questions:*

- *To what extent was the recently reported institutional action affected by entities and/or individuals outside the institution's established governing system?*
- *To what extent, if any, was the institution's established governing board involved in the decision-making process prior to the reported action?*
- *To what extent and in what ways is the recently reported institutional action consistent with the institution's published policy on academic freedom?*

Our response addresses the University of Florida's ongoing compliance with the stated standards and provides the necessary documentation and explanation of the areas of concern raised in the questions.

## Comprehensive Standard 4.2.f. - External Influence

In this section of our response, we address briefly how the University of Florida Board of Trustees (BoT) ensures that the institution is free from undue influence by external persons or bodies, and respond to these questions regarding external influence:

- To what extent was the recently reported institutional action affected by entities and/or individuals outside the institution's established governing system?
  - **None. These actions were not affected by entities or individuals outside of the university's established governing system.**
- To what extent, if any, was the institution's established governing board involved in the decision-making process prior to the reported action?
  - **The university's governing board was not involved in this decision-making process at any time.**

The decisions that have led to the media reports were all made internally. The University's established governing board, the Board of Trustees (BoT), was not involved in the decision-making process in any way, and entities and/or individuals outside the University's established governing system had no effect on the recently reported institutional action. Because the University's BoT was not involved in the decision-making process, there are no responsive minutes of any governing board meeting to provide.

The University of Florida abides by the regulations of the Board of Governors and the statutes of the State of Florida. These regulations and statutes set forth the processes and responsibilities of the Board of Trustees and ensures the Board is free from undue external influence. The State University System Board of Governors conducts an annual New Trustee Orientation, and this orientation addresses external influence as part of the Trustees Roles and Responsibilities.  Trustees are subject to the Florida Code of Ethics and Board of Trustees meetings are subject to Florida's public meeting statute.

## Comprehensive Standard 6.4. - Academic Freedom

In this section of our response, we address briefly how the University of Florida preserves and protects academic freedom, and respond to this question regarding academic freedom:

- To what extent and in what ways is the recently reported institutional action consistent with the institution's published policy on academic freedom?

The University of Florida values academic freedom and ensures that it is preserved and protected through policy, procedure, and practice. UF Regulation 6C1-7018 defines UF policy on academic freedom and responsibility, as the following excerpt describes:

> *The established policy of the University continues to be that the faculty member must fulfill his/her responsibility to society and to his/her profession by manifesting academic competence, scholarly discretion, and good citizenship. The university instructor is a citizen, a member of a learned profession, and an academic officer of the University. The instructor should be constantly mindful that these roles may be inseparable in the public view and should therefore at all times exercise appropriate restraint and good judgment. Academic freedom is accompanied by the corresponding responsibility to:*

> ➢ *Be forthright and honest in the pursuit and communication of scientific and scholarly knowledge.*

> ➢ *Respect students, staff and colleagues as individuals and avoid any exploitation of such persons for private advantage.*

> ➢ *Respect the integrity of the evaluation process with regard to students, staff and colleagues, so that it reflects their true merit.*

> ➢ *Indicate when appropriate that one is not an institutional representative unless specifically authorized as such; and recognize the responsibilities arising from the nature of the educational process, including such responsibilities, but not limited to, observing and upholding the ethical standards of their discipline; participating, as appropriate, in the shared system of collegial governance, especially at the department/unit level; respecting the confidential nature of*

> the relationship between professor and student; and adhering to one's proper
> role as teacher, researcher, intellectual mentor and counselor.

Article 10 of the 2021-2024 Collective Bargaining Agreement (CBA) between the University of Florida Board of Trustees and the United Faculty of Florida confirms the university's commitment to preserve and protect academic freedom as the following excerpt describes:

> 10.1 (a) The University and UFF shall maintain, encourage, protect, and promote the
> faculty's full academic freedom in teaching, research/creative activities, and
> professional, university, and employment-related public service, consistent with the
> exercise of academic responsibility.

The institutional actions reported in the media related to three faculty members who sought approval to engage in compensated work outside of their university employment. The University of Florida's process for completing these requests routes them through UFolio, the university's centralized electronic system for the approval of outside activities such as service as an expert witness.  The UFolio system is an online, sequential approval process that requires a series of decisions by ancillary reviewers germane to the type of request,

In a November 5, 2021 memo to the entire UF community, President W. Kent Fuchs exercised his authority to resolve the request by the three faculty members in a manner consistent with the university policies on outside activities and academic freedom.  In it, he stated, " … I have also asked UF's Conflict of Interest Office to reverse the decisions on recent requests by UF employees to serve as expert witnesses in litigation in which the state of Florida is a party and to approve the requests regardless of personal compensation, assuming the activity is on their own time without using university resources."  While work, such as this, performed by faculty members in their personal capacity and outside of their University employment is not covered by the tenets and protections of academic freedom afforded to faculty as part of their university employment, this final action by the

president ensured compliance with UF's commitment to preserve and protect academic freedom.

Furthermore, in response to community concerns, University of Florida President W. Kent Fuchs initiated a Task Force on Outside Activities to review the university's policy and procedure related specifically to faculty service as expert witnesses. The Final Report proposes both policy and process recommendations to the president.  The report recommends adopting a university policy that "publicly affirms the academic freedom of faculty when performing their duties as teachers and scholars" and "publicly affirms the free speech rights of faculty and staff to comment on matters of public concern…" President Fuchs has accepted the Final Report recommendations and has instructed staff to implement them.

## Conclusion

The University of Florida Board of Trustees ensures that the institution is free from undue influence by external persons or bodies through clear and consistently enforced policies and procedures. The University of Florida also preserves and protects academic freedom and its concomitant responsibilities in regulation, operationalizes it in its bargaining agreement with the United Faculty of Florida, and its UFolio process for the approval of outside activities.  The Task Force recommendations to reaffirm publicly the university's commitment to academic freedom of faculty and free speech rights of faculty and staff have been accepted.  The University of Florida remains in compliance with Comprehensive Standards 4.2.f – External Influence and 6.4 – Academic Freedom.

## Chairman's Remarks

**Appendix 5**

### Board of Trustees Meeting

December 3, 2021

**Good morning everyone, I'm so glad to see you all here today. I hope you had a restful Thanksgiving and that you were able to take time to reflect on how much we all have to be grateful for.**

**One of the things for which I'm grateful is the opportunity to serve as chair of the Board of Trustees for this wonderful university.**

**It is truly a privilege, and my top goal is to live up to the expectations and responsibilities that come with the job.**

**Those expectations, by law, include setting policy for the university and ensuring the efficient and effective use of our university's resources.**

**I owe the university nothing less than my best, and I know my fellow trustees feel the same way.**

**Today, I have something on my mind that I feel is important to address.**

1

It is an issue that you all have seen quite a bit about in the news.

I'm speaking about the issue of conflicts of interest and outside activities.

While I strongly support a free and independent press and I have great respect for professional and responsible journalists, the stories in the media about this issue have been incomplete.

This morning, I would like to set the record straight and give you the rest of the story.

Let me begin by reminding my fellow trustees, the cabinet and our faculty and staff why we are here.

Several years ago, the Ford Motor Company ran an advertising campaign with the tagline "Quality is Job 1."

Here at the University of Florida, we also have a "Job 1." For us, Job 1 is educating our students.

2

**Every single thing we do —**

- **as a board,**

- **as an administration,**

- **as faculty,**

- **as University of Florida employees and officials —**

**Everything MUST have our students as our number one priority.**

**Our job is to give our amazing students a top-five university education —**

**\* to teach them,**

**\* advise them,**

**\* mentor them,**

**\* allow them to explore opportunities,**

**\* expose them to a wide range of ideas and**

3

* to give them the tools they need to go out into the world and be successful in life.

As a board of trustees, we are responsible for implementing and maintaining the highest quality of educational programs consistent with the university's mission.

As a board, we are fiduciaries – meaning that we put our students' interests ahead of our own and we hold a position of trust to always do what is best for the university and its mission.

In this regard, we are responsible for developing policies and standards that uphold the mission we serve.

Not only do we have amazing students, we also have amazing faculty members who are here to

- teach our students,

- engage them in research,

4

- **mentor and advise them.**

**Make no mistake - the overwhelming majority of our faculty relish this role and live every day to fulfill it.**

**They are providing our students a Top 5 university education and – in countless cases across UF's footprint – are making research discoveries that are**

- **saving lives,**

- **improving our quality of life, and**

- **expanding how we think about the world.**

**Unfortunately, we learned a couple years ago, that we had a small number of faculty members who were not carrying out the responsibilities of their jobs here.**

**They were not putting the students first.**

In fact, they were using university time, resources, and sometimes even our students to benefit outside jobs and positions from which the faculty were personally profiting directly.

It was the discovery of what a small group of faculty members were doing at UF, and at other universities across the nation, that prompted us to revise our outside activities policy.

Although we've talked about this before, here's a reminder about how it all started.

Back in August 2018, universities around the country began receiving letters from the National Institutes of Health indicating that certain faculty members may be improperly profiting from secondary employment, that was undisclosed to their own employers.

Those faculty members were spending much time away from their responsibilities at their home institutions at which they were employed

to work full-time and were sometimes working with organizations that constitute a conflict of interest.

In January 2019, UF received such a letter from the NIH identifying two faculty members that NIH had reason to believe were spending significant time engaged in these outside activities that they intentionally did not disclose, instead of spending their time working for the University of Florida that was paying their full-time salary.

As university officials charged with responding to the NIH began looking into these issues, they discovered additional individuals who were engaged in undisclosed second jobs and who, once reviewed, had spent only minimal time at the university over the course of years – all the while being paid by UF to be full-time faculty here.

7

The university's regulations mirror the federal government's requirement that researchers should not simultaneously be pursuing competing endeavors.

As UF was learning about these faculty members who were

- moonlighting across the world and

- not disclosing their outside activities to UF and

- sometimes not in their classrooms or their labs for many months out of the year...

we realized we needed to make improvements to the outside activities approval process and the monitoring of time commitments.

We undertook the long, thorough and thoughtful work of improving that process and ensuring that the faculty across the university and their department chairs and deans were provided with ample

8

opportunity for input and comments into the revised outside activities policy.

In 2020, the university board approved the updated policy and the university was able to apply it to all of those employees not within the union.

The faculty union voted to approve and ratify the policy in July 2021 through an extensive negotiating and bargaining process.

Again - that new outside activities policy approved by the faculty union is the same one that has come under scrutiny in relation to some faculty members who disclosed outside activities requests to testify as expert witnesses in litigation in which the state of Florida is a party.

The catalyst for the 2020 revisions to the outside activities policy at UF had nothing to do with the First Amendment or academic freedom.

9

On the contrary, we as the board and the administration absolutely

support the First Amendment rights of our faculty and their academic

freedom to

- teach,

- research,

- publish, and

- exercise their rights as citizens.

We know it is core to our mission and we absolutely believe in that.

The catalyst for the policy changes had EVERYTHING to do with making

sure federal, state, and university resources are being used for their

intended purpose and not for purposes unrelated to the university of

Florida or for personal gain.

We have spent much effort ensuring that our policies and regulations protect the rights of our professors and promote the expression of all viewpoints.

And, I will repeat that the overwhelming majority of our faculty are here for the reasons we are:

- to educate,

- research and

- serve the University of Florida as their employer.

However, we saw that some have taken advantage of their positions.

- I am speaking here of faculty members taking second jobs using the university's state resources for their own personal gain.

- I am speaking about faculty members who use their positions of authority to improperly advocate personal political viewpoints to the exclusion of others.

- **I am speaking about a department chair who tried to find a way for his faculty to avoid coming into the classrooms by suggesting they limit their in-person seating to one or two students, in an apparent effort to dodge Board of Governors guidance.**

**To this I say – enough.**

**This behavior is unacceptable.**

**It is disrespectful not only to the taxpayers of Florida, whose hard-earned dollars pay faculty salaries, but it is also disrespectful to these faculty members' hard-working colleagues – the ones who are doing their jobs honestly and fulfilling their missions.**

**And importantly – it is disrespectful to the students who depend on their professors' full attention and commitment.**

**This. Will. Not. Stand.**

12

**It must stop, and it WILL stop.**

**If you allow something to happen, that means you condone it.**

**Enough.**

**Let me tell you, our legislators are not going to put up with the wasting of state money and resources, and neither is this board.**

**And we shouldn't.**

**We are accountable to our students and their families and the taxpayers to do our jobs.**

**I am also personally very disappointed in local faculty union leadership who are actively encouraging donors to stop contributing to the university and who are actively encouraging university presidents and provosts around the country to downgrade their reputation assessment of the University of Florida in rankings surveys.**

**All of that damages their fellow faculty members and the students we serve.**

13

**We have fought so hard over the years**

- **to get funding so our faculty could have raises,**

- **so our students could have good housing,**

- **so our employees' families could have day care through Baby Gator.**

**Think of everything we've been able to accomplish during the past five years to rebuild our infrastructure and establish world-class learning and research facilities so our faculty can engage in interdisciplinary work and our students can experience a state-of-the-art campus.**

- **Our Faculty 500 hiring initiative,**

- **the AI 100 faculty hiring initiative,**

- **Malachowsky Hall for Data Science & Information Technology,**

- **a brand-new home for the Student Health Care Center,**

- **the new Gator Village honors and undergraduate housing – and the list goes on.**

14

These things were all made possible through the support of our state leaders.

- Our Speaker of the House, Chris Sprowls, led an initiative to provide UF with $200 million for the education of our state's youth and has entrusted UF to carry out this important program that will ensure all of our children are able to read.

- Our Senate President, Wilton Simpson, committed $20 million per year to UF to lead the state and the country in Artificial Intelligence.

- That will mean $200 million over the next ten years for our AI initiative.

- Our Governor and his team paved the way for UF to take over the world-class Scripps Research Institute.

- Our state leaders understand how important these things are, and they have followed through when we have asked.

15

And, while the media has suggested that the Governor has played some role through his relationship with me in UF's decisions on outside activities and conflicts of interest, let me be clear:

That is 100% false.  Neither I, any other member of this board, the governor, nor any legislator had any influence on specific decisions on outside activities and conflicts of interest.  Period.

The first I learned about these decisions was when I read the story in the newspaper.

While, of course, in my role as board chair I have conversations with the Governor.  In fact, my conversations with the Governor have been about ONE thing and ONE thing only – asking him to help UF to become one of the leading universities in the country.

And, the Governor has done exactly that in response.


Our state leaders are the

- protectors of the taxpayers of the state of Florida,

16

- **they have entrusted UF with hundreds of millions of those dollars, and**

- **they are also fed up with the waste of those dollars by the few who are misusing their positions or aren't doing the jobs they were hired and committed to do.**

- **And, our job, as trustees, as fiduciaries, is to ensure that UF is fixing problems where they exist and that these state funds that our leaders have entrusted to UF are being used to support our most important and No. 1 asset --- our students.**

**It is time to stand up for what is right and to put a stop to what is wrong.**

**We owe nothing less to our students, to the overwhelming majority of our faculty and staff, and to our fellow Floridians.**

**And now, my friends, let us move forward with doing the business of this great university and Job 1: taking care of our students.**

17

18