## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

SHARON WRIGHT AUSTIN, MICHAEL : 
MCDONALD, DANIEL A. SMITH, JEFFREY : 
GOLDHAGEN, TERESA J. REID, and : 
KENNETH B. NUNN, :          1:21-cv-00184-MW-GRJ
:
              Plaintiffs, :
:
:
    v. :
:
:
UNIVERSITY OF FLORIDA BOARD OF :
TRUSTEES, the public body corporate acting for :
and on behalf of the University of Florida; W. :
KENT FUCHS, in his official capacity as :
President of the University of Florida; JOSEPH :
GLOVER, in his official capacity as Provost of :
the University of Florida; and LAURA :
ROSENBURY, in her official capacity as Dean of :
the Fredric G. Levin College of Law, :
:
              Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PLAINTIFFS' REPLY IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................1

ARGUMENT ........................................................................................2

I.     Defendants Misstate the Facts. .................................................2

       A.     Defendants Silenced Plaintiffs and Continue to Do So. .......2

       B.     There Is Only One Policy. ...............................................5

II.    Preliminary Injunctive Relief Is Warranted. .............................8

       A.     Plaintiffs Are Likely to Succeed on the Merits. ...................8

       B.     Plaintiffs Are Suffering Irreparable Injury. ........................11

CONCLUSION ....................................................................................14

## TABLE OF AUTHORITIES

**CASES**

*Barrett v. Walker Cnty. Sch. Dist.*,
  872 F.3d 1209 (11th Cir. 2017) ........................................................................8

*Blum v. Schlegel*,
  18 F.3d 1005 (2d Cir. 1994) ..............................................................................9

*Cate v. Oldham*,
  707 F.2d 1176 (11th Cir. 1983) ..........................................................11, 12, 13

*City of San Diego v. Roe*,
  543 U.S. 77 (2004) ..............................................................................................9

*Connor v. Palm Beach Cnty.*,
  1996 WL 438779 (S.D. Fla. May 29, 1996) ....................................................12

*Elrod v. Burns*,
  427 U.S. 347 (1976) ..........................................................................................11

*Ga. Latino All. for Hum. Rts. v. Governor*,
  691 F.3d 1250 (11th Cir. 2012) ........................................................................11

*GoTo.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ............................................................................8

*Harrell v. Florida Bar*,
  608 F.3d 1241 (11th Cir. 2010) ........................................................................11

*Hoover v. Morales*,
  164 F.3d 221 (5th Cir. 1998) ............................................................................10

*Lane v. Franks*,
  573 U.S. 228 (2014) ........................................................................................1, 9

*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) ............................................................................8

*Occupy Fort Myers v. City of Fort Myers*,
  882 F. Supp. 2d 1320 (M.D. Fla. 2011) ..........................................................12

*Otto v. City of Boca Raton,*
    981 F.3d 854 (11th Cir. 2020) ....................................................2, 8, 10

*Parker v. Jud. Inquiry Comm'n of Ala.,*
    295 F. Supp. 3d 1292 (M.D. Ala. 2018) ...........................................12

*Pickering v. Bd. of Educ.,*
    391 U.S. 563 (1968).....................................................................1, 9, 10

*Rankin v. McPherson,*
    483 U.S. 378 (1987)...............................................................................9

*Scott v. Roberts,*
    612 F.3d 1279 (11th Cir. 2010) .........................................................11

*Tracy v. Fla. Atl. Univ. Bd. of Trs.,*
    980 F.3d 799 (11th Cir. 2020) .............................................................8

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) .........................................................12

*United States v. Nat'l Treasury Emps. Union*
    513 U.S. 454 (1995)..........................................................................9, 14

## PRELIMINARY STATEMENT

It is now clear why Defendants brazenly suppressed faculty speech based on viewpoint and why they remain determined to defend, in public and in this Court, a policy that allows them to continue deciding whether professors can speak depending on whether the State likes the message.  Defendants believe they are entitled to prohibit professors from speaking against the State on topics related to their academic experience.  The President of the University of Florida, its Board of Trustees, its Provost, and the Dean of the Law School assert: "No UF employee has a constitutional right to work for the Gator"—*i.e.*, to serve as a faculty member at the University of Florida—"*and* feed their employer to one," *i.e.*, to testify in opposition to the State.  Opp. at 19 (Doc. 43).

There is a reason Defendants' only support for that proposition is a three-decade-old dissent; it is an egregiously incorrect statement of the law that has been "unequivocally" and "uniformly rejected" for at least a half-century.  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  The Supreme Court has "cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights."  *Lane v. Franks,* 573 U.S. 228, 236 (2014).  "[P]recedents dating back to *Pickering* have recognized that speech by public employees on the subject of their employment holds special value" under the First Amendment, *id.* at 240, and "above all else, the First Amendment means

that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020).

Defendants' skewed view of the First Amendment colors everything about their response to this controversy, and it is only the most glaring of a number of incorrect statements of fact and law in their Opposition. Properly applied to accurate facts, Eleventh Circuit precedent supports entry of a preliminary injunction here.

## ARGUMENT

### I.  Defendants Misstate the Facts.

#### A.  Defendants Silenced Plaintiffs and Continue to Do So.

Defendants misstate numerous facts about Plaintiffs' outside speech requests.

*First*, there should be no confusion about whether Defendants interfered with Dr. Goldhagen's right to speak. Dr. Goldhagen was unable to testify in a case challenging the State's ban on mask mandates because Defendants denied his request to do so. Goldhagen Decl. ¶¶8-10. That Dr. Goldhagen subjected himself to the possibility of severe punishment by testifying *pro bono* in two different cases without authorization simply reflects his courage to stand up to what he believes is unlawful censorship. His violation highlights an additional reason that

the dispute about the Policy's validity remains live, particularly in light of the warning by the Chairman of the Board of Trustees that conduct transgressing the Policy "Will.  Not.  Stand."  Ex. D at 12.[1]

*Second*, Defendants assert not only that the Law School Professors could have listed their University affiliations on the amicus brief, but also that such permission "was then, and continues to be, UF's policy." Second Fuller Decl. ¶4 (Doc. 44).  Neither assertion is correct.  Until July 2020, signing an amicus was not an "Outside Activity" requiring preapproval.  Ex. 1 at 2.  After the Law School Professors agreed to join an amicus brief in a high-profile case affecting the 2020 general election, the Law School changed its policy.  For the first time, Defendant Rosenbury informed Law School faculty that they needed permission to sign amicus briefs opposing the State because "faculty participation in litigation against the state of Florida or any agency thereof, including through amicus briefs, is considered a potential conflict of interest."  Ex. 4, at 6.[2]  Asked to clarify this new policy, Rosenbury added further confusion: "[T]his is not an Outside Activity, but

---

[1]   Exhibits with numerical ordering refer to exhibits to the Declaration in Support of Motion (Doc. 31) filed with Plaintiffs' Motion (Doc. 30). Exhibits with alphabetical ordering refer to exhibits to the Declaration in Support of Motion (Doc. 45) filed with the Opposition to Defendants' Motion (Doc. 42).

[2]   Rosenbury also announced that entities proposing to speak against the State "must separately receive approval from me, the General Counsel [of the University], and President Fuchs."  Ex. 4 at 6.

it is a potential conflict of interest because the amicus brief will be filed in an action against the state." *Id.* at 2.

While both of the Law School Professors' applications were initially approved, the official responsible for the conflict-of-interest policy changed the response by instructing Reid that she was "not permitted to use any UF marks, logos or other identifiers in [her] outside activity/interest, and [could] not otherwise imply or suggest any official affiliation with UF." Ex. 5; Second Fuller Decl. ¶5, Ex. 3 at 2. At that point, given the confusion about the rules, the warning to Reid, and the potentially severe consequences for violation, the only safe course for both Professors Reid *and* Nunn was to omit any UF identifications. Any "policy" on this issue was then, and continues to be, an incoherent and arbitrary collection of conflicting statements driven by expedience.[3] Only one thing is clear: if the Law School Professors wished then or now to sign a brief *supporting* the State, they would face none of these obstacles. That is quintessential viewpoint discrimination.

*Third*, Defendants state that Plaintiffs have recently obtained approval for outside activities. Defendants fail to mention, however, that none of those

---

[3]   The current "policy" apparently exists only in an affidavit. Neither the Policy nor the Task Force recommendations mention amicus briefs.

activities concerned UF or Florida, much less speech in opposition to either.[4] That Plaintiffs have continued regularly to receive outside-activity requests to speak is relevant only because it confirms that, particularly given Plaintiffs' expertise on controversial issues in Florida, it is a near certainty that Plaintiffs will continue to receive invitations to testify against the State on issues critical to Tallahassee.

## B. There Is Only One Policy.

Defendants' Opposition attempts to draw a sharp line between the past, when the "old policy" was in effect, and the present, when nothing that happened before matters because the "new policy is here now." Opp. at 8. The facts do not support that story.

There is no "old" and "new" Policy; since its adoption in 2020, there has only been one Policy, and the sum total of the recent "revisions" is a single one-line footnote stating that the Policy is "subject to the recommendations of the UF Task Force on Outside Activities." Doc. 44-1 at 6. There is no explanation of what that means—Defendants have not attempted, and evidently have no intent, to amend the Policy's text—but in any event, as this Court has recognized, the Policy's deficient features remain. *See* Amended Order Denying Motion to Dismiss (Doc. 47) ("Order"), at 3, 17. The vague definition of "conflict of

---

[4]   Professor McDonald requested to work on redistricting in New Jersey, while Professor Goldhagen requested to assist an international pediatrics non-profit. Second Fuller Decl. ¶¶9-10.

interest" is unchanged.   The Policy nowhere defines what an "interest" of the University might be.   The content of the proposed speech and the viewpoint of the speaker remain central to the Policy's application.   The University retains "sole discretion" to do whatever it deems "reasonably necessary" to address a perceived conflict.   Ex. 2 at 4–5.   There is no time limit for Defendants to render a decision. The Policy makes speaking without express written preapproval a violation punishable by termination, among other penalties entirely within Defendants' discretion.   Ex. 2 at 11.

The "new" aspects of the Policy that Defendants tout are vague, evolving, and in key respects indecipherable.   Take, for example, Defendants' assertion that "the revised policy . . . allows a requester to appeal a denial." Opp. at 21.   No such appeal process can be found anywhere in the Policy.   Although the Task Force recommended that the policy be revised to include one and provided an illustrative "example," Defendants have implemented nothing.   The only suggestion of an appeal process, depicted in Defendant Glover's recent PowerPoint, actually *conflicts* with the Task Force recommendation.   The former described an independent appellate panel that, following Provost denial, would issue a decision that "will be final."   Ex. 29 at 4.   Defendant Glover's presentation reverses that sequence, so that he reviews the ruling of the appeals panel and makes the final, unappealable decision.   Ex. I.

To the extent the revisions can be discerned, they are woefully inadequate to cure the Policy's constitutional flaws.  As Plaintiffs have explained, the rebuttable presumption against suppressing speech provides far less protection than the Constitution requires.  *See infra* at 10.  The requirement that the University's countervailing "interest" be "important and particularized" misses the point; the critical question, which the recommendations fail to address, is what type of "interest" can qualify.  Defendants refuse to limit that concept or to disavow the University's "interest" in garnering support from politicians as a basis for suppressing speech considered hostile to those audiences.  Given Defendants' willingness to make policy changes during this case to suit their litigating position, that refusal is telling.  *See, e.g.*, *supra* n.3.  It is also unsurprising; Defendants have elsewhere made clear that they regard the reactions of "the legislature, the taxpayers of Florida, the people that are funding" the University to be an interest "important and particularized to the University."  Ex. C at 6; Ex. F at 5 (Fuchs' statement that the University must not "fracture the relationship" with political supporters).

## II.    Preliminary Injunctive Relief Is Warranted.

Eleventh Circuit precedent demonstrates that preliminary injunctive relief is necessary and appropriate.[5]

### A.    Plaintiffs Are Likely to Succeed on the Merits.

For at least four separate and independent reasons, the Policy violates the First Amendment.  It is vague because it turns on undefined terms and leaves faculty members to guess at how Defendants will interpret and apply it.  Mot. for Prelim. Inj. (Doc. 30) at 15.  It is overbroad because it permits the suppression of "a substantial amount of protected free speech" under a lesser standard than First Amendment jurisprudence requires.  *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 808 (11th Cir. 2020).  It grants Defendants unconstitutionally broad discretion to suppress certain opinions and to "pocket veto" proposed speech by taking as long as they wish to decide whether to approve.  *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017).  And it is a "presumptively invalid" content-based prior restraint lacking any compelling interest.  *Otto*, 981 F.3d at 862.

---

[5]    Contrary to Defendants' assertions, Opp. at 12–13, Plaintiffs are not seeking to change the status quo but rather to restore the status quo that existed before Defendants implemented the unconstitutional Policy.  Previously, the University required only a yearly disclosure of potential conflicts and did not impose a content-based prior restraint.  *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("status quo ante litem refers" to "the last uncontested status which preceded the pending controversy.").  Even under the cases Defendants cite, Plaintiffs are entitled to a preliminary injunction because, as discussed *infra*, "the facts and law [are] clearly" in Plaintiffs' favor.  *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

Defendants' Opposition, which is remarkably thin on the merits, only confirms these conclusions. It reveals that Defendants' "side of the *Pickering* scale is entirely empty: [They] do not assert, and cannot demonstrate, any government interest that tips the balance in their favor," *Lane*, 573 U.S. at 242, much less anything satisfying the "heavy" burden required under *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 466 (1995). "The state interest element of the [*Pickering*] test focuses on the effective functioning" of the employer's office in the form of "[i]nterference with work, personnel relationships, or the speaker's job performance." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Defendants cannot show that expert testimony against the State causes "immediate workplace disruption" or undermines "the actual operation" of the University. *NTEU,* 513 U.S. at 455, 470. To the contrary, such speech *furthers* UF's "mission and purpose," *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)— "to share the benefits of its research and knowledge for the public good." Ex. 33. *See Blum v. Schlegel*, 18 F.3d 1005, 1012 (2d Cir. 1994) ("[T]he efficient provision of services by a State university's law school actually depends . . . on the dissemination in public fora of controversial speech implicating matters of public concern."). That is why the University has praised and encouraged expert testimony in the past. *See* Ex. 24 (annual evaluation of Professor Smith, noting that his "work in election science is important both as a scholar and as a

9

contribution to the people of Florida."). As in *Hoover*, Defendants have put forth only an "amorphous interest in protecting [the University's] interests," and that "is not the sort which may outweigh the free speech rights of state employees under *Pickering*."[6] *Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998).

To be sure, *Hoover* was "an unusually easy First Amendment case," Second Fuller Decl. Ex. 5 (Doc. 44-5) at 8, because, as Defendants note, it involved a flat prohibition on adverse expert testimony. But *Hoover*'s holding controls equally here: the State may never disfavor speech because of its viewpoint. The Policy's "strong presumption," Ex. 29 at 2, does not solve the issue; what matters is *relative* treatment of different opinions. Both as it is written and as Defendants have interpreted it, the Policy subjects speech deemed to "adversely impact UF's interest" to a "heightened level of scrutiny" for reasons having nothing to do with any *Pickering* rationale. *See* Ex. A. That sort of viewpoint discrimination "cannot be tolerated under the First Amendment." *Otto*, 981 F.3d at 862.

---

[6]  Defendants' sole proffered interest beyond overt discrimination is a strawman. Content-neutral commitment rules and state ethics laws already ensure professors do not "get a free pass to moonlight in any way they want and whenever they want." Opp. at 26–27. UF has never claimed it denied Plaintiffs' requests because they would pose a conflict of commitment or that faculty participation in litigation raises any such concern.

## B.      Plaintiffs Are Suffering Irreparable Injury.

As this Court has concluded, there is an "explicit" and "credible" threat—indeed, "little doubt"—that Defendants will enforce the Policy "in the manner Plaintiffs fear":  by privileging the State's political interests over Plaintiffs' First Amendment rights.  Order at 8.  That alone establishes irreparable injury.  *See Ga. Latino All. for Hum. Rts. v. Governor*, 691 F.3d 1250, 1269 (11th Cir. 2012) (irreparable harm requirement met by showing plaintiffs were "under the threat of [] prosecution"); *Harrell v. Florida Bar*, 608 F.3d 1241, 1254-55 (11th Cir. 2010) (explaining that threatened application of unconstitutional law establishes irreparable harm).

The Eleventh Circuit has "repeatedly held that harms to speech rights for even minimal periods of time unquestionably constitute irreparable injury supporting preliminary relief."  *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010); *see Elrod v. Burns*, 427 U.S. 347, 373 (1976).  The reason for "such stringent protection of First Amendment rights is the intangible nature of the benefits flowing from the exercise of those rights; and the fear that, if these rights are not jealously safeguarded, persons will be deterred, even if imperceptibly, from exercising those rights in the future."  *Cate v. Oldham*, 707 F.2d 1176, 1189 (11th Cir. 1983).  Those same principles require an injunction here.

Defendants oppose a preliminary injunction by repurposing the same "that-was-then, this-is-now" mootness arguments this Court has already rejected. Because nothing Defendants have done eliminates the Policy's First Amendment deficiencies, the ongoing injury remains. *See* Order at 15–17. Indeed, Defendants have not only refused to disavow the Policy's offending features, but the Board of Trustees has publicly declared the University's commitment to continue enforcing the Policy in an unconstitutional manner. *See id.* at 8. Courts regularly grant preliminary injunctive relief when faced with mootness gambits far less transparent than what Defendants have attempted here. *See United States v. Alabama*, 691 F.3d 1269, 1285 n.10 (11th Cir. 2012) (affirming preliminary injunction and concluding that statutory change did not moot case because it did not "affect the core" of plaintiff's challenge); *Connor v. Palm Beach Cnty.*, 1996 WL 438779, at *18, *23 (S.D. Fla. May 29, 1996) (granting permanent injunctive relief against city ordinances despite non-enforcement pledge); *Occupy Fort Myers v. City of Fort Myers*, 882 F. Supp. 2d 1320, 1338-40 (M.D. Fla. 2011) (granting preliminary injunction over city's mootness arguments); *Parker v. Jud. Inquiry Comm'n of Ala.*, 295 F. Supp. 3d 1292, 1308 (M.D. Ala. 2018) (enjoining regulation even though specific investigation had ended; "in the First Amendment

world, the chill to speech is *itself* the harm, and that harm, because of its intangible nature, cannot be compensated [with] monetary damages").[7]

Thus, contrary to Defendants' contention, the law neither supports nor requires leaving the Policy undisturbed until the next time Defendants fail to approve a specific speech request. Between now and then, the fears about chilling effects underlying Eleventh Circuit precedent would be realized. *Cate*, 707 F.2d at 1189. Litigants would be deterred from asking Plaintiffs and other UF faculty to serve as experts, opting for others who are not subject to a content-based prior restraint that could cause additional cost, delay, and uncertainty. That is particularly true in the kind of high-profile, politically charged, and fast-moving cases that matter most to the public and on which UF faculty have significant insight. Faculty would be deterred not only from seeking or accepting such invitations but also from pursuing a financially and professionally costly challenge to any denial. In that respect, Plaintiffs are exceptional; they include tenured and established UF leaders who are willing and able to incur Defendants' attacks for the sake of First Amendment principles. The rank and file will not be so brave,

---

[7] Defendants incorrectly contend that Plaintiffs should have "moved faster" in seeking a preliminary injunction. Opp. at 11–12. The day Plaintiffs sued, Defendants formed a "task force" to "study" the Policy. Ex. 21. Although Plaintiffs were skeptical, they waited to seek injunctive relief until Defendants made clear their intentions and then promptly moved to enjoin the Policy once the Defendants "adopted" the inadequate revisions. Had Plaintiffs done otherwise, Defendants would have attacked the filing as premature.

especially given the documented culture of fear and faculty self-censorship that Defendants have created.  *See* Ex. E at 1.  "The large-scale disincentive to [faculty] expression [would] also impose[] a significant burden on the public's," and the judiciary's, "right to read and hear what [the professors] would otherwise have written and said."  *NTEU*, 513 U.S. at 470.

## CONCLUSION

"To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation."  *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).  At this extraordinarily turbulent time, it has never been more important that First Amendment protections in the university setting be "jealously safeguarded."  *Cate*, 707 F.2d at 1189.  Until this Policy is enjoined, experts on controversies of profound public significance to our democracy and our institutions will "be deterred, even if imperceptibly, from exercising" their right to participate in the court cases that will decide these issues.  *Id.*  The motion should be granted.

Dated: January 5, 2022
Washington, D.C.


<u>/s/ David A. O'Neil</u>
DAVID A. O'NEIL (*pro hac vice*)       PAUL DONNELLY
Debevoise & Plimpton LLP              Florida Bar No. 813613
801 Pennsylvania Avenue N.W.          LAURA GROSS
Suite 500                            Florida Bar No. 858242

14

Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

MORGAN A. DAVIS (*pro hac vice*)
JAIME FREILICH-FRIED (*pro hac vice*)
SAMUEL ROSH (*pro hac vice*)
SOREN SCHWAB (*pro hac vice*)
KATHARINE WITTEMAN (*pro hac vice*)
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
mdavis@debevoise.com
jmfried@debevoise.com
sjrosh@debevoise.com
sschwab@debevoise.com
kwitteman@debevoise.com

CONOR P. FLYNN
Florida Bar No. 1010091
Donnelly + Gross LLP
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001
paul@donnellygross.com
laura@donnellygross.com
conor@donnellygross.com

ALEXANDRA P. SWAIN (*pro hac vice*)
Debevoise & Plimpton LLP
650 California Street
San Francisco, CA 94108
(415) 738-5700
apswain@debevoise.com

*Counsel for Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A. Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn*

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

I hereby certify that this reply memorandum of law contains 3,199 words.

<u>/s/ David A. O'Neil</u>
David A. O'Neil

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of January, 2022, a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

/s/ David A. O'Neil
David A. O'Neil