UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

```
SHARON WRIGHT AUSTIN, et al.,   )
                                )
             Plaintiffs,        ) Case No: 1:21cv184
                                )
         v.                     ) Tallahassee, Florida
                                ) January 7, 2022
UNIVERSITY OF FLORIDA BOARD OF  )
TRUSTEES, et al.,               )
                                ) 9:33 AM
             Defendants.        )
_____ )
```

**TRANSCRIPT OF TELEPHONIC PRELIMINARY INJUNCTION PROCEEDINGS**
**BEFORE THE HONORABLE MARK E. WALKER**
**CHIEF UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 86)**

APPEARANCES:

For Plaintiffs:                 Debevoise & Plimpton, PPL
                                By:  DAVID A. O'NEIL
                                     Attorney at Law
                                     daoneil@debevoise.com
                                801 Pennsylvania Avenue, NW
                                Suite 500
                                Washington, DC 20004


For Defendants:                 Schaerr Jaffe, LLP
                                By:  H. CHRISTOPHER BARTOLOMUCCI
                                     Attorney at Law
                                     cbartolomucci@schaerr-jaffe.com
                                1717 K Street NW
                                Suite 900
                                Washington, DC 20006


Court Reporter:                 MEGAN A. HAGUE, RPR, FCRR, CSR
                                111 North Adams Street
                                Tallahassee, Florida 32301
                                megan.a.hague@gmail.com

*Proceedings reported by stenotype reporter.*
*Transcript produced by Computer-Aided Transcription.*

**P R O C E E D I N G S**

1

2          (Call to Order of the Court at 9:33 AM on Friday,

3    January 07, 2022.)

4               THE COURT:  Good morning.  This is Judge Walker.

5               We are here in Case No. 1:21cv184.  We are here for

6    oral argument on a preliminary injunction motion.  In just a

7    moment I'm going to call roll as it relates to the lawyers that

8    will be appearing for the plaintiffs and for the defendants.

9               With that said, I need everyone other than the lawyers

10   that are going to be speaking to please mute your phones.  Last

11   time I had one of these hearings there were a bunch of folks

12   that were chatting with their neighbors and colleagues and it

13   was just very hard to hear anything.  So I need everybody to

14   mute their phones.

15              In so stating, I heard the number -- there's a large

16   number of folks that are listening in, and that's absolutely

17   fine.  This is a public proceeding and any and all folks that

18   want to call in can call in.  On occasion we've had such

19   interference because folks did not comply with my request to

20   mute, we've had to hang up and re-set up the phone call where

21   folks can call in, but are muted.  I hope that will be

22   unnecessary because I do not want to have to continue this

23   proceeding to make alternative arrangements.

24              I do not know, but I suspect, we may have some members

25   of the press on the line.  I will remind members of the press

1    and everybody else that's listening in that just because we are

2    doing this by telephone doesn't change the rules of the federal

3    court.  These proceedings may not be recorded.  You must not

4    record these proceedings.  I've issued that directive to

5    everyone listening in.  If you violate that directive, then you

6    will be violating a direct order of this Court and could be

7    subject to penalties up to and including being held in contempt.

8              I say that not to be -- and I'm saying that in a

9    pleasant tone.  I'm not saying that to be difficult.  I'm just

10   saying, You cannot record these proceedings.

11             Let me start with counsel for the plaintiff.  If you

12   could, please state your appearance.

13             MR. O'NEIL:  Morning, Judge Walker.

14             This is David O'Neil for the plaintiffs whom are with

15   us today.

16             THE COURT:  All right.  And, Mr. O'Neil, as I

17   understand it, you will be speaking on behalf of the plaintiffs

18   today; is that correct?

19             MR. O'NEIL:  That's correct.

20             THE COURT:  All right.  And then if counsel who is

21   going to be speaking for the defendants will please state your

22   appearance.

23             MR. BARTOLOMUCCI:  Yes, Your Honor.

24             This is Christopher Bartolomucci, counsel for the

25   defendants.  And the general counsel of the University is also

1    listening with us today.

2            THE COURT:  Welcome, Mr. Bartolomucci.

3            MR. BARTOLOMUCCI:  Thank you.

4            THE COURT:  Let me also note that I know that

5    originally we were doing this in person.

6            Mr. O'Neil, I understood it was the preference of the

7    plaintiffs to continue, that is, move forward, in person.  It's

8    generally my preference to have hearings, even if they are legal

9    argument, in person.  But given the fact that both of you are

10   out of town, given one of the greatest risks to you and your

11   families is air travel and airports and so forth, inasmuch as

12   there are is going to be no live testimony, it is on that basis

13   that I converted this to a telephonic hearing.

14           I apologize if I inconvenienced anyone.  I can assure

15   you it wasn't for my benefit or the benefit of the court

16   reporter.  We'd prefer to be in person.

17           But given the fact that, Mr. O'Neil, you and

18   Mr. Bartolomucci are out of town and it would require air travel

19   and potentially you, you know, quarantining and being tested and

20   so forth, that's why I made the decision to convert it to a

21   telephonic hearing.  If this were an evidentiary hearing, then

22   it might have been a different question.

23           Let me tell you what -- how I plan on conducting the

24   hearing, Mr. O'Neil and Mr. Bartolomucci, and it's consistent

25   with how I have any hearing.  I plan on asking some questions

1    first.  We'll then -- and each time I ask a question of one

2    lawyer, if the other lawyer wishes to add something, they can.

3    You don't have to, because there may not be anything you wish to

4    say in response to the question.  Once I've asked all the

5    questions that I want to ask, we'll then take a break.  And when

6    we come back, Mr. O'Neil, you can make whatever argument or

7    presentation you wish to make, and then I'll turn to

8    Mr. Bartolomucci and have him make whatever presentation he

9    wants to make.

10          First, I want to get some of my questions answered;

11   and, second, it just seems to me that if we do it that way --

12   and you take a break -- at least both sides know what some of my

13   concerns are, and it will give you an opportunity to respond to

14   my concerns as opposed to simply summarize your positions.

15          Let me start with you, Mr. O'Neil.  And I want to make

16   plain, I'm not telegraphing anything to either side.  Quite

17   frankly, I've got a list of questions and I'm not necessarily

18   going to ask them in any particular order.  And when I say "any

19   particular order," I'm not suggesting that one issue is a more

20   determinative question than the others.  I'm just -- again, want

21   to get through my questions.

22          Mr. O'Neil, starting, again, with you, I've read your

23   complaint, and you have not alleged void-for-vagueness under the

24   Fourteenth Amendment, and I'm not aware of any authority that

25   permits you to pursue a vagueness claim under the First

1    Amendment.  Now I certainly understand how vague language would

2    be implicated in an analysis where you are arguing unbridled

3    discretion, for example, under the *City of Lakewood* case.

4           But I just wanted to verify, since there is not a

5    Fourteenth Amendment claim, you are not pursuing a

6    void-for-vagueness claim, a traditional void-for-vagueness claim

7    under the Fourteenth Amendment because it's not pled; are you?

8           MR. O'NEIL:  Judge Walker, we -- we believe that the

9    statute is void-for-vagueness.  We think it's fairly encompassed

10   within the overbreadth argument that we plead in the complaint

11   and that we've argued in the papers.

12          We do also think that overbreadth encompasses

13   vagueness.  But to the extent the Court believes it would be

14   necessary to plead a separate Fourteenth Amendment

15   void-for-vagueness claim, we can very quickly amend the

16   complaint because we do think that is an important basis on

17   which this policy failed.

18          THE COURT:  Well, just let me -- so it's clear, I

19   think the United States Supreme Court, for example, in

20   *United States versus Williams* has explicitly said, "The

21   vagueness doctrine is an outgrowth not of the First Amendment,

22   but of the due process clause of the Fifth Amendment."

23          So are you aware of any authority that would suggest

24   that you can state a void-for-vagueness claim under the First

25   Amendment?

 1              MR. O'NEIL:  Your Honor, only to the extent that

 2    overbreadth -- as I said, overbreadth does encompass or overlap

 3    with the vagueness doctrine.

 4              THE COURT:  I understand that --

 5              MR. O'NEIL:  I would agree with you that --

 6              THE COURT:  Hold on.  Mr. --

 7              MR. O'NEIL:  -- it's traditionally pled and must be

 8    pled under the Fifth and Fourteenth Amendments.  And as I said,

 9    we are, therefore -- you know, if the Court believes that's

10    necessary, we would be willing and prepared to amend very

11    quickly.

12              THE COURT:  All right.  I say that because I

13    understand they are often brought in tandem, but they are often

14    brought in tandem because there's a First and Fourteenth

15    Amendment claim pled in a complaint.

16              But let me pause there and turn to Mr. Bartolomucci.

17              Mr. Bartolomucci, Mr. O'Neil has acknowledged that

18    they do not specifically plead a Fourteenth Amendment

19    void-for-vagueness claim but seek to make that argument.

20              What says the defense in response to that request to

21    amend the complaint?

22              MR. BARTOLOMUCCI:  Your Honor, I believe that the

23    plaintiffs' motion for preliminary injunction was clear that

24    they were advancing three theories and three theories only:

25    Viewpoint, unbridled discretion, and overbreadth.  So I don't

1   believe that they have a freestanding vagueness claim advanced

2   in support of their request for an injunction.  Perhaps they

3   will amend their complaints in the future to add such a claim,

4   but I don't think a freestanding basis claim ought to be

5   considered in connection with this motion.

6          THE COURT:  I agree it was not pled; it was not

7   argued, and I'm not going to allow an ore tenus motion to amend

8   at this juncture since we are in the middle of the preliminary

9   injunction hearing.

10          Having said that, I want to make plain that there was

11   argument regarding vagueness, but that language is part of -- or

12   that -- those arguments and that language I think is part of or

13   subsumed by the unbridled discretion argument.  So I'm not

14   suggesting that challenges to the nature and scope of the policy

15   itself aren't relevant for some of the other claims; I'm just

16   recognizing a different question and ruling on a different

17   issue, which is, is there a separate freestanding

18   void-for-vagueness claim.

19          I find there is not.  And while I would certainly

20   allow the complaint to be amended moving forward, I'm not

21   allowing it to be amended for purposes of this hearing since we

22   are in the mist of the preliminary injunction hearing.

23          Mr. O'Neil, do you require any further clarification

24   from the Court?

25          MR. O'NEIL:  No, Your Honor.

1          I would just point to paragraph 94 of our complaint

2   which -- which alleges that the policy violates plaintiffs'

3   First Amendment rights because its vague terms give plaintiffs

4   no notice and what conduct is prohibited and lead to arbitrary

5   and viewpoints discriminatory enforcement.

6          And so, as -- as Your Honor noted, you know, we do

7   think the vagueness goes to the unbridled discretion and,

8   frankly, to overbreadth.

9          THE COURT:  All right.  I agree, and I think I said

10  that before, which is why I started that it's -- those arguments

11  are relevant for other claims.  I was addressing a separate

12  issue, which is, is there a freestanding void-for-vagueness

13  claim in the Fourteenth Amendment, and I find there is not.

14          But --

15          MR. O'NEIL:  I understand.

16          THE COURT:  -- I understand.

17          I wasn't suggesting -- because, again, I think I

18  raised the issue, and I think I specifically cited the *Lakewood*

19  case, there certainly is an issue with respect to the language

20  of the policy as part of applying the standard under that case.

21          All right.  Let me -- sort of related to that, because

22  I think it's helpful to define what is or is not before the

23  Court -- and Mr. Bartolomucci anticipated this, and it's what I

24  understood slightly altered the claims to be -- that, one, I'm

25  going to call what's the unbridled discretion claim under

 1    *Lakewood* and its progeny; two, is a balancing argument, and we

 2    can call it *Pickering*, or *Pickering* and its progeny, or -- and I

 3    realize there's other cases such as *NTEU* that are related to the

 4    *Pickering* analysis.

 5           And so what I want to make sure is I understand,

 6    Mr. O'Neil, exactly what your claims are, and they seem to me to

 7    be different.  So, for example, it seems to me what I'm going to

 8    call the balancing challenge under *Pickering*, et cetera, is one,

 9    and that's separate and distinct, although related, to the

10    unbridled discretion.  And separate and apart from that, as

11    the -- I believe the *Hoover* case teaches us, a challenge under

12    the First Amendment, that its content or viewpoint challenge is

13    a third challenge to the policy at issue.

14           Do I have the sort of three general umbrellas of the

15    three claims correct, or no?

16           MR. O'NEIL:  You do, Your Honor.  That's exactly

17    right.  So, you know, as *Hoover* makes clear there is both the

18    *Pickering* problem and the content or viewpoint discrimination

19    problem, so those are two; third, unbridled discretion.

20           I'd add a fourth, which is overbreadth, because the

21    policy punishes a substantial amount of protected speech on a

22    standard that is less than what the First Amendment requires you

23    be subjected to.

24           THE COURT:  All right.  Let me then start in where you

25    finished, with overbreadth, because I want to make sure I

1  understand the nature of that challenge.  And I think it

2  would -- it also relates to a question I was going to ask you

3  anyway that relates to your challenge as well as the relief that

4  you seek on behalf of the plaintiffs.

5          As I read your papers -- and if I've got it wrong,

6  that's fine, but this is why I'm going through this exercise to

7  make sure that I know what's before me, what the claims are as

8  sort of a predicate to move forward with the balance of this

9  hearing.  As I understood -- and I want to set aside the amicus

10 brief claim which I'll talk about in a minute.

11         But as it relates to UF faculty serving as expert

12 witnesses in litigation, as I understood it -- and it's not up

13 to the Court; it's not up to Mr. Bartolomucci, quite frankly,

14 because I often times know that sometimes courts inadvertently

15 reframe issues or turn a case into something it wasn't or

16 oftentimes defense counsel try to redefine the claims and argue

17 something that's not even in the complaint.

18         So -- and I'm not saying Mr. Bartolomucci did that.

19 I'm just saying -- but I want to make sure I understand the

20 nature and scope of your claim, Mr. O'Neil.

21         As I understood the challenge and the relief you

22 sought, it's not the entire conflict -- policies related to the

23 conflict.  It's not the entire review process as it relates to

24 moonlighting or extra work or potential conflicts that somebody

25 may have based on a familial relationship or something, that it

1   was a much narrower claim and challenge.  And if I've got it

2   wrong, you will not offend me.  I'm asking for a reason.

3            As I understood it, your challenge specifically was

4   to -- setting, again, aside amicus briefs -- professors serving

5   as expert witnesses.

6            Do I have that wrong?

7            MR. O'NEIL:  I would say it is a challenge to the

8   policy to the extent it applies to participation by faculty in

9   litigation.  And I guess that means I'm not putting aside the

10  amicus brief because we see it as part of the same phenomenon.

11  But to the -- for purpose of the original plaintiffs, yes, it is

12  limited to how the policy applies to participation as expert

13  witnesses.

14           THE COURT:  So -- hold --

15           MR. O'NEIL:  Because of the claims by Professor Nunn

16  and Professor Reid, we think the challenge is actually to

17  participation in litigation generally.

18           THE COURT:  All right.  Because I want to make sure,

19  again, that I understand.

20           As I read the conflicts of commitment and conflicts of

21  interest policy as modified by the policy recommendations,

22  setting aside Professors Nunn and Reid, as I understand, the

23  other plaintiffs are challenging that gloss that was added to

24  the conflicts of commitment and conflicts of interest that was

25  adopted by President Fuchs; namely, the limitation on University

1  personnel serving as expert witnesses.

2          Do I have that right so far?

3          MR. O'NEIL:  Yes.  We are challenging the policy,

4  including the gloss that was -- including whatever gloss was

5  added by the acceptance of the task force recommendations --

6          THE COURT:  And --

7          MR. O'NEIL:  -- to the extent they apply to expert

8  testimony, if we are leaving to the side the amicus briefs for

9  the moment.

10          THE COURT:  That was going to be my next question

11 because I've got in front of me Exhibit -- I've got 44-2 which

12 are the emails that were exchanged with Professor Nunn and

13 Dean Rosenbury and others.

14          What I -- and let me, though, pause and circle back,

15 Mr. O'Neil.  As I understand it, though, Judge, we are not

16 trying to strike down the conflicts of commitment and conflicts

17 of interest provision or bar their application enjoining the

18 University.  Is it a much narrower request as it relates to rule

19 relief in our claim as it relates to serving as expert

20 witnesses, and it's just that provision and that gloss; correct?

21          MR. O'NEIL:  Yes, I want to make sure that I --

22      (Indiscernible conversation between unidentified persons.)

23          THE COURT:  Hold on.

24          Mr. O'Neil, is somebody talking in the background?

25 Because either somebody hasn't muted their phone or you've got

1    people wondering around in front of you because --

2            MR. O'NEIL:  It's not on my end.

3        (Indiscernible conversation between unidentified persons.)

4            THE COURT:  Whoever is not on mute, please put your

5    phone on mute.  I'm trying to be as respectful as possible, but

6    I've got to be able to hear --

7        (Indiscernible conversation between unidentified persons.)

8            THE COURT:  I hear a woman's voice.  Can you please

9    mute your phone?

10       (Indiscernible conversation between unidentified persons.)

11           THE COURT:  All right.  Mr. O'Neil, Mr. Bartolomucci,

12   I don't know what we are going to have to do.  I want this to be

13   a public proceeding, but we have people that have a listening

14   problem.

15           Whoever --

16           THE COURTROOM DEPUTY:  I'll take care of it, Judge.

17   One moment.

18           THE COURT:  Can you figure out who is it, Ms. Milton

19   McGee?

20           Because if they can't follow simple instructions, you

21   terminate them from the call.

22           THE COURTROOM DEPUTY:  Yes, sir.

23       (Indiscernible conversation between unidentified persons.)

24       (Pause in proceedings.)

25           AT&T OPERATOR:  Excuse the interruption.  This is the

1    At&T operator.

2            THE COURTROOM DEPUTY:  I'm going to have to talk to

3    the specialist.

4            AT&T OPERATOR:  Excuse the interruption.  This is the

5    AT&T operator.

6            THE COURT:  Yes, ma'am.

7            AT&T OPERATOR:  You requested assistance?

8            THE COURT:  Yes.  I've got --

9            THE COURTROOM DEPUTY:  We are trying to get the caller

10   in the background muted.

11           AT&T OPERATOR:  Okay.  I do hear the background noise.

12           Does that help?

13           THE COURTROOM DEPUTY:  Thank you.

14           THE COURT:  Thank you very much.  I'm grateful.

15           AT&T OPERATOR:  You're welcome.  And -- yes?

16           THE COURT:  No, thank you.

17           AT&T OPERATOR:  Okay.  I have dropped them from the

18   call, and I will be leaving the line.

19           THE COURT:  Thank you, ma'am.

20           AT&T OPERATOR:  Operator leaving the line.

21           THE COURT:  Thank you.

22           AT&T OPERATOR:  You're welcome.  Bye-bye.

23           MR. O'NEIL:  So, Judge --

24           THE COURT:  Hold on.

25           Mr. O'Neil and Mr. Bartolomucci, again, I try not to

1    be difficult or unpleasant, but it really -- this is important

2    to you and your clients, and I want you to be able to be heard

3    and make a record with the court reporter.  So, again, I'm not

4    trying to be unpleasant.  I just am really doing it for y'all's

5    benefit.  So my apologies.

6            Mr. O'Neil, you may proceed.

7            MR. O'NEIL:  We appreciate it, Your Honor.  Thank you.

8            I believe I understand what -- what you are asking,

9    and the answer is that yes, we are not challenging the conflict

10   of commitment policy or the conflict of interest policy to the

11   extent they apply to other kinds of activity -- moonlights, you

12   know, engaging in research, you know, with other institutions.

13   We are challenging as it applies to limitations on the ability

14   of faculty to serve as expert witnesses in litigation, again

15   putting aside the amicus brief.

16           THE COURT:  I understand.  And so what you would be

17   requesting is in an -- the relief you are requesting would be --

18   you would be asking me to enjoin the enforcement of those

19   provisions that relate to faculty serving as expert witnesses

20   setting aside, again, the amicus briefs; correct?

21           MR. O'NEIL:  Yes.  Or I guess, put differently,

22   enjoining the enforcement of the policy as applied to requests

23   to serve as expert witnesses.

24           THE COURT:  Okay.  Then let's turn to -- and,

25   Mr. Bartolomucci, I promise I'm not ignoring you.  I'm just

1   trying to make sure I know what the claims are and what there

2   are facts for and then that will lay the foundation for us to

3   have further discussion.

4           Let's turn to Professors Nunn and Reid.  And I'm going

5   to -- Mr. Bartolomucci may want to jump into this after you

6   respond to me, Mr. O'Neil.

7           It doesn't appear to me that the decisions regarding

8   amicus briefs or any policy regarding amicus briefs were being

9   applied under the conflicts of commitment and conflicts of

10  interest provisions, that it was a separate process policy,

11  which I put in air quotes, that was being enforced by

12  Dean Rosenbury; and it's not found with or being done pursuant

13  to the same set of policies as modified by the policy

14  recommendations related to expert testimony that are at issue

15  with respect to the other professors.

16          And both sides can certainly chime in, but I'm not --

17  it appears to be a separate and distinct not only issue, but,

18  again, policy, in air quotes.  And if I misapprehend what the

19  record is and what's before me, that's why I'm asking the

20  questions.

21          So, Mr. O'Neil, I'll start with you and then

22  Mr. Bartolomucci certainly can say, Well, Judge, we believe it

23  is and here's why.

24          But, Mr. O'Neil?

25          MR. O'NEIL:  So I'm going to try to restrain myself

1    and not argue the merits at this point.  I actually think that

2    to the extent that one can figure out what's being applied

3    there, it is both the policy as articulated by Dean Rosenbury

4    and also the conflict of interest policy.

5              And the reason I say that is, obviously,

6    Dean Rosenbury sent her email to the law faculty July 9th,

7    making clear that they needed to disclose and they needed to

8    disclose under the conflict of interest policy on UFOLIO.  The

9    professors then did, indeed, file UFOLIO requests.

10             And while Professor Nunn's was approved, if you look

11   at page-- this is in the second Fuller declaration --

12             THE COURT:  I understand.  He wasn't allowed to

13   identify himself as a member of the faculty and it had to be

14   just Kenneth Nunn --

15             MR. O'NEIL:  Right.

16             THE COURT:  -- Professor of Law.

17             MR. O'NEIL:  Right.  And, actually, that -- that

18   decision was made by Gary Winslet (phonetic) who is in charge of

19   the conflict of interest policy.  So our understanding is it was

20   an application to the policy, but it also appears to be an

21   application of Dean Rosenbury's separate law school policy both

22   for entities and for professors.  I think part of the confusion

23   comes from the fact that Dean Rosenbury said, It's not an

24   outside activity, but does need to be disclosed anyway.  But we

25   do read it as also an application of this policy.

1          THE COURT:  And what part of the policy?

2          I guess that's -- I understand we can have policy writ

3   large that anytime you want to do anything, you've got to go as

4   a faculty member through and report it and see.  But, you know,

5   it's easier for me to get my head around, I want to be an expert

6   because there's language that relates to me testifying as an

7   expert.

8          So can you direct my attention when we start talking

9   about somebody serving as -- on an amicus brief, are you saying

10  that that is a subset of expert witnesses?  I'm not saying you

11  are saying that.

12         Are you saying that, or is there some other provision

13  that somebody points to or relies on that I didn't see under the

14  conflicts of commitment and conflicts of interest that relates

15  to professors signing off on amicus briefs?

16         MR. O'NEIL:  It appears that the University believes

17  that is -- that is an outside activity subject to the conflict

18  of interest policy and --

19         THE COURT:  Just -- just generally.  But there's not a

20  specific --

21         MR. O'NEIL:  Just generally.

22         I don't -- so I don't see anything in the policy about

23  amicus briefs, but the University has told law faculty that they

24  have to disclose under the conflict of interest policy.  So we

25  are not aware of some other policy except the one that

1    Dean Rosenbury created.  And so we view it as a restriction that

2    is the written result of the University treating this as an

3    outside activity.  But, again, you know, there is a lot of

4    confusion on this.

5            THE COURT:  And, again, I don't want to get into

6    merits.  I just wanted to make sure I wasn't missing something

7    as I was going through the exhibits and the attachments.

8            Mr. Bartolomucci, I promise I will let you make

9    arguments on the merits, and I didn't mean to cut Mr. O'Neil

10   off -- because I really don't want to hear the arguments on the

11   merits now.  I want to make sure that I have a baseline in terms

12   of what it is I'm looking at.

13           So I understand that it was submitted and who signed

14   off on it.  I understand that Dean Rosenbury has her own

15   policies as reflected -- I mean, her own statements, I should

16   say, as reflected in the email exchange that was attached as an

17   exhibit.

18           If you could, so I -- and it will make more sense

19   later when we have argument.  Beyond those email exchanges and

20   the fact that it was processed as an outside activity generally

21   under the conflict policy, is there anything more specific than

22   that in this record?

23           MR. BARTOLOMUCCI:  Yes, Your Honor.  And I will answer

24   that question, but before I do, I wanted to back up because I

25   didn't get a chance to comment on Mr. O'Neil's discussion about

1   the scope of what they're challenging in this case --

2          THE COURT:  Can you hold off on that --

3      (Indiscernible crosstalk.)

4          THE COURT:  Can you hold off on that,

5   Mr. Bartolomucci?

6          And just being a -- I'm not a big D.C. lawyer like the

7   two of you.  I'm just a simple country judge in Tallahassee.  So

8   why don't we start by answering my question and then you can

9   circle back and be heard on the other because that way we are

10  close in time when I'm hearing it.

11         So just humor me by responding to the first question

12  and then you can certainly say, Judge, I think he overstates

13  what's pled, and we'll deal with that second.  I promise I won't

14  cut you off.

15         So let's start with the policy as it relates to amicus

16  briefs.

17         MR. BARTOLOMUCCI:  Thank you, Your Honor.

18         So the amicus brief request did go through the UFOLIO

19  system, and there is a provision in the policy on conflicts that

20  I believe -- I believe applies to amicus briefs.  So if you look

21  at the policy on conflicts in paragraph 5 --

22         THE COURT:  Give me one second.

23         MR. BARTOLOMUCCI:  -- (B)(10).

24         THE COURT:  5(B) -- hold on -- (10):  "Professional

25  services related to UF expertise."

1          MR. BARTOLOMUCCI:  Correct.

2          THE COURT:  "You provide or you are seeking approval

3    to provide paid or unpaid professional services to an outside

4    entity and the professional services relate to your UF

5    expertise."

6          MR. BARTOLOMUCCI:  I think that's what they were doing

7    when they joined an amicus brief in the area -- you know,

8    relating to an area within their expertise.  So I think that is

9    what's part of the policy that's a hook for amicus brief work.

10          THE COURT:  All right.  Fair enough.

11          And that's -- that was very helpful.  That's why I was

12    asking.  And it may be when I go back and re-review all the

13    attachments, since it was put through that process, I'll see

14    that -- I don't know if it's explicitly referenced or not -- but

15    I understand that certainly logically makes sense, so thank you.

16          Now we can circle back and you can -- although that's

17    one of the phrases that was recently suggested should be removed

18    from our lexicon.  But, anyway, setting aside popular news

19    events.

20          Let me start with, do you disagree that plaintiffs

21    make an unbridled discretion claim consistent with the type of

22    claim enunciated and outlined in the *City of Lakewood*?

23          MR. BARTOLOMUCCI:  Your Honor, I believe they have

24    advanced an unbridled discretion claim and have made such an

25    argument in support of their motion for preliminary injunction.

```
1              THE COURT:  Okay.

2              MR. BARTOLOMUCCI:  We disagree with the argument, of

3    course --

4              THE COURT:  Sure.

5              MR. BARTOLOMUCCI:  -- but they have made it.

6              THE COURT:  Do you agree that they've argued that

7    there is a balancing that needs to be made under some iteration

8    of Pickering or related authority?

9              MR. BARTOLOMUCCI:  No, Your Honor, I actually didn't

10   take that as their argument.  I took their argument to be based

11   on the Barrett versus Walker County case.  I didn't see in their

12   motion for preliminary injunction an argument that was really

13   based on a Pickering balancing analysis.

14             THE COURT:  I thought -- and correct me if I'm wrong,

15   I thought they relied on Hoover.  I thought they also went to

16   great lengths to suggest that the University had not -- or the

17   defendants had not identified an interest.  And so if you are

18   talking about balancing of interest and so forth, and since

19   Hoover, which you went to great lengths to distinguish, as I

20   recall, was a Pickering analysis, the fact the heading under the

21   analysis is "Pickering and its progeny," as I understood it, you

22   are saying, Judge, they may have made that argument in their

23   memorandum, but their motion for preliminary injunction itself

24   is ill-defined?  Because it seemed to me both sides talked ad

25   nauseam about Hoover which is a Pickering case.
```

1          MR. BARTOLOMUCCI:  Well, I understand them to be

2    raising *Hoover* in connection with their viewpoint discrimination

3    argument rather than the unbridled discretion argument.  I felt*,*

4    you know, *Barrett* to be the primary authority in support of

5    unbridled discretion and *Hoover* to relate to viewpoint.

6          THE COURT:  And I know they did that as a secondary.

7    In *Hoover*, they both applied *Pickering* and then said, Separate

8    and apart from that is content and viewpoint discrimination.

9          But let me circle back.  Are you saying *Pickering* --

10   because I was going to have this question for y'all as well.

11   Are you suggesting that unbridled discretion and *Pickering* are

12   synonymous?

13         I thought that's what I just understood you to say,

14   that those were the same thing.

15         MR. BARTOLOMUCCI:  Well, as I indicated before,

16   Your Honor, their memorandum in support of their motion for

17   preliminary injunction, you know, set forth three theories in

18   separate sections:  Viewpoint, unbridled discretion, and

19   overbreadth.  So my understanding was those were the three

20   arguments that we had to debate on this motion.

21         THE COURT:  All right.  I understand.

22         So, Judge, I agree with content, viewpoint, unbridled

23   discretion, and overbreadth.  We do not believe they advanced an

24   argument under *Pickering*.

25         So let me, then, turn to Mr. O'Neil -- which, again,

1    we've now spent 40 minutes in hearing just to ascertain what's

2    before the Court, but that's why I do this.

3              Mr. O'Neil, what says you?  I mean, I clearly am

4    attuned to and concerned with what's properly plead.  I've

5    already said I do not have a void-for-vagueness claim under the

6    Fourteenth Amendment properly before me.  So, clearly, I'm not

7    dismissive of the idea that people can't just bring up new

8    arguments and claims, because I started the hearing that way.

9    But Mr. Bartolomucci says, Judge, there's no *Pickering* and its

10   progeny claim before you.

11             MR. O'NEIL:  Your Honor, there is a *Pickering* claim

12   before you.  If you look at the motion, page 28 --

13             THE COURT:  Hold on one second.

14             I pulled it up.  This is ECF Document 30, for the

15   record, plaintiffs' motion for preliminary injunction and

16   memorandum of law.

17             You asked me to turn to what page?

18             MR. O'NEIL:  Your Honor, it's page 28 of the motion

19   for the preliminary injunction.

20             THE COURT:  Give me one second.

21          (Pause in proceedings.)

22             THE COURT:  I'm on page 28.

23             MR. O'NEIL:  So in discussing the inadequacy of the --

24   being proposed by the task force, "Second, the Constitution

25   specifies what type of interest a government employer can cite

1    as justification for prohibiting the employees from speaking on

2    matters of public concern."  And then we proceed to both *NTEU*

3    and *Pickering*.

4              THE COURT:  Give me one second.

5         (Pause in proceedings.)

6              THE COURT:  The way this is set up, Mr. O'Neil, as I

7    start with -- give me one second.

8         (Pause in proceedings.)

9              THE COURT:  Under the argument the policy violates the

10   First Amendment unbridled discretion, that's I(A) on page 17.

11             On page 20, (B) is "The policy imposes a

12   viewpoint-based prior restraint."

13             "(C) The policy is overbroad because it punishes a

14   substantial amount of protected speech."

15             And (D), they failed "...to remedy the policy's

16   Constitutional infirmities."

17             So you are saying, Judge, we included a fourth theory

18   as evidenced by we have A, B, C, and D, in which case, under D

19   we specifically rely on the very cases you are asking about?  Is

20   that your -- I want to make sure that I understand your argument

21   correctly.

22             MR. O'NEIL:  Yes, Your Honor.  And also, if you look

23   at the bottom of page 23 of the same document, in the context of

24   explaining why this is an impermissible viewpoint, why this is

25   impermissible viewpoint discrimination, states, "The government

1    may restrain speech on issues of public concern only to the

2    extent necessary to promote efficiency and integrity in the

3    discharge of official duties," citing *Lane v. Franks*, *Pickering*,

4    and *NTEU*.

5              THE COURT:  I understand.

6              Anything additional on that point, Mr. Bartolomucci,

7    in terms of whether it's before me?

8              MR. BARTOLOMUCCI:  Yes, Your Honor.

9              I've been looking at their memorandum while we've been

10   speaking, and I have to say I don't think a *Pickering* argument

11   is advanced in it.  They cite *Pickering* in two places, once on

12   page 24 which is part of the overbreadth argument, and then they

13   cite *Pickering* a second time on page 29, but that's in

14   subsection D which is addressed to the task force amendments.

15             So the way I read this brief --

16             THE COURT:  Well, let -- Mr. Bartolomucci, let me ask

17   you, because I'm a little bit confused.  We have a statement of

18   facts, so it's clearly not just gratuitous information regarding

19   the timetable and facts because that's clearly delineated at the

20   start of the motion.

21             I then have -- because that's how I outlined it for

22   purposes of today's hearing.  I have four sections, A through D.

23   One is listed as unbridled discretion; one is listed as

24   overbreadth; one is listed as viewpoint discrimination.  I

25   outlined subsection D.  Since I had four claims listed, I

1   identified A through D, as a separate section.

2          Setting aside any other reference to *Pickering*, what

3   am I supposed to view subsection D as, just gratuitous

4   commentary, or since it was set off as a fourth claim like the

5   other three, that it's some sort of claim?

6          MR. BARTOLOMUCCI:  Your Honor, the way I construe

7   section D is along the lines of the changes to the policy in

8   late November don't alter the prior analyses.  So this is kind

9   of an argument that, Hey, our arguments are not moot; they don't

10  suffer for lack of ripeness.  So I see this just as an

11  elaboration on the prior three theories.

12         And, you know, my suggestion would be that, you know,

13  if you want to consider a full-blown, you know, *Pickering*

14  balancing claim, perhaps that should be the subject of

15  additional briefing.  Because I -- I, for one, didn't see that

16  clearly telegraphed in their motion.  I only see the three

17  theories as before the Court.

18         THE COURT:  Except for the fact in your brief you take

19  the remarkable position that a University professor has no First

20  Amendment rights because -- if it relates to their expertise as

21  a professor.  If that's not a *Pickering* analysis, what is it?

22         MR. BARTOLOMUCCI:  Well, Your Honor, that was really

23  an introduction and by way of putting the *Hoover* case in

24  context.  The brief argued -- began by arguing that the *Hoover*

25  case was a similar type of case and, therefore, should get some

1    consideration.

2             But I think the three claims that they advanced are in

3    A, B, and C.

4             THE COURT:  All right.  Let me find out from you --

5    because I believe it is in front of me.  But if you believe you

6    need to provide additional briefing, I can certainly accommodate

7    additional briefing on that.  And I can -- I mean, I set this on

8    an expedited basis.  I can get briefing done on an expedited

9    basis, and I can circle back and address that on expedited basis

10   in an abundance of caution.

11            If you believe that was confusing, then I'm happy to

12   afford you additional time to brief that issue.  How much time

13   do you need to brief -- we are going to proceed forward with the

14   balance of this hearing, and then we are going to continue the

15   hearing and reset it once you file your papers.

16            How long do you need to file supplemental papers?

17            And I want to make plain, I believe it's before me,

18   but I'm also going to want to make sure everybody has a full and

19   fair opportunity to be heard.

20            MR. BARTOLOMUCCI:  We would only need a few days,

21   Your Honor.  I would propose to file a short brief by Wednesday

22   of next week.

23            THE COURT:  Give me one second, please.

24        (Pause in proceedings.)

25            THE COURT:  Mr. O'Neil, we are going to continue

1  through this hearing and address all issues, but I will allow

2  Mr. Bartolomucci, to the extent he said he didn't address it

3  fully because he didn't view the claims that way, if he files

4  it, I'll be prepared to set a continuation of this hearing

5  almost immediately.

6        But if he does it by next Wednesday -- do you wish to

7  file a reply to whatever he files the next day if he files it on

8  Wednesday?

9        MR. O'NEIL:  Yes, we would like to have the

10 opportunity to do that.  And if we believe there is anything in

11 there warranting a response, we can have it in the following

12 day.

13       THE COURT:  All right.  So I'm going to --

14 Mr. Bartolomucci, I am going to -- we are going to continue with

15 this hearing, but I'm going to continue the hearing to allow you

16 to file additional briefing.  And I want to make plain it's

17 different between me saying that's raised in the briefs as a

18 separate theory versus not allowing void-for-vagueness under the

19 Fourteenth Amendment which simply was not plead.  Those are two

20 distinct things.  That's why I'm treating those issues

21 differently.

22       So Mr. Bartolomucci will have until Wednesday the 12th

23 to file supplemental papers.  And then the plaintiff can file

24 whatever response they want on the 13th.

25       I then will set this for a telephonic hearing on

1    Friday, January the 14th, at 2 p.m.  I was supposed to be out of

2    town attending a ceremony on that day, but I have a family

3    emergency and I can't leave town on that day, so we will conduct

4    the hearing that day at 2 p.m.

5             I'm setting it later in the day to afford myself an

6    opportunity to fully digest what was filed the night before.

7    It's not a criticism, Mr. O'Neil or Mr. Bartolomucci, but what I

8    found when I give a deadline to lawyers, they take it to mean

9    that they should file it at midnight, at the last possible -- or

10   11:59, the last possible second.  And while I work very, very

11   long hours, I would hope to read it at 5 a.m., not stay up all

12   night and read it.  So I want to give myself some time to digest

13   whatever y'all file in response.

14            But I also understand, Mr. O'Neil, you and

15   Mr. Bartolomucci have other commitments.  So let me turn to you,

16   Mr. O'Neil, and find out, Are you available for a continuation

17   of this telephonic hearing -- and we are not done today -- but

18   to address *Pickering* at 2 p.m. on Friday, January the 14th?

19            MR. O'NEIL:  Yes, Your Honor.

20            THE COURT:  Mr. Bartolomucci, are you available?

21            MR. BARTOLOMUCCI:  Yes, I am, Your Honor.

22            Thank you.

23            THE COURT:  Thank you.  So we'll do that.

24            Let me do this.  It's been 50 minutes.  I know I tend

25   to talk fast.  My court reporter has a bit of a horrified look

1    on her face right now.  I'm going to put y'all on hold for just,

2    like, three minutes.  And we'll -- about every 45 minutes we'll

3    take a brief break.

4            While we are all talking, we are not having to type

5    while we talk.  So out of respect to her, I'm going to take a

6    three-minute break.  I'm going to put y'all on hold, but I need

7    y'all back -- use this as a comfort break.  We'll be back on the

8    line -- let's say five minutes.

9            It's 10:19.  We'll come back at 10:24.

10            Thank you.

11       (Recess taken at 10:20 AM.)

12       (Resumed at 10:25 AM.)

13            THE COURT:  All right.  We are back on the record.

14            Do I have Mr. O'Neil?

15            MR. O'NEIL:  Yes, Your Honor.

16            THE COURT:  Do I have Mr. Bartolomucci?

17            MR. BARTOLOMUCCI:  Yes, Your Honor.

18            THE COURT:  All right.  Let me pause here because I

19    don't want to conflate.  I was trying -- and I don't think I

20    articulated it particularly well.  I was trying to distinguish

21    between my ruling on a void-for-vagueness claim, which is a

22    claim and a separate claim, which is why I was not permitting it

23    since it wasn't properly plead, versus talking about *Pickering.*

24    *Pickering* is not a claim.  *Pickering* is a test that applies when

25    you're claiming -- government employee is claiming their First

1    Amendment rights are being violated.

2          What I'm permitting is additional briefing at the

3    request of Mr. Bartolomucci on the application of that

4    well-recognized test of First Amendment claims, which is

5    different from me saying -- and that's what I was trying to say

6    before, which I don't think I articulated particularly well --

7    versus not allowing a claim which is a stand-alone claim that

8    was not plead.

9          In this case, clearly, we have government employees

10   claiming their First Amendment rights were violated.  *Pickering*

11   is a test, not a theory or a claim.  So I want -- that more

12   clearly distinguishes between why I was doing what I was doing

13   and why I was treating one different than the other.

14         But, Mr. O'Neil, any further clarification on that

15   point?

16         MR. O'NEIL:  No, Your Honor.

17         THE COURT:  Mr. Bartolomucci?

18         MR. BARTOLOMUCCI:  No, Your Honor.  Understood.

19         THE COURT:  Okay.  Thank you.

20         All right.  Let me, then, go through, again in no

21   particular order, since we've established sort of the contours

22   of the relief sought, the nature of the policies that are being

23   challenged as it relates both to amicus briefs as well as

24   serving as experts.

25         But -- Mr. Bartolomucci, you may have said you were

1    just placing the viewpoint or content discrimination in context,

2    but you do make the argument that a government employee, in this

3    case a state employee, arguably has no First Amendment right

4    when they're speaking because it relates to their job as a

5    government employee.

6            And so I want to start with the *Lane* case, which you

7    really don't address in your papers.  And I understand, by the

8    way, that was a question that had -- had been raised in some

9    dissents.  It's an open question about -- like in the '90s --

10   what has the U.S. Supreme Court said about a state employee who

11   wishes to make some statement against their employer?

12           But wasn't that argument foreclosed in *Lane*?  Did not

13   the U.S. Supreme Court explicitly hold that just because what

14   you are doing derives from your work as an employee or a

15   professor doesn't make it -- throw it outside the ambit of the

16   First Amendment?  I mean, didn't the U.S. Supreme Court say that

17   directly?

18           I mean, I know you cite a dissent from Scalia.  And

19   last time I checked, a dissent is not binding authority on me.

20   It's the opposite of binding authority.  It's not the law of the

21   case -- I mean, it's not the law as announced in a case.  Law of

22   the case is a distinct legal concept.

23           So how do I square your reliance on that dissent

24   with *Lane* which explicitly addresses the issue?  Because I am

25   bound by majority decisions of the U.S. Supreme Court.

```
1              MR. BARTOLOMUCCI:  Your Honor, the section of our
2    brief that I think you're talking about was an introduction to
3    an argument addressing the three specific theories advanced by
4    the plaintiffs.  And the introduction, you know, began with the
5    discussion of the occurrence in the *Hoover* decision to point out
6    that cases like this one raise a number of unsettled issues,
7    including the fact that in the *National Treasury Employee*
8    opinion case the -- the speech of the government employees at
9    issue had -- had nothing to do with their -- with their
10   government job.
11             And, you know, that -- that is not the case here.
12   We're talking about --
13             THE COURT:  Well --
14             MR. BARTOLOMUCCI:  -- a speech that --
15        (Indiscernible crosstalk.)
16             THE COURT:  Again -- again -- again, Mr. Bartolomucci,
17   I want a direct answer to a very direct question.
18             You just cited *Hoover*, which is not Scalia's dissent.
19   It's a Fifth Circuit -- and he was not on the Fifth Circuit.  He
20   was on the U.S. Supreme Court.  So I was referring to a
21   different reference in your brief.  But let's go with *Hoover*.
22             *Hoover* did -- and that's what I said.  There were
23   opinions that raise the issue that it was an open question, and
24   in *Hoover* it actually said -- we need not address it is what the
25   concurring decision said, but that was from 1998.  And while in
```

1    some -- many ways our world is turned upside down as it relates

2    to facts and science and other things, last time I checked, 2014

3    came after 1998.  I still think calendars work, at least.

4            So help me to understand, since we are talking about

5    whether government employees have First Amendment rights,

6    whether you label it as your introduction or not, you make what

7    I believe is a remarkable suggestion that they don't if it

8    relates to their expertise as professors.  And you cite -- and

9    we'll talk about, for example, *Hoover*.

10           But what I'm asking is a very direct question.  And

11   you can say, Judge, it's distinguishable; it has nothing to do

12   with it, or, Judge, I just don't like the decision.  Whatever

13   your answer wants to be, I just want a direct answer.

14           How does *Lane* not foreclose that argument?

15           MR. BARTOLOMUCCI:  Well, let me be clear, Your Honor,

16   government employees do have First Amendment rights.  I never

17   meant to suggest anything to the contrary --

18           THE COURT:  Hold on a second.

19      (Indiscernible crosstalk.)

20           THE COURT:  I had a much narrower -- hold on.  I had a

21   much narrower statement:  You don't have rights when it relates

22   to the expertise or is related to your work as a government

23   employee?  That's much narrower than saying you have no First

24   Amendment rights at all.

25           MR. BARTOLOMUCCI:  Your Honor, I believe the only

1    sentence I said in the brief on this topic was that no

2    University of Florida employee has a constitutional right, you

3    know, both to work for the Gator and to feed their employer to

4    one.  It was a metaphorical point, but that is not the

5    University's policy.

6            The University's policy permits a wide range of

7    outside activities, including speech activities, because the

8    University is committed to robust academic freedom and to the

9    First Amendment --

10           THE COURT:  Unless you say something that offends the

11   Governor, the board of trustees, or the state legislature;

12   right?

13           MR. BARTOLOMUCCI:  I'm sorry.  Your Honor, could you

14   repeat that question?

15           THE COURT:  Yes.  Unless you say something that

16   offends the Governor, the State, or the majority in power in the

17   Florida Legislature, in which case your First Amendment rights

18   end; right?

19           MR. BARTOLOMUCCI:  Your Honor, I don't know how that

20   question relates to the record.  There's -- there's nothing in

21   the record to establish that First Amendments rights are

22   squelched, you know, because some external party, you know,

23   doesn't like the speech --

24           THE COURT:  So is it just a --

25           (Indiscernible crosstalk.)

```
1              THE COURT:  Hold on, Mr. Bartolomucci.

2              Mr. Bartolomucci, what's in the record before me --

3    and maybe I'm wrong, and you can correct me if I'm wrong, and

4    maybe it's just a koinkydink -- but professors for decades have

5    been permitted to serve as experts and they've been permitted to

6    serve as experts in all manner of -- on all manner of topics,

7    including controversial topics.  But suddenly, lo and behold, we

8    are talking about election laws and COVID, and suddenly the

9    rules are changed and they are not allowed to speak.

10             You then have the head of the board of trustees that

11   announces that you're not going to be able to -- we are -- the

12   reason why we are ranked and doing as well as we are as a school

13   is because we are getting so much money from the University -- I

14   mean, from the Florida Legislature and the support of the

15   Governor and so we can't offend them.  And that's been

16   explicitly articulated by the head of the board of trustees even

17   after this litigation began.

18             So help me to understand why there isn't anything in

19   this record to suggest that's exactly what's going on?

20             MR. BARTOLOMUCCI:  A couple of comments, Your Honor.

21   First, the University approved the three requests submitted by

22   Plaintiffs Austin, McDonald, and Smith.  And that was even

23   before it adopted a revised policy which is much more favorable

24   to faculty members and which is the only policy at issue today.

25   The only claim here is for injunctive relief.
```

1          The comments of the board of trustees chairman, I

2     think you have misconstrued, Your Honor, with respect.  He did

3     express some frustration, but it was not aimed at the plaintiffs

4     in this case.  He referenced faculty members taking second jobs,

5     using the University's state resources for their own personal

6     gain.  That's not this case.  He referenced a department chair

7     who tried to find a way for his faculty to avoid coming into

8     classrooms.  That's not this case.

9          And he referenced, quote, "faculty members who used

10     their positions of authority to improperly advocate personal

11     political viewpoints to the exclusion of others," end quote.

12     That doesn't describe this case either.  This case isn't about

13     the misuse of plaintiffs' positions of authority or their

14     advocacy of personal political viewpoints to the exclusion of

15     others.

16          The chairman's remarks don't mention the revised

17     policy at all.  He expressed not a hint of hostility toward the

18     revised policy.  So with respect, Your Honor --

19          THE COURT:  So with respect -- with respect --

20       (Indiscernible crosstalk.)

21          THE COURT:  With respect, Counsel, which generally

22     means "without respect."  Why don't you just delete that from

23     your hard drive because I know what "with respect" means.  I was

24     a lawyer as well.  But aside from being slightly offensive,

25     let's just not keep doing that.  So, Judge, I disagree will

1    suffice.

2             So context and timing of the statements are

3    irrelevant.  So as a fact finder reviewing the record in front

4    of me, context and timing are irrelevant?  Moreover --

5             MR. BARTOLOMUCCI:  I wouldn't say --

6             THE COURT:  -- I need to ignore --

7             MR. BARTOLOMUCCI:  -- that --

8         (Indiscernible crosstalk.)

9             THE COURT:  I need to ignore what I tell every jury

10   that I ever charge:  Jurors shouldn't leave common sense at the

11   door, but the judge in this case serving as fact finder should

12   leave common sense at the door?

13            MR. BARTOLOMUCCI:  Your Honor, we are here on a motion

14   for a preliminary injunction.  As you know, plaintiffs bear the

15   burden of clearly establishing likely merits, success, and

16   irreparable injury.  And these comments by the chairman, you

17   know, made after the revisions to the policy I think do nothing

18   to support the plaintiffs' First Amendment claim or their claim

19   of injury.

20            THE COURT:  Can I take -- can I take --

21            MR. BARTOLOMUCCI:  I disagree with your --

22            THE COURT:  Sure.

23            MR. BARTOLOMUCCI:  -- reading of the remarks,

24   Your Honor.

25            THE COURT:  I understand, Mr. Bartolomucci.

1            That's just one point.  So let me turn on -- do you

2    agree or disagree that the law is well settled that I can take

3    judicial notice of a entity -- a governmental entity's website,

4    in this case the University of Florida website?

5            MR. BARTOLOMUCCI:  Yes, I believe you can.  And the

6    chairman's remarks are in the record --

7            THE COURT:  No, no, I'm not talking about the

8    chairman's remarks.  Why don't you wait before you start

9    assuming that I'm making a nonsensical statement.

10           The president of the University just gave an address

11   announcing that he was leaving, and -- not once, but twice, and

12   ended his remarks when he was leaving the -- announcing he was

13   leaving the University talking about how much he owed the

14   Florida Legislature and the Governor, not Governor Scott who was

15   the governor for the majority of time he was president of the

16   University, but the current governor, and the Florida

17   Legislature for funding UF's programs.  He said it in the middle

18   of his address.  He said it -- and ended his address that way

19   and repeated it.  It became a focus of his address.

20           Since President Fuchs is one of the defendants in this

21   case -- so that would overcome any hearsay objection.  And the

22   issue is why they are doing what they are doing; does it matter

23   that he's focusing on the success -- his success and the success

24   of the University because of funding?  And one of the issues in

25   this case is are you yielding to the legislature and the

1    Governor and political whims so you can continue to keep the

2    cash flowing?

3         A, do I take -- can I say judicial notice of that?

4    Because it seems to me that the reason why President Fuchs is

5    doing what he is doings is an adjudicative fact before this

6    Court.  And if it's not hearsay because it's a party statement,

7    I can take judicial notice of the website.

8         Does that matter?  A, can I consider it; and, B, if I

9    can, does it not matter; and if it doesn't, why not?

10         MR. BARTOLOMUCCI:  Well, I'm aware that the president

11    announced some future plans yesterday.  I haven't read his

12    remarks so I have to be careful about what I say about them.

13         I'm not sure that you can take judicial notice of a

14    matter that a party has not asked you to take judicial notice

15    of.  I haven't looked into that one way or the other --

16         THE COURT:  Well, hold on -- hold on -- hold on --

17         (Indiscernible crosstalk.)

18         THE COURT:  Let's --

19         MR. BARTOLOMUCCI:  -- if you want to consider the

20    president's remarks.

21         THE COURT:  Sure.

22         You can object, but let's read Rule 201 together.

23    "Taking judicial notice, Rule 201(c):  The Court, (1), may take

24    judicial notice on its own."

25         So, I mean, you may oppose it and say, Judge, you

1    shouldn't take judicial notice and here's why; or, B, Judge, for

2    some other reason, like hearsay or something or hearsay within

3    hearsay, you shouldn't consider it.  But the, Judge, you can't

4    take judicial notice without being asked -- I'm a strict

5    constructionist.  I absolutely believe in the plain language of

6    the Constitution, laws, as well as rules.

7         And Rule 201 itself says, quote, again, "The Court may

8    take judicial notice on its own."  So unless we -- maybe we

9    should kind of redline that section out.  But, otherwise, isn't

10   that the law?

11        MR. BARTOLOMUCCI:  I accept your reading of the law,

12   Your Honor, but since I haven't read the president's statement,

13   I'm not going to waive any arguments relating to it.  But I will

14   say it's not apparent to me based on your description of the

15   statement that it has any bearing whatsoever on this case.

16        THE COURT:  I understand.  All right.

17        Let me pause there.  Mr. O'Neil, I'll turn to you.  I

18   asked about the First Amendment and whether or not the

19   suggestion that somehow if you are an employee and you are

20   talking about something related to your expertise as an

21   employee, that that takes you outside the First Amendment.  And

22   I asked:  Does the *Lane* decision foreclose what amounts to,

23   quite frankly, a silly argument?

24        MR. O'NEIL:  It does.

25        THE COURT:  I'm sorry?

1          MR. O'NEIL:  I can elaborate.  I can elaborate, but

2     the short answer is, yes, it does foreclose that argument.

3          THE COURT:  All right.  Two, Mr. Bartolomucci says,

4     Judge, it's all smoke and mirrors.  Nobody has ever said or done

5     anything to suggest that the reason why experts for years

6     testified, testified in controversial matters, suddenly several

7     people were blocked, suddenly we have a revised provision that

8     says that if it's contrary to the State -- and I don't

9     necessarily think that's an unfair reading when Mr. Bartolomucci

10    had his clever little statement in his brief saying that a Gator

11    shouldn't be able to feed its employer to a gator, or whatever

12    the statement was.  It seems to me that's before me.

13         But if you could, is it true the record is completely

14    devoid of why this is being done?  And, alternatively, it may

15    be, Judge, it doesn't matter whether there's anything on the

16    record that suggests why it's being done or not.  Their intent

17    is immaterial to the claims that they were advancing.

18         MR. O'NEIL:  Your Honor, I'll address both.  The first

19    question, I think the record is overwhelming that it is (audio

20    feed glitch/indiscernible) that speech in these instances was

21    suppressed.  It would be suppressed.  It was viewed as

22    conflicting with, in some cases explicitly, according to the

23    defendants, the executive branch of the state.

24         THE COURT:  And what's before me?

25         Hold on.  Mr. Bartolomucci says, Judge, there is

1    nothing on the record.  You are just coming up with stuff, that

2    the record is completely devoid of anything along those lines.

3               What's in the record?

4               MR. O'NEIL:  The record contains the denials by the

5    defendants of speech requests.  And the stated basis for those

6    was that a position contrary to the State of Florida is a

7    conflict for the University of Florida.  It includes the speech

8    by the highest authority in the University, the chair of the

9    board of trustees, who very clearly states after the revisions

10   were put in place that the University, in his words, will not

11   tolerate conduct that is deemed offensive or unacceptable to the

12   University's funders in Tallahassee.  That includes statements

13   by Defendant Fuchs --

14              THE COURT:  Hold on.  Wait a second, Mr. O'Neil.

15              I'm confused.  So it wasn't just a general statement

16   about if you are violating or doing something with a conflict?

17   It specifically referenced funding?

18              MR. O'NEIL:  The statement about the denials does not

19   explicitly address funding --

20       (Indiscernible crosstalk.)

21              THE COURT:  No, no.

22              I'm talking about the chairman's statements, the

23   chairman's statements.

24              MR. O'NEIL:  It does reference a conflict of interest

25   of the University, and the interest that is identified there is

1    a conflict with the executive branch of the state.

2           THE COURT:  Yeah, I was asking about the chairman's

3    statements.  The chairman's statements, I thought I heard

4    earlier, they were completely innocuous and had nothing to do

5    with funding and alienating the legislature?

6           MR. O'NEIL:  They are very clearly about not

7    compromising faculty activity that would alienate or frustrate

8    the legislature and thereby deprive the University of its

9    funding sources.  I'm speaking now about page 11 of the speech

10   where he contributes the overwhelming majority of our faculty

11   with some taking advantage of their positions.  He said --

12   speaking of faculty members taking second jobs, using the

13   University's resources, speaking about faculty members using

14   their positions of authority to improperly advocate for personal

15   political viewpoints.

16          And then he says (audio feed glitch/indiscernible)

17   this behavior is unacceptable; it's disrespectable not only to

18   the taxpayers of Florida whose hard-earned dollars pay faculty's

19   salaries and it's also disrespectful to other faculty.  And he

20   then proceeds to say, Our legislators are not going to put up

21   with (audio feed glitch/indiscernible) resources and neither is

22   this board.

23          So it very clearly ties activities that the

24   legislators do not like and view as improper use of a

25   professor's position with a threat to the University's funding.

```
 1            THE COURT:  Let's move on to another topic, and then
 2   I'll ask you and then Mr. Bartolomucci will respond.
 3            I want to find out -- based on your argument of
 4   unbridled discretion under Lakewood, I understand there's no
 5   time limit, correct, and that's a problem recognized
 6   in Lakewood; correct?
 7            MR. O'NEIL:  Both in Lakewood, but more specifically,
 8   Your Honor, in Barrett.
 9            THE COURT:  Right.  All right.  And --
10            MR. O'NEIL:  Barrett is very --
11            THE COURT:  And then -- and I'm going to want
12   Mr. Bartolomucci to address Lakewood and Barrett on time limits,
13   but I also will want Mr. Bartolomucci as it relates to the
14   unbridled discretion claim to address the ruling in Lakewood
15   that explicitly states that you don't have to apply and that it
16   is not necessary to state a claim and be denied to state a claim
17   for unbridled discretion in violation of the First Amendment
18   under Lakewood prior restraint.  I need him to address those two
19   things.
20            But what I need you, Mr. O'Neil, to address under
21   unbridled discretion is help me to understand if the University
22   of Florida says that there's a presumption that you get to serve
23   as an expert, the University of Florida says that you've got to
24   articulate a reason by clearly and convincing evidence that --
25   why you are going to deny the request to overcome that
```

1      presumption.  With those qualifications, why do those

2      qualifications not distinguish this case from *Lakewood* and make

3      it not unbridled discretion?

4              So I need you to respond to that.  Then, certainly,

5      Mr. Bartolomucci can comment on that, but then I need him to

6      comment on the other two aspects of *Lakewood* and *Barrett* that I

7      mentioned.

8              MR. O'NEIL:  So, Your Honor, putting aside the time

9      limit issue, what *Lakewood* requires is a narrow, definite, and

10     objective standard by which the licensor's discretion will be

11     guided.  There is --

12             THE COURT:  And let me -- and let me ask you a

13     question.  As I understand it, your position is an important and

14     particularized interest of the University giving nobody notice

15     of anything is a nonstandard standard.  Is that correct?

16             MR. O'NEIL:  It's undefined.  I mean, there is the,

17     you know, task force provision (audio feed

18     glitch/indiscernible) -- you have the original policy attempted

19     what the interest is (audio feed glitch/indiscernible) --

20         (Reporter requested clarification.)

21             THE COURT:  Mr. O'Neil, you are breaking up.  We can't

22     hear you.  Do you have us on speaker?

23             MR. O'NEIL:  I don't, Your Honor.

24             THE COURT:  Is that --

25             MR. O'NEIL:  Can you hear me?

1          THE COURT:  You need to repeat what you just said.

2    The court reporter got none of it.

3          MR. O'NEIL:  Yes.  Sorry, Your Honor.

4          So what *Lakewood* and also *Forsyth County* require is

5    narrow objective investment standards.  I think you heard that

6    part.

7          What I just said was that it does not help at all that

8    the standard -- that the interest the institute puts forward

9    needs to be important and particularized.  The whole question is

10   what is an interest?  And nowhere in the policy does it try to

11   define that.  And the context and the record that we are

12   discussing makes very clear that in the University's mind an

13   interest includes the interest and not alienating legislators,

14   which is exactly the kind of interest that the University cannot

15   rely on both under *Pickering* and just on general principles of

16   viewpoint discrimination.

17          But in terms of unbridled discretion --

18          THE COURT:  Well, let me --

19          MR. O'NEIL:  -- the law --

20          THE COURT:  Let me ask you a question, Mr. O'Neil.

21   Isn't -- and I'm going to want Mr. Bartolomucci to respond to

22   this as well.

23          It just seems to me, isn't that the ultimate viewpoint

24   discrimination if you are saying there's a presumption that you

25   can serve as an expert whenever you want?  We have people for

1   decades that have served as experts.  You can continue to be

2   experts on pesticides, on teaching standards, on all manner of

3   noncontroversial topics, but we've carved out and we've now

4   clarified our policy to say we are really going to give

5   ourselves the ability, though, to stop speech when it could hurt

6   our bottom line as the University because it could alienate the

7   people that fund the University.

8          Just help me to understand, why is that not the

9   ultimate viewpoint discrimination if it's set up in such a way

10  where there's a presumption there will be no restriction unless

11  you are truly offending somebody?

12         Mr. O'Neil?

13         MR. O'NEIL:  I'm sorry, Your Honor.  Is that a

14  question for me or Mr. Bartolomucci?

15         THE COURT:  That's a question for you, although I

16  guess it's not much of a question.

17         MR. O'NEIL:  It is.  As we know from (audio feed

18  glitch/indiscernible) --

19     (Reporter requested clarification.)

20         THE COURT:  Mr. O'Neil, the court reporter is not

21  getting what you are saying.  You are breaking up.  I may need

22  you to call back in because we cannot -- you are simply not --

23  we can't hear you.

24         MR. O'NEIL:  Okay.  Is this any better?

25         THE COURT:  Now it is.

1          MR. O'NEIL:  Your Honor, that is the ultimate

2   viewpoint discrimination.  And the University, the defendants

3   have had every opportunity when they revised the policy in this

4   briefing to say, We will never rely as an interest on the

5   reactions of legislators or others, other political actors, to

6   the speech as a basis for suppressing it.  They haven't said

7   that.

8          That would be the bare minimum, first step, toward

9   making this a constitutional policy.  They have retained that

10  interest because, as the board chair's speech makes clear, they

11  believe that they are entitled to do it.

12         THE COURT:  All right.  Mr. Bartolomucci, let's -- you

13  can do it in whatever order, but I do want you to address the

14  issue, one, about whether or not to apply the unbridled

15  discretion challenge or theory, or however you want to

16  characterize it, that *Lakewood* says you do not have to apply for

17  and be denied in order to advance a prior restraint claim.

18         Number two, address Mr. O'Neil's argument that, Judge,

19  under the case law you have to have something beyond -- for it

20  to be a standard, something beyond important and particularized

21  interest.  And you can address those in whatever order you want,

22  sir.

23         MR. BARTOLOMUCCI:  Thank you, Your Honor.

24         And I think the revised policy is clear that there's

25  neither viewpoint discrimination nor unbridled discretion.  The

1   policy -- the revised policy as it relates to expert witnesses

2   says there's a strong presumption in favor of approving expert

3   witness requests, quote, "regardless of the viewpoint of the

4   faculty or staff members' testimony," end quote.

5           And the policy also makes clear that it applies,

6   quote, "in all litigation in which the State of Florida is a

7   party," quote," and in all cases," quote," that challenge the

8   constitutionality or legality," end quote, of a Florida law.  So

9   there is no viewpoint discrimination and there is also no

10  unbridled discretion.  In fact, it's almost the opposite.

11          There is a heavy burden on the University to overcome

12  the strong presumption that expert witness requests will be

13  approved.  And the policy goes on to explain their requests may

14  only be denied when clear and convincing evidence establishes

15  that the testimony would conflict with an important and

16  particularized interest of the University, which the University

17  must set forth in writing and explain.

18          And on the motion for preliminary injunction --

19          THE COURT:  Mr. Bartolomucci --

20      (Indiscernible crosstalk.)

21          THE COURT:  Mr. Bartolomucci, what interest -- is it

22  the position -- and it may be a correct position.  That's yet to

23  be determined.

24          But is it your position that by having -- stating that

25  there has to be just a particularized interest that that's,

1   under the case law, specific enough?

2          MR. BARTOLOMUCCI:  It is, Your Honor.  The discretion

3   has to be unbridled if it's going to give rise to a First

4   Amendment problem, and here the discretion is extremely bridled;

5   there's the heavy burden, the clear and convincing evidence

6   standard, the strong presumption.

7          So on a motion for a preliminary injunction where

8   plaintiffs bear the burden of clearly establishing likely merit

9   success, I don't think they can do that now.  Maybe at the end

10  of this case they can, after discovery, but on a motion for

11  extraordinary relief challenging the policy on its face where

12  the policy facially establishes a heavy burden, a strong

13  presumption, and the clear and convincing evidence standard, I

14  just don't see how the unbridled discretion claim can be said to

15  likely succeed in this case.

16         THE COURT:  And I understand --

17      (Indiscernible crosstalk.)

18         THE COURT:  I understand your view.  And I actually

19  started by asking Mr. O'Neil, of course, that very question.

20         But what says you to the fact that it doesn't have a

21  time limit?

22         MR. BARTOLOMUCCI:  Thank you, Your Honor.  There are

23  three points I'd like to make about timing.

24         First, the record here shows that outside activity

25  requests typically are decided in three days or less.  Sometimes

1    it takes longer sometimes due to the need for the requestors to

2    submit additional information, but there are several examples in

3    the record of these plaintiffs' requests being approved in three

4    days or less.

5              Professor Reid and Professor Nunn made requests in

6    July 2020.  Both were approved in two days --

7              THE COURT:  What does the case law say --

8         (Indiscernible crosstalk.)

9              THE COURT:  Help me here.  And you are absolutely

10   right, the record does show that -- those requests and the

11   timing.  And I'm -- if Mr. O'Neil thinks otherwise, he can say.

12   But I absolutely agree that's what the record shows in front of

13   me.

14             But what does the case law say about the discretion

15   such that there's not a specific time requirement versus

16   evidence that historically it's been done quickly?

17             Is there any case law that says what matters is not

18   whether there's a limit, but how you've previously exercised

19   your discretion?

20             MR. BARTOLOMUCCI:  Well, in the *Barrett* case, the

21   school board superintendent had exercised his unbridled

22   discretion to run out the clock on Mr. Barrett's request for a

23   meeting which prevented him from speaking at the school board

24   meeting.  And it was necessary to the Court's decision in that

25   case that his rights had been violated in that respect in the

1    past.  Here there was no evidence at all that the University has

2    ever slow-walked a request to run out the clock.

3              THE COURT:  What about Dr. Goldhagen?

4              MR. BARTOLOMUCCI:  Doctor Goldhagen's August 11th

5    request was acted on in one day.  Now, it was denied, but that

6    was not a time problem.  Professor McDonald submitted a request

7    under the new policy on December 7th, and it was approved three

8    days later.

9              So given the facts that are in the record and the

10   absence of any evidence that this has ever been an issue, I

11   don't see how a preliminary injunction can be granted based on

12   the lack of a timing cap within the policy.  There's just no

13   factual basis to support granting relief, and we know that facts

14   are everything in a First Amendment case.  First Amendment cases

15   are incredibly fact sensitive.

16             And, yes, there's no time limit in the policy, but

17   there's also no evidence that this has ever been an issue or a

18   problem, or that the University has ever done anything nefarious

19   with respect to timing.  There's a full-time assistant vice

20   president for conflicts whose job is to process these requests.

21   That's his whole job.

22             The University makes it very simple and easy to submit

23   an outside activity request.  It's an electronic process.  You

24   answer a few questions "yes" or "no" and you explain your

25   proposed activity.  You upload any relevant documents you have,

1   and that's all there is to it.

2        So there's just -- I'm very surprised to hear that

3   there's a possible First Amendment violation on a timing theory

4   when this has never been an issue for these plaintiffs, or, as

5   far as I know, anyone else.

6        THE COURT:  Thank you.

7        Let me ask before you turn to the next issue,

8   Mr. O'Neil, what says you with respect to the status of the law

9   as it relates to does it matter how it's drafted and whether

10  it's open-ended or how it's been applied for purposes of a prior

11  restraint challenge based on the fact that there's no time

12  limits?

13       Does it matter how it's applied, or what do we look

14  to, and what does the case law teach us?

15       And it would be helpful if somebody at some point

16  actually cites to binding authority from the Eleventh Circuit or

17  the U.S. Supreme Court.  There's an awful lot of cites to

18  concurrences and dissents and nonbinding authority.

19       But do you have any binding authority that addresses

20  that point?

21       MR. O'NEIL:  So, Your Honor, in *the Lakewood* Supreme

22  Court case, the defendants there, the City, argued -- and the

23  Court recounts the argument, "The City asks us to presume that

24  the mayor will deny a permit application only for reasons

25  related to..." permissible reasons.  And the Court says, This

presumes the mayor will act in good faith and adhere to

standards absent from the ordinance's face.  But this is the

very presumption that the doctrine for unbridled discretion

disallows.  The doctrine requires that the City claims are

implicit in its law be made explicit...

So the fact that the University believes that the time

limit is not a problem does not remove the unbridled discretion

if those time limits are not contained in the policy itself.

THE COURT:  All right.

MR. O'NEIL:  I would also note that while it is true

that the University quickly denied the requests of these

plaintiffs, there would have been no reason for them to drag

their feet because they were denying it and they believed they

were entitled to deny it.  In a situation where -- where they

knew that there was going to be significant repercussions for a

denial, it's much more -- much more of a concern that they would

simply drag their feet on approving.

THE COURT:  All right --

MR. O'NEIL:  Your Honor, I --

THE COURT:  Hold on.  Let me turn to --

MR. O'NEIL:  I --

THE COURT:  I'm sorry, Mr. O'Neil.  Go ahead.

MR. O'NEIL:  Could I -- Your Honor, if I could make

just a couple of other points on some of the previous questions

you asked Mr. Bartolomucci?

1          THE COURT:  You can, but --

2       (Indiscernible crosstalk.)

3          THE COURT:  Let me pause here to say --

4          MR. O'NEIL:  -- that issue and on the unbridled

5    discretion on the standards.

6          THE COURT:  Hold on one second.

7          Mr. Bartolomucci, I want to give everybody a full and

8    fair opportunity.  So as soon as Mr. O'Neil is done, you can

9    respond to anything he's said and you can also respond to his

10   statement about *Lakewood*.  Because I agree with your statement,

11   Mr. Bartolomucci, about the state of the record as it relates to

12   timing of the requests that are at issue.  I don't think that

13   could be reasonably challenged.  It is what it is.  But I do

14   want you to respond to his argument in terms of what *Lakewood*

15   means.

16         But, Mr. O'Neil, first finish your points, and then I

17   want to give Mr. Bartolomucci an opportunity to be heard.

18         MR. O'NEIL:  Thank you, Your Honor.

19         I also wanted to point you to *Granite State Outdoor*

20   *Advertising*.  It's an Eleventh Circuit case from 2003 that's

21   cited in *Barrett*.  And *Barrett* characterizes *Granite State* this

22   ways:  "Under the *Granite State* framework, if the prior

23   restraint is content based, then the lack of a time limit

24   necessarily renders the prior restraint unconstitutional."

25         This is a prior restraint; it is content based, and so

1   under *Granite State* it is invalid, necessarily unconstitutional

2   for that reason.

3            THE COURT:  Well --

4            MR. O'NEIL:  Then I would like to --

5            THE COURT:  Hold on, Mr. O'Neil.

6            But Mr. Bartolomucci says it's not content based

7   because it says it's presumed that you can testify as an expert

8   and that -- and so forth.  And that it's not -- based on the

9   limitations placed on it, he argues it's the opposite of content

10  based.

11           What says you to his description of the actual policy

12  recommendations that were incorporated that add a gloss?

13           What says you to that?

14           MR. O'NEIL:  Under the law it is -- it is pretty

15  clearly content based.  The question of whether it's content

16  based turns on whether the licensor, here the approver, has to

17  view or consider the consent of what the person is going to say

18  in order to approve or deny.

19           There's, I think, no question that the content of this

20  speech is going to be relevant.  Mr. Bartolomucci argues that

21  the new policy prohibits viewpoint discrimination, and I

22  strongly disagree with that.  It establishes a strong

23  presumption and favors speech generally.

24           So everybody gets -- is entitled to that strong

25  presumption, but the question is how are viewpoints treated

1   relative to one another?  And on the University's websites, as

2   the statute has -- as the policy has been applied, as was clear

3   from the speech that the board chair gave, the University

4   subjects speech that is deemed adverse to the University to a

5   higher standard of scrutiny.  Those are the University's words,

6   a higher standard of scrutiny.

7            So it does continue to discriminate against certain

8   viewpoints even if there is a strong presumption across the

9   board.

10           THE COURT:  Let me pause here to ask you -- and then

11  again, Mr. Bartolomucci, you can add this to his list.  I'm not

12  quite sure -- and this goes to a different issue but is

13  related -- how the two professors that have been allowed -- have

14  had approvals that are now plaintiffs, one has been allowed to

15  serve on a committee and the other is being allowed to testify

16  about something in -- or serve as a consultant on a matter

17  related to New Jersey.

18           How is the testifying as an expert on matters

19  involving the State of Florida implicated by the fact that a

20  professor is allowed to do something in New Jersey?

21           MR. O'NEIL:  It's not, Your Honor.  Neither of those

22  activity requests has anything to do with the issue that they

23  are suing about.

24           THE COURT:  Okay.  All right.

25           Let me -- Mr. Bartolomucci, I also want to give you

1    time to go through your notes.  Let me go ahead -- we are going

2    to take another five-minute break.

3            When we come back, you have the floor and you can do

4    them in whatever order you want, both adding to what you've

5    already told me and responding to anything Mr. O'Neil has said;

6    okay?

7            MR. BARTOLOMUCCI:  Thank you, Your Honor.

8            THE COURT:  Thank you.

9        (Recess taken at 11:06 AM.)

10       (Resumed at 11:16 AM.)

11           THE COURT:  Thank you for holding.

12           Mr. Bartolomucci, you have the floor.

13           MR. BARTOLOMUCCI:  Thank you, Your Honor.

14           Just a few quick points.  My friend Mr. O'Neil read

15   portions of *Lakewood* and *Granite State*, and what I heard him

16   read is that a lack of a time limit is a problem if the

17   challenged policy is viewpoint based or content based and

18   that -- or -- or gives unbridled discretion.  And as I've

19   explained, the policy -- the revised policy here, which is being

20   challenged on its face, is not content based; it's not viewpoint

21   based and doesn't give unbridled discretion.

22           The policy expressly says that the presumption in

23   favor of approving expert requests applies regardless of the

24   viewpoints of the faculty members' testimony.  The lack of

25   unbridled discretion is shown by the strong presumption in favor

1    of permitting expert work and the heavy burden on the University

2    to overcome it.

3             And as to content based, I would point the Court to a

4    passage of *Tracy versus Florida Atlantic University Board of*

5    *Trustees*.  And this is 980 F.3d, page 808, quote, "That

6    University officials must perform a cursory examination of a

7    professor's speech content -- which is at most what the policy

8    requires to assess whether an activity qualifies as a

9    professional practice -- does not transform the reporting

10   requirement into a content-based regulation," end quote.

11            So it's not viewpoint based.  It's not content

12   based --

13            THE COURT:  Mr. Bartolomucci, help me -- let me ask

14   you this because it's going to tie into another question I have

15   for you, which is what it means and the mischief that's sought

16   to be avoided.

17            So I understand there's a strong presumption you can

18   serve as an expert, that you've got to show by clear and

19   convincing evidence and -- there has to be clear and convincing

20   evidence and it has to be in writing explained why you are not.

21            But what I'm trying to figure out is, unlike to

22   determine whether or not it's a conflict, here, in order to

23   ascertain whether it implicates an important and particularized

24   interest of the University, how could you do that without

25   exploring the content beyond a cursory review of the content?

1              And that's part of my concern, what does it mean to be

2      an important and particularized interest of the University.   And

3      it would be helpful to this Court -- and I know we are bleeding

4      over into *Pickering*, so if you want to punt until next Friday,

5      you can.   I'm trying to figure out what is the mis -- there's an

6      exception here when there is an important and particularized

7      interest.   What is the mischief that's being addressed?

8              Because, for the life of me, it's this amorphous --

9      it's kind of like that meme:   I know it's in Aspen because of

10     the way it is.   I mean, I know it's an important and

11     particularized interest because of the way it is.

12             You know, what does that mean?   And because you've got

13     that generalized standard, don't you actually have to explore

14     content more than just some cursory review?

15             And I'm not -- that's not a ruling or a statement;

16     it's a question.

17             MR. BARTOLOMUCCI:   Well, I mean, this a newly revised

18     policy.   Plaintiffs want to paint a preliminary injunction.   You

19     know, there are questions about the policy, to be sure, because

20     it's brand new, but it's the plaintiffs' burden to demonstrate

21     clearly that they are entitled to relief.

22             So, you know, the fact that they're trying to get an

23     injunction, you know, now versus at the end of discovery is a

24     relevant consideration here.   They haven't deposed any

25     University officials to try to snuff out what some of the

1   language means.  So I think this request for relief comes too

2   soon.

3            THE COURT:  Well, Mr. Bartolomucci --

4   Mr. Bartolomucci, that circle backs to a question I did have on

5   my list of questions I haven't gotten to, which it seems to --

6   and that may be where the law is heading, particularly in this

7   circuit, but you seem to suggest with First Amendment cases

8   there is effectively no pre-enforcement review.  And I don't

9   want to overstate what your papers say, but that appears to be

10  an undercurrent, and it seems to be an undercurrent related to

11  what you just said.  But I also want you to be able to have an

12  opportunity to say, No, Judge, that's not what I mean and here's

13  why.

14           MR. BARTOLOMUCCI:  That's not what I mean and here's

15  why.  They still have to prove as plaintiffs both actual and

16  imminent injury; in other words, irreparable injury, and likely

17  merits success.  So if their theory is unbridled discretion in a

18  facial challenge to a policy that puts a strong presumption in

19  favor of the plaintiffs, that's not unbridled discretion.

20           A claim that the policy on its face is viewpoint based

21  when it expressly says that the strong presumption applies in

22  favor of the faculty regardless of the viewpoint of the faculty

23  member's expert testimony, that's not the stuff with which

24  likely merits success is based.

25           THE COURT:  Mr. Bartolomucci --

```
1          MR. BARTOLOMUCCI:  So --

2          THE COURT:  -- let me ask you a quick question -- and

3    it's by analogy because it's not exact.  But there's a lot of

4    case law that talks about if the Florida Legislature, for

5    example, bans anybody of color from protesting in numbers more

6    than two people, that just because you have a savings clause

7    that says "but this is will not be interpreted in violation of

8    the First Amendment," that sort of savings clause language

9    doesn't save it.

10          So just because they say it's not viewpoint -- and the

11   answer may be, Judge, that's distinguishable and here's why --

12   why isn't that essentially tantamount to the savings clause

13   that's been rejected as a defense when a statute does it?

14          MR. BARTOLOMUCCI:  Well, Your Honor, what's missing

15   here compared to the matter you just described is that there's

16   no provision in the policy that says, you know, we can deny your

17   claim and we will deny it if we think that someone in

18   Tallahassee doesn't like what you are going to do.  There's no

19   provision in the policy that says that.

20          The first provision is the strong presumption.  And --

21          THE COURT:  But can I ask you a question --

22      (Indiscernible crosstalk.)

23          THE COURT:  -- Mr. Bartolomucci, and your answer may

24   be, Well, Judge, that's the stuff that ultimately would be

25   resolved through the development of the facts during discovery,
```

1    and I appreciate that response if that's what it is.

2         But here help me to understand.  Since there's never

3    been an issue with people testifying as experts on pesticides,

4    the, you know, saltwater intrusion, the development of oyster

5    beds in Apalachicola Bay and the thousands of times where

6    professors historically have served as experts, the fact that

7    you're saying there is a strong presumption, which there always

8    has been as evidenced by, as you keep talking about, the way

9    it's always been applied from the beginning of the University,

10   how -- how does that actually help?

11        It seems to me what it says is, Look, we are really

12   only going to do it under these very limited, narrow

13   circumstances, which seems to me to suggest, based on the plain

14   language of the new policy, unless you really offend somebody or

15   unless this is really a hot-button decision, this is when you

16   are allowed to do it.

17        It seems to me what they -- what they did was they

18   codified what they were doing which is only disallowing people

19   to testify when they were doing something that they thought was

20   a hot potato.  So -- and I'm not saying -- that's not a finding;

21   that's not a ruling.  I just -- I'm having trouble to see how

22   that narrowing language narrows it.  It seems to me that it

23   takes it closer to viewpoint discrimination, not farther away,

24   by saying the only time we want to allow you to serve as an

25   expert is when we identify something.

1          And I think the answer is, Judge, well, that

2    presupposes that an important and particularized interest is

3    synonymous with a political issue.  And, Judge, you don't get to

4    read that into that, and that's the failure of the plaintiffs'

5    argument of the disconnect is they're reading particularized

6    interest to equate with we could offend somebody in the

7    legislature.  And, Judge, that could mean a lot of other things,

8    and you don't get to just read that in there.  And they're not

9    synonymous, and that's the flaw with the plaintiffs' reasoning.

10         And, again, I don't mean to be arguing for you because

11   you may disagree with that view of it, but -- and I'm going to

12   let Mr. O'Neil respond -- but isn't that the response that it

13   is -- there's nothing that suggests that that phrase is

14   weaponizing you're offending somebody in the legislature?

15         MR. BARTOLOMUCCI:  Well, there's a lot in your

16   question, Your Honor, but a couple of things stand out.  The

17   strong presumption is new, so the policy has changed.  It's not

18   a mere codification of past practice.

19         And, second, I agree with you that I think the request

20   in plaintiffs' position reads too much into the language of the

21   policy.  And, again, on a facial challenge there is nothing in

22   the policy that says, If you offend, you know, someone who is a

23   big deal in Tallahassee, we are going to shut you down.  That's

24   not in the policy.  That's not stated anywhere, and they haven't

25   developed a record that would, you know, make it likely that

1    they'll be able to prove that that's -- that that's the way the

2    policy will operate going forward.  You know, again, they're

3    seeking injunctive relief.

4          You know, to the extent we look at the past, we can

5    see that their activity requests were approved, with the

6    exception of Dr. Goldhagen who is sort of a special case.  But

7    going forward, you know, what we have is the facial language of

8    the policy which on its face is very favorable to the

9    plaintiffs.

10         And I'm going to come back to this, you know; I think

11   on a motion for preliminary injunction, you know, they are not

12   there yet.  I think they have a lot of work to be done in

13   discovery to try to prove what they want to prove, but I don't

14   think that on an extraordinary motion they can get that relief

15   now.

16         THE COURT:  I understand.

17         Mr. O'Neil, two things you need to respond to.  It

18   sounds like I can never issue preliminary injunctions, one, so

19   respond to that.  And, number two, though, if you will, directly

20   respond to why do I read an important and particularized

21   interest of the University equates to limiting folks that offend

22   our Governor or the majority of our legislature?

23         MR. O'NEIL:  Your Honor, to address the first point,

24   the case law in the Eleventh Circuit is very clear that if there

25   is a constitutional violation of ongoing harm to First Amendment

1    rights, that is irreparable injury for purposes of preliminary

2    injunctive relief.  And I'm happy to go into the concrete and

3    particular evidence of a chilling effect that this policy has

4    exerted and it's continuing to exert.  I think the record is

5    clear on that.

6              I'd be happy to elaborate on it.

7              THE COURT:  Why don't you elaborate briefly.

8              MR. O'NEIL:  In terms of --

9              THE COURT:  Hold on.  Why don't you elaborate briefly

10   by way of example, but not an exhaustive list.

11             MR. O'NEIL:  Yeah.  I mean, I'll just start with, you

12   know, Professor Nunn who has declined a specific opportunity to

13   sign an amicus brief in the Supreme Court on an area of his

14   expertise.  He reports that his colleagues are reluctant to

15   participant in litigation because of the policy.

16             Those are just, you know, specific examples.  But this

17   Court in a preliminary injunction stage can take into account

18   and take judicial notice of the University's Faculty Center

19   Report which could not be clearer on this.  It says there was

20   palpable reticence and even fear on the part of faculty to speak

21   up, grave concern about retaliation, and an attempt that anyone

22   who objected to the state of affairs might lose his or her job,

23   to be punished in some way.  Faculty often engaged in

24   self-censorship and chose not to rock the boat for fear of

25   retaliation.

1          That is -- you know, the Court does not need to blind

2    itself to what is obviously going on and which the chair of the

3    board of trustees intentionally emphasized, which is that the

4    University will not tolerate activity by faculty that it does

5    not agree with.  And so, you know, I think the chilling effect

6    is quite clear.

7          And that actually segues to your second question about

8    the nature of what an interest is for the University.  We are

9    not making that up.  I mean, the University itself has equated

10   the interest of the executive branch of the State of Florida

11   with the interest of the University which is, you know, explicit

12   in the denial of Dr. Goldhagen's activity request.  Outside

13   activities that may pose a conflict of interest to the executive

14   branch of the State of Florida create a conflict for the

15   University of Florida.  That is -- that's the University's

16   language that is applying the same policy that it is applying

17   now.

18         And, Your Honor, we agree very much that all the

19   University has done with these revisions is to restate what it

20   was already doing.  Of course, there was always a strong

21   presumption in favor of faculty speech.  Of course, you could

22   only suppress it if there was a good reason to do so.  But all

23   of those things -- the strong presumption, the rebuttal, the

24   clear and convincing evidence -- is meaningless unless the

25   University defines what an interest is.  And the University is

1    not willing to do the very basic step of saying, We will never

2    take viewpoint into account in determining whether we have an

3    interest in suppressing the speech.

4          In some ways, the best -- the best illustration of the

5    unbridled discretion here is in the application of the policy in

6    the course of this litigation.  First the University denied the

7    requests.  Then it approved them with conditions about

8    compensation that it made up that are not anywhere in the

9    policy, and then it approved them.  And, apparently, the

10   University thinks that all of those decisions are consistent

11   with the policy.  It has never acknowledged that the initial

12   denials were illegal.  It gives the University unbridled

13   discretion to make the determination for itself.

14         The standards -- you know, Mr. Bartolomucci believes

15   that the standards that are in the revised policy are

16   sufficient.  If you look at *Forsyth*, the Supreme Court case from

17   1992, again, it says the provision must contain "...narrow,

18   objective, and definite standards...if the permit scheme

19   involves appraisal of facts, the exercise of judgment, and the

20   formation of an opinion by the licensing authority, the danger

21   of censorship and of abridgment of our precious...freedoms is

22   too great to be permitted."

23         There is no question that this policy involves the

24   appraisal of facts, the exercise of judgment, and the formation

25   of an opinion as to whether the speech will implicate an

```
 1   important and particularized interest of the University.  So I
 2   think the unbridled discretion problem clearly remains.
 3            Your Honor, if I could -- I mean, I'd like to end --
 4   unless you have specific other questions -- with just placing
 5   this dispute in some boarder context.
 6            THE COURT:  Hold on one second, Mr. O'Neil.
 7            MR. O'NEIL:  Sure.
 8            THE COURT:  What I want to do is find out -- and I
 9   know we've gone a couple of hours and I've burned up the time by
10   asking questions, but y'all had filed your papers and I wanted
11   to make sure I didn't misapprehend any arguments or what the
12   facts were.  And both you and Mr. Bartolomucci have actually
13   helped a lot.
14            And so it's clear, you know, the last time I had a
15   hearing and I vigorously questioned folks, there was a
16   suggestion that I vigorously questioned one lawyer and that
17   lawyer ended up prevailing.  So nobody should read anything into
18   the way I ask questions.  I'm asking questions and probing for a
19   reason.  It simply means I want to make sure I know what each
20   side's position is and what their best support for their
21   arguments are and make sure I understand the contours of both
22   the claims as well as the defenses.
23            But I want to make sure both of you have a chance to
24   be heard.  Recognizing that y'all will be back with me next
25   Friday and I'll have another opportunity -- to the extent you've
```

```
1    thought about what went on here today and want to add something.
2    So I want to make plain I'm not, Mr. Bartolomucci or Mr. O'Neil,
3    going to artificially cut you off if there's something you want
4    to add next week because you've had time.
5             And I've asked a lot of questions.  It's been rapid;
6    it's been quick.  And y'all may want to be able to clarify
7    something or cite another case, and I'm doing it for that
8    reason.  I'm happy to give y'all more time to make a complete
9    record.
10            But with that said, Mr. O'Neil, I'm going to give both
11   you and Mr. Bartolomucci an opportunity to sum up today,
12   recognizing it will not be your last word, and I'm letting you
13   know, I will not artificially cut you off next Friday saying,
14   Oh, it doesn't relate to *Pickering*; therefore, I don't want to
15   hear any more; your time is up.  I'll give you a chance to sum
16   up some more next Friday.
17            With that qualification that you'll have another
18   opportunity to be heard, Mr. Bartolomucci -- I mean, Mr. O'Neil,
19   how long would you like to sum up this morning before we recess
20   until next Friday?
21            MR. O'NEIL:  Your Honor, with the -- with the
22   understanding that, as you just said, *Pickering* is a very
23   central part of our arguments and does relate to the question of
24   interest that we have been discussing today, I only need, you
25   know, a minute or two.
```

1          THE COURT:  All right.  And, Mr. Bartolomucci, I am

2    not -- since Mr. O'Neil spoke less, I'm in no way suggesting

3    it's only got to be a minute or two.  Again, I'm going to let

4    you speak next Friday and I'm going to let you -- not just limit

5    you to *Pickering*, but if you want to circle back and address

6    anything we talked about today, because, again -- and I say that

7    because I know some judges would say, Well, I only continued it

8    for *Pickering* and that's all we are talking about.  I won't do

9    that.  I'm going to let you circle back and talk about other

10   issues if you need to do that.

11         How much time do you need for this morning before we

12   recess?

13         MR. BARTOLOMUCCI:  Your Honor, I think I only need a

14   minute or two.

15         THE COURT:  Okay.  So that's what we'll do.  And,

16   again, I want to make plain, I encourage both of you, if you --

17   there's something you want to go back and say, Judge, I wish I

18   had of cited this case on this point or this part of the record

19   for that point, I'm absolutely -- that's how we are going to

20   start because I don't want to catch you off guard.  Before we

21   address --

22         COMPUTER-GENERATED VOICE:  (Indiscernible.)

23         THE COURT:  I didn't hear that.

24         Are you still there, Mr. O'Neil?

25         MR. O'NEIL:  I am.

1           THE COURT:  Mr. Bartolomucci?

2           MR. BARTOLOMUCCI:  Yes --

3           THE COURT:  All right.

4           MR. BARTOLOMUCCI:  -- still here.

5           THE COURT:  We are going to start -- somebody said

6    something.  I think it was AT&T.

7           We are going to start with letting you clarify

8    anything you want to clarify from today.  So I'll start with

9    Mr. O'Neil since he's plaintiffs' counsel, and then I'll go to

10   you, Mr. Bartolomucci.  Then we'll talk about *Pickering*.  So I

11   just want y'all to be prepared, we are going to start with

12   giving you a chance to circle back and address anything you want

13   to clarify or amplify based on today's discussion.

14          We'll then take a break, and then we'll start talking

15   about *Pickering*; okay?

16          MR. O'NEIL:  Yes, Your Honor.

17          THE COURT:  All right.  Very good.

18          All right.  Mr. O'Neil, you may proceed.

19          MR. O'NEIL:  Thank you, Your Honor.

20          As I said, I'd like to end with just placing this

21   dispute in some broader context.  This case is about fundamental

22   principles of academic freedom and expression in American

23   universities.  As you know much better than I do, the University

24   of Florida is one of the top public research universities in the

25   nation --

1          THE COURT:  It was when I attended the school, but, go

2     ahead.

3          MR. O'NEIL:  It's faculty includes leading experts on

4     issues that are existential for our county, issues like election

5     integrity, voting rights, rule of law, public health, just to

6     name a few.  And the faculty members want to share their views

7     with the courts that are deciding those fundamental issues.  The

8     First Amendment gives them that right.  The defendants, the

9     leaders of the University, are interfering and they're doing so

10    for the worst possible reason; they want to silence the

11    viewpoints that some professors would express because they fear

12    that the opinions will anger the state's political leaders.

13          And what is perhaps most alarming is that the

14    University believes it's perfectly entitled to suppress faculty

15    speech in this way.  The University is wrong and it needs to be

16    stopped, not only because it's chilling speech of its own

17    faculty, but also because if this is allowed to continue, it

18    will pave the way for similar intrusions on free expression at

19    other top research universities.

20          So while this case is about these plaintiffs and this

21    University, it's also about safeguarding our centers of higher

22    education from political interference by the state.  And it's

23    about protecting the free speech rights of those whose job it is

24    to discover the truth and then speak that truth to power.

25          For the reasons that we have explained today and in

 1   our briefs, the First Amendment requires that the defendants'

 2   ongoing violations of the First Amendment be enjoined.

 3          Thank you, Your Honor.

 4          THE COURT:  Thank you.

 5          Mr. Bartolomucci.

 6          MR. BARTOLOMUCCI:  Thank you, Your Honor.

 7          The first thing I wanted to do was finally get a

 8   chance to comment upon the scope of the injunction that

 9   plaintiffs seek, a matter that we talked about toward the

10   beginning of the arguments.  We were unclear, frankly, as to the

11   scope of injunctive relief they were seeking on this motion, but

12   I take it that plaintiffs have now clarified that they're only

13   seeking injunctive relief with respect to the expert

14   witness-type requests.

15          And the point I want to make about that is that the

16   conflict of commitment branch of the policy should still apply,

17   you know, even to expert witness work.  If a professor

18   hypothetically said, I'm going to spend 60 hours a week, every

19   week, for the next two years on my outside expert witness work,

20   I think the University could properly say, That's just too much

21   time away from your day job.

22          THE COURT:  Mr. Bartolomucci --

23          MR. BARTOLOMUCCI:  That would prohibit --

24      (Indiscernible crosstalk.)

25          THE COURT:  Mr. Bartolomucci, let me ask Mr. O'Neil.

1    Because absolutely you can't just not give your -- go to your

2    classes, pass it off to a TA, and go off and do whatever you

3    want, paid or unpaid, as an expert witness.  So there are all

4    kinds of other limitations on whether or not a professor can

5    engage in outside activities for a variety of reasons.  And

6    that's why I asked at the beginning of Mr. O'Neil whether or not

7    he was challenging anything beyond that provision.

8            And, Mr. O'Neil, as I understood it, that is the

9    provision you are challenging; correct?

10           MR. O'NEIL:  That's right.  So there are conflict of

11   commitment policies; there are state ethic laws.  We are

12   challenging the conflict of interest policy.

13           THE COURT:  As it relates to experts testifying as

14   modified by the policy -- the recommendation adopted by

15   President Fuchs?

16           MR. O'NEIL:  Expert witnesses, but also because the

17   defendants have said now for the first time that the particular

18   provision that Mr. Bartolomucci cited is -- applies to amicus

19   briefs.

20           THE COURT:  I understand.

21           MR. O'NEIL:  We are also seeking to enjoin the policy,

22   the conflict of interest policy, to the extent it applies to

23   amicus briefs.

24           THE COURT:  Let me pause there.  Mr. Bartolomucci, I'm

25   going to give you as much time as you need.

1          But, Mr. O'Neil, I am going to need you to address

2     with the amicus brief issue in applying *Pickering* and so forth

3     and the case law that talks about there's a difference between

4     do I keep you from talking at all; do I keep you from talking in

5     a particular forum; or do I in some way limit part of your

6     message or your identity?  In fact, there's case law, I believe,

7     that talks about you're permitted to talk; you're permitted to

8     serve as an expert; you're permitted to write letters.  You just

9     can't do it on the university letterhead.

10          So, you know, I do need you to be prepared to

11     distinguish the challenge of the expert provision to the amicus

12     issue and the subset of the amicus issue:  You are allowed to

13     sign a brief; you are allowed to do the work; you just can't

14     identify yourself with the University.  I am going to need you

15     to focus on that as it relates to that sort of subclaim when we

16     meet next Friday; okay?

17          Do you understand the question I've got?

18          MR. O'NEIL:  I understand the question.  I can address

19     it now, but I can also wait until next Friday.

20          THE COURT:  You can wait until next Friday.

21          MR. O'NEIL:  All right.  Thank you.

22          THE COURT:  And, Mr. Bartolomucci, I didn't mean to

23     cut you off, but you are absolutely correct.  There are a myriad

24     of ways that the University absolutely can restrict the

25     activities, in part the speech, of professors.  And this Court

1   will in no way be addressing anything except the very narrow

2   provisions that were just identified.

3            MR. BARTOLOMUCCI:  Thank you, Your Honor.

4            The next issue I wanted to raise about the scope of

5   the requested relief is whether plaintiffs are seeking an

6   injunction that applies only to the six plaintiffs or to all of

7   the hundreds of faculty members at the University of Florida.

8            Obviously, one type of relief would be much broader

9   than the other.  I had kind of read his papers as leaning

10  towards the broad side.  I think it would be helpful if we

11  clarified whether plaintiffs are seeking relief for more than

12  just the six actual plaintiffs in this case.

13           THE COURT:  That's a very fair question,

14  Mr. Bartolomucci.

15           Mr. O'Neil, I read your brief as requesting it's --

16  that it -- they be enjoined from applying it to any faculty

17  member.

18           Did I misapprehend your request for relief?

19           MR. O'NEIL:  No, you read it correctly.  That is

20  the -- that's what the overbreadth and unbridled discretion

21  doctrines permit.  And we believe that the chill is not only to

22  these plaintiffs, but to all of the University of Florida

23  faculty.

24           THE COURT:  I understand.

25           And that's not a ruling, Mr. Bartolomucci, but that

 1   was fair and appropriate to ask.  And to the extent you want to

 2   distinguish between those two things next Friday, then you

 3   certainly will have an opportunity to be heard.

 4           And I want to make plain, you are in no way suggesting

 5   that there is any violation or that any of the four parts of the

 6   preliminary injunction standard have been met by doing that.

 7   But you certainly can say, Judge, there's no First Amendment

 8   violation; they haven't met any, so there's not a substantial

 9   likelihood of success on the merits.  There's -- the other three

10   prongs are not met as well.

11           But in the unlikely event, Judge, that you disagree,

12   if you are going to grant relief, which you should not, any

13   relief should be cabined this way.  You certainly can argue that

14   and I know sometimes folks view that as a concession.  It's

15   abundantly clear to me, you and the University have not conceded

16   anything and don't agree with Mr. O'Neil's position, but

17   certainly if you want to be heard on that specifically, then we

18   absolutely can take that up next Friday as well.

19           MR. BARTOLOMUCCI:  Thank you, Your Honor.

20           If I may, the next matter I wanted to discuss briefly

21   is chilling effect.  And the law is that an alleged chilling

22   effect must be objectionably reasonable because a mere

23   subjectively felt chill is not enough, and here I think there

24   are several things that are relevant.

25           Professor Nunn apparently declined to join in the

1   amicus brief on or around November 7th, but that was before the

2   revised policy came into effect on November 23rd.  And I think

3   that a subjectively felt chill is not reasonable after the

4   enactment of the revised policy with its strong presumption.

5           Another important consideration I believe with respect

6   to chilling effect is that there's no punishment that comes from

7   filing an outside activity request that is denied.  The only

8   consequence is denial, and I don't think there's any evidence in

9   the record to suggest that, you know, any professor or faculty

10  member has been punished in any way, you know, other than having

11  the request denied.  So if the only consequence of filing a

12  request is that it's denied, I don't think it's reasonable to

13  say that you're chilled from even making the request.

14          Now, you know, further cutting against the idea

15  that --

16          THE COURT:  So, wait -- Mr. Bartolomucci, I want to

17  make sure I understand that.

18          So the University has told me I'm an expert -- I'm

19  not -- but you're an expert in the field of election law and I

20  go to the University and I seek a clearance, and they deny my

21  right to testify.  And in so doing, they've clearly made a

22  determination that there's an important and particularized

23  interest to the University that I not speak on that topic.

24  That's not telling the person that's made the request anything

25  and hasn't made a value judgment and doesn't create a chilling

1    effect?

2          I'm a little bit dumbstruck slightly by that argument.

3          MR. BARTOLOMUCCI:  Well, my point is that there's no

4    punishment in the form of, let's say, you know, determination or

5    some other adverse employment action that comes from having --

6    from making a request and then having it denied.  The fact that

7    it's denied is the only consequence.

8          So this is not like the situation where --

9          THE COURT:  If I'm a professor --

10         MR. BARTOLOMUCCI:  -- you know --

11     (Indiscernible crosstalk.)

12         THE COURT:  If I'm a professor and I can't go around

13   and testify relying on my expertise and build up my reputation,

14   in the academic community specifically and the broader community

15   generally, as an academic, that's not an adverse consequence to

16   me?

17         MR. BARTOLOMUCCI:  Well, it's not -- it's not a form

18   of punishment from the University.  But let me -- let me go on

19   to -- but the Court made a comment in regard to the stronger

20   argument, is that a subjectively felt chill is not reasonable

21   here in light of the strong presumption enacted in the revised

22   policy.

23         It's also worth noting that Dr. Goldhagen clearly

24   wasn't chilled.  There were two instances in which the

25   University denied his request, and he participated as an expert

1    anyway, so he clearly was not chilled.  And, frankly, I think

2    you could deny equitable relief to the Doctor based on the

3    doctrine of unclean hands.  If he's not going to respect the

4    University's decisions when it's a denial, I'm not sure that

5    equity gives him -- entitles him to injunctive relief.

6           Mr. McDonald -- this is limited evidence, but

7    Professor McDonald submitted a request last month, in December,

8    and it was approved within three days.  It wasn't, you know, on

9    all fours with the request made in October, but it was

10   election-related legal consulting work for members of a

11   political party.  But he was not deterred from submitting that

12   request.  And, again, it was granted.

13          So I'm not even sure there's much evidence of a

14   subjective chilling effect.  I'm not sure how much stock can be

15   placed in the faculty union reports.  I think the very --

16          THE COURT:  So because --

17          MR. BARTOLOMUCCI:  -- subjective chill --

18      (Indiscernible crosstalk.)

19          THE COURT:  So because McDonald -- I want to make sure

20   I understand this.

21          So because McDonald is willing to write a memo in

22   New Jersey, that's evidence that he would not be chilled to talk

23   about matters of important public concern with respect to

24   Florida's elections or challenge openly in court a position that

25   Governor DeSantis or Secretary Lee have taken?  That's the

1    extrapolation I'm going to make from that request?

2            MR. BARTOLOMUCCI:  It's some evidence.  It's not

3    overwhelming evidence, but certainly it does nothing to advance

4    the case of a chilling effect.  So we wanted to bring that to

5    the Court's attention, and the Court was interesting in learning

6    more about that.  So that's really all I wanted to say about

7    chilling effect.  Again, it must be objectively reasonable, and

8    I don't think they meet that test here.

9            Really the final point I wanted to make, Your Honor,

10   is that today the University is not waiving nor abandoning any

11   of the arguments made in its motion to dismiss.  Obviously, that

12   motion was denied and the Court wanted us to focus on the

13   preliminary injunction factors, which we've done today.

14           But we do continue to maintain that this lawsuit is

15   moot, that the plaintiffs lack standing and that their challenge

16   to the revised policy is not ripe.

17           THE COURT:  I understand.

18           MR. BARTOLOMUCCI:  Unless the Court has --

19           THE COURT:  Sure.  I've got, actually, two pages of

20   questions on those points, but we can do that on Friday.  It's

21   been a rather long morning.  So we will circle back because I've

22   got some additional questions as it relates to issues of

23   justiciability, so we'll circle back and have a few questions

24   about that as well.

25           MR. BARTOLOMUCCI:  I thought we weren't going to use

1  the phrase "circle back," Your Honor?

2          THE COURT:  You're right.  I forgot what -- my kids

3  sent me a list of terms that we weren't supposed to use,

4  including "no worries."

5          So, anyway, you're right.

6          MR. BARTOLOMUCCI:  I'm a big user of that one.

7          THE COURT:  Well, thank you for your hard work in this

8  case.  It's been well briefed by both sides and I appreciate

9  your thoughtful presentation today.  I'll look forward to

10  reviewing the additional briefing and we'll -- I'll hear from

11  you again next Friday.

12          With that said, court is in recess.

13          Thank you.

14      (Proceedings concluded at 11:53 AM on Friday, January 07,

15  2022.)

16                      * * * * * * * *

17          I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
18  Any redaction of personal data identifiers pursuant to the
   Judicial Conference Policy on Privacy is noted within the
19  transcript.

20

21  /s/ Megan A. Hague                    1/8/2022

22  Megan A. Hague, RPR, FCRR, CSR        Date
   Official U.S. Court Reporter

23

24

25