# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# GAINESVILLE DIVISION

------------------------------------x

SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A. SMITH, JEFFREY GOLDHAGEN, TERESA J. REID, and KENNETH B. NUNN,

      Plaintiffs,

  v.

UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, the public body corporate acting for and on behalf of the University of Florida; W. KENT FUCHS, in his official capacity as President of the University of Florida; JOSEPH GLOVER, in his official capacity as Provost of the University of Florida; and LAURA ROSENBURY, in her official capacity as Dean of the Fredric G. Levin College of Law,

      Defendants.

1:21-cv-00184-MW-GRJ

------------------------------------X

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...............................................................................1

ARGUMENT .............................................................................................................2

I.   The Policy Violates the First Amendment under the *Pickering* Framework. ...............................................................................................2

   A.   The Only Legitimate Reason for Suppressing Employee Speech Is Adverse Impact on Operational Efficiency. ......................................2

   B.   The Policy Permits Suppression of Speech for Reasons Other Than Operational Efficiency ................................................................4

II.  Other Policies Protect Any Legitimate Interest on Defendants' Side ...........10

CONCLUSION ........................................................................................................11

# **TABLE OF AUTHORITIES**

**CASES**

*Blum v. Schlegel*,
 18 F.3d 1005 (2d Cir. 1994) ...........................................................................8, 9

*City of Los Angeles v. Patel*,
 576 U.S. 409 (2015) ..............................................................................................5

*City of San Diego v. Roe*,
 543 U.S. 77 (2004) ................................................................................................8

*Connick v. Myers*,
 461 U.S. 138 (1983) ........................................................................................3, 11

*Forsyth Cnty. v. Nationalist Movement*,
 505 U.S. 123 (1992) ..............................................................................................5

*Garcetti v. Ceballos*,
 547 U.S. 410 (2006) .....................................................................................3, 4, 7

*Harris v. Quinn*,
 573 U.S. 616 (2014) ..............................................................................................3

*Hoover v. Morales*,
 164 F.3d 221 (5th Cir. 1998) .........................................................................1, 2, 4

*Lane v. Franks*,
 573 U.S. 228 (2014) ..............................................................................................2

*Pickering v. Bd. of Educ.*,
 391 U.S. 563 (1968) ...........................................................................2, 3, 4, 7, 8, 10

*Rankin v. McPherson*,
 483 U.S. 378 (1987) .....................................................................................1, 3, 8

*Tracy v. Fla. Atl. Univ. Bd. of Trustees*,
 980 F.3d 799 (11th Cir. 2020) ..............................................................................5

*United States v. Nat'l Treasury Emps. Union*
 ("*NTEU*"), 513 U.S. 454 (1995) ..................................................................2, 3, 4, 7

**STATUTES**

Fla. Stat. § 112.313(7)(a) ...................................................................................11

**OTHER AUTHORITIES**

Decl. of Principles on Acad. Freedom and Acad. Tenure (Am. Ass'n of
 Univ. Professors 1915) ..................................................................................9

**PRELIMINARY STATEMENT**

The Supreme Court has explained that, under the *Pickering* test, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." *Rankin v. McPherson*, 483 U.S. 378, 384 (1987). Defendants have repeatedly stifled Plaintiffs' speech for precisely that reason—because Plaintiffs' viewpoints "conflict" with those of the State's executive branch—and the Policy at issue here permits Defendants to continue doing so.

*Pickering* and its progeny make clear that only one type of interest—operational efficiency in the delivery of services—is a legitimate basis on which to silence employee speech on matters of public concern. Defendants have not even attempted to articulate why permitting faculty to testify on the topics of their expertise could interfere with the actual operation of the University of Florida. Nor have they been willing, despite multiple opportunities, to limit the Policy to furthering only the efficiency interests *Pickering* permits. Instead, as in *Hoover*, "the State's [asserted] interest is in preventing state employees from speaking in a manner contrary to the State's interest." *Hoover v. Morales*, 164 F.3d 221, 226 (5th Cir. 1998). That "amorphous interest in protecting its interests is not the sort

which may outweigh the free speech rights of state employees under *Pickering*." *Id.*

## ARGUMENT

I.  **The Policy Violates the First Amendment under the *Pickering* Framework.**

Under *Pickering*, "[t]he problem in any case is to arrive at a balance between the interests of the [employee], as a citizen . . . and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). The Policy cannot survive that framework.

A.  **The Only Legitimate Reason for Suppressing Employee Speech Is Adverse Impact on Operational Efficiency.**

*Pickering* and its progeny establish a two-part test. The first part asks whether the employee is speaking as a citizen on a matter of public concern. If so, the burden shifts to the employer to demonstrate that the employee's speech impedes "the effective and efficient fulfillment of their responsibilities to the public." *Lane v. Franks*, 573 U.S. 228, 242 (2014). Where, as here, the challenged regulation imposes a "wholesale deterrent to a broad category of expression by a massive number of potential speakers," a stricter test and greater burden applies. *United States v. Nat'l Treasury Emps. Union* ("*NTEU*"), 513 U.S. 454, 467-68 (1995). Because such a measure "chills potential speech before it happens," *id.* at 468, the Government "must show that the interests of both

2

potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* (quoting *Pickering*, 391 U.S. at 571).[1]

These precedents make plain that the "necessary impact on the actual operation of the Government" is the only legitimate interest on which the State may suppress speech. *Pickering*, 391 U.S. at 571. This "operational efficiency" interest could take the form of "immediate workplace disruption," *NTEU*, 513 U.S. at 470; impairment of the "proper performance of [the employee's] daily duties[]," *Pickering*, 391 U.S. at 572; "advers[e] [e]ffect [on] discipline and morale in the work place," *Connick v. Myers*, 461 U.S. 138, 151 (1983); or impact on "discipline by superiors or harmony among co-workers," *Rankin*, 483 U.S. at 388. But whatever the specific manifestation, the asserted justification for suppressing speech must be grounded in "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees." *Harris v. Quinn*, 573 U.S. 616, 653 (2014); *see also Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (any restriction on employee speech "must be directed at speech that has

---

[1] The record in this case reflects the chilling effect of the Policy. On top of all of the other evidence on that point, Dr. Goldhagen has submitted an additional declaration explaining that, after 30 years as a member of the UF Faculty, he has been so chilled by the University's conduct that he is considering his employment options. Second Goldhagen Decl. ¶ 5.

some potential to affect the entity's operations"); *NTEU*, 513 U.S. at 467 n.11 ("Our *Pickering* cases only permit the Government to take adverse action based on employee speech that has adverse *effects* on the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.") (emphasis in original); *Hoover*, 164 F.3d at 226 (noting that operational efficiency is "the only state interest acknowledged by *Pickering* and its progeny").

> B. **The Policy Permits Suppression of Speech for Reasons Other Than Operational Efficiency.**

Defendants do not challenge the first part of the *Pickering* test; they could not dispute that Plaintiffs and other faculty members who wish to testify as experts or otherwise participate in litigation on matters of public concern are engaged in core citizen speech. The dispositive question, then, is whether Defendants can demonstrate that the Policy ensures the "efficient provision of public services," *Garcetti,* 547 U.S. at 418, by limiting only speech that has a "necessary impact on the actual operation of the" University. *Pickering*, 391 U.S. at 571. The answer is clearly no.

> 1. **The History, Interpretation, and Context of the Policy Demonstrate Its Breadth.**

Defendants fail to grapple with the validity of the actual Policy at issue in this case. That Policy is a product not only of the literal words of the "revisions"

4

Defendants quote, but also of the history and circumstances of its development, the manner in which Defendants have interpreted and applied it, and the way Defendants have characterized it in public statements.[2] That history, context, and interpretation describe a Policy that is facially invalid under *Pickering* and *NTEU*.

For many years, the University routinely permitted professors to serve as witnesses or otherwise participate in litigation for and against the State. That changed abruptly in 2020, when, amid a documented series of politically-motivated intrusions by the State government on the University's independence, Defendants imposed a preclearance requirement for expert testimony and began applying it to prohibit speech that opposed the State's views. Defendants first did

---

[2]   Contrary to Defendants' approach, the "facial" nature of this challenge does not permit Defendants to pretend as if nothing exists but the words of the task force recommendations. As Plaintiffs have noted, the effect of those recommendations is unclear; at most, they are a gloss on the Policy, which remains in effect. Moreover, courts routinely look to the history, interpretation, and application of a regulation when assessing its facial validity. *See City of Los Angeles v. Patel*, 576 U.S. 409, 418 (2015) ("[W]hen assessing [the facial constitutionality of] a statute . . . the Court has considered . . . applications of the statute in which it actually authorizes or prohibits conduct."); *see also Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."). In *Tracy,* for example, the Eleventh Circuit rejected a facial unbridled-discretion challenge to a policy precisely because the plaintiff offered no evidence of discriminatory application. *Tracy v. Fla. Atl. Univ. Bd. of Trustees*, 980 F.3d 799, 809 (11th Cir. 2020) (noting that analysis would be different if Plaintiff could show "a pattern of unlawful favoritism.").

5

so when professors sought to inform courts about the racially discriminatory effects of a high-profile Florida law that prevented many ex-felons from voting in the 2020 general election. They did so again when professors sought to inform courts about the adverse health effects on children of the Governor's "signature" ban on mask mandates in schools. And they did so a third time when professors sought to testify about the harms to democracy that resulted from a law restricting when and how citizens could vote. Each time, the University explicitly interpreted the Policy to equate the University's "interest" with that of the State government and its "executive branch." Exs. 4, 10–11, 14–15.[3]

Although Defendants were forced under intense public pressure to revisit the Policy, they failed to address the basic question of what an "interest" of the University was for these purposes. Defendants did not narrow the definition of "interest" or disavow their position that the University's "interest" lies in aligning faculty speech with the political preferences of the ruling party. To the contrary, even after the revisions, Defendants made public statements about the Policy confirming that they continued to believe the University has a strong interest in not offending, and in prohibiting its faculty from offending, actors within the State

---

[3] Exhibits with numerical ordering refer to exhibits to the Declaration in Support of Motion (Doc. 31) filed with Plaintiffs' Motion (Doc. 30). Exhibits with alphabetical ordering refer to exhibits to the Declaration in Opposition to Motion (Doc. 45) filed with the Opposition to Defendants' Motion (Doc. 42).

government that control the University's budget.  The highest authority in the University system explicitly said that, in applying the Policy, the University "ha[s] to take . . . into consideration" the reaction to the proposed speech among "the legislature, the taxpayers of Florida, the people that are funding us." Ex. C at 6.

### 2. The Policy Fails *Pickering*.

Application of the *Pickering*/*NTEU* test to this Policy is simple, straightforward, and fatal.

As explained above, the sole interest on which Defendants may legally sustain the Policy is the need to ensure "efficient provision of public services" through the University.  *Garcetti*, 547 U.S. at 418.  Even assessed on its purely literal terms, the Policy is not limited to that interest and permits suppression of faculty speech based on other considerations.  For that reason alone, the Policy fails.

The manner in which Defendants have interpreted and applied the Policy underscores its unconstitutionality.  The "interest" Defendants have repeatedly asserted is avoiding ideological conflict with "the Executive Branch of the State of Florida."  Exs. 10–11.  Defendants have never attempted to explain how that interest has anything to do with the "necessary impact on the actual operation" of the University.  *Pickering*, 391 U.S. at 571.  Expert testimony against the State of Florida does not cause "immediate workplace disruption," *NTEU* 513 at 470,

7

impair the "proper performance of [the faculty's] daily duties," *Pickering,* 391 U.S. at 592, or impede "discipline by superiors or harmony among co-workers," *Rankin*, 483 U.S. at 388.[4]

To the contrary, expert testimony by faculty—whether for or against the State—affirmatively *furthers* the effective provision of public services through the University. Application of *Pickering* requires consideration of the "the mission and purpose of the employer," *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004), as well as "the nature of the services performed by the employee." *Blum v. Schlegel*, 18 F.3d 1005, 1011 (2d Cir. 1994). The self-stated mission of the University of Florida includes "shar[ing] the benefits of its research and knowledge for the common good," Ex. 33, and one important way leading universities like UF further that objective is by encouraging faculty experts to speak on matters of importance to society.[5] Because a key part of the public service the University provides is the

---

[4] Thus, to address a question the Court asked at oral argument, Jan. 7, 2022 Hearing, Tr. 44:13-17, while the record clearly demonstrates that Defendants have sought to suppress speech in order to curry favor with political actors, Defendants' specific motivation is not relevant. Because Defendants cannot show that the Policy targets speech that would undermine the University's operational efficiency, it is invalid under *Pickering* whatever Defendants' subjective reasons may be.

[5] "If there is one thing that distinguishes the more recent developments of democracy, it is the recognition by legislators of the inherent complexities of economic, social, and political life, and the difficulty of solving problems of technical adjustment without technical knowledge. The recognition of this fact has led to a continually greater demand for the aid of experts in these subjects,

8

development and promotion of knowledge in an environment that encourages free exchange of ideas, "the efficient provision of services by a State university[]" like the one Defendants run "actually depends, to a degree, on the dissemination in public fora of controversial speech implicating matters of public concern." *Blum*, 18 F.3d at 1012.

By the same token, faculty members enhance the performance of their official duties by contributing to critical court cases on the topics of their expertise. The experience and profile such opportunities provide make professors better qualified to teach students, help attract applicants to the University, and increase the University's national reputation. The University of Florida has long recognized that outside faculty speech is beneficial for both employer and employee, and to that end, the University continues to promote its faculty through a dedicated "Experts Center." *Experts Center*, Univ. of Fla., https://experts.ufl.edu/ ("University of Florida experts on thousands of subjects are available for commentary, interviews and speaking opportunities.").

---

> to advise both legislators and administrators. The training of such experts has, accordingly, in recent years, become an important part of the work of the universities; and in almost every one of our higher institutions of learning the professors of the economic, social, and political sciences have been drafted to an increasing extent into more or less unofficial participation in the public service." Decl. of Principles on Acad. Freedom and Acad. Tenure (Am. Ass'n of Univ. Professors 1915).

9

Because Defendants have failed to proffer, much less substantiate, a valid interest under *Pickering* and *NTEU*, the Policy violates the First Amendment.

## II. Other Policies Protect Any Legitimate Interest on Defendants' Side.

Defendants incorrectly assert that there would be "no ability to regulate" faculty conduct if this Court grants Plaintiffs' Motion for Preliminary Injunction. Br. at 8. There are other lawful means by which Defendants can protect any legitimate *Pickering*-based interest.

*First*, the conflict-of-commitment policy permits the University to deny outside activity requests when there is a genuine and documented concern that the amount of time a professor is spending on outside activity is interfering with her job responsibilities. Ex. 2 at 4–5. Unlike the interests the University has asserted under the Policy, a demonstration that an outside activity "impede[d] the teacher's proper performance of his daily duties in the classroom" would qualify under *Pickering*. 391 U.S. at 572. Thus, as long as Defendants apply it in a content- and viewpoint-neutral way, Plaintiffs do not challenge the conflict-of-commitment provisions.

*Second*, state ethics laws protect any interest the University has in preventing the sort of true financial or ethical conflicts of interest that would call into question the integrity either of a faculty member's scholarship or other services the University provides. Florida's Code of Ethics for Public Officers and

10

Employees prohibits State university professors from "hold[ing] any employment or contractual relationship . . . that will create a continuing or frequently recurring conflict between his or her private interests and the performance of his or her public duties or that would impede the full and faithful discharge of his or her public duties." Fla. Stat. § 112.313(7)(a). In contrast to the Policy, that provision is narrowly focused not on the content of proposed speech, but instead on contractual or other business arrangements that would genuinely undermine "integrity in the discharge of official duties." *Connick,* 461 U.S. at 151.

## CONCLUSION

For the reasons set forth above and in previous submissions, the motion should be granted.

Dated: January 13, 2022
Washington, D.C.


/s/ David A. O'Neil
DAVID A. O'NEIL (*pro hac vice*)
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Suite 500
Washington, D.C. 20004
(202) 383-8000
daoneil@debevoise.com

MORGAN A. DAVIS (*pro hac vice*)
JAIME FREILICH-FRIED (*pro hac vice*)

PAUL DONNELLY
Florida Bar No. 813613
LAURA GROSS
Florida Bar No. 858242
CONOR P. FLYNN
Florida Bar No. 1010091
Donnelly + Gross LLP
2421 NW 41st Street, Suite A-1
Gainesville, FL 32606
(352) 374-4001

11

SAMUEL ROSH (*pro hac vice*)
SOREN SCHWAB (*pro hac vice*)
KATHARINE WITTEMAN (*pro hac vice*)
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
mdavis@debevoise.com
jmfried@debevoise.com
sjrosh@debevoise.com
sschwab@debevoise.com
kwitteman@debevoise.com

paul@donnellygross.com
laura@donnellygross.com
conor@donnellygross.com


ALEXANDRA P. SWAIN (*pro hac vice*)
Debevoise & Plimpton LLP
650 California Street
San Francisco, CA 94108
(415) 738-5700
apswain@debevoise.com


*Counsel for Plaintiffs Sharon Wright Austin, Michael McDonald, Daniel A. Smith, Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn*

12

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)

I hereby certify that this supplemental memorandum of law contains 2,587 words.

/s/ David A. O'Neil
David A. O'Neil

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of January, 2022, a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

/s/ David A. O'Neil
David A. O'Neil