# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

FLORIDA RISING TOGETHER, FAITH IN FLORIDA, UNIDOSUS, EQUAL GROUND EDUCATION FUND, HISPANIC FEDERATION, PODER LATINX, HAITIAN NEIGHBORHOOD CENTER SANT LA, and MI FAMILIA VOTA EDUCATION FUND,

                Plaintiffs,

v.

LAUREL M. LEE, in her official capacity as the Secretary of State of Florida, KIM BARTON, in her official capacity as Supervisor of Elections for ALACHUA County, CHRIS MILTON, in his official capacity as Supervisor of Elections for BAKER County, MARK ANDERSEN, in his official capacity as Supervisor of Elections for BAY County, AMANDA SEYFANG, in her official capacity as Supervisor of Elections for BRADFORD County, LORI SCOTT, in her official capacity as Supervisor of Elections for BREVARD County, JOE SCOTT, in his official capacity as Supervisor of Elections for BROWARD County, SHARON CHASON, in her official capacity as Supervisor of Elections for CALHOUN County, PAUL A. STAMOULIS, in his official capacity as Supervisor of Elections for CHARLOTTE County, MAUREEN "MO" BAIRD, in her official capacity as Supervisor of Elections for CITRUS

Case No. 4:21-cv-201-MW-MJF

County, CHRIS H. CHAMBLESS, in his official capacity as Supervisor of Elections for CLAY County, JENNIFER J. EDWARDS, in her official capacity as Supervisor of Elections for COLLIER County, TOMI S. BROWN, in her official capacity as Supervisor of Elections for COLUMBIA County, MARK NEGLEY, in his official capacity as Supervisor of Elections for DESOTO County, STARLET CANNON, in her official capacity as Supervisor of Elections for DIXIE County, MIKE HOGAN, in his official capacity as Supervisor of Elections for DUVAL County, DAVID H. STAFFORD, in his official capacity as Supervisor of Elections for ESCAMBIA County, KAITI LENHART, in her official capacity as Supervisor of Elections for FLAGLER County, HEATHER RILEY, in her official capacity as Supervisor of Elections for FRANKLIN County, SHIRLEY KNIGHT, in her official capacity as Supervisor of Elections for GADSDEN County, CONNIE SANCHEZ, in her official capacity as Supervisor of Elections for GILCHRIST County, ALETRIS FARNAM, in her official capacity as Supervisor of Elections for GLADES County, JOHN HANLON, in his official capacity as Supervisor of Elections for GULF County, LAURA HUTTO, in her official capacity as Supervisor of Elections for HAMILTON County, DIANE SMITH, in her official capacity as Supervisor of Elections for HARDEE County, BRENDA HOOTS, in her official capacity as Supervisor of Elections for HENDRY County,

SHIRLEY ANDERSON, in her official capacity as Supervisor of Elections for HERNANDO County, PENNY OGG, in her official capacity as Supervisor of Elections for HIGHLANDS County, CRAIG LATIMER, in his official capacity as Supervisor of Elections for HILLSBOROUGH County, THERISA MEADOWS, in her official capacity as Supervisor of Elections for HOLMES County, LESLIE R. SWAN, in her official capacity as Supervisor of Elections for INDIAN RIVER County, CAROL A. DUNAWAY, in her official capacity as Supervisor of Elections for JACKSON County, MARTY BISHOP, in his official capacity as Supervisor of Elections for JEFFERSON County, TRAVIS HART, in his official capacity as Supervisor of Elections for LAFAYETTE County, ALAN HAYS, in his official capacity as Supervisor of Elections for LAKE County, TOMMY DOYLE, in his official capacity as Supervisor of Elections for LEE County, MARK EARLEY, in his official capacity as Supervisor of Elections for LEON County, TAMMY JONES, in her official capacity as Supervisor of Elections for LEVY County, GRANT CONYERS, in his official capacity as Supervisor of Elections for LIBERTY County, HEATH DRIGGERS, in his official capacity as Supervisor of Elections for MADISON County, MICHAEL BENNETT, in his official capacity as Supervisor of Elections for MANATEE County, WESLEY WILCOX, in his official capacity as Supervisor of Elections for MARION County, VICKI DAVIS, in her official

capacity as Supervisor of Elections for MARTIN County, CHRISTINA WHITE, in her official capacity as Supervisor of Elections for MIAMI-DADE County, JOYCE GRIFFIN, in her official capacity as Supervisor of Elections for MONROE County, JANET H. ADKINS, in her official capacity as Supervisor of Elections for NASSAU County, PAUL A. LUX, in his official capacity as Supervisor of Elections for OKALOOSA County, MELISSA ARNOLD, in her official capacity as Supervisor of Elections for OKEECHOBEE County, BILL COWLES, in his official capacity as Supervisor of Elections for ORANGE County, MARY JANE ARRINGTON, in her official capacity as Supervisor of Elections for OSCEOLA County, WENDY LINK, in her official capacity as Supervisor of Elections for PALM BEACH County, BRIAN CORLEY, in his official capacity as Supervisor of Elections for PASCO County, JULIE MARCUS, in her official capacity as Supervisor of Elections for PINELLAS County, LORI EDWARDS, in her official capacity as Supervisor of Elections for POLK County, CHARLES OVERTURF, in his official capacity as Supervisor of Elections for PUTNAM County, TAPPIE A.VILLANE, in her official capacity as Supervisor of Elections for SANTA ROSA County, RON TURNER, in his official capacity as Supervisor of Elections for SARASOTA County, CHRISTOPHER ANDERSON, in his official capacity as Supervisor of Elections for SEMINOLE County, VICKY OAKES, in her official capacity

as Supervisor of Elections for ST. JOHNS
County, GERTRUDE WALKER, in her
official capacity as Supervisor of Elections
for ST. LUCIE County, WILLIAM
KEEN, in his official capacity as
Supervisor of Elections for SUMTER
County, JENNIFER M. KINSEY, in her
official capacity as Supervisor of Elections
for SUWANNEE County, DANA
SOUTHERLAND, in her official capacity
as Supervisor of Elections for TAYLOR
County, DEBORAH OSBORNE, in her
official capacity as Supervisor of Elections
for UNION County, LISA LEWIS, in her
official capacity as Supervisor of Elections
for VOLUSIA County, JOSEPH R.
MORGAN, in his official capacity as
Supervisor of Elections for WAKULLA
County, BOBBY BEASLEY, in his
official capacity as Supervisor of Elections
for WALTON County, and CAROL
FINCH RUDD, in her official capacity as
Supervisor of Elections for
WASHINGTON County,

Defendants.

**OPENING EXPERT REPORT OF SHARON AUSTIN, PH.D.**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................1

II.   SUMMARY OF OPINIONS.........................................................1

III.  QUALIFICATIONS.................................................................2

IV.   MATERIALS CONSIDERED .......................................................4

V.    METHODOLOGY AND SOURCES ...............................................4

VI.   HISTORICAL    ANALYSIS    OF    MINORITY    VOTER
      PARTICIPATION IN FLORIDA................................................4

VII.  POST-RECONSTRUCTION BLACK DISENFRANCHISEMENT...........7

VIII. HISPANIC/LATINO DISENFRANCHISEMENT IN FLORIDA ...........11

IX.   BLACK    VOTER    DISENFRANCHISEMENT    AND    VOTE
      DILUTION FOLLOWING PASSAGE OF THE CIVIL RIGHTS ACT OF
      1957 AND THE VOTING RIGHTS ACT OF 1965 ...............................18

X.    THE    2000    ELECTION    AND    FURTHER    ATTEMPTS    TO
      DISENFRANCHISE BLACK AND HISPANIC VOTERS ...................27

VIII. POST-2000 DISENFRANCHISEMENT ...................................32

XI.   SB 90 IS A RESPONSE TO INCREASED BLACK AND HISPANIC
      VOTER TURNOUT ...............................................................55

## I.    INTRODUCTION

1.    I have been retained as an expert in this case by counsel for Plaintiffs. As part of my expert retention in this case, I have been asked to provide a historical analysis of the state of Florida's legislative responses to increased voter participation by minority groups, and in particular, increased voter participation by Black and Hispanic voters.[1]

2.    I am being compensated for my work on this report at an hourly rate of $250/hour. No part of my compensation is dependent on the outcome of this case or on the nature of the opinions that I provide.

## II.    SUMMARY OF OPINIONS

3.    In this expert report, I discuss the history of Florida's laws governing elections. My report demonstrates that progress by Florida's Black and Hispanic voters in the form of increased participation, increased utilization of new voting methods, and election of preferred candidates has historically been met by backlash against that progress by Florida's legislature and governors. This "progress followed by backlash" has been a pattern in Florida since the end of the Civil War, and continues to this day with the passage of SB 90, several portions of which plaintiffs in this case are challenging.

---

[1] In this report, I use the terms Black and African American interchangeably and I use the terms Hispanic and Latino interchangeably.

### III.   QUALIFICATIONS

4.     I am a Professor of Political Science at the University of Florida, Gainesville, where I teach courses in American Government, Urban Politics, and African American Politics. Prior to joining the faculty at the University of Florida, I taught at the University of Louisville, the University of Michigan, and University of Missouri at Columbia. Details about my professional qualifications and experience are described below and in the copy of my curriculum vitae attached as Exhibit A.

5.     I received a Ph.D. in political science from the University of Tennessee at Knoxville in 1993.

6.     I have authored or co-authored numerous articles that have been published in peer-reviewed journals in the social sciences field, including multiple articles analyzing minority voter participation. I have also published books and book chapters on that subject. My curriculum vitae provides a list of all of my publications.

7.     Since 1992, my research and work has focused on various aspects of American politics and public policy. These include American elections, with an emphasis on mayoral elections, racial voting behavior, African American women's political behavior, barriers to African American political participation, Black and white voting behavior in the South, rural political behavior, presidential politics, Congressional politics, American civil rights, and political activism and

participation in Florida. Since 1992, I have taught numerous courses, including courses that emphasize African American politics, American politics, Black women's politics, urban politics, state and local politics, Asian American politics, Latino politics and policy, and women of color and the law.

8. I have written numerous op-eds in newspapers, magazines, and on CNN's website. I have been cited as an expert on politics in newspapers including the Los Angeles Times, New York Times, Washington Post, and USA Today. I am the Senior Political Correspondent for the Today with Dr. Kaye syndicated radio show (based in Baltimore) and have provided analysis regarding civil rights and political topics on news shows in Australia, Canada, Great Britain, Korea, Pakistan, Russia, and Singapore.

9. I have served on editorial boards and advisory committees in the field of African American Studies, minority civil rights, politics, and voting. I have been an invited speaker and won numerous awards in this area. I am also a member of the editorial team of the American Political Science Review which was founded in 1903 and is the most prominent journal in the political science discipline. In 2023, I will become the first African American editor of this prestigious journal. I am also the editor of the Government and Politics in the South series of the University Press of Florida and I am a former editor of the National Review of Black Politics.

3

## IV.    MATERIALS CONSIDERED

10.    In preparing this report, I relied on my own knowledge and experience as outlined above. In addition, I have reviewed and considered the materials listed in Exhibit B. Exhibit B is intended to be a complete list, though I may not have included literally every document or piece of information that I have considered in forming my opinions presented in this report.

## V.    METHODOLOGY AND SOURCES

11.    In this report, I utilize the standard methodology that I and other political scientists use when investigating the history of election laws. When analyzing political decision-making, political scientists examine the circumstantial evidence regarding the political, institutional, and social context in which a decision is made, as well as direct evidence of the reasons asserted for the decision. We examine relevant scholarly studies; newspaper coverage of events; reports of local, state or federal governments; relevant court decisions, and statistical data. As seen in the list of materials (Exhibit B) and citations in this report, I have examined a large number of these sources.

## VI.    HISTORICAL ANALYSIS OF MINORITY VOTER PARTICIPATION IN FLORIDA

12.    The right to vote is a fundamental right in American society; yet, African Americans and Latinos have been the targets of disenfranchisement and dilution efforts throughout American history. The Voting Rights Act of 1965 ended

4

overt barriers and resulted in significantly higher voter registration and turnout rates, especially in predominantly Black Southern communities.

13.     African Americans and Hispanics have made phenomenal economic and political gains in Florida and nationwide over the past half-century. Their voter turnout and registration rates reflect high levels of interest in voting and the political process. Black voter turnout increased to a nationwide high of 68% in 2020 (U.S. Elections Project 2020). Nationwide Hispanic turnout grew from 29% in 1986 to 52% in 2020. (U.S. Elections Project 2020). In 2020, approximately 2.5 million Latinos were registered to vote in Florida – an increase of 500,000 votes since 2016. (Noe Bustamante 2020). In 2020, an additional 215,000 Black voters registered in Florida as compared with 2016, resulting in a total Black voter registration of 2.2 million. (Budiman 2020; Powers 2020).

14.     This progress has been met, however, with resistance from white legislators and governors, who have responded by passing legislation that makes voting more difficult for Black and Hispanic voters. While these new laws are couched as "reform" laws that supposedly address voter fraud, I see recent and current changes in the law as part of a long tradition of  purposeful efforts by Florida's governors and legislators to disenfranchise Black and Hispanic voters. As I will discuss, the Florida legislature has a well-established history of making voting

5

more difficult for Black and Hispanic voters and of citing purported fraud as a pretext for passing laws intended to disenfranchise Black and Hispanic voters.

15.    In particular, the legislatures of Florida, and  several other states (especially southern states such as Georgia) have implemented a number of election "reform" laws as racial voting demographics and practices have changed. In particular, it appears that in Florida, when Blacks and Hispanics vote in increasing numbers and begin to take advantage of voting mechanisms previously used by whites, the Florida legislature and governor have responded by curtailing the ability of Black and Hispanic voters  to take advantage of them. The purported justification for these restrictions is frequently to address "fraud," which in the past has been illusory. In other words, when Black and Hispanic voters utilize voting mechanisms and procedures that increase their turnout the progress is met with backlash.

16.    In this Report, I discuss the history of Black and Hispanic voter disenfranchisement in Florida and efforts of the legislature to make voting law changes after African Americans and Hispanics had record turnouts. I also describe the high rates of early and mail voting in Florida counties with the largest Black and Hispanic populations after state laws encouraged the same "no excuse" absentee ballots, mail voting, and early voting they now seek to curtail. My analysis of Florida's legislative responses to increased Black and Hispanic voter participation demonstrates that Florida has passed legislation intended to make it more difficult

6

for Black and Hispanics to vote at all, as well as to vote early and by mail, and that this was plainly the intended purpose of Florida's most recent legislation, SB 90.

## VII.  POST-RECONSTRUCTION BLACK DISENFRANCHISEMENT

17.    Efforts to disenfranchise people of color in Florida began during the 1800s. After the Civil War, Florida proposed a new constitution. A purpose of Florida's 1865 Constitution was to revoke its previous Ordinance of Succession so that Florida could rejoin the United States. Despite the outcome of the Civil War, the 1865 Constitution limited the voting franchise to "free white males."  Also in 1865, the Florida Legislature passed the Black Codes, a series of laws establishing "a separate class of citizenship for Blacks, making them inferior to whites." (Paulson 2013b).

18.    Despite the restrictions mentioned in Florida's 1865 Constitution, Black citizens were able to make some progress. The 1865 Constitution never took effect. On March 2, 1867, the United States Congress rejected it and declared that Florida had no legal government. Instead, Congress conditioned rejoining the Union on Florida's adoption of the 13th, 14th and 15th Amendments — ending slavery and protecting the citizenship and voting rights of newly freed slaves — and on the new state constitution conforming with the U.S. Constitution. Florida was one of ten ex-Confederate states that had previously rejected the 14th Amendment. (Wood 2016, 4). Congress also prohibited much of the traditional white power structure that

7

prevented Blacks from registering to vote, disenfranchising them as punishment for their involvement in the Civil War. Freed Black males, who comprised less than half of Florida's population, were allowed to vote during this time. (Shofner 1963).

19. The Congressional mandates, requiring, among other things, that Florida allow Black males to register and vote, led to significant Black voter participation. By the fall of 1867, the number of Black voters surpassed the number of white voters. Out of the 26,582 registered voters statewide, 11,148 were white and 15,434 were Black. (Shofner 1963, 359).

20. During the state's 1868 Constitutional Convention, the legislature drafted a new constitution that "kept Florida from becoming 'niggerized'" by diluting the Black vote so that the state legislature would remain predominantly white. (Shofner 1963, 374). Smaller counties were given their own representatives in the state Legislature, but larger counties, which were dominated by Blacks, were given multiple representatives based on their population. With Black strength concentrated in nine counties in the north-central part of the state, the arrangement insured white control of the Legislature. The governor also was given authority to appoint county officials, guaranteeing that whites would control the key jobs. (Paulson 2013b).

21. For a short time after adoption of the 1868 Constitution, Blacks managed to get elected to higher office in Florida. In 1870, Josiah Walls, a former

8

slave and Union soldier from Alachua County, became Florida's first Black member of Congress, and 19 Blacks were elected to the 76-member Florida Legislature.

22.     But progress was short-lived and Florida's legacy of vote suppression continued. Indeed, as I demonstrate throughout this Report, the pattern of progress for Black voters followed by backlash from the Florida legislature and governor has continued to this day. By 1876, Reconstruction was over, and white political dominance was restored. Indeed, in 1876, Congressman Josiah Walls, Florida's first Black congressman, was unseated.[2]  Florida adopted a new Constitution in 1885, which was described as a "white supremacy document." (Paulson 2013b). The 1885 Constitution and the laws passed by the Legislature thereafter erected multiple barriers to Black voting, such as the white primary, grandfather clause, poll tax, literacy test, ballot box law, long residency requirements and scores of other obstacles. (Kousser 1974, 40; Paulson 2013b). Florida's 1885 Constitution was in effect until 1968.

23.     Between the adoption of the 1885 Constitution and the passage of laws by the white-dominated Florida Legislature, Florida essentially disenfranchised all Black voters. The state permitted only whites to vote in  primaries, denied access to the ballot to anyone who couldn't read and imposed lengthy residency requirements

---

[2] It was not until 1993, well over one hundred years later, that Florida would have another Black congressman.

as a condition for voting. Florida also was the first state to adopt a $2 poll tax as a requirement for voting. (Klas 2016). Turnout among Black males in 1888, before the barriers went into effect, was 62 percent. (Paulson 2013a). Just four years later, after the barriers were enacted, Black male turnout in Florida dropped to 11 percent. (Paulson 2013a).

24.    In 1915, the Legislature enacted a literacy test and a companion grandfather clause. Although not implemented officially until 1915, "de facto literacy tests" had been utilized in Florida since the late 1800s and had done a particularly effective job of disenfranchising illiterate Black males (55% of whom were illiterate in 1900). (Kousser 1974, 50). The grandfather clause, common throughout the South, declared that any person who had a relative who voted prior to a certain date did not have to take the literacy test. (Paulson 2013a). According to the proposed Florida law, if you had a relative who was eligible to vote on Jan. 1, 1867, you were exempt from taking the test. Since no Black Floridian had voted prior to that date, all Blacks had to pass the test. Blacks were frequently asked more technical and legal questions than whites. When one Black applicant was asked what "habeas corpus" meant, he responded: "Habeas corpus means this Black man ain't gonna register today." (Paulson 2013a).

25.    Even after courts and federal laws eliminated the white primary, other suppression mechanisms like poll taxes and literacy tests could always be counted

on to limit Black political participation. (Paulson 2013a). In the same vein, the grandfather clause enabled voting by whites who would have lost the franchise had they been Black, thereby maintaining high white voter turnout.

26.     By 1940, as few as six percent of Black Floridians were registered to vote. By 1947, the statewide Black voter registration rate increased to 16 percent. (Klas 2016). Yet, few Black citizens were registered in most Florida counties before the ratification of the Voting Rights Act (discussed below). The voter disenfranchisement efforts that existed before the Voting Rights Act blatantly deprived African Americans and Latinos of their suffrage rights. State legislatures, including the Florida legislature, utilized vote dilution tactics in the years after the law's passage. Now, the reform term is used as a veiled attempt to disenfranchise voters of color in Florida.

## VIII.  HISPANIC/LATINO DISENFRANCHISEMENT IN FLORIDA

27.     Although Hispanics have played a prominent role in Florida politics throughout the state's history (for example, in 1822, Joseph Marion Hernandez was the first Florida delegate to the U.S. Congress), the empowerment of Latinos is a recent phenomenon. (Moreno and Austin 2015). Hispanics did not become a factor in modern state politics until the 1980s. In 1980, only one Latino, Elvin Martinez, served in the Florida legislature, representing the traditional Hispanic area of West Tampa in the Florida House of Representatives. (Moreno and Austin 2015). In 1982,

11

Roberto Casas and Ileana Ros were the first Cuban Americans to be elected to the Florida legislature. (Moreno and Austin 2015). In 1999, Anthony Suarez became the first Hispanic elected to represent the Orlando area in the Florida Legislature. (Moreno and Austin 2015). In 2012, Darren Soto became Central Florida's first Hispanic State Senator. (Moreno and Austin 2015). In 1989, Ileana Ros-Lehtinen was the first Latino elected to Congress in Florida since the election of Joseph Marion Hernandez in 1822. Mel Martinez's election to the U.S. Senate in the 2000 election is symbolic of the rapid political empowerment of Florida's growing Hispanic population. (Moreno and Austin 2015). Because of Hispanic political influence, Florida is a major battleground state in presidential elections. Cuban Americans in South Florida, the Puerto Rican population along the I-4 corridor, and the growing Central and South American populations make the state's Hispanics one of the most influential Latino populations in the United States. (Moreno and Austin 2015). Both George W. Bush in 2000, and Barack Obama in 2008 and 2012, won Florida's electoral votes because of their margins of victory among Hispanic voters. In fact, Florida's Hispanic voters have more political clout than the larger and more established Latino communities in California and Texas. (Moreno and Austin 2015).

28.    Florida's Latino citizens have also experienced voting discrimination because many are classified as language minorities. In 1975, Congress added section 203 as an amendment to the Voting Rights Act to prohibit discrimination against

"language minorities" (people of Spanish, Asian, Native American, and Alaskan Native descent). (U.S. Department of Justice 2021a). The U.S. Census Bureau defines certain areas as "covered jurisdictions" based on their voting age population, racial/ethnic composition, and illiteracy rate. According to the Department of Justice, "[section 203] covers those localities where there are more than 10,000 or over 5 percent of the total voting age citizens in a single political subdivision (usually a county, but a township or municipality in some states) who are members of a single language minority group, have depressed literacy rates, and do not speak English very well. Political subdivisions also may be covered through a separate determination for Indian Reservations." (U.S. Department of Justice 2021a). If a county is subject to a minority language requirement under section 203, the Supervisor of Elections must make voting materials and information available in the minority's language and provide assistance in the minority's native language in all elections. (U.S. Department of Justice 2021a). After the 2010 census, Broward, Collier and Glades counties in Florida were no longer covered jurisdictions for American Indian language, but the entire State of Florida (rather than individual counties) became a newly covered jurisdiction for Spanish. (U.S. Department of Justice 2021a). Since then, Florida has had to make statewide issued/produced voter registration-voting materials in Spanish. (U.S. Department of Justice 2021a).

13

29.    Some of the discrimination endured by African Americans and Hispanics has been regional. They were mostly excluded from elective offices in Dade County (now known as Miami-Dade County) until the *Meek v. Metropolitan Dade County* decision. This 1992 federal ruling nullified the usage of at-large elections in the county.

30.    Florida was the first state to adopt the runoff primary in 1901. At that time, Blacks made up 44 percent of the population and there was a fear that a Black candidate might win an election in a multi-candidate field. (Paulson 2013a). To diminish that possibility, a second or runoff primary was instituted. If no candidate received a majority of the vote in the first primary, the top two vote-getters would compete in a runoff. (Glaser 2006). Even when Black candidates received the most votes in the general election, they often lost runoff elections when competing against a white candidate because Black and white voters voted largely on the basis of race. (*Meek v. Metropolitan Dade County* 1992). White candidates benefitted from the larger white population or turnout in these cities when only two candidates (one white, one Black) were on the ballot. (Wright 2000). Recent studies find that Black candidates choose not to run for southern political offices if runoff elections are required because they do not believe they can win. (Keele et al. 2017).

31.    The efforts to replace at-large elections with district elections began in the 1980s. (Croucher 2002, 236). At-large elections require that minority candidates

14

win citywide, rather than in particular districts. This requires additional funding and name-recognition and that candidates win substantial support from white voters in cities with histories of racially polarized voting. In predominantly white cities with histories of racially polarized voting, white candidates are much more likely to win. (Paulson 2013a).

32. Eventually, a 1992 class-action lawsuit filed by a group of African American, Black ethnic, and Hispanic plaintiffs culminated in changes. Before the 1992 ruling, only one African American and one Latino had ever served on the Dade County Commission at any one time. (Grenier and Castro 1999, 287). Both groups were disadvantaged by at-large elections, but especially African Americans. By the early 1990s, Hispanics and African Americans together constituted about 70 percent of the population. (Warren and Moreno 2003, 289). Few minority candidates amassed the funding to win countywide elections nor did they have the crossover appeal that was sufficient for them to gain enough white and Hispanic votes to secure victories. (Warren and Moreno 2003, 290).

33. In 1986, African American attorney and Miami commissioner Arthur Teele Jr., filed a federal class-action lawsuit on behalf of minority voters in the Miami-Dade area. These plaintiffs argued that the at-large election system violated the Voting Rights Act because it diluted the votes of ethnic and racial minorities. (Croucher 2002, 236). The lawsuit referred to the difficulty minority voters had

15

when attempting to elect county commissioners. The major impediments included the small Black populations, residential patterns, the financial burdens minority candidates assumed when seeking countywide offices, and the racially polarized voting behavior of minorities and Anglos. (Croucher 2002, 236). Although whites were the minority, their voting bloc determined the outcome of elections. At times, minority candidates competed in runoff elections, but lost them because of their inabilities to attract crossover votes. For example, only five African Americans and two Hispanics served on the Miami-Dade county commission from 1957 to 1992 although several had run for office. (Warren and Moreno 2003, 289). On August 14, 1992, federal court judge Donald Graham ruled in favor of the plaintiffs, ordering that Dade County's at-large electoral structure be changed to one where commissioners would be elected from thirteen single-member districts. The court agreed that Miami-Dade County's at-large election system discriminated against African Americans and Hispanics by making it more difficult for them to elect their preferred representatives. (*Meek v. Metropolitan Dade County* 1992). Eventually, a thirteen-member district commission (with three predominantly Black, seven predominantly Hispanic, and three predominantly white districts) replaced the nine-member at-large commission. (Austin 2018, 110). As a result of the *Meek* case, the commission became much more diverse. One study reported, "In April 2003, the county commission went from a nine-member body with never more than one

16

African American and one Hispanic commissioner at a time to a thirteen-member body with six Hispanics, four African Americans, and three non-Hispanic whites." (Warren and Moreno 2003, 289).

34.     More recently, in the 2018 *Rivera v. Barton* case, several civil rights and justice organizations, including Faith in Florida, Hispanic Federation, Mi Familia Vota Education Fund, UnidosUS, and Vamos4PR, as well as individual voter Marta Rivera, filed a lawsuit in the United States District Court in the Northern District of Florida, Gainesville Division against the Florida Secretary of State and 32 Florida counties. (Sesin 2018). They argued that state election officials violated section 4e of the Voting Rights Act by failing to provide ballots and other information in Spanish to Puerto Rican voters who had recently moved to Florida. Puerto Rico is a U.S. territory and Puerto Ricans are U.S. citizens. (Slanker et al. 2018).[3] As a result, these individuals can register and vote in state elections after relocating to the U.S. Spanish is the primary language for many of them. (Sesin 2018). In 2018, approximately one million Puerto Ricans resided in Florida. Of those, approximately 859,000 were eligible to vote. (Sesin 2021). An undisclosed settlement was reached in early 2021. (Sesin 2021).

---

[3] Section 4e provides that "the right to register and vote may not be denied to those individuals who have completed the sixth grade in a public school, such as those in Puerto Rico, where the predominant classroom language is a language other than English." (U.S. Department of Justice 2021c).

## IX. BLACK VOTER DISENFRANCHISEMENT AND VOTE DILUTION FOLLOWING PASSAGE OF THE CIVIL RIGHTS ACT OF 1957 AND THE VOTING RIGHTS ACT OF 1965

35.     Before the ratification of the Voting Rights Act of 1965, the harassment and intimidation of Black voters in Florida (and throughout the South) resulted in extremely low voter registration rates. In Tennessee, Arkansas, Florida, and Texas, poll tax requirements were the primary method used to achieve disenfranchisement. (Salvatore et al 2007, 12). Because of widespread evidence of Black voter disfranchisement in Florida and other southern states, Congress passed the Civil Rights Act of 1957. Among other things, the Act established the U.S. Commission on Civil Rights to investigate allegations of citizen disfranchisement on account of race, color, religion, or national origin. (Wood 2016, 6). One of the first complaints of Black disfranchisement was from Gadsden County, Florida. In a sworn complaint, one citizen alleged that "through threats of bodily harm and losing of jobs, and other means, the Negro residents of Gadsden County, Fla., are being deprived of their right to vote." (Wood 2016, 7). The Civil Rights Act of 1957's scope was not comprehensive enough to combat the massive resistance to Black suffrage. (Anderson 2018, 20). The Civil Rights Commission's first report documented that in Gadsden County in 1958 "only 7 Negroes were registered [to vote] . . . although 10,930 adult Negroes lived there." (Wood 2016, 7). Three years later in 1960, the predominantly Black county had a 12,261 Black voting-age population, but still only

18

seven African Americans were registered to vote. (Klas 2016). Before the Voting Rights Act, Florida counties with the largest Black populations had the lowest Black voter registration rates. (Wood 2016, 7). According to a second U.S. Civil Rights Commission report, Black voters were confronted with threats, violence, and harassment when attempting to register. These tactics included cross burnings and fire bombs on their properties and threatening phone calls. (Wood 2016, 7).

36.     The Voting Rights Act of 1965 outlawed overt discriminatory voting practices that had the effect of prohibiting African Americans and Latinos from voting in states like Florida. Its key provisions included:

- Federal supervision of voter registration in areas where less than 50 percent of the nonwhite population were registered voters and with historical evidence of African American voting discrimination.

- The abolition of literacy tests.

- A U.S. attorney general investigation of poll taxes which had been banned by the 1964 24th Amendment to the U.S. Constitution in federal elections and by the 1966 U.S. Supreme Court *Harper v. Virginia Board of Elections* decision in state elections.

- A "coverage formula" in section 4b that identified counties that had to meet section 5's preclearance requirement. These areas had a history of minority disenfranchisement as well as a small percentage of Black registered voters.

19

Municipalities and states were prohibited from changing the voting rules and procedures in these "covered jurisdictions" unless they were authorized by either the U.S Attorney General or a three-judge D.C. panel. In addition, states were allowed to "bail out" if there was no evidence of discrimination for 10 years.

37.    Because of the passage of federal civil and voting rights legislation during the mid-1960s, the Florida legislature had to amend the state Constitution to guarantee civil and voting rights to Black and Latino citizens. In 1968, the state legislature drafted its first new constitution since 1885. (Wood 2016, 7). The 1885 Constitution had banned slavery in section 19 of its "Declaration of Rights" , but made no mention of either race or racial discrimination. (Florida Constitution Revision Commission 2021). The 1968 Constitution stipulated that "All natural persons, female and male alike, are equal before the law and have inalienable rights. . . . No person shall be deprived of any right because of race, religion, national origin, or physical disability." (Article 1, § 2, Florida Constitution, 1968).

38.    The Black voter registration rate increased significantly after the Voting Rights Act went into effect. In 1960, 40% of Florida's Black citizens were registered. In 1968, Gadsden County had 4,663 registered Black voters. (Isbell 2021a). By 1971, the statewide Black voter registration percentage had grown to almost 60% (Southern Oral History Program 2021). Also by 1972, the number of

registered Black voters (7,615) in Gadsden County had for the first time surpassed the number of white registered voters (7,391). (Isbell 2021a). During this period, Black Floridians won their first elected offices since Josiah T. Walls and Henry Harmon won state legislative seats and served from 1868 to 1870. (Brown 1998; Young 2006). In 1968, Joe Lang Kershaw became the first African American elected to the state House (Kral 1999), followed in 1970, by Gwen Cherry, the first Black female state House member. (Gwen S. Cherry Black Women Lawyers Association 2021). One analysis of Black political evolution in Florida discovered that "Florida's black minority was just coming into its own political power. Registration was steadily increasing as the Jim Crow structures fell apart. For example, 1970 would finally see African-Americans take control of registration in Gadsden, Florida's lone black-majority county." (Isbell 2021a).

39. After the percentages of registered minority voters increased, Black and Hispanic citizens wanted to continue electing people of color to major offices, but had to challenge legislative efforts to dilute their votes. The 1968 state constitution had required redistricting two years after every census and that the Florida Supreme Court approve the districts. (Isbell 2021a). Beginning in 1970 and for every subsequent decade thereafter, the legislature attempted to draw districts to prevent Florida's Black and Hispanic citizens from electing minority representatives. Blacks and Hispanics had to fight "for representation in the map-drawing process." (Isbell

2021a). Black voters and Republicans unsuccessfully challenged the newly-drawn 1970 districts in the *Wolfson v. Nearing* case. They accused the legislature of both racial and partisan gerrymandering and argued that "gerrymandering and multi-member districts are used with discriminatory effect so as to cancel out or minimize the votes of racial and political elements of the constituency. " (*Wolfson v. Nearing* 346 F. Supp. 799 (1972)). The plaintiffs specifically pointed to the drawing of districts in Gadsden, Broward, Dade, Duval, and Polk Counties. Plaintiffs alleged that districts were drawn in such a way that Gadsden (where Blacks outnumbered whites) was combined with surrounding predominantly white counties to prevent the election of Black representatives. Moreover in Broward, Dade, and Duval, "readily identifiable black ghetto areas" were not placed in the same district so that Black voters could elect Black representatives. (*Wolfson.*) As a result, other southern states (Alabama, Georgia, Tennessee, South Carolina, Louisiana, Texas, North Carolina, Arkansas, and Mississippi) had elected more state representatives than Florida by 1977. (Isbell 2021a). In 1977, Florida's 160-person legislature had only three Black representatives and no Black state senators. (Isbell 2021a). Thus, while Blacks in the state of Florida had made progress in the years following the Voting Rights Act, the legislature continued to dilute the Black vote so that few Blacks would win elections. Thus, as has been the pattern throughout most of Florida's  history, when minority

22

voters experience progress in advancing their use of the franchise, that progress is met with a backlash.

40.     In 1980, when Carrie Meek became the first Black female state senator, the Florida legislature had no Hispanic members. (Isbell 2021a). In 1982, Arnett E. Girardeau, an African American man, won election to the state Senate and Illeana Ros-Lehtenin, a Cuban American woman, won election to the state House. (Gadsden County, Florida Government 2021; Rohrer 2016). These victories again signaled that Black and Hispanic voters were making progress in their efforts to elect political representatives.

41.     In 1982, the NAACP and other civil rights organization challenged Florida's redistricting process. The legislature had again redrawn districts to make it difficult for Blacks to elect representatives. Instead of creating a predominantly Black district that combined neighborhoods in South Tallahassee with those in nearby Gadsden County, the state House created two predominantly white legislative districts (the 8th and the 9th) that combined the south sides of Tallahassee and Gadsden, respectively, with predominantly white, rural areas. (Isbell 2021a). Despite this, African American candidate Al Lawson won election to the House representing the 9th district because of a high Black turnout rate and a split of the vote among three white candidates. Lawson and Bette Wimbush, an African American woman, competed in the runoff election that Lawson later won. The 40%

23

Black turnout rate surpassed the 30% turnout among White voters. (Isbell 2021a). Despite the efforts of the legislature to prevent his election, Lawson's victory made him the first Black state representative from the Panhandle since Reconstruction.

42.     The 1982 redistricting process resulted in two predominantly Black and one predominantly Hispanic state legislative districts. (Isbell 2021a). However by the end of the 1980s, the number of African Americans in the state legislature grew from five to 10 and Hispanics increased from one to nine. (Isbell 2021a). During the 1992 redistricting process, both Black and Hispanic citizens demanded the creation of majority Black and Hispanic state legislative and congressional districts. While the NAACP and other civil rights groups requested the creation of two predominantly Black congressional districts, the Florida Black Legislative Caucus requested four such districts. (Isbell 2021b). Illeana Ros-Lehtinen became the first Cuban American congressional representative from Florida after winning a 1989 special election. (Isbell 2021b). Although this was a significant victory, State Senator Mario Diaz-Balart argued that the Miami-Dade area should have two districts with at least 60% Hispanic populations. (Isbell 2021b). Eventually, after many debates and compromises, the legislature later created three African American districts (two majority and one with a 45% black voting-age population) and two majority Hispanic districts, in South Florida. (Isbell 2021b). After winning election to the U.S. House of Representatives in 1992, Carrie Meek (along with Corinne

Brown and Alcee Hastings) became Florida's first Black congressional representatives since Reconstruction. (Isenstadt 2009). Illeana Ros-Lehtinen and Mario Diaz-Balart won the two majority Hispanic congressional districts. (Isbell 2021b). African Americans and Latinos have also won other political offices over the years, including holding the majority of the offices in some municipalities such as El Portal, Lauderdale Lakes, Quincy, North Miami, and Hialeah, and in counties such as Broward and Gadsden. (Austin 2018; Moreno and Austin 2015).

43.     Thus, while the Florida legislature had been attempting to dilute Black and Hispanic votes such that few minorities would be elected, that did not work as well as had been hoped. As a result, in later years, the Florida legislature would turn its attention to making it difficult for Black and Hispanic citizens to vote. However, they were prevented from doing so because of pre-clearance objections under the Voting Rights Act.

44.     In 1975, Hillsborough, Monroe, Collier, Hendry and Hardee counties in Florida were added to the Voting Rights Act's coverage formula in section 5 because fewer than half of the adults were registered to vote and more than 5 percent of the population was non-English speaking. (Paulson 2013b).

45.     These counties attempted to change their voting procedures many times. In at least five cases, the U.S. Department of Justice declined preclearance. For example, in 1985, the Department of Justice objected to a restriction on assisting

25

voters casting absentee ballots as a violation of section 208 of the Voting Rights Act (Reynolds). In 1998, the Department of Justice declined to preclear a requirement to include a social security number on submitted absentee ballots because of the requirement's racially discriminatory impact. (Lee). And in 2012, the United States sued the state to stop a voter purge that the court found likely discriminated against naturalized citizens. *See United States v. Florida*, 870 F. Supp.2d 1346, 1350 (N.D. Fla. 2012).

46.     Florida also blocked Black residents from exercising political power by such devices as at-large elections. Since 1983, scores of legal actions have been brought in Florida against the state, its counties, and its municipalities, under the Fourteenth Amendment, the Fifteenth Amendment, and/or the Voting Rights Act. Examples of such cases include:  *Meek v. Metropolitan Dade County, Fla.*, 805 F. Supp 967 (S.D. Fla. 1992) (holding that Dade County's at-large system of election to the County Commission violates Section 2 of the Voting Rights Act by diluting both Black and Hispanic voting power and enjoining Defendants from conducting elections under said at-large system), *aff'd in part, rev'd on other grounds,* 985 F.2d 1471 (11th Cir. 1993); *McMillan v. Escambia County, Fla.*, 748 F.2d 1037 (5th Cir. 1984 (ruling that the at-large system for electing the Escambia County Commission in Escambia County, Florida, violated section 2 of the Voting Rights Act); *NAACP v. Gadsen County School Board*, 691 F.2d 978, 982 (11th Cir. 1982) (finding that

26

the at-large school board electoral system in Gadsden County was enacted for a discriminatory purpose and that the system had the effect of diluting minority votes).

## X. THE 2000 ELECTION AND FURTHER ATTEMPTS TO DISENFRANCHISE BLACK AND HISPANIC VOTERS

47.     As discussed, the Voting Rights Act led to dramatic increases in Black and Hispanic voter turnout. Florida responded to this progress in various ways that adversely affected Blacks' and Hispanic's right to vote.

48.     One technique used to disenfranchise Black and Hispanic voters prior to the 2000 election was voter registration purges. The discriminatory effect, if not intent, of these registration purges is plain from the data. A U.S. Commission on Civil Rights investigation concluded that Black and Hispanic citizens were disproportionately purged from the voter rolls before the 2000 election. For example in Miami-Dade County, Blacks were 65 percent of the voters purged even though they made up only 20.4 percent of the population. (Paulson 2013a).

49.     Thus, while Black and Hispanic turnout in the 2000 election was strong, it very likely would have been even stronger had Florida not purged so many registrations.

50.     Registration purges were not the only means used to make it more difficult for Black and Hispanic Floridians to vote. In April 2001, the U.S. Commission on Civil Rights issued a report entitled *Status Report on Probe of*

27

*Election Practices in Florida During the 2000 Presidential Election*, which found that the following occurred on election day in November 2000:

- Officials did not ensure that all precincts received adequate resources, especially those precincts catering to Black and Hispanic voters.

- "Police sweeps and roadblocks" in African American neighborhoods intimidated many Black voters. Civil rights groups like the N.A.A.C.P. and the Rainbow Coalition requested a federal inquiry after many African American voters alleged voting discrimination in Black and Hispanic neighborhoods. They voluntarily gave sworn statements to the U.S. Justice Department. (Navarro and Sengupta 2000).

- Non-felons were purged from voter registration rolls based on unreliable information and poor purge policies.

- Voter registration applications were not processed in a timely and proper manner under the National Voter Registration Act, commonly referred to as the "motor-voter law."

- Old and defective election equipment was found in poor precincts.

- Language assistance when required and requested was not provided.

- Persons with disabilities faced accessibility problems at polling sites.

- Poll worker training was inadequate.

28

- Insufficient funds were appropriated for voter education (U.S. Commission on Civil Rights 2002a).

51.     A June 2002 report from the U.S. Commission on Civil Rights, "Voting Irregularities in Florida During the 2000 Presidential Election," included sworn statements from African American and Hispanic voters that substantiated disfranchisement claims during the November 2000 election period. The Blacks and Hispanics alleged that:

- Their names were not on rolls of eligible registered voters, and Supervisors of Elections offices failed to answer their calls  R. Jai Howard, an African American female and the vice president of the Florida Agricultural and Mechanical University Student Government Association, testified on behalf of herself and approximately 12,000 mostly African American students. These students had participated in extensive voter registration efforts in the months prior to the November 2000 election. After election day, the Student Government Association learned that several Black students encountered difficulties when attempting to vote and some were prohibited from voting. These accounts included statements from one student "who had two voter registration cards with two different precincts, some students who received no voter registration cards, switching of precincts without prior notification, misinformation at precincts, and students who had attempted to register

29

numerous times and never received registration [cards] and were never entered into the system." (U.S. Commission on Civil Rights 2002b).

- Poll workers confirmed that hundreds, if not thousands, of Black and Hispanic voters were disenfranchised. For example, according to Barbara Phoele, a Broward County poll worker, most of the individuals who were prohibited from voting were African American and Hispanic voters whose names were not listed on the rolls. In addition, the clerk at the precinct where Ms. Phoele worked made no attempt to obtain affidavits from these voters so that he/she could send them to the central election office. The report stated, "According to Ms. Phoele, the clerk did not communicate with the voters and did nothing to encourage them to vote. In fact, Ms. Phoele noticed later that afternoon that the sign informing voters where they should call if they experienced problems had never been posted. She brought this to the attention of the precinct clerk who explained, 'I didn't have time to put it up.' Ms. Phoele recalled that in past elections it took only about 10 minutes to reach the elections supervisor, but on November 7, 2000, she turned away approximately 40 or 50 people because she could not access the supervisor of elections." (U.S. Commission on Civil Rights 2002b).

- Polling places closed at an earlier time than that posted. According to Lavonna Lewis, an African American first-time voter, her assigned polling

30

place was closed when she arrived to cast a vote. After being informed that it was closed by a white poll worker standing outside, she noticed that the same worker "allowed a white gentleman to walk in and get in line to vote." (U.S. Commission on Civil Rights 2002b).

- Polling places closed without notice (in violation of a requirement that Supervisors of Elections moving polling places "not more than 30 days or fewer than seven days prior to the holding of an election, give notice of the change". (U.S. Commission on Civil Rights 2002b). This notice had to be published in a county newspaper, mailed to each registered voter at least 14 days before election day, posted at the old polling place advising voters of the new polling location which had to be identified with a sign.

- Several Florida voters reported seeing Florida Highway Patrol troopers in and around polling places. Troopers conducted an unauthorized vehicle checkpoint within a few miles of a polling place in a predominantly African American neighborhood. In another area, trooper vehicles were reportedly parked within sight of at least two polling places. The FHP reported that troopers only visited polling places on Election Day in order to vote. However, in light of the high voter turnout that was expected during the 2000 presidential election, particularly among communities of color that may have a strained relationship with law enforcement, some Floridians

31

questioned the timing of and the motivation for the FHP's actions and believed that they were there to intimate voters which violates the Florida Election Code. (U.S. Commission on Civil Rights 2002b).

52.     In sum, Florida's actions during the 2000 election demonstrated that Black and Hispanic voters, despite significant progress, faced barriers to voting that white voters did not, which depressed minority voter participation. This is continued evidence of voting discrimination against Black and Hispanic voters that has plagued the state for several decades.

## VIII.  POST-2000 DISENFRANCHISEMENT

53.     Florida's attempts at disenfranchising Black and Hispanic voters continued after the well-publicized steps taken prior to the 2000 election. Unfortunately, despite the Voting Rights Act, Florida continued to implement policies that disenfranchised Black and Hispanic voters. I will discuss a number of these policies because they provide important context; SB 90 was not passed in a vacuum. Indeed, SB 90 is in many ways a culmination of years of attempts by white legislators and governors to discriminate against Black and Hispanic voters.

54.     After the 2000 election exposed significant problems with Florida's election administration, the legislature passed, and Governor Jeb Bush signed, the Florida Election Reform Act of 2001 (SB 1118) which, according to Governor Bush, was supposed to correct the problems associated with the 2000 election. It prohibited

32

the use of voting systems that required paper ballots and punch cards; allowed voters to return provisional ballots to the Supervisor of Elections; provided procedures for voting and counting provisional ballots; substantially modified standards and procedures for manual recounts; provided for absentee ballots for overseas voters; allowed voters who had previously requested absentee ballots to cast provisional ballots if they desired to vote in person; and authorized the Elections Canvassing Commission to facilitate absentee voting during emergencies (Florida Senate 2002). SB 1118 eliminated the "for cause" requirement for casting an absentee ballot, thus allowing all registered Florida voters to cast an absentee ballot without restriction.

55.     The 2001 Election Reform Act also included a ten-point Voter's Bill of Rights statement that guaranteed the right of every citizen to: 1) vote and have his or her vote counted accurately; 2) cast a vote if in line at poll closing time; 3) seek and receive assistance in voting; 4) receive up to two replacement ballots if needed; 5) receive an explanation if his or her registration is in question; 6) cast a provisional ballot if his or her registration is in question,; 7) prove his or her identity by signing an affidavit if there is any doubt; 8) receive written instructions to use when voting, and oral instructions from election officers when requested; 9) vote free from any kind of coercion or intimidation; and 10) vote on a voting system that is not defective and accurately casts votes (Mills 2001, 77).

56.     The 2001 Election Reform Act, however, contained several changes to Florida's election laws that were directed at disenfranchising Black and Hispanic Voters. An African American voter and two organizations challenged the law immediately after it was signed, alleging that it violated the Voting Rights Act as well as the First, Fourteenth, and Fifteenth Amendment of the U.S. Constitution. *Major v. Sawyer*, Case No. 4:01-cv-10088-KMM (SDFL, 2001). In particular, the *Major* lawsuit challenged the following provisions of SB 1118:

- A voter list maintenance section that had standardless ex-felon identification procedure, was more likely to erroneously identify minorities as ex-felons, and also relied on a certified mail procedure that placed the burden on the voter (as opposed to the government) for remaining on the voter rolls.

- The system used to disqualify provisional ballots disproportionally would affect minority voters because it required rejecting as illegal provisional ballots from legal, eligible voters who mistakenly voted in the wrong precinct, and also because the provisions would prevent a provisional ballot from counting if a voter who was erroneously removed from the voter roll did not resolve the eligibility question.

- The requirement that precincts post a list of voter responsibilities. These responsibilities include an obligation to 1) study and know candidates and issues; 2) keep his or her voter address current; 3) know his or her precinct

34

and its hours of operation; 4) bring proper identification to the polling station; 5) know how to operate voting equipment properly; 6) treat precinct workers with courtesy; 7) respect the privacy of other voters; 8) report problems or violations of election law; 9) ask questions when confused; and 10) check his or her completed ballot for accuracy (Mills 2001, 77).

57.     One observer described the voter responsibilities statement as an example of a "modern-day analogy to unconstitutional literacy tests." (Mills 2001, 76). Indeed, in the aftermath of the 2000 Florida election, in which it was thought that many voters made errors in filling out their ballots, Florida's Speaker of the House "was quoted by the news media as stating that the widespread voter confusion might be a reason to require literacy tests." *See Major v. Sawyer*, Amended Complaint, ¶ 21. The Voting Rights Act of 1957 had previously banned literacy tests.

58.     Another observer expressed the belief that the requirement would "disproportionately discourage minorities from voting." (Ulferts 2005). And the *Major v. Sawyer* plaintiffs asserted that "[t]he Voter Responsibilities section of the Election Reform Act has the potential for discrimination in that it is likely to deter electors, particularly racial and language minorities, from voting who have not studied the candidates and issues, are uninformed as to their precinct and its hours of operation, who do not have identification, do not know how to operate voting

35

equipment properly or are otherwise confused regarding some aspect of the election process." (*Major v. Sawyer*, Amended Complaint, ¶ 57).

59.    At the time the *Major* lawsuit was filed, certain of the challenged provisions were under preclearance review, pursuant to section 5 of the Voting Rights Act, by the Department of Justice. In response, the Florida Secretary of State moved to dismiss several of plaintiffs' claims, asserting that those challenged provisions were not being enforced because they were under preclearance review. Accordingly, the Court granted the motion to dismiss. However, the plaintiffs' challenge to the voter responsibilities portion of SB 1118 was not dismissed and thus the lawsuit proceeded on that claim. However, the Florida legislature, no doubt fearing it would lose the lawsuit, repealed the requirement, which led to the lawsuit's dismissal.

60.    As a result of SB 1118, Florida's governors and state legislatures began encouraging voters to cast absentee, mail, or drop box ballots. Beginning in 2002, the governor and state legislature encouraged the state's voters to cast "no excuse" absentee ballots and submit them either by mail or drop box. (Sherman 2012). At the time, voters did not have to provide reasons for their ballot requests and in 2016, state legislators changed the names of these ballots from absentee to "vote-by-mail" ballots." (Turner 2020).

36

61.     Florida statute 101.62 (Fla. Stat. § 101.62) stipulated the manner in which absentee ballots could be requested and delivered. (The Florida Senate 2002). In 2002, one would have predicted that white voters would be more likely to mail in absentee ballots because of our nation's history. Throughout most of American history, white members of the military, American citizens living abroad, and the physically disabled voted by absentee ballot much more frequently than did other Americans. (Rotondi 2020).

62.     Indeed, the first documented usage of absentee ballot voting occurred in 1864 during the Civil War when approximately 150,000 of one million white males voted in the 1864 presidential election. (Rotondi 2020). Additional federal voting legislation was passed in 1942, 1955, 1986, and 2009 to make it easier for military men and women (most of whom were white) to vote by absentee ballot. (Rotondi 2020). For many years, the governor and legislature also encouraged no-excuse absentee voting because it benefits "Republican-leaning voters" who usually are white. (Jeffe and Jeffe 1990; Karp and Banducci 2001; Oliver 1996).

63.     As white Floridians continued to vote by mail in larger numbers, Florida continued to make it easier to do so. In 2004, Florida promulgated SB 2566, which took effect on July 1, 2004. SB 2566 amended earlier legislation by eliminating the previous requirement that signatures on absentee ballots had to be witnessed. Instead, SB 2566 gave the Supervisor of Elections in each county

authority to compare voter signatures to verify registration. SB 2566 also allowed voters to submit their ballots up to 15 days before election day at an early voting site and until two days before a scheduled election. (Herron and Smith 2012). All of these actions on the part of the governor and legislature were designed to increase the number of citizens voting by absentee ballot, mail ballot, or early voting, and to avoid issues such as long lines and defective machines on election day. (Posner 2001).[4]

64.     After the enactment of SB 2566, increasing numbers of Black and Hispanic citizens began voting during early voting periods (both in-person and by absentee ballot) rather than on election day. In 2008 and 2012, Barack Obama received the majority of votes from Florida's Hispanic population. Florida's Hispanic voters were an important component of President Obama's victory as he carried Florida by only 236,450 votes in 2008. (Moreno and Austin 2015). As shown in Table 1 below, in 2008, members of the African American and Hispanic electorate voted early in larger numbers as compared to their percentage of the population. According to the 2000 U.S. Census, Florida's Black population was approximately

---

[4] Prior to the 2020 election, politicians praised Florida's vote by mail system, and it continued to be popular. For example, in 2020, then president Donald J. Trump praised the efficiency of Florida's mail and absentee voting practices and said, "Whether you call it Vote by Mail or Absentee Voting, in Florida the election system is Safe and Secure, Tried and True. Florida's Voting system has been cleaned up (we defeated Democrats attempts at change), so in Florida I encourage all to request a Ballot & Vote by Mail! #MAGA." (Oprysko 2020). Also in 2020, Thea McDonald, the deputy national press secretary for the Trump campaign, defended the efficiency of Florida's absentee voting procedures in an emailed statement, saying: "What most states call 'absentee voting' has long been termed 'vote-by-mail' in Florida — it's been that way for years, and it works." (Oprysko 2020).

14.6 percent, but the Black share of early voting turnout was more than twice that. (U.S. Census 2000, 2). As seen in Table 1, the Black portion of early voting turnout ranged from 31.5 percent to 40 percent. Hispanics accounted for 16.8 percent of the Florida population in 2000, but they accounted for 21-24 percent of early voters in 2008.

Table 1 Florida Early Voting in the November 2008 Election

| Race of Voter | NYU Law | Loyola Law | Smith and Herron (2012) |
|---|---|---|---|
| Black | 33.2 | 31.5 | 40 |
| White | N/A | 37.2 | 34 |
| Latino | 23.6 | 22.4 | 21 |

(Source: Herron, Michael C. and Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355." *Election Law Journal* 11, no. 3: 331-347; Sherman, Amy. 2012. "'Souls to the Polls' Sunday Drew High Numbers of African-Americans and Hispanics, Corinne Brown Says." *Politifact: The Poynter Institute*. June 22. https://www.politifact.com/factchecks/2012/jun/22/corrine-brown/souls-polls-sunday-drew-more-african-american-and-/. Accessed on July 22, 2021).

65. The Florida legislature and governor responded to increased use of early and mail voting by Black and Hispanic voters in the 2008 election by

attempting to curtail its use. In 2011, Florida Governor Rick Scott signed House Bill 1355 after the legislature passed it. The lead sponsor of HB 1355 was Dennis Braxley, who, I note, was also the lead sponsor of SB 90, which is the subject of the present litigation.

66. Among other things, HB 1355 reduced the early voting period to eight days. (The Florida Senate 2011). HB 1355 also reduced the amount of time for third-party voter registration organizations to submit their voter registration applications from 10 days to "within 48 hours" of receipt, required that they provide the names of the persons collecting applications and that registration forms contain certain identifying information, and ordered the Florida Division of Elections to maintain a database of forms issued to third-party voter registration groups. (The Florida Senate 2011). In addition, HB 1355 required county canvassing boards to report all early voting and tabulated absentee ballots to the Department of State within 30 minutes after the polls close, and to subsequently report all results (other than provisional ballots) every 45 minutes until complete. (The Florida Senate 2011).

67. A stated rationale for HB 1355 was preventing voter fraud. For example, in an October 11, 2011 press release, the then Florida Secretary of State stated that HB 1355 was needed "to combat voter fraud by preventing voters from casting a vote in multiple counties." (Simon, p. 5). Indeed, according to an article in the Palm Beach Post, "Republican leaders said in proposing the law that it was

meant to save money and fight voter fraud." (Kam, Palm Beach Post, *Former Florida GOP leaders say voter suppression was reason they pushed new election law*, November 27, 2012). However, the article quotes former Florida Republican Party Chairman Jim Greer as stating: "They never came in to see me and tell me we had a (voter) fraud issue. . . . It's all a marketing ploy." While Mr. Greer was under indictment when he made these statements, Wayne Bertsch, a former Republican official involved in Republican campaigns, and Charlie Crist, the former Republican governor, confirmed Mr. Greer's comments, according to the same article. The article further reported that "[Governor] Crist said in a telephone interview this month that he did not recall conversations about early voting specifically targeting black voters 'but it looked to me like that was what was being suggested. And I didn't want them to go there at all.'"

68.    One private citizen referred to HB 1355 as "nothing but a direct attack on black voters. In Florida in 2011, when there were all of these laws passed to restrict early voting days to get rid of Souls to the Polls Sundays, to make it harder to register voters, that was an explicit strategy to suppress the black vote." (Lerner 2016). As a result of this law, early voting sites would be closed on the Sunday before election day. (Sherman 2012). In response to HB 1355, then-U.S. Attorney General Eric Holder wrote a letter to then-Governor Scott that said, "I am deeply disturbed that during your tenure, your state has repeatedly added barriers to voting

41

and restricted access to the polls." (Sherman 2014). According to Holder, the law would have resulted in a "dramatic reduction in a form of voting disproportionately used by African Americans" and further that "[a]ccordingly, the court [discussed below] refused to approve reduced early voting hours with respect to the five counties in Florida covered by the preclearance provision in the Voting Rights Act." (Sherman 2014).

69.  In 2012, U.S. District Judge Robert Hinkle struck down some of HB 1355's provisions, including one that levied fines against voter-registration groups if they fail to submit registrations forms within 48 hours, as opposed to the 10 days they had to submit forms before HB 1355. (Hastings 2012). According to Judge Hinkle, the 48-hour requirement placed an undue burden on these groups. He also stressed the importance of "permitting responsible organizations to conduct voter-registration drives and making it easier for citizens to register and vote promotes democracy." (Hastings 2012). Denise Velázquez, executive director of State Voices of Florida, was one of many Floridians who believed that HB 1355 was designed to prevent Black and Hispanic Floridians from voting and expressed her disapproval of the law when she said, "They [the legislature and then-Governor Rick Scott] did it on purpose. There was no mistake about it. When we minority voters came out in 2008 in unprecedented numbers, they started looking for a way to keep that from happening again." (Hastings 2012). José Balasquide, Florida state director for

42

plaintiff Mi Familia Vota Education Fund (a voter education, registration and mobilization group that registered thousands of Latino voters during the 2008 and 2010 elections) agreed that the new law had the ulterior motive of suppressing the Hispanic vote in particular and said: "They haven't been able to demonstrate premeditated fraud. If they don't have proof, it seems to me that this is a strategy to depress the community's interest in participating in the electoral process, and organizations like ours from persuading and promoting electoral participation in the Latino community." (Hastings 2012).

70.     HB 1355's proponents also either did or should have understood that it would have a disparate impact on Black and Hispanic voters since these voters used early voting opportunities (as opposed to vote by mail) at greater rates than white voters. For example, the elimination of voting on the Sunday before election day would make it more difficult for the members of predominantly African American churches to participate in "Souls to the Polls" events. As shown in the photos below, caravans of black voters traveled to the polls after the end of church services, listened to gospel choirs, and participated in other festivities. (Sherman 2012). Sunday voting was never required in Florida, but some counties offered it before it was eliminated in 2011.





44





71.    Given that it was well-known that Black voters in particular voted in high numbers on the Sunday before election day, the legislature and the governor would have known that eliminating this day of voting would curtail the ability of African Americans to vote. In November 2012, a group of Florida citizens filed a class-action lawsuit in federal court after Governor Scott refused to issue an executive order extending the amount of time to vote early (including a reinstatement of Sunday voting). (Reid 2012). After the filing, Hillsborough, Miami-Dade, Orange, Palm Beach, and Pinellas counties again allowed their residents to vote on Sundays. (Reid 2012).

72.    Because the five counties that were still under the preclearance requirement of the Voting Rights Act were not allowed to implement any unauthorized voting restrictions, the Department of Justice successfully sued Florida. As a result, these new restrictions were prohibited from taking effect in the covered counties. In *Florida v. United States*, the court stated that "the State has failed to satisfy its burden of proving that those changes will not have a retrogressive effect on minority voters."

73.    In addition, Florida has and continues to underfund its election infrastructure, and this has led to additional voting challenges for Black and Hispanic voters. For example, during the November 2012 election, many Floridians were still in line waiting to vote when polls closed. A study by Ohio State University professor

46

Theodore Allen discovered that 201,000 Floridians did not vote due to the long lines. (Paulson 2013a). The Presidential Commission on Election Administration, a bipartisan ten-member commission established by an Executive Order issued by President Obama, recommended reforms after listening to hours of testimony from election officials, voting-rights advocates, professors, and citizens about, e.g., Florida's long waits to vote. (Presidential Commission on Election Administration 2014). Its members concluded that Florida's voters waited in line for much longer periods than voters in other states. (Presidential Commission on Election Administration 2014).

74.     Black and Hispanic voters waited for longer periods than white voters. On average, Florida voters waited for 39 minutes to cast a ballot on election day in 2012 (compared to a 13-minute wait time nationally). (Bennett 2013). While white Floridians waited for an average of 11.6 minutes to vote, Black voters waited twice as long (23.3 minutes) and Latinos waited seven minutes longer (an average of 18.7 minutes). (Bennett 2013).

75.     In sum, because HB 1355 reduced the number of early voting days, more voters were forced to vote on election day. African American and Latino voters were the targets of voting discrimination because of the elimination of Sunday voting and the longer wait times that were designed to discourage many from voting.

47

76.    In late April 2013 in a complete reversal of the previous policy, the Florida Legislature passed a bill, HB 7013, that eliminated many of the early voting restrictions contained in HB 1355, such that Florida extended early voting times and the number of polling places. This legislation was passed after Governor Rick Scott commented in January that he had three goals aimed at fixing Florida's voting laws that became an embarrassment for the state during the 2012 National election. "There were inefficiencies in the 2012 General Election …and our system needed to be corrected… I asked the Legislature to enhance our system of elections and they met the challenge," the Governor commented. The issues Scott was referring to boiled down to an increase of early voting days and hours, as well as the institution of more early voting places as well as shorter, easier to complete ballots. After a 115-1 vote in the State House and then a 27-13 vote in the Senate, HB 7013 was signed into law by Governor Scott (Cohen 2014).

77.    HB 7013 reinstated the longer voting day period which was approximately cut in half by 2011's HB 1355. Pursuant to HB 7013, Supervisors of Elections were required to hold a minimum of eight early voting days, but were allowed to hold up to fourteen, including the Sundays that were excluded in 2011. The reinstatement of voting on Sundays resulted in increased Black voter turnout because it allowed many Black churches to resume "souls to the polls" voter turnout efforts.

48

78.    HB 7013 also provided Supervisors of Elections more discretion over where early voting could be held. County-level supervisors used this discretion to add early voting sites at convention, civic, community and senior citizen centers, as well as fairgrounds.

79.    Leon County elections supervisor Ion Sancho called HB 7013 "the best piece of elections legislation coming out of the Florida Legislature in the last decade." (Cohen 2014). League of Women Voters of Florida President Deirdre Macnab hailed the reforms, saying, "it will go a long way in repairing the damage done by the 2011 voter suppression bill." (Cohen 2014). She conceded, however, that persuading lawmakers to pass HB 7013 was not easy, adding that "sometimes it felt like climbing a mountain with concrete boots" and she urged the public to "stay vigilant to ensure that our elections system does not slide backwards." (Cohen 2014).

80.    Despite HB 7013, however, Florida's implementation of its laws continued to disenfranchise Black and Hispanic voters.

81.    In *Democratic Executive Committee of Florida v. Detzner*, the plaintiffs challenged Florida's signature match statute, which had been amended in 2017, as unconstitutional. According to the district court, the signature matching provisions in Florida's election law protected the state's interest in preventing fraud. *See* p.

49

1030 (p. 11 of the PDF I have reviewed). The district court found that the process was illegal and thus issued a preliminary injunction. In particular, the court held that Florida's then in place signature matching statute was "based on a standardless determination made by laypeople that the signature on a voters' vote-by-mail or provisional ballot does not match the signature on file with the supervisor of elections." The court went on, stating the following:

> Signature matching is a questionable practice, but it is hard to think of another way for canvassing boards to confirm vote-by-mail voters' identities. What makes Florida's signature matching process even more problematic is that fact that counties have discretion to apply their own standards and procedures. Certain counties, such as Leon County, go above and beyond to ensure voters have a chance to cure a signature mismatch. But nothing in the law requires that and other counties may choose not to exercise the level of care and concern Leon County does. The only way such a scheme can be reasonable is if there are mechanisms in place to protect against arbitrary and unreasonable decisions by canvassing boards to reject ballots based on signature mismatches.

82.     The court hed that the statutory cure period was insufficient:

> The cure period was intended to solve the inherent problems in signature matching, but the opportunity to cure has proven illusory. Vote-by-mail voters, in this election, were not notified of a signature mismatch problem until it was too late to cure. Provisional ballot voters are provided no opportunity to cure under the law. Without this Court's intervention, these potential voters have no remedy. Rather, they are simply out of luck and deprived of the right to vote. What is shocking about Florida law is that even though a voter cannot challenge a vote rejected as illegal, any voter or candidate could challenge a vote accepted as legal. The burden on the right to vote, in this case, outweighs the state's reasons for the practice.

83. The court also found that unchecked discretion held by election officials to reject vote-by-mail ballots from eligible voters deemed "noncompliant" was not allowed, holding that this absolute power to throw out votes was facially unconstitutional because it unduly burdened the fundamental right of Florida citizens to vote and have their votes counted. *See Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1022 (N.D. Fla. 2018) ("The precise issue in this case is whether Florida's law that allows county election officials to reject vote-by mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection—passes constitutional muster. The answer is simple. It does not.").

84. The defendants, including Florida's Secretary of State, appealed and sought to stay the district court's order. The 11th Circuit Court of Appeals summarized the issues in the appeal as follows:

> This case requires us to consider Florida's practice of counting vote-by-mail ballots only after verifying that the voter's signature provided with the ballot matches the voter's signature in the state's records. Although this practice is designed to prevent fraud, signature mismatches occur for a variety of reasons—including purely innocent ones. And Florida's lack of any standards or formal training requirements for those who assess the signatures as mismatched can also contribute to false positives for signature mismatches. So the fact that a Florida election official may decide a voter's signature provided with her ballot does not match her signature in the state's records does not necessarily mean her vote is fraudulent and should not be counted.

51

> But Florida's election code allows for just that. Because of the way Florida has scheduled its election process, some voters who submit a vote-by-mail ballot by the stated deadline are not notified about a signature mismatch until after it is too late to demonstrate their eligibility to vote. As a result, their votes do not count, and they are disenfranchised.

(*Democratic Executive Committee of Florida v. Lee*). The 11th Circuit denied the motion to stay the preliminary injunction. I understand that the appeal was eventually dismissed for being "moot" because Florida promulgated a new statute that replaced the one found unconstitutional by the district court.

85.    This litigation took place in the context of significant racial disparities in signature matching rejections, as Black and Hispanic voters had considerably higher ballot rejections than did white voters, as the following data from the 2018 election in Florida demonstrates:

| | County | Black Voters | Hispanic Voters | White Voters | Overall Rate | Rejected Votes |
|---|---|---|---|---|---|---|
| | | | **Vote by Mail Ballot Rejection Rates** | | | |
| | Volusia | 4.4% | 5.0% | 2.0% | 2.4% | 1,960 |
| | Lee | 2.1% | 1.7% | 0.7% | 0.8% | 1,262 |
| | Collier | 3.9% | 1.4% | 0.6% | 0.7% | 428 |
| | Manatee | 1.4% | 1.4% | 0.5% | 0.9% | 386 |
| Large | Pasco | 1.0% | 1.3% | 0.4% | 0.5% | 365 |
| | Alachua | 3.0% | 4.3% | 1.8% | 2.3% | 736 |
| | Bay | 4.6% | 4.9% | 2.8% | 3.0% | 373 |
| Mid-Size | Flagler | 2.7% | 3.5% | 1.4% | 1.7% | 246 |
| | Hernando | 0.9% | 1.0% | 0.3% | 0.4% | 140 |
| | Highlands | 2.3% | 1.2% | 0.5% | 0.7% | 79 |
| Small | Madison | 4.6% | 0 | 1.9% | 2.7% | 33 |

(American Civil Liberties Union. 2020, p. 19-21)

86.    Other recent evidence of Florida's attempts to discriminate against minority voters is seen in *Madera v. Detzner*. In that case, the court ordered the Florida Secretary of State to require Florida's county election supervisors to provide Spanish language voting materials, as its failure to do so violated the Voting Rights Act.

87.    Another example of Florida's backlash against progress made by Black and Hispanic Floridians' voting rights was the response of the Florida legislature and governor to passage of Amendment 4 to the state constitution. In Amendment 4, Florida's citizens voted overwhelmingly to end felony disenfranchisement—a

relic of the Reconstruction Era that disproportionately impacts Black and Latino voters. Almost immediately upon passage, the Florida legislature took steps to limit the vote's impact and preserve, as much as possible, the racially discriminatory practice. Prior to 2019, Florida's constitution  permanently disenfranchised all citizens who had been convicted of any felony offense unless the Clemency Board restored their voting rights—making Florida one of only four states to impose a lifetime voting ban for a felony conviction. Disenfranchisement based on criminal conviction, which has been called the "new Jim Crow," is "inextricably tied to the United States' history of racial discrimination," and Florida adopted this constitutional provision "in the post-Civil War era as a means to disenfranchise former slaves who had been granted the right to vote under the Reconstruction Amendments." (Figueredo 2020). By 2016, the provision disenfranchised an estimated 1.6 million Floridians. In 2018, Florida voters addressed this longstanding discrimination by approving Amendment 4, which automatically restored voting rights to as many as 1.4 million Floridians who had completed the terms of their sentences.

88.     The Florida legislature responded with SB 7066, prohibiting returning citizens from voting unless they pay off all legal financial obligations imposed by a court pursuant to a felony conviction, even if they cannot afford to pay. According to a 2020 report issued by The Sentencing Project, nearly 900,000 Floridians who

would otherwise have been eligible to vote under Amendment 4 were disenfranchised by the law. In all, more than 1.1 million Floridians are unable to vote because they have felony convictions or owe court debts, making Florida the nation's disenfranchisement leader. Reportedly, about 15 percent of the state's Black voting-age population is disenfranchised because of a conviction history, compared to about 6 percent for the state's non-Black population. (Uggen 2020)

## XI. SB 90 IS A RESPONSE TO INCREASED BLACK AND HISPANIC VOTER TURNOUT

89.     By 2020, Black and Hispanic voters made unprecedented use of expanded early voting opportunities. Similarly, Black and Hispanic voters also expanded their voting by mail and drop boxes. In fact, the historical data shows that Black and Hispanic use of vote-by-mail and drop boxes had dramatically increased by 2020. As I previously mentioned in Table 1, African American early voting percentages were in the thirty percentile range and those for Latinos were in the twenty percentile range. These numbers had increased in several counties during the 2020 early voting election season.

90.     Table 2 provides the 2020 mail and early voting percentages in Florida counties with the largest Black populations. The Supervisors of Elections for these counties published data showing the number of individuals in each county that received a mail ballot, but failed to return it, as well as the numbers of people who

55

cast mail ballots and/or voted during the early voting period. (Florida Department of State 2020). In the November 2020 election, large numbers of African Americans took advantage of mail and early voting efforts in counties with the largest Black populations in the state. For example, according to Table 3, Palm Beach County has an 18.7 percent Black population, but 53.6 percent of Blacks voted during the in-person early voting period and 33.4 percent voted by mail.

Table 2
Mail and Early Voting in Florida Counties with the Largest Black Populations,
November 2020

| Florida County | Black Population | Area of the State | Mail Voting | Early Voting |
|---|---|---|---|---|
| Gadsden | 55.8 | Northwest | 38.8 | 52.2 |
| Madison | 37.8 | North-central | 24.7 | 69.3 |
| Jefferson | 34.3 | North-central | 39.4 | 53.0 |
| Hamilton | 32.8 | Northeast | 40.5 | 52.3 |
| Leon | 31.7 | Northeast | 44.0 | 42.5 |
| Duval | 30.6 | Northeast | 30.7 | 59.0 |
| Broward | 30.1 | Southeast | 49.3 | 37.9 |
| Escambia | 23.2 | Northwest | 41.8 | 47.5 |
| Orange | 22.7 | Central | 4.63 | 43.5 |
| Union | 22.7 | Northeast | 26.8 | 68.6 |
| Jackson | 26.9 | Northwest | 33.0 | 58.8 |
| St. Lucie | 21.0 | Southeast | 47.8 | 41.9 |
| Alachua | 20.6 | Northeast | 48.0 | 42.6 |
| Bradford | 20.1 | Northeast | 37.8 | 52.5 |
| Liberty | 19.6 | Northwest | 26.2 | 66.9 |

57

| Taylor | 19.6 | North-central | 37.8 | 52.5 |
| Palm Beach | 18.7 | Southeast | 53.6 | 33.4 |
| Columbia | 18.5 | Northeast | 34.4 | 58.6 |
| Hillsborough | 17.8 | Southwest | 48.4 | 39.0 |
| Miami-Dade | 16.9 | Southeast | 43.3 | 43.5 |

---

Sources: Index Mundi: 2021. Florida Black Population by County. https://www.indexmundi.com/facts/united-states/quick-facts/florida/black-population-percentage#map. Accessed on July 24, 2021; Florida Department of State. "2020 General Election." https://fldoswebumbracoprod.blob.core.windows.net/media/703948/gen-2020.pdf. Accessed on July 31, 2021.

91. Another data point in this regard is as follows. In 2020, Black residents of census-designated places (CDPs) (with the largest statewide Black populations and registered voter percentages) voted by mail and voted early in large numbers. For example, Franklin Park, Florida, is a CDP near the city of Fort Lauderdale in Broward County. It has a population below 1,000 residents and is 99.9% Black. (Broward County Board of County Commissioners 2011, 11). The U.S. Census creates CPDs for the purpose of providing data "for settled concentrations of populations." (U.S. Census 2018). When examining the voting behavior of Franklin Park's residents (who voted in precinct R030 in Broward County), I found that the overwhelming majority of them are registered voters (94.6 percent), the overall

turnout rate was high (60.7 percent), 49.9 percent of those who voted cast mail ballots and 65 percent voted in-person during the early voting period. (World Population Review 2021). This is evidence of Black voter utilization of mail and early voting procedures in Florida.

92.     According to the information in Table 3 below, substantial numbers of Latinos also voted by mail or during the early voting period in the 2020 election. For example, Lee County has a 21.9 percent Hispanic population. 60.9 percent of the members of their population voted by mail and 30.7 percent voted in person during early voting. Also, Palm Beach County has a 22.9 percent Latino population, but 53.6 percent voted by mail and 33.4 percent voted during the in-person early voting period.

Table 3
Mail and Early Voting in Florida Counties with Largest Hispanic Populations,
November 2020

| Florida County | Hispanic Population | Area of the State | Mail Voting | Early Voting |
|---|---|---|---|---|
| Miami-Dade | 65.0 | Southeast | 43.3 | 43.5 |
| Osceola | 55.3 | Central | 45.0 | 42.0 |
| Hendry | 54.3 | South-central | 29.4 | 61.2 |
| Hardee | 44.0 | Southwest | 26.6 | 61.1 |
| Orange | 32.3 | Central | 4.63 | 43.5 |
| DeSoto | 31.9 | Southwest | 34.2 | 58.7 |
| Broward | 30.4 | Southeast | 49.3 | 37.9 |
| Hillsborough | 29.2 | Southwest | 48.4 | 39.0 |
| Collier | 28.2 | Southwest | 51.5 | 38.8 |
| Okeechobee | 25.5 | Central | 37.0 | 55.1 |
| Monroe | 24.9 | Southwest | 52.9 | 36.3 |
| Polk | 23.6 | Central | 47.1 | 42.1 |
| Palm Beach | 22.9 | Southeast | 53.6 | 33.4 |
| Seminole | 22.0 | Central | 41.8 | 46.7 |
| Lee | 21.9 | Southwest | 60.9 | 30.7 |

60

| Glades | 21.1 | South-central | 50.9 | 36.5 |

Index Mundi: 2021. Florida Hispanic or Latino Origin Population Percentage by County. https://www.indexmundi.com/facts/united-states/quick-facts/florida/hispanic-or-latino-population-percentage#map. Accessed on July 29, 2021; Florida Department of State. "2020 General Election." https://fldoswebumbracoprod.blob.core.windows.net/media/703948/gen-2020.pdf. Accessed on July 31, 2021.

93.    However, just as the legislature and governor responded to Black and Hispanic increased use of early voting in 2012 by passing HB 1355, in 2021, they responded by passing SB 90, which created several impediments to using these voting mechanisms, and which will plainly affect Black and Hispanic voters far more than white voters, a fact the legislature and governor had to know. As I have pointed out, African American and Hispanic citizens have constantly challenged the efforts of the Florida legislature and of Florida governors to disenfranchise them and to prevent them from electing their preferred representatives. For several years before the Voting Rights Act of 1965, most African Americans were prohibited from voting. In later years, the Hispanic population grew significantly in Florida. They too faced impediments when attempting to vote and elect Hispanic representatives. Eventually, Black and Hispanic voters were able to vote and elect Black and Hispanic officials. However, the state of Florida has continuously engaged in a backlash against this progress. When African Americans and Latinos took advantage of new or expanded voting laws and procedures (such as early in-person, drop box,

61

absentee and/or mail voting, the legislature engaged in a backlash by enacting laws that made it more difficult for these citizens to benefits from these voting laws and procedures. SB 90 is yet another attempt to disenfranchise Black and Hispanic voters so that they will not be able to elect their preferred representatives.

94.    According to Florida Governor Ron DeSantis, SB 90 is an election reform law that will prevent election fraud and preserve election integrity. As he signed it, the governor explained the rationale behind it when he said, "Your vote is going to be passed with integrity and transparency. . . . Right now I have what we think is the strongest election integrity measures in the country. . . . We're also banning ballot harvesting. We're not going to let political operatives go and get satchels of votes and dump them in some drop box." (Mower 2021). However, he acknowledged that no serious voting irregularities during the November 2020 election. (Calvan 2021).

95.    Key provisions of the bill include the following requirements:

- Floridians now have to provide a driver's license number, state ID number or the last four digits of their Social Security number to request a vote by mail ballot.

- Instead of requesting a mail ballot through the next two general elections (for the next four years), requests are limited to the next general election (for two years).

- Drop boxes can only be used during early voting hours, unless it is located at the Supervisor's office, and the boxes must be physically supervised while in use. Relying on remote video surveillance is not allowed. Failure to provide adequate supervision carries a $25,000 fine for leaving drop boxes unattended during early voting hours.

- Nonprofit organizations seeking to register voters must now include a mandatory disclaimer "warning" voters that their registrations may not arrive on time, and are required -- under penalty of severe fines -- to deliver completed registrations to the voter's individual county within 14 days.[5]

- The bill expands the definition of "solicitation" to include "engaging in any activity with the intent to influence or effect of influencing a voter" and it extends the "no-solicitation zone" to the 150 feet around ballot drop boxes (Mower 2021).

96.    Given that the restrictions of SB 90 were not put in place until after increased use of early and mail voting by Black and Hispanic voters, and that the specific restrictions target issues that more Black and Hispanic voters will face than

---

[5] Many of these organizations successfully mobilized Black and Hispanic voters, especially during presidential elections. For example, the members of groups such as Florida New Majority and the National Council of La Raza knocked on thousands of doors to encourage Latino/a voter registration and turnout during presidential and other elections since 2008. (DeRuy 2012; New Florida Majority 2021). In 2008, for instance, the number of Hispanic Democratic registered voters (513,252) surpassed the number of Hispanic Republican registered voters (445,526). Two years earlier, there were more Hispanic Republicans (414,185) than Democrats (369,906). (Pew Research Center 2008).

white voters, the legislation is the legislature's and the Governor's response to the mail and early voting participation of Florida's African American and Hispanic populations. This follows Florida's long-standing pattern of responding to Black and Hispanic Floridians' progress in exercising their right to vote by curtailing those rights. Thus, SB 90 is best understood as a backlash to Black and Hispanic turnout in 2020.

97.     I respectfully reserve the right to supplement, augment, or amend my

opinions and/or to supplement my expert report in response to any report provided

by expert(s) provided by defendants and/or intervenors.


Dated: September 1, 2021


_____

SHARON AUSTIN, Ph.D.

65

**EXHIBIT A**

**DR. SHARON D. WRIGHT AUSTIN**
**UNIVERSITY OF FLORIDA**
**234 ANDERSON HALL**
**GAINESVILLE, FL 32611**
polssdw@ufl.edu

**Education:**

*The University of Tennessee at Knoxville*
Earned doctorate in political science in August 1993

Major areas of emphasis: American Government (Public Law; Congress, the Presidency, and the Judiciary, and Minority Politics)

Minor areas of emphasis: Comparative Politics and Public Administration

Dissertation: *Aftermath of the Voting Rights Act of 1965: Racial Voting Patterns in Memphis Mayoral Elections, 1967-1991*

*The University of Memphis*
Earned master's degree in political science with a minor in education in December 1989

*Christian Brothers University*
Earned bachelor's degree in history with a minor in political science in May 1987

**Teaching:**

*The University of Florida*
Professor, August 2018-Present
Director of the African American Studies Program, July 2012-August 2019
Interim Director of the African American Studies Program, August 2011-July 2012
Associate Professor, August 2004-August 2018.
Undergraduate Coordinator, August 2008- August 2010
Visiting Associate Professor, August 2001-August 2004. Received tenure in June 2007

Courses offered:
African American Politics; American Government; Latino Politics and Policy; African American Studies Seminar; African Americans in Paris; Asian American Politics; Cultural Diversity; Community Analysis; Honors American Government; Key Issues in Black Atlantic Thought; Presidential Inauguration Seminar; Race, Gender, and Politics; Urban Politics; Women of Color and the Law

*The Junior Statesman Program at Yale University*
Associate Professor of American Government from July 1-26, 2002

*The University of Michigan at Ann Arbor*
Visiting Scholar of Political Science from August 2000-May 2001

Courses offered:
Political Participation and Pressure Groups; State and Local Government; Urban Analysis

*The University of Missouri at Columbia*
Associate Professor of Political Science and Black Studies from July 2000-August 2002
Assistant Professor of Political Science and Black Studies from August 1995-July 2000

Courses offered:
American Government; Black Political Thought; Black Women in Politics; Community Analysis; Introduction to Black Studies; Municipal Problems; State and Local Government; Urban Politics; Women and the Law

*The University of Louisville*
Assistant Professor of Pan African Studies from August 1992-May 1995

Courses offered:
Black Nationalist Politics in America; Civil Rights and the Law, Parts I and II; Constitutional Law-Civil Rights and Civil Liberties; Constitutional Law-Powers of Government; Contemporary African American Political Topics; Politics of the Black Community; Race, Class, and Gender in the U.S.; Southern Politics

2

**Grants for the African American Studies Program:**

Received a $3,000 "Support for Workshops and Speaker Series in the Humanities" Grant from the Center for the Humanities and Public Sphere in February 2016. This grant funded "The Black Women in the Academy" workshop in February 2017 at the University of Florida.

Received a $3,500 "Support for Workshops and Speaker Series in the Humanities" Grant from the Center for the Humanities and Public Sphere in March 2015. This grant funded "The Legacy and Influence of President Barack Hussein Obama" workshop in February 2016.

Received a $1,500 "Civil Debate Wall" Grant from the Bob Graham Center for Public Service in July 2012. This grant funded an online discussion of African American views about same-sex marriage.

Received a $3,500 "Support for Workshops and Speaker Series in the Humanities" Grant from the Center for the Humanities and Public Sphere in February 2012. This grant funded "The Education and Identity of African American Men" workshop in February 2013.


**Grants for My Research and Teaching:**

Primary Investigator, University of Florida Racial Justice Grant for $60,000 to conduct research on Black faculty recruitment and retention, November 2020.

Primary Investigator, University of Florida Racial Justice Grant for $60,000 to conduct research on the university's ties to slavery, November 2020.

University of Florida Department of Political Science Grant for $1,000 to conduct research on "Racial Group Consciousness and the Haitian Immigrant Quest for Political Incorporation" with Doctoral Student Danielle King, April 2010.

University of Florida Graham Center Case Study Grant for $4,000 to conduct research on "Taking Back the Land: The Battle of Liberty City's Resident against Gentrification." Coauthored by undergraduate student Leonard J. Laurenceau, April 2009.

3

University of Florida Graham Center for $3,000 to develop a Latino Politics and Policy course, April 2008.

University of Florida Department of Political Science Grant for $3,000 to conduct research on "Concentrated Poverty, Social Isolation, and Political Participation in the Southern Black Belt" during the summer of 2006, March 2006

University of Florida College of Liberal Arts and Sciences Humanities Enhancement Grant for $4,000 to conduct research on "Concentrated Poverty, Social Isolation, and Political Participation in the Southern Black Belt," December 2005

Summer Research Fellowship for $7,000 from the University of Missouri in June 1996 to conduct research on "An Analysis of a New Generation of Black Mayors"

Research Council Grant for $2,000 from the University of Missouri in June 1996 to conduct research on "An Analysis of a New Generation of Black Mayors"

Faculty Development Grant for $3,300 from the University of Missouri in June 1997 to attend the Inter-Consortium for Political and Social Science Research at the University of Michigan

Research Grant for $2,000 from the Office of the Provost at the University of Louisville in June 1994 to conduct research at the University of West Indies at Cave Hill, Barbados, West Indies

Research Grant for $500 from the University of Louisville in May 1993 to conduct research on "Black Women in Kentucky Politics"

Received Dissertation Fellowship for $2,000 from the University of Louisville in August 1992

**Honors, Awards, and Recognitions:**

Selected as a University Term Professor, 2021-2024, for excellence in scholarship, teaching, and service at the University of Florida.

4

Selected for induction into the Edward A. Bouchet Graduate Honor Society's UF Chapter on February 8, 2021 because of my "scholarship, leadership, character, service, and advocacy" on behalf of under-represented graduate students.

Selected as a University Term Professor, 2018-2021, for excellence in scholarship, teaching, and service at the University of Florida.

Selected as a 2010-2011 Colonel Allen R. and Margaret G. Crow Term Professor of Liberal Arts and Sciences for excellence in scholarship, teaching, and service at the University of Florida, April 2010.

Winner of the Erika Fairchild Award of the Women's Caucus of the Southern Political Science Association on January 8, 2009. The award is given to a female scholar with a strong record of scholarship who is committed to students, teaching, and mentoring other female scholars, is a thoughtful, caring good citizen of the discipline, and has a collegial spirit.

Best Paper on Blacks and Politics Award for "**Black Group Consciousness in South Florida". Paper Presented at the Annual Meeting of the Western Political Science Association, San Diego, California, March 18-21, 2008.**

2006 SAVANT UF Honorary Membership Award. SAVANT UF was established in 1967 to recognize those "who have attained a high standard of leadership in collegiate activities and outstanding service to the University of Florida and the surrounding community." Its approximately 140 members granted an honorary membership to me during the spring 2006 semester.

2004-2005 University of Florida University-wide Advisor of the Year

2004-2005 College of Liberal Arts and Sciences Advisor of the Year at the University of Florida

2004-2005 Student Activities Center Student Organization Advisor of the Year at the University of Florida for my work with the Black Political Science Association

Fellow, "Analyzing Poverty and Welfare Trends Using Census 2000 Data" Workshop at the University of Michigan, Ann Arbor, June 23-27, 2003.

Outstanding Mentor of the Gatorlaunch Program during the 2002-2003 academic year.

Best Paper on Blacks and Politics Award for "The 2001 Los Angeles Mayoral Election: An Analysis of the Racial Threat Hypothesis and Black-Latino Electoral Coalitions" by Sharon D. Wright and Richard T. Middleton IV. Paper Presented at the Annual Meeting of the Western Political Science Association, Long Beach, CA, March 22, 2002.

My chapter "Clinton and Racial Politics" is published in *The Postmodern Presidency: Bill Clinton's Legacy in U.S. Politics*, which was selected by *CHOICE* AS ONE OF THE "Outstanding Academic Books of the Year" for 2001.

Outstanding Mentor of the McNair Scholars Program during the 2001-2002, 2002-2003, and 2004-2005 academic years

Freedom Journal Award, "The Voice Magazine Recognizes Dr. Sharon D. Wright as an Exemplar of Outstanding Service to the Students of the University of Missouri-Columbia, April 25, 1999

Profile in the *Columbia Missourian* newspaper, "The Wright Stuff: MU Professor Spearheads Civil Rights Education," October 19, 1997

Certificate of Recognition, "The Association of Black Graduate and Professional Students Recognizes Dr. Sharon D. Wright for Dedicating her Time and Expertise to the 1998 Graduate Professional Development Workshop," April 3, 1999

Certificate of Appreciation, "The Association of Black Graduate and Professional Students Recognizes Dr. Sharon D. Wright for Participating in the 1997 Graduate Professional Development Workshop," April 9, 1998

"A Case Study in Intra-Racial Divisions: The 1994 Shelby County Mayoral Election" received the Rodney Higgins Best Paper Award of the National Conference of Black Political Scientists, March 6-10, 1996

Fellow, Sixth Annual Africana Studies Summer Institute at the University of Ghana at Legon, West Africa. The four-week institute (July 9-August 6, 1995) was sponsored by the National Council for Black Studies and a grant from the Ford Foundation

6

Fellow, Summer Institute at the University of West Indies, Cave Hill in Barbados, West Indies. The four-week institute (July 19-August 22, 1994) was sponsored by the University of Louisville and the University of West Indies.

**Publications:**

**Manuscripts-Published:**

Sharon D. Wright Austin. *The Caribbeanization of Black Politics: Group Consciousness and Political Participation in America*, (State University of Albany Press, 2018), 256 pages.

Sharon D. Wright Austin. *The Transformation of Plantation Politics in the Mississippi Delta: Black Politics, Concentrated Poverty, and Social Capital in the Mississippi Delta* (Albany, NY: State University of New York Press, 2006), 280 pages.

Sharon D. Wright. *Race, Power, and Political Emergence in Memphis* (New York: Routledge Press, 2000), 218 pages.

**Manuscript Under Contract:**

Sharon D. Wright Austin, editor. *Political Black Girl Magic: The Elections and Governance of Black Female Mayors*. Under contract. Temple University Press.

**Refereed Journal Articles-Published:**

Sharon D. Wright Austin. 2021. Contemporary Black Populism and the Development of Multiracial Coalitions: The 2018 Stacey Abrams and Andrew Gillum Gubernatorial Campaigns. *Political Science Quarterly*. June 15. https://onlinelibrary.wiley.com/doi/epdf/10.1002/polq.13203.

Sharon D. Wright Austin, Editor of a special issue of *The National Political Science Review: The Journal of the National Conference of Black Political Scientists* entitled *The Caribbeanization of Black Politics*. Volume 19.1: 2018.

Sharon D. Wright Austin, "The Group Consciousness and Political Participation of African Americans and Black Ethnics." *The Caribbeanization of Black Politics* special issue of *The National Political Science Review: The Journal of the National Conference of Black Political Scientists*. Volume 19.1: 2018.

Sharon D. Wright Austin, Sekou M. Franklin, and Angela K. Lewis. "The Effects of Concentrated Poverty on Black and White Political Participation in the Southern Black Belt." *National Political Science Review* 15 (2013): 57-69.

Sharon D. Wright Austin, Richard T. Middleton IV, and Rachel Yon. The Effect of Racial Group Consciousness on the Political Participation of African Americans and Black Pan-Ethnics in Miami-Dade County, Florida. *Political Research Quarterly* 65, 3 (September 2012): 629-641.

Baodong Liu, Sharon D. Wright Austin, and Byron D'Andra Orey. Church Attendance, Social Capital, and Black Voting Participation. *Social Science Quarterly* 90, 3 (September 2009): 576-592.

Sharon D. Wright Austin and Richard T. Middleton IV. The Limitations of the Deracialization Concept in the 2001 Los Angeles Mayoral Election. *Political Research Quarterly* 57, 2 (June 2004): 283-293.

Sharon D. Wright and Richard T. Middleton IV. The 2001 Los Angeles Mayoral Election: Implications for Deracialization and Biracial Coalition Theories. *Politics and Policy* (formerly known as the *Southeastern Political Review*) 29, 1 (2002): 692-707.

Sharon D. Wright. The Tennessee Caucus of Black State Legislators. *The Journal of Black Studies* 31, 1 (September 2000): 3-19.

Sharon D. Wright. Political Organization or Machine: The Impact of Harold E. Ford's Endorsements in Memphis Mayoral Elections. *National Political Science Review: The Journal of the National Conference of Black Political Scientists* 7(Fall 1999): 210-220.

*Sharon D. Wright*. Electoral and *Biracial Coalition:* Possible Election Strategy for African American Candidates in *Louisville,* Kentucky. *The Journal of Black Studies* 25, 6 (July 1995): 749-758.

**Refereed Book Chapters-Published:**

Sharon D. Wright Austin. African American, Black Ethnic, and Dominican Political Relations in Contemporary New York City. In *Black Politics in Transition: Immigration, Suburbanization, and Gentrification*, eds. Candis Watts Smith and Christina M. Greer. (New York: Routledge, 2018).

Sharon D. Wright Austin and Danielle King. President Barack Obama and Racial Politics. In *Barack Obama's Historic Legacy: A Two Year Assessment*, ed. John Davis. (New York: Palgrave Macmillan, 2011).

Sharon D. Wright Austin and Richard T. Middleton IV. Racial Politics of Gaming in the Delta. In *Resorting to Casinos: The Mississippi Gaming Industry*, ed. Denise von Hermann (Oxford, MS: University Press of Mississippi, 2006).

Sharon D. Wright Austin and Richard T. Middleton IV. The 2001 Los Angeles Mayoral Election: Implications for Deracialization and Biracial Coalition Theories. In *Black and Latino/a Politics: Issues in Political Development in the United States*, eds. Jessica Lavariega Monforti and William E. Nelson Jr. (Miami, FL: Barnhardt and Ash, 2006) [reprint of "The 2001 Los Angeles Mayoral Election: Implications for Deracialization and Biracial Coalition Theories." *Politics and Policy* (formerly known as the *Southeastern Political Review*) 29, 1 (2002): 692-707.]

Sharon D. Wright Austin and Richard T. Middleton IV. Sustainability in the Twin Cities of Biloxi-Gulfport, Mississippi. In *Governing Middle-Sized Cities: Studies in Mayoral Leadership*, eds. Wilbur C. Rich and James Bowers (Boulder, CO: Lynne Rienner Publishers, 2000).

Sharon D. Wright and Minion K.C. Morrison. The African American Political Experience. In *The Historical and Bibliographical Guide to the African American Experience*, eds. Arvarh Strickland and Robert E. Weems Jr. (Westport, CT: Greenwood Press, 2000).

Sharon D. Wright. Clinton and Racial Politics. In *The Postmodern Presidency: Bill Clinton's Legacy in U.S. Politics*, ed. Steven Schier (Pittsburgh, PA: University of Pittsburgh Press, 1999).

Sharon D. Wright. The Activism of Black Women in Congress, 1967-1997. In *African American Women's Activism Since the Civil Rights Movement*, ed. Kimberly Springer. (New York: New York University Press, 1999).

Sharon D. Wright. The Deracialization Strategy and African American Candidates in Memphis Mayoral Elections. In *Race, Politics and Governance in the United States*, ed. Huey L. Perry (Gainesville, FL: University of Florida Press, 1997).

## Forthcoming Publications:

Tatiana Benjamin and Sharon D. Wright Austin. The Black Social Economy: Black American Women Using Susu and Cooperatives as Resistance. In *Black People and Social Finance: Money Pools Counteract Racial Capitalism in the West*, edited by Caroline Shenaz Hossein. Chapter is complete. Book is under contract with Routledge Press.

Sharon D. Wright Austin. Andrew Gillum's Quest to Become Florida's First Black Governor. In *Historic Firsts in U.S. Elections: Gubernatorial, Congressional, and Mayoral Campaigns, 2018-2019*, edited by Evelyn M. Simien. Chapter is complete. Book is under contract with Routledge Press.

## Research in Progress:

Sharon D. Wright Austin, Caroline Shenaz Hossein, Tatiana Benjamin, Silvane Silva, Sherice J. Nelson. *African Diaspora Economics: How Black Feminist Political Women Advance Communities Through Cooperative Economics*. Book is under contract with Cambridge University Press.

Angela Lewis-Maddox, Sherice J. Nelson, LaRaven Temoney, and Sharon D. Wright Austin. "Black Lives Matter: How Black Women Lead the Movement for Global Transformational Change." Paper under review for inclusion in a special issue of the *Social Science Quarterly* (Freedom Dreaming: A Symposium on Racial Justice, Unrest, and Abolition). Guest Edited by: Drs. Jenn M. Jackson (Syracuse), Traci Burch (Northwestern), and Periloux Peay (Georgia State University). Submitted in October 2020.

**Research Report:**

Sharon D. Wright. Casino Gaming in the Delta: Race, Politics, and Gaming in Tunica County, Mississippi. In *The Trotter Review of the University of Massachusetts, Boston* 38 (Summer 2000).

**Encyclopedia Entries:**

Sharon D. Wright Austin. Constance Baker-Motley. In *An Encyclopedia of American Civil Rights and Liberties*, eds. Otis H. Stephens Jr., John M. Scheb II, and Kara E. Stooksbury (Westport, CT: Greenwood Press, 2006).

Sharon D. Wright Austin. Rosa Parks. In *An Encyclopedia of American Civil Rights and Liberties*, eds. Otis H. Stephens Jr., John M. Scheb II, and Kara E. Stooksbury (Westport, CT: Greenwood Press, 2006).

**Book Reviews:**

Sharon D. Wright Austin. *The Black Banker Ladies: Mutual Aid and Rotating Savings and Credit Associations of Racialized Women*. Caroline Shenaz Hossein (Manuscript reviewed for University of Toronto Press in November 2019).

Sharon D. Wright Austin. *Latino Politics in America: Community, Culture and Interests*. John A. Garcia (Manuscript reviewed for Rowman and Littlefield in November 2019).

Sharon D. Wright Austin. *Redefining the Political: Poor Black Women in Chicago and New Understandings of Political Identity and Action*. Alexandra Moffett-Bateau (Manuscript reviewed for Temple University Press in October 2019).

Sharon D. Wright Austin. *Much Sound and Fury, or the New Jim Crow? The Twenty-First Century's Restrictive New Voting Laws and their Impact in the States*. Edited by Michael A. Smith (Manuscript reviewed for State University of New York at Albany Press in September 2019).

Sharon D. Wright Austin. *Losing Power: African Americans and Racial Polarization in Tennessee Politics, 2000-2012*. Sekou M. Franklin and Ray Block Jr. (Manuscript reviewer for the University of Georgia Press in August 2017).

11

Sharon D. Wright Austin. American Politics and the African American Quest for Universal *Freedom*. *Eighth Edition*. Hanes Walton Jr., Robert Smith, and Sherri Wallace (Manuscript reviewed for Routledge Press in June 2015).

Sharon D. Wright Austin. *African American Politics*. Andra Gillespie and Shayla Nunnally. (Manuscript reviewed for Routledge Press in December 2012).

Sharon D. Wright Austin. *Contemporary Southern Politics*. Seth McKee. (Manuscript reviewed for Routledge Press in August 2012).

Sharon D. Wright Austin. *Ciencia Politica: The Scientific Analysis of Latino Politics in the United States*. Edited by Tony Affigne, Evelyn Hu-DeHart, and Marion Orr. (Manuscript reviewed for Routledge Press in March 2011).

Sharon D. Wright Austin. *To the Right and Misunderstood: Conservatism in the Black Community*. Angela K. Lewis. (Manuscript reviewer for SUNY Albany Press in 2009).

Sharon D. Wright Austin. *Whose Black Politics?  Case Studies in Post-Racial Black Leadership*. Edited by Professor Andra Gillespie. (Manuscript reviewed for Routledge Press in January 2009).

Sharon D. Wright Austin. *African American Politics in the 21st Century*. Andra Gillespie, Editor. (Manuscript reviewed for the Congressional Quarterly Press and Routledge Press in 2007).

Sharon D. Wright Austin. W*here Have You Gone, Horatio Alger?  A Convergence of Race and Poverty in the Memphis City Schools*. Marcus Pohlmann (Manuscript reviewed for the University of Tennessee Press in 2007).

Sharon D. Wright Austin. *Freedom Is a Constant Struggle: The Mississippi Civil Rights Movement and Its Legacy* by Kenneth T Andrews (Chicago: University of Chicago Press, 2004) for the *Journal of Southern History*.

Sharon D. Wright Austin. *Black Feminist Voices in Politics* by Evelyn Simien for the State University of New York Press, 2004.

12

Sharon D. Wright Austin. *The Politics of the New South: Representation of African Americans in Southern State Legislatures* by Charles E. Menifield and Stephen D. Shaffer (eds.) for the State University of New York Press, July 2003.

Sharon D. Wright. *The Encyclopedia of Memphis* by Timothy Huebner and Michael Nelson (eds.) for the University of Tennessee, Knoxville Press, October 2002.

Sharon D. Wright. *Red Lines, Black Spaces: The Politics of Race and Space in a Black Middle-Class Suburb* by Bruce D. Haynes (New Haven, CT: Yale University Press, 2001) for the *Journal of Politics*.

Sharon D. Wright. Comparison Review of *Enforcing Civil Rights: Race Discrimination and the Department of Justice* by Brian K. Landsberg (Lawrence, KS: University Press of Kansas, 1997); *Reaching Beyond Race* by Paul M. Sniderman and Edward G. Carmines (Cambridge, MA: Harvard University Press, 1997), and *Racism in the post-Civil Rights Era: Now You See It, Now You Don't* (Albany, NY: State University of New York Press, 1995) for the *Policy Studies Journal*.

Sharon D. Wright. *Racial Politics at the Crossroads: Memphis Elects Dr. W.W. Herenton* by Marcus Pohlmann and Michael Kirby (Knoxville, TN: University of Tennessee Press, 1996) for the *National Political Science Review: The Journal of the National Conference of Black Political Scientists*.

Sharon D. Wright. *Government in America, Brief Version, Third Edition* by Edwards, Wattenberg, and Lineberry (New York: Longman , 1995) for Longman Publishing.

Sharon D. Wright. *African Americans at the Crossroads: The Restructuring of Black Leadership and the 1992 Elections* by Clarence Lusane (Boston, MA: South End Press, 1995) for the *Social Science Quarterly*.

Sharon D. Wright. *Abortion and American Politics* by Barbara H. Craig and David M. O'Brien (Chatham, NJ: Chatham House, 1994) for the *National Political Science Review: The Journal of the National Conference of Black Political Scientists*.

Sharon D. Wright. *Studying Politics* by Roderick Church, Terrence Carroll, and Nicolar Baxter-Moore (New York: Longman, 1994) for Longman Press.

13

Sharon D. Wright. Comparison Review of *the Year of the Woman: Myths and Realities* by Thomas Cook (Greenwood, CT: Westview Press, 1994); *Women, Elections and Representation. Second Edition* by Darcy, Welch, and Clark for the *Southeastern Political Review*.

Sharon D. Wright. *Empirical Political Analysis: Research Methods in Political Science. Third Edition* by Jarol B. Mannheim and Richard C. Rich (New York: Longman, 1993).

**Conference Presentations:**

**Presenter**
The Legacy of Plessy v. Ferguson at Predominantly White Institutions: The Politics of Defining "Black" Students for Admissions Purposes
Russell Sage Journal Conference: The Legacy of Separate But Equal: Policy Implications for the 21st Century, New York, New York, September 27, 2019.

**Chair and Presenter**
The Campaigns, Elections, and Governance of Black Female Mayors
American Political Science Association, Washington, D.C., August 28-September 1, 2019.

**Presenter**
Afro-Cuban Group Consciousness and Political Participation in Miami-Dade County
National Conference of Black Political Scientists, Baton Rouge, Louisiana, March 14-17, 2019.

**Discussant**
Black Women as Elected Officials Panel
National Conference of Black Political Scientists, Baton Rouge, Louisiana, March 14-17, 2019.

**Panelist on Roundtable Panel**
The Politics of Faculty Diversity and Tenure Panel
National Conference of Black Political Scientists, Chicago, Illinois, March 14-17, 2018.

14

**Chair and Discussant**
Pan African Thought and Method Panel
National Conference of Black Political Scientists, Chicago, Illinois, March 14-17, 2018.

**Panelist on Roundtable Panel**
*National Political Science Review*: A Standard-Driven Academic Refereed Journal of Black Politics
National Conference of Black Political Scientists, Jackson, Mississippi, March 14-17, 2016

**Chair and Discussant**
Descriptive Representation Without Substance: Black Inclusion in the Era of Racial Animus
National Conference of Black Political Scientists, Jackson, Mississippi, March 14-17, 2016

**Chair and Discussant**
Schools, Cities, and Cradle-to-Prison Pipeline
National Conference of Black Political Scientists, Jackson, Mississippi, March 14-17, 2016

**Chair and Discussant**
African American Archival Research
Associate for the Study of Afro American Life and History, Jacksonville, Florida, October 2-4, 2013.

**Chair and Discussant**
African American Political and Policy Issues
Associate for the Study of Afro American Life and History, Jacksonville, Florida, October 2-4, 2013.

**Discussant**
Urban Political Empowerment
Southern Political Science Association, Orlando, Florida, January 3-5, 2013.

**Chair and Discussant**
African and African American Policy Issues
National Council for Black Studies, Atlanta, Georgia, March 8, 2012.

**Chair and Discussant**
African and African American Political Leadership
National Council for Black Studies, Atlanta, Georgia, March 9, 2012.

**Chair and Discussant**
The Politics of African American Educational and Identity Issues
National Council for Black Studies, Atlanta, Georgia, March 9, 2012.

**Presenter:**
Church Attendance, Social Capital, and Black Voting Participation
Midwest Political Science Association, Chicago, Illinois, April 1-3, 2008.

**Presenter:**
Black Group Consciousness in South Florida
Western Political Science Association, San Diego, California, March 18-21, 2008.

**Chair and Discussant:**
Latino Politics Panel
Southern Political Science Association, New Orleans, Louisiana, January 4-6, 2007

**Discussant:**
 The New Politics of Multiracial Cities Panel
American Political Science Association, Philadelphia, Pennsylvania, August, 31-September 3, 2006

**Discussant:**
Emerging Issues in African American Opinion Panel
American Political Science Association, August 28-September 1, 2005, Washington, D.C.

**Chair and Discussant:**
The Political Research of Dr. Ronald McNair Scholars
Panel participants included four University of Florida students: Gloria Bowens, James Holloway III, Natassia Kelly, and Funmi Olorunnipa.
National Conference of Black Political Scientists, Oakland, California, March 8-12, 2003

**Chair:**
Getting Through the Tenure and Promotion Process
National Conference of Black Political Scientists, Oakland, California, March 8-12, 2003

**Presenter:**
"Coping with the Graduate School Experience"
Western Political Science Association, Long Beach, California, March 23, 2002

**Presenter:**
"The 2000 Los Angeles Mayoral Election: An Analysis of the Racial Threat Hypothesis and Black-Latino Electoral Coalitions"
Western Political Science Association, Long Beach, California, March 23, 2002

**Chair and Discussant:**
The Role of Race in Southern Elections and Public Policies
National Conference of Black Political Scientists, Atlanta, Georgia, March, 8, 2002

**Section Chair:**
State and Local Politics Section
National Conference of Black Political Scientists, Atlanta, Georgia, March, 6-1-, 2002; March 8-12, 2003

**Presenter:**
"Coping with the Graduate School Experience"
Western Political Science Association, Las Vegas, Nevada, March 22, 2001

**Chair:**
Racial Contexts and Representations in the Political Space
Students of Color of Rackham Conference, University of Michigan, Ann Arbor, February 17, 2001

**Presenter:**
"Women of Color in Academia"
Students of Color of Rackham Conference, University of Michigan, Ann Arbor, February 16, 2001

**Chair:**
Political Empowerment and Racial Minorities: Where We Are at Century's End

American Political Science Association, Washington, D.C., August 31-September 3, 2000

**Discussant:**
Representation, Redistricting, and Race in Electoral Politics
American Political Science Association, Boston, Massachusetts, September 3-6, 1998

**Chair:**
Issues Related to Teaching
American Association of Behavioral and Social Sciences, Las Vegas, Nevada, January 13-15, 1998

**Presenter:**
"Developing Black Studies Programs in Order to Enhance Diversity"
American Association of Behavioral and Social Sciences, Las Vegas, Nevada, January 13-15, 1998

**Presenter:**
"America's Ethiopia: The Politics of Casino Gambling in Tunica County, Mississippi"
Urban Affairs Association, Toronto, Canada, April 19, 1997

**Presenter:**
"The Elections of the Nineties: An Analysis of a New Generation of Black Mayors"
American Political Science Association, San Francisco, California, August 30-September 2, 1996

**Chair and Discussant:**
Black State Legislative Politics
National Conference of Black Political Scientists, Savannah, Georgia, March 6-10, 1996

**Presenter and Chair:**
Challenges to Governance: The Freeman Bosley Administration of St. Louis
Southern Political Science Association, Tampa, Florida, November 1995

**Presenter:**
"A Case Study in Black Activism: The Freeman Bosley Mayoral Election in St. Louis"
Missouri Political Science Association, Columbia, Missouri, October 1995

**Presenter:**
"A Case Study in Intra-racial Divisions: The 1994 Shelby County Mayoral Election"
National Conference of Black Political Scientists, Baltimore, Maryland, March 1995

**Presenter:**
"The Political Economy of Racism Revisited: The Relationship between the Black Political Establishment and the White economic Community in Memphis, Tennessee"
American Political Science Association, New York, New York, September 1994

**Discussant:**
Blacks as the Old Minorities or Role Model?
Annual Conference on Minority Relations, Wellesley College, April 1994

**Presenter:**
"The Effect of Majority Vote Requirements on Black Candidate Success in At-Large Memphis Elections"
National Conference of Black Political Scientists, Hampton, Virginia, March 9, 1994

**Presenter:**
"Organization or Machine: The Power of Ford Endorsements in Memphis Mayoral Elections"
Southern Political Science Association, Savannah, Georgia, November 1993

**Presenter:**
"Independent Black Political Leadership: The Presidential Campaigns of Dr. Lenora B. Fulani"
Southern Political Science Association, Savannah, Georgia, November 1993

**Presenter:**
"Racial Gerrymandering in Louisville: The Effect of Legislative Reapportionment on African American Legislative Representation"
Women's Studies Conference, Bowling Green, Kentucky, September 1993.

**Presenter:**
"Deracialization and Biracial Coalition: Possible Election Strategy for African American Candidates in Louisville, Kentucky"
American Political Science Association, Washington, D.C., September 1993

**Presenter:**
"We Can't Hackett Anymore: The Failure of the Deracialization Strategy in Memphis Mayoral Campaigns"
Southwestern Political Science Association, New Orleans, Louisiana, March 1993

**Presenter:**
"Racial Voting Patterns in Memphis Mayoral Elections: An Analysis of the 1991 Election of Dr. Willie W. Herenton"
Southern Political Science Association, Atlanta, Georgia, November 1992

**Presenter:**
"The Application of the Voting Rights Act of 1965 to State Judicial Elections: Implications for Judicial Selection Systems"
Southwestern Political Science Association, Austin, Texas, March 1992

**Service for the Political Science Department, University of Florida:**

Member of the Political Science Lecturer Committee, 2019

Chairman of the Latino Politics Search Committee, 2015

Member of the Strategic Planning Committee, 2010-2011

Chairman of Curriculum Committee, 2009-2011

Chairman of the Department's Speakers Series, 2007-2008

Chairman of the James W. Button/Barbara Roth Memorial Award Committee, 2006-Present

Chairman of the Best Undergraduate Paper Committee, 2009-2010

Master's and Doctoral Committee Member for Several Graduate Students Since 2003 and Chair of Committee for Several Students

Member of Chair Advisory Committee, 2004-2005, 2005-2006

Supervised Independent Research Projects for Several Students Since 2003.

Supervised the selection of the recipients of the Multicultural Scholar Award from the department of political science each year since March 2006.

Undergraduate Coordinator during the 2008-2009 and 2009-2010 academic years.

**Service for the Profession:**

**Author:**    "The Mayoral Elections of the Nineties: An Analysis of a New Generation of Black Mayors." *Urban News Newsletter of the Urban Politics Section of the American Political Science Association*. 11,3 (Autumn 1997): 1-2, 4.

**Member:**    American Political Science Association, 1992-Present
        Member of the 2020-24 Editorial Team, June 2020-May 2024
        Council Member of the Urban Politics Section, 2005-2008
        Member of the Race and Ethnicity Section, 2000-Present
        Chair of the Byran Jackson Dissertation Support Committee, 2005-2006
        Chair of the Best Book in Urban Politics Committee, 2006-2007

    CLAS Teacher of the Year Award Selection Committee, 2017-18 Academic Year

    Editorial Board of the *Ralph Bunche Journal of Public Affairs*, 2013-Present

    National Conference of Black Political Scientists, 1992-Present
        Member of the Anna Julia Cooper Teaching Award Committee, 2005-2009

UF Provost's Student Retention and Success Task Force, May 2017-2018

Southern Political Science Association, 2000-Present
    Member of the Executive Council, 2005-2008

**Reviewer:**  *National Review of Black Politics*, 2020-Present
    *Journal of Black Studies*, 1996-Present
    *Journal of Women, Politics, and Policy*, 2006-Present
    *National Political Science Review*, 2005-2006
    *Political Research Quarterly*, 2005-Present
    *State and Local Government Review*, 2005-Present
    *Social Science Quarterly*, 2005-Present
    *Transforming Anthropology*, 2011
    *Western Journal of Black Studies*, 1996-2000

**Service for the African American Studies Program:**

**Speaker:**
The Integration of the University of Florida
February 22, 2017, Naval Air Station, Jacksonville, Florida Multicultural Awareness Day.

**Member:**
Reitz Union Storytelling Committee, Spring 2017.

**Organizer:**
Black Women in the Academy Symposium which included lectures by Dr. Pearl Ford Dowe of the University of Arkansas, Fayetteville and Dr. Beverly Guy Sheftall of Spelman College, February 2017.

**Chair and Member:**
College of Liberal Arts and Sciences Diversity Steering Committee March 2016-Present.

**Organizer:**
Symposium on the Presidency of Barack Hussein Obama which included lectures by Dr. Michael Jeffries of Wellesley College and Dr. Fredrick Harris of Columbia University, February 2016.

**Organizer and Moderator:**
Dr. Ronald Foreman Lecture by Dr. Fredrick Harris of Columbia University, February 2016.

**Organizer and Moderator:**
Dr. Ronald Foreman Lecture by Dr. Paula McClain of Duke University, February 2015.

**Organizer and Moderator:**
Dr. Ronald Foreman Lecture by Dr. Abdul Alkalimat of the University of Illinois, University of Florida, February 2014.

**Campus Event Panelist:**
Panelist on *Trouble the Water* documentary panel, January 15, 2014.

**Organizer and Moderator:**
Lecture by Dr. David J. Garrow of the University of Pittsburgh, January 2014.

**Campus Event Moderator:**
Passing the Torch Career and Information Session, University of Florida, October 2013.

**Campus Event Speaker:**
"Graduate and Law School Opportunities"
James E. Scott Leadership Conference, University of Florida, February 2013.

**Organizer and Moderator:**
Dr. Ronald Foreman Lecture by Dr. Marc Lamont Hill of Columbia University, University of Florida, February 2013.

**Campus Event Speaker and Moderator:**
"Integration Efforts at the University of Florida from 1958-One Florida"
The Integration of the University of Florida and the Challenges that Remain Panel, University of Florida, January 2013.

23

**Campus Event Speaker:**
"Abraham Lincoln and Obama"
Grand Opening Event for Lincoln and the Constitution Exhibit, University of Florida, February 2012

**Campus Event Speaker:**
"The Activism of Mrs. Fannie Lou Hamer of the Mississippi Freedom Democratic Party"
Women in the Civil Rights Movement Panel, University of Florida, January 2012

**Campus Event Speaker:**
"How to Gain Acceptance to and Succeed in Graduate School"
Campus Visitation Program, Office of Graduate Minority Programs, November 2011

**Campus Event Speaker:**
"Are Asian Americans a Model Minority?"
Lunch Series for the Asian American Student Union, University of Florida, November 2010.

**Campus Event Speaker:**
"Graduate and Law School Forum"
Panel Discussion Sponsored by the Black Political Science Association. University of Florida, October 2009.

**Campus Event Moderator:**
"A Mock Debate Between Presidential Candidates Barack Obama and John McCain"
Event Sponsored by the Black Political Science Association. University of Florida, October 2008.

**Campus Event Speaker:**
"Latino and Latin American Politics"
Panel Discussion Sponsored by the Latin American Studies Collection in Smathers Library, November 2008.

**Campus Event Speaker and Moderator:**
"Should Asian Americans Support Affirmative Action?"

24

Southeastern Conference on Asian American Leadership, University of Florida
October 2005

**Campus Event Speaker and Moderator:**
"Contemporary Issues in Asian American Politics"
Southeastern Conference on Asian American Leadership, University of Florida
October 2004

**Campus Event Speaker and Moderator:**
"African and African American Race Relations at the University of Florida"
Black Political Science Association and Association of African Studies Forum, April
2003


**Committee Member:**

Atlantic Coast Social, Behavioral, and Economic Sciences (ACSBE) Alliance
Committee to recruit minority graduate students and provide them with additional
travel and research funding, 2005-2019

CLAS Humanities Scholarship Enhancement Grant Selection Committee, Fall 2006

Faculty Affiliate for the African American Studies Program, 2008-2011.

Faculty Affiliate for the Women's Studies Program, 2007-2017.

Member of the 2010 and 2011 Dr. Martin Luther King Jr. Program Committee

Member of the Search Committee for the Assistant Director of Multicultural Affairs,
March 2011.

Member of the Search Committee for the Director of the U.S. Senator Bob Graham
Center, 2006-2007.

The Graham Center Advisory Committee (Develops curriculum for the Center with
other committee members).

University-wide Teacher and Adviser of the Year Selection Committee, 2006.

**Faculty Mentor for approximately 50 students since 2001:**
(Supervised their research projects and served as their mentor in Gatorlaunch, Minority Mentoring, and McNair Scholars Programs).

**Organizational Advisor for:**
The Black Political Science Association, 2001-200Present
Nu Alpha Lambda Christian Service Organization, 2005-Present

**Recruiter:**
Ralph Bunche Summer Institute, Duke University, June 2004, June 2006


**Service for the University of Missouri:**

**Author:**
"Barbara Jordan: A Champion of Civil and Human Rights"
*The African Americanist Newsletter*
Winter 1996, volume six, number five

**Author:**
"Black Students and Professors: The Need for Communication and Understanding"
*The Legion of Black Collegians Newsletter*
February 26, 1997, volume 1

**Author:**
"Gender and Race in 1996 Presidential Campaign Strategies"
The MU School of Journalism Web Page, October 1996

**Author:**
"The 25th Annual Congressional Black Caucus Legislative Conference"
*The Voice of Black Studies Newsletter*
Spring 1996, volume 20, number one

**Author:**
"The 6th Annual Africana Studies Summer Institute"
*The Voice of Black Studies Newsletter*
Spring 1996, volume 20, number one

**Author:**
"The Mayoral Elections of the Nineties: An Analysis of a New Generation of Black Mayors"
Urban News: The Newsletter of the Urban Politics Section of the American Political Science Association

Volume II, Number 3
Fall 1997


**Commentator:**
KOMU-TV 8 News-Columbia, Missouri
"Saturday Caucus: The Issue of Gender in the 1996 Presidential Election"
April 21, 1996


**Commentator:**
"Sexual Harassment in the Workforce"
KOMU-TV 8 News
Columbia, Missouri
February 16, 1999


**Commentator:**
"Black Women in the Civil Rights Movement: 1950-1980"
KOMU-TV 8 News
Columbia, Missouri
October 24, 1997


**MU Committees:**  Black History Month Committee, 1996-1997
Honors and Awards Committee-Department of Political Science
McNair Scholars Program Committee, 1996-1997
Women's Studies Executive Committee, 1996-1997


**Editorial Advisory**
**Board Member for:**    The *Western Journal of Black Studies* (winner of the 1996 National Council for Black Studies CLR James Award for Outstanding Publication)

*A Turbulent Voyage: Readings in African American Studies*. San Diego: Collegiate Press

**Moderator:**

City of Columbia Race Relations Task Force Symposium

Panelists included Attorney Gary Oxenhandler, Attorney Al Plummer, Mayor Darwin Hindman, Professor Robert Bailey of the MU School of Law, Professor Angela Bartee of Stephens College, and Ms. Monica Naylor of the Columbia Public Schools.

November 7, 1996

28

**Reader:**
Government and Politics Advanced Placement Exams
Sponsored by the Educational testing Service
University of Nebraska, Lincoln, June 10-17, 2000; June 11-18, 2001, June 12-19, 2002
Colorado State University, June 13-20, 2003

**Regional Member of the Board of Directors:**
National Council for Black Studies
One of the representatives of NCBS at the Congressional Black Caucus Legislative Conference, Washington, D.C., September 1995

**Speaker:**
"African American Politics Today: The 1996 Presidential Election"
1996 Black History Month Brown Bag Lunch Series
The University of Missouri, Columbia
February 26, 1996

**Speaker:**
"How to Handle Joint Appointment Responsibilities"
Association of Black Graduate and Professional Students
Graduate Professional Development Workshop
The University of Missouri, Columbia
October 18, 1997

**Speaker:**
"The Activism of Black Women in Congress Since the Civil Rights Movement"
1997 Black women in the Civil Rights Movement Conference
The University of Missouri, Columbia
October 24, 1997

**Moderator:**
"The Black Experience at MU"
Sponsored by the Black Faculty and Staff Organization
The University of Missouri, Columbia
February 11, 1998

**Speaker:**
"How to Handle Joint Appointment Responsibilities"

29

Association of Black Graduate and Professional Students
Graduate Professional Development Workshop
The University of Missouri, Columbia
October 24, 1998

**Speaker:**
"Black Issues in Higher Education"
Sponsored by the Black Culture Center
The University of Missouri, Columbia
January 25, 1999


**Service for the University of Louisville:**


**Author:**
"Voting Patterns of the 1991 Mayoral Election: Herenton's Victory Maximized
Racial Voting Factors that Had Eluded Previous Candidates"
Article published in the *Memphis Commercial Appeal* newspaper
November 15, 1992

**Commentator:**
"The O.J. Simpson Trial: Will Race Be a Factor?
WAVE 3 News
Louisville, Kentucky
January 28, 1994

**Discussion Leader:**
Film: A Place of Rage: Black Women and the Civil Rights Movement
Women's History Month
The University of Louisville
March 3, 1994

**Guest Speaker:**
Symposium: The Evolving Roles of Men and Women
Topic of Speech: "Men, Women, and the Dilemmas of the Youth"
The University of Louisville
October 11, 1994

**Guest Speaker:**
Symposium: Racism: America's Most Challenging Issue
Topic of Speech: "The Dual Oppression: Racism, Sexism, and the Black Woman"
The University of Louisville
October 27, 1993

**Keynote Speaker:**
Awards and Recognition Banquet: Keep Growing in Girl Scouts
Topic of Speech: "Yes I can"
Kentuckiana Girl Scouts
May 13, 1994

**Lecturer:**
Multicultural "Coffee" Symposium
"A Comprehensive History of African American Politics in Louisville, Kentucky"
The University of Louisville
November 11, 1993

**Panel Organizer and Participant:**
Symposium: The Political Activities of Louisville Women
Women's History Month
The University of Louisville
March 7, 1994

**Panel Organizer and Moderator:**
Multicultural "Coffee" Symposium: An African American Congressional Debate
The University of Louisville
April 5, 1994

31

**EXHIBIT B**

Exhibit B - References

American Civil Liberties Union. 2001. "ACLU of Florida Launches Equal Voting
Rights Project to Address Irregularities, Reform Election Practices in
Florida." February 17. https://www.aclu.org/press-releases/aclu-florida-launches-equal-voting-rights-project-address-irregularities-reform. Accessed
on August 5, 2021.

American Civil Liberties Union. 2020. "Let Florida Vote: Coronavirus is only the
newest barrier to voting in Florida."
https://www.aclufl.org/en/publications/let-florida-vote-coronavirus-only-newest-barrier-voting-florida. Accessed August 26, 2021.

Austin, Sharon D. Wright. 2018. *The Caribbeanization of Black Politics: Race,
Group Consciousness, and Political Participation in America.* Albany: State
University of New York Press.

Bennett, George. 2013. "Experts Tell Panel: Floridians Waited Three Times
Longer to Vote than National Average." *Palm Beach Post*. June 28.
https://www.palmbeachpost.com/news/state--regional-govt--politics/experts-tell-panel-floridians-waited-three-times-longer-vote-than-national-average/ECebodao46jYrbWZosuHdP/. Accessed August 5, 2021.

Broward County Board of County Commissioners. 2011. "Broward County Unincorporated County Data." October. https://www.broward.org/Planning/Demographics/Documents/Census/ReportUnincorpNeighborData.pdf. Accessed on August 3, 2021.

Brown Jr., Canter. 1998. *Florida's Black Public Officials, 1867-1924*. Tuscaloosa: University of Alabama Press.

Budiman, Abby. 2020. "Key Facts About Black Eligible Voters in 2020 Battleground States." *Pew Research Center.* October 21. https://www.pewresearch.org/fact-tank/2020/10/21/key-facts-about-Black-eligible-voters-in-2020-battleground-states/. Accessed on August 2, 2021.

Calvan, Bobby Caina. 2021. "DeSantis Signs GOP-drafted Voting Bill, Legal Fight Begins." PBS News Hour. May 6. https://www.pbs.org/newshour/politics/desantis-signs-gop-drafted-voting-bill-legal-fight-begins. Accessed on July 26, 2021.

Cohen, Michael B. 2014. "Changes to Florida Voting Laws 5 – The Reversal: Governor Scott Signs New Bill to Extend Early Voting." National League News. https://www.southflalaw.com/changes-to-florida-voting-laws-5-the-reversal-governor-scott-sig.html. Accessed on July 18, 2021.

Croucher, Sheila L. 2002. "Miami in the 1990s: 'City of the Future; or 'City on the Edge'?" *Journal of International Migration and Integration* 2, no. 3: 223-239.

DeRuy, Emily. 2012. "Advocacy Organization Registers 90,000 Latino Voters. Latinos Are Poised to Play a Major Role in Florida." ABC News. October 8. https://abcnews.go.com/ABC_Univision/Politics/advocacy-organization-nclr-registers-90000-latino-voters/story?id=17510451. Accessed on August 31, 2021.

Figueredo, Dalia. *Affording The Franchise: Amendment 4 & The Senate Bill 7066 Litigation*, 72 FLA. L. REV. 1135, 1136 (2020).

Florida Department of State. "2020 General Election." https://fldoswebumbracoprod.blob.core.windows.net/media/703948/gen-2020.pdf. Accessed on July 31, 2021.

Florida Department of State. *The Constitution of the State of Florida. As Revised in 1968. And Subsequently Amended in 2016.* https://files.floridados.gov/media/693801/florida-constitution.pdf. Accessed on August 20, 2021.

Florida Senate. 2013. "CS/ HB 7013 – Florida Election Code."
https://www.flsenate.gov/Committees/BillSummaries/2013/html/562.
Accessed on July 27, 2021.

Florida Senate. 2011. "CS/CS/ HB 1355 – Elections."
https://www.flsenate.gov/Committees/BillSummaries/2011/html/1355EE.
Accessed on July 22, 2021.

Florida Senate. 2004. CS/SB 2566: Absentee Ballots."
http://archive.flsenate.gov/session/index.cfm?Mode. Accessed on July 22,
2021.

Florida Senate. 2002. "2002 Florida Statutes."
https://www.flsenate.gov/laws/statutes/2002/101.62. Accessed on August 27,
2021.

Gadsden County, Florida Government. 2021. "Black First in Florida 'Celebrate
Black History Gadsden County.'"
https://www.gadsdencountyfl.gov/news_detail_T34_R172.php. Accessed on
August 20, 2021.

Grenier, Guillermo J. and Max Castro. 1999. "Triadic Politics: Ethnicity, Race, and Politics in Miami, 1959-1998." *The Pacific Historical Review* 68, no. 2: 273-292.

Gwen S. Cherry Black Women Lawyer's Association. 2021. "Gwen S. Cherry Esq." https://gscbwla.org/Gwendolyn-Sawyer. Accessed on August 20, 2021.

Hastings, Maribel. 2012. "Voter Suppression: A Perfect Storm." *America's Voice En Espanol* June 6. https://americasvoice.org/blog/voter-suppression-a-perfect-storm/. Accessed on August 28, 2021.

Headcount. 2013. "The Governor that Made Voting Harder, Just Relented, Sort Of." https://www.headcount.org/politics-and-elections/the-governor-that-made-voting-harder-just-relented-sort-of/. Accessed on July 27, 2021.

Herron, Michael C. and Daniel A. Smith. 2013. "The Effects of House Bill 1355 and Voter Registration in Florida." *State Politics and Policy Quarterly* 13, no. 3 (September): 279-305.

Herron, Michael C. and Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355." *Election Law Journal* 11, no. 3: 331-347.

Isbell, Matthew. 2021a. "Florida Redistricting Preview #2: 1970s through 1980s." MCI Maps. August 4. https://mcimaps.com/florida-redistricting-preview-2-1970s-through-1980s/. Accessed on August 21, 2021.

Isbell, Matthew. 2021b. "Florida Redistricting Preview #4: Florida's 1990 Congressional Redistricting." MCI Maps. August 4. https://mcimaps.com/florida-redistricting-preview-4-floridas-1990s-congressional-redistricting/. Accessed on August 21, 2021.

Isenstadt, Alex. 2009. "Brown, Carrie Meek Were Close." *Politico* June 22. https://www.politico.com/story/2009/06/brown-carrie-meek-were-close-023989. Accessed on August 20, 2021.

Jeffe, Douglas and Sherry B. Jeffe. 1990. "Absence Counts: Voting by Mail." *The American Enterprise* 1 (1): 19–21.

Kam, Palm Beach Post, *Former Florida GOP leaders say voter suppression was reason they pushed new election law*, November 27, 2012. Retrieved from https://www.palmbeachpost.com/article/20121125/news/812021098 on August 30, 2021.

Karp, Jeffrey A., and Susan A. Banducci. 2001. "Absentee Voting, Mobilization, and Participation." *American Politics Research* 29 (2): 183–95.

Keele, Luke J., Paru R. Shah, Ismail White, and Kristine Kay. 2017. "Black Candidates and Black Turnout: A Study of Viability in Louisiana Mayoral Elections." *Journal of Politics* 79, no. 3 (July): 780-791.

Klas, Mary Ellen. 2016. "Florida Has a History of Making It Harder for Black Citizens to Vote." *Miami Herald.* August 12. https://www.miamiherald.com/news/politics-government/election/article95105602.html. Accessed on July 16, 2021.

Kousser, J. Morgan. 1974. *The Shaping of Southern Politics: Suffrage Restriction and the Establishment of the One-Party South, 1880–1910* New Haven, CT: Yale University Press.

Kral, John. 1999. "Joe Lang Kershaw, Legislator, Dies at 88." *Lakeland Ledger* November 11. https://news.google.com/newspapers?id=YeRNAAAAIBAJ&sjid=T_0DAAAAIBAJ&pg=5371,117130&dq=joseph+lang+kershaw+died&hl=en. Accessed on August 20, 2021.

Lee, Acting Assistant Attorney General, Civil Rights Div., U.S. Dep't of Justice, Letter to Robert A. Butterworth, Attorney General, State of Florida (Aug. 14,

1998), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1030.pdf.

Lerner, Kira. 2016. "Black Voters Celebrate 'Souls to the Polls' Despite Efforts to Cut the Crucial Early Voting Day." *Think Progress* November 6. https://archive.thinkprogress.org/black-voters-celebrate-souls-to-the-polls-despite-efforts-to-cut-the-crucial-early-voting-day-9100e53f828b/. Accessed on August 27, 2021.

McKee, Seth C. and Melanie J. Springer. 2015. "A Tale of "Two Souths": White Voting Behavior in Contemporary Elections." *Social Science Quarterly* 96, no. 2 (June): 588-607.*Meek v. Metropolitan Dade County, Fla.*, 805 F. Supp. 967 (S.D. Fla. 1992).

Mills, Jon L. 2001. "Reforms in Florida after the 2000 Presidential Election." 13 *University of Florida Journal of Law and Public Policy* 69-80. https://scholarship.law.ufl.edu/cgi/viewcontent.cgi?article=1584&context=facultypub. Accessed on August 5, 2021.

Moreno, Dario V. and Sharon D. Wright Austin. 2015. "Politics and Ethnic Change in Florida." Unpublished document.

8

Mower, Lawrence. 2021. "Gov. Ron DeSantis Signs Florida Voting Bill in Front of Trump Fan Club." *Tampa Bay Times* May 6. https://www.tampabay.com/news/florida-politics/2021/05/06/gov-ron-desantis-signs-florida-voting-bill-in-front-of-trump-fan-club/. Accessed on July 26, 2021.

National Conference of State Legislatures. 2021. "Voting Outside the Polling Place (VOPP): Table 1: States with No-Excuse Absentee Voting." https://www.ncsl.org/research/elections-and-campaigns/vopp-table-1-states-with-no-excuse-absentee-voting.aspx. Accessed on July 31, 2021.

Navarro, Mireya and Somini Sengupta. 2000. "Contesting the Vote: Black Voters; Arriving at Florida Voting Places, Some Blacks Found Frustration" *New York Times* November 30. https://www.nytimes.com/2000/11/30/us/contesting-vote-black-voters-arriving-florida-voting-places-some-blacks-found.html. Accessed on August 27, 2021.

New Florida Majority. 2021. "Florida Get-Out-the-Vote Groups Press for Big Latino Turnout in November." https://newfloridamajority.org/florida-get-out-the-vote-groups-press-for-big-latino-turnout-in-november/. Accessed on August 31, 2021.

Noe-Bustamante, Luis. 2020. "Latinos Make Up Record 17% of Florida Registered Voters in 2020." October 19. https://www.pewresearch.org/fact-tank/2020/10/19/latinos-make-up-record-17-of-florida-registered-voters-in-2020/. Accessed on August 2, 2021.

Oliver, J. Eric. 1996. "The Effects of Eligibility Restrictions and Party Activity on Absentee Voting and Overall Turnout." *American Journal of Political Science* 40 (2): 498–513.

Oprysko, Caitlin. 2020. "Trump Backtracks on Mail Florida, Says It's OK to Do in Florida." *Politico* August 4. https://www.politico.com/news/2020/08/04/trump-backtracks-mail-voting-florida-391373. Accessed on August 31, 2021.

Paulson, Darryl. 2013a. "How Florida Kept Blacks from Voting." *Tampa Bay Times*. October 17. https://www.tampabay.com/news/perspective/how-florida-kept-Blacks-from-voting/2147745/. Accessed on July 16, 2021.

Paulson, Darryl. 2013b. "Florida So Often Denied Black Voters." *Tampa Bay Times*. November 24. https://www.tampabay.com/news/perspective/florida-so-often-denied-Black-voters/2154126/. Accessed on July 16, 2021.

Pew Research Center. 2008. "Among Hispanics in Florida, 2008 Voter Registration Rolls Swing Democratic." Pew Research Center. October 29. https://www.pewresearch.org/hispanic/2008/10/29/among-hispanics-in-florida-2008-voter-registration-rolls-swing-democratic/. Accessed on August 31, 2021.

Posner, Richard. 2001. *Breaking the Deadlock: The 2000 Election, the Constitution, and the Courts* Princeton: Princeton University Press.

Powers, Scott. 2020. "How Florida's Electorate Has Changed Since the 2016 Election." *Florida Politics*. October 26. https://floridapolitics.com/archives/376769-how-floridas-electorate-has-changed-since-2016-election/. Accessed on August 2, 2021.Reynolds, Assistant Attorney General, Civil Rights Div., U.S. Dep't of Justice, Letter to Jim Smith, Attorney General, State of Florida (Jan. 15 1985), https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/FL-1010.pdf.

Presidential Commission on Election Administration. 2014. *The American Voting Experience: Report and Recommendation of the Presidential Commission on Election                                        Administration*

11

http://web.mit.edu/supportthevoter/www/files/2014/01/Amer-Voting-Exper-final-draft-01-09-14-508.pdf. Accessed on August 28, 2021.

Reid, Joy Ann. 2012. "Florida Dems Sue to Keep Early Voting Open; Sunday Voting Resumes in Five Counties. *The Grio* November 4. https://thegrio.com/2012/11/04/florida-democratic-party-files-suit-to-keep-early-vote-sites-open/. Accessed on August 28, 2021.

Rohrer, Gray. 2016. "Number of Women, Hispanics Lag in Tallahassee." *Orlando Sentinel* May 13. https://www.orlandosentinel.com/politics/os-florida-legislature-women-minorities-20160513-story.html. Accessed on August 21, 2021.

Rotondi, Jessica Pearce. 2020. "Vote-by-Mail Programs Date Back to the Civil War." *History* September 24. https://www.history.com/news/vote-by-mail-soldiers-war. Accessed on August 27, 2021.

Salvatore, Susan Cianci, Neil Foley, Peter Iverson, and Steven F. Lawson. 2007. *Civil Rights in America. Racial Voting Rights*. Washington, D.C.: National Historical Landmarks Study.

Sesin, Carmen. 2021. "Settlement Reached in Lawsuit Over Lack of Spanish-language Voting Materials in Florida Counties." NBC News. February 1.

https://www.nbcnews.com/news/latino/settlement-reached-lawsuit-over-lack-spanish-language-voting-materials-florida-n1256384. Accessed on July 29, 2021.

Sesin, Carmen. 2018. "Latino Civil Rights Groups Sue 32 Florida Counties for Not providing Bilingual Voting Material." NBC News. August 16. https://www.nbcnews.com/news/latino/latino-civil-rights-groups-sue-32-florida-counties-not-providing-n901461?icid=related. Accessed on July 29, 2021.

Sherman, Amy. 2014. "Eric Holder Signed Off On Florida's 2011 Early Voting Law, Rick Scott Says." *Politifact: The Poynter Institute*. August 4. https://www.politifact.com/factchecks/2014/aug/04/rick-scott/eric-holder-signed-floridas-2011-early-voting-law-/. Accessed on August 27, 2021.

Sherman, Amy. 2012. "'Souls to the Polls' Sunday Drew High Numbers of African-Americans and Hispanics, Corinne Brown Says." *Politifact: The Poynter Institute*. June 22. https://www.politifact.com/factchecks/2012/jun/22/corrine-brown/souls-polls-sunday-drew-more-african-american-and-/. Accessed on July 22, 2021.

Shofner, Jerrell H. 1963. "The Constitution of 1868." *Florida Historical Quarterly.* 41, No. 4 (April): 356-374.

Simon, Written Statement of Howard L. Simon, Ph.D. for Field Hearing on "New State Voting Laws II: Protecting The Right to Vote in the Sunshine State," submitted to the Subcommittee on the Constitution, Civil Rights and Human Rights U.S. Senate Committee on the Judiciary, January 27, 2012 (retrieved from

https://www.aclu.org/sites/default/files/field_document/aclu_fl_statement_for_senate_judicary_subcomm_field_hearing_on_voter_suppression_2_2_12.pdf on August 30, 2021)

Slanker, Jeffrey D. 2021. "Voting Rights Act Class Action Litigation." Florida Association of County Attorneys. http://faca.fl-counties.com/voting-rights-act-class-action-lititgation.

Southern Oral History Program. 2021. "The Fight for Voting Rights." https://k12database.unc.edu/wp-content/uploads/sites/31/2018/01/FightforVotingRightsPPT.pdf. Accessed on August 20, 2021.

Turner, Jim. 2020. "DeSantic Says Florida Is In 'A Good Spot' for Elections." *Panama City News Herald* https://www.newsherald.com/story/news/politics/elections/2020/07/30/desantis-says-florida-is-in-rsquogood-spotrsquo-for-elections/41987909/. Accessed on August 31, 2021.

Uggen et al., The Sentencing Project, *Locked Out 2020: Estimates of People Denied Voting Rights Due to a Felony Conviction* 17 (Oct. 15, 2020), https://www.sentencingproject.org/wpcontent/ uploads/2020/10/Locked-Out-2020.pdf#page=17.

Ulferts, Alisa. 2005. "Lawsuit: 'Jim Crow' Taints Vote Law." *Tampa Bay Times*. September 10. https://www.tampabay.com/archive/2001/08/16/lawsuit-jim-crow-taints-vote-law/. Accessed on August 5, 2021.

U.S. Bureau of the Census. 2018. "Data Gems: What is a CDP?" May 21. https://www.census.gov/data/academy/data-gems/2018/cdp.html. Accessed on August 3, 2021.

U.S. Bureau of the Census. 2000. "Florida: 2000." U.S. Department of Commerce Economics and Statistics Administration. Issued 2002.

https://www.census.gov/prod/2002pubs/c2kprof00-fl.pdf. Accessed on July 31, 2021.

U.S. Commission on Civil Rights. 2020a. "Voting Right and Voter Disfranchisement in Florida." June 2002. https://www.usccr.gov/pubs/vote2000/imp0602.htm. Accessed on July 28, 2021.

U.S. Commission on Civil Rights. 2020b. "Voting Rights in Florida. The Impact of the Commission's Report and the Florida Election Reform Act of 2001." October 6. https://www.usccr.gov/pubs/vote2000/report/ch2.htm. Accessed on July 28, 2021.

U.S. Department of Justice. 2021a. "Language Minority Citizens. Section 203 of the Voting Rights Act." https://www.justice.gov/crt/language-minority-citizens. Accessed on July 30, 2021.

U.S. Department of Justice. 2021b. "Section 2 of the Voting Rights Act." https://www.justice.gov/crt/section-2-voting-rights-act. Accessed on July 26, 2021.

U.S. Department of Justice. 2021c. "Section 4 of the Voting Rights Act." https://www.justice.gov/crt/section-4-voting-rights-act. Accessed on July 29, 2021.

U.S. Elections Project. 2020. "Voter Turnout Demographics." http://www.electproject.org/home/voter-turnout/demographics. Accessed on July 27, 2021.

Warren, Christopher L. and Dario V. Moreno. 2003. "Power Without a Program: Hispanic Incorporation in Miami." In *Racial Politics in American Cities. Third Edition*, edited by Rufus Browning, Dale Rogers Marshall, and David Tabb, 281-308. New York: Longman.

Wood, Erika L. 2016. Florida: An Outlier in Denying Voting Rights. Brennan Center for Justice at New York University School of Law.

World Population Review. 2021. "Franklin Park, Florida Population 2021." https://worldpopulationreview.com/us-cities/franklin-park-fl-population. Accessed on August 3, 2021.

*Wolfson v. Nearing* 346 F.Supp. 799 (1972).

Wright, Sharon D. 2000. *Race, Power, and Political Emergence in Memphis*. New York: Garland Publishing.

Young, Darius J. 2006. "Henry S. Harmon: Pioneer African American Attorney in Reconstruction-Era Florida." *Florida Historical Quarterly* 85 (Fall): 177-196.

Pleadings identified in my report, including the Complaint and the Amended Complaint

The court cases cited in my report.

Expert Report of J. Morgan Kousser, Ph.D. in the Jones v. DeSantis case.

Expert Report of J. Morgan Kousser, Ph.D. in the Williams v. DeSantis case.

Plaintiffs' First Set Of Requests For Production To Defendant (Florida State Conference of Branches and Youth Units of the NAACP et al. v. Lee, Case No. 4:21-cv-187-MW-MAF

Plaintiffs' First Set Of Interrogatories To Defendant (Florida State Conference of Branches and Youth Units of the NAACP et al. v. Lee, Case No. 4:21-cv-187-MW-MAF

Florida Senate Bill Summaries for "Elections and Ethics," found at https://www.flsenate.gov/Committees/Publications/

Plaintiffs' First Set Of Interrogatories To Supervisors Of Elections Defendants (Florida State Conference of Branches and Youth Units of the NAACP et al. v. Lee, Case No. 4:21-cv-187-MW-MAF

Plaintiffs' First Set Of Requests For Production To Supervisors Of Elections Defendants (Florida State Conference of Branches and Youth Units of the NAACP et al. v. Lee, Case No. 4:21-cv-187-MW-MAF

Plaintiffs' First Set Of Interrogatories To Supervisor Of Elections Defendants (League of Women Voters of Florida, Inc. v. Lee, Case No. 4:21-cv-186-MW-MAF

Plaintiffs' First Set Of Interrogatories To Secretary of State (League of Women Voters of Florida, Inc. v. Lee, Case No. 4:21-cv-186-MW-MAF

Plaintiffs' First Set Of Interrogatories To The Attorney General (League of Women Voters of Florida, Inc. v. Lee, Case No. 4:21-cv-186-MW-MAF

Plaintiffs' First Set Requests For Production To Secretary of State (League of Women Voters of Florida, Inc. v. Lee, Case No. 4:21-cv-186-MW-MAF

Plaintiffs' First Set Of Requests For Production To Supervisor Of Elections Defendants (League of Women Voters of Florida, Inc. v. Lee, Case No. 4:21-cv-186-MW-MAF

Plaintiffs' First Set Of Requests For Production To The Attorney General (League of Women Voters of Florida, Inc. v. Lee, Case No. 4:21-cv-186-MW-MAF

Newman, Voting Rights In Florida, March 2006