# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA RISING TOGETHER, FAITH IN FLORIDA, UNIDOSUS, EQUAL GROUND EDUCATION FUND, HISPANIC FEDERATION, PODER LATINX, HAITIAN NEIGHBORHOOD CENTER SANT LA, and MI FAMILIA VOTA EDUCATION FUND, | Case No. 4:21-cv-201-MW-MJF |
| FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP, DISABILITY RIGHTS FLORIDA, and COMMON CAUSE, | Case No. 4:21-cv-187-AW-MAF |
| HARRIET TUBMAN FREEDOM FIGHTERS, CORP. et al., | Case No. 4:21-cv-242-MW-MJF |
| Plaintiffs, | |
| v. | |
| LAUREL M. LEE, in her official capacity as the Secretary of State of Florida, et al. | |
| Defendants. | |

1

# DECLARATION OF MICHAEL MCDONALD

I am Dr. Michael P. McDonald, Professor of Political Science at the University of Florida. I have a Ph.D. in Political Science from University of California, San Diego and a B.S. in Economics from California Institute of Technology.

I have consulted with numerous governments and media organizations. In the course of my election work, I consulted for the United States Election Assistance Commission, the Department of Defense's Federal Voting Assistance Program, the Colorado Secretary of State, the Virginia Division of Elections, the Arizona Independent Redistricting Commission, the New Jersey State Legislative Redistricting Commission, the New Jersey Congressional Redistricting Commission, Virginia Governor McDonnell's Independent Bipartisan Advisory Redistricting Commission, the California Assembly, the media's National Exit Poll organization, the Associated Press, ABC News, and NBC News.

I have an extensive publishing record regarding elections. I am widely known for producing what are considered the authoritative United States turnout rates for those eligible to vote.[1] Within the sphere of election administration, I recently devised a methodology to audit the assignment of registered voters to districts, which is the subject of my consulting work for the Colorado Secretary of State and the Virginia Division of Elections. I serve on an advisory board for the National States Geographic Information Council to assist other state governments with similar audits.[2] I recently published a study of the reliability of information found in Florida's voter registration database,[3] which builds upon earlier work I

---

[1] Michael P. McDonald and Samuel Popkin. 2001. "The Myth of the Vanishing Voter." *American Political Science Review* 95(4): 963-74. I continue to disseminate turnout rates on www.electproject.org.

[2] Brian Amos and Michael P. McDonald. 2020. "A Method to Audit the Assignment of Voters to Districts." *Political Analysis* 28(3): 356-71.

[3] Enrijeta Shino, Michael Martinez, Michael P. McDonald, and Daniel Smith. 2020. "Verifying Voter Registration Records: Part of Special Symposium on Election Sciences." *American Politics Research* 48(6): 677-81.

conducted on the reliability of voter file data[4] and the matching of voter registration records.[5]

I have been involved as an expert witness in numerous election related cases. Within the past four years, I provided deposition and trial testimony for plaintiffs in an ongoing case challenging Georgia's voter registration matching procedures[6] and a case challenging Georgia's voter registration purging practices.[7]

Please see my curriculum vitae (attached) for more information.

I am receiving $450 per hour for my work in this matter. My compensation is not contingent upon the contents of this report.

## 1. Summary

I have been asked by plaintiffs' counsel to review and respond to a declaration from Dr. Quentin Kidd submitted on behalf of the Florida Secretary of State and the Florida Attorney General, in which he renders several opinions related to Senate Bill 90 (hereafter SB 90).

A summary of my responses are as follows:

1. Throughout his report, Dr. Kidd inconsistently chooses elements of the Florida election code to analyze. At times, he analyzes aspects of Florida's election administration that are not a component of SB 90. For example, Dr. Kidd provides a recent history of in-person early voting, which is not challenged in this case. In another example, Dr. Kidd compares Florida's

---

[4] Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.
[5] Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22.
[6] *Georgia Coalition for the Peoples' Agenda, Inc. et al.* v. Brad Raffensperger. Case No. 1:18-cv-04727-ELR (N.D. Ga.) (I testified or provided testimony three times in this ongoing litigation. Some challenged elements involving Georgia's exact match policy were resolved by a settlement with the Secretary of State's office and revised statutes enacted by Georgia's state government.)
[7] *Fair Fight Action, Inc. et al.* v. *Brad Raffensperger*. No. 1:18-CV-5391-SCJ (N.D. Ga.) (An element of this case was resolved by the Georgia Secretary of State restoring approximately 22,000 registered voters.)

third-party registration rules to other states on a number of facets, but among those he reviews, plaintiffs are only challenging Florida's disclaimer requirement and delivery restrictions. Dr. Kidd provides no rationale as to how these extraneous provisions are relevant to inform his opinions on the issues at stake in this litigation challenging SB 90.

2. Dr. Kidd at times omits elements of SB 90 from his comparative analyses. For example, Dr. Kidd does not review state laws on drop boxes to assess whether any states impose a comparable $25,000 penalty on Supervisors of Elections who seek to use drop boxes outside of the restrictions imposed by SB 90.[8]

3. Dr. Kidd omits recent history, including the passage of SB 90, entirely from his narrative of historical changes to Florida's mail balloting and in-person voting laws since 1995. This omission is significant, and implicitly means Dr. Kidd does not opine on any future effect that SB 90 may have.

4. Dr. Kidd's narrative of recent historical changes to Florida's mail balloting and in-person voting laws fails to mention any negative effects that may burden Florida voters, or any changes in Florida law that were not undertaken voluntarily but that were the result of litigation.

5. Dr. Kidd cites no authority supporting his classification of states' voting laws with respect to drop box usage, third-party ballot collection rules, third-party voter registration rules, absentee ballot application verification rules, no excuse absentee voting rules, and electioneering provisions. By repeatedly employing opaque classification and measurement schemes, Dr. Kidd does not follow "standard methods used by political scientists and social scientists when conducting a comparative analysis of laws and rules across time and states regarding the administration of elections" (Kidd, p. 5). As a consequence, he does not permit me to fairly evaluate and critique his methods. Since he provides no description of his methodology, I am unable to reanalyze his work to ascertain if I can reproduce his results.

6. To the extent that I can externally test the validity of Dr. Kidd's classifications of states, I find them inaccurate and otherwise wanting. For example, he misclassifies nineteen states as not offering mail ballot return drop boxes, when in fact those states did provide drop boxes in the 2020 presidential election.

---

[8] SB 90 Section 28; F.S. §101.69(3).

4

7. Dr. Kidd employs inconsistent classification schemes to the favor of the defendants. For example, when categorizing states on their drop box usage, he distinguishes states that require drop boxes from those that allow localities the discretion to provide them. When categorizing states with voter registration notification laws, he does not distinguish Florida's mandatory disclaimer from states with permissive guidelines for third-party organizations.

### 2. Inconsistent Scope of Analysis

Generally, Dr. Kidd's analysis is two-pronged.

1. In the first prong of his declaration, Dr. Kidd analyzes changes to Florida's in-person early voting and mail balloting laws since 1995.
2. In the second prong, Dr. Kidd compares current Florida election laws with other states' laws, with respect to the use of mail ballot return drop boxes, mail ballot voter assistance, third-party registration activities, mail ballot verification, mail ballot requests, and polling place electioneering activities.

Dr. Kidd inconsistently selects elements of Florida's election administration for his analysis of Florida's recent history of election laws. He assesses only in-person early voting and mail ballot laws in recent decades. In-person early voting is not a subject of plaintiffs' challenge to SB 90. Dr. Kidd offers no explanation as to why he chose to examine this facet of Florida's voting laws over others.

Dr. Kidd provides no similar recent historical analysis of legal changes in other states. It is thus impossible to assess from Dr. Kidd's analysis whether or not Florida is a leader or laggard in modernization of election administration in the two areas he chooses to analyze.

A complete analysis of Florida's voting laws, if included in Dr. Kidd's analysis, might cast the defendants in a less favorable light. For example, Dr. Kidd provides no historical analysis of Florida's voter registration laws. Florida's voter registration deadline of 28 days prior to an election ranks Florida's among the least convenient of pre-election voter registration deadlines in the country.[9]

---

[9] For a compilation of states' voter registration deadlines by the National Conference of State Legislatures, see: https://www.ncsl.org/research/elections-and-campaigns/voter-registration-deadlines.aspx

5

Dr. Kidd's Table 1 (p. 10) and Table 2 (p. 14) are titled "Changes to Florida's…Voting Rules Since 1995." However, an analysis of SB 90 is missing from these sections of his report.

Moreover, Dr. Kidd provides no similar recent historical analysis of all SB 90 provisions that are later subjects of his report, namely Florida's mail ballot collection rules, third-party registration activities, absentee ballot application verification rules, and polling place electioneering activities.

### 3. Lack of a Balanced Historical Analysis

Dr. Kidd approvingly notes that Florida's rules for mail balloting evolved "from a very restrictive process to a much less restrictive process" (Kidd p. 9). Similarly, he notes how in-person early voting evolved "from a relatively supervised process for voters who were unable to vote on election day to one oriented around convenience for voters" (Kidd p. 13).

Dr. Kidd's selective historical narratives of Florida's in-person early voting and mail balloting laws are framed only in positive terms to describe how Florida's government has enacted new laws with respect to in-person early voting and mail balloting. A balanced analysis would include policy changes that had a negative effect on minority and student communities or that courts imposed upon Florida.[10]

These omissions are important in light of the fact that Dr. Kidd's selective historical analysis does not continue to the present, stopping short of the enactment of SB 90. He renders no opinion as to whether SB 90 enhances or impairs the participation for Florida's voters in the electoral process.

### A. Mail Balloting

In Dr. Kidd's chronology of Florida's "Absentee Voting Rules" (Table 1, p. 10), Dr. Kidd omits from Table 1 a 2019 law[11] that codified a 2018 preliminary injunction requiring the state to allow voters to cure a mismatched signature on an

---

[10] *See, e.g.*, *Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) (regarding changes to early voting that disproportionately impacted minority voters).
[11] 2019 Fla. Sess. Law 2019-162 (codified at F.S. 101.68(4)(b), (2021)).

6

absentee ballot return envelope. In his preliminary injunction order on this matter, a district federal court ruled:[12]

> The precise issue in this case is whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection—passes constitutional muster. The answer is simple. It does not.

By omitting a law that was passed in response to a federal court injunction, Dr. Kidd fails to consider evolution of Florida's election laws that may not have otherwise been adopted absent a federal court order.

### B. In-Person Early Voting

Dr. Kidd's analysis of in-person early voting – which is not a subject of plaintiffs' challenges – provides an anodyne narrative of some changes to mask adverse effects on minority and youth communities.

In 2011, Florida reduced the number of in-person early voting days permitted from up to 14 days to 8 days, while changing the number of hours offered from 8 to 12 hours. Dr. Kidd (p. 15) approvingly notes how, "[t]his change in the early voting hours requirement amounted to an increase in the available time for early voting on weekends."

Dr. Kidd fails to acknowledge that the state's policy specifically discontinued in-person early voting on the Sunday before the election. He does so by framing his discussion of the allowed in-person early voting days relative to the number of days before an election, without addressing the specific days of the week impacted (Kidd pp. 14-15).[13]

---

[12] Democratic Executive Committee of Florida v. Detzner, 347 F.Supp.3d 1017 (2018) at 6.

[13] Dr. Kidd's Table 2 (p.14) notes, "…but supervisor of elections has discretion to offer it on the 15th, 14th, 13th, 12th, 11th, or 2nd day before election." Likewise in the body of his report Dr. Kidd (p. 15) notes, "…stipulated an early voting period from the 15th day before an election to the 2nd day before an election (fourteen days of early voting)."

7

The Sunday prior to Election Day is when African-American communities typically conduct "Souls to Polls" voter mobilization drives. A recent article by Drs. Herron and Smith demonstrates that Florida's 2011 change had the following effects:[14]

> [R]acial/ethnic minorities, registered Democrats, and those without party affiliation had significant early voting participation drops and that voters who cast ballots on the final Sunday in 2008 were disproportionately unlikely to cast a valid ballot in 2012. Florida's decision to truncate early voting may have diminished participation rates of those already least likely to vote.

Florida in a 2013 law reinstated local Florida Supervisors of Elections' discretion to offer in-person early voting on the Sunday prior to the election and other days, as Dr. Kidd (pp. 15-16) obliquely notes. He provides no analysis of to what extent Supervisors of Elections exercised their discretion. Did any Supervisor of Elections offer in-person early voting on the Sunday prior to an election? If so, how many?

Dr. Kidd fails to analyze administrative rulemaking by the Florida government which implemented the state's in-person early voting rules. For example, in 2018, the Florida League of Women Voters challenged a 2014 Florida administrative rule that found college facilities did not meet the definition of a "government-owned community center."[15] A federal district court overturned this interpretation of Florida's law, noting that "[t]hrowing up roadblocks in front of younger voters does not remotely serve the public interest."[16]

A balanced reading of Florida's in-person early voting laws is that while the state has expanded in-person early voting options, Florida has at times – legislatively or administratively – adopted measures that disproportionately impacted certain groups, such as communities of color or college students.

---

[14] Michael C. Herron and Daniel A. Smith. 2014. "Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election." *Political Research Quarterly* 67(3): 646-665.

[15] Florida Department of State, Division of Elections. 2017. ''Voting Activity by Ballot Type for 2016 General Election.''

[16] See: *League of Women Voters of Florida, Inc., et al.* v. *Detzner*, 314 F. Supp. 3d 1205, (N.D. Fla. 2018), available at: www.leagle.com/decision/infdco20180725987.

## 4. Dr. Kidd's Comparative Analysis is Inconsistent and Biased in Favor of the State

Dr. Kidd inconsistently classifies Florida's laws and compares them to other states' laws and policies in a manner that makes Florida appear more favorable than warranted.

For example, when analyzing drop boxes, Dr. Kidd (Table 3, p. 19) uses as his analytic framework a comparison between whether a state requires a voting method or merely allows a voting method. Dr. Kidd classifies Florida as one of ten states that require election officials to provide drop boxes for voters to return mail ballots. Dr. Kidd classifies fourteen states where election officials are allowed, at their discretion, to provide drop boxes.

By contrast, in analyzing disclaimers that third-party voter registration efforts are required to provide voters, Dr. Kidd (Table 5, p. 26) changes his methodology. He lumps together all states with any rules in any way related to disclaimers, without distinguishing between states that require disclaimers and states that do not. Dr. Kidd classifies Florida as one of eight states with "some notice/disclaimer rules." For example, Dr. Kidd's placement of Virginia and Florida in the same classification is deceptive, as Virginia's law is not a mandate for third-party organizations to provide similar disclaimers as Florida to people they interact with. Rather, Virginia's law applies to *government officials* instructing individuals or groups they provide voter registration applications to.[17] With respect to information provided to applicants, Virginia's training guide clearly describes only *best practices* for third-party groups conducting voter registration drives, not requirements that may place individuals or groups into legal jeopardy for failing to provide information.[18]

Thus, when Dr. Kidd analyzes drop boxes, he chooses to differentiate between required and discretionary practices, to opine "If the use of drop boxes is

---

[17] Va. Code. § 24.2-416.6. https://law.lis.virginia.gov/vacode/title24.2/chapter4/section24.2-416.6/
[18] See: https://www.elections.virginia.gov/media/formswarehouse/veris-voter-registration/voterregistrationdrives/2021-Guidelines-for-Voter-Registration-Drives-[Final]-(1).pdf (Note, Dr. Kidd's report provides a defunct link).

9

considered an expansion of voting rights, then Florida is among the minority of states (10 of 51, or about 20%)" (Kidd p. 20).

In contrast, when Dr. Kidd analyzes third-party voter registration notice requirements, he does not differentiate between required and discretionary policies, and thereby opines, "disclaimer requirements are not unique among states that require them and certainly not as proscriptive as several of them" (Kidd p. 29). Dr. Kidd's analysis is therefore unpersuasive and unreliable.

### 5. Drop Box Classification Errors from an Unknown Data Source

At places in his report, Dr. Kidd provides precise citations to state laws and policies he discusses. However, Dr. Kidd provides no citation as to the authority he used to classify states' mail ballot drop box return laws and the table of comparative state laws found in his report. A reader must take as a matter of faith that Dr. Kidd correctly classifies each state's laws and policies.

Dr. Kidd's classification of states' mail ballot return drop boxes is wanting. Mail ballot drop boxes were a high-profile issue in the 2020 election, with extensive court action regarding their usage. For example, Dr. Kidd classifies Ohio as prohibiting drop boxes; however, all Ohio election offices had drop boxes in the 2020 general election, and there was a legal battle over expanding their use.[19] Dr. Kidd classifies Texas as prohibiting drop boxes, yet there was extensive court action that eventually allowed drop boxes, but restricted them to election offices.[20] Dr. Kidd cites Virginia as a state comparable to Florida, but neglects to mention that Virginia does not have a $25,000 penalty imposed on local election officials who seek to provide drop boxes beyond the limitations imposed by SB 90.[21]

---

[19] Julie Carr Smyth. "Dispute over Ohio drop box limit ends as advocates drop suit." *Associated Press*. Oct. 23, 2020. Available at: https://apnews.com/article/election-2020-donald-trump-columbus-cincinnati-lawsuits-e2bcbb042c0704a94dd7c95f8b26b932

[20] Jolie McCullough. "Texas counties will be allowed only one drop-off location for mail-in ballots, state Supreme Court rules." *Texas Tribune*. Oct. 27, 2020. Available at: https://www.texastribune.org/2020/10/27/texas-voting-elections-mail-in-drop-off/

[21] See SB 90, Section 28; F.S. §101.69(3) (2021); compare to Va. Code Ann. §24.2-707.1 (no penalty provisions).

Dr. Kidd can easily discover which states use mail ballot return drop boxes. FiveThirtyEight and other news and advocacy organizations provided informational websites listing mail ballot policies for all the states, including if drop boxes are permitted and including links to states' lookup tools for voters to find their nearest drop box location.[22] In all, based on the information collected by FiveThirtyEight, Dr. Kidd misclassifies the following nineteen states as prohibiting drop boxes, when in at least some – if not all –local election officials in these states provided them: Alaska, Connecticut, Delaware, District of Columbia, Idaho, Kansas, Louisiana, Maine, Nevada, New Hampshire, New York, North Carolina, North Dakota, Ohio, Rhode Island, South Dakota, Texas, Wisconsin, and Wyoming.

Dr. Kidd's classification of states' drop box laws is fatally flawed and his analysis is therefore unreliable.

### 6. Third-party Ballot Collection Rules

Dr. Kidd provides no authority for the classifications set forth in his Table 4, "Third-Party Ballot Collection Rules" (p.22). Table 4 appears to be largely consistent with information provided by the National Conference of State Legislatures.[23] Dr. Kidd's analysis concludes, "However, among those forty-one states that impose some regulation, Florida is less restrictive than over half" (Kidd, p. 23).

There are two problems with Dr. Kidd's analysis.

First, Dr. Kidd performs a sleight of hand by restricting his opinion to only those states that "impose some regulation" and thereby omits from his analysis the most permissive states that impose no regulation.

Second, Dr. Kidd does not provide a measure of how to score the restrictiveness of states' third-party ballot collection rules. He notes two elements that might reasonably be inferred to inform his measurement of restrictiveness: who may

---

[22] See: https://projects.fivethirtyeight.com/how-to-vote-2020/
[23] See: https://www.ncsl.org/research/elections-and-campaigns/vopp-table-10-who-can-collect-and-return-an-absentee-ballot-other-than-the-voter.aspx

11

return a mail ballot and the number that they may return.[24] Dr. Kidd does not explain how he weighs these two elements against each other, or how he quantifies who is allowed to return a ballot. For example, Dr. Kidd codes Montana's exception for an "acquaintance" as a "limit" on par with other states that restrict ballot return to immediate family members (Kidd Table 4, p. 22).[25] Dr. Kidd does not explain how he accounts for the fact that his scoring of his measurement for Montana allows a voter to return up to six ballots, provided they are from another voter in an exempt category (e.g., family member, member of same household or acquaintance),[26] but Florida allows anyone to return up to two ballots in addition to those of a family member.[27] These nuanced differences among state laws demonstrate the unreliability of Dr. Kidd's simplistic analysis in Table 4. Moreover, Dr. Kidd does not address the specific change in Florida law implemented by SB 90: expanding the scope of the restriction on returning ballots from prohibitions on returning a ballot for "pecuniary gain" to restrictions on returning ballots, generally. Thus, Dr. Kidd provides no insight as to how Florida compares to other states on a specific issue at stake in this litigation.

Dr. Kidd's opaque classification and measurement scheme is inconsistent with "standard methods used by political scientists and social scientists when conducting a comparative analysis of laws and rules across time and states regarding the administration of elections" (Kidd, p. 5). He does not permit me to fairly evaluate and critique his methods. He does not permit me to reanalyze or reproduce his work by including all states in a similar analysis, rather than focusing only on those that impose some restriction.

Dr. Kidd also provides no analysis of the disparate burdens Florida's third-party mail ballot collection laws may impose upon certain communities. For example, he provides no analyses of how SB 90 may affect how home-bound or disabled people will participate in elections.

---

[24] For example, Dr. Kidd writes (p.21), "By comparison, SB 90's ballot collection provision allows anyone to return up to two completed absentee ballots in addition to their own. The law also allows a person to collect and return any number of their immediate family member's ballots, and expands the definition of immediate family member to include a grandchild."

[25] See: Mont. Code Ann. §13-35-703; for the latter, see, for example, Massachusetts M.C.L.A. 168.764a, which limits ballot return to family members or persons residing in a household.

[26] *See* Mont. Code Ann. §13-35-703

[27] F.S. § 104.0616(2)

12

## 7. Third-Party Voter Registration Rules

Dr. Kidd's analysis of third-party ballot collection rules encapsulated in his Table 5 (p. 26) does not address plaintiffs' challenges to SB 90 as to where or when third-parties must return voter registrations and any fines they may incur for delivering registration forms elsewhere. Dr. Kidd's Table 5 does include one aspect of plaintiffs' challenge: the disclaimer third-party organizations are legally required to provide to people they interact with.

Dr. Kidd's analysis includes several third-party registration rules that plaintiffs are not challenging, such as if third-party volunteers must be officially recognized (deputized) by the state, if they must be trained, reporting requirements, return deadlines, and pay allowed. Dr. Kidd does not explain how these rules inform his opinion of the third-party voter registration rules in SB 90 that plaintiffs are challenging.

The one SB 90 rule that plaintiffs are challenging and that Dr. Kidd addresses in (Table 5, p. 26) is "some notice/disclaimer rules."

Dr. Kidd's classification employs a deceptive usage of the word "some." As Dr. Kidd acknowledges in his report, the notifications prescribed by other states are in many cases guidelines, not mandates. Virginia's instructions to voter registration groups cited by Kidd are "best practices" for individuals and groups conducting voter registration drives,[28] and not statutory mandates.[29] Even these best practices do not include anything like the mandatory disclaimer found in SB 90. For Alabama the "guidelines" cited by Kidd describe the duties of voter registration officials and not third-party organizations;[30] and for Arkansas, Kidd cites to "recommendations", but does not identify any statutory requirements for notice or

---

[28] See: https://www.elections.virginia.gov/media/formswarehouse/veris-voter-registration/voterregistrationdrives/2021-Guidelines-for-Voter-Registration-Drives-[Final]-(1).pdf

[29] Virginia law does not require a disclaimer of any kind, and only requires third-party registrants to provide a receipt to the registrant with the name of the organization, the date it received the application, and the phone number of the registration official to confirm the registration. *See* Va. Code Ann. 24.2-418.1(A).

[30] See: https://www.sos.alabama.gov/sites/default/files/voter-pdfs/VoterDriveGuidelines.pdf

disclaimer to voters by third-party organizations. Dr. Kidd completely misrepresents Iowa's law, which references mail ballot request forms, not voter registration applications.[31] In any case, Iowa law contains no requirement for disclaimers.[32] For California, Kidd also cites guidelines, glossing over the fact that the only disclaimer required under California law is to inform voters that they may be entitled to "confidential voter status."[33]

Dr. Kidd in his report neglects an analysis of two states listed as having some notice/disclaimer rules: Colorado and Georgia. For completeness, I include them here.

Colorado has mandatory training for voter registration drive organizers, but only requires a specific notice to voters for registrations collected 22 days or fewer prior to an election. Colorado does not permit persons registering by a third-party organization within 22 days of an election to vote in that election. Colorado's notice thus provides prospective registrants voters with guidance on how to avail themselves of same-day and online registration options that will permit them to vote.[34]

Georgia is the only state, other than Florida, that requires voter registration organizations and individuals to provide specific information to persons they interact with (beyond a receipt for the registration). A distinction between Georgia and Florida is that Georgia does not require disclaimer language similar to the language in SB 90 (warning prospective registrants that "the organization might not deliver the application…in less than 14 days or before registration closes").[35] This language may reasonably cause a prospective registrant concern and thereby deter them from interacting further with a voter registration effort. In contrast, Georgia only requires organizations to inform registrants that they are not registered to vote until they receive notice from their county election official, and

---

[31] See: https://sos.iowa.gov/elections/pdf/absenteeballotapprec.pdf
[32] *See* Iowa Code § 48A.22.
[33] *See* Cal. Elec. Code § 2157(4).
[34] CO Rev Stat § 1-2-701 & 1-2-702 (2016).
[35] FL. Statutes § 97.0575 (3)(a) (2021).

14

that if they do not receive such notice in two weeks they should check with their county officials.[36]

Thus, Florida and Georgia are differentiated from other states in that they are the only two that require third-party voter registration notices/disclaimers to all prospective registrants, and Florida is the only state that requires an organization or individual to affirmatively assert to a prospective registrant that the organization or individual may fail to deliver their registration on time.

### 8. Absentee Ballot Application Verification

With respect to SB 90's requirement to provide identification in applying for an absentee ballot, Dr. Kidd again provides no authority for his classification and is opaque about the classification and measurement scheme he uses in Table 6 of his report. As a result, I am unable to fairly evaluate and critique his methods. He does not permit me to reanalyze his work or reproduce his results by including all states in a similar analysis, rather than focusing only on those that impose some restriction.

Dr. Kidd brushes away any number of classification choices. For example, what does it mean for a state to have "minimal" requirements? How do states check a ballot request against a voter registration record? What degree of discretion do local election officials have in curing deficiencies they identify when verifying information on a voter registration record? What does Dr. Kidd mean when he categorizes states as "[i]nformation and eligibility checked against voter registration records" (Table 6, p. 31)?

Some of Dr. Kidd's classifications are clearly incorrect. For example, he says that Vermont voters must request a ballot each election, but the state adopted all-mail ballot elections.[37]

---

[36] Ga Comp. R. & Regs. r. 183-1-6-.02(6). Georgia also provides a template written handout to assist organizations with compliance, whereas Florida is vague as to the specific language and method in which organizations need to provide the disclaimer/disclosure. See:
*http://sos.ga.gov/admin/files/Required_Voter_Registration_Notices_Handout.pdf*
[37] See: https://vtdigger.org/2021/06/07/scott-signs-bill-expanding-vote-by-mail-in-general-elections/

15

Even a cursory review demonstrates further flaws in Dr. Kidd's grouping of states. Dr. Kidd identifies Florida, along with 14 other states (Kansas, Maine, Maryland, Minnesota, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, South Dakota, Virginia, Wisconsin and Wyoming) as states with "Information and eligibility checked against voter registration records" (Table 6). Dr. Kidd offers no insights as to what these criteria are, or how the criteria used by other states compare to Florida. For example, Kansas, Maine, Nebraska, Nevada, Ohio, Oklahoma, South Dakota, Virginia and Wisconsin all allow voters multiple alternative ways to confirm their identity beyond the limited forms necessary under SB 90.[38] Maryland and New Mexico's identification requirements apply only to persons accessing online portals, not paper applications.[39] Even Minnesota, which requires that the identification information be verified, does not require that the information provided by the voter match the information the voter used to register to vote.[40] It appears that Florida may be the only state requiring this "two-key" authentication method.

Furthermore, Dr. Kidd provides no analysis of the disparate burdens Florida's mail ballot application verification laws may impose upon certain individuals, for example, those without a state drivers' license or state issued ID number, or those whose voter records do not include such a number.

It is thus impossible for me, using Kidd's classification and measurement scheme, to determine to what degree, "[i]n terms of burden, Florida's requirements are largely *average*" (p. 32, emphasis added). Moreover, it is impossible to determine

---

[38] *See* https://www.vote.org/voter-id-laws/#kansas (Kansas); Me. Rev. Stat. Ann. Tit. 21-A; §753-A (Maine); Neb. Rev. Stat. § 32-939(1), see also: https://sos.nebraska.gov/elections/voter-forms (Nebraska, which includes absentee ballots as a form of early voting); Nevada Rev. Stat. §293.2725(1)-2(b) (Nevada); Ohio Rev. Code §3509.03(B)(5) (Ohio); https://oklahoma.gov/content/dam/ok/en/elections/absentee-ballots/absentee-ballot-application-012020.pdf (Oklahoma); S.D. Codified Laws §§ 12-18-6.1 & 12-18-6.2 (South Dakota); Va. Code Ann. §24.2-701(C) (Virginia); Wis Stat. § 6.87, see also https://greenbaywi.gov/DocumentCenter/View/1670/Absentee-Application-PDF?bidId= (Wisconsin); Wyo. Stat. Ann. §22-9-104 (Wyoming).

[39] *See* Md. Code Ann. Elec. Law § 9-305 (Maryland – ID requirements apply to absentee ballot on-line requests only); and N.M. Stat. §1-6-4(B-C), see also: https://www.bernco.gov/clerk/wp-content/uploads/sites/46/2021/08/Absentee-Voting-Application-2021.pdf (New Mexico).

[40] Minn. Stat. § 203B.04(a).

16

how Dr. Kidd reaches that conclusion, since his report is bereft of any specific analysis of burden. Dr. Kidd devises no number that allows me to compute the average "burden" to voters across states, much less how Florida deviates from it for all Florida voters or specific Florida communities.

## 9. No Excuse absentee voting rules

Dr. Kidd again moves the goalposts in Florida's favor when analyzing states' absentee ballot request rules, by explicitly removing states "short of no-excuse permanent absentee or all-mail voting" (p. 35) from his analysis.

Plaintiffs are challenging only SB 90's change to the duration of a mail ballot request, not who may request a mail ballot (which is unaffected by SB 90). Dr. Kidd does not explain his justification as to why he considers who may request a mail ballot to be relevant to his analysis. Moreover, Dr. Kidd also does not analyze how the frequency of requesting an absentee ballot interacts with verification procedures. A voter who must repeatedly request a mail ballot will be repeatedly subjected to verification procedures, thus imposing further administrative obstacles to voting.

Because Dr. Kidd evaluates simultaneously two different aspects of Florida's absentee voting laws, I cannot fairly evaluate the correctness of Dr. Kidd's opinion that Florida is "…the most lenient among the thirty-eight states that impose some restrictions on who can request an absentee ballot *and* for how long" (p. 33, emphasis added).

Here, as elsewhere in his report, if Dr. Kidd wishes to evaluate aspects of SB 90 that are not among plaintiffs' allegations, it is incumbent upon him to explain clearly the relevance of these facets.

## 10. Electioneering Provisions

In Section XI and Table 8 of his report, Dr. Kidd provides an anodyne description of states' laws regarding electioneering outside of polling locations. The sole basis of his comparison is how far outside a polling location electioneering is prohibited. Missing from his analysis is SB 90's restriction on line-warming activities by organizations and individuals to provide assistance to persons – such as disabled and the elderly – standing in line by providing seating or water in a nonpartisan manner, free of electioneering.

SB 90 extended the pre-existing ban on activities near to polling places to also prohibit "engaging in any activity with the intent to influence or effect of influencing a voter."[41] None of the examples of other states' regulation of voting line activity cited by Dr. Kidd are as broad as Florida's. The examples he cites from Arizona, Maine, Massachusetts, Michigan and Montana all prohibit promoting or influencing a voter to vote for a particular candidate, party, or ballot question,[42] but are not nearly as onerous as the Florida restriction which also bars even non-partisan line-warming activities intended to encourage voters to stay on line to vote, such as providing water, food, chairs or umbrellas. Even the Wisconsin law cited by Kidd is limited to activity "intended to influence voting",[43] and does not reach to activity that has "the effect of influencing a voter" even without such intent.

I declare that the foregoing is true and correct. Executed this 13th day of October, 2021, in Alachua County, Florida.

_____
Michael McDonald

---

[41] SB 90, Section 29; F.S. § 102.031(4)(b).
[42] *See* Ariz Rev. Stat. Ann. §16-515(A) (Arizona); Maine Rev. Stat. Ann. Tit.21-A §682(2) (Maine); Mass. Gen. Laws ch. 54 §65 (Massachusetts); Mich. Comp. Laws §168.744 (Michigan); and Mont. Code Ann. §13-35-211 (Montana).
[43] Wis. Stat. § 12.03.