# Supplemental and Rebuttal Expert Report Submitted on Behalf of

# *Florida State Conference of NAACP v. Lee*, 4:21-cv-187-MW-MAF,

# and *Florida Rising Together v. Lee*, 4:21-cv-201-MW-MJF

Daniel A. Smith, Ph.D.*

October 13, 2021

Daniel A. Smith, Ph.D.

---

*Professor and Chair of Political Science, University of Florida, and President, ElectionSmith.

1 **EXHIBIT 6**



Daniel Smith, Ph.D.
10/25/21

**EX. 6**

T. Piderit

# Contents

I Introduction     3

II Conclusions from my expert report not challenged by the Lockerbie Report, the Moreno Report, or the Kidd Report     4

III Response to the Lockerbie Report     5

IV Response to the Moreno Report     22

V Response to the Kidd Report     23

VI Analysis of Additional Data or Information from Supervisors of Elections in Discovery or in Depositions     23

VII Conclusion     29

# I  Introduction

**1**     In the matter of *Florida State Conference of NAACP v. Lee*, 4:21-cv-187-MW-MAF, and *Florida Rising Together v. Lee*, 4:21-cv-201-MW-MJF, I authored an Expert Report dated September 1, 2021.

**2**     Defendants submitted three reports that to varying degrees address my expert report: one by Dr. Brad Lockerbie, one by Dr. Dario Moreno, and one by Dr. Quentin Kidd. I refer, respectively, to the three reports as the Lockerbie Report, the Moreno Report, and the Kidd Report.

**3**     I begin by summarizing the key analyses and conclusions in my expert report. I first respond to the Lockerbie Report regarding all the references Dr. Lockerbie makes to my expert report. I then respond to the Moreno Report as far as it purports to discuss the impact of SB 90 and the impact of "boleteros." Finally, I respond to the Kidd Report, although Dr. Kidd makes no specific reference to my expert report.

**4**     Because a few of the Supervisors of Elections (SOEs) amended their data, affidavits, or declarations as part of the discovery process *after* September 1, the date of my expert report, I also take this opportunity to consider these additional materials as they are relevant to my original report. Considerations of these additional materials reinforce my original conclusions.

**5**     In formulating my opinions, I utilize the same methods as in my original report. These methods are informed by standard sources and methodologies used in political science

analyses. My background and qualifications, in addition to my curriculum vitae and rate of pay, are included in my original report. My compensation is contingent neither on the results of the analyses described herein nor on the contents of my report.

# II   Conclusions from my expert report not challenged by the Lockerbie Report, the Moreno Report, or the Kidd Report

**6**      Drawing on an array of statewide and county data sources, my September 1, 2021 expert report offers several findings concerning the overall impact SB 90 has on Florida voters, and specifically, the disparate impact SB 90 has on people of color as well as those with disabilities in Florida. Dr. Lockerbie Dr. Moreno and Dr. Kidd do not dispute the following findings in my report:

A. Persons of color rely more heavily on 3PVROs when registering to vote than other groups of voters and SB 90's limits placed on 3PVROs will result in Black and Hispanic eligible Florida citizens having fewer opportunities to register to vote.

B. SB 90's new exact-match ID requirements placed on registered voters who want to request a Vote-by-Mail (VBM) ballot disproportionately affects voters of color and will lead to fewer opportunities for Black and Hispanic registered voters to receive a VBM ballot.

C. SB 90 cuts in half the length of time a voter may have a standing request to have a VBM ballot mailed to them and will result in thousands of registered voters having fewer opportunities to receive a VBM ballot.

D. Limits that SB 90 place on the locations, dates, and hours of operation of VBM ballot drop boxes will result in all Florida voters, but particularly voters of color, having fewer

4

opportunities to securely return their VBM ballots in person.

E.  SB 90's restrictions on the return of VBM ballots for voters in need of assistance will
    lead to all voters, but particularly voters of color and those with disabilities, having fewer
    opportunities to return their VBM ballots.

F.  SB 90's restrictions on providing aid and comfort to voters waiting in lines during early
    in-person voting or on Election Day will result in all Florida voters, but particularly
    voters of color and those with disabilities, having to face higher barriers to cast their
    ballots in person, potentially causing them not to vote at all.

# III    Response to the Lockerbie Report

**7**    Dr. Lockerbie (Lockerbie Report, paragraphs 34 - 50) offers a series of critiques of
my expert report. I enumerate and address each of his points sequentially.

## III.I    "34. In section IV, number 18, Smith implies that any limits on drop boxes are discriminatory. No basis is provided for this assertion."

**8**    Dr. Lockerbie mischaracterizes my summary conclusion statement while ignoring
the body of my report. In fact, I provide thorough documentation in my report regarding
the impact of SB 90's drop box restrictions, on Florida voters generally, and in particular
on Black and Hispanic voters. Section X of my expert report provides extensive evidence of
how SB 90's restrictions on VBM drop boxes decrease the opportunities of voters, including
persons of color and individuals with disabilities, to return their VBM ballots. Contrary to
my report, in which I document the usage of drop boxes by some 1.5 million Florida voters in

the 2020 General Election, including by voters of color, and how SB 90 will curtail in whole or in part the deployment of VBM drop boxes in future elections, Dr. Lockerbie cites no scholarship and no empirical evidence to challenge my findings, namely, that limiting VBM drop boxes will negatively affect Florida voters in general, and racial and ethnic minority voters in particular.

**9** In my expert report (Section X, paragraphs 122 - 223) I provide an extensive review of the scholarly literature on VBM drop boxes. I then draw on administrative data provided by Florida SOEs in discovery to analyze the usage of VBM drop boxes in the 2020 General Election. I provide empirical evidence, drawing on data from the Florida counties that provided racial/ethnic data in discovery, showing that Black and Hispanic voters were more likely to return their VBM ballots via drop boxes on days/times that SB 90 curtails in whole or in part. I also provide evidence from the affidavits and interrogatory responses of the SOEs regarding their expectations of how SB 90 will affect their deployment of VBM drop boxes in future elections, underscoring their concern that drop box usage will be curtailed in future Florida elections.

**10** Dr. Lockerbie does not dispute my finding that over 120 VBM drop boxes deployed by SOEs in the 2020 General Election will likely be curtailed in whole or in part under SB 90. Dr. Lockerbie also does not dispute my finding that SB 90 will reduce the opportunities of Florida voters generally, and racial and ethnic minority voters in particular, to return their VBM ballots in future elections.

### III.II  "35.  In section IV, number 21, he says 'an increase in the cost of voting can lead to voter disenfranchisement.'  Note the conditional nature of his statement."

**11**     In contrast to Dr. Lockerbie's report, my report is well grounded in the scholarly literature on the "cost of voting" (see paragraph 21 of my Expert Report).  As a political scientist, Dr. Lockerbie is certainly aware of this prevailing analytical framework to understand the calculus of voting, and he does not challenge it.  There is extensive empirical literature in political science that is grounded in the calculus of voting if sometimes implicitly (e.g., Aldrich 1993; Verba, Schlozman & Brady 1995; Brady & McNulty 2011; Herron & Smith 2013*a*; Leighley & Nagler 2013; Biggers & Smith 2018; Li, Pomante II & Schraufnagel 2018).

**12**     To Dr. Lockerbie's point, it is theoretically possible that an increase in the cost of voting might not lead to voter disenfranchisement; my report, however, examines the specific effects of SB 90, and I find that SB 90 does have a negative effect on Florida voters generally, and on voters of color specifically.  The conditional nature of the cost of voting does not affect the specific findings documented in my expert report with respect to SB 90, or my overall conclusion that SB 90 places additional burdens on Floridians, particularly people of color.

**13**     As I show in my expert report, the increase in the cost of voting under SB 90 is clear.  Dr. Lockerbie does not challenge my findings that the legislation burdens Floridians wishing to register to vote and to cast a ballot, or my findings that these burdens fall disproportionately on racial and ethnic minorities and on disabled voters.  Specifically, Dr. Lockerbie does not challenge my findings that SB 90 increases the cost of voting for individuals who rely on 3PVROs when registering to vote, that it increases the cost of voting for

registered voters who do not have a Social Security number, driver's licence, or a state ID number on file, that it increases the cost of voting for registered voters who no longer can have a standing request to have a VBM ballot mailed to them, that it increases the cost of voting for voters who rely on VBM ballot drop boxes to return their mail ballots, that it increases the cost of voting for voters who need assistance to return their VBM ballots, and that it increases the cost of voting for voters waiting in line to cast a ballot in person who may need assistance.

### III.III   "36. In section IV, number 25, he neglects to consider that VBM increased because of COVID."

**14**     The use of VBM ballots increased in the 2020 General Election, in Florida and in other states, in part due to the COVID-19 pandemic. This is documented in my expert report (see paragraphs 52 - 54, and Table 5), and is also well documented by scholars, including in my recent peer reviewed article focusing on the increased use of VBM in Florida (Cottrell, Herron & Smith 2021$a$) as well as in a report I authored following the election (Smith 2021). That record numbers of Black and Hispanic voters utilized a method of voting that is arguably safer during a pandemic raises further questions about the decision of the Republican legislature to curtail VBM ballots in the future. Whether or not VBM use in Florida increased because of COVID, the costs that SB90 imposes on using VBM as a voting method remain the same, and those costs are imposed disproportionately on people of color and people with disabilities.

**III.IV**   **"37.  In section IV, number 31, he notes that the modal response for referrals for illegal voting or registration was zero.  That does not tell us much at all.  Given that this is an interval measure, he could have presented the mean. If the distribution is highly skewed, he could present the median."**

**15**     My expert report provides the modal response from SOEs to the House of Representatives PIE Committee's questionnaire regarding the number of referrals made in the past four years to "the state attorney's office for illegal registration or voting practices." As I report in footnote 5 (p. 21) of my expert report, the modal response from SOEs in response to this question is zero (0).

**16**     Dr. Lockerbie says that I "could have presented the mean." I have calculated the mean response of SOEs who responded to the PIE Committee's questionnaire.  The mean response is 4.3 cases referred to state attorneys over the past four years.  Dr. Lockerbie is correct that the distribution is highly skewed.  This is because a majority of SOEs have referred zero cases of fraud to a state attorney's office over the past four years.  I also have calculated the median response of the SOEs who responded to the questionnaire.  The median response is zero (0) cases referred to state attorneys over the past four years. Given that there are over 15 million registered voters in Florida and over 11 million who voted in the 2020 General Election, by the SOEs' own accounting, over the past four years there is imperceptible "illegal registration or voting practices" occurring in Florida.

**III.V**   "38.  In section VI, number 37, he states that the drop in registration after the 2011 change in the law for Blacks was the only significant drop among racial/ethnic groups.  He does not tell us how big the drop was.  Also, it would be important to know if the drop for Blacks was significantly different than the drop for the other groups."

**17**      As reported in my 2013 peer reviewed article with Dr. Michael Herron (Herron & Smith 2013*b*), the proportional drop off in voter registrations for Black and Hispanic voters was significantly greater than for white voters following the implementation of HB 1355.  Using a standard difference-in-difference approach, we find that voter registrations across Florida dropped in the second half of 2011 (after the implementation of HB 1355) compared with new voter registrations in the second half of 2007 for Black, Hispanic, and white individuals.  Our statistical models find that the only significant difference in the registration drop from 2007 to 2011 was for Black ("African American") individuals.

**III.VI**   "39.  In section VI, number 44, he argues that the online voter registration system has been plagued with problems. It has crashed at least five times from 2017 to 2020.  Calling five crashes of indeterminant [sic] length plagued with problems is more than a bit of a stretch."

**18**      According to media reports, the Division of Elections online voter registration system has crashed *at least* five times.  More critical than the number of times the system has crashed is the *timing* of these system crashes.  As I write in paragraph 44 of my expert report, "[t]he state's online voter registration system has crashed at least five times since 2017. Most recently, the online voter registration portal crashed on the final day before the state's book closing in October 2020."  As Judge Mark E. Walker wrote in his Order on

10

Motion for Preliminary Injunction on October 9, 2020 in a lawsuit dealing with this latest online voter registration crash (Namphy, et a. v. DeSantis and Lee, Case No.: 4:20cv485-MW/MAF), "Florida has done it again. In the final hours of Florida's voter registration period, during an election year coinciding with a prolonged and incredibly damaging public health emergency, Florida's voter registration website crashed, effectively preventing thousands of potential voters from safely registering to vote before the midnight deadline" (pp. 1-2). Judge Walker concluded, "This case is about how a state failed its citizens. In this case, potential voters attempted to perform their civic duty, to exercise their fundamental right, only to be thwarted, once again, by a state that seemingly is never prepared for an election (p. 28)."

**19**     Florida's online voter registration system also crashed prior to the 2020 primary elections and was also down—apparently for routine maintenance, according to the Division of Elections—on National Voter Registration Day in 2019.[1] In addition, the state's online voter registration system failed in 2018—on October 9, the last day to register to vote for the midterm elections.[2]

---

[1]"A crashed voter registration website is Floridians' latest obstacle to the right to vote," *Vox*, October 9, 2020, available at `https://www.vox.com/recode/2020/10/6/21504401/florida-voter-registration-website-crash-right-vote-suppression` (last accessed October 3, 2021).

[2]"'A mess': Florida's online voter-registration system panned," *Politico*, October 9, 2018, available `https://www.politico.com/states/florida/story/2018/10/09/a-mess-floridas-online-voter-registration-system-panned-641953` (last accessed October 3, 2021).

**III.VII**   **"40. In section VII.V.6, number 89 and Table 11, the numbers are more than a bit confusing. In 2020, for example, it looks like 427 Blacks registered without a driver's license or Social Security card and that constitutes 10.62 percent of the Blacks who registered."**

**20**      Dr. Lockerbie finds Table 11 in my expert report "more than a bit confusing," but in fact, he has interpreted correctly. According to data provided by the Division of Elections ("LitigationRR_NoDL-SSN_20210722.txt"), in 2020 there were 427 Black individuals who successfully registered to vote notwithstanding their lack of a driver's license or a Social Security number, and that accounts for 10.62 percent of all Black individuals who successfully registered to vote from 2006 to 2020 who lacked a driver's license or Social Security number. The point of Table 11 (p. 63), as I write in my expert report, is twofold: first, that in "2016, 2018, and 2020, there were twice, and sometimes three times, as many new Black registrants as white registrants who were able to register without providing a driver's license or a Social Security number," as permitted by law, and second, "compared to white voters, in recent years, both the overall numbers and the relative rates of such new registrants are disproportionately more likely to be people of color." None of these individuals, all of whom legally registered to vote, will be able to request a VBM ballot under SB 90, as they do not possess an ID that can be matched to a record on the Florida Voter Registration System (FVRS). Dr. Lockerbie does not appear to challenge these conclusions.

### III.VIII "41. In section IX.I, number 109, he states a lot of ballots were rejected for being late. For that to be meaningful, we would need to know when they were mailed."

**21**      A VBM ballot placed in a SOE's VBM drop box anytime prior to the close of polls on Election Day in Florida will be tabulated, whereas a VBM ballot placed in a mailbox, or delivered to a Post Office—even well before the close of polls on Election Day—may not be tabulated, as there is a possibility it will not arrive at the SOE office on time. As I write in my expert report in paragraph 109, "SB 90's limits on voters receiving assistance to return VBM ballots and on drop boxes increase the costs of voting for Floridians." I have written extensively elsewhere on the rejection rates of VBM ballots in Florida (Smith 2018; Smith & Baringer 2020; Smith 2021), including a recent peer reviewed article (Cottrell, Herron & Smith 2021$a$), as well as a peer reviewed article on postal delays affecting VBM ballots (Herron & Smith 2021).

**22**      My point, which Dr. Lockerbie does not appear to contest, is that reducing the availability of drop boxes will increase the reliance on mailing VBM ballots via the USPS, which is less reliable than returning VBM ballots via a drop box. Indeed, Lake County SOE Alan Hays, wrote in an email to other SOEs dated May 26, 2021, "Thanks to the so-called wisdom of our stellar legislature, those voters will now have to use the USPS box instead of our private box," which was a 24/7 VBM drop box located in front of his office. "I just hope USPS gets the ballots to us promptly," Hays continued, noting earlier in the email chain that the problem of late arriving VBM ballots in previous elections was not an issue when his staff was able to retrieve VBM ballots directly from the SOE's VBM drop box.[3]

---

[3]See email from Alan Hays to numerous SOEs and Ron Labasky, "Subject: Re: SB 90 Compliance for the Convenience of our Voters," May 26, 2021. Available in SOE Mark Earley's "Response to Plaintiffs' First Set of Interrogatories to Supervisor of Elections Defendants," p.

**III.IX** **"42. In section X, number 123, he states that voters have come to depend on the convenience of drop boxes. A requirement that was put in place for the election 2020 would not appear to create dependence because it was only one election cycle carried out during a pandemic."**

**23**     Dr. Lockerbie's statement that Florida voters have not come to depend on VBM drop boxes is unfounded. Over 1.5 million voters used VBM drop boxes in the 2020 General Election, and thousands of voters across Florida have been depositing their VBM ballots in secure drop boxes for years, not only in November general elections, but in statewide primary elections, presidential primary elections, and local elections.

**24**     Contrary to Dr. Lockerbie's pronouncement, VBM drop boxes in Florida were *not* "put in place for the election 2020." Rather, many county SOEs have deployed VBM drop boxes for several election cycles, and in some counties, VBM drop boxes have been utilized by SOEs for more than a decade. Elections experts in Florida certainly recall when former Pinellas County SOE, Republican Deborah Clark, famously challenged a directive issued on November 25, 2013, by former Secretary of State, Scott Detzner, who was appointed by Republican Governor Rick Scott, that stated that SOEs "should not solicit return of absentee ballots at any place other than a supervisor's office."[4] SOE Clark stood up to the Secretary of State—who subsequently relented—and Pinellas County voters were permitted to drop off VBM ballots for a special congressional election at drop boxes stationed at "two libraries and three tax collector branch offices" in addition to the drop boxes located at "her three

---

221.

[4] Florida Department of State, "Directive 2013-01-Return of Absentee Ballots," November 25, 2013, available https://files.floridados.gov/media/693333/sos_directive_2013-01.pdf (last accessed October 3, 2021).

offices."[5] By 2013, Pinellas County had already been offering voters the convenience of VBM drop boxes for six years. My research and investigation have not revealed a single instance of voter fraud or election security problems with VBM drop boxes in Pinellas County, which have been in use for over a decade. Similar to other counties, Hillsborough County also has used VBM drop boxes for roughly a decade. In the 2012 General Election, for example, Hillsborough SOE, Democrat Craig Latimer, "used 13 public libraries as sites where voters could drop off absentee ballots."[6] Rather, by 2020, VBM drop boxes were commonplace across Florida counties, and Florida voters—and Florida SOEs—have come to depend on VBM drop boxes. "I'm at a loss for words," Pasco County SOE, Republican Brian Corley, said to the press in March 2021 after hearing that the state legislature was contemplating completely banning drop boxes. "It's a solution looking for a problem."[7]

### III.X "43. In section X, number 127, he states that SB 90 curtails drop boxes because they had not been staffed in 2020. He appears to neglect the possibility that they could be staffed in the future."

**25**     Dr. Lockerbie is apparently unfamiliar with the affidavits and interrogatory responses from SOEs that indicate which drop boxes in their counties they do not plan to staff in future elections. I use information from these affidavits and interrogatories as a basis for conclusions in my expert report. For example, in paragraph 127 in my expert report that

---

[5]"Gov. Rick Scott's administration eases showdown over Pinellas election," *Tampa Bay Times*, December 3, 2013, available `https://www.tampabay.com/news/politics/elections/bill-nelson-attacks-absentee-ballot-drop-off-edict-as-voter-suppression/2155369/` (last accessed October 3, 2021).

[6]"Ibid.

[7]"Florida may ban drop boxes used for mail-in ballots," *Politico*, March 9, 2021, available `https://www.politico.com/states/florida/story/2021/03/09/crackdown-coming-florida-may-ban-drop-boxes-used-for-mail-in-ballots-1367575` (last accessed October 3, 2021).

Dr. Lockerbie references, I state that SB 90 "curtails in whole or in part" 122 VBM drop boxes deployed in the 2020 General Election. This is because the "65 VBM drop boxes in 48 counties that were available 24/7 for voters to deposit their VBM ballots" as well as the "57 VBM drop boxes in 15 counties that were located at a SOE office (or a permanent SOE branch office) that were available to voters [in the 2020 General Election] on days either before of after EIP voting in the county, but not open 24/7" can only remain unimpacted if they are continually staffed in person with SOE personnel in future elections. It is clear from the affidavits and interrogatory responses of Florida SOEs—which I extensively document in my expert report—that this is highly unlikely to happen. I did not include in my count of impacted drop boxes in my expert report any instance where an SOE indicated specific plans to augment staffing so as to provide 24/7 staffing for a drop box in future elections. Indeed, I have not found any indication in the affidavits or interrogatory responses that SOEs plan to increase staffing to provide 24/7 drop boxes.

## III.XI    "44. In section XI, number 224, he argues that SB 90 restricts those waiting in line from receiving assistance. He does not take into [sic] the limitation might speed up the voting process."

**26**    Dr. Lockerbie provides no basis for his suggestion that restricting "line warming" (that is, the provision of material assistance, such as drink, food, seating, or shelter) might speed up the voting process. Dr. Lockerbie's logic seems to be that if assistance to people waiting in line to vote is limited, individuals who need assistance will renege, that is, leave the line, thereby shortening the wait times for the remaining individuals who are willing to endure a long line. Even more, limiting access to those in line could also cause potential voters who require assistance when waiting in line to balk, that is, not even join a queue in the first place, as they know they will not receive any assistance from groups providing

material assistance to help them endure long wait times.  Dr. Lockerbie does not explain how restrictions on assistance will speed up voting, and provides no evidence in support of this proposition.  Significantly, in legislative consideration of SB 90, I am not aware of any lawmaker who provided any evidence for this proposition; indeed, to my knowledge, there was no indication that the new law was motivated by a desire to speed up the voting process.

III.XII    "45.  In section XI.II, number 234, he cites Stewart and Ansolabehere's 2013 report to the U.S. Election Commission on Voting to assess why people did not vote and argues that people did not vote because of long lines.  This work assumes that people were not giving what might be thought of as a socially acceptable excuse for not voting.  Moreover, he does not note that Stewart and Ansolabehere state that differential wait times for blacks and whites are not the result of discrimination.  Specifically, Stewart and Ansolabehere (2013, page 12) state: explain: [sic] 'This analysis suggests that minority voters do not tend to wait longer than white voters because of discrimination at the polls against individuals.  Rather, the neighborhoods that have high minority populations tend to experience long waiting times for all voters in that neighborhood, regardless of the race of individual voters.  Whites who live in racially diverse ZIP Codes wait to vote longer than whites who live in all-white neighborhoods; African Americans who live in predominantly white neighborhoods stand in shorter lines than African Americans who live in more diverse neighborhoods.'"

**27**    Dr. Lockerbie makes two points regarding the working paper by Stewart III & Ansolabehere (2013) that I cite in paragraph 233 (and not paragraph 234 as Dr. Lockerbie incorrectly cites) of my expert report.  Neither point is relevant to my findings concerning both the overall and the disparate impact of SB 90.

17

**28**     Dr. Lockerbie criticizes me for citing Stewart III & Ansolabehere (2013) because he suggests that some respondents in the two national surveys (the 2012 Voting and Registration Supplement (VRS) of the Current Population Survey (CPS) and the 2012 Cooperative Congressional Election Study (CCES) that they analyze for their study, "were not giving what might be thought of as a socially acceptable excuse for not voting," that is, that they "did not vote because of long lines." Dr. Lockerbie cites no scholarly articles to support his claim.

**29**     After criticizing their working paper for relying on survey data that might be susceptible to social desirability response bias, Dr. Lockerbie then proceeds to emphasize one of the findings from Stewart III & Ansolabehere (2013) to conclude that "differential wait times for blacks and whites are not the result of discrimination." Dr. Lockerbie's invocation of Stewart III & Ansolabehere (2013), it seems to me, is for the simple proposition that longer wait times in majority-minority precincts are not due to particularized discrimination against voters of color by poll workers or election officials with whom they interact, as voters of all racial and ethnic groups in precincts experience the same longer wait times in these majority-minority precincts. Dr. Lockerbie is knocking down a straw man. I have not claimed that long wait times are due to particularized discrimination against voters of color in minority-majority precincts. Rather, my contention, which Dr. Lockerbie does not appear to challenge, is that precincts with higher proportions of voters of color disproportionately face longer wait times, and so the impact of restrictions on line warming in Florida under SB 90 will disproportionately impact Black and Hispanic voters. The intent of poll workers in majority-minority precincts is irrelevant to my analysis.

**30**    Furthermore, Dr. Lockerbie ignores several peer reviewed studies that find that Black and Hispanic voters are more likely to wait in lines at the polls than white voters. Studies drawing on survey data, like the Stewart III & Ansolabehere (2013) working paper, are not the final word on what voters are likely to experience with respect to wait times at the polls. Indeed, in one of my recent peer reviewed articles, I include a discussion of the Stewart III & Ansolabehere (2013) working paper in the literature review, noting its limitations.[8] Stewart III & Ansolabehere (2013) aggregate individual-level survey results up to the ZIP code level to determine the distribution of wait times, but their finding does not mean that precincts that have high concentrations of voters of color (but that also include some non-minority voters) have the same wait times as precincts that are all (or nearly all) comprised of white voters. ZIP codes are not precise measures of wait times at the polls. Scholars should be cautious when drawing conclusions concerning racial/ethnic differences from studies that use ZIP codes as the unit of analysis, as the geographic unit for voting an in-person ballot is not a ZIP code. Rather, voters cast ballots in their assigned precinct (on Election Day) or at an early voting location in their county on a given day. ZIP codes typically include dozens of precincts and can include multiple early voting locations, particularly in larger, more urban counties with sizeable minority populations. Precincts, and even early voting locations (particularly on a given day) tend to be much more homogeneous than a ZIP code, and often have very different associated wait times, despite all being located in the same ZIP code.

**31**    When it comes to wait times in Florida, there is no need to rely on national survey data, like the Stewart III & Ansolabehere (2013) study, to know that Black and Hispanic voters are more likely to wait in long lines compared to white voters. Dr. Lockerbie is either

---

[8]"The utility of surveys in the study of voter wait times depends on a crucial assumption: voter self-reports of wait times are accurate." See (Cottrell, Herron & Smith 2021*b*, p. 113).

unaware of this scholarly literature or has chosen to ignore it. "In contrast to survey-based research," as I write in a recent peer review study (Cottrell, Herron & Smith 2021b, p. 113), "our design aimed at understanding the extent and consequences of voting lines draws on observed check-in times of voters in Florida who cast their ballots at early, in-person polling sites prior to the 2012 and 2016 General Elections." In this article, as well as in another peer reviewed article focusing on wait times in Florida (Herron & Smith 2015), both of which draw on administrative data from Florida counties, we find that Black and Hispanic voters in Florida are more likely to face longer wait times at the polls than white voters. These findings are bolstered by the peer reviewed work of Pettigrew (2017, 2021), as well as innovative peer reviewed research using smartphone data by Chen et al. (2019), who find that voters in predominantly Black neighborhoods are more likely to wait in line than voters in predominantly white neighborhoods.

**32**      In short, Dr. Lockerbie does not challenge the broad conclusion in my expert report that SB 90's restrictions on line support will disproportionately impact voters of color.

## III.XIII    "46.  They also add that it is unlikely that these longer wait times are 'because of widespread concerted efforts to lengthen waiting times in minority communities for partisan gains, since the local governments of most of these communities are controlled by Democrats.'"

**33**      This comment by Dr. Lockerbie in reference to the Stewart III & Ansolabehere (2013) study is a non-sequitur and is also not correct.  Dr. Lockerbie's statement has no relevance to the impact that SB 90 will have on wait times for voters of color. The cause of persistently longer wait times in precincts with voters of color is irrelevant to the findings

of my expert report. My expert report shows that SB 90 disproportionately impacts Black and Hispanic voters who are more likely to face longer lines at the polls.

### III.XIV    "47. In section XI.III, number 238 does not explain how the wait times were calculated."

**34**      Dr. Lockerbie notes that I do not explain how the wait times (for Miami-Dade County) are calculated. As clearly noted in paragraph 235 of my expert report, I relied on wait time data made available by the SOE of Miami-Dade County.

### III.XV    "48. In section XI.III, number 240, he implies that those in line are out in inclement weather. He does not tell us what proportion of the wait time is spent inside and what proportion is spent outdoors."

**35**      I am not sure what Dr. Lockerbie is referring to, as there is nothing in paragraph 240, or in any other paragraph of my expert report, concerning "inclement weather."

### III.XVI    "49. In section XI.V.1, number 265, he does not tell us how accurate these estimates are."

**36**      As I note in my expert report (paragraph 260), the wait times I analyze were provided by the Lee County SOE in discovery.

III.XVII   "50.  In section XI.V.1, number 267, he notes again the
150-foot buffer.  Presumably people in line outside the
buffer can be approached.  It would be important to note
how long the wait was once one gets within 150 feet."

37      Data on "how long the wait was once one gets within 150 feet" were not made
available to me by Florida's SOEs, but it does not change the fundamental point—which
Dr. Lockerbie does not challenge—that longer wait times in Florida are experienced dispro-
portionately by voters of color.

# IV   Response to the Moreno Report

38      Dr. Moreno offers a lengthy history of voting in Miami-Dade County which has
no relevance to the conclusions of my report or the specific provisions being challenged in SB
90.  Prior to the enactment of SB 90, Miami-Dade had a local ordinance to regulate vote-by-
mail processes.  As such, Dr. Moreno's conclusion that "SB90 is an appropriate response to
Florida's history of absentee ballot fraud, and it will not have racially discriminatory effects"
seems contrived, as it is not supported by his analysis of voting in Miami-Dade County.  Dr.
Moreno's analysis in fact demonstrates the absence of rationale for SB 90, since Miami-Dade
County already has a measure in place to address it.  Dr. Lockerbie does not provide any
basis for extrapolating his observations to other jurisdictions or the rest of the state.

39      With a few isolated exceptions, other Florida counties have not experienced prob-
lems with the collection of VBM ballots.  As I write in my expert report (paragraph 31, p.
21), "the SOEs' responses to the PIE Committee offered no evidence of 'ballot harvesting' in
previous elections."  In addition, based on the affidavits and interrogatory responses of SOEs

produced in discovery, I did not uncover a single case of a SOE reporting problems with so-called "ballot harvesting" in the 2020 General Election (see Section X of my expert report (pp. 95 - 120). Furthermore, none of the opposing experts (Dr. Moreno, Dr. Lockerbie, and Dr. Kidd) challenge my finding that there was no "ballot harvesting" in Florida's 2020 General Election, much less any fraud related to the requesting or returning of VBM ballots (at drop boxes or otherwise) in the 2020 General Election.

**40**      Dr. Moreno's report does not address the actual impact of SB 90, and thus does not in any way refute the conclusions of my report.

# V    Response to the Kidd Report

**41**      Dr. Kidd implies that if Florida's laws are in the mainstream of other states, then there is no impact or burden to SB 90. This is not the case. As I document extensively in my Expert Report, SB 90 has a significant and substantial impact on Florida voters generally, and on voters of color and voters with disabilities in particular. Dr. Kidd's report does not address the actual impact of SB 90, and thus does not in any way refute the conclusions of my report.

# VI    Analysis of Additional Data or Information from Supervisors of Elections in Discovery or in Depositions

**42**      Several additional pieces of information were provided to me after I submitted my expert report on September 1, 2021.

## VI.I   Information pertaining to "PRR_NAACP_VoterDetail.txt"

**43**     It is my understanding that Miami-Dade SOE Christina White noted in her deposition on September 27, 2021, that the FVRS data ("PRR_NAACP_VoterDetail.txt") provided in discovery by the Division of Elections that contains a code for how an individual registered to vote, only captures the most recent event. This means, as I had surmised in my report (paragraph 41), that the number of individuals who have registered with 3PVROs in Florida is likely an undercount, as "[i]t is quite likely that some individuals who initially registered with 3PVROs, say in 2018, are no longer registered in Florida as of mid-2021, and as such, would not be found in the FVRS data from mid-2021" and that "[s]ome individuals who initially registered with 3PVROs likely updated their registration by another method, and as such, would not be found in the FVRS data from mid-2021," to say nothing of the "millions of Florida registrants who registered to vote prior to 2005, before the state started to record 3PVROs as a distinct method of registering to vote in the state."

**44**     I note here that I received the FVRS data ("PRR_NAACP_VoterDetail.txt") produced in discovery by the Division of Elections on August 26, 2021, from counsel, just days before my expert report was due.   It is clear from the FVRS ("PRR_NAACP_VoterDetail.txt") snapshot that it was produced by the the Division of Elections around August, 2021, so my calculations concerning the "more than 750,000 eligible citizens currently registered in Florida" who registered with 3PVROs (paragraph 42) is very recent.  Furthermore, my finding (paragraph 46) that "10.9 percent of the nearly 2.05 million Black registered voters"—more than 222,000 Black registered voters—"relied on 3PVROs when they joined Florida's voter rolls" and 9.6 percent of "the state's nearly 2.65 million Hispanic registered voters"—more than 253,000—"relied on a 3PVRO when registering to vote in Florida" is quite current. In sum, as I write in my expert report (paragraph

46), and which is unchallenged by the opposing experts, the rates of Black and Hispanic individuals who registered to vote with a 3PVRO are "more than 5 times the rate of white individuals who relied on 3PVROs" when registering to vote.

## VI.II    Information pertaining to "PRR_NAACP_VoterDetail.txt"

**45**      In discovery, the Division of Elections produced a text file, "LitigationRR_NoDL-SSN_20210722.txt", which I surmised in my expert report (despite not having any supporting documentation) was a "a subset of the FVRS," and is "likely limited to registered voters with no driver's license and no Social Security number ("NoDL-SSN") on file with the Division of Elections" (paragraph 79). On September 20, 2021, Director Maria Matthews in her interrogatory response (p. 5) stated that it is indeed an extract of the FVRS that contains "all registered voters for whom FVRS does not record a driver's license number, state-issued identification card number, social security number, or the last four digits of the Social Security number for such voters." She continues, "This file does not include voters for which there is a response in these fields that has been found invalid." As I write in my expert report (paragraph 82), "Under SB 90, given the previous assumptions about what these data represent, none of these 586,788 registered voters would be able to successfully request a VBM ballot because they do not have a valid form of ID on file with the Division of Elections," even though "nearly 74 percent of these voters cast ballots in the 2020 General Election."

## VI.III    Additional information from SOEs not initially provided in discovery

**46**      The Bay County SOE, Mark Andersen recently produced a one page "Media Release" dated May 21, 2021, in response to an RFP. I reproduce the Bay County Media

Release in Figure 1, below.

Figure 1: Bay County Media Release, May 21, 2021

**Mark Andersen**
**Bay County**
**Supervisor Of Elections**



830 W. 11th Street
Panama City, FL  32401
**Phone:**  (850) 784-6100
**Fax:**      (850) 784-6141
**Cell:**     (850) 819-6933
**Email:**  baysuper@bayvotes.org

# Media Release

Contact: Mark Andersen, Bay SOE
Phone: (850) 784-6100
Cell:    (850) 819-6933

FOR RELEASE
10:15 AM, May 21, 2021

**Office Dropbox Removal**

- The Vote By Mail Drop Box outside of the Supervisor of Elections office has been removed.

- Due to Florida Senate Bill 90 expected to be signed by the Governor, the office will no longer be allowed to have the Vote By Mail Drop Box except during Early Voting Hours.

- Vote by mail ballots can be delivered inside the Supervisor of Election office during business hours.

**Media questions please contact Supervisor of Elections Mark Andersen at 819-6933**

-End-

Page 1 of 1                         10109 REV E 03/04/13

BAY000024

**47**     In his July 30, 2021 interrogatory response, SOE Andersen did not mention that Bay County had already planned on eliminating the "Vote By Mail Drop Box outside of the Supervisor of Elections office" "[d]ue to Florida Senate Bill 90 expected to be signed by the Governor." Quite the contrary. In his interrogatory response, SOE Andersen stated that VBM drop off locations "will be very close to what we have done in the prior election." This is clearly not the case. In the 2020 General Election, Bay County, as I state in my expert report (paragraph 206) offered a 24/7 drop box at the SOE office. That 24/7 VBM drop box will no longer be available to voters in Bay County. The SOE's Media Release also makes it clear that in future elections, VBM drop box will only be permitted "during Early Voting Hours." In the 2020 General Election, as I write in my expert report (paragraph 206), Bay County offered "drop boxes at all 13 of its Super Voting Centers on the Monday before Election Day, which is not an allowed EIP day under state statute." The new information from SOE Andersen confirms what I had surmised in my expert report, that opportunities for voters to return their VBM ballots in drop boxes will be curtailed in Bay County as a result of SB 90.

**48**     I recently received an amended interrogatory response from Manatee County SOE, Republican Michael Bennett, dated September 16, 2021. In this amended interrogatory response, SOE Bennett states, "However, because SB 90 requires drop boxes at elections offices to be continuously monitored in person by an employee of the Supervisor's office when accessible for deposit of ballots, the Supervisor does not at this time anticipate that he will continue to provide an outdoor drop box at the elections office on a twenty-four-hour, seven-day-a-week basis. Instead, the Supervisor expects to provide a continuously monitored outdoor drop box at the elections office during normal business hours." As I write in my expert report (paragraph 151), in the 2020 General Election, the VBM drop box in Manatee County was open 24/7, but that (paragraph 157) "SOE Bennett indicated that SB 90 has not

yet had an impact, and that he has made no decision on whether to allow VBM drop boxes beyond the mandated EIP time period." It is also my understanding that in the deposition of SOE Bennett taken on October 7, 2021, SOE Bennett said, "Any time you change the pattern of what people have been doing . . . people are going to find it inconvenient to do it another way." Based on this new information, it is clear that the opportunities for Manatee County voters to return their VBM ballots in drop boxes will be curtailed as a result of SB 90.

49    It is my understanding that, in the deposition of SOE Bennett taken on October 7, 2021 SOE Bennett stated that VBM drop boxes in Manatee County were first installed in 2014, which once again contradicts Dr. Lockerbie's pronouncement that VBM drop boxes in Florida were "put in place for the election 2020."

50    It is also my understanding that, in the deposition of SOE Bennett taken on October 7, 2021 SOE Bennett stated VBM ballots deposited in VBM drop boxes after-hours in the 2020 General Election were typically processed the next morning (or Monday morning if deposited over the weekend). The Manatee SOE staff would scan the VBM ballots to make sure they know the delivery date, including those deposited in the 24/7 VBM drop box. SOE Bennett also confirmed that most VBM ballots in the 2020 General Election were deposited in the county's 24/7 drop box, and that the county received many ballots in that box at night, which his staff took out of the box in the the morning and then scanned with a time stamp. This reaffirms the analysis in my expert report in Section X.III.2, "Manatee County VBM drop box returns after business hours, by race and ethnicity and disability status."

**51**     I also recently received an amended interrogatory response from Citrus County SOE, Maureen Baird, dated September 20, 2021.  In her amended interrogatory response, SOE Baird states, "As to the 24-hour drop-box previously located outside of the Supervisor's office in Crystal River, to ensure in person monitoring, it will be moved to within the office, and will be available during business/voting hours."  Based on this new information, I would add Citrus County to the list of counties in paragraph 203 of my expert report, that concludes: "In my opinion, because of these planned cutbacks on 24/7 VBM drop boxes in these four counties, SB 90 will increase the costs to voters in [Citrus,] Clay, Flagler, Glades, and Lafayette counties—including costs on their *time*, *transportation*, *information*, and *health*."

## VII   Conclusion

**52**     The three opposing experts—Dr. Lockerbie, Dr. Moreno, and Dr. Kidd— do not challenge the scholarly literature upon which I ground my analysis nor do they challenge any of my empirical findings on the impact that SB 90 will have on the voting rights all Florida voters, but particularly persons of color and individuals with disabilities.  There is nothing in the reports of Dr. Lockerbie, Dr. Moreno, or Dr. Kidd that has caused me to change my opinions in any way.

**53**     I reserve the right to continue to supplement my declaration in light of additional facts, data, and testimony.

# References

Aldrich, John H. 1993. "Rational choice and turnout." *American Journal of Political Science* (1):246–278.

Biggers, Daniel R. & Daniel A. Smith. 2018. "Does threatening their franchise make registered voters more likely to participate? Evidence from an aborted voter purge." *British Journal of Political Science* p. 1–22.

Brady, Henry E. & John E. McNulty. 2011. "Turning out to vote: The costs of finding and getting to the polling place." *American Political Science Review* 105(01):115–134.

Chen, M Keith, Kareem Haggag, Devin G Pope & Ryne Rohla. 2019. Racial Disparities in Voting Wait Times: Evidence from Smartphone Data. Technical report National Bureau of Economic Research.

Cottrell, David, Michael C. Herron & Daniel A Smith. 2021*a*. "Vote-by-mail ballot rejection and experience with mail-in voting." *American Politics Research* .

Cottrell, David, Michael C. Herron & Daniel A Smith. 2021*b*. "Voting lines, equal treatment, and early voting check-in times in Florida." *State Politics & Policy Quarterly* 21(2):109–138.

Herron, Michael C. & Daniel A. Smith. 2013*a*. "The Effects of House Bill 1355 on Voter Registration in Florida." *State Politics & Policy Quarterly* 13(3):279–305.

Herron, Michael C. & Daniel A. Smith. 2013*b*. "The effects of House Bill 1355 on voter registration in Florida." *State Politics & Policy Quarterly* 13(3):279–305.

Herron, Michael C. & Daniel A. Smith. 2015. "Precinct Closing Times in Florida During the 2012 General Election." *Election Law Journal* 14(3):220–238.

Herron, Michael C. & Daniel A Smith. 2021. "Postal delivery disruptions and the fragility of voting by mail: Lessons from Maine." *Research & Politics* 8(1).

Leighley, Jan E. & Jonathan Nagler. 2013. *Who Votes Now?: Demographics, Issues, In-*

*equality, and Turnout in the United States*. Princeton University Press.

Li, Quan, Michael J. Pomante II & Scot Schraufnagel. 2018. "Cost of Voting in the American States." *Election Law Journal* 17(3):234–247.

Pettigrew, Stephen. 2017. "The racial gap in wait times: why minority precincts are underserved by local election officials." *Political Science Quarterly* 132(3):527–547.

Pettigrew, Stephen. 2021. "The downstream consequences of long waits: How lines at the precinct depress future turnout." *Electoral studies* 71:102188.

Smith, Daniel A. 2018. "Vote-By-Mail Ballots Cast in Florida." `https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf`.

Smith, Daniel A. 2021. "Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election." `https://allvotingislocal.org/wp-content/uploads/2021/03/031121_FL_VBM-Report_final.pdf`.

Smith, Daniel A. & Anna Baringer. 2020. "ACLU Florida: Analysis of Vote-By-Mail Ballots in the 2018 General Election." `https://www.aclufl.org/en/aclu-florida-report-vote-mail-ballots-2018-general-election`.

Stewart III, Charles & Stephen Ansolabehere. 2013. "Waiting in Line to Vote (White Paper)." *U.S. Election Assistance Commission* .

**URL:** *https://www.eac.gov/sites/default/files/event_document/files/Charles−Stewart−Waiting−in−Line−to−Vote−White−Paper.pdf*

Verba, Sidney, Kay Lehman Schlozman & Henry E. Brady. 1995. *Voice and equality: Civic voluntarism in American politics*. Cambridge, MA: Harvard University Press.