League of Women Voters of Florida, Inc.

vs.

Laurel Lee

---

Deposition of:

Daniel Smith, Ph.D.

October 25, 2021

*Vol 01*

---



Daniel Smith, Ph.D.
October 25, 2021

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Case No.  4:21CV186-MW/MAF          4:21-cv-187
          4:21-cv-201              4:21-cv-242

LEAGUE OF WOMEN VOTERS OF FLORIDA,
et al.,

                Plaintiffs,

     v.

LAUREL M. LEE, Florida Secretary
of State, et al.,

                Defendants,

     and

NATIONAL REPUBLICAN SENATORIAL COMMITTEE, et al.,

                Intervenor-Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

     WEB CONFERENCE DEPOSITION OF DANIEL A. SMITH, Ph.D.


                Volume 1 (Pages:  1-78)



                Monday, October 25, 2021
                10:05 a.m. - 12:17 p.m.



          Location:  Via Web Conference



          STENOGRAPHICALLY REPORTED VIA WEB BY:
          Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR
                Certified Realtime Reporter


Job No. 214151

Daniel Smith, Ph.D.
October 25, 2021

```
 1    APPEARANCES:  (All parties appeared via Web conference)

 2

      ON BEHALF OF FLORIDA RISING TOGETHER:
 3
              ARNOLD & PORTER KAYE SCHOLER, LLP
 4            601 Massachusetts Avenue, Northwest
              Washington, D.C. 20001
 5            202.942.5564
              BY:  Jeremy Karpatkin, Esquire
 6            jeremy.karpatkin@arnoldporter.com

 7            LATINO JUSTICE, PRLDEF
              523 West Colonial Drive
 8            Orlando, Florida 32804
              321.250.2853
 9            BY:  Kira Romero-Craft, Esquire
              kromero@latinojustice.org
10
              DEMOS
11            80 Broad Street
              Fourth Floor
12            New York, New York 10004
              212.633.1405
13            BY:  Brenda Wright, Esquire
              bwright@demos.com
14

15   ON BEHALF OF FLORIDA STATE CONFERENCE OF THE NAACP:

16            NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.:
              700 14th Street, Northwest
17            Suite 600
              Washington, D.C. 20005
18            202.682.1300
              BY:  Mahogane D. Reed, Esquire
19            mreed@naacpldf.org
              BY:  Morenike Fajana, Esquire
20            mfajana@naacpldf.org

21            COVINGTON & BURLING, LLP
              620 Eighth Avenue
22            New York, New York 10018
              212.841.1072
23            BY:  P. Benjamin Duke, Esquire
              pbduke@cov.com
24            BY:  Shira M. Poliak, Esquire
              spoliak@cov.com
25
```

Daniel Smith, Ph.D.
October 25, 2021

Page 3

```
 1    APPEARANCES, Continued:

 2
      ON BEHALF OF LAUREL M. LEE IN HER OFFICIAL CAPACITY AS
 3    SECRETARY OF STATE:

 4            HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
              119 South Monroe Street
 5            Suite 500
              Tallahassee, Florida 32301
 6            850.274.1690
              BY:  Gary V. Perko, Esquire
 7            gperko@holtzmanvogel.com

 8
      ON BEHALF OF THE ATTORNEY GENERAL:
 9
              OFFICE OF THE ATTORNEY GENERAL
10            General Civil Litigation Division
              PL-01, The Capitol
11            Tallahassee, Florida 32399
              850.414.3670
12            BY: William H. Stafford, III, Esquire
              william.stafford@myfloridalegal.com
13

14    ON BEHALF OF ALACHUA COUNTY SUPERVISOR OF ELECTIONS:

15            ALACHUA COUNTY ATTORNEY'S OFFICE
              12 Southeast First Street
16            Second Floor
              Gainesville, Florida 32601
17            352.374.5218
              BY:  Robert C. Swain, Esquire
18            bswain@alachuacounty.us

19

20

21

22

23

24

25
```

```
 1   APPEARANCES, Continued:

 2
     ON BEHALF OF BAKER COUNTY SUPERVISOR OF ELECTIONS, BAY
 3   COUNTY SUPERVISOR OF ELECTIONS, BRADFORD COUNTY SUPERVISOR
     ELECTIONS, CALHOUN COUNTY SUPERVISOR OF ELECTIONS, COLUMBIA
 4   COUNTY SUPERVISOR OF ELECTIONS, DIXIE COUNTY SUPERVISOR OF
     ELECTIONS, FRANKLIN COUNTY SUPERVISOR OF ELECTIONS, GADSDEN
 5   COUNTY SUPERVISOR OF ELECTIONS, HAMILTON COUNTY SUPERVISOR
     OF ELECTIONS, JACKSON COUNTY SUPERVISOR OF ELECTIONS,
 6   LAFAYETTE COUNTY SUPERVISOR OF ELECTIONS, LIBERTY COUNTY
     SUPERVISOR OF ELECTIONS, NASSAU COUNTY SUPERVISOR OF
 7   ELECTIONS, PUTNAM COUNTY SUPERVISOR OF ELECTIONS, SANTA
     ROSA COUNTY SUPERVISOR OF ELECTIONS, ST. JOHNS COUNTY
 8   SUPERVISOR OF ELECTIONS, SUMTER COUNTY SUPERVISOR OF
     ELECTIONS, SUWANNEE COUNTY SUPERVISOR OF ELECTIONS, TAYLOR
 9   COUNTY SUPERVISOR OF ELECTIONS, UNION COUNTY SUPERVISOR OF
     ELECTIONS, WAKULLA COUNTY SUPERVISOR OF ELECTIONS, WALTON
10   COUNTY SUPERVISOR OF ELECTIONS, and WASHINGTON COUNTY
     SUPERVISOR OF ELECTIONS:
11
                 MARKS GRAY, P.A.
12               1200 Riverplace Boulevard
                 Suite 800
13               Jacksonville, Florida 32207
                 904.398.0900
14               BY:  Edward P. Cuffe, Esquire
                 pcuffe@marksgray.com
15               BY:  Susan S. Erdelyi, Esquire
                 serdelyi@marksgray.com
16               BY:  Julianna Favale, Esquire
                 jfavale@marksgray.com
17

18   ON BEHALF OF BROWARD COUNTY SUPERVISOR OF ELECTIONS:

19               BROWARD COUNTY ATTORNEY'S OFFICE
                 115 South Andrews Avenue
20               Suite 423
                 Fort Lauderdale, Florida 33301
21               954.357.7600
                 BY:  Benjamin Salzillo, Esquire
22               bsalzillo@broward.org
                 BY:  Nathaniel A. Klitsberg, Esquire
23               nklitsberg@broward.org
                 BY:  Joseph K. Jarone, Esquire
24               jkjarone@broward.org

25
```

Daniel Smith, Ph.D.
October 25, 2021

Page 5

```
 1    APPEARANCES, Continued:

 2
      ON BEHALF OF CITRUS COUNTY SUPERVISOR OF ELECTIONS:
 3
              BELL & ROPER, P.A.
 4            2707 East Jefferson Street
              Orlando, Florida 32803
 5            407.897.5150
              BY:  Dale A. Scott, Esquire
 6            dscott@bellroperlaw.com

 7
      ON BEHALF OF OKALOOSA COUNTY SUPERVISOR OF ELECTIONS:
 8
              NABORS, GIBLIN & NICKERSON, P.A.
 9            1500 Mahan Drive
              Suite 200
10            Tallahassee, Florida 32308
              850.224.4070
11            BY:  Elizabeth D. Ellis, Esquire
              eellis@ngnlaw.com
12

13    ON BEHALF OF VOLUSIA COUNTY SUPERVISOR OF ELECTIONS:

14            VOLUSIA COUNTY ATTORNEY'S OFFICE
              123 West Indiana Avenue
15            DeLand, Florida 32720
              386.736.5950
16            BY:  London L. Ott, Esquire
              lott@volusia.org
17

18    ON BEHALF OF OKEECHOBEE COUNTY SUPERVISOR OF ELECTIONS,
      HOLMES COUNTY SUPERVISOR OF ELECTIONS, HENDRY COUNTY
19    SUPERVISOR OF ELECTIONS, GLADES COUNTY SUPERVISOR OF
      ELECTIONS, HARDEE COUNTY SUPERVISOR OF ELECTIONS, LEVY
20    COUNTY SUPERVISOR OF ELECTIONS, and OKEECHOBEE COUNTY
      SUPERVISOR OF ELECTIONS:
21
              HENDERSON, FRANKLIN, STARNES & HOLT, P.A.
22            1715 Monroe Street
              Fort Myers, Florida 33901
23            239.344.1598
              BY:  Robert V. White, Esquire
24            robert.white@henlaw.com

25
```

Page 6

```
 1    APPEARANCES, Continued:

 2
      ON BEHALF OF MIAMI-DADE COUNTY SUPERVISOR OF ELECTIONS:
 3
              MIAMI-DADE COUNTY ATTORNEY'S OFFICE
 4              111 Northwest First Street
                Suite 2810
 5              Miami, Florida 33128
                305.375.5620
 6              BY:  Michael B. Valdes, Esquire
                mbv@miamidade.gov
 7              BY:  Oren Rosenthal, Esquire
                orosent@miamidade.gov
 8

 9    ON BEHALF OF FLAGLER COUNTY SUPERVISOR OF ELECTIONS,
      BREVARD COUNTY SUPERVISOR OF ELECTIONS, MADISON COUNTY
10    SUPERVISOR OF ELECTIONS, GILCHRIST COUNTY SUPERVISOR OF
      ELECTIONS, and HIGHLANDS COUNTY SUPERVISOR OF ELECTIONS:
11
              ROPER, P.A.
12              2707 East Jefferson Street
                Orlando, Florida 32803
13              407.897.5150
                BY: Frank M. Mari, Esquire
14              fmari@roperpa.com

15
      ON BEHALF OF THE INTERVENOR DEFENDANTS:
16
              SHUTTS & BOWEN, LLP
17              215 South Monroe Street
                Suite 804
18              Tallahassee, Florida 32301
                850.241.1717
19              BY:  Daniel E. Nordby, Esquire
                dnordby@shutts.com
20

21    ALSO PRESENT:

22    Colleen O'Gorman
      Noah Sjostrom, OAG Law Clerk
23

24

25
```

Daniel Smith, Ph.D.
October 25, 2021

```
1                          I N D E X

2    Testimony of Daniel Smith, Ph.D.

3         Direct Examination By Mr. Perko          8
          Cross-Examination By Mr. Nordby          49
4         Certificate of Oath                      77
          Certificate of Reporter                  78
5

6

7

8

9                          EXHIBITS
10
     NO.               DESCRIPTION                 PAGE
11
     Exhibit 1    09/01/21 Expert Report Submitted  9
12                on Behalf of Florida State Conference
                  of NAACP v. Lee
13
     Exhibit 2    "The Effects of House Bill 1355 on 10
14                Voter Registration in Florida"

15   Exhibit 3    Florida Statue 101.657            30

16   Exhibit 4    Defendant Christina White's Response 35
                  to Plaintiff's First Set of
17                Interrogatories

18   Exhibit 5    "Verifying Voter Registration     40
                  Records"
19
     Exhibit 6    10/13/21 Supplemental and Rebuttal 45
20                Expert Report Submitted on Behalf
                  of Florida Conference of NAACP v.
21                Lee

22

23      (Stenographer's Note:  Exhibits sent to stenographer
     electronically.  A digital exhibit sticker was placed on
24   the documents that were marked during the proceeding and
                   retained by the stenographer.)
25
```

Page 8

 1    Thereupon,

 2    The following Web proceedings began at 10:05 a.m.:

 3                    ~ ~ ~ ~ ~

 4         THE STENOGRAPHER:  Will you raise your right hand,

 5         please?

 6         Do you solemnly swear or affirm that the testimony

 7         you are about to give in the matter before you will be

 8         the truth, the whole truth, and nothing but the truth?

 9         THE WITNESS:  Yes.

10    Thereupon,

11                    DANIEL SMITH, Ph.D.,

12    having been duly sworn, was examined and testified as

13    follows:

14                    DIRECT EXAMINATION

15    BY MR. PERKO:

16    Q.   Good morning, Dr. Smith.  My name is Gary Perko.

17    I represent the Secretary of State in this litigation.  We

18    have met before.  I know you have been deposed before

19    because I have taken your deposition, so you generally know

20    the ground rules, but I will go over them again.

21         I will be asking you a number of questions about

22    your expert opinions in this matter and any facts that you

23    may have or knowledge that you have of facts that may be

24    pertinent to this litigation.

25         If at any time you do not understand my questions,

Page 9

1    please let me know, and I will try to rephrase them.  I'm

2    not a political scientist or a statistician, so I may get

3    things wrong on occasion, so please let me know.

4         If you do go ahead and answer my question, I will

5    assume that you understood it.  Is that fair?

6    A.   Yes.

7    Q.   Okay.  If at any time you need a break during the

8    deposition, please let me know.  I don't think we will be

9    going that long, but I will be happy to accommodate you.

10        With that, I guess we will go ahead and get

11   started.  You do have a copy of your expert report dated

12   September 1st in front of you?

13   A.   Correct.

14   Q.   Okay.

15        MR. PERKO:  Madam Court Reporter, I think it's

16        been premarked as Exhibit 1, but if we can mark it as

17        Exhibit 1 to this deposition.

18        THE STENOGRAPHER:  Yes, Counsel.

19             (Document marked as Exhibit 1

20                  for identification)

21   BY MR. PERKO:

22   Q.   Dr. Smith, if I can refer to page 25 of your

23   expert report, specifically paragraph 37, you talk about a

24   prior piece of legislation passed in 2011 called House Bill

25   1355, and you mention a paper by Herron and Smith 2013.

Daniel Smith, Ph.D.
October 25, 2021

1    And you say that, "It found that in the months after

2    HB 1355 went into effect in 2011, overall voter

3    registrations dropped for black, Hispanic, and white voters

4    compared to a similar time frame four years earlier, but

5    that the drop in black registration was the only

6    statistically significant estimate providing evidence that

7    HB 1355 effects varied by ratio/ethnic group and were

8    particularly pronounced for a group in Florida that is

9    closely tied to the democratic party."

10           Do you see that?

11   A.   Yes, I do.

12   Q.   I would like to see if I can do that.  I

13   apologize, I'm a little bit technically challenged.

14           Is my screen showing up here?

15   A.   Yes, it is.

16   Q.   Is there a paper on it?

17   A.   Yes.

18           MR. PERKO:  Go off the record for a second.

19           (Discussion held off the record.)

20           MR. PERKO:  Madam Court Reporter, what I'm showing

21       on the screen here I believe has been premarked as

22       Exhibit No. 2.  If we can mark that as Exhibit No. 2

23       to the deposition.

24               (Document marked as Exhibit 2

25                   for identification)

Daniel Smith, Ph.D.
October 25, 2021

1   BY MR. PERKO:

2       Q.   Dr. Smith, I would like you to take a look at this

3   paper and let me know if this is the Herron and Smith 2013

4   paper that you reference in paragraph 37 of your expert

5   report?

6       A.   Yes, it appears to be.

7       Q.   I'm going to scroll down, if you need to take a

8   look at any other parts of this.  I'm going to scroll down

9   to page 197 -- or 297, rather, which is the page that you

10  reference in your report.

11          Here we are.  Do you see here under the heading

12  "Race and Ethnicity in Registrations," the second paragraph

13  you state, "Visually speaking, one can take from Figure 4

14  the idea that the three main racial groups in Florida all

15  suffered from drops in voter registrations in late 2011 as

16  compared with late 2007."

17          Do you see that?

18      A.   That's correct.

19      Q.   If I could turn now to Figure 4 on the next page,

20  do you see that Figure 4 now?

21      A.   Yes, I do.

22      Q.   Would you agree with me that referring to

23  Figure 4, visually speaking, the drop in white voter

24  registration was greater than the drop in African-American

25  voter registration?

Daniel Smith, Ph.D.
October 25, 2021

Page 12

1        A.    I think it's important to go back to the paragraph

2   you just referenced to understand these three figures

3   because the predicate here is visually speaking.  It looks

4   like there is a large drop for all three, and if you want

5   to refer back up, I'm happy to walk you through why it's

6   important to do a statistical analysis because the visual

7   depictions may be misleading.  I can explain specifically

8   why they are with respect to Panel C.

9        **Q.    Dr. Smith, I'm just referring to you reference**

10   **"visually speaking" in this paper.  I just want to know if**

11   **"visually speaking" in reference to Figure 4, the drop in**

12   **white voter registration between 2011 and 2007, visually**

13   **speaking is greater than the drop in African-American voter**

14   **registrations.**

15       A.    If you would refer back to that paragraph, I would

16   like to clarify what is actually written there.  It says,

17   "Individually speaking, one takes from Figure 4 the idea,

18   the idea, that the three main racial groups all suffered

19   from drops in voter registrations in late 2011 as compared

20   with 2007."

21            So the whole setup to this paragraph is visually

22   when you look at this, it appears that there is a

23   significant drop across all three groups, and certainly it

24   appears there is a bigger one for whites.

25            This is easily explainable and it's easily shown

Daniel Smith, Ph.D.
October 25, 2021

Page 13

1  not to be the case when you look at a statistical analysis.

2  The reason why it appears that, if we go back down to the

3  figure itself, is that Panel C for white individuals,

4  looking at the difference in the total registrations from

5  2007 to 2011 in which all three racial groups, A, B, and C,

6  African American, Hispanic, and white, they all take a dip

7  down after August 17, 2011.  If you look at the Y axis, the

8  Y axis is all the same across the three panels from minus

9  400 to plus 400 registrations.  That's on a daily count.

10       If you think about the number of white registrants

11  in the state of Florida, I don't have the numbers at hand,

12  but in 2011, there were probably seven times as many white

13  registrants as black registrants.  And as a result, a drop

14  in 400 black registrants as opposed to a drop in 400 white

15  registrants or a drop in 100 black registrants on a day as

16  opposed to a drop in 100 white registered voters in a day

17  is disparately more for black voters than white voters.

18       So that's why the whole setup is visually

19  speaking, one could take away the idea.  But when you do

20  the statistical analysis, it's really only the black or

21  African-American registered voters who had a disparate

22  impact from the passage of HB 1355.

23  Q.   If there were no statistically significant

24  difference in any of these, then this analysis would not

25  have been particularly useful?

1    A.   No, I don't think that's how political scientists

2    think about it.  If you have null effects, they can be

3    important.  What we have is statistically significant for

4    black or African-American registrants dropping.  That is

5    the statistically significant fact from this analysis.  The

6    others are null.

7        **Q.   So if African-American voter registration -- the**

8    **drop in African-American voter registration had not been**

9    **statistically significant, would this analysis still have**

10   **been helpful in understanding effects of Senate Bill 1355?**

11   A.   Well, as a scholar, I present the empirical

12   findings.  This is one of several different categories in

13   which we looked at the effects of 1355 on registrations.

14   This is a very standard method to understand a change in

15   time where you are looking at time X and looking at time Y.

16   You are looking at the difference in the difference across

17   these two times and across these two categories, in this

18   case, race and ethnicity.

19       **Q.   Would you say that even the nonstatistically**

20   **significant analysis here would be suggestive?**

21   A.   I don't know what you are --

22            MR. KARPATKIN:  I'm going to object.

23   A.   I don't know what you are suggesting to.

24   BY MR. PERKO:

25       **Q.   Is the term "suggestive" a term of art in**

Page 15

1    statistics?

2        A.    No.

3        Q.    Do you ever use that in any of your papers or

4    analysis?

5        A.    In terms of -- I'm not sure how you are referring

6    to the thousands of pages I have written.

7        Q.    Okay.  Fair enough.

8              Going down to the next paragraph on page 25 of

9    your expert report -- I guess I can take this off.  Forgive

10   me, I will get better at this.

11             If we can go back to your expert report now.

12       A.    Yes.

13       Q.    Page 25, paragraph 38, you state, "As my analysis

14   below shows, persons of color who are eligible to register

15   to vote in Florida are much more likely to bear the brunt

16   of additional restrictions placed on the activities and

17   speech of 3PROs under SB 90, as persons of color

18   disproportionately rely on 3PVROs in registering to vote in

19   Florida."

20             Do you see that?

21       A.    Yes.

22       Q.    Could you tell me what exactly are the additional

23   restrictions placed on the activities and speech of 3PVROs

24   under SB 90 to which you refer to here?

25       A.    Sure.  I think I discuss that in an earlier

Daniel Smith, Ph.D.
October 25, 2021

Page 16

1   section of my report, but SB 90 added several conditions on

2   3PVROs when they are doing voter registration drives.  One,

3   if I recall correctly, they need to inform a potential

4   registrant that the application may not be delivered to the

5   Supervisor of Elections in an expedient amount of time,

6   that the registrant could instead mail a voter registration

7   application off, drop it off in person, and I'm pretty sure

8   they have to instruct the potential registrant that they

9   can register online.

10        Q.    So those are the restrictions that you are

11   referring to in this paragraph 38?

12        A.    To my knowledge, those are the main additions that

13   SB 90 places on 3PVROs.

14        Q.    And do you consider those to be a burden on

15   persons of color who are eligible to register to vote in

16   Florida?

17        A.    That's not what my report addresses.  I was asked

18   to look at the effects of SB 90 on voter registration of

19   black and Hispanic and white voters, and others, in the

20   state of Florida, and what I found is clearly delineated in

21   the report, but black and Hispanic voters are five times

22   more likely than white voters to rely on 3PVROs when

23   registering to vote.

24        Q.    I'm interested in -- you say here that, "Persons

25   of color who are eligible to register to vote in Florida

1  are much more likely to bear the brunt of these additional

2  restrictions."

3          How would persons of color who are eligible to

4  register to vote in Florida, how would they bear the brunt

5  of these restrictions?

6      A.   Well, if there are restrictions placed on groups

7  that typically are registering five times more black and

8  Hispanic voters than white voters, then those effects are

9  going to be disparately felt by black and Hispanic

10  individuals who would like to register to vote.

11      Q.   I guess what I'm trying to understand is how is

12  the requirement to inform a registrant that the

13  registration may not be delivered in an expeditious amount

14  of time or expedient amount of time, how is that a

15  restriction on a 3PVRO?

16      A.   I wasn't asked to look at the impact of SB 90 on

17  the 3PVROs themselves.  I was asked to look at the impact

18  of 3PVROs on registering voters and whether or not black

19  and Hispanic voters were more likely than white voters to

20  rely on 3PVROs to register.

21      Q.   Okay.  But just because African American or

22  persons of color are eligible to register in Florida may

23  rely on 3PVROs more than other ethnic groups, why would the

24  requirements that they be informed that their registration

25  may not be submitted on time, why would that burden them?

Page 18

1    A.    Again, I was not asked by counsel to look at any

2    direct effects of SB 90 on the activities of 3PVROs.  I was

3    asked to look at who registers with 3PVROs.  And what I

4    document quite clearly from data from the Division of

5    Elections is that about one in ten black individuals and

6    one in ten Hispanic individuals rely on 3PVROs when

7    registering to vote.

8         Q.    I'm trying to understand how those

9    African-American voters who are eligible to register are

10   impacted by this requirement that they be informed that

11   their registration may not be submitted on time?

12        MR. KARPATKIN:  Objection; asked and answered.

13        MR. PERKO:  I don't think it has been answered,

14   Counsel.

15        A.    I was not asked to look at that question by

16   counsel.

17   BY MR. PERKO:

18        Q.    Okay.  And I guess I would ask the same thing, and

19   I think I know what the answer is going to be, but how are

20   African-American voters eligible to register in Florida

21   impacted by the requirement that they be told of alternate

22   means of registering to vote, including ability to mail in

23   or drop off or vote or register on the Internet?

24        A.    I was not asked by counsel to look at the question

25   of how SB 90 directly affects the activities of 3PVROs.  I

Daniel Smith, Ph.D.
October 25, 2021

1    was asked to look at who registers with 3PVROs and look at

2    the distribution of those registrations across race and

3    ethnicity.

4         Q.   Okay.  If we can go to page 43 of your report,

5    paragraph 60.

6         A.   Yes.

7         Q.   About halfway through this paragraph, you refer to

8    the likely millions of legally registered voters in Florida

9    who did not have a valid driver's license -- excuse me --

10   state ID or Social Security number on file with the

11   Division of Elections.

12        What's your basis for saying there are likely

13   millions of voters in Florida who do not have a valid

14   driver's license, state ID, or Social Security number?

15        A.   So according to internal emails with Maria

16   Matthews and others in the Division of Elections, there was

17   a mention of 3.5 or 3.6 million individuals who have

18   registered successfully in the state of Florida but did so

19   prior to the Help America Vote Act, HAVA, so it's very

20   possible that these are not valid driver's licenses or

21   valid Social Security numbers when it comes to their

22   registrations.

23        So it's merely relying on Division of Elections

24   own internal records.  I have not seen those raw data.  And

25   as I say a little farther down, it's dependent on DHSMV to

Page 20

1   validate those records.

2       Q.   Moving to page 53, paragraph 76.

3       A.   Yes.

4       Q.   Now, beginning with this paragraph, you talk about

5   a zip file that you received from the Division of

6   Elections, or at least your counsel did.  It's labeled

7   20210609_RaceGenderAge.zip.  Do you see that?

8       A.   Yes, I do.

9       Q.   And I think it contained 622,998 voters without a

10  valid ID; 80.6 of those were white, 12.4 black, and 3.8

11  Hispanic; is that correct?

12      A.   I'm not sure I would agree with your

13  characterization of it.  It purports to be that.  What I

14  would like to make known is that that file had no unique

15  voter identification number.  It just had three columns, if

16  I recall correctly, of data of an individual who had some

17  racial or ethnic category, some gender category, and some

18  discrete age, but I cannot independently verify that that

19  is coming from the Florida Voter Registration System's

20  database or not.

21      Q.   Did you do that with all the other data files that

22  you used in this -- in your analysis?

23           MR. KARPATKIN:  Objection as to form.

24      A.   Did I do what?

25           MR. PERKO:  Could you read back the last answer,

Daniel Smith, Ph.D.
October 25, 2021

1      Madam Court Reporter?

2          THE STENOGRAPHER:  Last question or last answer?

3          MR. PERKO:  Answer.

4          (Record read.)

5   BY MR. PERKO:

6      **Q.   So for all the other files that you used, did you**

7   **independently verify that they came from the voter**

8   **registration database?**

9      A.   That's a pretty broad question for a report that

10  has dozens upon dozens of files and is 170 pages long.

11          For the other analysis that comes from this

12  section, I do, when there is an individual voter ID, match

13  it up against an existing statewide voter registration

14  system.

15     **Q.   Are there other circumstances throughout your**

16  **report where you would not have done that?**

17     A.   Again, there is quite a bit of analysis.  When I

18  do have a discrete voter ID number, the general practice is

19  to match it up to a voter registration monthly data file

20  that I have available.

21     **Q.   Why do you feel it necessary to do that?**

22     A.   Well, I think it's important to validate when I

23  can the data that purports to be something that has no

24  documentation with it, as is the case of this race, gender,

25  age file.

Daniel Smith, Ph.D.
October 25, 2021

Page 22

```
 1        Q.   Did you have any follow-up discussions with
 2   counsel for the Department of State regarding this
 3   particular data file or any underlying data that's included
 4   with that to try to determine whether it could be
 5   verifiable over the state Florida voter registration
 6   database?
 7             MR. KARPATKIN:  I'm going to object on grounds
 8        that this may breach privileged discussions.
 9             MR. PERKO:  All right.  I won't ask about counsel.
10        I will ask if there is any follow-up communication
11         with Department of State.
12        A.   I generally don't reach out to individuals in
13   litigation.
14   BY MR. PERKO:
15        Q.   Do you know if your counsel did?
16        A.   I have no idea.
17        Q.   I am going to refer to page 72 under 104.
18        A.   I didn't catch the second part.  Seventy-two?
19        Q.   104.
20        A.   Yes.  Paragraph 104?
21        Q.   Yes, sir.
22             Here you state, "It's certainly possible that
23   black registered voters with status of R also had a
24   standing request but that the SOE offices had already
25   processed them and changed their status to request it."
```

Daniel Smith, Ph.D.
October 25, 2021

```
 1            Do you see that?
 2      A.   Yes.
 3      Q.   The same would be true for Hispanic and white
 4  registered voters, wouldn't it?
 5      A.   That general statement would be true.  There is a
 6  lot of variation across the counties, so I can't say with
 7  certainty.
 8      Q.   But there is no reason to think it wouldn't be
 9  true for Hispanic and white registered voters as well, is
10  there?
11      A.   This is predicated on the rule that the
12  supervisors are supposed to follow that when they receive a
13  request, they verify that request.  If that individual is
14  determined to be eligible to vote in the election, that
15  then shifts to a provided ballot.  If a person has an S, or
16  a standing request, that individual will be vetted and
17  changed to an R when determined to be eligible and then
18  provided a ballot.  So it's a sequence of codes.
19      Q.   But there is no reason to believe that Hispanic
20  voters would be -- that sequence would not be followed for
21  Hispanic voters any less than for black voters, would it?
22      A.   I don't know off the top of my head whether or not
23  that is the case.
24      Q.   I guess I'm curious as to why you singled out that
25  it's certainly possible that black registered voters who
```

Page 24

 1   have the code of R have a standing request but the SOE

 2   offices had already processed them and having changed them

 3   to requested.  Why did you single out black voters and not

 4   Hispanic or white?

 5       A.   It could be the case for all three, yes.

 6       Q.   Okay.

 7       A.   For all four including Other.

 8       Q.   Do you have any idea of how many registered voters

 9   with a status code of R also had a standing request the SOE

10   office had already processed them and changed it to

11   registered?

12       A.   Unfortunately, I do not have that information.

13       Q.   Page 79, 116, you state --

14       A.   One second, please.

15       Q.   You state at the end of that first incomplete

16   paragraph, "I presume that voters who had a third-party

17   request" --

18       A.   Gary, could you please just direct me?  It's page

19   79 and where in this paragraph?

20       Q.   The last sentence of the top paragraph before 117.

21       A.   Okay.  So it's in 116.  Got you.

22       Q.   Last two sentences.

23       A.   Got you.

24       Q.   You state, "I presume that voters who had a

25   third-party request VBM ballot likely had assistance in

Page 25

1    returning their VBM ballot."

2            What's the basis for that presumption?

3        A.    So this is an interesting question on the

4    assistance.  And Volusia County did provide data that I

5    wasn't able to find from other counties on the method of

6    requesting a vote-by-mail ballot.  So I leveraged that in

7    terms of trying to understand who requested a vote-by-mail

8    ballot to get a sense of whether or not that individual or

9    those individuals would need assistance.

10            Basically the presumption here, as I say, I

11    presume those individuals who had a third party request a

12    vote-by-mail ballot for someone else, that that voter who

13    they requested it for would more likely need assistance in

14    returning that ballot.

15        Q.    You presume in all cases voters who have a third

16    party request a vote-by-mail ballot likely had assistance

17    in returning the vote-by-mail ballot?

18        A.    As I said, there is very little data that I was

19    able to derive from any of the discovery from the SOEs.

20    This was one piece that I thought was informative to think

21    about who is needing assistance when returning a

22    vote-by-mail ballot, and it seems to me that there is a

23    likelihood, a stronger likelihood, if I, as a voter, have

24    someone else requesting a vote-by-mail ballot on my behalf,

25    that I will probably need assistance returning that

Daniel Smith, Ph.D.
October 25, 2021

 1    vote-by-mail ballot.

 2        Q.   Going to the next paragraph, the very last

 3    sentence of that page you state that, "Although the overall

 4    number of voters that relied on a third party to request

 5    their vote by mail -- VBM ballot is relatively small, black

 6    voters were three times more likely than white and Hispanic

 7    voters to rely on a third party to make their VBM ballot

 8    requests, herein 0.18 percent versus 0.06 percent

 9    respectively."

10             Do you see that?

11        A.   Yes, I do.

12        Q.   If we go to the next page and look at Table 14,

13    when you speak of the relatively small overall numbers of

14    voters that you refer to there, that relatively small

15    number of overall voters would be 128, correct?

16        A.   Yes, I think your math is correct.

17        Q.   So the number of black voters in that total would

18    be 23?

19        A.   Correct.

20        Q.   And the number of whites would be 87?

21        A.   Correct.

22        Q.   I forgot to ask you, let me go back to that -- I

23    can still share it.  Going back to I think it was

24    Exhibit No. 2, this Table 4, this was your paper with

25    Dr. Herron.  I meant to ask, you mentioned that the drop in

Daniel Smith, Ph.D.
October 25, 2021

1   the African-American voter registration between 2011 and

2   2007 was statistically significant and the others were not.

3   I was just curious, do you know if the difference between

4   the drop in African-American voter registration and the

5   drop in white voter registration, if that difference

6   between those two was statistically significant?

7       A.   It's been a decade since I wrote that paper with

8   Dr. Herron, and I cannot remember whether we looked at that

9   or not.

10      Q.   Okay.

11      A.   I'm sorry, I just don't recall.

12      Q.   Okay.  Sorry for that diversion.

13      A.   We were talking about that 128, I think it was.

14      Q.   Yes.

15      A.   Third party, right.  I just want to emphasize this

16  comes from one county, Volusia County.  I analyzed all the

17  data that I had, and so I would put that into that context

18  that this is one out of 67 counties, and I analyzed all the

19  data that I had made available to me by the supervisors.

20      Q.   Understood.

21           Now, beginning on page 84, it's section Roman

22  numeral X of your report, you talk about Senate Bill 90

23  drop box restrictions.  And in paragraph 122 you refer to

24  Section 28 of Senate Bill 90.  And then you go on on

25  page 89 in that context.

1          In paragraph 131, you talk about -- in the second

2    sentence of that paragraph you say, "Under Senate Bill 90,

3    it was my understanding that these VBM drop boxes, some of

4    which were open 24/7 to voters, are not permissible in

5    whole or in part," and then you provide some examples from

6    the 2020 general election.

7          I just want to make sure I understood this.  When

8    you refer to the next bullet, you say, "Duval County

9    offered a VBM drop box at a weekend drive-through event at

10   the Jacksonville Jaguars TIAA Bank Field, but it was not an

11   EIP voting location."

12         Are you suggesting that Duval County could no

13   longer utilize Jacksonville Jaguars TIAA Bank Field as a

14   location for a VBM drop box?

15   A.   Well, they could if they made it into an early

16   in-person voting location or if they made it into a

17   permanent SOE branch office.  But even still, in the first

18   category, they would not be able to use it outside of the

19   days of early in-person voting.

20   Q.   Now --

21   A.   And they, of course, would have to have continual

22   monitoring by SOE personnel at that location.  So there are

23   a lot of qualifications to your statement that they could

24   do this in the future.

25   Q.   I'm just trying to get your understanding of

Daniel Smith, Ph.D.
October 25, 2021

1    whether it would be eligible.

2            You go on to say --

3    A.   Well, as I said, it would eligible if it was a

4    permanent SOE location that had continual SOE staff or if

5    they made it into an early in-person voting location and it

6    was receiving ballots during the operational hours of the

7    early in-person location.  They can certainly not do it in

8    that latter case if it was outside of the early in-person

9    voting hours and days.

10   Q.   If I could refer you to page 84 where you, I

11   guess, quote Section 28 of Senate Bill 90.

12   A.   Yes.

13   Q.   Do you read this to say -- let me ask you, how do

14   you read this as far as what locations a supervisor could

15   put a drop box?

16   A.   Well, we can read right through this.

17   Q.   I just want your understanding.

18   A.   My understanding is that drop boxes shall be

19   placed at the main office of a supervisor and at the

20   permanent branches of the supervisor and at early voting

21   locations, and they may be put at other sites that would

22   qualify as an early voting site, but those early voting

23   ones must be only used during the County's early voting

24   hours of operation and must be operated by an SOE

25   continuously, SOE employee.  Of course, those at the office

1   of a supervisor or a branch office must be continually

2   monitored by SOE personnel.

3       Q.   So going back to paragraph 131, are you saying

4   that Jacksonville Jaguars TIAA Bank Field is not eligible

5   under this to serve as a drop box location under this

6   language?

7       A.   It depends on when that event would happen.  If

8   it's happening outside the window of the early in-person

9   voting in that county, then, no, unless it's a permanent

10  branch office or maybe the SOE moves his office into TIAA

11  Bank Field.

12      Q.   So if it was during the hours of early voting,

13  Jacksonville Jaguars TIAA Bank Field could be used as a

14  drop box location, do you agree with me on that?

15      A.   We would have to go and look at the provisions on

16  whether or not it qualifies as an early voting location.

17      Q.   Okay.  Take a look at Exhibit No. 4.

18           Madam Court Reporter, if we can have that marked.

19    I guess that's 3.

20                (Document marked as Exhibit 3

21                   for identification)

22  BY MR. PERKO:

23      Q.   This is a copy of Section 101.657 that's

24  referenced to that Section 28 of Senate Bill 90.  If you

25  can see down to the --

Daniel Smith, Ph.D.
October 25, 2021

```
1        A.   I can't see your exhibit yet, sorry.
2        Q.   The one, two, three, fourth sentence there.  Do
3   you see that?
4        A.   Mr. Perko, I don't see your screen at this point.
5             MR. KARPATKIN:  Gary, it's not showing.
6   BY MR. PERKO:
7        Q.   Is it showing now?
8        A.   Yes, thank you.
9        Q.   If you go down to the fourth sentence, do you see
10   that?  It says that, "The supervisor may also designate any
11   City Hall, permanent public library facility, fairground,
12   civic center, courthouse, county commission building,
13   stadium, convention center, government-owned senior center,
14   or a government-owned community center as an early voting
15   site."
16        A.   Yes, I see that.
17        Q.   Would that seem to suggest to you that
18   Jacksonville Jaguars TIAA Bank Field could be used as a
19   drop off -- drop box location if used during the hours of
20   early voting?
21        A.   If you can pull that screen back up, there are
22   some qualifications to that that I think it's important to
23   go through.
24        Q.   Can you see it now?
25        A.   So it continues.  "If so designated, the sites
```

Daniel Smith, Ph.D.
October 25, 2021

Page 32

1    must be geographically located so as to provide all voters

2    in the county an equal opportunity to cast a ballot,

3    insofar as practicable."

4         I don't know whether that's the case.

5         "There must be sufficient nonpermitted parking to

6    accommodate the anticipated amount of voters."

7         I don't know whether that's a condition either.

8    So there are several qualifications to your assertion that,

9    you know, we would have to know the answers to.

10        Q.   Well, it's your understanding that Jacksonville

11   Jaguars TIAA Bank Field was used as a drop box location in

12   the last election; is that correct?

13        A.   Yes, that's my understanding.

14        Q.   So that --

15        A.   That was prior to Senate Bill 90 passage.

16        Q.   If Senate Bill 90 did not affect this particular

17   section of Section 101.657, that would seem to suggest that

18   Jacksonville Jaguars TIAA Bank Field did, in fact, qualify

19   under this language, wouldn't it?

20        A.   I don't recall the dates that this weekend event

21   happened.  And I do not know when Duval County will hold

22   its early in-person voting.  They can do it from Saturday

23   to Saturday, and if they had this event on the final

24   Sunday, that would be prohibited.  So there is a lot of

25   qualifications here, so I cannot agree with your

Daniel Smith, Ph.D.
October 25, 2021

1  characterization without knowing more of the details.

2      Q.   Do you know of any specific provision in Senate

3  Bill 90 that would have affected the use of eligibility for

4  Jacksonville Jaguars TIAA Bank Field to be used as a drop

5  box location during early voting hours?

6      A.   Again, I don't know the details of that location

7  to be able to make that declaration.

8      Q.   I'm asking about any provisions in Senate Bill 90

9  that would preclude Jacksonville Jaguars TIAA Bank Field

10  from being used as a location for a drop box during early

11  voting periods.  Do you know of any?

12     A.   Again, I am unable to opine on that since I don't

13  know all the details of that location.

14     Q.   If we can move to page 132, paragraph 213.

15     A.   Yes.

16     Q.   You state that, "Neighboring Miami-Dade SOE

17  Christina White states in her interrogatory response from

18  August 12, 2021, that the impact of Senate Bill 90 is

19  apparent.  She intends on reducing the number of available

20  VBM drop boxes from 33 to 28 for the 2020 election."

21          Do you see that?

22     A.   Yes, I do.

23     Q.   Is it your understanding that Ms. White intends to

24  reduce the number of available VBM drop boxes from 33 to 28

25  for the '22 election as a result of Senate Bill 90?

Page 34

1    A.   Well, as she says, and I quote here below in that

2   paragraph, "For future county-wide elections, the County

3   doesn't intend to provide drop boxes at South Dade

4   Government Center or the North Dade Government Center

5   outside the days of early -- outside the days and hours of

6   early voting."

7         So that's certainly two of those.

8    Q.   I'm speaking to the drop from 33 to 28 in the 2020

9   election.  Do you know if that's a result of Senate

10  Bill 90?

11   A.   No, that's a different question that you asked

12  earlier.

13   Q.   That's the same question I asked.

14   A.   A direct result of Senate Bill 90?

15   Q.   Yes, sir.

16   A.   You would have to ask SOE White that specifically

17  as to whether or not there are other reasons.

18   Q.   You are certainly implying here it was the reason

19  for the drop?

20   A.   Well, I'm reading that line that you quoted for me

21  on page 132.  She intends on reducing the number of

22  available VBM drop boxes from 33 to 28 for the 2022

23  election.  I don't think I have implied what you just said.

24   Q.   Let me show you --

25   A.   I am stating a fact that came from her

Daniel Smith, Ph.D.
October 25, 2021

Page 35

1   interrogatory response, and you are implying that that's

2   what I said when the plain text says she intends on

3   reducing the number of available VBM drop boxes from 33 to

4   28.  I know that there are two later on in that paragraph

5   that she says she is eliminating clearly because they do

6   not meet the definition of a permanent branch office.

7        Q.   If I can show you what has been marked as --

8             MR. PERKO:  I guess this is Exhibit 5, but Court

9        Reporter, I will ask you mark it as Exhibit 4.

10            (Document marked as Exhibit 4

11                  for identification)

12   BY MR. PERKO:

13        Q.   This is Christina White's responses to the League

14   of Women Voters interrogatories.  Number 3, Ms. White

15   states, "For the '22 general election, Supervisor White

16   currently plans to offer drop boxes at 28 early voting

17   locations rather than the 33 early voting locations

18   provided in the 2020 election.  The 28 early voting sites

19   is the same number of early voting sites provided during

20   the previous gubernatorial election in 2018.  This

21   reduction from 33 to 28 sites is customary and based on the

22   lower turnout expected for a nonpresidential election.

23   Just like the 2020, these drop boxes will be available

24   during the same days and hours of operation as the early

25   voting sites."

Daniel Smith, Ph.D.
October 25, 2021

Page 36

1              Then she goes on to talk about the South Dade and
2    North Dade Government Centers being no longer used.
3              Based on this, would you agree that the reduction
4    from 33 to 28 in the 2020 -- or 2022 election is not the
5    result of Senate Bill 90?
6         A.   It didn't say one way or the other.  She is
7    reducing it.  She is saying it's going back to the 2018.
8    But that doesn't mean that she could continue to keep them
9    if she had wanted to if not for Senate Bill 90.
10        Q.   Turn to page 138.
11        A.   Yes.
12        Q.   Paragraph 225, beginning in the second sentence,
13   you state, "Under Senate Bill, or SB, 90, with the
14   exception of election officials or individuals who have
15   been requested by an elector (and who have signed an
16   affidavit) to provide assistance, individuals are not
17   permitted to solicit an elector within 150 feet of the
18   entrance to a polling place, a drop box location, or an
19   early voting site.  As such, individuals with groups
20   wanting to provide voters waiting in line -- in a queue,
21   rather, that is within 150 feet of a polling entrance are
22   not allowed to do so, even if it is just to distribute
23   drink, food, seating, or shelter."
24              My question is, are you aware of any supervisors
25   in the state of Florida that are allowing groups to provide

Daniel Smith, Ph.D.
October 25, 2021

Page 37

1    voters waiting in line within that 150 feet of the polling

2    place to provide and distribute, drink, food, seating,

3    shelter?

4         A.   Well, the 150-foot rule is new, so I would be

5    happy to answer that based on past elections --

6         **Q.   I'm sorry.  Go ahead.**

7         A.   -- where the length was not 150 feet.

8         **Q.   Do you personally know if any Supervisors of**

9    **Elections allowed individuals with groups to provide voters**

10   **waiting in a queue within 150 feet of a polling place to**

11   **distribute drink, food, seating, or shelter?**

12        A.   Again, I'm not sure about the 150 feet, but

13   certainly supervisors over the last, say, five election

14   cycles have allowed groups to provide water or shelter or

15   food or seating, and we can see that in the interrogatories

16   and declarations themselves.

17             If I recall, and this is off the top of my head

18   after reading hundreds and thousands of pages in this

19   trial, there were supervisors, maybe Brian Corley in Pasco,

20   who said, sure, we have had pizza delivery people come in

21   and drop off boxes to people waiting in lines.

22             We can all remember 2012 in Miami-Dade with the

23   lines that stretched around the block that all kinds of

24   food and water and shelter was provided and seating was

25   provided to voters.  I mean, my goodness, some of those

Page 38

1  lines, people were in them for six hours.

2          So absolutely there have been examples in which

3  supervisors have permitted groups to provide shelter and

4  water -- again, this is anecdotal, it's outside the scope

5  of my report, but I'm happy to tell you other anecdotal

6  evidence.  It's not within the scope of my report.  Mine is

7  focusing on an analysis of who waits in the lines and who

8  likely is to be affected by these new provisions.

9      Q.   What is the basis for your understanding that no

10  one is allowed to approach a voter waiting in the queue

11  within 150 feet of the polling place just to provide or

12  distribute drink, food, seating, or shelter?

13      A.   I wasn't asked to opine on the interpretation of

14  SB 90, so I'm not going to do so here.

15      Q.   That seems to be the position that you are taking

16  here.  I'm just trying to understand what the basis is for

17  that understanding.

18      A.   No, I don't think that's correct.  You asked me if

19  I know of any examples in which groups or individuals have

20  provided -- have provided such items, and I provided you

21  with some anecdotal evidence outside the scope of my

22  report.

23      Q.   I have moved on to a different question, sir.  You

24  state here, "Individuals with groups wanting to provide

25  voters waiting in a queue that is within 150 feet of the

Page 39

1  polling entrance are not allowed to do so even if it is

2  just to distribute drink, food, seating or shelter."

3          What's the basis for your statement that those

4  folks are not allowed to do so?

5      A.   I will be happy to rephrase that if they are not

6  allowed to do so because my report is focusing on those who

7  do wait in line in the state of Florida in elections.  I am

8  not here to opine on the interpretation of SB 90.

9      Q.   So you don't know whether or not individuals with

10 groups wanting to provide voters waiting in line within

11 150 feet of a polling place are allowed or not to just

12 distribute food, drink, shelter -- seating or shelter?

13     A.   Again, we can look at the depositions and

14 interrogatories and affidavits, and we can see quite a bit

15 of variation across the SOEs.  I am sure you have read them

16 as close, if not closer, than I have.  There is quite a bit

17 of variation.  Some say they never allow voters to be

18 approached, others don't have a problem with it.

19          I am not writing in my report addressing that

20 particular question.  Mine is based on an interpretation

21 that it would affect, and if so, who is it going to affect.

22 That's what I'm looking at is who would this affect, who

23 waits in lines.

24     Q.   If I can refer you, backtrack a little bit here,

25 to page 41 of your report.  You refer to -- about midway

```
 1   through paragraph 58, you refer to a 2020 study, and I ask

 2   you to pronounce the author's name.  Is it Shino?

 3       A.   Shino.

 4       Q.   Et al, 2020.  You say they conducted a phone

 5   survey to investigate the reliability of Florida's voter

 6   registration files.  "Of the 402 respondents, nearly

 7   18 percent failed to verify at least one of their name,

 8   address, birth date, sex, or race.  These errors are likely

 9   due to coverage error, measurement error, or processing

10   error.  There is no reason why these discrepancies might

11   not extend to the form of identification on file at the SOE

12   that may or may not be correct or current."

13            Do you see that?

14       A.   Yes, I do.

15       Q.   I'm going to try to pull up the Shino report.

16            Do you see it up there?

17       A.   No, not yet.

18       Q.   Now --

19       A.   Yes.

20                 (Document marked as Exhibit 5

21                       for identification)

22   BY MR. PERKO:

23       Q.   Dr. Smith, if you can take a look at this.  Is

24   this the Shino paper that you cite in your expert report?

25       A.   Yes, it appears to be so.
```

Daniel Smith, Ph.D.
October 25, 2021

1    Q.    In your report, you mention that the errors that

2    were found in the Shino report or paper were likely due to

3    coverage error, measurement error, or processing error.

4    Could you explain to me what coverage error is?

5    A.    Well, if you want to scroll down a little, I think

6    I have a definition in there.  Coverage error is when --

7    well, let me see how we are referring to it in this

8    context.

9          So it's possible when you are serving individuals

10   that you are identifying folks who are no longer in the

11   voter file or who have been -- and partly because they have

12   been improperly purged from the rolls, so that's a

13   possibility with respect to when you are serving that you

14   might have an error in terms of contacting individuals and

15   asking them about their registration status and it not

16   being current.

17   Q.    Okay.  Do you see the highlighted language there

18   that says under Coverage Error, "One particular challenge

19   is to update your voter registration address in a mobile

20   population" --

21   A.    Yes.

22   Q.    -- "as federal and state laws govern."

23         Would you agree with that statement?

24   A.    In what context of agreeing with it?

25   Q.    In any context.  Do you think that's a valid --

Daniel Smith, Ph.D.
October 25, 2021

1  that that is a particular challenge?

2      A.   It's a challenge to individuals who are mobile of

3  updating their information, correct.

4      **Q.   Okay.  And then could you explain what measurement**

5  **error is?**

6      A.   Sure.  There are issues with any survey, and

7  that's the idea of this study, is that you can think a

8  voter registration form as being a survey.  If you have a

9  poorly designed survey, you might have measurement error.

10  So an M or an F without specifying male or female might not

11  be understood when you have a social-constructed racial

12  category like the Florida voter registration form that

13  doesn't give voters an opportunity to identify as, say,

14  white and Hispanic, but just white or Hispanic or black, et

15  cetera.  That could lead to some measurement error and so

16  forth.

17      **Q.   Could you explain what processor error is?**

18      A.   Sure.  Processing error happens on both electronic

19  and paper forms where there is information that is inputted

20  that is not correct.  As a result, those errors may lead to

21  individuals not being able to -- well, in this case, verify

22  the information that they have on the voter file.

23      **Q.   In this study, there were a number -- or this**

24  **survey, there were a number of questions asked about**

25  **information that may be on file within the voter**

Daniel Smith, Ph.D.
October 25, 2021

1    registration records, but am I understanding correctly that

2    the only two pieces of information that were actually

3    necessarily for a voter to register were name and address?

4        A.   No, I don't understand your question.  Sorry.

5        Q.   Let me be a little more precise.

6             The paper says that, "Here in all, 71 of 402

7    respondents failed to verify at least one of their name,

8    address, birth date, sex, or race."

9             Now, in order to register to vote, you only have

10   to provide your name, correct?

11       A.   Yes.

12       Q.   And you have to provide your address, correct?

13       A.   Correct.

14       Q.   You have to provide your birth date?

15       A.   That is correct.

16       Q.   But sex and race are not required; is that

17   correct?

18       A.   They are not required.  They are voluntary.

19       Q.   Okay.  If you look at the results of this study,

20   regarding measurement errors, there were 4 respondents out

21   of 402, roughly 1 percent, that had their names misspelled

22   or misidentified.  Two were likely measurement issues

23   because the women reported different last names, and it

24   could be due to marriage or divorce.  Do you see that?

25       A.   Yes.

Page 44

1    Q.   And then as far as addresses, there were 22

2    respondents, or 5½ percent, and much of that may be

3    explained by the voter's address was accurate at the time

4    of registration but it had since changed.  Do you see that?

5    A.   Correct.

6    Q.   And that's going back to the issue that we talked

7    about previously that it can be a challenge to update voter

8    registration as addresses change in a mobile population.

9    A.   Sure.

10    Q.   And then some of the other questions regarding

11    gender, race, those are more -- can be subject to ambiguity

12    or misinterpretation, would you agree?

13    A.   That's one possibility, yes.

14    Q.   All right.  That's all I have on that.

15    MR. PERKO:  I think we are getting close to the

16    end here.  Can we take a ten-minute break?

17    MR. KARPATKIN:  I'm at your disposition.

18    MR. PERKO:  Okay.  Why don't we take a ten-minute

19    break.

20    (Recessed at 11:12 a.m.)

21    (Resumed at 11:21 a.m.)

22    BY MR. PERKO:

23    Q.   Dr. Smith, I think you had a copy of your expert

24    rebuttal report with you?

25    A.   Yes, I do.

Daniel Smith, Ph.D.
October 25, 2021

Page 45

1           MR. PERKO:  That's going to be marked as Exhibit 6

2      for the court reporter.

3                 (Document marked as Exhibit 6

4                      for identification)

5  BY MR. PERKO:

6      Q.   On page 18, Dr. Smith, paragraph 29, you discuss

7  Dr. Lockerbie's citation and quotation of the Stuart III

8  and Ansolabehere (2013) --

9      A.   Ansolabehere, um-hm.

10      Q.   And you state that, "Dr. Lockerbie is knocking

11  down a straw man.  I have not claimed that long wait times

12  are due to particularized discrimination against voters of

13  color.  Rather, my contention, which Dr. Lockerbie does not

14  appear to challenge, is that precincts with higher

15  proportions of voters of color disproportionately face

16  longer wait times, and so the impact of restrictions on

17  line warming in Florida under Senate Bill 90 will

18  disproportionately impact black and Hispanic voters."

19           Do you see that?

20      A.   Yes, I do.

21      Q.   I guess I'm following up on this notion of

22  particularized discrimination.  Is it your contention that

23  any of the, you call them, restrictions imposed by Senate

24  Bill 90 are the result of particularized discrimination?

25      A.   I missed a key word there.  Am I affirming or -- I

```
 1   didn't hear that.
 2        Q.   Is it your contention that any of the restrictions
 3   that you refer to being imposed by Senate Bill 90 are the
 4   result of particularized discrimination?
 5        A.   No.
 6        Q.   Okay.
 7        A.   I'm not making that claim at all about the motives
 8   of SB 90.
 9        Q.   So you are just presenting what you believe to be
10   the disparate impacts?
11        A.   I'm looking at what the potential impact is of
12   SB 90 based on past elections looking forward with those
13   considerations, correct.
14        Q.   As I understand from reading your supplemental
15   rebuttal report, the additional data that you reviewed that
16   you discuss at the end of that report, is it correct to say
17   that in your view, it buttresses your conclusions, but it
18   doesn't really alter them; is that correct?
19        A.   Well, I'm not sure what you are specifically
20   referring to.  There are several bits of information, I
21   guess.
22        Q.   Does it change the overall conclusions of your
23   initial expert report?
24        A.   No.  I'm happy to go through them.  I think the
25   additional information I received buttresses and
```

Daniel Smith, Ph.D.
October 25, 2021

1   reenforces.  So the information that I received in
2   September through, I think it was an interrogatory response
3   from Maria Matthews, as I write on page 45, provides more
4   details about a very important text file that I received,
5   LitigationRR_noDL-SSN202010722, that's important
6   information that I didn't have when I wrote my report about
7   who are included in these fields and who is not included in
8   this field.
9           Specifically the file does not include voters for
10  which there is a response in these fields that has been
11  found invalid.  You know, so that's an important piece of
12  information when I'm talking about the 586,000 individuals
13  who would not be able to successfully request a
14  vote-by-mail ballot under SB 90 because they don't have a
15  valid form of ID on file with the Division of Elections.
16  It actually is going to be more than that because the
17  Division of Elections has evidently found more individuals
18  where that invades.  Yes, I think that's an important piece
19  of information.
20          When I look at the other pieces, I'm happy to go
21  into them, with respect to reaffirming my understanding of,
22  say, 3PVROs where Supervisor White in Miami-Dade affirms
23  that many people who register with 3PVROs subsequently
24  update their registrations through another medium.  And so
25  my 760,000 or so individuals who are disparately likely to

Page 48

 1  be black and Hispanic who register with 3PVROs is probably

 2  an undercount because many of those individuals who

 3  initially registered with 3PVROs subsequently updated.  And

 4  as Supervisor White reaffirms, it's only the current code

 5  of registration method that I am receiving in my

 6  PRR_NAACP_voter detail text that I received from the

 7  Division of Elections in discovery.

 8         So, yeah, I think these are largely pieces of

 9  information that bolster the initial finding of individuals

10  who are going to be affected broadly by SB 90 and

11  particularly with respect to race and ethnicity in several

12  provisions under SB 90.

13     Q.   Beginning on page 10 of your initial expert

14  report, you have a summary of your findings.  Have any of

15  these findings changed as a result of the analysis that you

16  provide in your supplemental rebuttal report?

17     A.   Paragraph 10 in my initial?

18     Q.   Page 10.

19     A.   Sorry, page 10.

20     Q.   It's the heading Roman numeral III.

21     A.   Which paragraph, I'm sorry, on page 10?

22     Q.   I'm just saying you summarize your findings here

23  in your initial report.  I'm asking if the analysis that

24  you present in your supplemental rebuttal report changed

25  any of these findings?

Page 49

1      A.   I mean, I would have to really take a deep look at

2   these and think through them, but generally speaking, I

3   don't think there has been any reason with the supplemental

4   to change those broad conclusions that I write on those

5   pages.

6      Q.   Okay.

7           MR. PERKO:  I don't have anything further.

8           THE WITNESS:  Thank you.

9           MR. NORDBY:  This is Dan Nordby from Shutts &

10      Bowen.  I have a few questions for Dr. Smith.

11                     CROSS-EXAMINATION

12   BY MR. NORDBY:

13      Q.   Dr. Smith, do you still have a copy of your expert

14   report in front of you?

15      A.   Yes, I do.

16      Q.   We were talking about specific pages of the

17   report.  I will ask you, you have testified as an expert in

18   many cases involving Florida election laws; is that right?

19      A.   Yes, both for plaintiffs as well as defendants.

20      Q.   So you are familiar with the three methods for

21   casting a ballot in Florida?

22      A.   Yes, I am familiar with the three methods for

23   casting a ballot in Florida.

24      Q.   What are those three methods?

25      A.   One could cast a ballot on election day in the

Daniel Smith, Ph.D.
October 25, 2021

Page 50

1  precinct in which they are registered to vote, one can cast

2  a ballot during the early voting in-person period which is

3  set by counties and varies between 8 and 14 days and has

4  the ability to update their residence in the county or even

5  pull in the registration from out of county during that

6  window, and one has the ability to vote by mail by

7  requesting a vote-by-mail ballot and returning it either

8  through post or in person or with assistance.

9      Q.   Sorry.  I didn't mean to interrupt you.

10     A.   Sorry.

11     Q.   So when you say "vote by mail," you recall

12  referring to that as voting by mail even if the person does

13  not use the mail because of their vote-by-mail ballot but

14  can drop it off at the supervisor's office?  Do you

15  understand --

16     A.   That's correct.

17     Q.   Of those three methods, which of those three is

18  the most susceptible to either fraud or voter error that

19  might prevent a voter from accurately having their ballot

20  counted?

21     A.   I don't have any systematic study that has looked

22  at voter fraud across these three methods in Florida, so I

23  can't opine -- we are talking a universe of very small

24  numbers, so I don't know which of these three in these very

25  rare events is more susceptible.

1      Q.   On the topic of voter error, you have issued

2   expert reports in the past on voter error in completing a

3   ballot that might prevent them from having their ballot

4   counted, haven't you?

5      A.   Not on the ballot per se, no.  I don't know of any

6   work that I have done that has looked at over votes which

7   would invalidate a ballot.  I can't think of publishing or

8   writing any reports on that.

9      Q.   I'm not trying to hide the ball here.  I'm talking

10   specifically about signatures, lack of signatures,

11   mismatching of signatures and so forth.  Does that --

12      A.   Sure.

13      Q.   -- give you a better understanding of my question?

14      A.   Absolutely.  Obviously I'm not looking at ballots,

15   I'm looking at return envelopes, and so that's where my

16   confusion was on answering your first question.  I'm not

17   trying to be duplicitous or deceptive.

18           Yes, I have looked at ballot returns of

19   vote-by-mail envelopes and have looked at the envelopes

20   being rejected for a missing or mismatched signature or

21   coming in after the deadline, which is for domestic ballots

22   7 p.m. on election day.

23      Q.   Those sort of potential errors that might lead to

24   a vote-by-mail ballot not being properly counted and

25   canvassed don't exist in the same way for in-person

Daniel Smith, Ph.D.
October 25, 2021

1 **election day voting or in-person early voting, do they?**

2      A.    There are different issues that face individuals

3 who are voting in person than by mail, absolutely.

4      Q.    **Are you familiar with any examples of vote-by-mail**

5 **ballot fraud in the state of Florida?**

6      A.    Well, certainly I'm familiar with issues dating

7 back now over 20 years in Miami-Dade that had to do with

8 vote-by-mail ballot fraud.  And I'm certainly familiar,

9 although I don't detail it in my report and it's outside

10 the scope of my report, with one-off instances in which,

11 say, a spouse signs a ballot envelope for someone else.

12 Yes, I'm familiar with one-offs such as that.

13      Q.    **Are you familiar with any of the vote-by-mail**

14 **ballot fraud issues in Miami about ten years ago,**

15 **2011-2012?**

16      A.    No, I don't.  Not off the top of my head I'm not

17 remembering those.

18      Q.    **And you are not familiar with the Miami-Dade**

19 **County grand jury report addressing vote-by-mail ballot**

20 **fraud and proposing potential recommendations to address**

21 **that?**

22      A.    I do recall parts of that where Miami-Dade then

23 came up with some different provisions dealing with the

24 handling of vote-by-mail ballots.

25      Q.    **What about Palm Beach County in the 2016 election,**

Daniel Smith, Ph.D.
October 25, 2021

1    do you recall any issues with vote-by-mail ballot fraud in

2    that election?

3        A.   I recall allegations in some camps about

4    vote-by-mail ballot problems.

5        Q.   Do you recall any of the specifics of that?

6        A.   I do recall that it was in a primary election

7    where there were allegations of pressuring individuals of

8    filling out ballots.

9        Q.   There were news reports at the time that quoted

10   you as saying that "the campaign's actions were highly

11   suspect after reviewing filings."

12            Do you have any information subsequent to that

13   that would lead you to revisit those conclusions?

14       A.   No.  I do recall a reporter contacting me and

15   looking at some of the returns and looking with some

16   skepticism of voting patterns with respect to precinct

17   results, but I haven't done anything subsequent to that

18   time with that study.

19       Q.   Do you recall the allegation of a blind voter

20   stating that a candidate had filled out the voter's ballot

21   and signed it and returned it?

22       A.   No, I don't recall that specific instance.

23       Q.   You mentioned in talking about these Palm Beach

24   County allegations that they were allegations from some

25   camps.  I want to talk about that a little bit more.

Daniel Smith, Ph.D.
October 25, 2021

1          When you say that there were allegations from some

2    camps, are you intending to imply that something didn't

3    happen unless there was a criminal conviction as to a

4    particular example of fraud?

5         A.   Again, I'm not in Palm Beach.  I was contacted by

6    a reporter.  I was asked to look into this.  I looked at

7    some patterns of voting for candidates in the democratic

8    primary.  I wanted to say it was an August primary.  It's

9    been a while ago.  And after that story ran, I didn't come

10   back to it.

11         I do recall that it was probably sent off to a

12   District Attorney or State Attorney office, but I honestly

13   don't have any idea of whatever came of that.

14        Q.   You would agree that criminal actions can occur

15   even if a crime and then a conviction does not actually

16   result from those actions?

17         MR. KARPATKIN:  Objection.

18        A.   I'm not an attorney, and this is not my area of

19   expertise in terms of opining on when a criminal activity

20   occurs and the definition of when that is such the case.

21   BY MR. NORDBY:

22        Q.   You had stated in your report and today that

23   examples of absentee ballot fraud or vote-by-mail ballot

24   fraud were rare.  When you say that they are rare, are you

25   only counting convictions as examples of vote-by-mail

Daniel Smith, Ph.D.
October 25, 2021

Page 55

1   ballot fraud, or are you stating generally that it does not

2   happen to a high level?

3        A.   That's a really interesting question.  Does a tree

4   make noise when it falls in the forest and no one is there?

5   I look at data.  That's what I do as a political scientist.

6   So in the case of, quote/unquote, ballot harvesting of the

7   60-some-odd supervisors who sent responses back to the

8   House Committee on Public Integrity in Elections, this pie

9   report that was done back in I think February, I believe

10  there was one supervisor who said there was an allegation

11  of ballot harvesting, and when he looked at the video

12  footage, saw nothing.

13           So I take the supervisors when they look at this

14  data from a very ground level, granular perspective, I look

15  at it.  Quite honestly, you know, I'm not here to opine

16  that there are concerns in whatever area, but I am not

17  seeing it, and the supervisors who are running these

18  elections aren't reporting it or seeing it.  So that's all

19  I can say in terms of, you know, did that tree make noise

20  in the forest.

21       Q.   On one specific example in your report, you talked

22  about Volusia County and voters who received assistance in

23  requesting a vote-by-mail ballot.

24       A.   I talked about that earlier, I think.  If you can

25  refer me to where that is in my report, that would be

Page 56

1  helpful.

2      Q.   The section begins on page 74, I think.  Let me

3  find the Volusia County information.  Page 78 of your

4  report.

5      A.   Page 78, yes.

6      Q.   In response to some questions from Mr. Perko, a

7  couple of times you stated that you reviewed the limited

8  information that you had.  Are you stating in this report

9  that you are able to generalize from these 128 examples in

10 Volusia County across the entire state?  Are you reaching

11 broader conclusions than just the Volusia County data?

12     A.   No.  As I think I replied to Mr. Perko, I have

13 analyzed all the data that I have received on this

14 particular issue from all 67 supervisors in this litigation

15 through discovery.  This is the only data that I came

16 across that allows me to look at the internal records of a

17 supervisor on how a vote-by-mail ballot was requested and

18 then look to see about those individuals and infer that if

19 they needed assistance requesting, it's logical, I think,

20 to presume that they needed some assistance in returning

21 their ballots.

22          I'm not generalizing across the other 66 counties.

23 I would love to have other data because I think this is an

24 interesting way to get at this question of who needs

25 assistance returning a vote-by-mail ballot, which I don't

Daniel Smith, Ph.D.
October 25, 2021

Page 57

1  have any other form of data that allows me to get at that.

2      Q.   Okay.  You reached no general conclusions based on

3  a review of the Volusia County data?

4      A.   No, I'm sticking here to Volusia County and what I

5  find there.  I have analyzed all the data that I have been

6  able to process, and that is the one county that I can draw

7  conclusions from.

8      Q.   And the conclusions you draw for Volusia County

9  depend on the accuracy of your presumption that a voter who

10  had a third person request their vote-by-mail ballot likely

11  had assistance returning their vote-by-mail ballot, if that

12  is inaccurate, then your conclusions, even as to Volusia

13  County, wouldn't hold?

14      A.   I think that's fair to say.

15      Q.   Could you turn to page 24 of your report?

16      A.   Sure.

17      Q.   I apologize for skipping around a bit.  Mr. Perko

18  did a very thorough job in his questioning, so I'm trying

19  to shorten my portion by not treading the same ground.

20          Could you let me know when you are at page 24?

21      A.   I'm here, page 24.

22      Q.   The title of this section of your report is, "SB

23  90's voter registration disclaimer and delivery

24  restrictions on 3PVROs place burdens on eligible Florida

25  citizens and particularly persons of color for registering

Daniel Smith, Ph.D.
October 25, 2021

1    to vote due to restrictions placed on 3PVROs."

2            My question for you is, what are the burdens

3    placed on eligible Florida citizens from registering to

4    vote?

5        A.    As I think I said to Mr. Perko, I'm not offering

6    an opinion on the direct impact that SB 90 has on the

7    activities of 3PVROs in Florida.  I am looking at who

8    registers for 3PVROs, and if there are, indeed, burdens,

9    who is going to suffer.

10            I think it's an important consideration.

11    Obviously if no one registers with 3PVROs, then no one

12    would be burdened if you actually eliminated 3PVRO

13    activities all together.  I think we can agree with that,

14    right?  If there was no evidence that anyone registered

15    with the 3PVRO over the last ten years in Florida and

16    3PVROs were effectively eliminated, no one would suffer.

17            I am looking at who actually does register with

18    3PVROs with the presumption that restrictions on the

19    activities of those organizations are going to affect that

20    universe of people who register with 3PVROS.  And he finds

21    quite clearly that of the 760,000 or so individuals, as of

22    the summer of 2021, who the Division of Elections has noted

23    as registering with the 3PVRO, that they are very

24    disparately more likely to be black and Hispanic voters

25    than white voters, five times as many, and that, indeed,

Page 59

1  one out of ten black and almost one out of ten Hispanic

2  registrants in the state of Florida registered through a

3  3PVRO.

4       Q.   So if I understand your conclusions correctly,

5  your conclusions related to the variation in demographics

6  among voters who are registered by 3PVROs as opposed to

7  some other method of voter registration; is that a fair

8  summary?

9       A.   That's a fair summary.  I was asked by counsel to

10  look at the registration of individuals through 3PVROs

11  relative to others and relative to other racial and ethnic

12  groups.

13       Q.   And you don't reach any conclusions as to whether

14  Senate Bill 90 actually does impose burdens on third-party

15  voter registration organizations?

16       A.   Correct, that's outside the scope of my report.

17       Q.   And you don't reach any conclusions as to whether

18  Senate Bill 90 actually imposes burdens on individual

19  registrants who would like to register through a

20  third-party voter registration organization?

21       A.   That is correct.  I look at who does actually

22  register with them.

23       Q.   Given that scope of your analogy, I would like to

24  go back to the title of the section which says that "Senate

25  Bill 90 voter registration disclaimer and delivery

1    restrictions on 3PVROs places burdens on eligible Florida

2    citizens and particularly persons of color from registering

3    to vote due to restrictions placed on 3PVROs."

4            What are the burdens to which you refer in this

5    section of your report?

6        A.   I will let others opine on the direct impact that

7    SB 90 has on the activities of 3PVROs.  I am looking at

8    based on that assumption that these restrictions will

9    impact them, that those individuals who register are more

10   likely to be black and Hispanic than white, and that one

11   out of ten black and almost one out of ten Hispanic

12   registered voters in the state of Florida registers with a

13   3PVRO.

14       Q.   The disclaimer requirement to which you refer in

15   this section of your report, that's the section of Senate

16   Bill 90 that requires third-party voter registration

17   organizations to tell potential registrants that their

18   application may not be delivered on time?

19       A.   That's correct.

20       Q.   Do you have any understanding of whether, in fact,

21   some third-party voter registration organizations have

22   untimely submitted applications in the past?

23       A.   I have certainly seen some of that in the record

24   that's been produced.

25       Q.   Do you have any reason to think that is an

Daniel Smith, Ph.D.
October 25, 2021

Page 61

 1    untruthful statement, that it may not be delivered on time?

 2        A.   I'm not connecting the two pieces here,

 3    Mr. Nordby.  There is one piece that you said am I familiar

 4    with some groups who may not have returned ballots on time,

 5    and the second question you asked?

 6        **Q.   My second question is is that an inaccurate**

 7    **disclaimer if a third-party voter registration organization**

 8    **informs a voter that their form may not be returned on**

 9    **time?**

10        MR. KARPATKIN:  I'm going to object to form and

11         also object it's beyond the scope of this witness's

12         expert report.

13        A.   It is beyond -- I did not look at any of those

14    questions in my report, so this is just anecdotal in terms

15    of my familiarity with Florida elections.  I mean, we can

16    all recall the schoolteacher who was parodied on "The Daily

17    Show" about missing the 48-hour window to return her

18    student's registration forms.  I know this does happen

19    occasionally, but is it an accurate thing to say?  I

20    suppose it depends on the group.

21        There are groups that don't have any problems

22    returning vote-by-mail ballots -- I'm sorry, returning

23    3PVRO -- there are plenty of 3PVRO groups that have no

24    problems returning voter registration forms on time.

25

Daniel Smith, Ph.D.
October 25, 2021

Page 62

1    BY MR. NORDBY:

2        Q.  You don't reach any conclusions, though, as to

3    whether Senate Bill 90 actually imposes burdens on either

4    3PVROs or on potential registrants who would like to

5    register using their services?

6        A.  Again, my report looks at the impact of 3PVROs if

7    they are, indeed, restrained with respect to who registers

8    with them.  And I find, quite clearly, that black and

9    Hispanic voters are much more likely, five times more

10   likely, than white individuals to register with 3PVROs.

11   Less than 2 percent of all white registrants in the state

12   of Florida register with 3PVROs, and roughly 10 percent of

13   black and almost 10 percent of white -- of Hispanic

14   individuals register with 3PVROs.

15       Q.  If, in fact, Senate Bill 90 does not burden

16   third-party registration organizations, would you agree

17   that the demographic information in conclusions that you

18   draw could not actually have any affect on the ability of

19   voters to register?

20       A.  I'm not prepared to agree with that assumption,

21   but if you want to make that assumption, you can draw that

22   conclusion.

23       Q.  Could you turn to page 84 of your report?

24       A.  Sure.

25       Q.  If I have the right page number, that's the

1    section of your report addressing drop boxes.

2        A.   Yes, correct.

3        Q.   You are familiar with the drop box provisions of

4    Senate Bill 90?

5        A.   Yes, I am familiar with that section, 28.

6        Q.   Are you aware of when Florida first addressed by

7    statute the availability of drop boxes as an option for

8    voters to return their vote-by-mail ballot?

9        A.   That's a good question.  I actually don't know off

10   the top of my head the statutory provisions.  There was

11   quite a bit of rulemaking in the Division of Elections,

12   and, of course, there was quite a bit of discretion on the

13   supervisors themselves.  I'm not sure on the answer to that

14   question.

15       Q.   Okay.  The comparisons in your report are from the

16   2020 general election and not from earlier elections; is

17   that correct?

18       A.   That's correct.

19       Q.   Okay.  If I were to represent to you that that

20   statute was enacted in 2019, would you have any reason to

21   disagree with that?

22       A.   That sounds generally correct in terms of these

23   provisions being in place in the 2020 election cycle.

24       Q.   If counties across the state of Florida generally

25   did not have drop boxes for the return of their

Page 64

1    vote-by-mail ballot prior to the 2020 election, what

2    conclusions can you draw based on the effect of Senate

3    Bill 90 as to earlier elections?

4        A.   Well, again, I would object to the

5    characterization of prior to 2019 of counties not having

6    drop boxes.  As I document either in my report or I think

7    it's actually in my supplemental report, there are lots of

8    counties that used drop boxes prior to the statutory

9    language codifying it.  So I think the whole premise of

10   your question is not accurate.

11       Q.   Okay.  Do you reach any conclusions as to the

12   relative availability of drop boxes after Senate Bill 90 as

13   opposed to the 2018 election?

14       A.   No.  I always look at the impact of Senate Bill 90

15   moving forward.  It's not looking at prior legislation and

16   the effects that that prior legislation may have had.

17       Q.   Am I correct, though, that you compare or purport

18   to compare Senate Bill 90's drop box restriction as

19   compared to the 2020 general election?  You do look

20   backward in that respect, correct?

21       A.   Since we don't have another statewide election,

22   that would be in 2022, I have looked at drop boxes in this

23   case that were in place to try to understand how they would

24   be impacted in future general elections.  So absolutely I

25   have looked at the 2020 general election to identify the

Daniel Smith, Ph.D.
October 25, 2021

Page 65

1    nearly 500 drop boxes around the state to figure out which

2    ones would be curtailed in whole or in part under SB 90

3    moving forward.

4         Q.   Do you know whether voters will have greater

5    access to drop boxes under Senate Bill 90 as compared to

6    the 2018 general election drop box availability?

7         A.   I did not look at that in my report.

8         Q.   The same answer would be true to earlier

9    elections, then, between 2016, 2014, 2012?

10        A.   I did not address that in my report.

11        Q.   Okay.  Do you know based on your prior expert work

12   in this field whether drop boxes would be more available to

13   voters under Senate Bill 90 than they were in 2018, 2016,

14   or 2014?

15        A.   If you are asking me to go outside my report and

16   just opine anecdotally, I'm happy to do that.

17             It depends on the county.  There are certain

18   counties that have used in previous elections, including

19   the 2018 election, that clearly will have difficulty, if

20   not impossibility, of providing drop boxes on certain days

21   that they have provided in the past.

22             The best example of that are counties that have

23   provided drop boxes that are not manned with SOE personnel

24   on days outside of the early voting period whether or not

25   they are at an SOE office or elsewhere.  There are examples

Daniel Smith, Ph.D.
October 25, 2021

Page 66

1  in counties, as I document in my report, that have been

2  providing drop boxes in locations that are not permitted

3  under any reading of SB 90 because they are not an early

4  voting location and they were not thus permitted under

5  SB 90.  They are not an SOE permitted or branch office

6  either.

7           So we would have to go and look carefully at every

8  county, which is what I do for the 2020 general election.

9  I would have to do that for the 2018 and previous

10  elections, which I did not do in my report.

11      **Q.   You don't reach any conclusions, then, as to the**

12  **effects of Senate Bill 90 on drop boxes as compared to any**

13  **other election other than the 2020?**

14      A.   Not in my report I do not look at that.  But there

15  is clear evidence in the affidavits, interrogatories, and

16  declarations that some of these SOEs have been using these

17  drop boxes in previous elections that are clearly not

18  permissible under SB 90.

19      **Q.   There is a portion of your report -- page 93 of**

20  **your report refers to vote-by-mail ballot drop boxes with**

21  **video surveillance were secure in the 2020 general**

22  **election.**

23      A.   Could you point specifically where I say that?

24      **Q.   Page 93 of your report.**

25      A.   Yes.  I see, yes.

Daniel Smith, Ph.D.
October 25, 2021

Page 67

 1    Q.   That conclusion is based on responses of
 2    Supervisors of Elections in Florida?
 3    A.   Correct.
 4    Q.   Are you aware of any examples outside the state of
 5    Florida of vandalism of vote-by-mail ballot drop boxes
 6    leading to destruction of ballots?
 7    A.   I recall some media reports just as a general
 8    consumer of election news.
 9    Q.   Are you familiar with any of the details of those
10    incidents outside the state of Florida?
11    A.   I recall some Republican operatives trying to
12    destroy a drop box in California off the top of my head.
13    Q.   Any other examples that you are aware of?
14    A.   I can't think of any details off the top of my
15    head.
16    Q.   One of the areas that we discussed earlier was in
17    the return of vote-by-mail ballots, the requirement that a
18    vote-by-mail ballot envelope be signed by the voter.  Do
19    you remember that discussion?
20    A.   Yes.
21    Q.   Were you aware that Supervisors of Elections in
22    some counties were providing assistance to the voters at
23    the drop boxes to ensure that their ballot envelope was
24    properly signed before accepting it?
25    A.   I do not know what's going on across all 67

Page 68

1  supervisors in terms of drop box.  Are you referring to the

2  2020 election?

3      Q.  Yes.

4      A.  I would not be surprised if some of the staff

5  outside of a drop box may have been asking for voters to

6  verify that they have signed their vote-by-mail ballot.

7      Q.  I want to go back to some of the discussion we had

8  earlier about the three methods of voting in Florida.

9          Do political campaigns influence the voting method

10  used by their supporters in elections?

11      A.  Do political campaigns influence, is that the verb

12  you used?

13      Q.  Yes.

14      A.  If they are any good, they should be trying to

15  influence their voters to turn out the vote, absolutely.

16      Q.  More specifically than turning out the vote

17  generally, though, in your experience based on your prior

18  expert reports and on this, have you seen examples of where

19  political campaigns will influence their supporters to use

20  in-person early voting as opposed to some other voting

21  method, for example?

22      A.  Yes, I think you could point to several pieces of

23  my scholarship where I have shown that various actors try

24  to influence the method of voting by voters, correct.

25      Q.  And the same would be true as to vote-by-mail

Daniel Smith, Ph.D.
October 25, 2021

1    voting methodology?

2         A.   Sure.

3         Q.   Does your report in analyzing the 2020 general

4    election attempt to account for those type of factors in

5    evaluating the effect of Senate Bill 90?

6         A.   No, it does not.

7         Q.   You don't attempt to quantify the scale of that

8    effect, setting aside the legal effect of the law, that

9    affect campaigns themselves in influencing their supporters

10   on how to vote?

11        A.   I did not do that in this report, no.  Nor was I

12   asked to do it.

13        Q.   Would you agree that that likely has some effect,

14   regardless of quantifying it, that a campaign has the

15   ability to influence whether its supporters vote by mail or

16   choose not to vote by mail and to vote by one of the other

17   methodologies in Florida?

18        A.   I have no reason to disagree with that statement.

19        Q.   Would you agree that the pandemic likely affected

20   the manner in which voters chose to vote in the 2020

21   general election?

22        A.   Well, this is an interesting question and one that

23   I have actually done some empirical work as a scholar, and

24   we can see that there was a jump in Florida, as in other

25   states because of the pandemic, towards vote by mail.  We

Daniel Smith, Ph.D.
October 25, 2021

Page 70

1   need to put that in context that this has been moving

2   towards more voting by mail since at least 2008.

3          So there has been a steady increase, and we saw a

4   steeper increase in the 2020 primary election, presidential

5   primary election, primary election, and then the general

6   election compared to others, but it's a trend that's been

7   turned over the last decade.

8      Q.   I would like to ask you to turn to page 184 of

9   your report, which is your CV.

10     A.   Sure.  Yes.

11     Q.   Actually, I stated the wrong page number.  Page

12  number 178 is your CV; is that correct?

13     A.   184 is part of my CV.  I think.  174 is merely a

14  reference to all the academic materials I refer to in my

15  report.

16     Q.   Page 178, is that the first page?

17     A.   Page 178, yes, is the first page of my CV.

18     Q.   The date at the top is 9 August 2021?

19     A.   That's, yes, correct.

20     Q.   When I say the top, it's the top of the CV portion

21  of the page?

22     A.   Correct.

23     Q.   Have there been any additional items that are

24  included in your current CV as of 25 October that were not

25  included on this 9 August CV?  Do you have any additional

Daniel Smith, Ph.D.
October 25, 2021

1    journal articles, publications, or other areas that would

2    have items listed?

3        A.   That's a good question.  It's kind of like the

4    Florida voter file, it's dynamic and fluid.  I cannot tell

5    you precisely what's on my CV.  I update it as it's going

6    on, but, yes, I'm sure that I have added items to this CV

7    since August.  I try to keep it updated.

8        Q.   Are there any items that you have added to the CV

9    since August that bear on any of the topics in your expert

10   report in this case?

11       A.   I suspect -- again, I don't have my current CV in

12   front of me, but I suspect that I have added some

13   conference papers that I have presented.  I don't know if I

14   have given any public talks, which I generally list.  I

15   have submitted articles under review.

16            Looking at this, I don't know if there is another

17   article that has been accepted since that one from July.  I

18   wouldn't know.  Certainly this is an area that I work on as

19   a scholar.  And to answer your question, I would not be

20   surprised if I had other items, and I probably agree with

21   your statement that there are items, as I have already

22   described.

23       Q.   I believe you stated in response to one of

24   Mr. Perko's questions that you stand by the conclusions in

25   your expert report.  Nothing you have done since then would

Daniel Smith, Ph.D.
October 25, 2021

Page 72

1    lead you to question or doubt any of the conclusions you

2    reached?

3        A.    No, absolutely not.  My report is drawing on

4    administrative data, it's the universe of cases, and, you

5    know, there is -- actually, it's a privilege to be able to

6    have some data that normally I wouldn't have access to as a

7    scholar and that I can't publish because it's under

8    court-protected order that is very informative to the

9    questions that I have been employed to answer by counsel.

10       Q.    I would like you to turn to page 184 of your

11   report, which is a portion of your CV.  Toward the bottom

12   of that page, there is a title "Outside Activities, Boards,

13   Expert Witness, Political Consultant, Invited Testimony,

14   Miscellaneous."  Do you see that portion?

15       A.    Yes, I do.

16       Q.    And the activities under that heading, am I

17   correct that those carry over to pages 185, 186, and the

18   first part of 187 of your report?

19       A.    (Witness reviewing document.)

20             Am I back?

21       Q.    I can see you now.  I didn't hear the answer to my

22   question.

23       A.    I didn't hear your question.  It cut out right

24   after carrying forward from 184 to 185.

25

Daniel Smith, Ph.D.
October 25, 2021

1    BY MR. NORDBY:

2        Q.   Okay.  Let me repeat the question.

3        A.   So I heard none of the question.  Sorry.

4        Q.   Okay.  I am just trying to make sure the manner in

5    which you have divided your CV.  The heading at the bottom

6    of page 184 that includes expert witness, political

7    consultant, and so forth, do the topics listed on page 185,

8    186, and the first part of 187 fall under that general

9    heading?

10       A.   Yes.

11       Q.   You mentioned political consulting.  Can you

12   describe the political consulting work that you do?

13       A.   I don't think I have done any political consulting

14   since I have been in Florida.  I cannot think of any.

15       Q.   Okay.  So the reference to political consultant

16   refers to something you did before you came to Florida?

17       A.   I don't think I have worked as a political

18   consultant since the early 1990s.  I cannot think of an

19   example.

20       Q.   Okay.  You mention and you describe several expert

21   witness engagements that you have had.  You divided it into

22   domestic and international consulting.  I would like to ask

23   you about the domestic consulting expert witness

24   engagements similar to an earlier question.  Other than

25   your work in this litigation, are you currently engaged as

Page 74

1   an expert witness or performing any analysis as a potential

2   expert witness in other litigation that's not listed on the

3   CV?

4        A.   No.

5             Let me clarify.  I have no idea if things in the

6   past that I have been engaged with will come back.  I will

7   clarify that way.  But currently I have signed no other

8   engagements with any groups to do any work.  That there may

9   be items listed that come back at a later point, I cannot

10  say.

11       Q.   Are you thinking of something in particular with

12  that clarification?

13       A.   Yeah, I am.

14       Q.   Okay.

15       A.   There have been cases in which I have been engaged

16  in which I thought the engagement was over and it

17  reappears.

18       Q.   Okay.  Are there some of those that are listed on

19  your CV that you think may come back?

20       A.   No.  The point is there are some that in the past

21  have come back later which I had thought were over.  So I'm

22  just letting you know that there is that possibility that

23  although currently I'm not engaged in anything, there is a

24  possibility that unbeknownst to me it will come back.

25       Q.   Okay.  And you mention specifically you have not

Daniel Smith, Ph.D.
October 25, 2021

Page 75

1    signed an engagement letter.  Are you performing any

2    analysis without the signing of an engagement letter on any

3    topics currently?

4        A.   That's a good question.  No, I am not currently

5    doing any analysis for any groups, nor have I signed on

6    with any other groups at this time.

7        Q.   Okay.

8             MR. NORDBY:  If I can have two minutes, I don't

9        know that we need a break, I may be done, but I want

10       to check my notes.

11            Can we go off the record, please?

12            THE STENOGRAPHER:  Off the record, Counsel.

13            (Recessed at 12:14 p.m.)

14            (Resumed at 12:15 p.m.)

15            MR. NORDBY:  I don't have any more questions.

16       Thank you, Dr. Smith, for your time.

17            THE WITNESS:  Thank you, Mr. Nordby.

18            MR. KARPATKIN:  Do any other defendants have

19       questions for Dr. Smith?

20            If not, can I take a minute to consult with -- or

21       two minutes to consult with co-counsel as to redirect?

22       And can we go off the record.

23            (Recessed at 12:16 p.m.)

24            (Resumed at 12:16 p.m.)

25            MR. KARPATKIN:  Plaintiffs have no redirect.

Page 76

1      MR. PERKO:  Thank you, Dr. Smith.

2      THE STENOGRAPHER:  Gary, did you need to order at

3   this time?

4      MR. PERKO:  Yes, we will.

5      THE STENOGRAPHER:  Does anybody else need a copy

6   of the transcript?

7      MR. KARPATKIN:  Plaintiffs need one, of course.

8      THE STENOGRAPHER:  Have a wonderful day,

9   everybody.  Thank you.

10     (Thereupon, the proceedings were concluded

11                    at 12:17 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Daniel Smith, Ph.D.
October 25, 2021

Page 77

```
 1                    CERTIFICATE OF OATH

 2

 3    STATE OF FLORIDA        )

 4    COUNTY OF BROWARD       )

 5

 6

 7            I, Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR,

 8    Notary Public, State of Florida, certify that Daniel A.

 9    Smith, Ph.D. remotely appeared before me on the 25th day of

10    October, 2021, and was duly sworn.

11

12            WITNESS my hand and official seal this 27th day of

13    October, 2021.

14

15

16            _____

17                   Tamra K. Piderit
                     Florida Professional Reporter
18                   Registered Professional Reporter
                     Registered Merit Reporter
19                   Registered Diplomate Reporter
                     Certified Realtime Reporter
20                   Notary Public, State of Florida
                     My Commission #GG 915608
21                   Expires January 19, 2024

22

23

24

25
```

Daniel Smith, Ph.D.
October 25, 2021

Page 78

1                      CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA        )

4     COUNTY OF BROWARD       )

5

6                  I, Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR,

7     do hereby certify that I was authorized to and did

8     stenographically report the foregoing Web deposition of

9     Daniel A. Smith, Ph.D., that a review of the transcript,

10    pages 1 through 76, was not requested; and that the

11    transcript is a true record of my stenographic notes.

12                  I further certify that I am not a relative,

13    employee, attorney or counsel of any of the parties, nor am

14    I a relative or employee of any of the parties' attorneys

15    or counsel connected with the action, nor am I financially

16    interested in the action.

17                  DATED this 27th day of October, 2021.

18

19

20    _____
                Tamra K. Piderit
21              Florida Professional Reporter
                Registered Professional Reporter
22              Registered Merit Reporter
                Registered Diplomate Reporter
23              Certified Realtime Reporter

24

25

Daniel Smith, Ph.D.
October 25, 2021

---
**Exhibits**
---

**Exhibit 001 Smith**

  7:11 9:16,17, 19

**Exhibit 002 Smith**

  7:13 10:22,24 26:24

**Exhibit 003 Smith**

  7:15 30:20

**Exhibit 004 Smith**

  7:16 30:17 35:9,10

**Exhibit 005 Smith**

  7:18 35:8 40:20

**Exhibit 006 Smith**

  7:19 45:1,3

---
**(**
---

**(2013)**

  45:8

---
**0**
---

**0.06**

  26:8

**0.18**

  26:8

---
**1**
---

**1**

**9:16,17,19**

  43:21

**10**

  48:13,17,18, 19,21 62:12, 13

**100**

  13:15,16

**101.657**

  30:23 32:17

**104**

  22:17,19,20

**10:05**

  8:2

**116**

  24:13,21

**117**

  24:20

**11:12**

  44:20

**11:21**

  44:21

**12**

  33:18

**12.4**

  20:10

**122**

  27:23

**128**

  26:15 27:13 56:9

**12:14**

  75:13

**12:15**

  75:14

**12:16**

  75:23,24

**12:17**

  76:11

**131**

  28:1 30:3

**132**

  33:14 34:21

**1355**

  9:25 10:2,7 13:22 14:10, 13

**138**

  36:10

**14**

  26:12 50:3

**150**

  36:17,21 37:1,7,10,12 38:11,25 39:11

**150-foot**

  37:4

**17**

  13:7

**170**

  21:10

**174**

  70:13

**178**

  70:12,16,17

**18**

  40:7 45:6

**184**

  70:8,13 72:10,24 73:6

**185**

  72:17,24 73:7

**186**

  72:17 73:8

**187**

  72:18 73:8

**197**

  11:9

**1990s**

  73:18

**1st**

  9:12

---
**2**
---

**2**

  10:22,24 26:24 62:11

**20**

  52:7

**2007**

  11:16 12:12, 20 13:5 27:2

**2008**

  70:2

**2011**

  9:24 10:2 11:15 12:12, 19 13:5,7,12 27:1

**2011-2012**

  52:15

**2012**

  37:22 65:9

**2013**

  9:25 11:3

**2014**

  65:9,14

**2016**

  52:25 65:9,13

**2018**

  35:20 36:7 64:13 65:6,

Daniel Smith, Ph.D.
October 25, 2021

2

13,19 66:9

**2019**
63:20 64:5

**2020**
28:6 33:20
34:8 35:18,23
36:4 40:1,4
63:16,23
64:1,19,25
66:8,13,21
68:2 69:3,20
70:4

**2021**
33:18 58:22
70:18

**20210609_**
**racegenderage.**
**zip**
20:7

**2022**
34:22 36:4
64:22

**213**
33:14

**22**
33:25 35:15
44:1

**225**
36:12

**23**
26:18

**24**
57:15,20,21

**24/7**
28:4

**25**
9:22 15:8,13
70:24

**28**
27:24 29:11
30:24 33:20,
24 34:8,22
35:4,16,18,21
36:4 63:5

**29**
45:6

**297**
11:9

---

**3**

**3**
30:19,20
35:14

**3.5**
19:17

**3.6**
19:17

**3.8**
20:10

**33**
33:20,24
34:8,22 35:3,
17,21 36:4

**37**
9:23 11:4

**38**
15:13 16:11

**3pros**
15:17

**3PVRO**
17:15 58:12,
15,23 59:3
60:13 61:23

**3pvros**
15:18,23
16:2,13,22

17:17,18,20,
23 18:2,3,6,
25 19:1
47:22,23
48:1,3 57:24
58:1,7,8,11,
16,18,20
59:6,10 60:1,
3,7 62:4,6,
10,12,14

---

**4**

**4**
11:13,19,20,
23 12:11,17
26:24 30:17
35:9,10 43:20

**400**
13:9,14

**402**
40:6 43:6,21

**41**
39:25

**43**
19:4

**45**
47:3

**48-hour**
61:17

---

**5**

**5**
35:8 40:20

**500**
65:1

**53**
20:2

**58**
40:1

**586,000**
47:12

**5½**
44:2

---

**6**

**6**
45:1,3

**60**
19:5

**60-some-odd**
55:7

**622,998**
20:9

**66**
56:22

**67**
27:18 56:14
67:25

---

**7**

**7**
51:22

**71**
43:6

**72**
22:17

**74**
56:2

**76**
20:2

**760,000**
47:25 58:21

**78**
56:3,5

Daniel Smith, Ph.D.
October 25, 2021

3

**79**
24:13,19

**8**

**8**
50:3
**80.6**
20:10
**84**
27:21 29:10
62:23
**87**
26:20
**89**
27:25

**9**

**9**
70:18,25
**90**
15:17,24
16:1,13,18
17:16 18:2,25
27:22,24 28:2
29:11 30:24
32:15,16
33:3,8,18,25
34:10,14
36:5,9,13
38:14 39:8
45:17,24
46:3,8,12
47:14 48:10,
12 58:6
59:14,18,25
60:7,16 62:3,
15 63:4 64:3,
12,14 65:2,5,
13 66:3,5,12,

18 69:5
**90's**
57:23 64:18
**93**
66:19,24

**A**

**a.m.**
8:2 44:20,21
**ability**
18:22 50:4,6
62:18 69:15
**absentee**
54:23
**absolutely**
38:2 51:14
52:3 64:24
68:15 72:3
**academic**
70:14
**accepted**
71:17
**accepting**
67:24
**access**
65:5 72:6
**accommodate**
9:9 32:6
**account**
69:4
**accuracy**
57:9
**accurate**
44:3 61:19
64:10
**accurately**
50:19

**Act**
19:19
**actions**
53:10 54:14,
16
**activities**
15:16,23
18:2,25 58:7,
13,19 60:7
72:12,16
**activity**
54:19
**actors**
68:23
**added**
16:1 71:6,8,
12
**additional**
15:16,22 17:1
46:15,25
70:23,25
**additions**
16:12
**address**
40:8 41:19
43:3,8,12
44:3 52:20
65:10
**addressed**
63:6
**addresses**
16:17 44:1,8
**addressing**
39:19 52:19
63:1
**administrative**
72:4
**affect**
32:16 39:21,

22 58:19
62:18 69:9
**affected**
33:3 38:8
48:10 69:19
**affects**
18:25
**affidavit**
36:16
**affidavits**
39:14 66:15
**affirm**
8:6
**affirming**
45:25
**affirms**
47:22
**African**
13:6 17:21
**African-american**
11:24 12:13
13:21 14:4,7,
8 18:9,20
27:1,4
**age**
20:18 21:25
**agree**
11:22 20:12
30:14 32:25
36:3 41:23
44:12 54:14
58:13 62:16,
20 69:13,19
71:20
**agreeing**
41:24
**ahead**
9:4,10 37:6

Daniel Smith, Ph.D.
October 25, 2021

4

allegation
53:19 55:10

allegations
53:3,7,24
54:1

allowed
36:22 37:9,14
38:10 39:1,4,
6,11

allowing
36:25

alter
46:18

alternate
18:21

ambiguity
44:11

America
19:19

American
13:6 17:21

amount
16:5 17:13,14
32:6

analogy
59:23

analysis
12:6 13:1,20,
24 14:5,9,20
15:4,13 20:22
21:11,17 38:7
48:15,23 74:1
75:2,5

analyzed
27:16,18
56:13 57:5

analyzing
69:3

anecdotal
38:4,5,21
61:14

anecdotally
65:16

Ansolabehere
45:8,9

answering
51:16

answers
32:9

anticipated
32:6

apologize
10:13 57:17

apparent
33:19

appears
11:6 12:22,24
13:2 40:25

application
16:4,7 60:18

applications
60:22

approach
38:10

approached
39:18

area
54:18 55:16
71:18

areas
67:16 71:1

art
14:25

article
71:17

articles
71:1,15

assertion
32:8

assistance
24:25 25:4,9,
13,16,21,25
36:16 50:8
55:22 56:19,
20,25 57:11
67:22

assume
9:5

assumption
60:8 62:20,21

attempt
69:4,7

attorney
54:12,18

August
13:7 33:18
54:8 70:18,25
71:7,9

author's
40:2

availability
63:7 64:12
65:6

aware
36:24 63:6
67:4,13,21

axis
13:7,8

---

**B**

---

back
12:1,5,15
13:2 15:11

20:25 26:22,
23 30:3 31:21
36:7 44:6
52:7 54:10
55:7,9 59:24
68:7 72:20
74:6,9,19,21,
24

backtrack
39:24

backward
64:20

ball
51:9

ballot
23:15,18
24:25 25:1,6,
8,12,14,16,
17,22,24
26:1,5,7 32:2
47:14 49:21,
23,25 50:2,7,
13,19 51:3,5,
7,18,24 52:5,
8,11,14,19
53:1,4,20
54:23 55:1,6,
11,23 56:17,
25 57:10,11
63:8 64:1
66:20 67:5,
18,23 68:6

ballots
29:6 51:14,21
52:24 53:8
56:21 61:4,22
67:6,17

Bank
28:10,13
30:4,11,13

Daniel Smith, Ph.D.
October 25, 2021

5

31:18 32:11,
18 33:4,9

**based**
35:21 36:3
37:5 39:20
46:12 57:2
60:8 64:2
65:11 67:1
68:17

**Basically**
25:10

**basis**
19:12 25:2
38:9,16 39:3

**Beach**
52:25 53:23
54:5

**bear**
15:15 17:1,4
71:9

**began**
8:2

**beginning**
20:4 27:21
36:12 48:13

**begins**
56:2

**behalf**
25:24

**bigger**
12:24

**Bill**
9:24 14:10
27:22,24 28:2
29:11 30:24
32:15,16
33:3,8,18,25
34:10,14
36:5,9,13

45:17,24 46:3
59:14,18,25
60:16 62:3,15
63:4 64:3,12,
14,18 65:5,13
66:12 69:5

**birth**
40:8 43:8,14

**bit**
10:13 21:17
39:14,16,24
53:25 57:17
63:11,12

**bits**
46:20

**black**
10:3,5 13:13,
14,15,17,20
14:4 16:19,21
17:7,9,18
18:5 20:10
22:23 23:21,
25 24:3 26:5,
17 42:14
45:18 48:1
58:24 59:1
60:10,11
62:8,13

**blind**
53:19

**block**
37:23

**Boards**
72:12

**bolster**
48:9

**bottom**
72:11 73:5

**Bowen**

49:10

**box**
27:23 28:9,14
29:15 30:5,14
31:19 32:11
33:5,10 36:18
63:3 64:18
65:6 67:12
68:1,5

**boxes**
28:3 29:18
33:20,24
34:3,22 35:3,
16,23 37:21
63:1,7,25
64:6,8,12,22
65:1,5,12,20,
23 66:2,12,
17,20 67:5,23

**branch**
28:17 30:1,10
35:6 66:5

**branches**
29:20

**breach**
22:8

**break**
9:7 44:16,19
75:9

**Brian**
37:19

**broad**
21:9 49:4

**broader**
56:11

**broadly**
48:10

**brunt**
15:15 17:1,4

**building**
31:12

**bullet**
28:8

**burden**
16:14 17:25
62:15

**burdened**
58:12

**burdens**
57:24 58:2,8
59:14,18
60:1,4 62:3

**buttresses**
46:17,25

---

C

**California**
67:12

**call**
45:23

**called**
9:24

**campaign**
69:14

**campaign's**
53:10

**campaigns**
68:9,11,19
69:9

**camps**
53:3,25 54:2

**candidate**
53:20

**candidates**
54:7

**canvassed**
51:25

Daniel Smith, Ph.D.
October 25, 2021

6

carefully
66:7

carry
72:17

carrying
72:24

case
13:1 14:18
21:24 23:23
24:5 29:8
32:4 42:21
54:20 55:6
64:23 71:10

cases
25:15 49:18
72:4 74:15

cast
32:2 49:25
50:1

casting
49:21,23

catch
22:18

categories
14:12,17

category
20:17 28:18
42:12

center
31:12,13,14
34:4

Centers
36:2

certainty
23:7

cetera
42:15

challenge

41:18 42:1,2
44:7 45:14

challenged
10:13

change
14:14 44:8
46:22 49:4

changed
22:25 23:17
24:2,10 44:4
48:15,24

characterizatio
n
20:13 33:1
64:5

check
75:10

choose
69:16

chose
69:20

Christina
33:17 35:13

circumstances
21:15

citation
45:7

cite
40:24

citizens
57:25 58:3
60:2

City
31:11

civic
31:12

claim
46:7

claimed
45:11

clarification
74:12

clarify
12:16 74:5,7

clear
66:15

close
39:16 44:15

closely
10:9

closer
39:16

co-counsel
75:21

code
24:1,9 48:4

codes
23:18

codifying
64:9

color
15:14,17
16:15,25
17:3,22
45:13,15
57:25 60:2

columns
20:15

commission
31:12

Committee
55:8

communication
22:10

community
31:14

compare
64:17,18

compared
10:4 11:16
12:19 64:19
65:5 66:12
70:6

comparisons
63:15

completing
51:2

concerns
55:16

concluded
76:10

conclusion
62:22 67:1

conclusions
46:17,22 49:4
53:13 56:11
57:2,7,8,12
59:4,5,13,17
62:2,17 64:2,
11 66:11
71:24 72:1

condition
32:7

conditions
16:1

conducted
40:4

conference
71:13

confusion
51:16

connecting
61:2

consideration

Daniel Smith, Ph.D.
October 25, 2021

7

58:10

considerations
46:13

consult
75:20,21

consultant
72:13 73:7,
15,18

consulting
73:11,12,13,
22,23

consumer
67:8

contacted
54:5

contacting
41:14 53:14

contained
20:9

contention
45:13,22 46:2

context
27:17,25
41:8,24,25
70:1

continual
28:21 29:4

continually
30:1

continue
36:8

continues
31:25

continuously
29:25

convention
31:13

conviction
54:3,15

convictions
54:25

copy
9:11 30:23
44:23 49:13
76:5

Corley
37:19

correct
9:13 11:18
20:11 26:15,
16,19,21
32:12 38:18
40:12 42:3,20
43:10,12,13,
15,17 44:5
46:13,16,18
50:16 59:16,
21 60:19
63:2,17,18,22
64:17,20 67:3
68:24 70:12,
19,22 72:17

correctly
16:3 20:16
43:1 59:4

counsel
9:18 18:1,14,
16,24 20:6
22:2,9,15
59:9 72:9
75:12

count
13:9

counted
50:20 51:4,24

counties
23:6 25:5

27:18 50:3
56:22 63:24
64:5,8 65:18,
22 66:1 67:22

counting
54:25

county
25:4 27:16
28:8,12 30:9
31:12 32:2,21
34:2 50:4,5
52:19,25
53:24 55:22
56:3,10,11
57:3,4,6,8,13
65:17 66:8

County's
29:23

county-wide
34:2

couple
56:7

court
9:15 10:20
21:1 30:18
35:8 45:2

court-protected
72:8

courthouse
31:12

coverage
40:9 41:3,4,
6,18

crime
54:15

criminal
54:3,14,19

CROSS-
EXAMINATION

49:11

curious
23:24 27:3

current
40:12 41:16
48:4 70:24
71:11

curtailed
65:2

customary
35:21

cut
72:23

CV
70:9,12,13,
17,20,24,25
71:5,6,8,11
72:11 73:5
74:3,19

cycle
63:23

cycles
37:14

_____

D

_____

Dade
34:3,4 36:1,2

daily
13:9 61:16

Dan
49:9

DANIEL
8:11

data
18:4 19:24
20:16,21
21:19,23 22:3
25:4,18

Daniel Smith, Ph.D.
October 25, 2021

27:17,19
46:15 55:5,14
56:11,13,15,
23 57:1,3,5
72:4,6

**database**
20:20 21:8
22:6

**date**
40:8 43:8,14
70:18

**dated**
9:11

**dates**
32:20

**dating**
52:6

**day**
13:15,16
49:25 51:22
52:1 76:8

**days**
28:19 29:9
34:5 35:24
50:3 65:20,24

**deadline**
51:21

**dealing**
52:23

**decade**
27:7 70:7

**deceptive**
51:17

**declaration**
33:7

**declarations**
37:16 66:16

**deep**

49:1

**defendants**
49:19 75:18

**definition**
35:6 41:6
54:20

**delineated**
16:20

**delivered**
16:4 17:13
60:18 61:1

**delivery**
37:20 57:23
59:25

**democratic**
10:9 54:7

**demographic**
62:17

**demographics**
59:5

**Department**
22:2,11

**depend**
57:9

**dependent**
19:25

**depends**
30:7 61:20
65:17

**depictions**
12:7

**deposed**
8:18

**deposition**
8:19 9:8,17
10:23

**depositions**
39:13

**derive**
25:19

**describe**
73:12,20

**designate**
31:10

**designated**
31:25

**designed**
42:9

**destroy**
67:12

**destruction**
67:6

**detail**
48:6 52:9

**details**
33:1,6,13
47:4 67:9,14

**determine**
22:4

**determined**
23:14,17

**DHSMV**
19:25

**difference**
13:4,24 14:16
27:3,5

**difficulty**
65:19

**dip**
13:6

**direct**
8:14 18:2
24:18 34:14
58:6 60:6

**directly**
18:25

**disagree**
63:21 69:18

**disclaimer**
57:23 59:25
60:14 61:7

**discovery**
25:19 48:7
56:15

**discrepancies**
40:10

**discrete**
20:18 21:18

**discretion**
63:12

**discrimination**
45:12,22,24
46:4

**discuss**
15:25 45:6
46:16

**discussed**
67:16

**discussion**
10:19 67:19
68:7

**discussions**
22:1,8

**disparate**
13:21 46:10

**disparately**
13:17 17:9
47:25 58:24

**disposition**
44:17

**disproportionat
ely**
15:18 45:15,
18

Daniel Smith, Ph.D.
October 25, 2021

9

distribute
36:22 37:2,11
38:12 39:2,12

distribution
19:2

District
54:12

diversion
27:12

divided
73:5,21

Division
18:4 19:11,
16,23 20:5
47:15,17 48:7
58:22 63:11

divorce
43:24

document
9:19 10:24
18:4 30:20
35:10 40:20
45:3 64:6
66:1 72:19

documentation
21:24

domestic
51:21 73:22,
23

doubt
72:1

dozens
21:10

draw
57:6,8 62:18,
21 64:2

drawing
72:3

drink
36:23 37:2,11
38:12 39:2,12

drive-through
28:9

driver's
19:9,14,20

drives
16:2

drop
10:5 11:23,24
12:4,11,13,23
13:13,14,15,
16 14:8 16:7
18:23 26:25
27:4,5,23
28:3,9,14
29:15,18
30:5,14 31:19
32:11 33:4,
10,20,24
34:3,8,19,22
35:3,16,23
36:18 37:21
50:14 63:1,3,
7,25 64:6,8,
12,18,22
65:1,5,6,12,
20,23 66:2,
12,17,20
67:5,12,23
68:1,5

dropped
10:3

dropping
14:4

drops
11:15 12:19

due
40:9 41:2

43:24 45:12
58:1 60:3

duly
8:12

duplicitous
51:17

Duval
28:8,12 32:21

dynamic
71:4

_____

E

earlier
10:4 15:25
34:12 55:24
63:16 64:3
65:8 67:16
68:8 73:24

early
28:15,19
29:5,7,8,20,
22,23 30:8,
12,16 31:14,
20 32:22
33:5,10 34:5,
6 35:16,17,
18,19,24
36:19 50:2
52:1 65:24
66:3 68:20
73:18

easily
12:25

effect
10:2 64:2
69:5,8,13

effectively
58:16

effects
10:7 14:2,10,
13 16:18 17:8
18:2 64:16
66:12

EIP
28:11

election
23:14 28:6
32:12 33:20,
25 34:9,23
35:15,18,20,
22 36:4,14
37:13 49:18,
25 51:22
52:1,25 53:2,
6 63:16,23
64:1,13,19,
21,25 65:6,19
66:8,13,22
67:8 68:2
69:4,21 70:4,
5,6

elections
16:5 18:5
19:11,16,23
20:6 34:2
37:5,9 39:7
46:12 47:15,
17 48:7 55:8,
18 58:22
61:15 63:11,
16 64:3,24
65:9,18
66:10,17
67:2,21 68:10

elector
36:15,17

electronic
42:18

Daniel Smith, Ph.D.
October 25, 2021

10

eligibility
33:3

eligible
15:14 16:15,
25 17:3,22
18:9,20
23:14,17
29:1,3 30:4
57:24 58:3
60:1

eliminated
58:12,16

eliminating
35:5

emails
19:15

emphasize
27:15

empirical
14:11 69:23

employed
72:9

employee
29:25

enacted
63:20

end
24:15 44:16
46:16

engaged
73:25 74:6,
15,23

engagement
74:16 75:1,2

engagements
73:21,24 74:8

ensure
67:23

entire
56:10

entrance
36:18,21 39:1

envelope
52:11 67:18,
23

envelopes
51:15,19

equal
32:2

error
40:9,10 41:3,
4,6,14,18
42:5,9,15,17,
18 50:18
51:1,2

errors
40:8 41:1
42:20 43:20
51:23

estimate
10:6

ethnic
17:23 20:17
59:11

ethnicity
11:12 14:18
19:3 48:11

evaluating
69:5

event
28:9 30:7
32:20,23

events
50:25

evidence
10:6 38:6,21
58:14 66:15

evidently
47:17

EXAMINATION
8:14

examined
8:12

examples
28:5 38:2,19
52:4 54:23,25
56:9 65:25
67:4,13 68:18

exception
36:14

excuse
19:9

exhibit
9:16,17,19
10:22,24
26:24 30:17,
20 31:1 35:8,
9,10 40:20
45:1,3

exist
51:25

existing
21:13

expected
35:22

expedient
16:5 17:14

expeditious
17:13

experience
68:17

expert
8:22 9:11,23
11:4 15:9,11
40:24 44:23
46:23 48:13

49:13,17 51:2
61:12 65:11
68:18 71:9,25
72:13 73:6,
20,23 74:1,2

expertise
54:19

explain
12:7 41:4
42:4,17

explainable
12:25

explained
44:3

extend
40:11

_____

F

_____

face
45:15 52:2

facility
31:11

fact
14:5 32:18
34:25 60:20
62:15

factors
69:4

facts
8:22,23

failed
40:7 43:7

fair
9:5 15:7
57:14 59:7,9

fairground
31:11

Daniel Smith, Ph.D.
October 25, 2021

11

fall
  73:8
falls
  55:4
familiar
  49:20,22
  52:4,6,8,12,
  13,18 61:3
  63:3,5 67:9
familiarity
  61:15
farther
  19:25
February
  55:9
federal
  41:22
feel
  21:21
feet
  36:17,21
  37:1,7,10,12
  38:11,25
  39:11
felt
  17:9
female
  42:10
field
  28:10,13
  30:4,11,13
  31:18 32:11,
  18 33:4,9
  47:8 65:12
fields
  47:7,10
figure
  11:13,19,20,
  23 12:11,17

13:3 65:1
figures
  12:2
file
  19:10 20:5,14
  21:19,25 22:3
  40:11 41:11
  42:22,25
  47:4,9,15
  71:4
files
  20:21 21:6,10
  40:6
filings
  53:11
filled
  53:20
filling
  53:8
final
  32:23
find
  25:5 56:3
  57:5 62:8
finding
  48:9
findings
  14:12 48:14,
  15,22,25
finds
  58:20
Florida
  10:8 11:14
  13:11 15:15,
  19 16:16,20,
  25 17:4,22
  18:20 19:8,
  13,18 20:19
  22:5 36:25

39:7 42:12
45:17 49:18,
21,23 50:22
52:5 57:24
58:3,7,15
59:2 60:1,12
61:15 62:12
63:6,24 67:2,
5,10 68:8
69:17,24 71:4
73:14,16
Florida's
  40:5
fluid
  71:4
focusing
  38:7 39:6
folks
  39:4 41:10
follow
  23:12
follow-up
  22:1,10
food
  36:23 37:2,
  11,15,24
  38:12 39:2,12
footage
  55:12
forest
  55:4,20
Forgive
  15:9
forgot
  26:22
form
  20:23 40:11
  42:8,12 47:15
  57:1 61:8,10

forms
  42:19 61:18,
  24
forward
  46:12 64:15
  65:3 72:24
found
  10:1 16:20
  41:2 47:11,17
fourth
  31:2,9
frame
  10:4
fraud
  50:18,22
  52:5,8,14,20
  53:1 54:4,23,
  24 55:1
front
  9:12 49:14
  71:12
future
  28:24 34:2
  64:24

───────

G

Gary
  8:16 24:18
  31:5 76:2
gender
  20:17 21:24
  44:11
general
  21:18 23:5
  28:6 35:15
  57:2 63:16
  64:19,24,25
  65:6 66:8,21
  67:7 69:3,21

Daniel Smith, Ph.D.
October 25, 2021

12

70:5 73:8

**generalize**
56:9

**generalizing**
56:22

**generally**
8:19 22:12
49:2 55:1
63:22,24
68:17 71:14

**geographically**
32:1

**give**
8:7 42:13
51:13

**good**
8:16 63:9
68:14 71:3
75:4

**goodness**
37:25

**govern**
41:22

**Government**
34:4 36:2

**government-owned**
31:13,14

**grand**
52:19

**granular**
55:14

**greater**
11:24 12:13
65:4

**ground**
8:20 55:14
57:19

**grounds**
22:7

**group**
10:7,8 61:20

**groups**
11:14 12:18,
23 13:5 17:6,
23 36:19,25
37:9,14 38:3,
19,24 39:10
59:12 61:4,
21,23 74:8
75:5,6

**gubernatorial**
35:20

**guess**
9:10 15:9
17:11 18:18
23:24 29:11
30:19 35:8
45:21 46:21

---

**H**

**halfway**
19:7

**Hall**
31:11

**hand**
8:4 13:11

**handling**
52:24

**happen**
30:7 54:3
55:2 61:18

**happened**
32:21

**happening**
30:8

**happy**
9:9 12:5 37:5
38:5 39:5
46:24 47:20
65:16

**harvesting**
55:6,11

**HAVA**
19:19

**HB**
10:2,7 13:22

**head**
23:22 37:17
52:16 63:10
67:12,15

**heading**
11:11 48:20
72:16 73:5,9

**hear**
46:1 72:21,23

**heard**
73:3

**held**
10:19

**helpful**
14:10 56:1

**Herron**
9:25 11:3
26:25 27:8

**hide**
51:9

**high**
55:2

**higher**
45:14

**highlighted**
41:17

**highly**

53:10

**Hispanic**
10:3 13:6
16:19,21
17:8,9,19
18:6 20:11
23:3,9,19,21
24:4 26:6
42:14 45:18
48:1 58:24
59:1 60:10,11
62:9,13

**hold**
32:21 57:13

**honestly**
54:12 55:15

**hours**
29:6,9,24
30:12 31:19
33:5 34:5
35:24 38:1

**House**
9:24 55:8

**hundreds**
37:18

---

**I**

**ID**
19:10,14
20:10 21:12,
18 47:15

**idea**
11:14 12:17,
18 13:19
22:16 24:8
42:7 54:13
74:5

**identification**
9:20 10:25

Daniel Smith, Ph.D.
October 25, 2021

13

20:15 30:21 35:11 40:11, 21 45:4

**identify**
42:13 64:25

**identifying**
41:10

**III**
45:7 48:20

**impact**
13:22 17:16, 17 33:18 45:16,18 46:11 58:6 60:6,9 62:6 64:14

**impacted**
18:10,21 64:24

**impacts**
46:10

**implied**
34:23

**imply**
54:2

**implying**
34:18 35:1

**important**
12:1,6 14:3 21:22 31:22 47:4,5,11,18 58:10

**impose**
59:14

**imposed**
45:23 46:3

**imposes**
59:18 62:3

**impossibility**
65:20

**improperly**
41:12

**in-person**
28:16,19 29:5,7,8 30:8 32:22 50:2 51:25 52:1 68:20

**inaccurate**
57:12 61:6

**incidents**
67:10

**include**
47:9

**included**
22:3 47:7 70:24,25

**includes**
73:6

**including**
18:22 24:7 65:18

**incomplete**
24:15

**increase**
70:3,4

**independently**
20:18 21:7

**individual**
20:16 21:12 23:13,16 25:8 59:18

**Individually**
12:17

**individuals**
13:3 17:10

18:5,6 19:17 22:12 25:9,11 36:14,16,19 37:9 38:19,24 39:9 41:9,14 42:2,21 47:12,17,25 48:2,9 52:2 53:7 56:18 58:21 59:10 60:9 62:10,14

**infer**
56:18

**influence**
68:9,11,15, 19,24 69:15

**influencing**
69:9

**inform**
16:3 17:12

**information**
24:12 42:3, 19,22,25 43:2 46:20,25 47:1,6,12,19 48:9 53:12 56:3,8 62:17

**informative**
25:20 72:8

**informed**
17:24 18:10

**informs**
61:8

**initial**
46:23 48:9, 13,17,23

**initially**
48:3

**inputted**

42:19

**instance**
53:22

**instances**
52:10

**instruct**
16:8

**Integrity**
55:8

**intend**
34:3

**intending**
54:2

**intends**
33:19,23 34:21 35:2

**interested**
16:24

**interesting**
25:3 55:3 56:24 69:22

**internal**
19:15,24 56:16

**international**
73:22

**Internet**
18:23

**interpretation**
38:13 39:8,20

**interrogatories**
35:14 37:15 39:14 66:15

**interrogatory**
33:17 35:1 47:2

**interrupt**
50:9

Daniel Smith, Ph.D.
October 25, 2021

invades
47:18

invalid
47:11

invalidate
51:7

investigate
40:5

Invited
72:13

involving
49:18

issue
44:6 56:14

issued
51:1

issues
42:6 43:22
52:2,6,14
53:1

items
38:20 70:23
71:2,6,8,20,
21 74:9

**J**

Jacksonville
28:10,13
30:4,13 31:18
32:10,18
33:4,9

Jaguars
28:10,13
30:4,13 31:18
32:11,18
33:4,9

job
57:18

journal
71:1

July
71:17

jump
69:24

jury
52:19

**K**

KARPATKIN
14:22 18:12
20:23 22:7
31:5 44:17
54:17 61:10
75:18,25 76:7

key
45:25

kind
71:3

kinds
37:23

knocking
45:10

knowing
33:1

knowledge
8:23 16:12

**L**

labeled
20:6

lack
51:10

language
30:6 32:19
41:17 64:9

large
12:4

largely
48:8

late
11:15,16
12:19

law
69:8

laws
41:22 49:18

lead
42:15,20
51:23 53:13
72:1

leading
67:6

League
35:13

legal
69:8

legally
19:8

legislation
9:24 64:15,16

length
37:7

letter
75:1,2

letting
74:22

level
55:2,14

leveraged
25:6

library
31:11

license
19:9,14

licenses
19:20

likelihood
25:23

limited
56:7

lines
37:21,23
38:1,7 39:23

list
71:14

listed
71:2 73:7
74:2,9,18

litigation
8:17,24 22:13
56:14 73:25
74:2

Litigationrr_
nodl-
ssn202010722
47:5

located
32:1

location
28:11,14,16,
22 29:4,5,7
30:5,14,16
31:19 32:11
33:5,6,10,13
36:18 66:4

locations
29:14,21
35:17 66:2

Lockerbie
45:10,13

Lockerbie's
  45:7
logical
  56:19
long
  9:9 21:10
  45:11
longer
  28:13 36:2
  41:10 45:16
looked
  14:13 27:8
  50:21 51:6,
  18,19 54:6
  55:11 64:22,
  25
lot
  23:6 28:23
  32:24
lots
  64:7
love
  56:23
lower
  35:22

_____

**M**

Madam
  9:15 10:20
  21:1 30:18
made
  27:19 28:15,
  16 29:5
mail
  16:6 18:22
  26:5 50:6,11,
  12,13 52:3
  69:15,16,25
  70:2

main
  11:14 12:18
  16:12 29:19
make
  20:14 26:7
  28:7 33:7
  55:4,19 62:21
  73:4
making
  46:7
male
  42:10
man
  45:11
manned
  65:23
manner
  69:20 73:4
Maria
  19:15 47:3
mark
  9:16 10:22
  35:9
marked
  9:19 10:24
  30:18,20
  35:7,10 40:20
  45:1,3
marriage
  43:24
match
  21:12,19
materials
  70:14
math
  26:16
matter
  8:7,22

Matthews
  19:16 47:3
means
  18:22
meant
  26:25
measurement
  40:9 41:3
  42:4,9,15
  43:20,22
media
  67:7
medium
  47:24
meet
  35:6
mention
  9:25 19:17
  41:1 73:20
  74:25
mentioned
  26:25 53:23
  73:11
met
  8:18
method
  14:14 25:5
  48:5 59:7
  68:9,21,24
methodologies
  69:17
methodology
  69:1
methods
  49:20,22,24
  50:17,22 68:8
Miami
  52:14

Miami-dade
  33:16 37:22
  47:22 52:7,
  18,22
midway
  39:25
million
  19:17
millions
  19:8,13
Mine
  38:6 39:20
minus
  13:8
minute
  75:20
minutes
  75:8,21
Miscellaneous
  72:14
misidentified
  43:22
misinterpretati
on
  44:12
misleading
  12:7
mismatched
  51:20
mismatching
  51:11
missed
  45:25
missing
  51:20 61:17
misspelled
  43:21

Daniel Smith, Ph.D.
October 25, 2021

16

mobile
41:19 42:2
44:8

monitored
30:2

monitoring
28:22

monthly
21:19

months
10:1

morning
8:16

motives
46:7

move
33:14

moved
38:23

moves
30:10

moving
20:2 64:15
65:3 70:1

---

**N**

names
43:21,23

necessarily
43:3

needed
56:19,20

needing
25:21

Neighboring
33:16

news

53:9 67:8

noise
55:4,19

nonpermitted
32:5

nonpresidential
35:22

nonstatistically
14:19

Nordby
49:9,12 54:21
61:3 62:1
73:1 75:8,15,
17

North
34:4 36:2

noted
58:22

notes
75:10

notion
45:21

null
14:2,6

number
8:21 13:10
19:10,14
20:15 21:18
26:4,15,17,20
33:19,24
34:21 35:3,
14,19 42:23,
24 62:25
70:11,12

numbers
13:11 19:21
26:13 50:24

numeral
27:22 48:20

---

**O**

object
14:22 22:7
61:10,11 64:4

Objection
18:12 20:23
54:17

occasion
9:3

occasionally
61:19

occur
54:14

occurs
54:20

October
70:24

offer
35:16

offered
28:9

offering
58:5

office
24:10 28:17
29:19,25
30:1,10 35:6
50:14 54:12
65:25 66:5

offices
22:24 24:2

officials
36:14

one-off
52:10

one-offs
52:12

online
16:9

open
28:4

operated
29:24

operation
29:24 35:24

operational
29:6

operatives
67:11

opine
33:12 38:13
39:8 50:23
55:15 60:6
65:16

opining
54:19

opinion
58:6

opinions
8:22

opportunity
32:2 42:13

opposed
13:14,16 59:6
64:13 68:20

option
63:7

order
43:9 72:8
76:2

organization
59:20 61:7

organizations
58:19 59:15
60:17,21
62:16

**P**

p.m.
51:22 75:13,
14,23,24
76:11

pages
15:6 21:10
37:18 49:5,16
72:17

Palm
52:25 53:23
54:5

pandemic
69:19,25

Panel
12:8 13:3

panels
13:8

paper
9:25 10:16
11:3,4 12:10
26:24 27:7
40:24 41:2
42:19 43:6

papers
15:3 71:13

paragraph
9:23 11:4,12
12:1,15,21
15:8,13 16:11
19:5,7 20:2,4
22:20 24:16,
19,20 26:2
27:23 28:1,2

30:3 33:14
34:2 35:4
36:12 40:1
45:6 48:17,21

parking
32:5

parodied
61:16

part
22:18 28:5
65:2 70:13
72:18 73:8

particularized
45:12,22,24
46:4

partly
41:11

parts
11:8 52:22

party
10:9 25:11,16
26:4,7 27:15

Pasco
37:19

passage
13:22 32:15

passed
9:24

past
37:5 46:12
51:2 60:22
65:21 74:6,20

patterns
53:16 54:7

people
37:20,21 38:1
47:23 58:20

percent

26:8 40:7
43:21 44:2
62:11,12,13

performing
74:1 75:1

period
50:2 65:24

periods
33:11

Perko
8:15,16 9:15,
21 10:18,20
11:1 14:24
18:13,17
20:25 21:3,5
22:9,14 30:22
31:4,6 35:8,
12 40:22
44:15,18,22
45:1,5 49:7
56:6,12 57:17
58:5 76:1,4

Perko's
71:24

permanent
28:17 29:4,20
30:9 31:11
35:6

permissible
28:4 66:18

permitted
36:17 38:3
66:2,4,5

person
16:7 23:15
50:8,12 52:3
57:10

personally
37:8

personnel
28:22 30:2
65:23

persons
15:14,17
16:15,24
17:3,22 57:25
60:2

perspective
55:14

pertinent
8:24

Ph.d.
8:11

phone
40:4

pie
55:8

piece
9:24 25:20
47:11,18 61:3

pieces
43:2 47:20
48:8 61:2
68:22

pizza
37:20

place
36:18 37:2,10
38:11 39:11
57:24 63:23
64:23

places
16:13 60:1

plain
35:2

plaintiffs
49:19 75:25
76:7

Daniel Smith, Ph.D.
October 25, 2021

18

plans
  35:16

plenty
  61:23

point
  31:4 66:23
  68:22 74:9,20

political
  9:2 14:1 55:5
  68:9,11,19
  72:13 73:6,
  11,12,13,15,
  17

polling
  36:18,21
  37:1,10 38:11
  39:1,11

poorly
  42:9

population
  41:20 44:8

portion
  57:19 66:19
  70:20 72:11,
  14

position
  38:15

possibility
  41:13 44:13
  74:22,24

post
  50:8

potential
  16:3,8 46:11
  51:23 52:20
  60:17 62:4
  74:1

practicable
  32:3

practice
  21:18

precinct
  50:1 53:16

precincts
  45:14

precise
  43:5

precisely
  71:5

preclude
  33:9

predicate
  12:3

predicated
  23:11

premarked
  9:16 10:21

premise
  64:9

prepared
  62:20

present
  14:11 48:24

presented
  71:13

presenting
  46:9

presidential
  70:4

pressuring
  53:7

presume
  24:16,24
  25:11,15
  56:20

presumption
  25:2,10 57:9

58:18

pretty
  16:7 21:9

prevent
  50:19 51:3

previous
  35:20 65:18
  66:9,17

previously
  44:7

primary
  53:6 54:8
  70:4,5

prior
  9:24 19:19
  32:15 64:1,5,
  8,15,16 65:11
  68:17

privilege
  72:5

privileged
  22:8

problem
  39:18

problems
  53:4 61:21,24

proceedings
  8:2 76:10

process
  57:6

processed
  22:25 24:2,10

processing
  40:9 41:3
  42:18

processor
  42:17

produced
  60:24

prohibited
  32:24

pronounce
  40:2

pronounced
  10:8

properly
  51:24 67:24

proportions
  45:15

proposing
  52:20

provide
  25:4 28:5
  32:1 34:3
  36:16,20,25
  37:2,9,14
  38:3,11,24
  39:10 43:10,
  12,14 48:16

provided
  23:15,18
  35:18,19
  37:24,25
  38:20 65:21,
  23

providing
  10:6 65:20
  66:2 67:22

provision
  33:2

provisions
  30:15 33:8
  38:8 48:12
  52:23 63:3,
  10,23

Daniel Smith, Ph.D.
October 25, 2021

19

| | | | |
|---|---|---|---|
| **PRR_NAACP_VOTER** | 21:2,9 25:3 | **racial** | 49:3 60:25 |
| 48:6 | 34:11,13 | 11:14 12:18 | 63:20 69:18 |
| **public** | 36:24 38:23 | 13:5 20:17 | **reasons** |
| 31:11 55:8 | 39:20 43:4 | 42:11 59:11 | 34:17 |
| 71:14 | 51:13,16 55:3 | **raise** | **rebuttal** |
| **publications** | 56:24 58:2 | 8:4 | 44:24 46:15 |
| 71:1 | 61:5,6 63:9, | **ran** | 48:16,24 |
| **publish** | 14 64:10 | 54:9 | **recall** |
| 72:7 | 69:22 71:3,19 | **rare** | 16:3 20:16 |
| **publishing** | 72:1,22,23 | 50:25 54:24 | 27:11 32:20 |
| 51:7 | 73:2,3,24 | **ratio/ethnic** | 37:17 50:11 |
| **pull** | 75:4 | 10:7 | 52:22 53:1,3, |
| 31:21 40:15 | **questioning** | **raw** | 5,6,14,19,22 |
| 50:5 | 57:18 | 19:24 | 54:11 61:16 |
| **purged** | **questions** | **reach** | 67:7,11 |
| 41:12 | 8:21,25 42:24 | 22:12 59:13, | **receive** |
| **purport** | 44:10 49:10 | 17 62:2 64:11 | 23:12 |
| 64:17 | 56:6 61:14 | 66:11 | **received** |
| **purports** | 71:24 72:9 | **reached** | 20:5 46:25 |
| 20:13 21:23 | 75:15,19 | 57:2 72:2 | 47:1,4 48:6 |
| **put** | **queue** | **reaching** | 55:22 56:13 |
| 27:17 29:15, | 36:20 37:10 | 56:10 | **receiving** |
| 21 70:1 | 38:10,25 | **read** | 29:6 48:5 |
| | **quotation** | 20:25 21:4 | **recessed** |
| Q | 45:7 | 29:13,14,16 | 44:20 75:13, |
| | **quote** | 39:15 | 23 |
| **qualifications** | 29:11 34:1 | **reading** | **recommendations** |
| 28:23 31:22 | **quote/unquote** | 34:20 37:18 | 52:20 |
| 32:8,25 | 55:6 | 46:14 66:3 | **record** |
| **qualifies** | **quoted** | **reaffirming** | 10:18,19 21:4 |
| 30:16 | 34:20 53:9 | 47:21 | 60:23 75:11, |
| **qualify** | | **reaffirms** | 12,22 |
| 29:22 32:18 | R | 48:4 | **records** |
| **quantify** | | **reappears** | 19:24 20:1 |
| 69:7 | **race** | 74:17 | 43:1 56:16 |
| **quantifying** | 11:12 14:18 | **reason** | **redirect** |
| 69:14 | 19:2 21:24 | 13:2 23:8,19 | 75:21,25 |
| **question** | 40:8 43:8,16 | 34:18 40:10 | **reduce** |
| 9:4 18:15,24 | 44:11 48:11 | | 33:24 |

Daniel Smith, Ph.D.
October 25, 2021

20

**reducing**
33:19 34:21
35:3 36:7

**reduction**
35:21 36:3

**reenforces**
47:1

**refer**
9:22 12:5,15
15:24 19:7
22:17 26:14
27:23 28:8
29:10 39:24,
25 40:1 46:3
55:25 60:4,14
70:14

**reference**
11:4,10 12:9,
11 70:14
73:15

**referenced**
12:2 30:24

**referring**
11:22 12:9
15:5 16:11
41:7 46:20
50:12 68:1

**refers**
66:20 73:16

**register**
15:14 16:9,
15,25 17:4,
10,20,22
18:9,20,23
43:3,9 47:23
48:1 58:17,20
59:19,22 60:9
62:5,10,12,
14,19

**registered**
13:16,21
19:8,18 22:23
23:4,9,25
24:8,11 48:3
50:1 58:14
59:2,6 60:12

**registering**
15:18 16:23
17:7,18 18:7,
22 57:25
58:3,23 60:2

**registers**
18:3 19:1
58:8,11 60:12
62:7

**registrant**
16:4,6,8
17:12

**registrants**
13:10,13,14,
15 14:4 59:2,
19 60:17
62:4,11

**registration**
10:5 11:24,25
12:12 14:7,8
16:2,6,18
17:13,24
18:11 20:19
21:8,13,19
22:5 27:1,4,5
40:6 41:15,19
42:8,12 43:1
44:4,8 48:5
50:5 57:23
59:7,10,15,
20,25 60:16,
21 61:7,18,24
62:16

**registrations**
10:3 11:12,15
12:14,19
13:4,9 14:13
19:2,22 47:24

**rejected**
51:20

**related**
59:5

**relative**
59:11 64:12

**reliability**
40:5

**relied**
26:4

**rely**
15:18 16:22
17:20,23 18:6
26:7

**relying**
19:23

**remember**
27:8 37:22
67:19

**remembering**
52:17

**repeat**
73:2

**rephrase**
9:1 39:5

**replied**
56:12

**report**
9:11,23 11:5,
10 15:9,11
16:1,17,21
19:4 21:9,16
27:22 38:5,6,
22 39:6,19,25

40:15,24
41:1,2 44:24
46:15,16,23
47:6 48:14,
16,23,24
49:14,17
52:9,10,19
54:22 55:9,
21,25 56:4,8
57:15,22
59:16 60:5,15
61:12,14
62:6,23 63:1,
15 64:6,7
65:7,10,15
66:1,10,14,
19,20,24
69:3,11 70:9,
15 71:10,25
72:3,11,18

**reported**
43:23

**reporter**
9:15 10:20
21:1 30:18
35:9 45:2
53:14 54:6

**reporting**
55:18

**reports**
51:2,8 53:9
67:7 68:18

**represent**
8:17 63:19

**Republican**
67:11

**request**
22:24,25
23:13,16
24:1,9,17,25

Daniel Smith, Ph.D.
October 25, 2021

21

25:11,16 26:4
47:13 57:10

**requested**
24:3 25:7,13
36:15 56:17

**requesting**
25:6,24 50:7
55:23 56:19

**requests**
26:8

**required**
43:16,18

**requirement**
17:12 18:10,
21 60:14
67:17

**requirements**
17:24

**requires**
60:16

**residence**
50:4

**respect**
12:8 41:13
47:21 48:11
53:16 62:7
64:20

**respondents**
40:6 43:7,20
44:2

**response**
33:17 35:1
47:2,10 56:6
71:23

**responses**
35:13 55:7
67:1

**restrained**
62:7

**restriction**
17:15 64:18

**restrictions**
15:16,23
16:10 17:2,5,
6 27:23
45:16,23 46:2
57:24 58:1,18
60:1,3,8

**result**
13:13 33:25
34:9,14 36:5
42:20 45:24
46:4 48:15
54:16

**results**
43:19 53:17

**resumed**
44:21 75:14,
24

**return**
51:15 61:17
63:8,25 67:17

**returned**
53:21 61:4,8

**returning**
25:1,14,17,
21,25 50:7
56:20,25
57:11 61:22,
24

**returns**
51:18 53:15

**review**
57:3 71:15

**reviewed**
46:15 56:7

**reviewing**
53:11 72:19

**revisit**
53:13

**rolls**
41:12

**Roman**
27:21 48:20

**roughly**
43:21 62:12

**rule**
23:11 37:4

**rulemaking**
63:11

**rules**
8:20

**running**
55:17

_____

**S**

_____

**Saturday**
32:22,23

**SB**
15:17,24
16:1,13,18
17:16 18:2,25
36:13 38:14
39:8 46:8,12
47:14 48:10,
12 57:22 58:6
60:7 65:2
66:3,5,18

**scale**
69:7

**scholar**
14:11 69:23
71:19 72:7

**scholarship**
68:23

**schoolteacher**

**scientist**
9:2 55:5

**scientists**
14:1

**scope**
38:4,6,21
52:10 59:16,
23 61:11

**screen**
10:14,21
31:4,21

**scroll**
11:7,8 41:5

**seating**
36:23 37:2,
11,15,24
38:12 39:2,12

**Secretary**
8:17

**section**
16:1 21:12
27:21,24
29:11 30:23,
24 32:17 56:2
57:22 59:24
60:5,15 63:1,
5

**secure**
66:21

**Security**
19:10,14,21

**Senate**
14:10 27:22,
24 28:2 29:11
30:24 32:15,
16 33:2,8,18,
25 34:9,14
36:5,9,13

61:16

Daniel Smith, Ph.D.
October 25, 2021

22

45:17,23 46:3
59:14,18,24
60:15 62:3,15
63:4 64:2,12,
14,18 65:5,13
66:12 69:5

**senior**
31:13

**sense**
25:8

**sentence**
24:20 26:3
28:2 31:2,9
36:12

**sentences**
24:22

**September**
9:12 47:2

**sequence**
23:18,20

**serve**
30:5

**services**
62:5

**serving**
41:9,13

**set**
50:3

**setting**
69:8

**setup**
12:21 13:18

**Seventy-two**
22:18

**sex**
40:8 43:8,16

**share**
26:23

**shelter**
36:23 37:3,
11,14,24
38:3,12 39:2,
12

**shifts**
23:15

**Shino**
40:2,3,15,24
41:2

**shorten**
57:19

**show**
34:24 35:7
61:17

**showing**
10:14,20
31:5,7

**shown**
12:25 68:23

**shows**
15:14

**Shutts**
49:9

**signature**
51:20

**signatures**
51:10,11

**signed**
36:15 53:21
67:18,24 68:6
74:7 75:1,5

**significant**
10:6 12:23
13:23 14:3,5,
9,20 27:2,6

**signing**
75:2

**signs**
52:11

**similar**
10:4 73:24

**single**
24:3

**singled**
23:24

**sir**
22:21 34:15
38:23

**site**
29:22 31:15
36:19

**sites**
29:21 31:25
35:18,19,21,
25

**skepticism**
53:16

**skipping**
57:17

**small**
26:5,13,14
50:23

**Smith**
8:11,16 9:22,
25 11:2,3
12:9 40:23
44:23 45:6
49:10,13
75:16,19 76:1

**Social**
19:10,14,21

**social-
constructed**
42:11

**SOE**
22:24 24:1,9

**signs**
28:17,22
29:4,24,25
30:2,10 33:16
34:16 40:11
65:23,25 66:5

**SOES**
25:19 39:15
66:16

**solemnly**
8:6

**solicit**
36:17

**sort**
51:23

**sounds**
63:22

**South**
34:3 36:1

**speak**
26:13

**speaking**
11:13,23
12:3,10,11,
13,17 13:19
34:8 49:2

**specific**
33:2 49:16
53:22 55:21

**specifically**
9:23 12:7
34:16 46:19
47:9 51:10
66:23 68:16
74:25

**specifics**
53:5

**speech**
15:17,23

Daniel Smith, Ph.D.
October 25, 2021

23

spouse
52:11

stadium
31:13

staff
29:4 68:4

stand
71:24

standard
14:14

standing
22:24 23:16
24:1,9

started
9:11

state
8:17 11:13
13:11 15:13
16:20 19:10,
14,18 22:2,5,
11,22 24:13,
15,24 26:3
33:16 36:13,
25 38:24 39:7
41:22 45:10
52:5 54:12
56:10 59:2
60:12 62:11
63:24 65:1
67:4,10

stated
54:22 56:7
70:11 71:23

statement
23:5 28:23
39:3 41:23
61:1 69:18
71:21

states

33:17 35:15
69:25

statewide
21:13 64:21

stating
34:25 53:20
55:1 56:8

statistical
12:6 13:1,20

statistically
10:6 13:23
14:3,5,9
27:2,6

statistician
9:2

statistics
15:1

status
22:23,25 24:9
41:15

statute
63:7,20

statutory
63:10 64:8

steady
70:3

steeper
70:4

STENOGRAPHER
8:4 9:18 21:2
75:12 76:2,5,
8

sticking
57:4

story
54:9

straw
45:11

stretched
37:23

stronger
25:23

Stuart
45:7

student's
61:18

study
40:1 42:7,23
43:19 50:21
53:18

subject
44:11

submitted
17:25 18:11
60:22 71:15

subsequent
53:12,17

subsequently
47:23 48:3

successfully
19:18 47:13

suffer
58:9,16

suffered
11:15 12:18

sufficient
32:5

suggest
31:17 32:17

suggesting
14:23 28:12

suggestive
14:20,25

summarize
48:22

summary
48:14 59:8,9

summer
58:22

Sunday
32:24

supervisor
16:5 29:14,
19,20 30:1
31:10 35:15
47:22 48:4
55:10 56:17

supervisor's
50:14

supervisors
23:12 27:19
36:24 37:8,
13,19 38:3
55:7,13,17
56:14 63:13
67:2,21 68:1

supplemental
46:14 48:16,
24 49:3 64:7

supporters
68:10,19
69:9,15

suppose
61:20

supposed
23:12

surprised
68:4 71:20

surveillance
66:21

survey
40:5 42:6,8,
9,24

Daniel Smith, Ph.D.
October 25, 2021

24

susceptible
50:18,25

suspect
53:11 71:11,
12

swear
8:6

sworn
8:12

system
21:14

System's
20:19

systematic
50:21

**T**

Table
26:12,24

takes
12:17

taking
38:15

talk
9:23 20:4
27:22 28:1
36:1 53:25

talked
44:6 55:21,24

talking
27:13 47:12
49:16 50:23
51:9 53:23

talks
71:14

technically
10:13

ten
18:5,6 52:14
58:15 59:1
60:11

ten-minute
44:16,18

term
14:25

terms
15:5 25:7
41:14 54:19
55:19 61:14
63:22 68:1

testified
8:12 49:17

testimony
8:6 72:13

text
35:2 47:4
48:6

thing
18:18 61:19

things
9:3 74:5

thinking
74:11

third-party
24:16,25
59:14,20
60:16,21 61:7
62:16

thought
25:20 74:16,
21

thousands
15:6 37:18

TIAA
28:10,13
30:4,10,13

31:18 32:11,
18 33:4,9

tied
10:9

time
8:25 9:7 10:4
14:15 16:5
17:14,25
18:11 44:3
53:9,18 60:18
61:1,4,9,24
75:6,16 76:3

times
13:12 14:17
16:21 17:7
26:6 45:11,16
56:7 58:25
62:9

title
57:22 59:24
72:12

today
54:22

told
18:21

top
23:22 24:20
37:17 52:16
63:10 67:12,
14 70:18,20

topic
51:1

topics
71:9 73:7
75:3

total
13:4 26:17

transcript
76:6

treading
57:19

tree
55:3,19

trend
70:6

trial
37:19

true
23:3,5,9 65:8
68:25

truth
8:8

turn
11:19 36:10
57:15 62:23
68:15 70:8
72:10

turned
70:7

turning
68:16

turnout
35:22

type
69:4

typically
17:7

**U**

um-hm
45:9

unable
33:12

unbeknownst
74:24

undercount
48:2

Daniel Smith, Ph.D.
October 25, 2021

25

underlying
22:3

understand
8:25 12:2
14:14 17:11
18:8 25:7
38:16 43:4
46:14 50:15
59:4 64:23

understanding
14:10 28:3,25
29:17,18
32:10,13
33:23 38:9,17
43:1 47:21
51:13 60:20

understood
9:5 27:20
28:7 42:11

unique
20:14

universe
50:23 58:20
72:4

untimely
60:22

untruthful
61:1

update
41:19 44:7
47:24 50:4
71:5

updated
48:3 71:7

updating
42:3

utilize
28:13

---
V
---

valid
19:9,13,20,21
20:10 41:25
47:15

validate
20:1 21:22

vandalism
67:5

variation
23:6 39:15,17
59:5

varied
10:7

varies
50:3

VBM
24:25 25:1
26:5,7 28:3,
9,14 33:20,24
34:22 35:3

verb
68:11

verifiable
22:5

verify
20:18 21:7
23:13 40:7
42:21 43:7
68:6

versus
26:8

vetted
23:16

video
55:11 66:21

view

46:17

visual
12:6

visually
11:13,23
12:3,10,11,
12,21 13:18

voluntary
43:18

Volusia
25:4 27:16
55:22 56:3,
10,11 57:3,4,
8,12

vote
15:15,18
16:15,23,25
17:4,10 18:7,
22,23 19:19
23:14 26:5
43:9 50:1,6,
11 58:1,4
60:3 68:15,16
69:10,15,16,
20,25

vote-by-mail
25:6,7,12,16,
17,22,24 26:1
47:14 50:7,13
51:19,24
52:4,8,13,19,
24 53:1,4
54:23,25
55:23 56:17,
25 57:10,11
61:22 63:8
64:1 66:20
67:5,17,18
68:6,25

voter

10:2 11:15,
23,25 12:12,
13,19 14:7,8
16:2,6,18
20:15,19
21:7,12,13,
18,19 22:5
25:12,23
27:1,4,5
38:10 40:5
41:11,19
42:8,12,22,25
43:3 44:7
50:18,19,22
51:1,2 53:19
57:9,23 59:7,
15,20,25
60:16,21
61:7,8,24
67:18 71:4

voter's
44:3 53:20

voters
10:3 13:16,
17,21 16:19,
21,22 17:8,
18,19 18:9,20
19:8,13 20:9
22:23 23:4,9,
20,21,25
24:3,8,16,24
25:15 26:4,6,
7,14,15,17
28:4 32:1,6
35:14 36:20
37:1,9,25
38:25 39:10,
17 42:13
45:12,15,18
47:9 55:22
58:24,25 59:6

Daniel Smith, Ph.D.
October 25, 2021

26

60:12 62:9,19
63:8 65:4,13
67:22 68:5,
15,24 69:20

**votes**
51:6

**voting**
28:11,16,19
29:5,9,20,22,
23 30:9,12,16
31:14,20
32:22 33:5,11
34:6 35:16,
17,18,19,25
36:19 50:2,12
52:1,3 53:16
54:7 65:24
66:4 68:8,9,
20,24 69:1
70:2

---

**W**

**wait**
39:7 45:11,16

**waiting**
36:20 37:1,
10,21 38:10,
25 39:10

**waits**
38:7 39:23

**walk**
12:5

**wanted**
36:9 54:8

**wanting**
36:20 38:24
39:10

**warming**
45:17

**water**
37:14,24 38:4

**Web**
8:2

**weekend**
28:9 32:20

**white**
10:3 11:23
12:12 13:3,6,
10,12,14,16,
17 16:19,22
17:8,19 20:10
23:3,9 24:4
26:6 27:5
33:17,23
34:16 35:14,
15 42:14
47:22 48:4
58:25 60:10
62:10,11,13

**White's**
35:13

**whites**
12:24 26:20

**window**
30:8 50:6
61:17

**witness's**
61:11

**women**
35:14 43:23

**wonderful**
76:8

**word**
45:25

**work**
51:6 65:11
69:23 71:18
73:12,25 74:8

**worked**
73:17

**write**
47:3 49:4

**writing**
39:19 51:8

**written**
12:16 15:6

**wrong**
9:3 70:11

**wrote**
27:7 47:6

---

**Y**

**years**
10:4 52:7,14
58:15

---

**Z**

**zip**
20:5

# Expert Report Submitted on Behalf of *Florida State Conference of NAACP v. Lee*, 4:21-cv-187-MW-MAF, and *Florida Rising Together v. Lee*, 4:21-cv-201-MW-MJF

Daniel A. Smith, Ph.D.*

September 1, 2021

*(signature)*

Daniel A. Smith, Ph.D.

---

*Professor and Chair of Political Science, University of Florida, and President, ElectionSmith.

1

**EXHIBIT 1**

Daniel Smith, Ph.D.
10/25/21
**EX. 1**
T. Piderit

# Contents

I Purpose of engagement   7

II Qualifications   8

III Summary of findings   10

IV Costs of voting   13

V Data used in this report   21

VI SB 90's Voter Registration Disclaimer and Delivery Restrictions on 3PVROs place burdens on eligible Florida citizens, and particularly persons of color, from registering to vote due to restrictions placed on 3PVROs   24

  VI.I Method of registration by racial and ethnic groups . . . . . . . . . . . . . . .   31

  VI.II 3PVRO Registrations by Race/Ethnicity across Counties . . . . . . . . . .   33

  VI.III Summary: SB 90 regulates the registration efforts of 3PVROs, disproportionately burdening eligible persons of color . . . . . . . . . . . . . . . . . . . .   36

VII SB 90's Vote-By-Mail Application Restrictions burden registered voters in Florida, and particularly voters of color, requiring a voter provide a valid driver's license, state ID, or Social Security number that is an exact match with the ID in the FVRS in order to request a VBM ballot.   37

  VII.I Rise of VBM ballots cast by voters of color in the 2020 General Election . .   38

  VII.II Scholarship on who possesses a valid ID . . . . . . . . . . . . . . . . . . . .   39

  VII.III SB 90's voter ID exact-match requirements to request VBM ballots burdens voters, particularly voters of color . . . . . . . . . . . . . . . . . . . . . . . .   44

VII.IV  Registered voters who lack a driver's license or Social Security number on file in the FVRS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   45

VII.V  Analysis of voter ID data provided by the Division of Elections . . . . . . . .   47

    VII.V.1  Registered voters who do not have on file a driver's license starting with a letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   48

    VII.V.2  Registered voters who have on file a Social Security number that ends in four zeros . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   50

    VII.V.3  Registered voters whose driver's license is not 13 digits long  . . . . .   51

    VII.V.4  Registered voters who do not have on file a valid driver's license, state ID, or Social Security number  . . . . . . . . . . . . . . . . . . . . .   53

    VII.V.5  Registered voters without a valid ID on file who registered *prior* to implementation of HAVA . . . . . . . . . . . . . . . . . . . . . . . . .   57

    VII.V.6  Registered voters with ID on file but not vetted under HAVA . . . . .   58

    VII.V.7  Vote history of post-HAVA registered voters with no valid ID on file .   64

VII.VI  Summary: SB 90's exact-match requirement for voter IDs on file will make it more difficult to request a Vote-By-Mail ballot, disproportionately burdening voters of color . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   67

**VIII  SB 90's restrictions on "Standing" requests for VBM ballots burden thousands of voters who want to have a VBM ballot mailed to them**   **67**

    VIII..1  SB 90 will raise the costs of voting by mail for thousands of registered voters  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   68

    VIII..2  Tracking standing VBM ballot requests . . . . . . . . . . . . . . . . .   70

VIII.I  Summary:  SB 90 will make it more difficult to request a a VBM ballot, disproportionately burdening voters of color and voters with disabilities . . .   73

**IX  SB 90's Volunteer Assistance Ban decreases the opportunities of voters,**

including persons of color and individuals with disabilities, from receiving

assistance when returning their VBM ballots      **74**

   IX.I   Scholarship on the return of VBM ballots . . . . . . . . . . . . . . . . . . . 74

  IX.II   SB 90's limits on voters receiving assistance when returning VBM ballots

affects voters of color and voters with disabilities . . . . . . . . . . . . . . . . 76

     IX.II.1   Volusia County VBM ballot assistance for voters needing assistance .   78

IX.III   Summary: SB 90 will burden voters needing assistance to return their VBM

ballots, disproportionately burdening voters of color and voters with disabilities   84

**X   SB 90's Drop Box Restrictions decrease the opportunities of voters, in-**

**cluding persons of color and individuals with disabilities, from returning**

**their VBM ballots to secure drop boxes**      **84**

   X.I   Scholarship on drop boxes . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

  X.II   24/7 VBM drop boxes with video surveillance were secure in the 2020 General

Election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

X.III   Use of VBM drop boxes on days, hours, and locations in 2020 General Election,

and the impact of SB 90 on voters of color returning VBM ballots to drop boxes   94

     X.III.1   Columbia County VBM drop box returns on days before EIP voting,

by race and ethnicity and disability status . . . . . . . . . . . . . . . 95

     X.III.2   Manatee County VBM drop box returns after business hours, by race

and ethnicity and disability status . . . . . . . . . . . . . . . . . . . . 99

     X.III.3   Indian River County VBM drop box returns before EIP voting, includ-

ing locations not permissible under SB 90 . . . . . . . . . . . . . . . 103

     X.III.4   Hernando County VBM drop box returns before EIP voting, including

at locations not permissible under SB 90 . . . . . . . . . . . . . . . 105

     X.III.5   St. Lucie County VBM drop box returns outside EIP voting . . . . . 107

X.III.6 Madison County VBM drop box returns before EIP voting . . . . . . 109

X.III.7 Putnam County VBM drop box returns before and after EIP voting

and 24/7 drop box returns . . . . . . . . . . . . . . . . . . . . . . . 112

X.III.8 Lee County VBM drop box returns before EIP voting . . . . . . . . . 114

X.III.9 Pinellas County VBM drop box returns before EIP voting and at lo-

cations that did not offer EIP voting . . . . . . . . . . . . . . . . . . 115

X.III.10 Taylor County 24/7 VBM drop box returns before EIP voting . . . . 117

X.III.11 Franklin County VBM drop box returns before EIP voting . . . . . . 119

X.III.12 St. Johns County VBM drop box returns before EIP voting . . . . . 120

X.III.13 Okechobee County VBM drop box returns before EIP voting and de-

posited after hours . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

X.III.14 Polk County VBM drop box returns before and after EIP voting . . . 123

X.IV Affidavits and interrogatory responses of SOEs regarding the impact of SB 90

on VBM drop box availability to voters . . . . . . . . . . . . . . . . . . . . 125

X.V Summary: SB 90 will burden voters' ability to return their VBM ballots by

decreasing the availability of VBM drop boxes, including burdening voters of

color . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

**XI SB 90's restrictions on assistance to voters waiting in lines at the polls bur-**

**dens all in-person voters, and particularly persons of color and individuals**

**with disabilities, who wait in line to cast a ballot** **137**

XI.I A legacy of long lines at the polls in Florida . . . . . . . . . . . . . . . . . . 138

XI.II Scholarship on who waits in lines when voting . . . . . . . . . . . . . . . . . 140

XI.III Wait times in Miami-Dade County, early voting, 2020 General Election . . . 143

XI.IV Wait times in Orange County, early voting, 2020 General Election . . . . . . 155

XI.V Wait times in other counties, early voting, 2020 General Election . . . . . . . 163

XI.V.1 Wait times in Lee County, early voting, 2020 General Election . . . . 163

XI.VI Summary: SB 90 will disproportionately affect voters of color and voters with
disabilities who are more likely to face long lines and wait times at the polls   169

**XII Conclusion**                                                                **170**

**XIII Academic material cited**                                                  **172**

**A Appendices**                                                                  **178**

A.I *Curriculum vitae* of Daniel A. Smith . . . . . . . . . . . . . . . . . . . . 178

A.II Sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

# I   Purpose of engagement

**1**     Counsel for the Plaintiffs in *Florida State Conference of NAACP v. Lee*, 4:21-cv-187-MW-MAF, and *Florida Rising Together v. Lee*, 4:21-cv-201-MW-MJF, have engaged me to form expert opinions on several issues related to Senate Bill 90 (hereafter, "SB 90"). Specifically, I have been asked to assess the following:

A. any effects of SB 90's *Voter Registration Disclaimer and Delivery Restrictions on Third Party Registration Organizations (hereafter, "3PVROs") (SB 90 Section 7)*, negatively impacting the ability of eligible citizens to register to vote in Florida, and in particular, if they have disproportionate effects on the ability of Black and Hispanic[1] individuals to register to vote;

B. any effects of of SB 90's *Vote-By-Mail ID Request Restrictions (SB 90 Section 24)* placed on registered voters when requesting a Vote-by-Mail (hereafter, "VBM") ballot, which requires an exact match to the specific form of ID on file, be it a driver's license number, Florida identification card number (hereafter, "state ID"), or the last four digits of their Social Security number—and in particular, any disproportionate effects on the ability of registered voters who are Black and Hispanic to obtain VBM ballots;

C. any effects of of SB 90's *Vote-By-Mail Request Restrictions (SB 90 Section 24)* placed on registered voters with "Standing" requests to have VBM ballots mailed to them in subsequent elections, and in particular, any disproportionate effects on the ability of Black and Hispanic registered voters and voters with disabilities to make standing VBM ballot requests;

---

[1] I use the term Hispanic throughout this report, as it is the term used by the Florida Division of Elections to recognize Latino.

D. any effects of SB 90's *Drop Box Restrictions (SB 90 Section 28)* that limit the locations, days, and hours of secure drop boxes available to cast VBM ballots in person, and in particular, any disproportionate effects on the ability of Black and Hispanic registered voters and registered voters with disabilities to cast VBM ballots in person;

E. any effects of SB 90's *Volunteer Assistance Ban (SB 90 Section 32)* limiting assistance to registered voters needing help to return their VBM ballots, and in particular, any disproportionate effects on the ability of Black and Hispanic registered voters and registered voters with disabilities from returning their VBM ballots.

F. any effects of SB 90's *Voting Line Relief Restrictions (SB 90 Section 29)* limiting assistance to voters waiting in lines during the early voting period or on Election Day, and in particular, any disproportionate effects on the ability of Black and Hispanic registered voters and registered voters with disabilities to receive assistance when waiting in lines at the polls.

# II  Qualifications

**2**    I am Professor and Chair, Department of Political Science, at the University of Florida. I received my doctorate in Political Science from the University of Wisconsin-Madison in 1994. I am also President of ElectionSmith, which specializes in empirical research on voting and election administration in the American states.

**3**    For nearly 30 years, I have conducted research on electoral politics in the American states, focusing on the effect of political institutions on political behavior. I have written extensively on election administration in the American states, including the effects of changes

8

of election laws and rules on voter participation and turnout. I have published more than 100 articles and book chapters, including many that have appeared in the discipline's top peer-reviewed journals. My research has been cited over 3,800 times according to Google Scholar. In addition, I have published two academic books on electoral politics in the American states and am the coauthor of a widely used college textbook, *State and Local Politics: Institutions and Reform*, which includes several discussions of state voting laws, election administration, and voter participation and turnout, including in Florida. I have taught an array of undergraduate and graduate courses focusing on American political institutions, voting and election administration, and political behavior in the American states, including Florida.

**4**      I have testified before the U.S. Senate and state legislatures, including Florida, on voting and election issues. A former Senior Fulbright Scholar, I have received numerous grants and awards for my work on campaigns and elections, including from the U.S. Department of State and the American Political Science Association ("APSA"). I am a past-President of the State Politics and Policy Section of the APSA. In 2010, I was the lead author of the "Direct Democracy Scholars" *amicus* brief in *Doe v. Reed*, which was successfully argued by the Attorney General of the state of Washington before the U.S. Supreme Court, and my scholarship has been cited in an opinion of the U.S. Supreme Court. I have served as an expert in election-related litigation in numerous states, including in Florida in cases heard in this court, and have worked for both plaintiffs and defendants (including serving as an expert for the State of Florida, the State of Colorado, and the State of California to defend their election laws). All of these cases relate to aspects of voting rights and election administration.

**5**      I am well-versed on this topic. I have written extensively about election procedures, including voter registration, early voting, wait times, and VBM ballots over the past decade. My methods are reliable and appropriate in the discipline of political science, and my opinions result from applying these methods to answer questions addressed in this litigation.

**6**      I am being paid at a rate of $450/hour for work in this litigation. My compensation is contingent neither on the results of the analyses described herein nor on the contents of my report. A list of my publications in the previous ten years and my testimony during the previous four years are in my curriculum vitae, attached as Appendix A.I. In addition to the scholarly articles listed in Section XIII (Academic material cited), the facts and data I considered in forming my opinions are described in Section V and listed in Appendix A.II of this report.

## III   Summary of findings

**7**      My analysis shows that all eligible citizens in Florida wishing to register to vote, as well as citizens currently registered to vote in Florida, are burdened by provisions of SB 90. Persons of color and individuals with disabilities are more likely to be disparately burdened by several provisions SB 90.

**8**      First, disclaimer and delivery restrictions placed on the activities of third party voter registration organizations, or 3PVROs, that predominantly circulate in urban and racially and ethnically diverse communities (*Voter Registration Disclaimer and Delivery Restrictions (SB 90 Section 7)*), are directed at a practice that has been disproportionately used to register minority voters in past elections, and will decrease the opportunities of thou-

sands of individuals to register to vote every year, with the burdens falling most heavily on persons of color. Persons of color in Florida are five times more likely to rely on 3PVROs when registering to vote than white individuals. Both the academic literature and my data analysis finds that the costs of voting fall most heavily on persons of color.

**9**  Second, the requirement (*Vote-By-Mail ID Request Restrictions (SB 90 Section 24)*) that a voter's ID on file with an SOE must be an exact match with the ID submitted by a voter when requesting a VBM ballot (that is, a Social Security number, a driver's licence, or a state ID number), is directed at a practice that was used to an unprecedented degree by minority voters in the 2020 General Election and will decrease the opportunities of thousands of registered voters to be able to vote a mail ballot. Both the academic literature and my data analysis reflect that the costs of requesting a VBM ballot fall most heavily on persons of color.

**10**  Third, the curtailment of standing requests to have VBM ballots mailed out automatically (*Vote-by-Mail Application Restrictions (SB 90 Section 24)*) decrease the opportunities for thousands of registered voters to request their VBM ballots, with the burdens falling most heavily on persons of color and individuals with disabilities. This provision of SB 90 is directed at a practice that minority voters turned to in record numbers in the 2020 election and will lead to a decrease in the opportunities of thousands of registered voters to be able to request and vote a mail ballot. Both the academic literature and my data analysis reflect that the costs associated with requesting a VBM ballot, which already fall most heavily on racial and ethnic minority voters and particularly voters with disabilities, will be exacerbated under this law.

**11**     Fourth, the limits placed on who can collect and deliver VBM ballots (*Volunteer Assistance Ban (SB 90 Section 32)*) decrease the opportunities for thousands of registered voters to return their VBM ballots. Both the academic literature and my data analysis reflect that SB 90 will impose costs on the ability of voters to return their VBM ballots.

**12**     Fifth, the restrictions placed on SOEs when determining the locations, dates, hours, and security of VBM drop boxes (*Drop Box Restrictions (SB 90 Section 28)*) decrease the opportunities for thousands of registered voters to return their VBM ballots and is directed at a practice that was used to an unprecedented degree by minority voters in the 2020 General Election. The limits placed on VBM drop boxes—which will curtail in whole or in part 122 VBM drop boxes deployed by SOEs in the 2020 General Election—decrease the opportunities of tens of thousands of voters across the state to return their mail ballots. Both the academic literature and my data analysis reflect that the costs of voting due to reduced opportunities for voters to return a VBM ballot to a secure drop box under SB 90 fall most heavily on racial and ethnic minority voters.

**13**     Sixth, restrictions placed on providing assistance to voters waiting in lines at the polls during early voting (*Voting Line Relief Restrictions (SB 90 Section 29)*) decrease the opportunities for thousands of registered voters to receive fundamental aid, depriving those waiting in lines of drink, food, seating, or shelter from the elements, with the burdens falling most heavily on persons of color and individuals with disabilities. Both the academic literature and my data analysis reflect that SB 90 is directed at a practice of volunteer groups providing assistance to voters that frequently occurs at predominantly Black and Hispanic polling places, particularly where lines to vote can be long.

# IV  Costs of voting

**14**      Florida's SB 90 increases burdens on several groups of individuals—most prominently, persons of color (Black and Hispanic) and individuals with disabilities.

**15**      First, because persons of color rely more heavily on 3PVROs when registering to vote than other groups of voters, SB 90's limits placed on 3PVROs will result in Black and Hispanic eligible Florida citizens having fewer opportunities to register to vote.

**16**      Second, because SB 90's new ID requirements placed on registered voters who merely want to request a VBM ballot—that is, a requirement to include personal information (Social Security number, or a driver's licence or a state ID number) that exactly matches the voter's information on file—disproportionately affect voters of color, it will lead to fewer opportunities for Black and Hispanic registered voters to receive a VBM ballot.

**17**      Third, because SB 90 cuts in half the length of time a voter may have a standing request to have a VBM ballot mailed to them, thousands of registered voters will have fewer opportunities to receive a VBM ballot.

**18**      Fourth, because of the limits SB 90 places on the locations, dates, and hours of operation of VBM ballot drop boxes, all Florida voters, but particularly voters of color, will have fewer opportunities to securely return their VBM ballots in person.

**19**      Fifth, because SB 90 places restrictions on the return of VBM ballots for voters in need of assistance, all voters, but particularly voters of color and those with disabilities will have fewer opportunities to return their VBM ballots.

**20**      Sixth, because of the restrictions SB 90 places on providing aid and comfort to voters waiting in lines during early in-person (what I refer to throughout as "EIP") voting or on Election Day, voters of color and those with disabilities will face higher barriers to cast their ballots in person, potentially causing them not to vote at all.

**21**      Scholars of voting and elections often refer to barriers such as these as "costs of voting" (Rosenstone & Wolfinger 1978; Aldrich 1993; Verba, Schlozman & Brady 1995; Brady & McNulty 2011; Leighley & Nagler 2013; Tokaji & Colker 2007; Mukherjee 2009; Li, Pomante II & Schraufnagel 2018; Schraufnagel, Pomante II & Li 2020). Derived from the guiding rational choice theoretical perspective put forth by Downs (1957), prospective voters will participate in an election if the benefit they derive from the activity exceeds the cost. As Rosenstone & Hansen (1993, p. 209) summarize, "legal restrictions on the exercise of the franchise" can create institutional barriers to political participation, which impose "significant burdens on American citizens and lower the probability they will participate in political life." In short, an increase in the cost of voting can lead to voter disenfranchisement.

**22**      In my opinion, SB 90 increases the costs of voting for citizens residing in Florida. Under SB 90, eligible citizens who 1) would register to vote with 3PVROs, 2) would request a VBM ballot, 3) would prefer to keep a standing request for a VBM ballot, 4) would return their VBM in person at a drop box location, 5) would need assistance when returning their VBM ballots, or 6) would need assistance when waiting in line at the polls, all face new

restrictions on their ability to register to vote and/or cast a ballot.

**23**      According to Schraufnagel, Pomante II & Li (2020), whose 2020 article, "Cost of Voting in the American States" provides an index of both the opportunities and restrictions on the franchise in each state (e.g., registration deadlines, restrictions on voter registrations, registration drive restrictions, preregistration laws, convenience voting, voter identification laws, and poll hours), only 10 states have worse Cost of Voting Index scores than Florida. There is little doubt that the restrictions put in place by SB 90 will move Florida further down the list of states with the greatest barriers to the franchise. These increased costs in Florida negatively impact enfranchisement and voting.

Figure 1: Schraufnagel, Pomante II & Li (2020), Costs of Voting in the American States



**FIG. 1.** Cost of Voting Index values for all 50 states in 2020. *Note:* Index values that extend beyond two decimal points are available from the authors.

*Note: Image from Schraufnagel, Pomante II & Li (2020, p. 506).*

**24**     With regard to SB 90's *Voter Registration Disclaimer and Delivery Restrictions on 3PVROs (SB 90 Section 7)*, the law increases the costs of voting—*time, transportation,* and *information*—on all eligible citizens residing in Florida who want to register to vote by restricting the activities of 3PVROs. Florida has a long history of groups working on the ground to register voters (Herron & Smith 2013). Over the years 3VPROs in the state have registered hundreds of thousands of eligible citizens in Florida. This method has been disproportionately and most heavily used to register people of color. Based on my analysis in this report, SB 90 will disproportionately impact registration of persons of color who are eligible to vote in Florida.

**25**     With regard to both SB 90's exact-match ID requirement *Vote-By-Mail ID Request Restrictions (SB 90 Section 24)* and the *Vote-by-Mail Application Restrictions (SB 90 Section 24)*, the new law increases the costs of voting—*time, transportation, information,* and *health*—on all registered voters in Florida who want to request a mail ballot, but particularly on voters of color. SB 90 places restrictions on the ability of registered voters to obtain VBM ballots. Voting by mail—a safe and secure method of voting—has become increasingly popular in Florida. Over 4.8 million Floridians cast VBM ballots in the 2020 General Election, up from 2.7 million million in the 2016 General Election.[2] Restricting who is permitted to request VBM ballots increases the cost of voting for all Floridians. Based on my analysis in this report, the burdens associated with requesting VBM ballots—particularly the exact-match ID requirement—will likely fall disproportionately on voters of color and those with a disability.

---

[2]See "Archived Early Voting and Vote-by-Mail Statistics," Florida Division of Elections, available `https://dos.myflorida.com/elections/data-statistics/elections-data/absentee-and-early-voting/` (last accessed July 7, 2021).

**26**     With regard to both the *Volunteer Assistance Ban (SB 90 Section 32)* and *Drop Box Restrictions (SB 90 Section 28)*, the law increases the costs of voting—*time*, *transportation*, *information*, and *health*—on all registered voters in Florida desiring to have their VBM ballots dropped off in person.  Restricting who is permitted to return VBM ballots and limiting the availability, locations, and hours of VBM drop boxes increases the cost of voting for all Floridians.  SB 90 increases the *time*, *transportation*, *information*, and *health* costs for voters who want to avoid using the US Postal Service to return their VBM ballots or wish to have others assist them in returning their VBM ballots.  Based on my analysis in this report, these burdens—particularly the limits on the locations, days, and times that VBM drop boxes may be accessible to voters—will fall disproportionately on voters of color and those with a disability.

**27**     With regard to *Voting Line Relief Restrictions (SB 90 Section 29)*, the law increases the costs of voting—*time*, *information*, and *health*—on all registered voters who are confronted by long lines at early voting and Election Day precincts.  As scholars have documented, Florida has an ignominious history of long lines at the polls, particularly in urban and more populous counties, which are strongly associated with the residency of racial and ethnic minority voters.  Because of the restrictions placed on requesting and returning a VBM ballot, there will be increased pressures placed on EIP voting locations.  Many voters, particularly those in urban and more populous counties, which are strongly associated with the residency of racial and ethnic minority voters in Florida, will also likely be burdened with longer wait times at the polls during the early voting period or on Election Day, or even at lines to drop off their VBM ballots.  Based on my analysis in this report, SB 90's restriction on line relief will likely fall disproportionately on voters of color and those with a disability.

18

**28**     As I document throughout this report relying on data produced by the Division of Elections and 67 SOEs, in my opinion a large fraction of the more than half-a-million Black voters and more than 700,000 Hispanic voters who cast VBM ballots in the 2020 General Election will likely be disproportionately burdened by the provisions of SB 90 that I have been asked to assess.[3]

**29**     As with the higher costs placed on individuals wanting to register to vote and who need assistance while waiting in line a the polls, SB 90 provisions targeting Florida's processes of requesting and returning VBM ballots will create additional burdens for registered voters of color. As a percentage of all votes cast by any method, voting by mail in the 2020 General Election increased at higher rates for minority voters than white voters when compared to previous elections, including the 2016 General Election. The total number of valid VBM ballots cast by Black voters in the 2020 General Election more than doubled the total cast in the 2016 General Election, from roughly 230,300 to roughly 549,300 valid VBM ballots cast. In the 2016 General Election, valid VBM ballots accounted for 20.0 percent of all ballots cast by Black voters; four years later, valid VBM ballots accounted for 39.8 percent of all ballots cast by Black voters. The total number of valid VBM ballots cast by Hispanic voters in the 2020 General Election nearly doubled the 2016 General Election number of valid VBM ballots cast, from roughly 370,000 to roughly 739,000 valid VBM ballots cast. In the 2016 General Election, valid VBM ballots accounted for 26.7 percent of all ballots cast by Hispanic voters; in the 2020 General Election, they accounted for 41.0 percent of all ballots cast by Hispanic voters, an increase of nearly 15 percentage points. Comparable

---

[3]Throughout this report, I take a voter's racial/ethnic identity to be what is coded in the Division of Elections Florida Voter Registration System (FVRS), circa January, 2021, as recorded in an individual's voter registration application. See Florida Division of Elections, "Florida Voter Registration Application," DS-DE 39, R1S-2.040, F.A.C. (effective July 2019), available at https://dos.myflorida.com/media/693757/dsde39.pdf (last accessed July 15, 2021).

counts of white voters casting valid VBM ballots in the 2020 General Election versus the 2016 General Election do not come close to doubling, and the overall increase was less than 14 percentage points in the rates of valid VBM ballots cast by white voters in 2020 compared to in 2016.

**30** In addition, a sizeable share of the nearly 140,000 voters needing assistance in Florida in 2021, according to data maintained by the Division of Elections, who vote by mail or who wait in long lines will likely be burdened by provisions of SB 90 that I have been asked to assess.[4]

**31** It is important to point out that the Florida SOEs have not called for these changes, nor have they been concerned about voter fraud. In her request to the SOEs on February 24, 2021, Representative Erin Grall, Chair of the House Public Integrity and Elections Committee, asked county election officials to provide the committee information concerning a wide range of election-related questions, including incidence of fraud. SOEs were specifically asked by Rep. Grall, "In the past 4 years, how many referrals did you make to the state attorney's office for illegal registration or voting practices? Which state attorney did you refer the matter to? Please provide any documentation related to those referrals." For the 62 SOEs for whom I have responses to Rep. Grall's request, the modal response for referrals to the state attorney's office for illegal registration or voting practices of any sort—much less associated with mail voting—was zero (0). Despite the more than two million newly registered voters statewide and more than 20 million votes cast statewide

---

[4] Throughout this report, I take a voter's indication that he or she "will need assistance with voting" to be a proxy for a voter having some type of disability. See Florida Division of Elections, "Florida Voter Registration Application," DS-DE 39, R1S-2.040, F.A.C. (effective July 2019), available at `https://dos.myflorida.com/media/693757/dsde39.pdf` (last accessed July 15, 2021).

in elections over the past four years, the SOEs from 40 counties reported to the committee that they had no cases of illegal voter registrations or voting practices.[5] In addition, the SOEs' responses to the PIE Committee offered no evidence of "ballot harvesting."[6]

**32**     In short, I conclude that SB 90 burdens eligible Florida citizens, but particularly persons of color, from registering to vote due to restrictions placed on 3PVROs; burdens registered voters in Florida, and particularly persons of color and individuals with disabilities, from requesting a VBM ballot or maintaining a standing VBM request; burdens the ability of voters, and particularly persons of color and individuals with disabilities, to return their VBM ballots to drop boxes or to receive assistance when returning their VBM ballots; and burdens groups from assisting voters, and particularly persons of color and individuals with disabilities, waiting in line at the polls to cast a ballot. In my opinion, these increased costs to voting—while negatively affecting all Floridians—will in whole or in part disproportionately affect persons of color and individuals with disabilities.

# V    Data used in this report

**33**     This report covers aspects of SB 90 related to methods of voter registration, requests for VBM ballots, returning of VBM ballots to drop boxes, and wait times for voters casting EIP ballots. In this report I analyze statewide and county data from the 2020 General Election and previous elections. The data that I rely upon for my analysis are cited in this section and well as throughout my report, and are listed in Appendix A.II. The scholarly

---

[5]The following 21 counties reported one or more referrals: Brevard, Broward, Charlotte, Clay, Collier, Escambia, Flagler, Hernando, Hillsborough, Indian River, Lake, Leon, Manatee, Marion, Okaloosa, Osceola, Pasco, Pinellas, Putnam, Sarasota, and Seminole.
[6]See SOE responses to Florida House of Representatives, Public Integrity and Elections Committee, Chair Erin Grall, February 24, 2021.

publications on which I rely in this report are cited throughout the report and listed in Section XIII (Academic material cited).

**34**    To conduct my analyses, I draw on multiple statewide "VoterDetail" and "Vote History" files (hereafter, "voter files"), statewide Legislative Report Election/Recap files (hereafter, "Recap files"), statewide VBM daily files, statewide and county EViD files, files produced by the Florida Division of Elections and SOEs during the discovery process, county-level data obtained through public records requests, and voting and election related information and data available online. In addition, I draw on publicly available U.S. Census Bureau data from the 2019 American Community Survey (ACS), 5-Year Estimates.

**35**    The Office of the Secretary of State, Division of Elections, maintains the Florida Voter Registration System (FVRS) that SOEs rely upon daily. My analysis draws on statewide files of the FVRS, monthly snapshots of the state's data that are made available to the public by the Division of Elections,[7] statewide Recap files made available by the Division of Elections after each Florida election[8], Vote-by-Mail Ballot Request Information

---

[7]I rely on the Florida Division of Elections publicly available monthly statewide voter files from January 2021.

[8]"Within 30 days after the Elections Canvassing Commission certifies the election results," SOEs "must submit voting history ["VH03"] data to the Division of Elections for each presidential preference primary election, special election, primary election, and general election." "The Division of Elections on behalf of the Department of State will compile the 67 county's files of official voting history and voter registration information on voters who were qualified and voted in the election and submit the elections recap report to the Florida Legislature after each of the above-referenced elections." See Florida Statutes, § 98.0981, Rule 1S-2.043(7), F.A.C. (effective 10/27/2010), and Rule 1S-2.053(6) – Election Results, Precinct-Level Election Results, Voting History, and Reconciliation Reporting (effective 7/1/2017). I rely on the January 2021 Recap files made available after the 2020 GE, as it includes denotes which voters indicated when they registered to vote that they would need assistance with voting. Specifically, individuals registering to vote in Florida are given the option to check a box indicating, "I will need assistance with voting." I take a voter's indication that he or she "will need assistance with voting" to be a proxy for the voter having some type of disability. See Florida Division of Elections, "Florida Voter Registration Application," DS-DE 39, R1S-2.040, F.A.C. (effec-

Files made available daily by the Division of Elections during every election,[9] and early in-person (EIP) turnout and EViD (Electronic Voter Identification) poll book data obtained both through ordinary public record requests or through the discovery process.[10] I also rely upon a variety of data files, affidavits and interrogatory responses of SOEs, and documents provided by the SOEs during the discovery process, additional statewide data and documents made available by the Division of Elections during the discovery process, the SOEs' association, the Florida Supervisors of Elections, Inc., as well as scholarly articles, books, working papers, and reports related to the topic.

---

tive July 2019), available at `https://dos.myflorida.com/media/693757/dsde39.pdf` (last accessed June 15, 2021). The previous DS-DE 39 form (effective October 2013), uses identical wording.

[9]See Rule 1S-2.043, F.A.C., and Florida Statutes § 101.62(3), which states: "For each request for a vote-by-mail ballot received, the supervisor shall record the date the request was made, the date the vote-by-mail ballot was delivered to the voter or the voter's designee or the date the vote-by-mail ballot was delivered to the post office or other carrier, the date the ballot was received by the supervisor, the absence of the voter's signature on the voter's certificate, if applicable, and such other information he or she may deem necessary. This information shall be provided in electronic format as provided by rule adopted by the division. The information shall be updated and made available no later than 8 a.m. of each day, including weekends, beginning 60 days before the primary until 15 days after the general election and shall be contemporaneously provided to the division." In particular, I rely on one VBM daily activity report uploaded by SOEs to the Division of Elections during the 2020 GE.

[10]During the early voting period, the Division of Elections posts daily EIP turnout data, at the individual-level, as part of its "Early Voting Reports," downloadable at `https://countyballotfiles.floridados.gov/VoteByMailEarlyVotingReports/PublicReports`. I rely on numerous EIP and EViD data sources.

# VI  SB 90's Voter Registration Disclaimer and Delivery Restrictions on 3PVROs place burdens on eligible Florida citizens, and particularly persons of color, from registering to vote due to restrictions placed on 3PVROs

**36**     SB 90 restricts the activities of 3PVROs to register voters in Florida. According to Section 7 of SB 90:

> A third-party voter registration organization that collects voter registration applications serves as a fiduciary to the applicant, ensuring that any voter registration application entrusted to the organization, irrespective of party affiliation, race, ethnicity, or gender, must be promptly delivered to the division or the supervisor of elections in the county in which the applicant resides within 14 days after completed by the applicant, but not after registration closes for the next ensuing election. A third-party voter registration organization must notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election and must advise the applicant that he or she may deliver the application in person or by mail. The third-party voter registration organization must also inform the applicant how to register online with the division and how to determine whether the application has been delivered. If a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections in the county in which the applicant resides, the third-party voter registration

organization is liable for the following fines:[11]

**37**     SB 90 is the latest effort by the Florida state legislature to regulate 3PVROs. In 2011, the Florida legislature placed restrictions on 3PVROs.[12] Herron & Smith (2013, p. 297) found that, in the months after HB 1355 went into effect in 2011, overall voter registrations dropped for Black, Hispanic, and white voters compared to a similar time frame four years earlier, but that the drop in Black registration was "the only statistically significant estimate," providing "evidence that HB 1355's effects varied by racial/ethnic group and were particularly pronounced for a group that in Florida is closely tied to the Democratic Party."

**38**     As my analysis, below, shows, persons of color who are eligible to register to vote in Florida are much more likely to bear the brunt of additional restrictions placed on the activities and speech of 3PROs under SB 90, as persons of color disproportionately rely on 3PVROs when registering to vote in Florida.

---

[11] See "Enrolled CS for CS for CS for SB 90," 2nd Engrossed, Section 7. Available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 10, 2020).

[12] See the summary of HB 1355 in Herron & Smith (2013, p. 282): "Upon becoming law in Florida, HB 1355 placed several new restrictions on what are commonly known as "Third-Party Voter Registration Organizations," or 3PVROs. A 3PVRO is "any person, entity, or organization that solicits (for collection) or collects any voter registration application," although this definition allows for some exceptions like official state agencies that play a role in the voter registration process. Specifically, HB 1355 states that registration agents of 3PVROs must preregister, sign an oath warning of prison time and fines, and submit background information to the Florida Division of Elections. Prior to HB 1355, preregistration of 3PVROs was not enforced and no such oath was required by Florida law. Moreover, HB 1355 specifies that all 3PVROs in Florida are required to communicate to the Florida State Division of Elections within ten days any changes concerning their registration agents, file monthly reports with the Division accounting for all registration forms provided to and received from their registration agents, and ensure that they assign identification numbers to all voter registration forms in possession of their registration agents. Finally, once a registration agent of a 3PVRO receives a completed voter registration application, under HB 1355, he or she has 48 hours to deliver it to the Florida Division of Elections or the appropriate county Supervisor of Elections; these Supervisors, one per county for each of Florida's 67 counties, are elected, constitutional officers of the state of Florida."

**39**    The Division of Elections FVRS database contains information on how each individual in Florida registered to vote or updated his or her voter registration. This information is not made available to the public. On August 26, 2021, I received from counsel a data file ("PRR_NAACP_VoterDetail.txt") produced in discovery from the Division of Elections that includes a column maintained in the FVRS that contains the source of each registered voter's method of registration.

**40**    As shown in Table 1, 5 percent of the 15,160,576 voters registered in Florida, some 763,240 individuals, registered to vote with a 3PVRO.[13] This total is an undercount of voters who *initially* registered with 3PVROs. The FVRS data provided in discovery by the Division of Elections appears to be the *most recent* method of of an individual's registration, meaning that voters who registered with a 3PVRO who subsequently updated their registration online or at the DMV, say, would not be reflected in the 763,240 figure.

---

[13]I found no documentation from the Division of Elections as to what date the FVRS data was generated by the Division of Elections, but judging by the total number of registrants, it appears to be from mid-2021. There are roughly 2.6 million individuals, or 17.2 percent of the more than 15 million registrants in the state, that do not have a source of registration listed in the FVRS file provided by the Division of Elections.

Table 1: Statewide Sources of Voter Registration
(Raw Counts and Percentage of Each Group)

| Source of Registration | Count |
|---|---|
| Disability Agencies and CILs | 20,325 |
| Armed Forces Recruitment Offices | 1,844 |
| DMV | 5,855,333 |
| Libraries | 87,041 |
| Mail | 2,015,312 |
| Not Listed | 2,604,341 |
| Online Voter Registration | 1,556,352 |
| Other Means | 2,190,018 |
| Public Assistance Agencies | 66,770 |
| Third Party Registration Organization | 763,240 |
| | Percent |
| Disability Agencies and CILs | 0.13 |
| Armed Forces Recruitment Offices | 0.01 |
| DMV | 38.62 |
| Libraries | 0.57 |
| Mail | 13.29 |
| Not Listed | 17.18 |
| Online Voter Registration | 10.27 |
| Other Means | 14.45 |
| Public Assistance Agencies | 0.44 |
| Third Party Registration Organization | 5.03 |

*Note: Data from Florida Division of Elections, LWV RPF, "PRR_NAACP_2021.zip", "PRR_NAACP_VoterDetail.txt" (820,507KB) (last accessed August 23, 2021). For space considerations, "Agencies serving persons with disabilities and Centers for Independent Living" is labeled "Disability Agencies and CILs".*

**41**     Indeed, the undercount of individuals who have registered with 3PVROs is easily confirmed by comparing the individual-level data in the FVRS with aggregate totals for each method of registration that the Division of Election regularly posts online.[14]  For example, from January 2018 through December 2020, according to the data posted on website of the Division of Elections, 219,533 individuals registered with 3PVROs in Florida, accounting for 8.0 percent of all registered voters. The FVRS data provided by the Division of Elections in discovery indicates that there are 197,850 individuals who are flagged as having a 3PVRO as the source of their voter registration, some 21,683 fewer (or roughly 10 percent) than the aggregate statistics reported on Division of Elections website.  It is not surprising to me that the percentage of new registrants in Florida from 2018-2020, according to the Division of Elections aggregate totals, is 3 percentage points higher than the percentage of registrants in the FVRS data provided by the Division of Elections in discovery.  It is quite likely that some individuals who initially registered with 3PVROs, say in 2018, are no longer registered in Florida as of mid-2021, and as such, would not be found in the FVRS data from mid-2021. Some individuals who initially registered with 3PVROs likely updated their registration by another method, and as such, would not be found in the FVRS data from mid-2021.  And millions of Florida registrants who registered to vote prior to 2005, before the state started to record 3PVROs as a distinct method of registering to vote in the state, would not be listed as registering with a 3PVRO in the FVRS data from mid-2021, even if they actually did initially register with, say, a nonprofit group or a political party.[15]  In short, 3PVROs continue to play a vital role in registering voters in the state, even with the likely under-reporting of

---

[14]See Florida Division of Elections, "Archived Monthly Reports," available at `https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reportsxlsx/` (last accessed August 22, 2021).

[15]See 2021 Florida Statutes, Title IX "ELECTORS AND ELECTIONS," Chapter 97 "QUALIFICATION AND REGISTRATION OF ELECTORS," 97.0575"Third-party voter registrations," available `http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0000-0099/0097/Sections/0097.0575.html` (last accessed August 28, 2021).

initial source of registration in the Division of Election FVRS statewide data.

**42**     Despite the undercount of 3PVROs, Table 1 reveals clearly that hundreds of thousands of individuals currently registered in Florida relied on 3PVROs when registering to vote.  Indeed, more than 750,000 eligible citizens currently registered in Florida did so with 3PVROs—more than the *total* number of registered voters in seven states (WY, VT, SD, ND, AK, MT, and DE). In Florida, 3PVROs are essential players in the registration of voters in Florida.

**43**     Why do 3PVROs play such an essential role in registering voters in Florida? Even during the COVID-19 pandemic, which has curtailed many 3PVROs' registration efforts on the ground, 3PVROs continued to register voters.  As the October book closing date for the 2020 General Election neared, for example, 3PVRO registrations picked up, topping 6,000 new registrations in September and 7,000 in October 2020.  Despite health concerns and social distancing guidelines in place during the pandemic, tens of thousands of Floridians relied on 3PVROs when registering to vote ahead of the state's 29 day registration deadline before Election Day.  To be clear, the drop in the overall number of 3PVRO voter registrations in 2020 (and the first four months of 2021) should not be mistaken as evidence that individuals are no longer interested in registering to vote with groups on the ground conducting registration drives.[16]  Quite the contrary: eligible citizens wanting to register to vote in 2020 continue to rely on 3PVROs to register to vote. Many do not have alternatives: they may not possess a valid driver's licence, so they are unable to register online; others

---

[16]In the Spring of 2020, due to the COVID-19 pandemic, many 3PVROs ceased ground operations to register new voters. See "Voter Registration In Florida Plunged Amid the Coronavirus Pandemic," PBS Frontline, June 11, 2020, available `https://www.pbs.org/wgbh/frontline/article/coronavirus-voter-registration-florida/` (last accessed July 31, 2021).

may not have ready access to the Internet, so cannot register online;[17] others may have no need for nor be able to afford a driver's license.[18] Nonprofits, advocacy groups on the ideological right and left of the political spectrum, high schools, colleges and universities, political parties—organizations of all stripes and colors—who are registered with the state as 3PVROs, provide a convenient—and free—alternative for thousands of individuals in Florida who are eligible, but not yet registered, to vote.

**44** Furthermore, other methods to register to vote are not always reliable in Florida. In particular, the Division of Elections online voter registration system has a history of malfunctioning, particularly as the registration deadline before general elections approaches. Indeed, ever since since the Division of Elections online voter registration system finally went live on October 1, 2017,[19] the state's online registration system has been plagued with problems. The state's online voter registration system has crashed at least five times since 2017. Most recently, the online voter registration portal crashed on the final day before the state's book closing in October 2020.[20]

---

[17]According to data from the 2019 American Community Survey, 13.1 percent of Black households and 10.3 percent of Hispanic households in Florida do not subscribe to broadband internet, and 9.1 percent of Black households and 6.1 percent of Hispanic households do not have a computer. See US Census Bureau, 2019: ACS 5-Year Estimates Detailed Tables, "TYPES OF COMPUTERS AND INTERNET SUBSCRIPTIONS," Table S2801, available `https://data.census.gov/cedsci/table?q=B08201&g=0400000US12&tid=ACSDT5Y2019.B08201` (last accessed August 27, 2019).

[18]According to data from the 2019 American Community Survey, nearly half-a-million of Florida households, or 6.3 percent, have no vehicles available. See US Census Bureau, 2019: ACS 5-Year Estimates Detailed Tables, "HOUSEHOLD SIZE BY VEHICLES AVAILABLE" Table B08201, available `https://data.census.gov/cedsci/table?q=B08201&g=0400000US12&tid=ACSDT5Y2019.B08201` (last accessed August 27, 2020).

[19]See "Florida Department of State Announces Upcoming Launch of New Online Voter Registration Website – RegisterToVoteFlorida.gov – on Sunday, October 1," Florida Department of State, `https://dos.myflorida.com/communications/press-releases/2017/florida-department-of-state-announces-upcoming-launch-of-new-online-voter-registration-website-registertovotefloridagov-on-sunday-october-1/` (last accessed July 5, 2021).

[20]See "On day of deadline, Florida voter registration site crashes, is down for hours," *Tallahassee Democrat*, October 5, 2020, available `https://www.tallahassee.com/story/`

## VI.I   Method of registration by racial and ethnic groups

**45**     The individual-level data provided by the Division of Elections details the type of registration for the more than 15 million registered voters in the FVRS at the time the snapshot was generated by the Division of Elections.[21]   Since registered voters regularly update their voter registrations using different methods (online and at the DMV, primarily) after they initially registered through 3PVROs, the counts and percentages of individuals, broken down by their race and ethnicity, likely underestimates those who initially registered with 3PVROs.  The only way to verify this supposition, though, is if the Division of Elections supplied additional snapshots from earlier iterations of the FVRS database, which could then be used to determine if voters who updated their registration relied on different methods. At this time, I have not received earlier snapshots of the FVRS with the field, "Registration Source."

**46**     According to Table 2, of the 15,160,576 voters registered in Florida at the time the Division of Elections took a snapshot of the FVRS, 10.9 percent of the nearly 2.05 million Black registered voters—a total of 222,381 Black registered voters—relied on 3PVROs when they joined Florida's voter rolls.  Among the state's nearly 2.65 million Hispanic registered voters, 9.6 percent (253,370) relied on a 3PVRO when registering to vote in Florida.  Not only are the rates of Black and Hispanic individuals who registered with 3PVROs more than 5 times the rate of white individuals who relied on 3PVROs, the *total counts* of Black and Hispanic individuals who registered with 3PVROs are each larger than the total number

---

news/local/state/2020/10/05/florida-election-register-to-vote-registration-web-site-crash-crashed-deadline-secretary-of-state/3631938001/   (last   accessed July 5, 2021).

[21]The Division of Elections FVRS data file, "PRR_NAACP_VoterDetail", includes no source of voter registration for 2,604,341 individuals registered to vote in Florida.

of white registrants who registered with 3PVROs. When it comes to registering persons of color in Florida, 3PVROs play an out-sized role in getting eligible citizens on the rolls.

Table 2: Statewide Sources of Voter Registration, by Race and Ethnicity
(Raw Counts and Percentage of Each Group)

| Count | Black | Hispanic | Other | White |
|---|---|---|---|---|
| Disability Agencies and CILs | 1,807 | 834 | 1,091 | 16,593 |
| Armed Forces Recruitment Offices | 224 | 225 | 420 | 975 |
| DMV | 647,062 | 845,689 | 242,468 | 4,120,114 |
| Libraries | 12,684 | 14,622 | 9,643 | 50,092 |
| Mail | 241,693 | 396,418 | 187,241 | 1,189,960 |
| Not Listed | 382,399 | 379,777 | 169,894 | 1,672,271 |
| Online Voter Registration | 161,910 | 371,756 | 226,300 | 796,386 |
| Other Means | 360,874 | 368,711 | 226,078 | 1,234,355 |
| Public Assistance Agencies | 17,570 | 15,719 | 6,088 | 27,393 |
| Third Party Registration Organization | 222,381 | 253,370 | 113,873 | 173,616 |
| Percent | Black | Hispanic | Other | White |
| Disability Agencies and CILs | 0.09 | 0.03 | 0.09 | 0.18 |
| Armed Forces Recruitment Offices | 0.01 | 0.01 | 0.04 | 0.01 |
| DMV | 31.59 | 31.95 | 20.49 | 44.39 |
| Libraries | 0.62 | 0.55 | 0.82 | 0.54 |
| Mail | 11.80 | 14.98 | 15.83 | 12.82 |
| Not Listed | 18.67 | 14.35 | 14.36 | 18.02 |
| Online Voter Registration | 7.90 | 14.04 | 19.13 | 8.58 |
| Other Means | 17.62 | 13.93 | 19.11 | 13.30 |
| Public Assistance Agencies | 0.86 | 0.59 | 0.51 | 0.30 |
| Third Party Registration Organization | 10.86 | 9.57 | 9.63 | 1.87 |

*Note: Data from Florida Division of Elections, LWV RPF, "PRR_NAACP_2021.zip", "PRR_NAACP_VoterDetail.txt" (820,507KB) (last accessed August 23, 2021). For space considerations, "Agencies serving persons with disabilities and Centers for Independent Living" is labeled "Disability Agencies and CILs".*

**47** Registering to vote with a 3PVRO is one of nine permissible methods to register in Florida. Black and Hispanic registered voters, according to the data provided by the Division of Elections, are roughly 30 percent less likely to register to vote at the DMV than white voters. Black registrants are also less likely than white voters to register through the

state's online registration system. In addition, both Black and Hispanic registrants are more likely than white registrants to have registered by "Other Means."[22] Overall, roughly one in 10 Black and Hispanic individuals currently registered in Florida did so with the assistance of a 3PVRO; in contrast, fewer than one in 50 white individuals currently registered in Florida did so with the assistance of a 3PVRO. It is clear that SB 90's voter registration disclaimer requirement and delivery restrictions placed on 3PVROs will directly impact the opportunities of thousands of eligible citizens in Florida wanting to register to vote, and that it will disproportionately affect persons of color.

## VI.II 3PVRO Registrations by Race/Ethnicity across Counties

**48** Finally, it is important to note that 3PVROs in Florida are much more active in certain counties. As such, their importance with regard to registering voters is heightened in these jurisdictions. Of the 763,240 individuals in Florida who relied on a 3PVRO when registering to vote, it is clear that 3PVROs have concentrated their efforts registering voters in counties with large populations of eligible citizens, which also are more likely to have larger concentrations of persons of color. Indeed, just 16 counties account for 88.0 percent (672,024) of the 763,240 individuals statewide who are recorded by the Division of Elections as having registered with a 3PVRO. For these 16 counties, Table 3 provides the overall count of voters who registered with a 3PVRO along with the percent of 3PVRO registrants out of all registered voters in the county.

**49** For each of these 16 counties, Table 4 provides (top of the table) the percentage of registered voters, broken down by their race and ethnicity, who were registered by a 3PVRO

---

[22]The documentation provided by the Division of Elections as part of discovery does not provide a definition of "Other Means."

Table 3: Count of 3PVRO Registrations and Percent of 3PVRO Registrations out of all Registrations, by County

| County | Count | % Registered by 3PVROs |
|--------|-------|------------------------|
| Miami-Dade | 166,080 | 10.4 |
| Orange | 81,969 | 8.9 |
| Broward | 75,839 | 5.8 |
| Hillsborough | 59,379 | 6.0 |
| Duval | 45,812 | 6.6 |
| Palm Beach | 40,504 | 3.9 |
| Osceola | 38,900 | 14.7 |
| Volusia | 27,034 | 6.3 |
| Pinellas | 26,427 | 3.6 |
| Seminole | 24,908 | 7.2 |
| Polk | 22,025 | 4.5 |
| Leon | 21,773 | 9.6 |
| Pasco | 14,825 | 3.6 |
| Brevard | 14,497 | 3.0 |
| Alachua | 13,717 | 6.9 |
| Escambia | 10,681 | 4.4 |

*Note: Data calculated from Division of Elections production, "PRR_NAACP_VoterDetail."*

in each county, and (bottom of the table) the percent of all registered voters in each county, broken down by their race and ethnicity. A quick perusal of the table reveals that in every one but one (Osceola) of these 16 counties, the percentage registered voters in a county who relied on a 3PVRO to register them and who are Black is *higher* than the overall percentage of registered voters in the county who are Black individuals. In some of these counties, the percentage of registered voters who were assisted by 3PVROs to register and who are Black individuals outpace the overall registration rate of Black voters in a county by two or three times. In Broward County, for example, nearly 45 percent of those registered by 3PVROs are Black, yet fewer than 25 percent of registered voters in the county, overall, are Black registrants. In Escambia County, nearly two-thirds of all 3PVRO registrants are Black individuals, whereas fewer than one-in-five registered voters in the county are Black registrants. Similar patterns exist for 3PVRO registrants who are Hispanic, where they outpace the percentage compared to the overall registration rate, with few exceptions. In not a single county does the rate of 3PVRO registrants who are white come even close to matching the overall registration rate of white registrants in the county.

**Table 4:** Racial/Ethnic Percent of 3PVRO Registrants (top) and Overall Registrants (bottom), by County

| 3PVROs | ALA | BRE | BRO | DAD | DUV | ESC | HIL | LEO | ORA | OSC | PAL | PAS | PIN | POL | SEM | VOL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Black | 32.76 | 19.12 | 44.85 | 23.87 | 59.37 | 64.19 | 34.62 | 55.35 | 25.01 | 6.30 | 26.93 | 7.64 | 27.21 | 19.93 | 19.31 | 21.41 |
| Hispanic | 9.86 | 9.48 | 21.69 | 57.57 | 4.68 | 1.68 | 27.37 | 6.56 | 47.61 | 81.79 | 22.76 | 14.08 | 7.67 | 44.48 | 28.14 | 24.65 |
| Other | 21.76 | 14.22 | 16.95 | 13.74 | 16.36 | 15.91 | 14.53 | 13.05 | 12.62 | 5.95 | 25.55 | 13.12 | 16.88 | 12.25 | 19.41 | 12.74 |
| White | 35.61 | 57.17 | 16.52 | 4.82 | 19.60 | 18.23 | 23.48 | 25.04 | 14.76 | 5.97 | 24.77 | 65.16 | 48.23 | 23.35 | 33.13 | 41.20 |
| **Overall** | **ALA** | **BRE** | **BRO** | **DAD** | **DUV** | **ESC** | **HIL** | **LEO** | **ORA** | **OSC** | **PAL** | **PAS** | **PIN** | **POL** | **SEM** | **VOL** |
| Black | 16.89 | 8.65 | 24.67 | 16.33 | 28.32 | 19.56 | 16.18 | 28.78 | 17.58 | 9.17 | 14.28 | 5.62 | 8.63 | 12.95 | 10.55 | 9.00 |
| Hispanic | 7.78 | 6.72 | 22.81 | 58.41 | 5.85 | 2.58 | 18.58 | 4.54 | 25.59 | 48.94 | 12.86 | 11.11 | 5.66 | 18.50 | 15.94 | 9.99 |
| Other | 10.40 | 6.28 | 10.87 | 8.04 | 9.22 | 7.70 | 9.60 | 7.84 | 12.25 | 8.34 | 9.04 | 6.87 | 7.45 | 6.72 | 11.02 | 5.95 |
| White | 64.93 | 78.34 | 41.65 | 17.22 | 56.61 | 70.16 | 55.65 | 58.84 | 44.59 | 33.54 | 63.82 | 76.39 | 78.26 | 61.82 | 62.49 | 75.06 |

*Note: Data calculated from Division of Elections production, "PRR_NAACP_VoterDetail."*

## VI.III   Summary:   SB 90 regulates the registration efforts of 3PVROs, disproportionately burdening eligible persons of color

**50**     It is clear from the foregoing analyses that Black and Hispanic eligible citizens are roughly 5 times more reliant on 3PVROs than white eligible citizens when registering to vote in Florida.  Over 222,381 Black registered voters and over 253,000 Hispanic registered voters relied on a 3PVRO when they joined Florida's voter rolls.  My analysis of over 15 million individual-level records in the FVRS database, as provided by the Florida Division of Elections, shows that all eligible citizens in Florida, but most notably Black and Hispanic eligible citizens, rely on 3PVROs to register to vote.  My findings that persons of color are five times more likely to rely on 3PVROs when registering to vote than white individuals comport with more general studies of voter registration methods (Merivaki 2021, 2019; Merivaki & Smith 2019; Leighley & Nagler 2013) that find that racial and ethnic minorities are more likely to utilize third-party organizations when registering.  There is no question that 3PVROs play an out-sized role in registering eligible people of color to vote in Florida, and in my opinion, SB 90's restrictions on their activities will lead to a decline in opportunities for Black and Hispanic individuals to register to vote, particularly in the state's most urban and racially and ethnically diverse counties.

# VII SB 90's Vote-By-Mail Application Restrictions burden registered voters in Florida, and particularly voters of color, requiring a voter provide a valid driver's license, state ID, or Social Security number that is an exact match with the ID in the FVRS in order to request a VBM ballot.

**51**     SB 90 restricts VBM ballot requests. According to Section 24 of SB 90:

> The supervisor may accept a written, an in-person, or a telephonic request for a vote-by-mail ballot to be mailed to an elector's address on file in the Florida Voter Registration System from the elector, or, if directly instructed by the elector, a member of the elector's immediate family, or the elector's legal guardian. If an in-person or a telephonic request is made, the elector must provide the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records. If the ballot is requested to be mailed to an address other than the elector's address on file in the Florida Voter Registration System, the request must be made in writing. A written request must be signed by the elector and include the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number.[23]

---

[23]See "Enrolled CS for CS for CS for SB 90," 2nd Engrossed, Section 24. Available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 10, 2020).

## VII.I  Rise of VBM ballots cast by voters of color in the 2020 General Election

**52**     Before examining the burdens SB 90 places on voters, particularly voters of color, to request and (as I turn to in the following section) return VBM ballots, it is important to first provide some context about the dramatic increase in the use of VBM ballots in Florida. Simply put, in Florida's 2020 General Election there was an explosion in the use of VBM ballots, particularly among Black and Hispanic voters. There are various ways to assess the dramatic rise in the demand in the use of VBM ballots (Cottrell, Herron & Smith 2020).

**53**     Table 5, which draws on the individual-level voting records of the more than 15 million registrants in the state as of January 2021, offers the raw counts and the percentages within each racial/ethnic group for the method of votes cast in the 2020 and 2016 general elections among those voters who remained registered in the state in January 2021.

**54**     The jump in the use of VBM ballots among voters—particularly Black and Hispanic voters—is striking. Among voters who were registered and who could participate in both the 2016 and 2020 general elections, and who remained registered in January 2021, the use of VBM ballots more than doubled. Among this set of Black voters, there was a net increase of more than 329,000 Black voters who cast valid VBM ballots, from 220,308 to 549,379 mail ballots. That is, among Black voters who remained registered in January 2021, fewer than one-in-five cast a mail ballot in the 2016 election; in the 2020 General Election, nearly 40 percent of Black voters who remained registered in January 2021 cast mail ballots. The raw numbers and percent of VBM ballots cast across the two elections among Hispanic voters registered in January 2021 are similarly striking. The number of VBM ballots cast by this set of Hispanic voters who were registered in January 2021 also more than doubled

from 2016 to 2020, from 352,120 valid VBM ballots cast to 738,948 valid VBM ballots cast four years later.

Table 5: Method of Ballot Cast in 2020 and 2016 General Elections for Voters Registered as of January 2021, by Race/Ethnicity (Raw Counts and Percentage of Each Group)

| Count | Black | Hispanic | Other | White |
|---|---|---|---|---|
| 2020 General Election | | | | |
| A | 549,379 | 738,948 | 380,036 | 3,177,597 |
| B | 2,029 | 3,064 | 1,733 | 7,195 |
| E | 620,512 | 759,605 | 300,294 | 265,0850 |
| P | 907 | 1,381 | 1,188 | 3,320 |
| Y | 208,501 | 299,337 | 130,757 | 1,303,806 |
| 2016 General Election | | | | |
| A | 220,308 | 352,120 | 130,798 | 1,715,270 |
| B | 3,522 | 5,405 | 2,009 | 10,143 |
| E | 606,668 | 620,106 | 216,638 | 2,242,326 |
| P | 630 | 947 | 515 | 1,936 |
| Y | 319,445 | 390,297 | 157,303 | 1,930,890 |
| Percent | Black | Hispanic | Other | White |
| 2020 General Election | | | | |
| A | 39.77 | 41.00 | 46.69 | 44.49 |
| B | 0.15 | 0.17 | 0.21 | 0.10 |
| E | 44.92 | 42.15 | 36.89 | 37.11 |
| P | 0.07 | 0.08 | 0.15 | 0.05 |
| Y | 15.09 | 16.61 | 16.06 | 18.25 |
| 2016 General Election | | | | |
| A | 19.15 | 25.72 | 25.79 | 29.07 |
| B | 0.31 | 0.39 | 0.40 | 0.17 |
| E | 52.73 | 45.30 | 42.71 | 38.00 |
| P | 0.05 | 0.07 | 0.10 | 0.03 |
| Y | 27.76 | 28.51 | 31.01 | 32.72 |

*Note: Data calculated from the January 2021 statewide voter file and vote history file. The following codes indicate: A, Voted by Mail; B, Vote-by-Mail Ballot Not Counted; E, Voted Early; P, Provisional Ballot Not Counted; Y, Voted at Polls*

## VII.II   Scholarship on who possesses a valid ID

**55**     Given what scholars have shown about who possesses and has access to a valid photo ID in other states, in my opinion SB 90 will likely have a disparate impact on registered voters of color who want to vote by mail. Scholars have documented that not all individuals—

and particularly persons of color—possess IDs that under SB 90 are necessary to request (or have someone else request) a VBM ballot be mailed to them. Leveraging voter file data to survey over registered voters across four states (Wisconsin, Indiana, Pennsylvania, and Texas), as well as drawing on two nationally representative surveys, Barreto et al. (2019, p. 242) find that white registered voters "were statistically more likely to possess a valid form of ID than other racial groups," given the laws in each state at the time a state's ID laws were in place.

**56**     Similarly, in their study of voter ID possession in Georgia, Hood & Bullock (2012, p. 399) report that the Georgia Department of Motor Vehicles (DMV) in 2007 "cross-referenced its database with the voter registration database maintained by the Secretary of State" and found that "289,622 Georgia registrants had neither a valid driver's license nor state ID card." In another study conducted by Professor Hood in litigation in South Carolina, he reported that roughly 4 percent of non-Hispanic whites, 6 percent of Black, and 7 percent of Hispanic registered voters on the state's active voter list lacked an acceptable ID to vote(Stewart III 2013, p. 25). And in a nationwide study surveying 10,200 registered voters in 2012, Stewart III (2013) finds that 9 percent of respondents did not possess a driver's license, and that only 30 percent of those without a driver's license (or a passport) had an ID card issued by a state agency. Stewart III (2013, p. 41) reports that while 93 percent of surveyed registered voters reported possessing a driver's license, only 90 percent of Hispanics reported possessing a driver's license and only 79 percent of Black respondents reported possessing a driver's license.

**57**     Not only does SB 90 burden registered voters who do not possess, or do not have access to, a valid driver's license, state ID, or their Social Security number, to say nothing

of not having an ID on file with their SOE, many registered voters may also not recall what form of ID (if any) they used to register to vote. Furthermore, many voters may think they have a valid ID on record, but in fact do not.

**58**     Leveraging the publicly available Florida voter file, for example, scholars have documented considerable discrepancies with public records maintained in Florida's statewide voter registration system, which could lead to a mismatch with the identification provided by registered voters (or those requesting a VBM ballot on behalf of a registered voter) and the information on file, when a voter requests a VBM ballot. Valid information provided by a legally registered voter may not match the data on file with the SOE. In a 2020 study, Shino et al. (2020) conducted a phone survey to investigate the reliability of Florida's voter registration files. Of the 402 respondents, nearly 18 percent "failed to verify at least one of their name, address, birth date, sex, or race" (Shino et al. 2020, p. 678). These errors are likely due to coverage error, measurement error, or processing error. There is no reason why these discrepancies might not also extend to the form of identification on file with an SOE that may or may not be correct or current.

**59**     Finally, it is apparent that registered voters who desire to request a VBM ballot under SB 90 may be deterred from doing so because of the way some SOEs are interpreting the language of the legislation. Under SB 90, when requesting a VBM ballot, "the elector must provide the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records." A voter may, for example, provide the last four digits of her valid Social Security number when requesting a VBM ballot, only to have the SOE not be able to verify this information because the voter initially registered with her driver's

41

license number.  As a result, some SOEs are *requiring* that voters provide both a driver's license/state ID *and* the last four digits of their Social Security number.  As Figure 2 shows, as of August 6, the Palm Beach SOE was requiring registered voters to provide *both* a "FL Driver License or ID Number" *and* the "Last 4 digits of SSN" in order to request a VBM ballot, stating at the bottom of the form (noted in fine print preceded with two red asterisks) that, "This information is required by law for verification purposes as of May 6, 2021." At a minimum, this interpretation of SB 90 by the Palm Beach SOE has likely dissuaded some registered voters from requesting a VBM ballot to vote in future elections.

Figure 2: Palm Beach County Vote-by-Mail Ballot Request Form



*Note: Downloaded from the Palm Beach Supervisor of Elections website, available* `https://www.pbcelections.org/Voters/Vote-By-Mail` *(last accessed August 6, 2021).*

**60**     In my opinion, it is likely that SB 90 will lead some registered voters to demur when asked to provide their driver's license/state ID or their Social Security number when applying for a VBM ballot, or apparently both, as in the case in Palm Beach County. To be sure, not all legally registered voters in Florida possess both a valid driver's license/state ID or a Social Security number, considering that *neither* form of ID is required when they register to vote in Florida.[24]  For the likely millions of legally registered voters in Florida who do not have a valid driver's license/state ID or Social Security number on file with the Division of Elections, it will be impossible for them to obtain a VBM ballot under SB 90. And, such exact-match verification will likely be a bureaucratic nightmare, as according to the Division of Elections, the Secretary of State does not have direct access to verifying either state driver's licenses, state IDs, or Social Security numbers, but rather is "dependent on DHSMV"[25] to validate new voter registration applications.

**61**     It is also apparent that under SB 90, in my opinion, that even individuals who *do* have a valid ID on file with the Division of Elections may very well be denied a VBM ballot request. Imagine the following scenario. A registered voter requests a VBM ballot, accurately providing her current, valid driver's license number. But she registered five years ago with the last four digits of her Social Security number, which is permissible. Her driver's

---

[24]See "Florida Voter Registration Application, Part 1 – Instructions (DS-DE 39, R1S-2.040, F.A.C.)(eff. 10/2013)," which states: "Identification (ID) Requirements: New applicants must provide a current and valid Florida driver's license number (FL DL) or Florida identification card number (FL ID). If you do not have a FL DL or FL ID, then you must provide the last four digits of your Social Security number (SSN). **If you do not have any of these numbers, check 'None.'** If you leave the field and box blank, your new registration may be denied. See section 97.053(6), Fla.Stat." Application downloaded from the Palm Beach Supervisor of Elections website, available `https://www.pbcelections.org/Portals/PalmBeach/Documents/ApplicationForms/dsde39-english-spanish.pdf` (last accessed August 6, 2021), **bold** added for emphasis.

[25]See Maria I. Matthews' email to Pierce W. Schuessler and Jennifer L. Kennedy, April 16, 2021, "RE: question about social security number validation," in response to NAACP, et al.'s RFP.

license number—current and valid—will not be on file with the SOE; as such, her valid Florda driver's license, which she can use to vote in person (early or on Election Day) is somehow insufficient to merely request a VBM ballot due to SB 90's exact-mactch requirement. Under the law, her VBM *application* would have to be rejected by the SOE, even though she has a valid, current, acceptable ID on file (the last four digits of her Social Security number). As such, the following analyses that I offer on the impact of Florida's exact-match requirement are conservative, as potentially millions of registered voters in Florida with a valid ID to vote will fail to exactly match the equally valid data on record for those voters in the FVRS. As such, in my opinion, SB 90 burdens not only individuals without any identification number on file with the Division of Elections, but those who do have an ID on file, but who provide other valid and acceptable IDs that are not an exact match, causing their VBM application to be rejected by SOEs.

## VII.III   SB 90's voter ID exact-match requirements to request VBM ballots burdens voters, particularly voters of color

**62**     SB 90 requires all registered voters, as well as those making a request for a registered voter, to provide a valid Florida driver's license number, a valid Florida identification number (state ID), or the last four digits of their (and the requestor's) Social Security number when requesting a VBM ballot. Voters (or those requesting VBM ballots for other voters) will not be able to obtain a VBM ballot unless the information provided with a VBM request exactly matches information in the FVRS. Prior to SB 90, any registered voter could sign up to vote by mail, and voters were permitted to request VBM ballots online, in person, or by phone, fax, mail or email, without having to provide the aforementioned information.

44

**63** What is the likely impact on registered voters in Florida who need to provide a valid driver's license/state ID or a Social Security number that is an exact mach with data in the FVRS in order to request a VBM ballot, and which groups of voters are more likely to bear the burdens of SB 90?

## VII.IV   Registered voters who lack a driver's license or Social Security number on file in the FVRS

**64** According to an internal report generated by the Division of Elections, in an Excel file the Division of Elections identified a total of 681,481 registered voters who either lacked a driver's license or Social Security number on file in the FVRS, or who had an incomplete driver's license or Social Security number on file in the FVRS.[26] The Florida Division of Election Excel file, "VoterDataCK-20200219.xlsx", is associated with an email chain, started with a message from Maria I. Matthews on the morning of February 4, 2021, to Janet Modrow, stating, "I am pretty sure you have run most these numbers before but we need the total number of registers voters (active, inactive) that have Only DL, only SSN9, only ssn4, DL & ssn9, DL & ssn4, no Dl or ssn, incomplete DL or ssn (eg dl begins w number instead of letter) for those latter can you pull list of names. Thanks."[27] A little after 4PM on February 4, 2020, Ms. Modrow sent an email back to Ms. Matthews with several Excel files ("VoterDataCK_DL_StartsWithNumber", "VoterDataCK_DLnot13.xlsx", and "VoterDataCK_SSN4") with individual-level registered voters, a summary file ("VoterDataCK-20200204.xlsx"), and a screenshot (that appears to be partially redacted) with a summary

---

[26] An incomplete driver's license, including just missing the leading letter, or a Social Security number without the final four digits, on file in the FVRS would mean that an SOE would not be able to match a voter's identification when applying for a VBM ballot.

[27] See NAACP, et al.'s RFP, email chain, Janet Modrow and Maria I. Matthews, June 7, 2021, NAACP, et al.'s RFP, "RE: Stats - DL/SSN.msg.

of the four categories of registered voters pertaining to Ms. Matthews' request.[28]

**65**     The Excel file, "VoterDataCK-20200204.xlsx", provides a summary of the IDs the state's 15.2 million registered voters have on file in the FVRS. For example, 625,816 registered voters have on file both a driver's licence and a Social Security number with all 9 digits. Nearly 1.4 million registered voters have on file a driver's licence with all 13 digits; another 1 million have the last four digits of their Social Security number, and so on.

**66**     The Excel file, "VoterDataCK-20200204.xlsx", also provides the raw count of the number of registered voters—681,481—who have "No" valid ID or an "Invalid" ID on file in the FVRS. Under SB 90, these 681,481 registered voters would not be able to request a VBM ballot. These registered voters with no ID or an invalid ID comprise roughly 4.5 percent of the roughly 15.2 million registered voters in the FVRS at the time the report was likely generated. According to the Division of Elections email chain, the 681,481 registered voters were out of all "registered voters (active, inactive) that have Only DL, only SSN9, only ssn4, DL and ssn9, DL and ssn4, no Dl or ssn, incomplete DL or ssn (eg dl begins w number instead of letter)."[29] Of the 681,481 registered voters identified with the code "X-ERR" by the Division of Elections, 658,608 (96.6 percent) were "active" voters.

---

[28]Ibid.

[29]Ibid. According to a tab "ErrorDetail" in "VoterDataCK-20200204.xlsx", the registered voters with errors include records with "leading 0s", "s9 trailing 0s", "both ssn and ssn4 all zeroes" concerning the length of the Social Security number associated with the record; "all 0s" and "ssn trailing spaces" concerning Social Security numbers with four digits associated with the record; and "starts with a number" concerning the length of a driver's license associated with the record.

# VII.V   Analysis of voter ID data provided by the Division of Elections

**67**     At this time, I do not have individual-level data for all 681,481 registered voters associated with this email chain and summarized in Excel file "VoterDataCK-20200204.xlsx". Rather, included in the Secretary of State's RFP, I was able to analyze the individual-level data contained in three Excel files generated by Ms. Modrow. As shown in Figure 3, the three Excel files—visible in the screenshot of the referenced email chain—appear to include a total of 96,415 registered voters: 2,258 who do not have a letter starting the driver's license on file; 93,032 who have a driver's license that is not 13 characters long; and 1,125 whose the last four digits of the Social Security number are all zeros, respectively.[30]

**68**     At this time, the Division of Elections has not produced individual-level data that account for the remaining 585,066 registered voters who presumably have "no Dl or ssn" or an "incomplete DL or ssn" on record, as logically deduced from the remaining categories identified in the Division of Elections internal email chain.[31] After the following three subsections, I return to the question of these registered voters with "no Dl or ssn" or an "incomplete DL or ssn" on record. For the other three Excel files that were produced, I am able to join each of the datasets to a statewide voter file from January 2021 using unique voter IDs. It appears that the three files were created by the Division of Elections in early February 2021, so I join each of them with the January 2021 statewide voter file and the January 2021 Recap file to obtain the race/ethnicity and disability status of each voter, respectively.

---

[30]Ibid. See screenshot with summaries for "VoterDataCK_DL_StartsWithNumber.xlsx", "VoterDataCK_DLnot13.xlsx", and "VoterDataCK_SSN4.xlsx", respectively. These counts match the counts in the three raw Excel files produced as part of the RFP.

[31]See NAACP, et al.'s RFP, email chain, Janet Modrow and Maria I. Matthews, June 7, 2021, NAACP, et al.'s RFP, "RE: Stats - DL/SSN.msg.

Figure 3: Snapshot of "Stats - DL/SSN" Email, Files Generated by Division of Elections



RE: Stats - DL/SSN



**Modrow, Janet**
To ○ Matthews, Maria I.
Cc ○ Marconnet, Amber

Maria,

Man this was a very time consuming assignment which took over 3 hours to process.

The spreadsheets are in the 2021 folder – the counts and the detailed error reports.

| Error | Total |
| --- | --- |
| DL not 13 characters | 93,032 |
| DL starts with a number | 2,258 |
| SSN4 = 0000 and SSN9 has trailing zeros (i.e. 123400000 in the SSN9) | 1,125 |
| No or Invalid DL and SSN | 681,481 |

Let me know if you have any questions.

Janet Modrow, PMP®
IT Section Lead, Office of Information Technology
Florida Department of State
R. A. Gray Building
500 S. Bronough Street
Tallahassee, Florida 32399-0250

*Note: Screenshot of NAACP, et al.'s RFP, email chain, Janet Modrow and Maria I. Matthews, June 7, 2021, NAACP, et al.'s RFP, "RE: Stats - DL/SSN" April 19, 2021.*

## VII.V.1   Registered voters who do not have on file a driver's license starting with a letter

**69**     Of the 2,258 registered voters identified by the Division of Elections who do not have a letter starting their driver's license on file, 262 (11.6 percent) are Black, 496 are Hispanic (22.0 percent), and 1,338 (59.3 percent) are white. When compared with the overall registration rates broken down by race/ethnicity in the January 2021 statewide voter

file, the percentage of Black registered voters is slightly under-represented (less than 13.5 overall), but the percentage of Hispanic registered voters is over-represented (above 17.4 percent overall) when it comes to voters who do not have a letter starting their driver's license on file.

**70**     Table 6 shows the method of voting for the 1,798 individuals who cast a ballot in the 2020 General Election, a turnout rate of 79.6 percent (which was nearly 6 percentage points higher than the overall turnout of registered voters in the election). Some 41.5 percent of Black voters and 53.2 percent of Hispanic voters who do not have a letter starting their driver's license on file, and who under SB 90 would not have been able to request (much less vote) a VBM ballot, cast a valid mail ballot in the 2020 General Election. Both of these rates are greater than the overall percentages of Black and Hispanic voters who cast VBM ballots in the 2020 General Election, which, respectively, were slightly less than 40 percent, and slightly less than 47 percent of all ballots cast. White voters, too, who did not have a letter starting their driver's license on file were also more likely to vote by mail than the overall rate of white voters casting mail ballots (44.5 percent) in the 2020 General Election.

Table 6: Turnout of Voters whose Driver's License Starts with a Number, by Method of Vote and by Race/Ethnicity (Raw Counts and Percentage of Each Group)

| Vote Method | Black | Hispanic | Other | White |
|---|---|---|---|---|
| VBM | 81 | 188 | 59 | 560 |
| VBM (reject) | 0 | 0 | 0 | 1 |
| EIP | 86 | 150 | 41 | 373 |
| Provisional (reject) | 0 | 0 | 1 | 0 |
| ED | 28 | 41 | 10 | 179 |
| VBM | 41.54 | 49.60 | 53.15 | 50.31 |
| VBM (reject) | 0.00 | 0.00 | 0.00 | 0.09 |
| EIP | 44.10 | 39.58 | 36.94 | 33.51 |
| Provisional (Reject) | 0.00 | 0.00 | 0.90 | 0.00 |
| ED | 14.36 | 10.82 | 9.01 | 16.08 |

*Note: Data from Florida Division of Elections, NAACP RPF, "VoterDat-aCK_DL_StartsWithNumber.xlsx" (last accessed August 8, 2021).*

## VII.V.2 Registered voters who have on file a Social Security number that ends in four zeros

**71**      Of the registered voters flagged by the Division of Elections who have invalid Social Security numbers (the last four digits are all zeros), 176 are Black (15.6 percent), 215 (19.1 percent) are Hispanic, and 673 (59.8 percent) are White. Compared to the percentages of voters registered in January 2021 broken down by race/ethnicity, both Black and Hispanic registrants are over-represented and white voters are less likely not to have a Social Security number with the last four digits as zeros in the FVRS. The dataset includes 41 registrants in need of assistance when voting who have zeros as their last four digits, or 3.6 percent of the total, above the 2.9 percent of voters needing assistance in the statewide voter file circa January 2021.

**72**      Table 7 shows the method of votes in the 2020 General Election, broken down by race/ethnicity, of the 864 registered voters who turned out to vote, despite the Division of Elections identifying them as having a Social Security number on file with the last four

digits all zeros. Overall turnout of this group of voters was 76.8 percent, including over 400 voters who successfully cast VBM ballots, voters who would not have been permitted to even request a VBM ballot under SB 90. These Black and Hispanic voters identified by the Division of Elections were considerably more likely to cast VBM ballots than the overall electorate in the 2020 General Election. Unlike the rest of the voters in the election, not one of these voters who cast a VBM ballot, despite having four trailing zeros in their Social Security number and who would have been unable to request a VBM ballot under SB 90, had their VBM ballot rejected.

Table 7: Turnout of Voters whose Social Security Number Ends with Four Zeros, by Method of Vote and by Race/Ethnicity (Raw Counts and Percentage of Each Group)

| Vote Method | Black | Hispanic | Other | White |
|---|---|---|---|---|
| VBM | 58 | 73 | 25 | 302 |
| EIP | 59 | 48 | 15 | 160 |
| ED | 18 | 15 | 6 | 85 |
| VBM | 42.96 | 53.68 | 54.35 | 55.21 |
| EIP | 43.70 | 35.29 | 32.61 | 29.25 |
| ED | 13.33 | 11.03 | 13.04 | 15.54 |

*Note: Data from Florida Division of Elections, NAACP RPF, "VoterDat-aCK_SSN4.txt.xlsx" (last accessed August 8, 2021).*

### VII.V.3   Registered voters whose driver's license is not 13 digits long

**73**      Finally, the Division of Elections created an excel file with 93,032 registered voters in the FVRS who have a driver's license on record that is not 13 characters long. Of these individuals, most of them have voter registration dates prior to the implementation of HAVA in Florida in 2006. Compared to the percentages of voters registered statewide in January 2021 by race/ethnicity, Blacks and Hispanics are both slightly under-represented, as 9,907 Black registered voters (10.7 percent) and 15,552 Hispanic registered voters (16.7 percent) make up this pool of voters whose driver's licenses have too few digits. There are also 2,784

51

registered voters who need assistance to vote, or 3.0 percent of the more than 93,000 voters with a driver's license on file that is not 13 digits long. Notwithstanding the problem facing this group of voters, turnout was 77.9 percent in the 2020 General Election.

**74**      Table 8 shows the method of voting in the November 2020 election, by racial/ethnic groups, for the 72,430 registered voters who have a driver's license on file with the Division of Elections that is not 13 characters long.[32] Nearly 78 percent of these registered voters cast ballots in the 2020 General Election, including over 33,500 who successfully cast a VBM ballot. These voters would not have been able to request a VBM ballot under the exact-match requirement of SB 90, much less vote a valid ballot. Again, a higher percentage of Black (42.0 percent) and Hispanic (43.2 percent) voters—who the Division of Elections has identified as having an invalid driver's license on file in the FVRS—cast a valid mail ballot in the 2020 General Election as compared to the overall electorate.

Table 8: Turnout of Voters whose Driver's License is Not 13 Characters, by Method of Vote and by Race/Ethnicity (Raw Counts and Percentage of Each Group)

| Vote Method | Black | Hispanic | Other | White |
|---|---|---|---|---|
| VBM | 3,047 | 4,751 | 1,714 | 24,021 |
| VBM (reject) | 11 | 8 | 5 | 26 |
| EIP | 3,299 | 4,709 | 1,315 | 17,984 |
| Provisional (reject) | 0 | 1 | 1 | 1 |
| ED | 900 | 1,537 | 530 | 8,570 |
| VBM | 41.99 | 43.17 | 48.08 | 47.47 |
| VBM (reject) | 0.15 | 0.07 | 0.14 | 0.05 |
| EIP | 45.46 | 42.79 | 36.89 | 35.54 |
| Provisional (reject) | 0.00 | 0.01 | 0.03 | 0.00 |
| ED | 12.40 | 13.97 | 14.87 | 16.94 |

*Note:   Data from Florida Division of Elections, NAACP RPF, "VoterDat-aCK_DLnot13.xlsx" (last accessed August 8, 2021).*

---

[32]When joining the file with the statewide voter file, 15 of the 93,032 registrants could not be matched by their unique voter ID.

## VII.V.4   Registered voters who do not have on file a valid driver's license, state ID, or Social Security number

**75**      At this time, I have not obtained a comparable Excel file(s) with individual-level data that comprise the remaining 585,066 registered voters who presumably have "no Dl or ssn" or have an "incomplete DL or ssn" on record, as logically deduced from the remaining categories identified in the Division of Elections internal email chain.[33]

**76**      However, another production offered by the Division of Elections in response to a NAACP, et al.'s RFP included an email with a zip file, "20210609_RaceGenderAge.zip". The file was generated by the Division of Elections in response to a public records request made in April, but was not produced until nearly two months later, in June.[34] The zip file attached to the responsive email, contains a "tab delimited text file" with "622,998 records."[35] According to a draft response, quoting the public records request, the file contains, ""records showing the total number of voters for whom there is no driver's license number, state-issued identification card number, social security number, or last for [sic] digits of the social security number contained within FVRS" detailing race or ethnicity, gender and age."[36]

**77**      Unfortunately, although the file has individual-level data, it does not include the unique voter IDs for the 622,998 registered voters, making my analysis of the data limited to the cross-tabulations that can generated from the race/ethnicity data included in the

---

[33]See NAACP, et al.'s RFP, email chain, Janet Modrow and Maria I. Matthews, June 7, 2021, NAACP, et al.'s RFP, "RE: Stats - DL/SSN.msg.
[34]Email chain, Colleen E. O'Brien, Janet Modrow, Maria I Matthews, Margaret A. Swain, Lenard J. Randolph, Amber Marconnet, Brad McVay), June 9, 2021, NAACP, et al.'s RFP, "RE PRR 04-25 Stuart Naifeh 4-19-21" (last accessed August 8, 2021).
[35]Ibid.
[36]"Draft response to PRR 04-25, Stuart Naifeh, 4-19-21," Email from Colleen E. O'Brien to Brad R. McVay, June 6, 2021.

file.[37]  As such, I am unable to verify these data that purport to be the race, gender, and age of individuals with "no driver's license number, state-issued identification card number, social security number, or last for [sic] digits of the social security number contained within FVRS," as represented by the Divisions of Elections.  Because the Division of Elections did not include the unique voter IDs in this dataset, I am unable to join this file to a statewide voter file for further analysis, to determine, for example, whether or not these individuals are active or inactive voters, and more importantly, if they regularly vote by mail.  Under SB 90, it is my understanding that they would not be able to request a VBM ballot.

**78**     According to the file, the registered voters who do not have on file in the FVRS a driver's license number, a state-issued identification card number, or a Social Security number (or the last four digits of a Social Security number) are disproportionately white.  As Figure 4 shows, 80.6 percent of the total number of these registered voters without a valid ID on files are white, not Hispanic, 12.4 percent are Black, not Hispanic, and 3.8 percent are Hispanic. (It is interesting why the Division of Elections uses these categories, as they are not the categories voters may self-report when they register to vote.  See Florida Division of Elections, "Florida Voter Registration Application," DS-DE 39, R1S-2.040, F.A.C. (effective July 2019), available at `https://dos.myflorida.com/media/693757/dsde39.pdf` (last accessed July 15, 2021).  In the end, the zip file, "20210609_RaceGenderAge.zip", produced by the Division of Elections in response to the April Public Records Request made in April, 2021, by Mr. Naifeh, is of limited utility.  As a result, because I am unable to link this file to the statewide

---

[37]It is curious that the Division of Elections staff, when discussing the public records request, made the determination not to include the voter ID numbers of the 622,998 registered voters whose "records without a DL and SSN (both fields are in the Voter table)," and also claimed that "DOB is a protected field and therefore must be calculated from DOB in the Voter table," as date of birth of registered voters in Florida is made readily available in monthly snapshots of the voter file by the Division of Elections.  See Email chain, Colleen E. O'Brien and Janet Modrow, June 9, 2021, NAACP, et al.'s RFP, "RE PRR 04-25 Stuart Naifeh 4-19-21".

FVRS using unique voter IDs, I am unable to render an opinion on what these data mean for disparate impact.

Figure 4: Counts and Percentages of Registered Voters with no Driver's License, State-Issued ID, or Social Security Number in the FVRS, by Race/Ethnicity

| Race/Ethnicity | Count of RACEDESC | Percent |
|---|---|---|
| American Indian or Alaskan Native | 839 | 0.1% |
| Asian Or Pacific Islander | 3,992 | 0.6% |
| Black, Not Hispanic | 77,437 | 12.4% |
| Hispanic | 23,831 | 3.8% |
| Multi-Racial | 441 | 0.1% |
| Other | 8,291 | 1.3% |
| Unknown | 6,140 | 1.0% |
| White, Not Hispanic | 502,027 | 80.6% |
| Grand Total | 622,998 | 100.0% |

*Note: Screenshot of an Excel spreadsheet pivot table generated from 20210609_RaceGenderAge.zip containing a tab deliminated file, produced by Division of Elections, attached to email chain, Colleen E. O'Brien, Janet Modrow, Maria I Matthews, Margaret A. Swain, Lenard J. Randolph, Amber Marconnet, Brad McVay), June 9, 2021, NAACP, et al.'s RFP, "RE PRR 04-25 Stuart Naifeh 4-19-21".*

**79**     An additional data file produced by the Division of Elections, however, contains a tab delimited data file, "LitigationRR_NoDL-SSN_20210722.txt". The file contains 587,207 individual-level records, complete with unique voter IDs. Though I have as of yet to find documentation about how, or why, of for whom this file was created, or the source and date when the data were derived, the file appears to be a subset of the FVRS. Judging by the name of the file, it is likely limited to registered voters with no driver's license and no Social Security number ("NoDL-SSN") on file with the Division of Elections. Although I cannot say for certain, as the data file lacks documentation from the Division of Elections, it appears to be in the range of the missing 585,066 voters the Division of Elections flagged as having "no Dl or ssn" or have an "incomplete DL or ssn" on record.

**80**     Upon processing the file, it appears that it has the same structure as the FVRS, including having the more than 30 fields that are included in the publicly available voter file. As such, the file, "LitigationRR_NoDL-SSN_20210722.txt", could be a subset of the FVRS. There is no way for me to verify, however, what form of IDs the 587,207 registered voters identified by the Division of Elections may or may not have on file, as no documentation was provided by the Division of Elections with this file.[38]

**81**     Upon processing the file, "LitigationRR_NoDL-SSN_20210722.txt", and joining it to the January 2021 statewide voter file, it is possible to link all but 419 of the 587,207 registered voters that the Division of Elections has identified as having no driver's license and no Social Security number on file, with their unique voter ID to information in the January 2021 statewide voter file. If one were to assume that the file is a subset of voters registered in Florida who have neither a driver's license nor a Social Security number on file, Table 9 provides the racial/ethnic breakdown—the raw counts and percentages—of these registered voters.

---

[38]See NAACP, et al.'s RFP, "LitigationRR_NoDL-SSN_20210722.txt".

Table 9: Registered Voters with No Driver's License and No Social Security Number (Raw Counts and Percentage of Each Group)

| Race/Ethnicity | Count |
|---|---|
| Black | 74,543 |
| Hispanic | 22,998 |
| Other | 18,748 |
| White | 470,499 |
| | Percent |
| Black | 12.70 |
| Hispanic | 3.92 |
| Other | 3.20 |
| White | 80.18 |

*Note: Data from Florida Division of Elections, NAACP RPF, "LitigationRR_NoDL-SSN_20210722.txt" (86,042KB) (last accessed August 15, 2021).*

**82**     Under SB 90, given the previous assumptions about what these data represent, none of these 586,788 registered voters would be able to successfully request a VBM ballot because they do not have a valid form of ID on file with the Division of Elections. Overall, nearly 74 percent of these voters cast ballots in the 2020 General Election. It is important to consider who among the nearly 600,000 ID-less registered voters voted a VBM ballot in the 2020 General Election, something that they will not be able to do in future elections as they do not have a valid ID on file. It is uncertain whether any of these voters know that they need to update their voter registration, much less be able to provide necessary identification to do so, in order to be eligible to apply for a VBM ballot.

## VII.V.5     Registered voters without a valid ID on file who registered *prior* to implementation of HAVA

**83**     Upon further inspection of the Division of Elections file, "LitigationRR_NoDL-SSN_20210722.txt", relying on the same assumptions above about what this file represents, after I join it to the January 2021 statewide voter file it is apparent that the vast majority

(573,892, or 97.7 percent) of registered voters without a valid driver's license or Social Security number (not even the last four digits) on file were registered *prior* to the implementation of HAVA. The enforcement of REAL ID in Florida commenced on January 1, 2006.[39]

### VII.V.6 Registered voters with ID on file but not vetted under HAVA

**84**    Why is this important? As Ms. Modrow notes in an email to Toshia Brown and Maria I. Matthews in a long email chain (including Tiffany M. Morley, Lavanya B. Acharya, Walter S. "Scott" Maynor) on July 22, 2021, when it comes to the verification of driver's licenses in the FVRS, "prior to 2006 (FVRS inception) [DL's] are not verified."[40] Ms. Modrow notes in the email chain that more than 3.5 million registered voters in the FVRS have pre-2006 driver's license on file that was prior to HAVA verification. In response to Toshia H. Brown's question, "Do any of these have 'proof' selected," As Ms. Modrow responded, quite logically, "I don't know but I also wouldn't rely on that field as we wouldn't know what value the proof was shown for."[41]

---

[39]According to an audit by the Florida Auditor General conducted in June 2006, "The Department [of State] began developing FVRS in 2003 to comply with HAVA requirements. The State received a waiver from the EAC, permitted under HAVA provisions, and was granted an extension from January 1, 2004, until January 1, 2006, to implement FVRS. Pivotal to the design of FVRS was the retention of county voter registration systems. Each of the 67 counties was to remediate its registration systems to accommodate the FVRS interface and operating specifications. FVRS communicated with county voter registration systems using a service-oriented architecture that supported establishing communication and information exchange by providing a platform for receiving requests and generating response messages that were processed by county voter registration systems." According to the audit, "Each new voter registration application and any updates to existing registration records which occurred after January 1, 2006, were submitted to FDLE for evaluation. The Department also provided FDLE with all active and inactive voter registrations maintained by FVRS on a monthly basis." See William O. Monroe, Auditor General, "DEPARTMENT OF STATE HELP AMERICA VOTE ACT (HAVA) AND THE FLORIDA VOTER REGISTRATION SYSTEM (FVRS), Operational Audit," June 2006, available https://flauditor.gov/pages/pdf_files/2006-194.pdf (last accessed August 7, 2021).
[40]See Secretary of State response to NAACP, et al.'s RFP, "RE: SB90 - PreVerification"Email chain, "SB90 - PreVerification," email from Janet Modrow to Toshia Brown, Maria I. Matthews, Tiffany M. Morley, Lavanya B. Acharya, and Walter S. "Scott" Maynor, July 22, 2021.
[41]Ibid.

**85**    That there are 3.5 million Florida citizens who registered to vote prior to 2006, and thus have a driver's license on file with the Division of Elections that was not verified under HAVA's REAL ID stringent requirements, is clearly a concern of the Division of Elections staff. To summarize, under SB 90, roughly 3.5 million registered voters are eligible to request and receive a VBM ballot, as they have a driver's license on file that the SOEs can crosscheck when a voter applies for a VBM ballot. However, none of these registered voters had their identity vetted under strict HAVA standards, as the driver's license they submitted when registering predates the implementation of the federal legislation. Presumably, they will all be able to request a VBM ballot if their ID matches that on file with the Division of Elections. In contrast, the nearly 600,000 individuals who do not have an ID on file with the Division of Elections will not be able to request a VBM ballot under SB 90, as they have no ID on file. Yet, individuals with no ID on file presumably went through a thorough vetting of their eligibility by the Division of Elections before they were registered to vote, including proof of citizenship and eligibility, whereas those who registered with a driver's license issued before 2006 had to provide no proof of citizenship.

**86**    Who are the roughly 3.5 million voters that the Division of Elections has identified as registering prior to 2006 with non-verified driver's license? I have yet to receive individual-level data from the Division of Elections to make this determination, so it is not possible to determine the percentages of racial/ethnic groups who have an unverified driver's license but who can nevertheless request (and receive) a VBM ballot. These are likely to be older voters who registered prior to 2006 (given the HAVA implementation date). Based on a January 2021 statewide voter file, there are some 6.2 million registered voters in Florida with a registration date *prior* to 2006. If we take the 3.5 million or so registered voters (actually, 3,627,073, according to a summary Excel file, "SB90_Preverification.xlsx"), roughly half of all individuals who registered in the state prior to January 2006 did so with a driver's license

that was not verified by DMV, as it was prior to the implementation of HAVA. According to the January 2021 statewide voter file, 70.5 percent of the 6.2 million pre-2006 registrants are white. In comparison, only 55.1 percent of the nearly 8.9 million voters with a registration date from 2006 through December 2020 are white. In short, it is highly likely that of the roughly 3.5 million voters who registered prior to 2006, according to the Division of Elections own internal data, they did so without having to show any 'proof' of their identity as required under HAVA. Yet these individuals will continue to be able to request (and receive) VBM ballots under SB 90 because they have a driver's license—albeit, pre-verification, on file in the FVRS.

**87**    The Division of Election file, "LitigationRR_NoDL-SSN_20210722.txt", provides information on which post-HAVA implementation registered voters do not have a driver's license (or Social Security number) on file in the FVRS. Recall that 2.3 percent of the 587,207 registered voters in "LitigationRR_NoDL-SSN_20210722.txt" were flagged by the Division of Elections as lacking a driver's license or Social Security number, and who registered to vote *after* the implementation of HAVA in January 2006. I created a subset of the file, retaining the 13,315 registered voters who registered in Florida beginning on January 1, 2006. It reveals clearly that these registrants are much more likely to be persons of color. Of these post-HAVA registrants who had neither a driver's license or Social Security number on file in the FVRS, 4,022 are Black (30.2 percent), 2,867 are Hispanic (21.5 percent), 34.6 are Other (including unknown race/ethnicity), and just 13.6 percent are white. The percentage of Black registered voters and those of Other (and unknown) race/ethnicity far exceed the percentages of comparable groups of registered voters in the January 2021 statewide voter file who registered post-2006.

60

**88**     As Table 10 reveals, since 2006, the rate of registered voters after the implemen-
tation of HAVA, and who the Division of Elections has flagged as having neither a driver's
license nor a Social Security number on file, is disproportionately more likely to be Black
registered voters, or voters of other or unknown racial or ethnic groups, compared to white
voters. Hispanic voters are only slightly more likely among post-HAVA registrants to not
have a driver's license or Social Security number on file, compared to the statewide voter
file. Black registered voters are over twice as likely to be identified by the Division of Elec-
tions as not having an ID on file that would allow them to request, much less vote, a VBM
ballot than their share of overall registered voters statewide: 30.2 percent versus just 13.6
percent. White voters, in contrast, are more than four times *less* likely since 2006 to register
to vote without a driver's license or Social Security number than their share of the statewide
electorate (13.7 percent versus 55.2 percent, respectively).

Table 10: Post-HAVA Percent of Registered Voters with No Driver's License and No Social
Security Number vs. Overall Voter File, by Race/Ethnicity)

| No DL or SSN Race/Ethnicity | Percent |
|---|---|
| Black | 30.21 |
| Hispanic | 21.53 |
| Other | 34.62 |
| White | 13.65 |
| Overall Voter File Race/Ethnicity | Percent |
| Black | 13.55 |
| Hispanic | 20.99 |
| Other | 10.34 |
| White | 55.12 |

*Note: Data from Florida Division of Elections, NAACP RPF, "LitigationRR_NoDL-
SSN_20210722.txt" (86,042KB) and January 2021 statewide voter file.*

**89**    Since the implementation of HAVA, not only are registered voters in Florida who have neither a driver's license nor a Social Security number on file in the statewide FVRS disproportionately more likely to be Black registered voters (or voters of other or unknown racial or ethnic groups) compared to white voters, in recent years, both the overall numbers and the relative rates of such new registrants are disproportionately more likely to be people of color. Beginning in 2016, as Table 11 reveals, the total number and percentage of registered voters in every year who successfully registered without a driver's license or a Social Security number on file are more likely to be Black and Hispanic compared to new white registrants.

Table 11 shows that in the most recent years, and particularly in the general election years of 2016, 2018, and 2020, there were twice, and sometimes three times, as many new Black registrants as white registrants who were able to register without providing a driver's license or a Social Security number, as is permissible. In 2016 and 2018, respectively, some 1,639 and 880 Black citizens who were determined to be eligible to vote, were vetted and successfully registered, though they do not have a driver's license or a Social Security number on file. The overall count (and percent) of Hispanic registrants also exceed that of white registrants in every year from 2016 through 2019, the exception being 2020. Over 1,500 Hispanic individuals—vetted and determined by SOEs that they were eligible to vote—were registered in 2016 and 2018. SB 90's exact-match restrictions for requesting a VBM ballot will directly affect all 587,207 registered voters identified by the Division of Elections, and when assessing the impact of those who have registered most recently, disparately affects voters of color.

Table 11: Registered Voters Post-HAVA with No Driver's License and No Social Security Number, Race/Ethnicity (Raw Counts and Percentage of Each Group)

| Count Year | Black | Hispanic | Other | White |
|---|---|---|---|---|
| 2006 | 26 | 19 | 21 | 23 |
| 2007 | 39 | 55 | 37 | 47 |
| 2008 | 95 | 92 | 89 | 115 |
| 2009 | 19 | 33 | 19 | 23 |
| 2010 | 43 | 43 | 25 | 49 |
| 2011 | 21 | 59 | 34 | 45 |
| 2012 | 151 | 218 | 172 | 117 |
| 2013 | 58 | 123 | 59 | 39 |
| 2014 | 87 | 121 | 88 | 85 |
| 2015 | 56 | 96 | 79 | 53 |
| 2016 | 1639 | 806 | 1411 | 505 |
| 2017 | 39 | 79 | 69 | 33 |
| 2018 | 880 | 772 | 1500 | 427 |
| 2019 | 442 | 241 | 601 | 112 |
| 2020 | 427 | 110 | 405 | 144 |

| Percent Year | Black | Hispanic | Other | White |
|---|---|---|---|---|
| 2006 | 0.65 | 0.66 | 0.46 | 1.27 |
| 2007 | 0.97 | 1.92 | 0.80 | 2.59 |
| 2008 | 2.36 | 3.21 | 1.93 | 6.33 |
| 2009 | 0.47 | 1.15 | 0.41 | 1.27 |
| 2010 | 1.07 | 1.50 | 0.54 | 2.70 |
| 2011 | 0.52 | 2.06 | 0.74 | 2.48 |
| 2012 | 3.75 | 7.60 | 3.73 | 6.44 |
| 2013 | 1.44 | 4.29 | 1.28 | 2.15 |
| 2014 | 2.16 | 4.22 | 1.91 | 4.68 |
| 2015 | 1.39 | 3.35 | 1.71 | 2.92 |
| 2016 | 40.75 | 28.11 | 30.61 | 27.79 |
| 2017 | 0.97 | 2.76 | 1.50 | 1.82 |
| 2018 | 21.88 | 26.93 | 32.55 | 23.50 |
| 2019 | 10.99 | 8.41 | 13.04 | 6.16 |
| 2020 | 10.62 | 3.84 | 8.79 | 7.93 |

*Note: Data from Florida Division of Elections, NAACP RPF, "LitigationRR_ NoDL-SSN_ 20210722.txt" (86,042KB) (last accessed August 23, 2021).*

## VII.V.7  Vote history of post-HAVA registered voters with no valid ID on file

**90**　　As information for the 13,315 registered voters with no IDs on file with the Division of Election can be linked to the January 2021 vote history file, it is possible to join the data with each individual's vote histories. In the 2020 General Election, 3,294, or 24.7 percent, of these individuals cast a ballot. Of these 3,294 registered voters with no ID on file who voted in the November election, 1,234 (37.5 percent) cast a VBM ballot, and all but six were deemed valid by SOEs and their Canvassing Boards. Under SB 90, none of these registered voters would have been able to request a VBM ballot, much less cast a mail ballot. Another 1,253 registered voters voted EIP, presumably showing one of the 12 forms of acceptable ID to verify their identity, and another 805 voted on Election Day, also presumably verifying their identity when signing in to vote. Two registered voters cast a provisional ballot that was later rejected by the local Canvassing Board.

**91**　　Table 12 provides the raw counts and percentages for each method of voting in the 2020 General Election, broken down for each racial/ethnic group who cast ballots (and who did not vote) in the election, despite not having a valid ID on file with the Division of Elections.

Table 12: Turnout of Registered Voters with Post-HAVA Registrations with No Driver's License and No Social Security Number, by Method of Vote and Race/Ethnicity (Raw Counts and Percentage of Each Group), 2020 General Election

| Vote Method | Black | Hispanic | Other | White |
|---|---|---|---|---|
| VBM | 261 | 312 | 383 | 272 |
| VBM (reject) | 2 | 2 | 1 | 1 |
| EIP | 304 | 337 | 391 | 221 |
| Provisional (reject) | 0 | 1 | 0 | 1 |
| ED | 171 | 197 | 260 | 177 |
| No Vote | 3,284 | 2,018 | 3,574 | 1,145 |
| VBM | 6.49 | 10.88 | 8.31 | 14.97 |
| VBM (reject) | 0.05 | 0.07 | 0.02 | 0.06 |
| EIP | 7.56 | 11.75 | 8.48 | 12.16 |
| Provisional (reject) | 0.00 | 0.03 | 0.00 | 0.06 |
| ED | 4.25 | 6.87 | 5.64 | 9.74 |
| No Vote | 81.65 | 70.39 | 77.54 | 63.02 |

*Note: Data from Florida Division of Elections, NAACP RPF, "LitigationRR_NoDL-SSN_20210722.txt" (86,042KB) (last accessed August 8, 2021).*

**92**    Just like those registered voters who registered prior to 2006 without HAVA validation, many of post-HAVA registrants, who do not have a Social Security number or a driver's license on file in the FVRS, have been voting by mail with no problem for years. In the 2016 General Election, 1,585 of these post-HAVA registrants who cast ballots, including 282 who cast valid VBM ballots. Of those who cast ballots in 2016 but do not have a valid ID on file with the Division of Elections that would allow them to obtain a VBM ballot under SB 90, 30.3 percent were Black, 21.5 percent were Hispanic, 34.6 percent were of Other or unknown race/ethnicity, and just 13.7 percent were white.

**93**    In short, there are hundreds of thousands of registered voters in Florida who the Division of Elections verified were eligible to vote who do not have requisite ID on file in the FVRS so that they may be able to request (and vote) a VBM ballot under SB 90. These registered voters, including those who have voted by mail with no problem in previous

elections, will not be able to request, much less vote, a VBM ballot under SB 90 in future elections.

94      Anecdotal evidence from SOEs confirms that this will be a problem in upcoming elections. In May 2021, *Bay News 9* reported that the Pinellas County SOE office confirmed that some 28,000 registered voters in the county did not have a drivers license, a state ID card, or a Social Security number on file, which would prevent them from being able to apply for a VBM ballot.[42]  As of January 2021, Pinellas County, the state's perennial leader in mail-in voting—had roughly 739,000 registered voters.  By its own account, nearly 4 percent of registered voters in the county do not have a valid ID on record with the SOE.  These figures are confirmed by the data in the file "LitigationRR_NoDL-SSN_20210722.txt' provided by the Division of Elections.  After matching the .txt file to the January 2021 voter file, I am able to determine that 28,078 registered voters in Pinellas County do not have a drivers license or a Social Security number on file, making it impossible for the SOE to honor a registered voter's request for a VBM ballot.  Yet these 28,000 registered voters turn out to vote by mail in very high numbers, particularly voting by mail.  In the 2020 General election, 77.0 percent of the 28,000 registered voters without a driver's license or Social Security number on file cast a ballot; more than two-thirds of these voters—some 14,448 voters with no ID on file—successfully cast a VBM ballot in the election.  Under SB 90, none of these Pinellas County registered voters who successfully cast a VBM ballot in the 2020 General Election are permitted to even request a VBM ballot, much less cast one.

---

[42]"In St. Pete, voting and civil rights advocates speak out against Florida elections bill," *Bay News 9*, available `https://www.baynews9.com/fl/tampa/politics/2021/05/11/voting-and-civil-rights-advocates-speak-out-against-florida-elections-bill` (accessed June 15, 2021).

## VII.VI    Summary: SB 90's exact-match requirement for voter IDs on file will make it more difficult to request a Vote-By-Mail ballot, disproportionately burdening voters of color

**95**      SB 90 requires registered voters to have on file a valid Florida driver's license number, a valid Florida identification number (state ID), or the last four digits of their Social Security number to be able to request a VBM ballot. Over half-a-million registered voters in Florida, according to the Division of Elections own data, including those who regularly vote VBM ballots that are valid, do not have one of these IDs on file with their SOEs. As such, they will not be able to request a VBM ballot under SB 90. This provision of SB 90, in particular, will negatively affect voters of color from obtaining a VBM ballot in future elections.

## VIII    SB 90's restrictions on "Standing" requests for VBM ballots burden thousands of voters who want to have a VBM ballot mailed to them

**96**      Under SB 90, the time period covered by a single application for an absentee ballot is reduced from two general elections cycles to just one. According to Section 24 of SB 90:

> The supervisor shall accept a request for a vote-by-mail ballot from an elector in person or in writing. One request is deemed sufficient to receive a vote-by-mail ballot for all elections through the end of the calendar year of the next regularly scheduled general election, unless the elector or the elector's designee indicates at the time the request is made the elections within such period for which the elector desires to receive a vote-by-mail ballot. Such request may be considered

canceled when any first-class mail sent by the supervisor to the elector is returned as undeliverable.[43]

Requesting a VBM ballot before every election entails a cost to the prospective voter. SB 90 eliminates (after the 2022 General Election) the ability of registered voters to have a "Standing" VBM request to have their ballot mailed to them.

## VIII..1  SB 90 will raise the costs of voting by mail for thousands of registered voters

**97**      SB 90's restriction placed on standing VBM ballot requests should be placed in context. No doubt a response to the public health concerns posed by COVID-19, the first cases coinciding with the state's March 17, 2020 Presidential Preference Primary, Florida voters started to turn towards VBM ballots en mass. In the March 17, 2020 PPP, nearly 1.4 million Florida votes cast VBM ballots, which amounted to 46.5 percent of the total ballots cast in the election. This was an increase of more than 50 percent in the use of VBM ballots compared to the 2016 PPP, when just 30.8 percent of all ballots cast were VBM ballots. Florida witnessed a similar explosion of VBM ballots cast in the August 18, 2020 Primary election. Out of the nearly 3.9 million total ballots cast, 60.1 percent were VBM ballots, which was nearly a 50 percent increase in the share of VBM ballots cast in the August 2016 Primary election.

**98**      The rise in the use of VBM ballots did not abate ahead of the November 3, 2020 General Election. Three weeks ahead of the November 3 General Election, on October 14,

---

[43]See "Enrolled CS for CS for CS for SB 90," 2nd Engrossed, Section 24. Available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 10, 2020).

2020, over 5.7 million Florida voters had requested VBM ballots. By Election Day, just shy of 6 million Florida registered voters had requested VBM ballots, with over 4.8 million voters casting a VBM ballot. [44]

**99** For comparative purposes, fewer than 3.5 million VBM ballots were requested (and 2.7 million cast) by Florida voters across the entire time-frame prior to the 2016 General Election. There was more than a 70 percent increase in the demand for VBM ballots by voters in the 2020 General Election as compared to the 2016 General Election.[45]

**100** Thousands of VBM ballots are mailed out by SOEs on dates that are likely to give voters few options except to return them in person to ensure that they arrive by 7:00 PM on Election Day. SOEs mailed out over 100,000 VBM ballots on October 13 and October 14 to requesting voters. Between October 15 and Election Day, SOEs provided over 300,000 VBM ballots to voters. The Florida Division of Elections notes on its webpage, "The United States Postal Service recommends that domestic nonmilitary voters mail back their voted ballots at least one (1) week before the Election Day deadline to account for any unforeseen events or weather issues."[46] Postal delays in Florida have been long known by

---

[44]Total vote counts can be found at the Florida Division of Elections, "Election Results Archive," available `https://results.elections.myflorida.com/Index.asp?ElectionDate=8/30/2016&DATAMODE=` (last accessed July 7, 2021). VBM totals provided by the Florida Division of Elections, "Archived Early Voting and Vote-by-Mail Statistics," available at https://dos.myflorida.com/elections/data-statistics/elections-data/absentee-and-early-voting/ (last accessed July 7, 2021).

[45]VBM totals for the 2016 General Election can be found at the Florida Division of Elections, "Archived Early Voting and Vote-by-Mail Statistics," available `https://dos.myflorida.com/elections/data-statistics/elections-data/absentee-and-early-voting/` (last accessed June 14, 2021).

[46]See "What is the Recommended Timeline to Return a Vote-by-Mail Ballot," *Vote-by-Mail*, available `https://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/` (last accessed July 7, 2021).

SOEs.[47]. Many of these voters who wanted to cast their VBM ballots had little choice but to return them in person.

## VIII..2   Tracking standing VBM ballot requests

**101**      Tracking VBM ballot requests, VBM ballots that are provided by SOEs, and VBM ballots that are returned by voters is done by the 67 SOEs, but the statewide database of VBM ballots requested, provided, and returned is maintained by the Florida Division of Elections. Before and after every statewide election, Florida SOEs create VBM activity reports that they upload to the Division of Elections on a daily basis during the election. These reports describe standing ballot requests, ballot requests, ballots provided, and several other corresponding codes assigned by SOEs.[48]

---

[47]At the June 18-22, 2017 Annual Summer Conference held by the Florida Supervisors of Elections, Clay County Assistant Supervisor of Elections, Robin Conte, gave a Power-Point presentation entitled, "Vote By Mail Envelope REDESIGN," that included a slide entitled, "Shared Issues," "Late Delivery." Mentioned under "Late Delivery" was "Voter Responsible–Waits until the last minute," as well as "USPS Responsible – A handful of ballots returned several weeks after the election; delivered by the USPS on the same day with varied post-election metered date." See "Vote by Mail Envelope REDESIGN," Florida Supervisors of Elections 2017 Annual Summer Conference, June 18-22, 2017, available `https://www.myfloridaelections.com/portals/fsase/Documents/ConferencePresentations/Robin_Conte__VBM_Redesign_reduced.pdf?timestamp=1499433610334` (last accessed July 7, 2020).

[48]These daily VBM activity reports do not always to conform to statutory requirements. While challenging, it is entirely possible, by relying on careful and conservative data processing methods, to disentangle discrepancies with official codes in the daily VBM files. For example, the ballot return codes counties use in the files to identify the status of VBM ballots are sometimes not reconcilable with final status codes as reported in statewide vote history files. According to the Division of Elections, Rule 1S-2.043, F.A.C., Form DS-DE 145, which went into effect in 2015, there are eight "applicable codes for [VBM ballot envelope] reporting purposes." The eight codes are: "**C**: Use when a voter cancels a request for vote-by-mail ballot. **E**: Use when there is any "voter-caused error" in a returned vote-by-mail ballot other than a failure to sign the Voter's Certificate. **N**: Use when a voter returns a vote-by-mail ballot with no signature on the Voter's Certificate. **P**: Use when the vote-by-mail ballot is provided to the voter by any proper means of delivery (mail, fax, etc.). (Only record one ballot provided per voter.) **R**: Use when the supervisor has processed a vote-by-mail ballot request and determined that the voter is eligible to vote-by-mail for that election. **S**: Use when a voter has or makes a standing request to receive a vote-by-mail ballot for all elections occurring from the date of the request through the end of the calendar year for the second ensuing regularly scheduled

102      Drawing on the counties' daily VBM activity reports, it is possible to get a sense of which voters, broken down by the race/ethnicity of registered voters, had either VBM standing ("S") requests on file or ordinary VBM ballot requests ("R") on file on a given day. Statutorily, ahead of the 2020 General Election, Florida SOEs were required to mail VBM out ballots to voters who had a standing request or who had newly requested a VBM ballot, by October 1, 2020. The deadline for voters to request a VBM ballot to be sent to them was 5 PM, October 24, 2020.

103      The first day that the SOEs uploaded their daily VBM activity reports ahead of the 2020 General Election was the morning of Friday, September 4, 2020. As of that morning, as Table 13 details, some 4,670,408 non-UOCAVA registered voters were in the statewide VBM ballot database. Over half a million Black registered voters, over 700,000 Hispanic registered voters, and over 3.1 million white voters were in the statewide VBM database. The VBM activity reports uploaded by the SOEs are maintained by the Division of Elections, Vote-by-Mail Ballot Request Information Files.

104      Table 13 shows that 393,990 of the 524,626 Black registered voters in the statewide VBM database—75.1 percent—had a status code of R, indicating that they had requested that a VBM ballot be mailed to them in the 2020 General Election. Roughly 2 percent of Black registered voters, some 9,892, had status code of S, indicating that they had

---

general election. (Once the supervisor determines that the voter is eligible to vote-by-mail in a particular election, the status of the standing request for that election is recorded as "R".) **U**: Use when a vote-by-mail ballot is returned as undeliverable to the address where it was sent. **V**: Use when a voted vote-by-mail ballot is returned and received in the supervisor's office and does not otherwise fall into a status code of E, N, or U. NOTE: The code for each voter shall be updated daily so that each voter has only one code associated with the voter's record. For example, a prior report for a voter reflecting an "S" will be changed on a subsequent report to an "R" if the voter is determined eligible to vote in the election.

a standing request to have the 2020 General Election, and future ballots, mailed to them automatically. It is certainly possible that Black registered voters with status code of R also had a standing request, but that the SOE offices had already processed them and changed their status to requested. The Division of Election notes that, "a prior report for a voter reflecting an "S" will be changed on a subsequent report to an "R" if the voter is determined eligible to vote in the election." Table 13 also provides comparable counts and rates for other groups.

Table 13: Vote-by-Mail Codes by Racial/Ethnic Groups,
September 4, 2020 VBM Statewide Daily Upload File

| VBM Code Count | Black | Hispanic | Other | White | Total |
|---|---|---|---|---|---|
| C | 8,280 | 10,103 | 4,868 | 62,226 | 85,477 |
| P | 112,464 | 79,361 | 62,934 | 672,360 | 927,119 |
| R | 393,990 | 607,659 | 249,424 | 2,348,960 | 3,600,033 |
| S | 9,892 | 3,384 | 3,815 | 40,688 | 57,778 |
| Total | 524,626 | 700,507 | 321,041 | 3,124,234 | 4,670,408 |
| VBM Code Percent | Black % | Hispanic % | Other % | White % | Total |
| C | 1.58 | 1.44 | 1.52 | 1.99 | 1.83 |
| P | 21.44 | 11.33 | 19.60 | 21.52 | 19.85 |
| R | 75.10 | 86.75 | 77.69 | 75.19 | 77.08 |
| S | 1.89 | 0.48 | 1.19 | 1.30 | 1.24 |

## VIII.I Summary: SB 90 will make it more difficult to request a a VBM ballot, disproportionately burdening voters of color and voters with disabilities

**105** SB 90's restrictions on standing VBM ballot requests will add costs on all Florida registered voters who have become accustomed to having their VBM ballot sent to them prior to each election. All voters, but particularly those with disabilities, will be particularly harmed by SB 90, as they will have to make additional requests to have their VBM ballots mailed to them. In January 2021, there were over 435,000 registered voters in Florida who checked a box on their voter registration form stating that they needed assistance when voting. Scholars have shown that registered voters with disabilities face higher barriers to casting a ballot (Karp & Banducci 2001; Miller & Powell 2016; Schur & Kruse 2014; Schur, Adya & Ameri 2015; Fay 2005). Voters with disabilities may face difficulties procuring, filling out, or returning a VBM ballot request application; under SB 90, after 2022, these voters will have to go through this process every year, as opposed to having a standing application to have their VBM ballots mailed to them automatically.

**106** Filling out a mail ballot application, given the additional ID requirements, may prove to be difficult for registered voters with disabilities, particularly those who require specialized equipment to read or fill out forms, such as a VBM ballot application form (Tokaji & Colker 2007; Belt 2016). Voters with disabilities may receive in-person help at a polling location, including voting on an accessible machine or having someone assist in filling out their ballot, but such assistance to request a VBM ballot might not be possible at home for those registered voters who are in need of assistance. As such, because voters will no longer be permitted to have standing requests to have their VBM ballots mailed to them, these voters may be at greater risk of not being able to obtain a VBM ballot to vote.

# IX   SB 90's Volunteer Assistance Ban decreases the opportunities of voters, including persons of color and individuals with disabilities, from receiving assistance when returning their VBM ballots

**107**   SB 90 restricts voters from receiving assistance to return their VBM ballots. According to Section 32 of SB 90:

> Any person who distributes, orders, requests, collects, delivers, or otherwise physically possesses more than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member, except as provided in ss. 101.6105-101.694, including supervised voting at assisted living facilities and nursing home facilities as authorized under s. 101.655, commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.[49]

SB 90 imposes new costs on registered voters needing assistance to return their VBM ballots.

## IX.I   Scholarship on the return of VBM ballots

**108**   There is limited literature on who needs assistance when returning their VBM ballots. We know that in the months prior to the 2020 General Election, citizens across the country who were considering voting by mail were understandably concerned about postal delays. Such postal delays ahead of the 2020 General Election were known by Florida election officials. Some SOEs warned voters requesting VBM ballots prior to the election that the

---

[49]See "Enrolled CS for CS for CS for SB 90," 2nd Engrossed, Section 32. Available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 10, 2020).

United States Postal Service mail could take a week to travel from a local election office to the requesting voter (even if that voter resides in the same county), and encouraged voters— through civic education efforts and digital market campaigns—to request, and return, their VBM ballots via drop boxes.[50] On-time postal delivery rates can fluctuate across the state of Florida. However, in the Southern Florida, Florida Suncoast, and Gulf Atlantic regions, on-time delivery of First Class mail was less than 90 percent in the months leading up to the November 2020 election.[51]

**109** Not surprisingly, in record numbers, voters followed the advice of their SOEs, dropping off VBM ballots in person rather than via post. As several studies have shown, including those drawn on data from Florida (Shino, Suttmann-Lea & Smith 2021; Herron & Smith 2021; Cottrell, Herron & Smith 2020), postal delays can cause otherwise valid VBM ballots to not arrive by Election Day, and thus be rejected by SOEs. Indeed, over the years, tens of thousands of VBM ballots have been rejected in Florida elections because they were received by officials after the state's deadline or were not cured in time for other deficiencies. Rejection rates of VBM ballots are consistently and disproportionately higher among minority voters than white voters in Florida (Smith 2018; Smith & Baringer 2020; Smith 2021), even when taking into account a voter's past "experience" casting VBM ballots (Cottrell, Herron & Smith 2020). SB 90's limits on voters receiving assistance to return VBM ballots and on drop boxes increase the costs of voting for Floridians.

---

[50]"Did mail delays lead to more late-arriving ballots? The opposite, Florida counties say," *Tampa Bay Times*, November 18, 2020, available `https://www.tampabay.com/news/florida-politics/elections/2020/11/18/did-mail-delays-lead-to-more-late-arriving-ballots-the-opposite-florida-counties-say/` (last accessed August 11, 2021).

[51]See "Key swing states vulnerable to USPS slowdowns as millions vote by mail, data shows," *The Washington Post*, available `https://www.washingtonpost.com/business/2020/10/20/swing-states-election-usps/` (last accessed July 7, 2020).

**110**    Scholars have found that in other states that have adopted secure drop boxes for VBM ballots that they help to reduce barriers to voting a mail ballot (Collingwood et al. 2018; McGuire et al. 2020; Collingwood & Gonzalez O'Brien 2021). In a 2014 study by Menger & Stein (2020, p. 196) of Colorado voters before and after Election Day, they find that nearly "two-thirds of persons who receive an unsolicited ballot in the mail before Election Day choose to travel out of their way to return their ballot in person, rather than through the less costly and more convenient U.S. Postal Service." Voters who receive their VBM ballots close to Election Day cannot be assured of being able to return the delivery of their ballots via post; drop boxes give them the assurance that their ballot will arrive safely and securely in time to be processed by local elections officials. As such, drop boxes reduce the burdens of voting by mail by providing more options to voters to return their—and other voters'—VBM ballots.

**111**    The restrictions placed on voters receiving assistance potentially burden all voters who vote by mail. Akin to when election officials change the location or reduce the number of polling locations (Haspel & Knotts 2005; Brady & McNulty 2011; Amos, Smith & Ste. Claire 2017), the limitations of SB 90 on VBM ballot assistance increases *information costs* and *transportation costs*, and potentially *time costs* and *health costs* for voters requiring assistance to return their VBM ballots.

## IX.II    SB 90's limits on voters receiving assistance when returning VBM ballots affects voters of color and voters with disabilities

**112**    More than two million registered voters in Florida in the 2020 General Election, but particularly Black and Hispanic voters and voters with disabilities, shifted to voting by mail from voting in person in the 2016 General Election. In the 2020 General Election, at

76

least 529,000 Black voters cast VBM ballots in the 2020 General Election (Smith 2021), more than twice as many as those who cast VBM ballots in the 2016 General Election (244,000). Among Hispanics, over 723,000 voters cast VBM ballots in the 2020 General Election (Smith 2021), nearly twice as many (382,000) who voted by mail in the 2016 General Election (Smith 2018). Roughly 3 million white voters cast VBM ballots in the 2020 General Election (Smith 2021), up from the roughly 2 million white voters who cast VBM ballots in the 2016 General Election (Smith 2018).

**113**     In 2020, particularly in the August primary and November General Election, rather than "souls to the polls" rallies to encourage individuals to vote in person, many groups encouraged voters to instead drop off their completed VBM ballots at SOE offices or secure drop boxes.[52] Voters with disabilities also shifted to voting by mail in the 2020 election. In the 2020 General Election, nearly 48 percent of the over 434,000 registered voters in Florida who indicated when they registered needed assistance when voting, 67.3 percent turned out to vote. Of these more than 291,000 voters who indicate that they need assistance when voting, 48 percent cast VBM ballots. Only 14 percent cast their ballots on Election Day. In the 2016 General Election, for comparative purposes, of the 434,000 voters registered in January 2021 who indicated that they needed assistance voting, only 28 percent cast a mail ballot. Many of these voters with disabilities face considerable burdens under SB 90 because their options for VBM ballot delivery have been cut, including at drop boxes, as discussed below.

---

[52]"Roll to the polls: The coronavirus changes get-out-the-vote efforts," *Tampa Bay Times*, August 15, 2020, available `https://www.tampabay.com/florida-politics/buzz/2020/08/15/roll-to-the-polls-the-coronavirus-changes-get-out-the-vote-efforts/` (last accessed August 5, 2021).

**114**    SB 90 now makes it a first-degree misdemeanor to possess or deliver more than two vote-by-mail ballots per election, other than a voter's own ballot and the ballots of "immediate" family members. In my opinion, SB 90 will likely increase the cost of voting for individuals with disabilities who need assistance requesting and returning their VBM ballots. Furthermore, SB 90 now requires registered voters needing assistance to request (and presumably, return) their VBM ballots to provide the "identity of the voter's designee making the request, if any; the Florida driver license number, Florida ID card number, or last four digits of the social security number of the elector provided with a written request".[53]

**115**    Registered voters who have a disability might not be afforded the same opportunity to return a VBM ballot as non-disabled voters. Voters with disabilities, particularly voters who have an impairment in their body structure or function or who have mobility limitations, already face barriers to voting (Schur & Kruse 2014). In my opinion, SB 90 will make it more difficult for persons with such disabilities to receive help when trying to return a mail ballot. Similarly, the prohibitions on VBM ballot collection will likely disproportionately impact Black and Hispanic voters, who face less reliable private and public transportation as well as mail services, and who are thus more likely than white voters to seek the assistance of volunteer ballot collectors (Palandrani & Watson 2020).

### IX.II.1   Volusia County VBM ballot assistance for voters needing assistance

**116**    Registered voters who use assistance to request a ballot bears on which voters rely on others to return a ballot. With the exception of Volusia County, I have not received individual-level data from SOEs documenting whether voters received assistance returning

---

[53]SB 90, available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 17, 2020).

their VBM ballots.[54]  However, included in its production, the Volusia County SOE provided an Excel spreadsheet ("NAACP_REV-00012069") that documents the method by which 177,304 registered voters *requested* their VBM ballots in the run-up to the 2020 General Election.  I presume that voters who had a third party request their VBM ballot likely had assistance in returning their VBM ballot.  The added barriers to request a VBM ballot are relevant because I presume that voters who had a third party request their VBM had assistance in returning their ballot.

**117**     Since unique voter IDs were included in the Volusia County SOE's spreadsheet, it is possible to determine the method of requesting a VBM ballot for both the race/ethnicity and the disability status of 175,728 of the 177,304 (99.1 percent) VBM-requesting registered voters (after matching unique voter IDs with a January 2021 statewide voter file).  Of these voters who requested VBM ballots, 133 voters had their ballots requested by a "3rdParty", or 0.08 percent of the total.  For comparative purposes, over 61 percent of the VBM ballots were requested by "Mail", nearly 18 percent by "Web", and over 9 percent over the "Counter".  Table 14, provides the racial/ethnic breakdown for those whose data in the county's spreadsheet could be joined to the January 2021 statewide voter file by unique Voter ID.  Although the overall number of voters that relied on a third party to request their VBM ballot is relatively small, Black voters were three times more likely than white and Hispanic voters to rely on a third party to make their VBM ballot request (0.18 percent versus 0.06 percent, respectively).

---

[54]The Miami-Dade SOE, as required under local ordinance, provided 1,313 hand-written sheets for the 2020 General Election, and 669 hand-written sheets for the 2020 August Primary Election, with up to 20 entries each, that included the day and location that VBM ballots were dropped, whether the individual depositing the ballots showed an ID and the relationship of the individual (including oneself) for whom the individual may have been delivering a ballot, as well as the FVRS voter ID on the VBM return envelope. See Miami-Dade SOE response, "Folder No. 3 (CONFIDENTIAL)" to LWV, et al.'s RFP 3).

Table 14: Method of VBM Ballot Request, Volusia County, 2020 General Election, by Race/Ethnicity (Raw Counts and Percentage of Each Group)

| Request Method | Black | Hispanic | Other | White |
|----------------|-------|----------|-------|-------|
| 1YrAll | 373 | 426 | 373 | 4,883 |
| 3rdParty | 23 | 8 | 10 | 87 |
| Counter | 1,454 | 1,389 | 823 | 13,049 |
| E-Mail | 61 | 62 | 55 | 470 |
| Fax | 5 | 6 | 6 | 47 |
| FPCA | 32 | 55 | 237 | 439 |
| FWAB | 3 | 4 | 5 | 5 |
| Mail | 6,822 | 7,429 | 5,271 | 87,900 |
| Persn | 121 | 86 | 91 | 745 |
| Phone | 1,059 | 651 | 536 | 7,112 |
| Pick-up | 314 | 318 | 159 | 1,372 |
| Web | 2,356 | 3,270 | 2,336 | 23,393 |
| 1YrAll | 2.95 | 3.11 | 3.77 | 3.50 |
| 3rdParty | 0.18 | 0.06 | 0.10 | 0.06 |
| Counter | 11.52 | 10.14 | 8.31 | 9.35 |
| E-Mail | 0.48 | 0.45 | 0.56 | 0.34 |
| Fax | 0.04 | 0.04 | 0.06 | 0.03 |
| FPCA | 0.25 | 0.40 | 2.39 | 0.31 |
| FWAB | 0.02 | 0.03 | 0.05 | 0.00 |
| Mail | 54.04 | 54.21 | 53.23 | 63.01 |
| Persn | 0.96 | 0.63 | 0.92 | 0.53 |
| Phone | 8.39 | 4.75 | 5.41 | 5.10 |
| Pick-up | 2.49 | 2.32 | 1.61 | 0.98 |
| Web | 18.66 | 23.86 | 23.59 | 16.77 |

*Note: Data from NAACP RPF, "REV-00012069.xlsx" (last accessed August 17, 2021).*

**118**      Turning to voters with disabilities in Volusia County who in the 2020 General Election requested VBM ballots, among the 175,728 registered voters for whom I was able to match to the statewide 2020 General Election Recap file, some 4,096 registered voters indicated that they needed voting assistance when they registered to vote. Of these registered voters needing assistance, as Table 15 shows, 0.24 percent (or 10 voters) relied on a third party to request their VBM ballots. In contrast, only 0.07 percent (118 out of 171,632 voters) without a voting assistance flag in the FVRS relied on a third party to request their VBM ballots. More notably, 411 registered voters needing assistance, or one in 10, requested their VBM ballot be mailed to them via the phone; only 5.2 percent of registered voters not needing voting assistance phoned the SOE to request their VBM ballot.

Table 15: Method of VBM Ballot Request, Volusia County, 2020 General Election, by Needing Voting Assistance (Raw Counts and Percentage of Each Group)

| Request Method | Black | Hispanic | Other | White |
|---|---|---|---|---|
| 1YrAll | 5,828 | 225 | | |
| 3rdParty | 118 | 10 | | |
| Counter | 16,386 | 329 | | |
| E-Mail | 639 | 9 | | |
| Fax | 64 | 0 | | |
| FPCA | 759 | 4 | | |
| FWAB | 17 | 0 | | |
| Mail | 104,996 | 2,425 | | |
| Persn | 958 | 85 | | |
| Phone | 8,947 | 411 | | |
| Pick-up | 2,100 | 63 | | |
| Web | 30,820 | 535 | | |
| | Black | Hispanic | Other | White |
| 1YrAll | 3.40 | 5.49 | | |
| 3rdParty | 0.07 | 0.24 | | |
| Counter | 9.55 | 8.03 | | |
| E-Mail | 0.37 | 0.22 | | |
| Fax | 0.04 | 0.00 | | |
| FPCA | 0.44 | 0.10 | | |
| FWAB | 0.01 | 0.00 | | |
| Mail | 61.18 | 59.20 | | |
| Persn | 0.56 | 2.08 | | |
| Phone | 5.21 | 10.03 | | |
| Pick-up | 1.22 | 1.54 | | |
| Web | 17.96 | 13.06 | | |

*Note: Data from NAACP RPF, "REV-00012069.xlsx" (last accessed August 17, 2021).*

**119**     It is my understanding that under SB 90, a "supervisor *may* accept a written, an in-person, or a telephonic request for a vote-by-mail ballot to be mailed to an elector's address on file in the Florida Voter Registration System from the elector, or, if directly instructed by the elector, a member of the elector's immediate family, or the elector's legal guardian," but that "[i]f an in-person or a telephonic request is made, the elector *must* provide the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records," *and must* provide the requester's "driver license number, the requester's identification card number, or the last four digits of the requester's social security number, if available," as well as the "requester's relationship to the elector," and the "requester's signature (written requests only)." In my opinion, these added barriers to requesting a VBM ballot will impose several burdens on registered voters needing assistance to return their VBM ballots, most notably for those who have a disability.

**120**     Finally, it is possible to match by unique voter ID the Volusia dataset documenting the method by which a registered voter requested a VBM ballot ahead of the 2020 General Election with the aforementioned Division of Elections file, "LitigationRR_NoDL-SSN_20210722.txt". Doing so reveals that more than 28,000 of the registered voters in Volusia County, or 16.0 percent of all registered voters who requested a VBM ballot ahead of the 2020 General Election, who do not have a driver's license or Social Security number on file in the FVRS, according to the Division of Elections. Of these roughly 28,000 registered voters, 20 (0.07 percent) relied on a third party to request (and presumably return) the voter's VBM ballot and 1,523 (5.4 percent) requested their VBM ballot over the phone. All 20 of the registered voters in the county who relied on a third party to request a VBM ballot successfully voted a VBM ballot in the 2020 General Election and 1,409 of the registered voters in the county requested their VBM ballot via telephone successfully voted a VBM

ballot in the election. It is my understanding that *all* of the more than 20,000 voters who requested a VBM ballot in the 2020 General Election, had SB 90 been in effect, would not have been in compliance with the statute and therefore would not have been permitted to request a VBM ballot, as none of them have an ID on file with the SOE.

## IX.III Summary: SB 90 will burden voters needing assistance to return their VBM ballots, disproportionately burdening voters of color and voters with disabilities

**121**     In my opinion, because SB 90 reduces registered voters' ability to have assistance returning their VBM ballots by making it a first-degree misdemeanor to possess or deliver more than two vote-by-mail ballots per election other than a voter's own ballot and the ballots of "immediate" family members, it will likely increase the cost of voting for individuals with disabilities who need assistance returning their VBM ballots.

## X  SB 90's Drop Box Restrictions decrease the opportunities of voters, including persons of color and individuals with disabilities, from returning their VBM ballots to secure drop boxes

**122**     SB 90 restricts the ability of SOEs to determine the locations, dates, times, and type of monitoring of their secure VBM drop boxes. According to Section 28 of SB 90:

> Secure drop boxes shall be placed at the main office of the supervisor, at each permanent branch office of the supervisor, and at each early voting site. Secure drop boxes may also be placed at any other site that would otherwise qualify

84

as an early voting site under s. 101.657(1). Drop boxes must be geographically located so as to provide all voters in the county with an equal opportunity to cast a ballot, insofar as is practicable. Except for secure drop boxes at an office of the supervisor, a secure drop box may only be used during the county's early voting hours of operation and must be monitored in person by an employee of the supervisor's office. A secure drop box at an office of the supervisor must be continuously monitored in person by an employee of the supervisor's office when the drop box is accessible for deposit of ballots.[55]

In addition, SB 90 imposes a civil penalty on SOEs who operate drop boxes outside the prescribed means: "(3) If any drop box is left accessible for ballot receipt other than as authorized by this section, the supervisor is subject to a civil penalty of $25,000. The division is authorized to enforce this provision."[56] As a result of these limits on VBM drop boxes, SB 90 imposes new costs on registered voters wanting to return their VBM ballots in person.

**123**   According to data presented by the Florida Supervisors of Elections to the state legislature on March 22, 2021, roughly 31 percent of all VBM ballots returned in the 2020 General Election—or 1.5 million of 4.85 million VBM ballots—were deposited in secure drop box locations maintained by SOEs.[57] It is clear that Florida voters have come to depend on the convenience of VBM drop off boxes. Based on my analysis of VBM drop boxes deployed by SOEs in the 2020 General Election and based on statements SOEs have made in affidavits

---

[55] See "Enrolled CS for CS for CS for SB 90," 2nd Engrossed, Section 28. Available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 10, 2020).

[56] Ibid. *Emphasis* added.

[57] Florida Supervisors of Elections, "Florida Supervisors of Elections Statement on PCB-PIE 21-05," March 22, 2021, available `https://www.myfloridaelections.com/portals/fsase/Documents/Public%20Policy/FSE_Statement_032221.pdf` (last accessed August 1, 2021).

and interrogatory responses, at least 122 VBM drop boxes—that is one-fourth of all VBM drop boxes Florida voters had access to in that election will be curtailed in whole or in part under SB 90.

**124** It is my understanding that SB 90's limitations placed on SOEs curtails in whole or in part the opportunity for voters to drop off their VBM ballots at secure drop boxes outside of the designated days and hours and locations of EIP voting sites used by a county during an election, with the exception of VBM drop boxes stationed at SOE offices (or permanent SOE branch offices) that, when in operation, must be continually staffed in person by SOE employees.

**125** Based on data from the public record that I have collected and analyzed, a total of 485 VBM drop boxes were available across the 67 counties for voters to return their ballots in the 2020 General Election. Under the provisions of SB 90, I have identified 122 VBM drop boxes utilized in the 2020 General Election, that under SB 90, will be curtailed in whole or in part. In sum, one out of four VBM drop boxes offered by SOEs in the 2020 General Election are curtailed in whole or in part by SB 90.

**126** The following analyses are based on data on counties' drop box usage collected in September and October 2020, prior to the introduction of SB 90, directly through communications with all 67 SOE offices as well as information obtained from SOE websites and news reports on the days, hours, and locations of VBM drop boxes in their counties in the 2020 General Election. I subsequently cross-checked and validated these data with written responses by SOEs to a survey of SOEs from the Florida House of Representatives Public Integrity and Elections Committee during the 2021 legislative session, as well as with affi-

86

davits and interrogatory responses provided by SOEs in discovery in this case. The data collected in September and October of 2020 was the basis for an op-ed I co-authored in the *Tampa Bay Times. Tampa Bay Times.*[58] In assessing how SB 90 will impact the counties' use of drop boxes, I compared the counties' practices in the 2020 General Election with the provisions of SB 90 and I reviewed the counties' reporting of the impacts of SB 90 on drop box usage from the counties' discovery responses in this litigation.

**127** The 122 VBM drop boxes that SB 90 curtails in whole or in part include the following VBM drop boxes that SOEs deployed in the 2020 General Election:

1. 65 VBM drop boxes in 48 counties that were available 24/7 for voters to deposit their VBM ballots, but that were not continually staffed in person with SOE personnel;

2. 57 VBM drop boxes in 15 counties that were not located at a SOE office (or a permanent SOE branch office) that were available to voters on days either before or after EIP voting in the county, but not open 24/7 (to avoid double-counting);

**128** From a cost of voting perspective, the 65 24/7 VBM drop boxes in the 48 counties, that under SB 90 would have been curtailed (in whole or in part) in the 2020 General Election because they were not continually monitored by SOE personnel, amounts to a conservative estimate of more than 32,000 hours that voters in the 48 counties would not have had access to return their VBM ballots.[59] Nearly every one of these drop boxes was

---

[58]See Jose Vazquez and Daniel A. Smith, "All counties should offer secure, 24/7 drop boxes for mail ballots," *Tampa Bay Times*, October 12, 2020, available `https://www.tampabay.com/opinion/2020/10/12/all-counties-should-offer-secure-247-drop-boxes-for-mail-ballots-column/` (last accessed August 31, 2021).

[59]To calculate this, I multiple the 65 VBM drop boxes times 21 days (a rough number of days the drop boxes were open, from the time VBM ballots were mailed out to the start of EIP voting) times 24 hours a day. This is a conservative estimate, as many counties mailed out their domestic VBM ballots more than 21 days before they commenced EIP voting, and it does

available to voters 24/7 from the day their SOEs mailed out VBM ballots through 7:00PM on Election Day, that is, on days both *prior to* and *after* EIP voting was offered in the county.

**129**     My analysis indicates that not one of the 65 VBM drop boxes offered by the 48 SOEs that were available to voters 24/7 outside SOE offices (or permanent SOE branches) in the 2020 General Election was "continually monitored, in person, by an employee of the supervisor's office" as is required under SB 90. Based on the information provided by SOEs to the PIE committee, and in the SOE affidavits and interrogatory responses, nearly all 65 of the 24/7 VBM drop boxes available to voters from the time VBM ballots were first mailed by SOEs through Election Day were monitored using video surveillance—and not by security personnel who were SOE employees. It is my understanding that if SOEs do not provide SOE staff to continually monitor their VBM drop boxes, during normal business hours or at night, they are prohibited under SB 90.

**130**     I am also able to estimate a cost of voting for the 57 VBM drop boxes in the 15 counties that under SB 90 would not have been permissible in whole or in part, as they were not located at a SOE office (or a permanent SOE branch office), nor at an EIP voting site during the county's designated EIP voting period. Some of these VBM drop boxes were available 24/7 from the time VBM ballots were mailed out to voters through Election Day, while others were open only during the county's EIP voting period (but were not located at a EIP site). A conservative estimate is that these 57 drop boxes (which are separate from the 65 24/7 drop boxes, discussed above, to avoid double-counting) accounted for over 11,000 hours that voters in the eight counties were able to drop off their VBM ballots in person in

---

not include days (and hours) the 65 24/7 VBM drop boxes were open after EIP voting.

the 2020 General Election.[60]

**131**     Again, in the 2020 General Election, 15 SOEs stationed a total of 57 VBM drop boxes that were *not* located at SOE offices or permanent branch facilities, and were *not* a designated EIP locations or were open outside of EIP hours in the county. Under SB 90, it is my understanding these VBM drop boxes—some of which were open 24/7 to voters—are not permissible in whole or in part. For example, in the 2020 General Election:

• Duval County offered a VBM drop box at a weekend drive-thru event at the Jacksonville Jaguars TIAA Bank Field, but it was not an EIP voting location;

• Pinellas County offered a drive-through VBM drop box at the Tampa Bay Rays Tropicana Field during EIP voting, as well as 19 other venues with VBM drop boxes, none of which were EIP voting locations;

• Hardee County offered a 24/7 VBM drop box at the Hardee Public Library, which was open pre- and post-EIP voting in the county;

• Hernando County offered a 24/7 VBM drop box in the Brooksville Courthouse parking lot - Records Storage Facility;

• Levy County offered 24/7 VBM drop boxes at two sites that were not used for EIP voting;

• Bay County provided VBM drop boxes on Monday, November 2, at all of its Super Voting Centers, one day after EIP voting is permitted by statute (the Sunday prior to Election Day);

• Gulf County allowed voters to drop off their VBM ballots at its Super Voting Center located at the Charles Whitehead Public Library on November 2, a day after the statutory

---

[60]To calculate this, I multiple the 57 VBM drop boxes times 13 days of EIP voting (when many of these were open, although not at EIP locations; not all of the 15 counties offered 14 days of EIP voting), times 12 hours a day that each box was open (roughly half of the drop boxes were open 24/7, making this a conservative estimate).

end of EIP voting;

    ● Palm Beach County offered eight mobile VBM drop box sites located at various libraries and community centers during EIP voting, even though they are not permanent SOE branch offices and the locations did not offer EIP voting.

As discussed below in detail, it is my understanding that these 57 VBM drop boxes would not be permissible under SB 90 in whole or in part, even if they did have continuous monitoring by SOE personnel.

**132**    According to the affidavits and interrogatory responses of all the SOEs, it is my understanding that most of the 48 counties that offered 24/7 VBM drop boxes in the 2020 General Election do not plan on offering 24/7 VBM drop boxes in the next general election, as they are unable to provide the in-person monitoring by SOE staff that SB 90 requires. It is also my understanding from the 15 SOEs that I have identified as offering VBM drop boxes at locations other than EIP sites or their offices in the 2020 General Election either have no plans, or have not yet decided, to continue to do so in future elections, as SB 90 limits such locations in whole or in part.

**133**    In addition, beyond these 122 drop boxes, in their affidavits and interrogatory responses SOEs have indicated that they plan to curtail in whole or in part several additional VBM drop boxes due to the restrictions placed on them by SB 90. I detail these below.

## X.I   Scholarship on drop boxes

**134**    Barriers to casting a mail ballot are many, from postal delays, to the availability or cost of return postage, to limited hours of operation of postal service or election offices

(Schelker & Schneiter 2017; Herron & Smith 2021). Prior to the implementation of SB 90, these and other barriers were alleviated by SOEs who made secure drop box locations available to voters that were open prior to the start of EIP voting, open after the conclusion of EIP voting, or open after normal business hours via 24/7 drop boxes. Such secure drop boxes, particularly those open 24/7 and on days when election offices were not open and EIP voting was not taking place, allowed voters or their designees the ability to deliver VBM ballots securely and in a timely fashion to ensure they were counted.

**135**     As mentioned previously, USPS delivery rates fluctuate in Florida, and on-time deliveries were less frequent in the run-up to the 2020 General Election.[61] Over 1.5 million Florida voters followed the advice of the Secretary of State and SOEs and deposited their VBM ballots in secure drop boxes in the 2020 General Election. Scholars have shown that thousands of late VBM ballots are rejected by SOEs because they arrive in the mail after the state's deadline, including in Florida (Shino, Suttmann-Lea & Smith 2021; Herron & Smith 2021; Cottrell, Herron & Smith 2020). Rejected VBM ballots are disproportionately higher among minority voters than white voters in Florida (Smith 2018; Smith & Baringer 2020; Smith 2021; Cottrell, Herron & Smith 2020). Secure drop boxes used in other states help to reduce the barriers to casting a valid mail ballot (Collingwood et al. 2018; McGuire et al. 2020; Collingwood & Gonzalez O'Brien 2021). SB 90's restrictions placed on SOEs who want to continue to provide VBM drop boxes which will increase the costs of voting for Floridians. VBM drop boxes reduce the costs of voting by mail by providing more options to voters to return their VBM ballots.

---

[61]See "Key swing states vulnerable to USPS slowdowns as millions vote by mail, data shows," *The Washington Post*, available `https://www.washingtonpost.com/business/2020/10/20/swing-states-election-usps/` (last accessed July 7, 2020).

**136**     The limits placed on SOEs regarding the locations, days, hours, and security personnel for drop boxes will burden all voters who opt to vote VBM ballots. Akin to when election officials change the location or reduce the number of polling locations (Haspel & Knotts 2005; Brady & McNulty 2011; Amos, Smith & Ste. Claire 2017), the limitations on drop boxes under SB 90 will increase *information costs* and *transportation costs*, as well as *time costs* and *health costs* for voters wishing to hand deliver their VBM ballots. SB 90's provisions concerning the limits placed on where and when and under what supervision SOEs may provide drop boxes, will in whole or in part raise the costs of voting in Florida.

**137**     Based on available scholarship on the topic, there is also good reason to believe, all else equal, that voters of color are more inclined to drop off their VBM ballots in person than other voters, and as such, will be disparately negatively impacted by the limits placed on VBM drop boxes. Black Americans, according to a recent national survey (Plescia, Sevi & Blais 2021, p. 383) "favor the polling station even more than White Americans compared to mail voting." Black voters who have requested a VBM ballot may have good reason to want to return their VBM ballot in person, due to concerns over the reliability or timeliness of postal deliveries.[62] As I wrote ahead of the 2020 November election, "the potential for late—and thus uncounted—VBM ballots looms large. As has been widely reported, the United States Postal Service is under dire financial and staffing pressures. In several states, there have been reports of mail being delayed several days more than normal. Even a small perturbation in mail deliveries has the potential to wreak havoc on mail-in voting."[63]

---

[62]"Postal problems could continue despite suspension of policies blamed for mail delays," *Washington Post*, August 19, 2020, available `https://www.washingtonpost.com/business/2020/08/19/postal-problems-could-continue-despite-suspension-policies-blamed-mail-delays/` (last accessed August 3, 2021).

[63]Michael C. Herron and Daniel A. Smith, "Minor postal delays could disenfranchise thousands of Florida vote-by-mail voters," *Tampa Bay Times*, August 14, 2020, available `https://www.tampabay.com/opinion/2020/08/14/minor-postal-delays-could-disenfranchise-thousands-of-florida-vote-by-mail-voters-column/` (last ac-

## X.II   24/7 VBM drop boxes with video surveillance were secure in the 2020 General Election

**138**     Before examining the usage of VBM drop boxes in the 2020 General Election, it is important to provide some context about the security of drop boxes in that election, which saw a record-breaking number of VBM ballots cast. It is my understanding that in the 2020 General Election, prior to the implementation of SB 90, voters (or designees of the voters) were permitted to drop off completed VBM ballots in person at their SOE office during normal business hours (which varied across counties), as well as at secure drop-boxes, often after normal business hours (24/7), before and after the EIP voting period, and even at some locations that were not SOE offices. These secure VBM drop boxes were located outside and nearly all were monitored by video surveillance, at the SOE office, a branch office, or other locations. Nearly all of these secure, 24/7 video-monitoried drop boxes were open both prior to the designated two-week EIP voting period, as well as after the EIP voting period, including on Election Day. Additionally, all SOEs, as required by statute, offered secure drop boxes at all EIP voting sites during their EIP voting days and hours.

**139**     As indicated by the responses of the 62 SOEs who provided data to a request made on February 24, 2021, by Florida House of Representatives Chair of the House Public Integrity and Elections Committee ("PIE Committee"), Representative Erin Grall, *not a single SOE* reported any concerns with the security of their VBM drop boxes, including those that were open 24/7 under video surveillance.[64]

---

cessed June 19, 2021).

[64]I have not obtained or reviewed responses to the PIE Committee from Monroe, Palm Beach, Polk, Sumter, and Washington counties. In response to two questions asked by Rep. Grall, "What did you do to respond to reports of ballot harvesting? and "Did video surveillance reveal any evidence of ballot harvesting?", for the 62 counties for which I have written responses to the PIE Committee, only one SOE (Marion County) reported a single instance of so-called "ballot harvesting." The SOE of Marion County, however, after investigating the allegation of

93

## X.III    Use of VBM drop boxes on days, hours, and locations in 2020 General Election, and the impact of SB 90 on voters of color returning VBM ballots to drop boxes

**140**    Given the nature of the data produced by the SOEs in discovery, I am unable to provide an exact number of the total VBM ballots that were returned to drop boxes in the 2020 General Election that were cast on days/hours or at locations that are either expressly prohibited, or potentially limited (due to choices of SOEs, including the requirement of continuous SOE surveillance by SOE staff), under SB 90.[65]

**141**    However, drawing on the data I have received from the SOEs, in the following subsections I provide counts of the usage of VBM drop boxes in the 2020 General Election, specifically the number of VBM ballots deposited in drop boxes *outside* the expressly mandated period of drop box use under SB 90—that is, *only* on days (and hours) of EIP voting and at SOE offices (or permanent branch offices). I also provide counts, in counties that provided data, of the number of VBM ballots deposited in 24/7 drop boxes after normal business hours, as under SB 90, 24/7 drop boxes must now be continually monitored, in person, by an employee of the supervisor's office, whenever the drop box is accessible for

---

so-called ballot harvesting, the SOE reported to the committee that his office, "Viewed camera footage of drop box, examined contents of drop box," and concluded that there was no evidence of "ballot harvesting." See SOE responses to Florida House of Representatives, Public Integrity and Elections Committee, Chair Erin Grall, February 24, 2021.

[65]For example, Escambia County SOE, David H. Stafford, stated in his LWV, et al.'s affidavit that, "Drop boxes were only utilized in the 2020 election cycle. There was no separate coding for drop box ballots." "For each election involving a statewide or federal race from January 2016 to the present day, my office has neither created nor kept records about the number of voters who had their ballots delivered by a third-party organization or another individual." In her LWV, et al.'s declaration (RTP 39), Lori Scott, the Brevard County SOE, stated, "Once received at the Election Support Center, transported [VBM] ballots were date stamped and scanned by the inbound mail processing system. The ballots were entered as 'received' once the signature verification process was completed. Mail ballots, whether hand delivered or received via postal service or drop box, were processed all together."

deposit of ballots. Where possible, I also provide breakdowns by race and ethnicity (and voters with disabilities) for VBM drop box usage in the 2020 General Election, including on days/hours not expressly required under SB 90.

**142**     I provide empirical analyses, based on the availability of data, for the following 14 counties: Columbia, Manatee, Indian River, Hernando, St. Lucie, Madison, Putnam, Lee, Pinellas, Taylor, Franklin, St. Johns, Okeechobee, and Polk. I also provide evidence from the affidavits and interrogatory responses of the SOEs on their expectations on how SB 90 will likely affect the deployment of VBM drop boxes in future elections.

## X.III.1   Columbia County VBM drop box returns on days before EIP voting, by race and ethnicity and disability status

**143**     It is my understanding that in the 2020 General Election, Columbia County, located in north central Florida, maintained 24/7 VBM drop boxes with video surveillance that were stationed at its two SOE offices, one in Lake City and one in Fort White. Both VBM drop boxes were available to voters from the time VBM ballots were mailed through 7:00PM on Election Day. Both locations also served as the county's two EIP voting locations, which were open 10 days to voters, from Thursday, October 22, 2020 thru Saturday, October 31, 2020, from 8:30AM until 7:00PM.[66]

**144**     As part of its production, the Columbia SOE provided a .pdf document, "SOE DROP BOX LOG", that contains two pages of hand-written entries followed 20 pages of

---

[66] According to Columbia County SOE Tomi S.Brown, its two VBM drop boxes were secured with "video surveillance," and that the "Drop Boxes are slots in wall of main office (drops into secured room)/locked box in lobby during office hours and door of satellite office (drops into locked box on door)." The SOE replied, too, that she did not receive any reports of "ballot harvesting" in her county. See Columbia SOE response to PIE Committee.

typed entries, ordered by date, with voter IDs for each day of VBM ballots that apparently collected from the county's drop boxes.[67] The first date on the drop box log with an entry is October 2, 2020, and the final date with an entry is November 2, 2020. In all, there are 2,306 entries with voter IDs across the month in which the drop boxes were available for voters to hand-return their VBM ballots.[68] After processing the county's drop box log .pdf, I was able join it to the January 2021 voter file. I was able to match the voter IDs of 2,249 of the 2,306 (97.5 percent) of entries on the log.[69] Over 9,700 of Columbia County's registered voters cast VBM ballots in the 2020 General Election; roughly 23 percent of all VBM ballots cast in the county were deposited by voters in the county's two VBM drop boxes.

**145**     Of the 2,249 entries for which I have information about the individuals whose VBM ballots were deposited in the drop boxes, 1,117 (49.7 percent) were logged as being retrieved on the 10 days (October 22 - October 31) of EIP voting that the county provided at the two locations. During these 10 days, VBM drop boxes were monitored by SOE personnel and were available to voters from 8:30AM until 7:00PM.

**146**     On the days before and after the county's 10 days of EIP voting, the SOE recorded retrieving 1,132 (50.3 percent) of VBM ballots from its 24/7 VBM drop boxes that, according to the county's response to the PIE Committee, were secured by video surveillance. In other words, more than half of all VBM ballots recorded by the Columbia SOE in the 2020 General Election were deposited on days *outside* the dates on which, under SB 90,

---

[67]See Columbia County response to LWV, et al.'s RFP 2.

[68]There are clearly some data-entry errors: of the 2,306 voter IDs entered, there are 15 with only 8 digits and 7 with 10 digits, and not the 9 digits that all voter IDs have in the FVRS.

[69]In addition to the 22 entries on the log that did not have precisely nine digits for the voter ID, 35 voter IDs on the VBM drop box log did not match with records on the January 2021 statewide voter file, indicating that these individuals may have been removed from the voter rolls after the election or that there were additional data entry errors.

96

the SOE would be required to have VBM drop boxes available, i.e., the days on which it offers EIP voting. It is highly likely that at least some voters dropped off their ballots after hours on the days of EIP voting, when the VBM drop boxes were only monitored by video at the two locations. It is not possible to determine from the SOE's log, however, if VBM ballots recorded on those 10 days were deposited by voters during the early voting hours of operation, or if they were deposited in the VBM drop box before or after early voting was held.[70]

**147**     Because I am able to match the unique voter IDs on the county's log for the more than 2,200 registered voters in Columbia County who deposited VBM ballots in the two drop boxes, I am able to determine the race and ethnicity of voters who utilized the VBM drop boxes during EIP days, and those that utilized the drop boxes on days outside the early voting period. As Table 16 shows, more than 310 Black voters cast VBM ballots in the county's two secure drop boxes, according to the SOE's log. Of these VBM ballots deposited in the drop boxes, 52.4 percent of ballots cast by Black voters were recorded being retrieved by the SOE on days *outside* the county's 10 days of EIP voting. In contrast, 50.2 percent of VBM ballots cast by white voters were recorded as being on days on which the county did not offer EIP voting.[71]

---

[70] According to the SOE's response to the PIE Committee, the drop boxes were checked or emptied "Multiple times" each day.

[71] I do not find that voters who indicated when they registered to vote that they "needed assistance" when voting were more likely to utilize the county's VBM drop boxes outside of EIP voting days. Of the 66 individuals who indicated they needed assistance, 48.5 percent voted outside the county's designated EIP voting period, and 51.5 percent did not; those not requiring assistance were slightly more likely to utilize the VBM drop boxes outside of EIP voting, 50.4 percent to 49.6 percent.

Table 16: Dates of VBM Ballots Retrieved from Drop Boxes during EIP Voting and VBM Ballots Retrieved from Drop Boxes before and after EIP Voting, Columbia County, 2020 General Election, by Race/Ethnicity (Raw Counts and Percentage of Each Group)

| Dates of Drop Box | Black | Hispanic | Other | White |
|---|---|---|---|---|
| During EIP | 151 | 27 | 44 | 895 |
| Before & After EIP | 166 | 19 | 45 | 902 |
| During EIP | 47.63 | 58.70 | 49.44 | 49.81 |
| Before & After EIP | 52.37 | 41.30 | 50.56 | 50.19 |

*Note: Data from Columbia County LWV RPF "9402.pdf".*

**148**    To put these figures in broader context, Black voters in Columbia County were nearly 9 percentage points more likely to vote by mail in the 2020 General Election than white voters. Overall, of the more than 4,200 Black voters who cast ballots in the election, 36.3 percent did so by VBM ballot (in person or by mail), whereas only 27.8 percent of the roughly 27,000 white voters who turned out did so, an 8.5 percentage point difference. Moreover, one in five Black voters who cast a VBM ballot in the county did so via a drop box, and one in 10 of all Black voters in the county who cast a VBM ballot returned it to a drop box on a day *outside* the required period the county must offer drop boxes in future elections under SB 90.

**149**    In her July 30 interrogatory response, SOE Brown indicated that SB 90 has not yet had an impact, as she has not yet determined drop box locations for the 2022 election at this time. But clearly my analysis above indicates that it will, unless the Columbia County SOE again extends to the county's voters two VBM drop box locations that are open 24/7 with SOE personnel continually monitoring them, from the day VBM ballots were mailed through 7:00PM on Election Day. If, because it is cost prohibitive, or if she does not have SOE personnel available to continually monitor the drop boxes outside her two offices that in 2020 were available with video security prior to and after the conclusion of EIP voting, over half of all voters who used VBM drop boxes in the 2020 General Election in Columbia County

will have to find an alternative time and place to return their VBM ballots in person. This will undoubtedly increase the *time*, *transportation*, *information*, and *health* costs associated with voting. My analysis shows that these burdens will disproportionately affect voters of color.

## X.III.2    Manatee County VBM drop box returns after business hours, by race and ethnicity and disability status

**150**      As part of the discovery process in this litigation, the Manatee County SOE, Michael Bennett, provided an Excel spreadsheet that included individual voter's Voter ID numbers ("RegNum") as well as a timestamp ("VoteDate") that includes detailed information about the time a VBM ballot was processed by the SOE.[72] Using individual-level voter IDs in the file, I was able to join it to the January 2021 statewide voter file and statewide Recap file to determine the race/ethnicity of the voters and the disability status of the voters. In doing so, I am able to determine the precise time that the Manatee SOE recorded (with a timestamp) each VBM ballot it received.

**151**      According to its responses to the PIE Committee, Manatee County maintained six drop box locations in the 2020 General Election, all of them stationed at early voting locations, including one located outside the county's main SOE office.[73] Only the drop box at the main SOE office was open 24/7; the other five locations, all at EIP voting locations, were open October 19 - November 1, 8:30AM to 6:30PM.

---

[72]The spreadsheet is labeled MAN_20201103_GEN_Voted.xlsx). See Manatee SOE response to LWV, et al.'s RFP 16.

[73]SOE responses to Florida House of Representatives, Public Integrity and Elections Committee, Chair Erin Grall, March 5, 2020 [sic], NAACP et al.'s RFP 1.

**152**     Given these data, it is possible to determine which Manatee County voters' VBM ballots were deposited in drop boxes after the Manatee SOE's normal business hours (in this case, 7:00AM to 7:00PM during the early voting period).  Counties such as Manatee typically collected any deposited VBM ballots in drop boxes at the end of the day (in this case, after EIP early voting locations closed at 6:30PM), processing them (and giving them timestamps) later that evening.  For a drop box that was open 24/7, such as the one at Manatee County SOE's main office building, SOE staff presumably collected and processed after-hour VBM ballots deposited in drop boxes late at night or the ensuing morning. SOE Bennett affirmed to the PIE committee that the county's six drop box locations were under continual monitoring and were checked or emptied "multiple times per day" and that only the "office drop box was available 24/7."[74]

**153**     Operating from this premise, I sort VBM ballots in the county by their timestamps to get a sense of VBM ballots that were processed in the early morning, a likely indicator that they were retrieved from a 24/7 drop box.  Early processing timestamps would likely rule out VBM ballots that were picked up directly from the Post Office or that were retrieved from other early voting locations (that were not open 24/7).

**154**     Figure 5 shows a histogram of the timestamps of VBM ballots processed by the Manatee SOE on October 19th through November 2 that were either accepted or rejected by the SOE, according to the final voter history code in the statewide voter file.  Early voting in the county ran from 7:00AM to 7:00PM, Monday, October 19, 2020 through Sunday, November 1, 2020.  The additional day of processing—Monday, November 2—captures the

---

[74]See Manatee County SOE response to Florida House of Representatives, Public Integrity and Elections Committee, "Manatee County Answers 3/5/2020," NAACP, et al.'s RFP 1.

processing of any VBM ballots that may have been dropped off by voters at the SOE office's 24/7 drop box on Sunday evening or early Monday morning (as that drop box remained open, 24/7, through Election Day). It is clear that the SOE processes the preponderance of VBM ballots it receives each day from 10AM through 4PM; the number of VBM ballots with earlier or later timestamps drops off before and after those peak hours. Without confirmation from the SOE, it is difficult to know which VBM were being processed after 8PM (e.g., hour 20); I suspect these are VBM ballots retrieved at the end of the day from early voting locations.

Figure 5: Manatee County VBM Ballot Timestamps, by Hour,
October 19 through November 2, 2020



**Count of VBM return timestamps, by hour**

**155** Over 51,000 Manatee County VBM ballots were processed with a timestamp over the 15 days. More than 6,000 of the VBM ballots processed during this early voting

period—11.6 percent—had an SOE received timestamp before 10AM; the remaining VBM ballots had a timestamp of 10AM or later. As shown in Table 17, during this two week period, over 2,600 Black voters cast VBM ballots in Manatee County; 350 of them with recorded timestamps, or 13.5 percent, had their VBM ballots processed before 10AM by the SOE, an indication that they were deposited after hours at the SOE's 24/7 drop box. Among Hispanic voters, over 2,800 cast VBM ballots in the county during the time frame; over 370 of them, or 13.4 percent with recorded timestamps, had their VBM ballots processed before 10AM by the SOE, an indication that they were deposited after hours at the SOE's 24/7 drop box. Of the more than 43,200 white voters who cast VBM ballots in the county during the early voting time frame in the 2020 General Election, a tad more than 4,900 of them, or 11.4 percent, had their VBM ballots processed before 10AM by the SOE, an indication that they were deposited after hours at the 24/7 drop box at the SOE's main office building.

**156**　　In addition, over the course of the same 14 days of early voting, more than 600 Manatee County voters who indicated they needed assistance when voting returned VBM ballots with recorded timestamps. Roughly 12.4 percent of these VBM ballots have timestamps earlier than 10AM, from October 19 through October 31, 2020, indicating that their VBM ballots were dropped off after normal business hours; 11.7 percent of those voters not indicating they needed assistance fell in this category.

Table 17: Likely VBM Ballots Returned after Hours in 24/7 Drop Box, October 19 thru October 31, by Race/Ethnicity (Raw Counts and Percentage of Each Group), Manatee County, 2020 General Election

| After Hours | Black | Hispanic | Other | White |
|---|---|---|---|---|
| No | 2,240 | 2,418 | 2,720 | 38,038 |
| Yes | 350 | 375 | 400 | 4,903 |
| No | 86.49 | 86.57 | 87.18 | 88.58 |
| Yes | 13.51 | 13.43 | 12.82 | 11.42 |

*Note: Data from Manatee County SOE, "MAN_ 20201103_ GEN_ Voted.xlsx".*

157     From these data, it is apparent that Black and Hispanic voters, as well as those with disabilities, were more likely than white voters and those not needing assistance to deposit their VBM ballots in Manatee County's 24/7 VBM drop box after hours. In his July 30 interrogatory response, SOE Bennett indicated that SB 90 has not yet had an impact, and that he has made no decision on whether to allow VBM drop boxes beyond the mandated EIP time period. Yet thousands of voters in the county likely dropped their ballots off after normal business hours at the county's SOE office that was open 24/7 and was monitored after hours with video surveillance. Black, Hispanic, and voters with disabilities were disproportionately more likely to have their ballots counted early in the morning. Unless the county keeps open its 24/7 drop box and monitors it continuously with SOE personnel as mandated by SB 90, these voters will face increased *time*, *transportation*, *information*, and *health* costs associated with delivering in person their VBM ballots in future elections.

### X.III.3   Indian River County VBM drop box returns before EIP voting, including locations not permissible under SB 90

158     The SOE of Indian River County, Leslie Swan, in response to the LWV, et al.'s RFP, provided hand-written sheets with times of when VBM drop boxes were emptied by SOE staff. It is my understanding, drawing from the county's responses to the PIE Committee, that Indian River had four locations that voters could drop off their VBM ballots, including one—the Indian River County SOE office—that was open 24/7 from the time VBM ballots were mailed out (40 days prior to Election Day), through 7:00PM on Election Day.[75]

---

[75]See Indian River SOE response to Florida House of Representatives, Public Integrity and Elections Committee, email from Leslie Swan to Erin Grall, February 25, 2021, NAACP, et al.'s RFP 1.

159     All of Indian River County's VBM drop boxes were secure, with continual physical presence at all three early voting sites (from 8AM - 4PM during the early voting period), and with physical presence at the SOE office during business hours. The 24/7 VBM drop box located at the SOE office, however, had video surveillance after normal business hours. At all three Indian River County early voting sites in the 2020 General Election, VBM ballots dropped off in the secure boxes were returned to the SOE office nightly, and the drop box at the SOE office was checked on a regular basis, including at the end of every business day. In its responses to the PIE Committee, the Indian River SOE did not report receiving any reports of so-called "ballot harvesting" in the county.

160     The first recorded date of VBM ballots being removed from a drop box by Indian River SOE staff was Thursday, September 24, 2020, which was around the same day the SOE office had begun mailing VBM ballots to its non-UOCAVA registered voters.[76] SOE staff collected 10 VBM ballots out of the 24/7 dropbox at 2:50 PM on that day. Over the next three and a half weeks, over 2,400 voters dropped off their VBM ballots in the county's 24/7 drop box, amounting to 72 percent of the more than 3,300 total VBM ballots deposited in the county's 24/7 secure drop box.

161     To get a sense of how many VBM ballots were deposited *after* normal business hours, when the Indian River County's 24/7 drop box was secured by a video camera but not monitored by an employee of the SOE (or otherwise), it is possible to tally the number of ballots that SOE staff first collected on any given day. From September 24, 2020 through

---

[76]Under the federal Uniformed and Overseas Citizens Absentee Voting Act (UOCAVA), U.S. citizens who are active members of the Uniformed Services, the Merchant Marine, and the commissioned corps of the Public Health Service and the National Oceanic and Atmospheric Administration, their eligible family members, and U.S. citizens residing outside the United States, are provided their VBM ballots at an earlier date.

Election Day, November 3, 2020, some 726 VBM ballots were retrieved by SOE staff from the SOE's secure 24/7 drop box on the first pick-up from that box, constituting over 21 percent of the more than 3,300 VBM ballots collected over the nearly six week period.

**162** According to her July 30 interrogatory response, SOE Swan indicated that she had not yet made a decision on how to respond to the drop box constraints under SB 90. Yet, it is my understanding that more than 700 voters in Indian River County who cast their ballots after normal business in the 2020 General Election would not have been in compliance with the statute and therefore would not have been permitted to do so, unless the SOE had provided continuous monitoring, in person by an employee of the SOE office, at the 24/7 location. If this is not done in future elections, these voters will face increased *time*, *transportation*, *information*, and *health* costs when trying to cast their VBM ballots.

## X.III.4 Hernando County VBM drop box returns before EIP voting, including at locations not permissible under SB 90

**163** According to internal records kept by the Hernando County SOE office, between Monday, October 5, 2020 and Sunday, October 18, 2020, more than 8,360 Hernando County voters (or their designees) dropped off VBM ballots at the "Forest Oaks LockBox", which was situated outside the Branch Library in Spring Hill. The SOE, Shirley Anderson, also set up a temporary drive-thru drop box outside the county courthouse in Brooksville,[77] which was located "at the eastern end of the courthouse parking lot at the Records Storage Facility" in Brooksville, allowing voters to "drive up to this box and turn in their ballot, eliminating

---

[77]The SOE also maintained an "Inside LockBox" at the Brooksville location. See Hernando SOE response to LWV, et al.'s RFP 2.

the need to put on a mask, enter the courthouse, and get a temperature check."[78]  That facility was open 24/7, starting immediately after domestic VBM ballots were mailed out. According to the Hernando County SOE, between Monday, October 5, 2020 and Sunday, October 18, 2020, over 1,860 voters (or their designees) dropped off their VBM ballots at the "Brooksville Outside LockBox."

**164**  In sum, over 10,200 VBM ballots were deposited by Hernando County voters in the two VBM drop boxes prior to the start of EIP voting. When compared to the total VBM ballots that were cast as reported in the January 2021 voter file, this amounts to over 36 percent of the roughly 28,000 VBM ballots the Hernando SOE reported receiving (mail or in person VBM) over the two week period.[79]  It is my understanding that, if SB 90 had been in effect, these voters who utilized the outside 24/7 drop boxes would have been prohibited from dropping off their ballots, as they did so prior to the start of early voting and the drop boxes were located at temporary locations.  Without the availability of these secure and convenient 24/7 drop boxes, these voters would have had to utilize the USPS, which is not always reliable, or would have had to drop off their VBM ballots at early voting locations during the limited window of early voting, likely causing long lines at the county's permissible drop box facilities during the allowable early voting period.

**165**  According to her July 13 interrogatory response, Hernando SOE Anderson stated that, "To comply with the new requirements imposed by Section 28, Chapter 2021-11, the Hernando County Supervisor of Elections Office anticipates that the drop boxes that it

---

[78]See "Vote-by-Mail Drop Boxes," Hernando Supervisor of Elections, archived webpage available  `https://web.archive.org/web/20200928094449/https://www.hernandovotes.com/Vote-By-Mail-Drop-Boxes` (last accessed August 15, 2021).
[79]See Hernando SOE response to LWV, et al.'s RFP 2.

will provide will only be open from Monday to Friday, between 8 a.m. and 4:30 p.m." If this is the case, thousands of voters in the county will be deprived of the ability to vote in this manner, that is, casting their VBM ballots in a secure and timely fashion. Under SB 90, voters will face increased *time*, *transportation*, *information*, and *health* costs when trying to cast their VBM ballots.

### X.III.5 St. Lucie County VBM drop box returns outside EIP voting

**166** In its response to the LWV et al.'s RFP, the St. Lucie County SOE Gertrude Walker provided an Excel spreadsheet, "Daily Mail, Ballot Drop Off and Early Voting Curbside Log," detailing the number of VBM ballots that were dropped off in the county between September 17 and Election Day.[80] Although I have not seen the SOE's response to the PIE Committee, it is apparent from the spreadsheet and other public information that the St. Lucie County SOE offered four 24/7 drop box locations (with two drop boxes each), located at four SOE offices: the St. Lucie West South County Annex/ SOE Office; the Walton Rd County Admin Annex/SOE office; the Tax collectors office/SOE office; and the Orange Blossom Business Center/ Main SOE office. The county also offered a 24/7 "Secure Vote by Mail Ballot Drop Off Location Only" at the Lakewood Park Library (which was not an EIP voting location) during the full 14 days of EIP voting the county allowed.[81] It is unclear if the SOE provided round-the-clock office personnel at the five drop box locations. Figure 6 shows a screenshot, circa November 1, 2020, of St. Lucie County's webpage promoting the available VBM drop off locations.

---

[80]Actually, through 11/13/2020, as 17 VBM ballots were retrieved from the "Mail/Fort Pierce Box" on that day, apparently arriving after 7:00PM on Election Day. See St. Lucie SOE response, to LWV et al.'s RFP 2.

[81]See "EARLY VOTING AND VOTE BY MAIL BALLOT DROP OFF LOCATIONS," St. Lucie Supervisor of Elections, archived webpage available `https://web.archive.org/web/20201101111700/https://www.slcelections.com/m/Early-Voting` (last accessed August 17, 2021).

Figure 6: Screenshot of St. Lucie County SOE website, "EARLY VOTING AND VOTE BY MAIL BALLOT DROP OFF LOCATIONS", November 1, 2020.



*Note: Screenshot of St. Lucie County SOE webpage, captured November 1, 2020. Available at: `https://web.archive.org/web/20201020234124/ocfelections.com/early-voting-locations` (last accessed August 15, 2021).*

**167**   Over the 32 days that the drop boxes were available before EIP voting began in St. Lucie County (September 17 thru October 18, 2020), the SOE's internal spreadsheet

reveals that some 38,764 voters deposited their VBM ballots in the drop boxes, along with another 5,159 voters who deposited their VBM ballots in the four drop boxes that were open on Monday, November 2, 2020 as well as Election Day. All told, the 43,923 VBM ballots deposited in the drop boxes in operation outside of EIP voting accounted for 57.0 percent of all VBM ballots deposited in drop boxes (including over EIP voting at the county's sites) in the 2020 General Election.

**168**      It is my understanding that the St. Lucie County's 24/7 drop boxes were not monitored by SOE personnel. The drop boxes would not have been in compliance with the statute and therefore would not have been permitted had SB 90 been in effect, as they were were in operation prior to and after the EIP voting period in the 2020 General Election. SOE Walker, in her interrogatory response from July 29, stated that the county offered a "drop box located at a county library in an outlying area to accommodate the large number of voters there. SB 90 requires locations for Supervisors of Elections Office and Early Voting sites. For the 2022 election cycles we are eliminating only 1 drop box." In addition, she stated that the "24 hour drop box will no longer be available." Under this scenario, tens of thousands of voters in the county will be deprived of the opportunity to cast their VBM ballots in a secure and timely fashion. Under SB 90, voters will face increased *time*, *transportation*, *information*, and *health* costs when trying to cast their VBM ballots.

## X.III.6   Madison County VBM drop box returns before EIP voting

**169**      Madison County offered voters a total of five VBM drop boxes, including one monitored 24/7 with video surveillance, located outside the SOE office in the City of Madison. The SOE office VBM drop box was available for voters to deposit their VBM ballots from the

time VBM mail ballots were sent out through Election Day.[82] The county's four additional VBM drop boxes were open during and located at the county's EIP voting locations.

170     In response to the LWV et al.'s RFP, the Madison County SOE provided a 26 page .pdf, "2020 General Election Ballots Received in Mail/Dropbox," comprised of 25 sheets with columns of hand-written dates (and in some cases, times) along with what appears to be hand-written names and voter ID numbers, beginning on October 8 and ending on November 3, as well as a summary sheet (on p. 9).[83] Unfortunately, these hand-entered entries, by day (and in some cases time) and names and voter IDs, on the logs are not all legible. More problematic for any analysis, though, is that the logs do not differentiate which logged ballots were collected from the mail and which were via a secure drop box, or, among VBM ballots presumably retrieved from a drop box, from which of the county's five VBM drop boxes the ballots were retrieved by SOE staff.

171     On page nine of the .pdf, there is what appears to be a summary sheet, "Dropbox VBM Ballots," that records the number of VBM ballots retrieved by SOE staff for each day (September 29 - October 7, and October 13, 2020), presumably out of the one 24/7 VBM drop box that was open in the county, as the dates precede the start of EIP voting in the county. There were 164 VBM ballots deposited by voters during this two-week period, but unfortunately there are no logs in the SOE's production with individual-level voter IDs associated with these dates. Presumably, all of these VBM ballots on a sheet that clearly indicates that they were "Dropbox VBM Ballots," were retrieved by the SOE staff from

---

[82]See Madison County SOE response to LWV et al.'s RFP 2, and Madison SOE response to PIE Committee.
[83]See Madison SOE response, "2020 General Election Ballots Received in Mail/Dropbox.pdf" to LWV et al.'s RFP 2.

Madison County's 24/7 drop box with video surveillance, a box outside the SOE office that would not be permitted under SB 90 if the county did not provide its own round-the-clock security personnel.

**172**     Overall, including the summary sheet tallying 164 VBM drop box ballots, there are 756 VBM ballots referenced by the SOE on the 26 page .pdf (including 10 VBM ballots with voter IDs that have no date associated with them). Of these, 380 (50.3 percent) have dates inclusive of the 13 days of EIP voting permitted by the county at its four early voting locations; the remaining 49.7 percent of VBM ballots have a date on days outside the required days under SB 90 that VBM drop boxes are mandated.

**173**     To put these figures in a broader context, according to the January 2021 vote history file, over 2,000 Madison county voters cast VBM ballots in the 2020 General Election, or 21.7 percent of the total (over 9,400) ballots cast. Black and Hispanic voters in the county in the election were more likely to cast VBM ballots than white voters: nearly 27 percent of Black voters and over 24 percent of Hispanic voters cast VBM ballots; less than 20 percent of all ballots cast by white voters were VBM ballots. It is certainly possible that Black voters in Madison County were more likely to drop off their VBM ballots on days pre- and post-EIP voting, but at this time, I am unable to process, much less verify, if the names and voter IDs listed on the SOE's log of "2020 General Election Ballots Received in Mail/Dropbox" are those of individuals who cast in-person VBM ballots at locations that under SB 90 are not required.

**174**     It is my understanding that Madison County's 24/7 drop box was not continually monitored by SOE personnel. Had SB 90 been in effect in the 2020 General Election,

the county's drop box would not have been in compliance with the statute and therefore would not have been permitted, including prior to and after the EIP voting period. In his interrogatory response from July 30, 2020, SOE Heath Driggers stated that he has not made a decision yet on whether to offer VBM drop boxes beyond the required EIP days/times under SB 90. If the county does not do so, registered voters will be deprived of the opportunity vote in this manner and will thereby have a reduced opportunity to cast their ballot in a secure and timely fashion. Under SB 90, voters will face increased *time*, *transportation*, *information*, and *health* costs when trying to cast their VBM ballots.

### X.III.7   Putnam County VBM drop box returns before and after EIP voting and 24/7 drop box returns

**175**      In response to the LWV et al.'s RFP, the Putnam County SOE in North Central Florida, provided an Excel spreadsheet, "PUTNAM000003 - No 2 - 2020 General Drop Box Totals," with daily counts of the 778 VBM ballots deposited in the three drop boxes located at the county's three EIP voting locations (which were open 8:30AM - 6:00PM, October 19 - October 31, 2020) in the 2020 General Election.[84] Starting September 17 and running through Election Day, the Excel spreadsheet also includes daily counts of 1,692 VBM ballots returned in person to the SOE's Palatka Office/Front Counter, the daily counts of the 35 Faxed (overseas) VBM ballots, and the daily counts of the 5,154 VBM ballots the office received via the USPS. Also included in the Putnam County SOE's spreadsheet is the daily counts of VBM ballots deposited in the county's 24/7 drop box located in the SOE parking lot. In total, the Putnam County SOE reported receiving 9,279 VBM ballots in the 2020 General Election.

---

[84]See Putnam County SOE response to LWV et al.'s RFP 2.

176     The Excel spreadsheet also provides daily counts for the 1,620 VBM ballots that were deposited by voters in the county's one 24/7 VBM drop box, which was located in the parking lot of the Elections Office in Palatka, and open from September 26 through Election Day.  Subtracting the mailed and faxed VBM ballots from the total 9,279 VBM ballots the county received through Election Day yields 4,090 VBM ballots that were deposited in person, either over-the-counter at the SOE office, in a drop box located in the three EIP voting sites, or deposited in the 24/7 parking lot VBM drop box.  In all, nearly 40 percent of all hand-delivered VBM ballots in Putnam County in the 2020 General Election were deposited in the 24/7 drive-through VBM drop box.[85]  In its response to the PIE Committee, in which the Putnman County SOE noted no reports of "ballot harvesting," the SOE Charles Overturf III stated that the county maintained "Physical Presence at 4 Locations" and "Video Surveillance at 1 location."  It appears that the 24/7 drive-through drop box had the video surveillance, and my understanding is that this type of surveillance would not be permissible under SB 90.

177     It is my understanding that Putnam County's 24/7 drop box was not continually monitored by SOE personnel.  Had SB 90 been in effect in the 2020 General Election, the county's 24/7 drop box would not have been in compliance with the statute and therefore would not have been permitted, including prior to and after the EIP voting period.  In his interrogatory response on July 30, 2020, SOE Charles Overture stated that he had "not determined 2022 locations for drop boxes at this time," but that "[t]he drop box located in the parking lot may be removed due to lack of funding to staff the drop box with an election worker as now required."  If the county does not offer the 24/7 drop box, thousands of voters will be denied the opportunity to cast their VBM ballots in a secure and timely fashion.

_____

[85]See Putnam County SOE response to LWV et al.'s RFP 2.

Under SB 90, voters will face increased *time*, *transportation*, *information*, and *health* costs when trying to cast their VBM ballots.

### X.III.8   Lee County VBM drop box returns before EIP voting

**178**      In his response to the LWV et al.'s RFP, the Lee County SOE Tommy Doyle provided a spreadsheet, "131 Gen Elec 2020 Drop Box Totals.xlsx", detailing the number of VBM ballots dropped off between September 30 and Election Day.[86]  Although Lee County did not offer any 24/7 drop box locations, it did allow voters (or their designees) to deposit their VBM ballots at three branch SOE locations from 8:30AM to 6:00PM (Lee County Elections Bonita Springs Branch Office, Lee County Elections - Cape Coral Branch Office, and the Lee County Elections Center) in the weeks leading up to the EIP voting period starting October 19, 2020.  According to the SOE's spreadsheet, 38,530 VBM ballots were deposited in the three available drop boxes between September 30 and October 18, 2020, accounting for some 40.5 percent of the 95,063 total VBM ballots that the SOE office collected from its secure drop boxes (including those later deployed at the county's EIP locations as well as at the county's main SOE office).

**179**      According to his July 30 interrogatory response, "The Supervisor has not made decisions concerning removal of previously offered drop boxes.  The Supervisor anticipates that the days of the week and times when drop boxes are available to voters will not change." Yet as SOE Doyle wrote in an email to the leadership of the Florida House and Senate on March 11, 2021, "There are many voters who would rather drop a ballot off than vote in person for many reasons, one is lack of trust in the USPS and of course coming in close

---

[86]See Lee SOE response to LWV et al.'s RFP 2.

contact with strangers at voting sites. Drop-offs were one of the most popular ways to vote in Lee County 95,000 voters dropped off their ballot, that's 25 % of the voters that voted in November. If we have those 95,000 voters showing up at the polls, you can expect very long lines and wait times."[87]

**180**      SOE Doyle clearly understands the increase costs to voters—*time*, *transportation*, *information*, and *health*—imposed by SB 90. It is my understanding that if Lee County's branch offices are not considered to be "permanent" under SB 90, and more critically, if they are not continually monitored by SOE personnel, none of the more than 38,500 VBM ballots deposited in the secure drop boxes located at the SOE's three branch offices prior to the start of EIP voting would have been permitted to do so in the 2020 General Election.

### X.III.9   Pinellas County VBM drop box returns before EIP voting and at locations that did not offer EIP voting

**181**      In its response to the LWV et al.'s RFP, the Pinellas County SOE Jule Marcus provided a spreadsheet, "398 NOV 2020 BALLOT DROP OFF", detailing the number of VBM ballots that were dropped off between September 18 and Election Day.[88] For more than a decade, the Pinellas County SOE office has taken the lead in making VBM drop boxes available for its voters. Although Pinellas County did not offer any 24/7 drop box locations, the county allowed voters (or their designees) to deposit VBM ballots at three SOE locations (the County Courthouse, the Election Service Center, and the County Building (which doubled as EIP locations) from 8:00AM to 5:00PM, from the day VBM ballots were mailed out through 7:00PM on Election Day; these locations also served as EIP sites.

---

[87]See Lee SOE Tommy Doyle, email "SB 90 Email to State Reps.pdf," March 11, 2021, NAACP, et al.'s RFP 1.

[88]See Pinellas SOE response to LWV et al.'s RFP 2.

According to the Pinellas County SOE's spreadsheet, "398 NOV 2020 BALLOT DROP OFF", 104,540 VBM ballots were deposited in VBM boxes at the three SOE locations, and another 10,624 and 2,692 VBM ballots were deposited at the county's two other EIP locations, The Centre of Palm Harbor and the SPC Allstate Center, respectively. In all, 60.5 percent of the 194,843 VBM ballots deposited in drop boxes in the county were at these five locations.[89]

**182**     More importantly, it is my understanding that 76,987 VBM ballots—accounting for 39.5 percent of all VBM drop box ballots in Pinellas County in the 2020 General Election—were deposited in 20 VBM drop boxes located around the county that would not have been permissible under SB 90. That is, the 20 VBM drop boxes—even though each was staffed with two deputized election employees—were not located at EIP voting locations and are not permanent SOE offices or branch offices. The 76,987 VBM ballots deposited in the 20 drop boxes include 4,019 VBM ballots deposited on Monday November 2, a day after the close of EIP voting, which I understand to be expressly prohibited under SB 90 if the drop box is not located at an SOE office or permanent branch office, and is continually monitored by SOE staff. These 20 drop boxes were spread around Pinellas County, stationed at libraries, community and neighborhood centers, tax collector offices, the EpiCenter at St. Petersburg College, and even at Tropicana Field. None of these 20 drop box locations served as an early voting site and none is a permanent SOE (or branch) office. Again, my understanding is that under SB 90, not a single one of the nearly 77,000 VBM ballots deposited at drop boxes at 20 locations in Pinellas County in the 2020 General Election would be permitted under SB 90.

---

[89]It should be noted that 352 (The Center of Palm Harbor) and 105 (SPC Allstate Center) VBM ballots were dropped off at the two EIP locations on Monday, November 2, a day expressly prohibited by SB 90, as neither of these locations is a permanent SOE or branch office.

**183**     According to her June 28, 2021 affidavit, Pinellas County SOE Julie Marcus said that she intends to maintain 25 ballot drop-box locations for the 2022 primary and general elections, as according to SOE Marcus, they "provide a critical, secure means for voters to return their mail ballots directly to deputized election employees, and/or to bypass the United States Postal Service."[90] But it is unclear how this will be achieved unless the 20 drop box locations that the county allowed during the EIP period (and extended through to the Monday before Election Day) that *did not* offer EIP voting are converted into EIP locations, or alternatively, become permanent SOE branch offices.

**184**     It is my understanding that if Pinellas County is not permitted to offer VBM drop boxes at non-SOE locations that are not also EIP locations, as is required under SB 90, none of the nearly 77,000 voters who deposited their VBM ballots in the county's secure drop boxes in the 2020 General Election in the county's 20 VBM drop box locations will be permitted to do so in future elections. SB 90, in my opinion, will increase *time*, *transportation*, *information*, and *health* costs to thousands of Pinellas County's voters.

## X.III.10   Taylor County 24/7 VBM drop box returns before EIP voting

**185**     In her response to the LWV et al.'s RFP, Taylor County SOE Dana Southerland provided a hand-written spreadsheet, "Log of VBM Ballots Returned to SOE by date and by method", detailing the number of VBM ballots were dropped off between September 24 and Election Day.[91] Rural Taylor County only offered one location for VBM ballots to be dropped off in person—the SOE Office in Perry. The SOE, however, kept the secure drop

---

[90]See Pinellas SOE response to Florida House of Representatives, Public Integrity and Elections Committee.
[91]See Taylor SOE response to LWV et al.'s RFP 2.

box open 24/7, from the day domestic VBM ballots were mailed out to Election Day. My understanding is that the county maintained two VBM drop boxes: one inside and one outside the office. According to the SOE's response to the PIE Committee, the two drop boxes were under continual monitoring using "video surveillance."

**186** Taylor SOE Southerland reported that the two 24/7 drop boxes were checked or emptied "1+ daily," and reported no "reports of ballot harvesting in your county."[92] Beginning on September 24, and running through the start of EIP voting on October 19, 2020, 536 VBM ballots were deposited in the SOE's one outside drop box under video surveillance. Over that same period, the Taylor SOE documented receiving 916 VBM via "USPS" and another 440 deposited in the inside secure drop box. Although the SOE did not report how many of the VBM ballots were dropped off after normal business hours, the two 24/7 outside VBM drop boxes in the county accounted for 51.6 percent of the 1,892 VBM ballots the SOE received prior to the start of EIP voting on October 19, 2020.

**187** It is my understanding that neither of the county's two secure 24/7 drop boxes would be permitted under SB 90, as both were monitored by video surveillance and preceded the commencement of EIP voting. According to SOE Southerland's interrogatory on July 30, 2021, the county has made no decision at this time on maintaining the number of VBM drop boxes or hours outside the mandated period under SB 90, despite the fact that more than half of all voters who cast a VBM ballot in the county utilized the two 24/7 drop boxes. If access to the VBM drop boxes in the county are not maintained, the costs to voters—*time*, *transportation*, *information*, and *health*—will increase under SB 90.

---

[92]See Taylor SOE response to Florida House of Representatives, Public Integrity and Elections Committee, NAACP, et al.'s RFP 1.

## X.III.11  Franklin County VBM drop box returns before EIP voting

**188**     In its response to the LWV et al.'s RFP, the Franklin County SOE, Heather Riley, provided a 53 page hand-written spreadsheet, "AP Dropbox – VBM ballots", detailing the number of VBM ballots that were dropped off each day from September 28 through Election Day.[93]  Franklin County offered two 24/7 VBM drop boxes monitored by video surveillance, one at its SOE office in Apalachicola and one at its office annex at the Carrabelle Courthouse, according to the SOE response to the PIE Committee.[94]  It is my understanding that the county offered voters EIP voting over 13 consecutive days, starting October 19 and running through October 31, from 8:30AM to 5:30PM.

**189**     Based on the data contained in the Franklin County SOE spreadsheet, "AP Dropbox – VBM ballots", a total of 937 VBM ballots were retrieved by SOE staff from the two 24/7 VBM drop boxes between September 28 and November 3, 2020.  Of these, fully two-thirds, some 560 (66.6 percent) VBM ballots, were retrieved by SOE staff from the two 24/7 VBM drop boxes between September 28 and October 18—days that preceded the start of EIP voting—with an additional 64 VBM ballots collected over the final three days after the close of EIP voting in the county (Sunday, November 1, Monday, November 2, and Election Day).

**190**     SOE Riley stated in her interrogatory response on July 30, 2021, "I have not made a decision about any changes at this time" regarding the two locations.  Yet, it is my understanding that neither of the county's two secure 24/7 drop boxes would be permissible

---

[93]See Franklin SOE response to LWV et al.'s RFP 2.

[94]The Franklin SOE reported that the two 24/7 drop boxes were checked or emptied "Twice a day" and were accessible by voters "At all times", and that the county did not receive any reports of "ballot harvesting" during the election.

under SB 90, as both were monitored by video surveillance and were not continually by SOE staff. In addition, both 24/7 VBM drop boxes were open prior to and after the conclusion of EIP voting in the county. Again, two-thirds of all VBM ballots hand-delivered by voters to the county's two drop boxes in the 2020 General Election were deposited outside SB 90's mandated EIP voting period. Under SB 90, it is clear that costs to voters—*time*, *transportation*, *information*, and *health*—will increase under SB 90.

### X.III.12   St. Johns County VBM drop box returns before EIP voting

**191**     In its response to the LWV et al.'s RFP, the St. Johns County SOE Vicky Oakes provided an Excel spreadsheet, "VOTE-BY-MAIL BALLOT DROPOFF LOCATIONS 11/3/2020 GENERAL ELECTION," detailing the number of VBM ballots that were dropped off between September 24 and Election Day.[95] The St. Johns County SOE offered one 24/7 drop box location, located at its elections office. According to the SOE's response to the PIE Committee, the "permanently installed" secure drop box was monitored "by 3 video cameras," was "emptied daily," with no reports of "ballot harvesting."[96]

**192**     It is my understanding that beginning on September 22, and running through the start of EIP voting on October 19, 2020, the St. Johns County SOE reported that there were a total of 8,156 VBM ballots deposited in the SOE's one available outside drop box under video surveillance. In addition, the county reported another 827 VBM ballots were deposited in its 24/7 drop box on the Sunday and Monday after the close of EIP voting in the county, as well as on Election Day itself. All told, voters in the county deposited

---

[95]See St. Johns SOE response to LWV et al.'s RFP 2.
[96]See St. Johns SOE response to Florida House of Representatives, Public Integrity and Elections Committee, NAACP, et al.'s RFP 1.

8,981 ballots in the outside drop box, accounting for 38.5 percent of the 23,318 VBM ballots dropped in person (including at the 10 drop boxes at the county's early voting locations) in the 2020 General Election.

193        According to St. Johns SOE Oakes' interrogatory on July 30, 2021, "The 24/7 drop box located outside the Supervisor of Elections office will no longer be available as it was previously monitored by security cameras." In addition, she stated that "Drop boxes will only be available inside the Supervisor of Elections Office and at all early voting locations; only accessible during business and early voting hours." It is my understanding that the county's 24/7 drop box would not have been in compliance with the statute and therefore would not have been permitted under SB 90, as it was monitored by video surveillance and its days of operation preceded (and succeeded) the commencement (and close) of EIP voting in the 2020 General Election. The costs to voters in the county—*time*, *transportation*, *information*, and *health*—will increase under SB 90.

### X.III.13    Okechobee County VBM drop box returns before EIP voting and deposited after hours

194        In response to the LWV et al.'s RFP, the SOE of Okeechobee County, Melissa Arnold, provided a hand-written spreadsheet, "General Election 11/03/2020, Dropbox Count," that tallied the number of VBM ballots collected by the SOE staff each day, from September 28 through Election Day. The VBM ballots were all retrieved from the one outside VBM drop box the county offered (located at the SOE Office in the city of Okeechobee). My understanding is that the city had a second drop box located inside its 304 NW 2nd St. office. According to the SOE's response to the PIE Committee, SOE staff retrieved and counted the number of VBM ballots dropped off at its outside box, "Twice daily based on

log," with the outside drop box monitored by a "Police officer at night and SOE Window by day."[97] A total of 762 VBM ballots were retrieved from the 24/7 outside drop box over the five weeks preceding Election Day.

195     Of the 762 VBM ballots deposited in the 24/7 drop box, 398 (52.2 percent) were dropped off prior the the start of EIP voting in the county, which was located only at the SOE office. Since the 24/7 drop box was not continually monitored in person by SOE staff (SOE staff monitored the drop box through a "SOE Window by day" and it was monitored by a "Police officer at night"), more than half of the county's voters who cast VBM ballots in person at the outside box in the 2020 General Election would not have been in compliance with the statute and therefore would not have been permitted had SB 90 been in effect. In addition, overall, the SOE reported that 208 of the 762 VBM ballots deposited in the county's 24/7 drop box, some 27.3 percent, were retrieved by staff in the "AM", indicating that these ballots were likely deposited *after* the close of the SOE office (prior to EIP voting), or *after* 4:30PM, the close of EIP voting that took place at at the SOE office from October 19 through November 1, 2020, and *before* the SOE office collected the deposited VBM ballots in the "AM".[98].

196     In her August 3, 2021 interrogatory response, SOE Arnold stated that no decision had yet been made on how to respond to SB 90, but that she would "most likely be extending the drop box hours to coincide with the extended early voting hours to better meet the needs of the citizens of Okeechobee County." In fact, even if the number of hours of EIP voting during the two week period are expanded, such a decision would not offset the

---

[97]See Okechobee SOE response to LWV et al.'s RFP 2.
[98]See Okechobee SOE response to the LWV et al.'s RFP 2.

loss of opportunities for county voters to deposit their ballots prior to or after the window of EIP voting. In short, the costs to voters in the county—*time*, *transportation*, *information*, and *health*—will increase under SB 90.

## X.III.14  Polk County VBM drop box returns before and after EIP voting

**197**    In the 2020 General Election, the Polk County SOE, Lori Edwards, according to information posted on her website, offered voters the opportunity to drop off their VBM ballots prior to the start of EIP voting through Election Day, at two locations: the county's Election Headquarters in Bartow and its Elections Operations Center in Winter Haven.[99] According to information posted in a .pdf on the SOE's website, the Bartow drop box was open 24/7 for the five week run-up to Election Day; the Winter Haven drop box was open weekdays, 8AM - 5PM over the same time period. Both drop boxes were also open on November 2, after the close of the county's two weeks of EIP voting, with the Bartow drop box open 24/7 and the Winter Haven drop box open from 8AM to 5PM that Monday.

**198**    In response to the LWV et al.'s RFP, the Polk County SOE provided two .pdfs ("2020 General Bartow Drop Box" and "2020 General Winter Haven DROP BOX") with the daily tallies of VBM ballots deposited in the two drop boxes (beginning October 1 and running through Election Day.[100] A total of 18,554 VBM ballots were cast at the two locations (Bartow and Winter Haven) starting October 1 through Election Day, including 10,076 that were cast *prior* to the start of EIP voting, and 2,214 that were deposited on

---

[99]"DROP BOX INFORMATION," Polk County SOE, available `https://www.polkelections.com/Portals/Polk/Documents/Drop%20Box%20locations%20-%202020%20General.pdf` (last accessed August 18, 2020).

[100]See Polk_Co_SOE_LWV_RTP_2 (1).pdf and Polk_Co_SOE_LWV_RTP_2 (3).pdf, Polk County SOE response to LWV et al.'s RFP 2.

Monday, November 2, and Tuesday, November 3 (Election Day).[101] The 10,076 VBM ballots retrieved by the SOE office through October 18, accounted for 54.3 percent of the total number of VBM ballots deposited in the Bartow and Winter Haven VBM drop boxes in the weeks leading up to, and including, Election Day.

**199**    In addition, the Polk SOE provided a .pdf, "Vote by Mail Drop Off at Early Voting Sites General Election 2020", that contained the count of daily VBM ballots deposited in the county's nine drop boxes located at EIP voting sites, and that were open from October 19 through November 1, 2020. Over those 14 days, according to the data in the .pdf, a total of 17,677 VBM ballots were deposited in drop boxes at the nine EIP locations. In total, then there were 36,231 VBM ballots deposited in drop boxes, according to figures provided by Polk County (plus any deposited in the Polk County Government Center and the Polk County Sheriffs District Office on Monday, November 2, 2020.) Finally, the 12,290 pre- and post-EIP VBM ballots deposited in the Bartow and Winter Haven drop boxes (September 29 - October 18, and November 2 - November 3) accounted for 33.9 percent of the 36,231 VBM ballots the SOE reported as being deposited in VBM drop boxes in the entire election.

**200**    In her interrogatory response on July 29, 2021, SOE Edwards was noncommittal on how her office planned to respond to the limits placed on VBM drop boxes under SB 90. But it is clear that under SB 90, given staffing issues at the two drop boxes, that the 12,290 voters who cast VBM ballots beyond the two-week EIP voting period will not have

---

[101]See "DROP BOX INFORMATION," Polk County SOE, available `https://www.polkelections.com/Portals/Polk/Documents/Drop%20Box%20locations%20-%202020%20General.pdf` (last accessed August 18, 2020). Unfortunately, I have not been able to locate a response from the Polk County SOE that documents the total number of VBM ballots that were deposited in the drop boxes located at the two additional sites (Polk County Government Center in Lakeland and the Polk County Sheriffs District Office in Davenport) that, according to the SOE's website, were open on Monday, November 2, 2020.

such an opportunity to do so in future general elections under SB 90 unless the county provides continual staffing. SB 90 will increase the costs to voters in the county—*time*, *transportation*, *information*, and *health*—as SOE Edwards noted that, "Under the terms of SB 90 the maximum number of locations in Polk County where a drop box may be located outside of early voting hours is 2."[102]

## X.IV Affidavits and interrogatory responses of SOEs regarding the impact of SB 90 on VBM drop box availability to voters

**201**     Based on information received from the 14 SOEs, in my opinion SB 90 has a negative impact on the ability of registered voters to return their VBM ballots to a secure drop box, and this burden is likely to fall most heavily on voters of color. Not all SOEs have provided data on drop box usage, however. Even without a complete data set on the usage of VBM drop boxes, it is clear that the impact of SB 90 will not be minimal. My opinion bolstered by affidavits and interrogatory responses of Florida's SOEs, as documented above, but also for additional SOEs for which I have not obtained VBM drop box data.

**202**     For example, the Alachua County SOE, Kim Barton, in her affidavit, indicated that SB 90 has had no impact yet, but stated that, the one 24/7 drop box "located at the main office (515 N Main St, Gainesvillle, FL 32601) will not be opened 24 hours" in future elections. Instead, the county's one 24/7 "drop box will remain open through designated early voting hours but the extra hours of availability are undetermined. Determinations will be finalized by December 31, 2021." Thousands of Alachua County voters likely cast their VBM ballots at the county's sole 24/7 drop box in the 2020 General Election prior to and

---

[102]See Polk County SOE response to the LWV et al.'s RFP 40.

after the 13 days of EIP voting the county offered, including after normal business hours. In short, by reducing the availability of the county's only VBM drop box, SB 90 will increase the costs to voters in the county—including costs on their *time*, *transportation*, *information*, and *health*.

**203**     Other SOEs clearly intend or expect that they will have to reduce the opportunities of voters in their counties to return their VBM ballots in secure drop boxes. For example:

• Clay County SOE Chris Chambless, in his interrogatory response from July 29, 2021, said that the impact of SB 90 was apparent. "The dropbox outside the SOE's main office will remain locked and inaccessible due to the box not being monitored." Clay County's 24/7 VBM drop box in the 2020 General Election was open from the time VBM ballots were mailed out through 7:00PM on Election Day. In future elections, voters who want to return their VBM ballots to the drop box after hours will be unable to do so, as SOE Chambless states that the drop box at the "SOE's main office" will remain open only "during business hours," and "will remain locked and inaccessible due to the box not being monitored."

• Flagler County SOE Kati Lenhart, in her affidavit on July 28, 2021, noted that, "The secure ballot drop box at the Elections Office will no longer be available 24/7. A secure drop box will be available 60 days prior to a Primary or General Election and through Election Day, during office hours only at the entrance of the Elections Office." In the 2020 General Election, Flagler County located its 24/7 VBM drop box outside its SOE Office in Bunnell, and it was open from the time VBM ballots were mailed out through Election Day at 7:00PM.

• Glades County SOE Aletris Farnam, in her August 3, 2021 interrogatory response, stated that she would probably not have a drop box outside that was available 24 hours a day, 7 days a week. Rather, she noted that drop boxes will most likely be inside the

Supervisor of Elections office, during working hours, which are Monday through Friday from 8:00 a.m. to 5:00 p.m. In the 2020 General Election, voters in the county had access to an outside VBM drop box that was open after hours.

• Lafayette County SOE Travis Hart, in his interrogatory response from July 27, 2021, states, "Barring a reversal of the law in the 2022 Legislative Session regarding drop boxes, the SOE will remove the drop box currently located at the courthouse," which was outside and open, 24/7, from the time VBM ballots were mailed out to Election Day at 7:00PM. In my opinion, because of these planned cutbacks on 24/7 VBM drop boxes in these four counties, SB 90 will increase the costs to voters in Clay, Flagler, Glades, and Lafayette counties—including costs on their *time*, *transportation*, *information*, and *health*.

**204**     Some SOEs are already feeling the effect of SB 90. For instance:

• In her interrogatory response, Amanda Seyfang, the Bradford County SOE, noted that her office removed the 24/7 drop box located outside her office that the county has offered voters. The drop box was not available to voters in a recent "2021 municipal election (the only election we have in 2021)...due to not having staff to monitor in person."

• SOE Lori Scott of Brevard County made it clear in her affidavit that "24/7 dropboxes will no longer be available." In the 2020 General Election, Brevard County offered voters four 24/7 drop boxes at their various SOE offices.

• Calhoun County SOE Sharon Charson, in her July 30, 2021 interrogatory response, said that she has "not yet determined" if she will maintain the availability of a 24/7 drop box outside her office that voters could use from the time VBM ballots were mailed out through 7:00PM on Election Day. In short, SB 90 will increase the costs to voters in these three counties—including costs on their *time*, *transportation*, *information*, and *health*.

205      A few SOEs, such as Baker County SOE, Chris Milton, claim that the impact on drop boxes is not readily apparent. SOE Milton, in his July 30, 2021 interrogatory claimed that the one drop box the county offered in the 2020 General Election, "will be available during early voting hours as set by law." What this means is that voters will no longer have access to the county's 24/7 VBM drop box prior to or after the county's EIP voting period, as Milton admitted that, "At this time, the only location that a drop box can be placed that could feasibly be open outside of early voting hours is at the Supervisor of Elections Office." In short, SB 90 will increase the costs to voters in the county—including costs on their *time*, *transportation*, *information*, and *health*.

206      Similarly, Bay County SOE, Mark Andersen, in his July 30, 2021 interrogatory response, claims that SB 90 has not had an impact. He states that in future elections, "locations will only be located inside our active early voting sites and main office as required. This will be very close to what we have done in the prior election." My understanding, however, is that SOE Anderson carries out such action, it will actually *not* be very close to what Bay County did in the 2020 General Election, as under SB 90, the county may no longer, as it did in the 2020 General Election, offer a 24/7 drop box at the SOE office unless it is continually monitored by SOE staff. In addition, if SB 90 is followed to the letter, Bay County will also not be permitted to offer drop boxes at all 13 of its Super Voting Centers on the Monday before Election Day, which is not an allowed EIP day under state statute. In short, SB 90 will increase the costs to voters in Bay County—including costs on their *time*, *transportation*, *information*, and *health*.

207      According to their affidavits and interrogatory responses, some SOEs have already made plans to reduce VBM drop box availability due to SB 90. For example:

128

• Shirley Freen Knight, Gadsden County SOE, in her interrogatory response on July 30, 2021, stated that "The drop box that is installed in the door of the SOE building has been removed." SOE Knight did not indicate that there would be a replacement for the drop box, which in the 2020 General Election was open 24/7 from the time VBM ballots were mailed out through Election Day at 7:00PM.

• Lake County SOE Alan Hays, in his interrogatory response, states that he has already made a decision to eliminate the county's 24/7 VBM drop box, as in "the 2022 elections, the drop box previously provided outside of the elections office will no longer be available because of the requirement that the drop box be continuously monitored in person by an employee of the Supervisor's office when accessible for deposit of ballots." It is my understanding that in the 2020 General Election, the Lake County drop box, located outside the SOE office, was open 24/7 from the time VBM ballots were mailed out until 7:00PM on Election Day. Functionally, since voters in these two counties will no longer have access to 24/7 VBM drop boxes, a conservative estimate is that voters in the two counties will have roughly 300 fewer hours (25 fewer days and at least 12 fewer hours each day, assuming the office is open 12 hours a day) to return their VBM ballots in person in future elections. In short, SB 90 will increase the costs to voters in Gadsden and Lake counties—including costs on their *time*, *transportation*, *information*, and *health*.

**208**    A handful of SOEs claim in their affidavits and interrogatory responses state they have no intention of making changes under SB 90, despite that continuing their practices in the 2020 General Election will comply with the statute and therefore will not be permitted in whole or in part. For example:

• Dixie County SOE Starlet Cannon, in her interrogatory response on July 30, 2021, claims that, "For 2022 elections, there are no changes. We only have one drop box location – at the SOE office." My understanding is that in the 2020 General Election, Dixie County

had one 24/7 drop box located outside of the SOE office that was open from the mailing of VBM ballots through 7:00PM on Election Day, and that based on SOE Cannon's response to the PIE Committee, the county's 24/7 drop box was secured by "Camera."

- DeSoto SOE Mark Negley's response is similar to that of SOE Cannon's. In his July 29, 2021 interrogatory response, SOE Negley stated that he does not intend to remove any drop boxes. My understanding is that the county offered two 24/7 drop boxes in the 2020 General Election that were available outside the SOE office, open for deposit of VBM ballots from the time VBM ballots were mailed to voters through 7:00PM on Election Day.

- In his affidavit from June 28, 2021, and then again in his affidavit from July 13, 2021, Escambia SOE David H. Stafford claims that he does not intend to reduce the number or hours of drop boxes nor change the dates or hours of operation. In the 2020 General Election, according to SOE Stafford's response to the PIE Committee, Escambia County offered one 24/7 drop box outside the SOE office in Pensacola, which was open to voters from the time VBM ballots were mailed out through 7:00PM on Election Day.

- Hardee County SOE Diane Smith, in her interrogatory response on August 3, 2021, states, "We do not currently anticipate any changes." My understanding is that in the 2020 General Election, Hardee County offered one VBM drop box, located at the Hardee Public Library, that was open before and after the start and end of EIP voting.

**209**    None of these SOEs acknowledge in their affidavits or interrogatory responses that SB 90 will require additional expense to staff drop boxes, nor do they state specifically that they intend to make the required investments in order to avoid any changes to their drop box 24/7 availability. Contrary to their affidavits and interrogatory responses, these SOEs—despite stating that have no intention to make changes due to SB 90—will need to make changes if they are to comply with the law.

210    At a minimum, to comply with SB 90, in order for these four counties to maintain the 24/7 VBM drop boxes available during the 2020 General Election they will need to provide continual monitoring by their staff from the time VBM ballots are mailed out through 7:00PM on Election Day. In addition, Hardee County will have to find a new location for its 24/7 drop box, as its location (a public library) is prohibited to have a drop box before or after the EIP period, as it is not a SOE office. Therefore, under SB 90, Hardee County voters will not have access to a VBM drop box, except–at most–for the 14 days during which they may drop off their VBM ballots during EIP–and that is only if the county extends its EIP period to include the final Sunday, something the county did not do during the 2020 General Election.

211    As it stands, voters in these four counties will experience a curtailment in drop box availability in future elections compared to 2020 if the SOEs do not make changes. As a result, voters in these counties will confront new barriers when trying to cast their VBM ballots in person—including costs on their *time*, *transportation*, *information*, and *health*.

212    SOE Joe Scott of Broward County, in his interrogatory response from July 30, 2021, claims that the impact of SB 90 will be "none," at least "[w]ith regard to drop boxes at early voting sites." As SOE Scott notes, "[t]here are potentially an infinite number of locations in Broward County where a drop box may be placed that could be open outside of early voting hours, dependent on the number of 'permanent offices' of the Broward County Supervisor of Elections." At this time, though, the county has just two such offices, with an additional four "permanent offices" to be opened shortly at Broward County libraries. In addition, SOE Scott notes that his office "is in the process of securing additional satellite sites for such 'permanent offices.'" Based on my knowledge of the budgets of SOEs, most SOEs do

131

not have comparable resources available to them to make such changes, as Broward intends to do, in response to SB 90. Still, even with these resources, SOE Scott notes that, "There will be a reduction in drop box times at permanent offices of the Supervisor of Elections because of the requirement under SB 90 that '[a] secure drop box at the office of the supervisor must be continuously monitored in person by an employee of the supervisor's office when the drop box is accessible for deposit of ballots.')" He notes that his office will likely "not have 24 hour availability [there] and will be a reduction in drop box times at permanent offices." Overall, even with these efforts by the SOE, SB 90 will likely increase the costs to voters in Broward County—including costs on their *time*, *transportation*, *information*, and *health*.

**213** Neighboring Miami-Dade SOE Christina White states in her interrogatory response from August 12, 2021, that the impact of SB 90 is apparent. She intends on reducing the number of available VBM drop boxes from 33 to 28 for the 2022 election. According to SOE White, she intends to restrict the North Dade and South Dade Government Center drop boxes outside of the days and hours of EIP voting. "For future county-wide elections," SOE White states, "Miami-Dade County does not intend to provide drop boxes at the South Dade Government Center or the North Dade Government Center outside of the days and hours of Early Voting because neither location meets the definition of 'permanent branch office' as described in Section 28 of Senate Bill 90 (2021)." This will result in greater costs for the hundreds of thousands of Miami-Dade voters who cast VBM ballots in the 2020 General Election—including costs on their *time*, *transportation*, *information*, and *health*.

**214** In the interrogatory response for Orange County from August 9, 2021, Orange County does not intend on removing any drop boxes in future general elections. "The Orange County SOE would note that it is his current intent to maintain in 2022 the . . . the

same number of drop boxes as were maintained in the General Election for 2020." It is my understanding that Orange County offered voters one 24/7 drop box located at the main SOE office at 119 West Kaley Street in Orlando. SOE Cowles does not intend on changing the dates or hours of operation of that drop box, which in the 2020 General Election, according to his response to the PIE Committee, was "under 24 hour surveillance, plus off duty deputy between end of EV hours and start of EV hours," from the time VBM ballots were mailed out to Election Day at 7:00PM. Under SB 90, the 24/7 drop box will have to be under continual monitoring by SOE staff.

**215**    Similarly, Hamilton County SOE Laura Hutto, in her interrogatory response on July 30, 2021, states that the county's one outside VBM drop box, "will be open and monitored in person according to F.S. 101.69." If voters in the county are to have the same access to the drop box as they did in the 2020 General election (that is, 24/7 access from the time VBM ballots were mailed out through Election Day), Hamilton County will have to provide 24/7 continual supervision by SOE staff to ensure that the county's one VBM drop box is accessible at all hours, from the time VBM ballots were mailed out to Election Day.

**216**    If either Orange County or Hamilton County does not in fact offer 24/7 drop boxes from the time VBM ballots were mailed out through Election Day, it will result in less opportunities for voters in two counties casting VBM ballots in future elections—raising costs on their *time*, *transportation*, *information*, and *health*.

**217**    Palm Beach SOE, Allison Novoa, in her August 2, 2021 interrogatory response, stated that she does not plan to eliminate any of her four 24/7 drop boxes that were open from the time VBM ballots were mailed out through Election Day. However, she did state

that she will limit the times during which voters will be able to drop off their VBM ballots and will not be offering temporary VBM drop boxes that the county provided voters in the 2020 General Election. "The SOE will not be removing any of the permanent drop boxes at our four (4) office locations, but we will limit the time during which voters will be able to drop off ballots, due to the expense and safety concerns implicated in staffing those drop boxes overnight by Supervisor of Elections employees," she states in her interrogatory response. "Our office will not be offering any of the temporary drop boxes that were offered in the 2020 General Election due to lack of funding. Grant money was used to implement and staff those twenty-five (25) drop boxes throughout the county, during Early Voting, and for drive-through drop boxes at the Main SOE Office and the day before Election Day and on Election Day." This included, presumably, eight mobile van VBM drop boxes that were open, from October 19 through November 1 from 7:00AM to 7:00PM at various libraries and town and community centers around the county. Although SOE Novoa did not provide precise details on how many fewer hours or days the 24/7 drop boxes will available in future elections, it will certainly result in several hundred fewer hours of VBM drop box availability for voters compared to the 2020 General Election. These cuts will result in greater costs for voters in Palm Beach County who intend to vote by mail in future elections—-including costs on their *time*, *transportation*, *information*, and *health*.

**218**     Finally, Hillsborough County SOE Chief of Staff, Margaret "Peg" Reese, in her June 25, 2021 affidavit claims that the impact of SB 90 is not readily apparent for her county. She claims that the the removal of both Amalie Arena and Raymond James Stadium as locations with VBM drop boxes does not appear to be due to SB 90. In addition, she claims that the four locations that had drop boxes available from 7:00AM to 7:00PM, from the time VBM ballots were mailed out to Election Day, with drive-thru available, do not appear to be impacted, but Resse failed to acknowledge that under SB 90, they will all have

to have continuous SOE personnel at each location. She did say that the county's one 24/7 drop box at the SOE's Elections Service Center will be discontinued.[103] These cuts will result in greater costs for thousands of voters who cast VBM ballots in future elections—-including costs on their *time*, *transportation*, *information*, and *health*.

## X.V   Summary: SB 90 will burden voters' ability to return their VBM ballots by decreasing the availability of VBM drop boxes, including burdening voters of color

**219**     In my opinion, because SB 90 reduces the availability of drop boxes prior to and after the start of EIP voting due to the requirement that drop boxes available 24/7 must now be continually staffed and only located at permanent SOE offices (or branch offices), Florida voters will be burdened in future elections when trying to return their VBM ballots. It is worth repeating that not one of the SOEs who responded to the PIE Committee's request reported any so-called "ballot harvesting" and that video surveillance did not reveal any evidence of ballot harvesting.[104]

**220**     It is possible to extrapolate from the VBM drop box data from the 14 counties the impact statewide on voters due to SB 90's restrictions on VBM drop boxes. Each of these counties provided documentation in discovery, in one form or another, including the number of voters who utilized secure drop boxes prior to or after the EIP voting in the 2020 General Election, as well as the use of 24/7 VBM drop boxes or at VBM drop box locations

---

[103]In the Hillsborough County response to the PIE Committee, there is no mention of a 24/7 drop box. "What periods of time were they accessible by voters? During office hours at our 4 offices, during Early Voting hours at our 26 Early Voting sites (which included our 4 offices)." But in her affidavit, Ms. Reese states on p. 3, "The SOE 24 hour drop box at the Elections Service Center will be discontinued."

[104]See SOE responses to Florida House of Representatives, Public Integrity and Elections Committee, Chair Erin Grall, February 24, 2021.

not permitted by SB 90, as applicable. Drawing on these data, as well as on the Florida Supervisor of Elections' statement that roughly 31 percent of all VBM ballots in the state were deposited in secure drop boxes, it is possible to provide a rough estimate the number of VBM ballots that were deposited in drop boxes prior to the start of EIP voting.

**221**     According to data from the statewide VBM daily activity reports, the 67 SOEs recorded receiving some 1.9 million VBM ballots during the period prior to the commencement of EIP voting (October 19) in the 2020 General Election. If we assume, based on a conservative estimate from available data from the 14 counties, that roughly one-third of all VBM ballots received by SOEs from late September until October 18, 2020 were deposited in secure drop boxes—drop boxes that SB 90 limits unless they are at a permanent SOE office and continually monitored with SOE staff—it is possible that more than 600,000 VBM ballots statewide were deposited in secure drop boxes before the commencement of EIP voting in the 2020 General Election.

**222**     In my opinion, rather than being able to drop off their VBM ballot before (or after the conclusion) of EIP voting, SB 90 curtails the opportunities for hundreds of thousands of voters to safely and securely cast their ballots in VBM drop boxes in future elections, as many SOEs will not opt to have their SOE personnel continually monitor drop boxes. In addition, it is my understanding that SB 90 limits SOEs from offering VBM drop boxes at many locations. As a result, thousands of voters will be forced to either mail their ballots, drop them off in person at their SOE office during normal business hours, or wait to drop them off during the early voting period, which will increase the cost of voting—*time*, *transportation*, *information*, and *health*. Many voters who decide to put their VBM ballot in the mail will have their ballots rejected for being late, as we have seen in past Florida

elections (Smith 2018; Smith & Baringer 2020; Smith 2021). And in my opinion, some voters will not return their VBM ballot at all if the availability of VBM drop boxes is curtailed in whole or in part.

223    My analysis suggests that SB 90's limitations on secure VBM drop boxes will negatively affect all voters, depriving them of an opportunity to securely return their VBM ballot to an official SOE drop box after hours. My analysis also indicates that during the 2020 General Election, in Columbia County and Manatee County, voters of color (and in Manatee County, voters with disabilities), were disproportionately more likely to drop off their VBM ballots outside the mandated days VBM drop boxes must be made available under SB 90.

# XI  SB 90's restrictions on assistance to voters waiting in lines at the polls burdens all in-person voters, and particularly persons of color and individuals with disabilities, who wait in line to cast a ballot

224    SB 90 restricts individuals waiting in line to vote to receive assistance. According to Section 29 of SB 90:

> For the purpose of this subsection, the terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; and selling

137

or attempting to sell any item; and engaging in any activity with the intent to influence or effect of influencing a voter.[105]

SB 90 imposes new costs on registered voters needing assistance when waiting in line to vote.

# XI.I   A legacy of long lines at the polls in Florida

**225**     Long lines at the polls are common in Florida. SB 90's "line warming" restrictions will potentially affect all voters who vote in person during the early voting period and on Election Day, but will particularly affect voters of color who might require material assistance (drink, food, seating, or shelter) when standing in lines at the polls. Under SB 90, with the exception of election officials or individuals who have been requested by an elector (and who have signed an affidavit) to provide assistance, individuals are not permitted to solicit an elector within 150 feet of the entrance to a polling place, a drop box location, or an early voting site. As such, individuals with groups wanting to provide voters waiting in a queue that is within 150 feet of a polling entrance are not allowed to do so, even if it is just to distribute drink, food, seating, or shelter.

**226**     How many voters might be in a queue reaching 150 feet outside the entrance to a polling place, drop box location, or early voting site? The Hernando SOE estimates that "the average voter count for less than 15 min is 25," and that the "average voter count for less than 30 min is 50."[106] That is, if there are 25 voters waiting in line to vote, the wait time will be approximately 15 minutes; if 50 voters are waiting in line, it will be a half hour

---

[105]See "Enrolled CS for CS for CS for SB 90," 2nd Engrossed, Section 28.  Available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 10, 2020).

[106]See "REV-00006449.xlsx," Hernando SOE response to NAACP, et al.'s RFP.

wait.

**227**     Scholars rely on queuing theory to tackle the question of long lines and wait times at the polls.  According to studies drawing on queuing theory and that examine the efficiency of the voting process (Willis, Murphy & Cotten 2014; Weil et al. 2019; Herron & Smith 2016), estimates range on how long it takes the average voter to cast a ballot, from anywhere from one minute to check in a voter to five minutes, on average, to fill out a ballot and cast a vote.  Assuming a five minute rate to vote with a single station for check-in, ballot marking, and vote tabulating, Smith, Monfort & Blumberg (2015, p.  123) surmise that a "line of voters would therefore take five minutes multiplied by the number of voters in that line," and that "a 10-foot line segment can contain approximately five voters" (who are standing two feet apart, and not a socially distanced six feet according to CDC guidelines under COVID-19 protocol).

**228**     Working backwards, then, an estimated 15 minute wait time roughly equates to three voters standing in a line, waiting five minutes each, when queuing to vote at a facility with one check-in station, one ballot marking station, and one vote tabulator.  The Hernando County SOE's estimate, then, is not as dire, as a 15 minute wait time would indicate roughly 25 voters in line, not just three, as the estimate indicates above.  This is because counties tend to use at polling stations multiple check-in (EViD) locations, ballot marking stations, and vote tabulators, which likely expedite the process.

**229**     However, a voter simulation study conducted by Willis, Murphy & Cotten (2014) shows that increasing the number of voting booths in a polling location, for example, results in diminishing returns in efficiency.  In addition, as Weil et al. (2019) show,

average wait times at the polls can vary greatly as the hourly arrival rate varies over a given hour. Based on a model in which a polling location can check in one voter every minute, Weil et al. (2019) find that as "the arrival rate reaches a critical point, the expected wait time increases exponentially. With 40 voters per hour, the average wait time is only two minutes; at 50 voters, it is five minutes; at 55 voters, the wait time is 11 minutes; and at 59 voters per hour, the wait time is almost an hour." In short, when it comes to voting, long wait times are typically indicative of long lines, and vice versa.[107]

## XI.II    Scholarship on who waits in lines when voting

**230**      There is ample scholarly evidence that Black and Hispanic voters face longer wait times when casting a ballot in person (Kimball & Baybeck 2013; Kaplan & Yuan 2020; Pettigrew 2017; Stewart III 2017; Chen et al. 2019; Stein et al. 2020), including in Florida (Herron & Smith 2012, 2014; Herron et al. 2017; Cottrell, Herron & Smith 2021). According to Stewart III (2017), whose surveys ask voters about their experiences at the polls, including how long they wait in line, Florida voters regularly report having to endure some of the longest lines in the country. For example, in 2012, Florida voters reported waiting an average of 39 minutes, three times the national average (Stewart III & Ansolabehere 2013). Other surveys, such as national studies by Mukherjee (2009) and Kimball (2013), find that minority voters are disproportionately face longer lines when they vote. Stewart III (2013) and Pettigrew (2017) estimate that predominantly Black and nonwhite, respectively, voting locations are associated with wait times that are approximately twice as long as those in predominantly white locations. Finally, matching some 93,000 polling locations in the 2016 General Election with anonymous location data captured from 10 million smartphones,

---

[107]At least one SOE worked with the Bipartisan Policy Center's "Line Length Data Collection" effort. See Nassau County SOE's response to the LWV et. al's RPF 15.

Chen et al. (2019) find that voters in predominantly Black neighborhoods were about 74 percent more likely to wait in line for over a half-hour than those in predominantly white neighborhoods.

**231**    It is quite possible that other provisions of SB 90 will exacerbate the well known wait time problems facing in-person voters in Florida, similar to the long lines that occurred in the 2012 General Election after the state reduced the number of days of early voting under HB 1355 (Herron & Smith 2014, 2015). For example, because SB 90 reduces the opportunities for registered voters to request and return VBM ballots, it will likely have a downstream effect of diverting some voters to casting their ballots in person. Because persons of color choosing to vote in person already face longer lines at the polls, on average, than white voters, the increased wait times at the polls may discourage voters from standing in line, particularly if they are not able to be approached to receive necessary aid.

**232**    Long lines at the polls tend to be the result of administrative resource allocation dedicated to staffing polling locations and demands placed on polling locations by voters. The interactions between in-person voter turnout at polling locations and administrative decisions about resource allocation are related (Herron & Smith 2016). Waiting in line to vote is a time tax (Mukherjee 2009) and this tax can be negligible (waiting a few seconds before checking in and initiating the voting process) or quite onerous (waiting several hours, exposed to the elements, before checking in to vote) (Cottrell, Herron & Smith 2021; Pettigrew 2021).

**233**    The burden of long lines and wait times—negligible or onerous—are not spread equally across groups of voters. Onerous wait times can cause reneging, that is, voters leaving a slow-moving line, or balking, that is, not joining the line in the first place upon

observing a long queue (Herron & Smith 2016; Lamb 2021). Stewart III & Ansolabehere (2013) estimate that in the 2012 General Election, there were between 500,000 and 700,000 "lost votes" due to long lines.[108] Long wait times/lines can also exacerbate existing health concerns for some voters. According to the Centers for Disease Control (CDC), millions of Floridians have underlying health conditions, which is an added concern with regard to the continuing COVID-19 pandemic. For example, Florida's rate of obesity is higher than the national average, and the CDC warns that obesity is a risk factor for contracting and becoming ill from COVID-19.[109] In addition, having a serious heart condition raises the risk that an individual becomes infected with COVID-19 or develops severe illness.[110] Florida voters with underlying medical conditions who wish to vote in person at an early voting location (or drop off their VBM ballot in person at a local drop box) may be subjected to long lines and wait times, jeopardizing their health. Yet these vulnerable individuals, under SB 90, are prohibited from receiving any aid while in line other than might be provided by the SOE office.

**234** Even with the anticipated shift to mail voting prior to the 2020 General Election due to the COVID-19 pandemic, many SOEs remained concerned about long lines at the polls

---

[108]Long lines also have secondary effects. First, long lines at the polls have "downstream" electoral effects on the calculus that individuals make on whether to vote in the future. Both Pettigrew (2021) and Cottrell, Herron & Smith (2021) show that voters who spend more time waiting in line at the polls in a given election—that is, as the cost of voting becomes more onerous—their likelihood of turning out in a future election decreases. In this sense, experiencing long wait times may have longer term consequences, and this depressive effect on turnout is not borne by all voters equally. Second, Herron et al. (2017), in a study measuring wait times and using exit polls across Miami-Dade precincts in the 2014 General Election, find that voters who waited longer in line had less confidence in electoral processes.

[109]See "Nutrition, Physical Activity, and Obesity: Data, Trends and Maps," *Centers for Disease Control and Prevention*, available at https://www.cdc.gov/nccdphp/dnpao/data-trends-maps/index.html (last accessed August 2, 2021).

[110]See "Heart Disease Mortality by State," *National Center for Health Statistics*, available at https://www.cdc.gov/nchs/pressroom/sosmap/heart_disease_mortality/heart_disease.htm (last accessed August 2, 2021).

or drop box locations. As a way to alleviate congestion during the early voting period, several SOEs posted on their websites estimated wait times at early voting sites. I was able to scrape estimated wait times across early voting locations for two counties, Miami-Dade and Orange, that the SOE offices posted on their web pages during the early voting period of the 2020 General Election.

## XI.III  Wait times in Miami-Dade County, early voting, 2020 General Election

**235**    Miami-Dade County posted wait times on its website during early voting in the 2020 General Election. The county offered 33 locations during the two-week EIP voting period. After merging the statewide voter file and county records, I am able to identify over 593,000 voters (of the county's 1.67 million registered voters) who cast their ballots in person during early voting in the county ahead of the November 2020 election. Table 18 provides the racial/ethnic composition (both the raw count and the percentage of votes cast by each racial/ethnic group across all 33 locations) of the voters who cast their ballots at each of the locations in the 2020 General Election.

**Table 18:** Racial/Ethnic Composition of Each Early Voting Location, Miami-Dade County, 2020 General Election

| Early Voting Location | Black | Hispanic | Other | White |
|---|---|---|---|---|
| ARCOLA LAKES BRANCH LIB | 6674 | 1709 | 520 | 413 |
| CALIFORNIA CL BRANCH LIB | 7956 | 2671 | 1122 | 1410 |
| CORAL GABLES BRANCH LIB | 1043 | 19484 | 2161 | 7621 |
| CORAL REEF BRANCH LIB | 4666 | 10316 | 1601 | 2851 |
| ELECTIONS DEPT–DORAL | 403 | 17561 | 1306 | 2019 |
| FIU –SASC ROOM | 547 | 12433 | 1091 | 1445 |
| FLA CITY YOUTH ACT CNT | 1733 | 1388 | 264 | 322 |
| HOMESTEAD COMM CNT | 2225 | 7995 | 1071 | 4322 |
| INT MALL BRANCH LIB | 173 | 14841 | 1103 | 1224 |
| JOHN F KENNEDY LIB | 181 | 31271 | 2258 | 1283 |
| JOSEPH CALEB CENTER | 8776 | 4662 | 635 | 235 |
| KENDALE LAKES BRANCH LIB | 401 | 23082 | 1750 | 1961 |
| KENDALL BRANCH LIB | 475 | 14587 | 1227 | 4657 |
| LEMON CITY BRANCH LIB | 5382 | 3638 | 1001 | 2645 |
| MDC KENDALL CAMPUS | 398 | 8866 | 919 | 2265 |
| MDC NORTH CAMPUS | 3439 | 2919 | 492 | 273 |
| MIAMI BEACH CITY HALL | 616 | 4844 | 1241 | 5802 |
| MIAMI LAKES COMM CENTER | 951 | 29593 | 2110 | 3013 |
| NARANJA BRANCH LIB | 3343 | 7400 | 888 | 1070 |
| NORTH DADE REG LIB | 18775 | 4693 | 1543 | 389 |
| NORTHEAST DADE AVENTURA BRANCH LIB | 1872 | 8175 | 2151 | 9100 |
| NORTH MIAMI PUBLIC LIB | 15028 | 4238 | 1814 | 2137 |
| NORTH SHORE BRANCH LIB | 465 | 6130 | 1153 | 4633 |
| PALMETTO BAY BRANCH LIB | 736 | 5767 | 817 | 3906 |
| P AND P FROST MUS OF SCI | 615 | 3984 | 850 | 2507 |
| PINECREST BRANCH LIB | 236 | 6368 | 947 | 5061 |
| SHENANDOAH BRANCH LIB | 229 | 13174 | 960 | 1552 |
| SOUTH DADE REG LIB | 5373 | 14245 | 1713 | 2338 |
| STEPHEN P CLARK GOVERNMENT CENTER | 2490 | 5637 | 674 | 1822 |
| VIZCAYA HISTORIC GARAGE | 434 | 7318 | 1089 | 4866 |
| WESTCHESTER REG LIB | 94 | 31060 | 1777 | 2227 |
| WEST KENDALL REG LIB | 1013 | 22592 | 2040 | 3318 |
| WEST MIAMI COMM CNT | 86 | 12844 | 738 | 983 |
| ARCOLA LAKES BRANCH LIB | 6.89 | 0.47 | 1.27 | 0.46 |
| CALIFORNIA CL BRANCH LIB | 8.22 | 0.73 | 2.73 | 1.57 |
| CORAL GABLES BRANCH LIB | 1.08 | 5.33 | 5.27 | 8.50 |
| CORALREEF BRANCH LIB | 4.82 | 2.82 | 3.90 | 3.18 |
| ELECTIONS DEPT–DORAL | 0.42 | 4.80 | 3.18 | 2.25 |
| FIU–SASC ROOM | 0.56 | 3.40 | 2.66 | 1.61 |
| FLA CITY YOUTH ACT CNT | 1.79 | 0.38 | 0.64 | 0.36 |
| HOMESTEAD COMM CNT | 2.30 | 2.19 | 2.61 | 4.82 |
| INT MALL BRANCH LIB | 0.18 | 4.06 | 2.69 | 1.37 |
| JOHN F KENNEDY LIB | 0.19 | 8.56 | 5.50 | 1.43 |
| JOSEPH CALEB CENTER | 9.06 | 1.28 | 1.55 | 0.26 |
| KENDALE LAKES BRANCH LIB | 0.41 | 6.32 | 4.27 | 2.19 |
| KENDALL BRANCH LIB | 0.49 | 3.99 | 2.99 | 5.19 |
| LEMON CITY BRANCH LIB | 5.56 | 1.00 | 2.44 | 2.95 |
| MDC KENDALL CAMPUS | 0.41 | 2.43 | 2.24 | 2.53 |
| MDC NORTH CAMPUS | 3.55 | 0.80 | 1.20 | 0.30 |
| MIAMI BEACH CITY HALL | 0.64 | 1.33 | 3.02 | 6.47 |
| MIAMI LAKES COMM CENTER | 0.98 | 8.10 | 5.14 | 3.36 |
| NARANJA BRANCH LIB | 3.45 | 2.02 | 2.16 | 1.19 |
| NORTH DADE REG LIB | 19.39 | 1.28 | 3.76 | 0.43 |
| NORTHEAST DADE AVENTURA BRANCH LIB | 1.93 | 2.24 | 5.24 | 10.15 |
| NORTH MIAMI PUBLIC LIB | 15.52 | 1.16 | 4.42 | 2.38 |
| NORTH SHORE BRANCH LIB | 0.48 | 1.68 | 2.81 | 5.17 |
| PALMETTO BAY BRANCH LIB | 0.76 | 1.58 | 1.99 | 4.36 |
| P AND P FROST MUSOF SCI | 0.64 | 1.09 | 2.07 | 2.80 |
| PINECREST BRANCH LIB | 0.24 | 1.74 | 2.31 | 5.64 |
| SHENANDOAH BRANCH LIB | 0.24 | 3.60 | 2.34 | 1.73 |
| SOUTH DADE REG LIB | 5.55 | 3.90 | 4.18 | 2.61 |
| STEPHEN P CLARK GOVERNMENT CENTER | 2.57 | 1.54 | 1.64 | 2.03 |
| VIZCAYA HISTORIC GARAGE | 0.45 | 2.00 | 2.65 | 5.43 |
| WESTCHESTER REG LIB | 0.10 | 8.50 | 4.33 | 2.48 |
| WEST KENDALL REG LIB | 1.05 | 6.18 | 4.97 | 3.70 |
| WEST MIAMI COMM CNT | 0.09 | 3.51 | 1.80 | 1.10 |

144

236     Overall, close to 97,000 Black voters cast EIP ballots in the 2020 General Election in Miami-Dade County. As Table 18 reveals, Black voters who cast EIP ballots in the county disproportionately voted at two locations: the North Dade Regional Library and the North Miami Public Library. Over the two-week period, more than one-in-three Black voters—over 33,000 EIP voters—cast their ballots at the two locations. In comparison, in not one of the county's 33 early voting locations did more than 11 percent of the total Hispanic EIP voters (over 363,000) or total white EIP voters (nearly 89,000) cast their ballots.

237     It is also worth noting that over 30 percent of all Black EIP voters cast their ballots on just two days of early voting offered in the county: 17.5 percent on the first Monday (October 19, 2020) and 13.8 percent on the final Sunday (November 1, 2020), indicating the activity of get-out-the-vote (GOTV) drives to get voters to the polls and cast their ballots well in advance of Election Day, or the final day of early voting. Roughly 25 percent of early voting Hispanic voters and 27 percent of all early voting white voters cast their ballots on these two days, indicating similar turnout patterns reflective of voter turnout drives at the start and end of early voting.

238     Not all of Miami-Dade's 33 locations had similar wait times across the two-week early voting period. The Miami-Dade SOE reported on its website multiple snapshots on multiple days the estimated wait times during early voting at all 33 locations in the 2020 General Election. For Miami-Dade County, I was able to process seven estimated wait times captured by the SOE at various times of day of operation for five days of early voting (two wait times snapshots from Monday, October 19, two wait times snapshots from Thursday, October 22, one wait times snapshot from Monday, October 26, one wait times snapshot from Saturday, October 31, and one wait times snapshot from Sunday, November 1). Overall, of

the more than 593,000 voters who cast EIP ballots in Miami-Dade County in the 2020 General Election, over 264,000 individuals voted on one of the five days for which I have an estimated wait time.

**239** By joining EViD data from the county that contains timestamps (date, hour, minute) of when each voter cast a ballot during early voting, statewide EViD data that has information, by county, of where each voter cast an EIP ballot, the statewide voter file to obtain the race/ethnicity of each voter, and the statewide Recap file to determine the disability status of each voter, I am able to determine the time and place that every voter in Miami-Dade County cast a ballot. I join this data to data capturing the county's own estimated wait times for each location for the five days (and seven wait time snapshots).

**240** Figure 7 shows the distribution of average estimated wait times, in minutes, for the five days (and seven snapshots) during early voting, as recorded by the Miami-Dade SOE. Although over 172,000, or 65 percent, of the more than 264,000 early voters in the county who cast ballots on the five days of early voting cast their ballots at locations that recorded zero minutes of estimated wait time, over 59,000 voters at locations that the SOE recorded wait times of at least a half-an-hour on the day that they voted. Nearly 14,900 voters—some 5.6 percent of all EIP voters in the county—cast ballots at locations that reported during the day at least an estimated 45 minute wait time; 5,200 (another 2 percent) voted at locations with at least an estimated 40 minute wait time; 12,300 (another nearly 5 percent) voted at locations with at least an estimate 35 minute wait time; and an additional 26,500 voters (over 10 percent of all EIP voters) cast ballots at locations that the SOE reported had at least an estimated 30 minute wait time at some point during the day.

146

Figure 7: Distribution of Wait Times, in Minutes, Across Miami-Dade County's 33 Early Voting Locations, 2020 General Election



**241** Not all voters who cast EIP ballots in voters in Miami-Dade faced the same wait times on the five days prior in the 2020 General Election (Monday, October 19, Thursday, October 22, Monday, October 26, Saturday, October 31, and Sunday, November 1) for which I have wait times snapshots recorded by the SOE. Table 19 provides the racial/ethnic composition of voters who cast their ballots at each of the locations in the 2020 General Election, broken down by the estimated wait times as provided by the SOE. The raw number of voters is in the top half of the table, and the percentage of voters in each racial/ethnic group who faced an estimated wait time is in the bottom half of the table.

Table 19: Estimated Wait Times for Early In-Person Voters (October 19, October 22, October 26, October 31, and November 1), by Race/Ethnicity (Raw Counts and Percentage of Each Group), Miami-Dade County, 2020 General Election

| Minutes | Black | Hispanic | Other | White |
|---|---|---|---|---|
| 0 | 32083 | 99706 | 12729 | 28173 |
| 15 | 165 | 3263 | 364 | 1689 |
| 20 | 3188 | 15478 | 1401 | 2780 |
| 25 | 528 | 3452 | 233 | 421 |
| 30 | 7931 | 14293 | 1614 | 2742 |
| 35 | 1645 | 9189 | 687 | 851 |
| 40 | 151 | 3659 | 292 | 1106 |
| 45 | 1184 | 10838 | 729 | 2129 |
| 0 | 68.44 | 62.36 | 70.52 | 70.62 |
| 15 | 0.35 | 2.04 | 2.02 | 4.23 |
| 20 | 6.80 | 9.68 | 7.76 | 6.97 |
| 25 | 1.13 | 2.16 | 1.29 | 1.06 |
| 30 | 16.92 | 8.94 | 8.94 | 6.87 |
| 35 | 3.51 | 5.75 | 3.81 | 2.13 |
| 40 | 0.32 | 2.29 | 1.62 | 2.77 |
| 45 | 2.53 | 6.78 | 4.04 | 5.34 |

**242** Similarly, Figure 8 offers a bar graph, showing the average estimated wait times for the roughly 47,000 Black, 160,000 Hispanic, and 40,000 white voters (and 18,000 voters with "Other" race/ethnicity) in Miami-Dade County who cast EIP ballots at the county's 33

early voting locations on Monday, October 19, Thursday, October 22, Monday, October 26, Saturday, October 31, and Sunday, November 1).

Figure 8: Distribution of Wait Times, in Minutes, by Race/Ethnicity, during Early Voting, Miami-Dade County, 2020 General Election



243      What is clear, as both Table 19 and Figure 8 show, is that over 23 percent of all Black voters, nearly 24 percent of Hispanic voters, but only 17 percent of white voters faced wait times of 30 minutes or more across the five days of early voting for which I have estimated wait times posted by the Miami-Dade SOE. In raw counts, nearly 11,800 Black, nearly 38,000 Hispanic, but fewer than 7,000 white EIP voters voted on the five days that had at least one estimated wait times of half an hour or more.

244      In contrast, nearly 71 percent of white voters who cast ballots in Miami-Dade County during the five days of early voting (including the first and last days of the two-week period) for which I have data faced wait times of less than 15 minutes prior to checking in, according to the SOE's own estimates. Only 68 percent of Black voters and 62 percent of Hispanic voters cast ballots at locations with estimated wait times of less than 15 minutes on the 5 days of early voting for which I have obtained the SOE's estimated wait times.

245      It is possible to subset the Miami-Dade data to be even more precise about the race/ethnicity of voters and their estimated wait times during early voting. Since I have a precise timestamp for the wait times at the county's locations, I am able to determine which voters on a given day were likely standing in line to vote when the Miami-Dade SOE provided an estimated wait time for each of the 33 early voting locations. I subset the data to include just those voters who checked in to vote at a location on either side of (roughly an hour) of the estimated wait time provided by the SOE's office.

246      For example, Figure 9 provides a bar graph of voters who were likely in line to vote (between 8AM and 10AM) when the SOE office posted 9AM wait times for all 33 locations on Monday, October 19, 2020. Some 3,200 Black voters, 7,500 Hispanic voters,

150

and 2,800 white voters cast ballots during this two hour period. As is clear from the plot, Hispanics disproportionately faced long wait times of at least 45 minutes. Indeed, there were over 1,300 Hispanic voters who likely waited at least 45 minutes to vote at the county's early voting locations that morning, the first morning of EIP voting, or roughly 18 percent of all Hispanic voters who cast ballots at the 33 locations between 8AM and 10AM.

Figure 9: Distribution of Wait Times, in Minutes, by Race/Ethnicity, October 19, 9AM, Miami-Dade County, 2020 General Election



247     The other six wait time snapshots (across the five days) show similar patterns. On Monday, October 19, 2020 for instance, the SOE published estimated wait times for the county's 33 early voting locations at 5PM. Between 5PM and through the 7:00PM close of polls that day, over 1,300 (43 percent) of the more than 3,000 Black voters, over 4,300 (48 percent) of the more than 9,000 Hispanic voters, but only 878 (33 percent) of the 2,600 white voters who checked in during the two hour period faced wait times in excess of 30 minutes. Overall, nearly 2,300 of the roughly 15,600 voters (15 percent) who checked in and cast ballots after 5PM on October 19 in the county voted at locations that the SOE reported had at least a 45 minute wait time at 5PM. Of those voters, 1,608 (71 percent) were Hispanic voters who waited at least 45 minutes late in the day on October 19, 2020.

248     It is also possible, using the same methods and data as described above, to determine the estimated wait times that voters who indicated when they registered that they require assistance when voting. In Miami-Dade County alone, over 33,500 voters who cast ballots during the EIP voting period in the 2020 General Election indicated that they required assistance when voting, including more than 15,000 individuals on the five days in the early voting period on which the SOE provided snapshots of estimated wait times. Roughly 5.7 percent of all EIP voters in Miami-Dade—both overall and limited to the five days for which I have wait time estimates from the SOE's website—indicated that they required assistance when voting according to their voter registration form.

249     Black and Hispanic voters who cast EIP ballots in Miami-Dade in the 2020 General Election were much more likely than white early voters to need assistance when voting. Nearly 13 percent of Black voters and nearly 5 percent of Hispanic voters who voted early (both overall and on the five days with wait times), compared to less than 2 percent

of early voting white voters, indicated that they needed assistance to vote.

**250**     Figure 10 provides the racial/ethnic breakdown, grouped by estimated wait times, across Miami-Dade County's 33 early voting locations across the five days, for the roughly 15,000 voters who reported needing assistance to vote when registering.  What is clear from the figure is that a much higher proportion of Black voters and Hispanic voters with disabilities were likely to face estimated wait times of at least 45 minutes at the location at which they cast their EIP ballot, compared to white voters with disabilities.  Hundreds more Black and Hispanic voters needing assistance to vote faced wait times in excess of 30 minutes across the county's early voting sites on the five days for which the SOE provided estimate wait times.

Figure 10: Miami-Dade County Reported EIP Wait Times, Only Voters Needing Assistance, by Race and Ethnicity



*Note: Wait Times estimates posted by the Miami-Dade County Supervisor of Elections on October 19, 2020, October 22, 2020, October 26, 2020, October 31, 2020, and November 1 2020. Available at: `https://web.archive.org/web/20200101000000*/https://www.miamidade.gov/elections/earlyvoting/wait-times.asp` (last accessed July 31, 2021).*

# XI.IV   Wait times in Orange County, early voting, 2020 General Election

**251**    Similar to the Miami-Dade County analysis, for Orange County I was able to process wait times from a single snapshot posted on Tuesday, October 20, 2020, the second day of the two-week early voting period.  The snapshot contains estimated wait times for the county's 20 polling locations.  It is unknown when during the day the county posted the estimated wait times.

**252**    By joining Electronic Voting Identification (EViD) data from the county that contains timestamps (date, hour, minute) of the times when each voter cast a ballot during early voting, statewide EViD data that has information, by county, of where each voter cast an EIP ballot, the statewide voter file to obtain the race/ethnicity of each voter, and the statewide Recap file to determine the disability status of each voter, I am able to determine the precise time and place that every voter in the county cast a ballot.  I then join this data to a dataset that contains the county's estimated wait times for each location for October 20, 2020.

**253**    Table 20 provides a breakdown of the composition of voters, by race/ethnicity, across the 20 early voting locations in Orange County on October 20, 2020.  Overall, across all 20 locations, nearly 18,000 individuals cast EIP votes, including nearly 4,000 Black voters, over 3,500 Hispanic voters, more than 8,400 white voters, and nearly 2,000 individuals of other races/ethnic groups.  Black voters made up slightly more than 22 percent, Hispanic voters made up nearly 20 percent, white voters made up over 47 percent, and those of other races/ethnic groups comprised the balance, roughly 11 percent.

254     Both halves of Table 20—the top (raw numbers) and bottom (percentage of all voters of each race/ethnic group who voted on October 20, 2020, across each early voting location)—make it clear that there there were some early voting locations that were more heavily utilized by Black and Hispanic voters on October 20, 2020.  In particular, Black voters disproportionately turned out to vote at the Amway Center, the Apopka Community Center, the Hiawassee Branch Library, the Supervisor of Elections Office, the Washington Park Branch Library, and the West Oaks Branch Library.  Hispanic voters disproportionately voted at the Alafaya Branch Library, the Chickasaw Branch Library, the Meadow Woods Recreation Center, the South Creek Branch Library, and the Southeast Branch Library.

255     The Orange County SOE reported on its website (from the snapshot) that three early voting locations (Amway Center, Southwest Branch Library, and the SOE office) had virtually no wait times, and one had at least a 180 minute wait time (Winter Park Library). For the three locations with negligible wait times on that day, Black voters disproportionately utilized the Amway Center, whites disproportionately utilized the Southwest Branch Library, and all groups of voters utilized the SOE office.  White voters disproportionately utilized the Winter Park Library, which reportedly suffered long lines on October 20, 2020.

256     Figure 11 compiles these data into a bar graph, showing the estimated wait times for Orange County voters who cast in-person ballots at the county's 20 early voting locations on October 20, 2020.  What is clear from the figure is that while white voters disproportionately were more likely to wait in line for three hours (at the Winter Park Library), Black and Hispanic voters were more likely than white voters to experience wait times of 15 or 30 minutes or more on October 20, 2020.

**Table 20:** Racial/Ethnic Composition of Each Early
Voting Location, Orange County, October 20, 2020

| | Black | Hispanic | Other | White |
|---|---|---|---|---|
| ALAFAYA BRANCH LIBRARY | 174 | 359 | 131 | 467 |
| AMWAY CENTER | 396 | 138 | 103 | 518 |
| APOPKA COMMUNITY CENTER | 379 | 153 | 75 | 619 |
| CHICKASAW BRANCH LIBRARY | 90 | 282 | 91 | 291 |
| FAIRVIEW SHORES | 201 | 96 | 71 | 382 |
| HIAWASSEE BRANCH LIBRARY | 569 | 118 | 153 | 147 |
| MARKS STREET SENIOR CENTER | 25 | 57 | 41 | 430 |
| MEADOW WOODS RECREATION CENTER | 118 | 320 | 93 | 222 |
| RENAISSANCE SENIOR CENTER | 137 | 253 | 102 | 398 |
| SOUTH CREEK BRANCH LIBRARY | 143 | 395 | 125 | 319 |
| SOUTHEAST BRANCH LIBRARY | 92 | 316 | 96 | 457 |
| SOUTHWEST BRANCH LIBRARY | 116 | 182 | 164 | 762 |
| SUPERVISOR OF ELECTIONS OFFICE | 374 | 227 | 156 | 760 |
| TIBET BUTLER PRESERVE | 47 | 93 | 76 | 515 |
| UCF: LIVE OAK EVENT CENTER | 84 | 115 | 104 | 293 |
| WASHINGTON PARK BRANCH LIBRARY | 422 | 63 | 56 | 66 |
| WATER CONSERV II | 41 | 67 | 41 | 330 |
| WEST OAKS BRANCH LIBRARY | 356 | 72 | 98 | 264 |
| WINTER GARDEN LIBRARY | 140 | 107 | 86 | 554 |
| WINTER PARK LIBRARY | 53 | 106 | 85 | 676 |
| ALAFAYA BRANCH LIBRARY | 4.40 | 10.20 | 6.73 | 5.51 |
| AMWAY CENTER | 10.01 | 3.92 | 5.29 | 6.12 |
| APOPKA COMMUNITY CENTER | 9.58 | 4.35 | 3.85 | 7.31 |
| CHICKASAW BRANCH LIBRARY | 2.27 | 8.01 | 4.67 | 3.44 |
| FAIRVIEW SHORES | 5.08 | 2.73 | 3.65 | 4.51 |
| HIAWASSEE BRANCH LIBRARY | 14.38 | 3.35 | 7.86 | 1.74 |
| MARKS STREET SENIOR CENTER | 0.63 | 1.62 | 2.11 | 5.08 |
| MEADOW WOODS RECREATION CENTER | 2.98 | 9.09 | 4.78 | 2.62 |
| RENAISSANCE SENIOR CENTER | 3.46 | 7.19 | 5.24 | 4.70 |
| SOUTH CREEK BRANCH LIBRARY | 3.61 | 11.22 | 6.42 | 3.77 |
| SOUTHEAST BRANCH LIBRARY | 2.32 | 8.98 | 4.93 | 5.40 |
| SOUTHWEST BRANCH LIBRARY | 2.93 | 5.17 | 8.42 | 9.00 |
| SUPERVISOR OF ELECTIONS OFFICE | 9.45 | 6.45 | 8.01 | 8.97 |
| TIBET BUTLER PRESERVE | 1.19 | 2.64 | 3.90 | 6.08 |
| UCF: LIVE OAK EVENT CENTER | 2.12 | 3.27 | 5.34 | 3.46 |
| WASHINGTON PARK BRANCH LIBRARY | 10.66 | 1.79 | 2.88 | 0.78 |
| WATER CONSERV II | 1.04 | 1.90 | 2.11 | 3.90 |
| WEST OAKS BRANCH LIBRARY | 9.00 | 2.05 | 5.03 | 3.12 |
| WINTER GARDEN LIBRARY | 3.54 | 3.04 | 4.42 | 6.54 |
| WINTER PARK LIBRARY | 1.34 | 3.01 | 4.37 | 7.98 |

Figure 11: Orange County Reported EIP Wait Times, October 20, 2020, by Race and Ethnicity



*Note: Wait Time estimates posted by the Orange County Supervisor of Elections on October 20, 2020. Available at:*
*https://web.archive.org/web/20201020234124/ocfelections.com/early-voting-locations (last accessed July 5, 2021).*

**257**     It is possible to subset the data that created the previous graph, limiting the analysis to only to EIP voters on October 20, 2020 in Orange County who indicated when they registered to vote that they were in need of assistance when voting. Table 21 details where the 381 individuals with disabilities cast their ballots on October 20, 2020 in Orange County. Across the 20 early voting sites, some locations were more likely to have to accommodate the 381 individuals who voted that day who indicated on their voter registration form that they were in need of assistance to vote. For example, on October 20, 2020, over 4 percent (27 voters) of the more than 600 voters who cast EIP ballots at the Washington Park Branch Library indicated that they needed assistance to vote, and nearly 6 percent (57 voters) of the nearly 1,000 voters who cast EIP ballots at the Hiawassee Branch Library indicated that they needed assistance to vote.

Table 21: Number and Percentage of Voters "Needing Assistance" who Voted at each of Orange County's 20 Early Voting Locations on October 20, 2020

| Location | N | % | Y | % |
|---|---|---|---|---|
| ALAFAYA BRANCH LIBRARY | 1113 | 98.41 | 18 | 1.59 |
| AMWAY CENTER | 1133 | 98.1 | 22 | 1.9 |
| APOPKA COMMUNITY CENTER | 1196 | 97.55 | 30 | 2.45 |
| CHICKASAW BRANCH LIBRARY | 736 | 97.61 | 18 | 2.39 |
| FAIRVIEW SHORES | 736 | 98.13 | 14 | 1.87 |
| HIAWASSEE BRANCH LIBRARY | 930 | 94.22 | 57 | 5.78 |
| MARKS STREET SENIOR CENTER | 549 | 99.28 | 4 | 0.72 |
| MEADOW WOODS RECREATION CENTER | 732 | 97.21 | 21 | 2.79 |
| RENAISSANCE SENIOR CENTER | 877 | 98.54 | 13 | 1.46 |
| SOUTH CREEK BRANCH LIBRARY | 955 | 97.25 | 27 | 2.75 |
| SOUTHEAST BRANCH LIBRARY | 940 | 97.81 | 21 | 2.19 |
| SOUTHWEST BRANCH LIBRARY | 1213 | 99.1 | 11 | 0.9 |
| SUPERVISOR OF ELECTIONS OFFICE | 1471 | 96.97 | 46 | 3.03 |
| TIBET BUTLER PRESERVE | 726 | 99.32 | 5 | 0.68 |
| UCF: THE GARDEN ROOM AT LIVE OAK EVENT CENTER | 589 | 98.83 | 7 | 1.17 |
| WASHINGTON PARK BRANCH LIBRARY | 580 | 95.55 | 27 | 4.45 |
| WATER CONSERV II | 476 | 99.37 | 3 | 0.63 |
| WEST OAKS BRANCH LIBRARY | 773 | 97.85 | 17 | 2.15 |
| WINTER GARDEN LIBRARY | 873 | 98.42 | 14 | 1.58 |
| WINTER PARK LIBRARY | 914 | 99.35 | 6 | 0.65 |

*Note: Wait Time estimates posted by the Orange County Supervisor of Elections on October 20, 2020. Available at:* `https://web.archive.org/web/20201020234124/ocfelections.com/early-voting-locations` *(last accessed July 5, 2021).*

**258**     Of the 381 individuals who needed voting assistance who cast their EIP ballots in Orange County on October 20, 2020, only 78 cast EIP ballots at locations at which the SOE office reported no lines.  However, six of these individuals with disabilities who voted at the Winter Park Library conceivably faced a three hour wait time on October 20, 2020, according to the SOE's own wait times estimate. Figure 12 provides the racial/ethnic breakdown, by estimated wait times across Orange County's 20 early voting locations, limited to those individuals who reported needing assistance to vote. What is clear from the figure is that a much higher proportion of Black voters and Hispanic voters who indicated they needed assistance when voting were likely to face the estimated three hour wait time at the Winter Park Library than comparable white voters; over a quarter of Black and Hispanic voters needing assistance to voter were also likely to face over an hour wait when voting at early voting locations in Orange County on October 20, 2020.

Figure 12: Orange County Reported EIP Wait Times, Only Voters Needing Assistance, by Race and Ethnicity



*Note: Estimates of Wait Times posted by the Orange County Supervisor of Elections on October 20, 2020. Available at:*
`https://web.archive.org/web/20201020234124/ocfelections.com/early-voting-locations` *(last accessed July 5, 2021).*

## XI.V   Wait times in other counties, early voting, 2020 General Election

**259**     As part of the discovery process, a handful of counties provided a smattering of snapshots or spreadsheets of estimated wait times, or alternatively, the estimated number of persons in line on various days, during the early voting period in the 2020 General Election.

### XI.V.1   Wait times in Lee County, early voting, 2020 General Election

**260**     Lee County, for example, provided daily snapshots of wait times using VRSystems' Dashboard application tied to EViD check-in times.[111] As an example of the wait time data provided in discovery, Figure 13 reproduces the Lee County SOE's snapshot for October 30, 2020, when three of the county's 11 early voting locations had wait times greater than 30 minutes at various times during the day. (The twelfth location ("StandbyEV (RegionF), appears to have been a training EViD machine, although one voter evidently cast a ballot on the machine on October 28, 2020.)

---

[111]See Lee daily estimated wait times, saved as .jpg screenshots, LWV, et al.'s RFP 15. As an aside, it is curious that other counties apparently do not use this technology, or did not produce these images in discovery, as to my knowledge, most of the 67 SOEs use VRSystems as their vendor for EViD check-ins.



Note: Wait Times estimates, Lee County, NAACP et al.'s RFP 15.

164

261     Unfortunately, the wait time documents produced in discovery by the Lee County SOE are not complete; some of the screenshots do not contain all of the polling locations, nor do all the screenshots have precise timestamps when the wait time estimate for a polling location was captured. (This should not be taken as a criticism of Lee County, as the wait time estimates during early voting that the SOE did provide are exemplary; they are just not complete.) Through a process of elimination, though, it is possible to infer which of the county's 11 early voting polling locations were missing, and the estimated wait times for each of them. It is not possible, however, to determine the precise timestamp for each estimated wait time for the early voting locations not captured in the daily screenshots, though most of the visible snapshots for each location were taken around mid-day (11AM until 2PM). Indeed, all but seven of the 74 EIP voting polling locations with time stamps indicate the estimated wait times at that location were between 11AM and 2PM. Scholarly studies show that these are typically the times *least* congested (Stewart III 2017; Stewart III & Ansolabehere 2013; Herron & Smith 2016), so the available sites with wait times likely underestimate longer wait times at the 11 sites.

262     In addition, there are no screenshots of wait times on the first day of EIP voting, October 19, 2020, despite news reports documenting extremely long lines of voters standing in line, including in the pouring rain and clearly within 150 feet of the polling site entrance, at several early voting locations in Lee County.[112] Figure 14 shows photos of voters standing in long lines outside the Dr. Carrie Robinson Community Center in Lee County on October 19, 2020. Unfortunately, the Lee County SOE did not provide a VRSystems' "Wait Times:

---

[112]See, for example, "Long lines and rain didn't dampen turnout on first day of early voting in Lee and Collier," *The News-Press*, October 19, 2020, available https://www.news-press.com/story/news/politics/elections/2020/10/19/early-voting-florida-2020-fort-myers-naples-cape-coral-lehigh-acres-estero-vote-election/3709337001/ (last accessed August 15, 2021).

Details" screenshot for several early voting days or locations, including October 19, 2020. As a result, the obvious long lines on October 19, 2020, visible in Figure 14, as well as other days of early voting with locations that were "NOT SET" (October 20 - October 24), are not included in my analysis, making my findings conservative.

Figure 14: Photos of Lines During EIP Voting, Lee County, October 19, 2020



Note: "Long lines and rain didn't dampen turnout on first day of early voting in Lee and Collier," *The News-Press*, October 19, 2020.

**263** Overall, according to the January 2021 Recap file for Lee County, more than 113,000 voters in the county cast EIP ballots in the 2020 General Election. As Table 23 reveals, in the county, more than 7,600 Black voters cast EIP ballots in the county, more than 13,400 Hispanic voters cast EIP ballots, and more than 86,000 white voters cast EIP ballots in the county. The distribution of Hispanic and white voters who cast EIP ballots was spread more evenly across the 11 locations than that of Black voters, who concentrated their voting at three locations. Over the nearly two-week period, roughly two-thirds of Black

voters who voted EIP ballots voted at the Dr. Carrie Robinson Community Center, the East County Regional Library, and the Veterans Park Recreation Center. Table 23 provides the racial/ethnic composition (both the raw count and the percentage of votes cast by each racial/ethnic group across all 11 locations) of ballots cast at each of the locations in the 2020 General Election.[113]

Table 22: Racial/Ethnic Composition of Each Early Voting Location (Raw Counts and Percentage of Each Group), Lee County, 2020 General Election

| Early Voting Location | Black | Hispanic | Other | White |
|---|---|---|---|---|
| CAPE CORAL-LEE COUNTY LIB | 309 | 1507 | 626 | 10596 |
| DR. CARRIE ROBINSON COMM CNTR | 2203 | 592 | 369 | 2655 |
| EAST COUNTY REGIONAL LIB | 1518 | 1747 | 549 | 5031 |
| ESTERO REC CTR | 227 | 699 | 501 | 9057 |
| LEE SOE BONITA SPRINGS | 129 | 873 | 476 | 10239 |
| LEE SOE CAPE CORAL | 409 | 2175 | 669 | 9245 |
| LEE SOE CNTR | 697 | 1400 | 1063 | 15889 |
| NORTH FORT MYERS REC CNTR | 161 | 644 | 374 | 8823 |
| NORTHWEST REGIONAL LIB | 331 | 1504 | 435 | 7511 |
| RIVERSIDE COMM CNTR | 385 | 463 | 236 | 3572 |
| VETERANS PARK REC CNTR | 1270 | 1870 | 452 | 3577 |
| CAPE CORAL-LEE COUNTY LIB | 4.04 | 11.18 | 10.89 | 12.29 |
| DR. CARRIE ROBINSON COMM CNTR | 28.84 | 4.39 | 6.42 | 3.08 |
| EAST COUNTY REGIONAL LIB | 19.87 | 12.97 | 9.55 | 5.84 |
| ESTERO REC CTR | 2.97 | 5.19 | 8.71 | 10.51 |
| LEE SOE BONITA SPRINGS | 1.69 | 6.48 | 8.28 | 11.88 |
| LEE SOE CAPE CORAL | 5.35 | 16.14 | 11.63 | 10.73 |
| LEE SOE CNTR | 9.12 | 10.39 | 18.49 | 18.43 |
| NORTH FORT MYERS REC CNTR | 2.11 | 4.78 | 6.50 | 10.24 |
| NORTHWEST REGIONAL LIB | 4.33 | 11.16 | 7.57 | 8.71 |
| RIVERSIDE COMM CNTR | 5.04 | 3.44 | 4.10 | 4.14 |
| VETERANS PARK REC CNTR | 16.62 | 13.88 | 7.86 | 4.15 |

**264** Across the 13 days of EIP voting that Lee County offered voters in the 2020 General Election (the county did not offer voting on the final Sunday prior to Election Day), turnout among Black and Hispanic voters, as with white voters and those of other racial/ethnic groups, was spread fairly evenly. However, there was a slight uptick in turnout by Hispanics on the final two days (Friday, October 30 and Saturday, October 31) of early

---

[113]Omitted is the one voter who, according to the Lee County SOE data, cast an EIP ballot at "StandbyEV(RegionF)".

voting.

265     So as to get a sense of the wait times voters likely had to endure at each early voting location, it is possible to determine the composition of voters, grouped by race and ethnicity, for those who cast ballots at the 11 locations on the final seven days of early voting in Lee County.[114]  According to the SOE's own estimates, in an election in which less than 30 percent of all voters in the county cast EIP ballots—roughly one in seven (over 9,900 voters) of the more than 63,000 EIP ballots voters who cast EIP ballots (on the seven days for which Lee County's wait time estimates are available)—there was at least a 30 minute wait time on the day on which they voted.[115]

266     Table 23 provides the county's estimated wait times broken down by racial/ethnic groups (both the raw count and the percentage of votes cast by each racial/ethnic group) over the 13 days of early voting.  Over 740 Black voters, or roughly 19 percent, and over 1,300 Hispanic voters, or roughly 16 percent, who cast EIP ballots in Lee County between October 25 and October 31, 2020, cast their ballots at locations that had wait times of at least 30 minutes, whereas comparable wait times was considerably lower for white voters. Again, these estimates likely underestimate the average wait time for Black and Hispanic voters, given the known long lines during early voting on October 19, particularly at the Dr. Carrie Robinson Community Center in Lee County.  In addition, of

---

[114]Again, Lee County did not provide detailed VRSystems wait time snapshots for every day in its RPF and apparently did not set up the EViD wait time technology at some locations on a few days of early voting in the 2020 General Election.

[115]According to Lee County's "SUMMARY REPT-GROUP DETAIL," that it ran on 11/13/20, roughly 28.5 percent of all votes cast in the November 2020 election were EIP ballots.  See Florida Division of Elections, "Official Election Results Summary for the General Election Results November 3, 2020," available https://www.lee.vote/Election-Results/Archived-Election-Results#2020 (last accessed August 14, 2021).

the more than 1,900 voters needing assistance to vote in Lee County who cast EIP ballots, or roughly 1.7 percent of all EIP voters in the county, some 200 of these voters cast ballots at sites on the seven days that had wait times of at least 30 minutes, or nearly one in five of all early in person voters who indicated they needed assistance when they registered to vote.

Table 23: Estimated Wait Times for Early In-Person Voters (October 19 thru October 31), by Race/Ethnicity (Raw Counts and Percentage of Each Group), Lee County, 2020 General Election

| Minutes | Black | Hispanic | Other | White |
|---|---|---|---|---|
| Greater than 30 | 746 | 1,310 | 599 | 7,321 |
| Less than 30 | 515 | 1,499 | 713 | 10,573 |
| Less than 15 | 2,662 | 5,332 | 2,147 | 29,634 |
| Greater than 30 | 19.02 | 16.09 | 17.32 | 15.40 |
| Less than 30 | 13.13 | 18.41 | 20.61 | 22.25 |
| Less than 15 | 67.86 | 65.50 | 62.07 | 62.35 |

## XI.VI  Summary: SB 90 will disproportionately affect voters of color and voters with disabilities who are more likely to face long lines and wait times at the polls

**267**     Long wait times tend to be correlated with long lines. As I show, long wait times during the early voting period in the 2020 General Election, as reported by several SOEs, were disproportionately located at early voting sites where, and when, voters of color, as well as those with disabilities, were in line to vote. Furthermore, given the likely shift to EIP voting due to SB 90's increased burdens placed on voters trying to request a VBM ballot, the downstream impact of SB 90 in future elections will likely be even longer lines and extended wait times at early voting sites. Under SB 90, it is my understanding that individuals or groups wishing to engage with voters in a queue within 150 feet of a polling entrance would not be permitted to solicit voters waiting in line, which includes not being able to provide drink, food, seating, or shelter. Many of the wait times at polling locations extended the length of the voting queues beyond the 150 foot no solicitation zone, making Black and

169

Hispanic voters, and those needing assistance to vote, more burdened while waiting in line to cast a ballot.

# XII   Conclusion

**268**      All eligible citizens, but particularly persons of color, and all registered voters, but particularly Black and Hispanic registered voters and registered voters with disabilities, have their voting rights harmed under SB 90.  Because persons of color rely more heavily on 3PVROs when registering to vote than other groups of voters, SB 90's limits placed on 3PVROs will result in Black and Hispanic eligible Florida citizens having fewer opportunities to register to vote.  Because of SB 90's new exact-match ID requirements for registered voters who want to request a VBM ballot—that is, a requirement to include personal information (Social Security number, or a driver's licence or a state ID number) that exactly matches the voter's information on file—disproportionately affects voters of color, it will lead to less opportunities for Black and Hispanic registered voters to receive a VBM ballot.  Because SB 90 cuts in half the length of time a voter may have a standing request to have a VBM ballot mailed to them, registered voters, including racial and ethnic minority voters and voters with disabilities, will have less opportunities to receive a VBM ballot.  Because of limits placed on the locations, dates, and hours of operation of VBM drop boxes, all Florida voters, but particularly voters of color, will have less opportunities to securely return their VBM ballots in person.  Because SB 90 places restrictions on the return of VBM ballots for voters in need of assistance, all voters, but particularly voters of color and those with disabilities will have less opportunities to return their VBM ballots. And, because of restrictions placed on providing aid and comfort to voters waiting in lines during early in-person or on Election Day, voters of color and those with disabilities will face higher barriers to cast ballots in

170

person, potentially causing them not to vote at all.

269      I ask to reserve the right to continue to supplement my declaration in light of additional facts, data, and testimony.

# XIII Academic material cited

# References

Aldrich, John H. 1993. "Rational choice and turnout." *American Journal of Political Science* (1):246–278.

Amos, Brian, Daniel A. Smith & Casey Ste. Claire. 2017. "Reprecincting and Voting Behavior." *Political Behavior* 39(1):133–156.

Barreto, Matt A, Stephen Nuño, Gabriel R Sanchez & Hannah L Walker. 2019. "The racial implications of voter identification laws in America." *American Politics Research* 47(2):238–249.

Belt, Rabia. 2016. "Contemporary Voting Rights Controversies Through the Lens of Disability." *Stanford Law Review* 68(6):1491–1550.

Brady, Henry E. & John E. McNulty. 2011. "Turning out to vote: The costs of finding and getting to the polling place." *American Political Science Review* 105(01):115–134.

Chen, M Keith, Kareem Haggag, Devin G Pope & Ryne Rohla. 2019. Racial Disparities in Voting Wait Times: Evidence from Smartphone Data. Technical report National Bureau of Economic Research.

Collingwood, Loren & Benjamin Gonzalez O'Brien. 2021. "Is Distance to Drop Box an Appropriate Proxy for Drop Box Treatment? A Case Study of Washington State." *American Politics Research* p. 1532673X211022192.

Collingwood, Loren, William McGuire, Benjamin Gonzalez O'Brien, Katherine Baird & Sarah Hampson. 2018. "Do Drop Boxes Improve Voter Turnout? Evidence from King County, Washington." *Election Law Journal* 17(1):58–72.

Cottrell, David, Michael C Herron & Daniel A Smith. 2020. "Vote-by-mail ballot rejection and experience with mail-in voting." *American Politics Research* p. 1532673X211022626.

Cottrell, David, Michael C Herron & Daniel A Smith. 2021. "Voting lines, equal treatment, and early voting check-in times in Florida." *State Politics & Policy Quarterly* 21(2):109–138.

Downs, Anthony. 1957. *An Economic Theory of Democracy*. New York: Harper and Row.

Fay, Jessica A. 2005. "Elderly Electors Go Postal: Ensuring Absentee Ballot Integrity for Older Voters." *Elder Law Journal* 13:453–487.

Haspel, Moshe & H Gibbs Knotts. 2005. "Location, location, location: Precinct placement and the costs of voting." *The Journal of Politics* 67(2):560–573.

Herron, Michael C. & Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355." *Election Law Journal* 11(3):331–347.

Herron, Michael C. & Daniel A. Smith. 2013. "The effects of House Bill 1355 on voter registration in Florida." *State Politics & Policy Quarterly* 13(3):279–305.

Herron, Michael C. & Daniel A. Smith. 2014. "Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election." *Political Research Quarterly* 67(3):646–665.

Herron, Michael C. & Daniel A. Smith. 2015. "Precinct Closing Times in Florida During the 2012 General Election." *Election Law Journal* 14(3):220–238.

Herron, Michael C. & Daniel A. Smith. 2016. "Precinct Resources and Voter Wait Times." *Electoral Studies* 42:249–263.

Herron, Michael C & Daniel A Smith. 2021. "Postal delivery disruptions and the fragility of voting by mail: Lessons from Maine." *Research & Politics* 8(1):2053168020981434.

Herron, Michael C., Daniel A. Smith, Wendy Serra & Bafumi Joseph. 2017. Wait Times and Voter Confidence: A Study of the 2014 General Election in Miami-Dade County. In *Races, Reforms, & Policy: Implications of the 2014 Midterm Election*. University of Akron Press.

Hood, M.V. & Charles S. Bullock. 2012. "Much ado about nothing? An empirical assessment of the Georgia voter identification statute." *State Politics & Policy Quarterly* 12(4):394–

173

414.

Kaplan, Ethan & Haishan Yuan. 2020. "Early Voting Laws, Voter Turnout, and Partisan Vote Composition: Evidence from Ohio." *American Economic Journal: Applied Economics* 12(1):32–60.

Karp, Jeffrey A & Susan A Banducci. 2001. "Absentee voting, mobilization, and participation." *American Politics Research* 29(2):183–195.

Kimball, David. 2013. "Why are Voting Lines Longer for Urban Voters?" *Available at SSRN 2255009* .

Kimball, David C. & Brady Baybeck. 2013. "Are All Jurisdictions Equal? Size Disparity in Election Administration." *Election Law Journal* 12(2):130–145.

Lamb, Matt. 2021. "Who Leaves the Line, Anyway? A Study of Who Leaves Polling Place Lines, and Why." *Election Law Journal: Rules, Politics, and Policy* .

Leighley, Jan E. & Jonathan Nagler. 2013. *Who Votes Now?: Demographics, Issues, Inequality, and Turnout in the United States*. Princeton University Press.

Li, Quan, Michael J. Pomante II & Scot Schraufnagel. 2018. "Cost of Voting in the American States." *Election Law Journal* 17(3):234–247.

McGuire, William, Benjamin Gonzalez O'Brien, Katherine Baird, Benjamin Corbett & Loren Collingwood. 2020. "Does Distance Matter? Evaluating the Impact of Drop Boxes on Voter Turnout." *Social Science Quarterly* 101(5):1789–1809.

Menger, Andrew & Robert M Stein. 2020. "Choosing the less convenient way to vote: An anomaly in vote by mail elections." *Political Research Quarterly* 73(1):196–207.

Merivaki, Thessalia. 2019. "Access Denied? Investigating Voter Registration Rejections in Florida." *State Politics amp; Policy Quarterly* 19(1):53–82.

Merivaki, Thessalia. 2021. *The Administration of Voter Registration: Expanding the Electorate Across and Within the States*. New York: .

Merivaki, Thessalia & Daniel A. Smith. 2019. "A Failsafe for Voters? Cast and Rejected

Provisional Ballots in North Carolina." *Political Research Quarterly* pp. 1–14.

Miller, Peter & Sierra Powell. 2016. "Overcoming voting obstacles: The use of convenience voting by voters with disabilities." *American Politics Research* 44(1):28–55.

Mukherjee, Elora. 2009. "Abolishing the time tax on voting." *Notre Dame L. Rev.* 85:177.

Palandrani, Joseph & Danika Watson. 2020. "Systemic Inequality| Racial Gerrymandering, The For the People Act, and Bronivich: Systemic Racism and Voting Rights in 2021." *Fordham Law Review Online* 89(1):21.

Pettigrew, Stephen. 2017. "The racial gap in wait times: why minority precincts are underserved by local election officials." *Political Science Quarterly* 132(3):527–547.

Pettigrew, Stephen. 2021. "The downstream consequences of long waits: How lines at the precinct depress future turnout." *Electoral studies* 71:102188.

Plescia, Carolina, Semra Sevi & André Blais. 2021. "Who Likes to Vote by Mail?" *American Politics Research* 49(4):381–385.

**URL:** *https://doi.org/10.1177/1532673X211005684*

Rosenstone, Steven J. & Raymond E. Wolfinger. 1978. "The effect of registration laws on voter turnout." *American Political Science Review* 72(1):22–45.

Rosenstone, Steven & John M. Hansen. 1993. *Mobilization, Participation and Democracy in America.* New York: MacMillan Publishing.

Schelker, Mark & Marco Schneiter. 2017. "The elasticity of voter turnout: Investing 85 cents per voter to increase voter turnout by 4 percent." *Electoral Studies* 49:65–74.

Schraufnagel, Scot, Michael J Pomante II & Quan Li. 2020. "Cost of Voting in the American States: 2020." *Election Law Journal: Rules, Politics, and Policy* 19(4):503–509.

Schur, Lisa & Douglas Kruse. 2014. Disability and Election Policies and Practices. In *The measure of American elections*, ed. Barry C. Burden, & Charles Stewart III. Cambridge University Press pp. 188–222.

Schur, Lisa, Meera Adya & Mason Ameri. 2015. "Accessible democracy: reducing voting

obstacles for people with disabilities." *Election Law Journal* 14(1):60–65.

Shino, Enrijeta, Mara Suttmann-Lea & Daniel A. Smith. 2021. "Determinants of Rejected Mail Ballots in Georgia's 2018 General Election." Forthcoming, *Political Research Quarterly*.

Shino, Enrijeta, Michael D Martinez, Michael P McDonald & Daniel A Smith. 2020. "Verifying Voter Registration Records: Part of Special Symposium on Election Sciences." *American Politics Research* 48(6):677–681.

Smith, Daniel A. 2018. "Vote-By-Mail Ballots Cast in Florida." `https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf`.

Smith, Daniel A. 2021. "Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election." `https://allvotingislocal.org/wp-content/uploads/2021/03/031121_FL_VBM-Report_final.pdf`.

Smith, Daniel A. & Anna Baringer. 2020. "ACLU Florida: Analysis of Vote-By-Mail Ballots in the 2018 General Election." `https://www.aclufl.org/en/aclu-florida-report-vote-mail-ballots-2018-general-election`.

Smith, Melissa A., Samuel S. Monfort & Eric J. Blumberg. 2015. "Improving Voter Experience Through User Testing and Iterative Design." *Journal of Usability Studies* 10(4):116–128.

Stein, Robert M, Christopher Mann, Charles Stewart III, Zachary Birenbaum, Anson Fung, Jed Greenberg, Farhan Kawsar, Gayle Alberda, R Michael Alvarez, Lonna Atkeson et al. 2020. "Waiting to vote in the 2016 presidential election: Evidence from a multi-county study." *Political Research Quarterly* 73(2):439–453.

Stewart III, Charles. 2013. "Voter ID: Who has them; who shows them." *Okla. L. Rev.* 66:21.

Stewart III, Charles. 2017. "2016 Survey of the Performance of American Elections: Final Report." *MIT* .

Stewart III, Charles & Stephen Ansolabehere. 2013. "Waiting in Line to Vote (White Paper)."

*U.S. Election Assistance Commission* .

**URL:** *https://www.eac.gov/sites/default/files/event_document/files/Charles − Stewart − Waiting − in − Line − to − Vote − White − Paper.pdf*

Tokaji, Daniel P & Ruth Colker. 2007. "Absentee voting by people with disabilities: Promoting access and integrity." *McGeorge L. Rev.* 38:1015–1046.

Verba, Sidney, Kay Lehman Schlozman & Henry E. Brady. 1995. *Voice and equality: Civic voluntarism in American politics*. Cambridge, MA: Harvard University Press.

Weil, Matthew, Charles Stewart III, Tim Harper & Christopher Thomas. 2019. "The 2018 Voting Experience: Polling Place Lines." *Washington, DC: Bipartisan Policy Center* .

**URL:** *https://bipartisanpolicy.org/report/the-2018-voting-experience/*

Willis, John T., Bob Murphy & Ann Cotten. 2014. "Voting and the Administration of Elections in Maryland." *Schaefer Center for Public Policy* .

**URL:** *www.elections.state.md.us/press_room/documents/SchaeferCenterFinalReport.pdf*

# A   Appendices

## A.I   *Curriculum vitae* of Daniel A. Smith

*9 August 2021*

**DANIEL A. SMITH**
*Curriculum Vitae*

**Mailing Address**
Department of Political Science
234 Anderson Hall
PO Box 117325
University of Florida
Gainesville, FL 32611-7325

**Contact**
Office: 303 Anderson Hall
Phone: 352.273.2346
Fax: 352.392.8127
Email: electionsmith@gmail.com  dasmith@ufl.edu
Homepage: http://people.clas.ufl.edu/dasmith/
www.electionsmith.com

**EDUCATION**
*University of Wisconsin-Madison*
        Ph.D., Political Science, 1994
        M.A., Political Science, 1989
*The Pennsylvania State University*
        B.A., Political Science (Foreign Affairs) & B.A., History (*cum laude*), 1988
            University Scholars Program (University Honors)
            *Phi Beta Kappa, Phi Alpha Theta*
            Macro Economics Program, *Westminster College*, *Oxford University*, Summer, 1987

**ACADEMIC EMPLOYMENT**
*University of Florida, Gainesville*
        Professor, Department of Political Science, 2010-
            Chair, 2017-
            Graduate Coordinator, 2014-2016
            Associate Chair, 2013-2014
            Director, Graduate Program in Political Campaigning, 2007-2011
            Affiliate Professor, Center for African Studies, 2010-
            Affiliate Professor, The Bob Graham Center for Public Service, 2013-
            Internship Coordinator, Department of Political Science, 2005-
        Associate Professor (with tenure), Department of Political Science, 2003-2009
*University of Denver*
        Associate Professor (with tenure), Department of Political Science, 2000-2003
        Assistant Professor, Department of Political Science, 1994-2000
        Director, *University of Denver/University of Ghana* Study Abroad Program, 1995-2002
*University of Ghana*
        Senior Fulbright Scholar, Department of Political Science, 2000-01
*West Virginia University*
        Visiting Assistant Professor, Department of Political Science, 1993-1994
*Beloit College*
        Visiting Lecturer, *Warner Mills Teaching Fellow*, Department of Government, 1992-1993
*University of Wisconsin-Madison*
        Teaching Assistant, Department of Political Science, 1988; 1990-1991
        Research Assistant, Center on Wisconsin Strategy, 1989-1991
        Project Assistant, Department of Political Science, 1989-1990

**RESEARCH FELLOWSHIPS**
University of Florida Term Professor, 2016-2018
Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, Fall 2011
University of Florida Research Foundation (UFRF) Professor, 2010-2012
Visiting Scholar, Bill Lane Center for the Study of the North American West, Stanford University, Spring 2007
Senior Research Scholar, Ballot Initiative Strategy Center, Washington, D.C., Spring 2006
Senior Fulbright Scholar (Ghana), United States Department of State, 2000-01
Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, 2000-01

**AREAS OF SPECIALIZATION**
American State Politics
        Voting and Elections (Voting Rights, Redistricting, Political Campaigns, Campaign Finance)
        Direct Democracy (Ballot Initiatives and Referendums)
American Institutions (Political Parties and Interest Groups)
Politics of Ghana (Voting and Elections)

178

***COURSES TAUGHT***

Intro to American Politics (Undergrad)      State and Local Government (Grad & Undergrad)
Interest Group Politics (Undergrad)       Political Parties (Grad & Undergrad)
Direct Democracy (Grad & Undergrad)     Politics of Campaign Finance (Grad & Undergrad)
Politics of Reform (Grad)              Problems of Markets and Governments (Undergrad)

***SCHOLARLY PUBLICATIONS***
***BOOKS***

3) Todd Donovan, Daniel A. Smith, Tracy Osborne, and Christopher Z. Mooney. 2015. *State and Local Politics: Institutions and Reform.* 4th edition. Boston: Cengage Learning/Wadsworth.

2) Daniel A. Smith and Caroline J. Tolbert. 2004. *Educated by Initiative: The Effects of Direct Democracy on Citizens and Political Organizations in the American States.* Ann Arbor: University of Michigan Press.

1) Daniel A. Smith. 1998. *Tax Crusaders and the Politics of Direct Democracy.* NY: Routledge.

***JOURNAL ARTICLES*** (current PhD students **bold**; former PhD students *italics*; undergrad students ***italics***)

71) David Cottrell, Michael Herron, and Daniel A. Smith. 2021. ``Vote-by-mail Ballot Rejection and Experience with Mail-in Voting," *American Politics Research* (July).

70) David Cottrell, Felix Herron, Michael Herron, and Daniel A. Smith. 2021. "Auditing the 2020 General Election in Georgia: Residual vote rates and a confusing ballot format," *Election Law Journal* 20(3): forthcoming.

69) ***Anna Baringer***, ***Justin Eichermuller***, ***William Zelin***, *Enrijeta Shino*, and Daniel A. Smith. 2021. "Election Administration and Public Records Responsiveness," *Public Integrity* (July).

68) *Enrijeta Shino* and Daniel A. Smith. 2021. "Pandemic Politics: COVID-19, Individual Health, and Vote Choice in the 2020 General Election," *Journal of Elections, Public Opinion and Parties.* (June).

67) *Enrijeta Shino*, Mara Suttmann-Lea, and Daniel A. Smith. 2021 "Assessing Rejected Mail Ballots in Georgia: Implications for COVID-19," *Political Research Quarterly* (February).

66) Michael C. Herron and Daniel A. Smith. 2021. "Postal Delivery Disruptions and the Fragility of Voting by Mail: Lessons from Maine," *Research & Politics* (January).

65) David Cottrell, Michael C. Herron, and Daniel A. Smith. 2021. "Voting Lines, Equal Treatment, and Early Voting Check-in Times in Florida," *State Politics and Policy Quarterly* 21(2): 109-138.

64) *William D. Hicks*, Seth C. McKee, and Daniel A. Smith. 2021. "Contemporary Views of Liberal Democracy and the 2016 Presidential Election." *PS: Political Science* 54(1): 33-40.

63) *Enrijeta Shino* and Daniel A. Smith. 2020. "Political Knowledge and Convenience Voting," *Journal of Elections, Public Opinion and Parties* (August).

62) ***Anna Baringer***, Michael Herron, and Daniel A. Smith. 2020. "Voting by Mail and Ballot Rejection: Lessons from Florida for Elections in the Age of the Coronavirus," *Election Law Journal* 19(3): 289-320.

61) *Enrijeta Shino* and Daniel A. Smith. 2020. "Mobilizing the Youth Vote? Early Voting on College Campuses." *Election Law Journal* 19(4): 524-541.

60) *Enrijeta Shino*, Michael Martinez, Michael P. McDonald, and Daniel A. Smith. 2020. "Verifying Voter Registration Records," *American Politics Review* 48(6): 677–681.

59) Charles Bullock, *William D. Hicks*, M.V. Hood III, Seth C. McKee, and Daniel A. Smith. 2020. "The Election of African American State Legislators in the Modern South." *Legislative Studies Quarterly* 45(4): 581-608.

58) *Thessalia Merivaki* and Daniel A. Smith. 2019. "A Failsafe for Voters? Cast and Rejected Provisional Ballots in North Carolina," *Political Research Quarterly* 73(1): 65-78.

57) Seth C. McKee, Daniel A. Smith, and M.V. Hood III. 2018. "The Comeback Kid: Donald Trump on Election Day in 2016." *PS: Political Science* 52 (2): 239-242.

56) Hannah L. Walker, Michael C. Herron, and Daniel A. Smith. 2019. "North Carolina voter turnout and early voting hours in the 2016 General Election." *Political Behavior* 41: 841-69.

55) Daniel Biggers and Daniel A. Smith. 2020. "Does Threatening their Franchise Make Registered Voters More Likely to Participate? Evidence from an Aborted Voter Purge." *British Journal of Political Science* 50(3): 933-954.

54) **Brian Amos**, *Diana Forster*, and Daniel A. Smith. 2018. "Who Signs? Ballot Petition Signatures as Political Participation," *American Review of Politics* 36(2): 19-37.

53) David Cottrell, Michael C. Herron, Javier M. Rodriguez, and Daniel A. Smith. 2019. "Mortality, Incarceration, and African-American Disenfranchisement in the Contemporary United States," *American Politics Research* 47(2) 195–237.

52) Daniel A. Smith, Seth C. McKee, and M.V. (Trey) Hood, III. 2018. "Election Daze: Voting Modes and Voter Preferences in the 2016 Presidential Election," *Florida Political Chronicle* 25(2): 123-141.

51) **Enrijeta Shino** and Daniel A. Smith. 2018. "Timing the Habit: Voter Registration and Turnout in the American States." *Electoral Studies* 51: 72-82.

50) William D. Hicks, Carl E. Klarner, Seth C. McKee, and Daniel A. Smith. 2018. "Revisiting Majority-Minority Districts and Black Representation," *Political Research Quarterly* 71(2): 408-23.

49) **Brian Amos**, Daniel A. Smith, and ***Casey Ste. Claire***. 2017. "Reprecincting and Voting Behavior," *Political Behavior* 39(1): 133-156.

3

48) *William D. Hicks*, Seth C. McKee, and Daniel A. Smith. 2016. "A Bipartisan Election Reform? Explaining Support for Online Voter Registration in the American States," *American Politics Research* 44(6): 1008-1036.

47) Michael C. Herron and Daniel A. Smith. 2016. "Race, Shelby County, and the Voter Information Verification Act in North Carolina," *Florida State University Law Review* 43: 465-506.

46) *William D. Hicks*, Seth C. McKee, and Daniel A. Smith. 2016. "The Determinants of State Legislator Support for Restrictive Voter ID Laws," *State Politics & Policy Quarterly* 16(4): 411-431.

45) Michael C. Herron and Daniel A. Smith. 2016. "Precinct Resources and Voter Wait Times," *Electoral Studies* 42: 249–63.

44) **Thessalia Merivaki** and Daniel A. Smith. 2016. "Casting and Verifying Provisional Ballots in Florida," *Social Science Quarterly* 97(3): 729–47.

43) Michael C. Herron and Daniel A. Smith. 2015. "Precinct Closing Times in Florida during the 2012 General Election," *Election Law Journal* 14: 220-38.

42) *William D. Hicks*, Seth C. McKee, **Mitchell Sellers**, and Daniel A. Smith. 2015. "A Principle or a Strategy? Voter Identification Laws and Partisan Competition in the American States," *Political Research Quarterly* 68: 18-33.

41) Michael C. Herron and Daniel A. Smith. 2014. "Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election," *Political Research Quarterly* 67: 646-65.

40) *Josh Brodbeck*, **Matthew T. Harrigan**, and Daniel A. Smith. 2013. "Citizen and lobbyist access to Members of Congress: Who gets and who gives?" *Interest Groups and Advocacy* 2: 323-42.

39) Michael C. Herron and Daniel A. Smith. 2013. "The Effects of House Bill 1355 on Voter Registration in Florida," *State Politics and Policy Quarterly*, 13: 279-305.

38) Michael C. Herron and Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355," *Election Law Journal* 11: 331-47.
     [Winner of the 2013 APSA State Politics and Policy Section's *Best Paper Award*]

37) Janine Parry, Daniel A. Smith, and Shayne Henry. 2011. "The Impact of Petition Signing on Voter Turnout," *Political Behavior 34: 117-36*.

36) *Stephanie Slade* and Daniel A. Smith. 2011. "Obama to Blame? African American Surge Voters and the Ban on Same-Sex Marriage in Florida," *The Forum* 9(2), Article 6: http://www.bepress.com/forum/vol9/iss2/art6.

35) Daniel A. Smith. 2011. "Generating Scholarship from Public Service: Media Outreach, Nonprofit Foundation Service, and Legal Expert Consulting," *PS: Political Science & Politics* 44: 255-9.

34) **Josh Huder**, **Jordan Ragusa**, and Daniel A. Smith. 2011. "The Initiative to Shirk? The Effects of Ballot Measures on Congressional Voting Behavior," *American Politics Research* 39 (3): 582-610.

33) Daniel A. Smith, Caroline J. Tolbert, and Amanda Keller. 2010. "Electoral and Structural Losers and Support for a National Referendum in the U.S." *Electoral Studies* 29: 509-520.

32) Daniel A. Smith and Caroline J. Tolbert. 2010. "Direct Democracy, Public Opinion, and Candidate Choice," *Public Opinion Quarterly* 74: 85-108.

31) Caroline Tolbert, Daniel A. Smith, and John Green. 2009. "Mass Support for Redistricting Reform: District and Statewide Representational Winners and Losers." *Political Research Quarterly* 62: 92-109.

30) Todd Donovan, Caroline J. Tolbert, and Daniel A. Smith. 2009. "Political Engagement, Mobilization, and Direct Democracy," *Public Opinion Quarterly* 73: 98-118.

29) Daniel A. Smith. 2009. "An Americanist in Africa," *PS: Political Science & Politics* 42 (4): 827-33.

28) Beatrix Allah-Mensa, *Kevin S. Fridy*, Daniel A. Smith, and Ukoha Ukiwo. "2009 APSA Workshop on African Elections and Democracy," *PS: Political Science & Politics*. 42 (4): 827-33. [Editors of a Special Symposium on the 2009 APSA Workshop in Ghana].

27) Todd Donovan, Caroline Tolbert, and Daniel A. Smith. 2008. "Priming Presidential Votes by Direct Democracy," *Journal of Politics* 70: 1217-31.

26) Daniel A. Smith and **Dustin Fridkin**. 2008. "Delegating Direct Democracy: Interparty Legislative Competition and the Adoption of the Initiative in the American States," *American Political Science Review* 102: 333-50.

25) Eric Heberlig, Bruce Larson, Daniel A. Smith, and **Kristen Soltis**. 2008. "Look Who's Coming to Dinner: Direct versus Brokered Member Campaign Contributions to the NRCC." *American Politics Research* 36 433-450.

24) Daniel A. Smith and Caroline J. Tolbert. 2007. "The Instrumental and Educative Effects of Ballot Measures: Research on Direct Democracy in the American States." *State Politics and Policy Quarterly* 4: 417-446.

23) Daniel A. Smith. 2007. "Representation and the Spatial Bias of Direct Democracy," *University of Colorado Law Review* 78 (4): 1395-1434.

22) Daniel A. Smith and Caroline J. Tolbert, and Daniel Bowen. 2007. "The Educative Effects of Direct Democracy: A Research Primer for Legal Scholars," *University of Colorado Law Review* 78 (4): 1371-94.

21) Daniel A. Smith, **Matthew DeSantis**, and **Jason Kassel**. 2006. "Same-Sex Marriage Ballot Measures and the 2004 Presidential Election," *State and Local Government Review* 38 (2): 78-91.

20) Caroline J. Tolbert and Daniel A. Smith. 2006. "Representation and Direct Democracy in the United States." *Representation: The Journal of Representative Democracy* 42 (1): 25-44.

19) Elizabeth Garrett and Daniel A. Smith. 2005. "Veiled Political Actors and Campaign Disclosure Laws in Direct Democracy." *Election Law Journal* 4 (4) 295-328.

18) Caroline J. Tolbert and Daniel A. Smith. 2005. "The Educative Effects of Ballot Initiatives on Voter Turnout." *American Politics Research* 33 (2): 283-309.

17) Daniel A. Smith. 2004. "Peeling Away the Populist Rhetoric: Toward a Taxonomy of Anti-Tax Ballot Initiatives." *Journal of Public Budgeting and Finance* 24 (4): 88-110.

16) Daniel A. Smith. 2003. "Overturning Term Limits: The Legislature's Own Private Idaho?" *PS: Political Science & Politics* 36 (2): 215-220.

15) Caroline J. Tolbert, Ramona McNeal, and Daniel A. Smith. 2003. "Enhancing Civic Engagement: The Effect of Direct Democracy on Political Participation and Knowledge." *State Politics and Policy Quarterly* 3 (1): 23-41.

14) Daniel A. Smith. 2003. "Distorted by Outside Money: National Parties and the Race for Colorado's Seventh Congressional District," *PS: Political Science & Politics* 36 (3) PSOnline E-Symposium <http://journals.cambridge.org/action/displayAbstract?aid=164256>.

13) Daniel A. Smith and **Joseph Lubinski**. 2002. "Direct Democracy during the Progressive Era: A Crack in the Populist Veneer?" *Journal of Policy History* 14 (4): 349-83.

12) Jonathan Temin and Daniel A. Smith. 2002. "Media Matters: Evaluating the Role of the Media in Ghana's 2000 Elections." *African Affairs* 101: 585-605.

11) Daniel A. Smith. 2002. "Consolidating Democracy? The Structural Underpinnings of Ghana's 2000 Elections." *Journal of Modern African Studies* 40 (4): 1-30.

10) Daniel A. Smith. 2002. "Ghana's 2000 Elections: Consolidating Multi-Party Democracy." *Electoral Studies* 21 (3): 519-26.

9) Daniel A. Smith and Caroline Tolbert. 2001. "The Initiative to Party: Partisanship and Ballot Initiatives in California." *Party Politics* 7 (6): 781-99.

8) Caroline Tolbert, John Grummel, and Daniel A. Smith. 2001. "The Effect of Ballot Initiatives on Voter Turnout in the American States." *American Politics Research* 29 (6): 625-48.

7) Daniel A. Smith. 2001. "Homeward Bound? Micro-Level Legislative Responsiveness to Ballot Initiatives." *State Politics and Policy Quarterly* 1 (1): 50-61.

6) Daniel A. Smith and **Robert J. Herrington**. 2000. "The Process of Direct Democracy: Colorado's 1996 Parental Rights Amendment." *Social Science Journal* 37 (2): 179-94.

5) Daniel A. Smith. 1999. "Reevaluating the Causes of Proposition 13." *Social Science History* 23 (2): 173-210.

4) Daniel A. Smith and **Nathaniel Golich**. 1998. "Some Unintended Consequences of TABOR." *Comparative State Politics* 19 (6): 33-40.

3) Daniel A. Smith, Kevin M. Leyden, and Stephen A. Borrelli. 1998. "Predicting the Outcomes of Presidential Commissions: Evidence from the Johnson and Nixon Years," *Presidential Studies Quarterly* 28 (2): 269-85.

2) Daniel A. Smith. 1996. "Populist Entrepreneur: Douglas Bruce and the Tax and Government Limitation Moment in Colorado, 1986-1992," *Great Plains Research* 6 (2): 269-94.

1) Daniel A. Smith. 1993. "Removing the Pluralist Blinders: Labor-Management Councils and Industrial Policy in the American States," *Economic Development Quarterly* 7 (4): 373-89.

**UNDER REVIEW** (current PhD students **bold**; former PhD students *italics*; undergrad students ***italics***)

1) *Enrijeta Shino*, Daniel A. Smith, **Laura Uribe**, and **Brandi Martinez**, "Voting by Mail: Elite Cue-Taking and Partisan Motivated-Reasoning."

2) Seth C. McKee, Daniel A. Smith, **Enrijeta Shino**, and **Brian Amos**, "Redrawn, Withdrawn: The Effects of Redistricting on the Representative-Constituent Relationship."

**BOOK CHAPTERS** (current PhD students **bold**; former PhD students *italics*; current undergrad students ***italics***)

29) Todd Donovan and Daniel A. Smith. 2020, "Direct Democracy and Political Speech in the United States," in Direkte Demokratie: Festschrift für Otmar Jung, Hermann K. Heußner, Arne Pautsch, and Fabian Wittreck, eds. Berlin: Richard Boorberg Verlag (479-488).

28) *Thessalia Merivaki* and Daniel A. Smith. 2019. "Challenges in Voter Registration," in *The Future of Election Administration*, Mitchell Brown, Kathleen Hale, and Bridgett A. King, eds. New York: Palgrave/Macmillan.

27) Seth C. McKee and Daniel A. Smith. 2019. "Trump Territory," in *Florida and the 2016 Election of Donald J. Trump*, Matthew Corrigan and Michael Binder, eds. Gainesville: University of Florida Press (49-75).

26) Daniel A. Smith, *Brian Amos*, Daniel Maxwell, and **Tyler Richards**. 2019. "Rigged? Assessing Election Administration in Florida's 2016 General Election," in *Florida and the 2016 Election of Donald J. Trump*, Matthew Corrigan and Michael Binder, eds. Gainesville: University of Florida Press (154-74).

25) Daniel A. Smith, **Dillon Boatner**, **Caitlin Ostroff**, **Pedro Otálora**, and **Laura Uribe**, "Early Bird Special: Convenience Voting in Florida's 2016 General Election," in *Florida and the 2016 Election of Donald J. Trump*, Matthew Corrigan and Michael Binder, eds. Gainesville: University of Florida Press (pp.134-53).

24) Michael C. Herron, Daniel A. Smith, **Wendy Serra**, and Joseph Bafumi. 2017. "Wait Times and Voter Confidence: A Study of the 2014 General Election in Miami-Dade County," in *The American Election 2014: Contexts and Consequences*, Tauna Sisco, Christopher Galdieri, and Jennifer Lucas, eds. Akron, OH: University of Akron Press (pp. 107-122).

23) **Joseph T. Eagleton** and Daniel A. Smith. 2015. "Drawing the Line: Public Support for Amendments 5 and 6," in *Jigsaw Puzzle Politics in the Sunshine State*, Seth C. McKee, ed. Gainesville, FL: University Press of Florida (pp. 109-25).

5

22) **Diana Forster** and Daniel A. Smith. 2014. "A Climate for Change? Environmental Ballot Measures," in *U.S. Climate Change Policy and Civic Society*, Yael Wolinsky-Nahmias, ed. Washington, DC: C.Q. Press.

21) Daniel A. Smith. 2014. "Direct Democracy," in *The Encyclopedia of Political Thought*, Michael T. Gibbons, ed. Oxford: Wiley-Blackwell.

20) **William Hicks** and Daniel A. Smith. 2013. "State Campaigns and Elections," in *The Oxford Handbook of State and Local Government,* Donald Haider-Markel, ed. New York: Oxford University Press.

19) Daniel A. Smith. 2012. "Direct Democracy: Regulating the 'Will of the People,'" in Matthew J. Streb, ed., *Law and Election Politics: The Rules of the Game*, 2nd ed. New York: Routledge.

18) Daniel A. Smith. 2011. "Direct Democracy in Colorado: A Historical Perspective," in Courtenay Daum, Robert Duffy, and John Straayer, eds., *State of Change: Colorado Politics in the Twenty-first Century*. Boulder: University of Colorado Press.

17) Daniel A. Smith. 2010. "Direct Democracy and Candidate Elections," in Stephen C. Craig and David Hill, *The Electoral Challenge: Theory Meets Practice,* 2nd edition. Washington, D.C.: CQ Press.

16) Daniel A. Smith. 2010. "Financing Ballot Measures in the U.S.," in Karin Gilland-Lutz and Simon Hug, eds., *Financing Referendum Campaigns*. New York: Palgrave.

15) Daniel A. Smith. 2008. "Direct Democracy and Campaigns," in Shaun Bowler and Amihai Glazer, eds., *Direct Democracy's Impact on American Political Institutions*. New York: Palgrave.

14) Todd Donovan and Daniel A. Smith. 2008. "Identifying and Preventing Signature Fraud on Ballot Measure Petitions," in Michael Alvarez, Thad E. Hall, and Susan D. Hyde, eds., *Election Fraud: Detecting and Deterring Electoral Manipulation.* Washington, DC: Brookings.

13) Daniel A. Smith. 2008. "Direct Democracy and Election and Ethics Laws," in Bruce Cain, Todd Donovan, and Caroline Tolbert, eds, *Democracy in the States: Experiments in Elections Reform.* Washington, DC: Brookings.

12) Daniel A. Smith. 2007. "Ballot Initiatives," in Gary Anderson and Kathryn Herr, eds., *Encyclopedia of Activism and Social Justice.* Thousand Oaks, CA: Sage Publications, Inc.

11) Raymond J. La Raja, **Susan E. Orr**, and Daniel A. Smith. 2006. "Surviving BCRA: State Party Finance in 2004," in John Green and Daniel Coffey, eds., *The State of the Parties* (5th edition). Lanham, MD: Rowman and Littlefield.

10) Daniel A. Smith. 2006. "Initiatives and Referendums: The Effects of Direct Democracy on Candidate Elections," in Steven Craig, ed., *The Electoral Challenge: Theory Meets Practice.* Washington, D.C.: CQ Press.

9) Daniel A. Smith (with **Sure Log**). 2005. "Orange Crush: Mobilization of Bias, Ballot Initiatives, and the Politics of Professional Sports Stadia," in David McCuan and Stephen Stambough, eds., *Initiative-Centered Politics*. Durham, NC: Carolina Academic Press.

8) Daniel A. Smith. 2005. "The Initiative to Party: The Role of Parties in State Ballot Initiatives," in David McCuan and Stephen Stambough, eds., *Initiative-Centered Politics*. Durham, NC: Carolina Academic Press.

7) Daniel A. Smith. 2004. "Strings Attached: Outside Money in Colorado's Seventh Congressional District," in David Magleby and Quin Monson eds., *The Last Hurrah?* Washington, D.C.: Brookings.

6) Daniel A. Smith. 2002. "Direct Democracy and Its Critics," in Peter Woolley and Albert Papa, eds., *American Politics: Core Argument/Current Controversy.* 2nd ed. Englewood Cliffs, NJ: Prentice Hall.

5) Daniel A. Smith. 2001. "Campaign Financing of Ballot Initiatives in the American States," in Larry Sabato, Bruce Larson, and Howard Ernst, eds., *Dangerous Democracy? The Battle Over Ballot Initiatives in America*. Lanham, MD: Rowman and Littlefield.

4) Daniel A. Smith. 2001. "Special Interests and Direct Democracy: An Historical Glance," in M. Dane Waters, ed., *The Battle Over Citizen Lawmaking*. Durham, NC: Carolina Academic Press.

3) Daniel A. Smith and Jonathan Temin. 2001. "The Media and Ghana's 2000 Elections," in Joseph Ayee, ed., *Deepening Democracy in Ghana: Politics of the 2000 Elections*, Volume 1 (Thematic Studies). Accra: Freedom Publications.

2) Daniel A. Smith. 2001. "The Politics of Upper East and the 2000 Ghanaian Elections," in Joseph Ayee, ed., *Deepening Democracy in Ghana: Politics of the 2000 Elections*, Volume 2 (Constituency Studies). Accra: Freedom Publications.

1) Daniel A. Smith. 1998. "Unmasking the Tax Crusaders," in Bruce Stinebrickner, ed., *Annual Editions: State & Local Government*. 9th ed. Guilford, CT: Dushkin/McGraw-Hill, 83-85 [Reprinted].

**RESEARCH GRANTS, CONTRACTS, HONORS, AND AWARDS**

39) University Scholars Program Grant (advising **Sara Loving**), University of Florida, "Movers and Political Polarization." Spring 2021/Fall 2021.

38) University Scholars Program Grant (advising **Emily Boykin** and **Jenna Tingum**), University of Florida, "Spanish Language Materials, Administrative Compliance, and Hispanic Voting in Florida." Fall 2019/Spring 2020.

37) CLAS Scholars Program Grant (advising **William Zelin**), University of Florida, "The Effect of Natural Disasters on Voter Turnout." Fall 2019/Spring 2020.

36) Gill Foundation Grant, "LGBT Issues in Florida," Spring 2018 (Co-PI, Michael Martinez).

35) University of Florida Term Professorship, 2017-2019.

34) University Scholars Program Grant (advising **Pedro Otálora**), University of Florida, "Political Participation of Native-Born and Naturalized Citizens in Miami-Dade." Summer/Fall 2017.

33) Ruben Askew Scholar Award (advising Wendy Serra), Bob Graham Center, University of Florida, Summer 2016.

32) Emerging Scholars Program (advising **Anthony Rychkov**), University of Florida, "The Timing of Voter Registration and Turnout," Spring/Summer 2016.

182

31) University Scholars Program Grant (advising **Casey Ste. Claire**), University of Florida, College of Liberal Arts & Sciences, "Reprecincting and Voter Turnout," Fall 2015/Spring 2016.

30) University Scholars Program Grant (with Frances Chapman), University of Florida, College of Liberal Arts & Sciences, "Trying or Suppressing the Vote? Private Voter Challenges in Florida," Fall 2013/Spring 2014.

29) Best Paper Award presented in 2012 by the APSA Organized Section on State Politics and Policy: "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355," 2013 (with Michael Herron).

28) University Scholars Program Grant (with Bryce Freeman), University of Florida, College of Liberal Arts & Sciences, "Impact of Voter Suppression on Political Participation," Spring 2013.

27) The William and Flora Hewlett Foundation, "Popular Support and Conditions for the Passage of Ballot Measures," June 2013.

26) Advancement Project, "Congestion at the Polls: A Study of Florida Precincts in the 2012 General Election," June 2013 (with Michael Herron).

25) Co-Principal Investigator, "Trans-Saharan Professionals Program," United States Department of State, Bureau of Educational and Cultural Affairs, S-ECAPPE-10-GR-231 (DT), September 2010-August 2012.

24) University of Florida Research Foundation (UFRF) Professor, 2010-2012 (annual salary supplement and research funding).

23) Co-Principal Investigator, *American Political Science Association* Workshop on Elections and Democracy, University of Ghana at Legon, Ghana, Summer 2009, funded by Mellon Foundation.

22) Best Paper Award presented in 2006 by the APSA Organized Section on State Politics and Policy: "Do State-Level Ballot Measures Affect Presidential Elections?" (with Caroline Tolbert and Todd Donovan).

21) Research Grant, "Did Gay Marriage Re-Elect George W. Bush?" University of Florida, College of Liberal Arts & Sciences, Summer 2005.

20) University Scholars Program Grant (with Kirsten Soltis), University of Florida, College of Liberal Arts & Sciences, "Money and the Member: An Analysis of Fundraising in Congressional Politics in the Post-Campaign Finance Reform Era," Fall 2005.

19) Research Grant, "Mobilization Effects of Ballot Measures in Colorado, Florida, Ohio, and Nevada," Ballot Initiative Strategy Center, Fall 2004.

18) Research Grant, "Mobilization Effects of Gay Marriage Ban in Ohio," Ballot Initiative Strategy Center, Fall 2004.

17) Research and Travel Grant, *Pew Charitable Trusts*, "Veiled Political Actors," Daniel Lowenstein, Kim Alexander, Robert Stern, Tracy Westeen, and Joseph Doherty, Principle Investigators, Fall 2003.

16) Travel Grant, *College of Liberal Arts and Sciences*, University of Florida, "Initiative and Referendum Campaigns," Fall 2003.

15) Research Grant, *Pew Charitable Trusts*, "Outside Money: Colorado's 7th Congressional District," David Magleby, Principal Investigator, Fall 2002.

14) Faculty Research Fund, "Ballot Initiatives during the Progressive Era," *University of Denver*, Fall 2002.

13) Research Grant, *American Political Science Association*, "Ballot Initiatives during the Progressive Era: Evidence from California, 1912-1920," Summer 2002.

12) Research Grant, *Colorado Endowment for the Humanities*, "The 'Golden Era' of Direct Democracy? Colorado's Election of 1912," (R017-0300-010) (with Joseph Lubinski), Spring 2000.

11) Partners in Scholarship: 2000 Winter Quarter Project Proposal, "The 'Golden Era' of Direct Democracy? Evidence from the Colorado Election of 1912," *University of Denver*, with **Joseph Lubinski**).

10) Rosenberry Fund, "Direct Democracy in Colorado," *University of Denver*, Spring 1999.

9) Best Paper, Charles Redd Politics of the American West, "Howard Jarvis, Populist Entrepreneur: Reevaluating Causes of Proposition 13," *Western Political Science Association*, Los Angeles, March 20, 1998.

8) Faculty Research Fund, "Ballot Warriors: Citizen Initiatives in the 1990s," *University of Denver*, Fall 1997.

7) Partners in Scholarship: 1997 Winter Quarter Project Proposal, "The Process of Direct Democracy: Parental Rights Amendment," *University of Denver*, with Robert Herrington, Winter 1997.

6) Faculty Research Fund, "*Faux* Populism: Populist Entrepreneurs and Populist Moments," *University of Denver*, Fall 1996.

5) International Small Grants, "Election Monitor: Ghana Presidential and Parliamentary 1996 Elections," Office of Internationalization, *University of Denver*, Fall 1996.

4) Faculty Research Fund, "Populist Prophets and the Mass Appeal of Direct Democracy," Program Support Services, *University of Denver*, Spring 1995.

3) Research Grant, Institute for Public Affairs, *West Virginia University*, Summer 1994.

2) Senate Research Travel Grant, Faculty Development Fund, *West Virginia University*, Fall 1994.

1) Research Travel Grant, Robert LaFollette Institute of Public Affairs, *University of Wisconsin-Madison*, Fall 1992.

### TECHNICAL REPORTS & OTHER SCHOLARLY PUBLICATIONS

29) Daniel A. Smith, "Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election," A Report Commissioned by *All Voting is Local*," March 2021.

28) Daniel A. Smith and Anna Baringer, "ACLU Florida: Report on Vote-by-Mail Ballots in the 2018 General Election," A Report Commissioned by *ACLU Florida*, April 2020.

27) Daniel A. Smith, "Audit of Assignment of Registered Voters to New, Court-Ordered House of Delegates Districts," Virginia Secretary of State (with Michael P. McDonald), Spring 2019.

26) Daniel A. Smith, "Vote-by-Mail Ballots Cast in Florida," A Report Commissioned by *ACLU Florida*, August 2018.

25) Michael C. Herron and Daniel A. Smith, "Congestion at the Polls: A Study of Florida Precincts in the 2012 General Election," A Report Commissioned by Advancement Project, Washington, DC, June 24, 2013. Available: http://www.advancementproject.org/news/entry/voters-of-color-faced-longest-wait-times-in-florida.

24) Michael C. Herron and Daniel A. Smith, "Florida's 2012 General Election under HB 1355:  Early Voting, Provisional Ballots, and Absentee Ballots," League of Women Voters Florida, January 2013.

23) Daniel A. Smith, "The Re-demarcation and Reapportionment of Parliamentary Constituencies in Ghana," *Ghana Center for Democratic Development (CDD-GHANA)*, Vol. 10 (2):  October 2011. Available: http://www.cddghana.org/documents/Vol.%2010,%20No.%202.pdf

22)  Daniel A. Smith. 2010. "Educative Effects of Direct Democracy: Evidence from the US States," Memorandum requested by the British House of Lords, Constitution Committee, January 4. Available: http://www.publications.parliament.uk/pa/ld200910/ldselect/ldconst/99/99we14.htm.

21) Daniel A. Smith. 2006. "Money Talks: Ballot Initiative Spending in 2004." *Ballot Initiative Strategy Center*, June. Available: http://ballot.org.

20) Daniel A. Smith. 2006. "Ballot Initiatives, Tax Issues," in Larry Sabato and Howard Ernst, eds., *Encyclopedia of American Political Parties and Elections*. New York: Facts on File.

19) Daniel A. Smith. 2004. "Direct Democracy," in David Wishart, ed., *Encyclopedia of the Great Plains*. Lincoln: University of Nebraska Press.

18) Daniel A. Smith and Caroline J. Tolbert. 2003. "Educated by Initiative," *Campaigns and Elections*, August, p. 31.

17) Elizabeth Garrett, and Daniel A. Smith. 2003. "Veiled Political Actors: The Real Threat to Campaign Disclosure Statutes" (July 22). USC Law and Public Policy Research Paper No. 03-13 http://ssrn.com/abstract=424603.

16) Daniel A. Smith. 2003. "Ballot Initiatives and the (Sub)Urban/Rural Divide in Colorado," in Daphne T. Greenwood, ed., *Colorado's Future: Meeting the Needs of a Changing State*. Colorado Springs: Center for Colorado Policy Studies.

15) Daniel A. Smith. 2003. "The Colorado 7th Congressional District," in David B. Magleby and Quin Monson, eds., *The Last Hurrah?* Provo, UT: Center for the Study of Elections and Democracy.

14) Stan Elofson, Daniel A. Smith, Jennifer Berg, and Joseph Lubinski. 2002. "A Listing of Statewide Initiated and Referred Ballot Proposals in Colorado, 1912-2001." Issue Brief No. 02-02. (March 5) *Colorado Legislative Council*, Colorado General Assembly, Denver. [Revised Edition].

13) Daniel A. Smith. 2001. "Howard Jarvis' Legacy? An Assessment of Antitax Initiatives in the American States." *State Tax Notes* 22: 10 (December): 753-764.

12) Daniel A. Smith. 2001. "The Structural Underpinnings of Ghana's December 2000 Elections." Critical Perspectives, No. 6. *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana.

11) Daniel A. Smith, Jonathan Temin, and Kwaku Nuamah. 2001. "Media Coverage of the 2000 Election: A Report on the Media Coverage of Election 2000 (May 2000-Janurary 2001)." Research Paper, No. 8. *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana.

10) Daniel A. Smith. 2000. "Election 2000: Debating the Issues?" Briefing Paper, Volume 2, Number 4, *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana.

9) Daniel A. Smith. 2000. "Growth and Transportation Ballot Measures in Colorado," in Floyd Ciruli, ed., *Moving Visions: Next Steps Toward Growing Smart*. Denver: Gates Family Foundation.

8) Stan Elofson, Daniel A. Smith, Jennifer Berg, and Joseph Lubinski. 2000. "A Listing of Statewide Initiated and Referred Ballot Proposals in Colorado, 1912-2000." Issue Brief No. 8. (December) *Colorado Legislative Council*, Colorado General Assembly, Denver.  [updated 2002, 2004, 2006, 2008]

7) Daniel A. Smith. 2000. "Progressives and the Initiative Process: A Call to Arms." *Ballot Initiative Strategy Center (BISC)*.

6) Daniel A. Smith and Joseph Lubinski. 2000. "Sponsoring 'Counter-Majoritarian' Bills in Colorado." *Ag Journal*. (September): 12-13.

5) Daniel A. Smith. 1998. "Unmasking the Tax Crusaders." *State Government News*. 41:2 (March): 18-21.

4) Daniel A. Smith. 1997. "Howard Jarvis, Populist Entrepreneur," Working Paper, 97-8, Institute of Governmental Studies, *University of California - Berkeley*.

3) Daniel A. Smith. 1995. "The West Virginia Labor-Management Advisory Council," *The West Virginia Public Affairs Reporter*. 12:4 (Winter): 1-11.

2) Daniel A. Smith. 1992. "A Tale of Five Cities," *The La Follette Policy Report*. 5 (Fall): 18-21.

1) Daniel A. Smith. 1991. "Emerging Skill Needs in the Wisconsin Non-Automotive Engines Industry," Commissioned by the Wisconsin Board of Vocational, Technical, and Adult Education, Working Paper, *Center on Wisconsin Strategy*, University of Wisconsin-Madison.

**OUTSIDE ACTIVITIES: BOARDS/EXPERT WITNESS/POLITIAL CONSULTANT/INVITED TESTIMONY/MISCELANEOUS**

President, ElectionSmith, Inc. www.electionsmith.com (S-Corp) 2006-
Board Member, Ballot Initiative Strategy Center (BISC) www.ballot.org 1999-2019.
Board Member, Common Cause Florida https://www.commoncause.org/florida/ 2014-
Board President, 300 Club https://300clubswimandtennis.com/ 2018-2020.

8

***Domestic Consulting***

Co-author, "Brief of Direct Democracy Scholars, et al. Supporting Petitioners," *Thompson et al. v. DeWine, et al.* [Contributed empirical evidence on ballot measures and freedom of speech.], March 2021.

Co-author, Brief of Amici Curiae Empirical Elections Scholars in Support of Respondents," *Brnovich v. Democratic National* Committee [Contributed empirical evidence of lack of fraud in American elections], January 2021.

Consultant, All Voting is Local [Provided analysis of Rejected and Cured Vote by Mail ballots in Florida], 2020.

Expert (written declaration), *1199SEIU United Healthcare Workers East v. Louis DeJoy and the USPS*. Case 1:20-cv-24069-RNS (US District Court for the Southern Division of Florida). [Provided written report for plaintiffs analyzing absentee ballot return rates in Florida], 2020.

Expert (written declaration), *Texas League of United Latin American Citizens, et al. v. Abbott, et al*. Case 1:20-cv-1006 (US District Court for the Western Division of Texas). [Provided written report for plaintiffs analyzing absentee ballot drop-off locations in Texas], 2020.

Expert (written declaration), *Dream Defenders, et al. v. DeSantis, et al*. Case 4:20-cv-00067-RH-GRJ (US District Court for the Northern District of Florida). [Provided written report for plaintiffs analyzing vote by mail records in Florida], 2020.

Expert (written declaration), *Lewis, et al. v. Hughs*. Case 5:20-cv-00577 (US District Court for the Western District of Texas). [Provided written report for plaintiffs analyzing vote by mail records in Texas], 2020.

Consulting Expert, *Nielsen, et al. v. DeSantis, et al*. Case 4:20-cv-00236-MW-MJF (US District Court for the Northern District of Florida). [Provided confidential work product for plaintiffs analyzing vote by mail records in Florida], 2020.

Expert (written declarations), *Gruver, et al. v. Barton, et al*. Case 1:19-cv-00121-MW-GRJ (US District Court for the Northern District of Florida). [Provided written reports and deposed for plaintiffs analyzing records on the impact of SB7066 on Florida residents with felony convictions and outstanding LFOs], 2019-20.

Consultant, Andrew Goodman Foundation [Analysis of on-campus early voting in Florida], 2019.

Consultant, ACLU-Florida [Data analysis of Ex-Felons in Florida], 2019-.

Expert (written declaration), *DNC Services Corporation et al. v. Lee et al*. Case 4:18-cv-00524-MW-CAS (US District Court for the Northern District of Florida) [Provided written report for plaintiffs on Vote by Mail ballots in Florida], 2019-.

Expert (written declaration), *MOVE Texas Civic Fund, et. al. v. Whitley, et. al*. Case 3:19-cv-00041 (US District Court for the Southern District of Texas) [Provided written reports for plaintiffs on number of naturalized citizens in Texas], 2019.

Expert (written declarations), *Fair Fight Action v. Crittenden*, Case No. 1:18-cv-05391 (US District Court for the Northern District of Georgia) [Retained by plaintiffs to analyze data related to Georgia's election laws], 2018-.

Expert, *The Democratic Party of Georgia v. Crittenden*, Case No. 1:18-cv-05443 (US District Court for the Northern District of Georgia) [Retained by plaintiffs to analyze data related to the 2018 gubernatorial election], 2018.

Consultant, ACLU-Florida [Provided analysis of Vote by Mail ballots in Florida], 2018.

Expert, *Judicial Watch, Inc., Election Integrity Project California, Inc., et al. v. Dean C. Logan, et al*. Case No. 2:17-cv-08948-R-SK (US District Court for the Central District of California, Western Division). [Retained by defendants (California Department of Justice) to analyze data concerning inactive voters], 2018.

Expert (written declaration), *Rivera v. Detzner*, Case 1:18-cv-61474 (US District Court for the Northern District of Florida) [Provided written report for plaintiffs on Puerto Rican population and registered voters], 2018.

Expert, *Thompson et al. v. Merrill*, Case No. 2: 16-cv-783 (US District Court for the Middle District of Alabama) [Retained by plaintiffs to analyze data related to the discriminatory impact of Alabama's felony disenfranchisement scheme over time], 2018-.

Expert (written affidavit), *League of Women Voters of Florida, Inc., et al. v. Detzner*, Case No. 4:18-cv-00251-MW-CAS (US District Court for the Northern District of Florida) [Provided written report for plaintiffs (LWV) to extend early voting in Florida], 2018.

Expert (written affidavit), *Ohio A. Philip Randolph Institute, et al. v. Secretary of State, Jon Husted*, Case 2:16-cv-00303 (US District Court for the Southern District of Ohio, Eastern Division) [Provided written report and deposed for plaintiffs (APRI, ACLU OH, Demos) to reinstate registered voters removed by Ohio's "Supplemental Process"], 2017. [Decision, *Husted v. APRI*, by SCOTUS, July 11, 2018].

Expert (written affidavits), *Bellito & ACRU v. Snipes*, Case 4:16-cv-61474 (US District Court for the Southern District of Florida, Ft. Lauderdale Division) [Provided written expert reports and deposed for intervenors (SEIU, Project Vote, Demos) to defend NVRA compliance by Broward Supervisor of Elections, 2017; testified at trial].

Consultant, ACLU, Georgia [Provided analysis of CVAP, VAP, and registered voters in Irwin County, Georgia], 2017.

Consultant, ACLU, Georgia [Provided analysis of proposed redistricting changes to the Georgia House of Representatives by the Georgia state legislature], 2017.

Expert (written affidavit), *Florida Democratic Party v. Scott*, Case 4:16-cv-00626 (US District Court for the Northern District of Florida) [Provided written expert report for plaintiff-intervenors (Mi Familia Vota Education Fund) to extend voter registration deadline in Florida due to Hurricane Matthew], 2016.

185

Consultant, ACLU, Georgia [Provided analysis of registration deadline in Georgia due to Hurricane Matthew], 2016.

Expert (written affidavit), *Florida Democratic Party v. Detzner*, Case 4:16-cv-00607 (US District Court for the Northern District of Florida) [Provided written empirical analysis for plaintiff on vote-by-mail ballots cast in Florida], 2016.

Advisor, "Mad As Hell: Howard Jarvis and the Birth of the Tax Revolt," Documentary Film by Jason Cohn, Bread and Butter Films [Academic Advisor on Jarvis and antecedents of Prop. 13], 2011-16.

Advisor, "Rigged," Documentary Film by Natasha del Torro, Fusion TV (Naked Truth). 2016. [Winner of the Robert F. Kennedy Journalism Award for Best Documentary]. Available: http://tv.fusion.net/story/352548/naked-truth-rigged-elections-documentary/.

Advisor, "Voting: Last Week Tonight with John Oliver," HBO, February 14, 2016. Available: https://www.youtube.com/watch?v=rI1FOwlMCdto.

Expert (written affidavit), *Frank v. Walker*, Case 16-3003, 16-3052 (US Court of Appeals for the Seventh Circuit) [Provided written empirical analysis for plaintiffs (*ACLU*) on voter ID and turnout], 2016.

Expert (consultant), *Greater Birmingham Ministries v. Alabama*, Case 2:15-cv-02193-LSC (US District Court for the Northern District of Alabama, Southern Division) [Provided oral empirical analysis for plaintiffs (*NAACP LDEF*) on use of absentee ballots], 2015.

Consultant, America Votes [Provided demographic shift of registered voters analysis for state of Florida], 2015.

Expert (written affidavits), *NAACP, et al. v. Husted, et al.,* 2:14 cv-00404 (US District Court for the Southern District of Ohio) [Provided written empirical analysis and deposed for plaintiffs (*ACLU*) on early in-person absentee voting in Ohio], 2014.

Expert (written affidavit), *John Sullivan, et al. v. Marni Lin Sawiki, et al.*, 2013-CA-003122 (20th Judicial Circuit (Lee County, FL) [Provided written empirical analysis and deposed on early, absentee, and Election Day vote totals in the November 5, 2013, Cape Coral mayoral election], 2014.

Expert (written affidavits), *Gateway Retail Center, LLC v. City of Jacksonville, Florida*, 3:13-cv1040-J-TJC-JRK (US District Court for the Middle District of Florida) [Provided empirical analysis for Gateway Retail Center's attorneys of African American voting during early voting in Duval County in the 2012 General Election], 2013.

Expert (written affidavits), *Arcia, et al. v. Detzner*, 1:12-cv-22282-WJZ (US District Court for the Southern District of Florida) [Provided empirical analysis for Arcia's attorneys of the Florida Department of State's various lists of "potential non-citizens"], 2012. [*Arcia, et al. v. Florida Secretary of State* (Defendant-Appellee) *and Garcia, et al.* (Intervenor Defendants), 12-15738 (Appealed in 11th Circuit, from the United States District Court for the Southern District of Florida), 2014.

Elections Analyst, WUFT (TV and Radio), Election Night Coverage, November 6, 2012.

Advisor, "Voters in America: Who Counts?" CNN Documentary Investigation, October 14, 2012. http://cnnpressroom.blogs.cnn.com/2012/10/19/voters-in-america-who-counts-joejohnscnn-investigates-voter-suppression-voter-fraud/

Expert (written affidavit), *Brown v Detzner  3:12-cv-00852* (US District Court for the Middle District of Florida) [Provided empirical analysis for Brown's attorneys of minority early voting in Duval County during the 2008 and  2010 general elections and the 2011 Jacksonville mayoral race], 2012.

Expert (written affidavits), *Romo v. Scott,* No. 2012-CA-000412 (Fla. Cir. Ct., Leon County). [Provided empirical analyses and deposed for Coalition's attorneys of new Congressional redistricting maps submitted and adopted by the Florida legislature as well as alternative maps submitted by the The League of Women Voters of Florida, the National Council of La Raza, and Common Cause Florida], 2012-14.

*Pro Bono* Consultant (written work product), *League of Women Voters of FL v. Browning*, N.D. Fla. (4:11-cv-00628). [Provided empirical analysis for LWV's attorneys (Brennan Center, New York University), assessing the impact of Florida's "third party organization" voter registration requirements], 2012.

*Pro Bono* Consultant (written work product), Hillsborough Hispanic Coalition, Tampa, Florida, 2012. [Provided empirical analysis of the likely racial/ethnic impact of the redistricting maps adopted by the Hillsborough County Commission and provided alternative maps to be submitted by the Hillsborough Hispanic Coalition, in anticipation of federal litigation], 2012.

Member, 2012 Citizen Election District Review Committee, City of Gainesville, 2012 (Appointed by Mayor Craig Lowe).

*Invited Testimony*, U.S. Senate, Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, "New State Voting Laws II: Protecting the Right to Vote in the Sunshine State," January 2012.

Expert (written affidavit), *Worley v. Detzner*, U.S. District Court, N.D. Fla (4:10-cv-00423-RH-WCS). [Provided expert opinion to Florida Secretary of State to help defend Election code provisions concerning the reporting, registration, and disclosure requirements applicable to political committees (ballot issues)], 2010.

Expert (written affidavit), *Citizens Against Slots v. PPE Casino*, 999 A.2nd 181 (2010) 415 Md. 117. [Provided empirical analysis of the validity rates of the signatures submitted by Citizens Against Slots for a county popular referendum], 2010.

Expert (written affidavit), *The Independence Institute, et. al. v. Bernie Buescher* 1:2010-cv-00609. (US 10th Circuit) [Provided empirical analysis for the Office of the Colorado Attorney General to defend Secretary of State's enforcement of public disclosure laws for ballot issue committees], 2010.

Lead Author, "Direct Democracy Scholars" Amicus Brief, *Doe v. Reed*, 132 S. Ct. 449. [Provided empirical evidence that public disclosure of signatures on ballot measures serves sufficiently important governmental interests in order

to prevent fraudulent signature gathering activities, to limit the deceptive solicitation of signatures, and to provide information to voters about ballot measures], 2010.

Expert (written affidavit), *Dallman, et al.* v. *William Ritter and Rich L. Gonzales and Daniel Ritchie, et al* 09SA224 (Colorado Supreme Court) [Provided empirical analysis for Ritter, Gonzales, and Ritchie of analysis of campaign financing of ballot measures], 2009-10.

Expert (written affidavit), *Sampson v. Buescher*, 08-1389, 08-1415 (US 10th Circuit) [Provided empirical analysis refuting claims of barriers to participation in ballot issue campaigns for Office of the Colorado Attorney General, defending Secretary of State's enforcement of disclosure laws], 2007-10.

Consultant, *Trust the Voters*, Tallahassee, 2006.

Consultant, *The Washington State Patrol Troopers Association* [Conducted empirical analysis for State Patrol Troopers of the validity of signatures collected on ballot issue campaign], 2006.

Expert (written affidavit), *The City of Winter Springs, FL v. Seminole County*, City of Winter Springs, 2004.

Expert (written affidavit), *California Pro-Life Council, Inc. v. Karen Getman, et al.* 328 F.3d 1088, 1101 (US 9th Cir) [Provided empirical analysis for the Office of the California Attorney General on veiled political actors in California ballot measure campaigns], 2004-05.

Expert (written affidavit), *Colorado Right to Life Committee, Inc. v. Donetta Davidson* 395 F.Supp.2d 1001 (US 10th Circuit) [Provided empirical analysis of broadcasted television and direct mail ads in Colorado between 1999-2003 for the Office of the Colorado Attorney General], 2004-05.

Invited Testimony, Ballot Initiative Reform, Florida Legislature, 2002; 2003-05.

Invited Testimony Witness, Ballot Initiative Reform, Colorado Legislature, 1999-2000.

Consultant (*pro bono*), *Ad Hoc Committee to Defend Heath Care*, Denver, CO, 1998-2000.

### *International Consulting*

Consultant, National Democratic Institute (NDI), Ghana, 2013.

Invited Written Testimony, *British House of Lords*, Constitution Committee (Direct Democracy), 2010.

Consultant, *Institute of International Education (IIE)*, New York, 2002-04.

Consultant, *Coalition of Domestic Elections Observers (CODEO)*, Accra, Ghana, 2000-01.

Consultant, *International Foundation for Election Systems (IFES)*, Washington, DC, 1999-2001.

Consultant, *International Student Exchange Program (ISEP)*, Washington, DC, 1995-97.

### *BOOK REVIEWS & REVIEW ESSAYS*

9) Daniel A. Smith. 2008. Review of Dorothy Holland, Donald M. Nonini, Catherine Lutz, Lesley Bartlett, Marla Frederick-McGlathery, Thaddeus C. Guldbradsen, and Enrique G. Murillo, Jr., Local Democracy Under Siege: Activism, Public Interests, and Private Politics, *Perspectives on Politics* 6: 386-86.

8) Daniel A. Smith. 2006. Review of Stephen Nicholson, Voting the Agenda: Candidates, Elections, and Ballot Propositions. *Political Science Quarterly* 120: 695-697.

7) Daniel A. Smith. 2005. Review of John Matsusaka, For the Many or the Few? The Initiative, Public Policy, and American Democracy, *Perspectives on Politics* 3: 646-47.

6) Daniel A. Smith. 2000. Review of Shaun Bowler and Todd Donovan, Demanding Choices: Opinion, Voting, and Direct Democracy, *Social Science Quarterly* 81: 1104-1106.

5) Daniel A. Smith. 1999. Review of Shaun Bowler, Todd Donovan, Caroline Tolbert, eds., Citizens as Legislators, *American Political Science Review* 93: 446-447.

4) Daniel A. Smith. 1998. Review of David Ryden, Representation in Crisis, *Politics and Policy* 26: 514-515.

3) Daniel A. Smith. 1998. Review of Grant Reeher and Joseph Cammarano, eds., Education for Citizenship, *H-Pol, H-Net.* (February).

2) Daniel A. Smith. 1997. Review Essay of William S. K. Reno, Corruption and State Politics in Sierra Leone, and Sahr John Kpundeh, Politics and Corruption in Africa, *Africa Today* 44: 362-365.

1) Daniel A. Smith. 1996. Review of Stephen Lowe, The Kid on the Sandlot: Congress and Professional Sports, 1910-1992, *Sport History Review* 27: 90-92.

### *TEACHING GRANTS, HONORS, AND AWARDS*

Anderson Scholar Award, College of Liberal Arts and Sciences, University of Florida, 2011; 2015; 2016; 2017

Political Science Board of Advisors, "Outstanding Professor Award," *University of Florida*, Spring 2008.

Center for Teaching and Learning Technology Grant, "Introduction to American Politics: Web-Based Interactive Learning," *University of Denver*, Spring, 1997.

Faculty Appreciation Award, Learning Effectiveness Program, *University of Denver*, April 1997.

Curriculum Diversity Grant, "A Theater History: The Racial and Class Politics of US Drama from Colonization Forward," *University of Denver*, Winter, 1997.

CORE Development Grant, "Drama of Politics/Politics of Drama," *University of Denver*, Summer, 1996.

International Small Grants, "Summer Student Study Abroad Program: University of Ghana at Legon," Office of Internationalization, *University of Denver*, Spring, 1995.

International Small Grants, "Ghana Study Abroad Program," Office of Internationalization, *University of Denver*, Spring, 1995.

**NEWSPAPER OP-EDS, INVITED BLOG POSTS & LETTERS TO THE EDITOR**

Op-Ed, "Election integrity requires transparency," *Tampa Bay Times*, February 9, 2021 (with **Danielle Dietz** and **Gabriella Zwolfer**).

Op-Ed, "*All counties should offer secure, 24/7 drop boxes for mail ballots,*" *Tampa Bay Times*, October 12, 2020 (with **Jose Vazquez**).

Op-Ed, "Do you usually vote by mail? A lot of Republicans who don't say so," *Washington Post* (Monkey Cage), October 9, 2020 (with *Enrijeta Shino*).

Op-Ed, "Minor postal delays could disenfranchise thousands of Florida vote-by-mail voters," *Tampa Bay Times*, August 14, 2020 (with Michael Herron).

Op-Ed, "Here's the problem with mail-in ballots: They might not be counted," *The Washington Post* (Monkey Cage), May 21, 2020 (with *Enrijeta Shino* and Mara Suttmann-Lea).

Op-Ed, "Your voting habits may depend on when you registered to vote," *Salon*, September 24, 2019. [Originally appeared in the *Conversation*] (with *Enrijeta Shino*).

Invited Blog Post, "Who Votes Provisionally and Why? A Look at North Carolina's 2016 General Election," MIT Election Science Data Lab, May 2, 2018. (with *Lia Merivaki*).

Op-Ed, "Do we have a right not to vote? The Supreme Court suggests we don't," *NY Daily News*, June 12, 2018 (with Michael C. Herron).

Op-Ed, "If more states start using Ohio's system, how many voters will be purged?" *The Washington Post* (Monkey Cage), June 17, 2018 (with Michael C. Herron).

Op-Ed, "2-to-1 Registration Advantage for Democrats among 440K New Hispanic Voters In Florida," *Huffington Post*, October 7, 2016.

Op-Ed, "The Battle Over "One Person, One Vote," Has Just Begun," *The American Prospect,* April 18, 2016. (with Carl Klarner).

Invited Blog Post, "Party competition is the primary driver of the recent increase in restrictive voter ID laws in the American states," London School of Economics, U.S. Politics and Policy, November 12, 2014 (with *William Hicks* and Seth McKee).

Op-Ed, "Rejected Ballots in Florida," *Florida Voices*, November 4, 2012 (with Michael Herron).

Op-Ed, "High ballot rejection rates should worry Florida voters," *Tampa Bay Times*, October 28, 2012 (with Michael Herron).

Op-Ed, "Voters need to push back against corporate cash," *St. Petersburg Times*, July 13, 2010.

Op-Ed, "A chance for Floridians to redraw rigged districts," *St. Petersburg Times*, November 25, 2009.

Op-Ed, "Lawmakers don't trust voters with the constitution," *Gainesville Sun*, October 21, 2006.

Op-Ed, "Jeb Bush's secret-squirrel hunt? Rocky, that's just a bunch of Bullwinkle," *Orlando Sentinel*, February 23, 2006.

Op-Ed, "Colorado: Independent of Whom?" Ballot Initiative Strategy Center, *Ballot Blog*, August 29, 2005.

Op-Ed, "Stop Political Fund-Raising Arm," *Gainesville Sun*, April 25, 2004 (with Nicole M. James).

Op-Ed, "Committees Hold the Secret to Campaign Financing," *St. Petersburg Times*, April 10, 2004 (with **Nicole M. James**).

Letter, "Reform Ballot Initiative and Preserve the People's Power," *Miami Herald*, February 29, 2004.

Op-Ed, "No: The Rich Have Taken Over," *Denver Post*, December 1, 2002.

Op-Ed, "The Millionaire's Club: Why Leave Ballot Initiatives to the Rich?" *Denver Post*, August 18, 2002.

Op-Ed, "The Political Consequence of 'Praying for Peace,'" *The Crusading Guide* [Accra, Ghana], 12-18 October 2000.

Letter, "Book's [*Democracy Derailed* by David Broder] premise is problematic," *Denver Post*, May 28, 2000.

Letter, "Initiative process ignores rural voices," *Denver Rocky Mountain News*, March 15, 2000.

Op-Ed, "Progressives need to show initiative on ballot signatures," *Denver Post*, January 13, 2000.

Op-Ed, "Colorado should put campaign finance data on the Internet," *Denver Post*, November 4, 1998 (with Richard Braunstein).

Letter, "Follow the Money," *Washington Post*, October 12, 1998.

Op-Ed, "Voters behind rule," *Denver Post*, June 21, 1998.

Op-Ed, "Founders crafted safeguards against popular excesses," *Denver Post*, May 21, 1995.

**INVITED TALKS AND PROFESSIONAL PRESENTATIONS**

Invited Talk, "Voting in the Time of COVID-19," UF Retired Faculty, October 14, 2020 [virtual].

Invited Panelist, "Implications of Amendment 4 and SB 7066 on voting rights in Florida," Federal Bar Association (South Florida Chapter), September 3, 2020 [virtual].

Invited Panelist, "Hispanic Voting Rights," UF Hispanic Student Association [virtual], July 17, 2020.

Invited Talk, "Voting Rights in Florida," Marin County (CA) League of Women Voters [virtual], August 3, 2020.

Invited Panelist, "Voting Rights in Florida," All Voting is Local & The Leadership Conference on Civil and Human Rights [virtual], August 13, 2020.

Invited Talk, "Ballot Design, Undervoting, and Pivotality: A Forensic Analysis of Florida's 2018 US Senate Race," Center for Voting and Parties, University of Denmark, December 3, 2019.

Keynote Speaker, "6 Things Every Democrat Should Know about Florida Elections," Democratic Women's Club of Florida, 63rd Annual Convention, Orlando, September 14, 2019.

Invited Talk, "5 Things Every Floridian Should Know about Florida Elections," *Stetson University*, April 25, 2019.

Invited Talk, "The 2018 Mid-Term Elections," Graham Center, University of Florida, Gainesville, Florida, November 13, 2018.

Invited Talk, "Is a Blue Wave Coming? The 2018 General Election," FedCon, National Association of Retired Federal Employees Association, Jacksonville, Florida, August 28, 2018.

Invited Talk, "Voting Rights Litigation," ACLU of Florida, 2018 Lawyers Conference, Delray Beach, Florida, September 7, 2018.

Invited Panelist, "The Black Vote: Is it being taken for Granted?" *Collaboratively Woke and The Virginia Leadership Institute*, Downtown Alachua Public Library, Gainesville, Florida, June 23, 2018.

Invited Talk, "Public Records Requests and Analyzing Elections in Florida," The Bob Graham Center for Public Service, University of Florida, Gainesville, Civic Scholar Lecture, February 14, 2018.

Invited Talk, "Voting in Florida," Voter Suppression Forum, The Bob Graham Center for Public Service, University of Florida, Gainesville, November 13, 2017.

Invited Talk, "Journalist-Scholar Big Data Partnerships," Investigative Reporters and Editors, The National Institute for Computer-Assisted Reporting, Annual Conference, Jacksonville, FL, March 2, 2016.

Invited Talk, "Florida's Constitutional Revision Commission and Game Theory," Future of Florida Summit, University of Florida, Gainesville, Florida, February 18, 2016.

Invited Talk, "Explaining Trump's Win in Florida: 10 Election Myths and Realities," Graham Center, University of Florida, Gainesville, Florida, November 14, 2016.

Invited Response, Michael Kang (Emory School of Law) "Law and Politics of Judging Election Cases," University of Florida School of Law, Gainesville, Florida, November 4, 2016.

Invited Talk, "Patterns of Political Participation in Florida," Women, Race, and the U.S. Presidency, The Center for The Study of Race and Race Relations & The Center for Gender, Sexualities, and Women's Studies Research, University of Florida, Gainesville, October 13, 2016.

Invited Talk, "The Structural Pathologies of the American Electoral System," US Fulbright Association (UF International Center), Gainesville, September 27, 2016.

Invited Talk, "Registered Voters and Turnout in Alachua County," Gainesville Area Chamber of Commerce's Leadership Gainesville 43 Government and Policy Day, September 8, 2016.

Invited Talk, "The Politics of Voter Suppression in Florida," Santa Fe College, American Democracy Project, February 9, 2016.

Invited Talk, "The Contributions and Conundrums of Technology: EAVS Data Reporting Consistency," at The Evolution of Election Administration since the VRA, Auburn University, September 15, 2015 (with Lia Merivaki).

Invited Talk, "2014 Election Wrap-Up," Graham Center, University of Florida, Gainesville, Florida, November 6, 2014.

Roundtable Participant, "I Am A Millennial: The Importance of the Youth and Minority Vote," Graham Center, University of Florida, October 23, 2014.

Invited Talk, "Voting Rights in North Carolina," Emory University, Atlanta, April 8, 2014.

Keynote Speaker, "Anticipating 2014: The State of Voting Rights in Florida," Gainesville Labor Council, Gainesville, Florida, December 9, 2013.

Invited Talk, "Design Fail: The Attack on Voting Rights in Florida," University of Florida Retired Faculty, Harn Museum, University of Florida, February 22, 2013.

Keynote Speaker, "The Attack on Voting Rights in Florida," Gainesville Labor Council, Gainesville, Florida, December 10, 2012.

"Moved by the Spirit? Atmospherics and Ballot Measure Vote Choice," Initiatives and Referendums in the Elections of 2012, University of Southern California, November 16, 2012 (with Charles Dahan).

Invited Talk, "Design #Fail: Voting Rights in Florida," Graham Center's Election Wrap Up: Decision 2012, University of Florida, Gainesville, Florida, November 13, 2012.

Invited Talk, "Consolidating Representation in Ghana? Parliamentary Malapportionment and Rejected Ballots," *Stability Amidst Chaos: Reflections on Two Decades of Ghanaian Democracy*, Program of African Studies, Northwestern University, Chicago, Illinois, October 12, 2012.

Keynote Speaker, "Curtailing Voting Rights in Florida," *Civic Dialogues and the 2012 Election in the United States*, College of Central Florida, Ocala, Florida, October 22, 2012.

Keynote Speaker, "The Return of Jim Crow? Voting Rights Under Florida's House Bill 1355," League of Women Voters, Annual Fall Luncheon, Gainesville, Florida, September 11, 2012.

Invited Talk, "Litigating Voting Rights in Florida," 8th Judicial Circuit Florida Bar Association, Continuing Legal Education, Gainesville, Florida, September 21, 2012.

Invited Presentation, "The Impact of HB 1355 on Florida's Hispanics," Gator Academic Outreach Symposium, co-hosted by Hispanic Alumni Association and Miami-Dade College, Miami, FL, May 11, 2012.

Invited Talk, "Voting and Elections in the United States," US Embassy, Accra, Ghana, live satellite talk to US Embassy, Ivory Coast, October 3, 2011.

Invited Public Lecture, "Ghana's National Electoral Commission and the 2012 Elections: The Malapportionment of Parliamentary Constituencies, Rejected Ballots, and Questions of Representation," Department of Political

Science International Lecture Series, University of Ghana, Accra, Ghana, November 17, 2011. [Q&A followed by several media interviews, including RadioUniverse, Ghana Television Broadcasting and TV3].

Invited Public Lecture, "Assessing the Credibility of Public Opinion Polls," Ghana Center for Democratic Development (CDD-Ghana), Accra, Ghana, November 23, 2011. [Taped broadcast by TV3 and several FM stations].

Invited Talk, "Obama to Blame?" Penn State University, February 26, 2010.

Invited Talk, "Shirking the Initiative?" Rutgers University, November 6-7, 2008.

Invited Talk, "Granting Power to the People: The Adoption of Direct Democracy in the American States," Bose Series Lecturer, University of Iowa, Iowa City, November 7-10, 2007.

Invited Talk, "Instrumental Effects of the Initiative in the American States," The Voice of the Crowd—Colorado's Initiative, Byron R. White Center for the Study of American Constitutional Law, University of Colorado, Boulder, Old Supreme Court Chambers, Colorado State Capitol, Denver, January 26, 2007.

Invited Paper/Presentation, "Initiating Reform: The Effects of Ballot Measures on State Election and Ethics Policy," 2008 and Beyond: The Future of Election and Ethics Reform in the States, Ohio State Capital Building, Kent State University, January 16, 2007.

Invited Paper/Presentation, "Financing Ballot Measures in the American States," Financing Referendum Campaigns Conference, University of Zurich, Switzerland, October 27-29, 2006.

Invited Talk, "Pressure at the Polls/Ballot Initiatives," Capitol Beat Conference, Columbus, OH, August 2006.

Invited Talk, "Turnout and Priming Effects of Ballot Initiatives," Ballot Initiative Strategy Center Spring Briefing, National Education Association, Washington, DC, May 11, 2006.

Invited Talk, "The People as Legislators: The Influence of Direct Democracy," Moritz College of Law, Ohio State University. Columbus, OH, March 3, 2006.

Invited Public Debate, "Initiative Reform in Florida," *Orlando Regional Chamber of Commerce*, Orlando, FL, February 23, 2006.

Invited Talk, "Direct Democracy: The Battle over Citizen Lawmaking," *Minnesota Council of Nonprofits*, *Public Policy Day 2006: Nonprofits as a Force for Change*, Minneapolis, MN, January 26, 2006.

Keynote Speaker, "Taking the Initiative in Florida," *National Conference of Editorial Writers* Regional Conference, University of Central Florida, Orlando, FL, October 16, 2005.

Panelist, "The Educative Effects of Direct Democracy," *Direct Democracy: Historical Roots and Political Realities*, The Bill Lane Center for the Study of the North American West, Stanford University, Stanford, CA, April 14-15, 2005.

Panelist, "The Initiative and Referendum Process," *The 2004 Election: What Does it Mean for Campaigns and Governance?* University of Southern California Law School, Los Angeles, CA, October 8, 2004.

Invited Talk, "Florida's Initiative Process," Oak Hammock, Gainesville, FL, October 21, 2004.

Invited Talk, "Educated by Initiative," Oak Hammock, Gainesville, FL, October 6, 2004.

Invited Talk, "Are Initiatives Good or Bad for Business," *National Chamber of Commerce Federation*, Boca Raton, FL, February 22, 2004.

Panelist, "Roundtable on Florida Politics," *UF-FSU Colloquium*, Gainesville, FL, November 10, 2003.

Panelist, "Initiatives and Referenda: Implications for Public Administration and Governance," *National Academy of Public Administration*, Washington, DC, October 22, 2003.

Panelist, "Initiatives and Referenda: Direct Democracy or Government for Sale?" *New York Bar Association*, New York City, May 8, 2003.

Keynote Speaker, "Direct Democracy in Colorado: The (Sub)Urban-Rural Divide," *Colorado Water Congress Annual Meeting*, Denver, November 8, 2002.

Invited Talk, "Prospects for a Universal Health Care Ballot Initiative in Florida," Alachua County Labor Party, Gainesville, FL, January 25, 2002.

Invited Talk, "The 2000 Ghana Elections: Lessons for the Future," The Center for African Studies, *University of Florida*, Gainesville, August 28, 2001.

Panelist, "Graduate Studies in Canada and U.S.," *University of Ghana at Legon*, Accra, Ghana, March 14, 2001.

Invited Talk, "Media Coverage of the 2000 [Ghanaian] Elections," *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana, March 2, 2001.

Invited Talk, "Ghana's 2000 Elections: The 'Politics of Absence,'" *Ghana Center for Democratic Development (CDD-Ghana)*, Accra, Ghana, February 20, 2001.

Panelist, "Special Forum on U.S. Presidential Elections 2000," *University of Ghana at Legon*, Accra, Ghana, November 21, 2000.

Invited Talk, "The Role of The Media in US Elections," *Public Affairs Section, United States Embassy*, Accra, Ghana, October 31, 2000.

Facilitator, "Three's A Crowd? The Fate of Third Parties in America," *Humanities Institute Salon*, Denver, May 4, 11, & 18, 2000.

Chair and Discussant, "Factors Affecting the Success of Initiatives," *Western Political Science Association Conference*, San Jose, March 24-26, 2000.

Invited Talk, "The Progressive Myth: Direct Democracy in Colorado, 1912," *Willamette University*, February 3, 2000.

Invited Talk, "The Initiative to Party: The Partisan - Ballot Initiative Nexus," *Willamette University*, February 3, 2000.

Invited Talk, "Taking the Initiative into the 21st Century," *Colorado Water Congress Annual Meeting*, Broomfield, January 27, 2000.

Invited Talk, "Foundations of the American Political System," *Zhejiang University*, Zhejiang, China, October 13, 1999.

Invited Talk, "Trade, Taiwan, Tiananmen, and Theft: Partisanship in US-China Relations," *Fudan University*, Shanghai, China, October 11, 1999.

Invited Talk, "Republicans, Democrats, and US-China Relations," *The People's University*, Beijing, China, October 9, 1999.

Invited Talk, "US-China Relations and the 2000 Presidential Election," *China Institute of Contemporary International Relations*, Beijing, China, October 7, 1999.

Invited Talk, "Taking the Initiative: The Role of Money in Ballot Initiatives in the US," *Aspen Community & Institute Committee*, Aspen, August 10, 1999.

Facilitator, "Taking the Initiative: The Politics of Direct Democracy in Colorado," *Humanities Institute Salon*, May 20, May 27, & June 3, 1999.

Invited Talk, "The State of Direct Democracy in Colorado," American Center Series, *University of Colorado at Boulder*, April 9, 1999.

Participant, "TABOR: Today & Tomorrow," Graduate School of Public Affairs, *University of Colorado at Denver*, January 20-21, 1999.

Keynote Speaker, *Colorado Water Congress Annual Meeting*, "The Initiative Process: What You Need to Know," November 10, 1998.

Invited Talk, "The Political Economy of the Bronco's New Stadium Proposal," George Washington High School, *Reach Out DU*, October 15, 1998.

Invited Talk, "The Political Economy of the Bronco's New Stadium Proposal," Cherry Creek High School, *Reach Out DU*, October 15, 1998.

Invited Talk, "Tax Crusaders and the Politics of Direct Democracy," Tattered Cover Bookstore, Denver, August 20, 1998.

Academic Session Leader, "The Politics of Building a New Broncos Stadium," West High School VIP Program, *University of Denver*, April 17, 1998.

Participant, "Proposition 13 and its Progeny: Is California Suffering from an Excess of Democracy?" Institute of Governmental Studies, *University of California, Berkeley*, April 1-2, 1998.

Moderator, "Politics 101," Student Forum, *University of Denver*, March 3, 1998.

Panelist, "Ways to use Technology in Teaching," Dean's Luncheon on Teaching and Learning, *University of Denver*, February 20, 1998.

Panelist, "The End of Empire in Ghana, 1957," The End of Empire: 50 Years of British Withdrawal, Center for Teaching International Relations, *University of Denver*, February 7, 1998.

Moderator, "1996 Candidate Forum," DU Programs Board, *University of Denver*, October 28, 1996.

Invited Talk, "Election 1996," KARIS Community, Denver, October 24, 1996.

Invited Talk, "*Faux* Populism: Douglas Bruce, Populist Entrepreneur, and the Anti-Tax Moment in Colorado," Humanities Institute, *University of Denver*, October 17, 1996.

Panelist, "The Federal Budget Battle," Sponsored by Omicron Delta Epsilon and Pi Sigma Alpha, *University of Denver*, October 2, 1995.

Invited Talk, "US Energy Policy," Highlands Ranch High School, *Reach Out DU*, November 10, 1995.

Panelist, "Study Abroad," Second Annual University Conference: Internationalization at the University of Denver, *University of Denver*, April, 1994.

Chair and Panelist, "African Studies," Second Annual University Conference: Internationalization at the University of Denver, *University of Denver*, April, 1994.

Panelist, "Public Policy and Work Force Participation: Making the School-to-Work Transition," Public Policy and Work Force Participation Seminar, *University of Pittsburgh*, September 15, 1993.

Rapporteur, "City$Money Conference," The La Follette Institute for Public Affairs, *University of Wisconsin-Madison*, February 4-6, 1992.

### CONFERENCE PAPER PRESENTATIONS

"The Behavioral Effects of Redistricting," Florida Political Science Association Annual Meeting, March 27, 2021 [virtual] (with Brian Amos, Enrijeta Shino, and Seth McKee (Oklahoma State University).

"The Electoral Landscape after a Natural Disaster: Hurricane Michael's Effect on Turnout in Florida," Southern Political Science Association Annual Meeting, January 8-11, 2020, San Juan, Puerto Rico (with William A. Zelin).

"The Turnout Effects of Spanish Language Voting Materials," Southern Political Science Association Annual Meeting, January 8-11, 2020, San Juan, Puerto Rico (with Emily Boykin and Jenna Tingum).

"Voter Registration after Parkland and Early Voting on College Campuses," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Enrijeta Shino).

"Did Ballot Design Oust a US Senator? A Study of the 2018 Election in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Michael C. Herron & Michael Martinez).

"Barriers to Registering Returning Citizens in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019.

"Ballot Design, Voter Intentions, and Representation: A Study of the 2018 Midterm Election in Florida," Election Sciences, Reform, and Administration, University of Pennsylvania, July 10-12, 201 (with Michael C. Herron & Michael Martinez).

"Mobilizing the Youth Vote? Early Voting on College Campuses in Florida," 19th State Politics and Policy Conference at the University of Maryland, May 30-June 1, 2019 (with Enrijeta Shino).

"Did Ballot-Design Outs an Incumbent Senator? A Study of the 2018 Midterm Election in Florida," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Michael Herron and Michael Martinez).

"Election Administration and Public Records Responsiveness," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Enrijeta Shino, Anna Baringer, Justin Eichermuller, and William Zelin).

"Voter Registration after Parkland and Early Voting on College Campuses," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Enrijeta Shino).

"Did Ballot Design Oust a US Senator? A Study of the 2018 Election in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019 (with Michael C. Herron & Michael Martinez).

"Barriers to Registering Returning Citizens in Florida," American Political Science Association, Washington, DC, August 28-September 1, 2019.

"Ballot Design, Voter Intentions, and Representation: A Study of the 2018 Midterm Election in Florida," Election Sciences, Reform, and Administration, University of Pennsylvania, July 10-12, 2019 (with Michael C. Herron & Michael Martinez).

"Mobilizing the Youth Vote? Early Voting on College Campuses in Florida," 19th State Politics and Policy Conference at the University of Maryland, May 30-June 1, 2019 (with Enrijeta Shino).

"Did Ballot-Design Outs an Incumbent Senator? A Study of the 2018 Midterm Election in Florida," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Michael Herron and Michael Martinez).

"Election Administration and Public Records Responsiveness," Midwest Political Science Association Annual Meeting, April 4-7, 2019, Chicago (with Enrijeta Shino, Anna Baringer, Justin Eichermuller, and William Zelin).

"Estimating the Differential Effects of Purging Inactive Registered Voters," American Political Science Association, Boston MA, August 28-September 1, 2018 (with Michael C. Herron).

"Estimating the Differential Effects of Purging Inactive Registered Voters," Election Sciences, Reform, and Administration, University of Wisconsin-Madison, July 26-27, 2018 (with Michael C. Herron).

"Exact-Match Voter List Verification and Turnout," 18th State Politics and Policy Conference at Penn State, June 7-9, 2018 (with Michael P. McDonald, Pedro Otálora, and Enrijeta Shino).

"Estimating the Differential Effects of Purging Inactive Registered Voters," at the 18th State Politics and Policy Conference at Penn State, June 7-9, 2018 (with Michael C. Herron).

"Who are Provisional Voters? Evidence from North Carolina," Midwest Political Science Association Annual Meeting, April 5-8, 2018, Chicago (with Lia Merivaki).

"A History and Analysis of Black Representation in Southern State Legislatures," Symposium on Southern Politics, The Citadel, Charleston, South Carolina, March 1-2, 2018 (with Charles S. Bullock III, William D. Hicks, M. V. (Trey) Hood III, Seth C. McKee, and Adam Myers).

"Who are Provisional Voters? Evidence from North Carolina," Southern Political Science Association Annual Meeting, January 4-7, 2018, New Orleans (with Lia Merivaki).

"Naturalizing the Party: Party Registration and Voter Turnout of Foreign-Born Citizens," State of the Party: 2016 & Beyond, November 10, 2017, Ray C. Bliss Institute of Applied Politics, University of Akron, Ohio (with Lidia Kurganova).

"The Erosion of Liberal Democracy: Dissensus and Ideology in America," American Political Science Association, San Francisco, August 31-September 3, 2017 (with William D. Hicks and Seth C. McKee.

"Early Voting Availability and Turnout in Florida and North Carolina," American Political Science Association, San Francisco, August 31-September 3, 2017 (with David Cottrell and Michael C. Herron).

"Determinants of County Level Voter Turnout, 1970-2016," American Political Science Association, San Francisco, August 31-September 3, 2017 (with Carl Klarner, Brian Amos, and Michael P. McDonald).

"Waiting to Vote: Using EViD Data to Assess the Electoral Consequences of Long Voting Lines," Midwest Political Science Association annual meetings, April 6-9, 2017, Chicago (with David Cottrell and Michael C. Herron).

"Timing the Habit: Voter Registration and Turnout in the American States," American Political Science Association, Philadelphia, September 1-4, 2016 (with Enrijeta Shino).

"Revisiting Majority-Minority Districts and Black Representation," American Political Science Association, Philadelphia, September 1-4, 2016 (with Seth C. McKee, William D. Hicks; Carl E. Klaner).

"Defending Democracy: How Political Scientists Are Engaging in the Fight over Voting Rights (and Why You and Your Dept. Should too)," APSA Roundtable with Theda Skocpol, Presented by the Scholars Strategy Network, American Political Science Association, Philadelphia, September 1-4, 2016.

"Timing the Habit: Voter Registration and Turnout in the American States," State Politics and Policy Conference, University of Texas at Dallas, May 19-21, 2016 (with Enrijeta Shino).

"Revisiting Majority-Minority Districts and Descriptive Representation," State Politics and Policy Conference, University of Texas at Dallas, May 19-21, 2016 (with Seth C. McKee, William D. Hicks; Carl E. Klaner).

"Purging Participation? Eligibility Challenges, Psychological Reactance, and the Decision to Vote," Midwest Political Science Association annual meetings, April 7-10, 2016, Chicago (with Daniel Biggers and Bryce Freeman).

"Missing Black Men and Representation in American Political Institutions," Midwest Political Science Association annual meetings, April 7-10, 2016, Chicago (with David Cottrell, Michael Herron, and Javier Rodriguez).

"Early Voting Effects on Pre-Election Poll Estimates," Southern Political Science Association, January 7-10, 2016, San Juan, Puerto Rico (with Michael P. McDonald, Michael D. Martinez, and Chris McCarty).

"Your Ballot's in the Mail: The Effects of Unsolicited Absentee Ballots," American Political Science Association, San Francisco, September 1-4, 2015 (with Michael Martinez)

"A Reassessment of the Turnout Effects in of Election Reforms in the United States," American Political Science Association, San Francisco, September 1-4, 2015 (with Michael P. McDonald and Enrijeta Shino).

"Reprecincting and Voting Behavior," American Political Science Association, San Francisco, September 1-4, 2015 (with Brian Amos and Casey Ste. Claire)

"Looks Can Be Deceiving: Explaining Support for Online Voter Registration in the American States," State Politics and Policy Conference, California State University, Sacramento, May 28-30, 2015 (with William Hicks and Seth McKee).

"Public Opinion on Statewide Ballot Measures," State Politics and Policy Conference, California State University, Sacramento, May 28-30, 2015 (with Diana Forster).

"Early Voting Effects on Pre-Election Poll Estimates," American Association for Public Opinion Research Annual Conference, May 14-17, 2015, Hollywood, Florida (with Michael P. McDonald, Michael D. Martinez, and Chris McCarty).

"Dumbing Down the Electorate? Assessing the Political Knowledge of Early Voters," Midwest Political Science Association annual meetings, April 15-19, 2015, Chicago (with Enrijeta Shino).

"Race, Shelby County, and the Voter Information Verification Act in North Carolina," American Political Science Association, Washington, DC, August 27-31, 2014 (with Michael C. Herron).

"Who Signs? Ballot Petition Signatures as Political Participation," American Political Science Association, Washington, DC, August 27-31, 2014 (with Diana Forster and Brian Amos).

"Race, Shelby County, and the Voter Information Verification Act in North Carolina," State Politics and Policy Conference, Indiana University, Bloomington, IN, May 15-17, 2014 (with Michael C. Herron).

"The Effects of Spatial Proximity on Voting," State Politics and Policy Conference, Indiana University, Bloomington, IN, May 15-17, 2014 (with Kenton Ngo).

"Race, Shelby County, and the Voter Information Verification Act in North Carolina," Midwest Political Science Association Conference, Chicago, April 3-6, 2014 (with Michael C. Herron).

"Beyond Regulatory Interpretation: The Demand and Supply of Provisional Ballots in Florida," Symposium on Regulation in the U.S. States, DeVoe Center, Florida State University, Tallahassee, February 21, 2014 (with Lia Merivaki).

"Evolution of an Issue: Voter ID Laws in the American States," American Political Science Association Conference, Chicago, August 28-September 2, 2013 (with Seth McKee, William Hicks, and Mitch Sellers).

"Closing the Door on Democracy": Early Voting and Participation in Florida," American Political Science Association Conference, Chicago, August 28-September 2, 2013 (with Michael Herron).

"Evolution of an Issue: Voter ID Laws in the American States," State Politics and Policy Quarterly 13th annual conference, University of Iowa, Iowa City, IA, May 23-25, 2013 (with Seth McKee, William Hicks, and Mitch Sellers).

"Early Voting in Florida in the Aftermath of House Bill 1355," State Politics and Policy Quarterly 13th annual conference, University of Iowa, Iowa City, IA, May 23-25, 2013 (with Michael Herron).

"Racial Disparities in Provisional Ballot Rejection Rates," Midwest Political Science Association Conference, Chicago, April 11-14, 2013 (with Michael Herron).

"Who Registers? The Differential Impact of Florida's House Bill 1355 on Voter Registration," American Political Science Association Conference, New Orleans, August 30-September 2, 2012 (with Michael Herron).

"The Effect of Polling Locations Upon Vote Choice: A Natural Experiment," Southern Political Science Association Conference, Orlando, January 3-5, 2013 (with Charles Dahan).

"Casting and Verifying Provisional Ballots in Florida," Southern Political Science Association Conference, Orlando, January 3-5, 2013 (with Lia Merivaki).

"Who Registers? The Differential Impact of Florida's House Bill 1355 on Voter Registration," American Political Science Association Conference, New Orleans, August 30-September 2, 2012 (with Michael Herron).

"The Participatory Impact of Truncating Early Voting in Florida," State Politics and Policy Quarterly 12th annual conference, Rice University, Houston, TX, February 18, 2012 (with Michael Herron).

"Engaging Potential Voters? The Collection of Valid Signatures on Ballot Petitions," State Politics and Policy Quarterly 11th annual conference, Dartmouth University, June 4-6, 2011 (with Diana Forster).

"Pledging Democracy: Congressional Support for a National Advisory Initiative and Referendum," Southern Political Science Association, January 5-8, 2011, New Orleans (presented by Matthew Harrigan).

"We Know What You Did Last Summer: The Impact of Petition Signing on Voter Turnout," State Politics and Policy Quarterly 10th annual conference, University of Illinois, Springfield, June 5-6, 2010 (with Janine Parry and Shayne Henry).

"Reassessing Direct Democracy and Civic Engagement: A Panel Study of the 2008 Election," State Politics and Policy Quarterly 10th annual conference, University of Illinois, Springfield, June 5-6, 2010 (with Caroline J. Tolbert and Amanda Frost).

"Generating Scholarship from Public Service: Media Work, Nonprofit Foundation Service, and Legal Expert Consulting," State Politics and Policy Quarterly 10th annual conference, University of Illinois, Springfield, June 5-6, 2010.

"Obama to Blame: Minority Surge Voters and the Ban on Same-Sex Marriage in Florida," American Political Science Association Conference, Toronto, September 2-5, 2009 (with Stephanie Slade).

"State Context and Support for a National Referendum in the U.S."  State Politics and Policy Quarterly 9th annual conference, UNC Chapel Hill/Duke University, May 22-23, 2009 (with Caroline J. Tolbert and Amanda Frost).

"Direct Democracy, Opinion Formation, and Candidate Choice," American Political Science Association Conference, Boston, August 2008 (with Caroline J. Tolbert).

"The Legislative Regulation of the Initiative," State Politics and Policy Quarterly 8th annual conference, Temple University, Philadelphia, PA, May 30-31, 2008.

"The Initiative to Shirk? The Effects of Ballot Measures on Congressional Voting Behavior," State Politics and Policy Quarterly 8th annual conference, Temple University, Philadelphia, PA, May 30-31, 2008 (with Josh Huder and Jordan Ragusa).

"Participatory-Based Trust? Political Trust and Direct Democracy," American Political Science Association Conference, Chicago, August 2007 (with Caroline J. Tolbert and Daniel Bowen).

"Giving Power to the People: The Adoption of Direct Democracy in the American States," Western Political Science Association Conference, Las Vegas, NV, March 7-9, 2007 (with Dustin Fridkin)

"Mass Support for Redistricting Reform: District and Statewide Representational Winners and Losers," State Politics and Policy Quarterly 7th annual conference, Austin, TX, February 22-24, 2007 (with Caroline J. Tolbert and John C. Green).

"Mass Support for Redistricting Reform: Partisanship and Representational Winners and Losers," American Political Science Association Conference, Philadelphia, August 2006 (with Caroline J. Tolbert and John C. Green).

"Gaming the System: The Effect of BCRA on State Party Finance Activities." *The State of the Parties: 2004 & Beyond.* Ray C. Bliss Institute for Applied Politics, Akron, OH, October 2005 (with Susan Orr).

"Do State-Level Ballot Measures Affect Presidential Elections?" *American Political Science Association Conference*, Washington, D.C., September 1-4, 2005 (with Caroline Tolbert and Todd Donovan).

"Did Gay Marriage Elect George W. Bush?" *Fifth Annual Conference on State Politics and Policy*, Michigan State University, East Lansing, MI, May 13-14, 2005 (with Todd Donovan, Caroline Tolbert, and Janine Parry).

"Was Rove Right? Evangelicals and the Impact of Gay Marriage in the 2004 Election." *Fifth Annual Conference on State Politics and Policy*, Michigan State University, East Lansing, MI, May 13-14, 2005 (with Matt DeSantis and Jason Kassel).

"Partisanship, Direct Democracy, and Candidate Choice," *Midwest Political Science Association Conference*, Chicago, IL, April 7-10, 2005 (with Caroline Tolbert and Todd Donovan).

"Did Gay Marriage Elect the President? Mobilizing Effects of Ballot Measures in the 2004 Election," *Western Political Science Association Conference*, Oakland, CA, March 17-19, 2005 (with Todd Donovan and Caroline Tolbert).

"Initiatives and Referendums: The Effects of Direct Democracy on Candidate Elections," Conference on *What We Know and Don't Know about Campaigns and Elections, Graduate Program in Political Campaigning,* University of Florida, Gainesville, FL, February 24-5, 2005.

"Was Rove Right? The Partisan Wedge and Turnout Effects of Issue 1, Ohio's 2004 Ballot Initiative to Ban Gay Marriage," *University of California Center for the Study of Democracy/USC-Caltech Center for the Study of Law and Politics/Initiative and Referendum Institute Conference*, Newport Beach, CA, January 14-15, 2005.

"The Educative Effects of Direct Democracy on Voter Turnout," *American Political Science Association Conference*, Chicago, IL, September 1-5, 2004 (with Caroline Tolbert).

"Turning On and Turning Out: Assessing the Indirect Effects of Ballot Measures on Voter Participation," *Fourth Annual Conference on State Politics and Policy*, Kent State University, Kent, OH, April 30-May 2, 2004 (with Todd Donovan).

"Veiled Political Actors:  The Real Threat to Campaign Finance Disclosure Statutes?" *Midwest Political Science Association Conference*, Chicago, April 14-18, 2004 (with Elizabeth Garrett).

"Elephants, Umbrellas, and Quarrelling Cocks:  Disaggregating Party Identification in Ghana's Fourth Republic," *Western Political Science Association Conference*, Portland, OR, March 11-13, 2004 (with Kevin Fridy).

"Gaming the System: State Party Finance Activities in Colorado and Florida," Southern Political Science Association Conference, New Orleans, January 7-10, 2004.

"The Educative Effects of Direct Democracy: Ballot Campaigns and Civic Engagement in the American States," Societa Italiana di Studi Elettorali (SISE) VIIIth International Conference on Electoral Campaigns (Initiative and Referendum),Venice, Italy, December 18-20, 2003.

"In the Wake of Prop. 13," *American Political Science Association Conference*, Philadelphia, PA, August 27-31, 2003.

"Soft Money and Issue Advocacy in the 2002 Colorado 7th Congressional District Election," *Western Political Science Association Conference*, Denver, CO, March 26-30, 2003.

"Educated by Initiative: Direct Democracy and Civic Engagement in the American States," *Third Annual Conference on State Politics and Policy*, University of Arizona, Tucson, AZ, March 14-15, 2003 (with Caroline Tolbert).

"Ballot Initiatives and the (Sub)Urban/Rural Divide in Colorado," *Colorado's Future: How Can We Meet the Needs of a Changing State?* University of Colorado at Colorado Springs, September 27, 2002.

"Representation and the Spatial Dimension of Direct Democracy," *American Political Science Association Conference*, Boston, MA, August 29-September 1, 2002.

"Representation and the Spatial Bias of Direct Democracy," *Second Annual Conference on State Politics and Policy*," University of Wisconsin-Milwaukee, Milwaukee, WI, May 24-25, 2002.

"Minority Rights and the Spatial Bias of Direct Democracy," *Southwestern Political Science Association Conference*, New Orleans, LA, March 27-30, 2002.

"Representation and the Urban Bias of Direct Democracy," *Western Political Science Association Conference*, Long Beach, CA, March 21-24 2002.

"Ghost Busters: The Structural Underpinnings and Politics of Ghana's 2000 Elections," *African Studies Association Conference*, Houston, TX, November 15-18, 2001.

"The Effect of Ballot Initiatives on Voter Turnout," *American Political Science Association Conference*, Washington, DC, August 31-September 3, 2000 (with Caroline Tolbert and John Grummel).

"Campaign Finance of Ballot Initiatives," *National Direct Democracy Conference*, University of Virginia's Center for Governmental Studies, Charlottesville, VA, June 8-9, 2000.

"Meet the Authors Roundtable: Recent Books on Direct Democracy in the States," *Midwest Political Science Association Conference*, Chicago, April 27-30, 2000.

"Counter-Majoritarian Bills and Legislative Response of State Ballot Initiatives," *Western Political Science Association Conference*, San Jose, March 24-26, 2000.

"The Gun Behind the Door Fires Blanks," *Pacific Northwest Political Science Association Conference*, Eugene, OR, October 14-16, 1999.

"Orange Crush: Mobilization of Bias, Ballot Initiatives, and the Politics of Professional Sports Stadia," *American Political Science Association Conference*, Atlanta, September 2-5, 1999 (with Sure Log).

"Direct Democracy in Colorado: Limited Information, Tough Choices," A Century of Citizen Lawmaking: Initiative and Referendum in America, *Initiative and Referendum Institute*, Washington, D.C., May 6-8, 1999.

"The Initiative to Party: The Role of Political Parties in State Ballot Measures," *Western Political Science Association Conference*, Seattle, March 25-28, 1999.

"Direct Democracy in the Late 20th Century: The Legacy(ies) of Prop. 13," Roundtable, *American Political Science Association Conference*, Boston, September 3-6, 1998.

"The Legacy of Howard Jarvis and Proposition 13? Tax Limitation Initiatives in 1996," *Western Political Science Association Conference*, Los Angeles, March 19-21, 1998.

"Special Interests and the Initiative Process in Colorado: The Case of the Parental Rights Amendment" (with Robert Herrington), Poster Session, *American Political Science Association Conference*, Washington, D.C., August 28-31, 1997.

"Howard Jarvis, Populist Entrepreneur: Reevaluating Causes of Proposition 13," *Western Political Science Association Conference*, Tucson, March 13-15, 1997.

"Guided Immersion: A Non-Traditional Study Abroad Program at the University of Ghana at Legon," *Midwest Political Science Association Conference*, Chicago, April 10-12, 1997.

"Exploring the Political Dimension of Privatization: A Tale of Two Cities" (with Kevin Leyden), *Midwest Political Science Association Conference*, Chicago, April 18-20, 1996.

"Populist Entrepreneur: Douglas Bruce and the Tax Limitation Movement in Colorado," *20th Annual Interdisciplinary Symposium of the Politics and Culture of the Great Plains*, Lincoln, April 11-13, 1996.

"*Faux* Populism: Douglas Bruce and the Anti-Tax *Moment* in Colorado, 1986-1992," *Western Political Science Association Conference*, San Francisco, March 14-16, 1996.

"Insular Democracy: Advisory Councils and Task Forces in the American States," *Western Political Science Association Conference*, Portland, March 1995.

"Supporting Labor-Management Initiatives at the State Level: The Case of the West Virginia Labor-Management Advisory Council," *Southern Industrial Relations and Human Resource Conference*, Morgantown, WV, October 1994.

"State Autonomy, Capacity, and Coherence: Labor-Management Councils in the American States," *Western Political Science Association Conference*, Albuquerque, March 1994.

"Removing the Pluralist Blinders: Labor-Management Councils and Industrial Policy in the American States," *American Political Science Association Conference*, Chicago, September 1992.

"You Can't Live with Them...The Emerging Role of Organized Labor in Industrial Policy in the American States," *Midwest Political Science Association Conference*, Chicago, April 1992.

"It Can Happen Here: Apprenticeship, Workplace-based Learning, and the Affirmative Role of Unions" (with Eric Parker), *Southwestern Political Science Association Conference*, Austin, TX, March 1992.

"The Affirmative Role of U.S. Unions in Restructuring" (with Eric Parker), *American Sociological Association Conference*, Indianapolis, IN, August 1991.

"Economic Development Strategy and the Problem of Skills: The Case of Wisconsin's Advanced Metalworking Sector" (with Eric Parker), *American Society for Public Administration Conference*, Cleveland, OH, October 1990.

*EDITORIAL/ADVISORY BOARDS/REVIEWER*
    Review Board, *National Science Foundation*, 2016
    Editorial Board, *State Politics and Policy*, 1999-2007; 2014-2016
    Editorial Board, *Election Law Journal*, 2012-2016.
    Review Board, *American Political Science Association (APSA) Small Research Grant Program*, 2004-05.
    Review Board, *Fulbright/ American Political Science Association (APSA) Congressional Fellowship Program*, 2002-2005.
    Academic Advisory Board, *Annual Editions, State & Local Government* (Brown & Benchmark), 1995-2015.
    Sub-Field Editor, *State Politics, FirstResearch*, 1999-2001.

*PROFESSIONAL MEMBERSHIPS*
American Political Science Association, 1990-
    State Politics and Policy Section, 2000-
        President, 2013-2015
        Executive Council, 2010-2012
    Political Organizations and Parties Section, 2000-
Midwest Political Science Association, 1990-
Southern Political Science Association, 2001-
Western Political Science Association, 1994-
    Local Co-Host, Annual Meeting (Denver), 2003
    Chair, Committee on Membership, Attendance, and Registration, 1998-2000
    Section Chair, State Politics and Policy, 1999 Annual Conference (Seattle)
    Member, Charles Redd Politics of the American West Award Committee, 1999
    Chair, Best Dissertation Award Committee, 1999-2001
Florida Political Science Association (1994-)
    Section Chair, State Politics, 2004 Annual Conference (Gainesville)

*PROFESSIONAL APPOINTMENTS*
Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, 2011.
Research Scholar, *Bill Lane Center for the Study of the American West*, Stanford University, 2007.
Senior Research Scholar, *Ballot Initiative Strategy Center Foundation (BISCF)*, Nonprofit 501 (c)(3), Washington, DC, (www.ballot.org), 2006.
Board of Directors, *Ballot Initiative Strategy Center Foundation (BISCF)*, Nonprofit 501 (c)(3), Washington, DC, 2000-2019.
Board of Scholars, *Initiative & Referendum Institute*, USC Law School, University of Southern California, 2004-.
Senior Research Fellow, *Initiative & Referendum Institute*, Washington, DC, 1998-2003.
Research Associate, *Ghana Center for Democratic Development* (*CDD-Ghana*), Accra, Ghana, 2000-01.
President & Co-Founder, *Citizens Institute for Voter Information in Colorado* (*CIVIC*), Denver, CO, 1998-2001.

*UNIVERSITY SERVICE*
**University of Florida**
    **College/University**
    Appointed Member, Latin American Studies Search Committee (Latino Studies), 2014-15
    Appointed Member, Political Science/African Studies Search Committee, 2013-14
    Appointed Member, 20th Century American History Search Committee (History), 2008-09
    Appointed Member, Latino Studies Search Committee (LAS), 2006-07
    Departmental Representative, United Faculty of Florida, 2003-
    Alternate Senator, United Faculty of Florida, 2005-
    State Delegate, Florida Education Association, 2006-
    Elected Member, College of Arts and Sciences, Nominating Committee, 2004-06
    Appointed Member, University of Florida Fulbright Committee, 2003-07

    **Department**
    Chair, 2017-
    Graduate Coordinator, 2014-2016
    Associate Chair, 2013-2014
    Appointed Member, Informatics Search Committee (Departmental Representative), 2013-14
    Appointed Member, Promotion (Full) Review Committee (Service), Leonardo Villalon, 2011
    Appointed Member, Promotion (Full) Review Committee (Research), Badredine Arfi, 2010
    Elected Member, Chair's Advisory Committee, 2004-05; 2006-07 (Chair); 2007-08 (Chair); 2010-11; 2012-13
    Elected Member, Chair Search Committee, 2004; 2009
    Appointed Member, Tenure Review Committee (Research), Daniel O'Neill, 2008
    Appointed Faculty Mentor, State Senator Mike Haridopolos, 2008-09
    Appointed Member, Strategic Planning Committee, 2008-09

Appointed Director, Graduate Program in Political Campaigning, 2007-11
Appointed Member, Committee to establish Undergraduate Certificate in Political Campaigning, 2007
Elected Member, Market Equity Committee, 2006-07 (Chair); 2007-08; 2008-09 (Chair)
Appointed Internship Coordinator, 2005-
Elected Member, Merit Committee, 2004-05; 2005-06; 2006-07 (Chair)
Appointed Faculty Mentor, Marcus Hendershot, 2006-
Appointed Faculty Mentor, Helena Rodriques, 2005-06
Appointed Member, Ad-Hoc Graduate Teaching Committee, 2005-06
Appointed Member (Chair), Latino Politics Search Committee, 2004-05
Appointed Member, Tenure and Promotion Committee (Samuel Barkin), 2004.
Appointed Member, Mid-Career and Mentoring Task Force, 2004-05
Appointed Member, Speakers Committee (Chair), 2003-05.
Appointed Member, Tenure and Promotion Committee (Richard Conley), 2003.

**University of Denver**

Social Science Promotion and Tenure Committee, 1999-2000
Joint Ph.D. Program in Religious and Theological Studies, (with *Iliff School of Theology*), 1999-2002
AH/SOCS Grade Appeals Committee, 1999-2001
*Phi Beta Kappa* Selection Committee, *Gamma* of Colorado, 1998-2002
Partners in Scholarship (PINS) Committee, 1997-2000
AH/SOCS Elected Faculty Committee, 1996-98
Post-Tenure Review Committee, 1996-98
SOAR (Summer Orientation), 1997-2000
Faculty Senate Representative, 1995-1996
Study Abroad Faculty Advisory Committee, 1995-2000
Study Abroad Travel Scholarships Committee, 1995-2000
Faculty Member, Culture and Critical Studies Program, 1995-2000
Faculty Mentor, 1995-2000
Reach-Out DU, 1995-2000
Advisor, Department of Political Science Honors Program, 1995-1996

**MEDIA INTERVIEWS**

Quoted more than 1,000 times by the media (newspaper, radio, television) on various political issues, including the *New York Times, Wall Street Journal, Washington Post, USA Today, Bloomberg, The Economist, Newsweek, Time, CNN, CBS News, Fox News, National Public Radio, Tampa Bay Times, Miami Herald, Florida Times-Union, San Francisco Chronicle, Los Angeles Times, Chicago Tribune, Boston Globe,* etc.

## A.II  Sources

1. 2021 Florida Statutes, available `http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0000-0099/0097/Sections/0097.0575.html` (last accessed August 28, 2021).

2. "Enrolled CS for CS for CS for SB 90," 2nd Engrossed, Section 7. Available `https://www.flsenate.gov/Session/Bill/2021/90/BillText/er/PDF` (last accessed August 10, 2020).

3. Florida Division of Elections, "Early Voting Reports," downloadable at `https://countyballotfiles.floridados.gov/VoteByMailEarlyVotingReports/PublicReports` (last accessed May 15, 2021).

4. Florida Division of Elections, "Florida Voter Registration Application," DS-DE 39, R1S-2.040, F.A.C. (effective July 2019), available at `https://dos.myflorida.com/media/693757/dsde39.pdf` (last accessed June 15, 2021).

5. Florida Division of Elections, "Archived Early Voting and Vote-by-Mail Statistics," available `https://dos.myflorida.com/elections/data-statistics/elections-data/absentee-and-early-voting/` (last accessed July 7, 2021).

6. Florida Division of Elections, "Vote-by-Mail Requests Activity Reports," available `https://countyballotfiles.floridados.gov/Account/Login?ReturnUrl=%2FVoteByMailEarlyVotingReports%2FReports` (last accessed July 25, 2021).

7. Florida Division of Elections, "Official Election Results Summary for the General Election Results November 3, 2020," available `https://www.lee.vote/Election-Results/Archived-Election-Results#2020` (last accessed August 14, 2021).

8. Florida Division of Elections, "Archived Monthly Reports," available at `https://dos.myflorida.com/elections/data-statistics/voter-registration-statistics/voter-registration-reportsxlsx/` (last accessed August 22, 2021).

9. Florida Division of Elections, "What is the Recommended Timeline to Return a Vote-by-Mail Ballot," *Vote-by-Mail*, available `https://dos.myflorida.com/elections/for-voters/voting/vote-by-mail/` (last accessed July 7, 2021).

10. Florida Division of Elections, "PRR_NAACP_VoterDetail.txt", produced in discovery.

11. Florida Division of Elections, "20210609_RaceGenderAge.zip", produced in discovery.

12. Florida Division of Elections, "VoterDataCK-20200219.xlsx", produced in discovery.

13. Florida Division of Elections Excel file, "VoterDataCK_DL_StartsWithNumber", produced in discovery.

14. Florida Division of Elections, "VoterDataCK_DLnot13.xlsx", produced in discovery.

15. Florida Division of Elections, "VoterDataCK_SSN4", produced in discovery.

16. Florida Division of Elections, "VoterDataCK20200204.xlsx", produced in discovery.

17. Florida Division of Elections, "SB90_Preverification.xlsx", produced in discovery.

18. "Draft response to PRR 04-25, Stuart Naifeh, 4-19-21," Email chain, Colleen E. O'Brien to Brad R. McVay, June 6, 2021, produced in discovery.

19. "RE PRR 04-25 Stuart Naifeh 4-19-21," Email chain, Colleen E. O'Brien, Janet Modrow, Maria I Matthews, Margaret A. Swain, Lenard J. Randolph, Amber Marconnet, Brad McVay), June 9, 2021, produced in discovery.

20. "Voter Registration In Florida Plunged Amid the Coronavirus Pandemic," PBS Frontline, June 11, 2020, available `https://www.pbs.org/wgbh/frontline/article/coronavirus-voter-registration-florida/` (last accessed July 31, 2021).

21. "Roll to the polls: The coronavirus changes get-out-the-vote efforts," *Tampa Bay Times*, August 15, 2020, available `https://www.tampabay.com/florida-politics/buzz/2020/08/15/roll-to-the-polls-the-coronavirus-changes-get-out-the-vote-efforts/` (last accessed August 5, 2021).

22. "On day of deadline, Florida voter registration site crashes, is down for hours," *Tallahassee Democrat*, October 5, 2020, available `https://www.tallahassee.com/story/news/local/state/2020/10/05/florida-election-register-to-vote-registration-web-site-crash-crashed-deadline-secretary-of-state/3631938001/` (last accessed July 5, 2021).

23. "Did mail delays lead to more late-arriving ballots? The opposite, Florida counties say," *Tampa Bay Times*, November 18, 2020, available `https://www.tampabay.com/news/florida-politics/elections/2020/11/18/did-mail-delays-lead-to-more-late-arriving-ballots-the-opposite-florida-counties-say/` (last accessed August 11, 2021).

24. "In St. Pete, voting and civil rights advocates speak out against Florida elections bill," *Bay News 9*, available `https://www.baynews9.com/fl/tampa/politics/2021/05/11/voting-and-civil-rights-advocates-speak-out-against-florida-elections-bill` (accessed June 15, 2021).

25. Jose Vazquez and Daniel A. Smith, "All counties should offer secure, 24/7 drop boxes for mail ballots," *Tampa Bay Times*, October 12, 2020, available `https://www.tampabay.com/opinion/2020/10/12/all-counties-should-offer-`

secure-247-drop-boxes-for-mail-ballots-column/ (last accessed August 31, 2021).

26. Michael C. Herron and Daniel A. Smith, "Minor postal delays could disenfranchise thousands of Florida vote-by-mail voters," *Tampa Bay Times*, August 14, 2020, available `https://www.tampabay.com/opinion/2020/08/14/minor-postal-delays-could-disenfranchise-thousands-of-florida-vote-by-mail-voters-column/` (last accessed June 19, 2021).

27. "Key swing states vulnerable to USPS slowdowns as millions vote by mail, data shows," *The Washington Post*, available `https://www.washingtonpost.com/business/2020/10/20/swing-states-election-usps/` (last accessed July 7, 2020).

28. "Postal problems could continue despite suspension of policies blamed for mail delays," *Washington Post*, August 19, 2020, available `https://www.washingtonpost.com/business/2020/08/19/postal-problems-could-continue-despite-suspension-policies-blamed-mail-delays/` (last accessed August 3, 2021).

29. "Long lines and rain didn't dampen turnout on first day of early voting in Lee and Collier," *The News-Press*, October 19, 2020, available `https://www.news-press.com/story/news/politics/elections/2020/10/19/early-voting-florida-2020-fort-myers-naples-cape-coral-lehigh-acres-estero-vote-election/3709337001/` (last accessed August 15, 2021).

30. US Census Bureau, 2019: ACS 5-Year Estimates Detailed Tables, "TYPES OF COMPUTERS AND INTERNET SUBSCRIPTIONS," Table S2801, available `https://data.census.gov/cedsci/table?q=B08201&g=0400000US12&tid=ACSDT5Y2019.B08201` (last accessed August 27, 2020).

31. US Census Bureau, 2019: ACS 5-Year Estimates Detailed Tables, "HOUSEHOLD SIZE BY VEHICLES AVAILABLE" Table B08201, available `https://data.census.gov/cedsci/table?q=B08201&g=0400000US12&tid=ACSDT5Y2019.B08201` (last accessed August 27, 2020).

32. "Nutrition, Physical Activity, and Obesity: Data, Trends and Maps," *Centers for Disease Control and Prevention*, available at `https://www.cdc.gov/nccdphp/dnpao/data-trends-maps/index.html` (last accessed August 2, 2021).

33. "Heart Disease Mortality by State," *National Center for Health Statistics*, available at `https://www.cdc.gov/nchs/pressroom/sosmap/heart_disease_mortality/heart_disease.htm` (last accessed August 2, 2021).

34. William O. Monroe, Auditor General, "DEPARTMENT OF STATE HELP AMERICA VOTE ACT (HAVA) AND THE FLORIDA VOTER REGISTRATION SYSTEM (FVRS), Operational Audit," June 2006, available https://flauditor.gov/pages/pdf_files/2006-194.pdf (last accessed August 7, 2021).

35. Florida Supervisors of Elections, responses to House of Representatives, Public Integrity and Elections Committee, Chair Erin Grall, February 24, 2021, produced in discovery.

36. Florida Supervisors of Elections, affidavits and interrogatory responses of SOEs, produced in discovery.

37. Florida Supervisors of Elections, early voting locations and drop box locations, dates, times, Personal Communications, September and October 2020.

38. Florida Supervisors of Elections, "Florida Supervisors of Elections Statement on PCB-PIE 21-05," March 22, 2021, available `https://www.myfloridaelections.com/`

portals/fsase/Documents/Public%20Policy/FSE_Statement_032221.pdf (last accessed August 1, 2021).

39. "Vote by Mail Envelope REDESIGN," Florida Supervisors of Elections 2017 Annual Summer Conference, June 18-22, 2017, available https://www.myfloridaelections.com/portals/fsase/Documents/ConferencePresentations/Robin_Conte__VBM_Redesign_reduced.pdf?timestamp=1499433610334 (last accessed July 7, 2020).

40. "Request a Vote-by-Mail Ballot/Solicitud Para El Voto-Por-Correo," Palm Beach Supervisor of Elections. Available https://www.pbcelections.org/Voters/Vote-By-Mail (last accessed August 6, 2021).

41. Columbia County SOE, "9402.pdf", produced in discovery.

42. Hernando County SOE, "REV-00006449.xlsx", produced in discovery.

43. Lee County SOE, "131 Gen Elec 2020 Drop Box Totals.xlsx", produced in discovery.

44. Lee County SOE, Daily estimated wait times .jpg screenshots, produced in discovery.

45. Lee County SOE, 'Official Election Results Summary for the General Election Results November 3, 2020," available https://www.lee.vote/Election-Results/Archived-Election-Results#2020 (last accessed August 14, 2021).

46. Manatee County SOE, "MAN_20201103_GEN_Voted.xlsx", produced in discovery.

47. Miami-Dade SOE, Wait Times estimates posted by the Miami-Dade County Supervisor of Elections on October 19, October 22, October 26, October 31, and November 1. Available at: https://web.archive.org/web/20200101000000*/https://www.miamidade.gov/elections/earlyvoting/wait-times.asp (last accessed July 31, 2021)

48. Orange County SOE, Wait Time estimates posted by the Orange County Supervisor of Elections on October 20, 2020. Available at: `https://web.archive.org/web/20201020234124/ocfelections.com/early-voting-locations` (last accessed July 5, 2021).

49. Polk County SOE, "DROP BOX INFORMATION," available `https://www.polkelections.com/Portals/Polk/Documents/Drop%20Box%20locations%20-%202020%20General.pdf` (last accessed August 18, 2020).

50. St. Lucie SOE, "EARLY VOTING AND VOTE BY MAIL BALLOT DROP OFF LOCATIONS", archived webpage available `https://web.archive.org/web/20201101111700/https://www.slcelections.com/m/Early-Voting` (last accessed August 17, 2021).

*Article*

# The Effects of House Bill 1355 on Voter Registration in Florida

State Politics & Policy Quarterly
13(3) 279–305
© The Author(s) 2013
Reprints and permissions:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/1532440013487387
sppq.sagepub.com
**$SAGE

## Michael C. Herron[1] and Daniel A. Smith[2]

### Abstract

In mid-2011, the Florida state legislature passed House Bill 1355 (HB 1355) and in so doing placed new regulations on community organizations that historically have helped eligible Floridians register to vote. Among the legal changes promulgated by this bill were new regulations on the operations of groups like the League of Women Voters and a new oath, warning of prison time and fines, that voter registration agents were required to sign. Such changes raised the implicit costs that eligible Florida citizens faced when registering to vote, and we show that voter registrations across the state in the second half of 2011 dropped precipitously compared with registrations in the second half of 2007. This pattern is evident among registrants in general, among registrants age 20 and younger, and among individuals who registered as Democrats. Outside of HB 1355, we know of no credible explanations for these results. Our findings thus show how restrictions on the way that third-party organizations register voters can have tangible effects on actual registrations. Given that registration prior to an election is a civic necessity in Florida and in many other states, such restrictions have the potential to affect electoral outcomes as well.

### Keywords

political participation, political behavior, election rules, public policy, elections, representation, voter registration, Florida

## Introduction

In mid-2011, the Florida state legislature passed House Bill 1355 (HB 1355), a controversial and multifaceted election-reform bill that placed new regulations on

[1]Dartmouth College, Hanover, NH, USA
[2]University of Florida, Gainesville, FL, USA

**Corresponding Author:**
Michael C. Herron, Dartmouth College, 6108 Silsby Hall, Hanover, NH 03755-3547, USA.
Email: michael.c.herron@dartmouth.edu

**EXHIBIT 2**

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms



Daniel Smith, Ph.D.
10/25/21

**EX. 2**

T. Piderit

community organizations that historically have helped eligible Floridians register to vote. These new regulations restricted the environment in which such organizations were permitted to operate and led to concerns that they might diminish the number of voter registrations across Florida. Many observers also saw in the new regulations an attempt to manipulate the partisan and racial composition of the Florida electorate. In August 2012, a federal judge permanently enjoined the facets of HB 1355 that were involved with new voter registration regulations, but by that time the regulations had been in force for over a year.

The proximity of HB 1355's passage to the 2012 General Election motivates our focus on the consequences of this legislation for voter registration in Florida. Although our empirical analysis consists solely of an analysis of HB 1355, the framework of this study is a general one and points toward the exploration of the effect of a formal law on an important form of civic behavior, in our case registering to vote. Registration is a necessity in Florida for those seeking to vote, and thus any law that affects registration is conceivably one that influences election outcomes as well.

Generally speaking, there is no doubt that laws and administrative rules affecting voter registration can profoundly shape the electorate. The contrasting histories of the pre– and post–Civil Rights South are ample evidence of this (e.g., Keyssar 2000). Here, however, we are not exploring whether in the aftermath of HB 1355 obvious race-based barriers to registration affected the composition of the registered voter pool in Florida. Rather, the contemporary political debate in the United States about registration and voting is more subtle and turns on issues like voter identification and the availability of early voting. Rules governing these issues remain in flux in many states, and race remains a dominant theme in the overall picture on voting even in the absence of obviously race-based rules.

As to why we study voter registration in Florida, the answer is a relatively simple one: citizens must in this state register prior to voting, and thus scholars interested in the factors that shape election outcomes must focus at least in part on what shapes the pool of registered voters. There is a literature on the relationship between voter registration laws and subsequent behaviors—see Tokaji (2008) for a review—and within it scholars have studied the effects of election day registration on turnout, identifying consequences that run from modest (Brians and Grofman 2001) to more significant (Fenster 1994), and the effect of the National Voter Registration Act (e.g., Highton and Wolfinger 1998). The literature on registration has very little to say to the question of which state laws have facilitated or hampered community-based voter registration efforts, and this is unfortunate given the large and prominent organizations, like the League of Women Voters and the National Association for the Advancement of Colored People (NAACP), that conduct mass voter registration drives.

We contribute to the literature on registration both substantively—with a focus on Florida and in particular HB 1355—and methodologically—by isolating the effects of HB 1355 with daily voter registration counts. In contrast to our approach, many studies of voter registration rely on survey data; this may not be ideal because surveys on voter registration can be unreliable (Ansolabehere and Hersh 2012; Bernstein, Chadha, and Montjoy 2003; Converse and Niemi 1971; Wolfinger and Rosenstone 1980). The

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

state of Florida maintains records that specify the day on which every registered Floridian actually registered, and our analysis takes advantage of this. In particular, we study the effects of HB 1355 on voter registration in Florida by comparing daily voter registration counts in 2007 with those in 2011. Our focus on these two years, which are identically placed in the four-year General Election cycle, reflects a recognition that a study of HB 1355 would be incomplete were we simply to ascertain whether, say, Florida registration numbers fell in the latter half of 2011 compared with the first half of that year.

We take advantage as well of the fact that the legal changes promulgated by HB 1355 did not immediately apply to all 67 Florida counties. As a consequence of the preclearance provision of the Voting Rights Act (VRA), five of Florida's counties were initially exempt from this law, and these counties provide a control group for our research, albeit not one that was randomly assigned. The presence of Section 5 areas within Florida allows us to compare 2011 registration counts with those from 2007 for the 62 Florida counties where HB 1355 took effect and then to carry out a comparable exercise using the five preclearance counties where it did not. The latter five counties are not a perfect control group, but the existence of an imperfect control is certainly fortuitous compared with the situation we would have faced had HB 1355 uniformly affected all 67 of Florida's counties as soon as it passed the Florida state legislature.

Briefly, we find that Florida voter registrations in the end of 2011 were sharply lower compared with registrations late in 2007, and we find no such 2011 versus 2007 difference when comparing the first few months of these years. The post–HB 1355 registration drop we find is evident across Florida in the aggregate, among registrants age 20 and younger, in the 62 non–Section 5 counties in Florida, and among the number of individuals who registered as Democrats. Although our analysis cannot directly speak to whether lower registration rates under HB1355 resulted from altered civic group strategies or the rational decisions of potential new registrants, it is nonetheless clear that this law produced differential effects across subgroups of Florida voters.

We now provide a short overview of the legal restrictions on voter registrations that followed from the passage and implementation of HB 1355. We then offer a theoretical way to think about the act of registering to vote, present our research design, and turn to results. The concluding section contains thoughts on the implications of our results for voter registration across the United States and comments on how the research design here can be instructive to scholars attempting to isolate the causal effects of changes in state election rules.

## HB 1355 and Limits on Third-Party Voter Registration Organizations

On May 19, 2011, the Republican-controlled state legislature in Florida passed HB 1355, an omnibus election-reform bill.[1] Among its many provisions, which were publicly motivated by allegations of voter fraud, HB 1355 reduced from a maximum of 14 to just eight, the number of days county Supervisors of Elections could offer early voting; eliminated early voting on the Sunday immediately preceding election day;

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

gave county Supervisors of Elections the discretion of offering between 48 and 96 hours of early voting over the reduced eight days as opposed to requiring them to provide 96 hours; required voters seeking to update their addresses at the polls to cast provisional ballots; and placed restrictions on individuals and community organizations wishing to engage in voter registration efforts (Herron and Smith 2012).

Upon becoming law in Florida, HB 1355 placed several new restrictions on what are commonly known as "Third-Party Voter Registration Organizations," or 3PVROs.[2] A 3PVRO is "any person, entity, or organization that solicits (for collection) or collects any voter registration application," although this definition allows for some exceptions like official state agencies that play a role in the voter registration process. Specifically, HB 1355 states that registration agents of 3PVROs must preregister, sign an oath warning of prison time and fines, and submit background information to the Florida Division of Elections. Prior to HB 1355, preregistration of 3PVROs was not enforced and no such oath was required by Florida law. Moreover, HB 1355 specifies that all 3PVROs in Florida are required to communicate to the Florida State Division of Elections within ten days any changes concerning their registration agents, file monthly reports with the Division accounting for all registration forms provided to and received from their registration agents, and ensure that they assign identification numbers to all voter registration forms in possession of their registration agents. Finally, once a registration agent of a 3PVRO receives a completed voter registration application, under HB 1355, he or she has 48 hours to deliver it to the Florida Division of Elections or the appropriate county Supervisor of Elections; these Supervisors, one per county for each of Florida's 67 counties, are elected, constitutional officers of the state of Florida.

Despite objections raised by various nonprofit groups, Florida Republican Governor Rick Scott signed HB 1355 when it was presented to him, and substantial portions of the legislation went into effect immediately, on May 19, 2011. However, existing 3PVROs had a window of 90 days, to August 17, 2011, to comply with some of the law's new regulations. Moreover, because HB 1355 had not, on May 19, 2011, received preclearance by the U.S. Department of Justice under Section 5 of the VRA, the legislation's new 3PVRO regulations did not apply to five of Florida's 67 counties. These counties—Collier, Hardee, Hendry, Hillsborough, and Monroe—fall under federal oversight, and thus the initial application of HB 1355 was uneven across Florida. 3PVROs operating in Florida after HB 1355 was signed were required accordingly to act under two separate sets of laws.

Following the passage of HB 1355 and concerned that they would not be able to meet the law's new regulatory standards, the League of Women Voters of Florida, the National Council of La Raza, Rock the Vote, and several other organizations completely ceased their voter registration activities in Florida. As of May 2011, it was unclear to these organizations whether they would "be subject to the law's requirements" if they limited their activities to the five Section 5 counties in Florida or whether they would be permitted to operate in these counties as they had before HB 1355 was implemented.[3]

On May 31, 2012, approximately one year after HB 1355 had gone into effect in Florida, U.S. District Judge Robert L. Hinkle in the case of *League of Women Voters*

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

*of FL v. Browning* granted a preliminary injunction blocking the enforcement of what appeared to be the most burdensome provisions placed on 3PVROs. Judge Hinkle enjoined the enforcement of the 48-hour turnaround deadline for collected voter registration forms and blocked the oath registration agents were required to sign before registering voters, calling the 48-hour deadline "harsh and impractical" (p. 2) and writing that the sworn oath "could have no purpose other than to discourage voluntary participation in legitimate, indeed constitutionally protected, activities" (p. 18).[4] In his published opinion, the judge ruled that the Florida law based on HB 1355 made voter registration drives "a risky business," and he ruled that the plaintiffs would likely succeed on their claims that the voter registration provisions in HB 1355 violate First Amendment rights protected under the U.S. Constitution and the National Voting Registration Act of 1993.

A week after the Hinkle ruling, the League of Women Voters, Rock the Vote, Florida PIRG (Public Interest Research Group), and various other organizations resumed their statewide efforts to register voters. Judge Hinkle's preliminary injunction against HB 1355's voter registration provisions became permanent in August 2012, and the key features of this bill that many feared would diminish voter registrations across Florida were thrown out. Nonetheless, neither Judge Hinkle's preliminary nor his permanent injunction assessed empirically whether the "harsh and impractical" regulations promulgated by HB 1355 actually did cause lower voter registrations in Florida. This is the subject of our upcoming analysis.

## The Returns and Costs of Voter Registration

How might a change in the laws that regulate community groups that engage in voter registration drives affect actual voter registrations? From a theoretical perspective, registering to vote involves a rational calculus as does the decision to vote, the antecedent of casting a ballot. As Downs (1957, 260) noted, "Every rational man decides to vote just as he makes all other decisions: if the returns outweigh the costs, he votes; if not, he abstains." We do not believe that the act of registering to vote should be thought of any differently. Because the most egregious barriers to registration and voting—racial and gender prohibitions, taxpayer or landholder requirements, poll taxes, literacy tests, and so forth—no longer are embedded in the American electoral landscape, the rational approach to registration is more amenable than it was, say, 50 years ago.

In considering the necessarily prior act of voter registration from a Downsian perspective, we argue that the motivation undergirding an individual's decision to register to vote is likely determined by some combination of potential returns offset by potential costs. The plausible individual benefits or returns of registering to vote are roughly constant for eligible individuals holding one's state constant. In contrast, costs or institutional barriers that confront these individuals when they try to register to vote can be quite variable.

The potential returns of registering to vote include a delayed instrumental benefit—being eligible to cast a decisive vote in a future election—combined with an expressive benefit—being a responsible citizen. With respect to the former, when an

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

individual considers whether to register, the associated instrumental benefit is very abstract, even more abstract than the potential instrumental return of casting a decisive vote in an election. And beyond abstraction, there is the fact that the instrumental value of registration is often delayed: with few exceptions, any gratification an individual gleans from registering to vote can be delayed by months and possibly by years. Any expressive benefits derived from registering to vote, too, are likely tertiary. Unlike in the aftermath of casting ballots, citizens usually do not receive Red, White, and Blue "I Registered" stickers after having filled out voter registration forms.

With respect to such costs, the institutional barriers to registering to vote can be considerable, and there is no reason to think that these costs are roughly uniform across individuals. In contrast to the gradual expansion and federal standardization of voting rights, in the latter half of the twentieth century state legislatures and election administrators continue to wield considerable discretion over regulating voter registration. As such, barriers to registration can vary greatly depending on where a citizen lives, and in part this is because registration laws within states—and even across local jurisdictions—are uneven and occasionally capricious (Burden et al. 2011; Leighley and Nagler 1992; Rosenstone and Wolfinger 1978). Within Florida, the 67 independently elected Supervisors of Elections do not offer an identical number of hours of operations, and they do not allocate proportionally (in terms of county population) similar numbers of staff members to the task of voter registration outreach.[5]

Because of the rather abstract benefits combined with the considerable costs of registering to vote, it should come as little surprise that many American citizens who are eligible to register do not. According to a recent report commissioned by the PEW Charitable Trusts, an estimated 51 million citizens in 2012 were unregistered, roughly 24% of the eligible population. And according to the U.S. Bureau of the Census, there are racial and ethnic differences among those eligible citizens who have registered to vote; in 2008, for example, eligible voters residing in households earning more than $100,000 per year were much more likely to be registered as those living in impoverished households, say, those earning less than $30,000 per year.[6] Unlike other western industrial countries, for example Canada as discussed in Rosenberg and Chen (2009), American state governments have no affirmative role to register citizens as qualified voters. Florida state law nonetheless requires that "every qualifying educational institution" give its enrolled students "the opportunity to register to vote or to update a voter registration record on each campus at least once a year," and these efforts are usually assisted by county Supervisors of Elections.[7]

Despite the fact that there is a dearth of scholarship devoted to the voter registration efforts of community groups in the American states, 3PVROs serve an important function registering eligible citizens to vote. For example, the nonpartisan League of Women Voters of Florida has registered voters in the state for seven decades, and Rock the Vote claims to have registered 90,000 citizens to vote in Florida, aged 18 to 29, in 2008 alone.[8] In Leon County, home of the state capital, Tallahassee, as well as Florida State University and Florida A&M University, in 2008 roughly 27,000 new voters were registered by third-party registration efforts, amounting to 15% of the approximately 175,000 county residents on the rolls, according to Leon County Supervisor of

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Case 4:21-cv-00184-MW-MAF Document 263-51 Filed 01/14/21 Page 316 of 382

Elections, Ion Sancho. Four years earlier according to Sancho, 3PVROs working in the county signed up 22,000 new voters, or 13% of those who were registered to vote.[9]

Notwithstanding the fact that HB 1355 was in force in 62 of Florida's 67 counties, 556 organizations and individuals registered as 3PVROs between July 1, 2011, and May 10, 2012. Only a handful of 3PVROs were actively engaged in registering new voters during this period, and of the 71,492 new voter registration applications received by the Florida Division of Elections nearly a year after HB 1355 went into effect, almost 90% of them were collected by just ten 3PVROs and their registered agents.[10] A cursory analysis of comparable months (July through December) in 2007 and 2011 similarly reveals a steep drop in the number of new registrations. Most notably, 25,000 fewer voter registration forms were submitted by 3PVROs in 2011 compared with 2007.[11]

## Research Design

We have provided background on HB 1355 and the voter registration regulations that came out of this legislation, and we elucidated a simple cost-and-benefit approach that one can use to think about the act of registration. We now turn to our attempt to ascertain the impact of HB 1355's regulations that until mid-2012 governed in Florida the environment of community groups who register voters, among other things. We surmise that these regulations raised the cost of registration to vote and thus may have diminished voter registrations across Florida. Whether this latter implication is true empirically is the subject of our research design and the results follow from it.

### Daily Registration Data

We take a Florida voter file that was valid as of April, 2012, and from this file we calculate the number of registrants on every day of 2011. We acquired the April 2012 voter file and all voter files mentioned in this article via a public records request to the Florida Secretary of State, Division of Elections. Because Florida voter files contain information on voter race and ethnicity, party registration, age, and gender, we can disaggregate our daily registration counts into counts of registered Democrats, registered Republicans, registered voters in Broward County, registered Democrats in Broward County, and so forth. We perform a similar exercise using a Florida voter file that was valid as of April, 2008, and from this file we assemble daily voter registration counts for each day in 2007.

As we noted earlier, we rely here on comparisons between Florida voter registrations from 2007 with those from 2011. The year 2007 is an appropriate comparison year for 2011 because both of these years fall one year before a year with a regularly scheduled presidential election. In addition, the contemporary Florida Voter Registration System—called the FVRS—went into effect starting in 2006. Because the FVRS was new as of 2006, comparing voter registration patterns in Florida in 2011 with, say, those that occurred in 2003 (another year that precedes a presidential election) would not be ideal.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

After we have retrieved both 2011 and 2007 daily registration series (for all registrants, for young registrants, for Democratic registrants, and so forth), we subtract them. We always subtract 2007 counts from 2011 counts, and this exercise produces a series of what we call "2011–2007 daily registration differences." We use these differences as opposed to absolute counts to draw conclusions about the effect of HB 1355 on voter registration in Florida.

### Smoothing

Both 2007 and 2011 contained 365 days, and this is fortuitous insofar as it facilitates our comparing registrations from these two years. Nonetheless, the days in 2007 and in 2011 do not line up perfectly. For example, January 1, 2007, was a Monday, and January 1, 2011, was a Saturday. It would obviously not make sense to compare voter registrations on a day in 2007 that occurred during a workweek and a day in 2011 that was on a weekend. Many other holidays are similar to New Year's Day in this way, for example Independence Day and Thanksgiving Day. The point here is that ordering the 365 days in 2011 and 2007 and then calculating registration differences will not necessarily provide for useful comparisons.

On account of this problem, we turn to smoothing. To be precise, after we calculate differences (2011 registration counts minus 2007 counts), we apply a loess smoother to the results. Smoothing calculations were done in the R computing environment (R Development Core Team 2011), and we used a first order smoother with a value of $\alpha = 0.6$. We emphasize that we smooth differences in counts and not raw counts themselves.

The primary reason that we smooth our registration differences is because of the way that the 365 days in 2011 line up with the 365 days of 2007. However, smoothing is also useful in light of the cycles and occasionally severe fluctuations that we observe in daily registration counts. Not surprisingly, registration counts tend to be higher on weekdays and lower on weekends, and this induces a registration count cycle with a seven-day period.

Although weekend registration counts are relatively low—often fewer than 10 per Saturday and Sunday—in 2007 and 2011, they were in general *not* zero. A Floridian's official date of voter registration is governed by the following: "[T]he date a signed voter registration application is postmarked or hand delivered to [a] county Supervisor of Elections office will be [the] registration date."[12] Post offices are in general not open on Sundays and neither are Supervisor of Election offices. However, Supervisors of Elections sometimes venture into their communities on weekends to register voters. Such behavior could lead to Sunday registrations. Still, we suspect that the nonzero registration counts we observe on Sundays embody some looseness in the way that official registration dates are recorded by the Florida Department of State (FDOS).

A Floridian who completed his or her voter registration form on a Saturday (assuming it was before post office closing time) could in principle have a true Saturday registration date. However, prior to the implementation of HB 1355, the lag between the date

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Case 4:21-cv-00184-MW-MJF Document 263-11 Filed 01/14/22 Page 318 of 382

an eligible registrant completed his or her paperwork and his or her formal registration date could have been up to ten days; HB 1355 reduced this time period to two days. We suspect that lags of this type are what lead to reported registrations on (federal) holidays.

Beyond weekly cycles, another source of registration count fluctuations is the periodic occurrence of voter registration drives; such drives can generate large spikes in registrations that are intense yet very brief in duration. During the spring of 2012, for example, when many civic groups were no longer engaged in voter registration efforts, the Miami-Dade Public School system registered itself as a 3PVRO with the Florida Division of Elections. On a single day, April 4, 2012, 60 district schools "registered more than 10,000 high school students."[13] A sense of the magnitude of this number can be gleaned from noting that the mean number in 2011 of daily registrations was approximately 1,327 ($s \approx 967$) and the median, 1,652.

### The Section 5 Counties in Florida

We have already noted that the implementation of HB 1355 upon passage was not uniform across Florida; this is because the regulations that followed from this legislation were not enforced in Florida's five counties covered by Section 5 of the VRA. Consequently, the costs of registering to vote for Floridians living in Section 5 counties were arguably less than those of eligible Floridians residing elsewhere. The presence in Florida of a set of Section 5 counties provides a natural experiment for us, but of course, this experiment is only meaningful to the extent that there was variance in 3PVRO behavior between the five Section 5 counties and their 62 counterparts.

The public record suggests that many if not the majority of 3PVROs either stopped their voter registrations when HB 1355 became the law or radically curtailed their efforts. Thus, to ensure that some 3PVROs were active in Florida's Section 5 counties, we contacted several of them. From personal correspondence, we learned that some 3PVROs did register voters in Florida's Section 5 counties; for example, Mi Familia Vota Education Fund continued registering voters in Hillsborough as did the Florida Consumer Action Network. Still, the natural experiment comparing Section 5 versus non–Section 5 is imperfect because many 3PVROs in the summer of 2011 suspended their registration drives throughout Florida irrespective of the fact that HB 1355 was not in force in Florida's Section 5 counties. This will make it difficult to detect differences between these two sets of counties; therefore, to the extent that we do find differences, our results are conservative.

### Potential Caveat: Presidential Primaries

One limitation of our research design is the fact that the treatment we are studying—the implementation of HB 1355—was not randomly assigned, and neither are the five Section 5 counties in Florida. Simply put, we cannot control for all exogenous events that might have affected Florida voter registrations between 2007 and 2011, and one

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

such exogenous event that theoretically could cause problematic inferences is the fact that there was no Democratic Presidential Preference Primary in January 2012. There was such a primary in 2008.

One might conjecture that the 2008 Democratic Presidential Preference Primary led to a surge in Democratic registration in late 2007. Such a surge might make the lack of a surge in 2011 appear to be a consequence of HB 1335 when in reality it was a reflection of the lack of a 2012 Democratic Presidential Preference Primary.

Fortuitously for our research design, the 2008 Florida Presidential Preference Primary was not officially sanctioned by the Democratic National Committee, no delegates were awarded based on its results, and the Democratic candidates for president did not officially campaign in Florida prior to it. Moreover, and particularly relevant for our objectives here, Barack Obama's field operation did not begin registering voters in Florida in earnest until May 2012.[14] This means that a possible Florida registration surge reflecting the historic 2008 General Election should not be visible in our registration counts, which end on the last day of 2007. Of course, one could argue that in 2008 there was not a "real" Democratic Presidential Preference Primary because officially this primary was effectively disowned by the Democratic National Committee. Nonetheless, we wish to be methodologically conservative, and hence we treat the 2008 Democratic Presidential Preference Primary as real.

Perhaps counterintuitively, in light of the fact that there was no Democratic Presidential Primary in January 2012, the Florida Democratic Party's voter registration efforts in the fall of 2011 far exceeded its efforts in 2007. Beginning in May 2011, President Obama's field campaign, Organizing for America, was already setting up shop in Florida to conduct voter registration drives in conjunction with the state party. According to a vice chair of the Florida Democratic Party, the party's voter registration effort in 2011 was "massive" and "night and day" from its efforts in 2007. In the summer and fall of 2011, the Democratic party trained "thousands of volunteers" in three-day sessions so as to comply with the 3PVRO requirements wrought by HB 1355.[15] This assists our research design because it means that a relative drop in voter registrations in 2011 cannot be attributed to the fact that the Florida Democratic Party was making only a lackluster effort at registration in the latter months of 2011.

If there were a registration surge in 2007 that might artificially make it appear that registrations in 2011 were relatively few in number—this could lead us wrongly to blame HB 1355 for depressing registrations—we lessen the chance of this surge causing problematic inferences by focusing almost all of our attention on voters who were no older than 7,300 days (20 years) when they registered to vote. We do this because, had an older voter registered during a 2007 surge in registrations, she would not need to register again in 2011. As noted, we have no reason to believe that such surges existed insofar as the Obama campaign began its registration push in 2008 as opposed to 2007. Still, as we exclude older voters from our analysis, this potential problem is not an issue for us. Florida law allows 16-year-olds to (pre)register to vote, and with a cutoff of 20 years, we can be sure that any registered voter younger than 20 years in 2011 could not have been legally registered to vote in 2007.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Case 4:21-cv-00184-MW-MAF Document 263-51 Filed 01/14/21 Page 320 of 382

**Table 1.** Summary of 2007 and 2011 Voter Registrations.

|                    | 2007    |          | 2011    |          |
| ------------------ | ------- | -------- | ------- | -------- |
|                    | All     | Under 20 | All     | Under 20 |
| January 1–June 30  | 257,470 | 70,743   | 228,826 | 71,415   |
| July 1–December 31 | 306,170 | 73,105   | 255,745 | 60,971   |
| Total              | 563,640 | 143,848  | 484,571 | 132,386  |

Note: Columns labeled "Under 20" contain counts of registrations who were no more than 20 years of age upon registration.

## Summary of Research Design

After we sort our 2007 and 2011 registration counts, take differences (based on all registrants, broken down by party, broken down by racial group, and so forth), and then smooth the differences, we assess the differences by constructing a series of plots. Most of the plots involve young registrants only for the reasons noted above. To complement our plots, we also fit a series of linear regressions to our daily differences. To keep the presentation simple, though, we do not report complete regression results in the article (all results are available from the authors). Each regression contains a constant, an indicator variable for days before May 19, and an indicator for days after August 17. These dates correspond to the initial signing of HB 1355 and the day on which existing 3PVROs in Florida had to comply fully with its directives.

We expect to see registration differences through May 19 that are roughly zero, thus connoting that registration counts in 2011 and 2007 were roughly similar through May 19. If HB 1355 depressed voter registrations, however, then we expect to see registration differences drop either after May 19 or after August 17. Recall that our differences are calculated based on 2011 counts minus 2007 counts, and hence, a falling difference connotes a drop in 2011 registrations compared with 2007 registrations.

## Findings

We now turn to results, and to provide context for our analysis we begin with a simple summary in Table 1 of 2007 and 2011 registration counts. This table reports counts of all voter registrations (see columns labeled "All") as well as counts of registrations of voters who were no older than 20 years on the day of registration (see columns labeled "Under 20"). Note as well that Table 1's results are broken down by date, specifically pre- and post–July 1. We use this date for convenience (it is halfway between January 1 and December 31) because it is approximately halfway through the 90-day period that started on May 1, 2011, and because some provisions of HB 1355 went into effect on July 1, 2011. Ideally, of course, the date of HB 1355's implementation would have cleanly divided 2011 into a pre- and a post-period. However, given the staggered way that HB 1355 went into effect, the reality is not so neat. Our upcoming figures are not based on July 1, but here we invoke this date for simplicity.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Case 4:21-cv-00184-MW-MAF Document 263-51 Filed 01/14/22 Page 321 of 382



**Figure 1.** 2011–2007 daily registration differences.
Note: Actual registration differences appear in gray in the background of the two panels. Solid lines connote smoothed differences.

Table 1 shows that total Florida voter registrations were lower in 2011 than in 2007. The decrease in registration was approximately 14% among all voters and approximately 8.0% among those voters less than or equal to 20 years on the day of registration. What is particularly notable about Table 1, though, is the extent to which the 2011 to 2007 registration drops differ depending on whether they calculated before or after July 1. For example, the pre–July 1 drop among total registrants in Florida was approximately 11% and the post–July 1 drop, approximately 16%. In other words, there was a greater percentage decrease in registrations from the second half of 2011 to the second half of 2007 compared with the first half of 2011 to the first half of 2007. Among younger registrants, the pre–July 1 registration drop was not a drop at all insofar as there were more young voters registered pre–July 1 in 2011 than in 2010. After July 1, however, the young registrant drop was almost 17%. If the full force of HB 1355 were not felt until approximately August 19, 2011, then the registration drops described here reflect registrations under both pre- and post–HB 1355 conditions, and hence the post–July 1 registration drops are conservative.

The calculations that follow from Table 1 are consistent with the conjecture that the implementation of HB 1355 led to decreased voter registrations in Florida. The data in the table are rough, however, and we now disaggregate them to further our ability to compare voter registration trends from 2007 with those of 2011.

## 2011–2007 Daily Registration Changes across Florida

Figure 1 contains two panels that describe daily 2011–2007 registration differences; the differences in Figure 1a reflect all voter registrations executed in 2007 and in 2011, and

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Case 4:21-cv-00184-MW-MAF Document 263-51 Filed 01/14/21 Page 322 of 382

the differences in Figure 1b include registrants no older than 20. Both Figures 1a and 1b display smoothed differences with observed differences in the background in gray.

The observed registration differences in Figure 1 exhibit significant temporal variance, and this accords well with reasons described earlier. One can see in Figure 1a that some differences are relatively large, around 2,000, for example. A number of these differences reflect 2011 to 2007 comparisons that involve one weekday and one weekend (where there were very few registrations). A similar statement applies to differences that hover around -2,000. There are also differences in Figure 1 that are much closer to zero; these involve for the most part comparisons between equivalent types of days in 2011 and 2007. The sort of variability in both panels of Figure 1 is a visual motivation for our plotting of smoothed differences.

Figure 1a highlights a sharp drop in 2011–2007 registration differences several weeks after August 17. Most important, the steepness of the drop is clearly unlike the trend in registration differences that existed prior to May 19. There is if anything a positive trend in such differences prior to this date—not a drop. Figure 1a is thus highly suggestive that something dramatic occurred in Florida in mid- to late-2011 that affected 2011 voter registrations in the state. Whatever the cause, it began to manifest itself around September 2011.

Notwithstanding this point, Figure 1b is based solely on relatively young registrants yet bears similarity to Figure 1a: both figures show 2011–2007 registration differences that started dropping shortly after August 2011. Because Figure 1b uses young voters only, one cannot argue that its downward trend in 2011–2007 registration differences reflects a surge in voter registration in late 2007 that could not have been repeated in 2011 because the voters registered in the surge were already registered by the time 2011 occurred.

Because Figure 1 plots registration changes, it contains no information about overall registration levels in 2007 and in 2011. That is, one cannot tell from the figure whether 2007 registrations increased throughout the year while 2011 registrations were flat, whether 2007 registrations were flat while 2011 registrations dropped as the year progressed; and so forth. It turns out that 2007 registrations were relatively flat from January through the fall of the year with two exceptions: a temporary upward bump around April and a surge that started in October and lasted through December. Registrations in 2011, in contrast, were relatively flat throughout the year excepting a temporary April bump. What this means is that the differences plotted in Figure 1 reflect a 2011 registration series that failed to keep up with a 2007 series that had a notable increase starting in the last quarter of the year.

Registrant age notwithstanding, one might be concerned about the extent to which 3PVROs in Florida acted strategically in the period surrounding the passage of HB 1355. During this time frame, these organizations could have changed their behaviors in ways that are problematic for our analysis, but we do not believe that they did so. In particular, there is neither evidence in the public record nor from our conversations with 3PVROs that these groups stepped up their voter registration drives in May and June 2011, prior to HB 1355's regulations going into effect. Alternatively, there is no indication that Florida 3PVROs lowered their efforts in this period, anticipating that any

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms



**Figure 2.** 2011–2007 registration differences by Section 5 status, registrants no older than 20.
Note: Actual registration differences appear in gray in the background of the two panels. Solid lines connote smoothed differences.

additional costs incurred expanding their operations might be for naught. We have also found no evidence that existing 3PVROs combined immediately prior to or after HB 1355's passage or that organizations scrambled to register as new 3PVROs during HB 1355's legislative hearings or around the time when Governor Scott signed this bill in May 2011. Indeed, of the 190 3PVROs that complied with HB 1355 by registering with the FDOS during the 2011 calendar year (out of the 739 3PVROs that registered between March 30, 2009, and the 2012 General Election), only 14 registered during the months of April and May 2011. According to state records, these 14 3PVROs subsequently registered a total of 19 voters prior to the 2012 presidential election.[16]

### Comparing Section 5 and Non–Section 5 Counties

We have noted already that there was variance across Florida in the extent that HB 1355 was implemented. Specifically, the presence in this state of five Section 5 counties provides us with a natural experiment that we can use to assess the effects of HB 1355. There were almost certainly spillover effects into these counties from the rest of Florida because some civic groups opted in the aftermath of HB 1355's passage to suspend voter registration activities in Florida overall. Nonetheless, patterns in 2011–2007 registration differences from both Section 5 and non–Section 5 counties are shown in Figure 2; this figure is based on registrants 20 years or younger.

Figure 2a shows that 2011–2007 registration differences among Section 5 counties in Florida did not vary excessively across the entire time period studied. While there was a downward trend in registration differences after August 17, the trend was very similar to that which existed before May 19. Between May 19 and August 17, there

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

was a temporary shift up in registration differences, meaning that in this window, there were more registrations in 2011 than in 2007. In contrast, Figure 2b shows the familiar and sharp downward trend in 2011–2007 registration differences. We saw this trend earlier (see Figure 1b) when we discussed overall trends in registration differences among Floridians no greater than 20 years of age.

The vertical axes in Figure 2a and 2b are different because there are only five Section 5 counties in contrast to 62 non–Section 5 counties. Therefore, one cannot directly compare the slopes of the lines in these two figures: that there are larger drops in the non–Section 5 counties could reflect the fact that more people live there. We can control for this problem with a simple regression analysis, and thus we estimated linear regressions of daily registration differences on time indicator variables, one indicator for the period between May 19 and August 17 and another for the period after August 17 (the omitted category is the period from January 1 through May 18). In the case of Section 5 counties, the estimated slope for the first time indicator is positive and statistically significant ($t = 2.73$) and the estimated slope for the second time indicator is negative and statistically insignificant ($t = 0.993$). All $t$ values are based on heteroskedastic-consistent standard errors. In contrast, the non–Section 5 slope estimate for the May 19 through August 17 indicator is negative and insignificant ($t = 0.868$), and the slope estimate for the post–August 17 indicator is significant at the 0.06 level ($t = 1.95$). Given expectations for the direction of this slope, a one-tailed test is arguably appropriate, in which this latter estimate is significant at the 0.03 level.

These regressions in conjunction with the visual patterns in the two panels of Figure 2 highlight a difference in voter registration patterns. In the Section 5 counties, there is no significant evidence of a relative drop-off in registrations after HB 1355 was passed; if anything, there was a slight bump in registrations in 2011 relative to 2007. This bump is hard to rationalize, but it certainly is not consistent with the registration patterns observed in Florida's non–Section 5 counties. In the latter, we see that a significant drop in registration occurred after HB 1355 was fully in force.

Our comparison of Section 5 versus non–Section 5 counties is methodologically useful in the sense that it flows from a natural experiment. More important, though, this comparison speaks to the value of the VRA. In *Shelby County v. Holder*, the U.S. Supreme Court is poised to rule on a challenge to Section 5 (oral arguments took place on February 27, 2013). The two panels in Figure 2 suggest that Section 5 of the VRA still has purchase 40 years beyond its initial passage. While racial breakdowns of the results in Figure 2b are not particularly useful (there are not enough minority registrations in the Section 5 counties to say much of anything regarding trends in registrations over time), one could still argue based on this figure that the VRA is working as it should be, protecting the registrants in areas of the United States known historically with barriers to electoral participation.

## Partisanship and Registration

Figure 3 breaks our results down by party, and we consider here only registrants 20 years or younger. We focus now on registrant party affiliation because it is important

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms



**Figure 3.** 2011–2007 registration differences by party, registrants no older than 20.
Note: Actual registration differences appear in gray in the background of the two panels. Solid lines connote smoothed differences.

to determine whether the results we have described thus far reflect exclusively registrants of one political party. It is fair to say that most of the objections to HB 1355 were associated publicly with supporters of the Democratic Party—to the extent that they had any partisan affiliation at all. Based on the rhetoric of such supporters, one might expect to see particularly negative trends in 2011–2007 registration changes among Democratic registrants.

Democrats and Republicans are the two largest partisan groups in Florida, and the third largest group consists of so-called No Party Affiliation (NPA) registrants. As of the end of March 2012, NPA registrants made up approximately 20% of all Florida registered voters; Democrats constituted 40% of this pool and Republicans, 36%. Our analysis of HB 1355 and partisanship thus considers registration trends in these three groups.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Figure 3 plots 2011–2007 registration differences by party, and visually speaking all party groups in the figure suffered from 2011–2007 registration drops after the implementation of HB 1355. Note, however, that the slopes in the three party-specific panels are not directly comparable on account of size differences across partisan groups in Florida.

Figure 3a highlights a distinct drop in 2011–2007 registration differences among Democrats. The drop is stark, and as we have seen before, it starts a few weeks after August 17. We fit a linear regression to the registration differences in Figure 3a, and the slope estimate for the post–August 17 indicator variable is negative and easily significant ($t = -2.28$). In contrast, the post–August 17 slope estimate from the Republican Figure 3b is not significant ($t = -1.29$), and the same is roughly true of the corresponding NPA estimate from Figure 3c ($t = -1.65$). This estimate would be considered significant were we to use one-sided tests at the 0.05 level, but such a standard is not very demanding.

Figure 3a's drop in Democratic registration could in theory be rationalized by arguing that it reflects the lack of a 2012 Democratic Presidential Preference Primary. However, as we noted previously, the Florida Democratic Party had a much stronger registration effort in 2011 compared with 2007, and because of this our results on the Democratic gap in Figure 3 are conservative. That Democratic registrations were down despite a relatively strong registration push from the Florida Democratic Party means that corresponding estimates of the putative effect of HB 1355 are biased down or lower than they would have been in the absence of a strong party registration effort.

Figure 3d contains another perspective on the relationship between partisanship and registration. In particular, this figure plots the Democratic–Republican difference in 2011–2007 registration differences. In other words, each point in this plot is a difference from Figure 3b subtracted from a difference from Figure 3a. When this difference-in-difference series decreases—as it does in Figure 3d—it implies that the Democratic registration difference is large compared with the associated Republican registration difference. As registration differences have been defined throughout as 2011 registrations minus 2007 registrations, a decreasing difference-in-difference in Figure 3d connotes a decreasing Democratic advantage in registrations in 2011 compared with 2007.

Indeed, we see from Figure 3d that by August 2011, Republicans started to gain (compared with 2007) in terms of young voter registrations. Moreover, the difference-in-difference series in Figure 3d is negative by the end of the year pictured. And recall that the Florida Democratic Party worked much harder in 2011 to register voters than it did in 2007. Thus, after HB 1355 was implemented, it appears that Democratic registrations among those 20 years and younger dropped at a much faster rate than corresponding Republican registrations.

Our findings about the relatively large number of young, Republican registrants in December 2011 are not an artifact of the smoothing processes behind Figure 3. To see this, consider Table 2's breakdown of monthly registration figures by party. According to this breakdown, there were 3,498 Republican registrations (age no greater than 20 years) in December 2011 and 3,208 Democratic registrations in this same month.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Case 4:21-cv-00184-MW-MJF Document 263-51 Filed 01/14/21 Page 327 of 382

**Table 2.** Monthly Registrations and Partisanship, Registrants No Older than 20.

| Month | 2007 | | | 2011 | | | Difference-in-Difference |
|---|---|---|---|---|---|---|---|
| | Democratic | Republican | Difference | Democratic | Republican | Difference | |
| January | 3,904 | 3,146 | 758 | 2,341 | 2,073 | 268 | −490 |
| February | 2,534 | 1,890 | 644 | 3,984 | 3,012 | 972 | 328 |
| March | 3,254 | 2,369 | 885 | 4,294 | 2,949 | 1,345 | 460 |
| April | 6,969 | 4,571 | 2,398 | 7,480 | 4,384 | 3,096 | 698 |
| May | 8,294 | 4,470 | 3,824 | 3,796 | 3,057 | 739 | −3,085 |
| June | 2,952 | 2,223 | 729 | 3,119 | 2,701 | 418 | −311 |
| July | 2,839 | 1,987 | 852 | 2,886 | 2,569 | 317 | −535 |
| August | 3,629 | 2,439 | 1,190 | 3,882 | 3,268 | 614 | −576 |
| September | 4,031 | 2,691 | 1,340 | 3,372 | 2,965 | 407 | −933 |
| October | 5,315 | 3,805 | 1,510 | 3,402 | 2,916 | 486 | −1,024 |
| November | 5,099 | 3,446 | 1,653 | 3,016 | 2,880 | 136 | −1,517 |
| December | 8,180 | 5,794 | 2,386 | 3,208 | 3,498 | −290 | −2,676 |

Note: Differences in the table are Democratic registrations minus Republican registrations. The Difference-in-Difference column reflects 2011 differences minus 2007 differences.

Indeed, across 2007 and 2011, December 2011 was the only month in which Republican registrations outweighed Democratic ones.

For both 2007 and 2011, the columns in Table 2 labeled "Difference" contain the number of Democratic registrations minus the number of Republican registrations. The "Difference-in-Difference" column is then the difference (2011 minus 2007) of these partisan differences. Starting in May, the Democratic minus Republican difference was smaller in 2011 than in 2007. This means that the advantage Democrats held in daily registrations between May and December was larger in 2007 than in 2011. And, the partisan difference-in-difference across 2007 and 2011 decreased in the second half of the year, meaning that the Democratic advantage in registrations was greater before May than after. This result is identical to that seen earlier in Figure 3 except that there is no smoothing in Table 2.

What is particularly notable about Table 2's results is the fact that the Democratic advantage in registrations (2011 vs. 2007) started to slip in May. We have mentioned before that HB 1355 was signed on May 19, 2011, and went immediately into effect. While existing 3PVROs had 90 days in which to comply with the law's regulation requirements, new 3PVROs had to comply with them right away upon registration with the state. The staggered implementation of HB 1355 helps rationalize the partisan differences in Table 2. Indeed, the numbers in Table 2 suggest that HB 1355 started to have an effect on the partisan composition of Florida's electorate very soon after it was signed. This conclusion would hold even if one were hesitant to ascribe excessive importance to the May difference in Table 2 insofar as the May 2007 registration count was so high. May 19, that is, is closer to June 1 than it is to May 1, and the fact that *all* of the partisan registration differences in Table 2 are negative starting in May is notable.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

The partisan effects in Figure 3 and Table 2 are arguably more meaningful than the overall decreases in registrations apparent in Figure 1. In this latter figure, we showed that absolute counts of registrations were down in 2011 compared with 2007, albeit not seriously until after HB 1355 was fully in force. While drops in overall registrations are not necessarily normatively pleasing, if such drops affected all Florida voter types equally, one could in theory argue that said drops would have no effect on election outcomes. Such an argument would not be compelling in light of our partisan findings. Elections are won based on vote margins between candidates, and because of this it would be very difficult to argue that the partisan composition of the Florida electorate is not important. HB 1355, by this logic, was not politically neutral.

### Race and Ethnicity in Registrations

We now turn to the racial and ethnic side of HB 1355 and assess whether this law had disparate effects on the different racial and ethnic groups in Florida. To this end, Figure 4 describes the racial and ethnic dimensions of 2011–2007 registration differences in the same way that we earlier studied partisan groups in Florida. African American, Hispanic, and white registrants constituted 94% of the Florida electorate as of the 2012 General Election.[17]

Visually speaking, one takes from Figure 4 the idea that the three main racial groups in Florida all suffered from drops in voter registrations in late 2011 as compared with late 2007. Nonetheless, when we fit regressions to the registration differences in the three panels of Figure 4, out of the six estimate coefficients (two time indicator variables per regression), the only statistically significant estimate is that for the post–August 17 variable in the African American regression. This is evidence that HB 1355's effects varied by racial/ethnic group and were particularly pronounced for a group that in Florida is closely tied to the Democratic Party. This raises the specter of what might befall nonregistered African Americans residing in Florida if Section 5 of the VRA is curtailed or eliminated.

### Two Possible Confounds: Growth and Regional Trends

We end our presentation of results by considering two possible confounds that may affect our conclusions. The first confound reflects the fact that our research design holds Florida constant between 2007 and 2011. That is to say, we have thus far ignored migration in and out of the state, and this is in theory problematic. It could be argued that one explanation for our claims about HB 1355 is that Florida's population shrunk between 2007 and 2011. If there were relatively few eligible registrants in Florida in 2011, it would be no surprise to see relatively small registration counts for that year, HB 1355 notwithstanding.

According the U.S. Census Bureau, the population of Florida in 2007 was estimated at 18,251,243 and in 2011, 19,057,542. Florida's growth between 2007 and 2011 implies that a shrinking state is unlikely a confound for us. Notwithstanding this point, we generated a plot akin to Figure 1 that contains 2011–2007 daily registration

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms



**Figure 4.** 2011–2007 registration differences by race, registrants no older than 20.
Note: Light gray denotes 2007 and dark gray denotes 2011. Actual registration counts appear in the background of the figure and are connected by dotted lines, solid lines are smoothed counts, and dashed lines denote 95% bootstrap confidence intervals.

differences but restricted to the 54 Florida counties that experienced positive population growth between 2007 and 2011 (plot available from the authors). By focusing on these counties in particular, we are biasing ourselves against finding low 2011–2007 registration differences.[18] Despite this fact, the patterns we observed earlier when analyzing all Florida counties exist as well in the counties whose populations grew between 2007 and 2011. From this, we conclude that decreasing populations in selected Florida locales cannot explain observed drops in 2011–2007 registration differences.

Another possible confound for our results is the presence of regional trends that affected Florida yet were independent of HB 1355. In the spirit of Campbell and Ross

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms



**Figure 5.** 2011–2007 registration differences in Louisiana, registrants age 18 to 21 for 2007 and 22 to 25 for 2011.
Note: Actual registration differences appear in gray in the background and solid lines connote smoothed differences. Based on 10,000 random draws of registrants no older than 34 from a December 7, 2012, Louisiana voter file.

(1968), we therefore compare daily registration trends in Louisiana, a southern state physically proximate to Florida, between 2007 and 2011. In particular, we acquired 10,000 random draws of Louisiana registrants less than 34 years of age (this particular limit reflects a data purchasing system used by the state of Louisiana), and from these draws, we calculated daily 2007 registration counts for voters aged 18 to 21 and daily 2011 registration counts for voters aged 22 to 25. We then calculated the difference between the 2011 counts and the 2007 counts, and we plot the difference series in Figure 5.

We observe in Figure 5 nothing that would make us believe that our Florida findings reflect general trends that affected the American South (or an area greater than the South). To be precise, trends in Louisiana registration differences do not mimic Florida trends. Figure 5 shows that 2011–2007 registration differences in Louisiana increased in the latter half of the pictured year, perhaps after August 1 or thereabouts. We saw no such increase in Florida.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Our consideration of Louisiana registration trends is particularly important because of the nature of our earlier Section 5 versus non–Section 5 comparison in Florida. As we pointed out in the course of that comparison, there was spillover between Florida's 62 non–Section 5 counties and the five covered ones; this weakens inferences from the Section 5 natural experiment although we argued that spillover makes our results conservative. Regardless, we can be reasonably sure that there was no such spillover in Louisiana unless one were to argue that Florida residents disproportionately moved to Louisiana during the period surrounding HB 1355; this would be hard to sustain given the surge in registrations that occurred in Florida after HB 1355 was enjoined in mid-2012.

## Conclusion

This article assesses the extent to which a set of Florida state regulations placed in mid-2011 on third-party community groups that traditionally conduct voter registration drives affected the number of voter registrations in the state. These regulations were implemented because of the passage of HB 1355, a controversial piece of election-related legislation whose implementation many feared would depress voter registrations. With a Downsian perspective as background, we have compared daily voter registration patterns in Florida for two comparable pre–General Election years. Our analysis concluded that voter registrations in the latter part of 2011 were significantly lower than registrations in the latter part of 2007. Furthermore, we identified a strong partisan aspect of the 2011–2007 registration drop, namely, that Democratic registrations were down much more than corresponding Republican registrations.

As of late August 2012, HB 1355's voter registration restrictions were no longer in force; by that time, a federal judge had found them to be in violation of the National Voting Registration Act. These restrictions were nonetheless on the books in Florida for almost a year and, notably, during the run-up to the 2012 General Election. How meaningful were they? Not until January 2012 did the FDOS include a category of 3PVRO registrations in its monthly registration reports, and thus we cannot know the precise number of 3PVRO registrations executed before and after HB 1355. Nonetheless, in October 2012, 3PVROs in Florida registered 46,673 voters, approximately 25% of the 189,736 voters registered in the state during this month.[19] If a voter registration method responsible for, roughly speaking, a quarter of registered Floridians has a partisan bias, then arguably the entire Florida registration system has a partisan bias. Given historical vote margins in Florida in important elections, it would be difficult to argue that the numbers of voters registered by 3PVROs is anything but important.

While our findings should be accompanied by the usual caveats regarding single-state case studies, our brief analysis of Louisiana assures us that Florida's voter registration experiences do not reflect broader trends in the American South. Moreover, Florida's experiences with HB 1355 and this law's focus on 3PVROs are not entirely unique. In the same year that HB 1355 was signed into law, bills were introduced in California, New York, North Carolina, and Texas to prohibit payments to individuals engaged in voter registration efforts; a bill in Texas sought to levy fines on 3PVROs

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

that were tardy in turning in voter registration applications, and a bill in Mississippi tried to force 3PVROs to register with the state. These pieces of legislation died in session, but no one should be surprised if other states experiment as Florida did with efforts to restrict the actions of 3PVROs. The possible repercussions of restrictions on 3PVROs in states across the country are conceivably very significant because fewer than half of all registered voters reported in 2008 that they registered at county or government registration offices or when obtaining driver's licenses. Indeed, 3PVROs account for a large share of voter registration applications across the entire United States.[20]

In our presentation of results, we described an analysis that compared Florida's five Section 5 counties with its 62 non–Section 5 counties. And, in the course of the said analysis, we offered evidence that post–HB 1355 registration drops in the former were muted compared with those in the latter. This implies, simply, that through 2011, Section 5 was continuing to provide meaningful restrictions on possibly discriminatory voting laws. The importance of this point cannot be understated in light of the contemporary legal debate about the continued relevance of the VRA and Section 5 in particular. As for this writing, the status of the VRA is uncertain as the Supreme Court has not yet ruled in *Shelby County v. Holder*. Independent of the court's eventual position in this case, the results shown here are consistent with the argument that a lack of overtly discriminatory voting practices does not imply that the VRA and the preclearance provisions in Section 5 are obsolete. Indeed, our evidence points to the impact of preclearance even when a voting law in question—here, HB 1355—lacks obviously racially discriminatory aspects.

Arguments about the relevance of Section 5 of the VRA are occurring in the United States concomitant with vigorous debates about voting procedures and the exigencies of voter identification. Ideally, we believe the promulgation of new voting laws across the United States will lead to a surge in research on the consequences of these laws. The methodological approach we have implemented here can be thought of as one way for scholars to study the consequences of new state laws. We have emphasized here the importance of temporal comparisons (e.g., pre–HB 1355 vs. post–HB 1355) within state comparisons (e.g., Section 5 counties vs. non–Section 5 counties), as well as across state comparisons (e.g., Florida vs. Louisiana). Different research venues will confront different methodological challenges of course, but we believe that the types of comparisons illustrated here should be part of the continuing research agenda on the effects of changing voting laws on various forms of electoral participation.

Relatedly, it would be beneficial if future research on the impact of voting laws were to focus on the mechanisms at work when registrations drop (or increase). The research design employed here is ultimately agnostic over whether the effects we have identified are entirely supply-based (meaning, the registration drops we have found reflect a lack of registration opportunities) or possibly somewhat demand-based (meaning that potential registrants in Florida changed their behaviors post–HB 1355 and shunned previously available opportunities to register). Although we cannot pin down the precise mechanism or mechanisms by which HB 1355 drove down registration, identifying such mechanisms should be a goal of future research.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Finally, our results raise concerns about excessive partisanship in the way that elections are run in the United States. Minnite (2012, 90) observed that, "[S]tate election codes can be read as records of past partisan conflict reflecting the efforts of the victors to impose or redesign rules that advantage their side, weaken their opponents, and institutionalize their power," and this seems very apropos given the history of HB 1355. This piece of legislation passed the Florida state legislature in a very partisan way; the margin in the Florida House was 77–38 (complete party-line vote) and in the Florida Senate, 25–13 (party-line except for two Republicans who voted nay). On top of this, we have shown that this law advantaged Republican registrations. The combination of these facts should draw attention to the question of whether Florida is best-served by having a partisan body dictate the laws that control access to voting. It is probably neither impossible nor appropriate to divorce completely partisanship from election administration (e.g., Hasen 2012), but one might honestly question whether a state legislature is best-suited to controlling the minutiae of registration details in the way that the Florida legislature did with HB 1355.

## Acknowledgment

The authors thank Diana Kasdan for helpful comments on an earlier draft as well as Pam Carpenter, Alachua County Supervisor at Electious, and her staff for insights on voter registration procedures in Florida.

## Authors' Note

This article was initially prepared for presentation at the 2012 Annual Meeting of the American Political Science Association, New Orleans, Louisiana, but not presented on account of Hurricane Isaac.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## Notes

1. This bill amended the Florida Election Code (Chapters 97–106, Florida Statutes) and became law (Chapter 2011–40, Laws of Florida).
2. See in particular Section 97.021 (37) Florida Statutes and Rule 1S.2.042. With respect to the fraud allegations mentioned in the legislative debate surrounding House Bill 1355 (HB 1355), Leon County Supervisor of Elections Ion Sancho stated in his declaration as a defendant-intervenor in a federal lawsuit (*State of Florida v. United States* (1:11-cv-1428-CKK-MG-ESH)) that, since his election in 1988, "[W]ith the exception of a high-profile incident in Orange County in 2009, I have never heard a confirmed report of intentional abuse by third-party voter registration organizations from my fellow Supervisors of Elections" (p. 13).

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

3. See "Rock the Vote's Legal Challenge to Florida Voting Law Goes before Federal Judge," *Huffington Post*, March 2, 2012, available from http://www.huffingtonpost.com/2012/03/02/ judge-hears-rock-the-vote_n_1316999.html (last accessed August 10, 2012), "Letter to the Honorable Kurt Browning, Florida Secretary of State," June 2, 2011, available from http:// www.brennancenter.org/page/-/Democracy/Letter%20to%20Sec.%20Browning%20re%20 Statewide%20implementation%206.2.11.pdf (last accessed August 13, 2012) and "Third-Party Groups Are Registering Voters—Very Carefully." Many of these groups protested HB 1355 before it was passed. See, for example, the Florida National Association for the Advancement of Colored People's (NAACP) press release on April 26, 2011, "NAACP Florida State Conference Opposes Florida Voter Suppression Bill Passed by the State House," available from http:// www.naacp.org/press/entry/naacp-florida-state-conference-opposes-florida-voter-suppression- bill-passe (last accessed August 18, 2012) and the League of Women Voters of Florida's press release on April 28, 2011, "League and Others Call for a Halt to the Attack on Voters' Rights," available from http://thefloridavoter.org/files/download/659 (last accessed April 25, 2013).

4. The ruling is available at http://brennan.3cdn.net/27b7dc85758f8a5fdd_a1m6b5aiy.pdf (last accessed April 25, 2013).

5. Conversation between Daniel A. Smith and Pam Carpenter, Alachua County Supervisor of Elections, Gainesville, Florida, April 17, 2012.

6. See PEW Charitable Trusts, "Inaccurate, Costly, and Inefficient: Evidence That America's Voter Registration System Needs an Upgrade," February 14, 2012, available from http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Pew_Upgrading_Voter_ Registration.pdf (last access August 7, 2012) and Table 2 on Page 4 of Thom File and Sarah Crissey's, "Voting and Registration in Election of November 2008," U.S. Bureau of the Census, Current Population Reports, available from http://www.census.gov/ prod/2010pubs/p20-562.pdf (last accessed August 21, 2012).

7. See Section 97.0583 Florida Statutes, available from http://www.leg.state.fl.us/Statutes/ index.cfm?App_mode=Display_Statute Search_String=URL=0000-0099/0097/Sections/ 0097.058.html (last accessed August 20, 2012).

8. "Voter Registration Groups Sue over New Florida Election Law," *Tampa Bay Times*, December 16, 2011, available from http://www.tampabay.com/news/politics/legislature/voter-registra- tion-groups-sue-over-new-florida-election-law/1206508 (last accessed August 20, 2012).

9. See "Declaration of Ion V. Sancho," *State of Florida v. United States*, United States District Court for the District of Columbia, No. 1:11-cv-1428-CKK-MG-ESH, p. 12.

10. Top 3PVROs in voter registration forms, with a date beginning July 1, 2012, were as fol- lows: the Florida Democratic Party (31,980); National Council of La Raza/Democracia USA (15,298); Miami-Dade County Public Schools Miami Florida (10,228); the Republican Party of Florida (4,373); Mi Familia Vota Education Fund, Inc. (1,699); America First Party (1,512); Pinellas County Republican Executive (791); Dr. Walter M. Fordham NAACP Political Action Chair/Bethune Cookman (422); Manatee Democratic Executive Committee (336); and Miami-Dade Young Democrats (331). See "Third Party Voter Registration Organizations," available from http://tpvr.election.myflorida.com/ Default.aspx (data accessed and downloaded on May 10, 2012).

11. These numbers reflect the authors' calculations, drawn from data available from the Florida Department of State Division of Elections, "Third Party Voter Registration Organizations."

12. See Florida State Association of Supervisors of Elections, "Register to Vote," available from http://www.myfloridaelections.org/?id=36 (last accessed August 21, 2012).

13. See "Florida Once Again at Center of Debate over Voting Rules," *Florida Center for Investigative Reporting*, available from http://fcir.org/2012/08/15/florida-once-again-at- center-of-debate-over-voting-rules (last accessed August 20, 2012).

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

14. Phone conversation between Daniel A. Smith and Steve Schale, Florida statewide campaign manager for Barack Obama, May 9, 2012.
15. Phone conversation between Daniel A. Smith and Alison Morano, vice chair, Democratic Party of Florida, August 15, 2012.
16. These numbers reflect the authors' calculations from Florida Department of State 3PVRO data, available from http://tpvr.election.myflorida.com.
17. See http://election.dos.state.fl.us/voter-registration/statistics/pdf/2012/GEN2012_County Race.pdf (last accessed December 14, 2012).
18. County population estimates of 2007 are available from http://www.census.gov/popest/data/state/totals/2007/tables/NST-EST2007-01.xls (last accessed February 6, 2013) and the 2011 estimate at http://quickfacts.census.gov/qfd/states/12000.html (last accessed August 21, 2012). The 13 negative growth counties are Bradford, Citrus, Columbia, Escambia, Gadsden, Gilchrist, Hardee, Hendry, Highlands, Lake, Okeechobee, Pinellas, and Volusia.
19. The October registration report is available from http://election.dos.state.fl.us/voter-registration/archives/2012/October/Monthly.pdf (last accessed December 4, 2012).
20. See "Voting and Registration in the Election of November 2008," July, 2012, available from http://www.census.gov/prod/2010pubs/p20-562.pdf (last accessed December 4, 2012).

## References

Ansolabehere, Stephen, and Eitan Hersh. 2012. *Validation: What Big Data Reveal about Survey Misreporting and the Real Electorate*. Unpublished working paper. http://polmeth.wustl.edu/media/Paper/hershpolmeth2012.pdf (accessed April 18, 2013).

Bernstein, Robert A., Anita Chadha, and Robert Montjoy. 2003. "Cross-State Bias in Voting and Registration Overreporting in Current Population Surveys." *State Politics & Policy Quarterly* 3 (4): 367–86.

Brians, Craig Leonard, and Bernard Grofman. 2001. "Election Day Registration's Effect on U.S. Voter Turnout." *Social Science Quarterly* 82 (1): 170–83.

Burden, Barry C., David T. Canon, Kenneth R. Mayer, and Donald P. Moynihan. 2011. "Early Voting and Election Day Registration in the Trenches: Local Officials' Perceptions of Election Reform." *Election Law Journal* 10 (2): 89–102.

Campbell, Donald T., and H. Laurence Ross. 1968. "The Connecticut Crackdown on Speeding: Time-Series Data in Quasi-Experimental Analysis." *Law & Society Review* 3 (1): 33–54.

Converse, Philip, and Richard Niemi. 1971. "Non-voting among Young Adults in the United States." In *Political Parties and Political Behavior*. 2nd ed., eds. William J. Crotty, Donald M. Freeman, and Douglas S. Gatlin. Boston: Allyn and Bacon, 443–66.

Downs, Anthony. 1957. *An Economic Theory of Democracy*. New York: HarperCollins Publishers.

Fenster, Mark J. 1994. "The Impact of Allowing Day of Registration Voting on Turnout in U.S. Elections from 1960-1992." *American Politics Research* 22 (1): 74–87.

Hasen, Richard L. 2012. *The Voting Wars: From Florida 2000 to the Next Election Meltdown*. New Haven, CT: Yale University Press.

Herron, Michael C., and Daniel A. Smith. 2012. "Souls to the Polls: Early Voting in Florida in the Shadow of House Bill 1355." *Election Law Journal* 11 (3): 331–47.

Highton, Benjamin, and Raymond E. Wolfinger. 1998. "Estimating the Effects of the National Voter Registration Act of 1993." *Political Behavior* 20 (2): 79–104.

Keyssar, Alexander. 2000. *The Right to Vote: The Contested History of Democracy in the United States*. New York: Basic Books.

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Case 1:21-cv-00184-MW-MAF Document 263-51 Filed 01/14/21 Page 336 of 382

Leighley, Jan E., and Jonathan Nagler. 1992. "Individual and Systemic Influences on Turnout: Who Votes? 1984." *Journal of Politics* 54 (3): 718–40.

Minnite, Lorraine. 2012. "Voter Identification Laws: The Controversy over Voter Fraud." In *Law and Election Politics: The Rules of the Game*. 2nd ed., ed. Matthew J. Streb. New York: Routledge, 88–133.

R Development Core Team. 2011. *R: A Language and Environment for Statistical Computing*. Vienna, Austria: R Foundation for Statistical Computing. ISBN 3-900051-07-0. http://www.R-project.org (accessed April 18, 2013).

Rosenberg, Jennifer, and Margaret Chen. 2009. "Expanding Democracy: Voter Registration around the World." Report published by the Brennen Center for Justice at New York University School of Law. http://brennan.3cdn.net/3234b49c4234d92bf3_3km6i2ifu.pdf (accessed April 18, 2013).

Rosenstone, Steven J., and Raymond E. Wolfinger. 1978. "The Effect of Registration Laws on Voter Turnout." *American Political Science Review* 72 (1): 22–45.

Tokaji, Daniel P. 2008. "Voter Registration and Election Reform." *William & Mary Bill of Rights Journal* 17:453–506.

Wolfinger, Raymond E., and Steven J. Rosenstone. 1980. *Who Votes?* New Haven: Yale University Press.

## Author Biographies

**Michael C. Herron** is professor of government at Dartmouth College and previously was on the faculty of Northwestern University. He has visited at the Hertie School of Governance, Harvard University, and the University of Rochester. His recent research interests cover voting problems and voting rights in Florida and across the rest of the United States.

**Daniel A. Smith** is University of Florida Research Foundation professor of political science. His research examines how political institutions affect political behavior across and within the American states. He has published extensively on politics and elections in the American states, testified before the United States Senate on voting rights in Florida, and is coauthor of *State and Local Politics: Institutions and Reform* (Cengage).

This content downloaded from
142.190.45.174 on Sun, 24 Oct 2021 18:35:37 UTC
All use subject to https://about.jstor.org/terms

Select Year: 2021 ∨ Go



# The 2021 Florida Statutes

<u>Title IX</u>
ELECTORS AND ELECTIONS

<u>Chapter 101</u>
VOTING METHODS AND PROCEDURE

<u>View Entire Chapter</u>

**101.657**   **Early voting.**—

(1)(a)   As a convenience to the voter, the supervisor of elections shall allow an elector to vote early in the main or branch office of the supervisor. The supervisor shall mark, code, indicate on, or otherwise track the voter's precinct for each early voted ballot. In order for a branch office to be used for early voting, it shall be a permanent facility of the supervisor and shall have been designated and used as such for at least 1 year prior to the election. The supervisor may also designate any city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center as an early voting site; however, if so designated, the sites must be geographically located so as to provide all voters in the county an equal opportunity to cast a ballot, insofar as is practicable, and must provide sufficient nonpermitted parking to accommodate the anticipated amount of voters. In addition, a supervisor may designate one early voting site per election in an area of the county that does not have any of the eligible early voting locations. Such additional early voting site must be geographically located so as to provide all voters in that area with an equal opportunity to cast a ballot, insofar as is practicable, and must provide sufficient nonpermitted parking to accommodate the anticipated amount of voters. Each county shall, at a minimum, operate the same total number of early voting sites for a general election which the county operated for the 2012 general election. The results or tabulation of votes cast during early voting may not be made before the close of the polls on election day. Results shall be reported by precinct.

(b)   The supervisor shall designate each early voting site by no later than the 30th day prior to an election and shall designate an early voting area, as defined in s. <u>97.021</u>, at each early voting site. The supervisor shall provide to the division no later than the 30th day before an election the address of each early voting site and the hours that early voting will occur at each site.

(c)   All early voting sites in a county shall allow any person in line at the closing of an early voting site to vote.

(d)   Early voting shall begin on the 10th day before an election that contains state or federal races and end on the 3rd day before the election, and shall be provided for no less than 8 hours and no more than 12 hours per day at each site during the applicable period. In addition, early voting may be offered at the discretion of the supervisor of elections on the 15th, 14th, 13th, 12th, 11th, or 2nd day before an election that contains state or federal races for at least 8 hours per day, but not more than 12 hours per day. The supervisor of elections may provide early voting for elections that are not held in conjunction with a state or federal election. However, the supervisor has the discretion to determine the hours of operation of early voting sites in those elections.

**EXHIBIT 4**

(e)   Notwithstanding the requirements of s. 100.3605, municipalities may provide early voting in municipal elections that are not held in conjunction with county or state elections. If a municipality provides early voting, it may designate as many sites as necessary and shall conduct its activities in accordance with the provisions of paragraphs (a)-(c). The supervisor is not required to conduct early voting if it is provided pursuant to this subsection.

(f)   Notwithstanding the requirements of s. 189.04, special districts may provide early voting in any district election not held in conjunction with county or state elections. If a special district provides early voting, it may designate as many sites as necessary and shall conduct its activities in accordance with the provisions of paragraphs (a)-(c). The supervisor is not required to conduct early voting if it is provided pursuant to this subsection.

(2)   During any early voting period, each supervisor shall make available the total number of voters casting a ballot at each early voting location and the total number of vote-by-mail ballots received under s. 101.69(2) during the previous day. Each supervisor shall prepare an electronic data file listing the individual voters who cast a ballot during the early voting period. This information shall be provided in electronic format as provided by rule adopted by the division. The information shall be updated and made available no later than noon of each day and shall be contemporaneously provided to the division.

(3)   The ballot of each elector voting early shall be counted even if the elector dies on or before election day.

(4)(a)   The elector must provide identification and must complete an Early Voting Voter Certificate in substantially the following form:

## EARLY VOTING VOTER CERTIFICATE

I,  , am a qualified elector in this election and registered voter of   County, Florida. I do solemnly swear or affirm that I am the person so listed on the voter registration rolls of   County and that I reside at the listed address. I understand that if I commit or attempt to commit fraud in connection with voting, vote a fraudulent ballot, or vote more than once in an election I could be convicted of a felony of the third degree and both fined up to $5,000 and imprisoned for up to 5 years. I understand that my failure to sign this certificate invalidates my ballot.

  (Voter's Signature)
  (Address)
  (City/State)

(b)   Any elector may challenge an elector seeking to vote early under the provisions of s. 101.111. Any challenged voter must vote a provisional ballot. The canvassing board shall review the ballot and decide the validity of the ballot by majority vote.

(c)   The canvass of returns for ballots cast under this subsection shall be substantially the same as votes cast by electors in precincts, as provided in s. 101.5614.

**History.**—s. 17, ch. 98-129; s. 2, ch. 2000-249; s. 55, ch. 2001-40; s. 21, ch. 2003-415; s. 7, ch. 2004-232; s. 13, ch. 2004-252; s. 45, ch. 2005-277; s. 39, ch. 2005-278; s. 39, ch. 2011-40; s. 13, ch. 2013-57; s. 57, ch. 2014-22; ss. 10, 18, ch. 2019-162; s. 17, ch. 2020-2.

Copyright © 1995-2021 The Florida Legislature • Privacy Statement • Contact Us

**United States District Court for the**
**Northern District of Florida**
**Tallahassee Division**

| | |
|---|---|
| **League of Women Voters of Florida, Inc.**, et al., | **Case No. 4**:21-cv-00186-MW-MAF |
| *Plaintiffs*, v. | |
| **Laurel M. Lee**, in her official capacity as Florida Secretary of State, et al., | |
| *Defendants*. | |

**Defendant Christina White's Response to**
**Plaintiffs' First Set of Interrogatories**

Defendant Christina White, by and through undersigned counsel, and pursuant to Rule 33 of the Federal Rules of Civil Procedure, hereby responds to the First Set of Interrogatories submitted by Plaintiffs League of Women Voters of Florida, Inc., League of Women Voters of Florida Education Fund, Inc., Black Voters Matter Fund, Inc., Florida Alliance for Retired Americans, Inc., Cecile Scoon, Dr. Robert Brigham, and Alan Madison (collectively, "Plaintiffs") on June 30, 2021.

**Interrogatory No. 1**

**For each election from January 2016 to the present day, please provide a list of all individuals and their voter ID numbers who had their ballots delivered by a third-party organization or another individual in your county. Please note whether the ballot was delivered (a) by mail; (b) at a drop box; (c) at a Supervisor of Elections' office; (d) at an early voting location; (e) at an election day polling place; or (f) via another method (please explain the method).**

For ballots delivered by mail, Miami-Dade County has no mechanism to track whether those vote-by-mail ballots were delivered to a post office or mailbox by a third-party organization or another individual.

For ballots delivered at early voting locations and drop boxes, please refer to the handwritten logs that Miami-Dade County has provided in response to Plaintiffs Request for Production No. 3. Please note that those handwritten logs may not have information for all individuals who dropped off vote-by-mail ballots other than their own. Because these logs were compiled by various temporary employees at multiple locations over multiple days of Early Voting, Supervisor White cannot be assured that these handwritten logs provide a complete listing of every ballot delivered by a third-party organization or another individual via a drop box in Miami-Dade

**EXHIBIT 5**

Daniel Smith, Ph.D.
10/25/21
**EX. 4**
T. Piderit

County. As shown, the logs provide (a) the name of the individual who dropped off ballots other than his or her own, (b) whether that individual showed ID, (c) the relation of the individual to the voter, and (d) the FRVS# on the vote-by-mail envelope that was dropped off.

For ballots dropped off at the Supervisor of Elections' office, Section 12-14 of the Code of Miami-Dade County states that an individual delivering a vote-by-mail ballot other than their own must "complete an affidavit that states that the designee is authorized by the elector to retrieve and/or return the elector's ballot and shall indicate his or her relationship to the elector, if any." A sample of that affidavit is available at: https://www.miamidade.gov/elections/library/forms/vote-by-mail-ballot-retrieve-return-en.pdf. Miami-Dade County does not maintain a centralized list of all ballots where the required affidavit was provided. However, Miami-Dade County has preserved submitted affidavits as public records in accordance with Chapter 119, Florida Statutes, and any corresponding retention schedules. If Plaintiffs wish to obtain copies of any affidavits that remain in Miami-Dade County's possession, Miami-Dade County shall arrange, upon Plaintiffs' request, a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries. Please note, however, Miami-Dade County may not have received a completed affidavit from every individual who dropped off vote-by-mail ballots other their own. Therefore, a review of every affidavit in Miami-Dade County's possession would not provide a complete listing of every ballot delivered by a third-party organization or another individual at the Supervisor of Elections' Office in Miami-Dade County. By examining, auditing, compiling, abstracting, or summarizing those records, a partial response to this interrogatory may be determined. Because the burden of deriving or ascertaining the relevant information will be substantially the same for either party, Supervisor White, in accordance with Fed. R. Civ. P. 33(d), simply refers Plaintiffs to the records provided.

For ballots delivered at election day polling places or via another method, Supervisor White cannot provide any list because voters may not deliver vote-by-mail ballots to an election day polling place and Supervisor White is unaware of any other method for the delivery of vote-by-mail ballots.

---

**Interrogatory No. 2**

---

**For each election from July 2019 to the present day, please provide a list of all individuals and their voter ID numbers who cast a ballot via drop box in your county.**

For information relevant to this interrogatory, please refer to the handwritten logs that Miami-Dade County has provided in response to Plaintiffs Request for Production No. 3. Please note that those handwritten logs may not have information for all individuals who dropped off vote-by-mail ballots other than their own. **This does not provide a complete listing of every ballot cast via drop box in Miami-Dade County**. As shown, the logs provide (a) the name of the individual who dropped off ballots other than his or her own, (b) whether that individual showed ID, (c) the relation of the individual to the voter, and (d) the FRVS# on the vote-by-mail envelope that was dropped off.

In addition, in accordance with our drop box procedures described in the documents provided in response to Request for Production No. 6, any voter who submitted their own vote-by-mail ballot at a drop box and showed ID to the Elections Department employee monitoring the drop box had the envelope containing their vote-by-mail ballot stamped with the word "SELF." Miami-Dade County does not maintain a centralized list of all vote-by-mail ballots that were stamped "SELF." However, Miami-Dade County has preserved those envelopes as public records in accordance with Chapter 119, Florida Statutes, and any corresponding retention schedules. If Plaintiffs wish to inspect those envelopes that remain in Miami-Dade County's possession, Miami-Dade County shall arrange, upon Plaintiffs' request, a reasonable opportunity to examine and audit the records and to make copies, compilations, abstracts, or summaries. Please note, however, that the drop boxes were monitored by various temporary employees at multiple locations over multiple days of Early Voting. Therefore, Supervisor White cannot be assured that these envelopes provide a complete representation of every individual who submitted their own vote-by-mail ballot at a drop box and showed ID. In addition, no notation or stamp was made on the envelopes of individual who stated that they were dropping off their own vote-by-mail ballot but did not show ID. (The showing of ID was not required for anyone to have their vote-by-mail ballot collected and counted.) Therefore, a review of every envelope in Miami-Dade County's possession would not provide a complete listing of every individual and their voter ID numbers who cast a ballot via drop box in Miami-Dade County.

By examining, auditing, compiling, abstracting, or summarizing those records, a partial response to this interrogatory may be determined. Because the burden of deriving or ascertaining the relevant information will be substantially the same for either party, Supervisor White, in accordance with Fed. R. Civ. P. 33(d), simply refers Plaintiffs to the records provided.

---

**Interrogatory No. 3**

---

**For any upcoming elections in 2021 and 2022, if you intend on removing any previously-offered drop boxes in your county, or changing the days or times on which drop boxes will be available, please describe your reasons for such changes.**

For municipal elections in 2021 and 2022, Miami-Dade County conducts elections at the request and direction of the relevant municipality. All decisions regarding the location, days, and hours that drop boxes will be available for those elections lies in the discretion of the relevant municipality.

For the 2022 Primary Election, Supervisor White currently plans to offer drop boxes at the same 23 Early Voting locations that were offered during the 2020 Primary Election. Just like in 2020, these drop boxes will be available during the same days and hours of operation as the Early Voting sites.

For the 2022 General Election, Supervisor White currently plans to offer drop boxes at 28 Early Voting locations rather than the 33 Early Voting locations provided in the 2020 General Election. The 28 Early Voting sites is the same number of Early Voting locations provided during the

previous gubernatorial election in 2018. This reduction from 33 to 28 sites is customary and based on the lower turnout expected for a non-presidential election. Just like in 2020, these drop boxes will be available during the same days and hours of operation as the Early Voting sites.

In addition, during the 2020 Primary Election, Miami-Dade County offered drop boxes on Election Day during the same hours that polls were open at four locations: (1) the Main Office of the Supervisor of Elections, (2) a Branch Office at the Stephen P. Clark Center, (3) the South Dade Government Center, and (4) the North Dade Government Center. This was provided in accordance with Resolution No. R-592-20, which was passed by the Miami-Dade Board of County Commissioners. For the 2020 General Election, Miami-Dade County offered drop boxes at those four locations on Election Day during the same hours that polls were open and the day prior from 7 am – 7 pm. All four of these locations also served as Early Voting locations during the 2020 Primary and General Elections.

For future county-wide elections, Miami-Dade County does not intend to provide drop boxes at the South Dade Government Center or the North Dade Government Center outside of the days and hours of Early Voting because neither location meets the definition of "permanent branch office" as described in Section 28 of Senate Bill 90 (2021). Those two locations, however, will continue to serve as drop box locations during the days and hours of Early Voting.

---

**Interrogatory No. 4**

---

**For any upcoming elections in 2021 and 2022, if you do not know whether you will remove any previously-offered drop boxes in your county, or whether you will change the days or times on which drop boxes will be available, please describe in detail any anticipated changes and how and when you will decide on whether you will make changes to drop box availability.**

*See* Response to Interrogatory No. 3.

---

**Interrogatory No. 5**

---

**For each election from January 1, 2015 to the present day, describe the process of retrieving vote-by-mail ballots from drop boxes, both at the Supervisor of Elections office and at other locations. Please describe whether the process was the same at every location, and if it was not, how it differed from location to location.**

The process of retrieving vote-by-mail ballots from drop boxes is described in the documents provided in response to Request for Production No. 6. This was the process that was followed at every location during the Early Voting period. However, for ballots submitted to drop boxes at the four locations described in the Response to Interrogatory No. 3, the same procedures were followed except that ballots were secured and immediately delivered to the Main Office of the Supervisor of Elections.

---
**Interrogatory No. 6**

---

**For each election, provide the address of each polling place that had lines with wait times of 30 minutes or longer during early voting or on election day; the estimated length of the wait-time at each such polling place; the times of day those wait-times occurred; the number of voters in line; and any information on whether voters left lines without voting and who those voters were.**

For a listing of every polling place or early voting location that had lines with wait times of 30 minutes or longer, please refer to the documents provided in response to Request for Production No. 15. By examining, auditing, compiling, abstracting, or summarizing those records, a partial response to this interrogatory may be determined. Because the burden of deriving or ascertaining the relevant information will be substantially the same for either party, Supervisor White, in accordance with Fed. R. Civ. P. 33(d), simply refers Plaintiffs to the records provided.

Supervisor White is unaware of how many voters were in line at any of these locations and has no information that any voters left the lines without voting.

---
**Interrogatory No. 7**

---

**For each election, identify how many voter registration forms submitted to you by Third-Party Voter Registration Organizations were delivered late and how many voter registration forms handled by Third-Party Voter Registration Organizations were not delivered.**

For a listing of how many voter registration forms submitted to by Third-Party Voter Registration Organizations were delivered late, please refer to the documents provided in response to Request for Production No. 33. By examining, auditing, compiling, abstracting, or summarizing those records, a partial response to this interrogatory may be determined. Because the burden of deriving or ascertaining the relevant information will be substantially the same for either party, Supervisor White, in accordance with Fed. R. Civ. P. 33(d), simply refers Plaintiffs to the records provided.

Supervisor White is unable to know how many voter registration forms handled by Third-Party Voter Registration Organizations were not delivered.

---

### Interrogatory No. 8

---

**Please identify the Voter ID number of each voter who registered to vote in your county using a Third-Party Voter Registration Organization.**

For a listing of all voters who registered to vote in Miami-Dade County using a Third-Party Voter Registration Organization from 2018 to present, please see attached spreadsheet titled: "MDC Voters with 3rd Party Reg (2018 to Present)."

---

### Interrogatory No. 9

---

**Identify all persons who were consulted for the information upon which your answers to these interrogatories are based.**

- Angela Rivero, Senior Executive Assistant to the Supervisor of Elections
- Suzy Trutie, Deputy Supervisor of Elections, Government Affairs and Media Relations
- Michelle McClain, Deputy Supervisor of Elections, Voter Services
- Allison McComb, Deputy Supervisor of Elections, Poll Worker Training
- Michael Johnson, Deputy Supervisor of Elections, Information Systems
- Gilbert Yurubi, Assistant Deputy Supervisor of Elections, Information Systems
- Erika Sierra-Trujillo, Deputy Supervisor of Elections, Operations Division
- Jose Ponce, Deputy Supervisor of Elections, Finance and Administration

## VERIFICATION OF ANSWERS TO INTERROGATORIES

As to all objections and references by incorporation to document productions.

By: _____

State of _Florida_
County of _Miami-Dade_
Sworn to and subscribed before me by means of ☒ physical presence or ☐ online
notarization this _19th_ day of _August_ , 2021 by
_Christina White_ , who is personally known to me or has
produced _____ as identification.
NOTARY PUBLIC
State of _Florida_
My Commission Expires: _____

Wilfred Castro

WILFRED CASTRO
Notary Public - State of Florida
Commission # HH 132694
My Comm. Expires May 23, 2025
Bonded through National Notary Assn.

Date: August 19, 2021

Respectfully submitted,

**GERALDINE BONZON-KEENAN**

MIAMI-DADE COUNTY ATTORNEY

By: */s/ Michael B. Valdes*

Michael B. Valdes

Assistant County Attorney

Florida Bar No. 93129

Miami-Dade County Attorney's Office

111 N.W. 1st Street, Suite 2810

Miami, Florida 33128

Phone: (305) 375-5151

Fax:      (305) 375-5634

E-mail:   mbv@miamidade.gov

*Counsel for Christina White*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served to all counsel of record via electronic mail on August 19, 2021.

*/s/ Oren Rosenthal*

Oren Rosenthal

Assistant County Attorney

*Article*

# Verifying Voter Registration Records

## Part of Special Symposium on Election Sciences

American Politics Research
2020, Vol. 48(6) 677–681
© The Author(s) 2020
Article reuse guidelines:
sagepub.com/journals-permissions
DOI: 10.1177/1532673X20920261
journals.sagepub.com/home/apr

⑤SAGE

**Enrijeta Shino**[1] ⓘ, **Michael D. Martinez**[2],
**Michael P. McDonald**[2], and **Daniel A. Smith**[2] ⓘ

## Abstract
This study investigates the reliability of Florida's voter registration files through a phone survey, asking respondents to verify their records. We find 17.7% of registrants fail to verify at least one identifying piece of information. Applying the total survey error (TSE) framework, we classify these errors as due to coverage error, measurement error, or processing error. These inconsistencies create election administration and campaign inefficiencies, which lead to poorer voter experiences, and challenge the validity of some research based on these data. Furthermore, if registration records do not accurately capture the members of protected groups, the data are less helpful in both government monitoring and enforcement. We suggest voter registration forms should be treated like survey questionnaires so as to improve data quality with better form design, and that some vote overreport bias is attributable to limitations of voter file data, not to respondents' vote misreporting.

## Keywords
voter registration, voter file, validation, survey

State and local election officials maintain voter registration files that contain a wealth of information, including registrants' names, birthdates, current addresses, and past vote histories. These data, which are critical to the administration of elections, are also extensively used by political campaigns to target messages and mobilize supporters. In addition, scholars use these data as sampling frames in voter persuasion and mobilization experiments (e.g., Gerber & Green, 2000), making inferences about the effects of registration laws on who registers and votes (e.g., Fraga et al., 2017; Holbein & Hillygus, 2016; Shino & Smith, 2018), and validating survey respondents' self-reports (e.g., Ansolabehere & Hersh, 2012; Silver et al., 1986), among other uses. Importantly, voter registration lists determine who may cast ballots in an election, which means registration errors could either permit votes by those who are ineligible or, more likely, complicate or prevent voting by people with mismatches between their registration record and the identification they provide at the polls (Ansolabehere & Hersh, 2014). Thus, the accuracy of these data is important for the efficiency and fairness in election administration, measurement validity, and the ability of individuals to exercise their fundamental right to vote.

Despite the importance of these records for election administration, campaigns, research, and voters, some have cautioned their reliability. After the American National Election Studies (ANES) discontinued its valiant, though frustrating and costly, efforts to validate respondents' self-reports of turnout in the 1980s by checking official records, Traugott et al. (1992) warned that " . . . administrative records should be treated with some care" (p. 13). The 2002 Help

America Vote Act's requirement that states maintain and regularly update centralized electronic voting files has reduced the costs of voter validation efforts but has not completely eliminated concerns about their reliability (Berent et al., 2016; Burden, 2014; McDonald, 2007).

Here, we explore the reliability of information found in Florida's voter registration file. Our insight is that a voter registration application is similar to a survey questionnaire, or even a ballot (Kimball & Kropf, 2005). We explore voter registration errors employing the total survey error (TSE) framework (Groves & Lyberg, 2010; Weisberg, 2005) by employing a test/retest methodology (Guttman, 1945) where we ask a sample of registered voters to verify their voter registration record. This approach mitigates potential false negative and positive matches in prior vote survey validation efforts that may arise from record linkage methodologies (Elmagrmid et al., 2007). Unlike a prior test/retest mail-back study (Ansolabehere et al., 2010), we employ an adaptive phone survey design to probe causal explanations as to why individuals may provide a survey response inconsistent with their administrative record. We find 17.7% of respondents fail to verify at least one field included in the publicly available Florida voter file, including name, address, birthdate, sex, or race. These inconsistencies create election administration and

[1]University of North Florida, Jacksonville, USA
[2]University of Florida, Gainesville, USA

**Corresponding Author:**
Enrijeta Shino, University of North Florida, 1 UNF Drive, Jacksonville, FL 32224, USA.
Email: e.shino@unf.edu

**EXHIBIT 3**

campaign inefficiencies, lead to poorer voter experiences, and challenge the validity of some prior research based on these data.

## A Voter Registration Application as a Survey Questionnaire

Florida's paper voter registration application, asks some open-ended responses (the registrant's name, address, and other identifying information) and some closed-ended responses (gender, party affiliation, and race/ethnicity).[1] The National Voter Registration Form asks for much of the same information, with some differences regarding party affiliation, race, and gender. Using Groves and Lyberg's (2010) TSE framework, we classify three validity challenges that arise as they relate to voter registration records: coverage error, measurement error, and processing error. TSE has more elements, but we focus here on those endemic to the accuracy of voter registration records.

*Coverage error* occurs when the voter registration list does not accurately reflect the population who should qualify as registered voters in a given jurisdiction. In this context, *overcoverage* is commonly referred to as "*deadwood*": registration records that have been rendered obsolete by changes in residence or death of the registrant (Ansolabehere & Hersh, 2014). *Undercoverage*, in this context, can include people who were improperly purged from the voter rolls, but who are legally entitled to continue voting in the jurisdiction. One particular challenge is to update voter registration addresses in a mobile population, as federal and state laws govern the process of updating and removing records of persons no longer eligible to vote at an address.

*Measurement error* occurs when respondents fail to give accurate responses to questions that are asked. Some measurement error might be attributable to respondents who *satisfice* by providing a quick answer in lieu of the best answer, or those who have difficulty understanding the question due to illiteracy or language barriers. Poorly designed forms can also induce measurement error, as when a crowded form causes a respondent to miss or misread a question, or when an abbreviation ("M" and "F") is ambiguous or not understood by all respondents. Social constructs, such as race, are particularly susceptible to measurement error as they depend on social norms. Respondents may have multiple race identifications, or considerations, that lead to unstable responses in repeated surveys (Harris & Sim, 2002). Florida's application is particularly vulnerable, as race and ethnicity are combined into a single question that forces a single response. In contrast, many survey organizations ask separate questions that permit respondents to self-identify their race and their Hispanic ethnicity, and the U.S. Census allows multiple responses to the race question rather than using a "multiracial" category.

*Processing error* occurs when election officials incorrectly enter data from voter registration applications. These errors arise from the operator's misinterpretation of ambiguous responses

(such as difficulty reading illegible handwriting), carelessness, or fatigue. For example, election officials erroneously recorded a North Carolina legislator who appeared to have voted in North and South Carolina until officials determined his mother signed the wrong poll book line (Ochsner, 2016).

## Survey Design

To assess the relative frequency of these types of errors in Florida voter registrations, we conducted a survey based on a random sample of 60,000 registered voters selected from the February 2017, vote file. Our purpose and approach is similar to the Ansolabehere et al. (2010) study, which sent two first class mail pieces to a sample of registered voters in Florida and Los Angeles County, California. Our innovation is that we field an adaptive telephone survey that allows interviewers to ask follow-up questions of respondents whose survey answers differ from their registration records.

Although telephone number is labeled as optional on Florida's registration form, 31.6% of our sample registrants provided one. L2, a voter list vendor, augmented our sample with phone numbers, yielding a total of 31,725 phone numbers, or 52.9% of our sample. From that sampling frame, we completed 402 interviews out of 6,227 unique phone numbers called, a 6.5% response rate. Using computer-assisted telephone interview software with voter file information, bilingual interviewers asked respondents questions identical to the voter registration application.[2] If a respondent provided an inconsistent answer, we asked follow-up questions to investigate these failures to help assure valid responses to the survey. A more complete description of our methodology is found in the Supplemental Material.

## Results

In all, 71 of 402 respondents (17.7%) failed to verify at least one of their name, address, birthdate, sex, or race. We report unweighted statistics, as we analyze small frequency subsamples that could be distorted by weights. Ansolabehere et al. (2010) report a similar estimated total error rate in their mail-back survey, which included name, address, birthdate, sex, race, and questions regarding vote history and party affiliation. We organize our discussion of the results presented in Table A1 in the Supplemental Material by grouping questions into coverage, measurement, and processing errors. Likely, processing errors are present in the coverage and measurement error topics, but we cannot always easily disentangle processing errors from these other error sources.

## Coverage Errors

### Registration Status

Eight (2.0%) of the respondents sampled who confirmed other personal identifying information reported they were not registered to vote in Florida. Upon further questioning,

five reported being registered in the past year, and two reported being registered within the past 3 years. None reported being registered to vote in another state or Florida county. It is possible that these respondents mistakenly thought they had been removed from the voter rolls.

## Measurement Errors

### Name

Four of our respondents (1.0%) reported that their name was listed incorrectly. Two are likely processing errors: one reported not having a middle name, though one was recorded in the voter file and another reported their first name was misspelled. The other two are likely measurement issues: two women reported a different last name than what was recorded on the official voter file, which could be due to a marriage or divorce, although we did not include a follow-up question to that effect.

### Addresses

Incorrect information may be indicators of poor data integrity. In our phone survey, we find that 22 respondents, or 5.5% of the respondents who answered that question, reported a different physical address than the one recorded in the voter file. Measurement error explains if a voter's address was accurate at the time of registration, but has since changed; however, processing error explains if a voter may have provided the wrong address at the time of registration, or the transcriber may have incorrectly input the wrong address from the registration form. Our findings indicate that when address errors are scaled nationally, there may be millions of similar problematic records.

### Gender

Thirteen respondents (3.2%) reported that the gender designation in the voter registration record was incorrect. Of these, 12 were recorded with an "unknown" gender, but they provided a male or female response in our survey. The "unknown" gender on the official administrative record could be indicative of a respondent having an ambiguous or nonbinary gender at the time of registration, but it is more likely the result of an applicant simply failing to mark a response to the optional gender question. Although most new registrants provide an answer to the gender question, as we noted above, the gender "M" and "F" response boxes are small and are not positioned near other required information on the form. Applicants may thus inadvertently miss this question, fail to interpret the abbreviations "M" and "F," or simply choose to skip this question as it is optional.

### Race

The most frequent verification failure in our survey is with respect to race and ethnicity. As noted above, the Florida

voter registration application offers six closed-ended response items to a single race and ethnicity question, plus an "Other" option with a very small box to write in one's racial identification, while the National Voter Registration Form instructs registrants who opt to answer this question to write in one of the same seven options (including "other," but with no additional space for a more specific response). Some 96.2% of all registrants supplied an answer corresponding to one of the six provided categories, 1.5% checked "other," and 2.3% skipped the question on the registration form. In our survey, we first asked respondents to self-identify their race and ethnicity with response items identical to those on the voter registration form. Respondents who did not verify being "Hispanic" were asked a separate Hispanic ethnicity question. In response to our question that mimicked the question on the registration application, 37 of the 402 (9.2%) respondents initially reported a race or ethnicity that did not match their registration. Five respondents who were recorded as Hispanic in the voter file self-reported an identification other than Hispanic, but all five self-identified as Hispanic in response to our follow-up question. Similarly, we observed 22 of the 37 inconsistent self-reports were for registrants listed in the voter file as "Multiracial" or "Other." Thus, a majority of the inconsistencies were from respondents with multiple identifications, either Hispanics who also identify as Black or White, or people who reported a mixed racial heritage. Those voters might have provided truthful answers (or considerations) on both the registration form and in our survey, as different identifications may have been salient (or made salient by the question format) to the registrant between the time of registration and the time of the survey.

### Party Registration

Party registration is also a voluntary category on the voter registration form. Thirteen of 402 (3.2%) respondents failed to verify their party registration. There were no clear patterns among these respondents, as three reported their correct party registration was Democrat, four reported Republican, four reported No Party Affiliation, and one reported a Minor party affiliation. The initial registration dates for these respondents ranged from 1958 to 2016, or from 1 to 59 years prior to our survey. The median respondent in this group registered in 2007, so it is likely intervening party system dynamics in Florida results in mismatches between these voters' original party registrations and their current party identifications. Notwithstanding, Florida's status as a closed-primary state means that these voters will not be able to participate in their preferred party's primary.

### 2016 General Election Vote

Most surveys estimate a greater percentage of individuals reporting voting than aggregate statistics indicate. While a

number of factors contribute to this phenomenon, overreporting (nonvoters claiming to have voted) usually accounts for most of the gap between actual and reported turnout (Jackman, 2019). Our survey fits this pattern, as 14 respondents who self-reported 2016 general election participation did not have a vote history record in Florida, while only one respondent reported not voting when a voting record existed. Our novel finding is that five of these 14 "overreporters" said they voted in another state. While we did not verify whether they actually voted outside of Florida, this does suggest some overreporting in election surveys may be attributed to respondents registering and voting elsewhere, for whatever reason. An important implication is vote-validation research finding overreporters tend to be high propensity voters (Ansolabehere & Hersh, 2012), but this may be an artifact of people truthfully reporting their vote, but in another state.

## Processing Errors

### Birthdate

Anticipating that many respondents may be concerned about potential identity theft, we asked three sequential questions regarding birth year, birth month, and birthday rather than asking directly respondents to confirm their recorded birthdate. Sixty respondents refused to answer any of these questions. Among the 342 valid responses to these questions, 11 (3.2%) responded with information inconsistent with their voter registration record. Some responses appear to be processing errors, with a single incorrect digit in a day or a year.[3]

## Discussion

Big data provide opportunities for small errors. We find in our phone survey of Florida's voter registration database that 17.7% of survey respondents sampled from the Florida voter file failed to verify at least one piece of their identifying information on their voter registration record: name, birthdate, address, gender, or race. This rate is similar to a 2010 mail-back survey in Florida finding 18% of respondents failed to verify similar information, in addition to vote history and race (Ansolabehere et al., 2010). We recognize our survey is limited in that we collected only 402 respondents, but the identified errors in our small sample is troubling if we scale these errors to the hundreds of millions of records nationally. Nevertheless, there are two advantages to our adaptive survey design approach when probing why respondents fail to verify their voter registration records. First, we have greater confidence that issues we observe are not caused by random respondent errors when they provide a causal justification for erroneous data on their record. Second, we can better understand the data-generating process that leads to potential recording errors on registration files.

The proportions of errors that Ansolabehere et al. (2010) and we find in any one field (race, birthday, vote history) are small, but they suggest caution for both researchers and

election administrators (Ansolabehere & Hersh, 2014). The TSE framework can alert researchers to the presence of measurement error in concepts like self-identified party registration, race, and gender on voter registration forms. Responses to questions about racial identity not only produce the most frequent verification failures, they also reflect a troubling aspect of the reliability of these data. Southern states tend to ask registrants' race so that these states, the Department of Justice, and the courts can use these data to evaluate when there are voting rights violations. If registration records do not accurately reflect how many registrants who are members of protected groups identify themselves, these data are less helpful in monitoring and enforcement.

Examining the accuracy of voter registration records from the TSE framework of processing error is another area worthy of study, which may help election administrators improve voter file accuracy. In many ways, filling out a voter registration form is akin to filling out a ballot (Kimball & Kropf, 2005; Kropf & Kimball, 2012). Considering them as a survey may yield low cost solutions that improving election administration and avoiding high costs. For example, understanding how sources of voter registration input (from motor vehicle offices, registration drives, or paper or online registration) affect error rates can illuminate trade-offs between costs and data quality. Survey methodologists find questionnaire design and mode affect data quality (Dillman & Christian, 2005), which suggests that different modes of data collection by paper, online registrations, and interactions with humans, such as department of motor vehicle (DMV) clerks or campaign workers, might affect processing error rates and measurement error biases. But there are trade-offs with the TSE framework, including constraints such as "costs, ethics, and time" (Lyberg & Weisberg, 2016, p. 27). Thinking of the voter registration application as a survey instrument thus helps illuminate potential biases of these data, assists in creating more savvy consumers of these data, and more reliable records for election administration.

### Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

### Funding

The author(s) disclosed receipt of the following financial support for the research, authorship, and/or publication of this article: The University of Florida's Informatics Institute provided a $50,000 seed grant to conduct the survey for this study.

### ORCID iDs

Enrijeta Shino [iD] https://orcid.org/0000-0003-1941-8012
Daniel A. Smith [iD] https://orcid.org/0000-0003-0621-1098

### Supplemental Material

Supplemental material for this article is available online.

## Notes

1. Florida's voter registration form is available at https://register-tovoteflorida.gov/en/Registration/Index. The 2013 version was replaced by a new form in July 2019.

2. We conducted our survey in English and Spanish. Although there are pockets of Haitian Creole speakers in Florida, in a recent statewide consumer confidence survey conducted by the same firm, 36% of the "language unable" contacts were French or Creole speakers, and that fewer than 10 potential respondents are excluded from a typical 500-complete study per month on the basis of language. All surveys have trade-offs; we do not think that the lack of a Creole-language survey affects our results.

3. In addition, 145 of the more than 13 million registrants in the voter file had birth years prior to 1903. These erroneous birth-dates likely result from legacy records, transcription, or other processing errors.

## References

Ansolabehere, S., Doherty, D., Hersh, E., & Gerber, A. (2010, June 8). *Voter registration list quality pilot studies*. Caltech/MIT Voting Technology Project Report.

Ansolabehere, S., & Hersh, E. (2012). Validation: What big data reveal about survey misreporting and the real electorate. *Political Analysis*, 20(4), 437–459.

Ansolabehere, S., & Hersh, E. (2014). Voter registration: The process and quality of lists. In B. C. Burden & C. Stewart, III (Eds.), *The measure of American elections* (pp. 61–90). Cambridge University Press.

Berent, M. K., Krosnick, J. A., & Lupia, A. (2016). Measuring voter registration and turnout in surveys: Do official government records yield more accurate assessments? *Public Opinion Quarterly*, 80(3), 597–621.

Burden, B. (2014). Registration and voting: A view from the top. In B. C. Burden & C. Stewart, III (Eds.), *The measure of American elections* (pp. 40–60). Cambridge University Press.

Dillman, D. A., & Christian, L. M. (2005). Survey mode as a source of instability in responses across surveys. *Field Methods*, 17(1), 30–52.

Elmagrmid, A., Ipeirotis, P., & Verykios, V. (2007). Duplicate record detection: A survey. *IEEE Transactions on Knowledge and Data Engineering*, 19(1), 1–16.

Fraga, B. L., Holbein, J. B., & Skovron, C. (2018). *Using nationwide voter files to study the effects of election laws* [Paper presentation]. *ESRA*, *Madison, Wisconsin*.

Gerber, A., & Green, D. (2000). The effects of canvassing, telephone calls, and direct mail on voter turnout: A field experiment. *American Political Science Review*, 94(3), 653–663.

Groves, R. M., & Lyberg, L. (2010). Total survey error: Past, present, and future. *Public Opinion Quarterly*, 74(5), 849–879.

Guttman, L. (1945). A basis for analyzing test-retest reliability. *Pyschometrika*, 10(4), 255–282.

Harris, D. R., & Sim, J. J. (2002). Who is multiracial? Assessing the complexity of lived race. *American Sociological Review*, 67(4), 614–627.

Holbein, J. B., & Hillygus, D. S. (2016). Making young voters: The impact of preregistration on youth turnout. *American Journal of Political Science*, 60(2), 364–382.

Jackman, S. (2019). Why does the American national election study overestimate voter turnout? *Political Analysis*, 27(2), 193–207.

Kimball, D. C., & Kropf, M. (2005). Ballot design and unrecorded votes on paper-based ballots. *Public Opinion Quarterly*, 69(4), 508–529.

Kropf, M., & Kimball, D. C. (2012). *Helping America vote: The limits of election reform*. Routledge.

Lyberg, L., & Weisberg, H. (2016). Total survey error: A paradigm for survey methodology. In C. Wolf, D. Joye, T. W. Smith, & Y. Fu (Eds.), *The Sage handbook of survey methodology* (pp. 27–41). SAGE.

McDonald, M. P. (2007). The true electorate: A cross-validation of voter file and election poll demographics. *Public Opinion Quarterly*, 71(4), 588–602.

Ochsner, N. (2016, July 27). Records show Charles Jeter 2004 "vote" marked in error. *WBTV*.

Shino, E., & Smith, D. A. (2018). Timing the habit: Voter registration and turnout in the American states. *Electoral Studies*, 51, 72–82.

Silver, B. D., Anderson, B. A., & Abramson, P. R. (1986). Who over-reports voting? *American Political Science Review*, 80, 613-624.

Traugott, M. W., Traugott, S., & Presser, S. (1992). *Revalidation of self-reported vote* (NES Technical Report Series, nes010160). ANES.

Weisberg, H. (2005). *The total survey error approach*. University of Chicago Press.

## Author Biographies

**Enrijeta Shino** is an assistant professor of Political Science at the University of North Florida. Her research interests fall broadly into the filed of elections, public opinion, and methodology. For more see https://enrijetashino.github.io.

**Michael D. Martinez** is a professor of Political Science at the University of Florida. His research interests fall broadly into the field of electoral behavior and public opinion. For more see http://users.clas.ufl.edu/martinez/about.html.

**Michael P. McDonald** is an associate professor of Political Science at the University of Florida. His research interests fall broadly into the field of elections and methodology. For more see https://polisci.ufl.edu/michael-mcdonald/.

**Daniel A. Smith** is a professor of Political Science at the University of Florida. His research interests fall boardly into the field of state politics, direct democracy, and voting rights and elections. For more see https://people.clas.ufl.edu/dasmith/.

Supplemental and Rebuttal Expert Report Submitted on Behalf of

*Florida State Conference of NAACP v. Lee*, 4:21-cv-187-MW-MAF,

and *Florida Rising Together v. Lee*, 4:21-cv-201-MW-MJF

Daniel A. Smith, Ph.D.*

October 13, 2021

Daniel A. Smith, Ph.D.

---

*Professor and Chair of Political Science, University of Florida, and President, ElectionSmith.

1 **EXHIBIT 6**



# Contents

I Introduction     3

II Conclusions from my expert report not challenged by the Lockerbie Report, the Moreno Report, or the Kidd Report     4

III Response to the Lockerbie Report     5

IV Response to the Moreno Report     22

V Response to the Kidd Report     23

VI Analysis of Additional Data or Information from Supervisors of Elections in Discovery or in Depositions     23

VII Conclusion     29

# I  Introduction

**1**     In the matter of *Florida State Conference of NAACP v. Lee*, 4:21-cv-187-MW-MAF, and *Florida Rising Together v. Lee*, 4:21-cv-201-MW-MJF, I authored an Expert Report dated September 1, 2021.

**2**     Defendants submitted three reports that to varying degrees address my expert report: one by Dr. Brad Lockerbie, one by Dr. Dario Moreno, and one by Dr. Quentin Kidd. I refer, respectively, to the three reports as the Lockerbie Report, the Moreno Report, and the Kidd Report.

**3**     I begin by summarizing the key analyses and conclusions in my expert report. I first respond to the Lockerbie Report regarding all the references Dr. Lockerbie makes to my expert report. I then respond to the Moreno Report as far as it purports to discuss the impact of SB 90 and the impact of "boleteros." Finally, I respond to the Kidd Report, although Dr. Kidd makes no specific reference to my expert report.

**4**     Because a few of the Supervisors of Elections (SOEs) amended their data, affidavits, or declarations as part of the discovery process *after* September 1, the date of my expert report, I also take this opportunity to consider these additional materials as they are relevant to my original report. Considerations of these additional materials reinforce my original conclusions.

**5**     In formulating my opinions, I utilize the same methods as in my original report. These methods are informed by standard sources and methodologies used in political science

analyses. My background and qualifications, in addition to my curriculum vitae and rate of pay, are included in my original report. My compensation is contingent neither on the results of the analyses described herein nor on the contents of my report.

## II  Conclusions from my expert report not challenged by the Lockerbie Report, the Moreno Report, or the Kidd Report

**6**     Drawing on an array of statewide and county data sources, my September 1, 2021 expert report offers several findings concerning the overall impact SB 90 has on Florida voters, and specifically, the disparate impact SB 90 has on people of color as well as those with disabilities in Florida. Dr. Lockerbie Dr. Moreno and Dr. Kidd do not dispute the following findings in my report:

A.  Persons of color rely more heavily on 3PVROs when registering to vote than other groups of voters and SB 90's limits placed on 3PVROs will result in Black and Hispanic eligible Florida citizens having fewer opportunities to register to vote.

B.  SB 90's new exact-match ID requirements placed on registered voters who want to request a Vote-by-Mail (VBM) ballot disproportionately affects voters of color and will lead to fewer opportunities for Black and Hispanic registered voters to receive a VBM ballot.

C.  SB 90 cuts in half the length of time a voter may have a standing request to have a VBM ballot mailed to them and will result in thousands of registered voters having fewer opportunities to receive a VBM ballot.

D.  Limits that SB 90 place on the locations, dates, and hours of operation of VBM ballot drop boxes will result in all Florida voters, but particularly voters of color, having fewer

4

opportunities to securely return their VBM ballots in person.

E. SB 90's restrictions on the return of VBM ballots for voters in need of assistance will lead to all voters, but particularly voters of color and those with disabilities, having fewer opportunities to return their VBM ballots.

F. SB 90's restrictions on providing aid and comfort to voters waiting in lines during early in-person voting or on Election Day will result in all Florida voters, but particularly voters of color and those with disabilities, having to face higher barriers to cast their ballots in person, potentially causing them not to vote at all.

# III   Response to the Lockerbie Report

**7**    Dr. Lockerbie (Lockerbie Report, paragraphs 34 - 50) offers a series of critiques of my expert report. I enumerate and address each of his points sequentially.

## III.I  "34. In section IV, number 18, Smith implies that any limits on drop boxes are discriminatory. No basis is provided for this assertion."

**8**    Dr. Lockerbie mischaracterizes my summary conclusion statement while ignoring the body of my report. In fact, I provide thorough documentation in my report regarding the impact of SB 90's drop box restrictions, on Florida voters generally, and in particular on Black and Hispanic voters. Section X of my expert report provides extensive evidence of how SB 90's restrictions on VBM drop boxes decrease the opportunities of voters, including persons of color and individuals with disabilities, to return their VBM ballots. Contrary to my report, in which I document the usage of drop boxes by some 1.5 million Florida voters in

the 2020 General Election, including by voters of color, and how SB 90 will curtail in whole or in part the deployment of VBM drop boxes in future elections, Dr. Lockerbie cites no scholarship and no empirical evidence to challenge my findings, namely, that limiting VBM drop boxes will negatively affect Florida voters in general, and racial and ethnic minority voters in particular.

**9**     In my expert report (Section X, paragraphs 122 - 223) I provide an extensive review of the scholarly literature on VBM drop boxes. I then draw on administrative data provided by Florida SOEs in discovery to analyze the usage of VBM drop boxes in the 2020 General Election. I provide empirical evidence, drawing on data from the Florida counties that provided racial/ethnic data in discovery, showing that Black and Hispanic voters were more likely to return their VBM ballots via drop boxes on days/times that SB 90 curtails in whole or in part. I also provide evidence from the affidavits and interrogatory responses of the SOEs regarding their expectations of how SB 90 will affect their deployment of VBM drop boxes in future elections, underscoring their concern that drop box usage will be curtailed in future Florida elections.

**10**     Dr. Lockerbie does not dispute my finding that over 120 VBM drop boxes deployed by SOEs in the 2020 General Election will likely be curtailed in whole or in part under SB 90. Dr. Lockerbie also does not dispute my finding that SB 90 will reduce the opportunities of Florida voters generally, and racial and ethnic minority voters in particular, to return their VBM ballots in future elections.

**III.II  "35.  In section IV, number 21, he says 'an increase in the cost of voting can lead to voter disenfranchisement.'  Note the conditional nature of his statement."**

**11**      In contrast to Dr. Lockerbie's report, my report is well grounded in the scholarly literature on the "cost of voting" (see paragraph 21 of my Expert Report).  As a political scientist, Dr. Lockerbie is certainly aware of this prevailing analytical framework to understand the calculus of voting, and he does not challenge it.  There is extensive empirical literature in political science that is grounded in the calculus of voting if sometimes implicitly (e.g., Aldrich 1993; Verba, Schlozman & Brady 1995; Brady & McNulty 2011; Herron & Smith 2013a; Leighley & Nagler 2013; Biggers & Smith 2018; Li, Pomante II & Schraufnagel 2018).

**12**      To Dr. Lockerbie's point, it is theoretically possible that an increase in the cost of voting might not lead to voter disenfranchisement; my report, however, examines the specific effects of SB 90, and I find that SB 90 does have a negative effect on Florida voters generally, and on voters of color specifically.  The conditional nature of the cost of voting does not affect the specific findings documented in my expert report with respect to SB 90, or my overall conclusion that SB 90 places additional burdens on Floridians, particularly people of color.

**13**      As I show in my expert report, the increase in the cost of voting under SB 90 is clear.  Dr. Lockerbie does not challenge my findings that the legislation burdens Floridians wishing to register to vote and to cast a ballot, or my findings that these burdens fall disproportionately on racial and ethnic minorities and on disabled voters.  Specifically, Dr. Lockerbie does not challenge my findings that SB 90 increases the cost of voting for individuals who rely on 3PVROs when registering to vote, that it increases the cost of voting for

registered voters who do not have a Social Security number, driver's licence, or a state ID number on file, that it increases the cost of voting for registered voters who no longer can have a standing request to have a VBM ballot mailed to them, that it increases the cost of voting for voters who rely on VBM ballot drop boxes to return their mail ballots, that it increases the cost of voting for voters who need assistance to return their VBM ballots, and that it increases the cost of voting for voters waiting in line to cast a ballot in person who may need assistance.

### III.III   "36. In section IV, number 25, he neglects to consider that VBM increased because of COVID."

**14**     The use of VBM ballots increased in the 2020 General Election, in Florida and in other states, in part due to the COVID-19 pandemic. This is documented in my expert report (see paragraphs 52 - 54, and Table 5), and is also well documented by scholars, including in my recent peer reviewed article focusing on the increased use of VBM in Florida (Cottrell, Herron & Smith 2021*a*) as well as in a report I authored following the election (Smith 2021). That record numbers of Black and Hispanic voters utilized a method of voting that is arguably safer during a pandemic raises further questions about the decision of the Republican legislature to curtail VBM ballots in the future. Whether or not VBM use in Florida increased because of COVID, the costs that SB90 imposes on using VBM as a voting method remain the same, and those costs are imposed disproportionately on people of color and people with disabilities.

III.IV    "37.  In section IV, number 31, he notes that the modal
         response for referrals for illegal voting or registration was
         zero.  That does not tell us much at all.  Given that this
         is an interval measure, he could have presented the mean.
         If the distribution is highly skewed, he could present the
         median."

**15**    My expert report provides the modal response from SOEs to the House of Representatives PIE Committee's questionnaire regarding the number of referrals made in the past four years to "the state attorney's office for illegal registration or voting practices." As I report in footnote 5 (p. 21) of my expert report, the modal response from SOEs in response to this question is zero (0).

**16**    Dr. Lockerbie says that I "could have presented the mean." I have calculated the mean response of SOEs who responded to the PIE Committee's questionnaire. The mean response is 4.3 cases referred to state attorneys over the past four years. Dr. Lockerbie is correct that the distribution is highly skewed. This is because a majority of SOEs have referred zero cases of fraud to a state attorney's office over the past four years. I also have calculated the median response of the SOEs who responded to the questionnaire. The median response is zero (0) cases referred to state attorneys over the past four years. Given that there are over 15 million registered voters in Florida and over 11 million who voted in the 2020 General Election, by the SOEs' own accounting, over the past four years there is imperceptible "illegal registration or voting practices" occurring in Florida.

III.V "38. In section VI, number 37, he states that the drop in registration after the 2011 change in the law for Blacks was the only significant drop among racial/ethnic groups. He does not tell us how big the drop was. Also, it would be important to know if the drop for Blacks was significantly different than the drop for the other groups."

**17** As reported in my 2013 peer reviewed article with Dr. Michael Herron (Herron & Smith 2013*b*), the proportional drop off in voter registrations for Black and Hispanic voters was significantly greater than for white voters following the implementation of HB 1355. Using a standard difference-in-difference approach, we find that voter registrations across Florida dropped in the second half of 2011 (after the implementation of HB 1355) compared with new voter registrations in the second half of 2007 for Black, Hispanic, and white individuals. Our statistical models find that the only significant difference in the registration drop from 2007 to 2011 was for Black ("African American") individuals.

III.VI "39. In section VI, number 44, he argues that the online voter registration system has been plagued with problems. It has crashed at least five times from 2017 to 2020. Calling five crashes of indeterminant [sic] length plagued with problems is more than a bit of a stretch."

**18** According to media reports, the Division of Elections online voter registration system has crashed *at least* five times. More critical than the number of times the system has crashed is the *timing* of these system crashes. As I write in paragraph 44 of my expert report, "[t]he state's online voter registration system has crashed at least five times since 2017. Most recently, the online voter registration portal crashed on the final day before the state's book closing in October 2020." As Judge Mark E. Walker wrote in his Order on

10

Motion for Preliminary Injunction on October 9, 2020 in a lawsuit dealing with this latest online voter registration crash (Namphy, et a. v. DeSantis and Lee, Case No.: 4:20cv485-MW/MAF), "Florida has done it again. In the final hours of Florida's voter registration period, during an election year coinciding with a prolonged and incredibly damaging public health emergency, Florida's voter registration website crashed, effectively preventing thousands of potential voters from safely registering to vote before the midnight deadline" (pp. 1-2). Judge Walker concluded, "This case is about how a state failed its citizens. In this case, potential voters attempted to perform their civic duty, to exercise their fundamental right, only to be thwarted, once again, by a state that seemingly is never prepared for an election (p. 28)."

**19**    Florida's online voter registration system also crashed prior to the 2020 primary elections and was also down—apparently for routine maintenance, according to the Division of Elections—on National Voter Registration Day in 2019.[1] In addition, the state's online voter registration system failed in 2018—on October 9, the last day to register to vote for the midterm elections.[2]

---

[1]"A crashed voter registration website is Floridians' latest obstacle to the right to vote," *Vox*, October 9, 2020, available at `https://www.vox.com/recode/2020/10/6/21504401/florida-voter-registration-website-crash-right-vote-suppression` (last accessed October 3, 2021).

[2]"'A mess': Florida's online voter-registration system panned," *Politico*, October 9, 2018, available `https://www.politico.com/states/florida/story/2018/10/09/a-mess-floridas-online-voter-registration-system-panned-641953` (last accessed October 3, 2021).

**III.VII** **"40. In section VII.V.6, number 89 and Table 11, the numbers are more than a bit confusing. In 2020, for example, it looks like 427 Blacks registered without a driver's license or Social Security card and that constitutes 10.62 percent of the Blacks who registered."**

20      Dr. Lockerbie finds Table 11 in my expert report "more than a bit confusing," but in fact, he has interpreted correctly. According to data provided by the Division of Elections ("LitigationRR_NoDL-SSN_20210722.txt"), in 2020 there were 427 Black individuals who successfully registered to vote notwithstanding their lack of a driver's license or a Social Security number, and that accounts for 10.62 percent of all Black individuals who successfully registered to vote from 2006 to 2020 who lacked a driver's license or Social Security number. The point of Table 11 (p. 63), as I write in my expert report, is twofold: first, that in "2016, 2018, and 2020, there were twice, and sometimes three times, as many new Black registrants as white registrants who were able to register without providing a driver's license or a Social Security number," as permitted by law, and second, "compared to white voters, in recent years, both the overall numbers and the relative rates of such new registrants are disproportionately more likely to be people of color." None of these individuals, all of whom legally registered to vote, will be able to request a VBM ballot under SB 90, as they do not possess an ID that can be matched to a record on the Florida Voter Registration System (FVRS). Dr. Lockerbie does not appear to challenge these conclusions.

## III.VIII   "41. In section IX.I, number 109, he states a lot of ballots were rejected for being late. For that to be meaningful, we would need to know when they were mailed."

**21**     A VBM ballot placed in a SOE's VBM drop box anytime prior to the close of polls on Election Day in Florida will be tabulated, whereas a VBM ballot placed in a mailbox, or delivered to a Post Office—even well before the close of polls on Election Day—may not be tabulated, as there is a possibility it will not arrive at the SOE office on time. As I write in my expert report in paragraph 109, "SB 90's limits on voters receiving assistance to return VBM ballots and on drop boxes increase the costs of voting for Floridians." I have written extensively elsewhere on the rejection rates of VBM ballots in Florida (Smith 2018; Smith & Baringer 2020; Smith 2021), including a recent peer reviewed article (Cottrell, Herron & Smith 2021*a*), as well as a peer reviewed article on postal delays affecting VBM ballots (Herron & Smith 2021).

**22**     My point, which Dr. Lockerbie does not appear to contest, is that reducing the availability of drop boxes will increase the reliance on mailing VBM ballots via the USPS, which is less reliable than returning VBM ballots via a drop box. Indeed, Lake County SOE Alan Hays, wrote in an email to other SOEs dated May 26, 2021, "Thanks to the so-called wisdom of our stellar legislature, those voters will now have to use the USPS box instead of our private box," which was a 24/7 VBM drop box located in front of his office. "I just hope USPS gets the ballots to us promptly," Hays continued, noting earlier in the email chain that the problem of late arriving VBM ballots in previous elections was not an issue when his staff was able to retrieve VBM ballots directly from the SOE's VBM drop box.[3]

---

[3]See email from Alan Hays to numerous SOEs and Ron Labasky, "Subject: Re: SB 90 Compliance for the Convenience of our Voters," May 26, 2021. Available in SOE Mark Earley's "Response to Plaintiffs' First Set of Interrogatories to Supervisor of Elections Defendants," p.

**III.IX**   **"42. In section X, number 123, he states that voters have come to depend on the convenience of drop boxes. A requirement that was put in place for the election 2020 would not appear to create dependence because it was only one election cycle carried out during a pandemic."**

23     Dr. Lockerbie's statement that Florida voters have not come to depend on VBM drop boxes is unfounded. Over 1.5 million voters used VBM drop boxes in the 2020 General Election, and thousands of voters across Florida have been depositing their VBM ballots in secure drop boxes for years, not only in November general elections, but in statewide primary elections, presidential primary elections, and local elections.

24     Contrary to Dr. Lockerbie's pronouncement, VBM drop boxes in Florida were *not* "put in place for the election 2020." Rather, many county SOEs have deployed VBM drop boxes for several election cycles, and in some counties, VBM drop boxes have been utilized by SOEs for more than a decade. Elections experts in Florida certainly recall when former Pinellas County SOE, Republican Deborah Clark, famously challenged a directive issued on November 25, 2013, by former Secretary of State, Scott Detzner, who was appointed by Republican Governor Rick Scott, that stated that SOEs "should not solicit return of absentee ballots at any place other than a supervisor's office."[4] SOE Clark stood up to the Secretary of State—who subsequently relented—and Pinellas County voters were permitted to drop off VBM ballots for a special congressional election at drop boxes stationed at "two libraries and three tax collector branch offices" in addition to the drop boxes located at "her three

---

221.

[4] Florida Department of State, "Directive 2013-01-Return of Absentee Ballots," November 25, 2013, available `https://files.floridados.gov/media/693333/sos_directive_2013-01.pdf` (last accessed October 3, 2021).

offices."[5]  By 2013, Pinellas County had already been offering voters the convenience of VBM drop boxes for six years. My research and investigation have not revealed a single instance of voter fraud or election security problems with VBM drop boxes in Pinellas County, which have been in use for over a decade. Similar to other counties, Hillsborough County also has used VBM drop boxes for roughly a decade. In the 2012 General Election, for example, Hillsborough SOE, Democrat Craig Latimer, "used 13 public libraries as sites where voters could drop off absentee ballots."[6]  Rather, by 2020, VBM drop boxes were commonplace across Florida counties, and Florida voters—and Florida SOEs—have come to depend on VBM drop boxes. "I'm at a loss for words," Pasco County SOE, Republican Brian Corley, said to the press in March 2021 after hearing that the state legislature was contemplating completely banning drop boxes. "It's a solution looking for a problem."[7]

## III.X  "43. In section X, number 127, he states that SB 90 curtails drop boxes because they had not been staffed in 2020.  He appears to neglect the possibility that they could be staffed in the future."

**25**    Dr. Lockerbie is apparently unfamiliar with the affidavits and interrogatory responses from SOEs that indicate which drop boxes in their counties they do not plan to staff in future elections. I use information from these affidavits and interrogatories as a basis for conclusions in my expert report. For example, in paragraph 127 in my expert report that

---

[5]"Gov. Rick Scott's administration eases showdown over Pinellas election," *Tampa Bay Times*, December 3, 2013, available `https://www.tampabay.com/news/politics/elections/bill-nelson-attacks-absentee-ballot-drop-off-edict-as-voter-suppression/2155369/` (last accessed October 3, 2021).

[6]"Ibid.

[7]"Florida may ban drop boxes used for mail-in ballots," *Politico*, March 9, 2021, available `https://www.politico.com/states/florida/story/2021/03/09/crackdown-coming-florida-may-ban-drop-boxes-used-for-mail-in-ballots-1367575` (last accessed October 3, 2021).

Dr. Lockerbie references, I state that SB 90 "curtails in whole or in part" 122 VBM drop boxes deployed in the 2020 General Election. This is because the "65 VBM drop boxes in 48 counties that were available 24/7 for voters to deposit their VBM ballots" as well as the "57 VBM drop boxes in 15 counties that were located at a SOE office (or a permanent SOE branch office) that were available to voters [in the 2020 General Election] on days either before of after EIP voting in the county, but not open 24/7" can only remain unimpacted if they are continually staffed in person with SOE personnel in future elections. It is clear from the affidavits and interrogatory responses of Florida SOEs—which I extensively document in my expert report—that this is highly unlikely to happen. I did not include in my count of impacted drop boxes in my expert report any instance where an SOE indicated specific plans to augment staffing so as to provide 24/7 staffing for a drop box in future elections. Indeed, I have not found any indication in the affidavits or interrogatory responses that SOEs plan to increase staffing to provide 24/7 drop boxes.

## III.XI   "44. In section XI, number 224, he argues that SB 90 restricts those waiting in line from receiving assistance. He does not take into [sic] the limitation might speed up the voting process."

**26**    Dr. Lockerbie provides no basis for his suggestion that restricting "line warming" (that is, the provision of material assistance, such as drink, food, seating, or shelter) might speed up the voting process. Dr. Lockerbie's logic seems to be that if assistance to people waiting in line to vote is limited, individuals who need assistance will renege, that is, leave the line, thereby shortening the wait times for the remaining individuals who are willing to endure a long line. Even more, limiting access to those in line could also cause potential voters who require assistance when waiting in line to balk, that is, not even join a queue in the first place, as they know they will not receive any assistance from groups providing

material assistance to help them endure long wait times. Dr. Lockerbie does not explain how restrictions on assistance will speed up voting, and provides no evidence in support of this proposition. Significantly, in legislative consideration of SB 90, I am not aware of any lawmaker who provided any evidence for this proposition; indeed, to my knowledge, there was no indication that the new law was motivated by a desire to speed up the voting process.

III.XII  **"45. In section XI.II, number 234, he cites Stewart and Ansolabehere's 2013 report to the U.S. Election Commission on Voting to assess why people did not vote and argues that people did not vote because of long lines. This work assumes that people were not giving what might be thought of as a socially acceptable excuse for not voting. Moreover, he does not note that Stewart and Ansolabehere state that differential wait times for blacks and whites are not the result of discrimination. Specifically, Stewart and Ansolabehere (2013, page 12) state: explain: [sic] 'This analysis suggests that minority voters do not tend to wait longer than white voters because of discrimination at the polls against individuals. Rather, the neighborhoods that have high minority populations tend to experience long waiting times for all voters in that neighborhood, regardless of the race of individual voters. Whites who live in racially diverse ZIP Codes wait to vote longer than whites who live in all-white neighborhoods; African Americans who live in predominantly white neighborhoods stand in shorter lines than African Americans who live in more diverse neighborhoods.'"**

27    Dr. Lockerbie makes two points regarding the working paper by Stewart III & Ansolabehere (2013) that I cite in paragraph 233 (and not paragraph 234 as Dr. Lockerbie incorrectly cites) of my expert report. Neither point is relevant to my findings concerning both the overall and the disparate impact of SB 90.

17

**28**    Dr. Lockerbie criticizes me for citing Stewart III & Ansolabehere (2013) because he suggests that some respondents in the two national surveys (the 2012 Voting and Registration Supplement (VRS) of the Current Population Survey (CPS) and the 2012 Cooperative Congressional Election Study (CCES) that they analyze for their study, "were not giving what might be thought of as a socially acceptable excuse for not voting," that is, that they "did not vote because of long lines." Dr. Lockerbie cites no scholarly articles to support his claim.

**29**    After criticizing their working paper for relying on survey data that might be susceptible to social desirability response bias, Dr. Lockerbie then proceeds to emphasize one of the findings from Stewart III & Ansolabehere (2013) to conclude that "differential wait times for blacks and whites are not the result of discrimination." Dr. Lockerbie's invocation of Stewart III & Ansolabehere (2013), it seems to me, is for the simple proposition that longer wait times in majority-minority precincts are not due to particularized discrimination against voters of color by poll workers or election officials with whom they interact, as voters of all racial and ethnic groups in precincts experience the same longer wait times in these majority-minority precincts. Dr. Lockerbie is knocking down a straw man. I have not claimed that long wait times are due to particularized discrimination against voters of color in minority-majority precincts. Rather, my contention, which Dr. Lockerbie does not appear to challenge, is that precincts with higher proportions of voters of color disproportionately face longer wait times, and so the impact of restrictions on line warming in Florida under SB 90 will disproportionately impact Black and Hispanic voters. The intent of poll workers in majority-minority precincts is irrelevant to my analysis.

18

**30** Furthermore, Dr. Lockerbie ignores several peer reviewed studies that find that Black and Hispanic voters are more likely to wait in lines at the polls than white voters. Studies drawing on survey data, like the Stewart III & Ansolabehere (2013) working paper, are not the final word on what voters are likely to experience with respect to wait times at the polls. Indeed, in one of my recent peer reviewed articles, I include a discussion of the Stewart III & Ansolabehere (2013) working paper in the literature review, noting its limitations.[8] Stewart III & Ansolabehere (2013) aggregate individual-level survey results up to the ZIP code level to determine the distribution of wait times, but their finding does not mean that precincts that have high concentrations of voters of color (but that also include some non-minority voters) have the same wait times as precincts that are all (or nearly all) comprised of white voters. ZIP codes are not precise measures of wait times at the polls. Scholars should be cautious when drawing conclusions concerning racial/ethnic differences from studies that use ZIP codes as the unit of analysis, as the geographic unit for voting an in-person ballot is not a ZIP code. Rather, voters cast ballots in their assigned precinct (on Election Day) or at an early voting location in their county on a given day. ZIP codes typically include dozens of precincts and can include multiple early voting locations, particularly in larger, more urban counties with sizeable minority populations. Precincts, and even early voting locations (particularly on a given day) tend to be much more homogeneous than a ZIP code, and often have very different associated wait times, despite all being located in the same ZIP code.

**31** When it comes to wait times in Florida, there is no need to rely on national survey data, like the Stewart III & Ansolabehere (2013) study, to know that Black and Hispanic voters are more likely to wait in long lines compared to white voters. Dr. Lockerbie is either

---

[8]"The utility of surveys in the study of voter wait times depends on a crucial assumption: voter self-reports of wait times are accurate." See (Cottrell, Herron & Smith 2021*b*, p. 113).

unaware of this scholarly literature or has chosen to ignore it. "In contrast to survey-based research," as I write in a recent peer review study (Cottrell, Herron & Smith 2021*b*, p. 113), "our design aimed at understanding the extent and consequences of voting lines draws on observed check-in times of voters in Florida who cast their ballots at early, in-person polling sites prior to the 2012 and 2016 General Elections." In this article, as well as in another peer reviewed article focusing on wait times in Florida (Herron & Smith 2015), both of which draw on administrative data from Florida counties, we find that Black and Hispanic voters in Florida are more likely to face longer wait times at the polls than white voters. These findings are bolstered by the peer reviewed work of Pettigrew (2017, 2021), as well as innovative peer reviewed research using smartphone data by Chen et al. (2019), who find that voters in predominantly Black neighborhoods are more likely to wait in line than voters in predominantly white neighborhoods.

**32**      In short, Dr. Lockerbie does not challenge the broad conclusion in my expert report that SB 90's restrictions on line support will disproportionately impact voters of color.

### III.XIII  "46.  They also add that it is unlikely that these longer wait times are 'because of widespread concerted efforts to lengthen waiting times in minority communities for partisan gains, since the local governments of most of these communities are controlled by Democrats.'"

**33**      This comment by Dr. Lockerbie in reference to the Stewart III & Ansolabehere (2013) study is a non-sequitur and is also not correct. Dr. Lockerbie's statement has no relevance to the impact that SB 90 will have on wait times for voters of color. The cause of persistently longer wait times in precincts with voters of color is irrelevant to the findings

of my expert report. My expert report shows that SB 90 disproportionately impacts Black and Hispanic voters who are more likely to face longer lines at the polls.

### III.XIV    "47.  In section XI.III, number 238 does not explain how the wait times were calculated."

**34**    Dr. Lockerbie notes that I do not explain how the wait times (for Miami-Dade County) are calculated. As clearly noted in paragraph 235 of my expert report, I relied on wait time data made available by the SOE of Miami-Dade County.

### III.XV    "48.  In section XI.III, number 240, he implies that those in line are out in inclement weather.  He does not tell us what proportion of the wait time is spent inside and what proportion is spent outdoors."

**35**    I am not sure what Dr. Lockerbie is referring to, as there is nothing in paragraph 240, or in any other paragraph of my expert report, concerning "inclement weather."

### III.XVI    "49.  In section XI.V.1, number 265, he does not tell us how accurate these estimates are."

**36**    As I note in my expert report (paragraph 260), the wait times I analyze were provided by the Lee County SOE in discovery.

III.XVII    "50.  In section XI.V.1, number 267, he notes again the
            150-foot buffer.  Presumably people in line outside the
            buffer can be approached.  It would be important to note
            how long the wait was once one gets within 150 feet."

**37**      Data on "how long the wait was once one gets within 150 feet" were not made
available to me by Florida's SOEs, but it does not change the fundamental point—which
Dr. Lockerbie does not challenge—that longer wait times in Florida are experienced dispro-
portionately by voters of color.

# IV    Response to the Moreno Report

**38**      Dr. Moreno offers a lengthy history of voting in Miami-Dade County which has
no relevance to the conclusions of my report or the specific provisions being challenged in SB
90.  Prior to the enactment of SB 90, Miami-Dade had a local ordinance to regulate vote-by-
mail processes.  As such, Dr. Moreno's conclusion that "SB90 is an appropriate response to
Florida's history of absentee ballot fraud, and it will not have racially discriminatory effects"
seems contrived, as it is not supported by his analysis of voting in Miami-Dade County.  Dr.
Moreno's analysis in fact demonstrates the absence of rationale for SB 90, since Miami-Dade
County already has a measure in place to address it.  Dr. Lockerbie does not provide any
basis for extrapolating his observations to other jurisdictions or the rest of the state.

**39**      With a few isolated exceptions, other Florida counties have not experienced prob-
lems with the collection of VBM ballots.  As I write in my expert report (paragraph 31, p.
21), "the SOEs' responses to the PIE Committee offered no evidence of 'ballot harvesting' in
previous elections."  In addition, based on the affidavits and interrogatory responses of SOEs

produced in discovery, I did not uncover a single case of a SOE reporting problems with so-called "ballot harvesting" in the 2020 General Election (see Section X of my expert report (pp. 95 - 120). Furthermore, none of the opposing experts (Dr. Moreno, Dr. Lockerbie, and Dr. Kidd) challenge my finding that there was no "ballot harvesting" in Florida's 2020 General Election, much less any fraud related to the requesting or returning of VBM ballots (at drop boxes or otherwise) in the 2020 General Election.

**40**　　Dr. Moreno's report does not address the actual impact of SB 90, and thus does not in any way refute the conclusions of my report.

# V　Response to the Kidd Report

**41**　　Dr. Kidd implies that if Florida's laws are in the mainstream of other states, then there is no impact or burden to SB 90. This is not the case. As I document extensively in my Expert Report, SB 90 has a significant and substantial impact on Florida voters generally, and on voters of color and voters with disabilities in particular. Dr. Kidd's report does not address the actual impact of SB 90, and thus does not in any way refute the conclusions of my report.

# VI　Analysis of Additional Data or Information from Supervisors of Elections in Discovery or in Depositions

**42**　　Several additional pieces of information were provided to me after I submitted my expert report on September 1, 2021.

## VI.I  Information pertaining to "PRR_NAACP_VoterDetail.txt"

**43**     It is my understanding that Miami-Dade SOE Christina White noted in her deposition on September 27, 2021, that the FVRS data ("PRR_NAACP_VoterDetail.txt") provided in discovery by the Division of Elections that contains a code for how an individual registered to vote, only captures the most recent event. This means, as I had surmised in my report (paragraph 41), that the number of individuals who have registered with 3PVROs in Florida is likely an undercount, as "[i]t is quite likely that some individuals who initially registered with 3PVROs, say in 2018, are no longer registered in Florida as of mid-2021, and as such, would not be found in the FVRS data from mid-2021" and that "[s]ome individuals who initially registered with 3PVROs likely updated their registration by another method, and as such, would not be found in the FVRS data from mid-2021," to say nothing of the "millions of Florida registrants who registered to vote prior to 2005, before the state started to record 3PVROs as a distinct method of registering to vote in the state."

**44**     I note here that I received the FVRS data ("PRR_NAACP_VoterDetail.txt") produced in discovery by the Division of Elections on August 26, 2021, from counsel, just days before my expert report was due.   It is clear from the FVRS ("PRR_NAACP_VoterDetail.txt") snapshot that it was produced by the the Division of Elections around August, 2021, so my calculations concerning the "more than 750,000 eligible citizens currently registered in Florida" who registered with 3PVROs (paragraph 42) is very recent.  Furthermore, my finding (paragraph 46) that "10.9 percent of the nearly 2.05 million Black registered voters"—more than 222,000 Black registered voters—"relied on 3PVROs when they joined Florida's voter rolls" and 9.6 percent of "the state's nearly 2.65 million Hispanic registered voters"—more than 253,000—"relied on a 3PVRO when registering to vote in Florida" is quite current.  In sum, as I write in my expert report (paragraph

24

46), and which is unchallenged by the opposing experts, the rates of Black and Hispanic individuals who registered to vote with a 3PVRO are "more than 5 times the rate of white individuals who relied on 3PVROs" when registering to vote.

## VI.II    Information pertaining to "PRR_NAACP_VoterDetail.txt"

**45**      In discovery, the Division of Elections produced a text file, "LitigationRR_NoDL-SSN_20210722.txt", which I surmised in my expert report (despite not having any supporting documentation) was a "a subset of the FVRS," and is "likely limited to registered voters with no driver's license and no Social Security number ("NoDL-SSN") on file with the Division of Elections" (paragraph 79). On September 20, 2021, Director Maria Matthews in her interrogatory response (p. 5) stated that it is indeed an extract of the FVRS that contains "all registered voters for whom FVRS does not record a driver's license number, state-issued identification card number, social security number, or the last four digits of the Social Security number for such voters." She continues, "This file does not include voters for which there is a response in these fields that has been found invalid." As I write in my expert report (paragraph 82), "Under SB 90, given the previous assumptions about what these data represent, none of these 586,788 registered voters would be able to successfully request a VBM ballot because they do not have a valid form of ID on file with the Division of Elections," even though "nearly 74 percent of these voters cast ballots in the 2020 General Election."

## VI.III    Additional information from SOEs not initially provided in discovery

**46**      The Bay County SOE, Mark Andersen recently produced a one page "Media Release" dated May 21, 2021, in response to an RFP. I reproduce the Bay County Media

Release in Figure 1, below.

Figure 1: Bay County Media Release, May 21, 2021

**Mark Andersen**
**Bay County**
**Supervisor Of Elections**



830 W. 11th Street
Panama City, FL  32401
**Phone:**  (850) 784-6100
**Fax:**      (850) 784-6141
**Cell:**     (850) 819-6933
**Email:**  baysuper@bayvotes.org

# Media Release

Contact: Mark Andersen, Bay SOE
Phone: (850) 784-6100
Cell:    (850) 819-6933

FOR RELEASE
10:15 AM, May 21, 2021

**Office Dropbox Removal**

- The Vote By Mail Drop Box outside of the Supervisor of Elections office has been removed.

- Due to Florida Senate Bill 90 expected to be signed by the Governor, the office will no longer be allowed to have the Vote By Mail Drop Box except during Early Voting Hours.

- Vote by mail ballots can be delivered inside the Supervisor of Election office during business hours.

**Media questions please contact Supervisor of Elections Mark Andersen at 819-6933**

-End-

**Page 1 of 1**                    **10109 REV E 03/04/13**

BAY000024

26

**47**    In his July 30, 2021 interrogatory response, SOE Andersen did not mention that Bay County had already planned on eliminating the "Vote By Mail Drop Box outside of the Supervisor of Elections office" "[d]ue to Florida Senate Bill 90 expected to be signed by the Governor." Quite the contrary. In his interrogatory response, SOE Andersen stated that VBM drop off locations "will be very close to what we have done in the prior election." This is clearly not the case. In the 2020 General Election, Bay County, as I state in my expert report (paragraph 206) offered a 24/7 drop box at the SOE office. That 24/7 VBM drop box will no longer be available to voters in Bay County. The SOE's Media Release also makes it clear that in future elections, VBM drop box will only be permitted "during Early Voting Hours." In the 2020 General Election, as I write in my expert report (paragraph 206), Bay County offered "drop boxes at all 13 of its Super Voting Centers on the Monday before Election Day, which is not an allowed EIP day under state statute." The new information from SOE Andersen confirms what I had surmised in my expert report, that opportunities for voters to return their VBM ballots in drop boxes will be curtailed in Bay County as a result of SB 90.

**48**    I recently received an amended interrogatory response from Manatee County SOE, Republican Michael Bennett, dated September 16, 2021. In this amended interrogatory response, SOE Bennett states, "However, because SB 90 requires drop boxes at elections offices to be continuously monitored in person by an employee of the Supervisor's office when accessible for deposit of ballots, the Supervisor does not at this time anticipate that he will continue to provide an outdoor drop box at the elections office on a twenty-four-hour, seven-day-a-week basis. Instead, the Supervisor expects to provide a continuously monitored outdoor drop box at the elections office during normal business hours." As I write in my expert report (paragraph 151), in the 2020 General Election, the VBM drop box in Manatee County was open 24/7, but that (paragraph 157) "SOE Bennett indicated that SB 90 has not

27

yet had an impact, and that he has made no decision on whether to allow VBM drop boxes beyond the mandated EIP time period." It is also my understanding that in the deposition of SOE Bennett taken on October 7, 2021, SOE Bennett said, "Any time you change the pattern of what people have been doing . . . people are going to find it inconvenient to do it another way." Based on this new information, it is clear that the opportunities for Manatee County voters to return their VBM ballots in drop boxes will be curtailed as a result of SB 90.

**49** It is my understanding that, in the deposition of SOE Bennett taken on October 7, 2021 SOE Bennett stated that VBM drop boxes in Manatee County were first installed in 2014, which once again contradicts Dr. Lockerbie's pronouncement that VBM drop boxes in Florida were "put in place for the election 2020."

**50** It is also my understanding that, in the deposition of SOE Bennett taken on October 7, 2021 SOE Bennett stated VBM ballots deposited in VBM drop boxes after-hours in the 2020 General Election were typically processed the next morning (or Monday morning if deposited over the weekend). The Manatee SOE staff would scan the VBM ballots to make sure they know the delivery date, including those deposited in the 24/7 VBM drop box. SOE Bennett also confirmed that most VBM ballots in the 2020 General Election were deposited in the county's 24/7 drop box, and that the county received many ballots in that box at night, which his staff took out of the box in the the morning and then scanned with a time stamp. This reaffirms the analysis in my expert report in Section X.III.2, "Manatee County VBM drop box returns after business hours, by race and ethnicity and disability status."

**51**     I also recently received an amended interrogatory response from Citrus County SOE, Maureen Baird, dated September 20, 2021.  In her amended interrogatory response, SOE Baird states, "As to the 24-hour drop-box previously located outside of the Supervisor's office in Crystal River, to ensure in person monitoring, it will be moved to within the office, and will be available during business/voting hours."  Based on this new information, I would add Citrus County to the list of counties in paragraph 203 of my expert report, that concludes: "In my opinion, because of these planned cutbacks on 24/7 VBM drop boxes in these four counties, SB 90 will increase the costs to voters in [Citrus,] Clay, Flagler, Glades, and Lafayette counties—including costs on their *time*, *transportation*, *information*, and *health*."

## VII   Conclusion

**52**     The three opposing experts—Dr. Lockerbie, Dr. Moreno, and Dr. Kidd— do not challenge the scholarly literature upon which I ground my analysis nor do they challenge any of my empirical findings on the impact that SB 90 will have on the voting rights all Florida voters, but particularly persons of color and individuals with disabilities.  There is nothing in the reports of Dr. Lockerbie, Dr. Moreno, or Dr. Kidd that has caused me to change my opinions in any way.

**53**     I reserve the right to continue to supplement my declaration in light of additional facts, data, and testimony.

# References

Aldrich, John H. 1993. "Rational choice and turnout." *American Journal of Political Science* (1):246–278.

Biggers, Daniel R. & Daniel A. Smith. 2018. "Does threatening their franchise make registered voters more likely to participate? Evidence from an aborted voter purge." *British Journal of Political Science* p. 1–22.

Brady, Henry E. & John E. McNulty. 2011. "Turning out to vote: The costs of finding and getting to the polling place." *American Political Science Review* 105(01):115–134.

Chen, M Keith, Kareem Haggag, Devin G Pope & Ryne Rohla. 2019. Racial Disparities in Voting Wait Times: Evidence from Smartphone Data. Technical report National Bureau of Economic Research.

Cottrell, David, Michael C. Herron & Daniel A Smith. 2021*a*. "Vote-by-mail ballot rejection and experience with mail-in voting." *American Politics Research* .

Cottrell, David, Michael C. Herron & Daniel A Smith. 2021*b*. "Voting lines, equal treatment, and early voting check-in times in Florida." *State Politics & Policy Quarterly* 21(2):109–138.

Herron, Michael C. & Daniel A. Smith. 2013*a*. "The Effects of House Bill 1355 on Voter Registration in Florida." *State Politics & Policy Quarterly* 13(3):279–305.

Herron, Michael C. & Daniel A. Smith. 2013*b*. "The effects of House Bill 1355 on voter registration in Florida." *State Politics & Policy Quarterly* 13(3):279–305.

Herron, Michael C. & Daniel A. Smith. 2015. "Precinct Closing Times in Florida During the 2012 General Election." *Election Law Journal* 14(3):220–238.

Herron, Michael C. & Daniel A Smith. 2021. "Postal delivery disruptions and the fragility of voting by mail: Lessons from Maine." *Research & Politics* 8(1).

Leighley, Jan E. & Jonathan Nagler. 2013. *Who Votes Now?: Demographics, Issues, In-*

*equality, and Turnout in the United States.* Princeton University Press.

Li, Quan, Michael J. Pomante II & Scot Schraufnagel. 2018. "Cost of Voting in the American States." *Election Law Journal* 17(3):234–247.

Pettigrew, Stephen. 2017. "The racial gap in wait times: why minority precincts are underserved by local election officials." *Political Science Quarterly* 132(3):527–547.

Pettigrew, Stephen. 2021. "The downstream consequences of long waits: How lines at the precinct depress future turnout." *Electoral studies* 71:102188.

Smith, Daniel A. 2018. "Vote-By-Mail Ballots Cast in Florida." `https://www.aclufl.org/sites/default/files/aclufl_-_vote_by_mail_-_report.pdf`.

Smith, Daniel A. 2021. "Casting, Rejecting, and Curing Vote-by-Mail Ballots in Florida's 2020 General Election." `https://allvotingislocal.org/wp-content/uploads/2021/03/031121_FL_VBM-Report_final.pdf`.

Smith, Daniel A. & Anna Baringer. 2020. "ACLU Florida: Analysis of Vote-By-Mail Ballots in the 2018 General Election." `https://www.aclufl.org/en/aclu-florida-report-vote-mail-ballots-2018-general-election`.

Stewart III, Charles & Stephen Ansolabehere. 2013. "Waiting in Line to Vote (White Paper)." *U.S. Election Assistance Commission* .

**URL:** *https://www.eac.gov/sites/default/files/event_document/files/Charles − Stewart − Waiting − in − Line − to − Vote − White − Paper.pdf*

Verba, Sidney, Kay Lehman Schlozman & Henry E. Brady. 1995. *Voice and equality: Civic voluntarism in American politics.* Cambridge, MA: Harvard University Press.