League of Women Voters of Florida, Inc.

vs.

Laurel Lee

---

Deposition of:

Sharon Austin

---

October 27, 2021

*Vol 1*

---



*Raising the Bar!*

Sharon Austin
October 27, 2021

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


LEAGUE OF WOMEN VOTERS OF |
FLORIDA, INC., et al., |
|
          Plaintiffs, | Case No.:
vs. |
4:21-cv-186-MW-MAF |
LAUREL M. LEE, in her official |   4:21-cv-187
capacity as Secretary of State |   4:21-cv-201
of Florida, et al., |   4:21-cv-242
|
         Defendants, |
and |
NATIONAL REPUBLICAN SENATORIAL |
COMMITTEE, et al., |
     Intervenor-Defendants. |
_____/


WEB CONFERENCE DEPOSITION

OF

SHARON AUSTIN, PhD


Wednesday, October 27th, 2021
10:04 a.m. - 4:16 p.m.


Location: Via web conference


Stenographically Reported Via Web By:
MaryKay Horvath, RMR, CRR, FPR
Certified Realtime Reporter


Job No.: 214976

Sharon Austin
October 27, 2021

```
 1    APPEARANCES: (all appearing via web conference)

 2

 3    On behalf of Plaintiffs Florida Rising:

 4         ARNOLD AND PORTER KAYE SCHOLER, LLP
           3000 El Camino Road
 5         Five Palo Alto Square
           Suite 500
 6         Palo Alto, California 94306
           (650)319-4500
 7         BY:  JEFFREY A. MILLER, ESQ.
           jeffrey.miller@arnoldporter.com
 8

 9

10    On behalf of Plaintiff LatinoJusticePRLDEF:

11         LATINOJUSTICEPRLDEF
           523 West Colonial Drive
12         Orlando, Florida 32804
           (321)418-6354
13         BY:  KIRA ROMERO-CRAFT, ESQ.
           kromero@latinojustice.org
14

15    On behalf of Defendant Secretary of State Lee:

16         HOLTZMAN VOGEL
           15405 John Marshall Highway
17         Haymarket, Virginia 20169
           (540)341-8809
18         BY:  DALLIN B. HOLT, ESQ.
           dholt@holtzmanvogel.com
19

20    On behalf of Defendant Attorney General Ashley
      Moody:
21
           OFFICE OF THE ATTORNEY GENERAL
22         PL-01 The Capitol
           Tallahassee, Florida 32399
23         (850)414-3300
           BY:  WILLIAM CHORBA, ESQ.
24         william.chorba@myfloridalegal.com
               BILAL FARUQUI, ESQ.
25         bilal.faruqui@myfloridalegal.com
```

Sharon Austin
October 27, 2021

```
 1    APPEARANCES (Continued):

 2
      On behalf of Okaloosa Supervisor of Elections:
 3
           NABORS, GIBLIN & NICKERSON, P.A.
 4         1500 Mahan Drive
           Suite 200
 5         Tallahassee, Florida 32308
           (850)224-4070
 6         BY:  KIRSTEN H. MOOD, ESQ.
           kmood@ngnlaw.com
 7

 8

 9    On behalf of Defendants Citrus and Brevard, DeSoto,
      Flagler, Gilchrist, Gulf, Highlands, Jefferson, and
10    Madison Counties Supervisors of Elections:

11         BELL & ROPER, P.A.
           2707 East Jefferson Street
12         Orlando, Florida 32803
           (407) 897-5150
13         BY:  ANNA E. ENGELMAN, ESQ.
           aengelman@bellroperlaw.com
14

15

16    On behalf of Defendant Alachua County:

17         ALACHUA COUNTY ATTORNEY'S OFFICE
           12 Southeast 1st Street
18         Gainesville, Florida 32601
           (352)374-5218
19         BY:  DIANA M. JOHNSON, ESQ.
           dmjohnson@alachuacounty.us
20

21

22

23

24

25
```

Sharon Austin
October 27, 2021

Page 4

```
 1    APPEARANCES (Continued):

 2

 3    On behalf of Intervenor-Defendant Republican
      National Committee/National Republican Senatorial
 4    Committee:

 5         SHUTTS & BOWEN, LLP
           215 South Monroe Street
 6         Suite 804
           Tallahassee, Florida 32301
 7         (850)241-1717
           BY:  AMBER S. NUNNALLY, ESQ.
 8         anunnally@shutts.com

 9

10    On Behalf of Defendants Glades, Hardee, Hendry,
      Holmes, Levy and Okeechobee Counties Supervisors of
11    Elections:

12         HENDERSON, FRANKLIN, STARNES & HOLT, P.A.
           1715 Monroe Street
13         Fort Myers, Florida 33901
           (239)344-1100
14         BY:  GERALDO F. OLIVO, III, ESQ.
           jerry.olivo@henlaw.com
15

16

17

18

19

20

21

22

23

24

25
```

Sharon Austin
October 27, 2021

```
 1                    I N D E X

 2

 3   Proceedings                                  Page

 4   SHARON AUSTIN, PhD                              6

 5   Direct              By Mr. Holt:               6
     Cross               By Mr. Miller:           223
 6   Redirect            By Mr. Holt:             232
     Certificate of Oath                          238
 7   Certificate of Reporter                      239

 8

 9                  E X H I B I T S

10   No.                                          Page

11    1   Printout from                             45
          https://www.census.gov/quickfacts/fact
12        /note/US/RHI62519

13    2   Table 6: Absentee Ballot Application     149
          Verification Rules Across the United
14        States

15    3   ACLU Florida Let FLorida Vote:           225
          Coronavirus is only the newest barrier
16        to voting in Florida

17    4   Florida Voter Registration Application   229
          Part 1 - Instructions (DS-DE 39,
18        R1S-2.040, F.A.C.)(eff. 10/2013)

19

20

21

22           (Stenographer's Note:  exhibits sent to
          stenographer electronically.  A digital exhibit
23        sticker was placed on the documents which were
          marked during the proceeding and retained by
24        stenographer.)

25
```

Sharon Austin
October 27, 2021

```
 1   The following proceedings began at 10:04 a.m.:
 2              THE STENOGRAPHER:  Would you raise your
 3        right hand?
 4              Do you swear or affirm that the testimony
 5        you're about to give will be true and accurate
 6        to the best of your ability?
 7              THE WITNESS:  Yes.
 8              THE STENOGRAPHER:  Thank you.
 9   Thereupon:
10              SHARON AUSTIN, PhD
11   having been first duly sworn, was examined and
12   testified as follows:
13              DIRECT EXAMINATION
14   BY MR. HOLT:
15        Q.   Okay.  Good morning, Dr. Austin.
16        A.   Good morning.
17        Q.   My name is Dallin Holt.  How are you
18   doing?
19        A.   I'm fine.
20        Q.   Excellent.  My name is Dallin Holt, and
21   I'm an attorney from Holtzman Vogel.  And I
22   represent the defendant -- one of the defendants in
23   the case, the Secretary of State, and I appreciate
24   you for joining us today.  I'm glad we were able to
25   get together from rescheduling from last week.
```

```
 1    Hopefully everything's okay.

 2            And we'll try to keep this short as

 3    possible, as far as the timing.  It's kind of hard

 4    to exactly know how long these will go.  I'll

 5    imagine I'd like to try for around three or four

 6    hours here, but we'll just kind of see where we're

 7    at.

 8            My plan is to start off with some general

 9    questions regarding yourself, your experience, and

10    then we'll dig into some specifics, some more

11    general matters under your expert report, and then

12    some specifics regarding SB 90 as we work through

13    this.

14            Would you please state and spell your full

15    name for the record.

16        A.   Sharon Wright Austin, S-H-A-R-O-N,

17    W-R-I-G-H-T, A-U-S-T-I-N.

18        Q.   Awesome, thank you.

19            And can everyone hear me?  I'm using some

20    headphones that sometimes have problems so if

21    anything goes out, please let me know.  Or if I'm

22    otherwise mumbly.

23            How many times have you been deposed

24    before, Dr. Austin?

25        A.   This is my first time.
```

Page 8

```
 1         Q.   Okay.  Well, I'm going to go through a few
 2   ground rules, then, just to kind of make sure we're
 3   all on the same page here.
 4              First off, I know we have a stenographer
 5   here, but is there anyone on this call that is
 6   recording these proceedings?  Okay.  I will assume
 7   that is a no.
 8              And, Dr. Austin, I know that Zoom has a
 9   mute function, but as we go through this today, I
10   would just ask that you do not use it unless we're
11   on break.  Is that okay?
12         A.   That's fine.
13         Q.   Okay.  And is there anyone else in the
14   room with you, who is not on camera?
15         A.   No.
16         Q.   Okay.  And will you let me know if someone
17   else does come in the room throughout this
18   deposition?
19         A.   I will.
20         Q.   Awesome.
21              And do you have any applications open on
22   your computer that someone could communicate with
23   you during your deposition?
24         A.   No, I don't.
25         Q.   Do you have a phone close by where someone
```

 1    can send you text messages or otherwise communicate

 2    with you?

 3         A.    I have a phone.

 4         Q.    Would you be able to disable the messaging

 5    function while we communicate?

 6         A.    Or I can just turn -- I can even just turn

 7    it off.  I just had it here.

 8         Q.    Yeah.  Whatever works best for you.

 9         A.    Okay.

10         Q.    And since we're on Zoom, I would just ask

11    that -- and I'll try to do the same, it's easier

12    said than done -- that we take extra care not to

13    speak over one another.  I'll try to wait a few

14    seconds, you try to wait a few seconds, that way we

15    can have a clear record of who's speaking; is that

16    okay?

17         A.    That's fine.

18         Q.    And while I know we're on video here, if

19    you could give me audible answers as we go through,

20    there will be a lot of yes or no, do you agree type

21    questions.  If you could audibly say yes or no as

22    opposed to shaking or nodding, that would be great.

23              Is that something you can do?

24         A.    Yes, that's fine.

25         Q.    Awesome.

Sharon Austin
October 27, 2021

```
 1              And do you understand that you are under

 2   oath today?

 3        A.    I do.

 4        Q.    The same as if you were sitting in a

 5   courtroom testifying before a judge?

 6        A.    I understand.

 7        Q.    Okay.  Now, if any of my questions are

 8   unclear as we proceed today, I would just ask that

 9   you ask me to rephrase, ask it in a different way so

10   it all makes sense.  Does that work?

11        A.    That's fine.

12        Q.    And if you answer a question, I'm going to

13   assume that you understood what I was asking.

14        A.    That's fine.

15        Q.    Does that make sense?

16        A.    Yes, that makes sense.

17        Q.    I want to make sure everything is clear to

18   you, that I'm not asking you to answer anything that

19   you don't understand.

20              Now, your attorney will likely object to

21   some things that I ask today.  Those typically come

22   in the form of what's called a form objection.

23   He'll say, objection, form.  There's a local rule in

24   this court that only permits form objections or

25   privileged objections.
```

Sharon Austin
October 27, 2021

```
 1              And so there won't be what's called --
 2    what you typically see in, you know, courtrooms or
 3    in the movies where there's long arguments over the
 4    objections.  Your attorney will simply say,
 5    objection, form, and then you can proceed and answer
 6    the question.  Those objections are for later
 7    proceedings.
 8              Does that make sense?
 9       A.   Yes, that makes sense.
10       Q.   Now, in the instance your attorney
11    instructs you not to answer due to something that's
12    privileged, then you can certainly follow your
13    attorney's advice.  I don't anticipate we're going
14    to have a lot of privileged objections, being as
15    we'll be discussing your expert report and your
16    opinions in this case, so...
17              Now, if there's any time, as we're getting
18    into this, that you need to take a break, please let
19    me know.  I'm more than happy to break for bathroom,
20    drinks, food, anything that comes up that you need
21    to break for, please let me know.  I want to make
22    sure you're fully able to answer the questions to
23    the best of your ability.  Is that okay?
24       A.   That's fine.
25       Q.   And then as far as breaking for lunch, I
```

Sharon Austin
October 27, 2021

```
 1    guess my plan is let's proceed for the next few
 2    hours and kind of see where we're at, and then you,
 3    with your counsel, can make a decision of if you
 4    want a lunch break and how long that would be.  Does
 5    that work, if we go for the next couple hours and
 6    then make that decision then?
 7         A.   That will be fine.
 8         Q.   Okay.  All right.  And finally, are you on
 9    any type of medication today that would affect your
10    ability to answer questions fully and truthfully and
11    understand what we're talking about?
12         A.   No.
13         Q.   Okay.  And is there any other reason or
14    things that I should be aware of that would affect
15    you from being able to truthfully and fully
16    understand and answer questions today?
17         A.   No.
18         Q.   Okay.  Awesome.
19              Now, other than conversations with your
20    attorneys in this case -- your attorney and
21    attorneys that hired you in this case, what did you
22    do to prepare for today's deposition?
23         A.   I read over my report, and also my
24    responses.
25         Q.   Okay.  Did you review any of the reports
```

Sharon Austin
October 27, 2021

1    that you referenced that you relied on in forming

2    your opinion?

3         A.   Can you explain -- do you mean the sources

4    that I used?

5         Q.   Yes.  You attached an exhibit to your

6    report with a lengthy list of sources that you

7    relied on and reviewed.  Did you review any of those

8    specifically?

9         A.   I mostly looked at the report, and I

10   didn't really have a lot of time to look at the

11   sources.  But I'm familiar with all of them.

12        Q.   Okay.  Did you review any other documents

13   aside from your report, then?

14        A.   I just looked at my report and the -- the

15   response that I wrote to the other professors.

16        Q.   Okay.  Awesome.

17             And have you spoken to anyone besides your

18   attorneys to prepare for today?

19        A.   Can you explain what you mean?  You mean

20   my -- can you explain what you mean.

21        Q.   Did you consult with any of your

22   colleagues, any of -- anyone else about how today

23   would go, about how you should answer questions?

24   Aside from the plaintiffs' attorneys or your

25   attorney in this case.

Sharon Austin
October 27, 2021

1    A.   No.

2    Q.   Okay.  Now, I've reviewed your CV that you

3    provided.  I appreciate you providing that, so

4    there's no need to go through in excruciating

5    detail, but if you wouldn't mind, if you could just

6    walk me through your educational background, kind of

7    how you arrived at where you're at today, that would

8    be great.

9    A.   Well, I guess you mean from high school?

10   I graduated from high school, valedictorian of my

11   high school.  And I then graduated from Christian

12   Brothers University with a bachelor's degree in

13   history, a minor in political science.

14           And I then graduated from Memphis State --

15   well, it's University of Memphis now but it was

16   Memphis State when I was there.  I earned a master's

17   in political science and a minor in education.  And

18   I then graduated from the University of Tennessee,

19   Knoxville with a doctorate in political science.

20   Q.   Okay.  Awesome.

21           And following your graduation with your

22   doctorate in political science, what was your first

23   faculty position and kind of where has your

24   professional career taken you to where you're at

25   today in the University of Florida?

Sharon Austin
October 27, 2021

```
1       A.    My first faculty position -- actually I
2   started with what's called ABD, all but
3   dissertation, when I was finishing -- I finished my
4   coursework and been admitted to candidacy and
5   finished my exams, and I started at the University
6   of Louisville in the fall of 1992.
7             I earned my doctorate in August of 1993
8   and remained at Louisville.  So I began my career
9   there and stayed there for three years, and then
10  after I left the University of Louisville I was in
11  the Department of Pan African studies and my
12  emphasis was there.  And then after that, I went to
13  the University of Missouri, Columbia.  After there,
14  I went to the University of Michigan.  And then I
15  came here to the University of Florida.
16      Q.    Okay.  And has your focus in each of those
17  stops been the same type of political science
18  instruction?  What kind of classes have you taught
19  in those different locations?
20      A.    I taught a variety of classes that are
21  listed on my CV at the different schools, mostly in
22  American politics with an emphasis on minority
23  politics, African American, Latino, and Asian
24  American.  So that's mostly been my specialty.
25      Q.    And do you focus primarily on upper-level
```

Sharon Austin
October 27, 2021

1   students at those universities, graduate level, or

2   are you teaching introductory courses, or just kind

3   of a cross mix of all of them?

4       A.   It's a cross mix.

5       Q.   Okay.  Did you do a senior thesis -- not a

6   senior thesis -- what was your PhD dissertation on?

7       A.   It was entitled Aftermath of the Voting

8   Rights Act.  And it looked at Memphis mayor

9   elections from 1967 until 1991, from -- it focused

10  on African American mayors, from the first Black

11  mayor running in 1967 until the first Black mayor

12  was elected in 1991.

13      Q.   Okay.  Any specific findings that you

14  arrived at in your conclusion?  I'm just curious.

15      A.   It looked at -- it was a combination of

16  history and political science dissertation, and it

17  looked at just the history of politics in the South,

18  especially with a focus on Memphis and political

19  machines.  And it -- it found that there were a

20  number of factors that prohibited Black mayors from

21  being able to win.

22      Q.   And what was it that allowed the first

23  Black mayor to be elected in the '90s?

24      A.   The fact that there wasn't a split Black

25  vote.  The fact that turnout was a record-high

Sharon Austin
October 27, 2021

 1    turnout among African American voters.  And so those

 2    were primarily the main two things.

 3         Q.   Okay.  Awesome.  Thank you.

 4              Now, you had mentioned this is your first

 5    deposition; is that correct?

 6         A.   Yes.

 7         Q.   Have you ever been retained to provide an

 8    expert report in cases, or is this your first expert

 9    report as well?

10         A.   This is my first expert report.

11         Q.   Okay.  Now, have you had any experience

12    working for any political campaigns or nonprofits?

13         A.   No, just as a volunteer.  But, no.

14         Q.   What campaigns and nonprofits have you

15    volunteered for?

16              MR. MILLER:  Objection, form.

17    BY MR. HOLT:

18         Q.   You can answer.

19         A.   I didn't hear you.  I didn't hear you.

20         Q.   I said --

21              THE WITNESS:  I know -- did you say

22         something?  I thought Jeffrey said something.

23              MR. HOLT:  He objected.

24              MR. MILLER:  I just said object to form.

25

Sharon Austin
October 27, 2021

1   BY MR. HOLT:

2       Q.   So you can answer the question.  He's

3   going to object from time to time to questions that

4   I asked -- that I ask.

5       A.   Okay.

6       Q.   And unless he instructs you otherwise,

7   you're still able to proceed and answer the

8   question.

9            So I had asked you what campaigns and

10  nonprofit organizations had you -- you said you

11  volunteered for some of those in the past.  I asked

12  you which ones.

13           MR. MILLER:  Same objection.

14      A.   As far as nonprofit organizations, I've

15  not volunteered for any.  As far as campaigns, it's

16  mostly my former students who run for office.  Do

17  you want me to name the specific ones?

18  BY MR. HOLT:

19      Q.   Yeah, any that come to mind, specific

20  campaigns, the races they were involved in.

21      A.   Okay.  One of my former students recently

22  was elected as -- on the city council in the city in

23  Maryland that he lives in.  Another of my students

24  is running for a school board position in suburban

25  Boston.  I also volunteered for the Obama campaign.

Sharon Austin
October 27, 2021

1    And so those are the only ones I

2  volunteered for.

3    Q.   And when you volunteer, let's talk about,

4  first, your -- for your students, your former

5  students.  I think that's great that you work with

6  your former students.  What type of things do you do

7  for their campaigns?

8    A.   Well, I provide emotional support to them.

9  I talk to them occasionally.  And with -- it's,

10 like, mostly door-to-door canvassing, internet/phone

11 banking during the pandemic.  And so when you say

12 what campaigns, are you talking about donations as

13 well -- oh, okay.

14    As far as working for campaigns, it's

15 mostly just providing support to them, just talking

16 to them.  Giving them encouragement through social

17 media, and just doing, you know, mostly online work

18 because of the pandemic.

19    Q.   Okay.  And I'm sorry, I broke my own rule

20 there by shaking my head "no."  So in response to --

21 I apologize for that.

22    So in response to your question, I was not

23 asking who you donated to.

24    A.   Okay.

25    Q.   I was simply asking what campaigns you

Sharon Austin
October 27, 2021

1    volunteered your time for.

2         A.   Okay.

3         Q.   Now, in regards to the Obama campaign, was

4    it his first run in 2008 and his reelection?

5         A.   Right.  It was both.

6         Q.   It was both of -- and what did you do when

7    you volunteered, the same type of phone banking-type

8    activities?

9         A.   Phone banking and door-to-door canvassing.

10   Registering voters.

11        Q.   Okay.  Now, that kind of segues into the

12   next kind of questions I want to ask, regarding your

13   experience -- any experience you might have in

14   administering elections.

15             So for the Obama campaign, how many

16   applications to vote via absentee ballot would you

17   say you helped process?  By process, I mean, did you

18   solicit?

19        A.   Can you repeat that question again?

20        Q.   For the Obama campaigns, if you had to put

21   a rough number on how many requests -- first off,

22   let me backtrack here.

23             Were you canvassing, requesting people

24   fill out absentee ballot applications, or register

25   to vote applications, or both?  What type of

1    applications were you seeking to get filled out?

2            MR. MILLER:  Objection, form.

3        A.   Just trying to get people to register --

4    to fill out voter registration applications.

5    BY MR. HOLT:

6        Q.   Okay.  Were you dealing with vote-by-mail

7    applications?

8        A.   No.

9        Q.   Okay.  Have you ever dealt with absentee

10   or vote-by-mail applications, either in requesting

11   them or processing them?

12       A.   Do you mean for myself or for others?

13       Q.   Let's say aside from yourself.

14       A.   Aside from myself, have I ever tried to

15   process absentee or vote-by-mail ballots; is that

16   what you're asking?

17       Q.   Yes.

18       A.   No.

19       Q.   Okay.  Have you ever participated in the

20   canvassing or opening of absentee ballots?

21       A.   No.

22           MR. MILLER:  Objection to form.

23   BY MR. HOLT:

24       Q.   Have you ever assisted in helping to

25   confirm the identity of voters who voted absentee?

Sharon Austin
October 27, 2021

```
 1        A.    No.
 2        Q.    Have you ever assisted in placing drop
 3   boxes?
 4        A.    No.
 5        Q.    Have you ever assisted in securing drop
 6   boxes?
 7        A.    No.
 8        Q.    Have you ever assisted in maintaining the
 9   order, security, and efficiency of a busy polling
10   location, such as acting as a poll worker?
11             MR. MILLER:  Objection, form.
12        A.    No.
13   BY MR. HOLT:
14        Q.    And would you agree, in talking about
15   SB 90 generally, that that is a bill that pertains
16   to the administration of elections?
17        A.    Repeat that again.
18        Q.    You would agree that SB 90 is a bill that
19   pertains to the administration of elections,
20   correct?
21             MR. MILLER:  Objection, form.
22        A.    Yes.
23   BY MR. HOLT:
24        Q.    Okay.  So when you make statements in your
25   report -- and I'm quoting one here -- that SB 90 is
```

Sharon Austin
October 27, 2021

```
 1   best understood as a backlash to Black and Hispanic

 2   turnout in 2020, you make those types of statements

 3   purely as an academic and not someone who has actual

 4   first-hand experience administering elections,

 5   correct?

 6        A.   What page -- what page are you reading

 7   from?

 8        Q.   It was from your summary of your findings

 9   at the beginning.

10        A.   Okay.

11        Q.   Do you have a copy --

12        A.   Do you have --

13        Q.   Do you have a --

14        A.   Yeah, I have it right here.

15        Q.   Okay.  Yeah, I'm quoting that from -- I

16   wrote down page numbers on every other quote except

17   this one.  Sorry.  I think it's at the end of your

18   report, actually.

19        A.   Okay.

20        Q.   It's the last sentence of your report, to

21   be exact.

22        A.   Oh, okay.

23        Q.   On page 64.

24        A.   Okay.  And can you read the quote again?

25        Q.   Yeah, you said SB 90 is best understood as
```

```
 1    a backlash to Black and Hispanic turnout in 2020.

 2              And I was just asking you to confirm --

 3    you reached these types of conclusions based on your

 4    academic experience and not any type of first-hand

 5    practical experience with the administration of

 6    elections; is that correct?

 7         A.   I've never administered elections, but

 8    when I say in this sentence SB 90 is best understood

 9    as a backlash to Black and Hispanic turnout, I'm

10    focusing on this part, best understood, from my

11    understanding of the history of suffrage in Florida,

12    that that's the way I interpret it to be, as a

13    person who has studied this for many years.

14         Q.   Okay.  And your understanding is based on

15    your academic experience, correct?

16         A.   It's based on my academic experience, and

17    it's also based on my extensive knowledge of voting,

18    and also of Florida politics and voting.  It's based

19    on those things.

20         Q.   Okay.  But you mentioned before you didn't

21    have any first-hand experience administering

22    elections; is that correct?

23         A.   No, I don't have experience in

24    administering elections.

25         Q.   So your opinions in this are not based on
```

Sharon Austin
October 27, 2021

1    any first-hand experience you have administering

2    elections?  In "this," I mean this report.

3         A.   In this report, my experience is based on

4    my knowledge as a professor.

5         Q.   Okay.

6         A.   And the research that I've done.

7         Q.   Okay.  Now, when you use the word

8    "Hispanic" throughout your report, are you referring

9    to Hispanic as a race?

10        A.   Hispanic is considered to be an ethnicity.

11   Like Hispanic/Latino/Latina.

12        Q.   And do you use it as an ethnicity or as a

13   race?

14        A.   Well, based on what I teach in my Latino

15   politics class, it -- people that refer to

16   themselves as Hispanic Latino think of themselves in

17   terms of their ethnicity.  Although society thinks

18   of their race.

19        Q.   Okay.  So when you use terms in your

20   report such as "Black and Hispanic voters," you

21   would agree that Black is referred as to a race,

22   correct?

23        A.   Right.

24        Q.   And Hispanic is an ethnicity?

25        A.   Right.

Sharon Austin
October 27, 2021

```
 1        Q.   And there can be crossover between those
 2   two, correct?  You can have a Black Hispanic
 3   individual, correct?
 4        A.   Yes.
 5        Q.   Okay.  Now, and you -- you are aware that
 6   the Census Bureau, as you stated, views race and
 7   ethnic heritage as different things?
 8        A.   Are you asking a question?
 9        Q.   Yes.  You're aware that the Census Bureau,
10   in taking the census and gathering data, views race
11   and ethnic heritage as different things?
12        A.   Yes.
13        Q.   And you would agree that the primary
14   source for data that yourself and other voting
15   experts rely on is gathered from the census, from
16   data gathered during the census, correct?
17        A.   You're saying that -- can you say that
18   again?
19        Q.   The primary source for data that you rely
20   on in your report, and other experts, the reports
21   that you relied on, is the United States Census?
22        A.   Yes, a lot of it is.
23        Q.   Okay.  Now, in regards -- are you aware --
24   the two ethnic questions that the Census Bureau asks
25   are Hispanic or Latino or not Hispanic or Latino; is
```

Sharon Austin
October 27, 2021

1    that correct?

2        A.    Repeat that again.

3        Q.    Would you agree that the two ethnic

4    categories or questions that are gathered in the

5    census are, one:  Are you Hispanic or Latino or not

6    Hispanic or Latino?  You would agree that that is a

7    correct assessment of how the census determines

8    Hispanic ethnicity?

9        A.    Well, that's not really -- I mean, I just

10   wonder, how does that retain to -- how does that

11   relate to my report?  Because it's not really

12   something that I looked at, as far as how --

13       Q.    I'm just trying --

14       A.    -- the census classes people.

15       Q.    You use the terms "Hispanic" and "Latino"

16   globally.  I'm just trying to understand what you

17   meant by use of those terms.  That's all.

18       A.    Okay.  I see.

19       Q.    And so you would agree that that's -- in

20   gathering ethnic information, the census asks are

21   you Hispanic or Latino or are you not Hispanic or

22   Latino; do you agree with that?

23       A.    Well, I agree with that to some extent.

24   Because the census also refers to some people as

25   white Hispanic, white non-Hispanic.  So I guess if

Sharon Austin
October 27, 2021

1   that would be the case, then I can't really give you

2   a yes-or-no answer to your question.

3        Q.   I'm asking about ethnicity here, not race.

4        A.   Okay.

5        Q.   I understand those are different

6   categories.

7        A.   Okay.

8        Q.   Now, in looking at Hispanics in Florida,

9   you agree that Hispanics or Latinos can come from a

10  variety of backgrounds and countries, correct?

11       A.   Yes.

12       Q.   Based on your understanding of Florida,

13  and the demographics there, what different

14  nationalities make up the Hispanic or Latino

15  population of Florida?

16       A.   There really are several.  There are

17  people who are Cuban, and then also with those

18  ethnicities, sometimes people refer to themselves as

19  white Cubans versus Afro-Cubans.  There are people

20  who are Puerto Rican.  There are people who are

21  Mexican.  There's a large variety.  There are people

22  who are Colombian.

23            So those are just some of the categories

24  that fall under the broad label Hispanic.

25       Q.   Okay.  So as we previously discussed, you

Sharon Austin
October 27, 2021

1    would agree that, for example, someone could also be

2    Black, per their race, for the census data, and also

3    be Hispanic, correct?

4          A.    Yes.

5          Q.    Now, in your report, when you use the term

6    Black or African American, are you including only

7    non-Hispanic Blacks or any part Black?

8          A.    I'm including just all people who refer to

9    themselves as -- as being -- or society classifies

10   as being Black.

11         Q.    The census has a specific way of

12   classifying, so that's kind of what I want to focus

13   on, as you relied on reports that use census data.

14              There's multiple ways to look at these

15   things.  Again, sometimes you look at only

16   non-Hispanic Black, or any part Black, which would

17   include Hispanic Black.  Are you -- did you attempt

18   to differentiate from those two groups when you

19   performed -- when you organized your expert report

20   in this case?

21         A.    No, I didn't.

22         Q.    Now -- and you agree that there can be

23   significant overlap in people who are Hispanic or

24   Latino and might -- that might also be Black,

25   correct?

Sharon Austin
October 27, 2021

Page 30

```
 1        A.   It is possible.

 2        Q.   I mean, you would agree it's more than

 3   possible, it's probable it's -- you know, that that

 4   occurs, correct?

 5        A.   You mean that I know that that occurs,

 6   that there are some people who are biracial who are

 7   both Black and Hispanic?

 8        Q.   Correct.

 9        A.   Yes.

10        Q.   Okay.  Now, when you are referring, in

11   your report, to statistics and studies that refer to

12   Hispanics and Latinos as compared to Black, are you

13   double counting individuals within those two

14   subgroups?

15        A.   I don't really know if I did or not.  I

16   just looked at the data that I had available to me

17   in the way that the studies classified people on the

18   basis of race or ethnicity.

19        Q.   That's not something you considered, then?

20        A.   What's not something I considered?

21        Q.   Whether or not you were double counting

22   individuals when you referred to Hispanic and

23   Latinos and Blacks, and compared the two groups.

24        A.   No, it's not something that I considered.

25   But there is a -- probably a relatively small
```

Sharon Austin
October 27, 2021

1    population of people who are both Black and

2    Hispanic.  But it's not something I consider.

3         Q.   Okay.  And you cite studies from the ACLU

4    and The Sentencing Project in your report, correct?

5         A.   Yes.

6         Q.   Are you aware of how those organizations

7    classified race and ethnicity in their studies and

8    reports?

9         A.   No, I didn't look into it.

10        Q.   So you don't know if they are referring to

11   non-Hispanic Blacks, any part Blacks, if they are

12   double counting?

13        A.   No.

14        Q.   So it's possible that you viewed race in a

15   different way than, for example, the ACLU viewed

16   race, correct?

17        A.   It's possible.

18        Q.   And that's not something that you checked

19   at all, correct?

20        A.   Whether or not I was --

21        Q.   You --

22        A.   Can you say it again?

23        Q.   You did not confirm that -- in the ACLU

24   report that you reference in your expert report, you

25   did not confirm that they classified race the same

Sharon Austin
October 27, 2021

1    way you did, such as, any part Black, non-Hispanic

2    Black, correct?

3        A.   Okay.  Now, which report specifically are

4    you talking about?  I need it to just refresh my

5    memory about the title of the report.

6        Q.   Yes, the ACLU report, you reference data

7    throughout your report.

8        A.   Okay.

9        Q.   Expert report.  I'm looking at a chart on

10   page 53, for example, where you look at vote-by-mail

11   rejection rates.

12       A.   Okay.

13       Q.   Based on race.

14       A.   Okay.

15       Q.   For example, when it says Black voters,

16   you don't know if that number includes any part

17   Black or non-Hispanic Black?

18       A.   Right.

19       Q.   And when it says Hispanic voters, you

20   don't know if that also includes Black Hispanic

21   voters?

22       A.   Right.

23       Q.   So you don't know if -- if the ACLU is

24   double counting voters in the report, correct?

25       A.   No.

1    Q.    Okay.  Do you think that's important when

2    comparing data sets from different reports, that you

3    know what data sets those reports are using?

4    A.    It is important to know that, and I -- but

5    I know that the ACLU, for years, has a long

6    tradition of having really quality reports.  So I

7    really have a lot of confidence in their findings.

8    Q.    I'm not questioning the quality of their

9    findings here.  I'm simply -- when we're comparing

10   racial subsets across different reports, you would

11   agree that it's important to know that you're

12   comparing apples to apples, correct?

13   A.    Okay.  So what do you mean by apples to

14   apples?

15   Q.    For example, if you say -- if you're

16   looking at the 2020 election results, or some type

17   of demographic make-up, and you made the statement

18   of Black voters in this county, X, Y, Z, and you

19   compared that to the ACLU report discussing

20   rejection rates, they might be classifying a Black

21   voter as something different than you are

22   classifying a Black voter.

23   A.    It's possible, but I think it's unlikely.

24   Q.    But you would agree that it's important to

25   confirm, if you're comparing data sets, that you are

Sharon Austin
October 27, 2021

1    defining those data sets in the same way, correct?

2         A.   I'm still kind of unclear as to what

3    you're asking.  Like, you're saying defining them in

4    the same way.  I'm kind of unclear about exactly

5    what you're asking.

6         Q.   Okay.  Let me rephrase it one more time.

7         A.   Okay.

8         Q.   So you used generally the term Black

9    voters throughout your report, correct?

10        A.   Yes.

11        Q.   And you said you did not clarify whether

12   or not you meant any part Black or non-Hispanic

13   Black, correct?

14        A.   Right.

15        Q.   And in your report, you cite, for example,

16   that ACLU report that we just referenced, correct?

17        A.   Yes.

18        Q.   And the ACLU quantifies what they believe

19   are categories associated with Black voters,

20   correct?

21        A.   Yes.

22        Q.   So when you are comparing your analysis of

23   Black voters with that of the ACLU, their conclusion

24   of Black voters, you don't know if you're both

25   referring to the same definition of what a Black

Sharon Austin
October 27, 2021

Page 35

1    voter is?

2         A.   I -- I really wouldn't say that.  And the

3    reason is because the ACLU, I think, based on my

4    knowledge of them and my reading of the report, they

5    define Black voters in the same way that I do.  And

6    so I would say that my assumption is that they

7    have -- that they've defined Black voters in the

8    same way that I do.

9         Q.   And how do you define a Black voter?

10        A.   A person of African descent.

11        Q.   And you know that's how the ACLU defines

12   it as well?

13        A.   Based on my reading of them, and my

14   knowledge of the organization, I would say so.

15        Q.   And you agree that you can have a person

16   of African descent who is also Hispanic, correct?

17        A.   Yes.

18        Q.   So what I'm trying to get at here, as you

19   compare Black and Hispanic data, is whether or not

20   you are double counting voters in your analysis of

21   Black and Hispanic voters, and it sounds like you

22   are; is that correct?

23             MR. MILLER:  Objection, form.

24        A.   I would say no.  And --

25

Sharon Austin
October 27, 2021

Page 36

1   BY MR. HOLT:

2       Q.   Why is that?

3       A.   Well, I would say because if you know

4   the -- the conception of race in this country, and

5   especially when it comes to people who are,

6   quote/unquote Black, they are considered to be

7   people of African descent.  And even if someone is

8   Black and Hispanic, that person, in this country, in

9   most situations, is nevertheless considered to be

10  Black.

11          And the reason for that is because of

12  something we call the one-drop rule, which says --

13  which unfortunately says, if you were born in this

14  country -- well, in regards to where you were

15  born -- if you're born in this country, if you have

16  one drop of Black blood, you're Black.

17          So because of that, I don't think there's

18  a large chance that I overcounted because people who

19  are Black and Hispanic, in this country, are

20  classified as Black.

21      Q.   And I'm not disputing the one-drop rule or

22  asking for you to opine on the one-drop rule.

23          You said previous -- what you just stated

24  was people who are Hispanic view themselves as

25  Black.  Is that what you just said?

Sharon Austin
October 27, 2021

1       A.   No, I said people who are both Black and

2   Hispanic, in this country, typically are classified

3   as Black.

4       **Q.   By whom?  Who classifies them as Black?**

5       A.   By just societal definitions, they're

6   considered to be Black, because of the one-drop rule

7   that I mentioned, which is also the hypodescent

8   rule.

9       **Q.   Okay.  I'm interested in how the census**

10  **views race and ethnicity, not how society views race**

11  **and ethnicity.**

12      A.   Okay.

13      **Q.   And you agreed that the census is the**

14  **primary data source that you relied on, correct?**

15      A.   Yes.

16      **Q.   So do you not think it would be important**

17  **to -- being as the census differentiates between**

18  **non-Hispanic Black and any part Black, to also**

19  **understand in your data whether you are referring to**

20  **non-Hispanic Black or any part Black?**

21      A.   Is that a yes-or-no question?

22      **Q.   Yes.  Do you think that's important to**

23  **understand those differences when relying on census**

24  **data?**

25      A.   Yes.  And I do understand those

Page 38

```
 1   differences.
 2       Q.   But you stated earlier you did not take
 3   them into account in forming your opinions in this
 4   case and relying on the data, correct?
 5       A.   That doesn't mean I don't understand them.
 6   You just asked me do I understand those differences,
 7   and I do.
 8       Q.   Forgive my question.
 9       A.   Okay.
10       Q.   Do you feel that it's important to take
11   into account those differences and the different
12   data subsets to know what you're looking at?
13       A.   Well, it's hard to answer that with just a
14   yes-or-no answer.  Because the obvious answer is
15   yes.  But it's also important to know, when relying
16   on the reports and data that I relied on, is how
17   people classified themselves.
18            And according to the census, you have to
19   check a box in which you define your race or
20   ethnicity, and so if someone checked the box Black,
21   then they're classified as Black.  And in the
22   reports that -- and data that I looked at, that --
23   those are the people that I'm referring to.
24            And so there are people who refer to
25   themselves as Black.  Other people refer to
```

Sharon Austin
October 27, 2021

1    themselves as Hispanic.  And so those are the

2    classifications that I looked at in just -- and in

3    referring to people by their race, it was based on

4    the way they identified themselves.

5        Q.   So, for example, in that ACLU report that

6    we looked at, that table that you included in your

7    report, they have a column for Black voters and they

8    have a column for Hispanic voters.

9        A.   Which table are you talking about?

10        Q.   It was the one we just barely referenced.

11        A.   Okay.

12        Q.   Previously.  Page 53 of your report.

13        A.   Okay.

14        Q.   And I'm sorry to go so long on this.

15        A.   No problem.

16        Q.   I'm just trying to understand --

17        A.   Page 53.

18        Q.   I'm just trying to understand when the

19    ACLU uses the term Black voters in one column and

20    Hispanic voters in another column.

21        A.   Okay.

22        Q.   And you agreed that you can have crossover

23    between the two -- for example, a Black Hispanic

24    voter -- do you know which category the ACLU

25    included that voter in?

Sharon Austin
October 27, 2021

```
1        A.    Whatever that person identified himself or
2    herself as.  If a person -- if that person was Black
3    and Hispanic, and they checked the box Black, then
4    they're considered to be Black.  If they checked the
5    box Hispanic, then they're considered to be
6    Hispanic.  Depending on how that person identified
7    himself or herself.
8        Q.    Well, we just talked about that you viewed
9    Hispanic as an ethnicity, correct?
10       A.    Yes.
11       Q.    And so race and ethnicity are different
12   things, correct?
13       A.    Yes.
14       Q.    And so if I'm a Black Hispanic, I'm going
15   to check the box Black, and I'm also going to check
16   the box Hispanic under the ethnicity question, which
17   is different than the racial question where I would
18   check Black, correct?
19       A.    Repeat that again.
20       Q.    There are different questions on the
21   census regarding race, where I would check the Black
22   box, correct, and ethnicity, where I would check the
23   Hispanic box, correct?
24       A.    There are different boxes for -- say that
25   one more time.  I'm sorry.
```

Sharon Austin
October 27, 2021

```
 1        Q.    There's a question on the census for race.

 2        A.    Uh-huh.

 3        Q.    Where a voter -- or a citizen would check

 4   the box saying they are Black.  They consider

 5   themselves to be Black, correct?

 6        A.    Yes.

 7        Q.    And then there's a separate question that

 8   asks for their ethnicity, that if they are Hispanic,

 9   correct?

10        A.    Well, based on my understanding of the

11   census, because when I looked at the reports --

12   well, based on my understanding of the census,

13   there's a category that says race ethnicity, and you

14   have pretty much the main categories are white,

15   Black, Hispanic, Asian, and then also other, and

16   sometimes you have non-Hispanic white.  And

17   typically, a person checks one box.

18              So if a person is Black and Hispanic, that

19   person could either check Black or Hispanic or

20   other, and then write Black and Hispanic.  So I hope

21   that answers your question.  I think, based on my

22   recollection and understanding of census, there's

23   just that one question about ethnicity and you just

24   checked the one box.

25        Q.    Give me just a minute here.  I'm going to
```

Sharon Austin
October 27, 2021

1    pull something up and share with you.

2         A.   Okay.

3         Q.   I just want to ask you a little bit more

4    here, okay?

5         A.   Okay.

6         Q.   So I just dragged in a document called

7    Census Race FAQs into the chat box there.  Can you

8    see that?

9         A.   Okay.  I see it.

10        Q.   Okay.  I pulled this down from the census'

11   website, and I want you to take a look at

12   specifically the -- you see where it says

13   "definition" right in the middle of that?

14        A.   Okay.  I'm having trouble downloading it.

15   Would it be possible for you to share your screen?

16        Q.   I can try to do that.

17             MR. HOLT:  Is everyone else able to open

18        that document?

19             MR. CHORBA:  Nothing came through.  This

20        is William Chorba.

21             MR. HOLT:  Okay.  I'll just share my

22        screen, then.

23   BY MR. HOLT:

24        Q.   Okay.  Do you see that there?

25        A.   I do.

Sharon Austin
October 27, 2021

```
 1        Q.   Okay.  So I'm going to scroll to the top
 2   here.  You'll see this is pulled down from the
 3   census -- census.gov; do you see that?
 4        A.   I do.
 5        Q.   Can you read for me that sentence right
 6   there, right above the word "definition"?
 7        A.   Okay.  The concept of race is separate
 8   from the concept of Hispanic origin.
 9        Q.   Okay.  And then under "definition," could
10   you read just the different bolded categories that
11   they have for race?
12        A.   Do you mean the entire definition, or just
13   the term, the different categories?
14        Q.   Just the different categories that they
15   have to define race.
16        A.   Okay.  White; Black or African American;
17   American Indian and Alaska Native; Asian; Native
18   Hawaiian and Other Pacific Islander.
19        Q.   Do you see the term "Hispanic" anywhere
20   under the race terms?
21        A.   And then at the bottom, you have two or
22   more races at the bottom.
23        Q.   Yes.  And so that's -- if you were two or
24   more of those five above that you checked, you would
25   check that box; is that how you understand that?
```

Sharon Austin
October 27, 2021

1      A.   Yes.

2      Q.   Take your time to read whatever you would

3   like.

4      A.   Okay.  Yes, I did.

5      Q.   Okay.  Do you see Hispanic anywhere as an

6   option to choose for your race?

7      A.   No.

8      Q.   And so read one more time that bolded

9   statement right above the word "definition" there.

10   And that's the bold from the Census Bureau's

11   website.  I didn't place that emphasis there.

12      A.   The concept of race is separate from the

13   concept of Hispanic origin.

14      Q.   Okay.  So I'm going to stop sharing my

15   screen, that okay?  Or do you want to look at

16   anything else here?

17      A.   I'm fine.

18      Q.   Okay.

19      MR. HOLT:  And, Mary, did you get that

20   exhibit?

21      THE STENOGRAPHER:  I'm sorry, is that

22   going to be No. 1?

23      MR. HOLT:  Yes.

24      THE STENOGRAPHER:  Okay.  Thanks.

25

Sharon Austin
October 27, 2021

1          (Marked for Identification is Exhibit 1.)

2    BY MR. HOLT:

3         Q.   Now, Dr. Austin, do you understand better

4    what I'm getting at when I ask which category --

5    when looking at the ACLU table on page 53 of your

6    report, when it has a Black voter and a Hispanic

7    voter, and separate columns, if someone both

8    identifies as a Black race and a Hispanic ethnicity,

9    which category would that voter be in?

10        A.   Do you mean the table on page 53 that you

11   just referred to?

12        Q.   Yes.  I'm using that as an example here.

13        A.   Okay.  Repeat your question one more time.

14        Q.   If you have someone who is a Black

15   Hispanic, that checked the box "Black" under race,

16   and then checked the box "Hispanic" under ethnicity,

17   which are two separate questions, which category

18   would that individual fall under in this data table

19   here on page 53?

20        A.   Based on my understanding, that person

21   would fall under whatever category he or she listed.

22   I think that if that person --

23        Q.   Okay.  Let's --

24        A.   Go ahead.

25        Q.   Sorry.  Excuse me.  Excuse me.  Finish

Sharon Austin
October 27, 2021

Page 46

1    your answer.  My bad.

2        A.   Okay.  If that person considers himself or

3    herself to be Black, then they would put that, and

4    that would be their race.  If that person considers

5    himself to be a Hispanic, that would be their

6    ethnicity.

7        Q.   But you understand my question, that that

8    person has considered themself to be both of those

9    things?

10       A.   That person would consider himself or

11   herself to be both of those things, but that person,

12   when in all likelihood, just checked one box for one

13   category.

14       Q.   I'll reference you back to Exhibit 1 that

15   we just looked at, that made very clear that

16   ethnicity is a different question than race,

17   correct?

18            MR. MILLER:  Objection, form.

19       A.   Yes.

20   BY MR. HOLT:

21       Q.   Is that correct?

22            So that person, the Black Hispanic person,

23   would check both boxes, they would have checked the

24   Black box, and they would check the Hispanic box,

25   because their ethnicity is Hispanic; their race is

Sharon Austin
October 27, 2021

1   Black, correct?

2          MR. MILLER:  Objection, form.

3      A.   I would say not really.  Because that

4   person -- just -- can you say that one more time?

5   I'm sorry.

6   BY MR. HOLT:

7      Q.   So when you have a citizen who is Black as

8   a race.

9      A.   Uh-huh.

10     Q.   But Hispanic as an ethnicity.

11     A.   Okay.

12     Q.   They would check both the "Black" box for

13  race and the "Hispanic" box for ethnicity; it would

14  not be one or the other?

15     A.   Well, I can't really say one way or the

16  other what that person would check.  Because I can't

17  speak for that person.  I mean, in some cases, that

18  person might consider himself or herself to be both.

19  In some cases, that person might just choose to

20  check one box.  So I really couldn't say one way or

21  the other.

22     Q.   I'm talking about the person that chose to

23  select both boxes.

24     A.   Okay.

25     Q.   Do you know which category that person

Sharon Austin
October 27, 2021

1    **would be in, Black voters, Hispanic voters, or would**

2    **they be double counted?**

3              MR. MILLER:  Objection, form.

4         A.    Again, I can't say what category that

5    person -- it all depends on what the person sees

6    himself or herself as.

7              For example, in some cases, you have

8    people who are Afro-Cubans, and they might consider

9    themselves to be both and check both boxes.  But in

10   some cases, they might consider themselves to be

11   Black.  There are a lot of factors at play that

12   would just, I guess, determine what they see

13   themselves as.  And in some cases, they might

14   consider themselves to be Hispanic.  It just all

15   depends on the person.

16             I can't say one way or the other if they

17   would have to check both boxes and therefore be

18   double counted.

19   BY MR. HOLT:

20        **Q.    I'm primarily concerned here with the**

21   **academic who performed the analysis and created this**

22   **table of how they viewed an individual who checked**

23   **both Black and Hispanic on the census form.**

24        A.    Uh-huh.

25        **Q.    Under which category would they have**

Sharon Austin
October 27, 2021

Page 49

1    included that individual:  Black, Hispanic, or would
2    they double count them in both?
3        A.   Again, it just depends on what the
4    person -- which box the person checked.
5        Q.   So it's safe to say you don't know?  Would
6    that be a safe answer?
7        A.   It would be safe to say that I can't speak
8    for people who are Black and Hispanic because I'm
9    not Black and Hispanic and I don't know what box
10   they would check.
11       Q.   I'm not asking you to speak for anyone
12   who's Black or Hispanic.  I'm simply asking you for
13   the person who is both Black and Hispanic, that
14   checked both the boxes, has yourself or another
15   academic who's viewing that, do you view that person
16   as Black, Hispanic, or both, in terms of which
17   category you place them in in your data sets?
18       A.   I can't answer that, because I would just
19   say, again, I feel like I'm repeating myself over
20   and over.  It just all depends on -- I would
21   classify that person based on what that person told
22   me to classify himself or herself as.
23       Q.   Okay.  And you don't know if the
24   Sentencing Project, if the ACLU, viewed that the
25   same way you do, correct?

Sharon Austin
October 27, 2021

```
 1        A.   Correct.
 2        Q.   Okay.  Thank you.  Sorry to belabor that
 3   point.  I was just trying to --
 4        A.   No problem.
 5        Q.   To better understand.
 6             How are you doing?  Do you need a break or
 7   anything?
 8        A.   Well, it's been about an hour.  So I think
 9   I could take a break.
10        Q.   Okay.
11             MR. HOLT:  Why don't we take five minutes.
12             THE WITNESS:  Okay.
13             MR. HOLT:  Does that work for everyone?
14             MR. MILLER:  Sure.
15             MR. HOLT:  Okay.  Sounds good.
16             THE WITNESS:  Thank you.
17             (Recess from 11:02 a.m. to 11:11 a.m.)
18   BY MR. HOLT:
19        Q.   Now, Dr. Austin, I wanted to talk about
20   Florida's political history, generally.  You spend a
21   great deal of your expert report discussing
22   postreconstruction, disenfranchisement of Black and
23   Hispanic Florida voters; is that correct?
24        A.   I've -- yeah, I discuss it in the report.
25        Q.   And you -- you discuss laws that you refer
```

Sharon Austin
October 27, 2021

```
 1    to as laws that essentially disenfranchised all
 2    Black voters.  That's in paragraph 23 on page 9 of
 3    your expert report.  And you refer to these laws as
 4    Jim Crow laws; is that correct?
 5         A.   Which sentence are you talking about?
 6         Q.   In paragraph 23 on page 9, in referring to
 7    Jim Crow laws, you said that they essentially
 8    disenfranchised all Black voters; is that correct?
 9         A.   Yes.
10         Q.   Can you tell me about those Jim Crow laws,
11    what they did, the effect they had?
12         A.   Well, for many years, the Jim Crow laws
13    had various requirements there that disfranchised
14    Black voters.  The overwhelming majority of Black
15    voters.  And then also there were ways in which
16    rules were applied differently for Blacks and
17    whites, that made it impossible, practically, for
18    Blacks to be able to vote.  And there were Jim Crow
19    laws, and then there also was an environment of
20    terror.
21         Q.   What are some examples of those --
22         A.   I didn't hear that last one.
23         Q.   Wait a minute.  I'm getting some really
24    bad feedback here.
25              MR. MILLER:  Yeah, I -- there was, like,
```

Sharon Austin
October 27, 2021

1    echoing or something.

2         MR. HOLT:  Are people still hearing that?

3         MR. MILLER:  It's gone now.

4         THE WITNESS:  I can hear you fine.

5         MR. HOLT:  All right.  Awesome.  Sorry

6    about that.

7    BY MR. HOLT:

8         **Q.   Can you please tell me about some of those**

9    **administrative laws that effectively disenfranchised**

10   **Black voters?  For instance, I think you referenced**

11   **white-only primaries, for example?**

12        A.   Well, there are several that I referenced:

13   Poll taxes, literacy tests, grandfather clauses for

14   many years.  I mention the white primary which at

15   the time was the white Democratic primary, movement

16   mostly.  And so those are the ones, the primary ones

17   that I mention in the report.

18        **Q.   How did a literacy test work?  What would**

19   **happen in order to establish to perform that test?**

20        A.   Okay.  I explain that on page 10 in

21   No. 24.  But the way it worked, it had a companion

22   grandfather clause, and so according to -- you

23   didn't have to take the literacy test if you had a

24   relative who could vote before a certain date, and

25   that date was usually on or before January 1st,

Sharon Austin
October 27, 2021

1   1967.

2          So if you had a relative that could vote

3   before that date, you didn't have to take the

4   literacy test.  And so that it disfranchised Black

5   people, of course, because before that date, Black

6   people were mostly -- were slaves, and so that meant

7   that, you know, white people who didn't have to take

8   the literacy test but Black people did.

9          And then even in cases in which, you know,

10  Black people took the test and there was, first of

11  all, a high illiteracy rate at the time, but even

12  with Blacks who were able to take the test, they

13  were sometimes asked questions that were very

14  technical questions, that it was almost impossible

15  to answer, and so that was the way that it worked.

16  **Q.   So if a Black voter showed up to vote, and**

17  **assuming they did not have a grandfather who voted,**

18  **what other options did that Black voter have to cast**

19  **a ballot in that election?**

20  A.   So if they couldn't -- repeat the question

21  again.

22  **Q.   When the literacy tests were in effect, if**

23  **someone could not pass that literacy test, a Black**

24  **voter could not pass a literacy test, and did not**

25  **have a grandfather who could vote, what other**

Sharon Austin
October 27, 2021

1    options does that voter have to vote, if any?

2         A.   That was pretty much it.  You were told

3    that you couldn't vote.

4         Q.   Now, many have referred to SB 90 as,

5    quote, Jim Crow 2.0 or the New Jim Crow.  Do you

6    agree with that comparison?

7         A.   I don't remember using that -- did I use

8    that term in my report, Jim Crow 2.0?

9         Q.   You did not use that.  You referred to a

10   predecessor of SB 90 and quoted an anonymous

11   voter --

12        A.   Uh-huh.

13        Q.   -- who referred to that law as the New

14   Jim Crow.  And that was on page 54 of your report.

15        A.   Okay.

16        Q.   I'm just curious if that is a

17   characterization that you would agree with.

18        A.   Page 54, I would say that that's the way

19   some people would perceive it, as being the New

20   Jim Crow.  And I would say that I would agree with

21   that.

22        Q.   Why would you agree with that?

23        A.   Because during the Jim Crow society,

24   efforts were put in place to keep people of color

25   from voting.  And -- and to make it difficult, if

Sharon Austin
October 27, 2021

Page 55

```
 1   not impossible, for them to vote.  SB 90 is putting

 2   obstacles there to disfranchise people and to make

 3   it difficult for them to vote.

 4        Q.   Okay.  Let's use that same hypothetical.

 5   If a Black voter who cannot read shows up to the

 6   polls today, what options does that voter have to

 7   cast a ballot?

 8             MR. MILLER:  Objection, form.

 9        A.   If that person can't read, that person can

10   still cast a vote.  I'm sure the person could ask

11   for some kind of assistance from a poll worker.  But

12   I think --

13   BY MR. HOLT:

14        Q.   So --

15        A.   So you're saying that if that person shows

16   up at the polls, or if this person just wants to

17   vote in any kind of way?

18        Q.   Just wants to vote.

19        A.   Okay.

20        Q.   Let's go that route.  What options are

21   available to that person to vote?

22        A.   If that person is illiterate and can't

23   read, I guess, that person -- if that person chooses

24   to vote by mail, can get someone in his or her

25   family to help, and if that person shows up at the
```

Sharon Austin
October 27, 2021

1    polls, then that person can get the assistance of

2    someone working there.

3         Q.    And they can vote early, they can vote on

4    Election Day, correct?

5         A.    They could.

6         Q.    Even after SB 90 passed, correct?

7         A.    They could vote early, and they could

8    still vote on Election Day.  But SB 90 places --

9    makes it harder for them to vote.

10        Q.    But they can still cast a ballot.  They

11   have that opportunity, correct?

12        A.    Do you want a yes-or-no answer for that?

13        Q.    Yes.

14        A.    They would still be able to vote, yes.

15        Q.    And you still stand by your answer, that

16   this is Jim Crow 2.0 or the New Jim Crow?

17        A.    Yes.

18        Q.    So even when someone was completely

19   disenfranchised, with no opportunity to vote, you're

20   saying that's the same as someone who has -- can

21   vote by mail, that can vote early, that can vote on

22   Election Day, under the exact same circumstances,

23   you're saying that's the same thing?

24        A.    I'm saying the two are similar, and that's

25   why it's called the New Jim Crow.

Sharon Austin
October 27, 2021

Page 57

```
 1              Under the old Jim Crow system, you just
 2      couldn't vote.  Because of the things that I
 3      mentioned, but also because there was an environment
 4      of terror if you even tried to vote in some
 5      communities.  In today's society, there's the New
 6      Jim Crow, in the sense that you can -- yes, you can
 7      vote, but there are obstacles there that make it
 8      more difficult, and those obstacles are directed at
 9      Black and Hispanic voters.
10          Q.   Now, courts these days -- first off, let
11      me -- you are not a lawyer, correct?
12          A.   No.
13          Q.   But yet, in your expert report, you cite,
14      I don't know, roughly a dozen cases for different
15      portions of your report, court cases, correct?
16          A.   Yes.
17          Q.   And so when I ask you this, I'm not asking
18      for a legal opinion, I'm asking for your opinion
19      using the same level of analysis you used in
20      reviewing these reports for your expert report.
21              So the Supreme Court and other courts
22      routinely use the term "the ordinary burdens of
23      voting."  Does that mean anything to you?
24          A.   I don't have that in my report, so can you
25      go into more detail and define exactly what that
```

Sharon Austin
October 27, 2021

1    means?

2         Q.    An ordinary burden of voting, depending on

3    the situation, would be something along the lines of

4    you're going to have to travel to a polling site.

5    You're going to have to exert some type of effort to

6    request a ballot or to register to vote.  And for

7    different people, that might be harder, or it might

8    be easier.  But there's -- they refer to those

9    things as the ordinary burdens of voting.

10             Does that make sense to you?

11        A.    Yes.

12             MR. MILLER:  Objection to form.

13        A.    The definition you gave me makes sense.

14   BY MR. HOLT:

15        Q.    Okay.  Now, what do you view as ordinary

16   burdens of voting that would not be racially

17   discriminatory on individuals, that everyone,

18   regardless of race, has to take part in, in order to

19   vote?

20        A.    I would say just the ordinary burdens of

21   everyone, regardless of race or ethnicity, I would

22   say -- did you say something?

23        Q.    I was just agreeing with you, yes.

24        A.    Okay.

25             I would say that you have to request a

Sharon Austin
October 27, 2021

Page 59

```
1    ballot.  If you choose to vote at the polls, you
2    have to travel, find transportation there.  To and
3    from home.  You have to be able to know that if you
4    try to vote, that you won't be intimidated or
5    punished.
6            You -- I would say in -- I don't know if
7    this would be a burden, but an ordinary
8    understanding of voting would be that you -- every
9    person, regardless of race, ethnicity, gender,
10   religion, color, creed, sexual orientation,
11   et cetera, should be able to vote and have just an
12   uninhibited right to vote.
13           And if you put any type of obstacle there,
14   it's not an ordinary burden.  It's just an unfair
15   and it might just -- even be a discriminatory
16   barrier.  So I hope that answers your question.
17       Q.   What if I live half a mile away further to
18   the polling location than my neighbor does.  Am I
19   being discriminated against by having to travel
20   longer to that polling location?
21       A.   In the example that you just described, if
22   you -- if it's at -- if it's only that short of
23   distance, then, no, simply because you live a
24   shorter distance away.  It wouldn't be.
25       Q.   What if I have a job that pays less than
```

Sharon Austin
October 27, 2021

1    my neighbor, so therefore, the cost of postage is

2    more to me than my neighbor, to send in my absentee

3    ballot, am I being discriminated against because of

4    that?

5         A.   Are you being discriminated against -- no.

6    I would say that you're not being.

7         Q.   So in the context of SB 90 -- and we'll go

8    through in great detail all the provisions before

9    today is over -- but in the context of SB 90, help

10   me understand what provisions are outside of the

11   ordinary burdens of voting that are discriminatory

12   towards minorities and why.

13        A.   Okay.

14        Q.   And how they're different from the

15   examples I just used.

16        A.   Okay.  I can refer to the ones that I --

17   the provisions that I mentioned.  I think this is

18   beginning on page 62.

19             But the key provisions that I looked at --

20   and so you're asking me out of these provisions that

21   I listed, in No. 95 in -- beginning on No. 95 on

22   page 62, which of those are discriminatory?

23        Q.   Which of those --

24        A.   Which are burdensome.

25        Q.   Which of those are outside of the ordinary

Sharon Austin
October 27, 2021

1    burdens of voting.  It's implied that there's going

2    to be some burden to vote.

3         A.    Uh-huh.

4         Q.    To register to vote.

5         A.    Okay.

6         Q.    Which of those requirements exit that

7    understanding?

8         A.    I would say -- I would say that my main --

9    well, to look at these provisions that I have here,

10   I would say with as far as the first one, where you

11   now -- you have to provide a license number, a state

12   ID number, last four digits of a Social Security

13   number to request a vote-by-mail ballot, and before

14   you didn't have to have this information.  My

15   understanding is that if you wanted to request a

16   mail -- a vote-by-mail ballot, you could just

17   request it.  And so now you have to identify

18   yourself.

19           I have a concern about that because even

20   though we live in 2021, versus the way it used to be

21   under the old Jim Crow system, I have a problem with

22   you having to provide -- you should be able to just

23   get a vote-by-mail ballot.  I don't think you should

24   have to provide any identification in order to get

25   it.

Sharon Austin
October 27, 2021

```
 1              As far as casting the ballot, you know,
 2    you'll have your signature, and that will be
 3    verified.  And if there's any chance that there's
 4    something fraudulent going on, then it will be
 5    discovered.  So I don't think that it's necessary
 6    for you to have to provide any type of number to
 7    identify yourself.
 8         Q.   Let me ask you this:  Is that requirement,
 9    to provide some type of identification -- and let's
10    make this clear -- they allow you to do the last
11    four digits of your Social Security number, your
12    driver's license, or a State ID if you don't have a
13    driver's license.
14         A.   Uh-huh.
15         Q.   Is that requirement applied equally to all
16    races and all citizens of Florida?
17         A.   The requirement is applied equally, so I
18    would say yes.
19         Q.   So how is that any different than living
20    half a mile further from a polling place or having
21    to pay a little more comparatively for a postage
22    stamp, how are those not discriminatory, but this
23    is?  Help me understand that.
24         A.   Okay.  I think with the examples that you
25    just gave me, those are just things that people have
```

Sharon Austin
October 27, 2021

Page 63

```
1    to deal with.  People have to travel different

2    distances.  Different people have to -- make

3    different incomes.  And that means that purchasing

4    stamps and things is probably a little bit more

5    burdensome for a person with lower incomes.

6              This is, I think, something that's

7    completely different from those examples because

8    now, you're talking about the fact that if you

9    want -- that in our -- really, I'm saying in our

10   society, we have always encouraged people to vote.

11   And we had no-excuse voting.

12             And now, all of a sudden, you have to

13   provide identification on your -- to get a mail

14   ballot, and I just don't see that that's necessary.

15   And I think that that is something that is applied

16   equally, but it also can lead to -- I just don't

17   think that it's necessary.  And I think it can lead

18   to discriminatory outcomes.

19        Q.   So if I understand correctly, you don't

20   believe that it's discriminatory currently, you

21   believe it's just unnecessary, correct?

22             MR. MILLER:  Objection.

23        A.   I think that --

24             THE WITNESS:  Say that again.

25             MR. MILLER:  I just made a form objection.
```

Sharon Austin
October 27, 2021

Page 64

```
 1        A.   Okay.  Say that -- read your question
 2   again.
 3   BY MR. HOLT:
 4        Q.   You had just said -- and I'm
 5   summarizing -- that you did not believe that SB 90,
 6   the provision regarding IDs or some type of
 7   identifying number, was discriminatory.  You said it
 8   was just unnecessary.
 9             But it might --
10        A.   Well --
11        Q.   -- lead to discriminatory actions later
12   on.  Is that correct?  Am I understanding you
13   correctly?
14        A.   I think what I'm saying is that it's
15   just -- it's not necessary.  And also, it's -- I
16   hope this answering your question, but it's
17   hypocrisy in the sense that we have always
18   encouraged people to vote, and we've always talked
19   about American democracy and how people can vote in
20   this country.
21             And to require someone to have to identify
22   themselves just to get a mail ballot, that in itself
23   is unnecessary, and also, it can lead to a
24   discriminatory outcome.
25        Q.   Okay.  Do you believe it's fair to request
```

Sharon Austin
October 27, 2021

1    ID for someone to purchase alcohol?

2        A.   Yes.

3        Q.   For someone to be able to drive, do I need

4    to have a driver's license?

5        A.   To do -- that they have to -- in order to

6    be able to drive, that they have to have a driver's

7    license, is that what you're asking?

8        Q.   Uh-huh.  Yes.

9        A.   Yes.

10       Q.   And if I want to get on an airplane, do I

11   have to have some type of photo identification?

12       A.   Yes.

13       Q.   But you don't believe that in order to

14   cast a ballot, I should have to confirm my identity

15   to the State?

16       A.   I think in order to -- here, this

17   provision is saying in order to request a

18   vote-by-mail ballot.  I don't think that that is

19   necessary.  Because once you send the ballot in,

20   your identity will be confirmed.  So why do you need

21   to produce this information just to even get access

22   to a ballot?  That's what I'm saying.

23       Q.   Okay.  So you disagree with the policy

24   reasons behind that decision, correct?

25       A.   I disagree with the policy reasons, and

Sharon Austin
October 27, 2021

Page 66

1    also I think the motivation behind it.

2        Q.    Do you have any evidence that there was

3    negative or racial motivations behind that

4    provision?

5        A.    Well, I have the evidence that I produced

6    in the entire report of a history of efforts to try

7    to disenfranchise Black and Hispanic voters, and I

8    use that as my basis for viewing this with

9    suspicion.

10        Q.    Okay.  But you have no information

11    regarding any current legislator that was involved

12    in the passage of this, that they did so for racial

13    motivations?

14        A.    Well, let me --

15              MR. MILLER:  Objection to form.

16        A.    Can I -- I think, in looking at this, I

17    need to just look at something.  Because it was

18    introduced -- and correct me if I'm wrong, there's

19    so much information in this report, I don't want to

20    give the wrong information -- but it was introduced

21    by I think Dennis Braxley.  I believe that's the

22    case.

23              And he was also the person who introduced

24    a bill in 2011, HB 1355, which reduced the early

25    voting period from 14 days to eight days, and it has

Sharon Austin
October 27, 2021

1    some other provisions.  And then he produced this.

2    And I don't know what his motivation is behind

3    introducing SB 90, but he did try to restrict voting

4    ten years ago, and now he's trying to restrict

5    voting again, I think, through this.

6             So to answer your question, I can't say

7    what the motivation is behind this, but I do view

8    this with suspicion that the same person who tried

9    to restrict voting ten years ago has introduced this

10   bill.

11   BY MR. HOLT:

12        Q.   Okay.  Like I said, we'll get into the

13   specifics of the other provisions here shortly.

14        A.   Okay.

15        Q.   What I want to see, if we can just agree

16   to this, that you would agree that the provisions --

17   the voting provisions today in the state of Florida

18   are -- have the effect to allow more people to vote,

19   especially minority voters, than they did in the

20   early 1900s, correct?

21        A.   So you're saying that the provisions that

22   are here today.

23        Q.   Uh-huh.

24        A.   Are making it easier for people to vote in

25   2021 than at the turn of the century?

Sharon Austin
October 27, 2021

```
 1        Q.   Yes.  The Jim Crow era.

 2        A.   I don't think these provisions are -- I

 3   don't think you should say that it's making it

 4   easier for people to vote.  I don't think they're as

 5   restrictive, of course, as the barriers that were

 6   there in 1900.  But I would say that they're making

 7   it easier.

 8        Q.   More minorities have the opportunity to

 9   cast a ballot today than they did during the

10   Jim Crow era, correct?

11        A.   Yes.  After a constant battle to

12   continuously keep fighting for it, yes.

13        Q.   Okay.  Now, let me just look at my notes

14   real fast here.

15             Can you tell me how many speakers of the

16   Florida House have been Hispanic?

17        A.   Let's see.  Off the top of my head, I

18   don't remember if I put that in the report.  Let me

19   look at my report.

20        Q.   We can agree that there have been several,

21   correct?

22        A.   Right.  There have been more than one.

23   I'm almost sure it's -- I thought it was 13, but let

24   me -- I can check and see.  I don't know the exact

25   number, but, you know, I know that there has been
```

Sharon Austin
October 27, 2021

1    more than one.

2        Q.    And do you know how many there will be

3    within the next four years?

4        A.    Off the top of my head, no.

5        Q.    Do you know how Florida chooses Speakers

6    of the House?

7        A.    Based on my knowledge of the legislature,

8    I -- I mean, I think, and correct me if I'm wrong,

9    but I think that the person has to be nominated.

10   And then the entire House, if it's -- you know, the

11   House -- the Speaker -- the entire House then votes.

12   I think that's the way it works.

13       Q.    Okay.  Would it surprise you to know that

14   there will be one more Hispanic Speaker within the

15   next four years?

16       A.    No, it wouldn't.

17       Q.    How many state Supreme Court justices are

18   Hispanic?

19       A.    I didn't include that in my report, so I

20   don't -- I don't really remember.

21       Q.    If I told you there were three, would that

22   surprise you?

23       A.    Would that surprise me?  I don't know if I

24   would say it would surprise me or not, but I think

25   that's -- that's a good thing.

Sharon Austin
October 27, 2021

1    Q.   Okay.  Now, throughout your report, in

2    multiple locations, you discuss the State's stated

3    rationale for passing SB 90.  And you addressed that

4    with great suspicion.

5         For example, on page 5, you say that

6    SB 90, and in quotes, you say, couched as a reform,

7    and then reform was in quotes, that supposedly

8    addresses voter fraud.  On page 6, you state you

9    refer to purported fraud.

10   A.   Uh-huh.

11   Q.   And later on page 6, you refer to fraud.

12   A.   Uh-huh.

13   Q.   In quotation marks.

14   A.   Okay.

15   Q.   Do you agree that the State's stated

16   purpose for passing SB 90 was to prevent voter

17   fraud?  Not asking what you think about it.  I'm

18   just asking:  You agree that that's the stated

19   purpose of -- that the State has given primarily for

20   passing SB 90, was to prevent voter fraud?

21   A.   Was that the stated purpose, is what

22   you're asking me?

23   Q.   Primarily, yes.

24   A.   Yes.  That's what they said the purpose

25   was.

Sharon Austin
October 27, 2021

1    Q.    And based on the statements that I just

2    read from pages 5 and 6, it's safe to say you

3    disagree with that?

4    A.    Yes.

5    Q.    Why do you disagree with that?

6    A.    Because of all of the reasons that I state

7    in the report, because of the history of backlash

8    that has occurred toward Black and Hispanic voters,

9    and in particular, because my emphasis is on African

10   Americans, and African American politics, especially

11   toward African American voters, I think that that --

12   there's a documented extensive history of backlash.

13   Whenever Blacks and Hispanics make progress,

14   usually, some type of legislation is put there to

15   make it more difficult for them to vote.

16   Q.    Do you believe that a State's desire to

17   prevent voter fraud is a valid interest, a valid

18   state interest?

19   A.    If they're telling the truth.  If that's

20   what the real intention is.

21   Q.    And how do you tell the difference between

22   what is a legitimate fraud prevention statute and an

23   illegitimate fraud prevention statute, in your

24   opinion?

25   A.    In my opinion, you first would have to

Sharon Austin
October 27, 2021

1  show that there is evidence of widespread statewide

2  fraud.  And I didn't see any evidence of that before

3  SB 90.

4        As a matter of fact, at the -- if you look

5  at the 2020 election, several state elected

6  officials praised the efficiency of the process in

7  2020.  And so I don't see that they produced any

8  evidence of any extensive widespread fraud in the

9  state of Florida that would justify SB 90.

10       **Q.   Okay.  Do you believe that a State should**

11  **have to wait for voter fraud to occur in order to**

12  **take steps to prevent it?**

13       A.   I think that a state would have to produce

14  evidence of there being some type of fraud there.

15       **Q.   Okay.  How much evidence is -- if there's**

16  **only one ballot that was fraudulent, is that enough**

17  **to try to prevent that?**

18       A.   No.

19       **Q.   How would you weigh that?**

20       A.   Again, I said widespread fraud.  I would

21  think that you would have to show evidence that

22  there was widespread statewide fraud in elections.

23  And -- and would I say that that would be a

24  justification for coming up with something, that you

25  would have to show some type of evidence that there

Sharon Austin
October 27, 2021

1    has been some type of fraudulent activity there.

2         Q.    Do you know if voter fraud has ever

3    happened in Florida?

4         A.    It has.

5         Q.    When has that happened?

6         A.    Well, there have been experiences in south

7    Florida with the -- hope I'm not mispronouncing

8    this, but the Boleteros or some Hispanic Latino

9    election workers who were trying to get people to

10   vote by absentee ballot and they found evidence of

11   fraud in some of the elections there.

12              And so -- but I think in the past, when

13   there has been fraudulent activity, the people who

14   have been guilty of it have been caught and have

15   been punished.  And so -- but to answer your

16   question, yes, there has been evidence of fraud.  I

17   mean, there's evidence of fraud in every election.

18   I mean, there are always -- is going to be some

19   fraud there.

20        Q.    If the State had a desire to prevent voter

21   fraud, what type of provisions would you view as

22   valid and appropriate in order to achieve the

23   State's interest to prevent fraud?

24        A.    I would say that a provision that lays out

25   strict punishments for people who are found to be

Sharon Austin
October 27, 2021

1    guilty of it.  That would be of something that would

2    prevent it.  If people know that if they prevent

3    fraud, that it will mean that they'll face a

4    possibility of jail time or significant fine.  I

5    would say that that would be the biggest deterrent.

6        Q.   And you're aware in all the instances

7    where fraud has occurred in Florida, that type of

8    strict punishment was already in existence, but yet,

9    it did not deter the fraud from occurring, correct?

10       A.   And the people who committed the fraud

11   were punished.  They were caught and they were

12   punished.

13       Q.   Okay.  I want to discuss -- are you

14   familiar with the 1993 Hialeah mayoral election?

15       A.   I'm somewhat familiar with it.

16       Q.   Now, in this case, the judge ordered a new

17   election due to the forging of hundreds of absentee

18   ballots.  Various people went to jail for committing

19   voter fraud.  Does that sound to be roughly what you

20   believe happened there?

21       A.   I didn't include that in my report, but I

22   did read about what happened there.

23       Q.   And I'm stating those facts accurately,

24   correct?

25       A.   I haven't -- I didn't include it in my

Sharon Austin
October 27, 2021

Page 75

1    report.  So I -- I'm assuming that you are.

2         **Q.   Well, you stated that -- you put fraud in**

3    **quotes.  You use the term purported fraud.  So I'm**

4    **trying -- in order to reach those conclusions, I'm**

5    **assuming you analyzed and determined whether or not**

6    **there actually were instances of fraud in Florida,**

7    **correct?**

8         A.   Yes.

9         **Q.   But yet, you chose to put fraud in**

10   **quotation marks as opposed to actually address**

11   **actual instances of fraud.  Why did you do that?**

12        A.   Because, again, I think in instances

13   where -- that you just described with the mayoral

14   election in Hialeah, again, when fraud takes place,

15   the people are caught and the people are punished

16   and a fair resolution is found, which is what

17   happened there.

18             And so the way that I refer to fraud in my

19   report is to view it with suspicion, because if you

20   look at that one election, that's one municipality

21   in the Miami area, but we're talking about SB 90

22   which affects the entire state.  And that one

23   election and those few incidents of fraud do not

24   justify SB 90.

25             There was not evidence of enough fraud for

Sharon Austin
October 27, 2021

1   this law to be put in place.

2       Q.    So in this case, there were hundreds of

3   ballots that were fraudulently cast.  Do we need

4   thousands of ballots fraudulently cast to justify

5   SB 90?  Give me a number in your opinion that you

6   need to see in order to feel that it's justified.

7       A.    I would say in order for it to be

8   justified, I don't think we should just look at one

9   election and that one unfortunate situation in that

10  one election in a small municipality.

11          In order for it to be justified, there

12  would have to be some type of evidence of widespread

13  fraud.  And I have not seen that in the state of

14  Florida recently.

15      Q.    Okay.  So that was in 1993.  Are you

16  familiar with the 1997 Miami mayoral election?

17      A.    Somewhat.

18      Q.    Based on your understanding, what happened

19  there?

20      A.    I didn't include that in my report, but I

21  do study in Miami and I wrote a recent book that has

22  a chapter on Miami.  So -- but I'm not as familiar

23  with that election.  So can you tell me what

24  happened?

25      Q.    Well, let me know if you think this is off

Sharon Austin
October 27, 2021

1    base from your understanding.  But a grand jury

2    found that voting in Miami that year was plagued by

3    widespread ballot fraud.  Ballot collectors filled

4    out absentee ballots and cast those ballots even in

5    the name of voters who were dead.  In all, 54 ballot

6    collectors had findings of guilt entered against

7    them by courts of law for voter fraud.

8            Does that sound about right?

9        A.   Can you say that last part again?

10       Q.   Fifty-four ballot collectors had findings

11   of guilt entered against them for voting fraud.  Do

12   you disagree with that summary of those facts?

13       A.   Well, because, again, I didn't include it

14   in my report, so do you know how many ballots there

15   were that would cast -- that were said to be cast

16   fraudulently.

17       Q.   It was enough to flip the election.  I

18   don't know the exact number, but the Court flipped

19   the election to the other candidate who was declared

20   a loser without the fraud.

21       A.   Okay.  So your question is?

22       Q.   Do those facts match up with your

23   understanding generally of what happened in the 1997

24   Miami mayoral election?

25       A.   Okay.  I didn't include it in my report,

Sharon Austin
October 27, 2021

Page 78

1   so I didn't study is extensively, so I can't comment

2   on it.

3       Q.   You did include statements in your report,

4   though, that fraud was nonexistent, that fraud was

5   purported, that fraud, you put in quotes.  So I

6   would assume --

7       A.   Uh-huh.

8       Q.   -- that you did examine -- that you did

9   examine actual instances of fraud to arrive at those

10  conclusions, correct?

11      A.   Well, I examined just the fact that when I

12  talk about fraud, again, I didn't see the widespread

13  comprehensive fraud taking place for a sustained

14  period of time throughout the state of Florida.  And

15  I think that that would be necessary for a law of

16  this kind.

17      Q.   Okay.  So we have two elections, 1993 and

18  in 1997, in one of the most populous counties of

19  Florida, where widespread fraud occurred, correct.

20      A.   1993 and 1997, that happened, according to

21  what you're saying.  And again, I did not put that

22  in my report.

23           But this is 2021, and several laws have

24  been put in place over the years to address fraud.

25  So as a result of those incidents occurring many

Sharon Austin
October 27, 2021

```
 1    years ago, the laws that already were in place

 2    should have been -- should have already taken care

 3    of that problem, and SB 90 as a result isn't

 4    necessary.

 5         Q.   What were those laws that you felt were

 6    necessary, that helped prevent voter fraud?

 7              MR. MILLER:  Objection, form.

 8         A.   Well, I will say that there were laws put

 9    in place and they had -- they were problematic but,

10    I mean, there were some benefits.  I guess in every

11    law there's a benefit but there's also a

12    disadvantage.

13              But there were laws over the years in the

14    state of Florida that I refer to in the report, that

15    were put in place, and they also were challenged

16    because in many ways, they were discriminatory as

17    well.  But the argument with those laws were that it

18    was -- they were supposed to address fraud and also

19    make things more efficient and correct problems that

20    had existed.

21              So with the examples that you just

22    referred to from those two elections, I would think

23    that previous -- previously passed laws would have

24    corrected those problems.

25
```

Sharon Austin
October 27, 2021

Page 80

```
 1   BY MR. HOLT:
 2        Q.   And do you agree that those laws were
 3   constitutional?  That they were fair?
 4        A.   Well, in my report, the ones that I refer
 5   to in some ways had some good qualities but in other
 6   ways, they show, as I argue, a pattern of
 7   discrimination.  They were designed to correct
 8   problems, and in some cases, they did.  But,
 9   nevertheless, they tended to have a tendency to put
10   Black and Hispanic voters at a disadvantage and make
11   it for difficult for them to vote.
12             And so I would argue that if a law is in
13   any way discriminatory, I would say that it's not a
14   good law because as a legislator, you are supposed
15   to come up with a way to enact a law to make the
16   process easier and fairer for everyone, and not to
17   make it more difficult for people to vote.
18        Q.   For the 1997 mayoral election, was it fair
19   that a candidate was declared a loser because of
20   voter fraud?
21        A.   No.  And the people who were found guilty
22   of causing that were punished and a fair result
23   eventually happened.
24        Q.   Should not the State then be able to take
25   steps to stop that type of behavior from occurring
```

Page 81

1    in the future?

2         A.   If there is recent evidence of any type of

3    fraudulent activity, then, yes, recent widespread

4    statewide evidence.

5         Q.   So they have to wait for elections across

6    the entire State to be overturned because of voter

7    fraud before they can act; is that what you're

8    saying?

9         A.   I wouldn't say across the entire state.  I

10   would just say that they would need more than just a

11   few examples from -- from many years ago.  1997,

12   this is 2021, that was how long ago?  That was -- I

13   don't remember.  But that was quite a while ago.

14   They would have to have some recent evidence of

15   something like that happening.

16        Q.   Let's --

17        A.   And it couldn't just be in one small -- in

18   one county or one area, it would have to be

19   something that was really significant statewide.

20        Q.   Okay.  Let's fast forward to May of 2013.

21        A.   Okay.

22        Q.   Okay?  In the 26th Congressional District

23   of Florida, are you familiar with that election?  It

24   was the 2012 election.

25        A.   I didn't include it in my report, so, no.

Sharon Austin
October 27, 2021

Page 82

```
 1        Q.    Did you study it in arriving at your
 2   conclusion that there was not widespread fraud in
 3   Florida?
 4        A.    No, I didn't study it.
 5        Q.    Okay.  If I told you that Congressman
 6   Joe Garcia's chief of staff went to jail after being
 7   implicated in a voter fraud scheme by submitting
 8   more than 2,500 fraudulently absentee ballot
 9   requests, would that surprise you?
10        A.    Yeah, it would -- well, on one hand it
11   would surprise me that he would do something like
12   that.  But on another hand, it would not surprise me
13   that he went to jail.  Because, again, that
14   reinforces my point, that when someone is guilty of
15   fraud, they're punished for it.
16        Q.    Okay.  You would agree that these examples
17   that I provided are actual voter fraud, correct?
18        A.    I would say yes.
19        Q.    It's not purported or hypothetical?
20        A.    Again, I didn't put it in my report, but
21   I'll take your word for it.
22        Q.    I'm not asking for you to take my word for
23   it.  You reached conclusions in your report that the
24   allegations of fraud in Florida were purported and
25   hypothetical.  But yet, I just cited three actual
```

Sharon Austin
October 27, 2021

Page 83

```
 1   circumstances of fraud that occurred.
 2          You would agree, then, that all instances
 3   of fraud in Florida are not hypothetical or
 4   purported, correct?
 5   A.   I think with the way that I -- that I
 6   wrote about purported fraud in my report, I was
 7   talking about just in recent years, for example, as
 8   recently as the 2020 election which was praised for
 9   its efficiency, and I didn't see any evidence of
10   fraud in that particular election here in Florida.
11          And so that's why I viewed SB 90 with
12   suspicion, because you were pointing to examples of
13   things that have happened but has it -- has there
14   been something that has happened in 2020 over the
15   last year or so that would justify SB 90?  And I
16   didn't see any fraud from that period of time.
17   Q.   So you cited in your report an unnamed
18   voter who discussed the fraud prevention measures
19   prior to SB 90 as being the New Jim Crow.  And you
20   agreed with that assessment, correct?
21   A.   Yes.
22   Q.   So being the fact that we, according to
23   you, have not had any widespread cases of fraud,
24   would that not serve as evidence that the fraud
25   prevention measures established by the state of
```

Sharon Austin
October 27, 2021

Page 84

1    Florida were effective in actually preventing fraud?

2              MR. MILLER:  Objection, form.

3         A.    Right.  I would say that the measures that

4    were in place prevented widespread fraud from

5    continuing and that's why SB 90 isn't necessary.

6    BY MR. HOLT:

7         Q.    But you refer to those laws as the New

8    Jim Crow.  How do you explain that?

9         A.    I mean, I refer to those laws as the New

10   Jim Crow because, despite the positive aspects of

11   them, and the fact that they might have been

12   somewhat effective in preventing fraud, they still,

13   I think, were designed with a discriminatory intent.

14   Which was to make it harder for Black voters

15   especially but for Hispanic voters as well to vote

16   and elect their preferred representatives.

17        Q.    So in your opinion, you would have to have

18   a statewide election for -- let's say for a

19   governor, for attorney general, and find widespread

20   statewide fraud in that case, in order to justify

21   the passage of SB 90?

22        A.    Well, I think that would be one thing that

23   would justify the passage.  But just -- it would

24   have to be proven that it's actually necessary.  Is

25   it necessary to do those things the provisions

Sharon Austin
October 27, 2021

```
 1   listed in SB 90?  Is it really necessary to have
 2   those things?  And I don't think that it is.
 3        Q.   Okay.  How many elections would need to be
 4   overturned in order for it to be necessary due to
 5   voter fraud?
 6        A.   I can't place a number on it.  But there
 7   would have to be some evidence of fraud --
 8   widespread fraud.  And in recent years, I just have
 9   not seen it.
10        Q.   Okay.  Now, generally speaking, what
11   opinion were you hired to give here?  What were
12   your -- what were you hired to opine on in your
13   expert report?
14        A.   I was hired to look at just the history
15   of -- of just voting, especially for African
16   Americans and Latinos in the state of Florida, and
17   just to look at different laws and the impact that
18   they had on Black and Hispanic voters as a group.
19        Q.   Okay.  And in arriving at your opinion,
20   did you review the text of SB 90?
21        A.   Yes.
22        Q.   Based on your understanding, what does
23   SB 90 do that is discriminatory?
24        A.   Based on my understanding, it just makes
25   it more difficult for Black and Hispanic voters to
```

Sharon Austin
October 27, 2021

Page 86

```
1    vote.  And it's a continuous -- it's a part of a
2    continuous pattern of that happening.
3            Whenever African Americans take advantage
4    of something that's in place in Florida, to try to
5    help people to vote, usually something happens and
6    there's some type of backlash on the part of the
7    Legislature in which they change laws.  Because it's
8    almost as if once African Americans and Latinos
9    start taking advantage of something that was put in
10   place, and they use that to increase their voter
11   turnout, there's a new law that comes up.  And the
12   excuse that usually is given is that -- a reform or
13   reforming from fraud and that type of thing, but the
14   real intention is to make it harder for them to
15   vote.
16       Q.   And what proof do you have or evidence
17   that you have that that was the Legislature's
18   intention in passing SB 90?
19       A.   Well, the things that I have cited in the
20   report, after each of the laws that have been
21   passed, when -- and this goes way back even to the
22   1800s, I just think the tactics nowadays are more
23   subtle.
24           In fact, then, the tactics were more
25   blatant, but even back to the Reconstruction period,
```

Sharon Austin
October 27, 2021

Page 87

```
1    dating way back to then, after Reconstruction,

2    passage of the 15th Amendment, African American men

3    started to vote.  And then, all of a sudden,

4    different things were put in place, Black codes and

5    other things, you know, you can read the report on

6    your own.

7            But even in recent years when African

8    American and Latino voters took advantage, as I

9    point out in the report, of things like mail

10   ballots, now, it's more difficult to request a mail

11   ballot, and there are other provisions about the --

12   the time that the mail ballot lasts -- it used to be

13   that it lasted through -- for a longer period of

14   time, through two general elections, and now it's

15   only for two years and, you know, the next general

16   election.

17           So it's those types of things that make it

18   more difficult.  These are more subtle tactics that

19   are used to make it more difficult for people to

20   take advantage of something that they took advantage

21   of in 2020.  So that's my argument.

22       Q.  You would agree that all of those

23   provisions yous just discussed apply equally to all

24   races, correct?

25       A.  It's a law that applies equally to
```

Sharon Austin
October 27, 2021

Page 88

1   everyone.

2       Q.   So if I'm a white person, I've still got

3   to provide some type of identifying information to

4   request a ballot?

5       A.   Right.  But it has a disparate impact.  I

6   mean, even though it's applied equally, the impact

7   on African American and Latino voters, I think, is

8   different, and I think is designed to make it harder

9   for them to vote and to take advantage -- continue

10  to take advantage of things that they took advantage

11  of in the last election.

12           Like drop boxes, you know, it makes it

13  more difficult for them to -- vote by mail and those

14  things.

15      Q.   But you would agree that the opportunity

16  applies equally to all voters, regardless of race,

17  correct?

18      A.   Does -- well, I think -- it sounds like

19  maybe that's two different questions, because even

20  though provisions are applied equally to everyone, I

21  wouldn't say that the opportunity is the same.

22           Because if you're putting these types of

23  restrictions there, on vote by mail and drop boxes,

24  then you're not really -- you're removing an

25  opportunity from people to continue to take

Sharon Austin
October 27, 2021

1  advantage of something that clearly they took

2  advantage of in the last election.

3      Q.  So you believe a state should be unable to

4  adjust their voter laws from what they previously

5  were?  Is that what I'm hearing?

6          MR. MILLER:  Objection, form.

7      A.  No.  No, I'm not saying that.  I think

8  that states should adjust the laws when it is

9  necessary to adjust them.

10 BY MR. HOLT:

11     Q.  And who determines when it's necessary?

12     A.  I think the -- all of the people that are

13 in that state determine when it's necessary.  You

14 have to look at the outcomes and see if they're --

15 after the 2020 election, you would have had to see

16 just what incidence of fraud were there.

17         Was it really necessary to reform the

18 election when people praised the election for its

19 efficiency.  So you would have to look at just the

20 perceptions of people within that state to see

21 whether there was any actual fraud and whether there

22 was any evidence that these reforms were actually

23 necessary.

24     Q.  So I'm just -- I'm confused here in that

25 you continually refer to the praise that the state

Sharon Austin
October 27, 2021

```
 1    of Florida got after the -- for the administration
 2    of the 2020 election, yet those -- that
 3    administration was premised upon laws which you
 4    refer to as, quote, the New Jim Crow.  So how can
 5    you praise the running of an election?
 6        A.   Uh-huh.
 7        Q.   And use that as evidence that SB 90 was
 8    not needed while at the same time saying that the
 9    laws that led to that smooth election are the New
10    Jim Crow and racially discriminatory?  How can you
11    use both of those arguments at the same time?
12        A.   Well, I would -- I didn't say that I
13    praised the election.  I'm saying that state
14    officials, elected officials, praise it, as I
15    pointed out in the report.  They praised the
16    election and talked about its efficiency.  But then
17    later, SB 90 was put in place.
18             So I'm saying that I didn't necessarily
19    praise it, praise the -- I think I praised it -- I
20    liked the fact that people took advantage of vote by
21    mail, and of the different things that were put in
22    place.  But state elected officials praised the
23    system and then later came up with SB 90, saying
24    that it needed to be reformed.
25             So how can you on one hand praise
```

Page 91

1  something and say it's efficient, but then in the

2  next sentence you say that it needs to be reformed?

3  If it's efficient, then why is there a need for a

4  reform?

5      Q.   Okay.  You state in your report and go

6  through the analysis that Florida's election laws

7  have evolved from election to election, correct?

8      A.   Yes.

9      Q.   Would you consider it a valid opinion that

10  Florida's elections are run efficiently because they

11  make adjustments following each election to make the

12  next election run smoother?

13      A.   Well, based on my reading of recent

14  election laws, I guess since 2000, those reforms

15  were put in place because there was proven evidence

16  that there was a problem.  And then also, those

17  reforms, I think, as I argue in the report, were put

18  in place as a way to discourage, again, Black and

19  Hispanic voters from voting.

20           But the argument was that there was

21  documented evidence that there were problems there.

22  And in some cases, for example, with the 2000

23  election, we know that there were problems.  But

24  despite the fact that there was a law that was

25  passed, SB 1118 in 2001, I mean, it was designed to

Sharon Austin
October 27, 2021

Page 92

1    correct the problems associated with punch cards and

2    paper ballots and those types of things.  But there

3    were also some things there that were very

4    objectionable.

5              So it's not that I'm saying that all these

6    laws had no good qualities, because some of them

7    actually had some good aspects to them, but in the

8    end, there was always some type of discrimination,

9    and it always ended up being a result that

10   African American and Latino voters were -- as groups

11   were placed at a disadvantage.  And so that kind of

12   makes me argue as I do in the report that this was,

13   in my opinion, purposeful discrimination.

14        Q.   Okay.  In a recent Supreme Court case,

15   Brnovich v. the DNC, are you familiar with that

16   case?

17        A.   No, I don't remember mentioning that one

18   in the report, but...

19        Q.   It's a Section 2 Voting Rights case

20   regarding some Arizona laws.  And again, I'm not

21   asking you to opine on anything from that opinion.

22        A.   Uh-huh.

23        Q.   But the Court, in discussing arguments

24   similar to the ones you just made, they made the

25   statement in reference to the Legislature's motives,

Sharon Austin
October 27, 2021

1    and they said "partisan motives are not the same as

2    racial motives."  Okay?  "Partisan motives are not

3    the same as racial motives."  That's at page 785 of

4    the Brnovich opinion.

5              What does that mean to you?

6        A.   That means that --

7             MR. MILLER:  Objection, form.

8        A.   What does it mean to me?  I -- first of

9    all, I don't know if I even agree with -- well, I

10   mean, partisan motivations aren't the same as racial

11   motivations which means that -- I don't know if I

12   even agree with that.  Because race and partisanship

13   are closely connected together.  Because whether we

14   want to realize it or not, the overwhelming majority

15   of African Americans are Democrats, but in my

16   report, I didn't really talk about focus on

17   partisanship.  I talked about I guess the race

18   issue.

19             But I guess to answer your question,

20   partisanship means that you're trying to place

21   someone at a disadvantage and harder for them --

22   make it harder for them to elect people from their

23   political party.  Racial motivations means that

24   you're trying to prevent someone of a certain race

25   from voting and electing people, their preferred

1    representative.  So to me, that's the distinction

2    between the two.

3    BY MR. HOLT:

4        Q.   Okay.  And you would agree that elections

5    have partisan consequences, correct?

6            MR. MILLER:  Objection, form.

7        A.   I don't know what you mean when you say

8    "partisan consequences."

9    BY MR. HOLT:

10       Q.   For example, the State House of Florida

11   has a majority Republican members.  You would agree

12   that will have an outcome on the type of things the

13   Legislature addresses during that session, where the

14   Republicans have a majority, correct?

15       A.   In most cases I would say probably yes.

16       Q.   And on the swing side, if there was a

17   Democratic majority in a State house, you would

18   agree they would consider different things that are

19   important to the members of their party, correct?

20       A.   Well, I don't know if I would say

21   different things, because one of the things that I

22   talk about in my government class, that in many

23   cases, you know, you hear so much about different

24   partisans, but in many ways, Democrats and

25   Republicans, they govern in the same way.

Sharon Austin
October 27, 2021

1         And they almost have, like, similar

2    priorities based on the needs and the interests of

3    their constituents.  So I wouldn't -- I don't know

4    if I would even say that -- if -- I guess the

5    logical inference is that if there's a majority

6    Democratic legislature, their priorities would be

7    different from those of Republicans.  I think that's

8    probably the inference that people would just assume

9    that to be the case, but sometimes, really, it isn't

10   the case.

11        Q.   Let's use our current Congress.  Okay?

12   That we have a Democratic president, a Democratic

13   House.  Their priority and their agenda is going to

14   be different than if we had a Republican president

15   and a Republican House, correct?  I'm not trying to

16   trip you up here.

17             MR. MILLER:  Objection to form.

18        A.   Okay.

19   BY MR. HOLT:

20        Q.   I mean, what type of things would a

21   Democratic House consider that a Republican House

22   would not?

23        A.   Are you talking about Congress, or are we

24   talking about Florida?

25        Q.   Either.  Just a legislative body that is

Sharon Austin
October 27, 2021

1    controlled by Democrats.

2         A.    Okay.

3         Q.    Versus Republicans, what are some things

4    that they might argue for and seek to establish,

5    that Republicans would object to?

6         A.    I would say that they -- their priorities

7    would be pretty similar.  Because mostly -- as we

8    talk about in one of my classes, mostly, the focus

9    is on economic issues.

10             Because that's what people are concerned

11   about, is the economy and jobs, so I would say

12   regardless of whether you have majority Republican

13   or majority Democrat, Democratic -- if we're talking

14   about Florida legislature, I would say the priority

15   would still be on economic development because

16   that's what the citizens want.

17        Q.    Okay.  What about social issues.  Are they

18   going to focus on different social issues?

19        A.    Are they going to focus on different

20   issues?  Probably not.  Are they going to take

21   different perspectives?  Probably so.

22        Q.    For example, the recent heartbeat abortion

23   law that passed in Texas that's currently before the

24   Supreme Court, would that law pass in, let's say,

25   New York, where they have a Democratic-controlled

Sharon Austin
October 27, 2021

1   State House?

2      A.   Probably not.

3      Q.   Can you think of a scenario where it would

4   in New York?

5      A.   Well, it would if the citizens in New York

6   said that they were in favor of it.  Which probably

7   wouldn't happen, in a place like New York.

8      Q.   I guess what I'm trying to get at here,

9   you would agree that in our representative

10  democracy, citizens elect people who will further

11  their interests, correct?

12     A.   Yes.

13     Q.   And when a majority of those people

14  control the State House, it's those interests that

15  will be furthered, correct?

16     A.   Yes.

17     Q.   So in the case of SB 90, the majority of

18  Republican voters feel that voter fraud is an

19  important issue to them.

20          MR. MILLER:  Objection to form.

21  BY MR. HOLT:

22     Q.   You'd agree with that statement, correct?

23          MR. MILLER:  Objection to form.

24     A.   Can you repeat that again.

25

Sharon Austin
October 27, 2021

1   BY MR. HOLT:

2        Q.   The majority of Republican voters feel

3   that preventing voter fraud is an important issue to

4   them.

5             MR. MILLER:  Objection, form.

6        A.   I haven't read that --

7             MR. MILLER:  That's not a question.

8   BY MR. HOLT:

9        Q.   I just said would you agree that the

10  majority of Republican voters in the state of

11  Florida believe that voter fraud prevention is a

12  good thing?

13            MR. MILLER:  Objection, form.

14       A.   I haven't read -- studied that, so I

15  really don't know how people along partisan lines

16  feel about voter fraud.  That's not something I

17  addressed in the report.

18  BY MR. HOLT:

19       Q.   Okay.  So let's hypothetically assume that

20  Republican voters believe that addressing voter

21  fraud is a priority.  Would it not, therefore,

22  assume that the Republican legislature, that was

23  elected by those Republican voters, would therefore

24  pass laws pertaining to voter fraud?  Is that not

25  how a democracy works?

Sharon Austin
October 27, 2021

1          MR. MILLER:  Objection to form.

2      A.   I guess I'm -- I'm just confused about,

3  you know, what you're asking me about Republicans

4  versus Democrat, because my report didn't really

5  focus on partisanship.

6           This is, to me, an issue of voter --

7  voting rights, for people of color, and so I didn't

8  really look at it, at Republican versus Democrat

9  because if you look at the report, throughout the

10  entire report, I talk about various periods in

11  American history, and at one time, Florida was a

12  part of the Solid South.

13           And, you know, you had your conservative

14  Southern Democrats, and they were people who didn't

15  want Black and Hispanic people to vote either.  And

16  so I didn't necessarily target Republicans or say

17  that this is anything to do necessarily -- I did

18  mention maybe some things, but that's not the

19  purpose of my report.

20           My report just talked about voting rights,

21  and the fact that it's important for people who are

22  Black and Hispanic -- for all people, but for people

23  who are Black and Hispanic -- to have an uninhibited

24  right to vote.  So that was the focus of my report.

25

```
 1   BY MR. HOLT:

 2        Q.   And I appreciate that.  My rationale for

 3   asking these questions is in your report, you took

 4   the position that voter fraud was hypothetical or

 5   purported or nonexistent, okay?  That's a position

 6   that you took in your report, correct?

 7        A.   It is.

 8        Q.   So what I'm trying to get at is, would you

 9   not agree that there are other -- there are other

10   interests besides trying to discriminate against

11   minority voters as to why SB 90 was passed?

12             MR. MILLER:  Objection, form.

13        A.   Were there other interests?  Were there --

14   BY MR. HOLT:

15        Q.   For example --

16        A.   Go ahead.

17        Q.   I was going to say, for example, the fact,

18   hypothetically speaking here, Republican voters felt

19   that preventing voter fraud was important to them.

20             MR. MILLER:  Objection, form.

21        A.   Well, I haven't had -- I haven't gotten --

22   read any survey data or polls that show that

23   Republican voters said that they wanted voter fraud

24   to be addressed here in Florida.

25
```

Sharon Austin
October 27, 2021

Page 101

1  BY MR. HOLT:

2      Q.   When do you tell the difference between

3  something that's motivated by race versus

4  partisanship when they're so closely aligned, as you

5  just said?

6      A.   I think you have to look at just the

7  history of Florida, which is what I've done in my

8  report, and just look at the fact that as a southern

9  state, Florida has a history of -- the Legislature

10  has a history of enacting legislation that has

11  discriminated against and disenfranchised Black and

12  Hispanic voters.

13      Q.   But I'm looking at the current make-up of

14  the legislature and what their intent was.  I

15  understand that Florida has a history of racial

16  Jim Crow laws and whatnot, and I'm not asking about

17  those.  I'm asking about the intent of the current

18  legislature.

19          You would agree that there are other

20  interests outside of racial interests that could

21  have led the Florida Legislature to pass SB 90,

22  correct?

23          MR. MILLER:  Objection, form.

24      A.   I really don't know what their interests

25  are.  But I would say that my only interest with

Sharon Austin
October 27, 2021

Page 102

1   this is looking at the race issue.  So it is

2   possible that maybe there was some partisan

3   motivation, but I'm just looking at -- I just saw

4   the racial issue.

5   BY MR. HOLT:

6        Q.   What about the desire to stop voter fraud,

7   is that not a valid interest of the legislature that

8   they could have considered?

9        A.   They could have.  But the question is did

10  they consider it?  Is that the real motivation for

11  this?

12       Q.   Do you have any evidence that they didn't?

13       MR. MILLER:  Didn't what?  Objection,

14       form.

15       A.   I don't have any evidence that they did

16  either.

17  BY MR. HOLT:

18       Q.   Okay.

19       MR. HOLT:  How's everyone doing right now,

20       in terms of lunch?  I probably got two or three

21       more hours.

22       MR. MILLER:  Why don't you -- let's go

23       offline, and Sharon and I can talk.  Why don't

24       we take five minutes and we can get back -- we

25       can report back as to what she's thinking

Sharon Austin
October 27, 2021

```
 1      about.
 2             MR. HOLT:  Sounds good.
 3             MR. MILLER:  All right.
 4             (Recess from 12:22 p.m. to 1:03 p.m.)
 5             MR. HOLT:  Go back on the record here.
 6             MR. MILLER:  Is the court reporter here?
 7             THE STENOGRAPHER:  Yes, sorry.
 8             MR. MILLER:  Just want to make sure we're
 9      actually on the record.
10             MR. HOLT:  Are we good to move forward?
11             THE WITNESS:  I'm fine.
12             MR. HOLT:  Are we good to start?
13             THE STENOGRAPHER:  Yes.
14      BY MR. HOLT:
15         Q.   Now, during the break, Dr. Austin, did you
16      speak with anyone aside from your attorney regarding
17      your testimony today?
18         A.   I talked to my attorneys.
19         Q.   Did you speak to anyone besides your
20      attorneys?
21         A.   No.  Just my attorneys.
22         Q.   Did you consult any sources or any
23      materials during the lunch break?
24         A.   Just my report.
25         Q.   Okay.  Awesome.
```

```
 1                    Let's jump back in here.
 2                    On page 65 of your expert report, this is
 3      a quote we've already talked about, you state that
 4      SB 90 is best understood as a backlash to Black and
 5      Hispanic turnout in 2020.
 6                    Is that a correct quote from your -- from
 7      page 64?
 8           A.   Yes.
 9           Q.   You would agree that early and absentee
10      turnout greatly increased across the board in
11      Florida, regardless of race, during the 2020
12      election, correct?
13           A.   I'm mostly just focused on Black and
14      Hispanic turnout.  So according to what I found, for
15      Black and Hispanic turnout, it was significant.
16           Q.   Okay.  If I told you that a statewide
17      increase of 78 percent, from 2016 to 2020, occurred,
18      regardless of race, would that number surprise you?
19           A.   Seventy-eight -- do you mean across the
20      board among all voters in Florida?
21           Q.   Yes.  The number of people who
22      participated in the 2016 election, general election,
23      versus the 2020 general election, via vote-by-mail.
24           A.   Okay.
25           Q.   Would that surprise you?
```

Sharon Austin
October 27, 2021

1       A.   Well, I haven't seen that data, so I don't

2   know.  I would have to see what you're talking

3   about.  So if you have something you want to share

4   on the screen, or -- I don't know -- I don't know

5   what the overall percentage was statewide.

6       Q.   In the interest of time, let's just assume

7   what I'm asking you is true and then if it's not,

8   it's not.  I got this from the Secretary of State's

9   website tallying their early voting statistics and

10  vote-by-mail statistics which showed a 78 percent

11  increase in vote by mail from 2016 to 2020, and

12  nearly 12 percent increase in early voting from 2016

13  to 2020 across all voters.

14      A.   Okay.

15      Q.   Assume --

16      A.   I would like to see it because I don't

17  know if I should comment on something if I -- if I

18  haven't actually seen it.

19      Q.   Okay.  Well, have you read the complaint

20  in this case, that you're -- have you read the

21  complaint of what you're providing an opinion to

22  support?

23      A.   So have I -- which -- which complaint?

24      Q.   Have you read the complaint filed by the

25  plaintiffs in this case, of which you're supporting

Sharon Austin
October 27, 2021

Page 106

1    via your opinion?

2         A.    Yes.

3         Q.    Okay.  Throughout the complaint, it talks

4    about the general increase of voting and turnout

5    from 2016 to 2020.  Is that something you can

6    generally agree to, that that happened?

7         A.    Well, I -- I'd like to review the -- I

8    mean, I've read the complaint, but I don't remember

9    exactly the specifics of what you're talking about.

10   So I really would like -- before I comment on

11   something, I'd like to see what you're talking

12   about.  So I would have to look at the complaint

13   again, and then -- and then see exactly what data

14   you're talking about.

15         So are you talking about -- you know, if

16   you're saying there's a large -- was a large

17   increase, then that's fine.  But are you talking

18   about -- are you making an argument or do you have

19   any evidence to say that there was a substantial

20   increase in white turnout as well as Black and

21   Hispanic turnout?  Is that what you're trying to

22   say?

23         Q.    No, I'm talking about the general overall

24   turnout.  We'll talk about this more after the next

25   break.  I'll pull up the reports from the Secretary

Sharon Austin
October 27, 2021

1    of State and we can --

2         A.   That's fine.

3         Q.   I'll enter them as exhibits and we can go

4    over them that way.

5              On page 53 of your report, you cut and

6    pasted the table from the ACLU that we've already

7    discussed --

8         A.   Uh-huh.

9         Q.   -- from the 2018 election pertaining to

10   absentee ballot rejection rates.  Is that correct?

11        A.   That I uploaded this table?

12        Q.   Yes.  It's -- that it pertains to the 2018

13   data pertaining to absentee ballot rejection rates.

14        A.   Okay.  And you're looking at the table on

15   page 53?

16        Q.   Yes.

17        A.   All right.

18        Q.   Okay.  Now, throughout your report, you

19   state that a massive shift in voting patterns took

20   place in 2020.  And the SB 90 was passed as a result

21   of those.  Is that correct?

22        A.   There was a substantial increase in voting

23   among Black and Hispanic voters.

24        Q.   Okay.  Now, you would agree that it is

25   difficult to use anything pre pandemic to draw

Sharon Austin
October 27, 2021

1    inferences regarding the 2020 voting experience, for

2    example, 2018 data trying to explain behavior in

3    2020 during the pandemic; you would agree that

4    that's a difficult analysis?

5              MR. MILLER:  Objection, form.

6         A.   So are you asking me that I would agree

7    that it's difficult to make conclusions about things

8    that happened before the pandemic, about changes in

9    voting before the pandemic?

10   BY MR. HOLT:

11        Q.   To draw conclusions about voting behavior

12   in 2020, using pre-pandemic data from 2018.  You

13   would agree that that is difficult and would

14   likely --

15        A.   Uh-huh.

16        Q.   -- and would likely be inaccurate?

17             MR. MILLER:  Objection, form.

18        A.   Well, no, I wouldn't -- I wouldn't say

19   that.  Because, I mean, you can make some

20   assumptions about some changes that resulted from

21   the pandemic, but who's to say that those changes

22   might not -- have already -- you know, if there was

23   an increase in turnout, by mail, or -- there's

24   not -- no evidence to say that even if the pandemic

25   had not occurred, those increases might not have

Page 109

```
 1    happened anyway.
 2              So I think you can make inferences about
 3    2020 based on data before the pandemic.
 4    BY MR. HOLT:
 5         Q.    We're looking specifically here at
 6    absentee ballot rejection rates, okay?
 7         A.    Okay.
 8         Q.    Did you attempt to locate or use the 2020
 9    numbers of absentee ballot rejection rates?
10         A.    I attempted to find -- well, not absentee
11    ballot rejection, but I have tables that have
12    information about voting by mail of just -- you
13    know, of the information that I could find, I have
14    it in the report.
15         Q.    Okay.  I'm specifically trying to
16    understand your use of the 2018 data here.
17         A.    Okay.
18         Q.    As opposed to the 2020 data.  Why did you
19    use 2018 data and not 2020 data?
20         A.    Because it was difficult for me to find.
21         Q.    Did you try to look for it?
22         A.    I looked on -- yeah, I did.
23         Q.    Did you just -- I just want to understand,
24    you would agree that you just cut and pasted the
25    table on page 53 of your report from an ACLU report,
```

Sharon Austin
October 27, 2021

1    correct?

2        A.    Right.

3        Q.    Do you often just cut and paste

4    information from external reports without providing

5    your own original analysis pertaining to those

6    reports?

7        A.    No, I usually don't.  But this was, I

8    thought, a good table, and it provided some useful

9    data.  And I didn't see anything wrong with it.

10   It's not like I plagiarized it because I cited it.

11   So I saw nothing wrong with it, and it was reliable

12   data.

13       Q.    I'm not accusing you of plagiarism.  I

14   apologize if it came off that way.  I'm trying to

15   simply understand -- and we kind of went through

16   this exercise before -- of relying on another

17   expert's data to reach your own conclusions.

18             Is that something that you often -- that

19   you do commonly?

20       A.    Well, I mean, I -- I think any researcher,

21   when you're doing research, and if you're looking at

22   census data -- that's not your data, you didn't

23   collect the census.  But that doesn't mean that you

24   can't use census data.  So I don't think that there

25   is anything problematic about using sources, as long

Sharon Austin
October 27, 2021

1    as they're legitimate sources, and as long as you

2    cite them.

3            So -- and then if you look at the overall

4    report, the other -- this is the only table that I

5    used that was just the one -- as you said, I cut and

6    pasted, but all of the other tables are tables that

7    I created myself.

8        **Q.   Okay.  You premised your main finding that**

9    **due to the shifting patterns between 2018 or 2016 to**

10   **2020, that SB 90 was passed as a result due to the**

11   **changing voting patterns among Black and Hispanic**

12   **voters; is that correct?**

13       A.   I would say yes.

14       **Q.   But yet, you rely on data from 2018,**

15   **before those changes in behavior took place, to draw**

16   **conclusions from.  Why is that?**

17           MR. MILLER:  Objection, form.

18       A.   I relied on data in this table that's on

19   page 53, from an ACLU report from 2020.  And it

20   showed just the rejection rates, the -- you know,

21   the vote-by-mail rejection rates.

22           And I thought it was some really

23   compelling data that needed to be included.  So I

24   saw nothing wrong with including this table or

25   including this data, because it showed just the --

Sharon Austin
October 27, 2021

```
 1   and then this is not the only table in the report.
 2   There are others that show the heavy usage of vote
 3   by mail for Black and Hispanic voters that I created
 4   myself.  So I saw nothing wrong with including this
 5   table.
 6            And then also for professors or someone
 7   who worked at a research university, it's not
 8   uncommon for people even to reproduce tables and
 9   information that's listed in other sources.  So this
10   is not uncommon in academia.
11   BY MR. HOLT:
12        Q.   I understand that.
13             What I'm trying to get at is the premise
14   of your argument is based upon the dramatic change
15   in voting behaviors from 2018 to 2020, yet you rely
16   on 2018 voter data to support your conclusion for
17   2020 behavior.
18             I just -- if the pattern's changed so
19   substantially from 2018 to 2020, why do you rely on
20   2018 data to help prove your point?
21        A.   Well, really, if you just look at the
22   entire --
23             MR. MILLER:  Form.  Objection, form.
24        A.   If you look at the entire report, it's
25   talking about just changes in voting behavior since
```

Sharon Austin
October 27, 2021

1    the 1800s.  So I'm not just focusing just on from

2    2018 to 2020.

3    BY MR. HOLT:

4         Q.   Okay.  Let's move on here.

5         A.   Okay.

6         Q.   That's fine.

7         A.   I don't understand what your question is.

8         Q.   It's simply your use of 2018 data to

9    support a conclusion that SB 90 was racially biased

10   in 2020.

11        A.   Okay.

12        Q.   When --

13        A.   Because --

14        Q.   When you admittedly base your premise of

15   the need -- the passage of SB 90 due to the changing

16   voting behaviors from 2018 to 2020.

17        A.   Right.

18        Q.   So -- anyways --

19        A.   Go ahead.

20        Q.   We can move on.  That's fine.  Unless

21   there's something you'd like to say.

22        A.   No.

23        Q.   Okay.  Looking further at that table that

24   you cited, you would agree that it only includes 11

25   of Florida's 67 counties, correct?

Page 114

```
 1        A.    Okay.  It does.
 2        Q.    Why were only -- why were only 11 counties
 3   included in that -- in your analysis, and not all
 4   67?
 5        A.    Well, one of the problems that I ran into
 6   with making the tables is that even though most of
 7   the websites include information in some counties,
 8   they don't really have the racial breakdown.  And
 9   so, you know, with some of the tables, I included
10   tables in -- in some of the tables I included
11   counties that had the largest Black and Hispanic
12   populations, and in others, there just was not the
13   same racial breakdown in some counties as in others,
14   so that data was hard to find.
15        Q.    Were you aware that in Appendix F, of the
16   ACLU report from which you took the table on page 53
17   of your report from, it has data for all 67 of
18   Florida's counties?
19        A.    Okay.
20        Q.    Were you aware of that?
21        A.    No.  I wasn't aware of that.
22        Q.    So why -- I guess if you -- the reason why
23   you didn't include that data simply was because you
24   were unaware that that data existed; is that
25   correct?
```

1          MR. MILLER: Objection, form.

2      A.   Well, I guess I would say I was unaware

3   that it was really necessary to include all 67

4   counties.  This is just a snapshot of vote-by-mail

5   rejection rates.

6   BY MR. HOLT:

7      Q.   Okay.  **Would you agree that perhaps one of**

8   **the reasons you decided not to include data from all**

9   **67 counties was because it would show the ballot**

10  **rejection rates were not as severe as you purported**

11  **to show in your report?**

12     A.   No.  Because my report is an honest

13  report, and I was just giving information about the

14  reliance on vote by mail and the impact that SB 90

15  would have on that, in my opinion.

16     Q.   Okay.  **What are the harms of selectively**

17  **choosing a few counties that fit your narrative and**

18  **passing conclusions based off of those few counties**

19  **as indicative of statewide behavior?**

20     A.   I guess that's what you're accusing me of,

21  it's just selectively choosing certain counties, but

22  I just wonder, have you looked at the entire report?

23  Because if you have, then you would notice in the

24  other tables, that I include information from

25  counties that have the largest Black and Hispanic

Sharon Austin
October 27, 2021

1    populations.

2              And that isn't something that I was doing

3    just to have some -- something that was biased to

4    support my narrative.  That is something that I was

5    using to just show the reality which is that Black

6    and Hispanic voters heavily relied on vote-by-mail

7    voting in counties with the largest Black and

8    Hispanic populations.  So I would think those would

9    be the tables that we would focus on rather than

10   this one.

11        Q.   Okay.  Explain to me how this is any

12   different than showing the existence of voter fraud

13   in a few selected counties and then passing that off

14   as a statewide problem.  Why can we not arrive at

15   that same conclusion based off of selective

16   occasions of voter fraud?

17             MR. MILLER:  Objection to form.

18        A.   Well, because, I think that the entire

19   report shows a history, a sustained history, of

20   discrimination against Black and Hispanic voters --

21   for Black voters dating back to -- especially for

22   Black men dating back to the late 1860s, when they

23   were supposed to get the right to vote with the

24   15th Amendment.

25             For Black women, I guess dating back to

Sharon Austin
October 27, 2021

Page 117

1  the 19th Amendment guaranteed the right for women to
2  vote, but Black women couldn't vote freely, at least
3  until the 1960s here.  So there's a distinct pattern
4  of discrimination against Black and Hispanic voters.
5           And I'm not just forecast on 2018, 2019,
6  2020, I'm talking about what has been a sustained
7  history.  And I think I provided a lot of evidence,
8  not so much to try to push a certain narrative, but
9  just to tell the truth, which is the State of
10 Florida has a history of discriminating, especially
11 against Black voters.
12          And if you look at the entirety of the
13 report, and everything that's in it, all the mini
14 sources that I cited, I guess I don't understand why
15 you're just focusing and honing in just on this one
16 table when there's extensive history that proves
17 that there has been discrimination.  Whether we want
18 to admit it or not, that's the reality here in the
19 state of Florida.  And that's why I have an
20 objection to SB 90.
21 BY MR. HOLT:
22      Q.   Okay.  I'm simply just trying to
23 understand why the selective showing of 11 counties
24 of ballot rejection rates is indicative of statewide
25 behavior, that Florida as a whole was discriminating

Sharon Austin
October 27, 2021

1    against minority voters based off of these 11

2    counties.

3            A.   Well, I think just this one table isn't in

4    itself -- if you just look at -- if this report only

5    consisted of one table, then you could argue that

6    I'm maybe only selectively looking at certain

7    counties.  But if you look at the other tables that

8    I've included, for example, you know, you were

9    talking about the 2020 data, if you look at Table 2,

10   which is on page -- begins on page 57 of the report,

11   and it talks about mail and early voting in counties

12   in November 2020 with the largest Black populations,

13   you can see that, clearly, there is a significant

14   percentage of Black voters in this table that relied

15   heavily on voting during the early voting period and

16   voting by mail.

17           And then if you look at the next table,

18   Table 3, that begins on page 60, you'll see the same

19   is the case for counties with the largest Hispanic

20   populations.  And that was from November 2020.

21           So you were asking me why I was relying on

22   2018 data in this table, but if you look at Tables 2

23   and 3, it has information from November of 2020, and

24   it shows that this was a practice, vote by mail and

25   early voting were practices that Black and Hispanic

1  voters in districts with the largest -- I mean in

2  counties with the largest Black and Hispanic

3  populations heavily took advantage of.  And now, all

4  of a sudden, SB 90 is trying to roll back on vote by

5  mail and -- on vote-by-mail procedures.

6         And so that's the argument that I'm

7  making.  So if you just focus on this one table, you

8  can reach one conclusion.  But if you look at the

9  entirety of the report, in Tables 2 and 3, you'll

10  reach a completely different one.

**11     Q.   Do Tables 2 and 3 discuss absentee ballot**

**12  rejection rates?**

13     A.   No, Tables 2 and 3 focus on the point that

14  I'm making throughout the entire -- the main focus

15  of the report, which is that there always usually is

16  some type of backlash whenever Black and Hispanic

17  voters take advantage of something, that usually is

18  even encouraged.

19         For example, in Florida, it was encouraged

20  for people to vote by mail and vote during the early

21  voting period.  Then, once Black and Hispanic voters

22  began to heavily utilize those things, all the

23  sudden, now, there's an attempt to sort of curtail

24  that.  And so that's the overall point that I'm

25  making throughout the entire report.

Sharon Austin
October 27, 2021

1      Q.   Okay.  Again, I'm particularly interested

2  in the ACLU report on page 53 of your report that

3  discusses absentee ballot rejection rates.

4      A.   Okay.

5      Q.   I understand the larger point that you're

6  making.  But this is the only table in your report

7  that discusses this.

8      A.   Okay.

9      Q.   Is that correct?

10     A.   Well, I mean, if you want to focus on that

11 table, that's fine.

12     Q.   Do you know Dr. Daniel A. Smith who is the

13 author of the report?

14     A.   Yes.

15     Q.   The ACLU report.

16     A.   Yes.

17     Q.   Okay.  On page 75 of the full ACLU report,

18 Dr. Smith stated that he excluded rates not

19 calculated for categories with fewer than ten

20 rejected ballots, okay?  In other words, he excludes

21 from his analysis any racial group in a county where

22 there are very few rejected ballots.  Okay?

23          In your opinion, what would be the effect

24 of ignoring counties that had low absentee ballot

25 rejection rates in this analysis?

Sharon Austin
October 27, 2021

```
 1        A.   I mean, I think if you're talking about

 2   Professor Smith, I really -- and his research, you

 3   should ask him about his research.  I refer to the

 4   table but I didn't write his report.  So if you have

 5   any questions specifically about him and the way

 6   that he conducted his research, I think you should

 7   ask him.

 8        Q.   You chose to include the report in your

 9   expert report, so --

10        A.   But I didn't write the report.

11        Q.   I'm not asking him --

12        A.   I didn't write it.  He did.

13        Q.   -- I'm asking you.

14             But you chose to include it in your expert

15   report, so therefore, I can ask you questions about

16   it.  You would agree with that?

17        A.   You can.  No, it's fine.  You can ask

18   questions about it, but I didn't write his report,

19   so -- but go ahead.

20        Q.   Were you aware that Dr. Smith excluded

21   counties that had low absentee ballot rejection

22   rates from his analysis?

23        A.   Right.  That's what he put in the report.

24        Q.   Were you aware that he had done that?

25        A.   I was aware, because he mentioned it in
```

Page 122

1   the report.

2       Q.   And yet, you still chose to use that

3   analysis in your expert report?

4       A.   I still chose to use it in the report

5   because, from my understanding of what he was

6   looking at, he was trying to find counties that had

7   higher rejection rates of Black -- at least that was

8   my understanding of -- of Black and Hispanic votes.

9            And I don't think that he needed -- he

10  felt that he needed to include those other counties,

11  but again, I did not do his research.  So you would

12  have to ask him why he did that.

13      Q.   Okay.  I want to move on to discuss

14  paragraph 91 of your report which starts on page 58.

15  Just let me know when you're there.

16      A.   Okay.

17      Q.   And as you did before, you focus on a very

18  small subset of data and attempt to draw general

19  inferences from it.  What are the dangers of doing

20  that?

21           MR. MILLER:  Form.

22      A.   Okay.  So No. 91 on page 58?

23  BY MR. HOLT:

24      Q.   Yes.

25      A.   Okay.

Sharon Austin
October 27, 2021

1      Q.   And what are the dangers of focusing on a

2  very small subset of data, in this case, a single

3  neighborhood in Florida --

4      A.   Uh-huh.

5           MR. MILLER:  Objection to form.

6  BY MR. HOLT:

7      Q.   -- and drawing general conclusions from

8  that data.

9           MR. MILLER:  Objection.

10      A.   Well, I was very happy to get this

11  information, and I wasn't able to find it for

12  predominantly Black CDPs which stands for

13  census-designated places.

14           But I thought this was a really compelling

15  point.  It really supported my point about the --

16  you know, the fact that in predominantly Black

17  communities, there was a heavy focus on voting -- I

18  was going to put together a table, but I couldn't

19  find the data.  But the overwhelming majority of a

20  community that's 99.9 percent Black, 94.6 percent of

21  them are registered, as it says here on page 58.

22           And then they also had an extremely high

23  turnout rate, which is 60.7 percent, and then

24  49.9 percent of them voted by mail and 65 percent of

25  them voted in person during the early voting period.

Sharon Austin
October 27, 2021

```
 1              And so that's -- proves the point that I
 2   was making, which is that the African American voter
 3   registration in 2020 was high, that this was one
 4   example of a community that was overwhelmingly
 5   Black, almost 100 percent Black, and they had a high
 6   rate of participation in the early voting period and
 7   in voting by mail.  So that proved my point.
 8              So you can argue that maybe I could have
 9   included other places.  If I could have found that
10   data, I would have included it, but I had to write
11   an honest report and this was what I could find.
12              But it also proved my point.  So you could
13   argue that I should have included more, but this in
14   itself is making a very strong point.  As I say on
15   page 59, the last sentence of No. 91, this is
16   evidence of Black voter utilization of mail-in early
17   voting procedures in Florida.  That's what my
18   argument was, and I think this proves my point
19   extremely well.
20   BY MR. HOLT:
21      Q.   Okay.  How can any evidence of a single
22   neighborhood in Florida be evidence of anything on a
23   statewide basis?
24              MR. MILLER:  Objection, form.
25      A.   Well, I could ask you how can evidence of
```

Sharon Austin
October 27, 2021

1    some elections that took place in 1993 and 1997 be

2    evidence that it's necessary in 2021 to come up with

3    a sweeping statewide law to impact voter fraud for

4    something that happened many, many years ago.

5    BY MR. HOLT:

6        Q.   You could.  Unfortunately, I'm here asking

7    you questions today.

8        A.   I mean, I understand.  But I'm just

9    saying, I'm just making that parallel.

10       Q.   And I will opine on making that parallel

11   as well.

12       A.   That's fine.

13       Q.   You know where I'm going with this.

14       A.   That's fine with me.

15       Q.   Just explain to me again how evidence of

16   behavior of a single neighborhood allows you to draw

17   the conclusion that this is evidence of Black voter

18   utilization of mail and early voting procedures in

19   Florida.

20       A.   Okay.

21       Q.   I mean, isn't evidence of utilization of

22   voting procedures in that neighborhood and not --

23       A.   In that neighborhood, and also if you look

24   at just the other table that I have here, that I've

25   just referred to, that talks about -- I think was it

Sharon Austin
October 27, 2021

1    Table 2, that talks about Black voting in -- not

2    just in one neighborhood but in counties with the

3    largest Black populations.

4             And the other table that has counties with

5    the largest Hispanic populations, they also had

6    sizeable mail --vote-by-mail rates, and also they

7    also had sizeable participation during the early

8    voting period.  So this is one neighborhood which is

9    one example, but combined with the other information

10   that I have, the other original data that I have

11   from the other tables, then I think those things

12   combined prove my point, that African American and

13   Latino voters participated in high numbers in mail

14   voting and also early voting.

15        **Q.   Okay.  If you can rely on and draw**

16   **inferences from a single neighborhood, why can the**

17   **Legislature not rely on instances of voter fraud in**

18   **a congressional race, which is a much larger area**

19   **than a single neighborhood, why is that not**

20   **indicative of fraud, but use of absentee ballots in**

21   **a single neighborhood is indicative of use of**

22   **absentee ballots across the whole state?  Explain**

23   **that to me.**

24        A.   Because of the information that I just

25   showed you in Tables 2 and 3.  I didn't just look at

Sharon Austin
October 27, 2021

1   that -- if I had just put that one neighborhood and

2   nothing else, then you could make that inference.

3   But since I had information from the counties with

4   the largest Black and Hispanic populations

5   statewide, and I didn't just selectively choose

6   some, I chose the ones with the largest percentages

7   of Black and Hispanic residents, and in looking at

8   those counties, there was a high rate of

9   participation in vote by mail and early voting.

10          And so all of those things combined

11  together prove that in 2020, November 2020 election,

12  there was a high rate of participation by -- of

13  Black and Hispanic voters in vote by mail and also

14  during the early voting period.

15      Q.   I understand --

16      A.   I didn't just focus on that one

17  neighborhood.  I looked at counties throughout the

18  state of Florida, with the largest Black population

19  and the largest Hispanic populations, as my -- as my

20  report indicates.

21      Q.   I understand that's what you're saying

22  now.  But when you look at your report, in reference

23  to paragraph 91 and the data pertaining to that one

24  small neighborhood, you say, this is evidence of

25  Black voter utilization of mail and early voting

Sharon Austin
October 27, 2021

Page 128

1    procedures in Florida.

2             You're not referencing any other studies

3    or reports.  You're referencing that one

4    neighborhood in Florida, correct?

5        A.   I'm referencing that one neighborhood, but

6    if you look at the entire report, it's -- if you --

7    it's combined with the other information that I

8    already had presented so I saw no need to repeat it

9    again.

10       Q.   Okay.  Now, in paragraph 91, you state

11   that 49.9 percent of this particular neighborhood

12   voted by mail and 65 percent voted early in person,

13   okay?  Now, this leads to a total voter turnout, and

14   this is assuming that no one voted on Election Day,

15   of 114.9 percent.

16       A.   Okay.

17       Q.   Can you explain to me how that is?

18       A.   Let me see.  No, I guess not.  I need

19   to -- to review my numbers.  Right, so --

20       Q.   You would agree -- you would agree that

21   the numbers are mistaken in this part of your

22   report, correct?

23       A.   I would agree that I need to review the

24   numbers, yes.

25       Q.   That they're incorrect, correct?

Page 129

```
 1         A.   I won't say they're incorrect.  I just
 2    think that I need to review them to see maybe if
 3    there's a typo or something.  But I need to review
 4    the numbers.
 5         Q.   Okay.  If you're not going to say they're
 6    incorrect, help me understand how 49.9 percent and
 7    65 percent, which equals 114.9 percent, could be
 8    correct.
 9         A.   Well, it could be that there's a typo.
10         Q.   So the -- so the numbers you provided in
11    your report are incorrect?
12              MR. MILLER:  Objection, form.
13         A.   The numbers that I provide -- I won't say
14    in my report but I'll say on page 59, when it comes
15    to turnout, I need to review those numbers.
16    BY MR. HOLT:
17         Q.   So you agree that those numbers are
18    incorrect on page 59?
19         A.   No, they -- they just may have had a typo.
20         Q.   Okay.  The numbers that you typed in on
21    page 59 of your report are incorrect?
22         A.   If that's what you say.
23         Q.   Dr. Austin, I'm asking you.  I'm not
24    trying to trip you up here.  You agree that there is
25    a typo on page 59, that the numbers that are
```

Sharon Austin
October 27, 2021

1    presently there are incorrect?

2        A.   I agree that there's a typo on page 59

3    possibly.

4        Q.   Okay.  Explain to me how there is not a

5    typo.  Under what scenario --

6        A.   I just said there is one.

7        Q.   You said "possibly."

8        A.   Right.  I just said that there is a typo

9    there possibly, and I need to look at the report

10   again.

11       Q.   Okay.  Under what scenario could there not

12   be a typo, then, if there's only possibly a typo?

13       A.   Under the scenario that when you write a

14   long report, that you're bound to have something in

15   the report that you need to review again.  And

16   that's what I'm saying about this.

17       Q.   So you will agree that the numbers you

18   included on page 59, for whatever reason, are not

19   100 percent accurate?

20       A.   I would say that's the way it looks.

21       Q.   Okay.  I'll ask this as many times as it

22   takes, Dr. Austin.

23       A.   That's fine.

24       Q.   The numbers on page 59 of your report,

25   where you state that 49.9 percent voted by mail and

Sharon Austin
October 27, 2021

1    65 voted in person, you did not even take into

2    account any same-day-of-election voting.

3         A.   Uh-huh.

4         Q.   Just early and mail voting accounts for

5    nearly 115 percent turnout.

6         A.   Okay.

7         Q.   How could that possibly be correct?

8         A.   Okay.  As I just have already told you,

9    that I need to look at the numbers again, because it

10   probably is a typo.

11        Q.   You would agree that there is a typo?

12        A.   There probably is one.

13        Q.   Okay.  What scenario could there not be a

14   typo?

15        A.   Well, I mean, I don't know.  I could -- I

16   just need to go back through the report.

17        Q.   Okay.  You would agree that 49.9 percent

18   plus 65 percent equals more than 100 percent,

19   correct?

20        A.   Yes.

21        Q.   And you agree that you cannot have more

22   than 100 percent voter turnout?

23        A.   Right.

24        Q.   In a legal election, let's put it that

25   way.

Sharon Austin
October 27, 2021

1      A.    Right.

2      Q.    So either your information here is

3  evidence of a severe case of voter fraud in this

4  neighborhood, where extra ballots were cast, or you

5  have a typo there; will you agree that there is a

6  typo and you used incorrect information in your

7  report on this page, of page 59?

8      A.    I would say that there is a typo on page

9  59.

10     Q.    Thank you, Dr. Austin.

11          Now, I want to go into -- on page 62 of

12  your report, you start discussing the specific

13  provisions of SB 90.  Just let me know when you're

14  there.

15     A.    Okay.  I'm there.

16     Q.    And so we've already talked about the ID

17  information.  And I'm going to ask just a couple

18  questions about that and then we're going to go

19  through these -- some different provisions of SB 90.

20  And I want to ask you some questions about those,

21  okay?

22     A.    Okay.

23     Q.    So what is your understanding of the

24  provision of SB 90 that requires someone requesting

25  a ballot to provide identifying information on their

Sharon Austin
October 27, 2021

1    vote-by-mail application?  What is your

2    understanding that that provision does?

3         A.   That provision says that before you can --

4    in order to request a vote-by-mail ballot, you have

5    to provide your -- either as it says here, your

6    driver's license number, your state ID number, or

7    the last four digits of your Social Security number.

8         Q.   Okay.  And what is this understanding

9    based on?

10        A.   What is the understanding based on?

11        Q.   Yeah.  Did you review the statute, did you

12   review reports about the statute?  What is -- how

13   did you form that opinion of that provision of

14   SB 90?

15        A.   Because of -- based on what I read.

16   That's what it requires.

17        Q.   You read the statute?

18        A.   No, I -- yeah.  In order -- I read about

19   SB 90, and it requires that you put some type of

20   identification before you can request a vote-by-mail

21   ballot.

22        Q.   And you said you read about SB 90.  What

23   do you mean by --

24        A.   Right.  I read SB 90.  And based on my

25   understanding of it, that's what this is saying.

Sharon Austin
October 27, 2021

 1    That's what it requires.

 2        Q.   Okay.  How was this different than what

 3    was required during the 2020 election?

 4        A.   My understanding is -- and again, I don't

 5    remember exactly what I had in the report -- but my

 6    understanding is that it used to be that you didn't

 7    have to provide this type of -- these types of

 8    numbers or this type of identification to request a

 9    vote-by-mail ballot.  You could just request one.

10        Q.   Okay.  Now in your opinion, does this

11    provision of SB 90 protect a legitimate state

12    interest?

13        A.   I would say no.

14        Q.   Okay.  You would agree that courts have

15    recognized that limiting fraud and elections is a

16    legitimate state interest?

17        A.   It is.

18        Q.   So it's your opinion that this provision

19    of SB 90 does not advance that state interest of

20    limiting fraud?

21        A.   Right.

22             THE STENOGRAPHER:  I'm sorry to interrupt.

23    Is Mr. Holt glitching for anyone?

24             MR. MILLER:  Fine with me.

25             THE WITNESS:  No.

Sharon Austin
October 27, 2021

```
 1              THE STENOGRAPHER:  Okay.  I'll keep an eye
 2         on it because it never seems to get better, it
 3         always seems to get worse.
 4    BY MR. HOLT:
 5         Q.   Okay.  And, Dr. Austin, if any of my
 6    questions are not audible to you, please let me know
 7    and I'll rephrase them and make sure you understand
 8    them.
 9         A.   Okay.
10         Q.   Now, Dr. Austin, what burdens or harms, if
11    any, are allegedly caused by this provision of
12    SB 90?
13         A.   I would say the burden -- and I think the
14    harm is caused by the fact that if you want to get a
15    vote-by-mail ballot, you should be able to just get
16    one.  Because we should have a society in a -- and
17    in our state, we should encourage people, as was
18    done before.
19              As I point out in the report, people were
20    encouraged to vote by mail, and we should make these
21    easily accessible, and people should not have to
22    provide identification just to get access to a
23    ballot.
24         Q.   Okay.  Can you quantify (indiscernible) --
25              THE WITNESS:  You did break a little bit
```

Page 136

 1       there.

 2            THE STENOGRAPHER:  We heard "can you

 3       quantify."

 4            THE WITNESS:  Can we take a five-minute

 5       break?  I need to send a text to my daughter.

 6            MR. MILLER:  He probably couldn't hear you

 7       so you can ask for it when he gets back.

 8            THE WITNESS:  Okay.

 9            MR. HOLT:  Can you guys hear me?

10            MR. MILLER:  Loud and clear but while

11       you --

12            MR. HOLT:  I cannot hear you.

13            (Recess from 1:44 p.m. to 1:50 p.m.)

14            MR. HOLT:  Back on the record?

15            THE STENOGRAPHER:  Yes, sir.

16  BY MR. HOLT:

17       Q.   Okay.  Dr. Austin, can you quantify what

18  the burden would be on a Black or Hispanic voter due

19  to the application of the ID information provision

20  of SB 90?

21       A.   You mean can I quantify, meaning, can I

22  predict approximately how many people would be

23  impacted?

24       Q.   Yes.

25       A.   Well, to be honest with you, to answer

Sharon Austin
October 27, 2021

1    your question, no.  But it's not about quantifying

2    the numbers, it's about the fact that this is a

3    discriminatory barrier, in the sense that these

4    ballots should be accessible and openly accessible.

5            I mean, I'm originally from the state of

6    Tennessee, and I remember being able to go to

7    libraries, to post offices, to be able to register

8    to vote in those places, because people really

9    wanted to encourage you to vote.  And in Florida, as

10   my report shows, there's a history of wanting people

11   to participate by mail because it avoided a lot of

12   the problems, as I pointed out, long lines, the

13   possibility something could go wrong on

14   Election Day.

15           And so that's why vote by mail was

16   convenient, and it also helped to make sure that you

17   would be able to vote.  And if there was a problem,

18   you could correct it, and so it had its advantages.

19           But by doing this, you're placing a

20   barrier there for African Americans and Hispanics

21   and for people who want to vote by mail, you're

22   making them identify themselves.  And there are a

23   lot of issues I can even talk about even with that,

24   but you're making it more difficult for them to gain

25   access to these ballots, when really, they should be

Page 138

1    accessible to anyone who wants them.

2        Q.    Are you aware of a large number of

3    minority voters, African -- Black or Hispanic that

4    do not have a driver's license number, a state ID

5    number, or know the last four digits of their Social

6    Security number?

7            MR. MILLER:  Objection, form.

8        A.    I think that the -- that there's an issue,

9    I think, with some people who are -- well, as far as

10   with driver's licenses, we can't assume that

11   everyone has a driver's license.  Or even we can't

12   assume that everyone has a state ID.

13           But that's not even the point.  The point

14   is that you should be able to get a vote-by-mail

15   ballot without having to identify yourself.  And I

16   think regardless of whether it's a large number or

17   small number, it's irrelevant, even if only one

18   person is impacted, that is a problem because we're

19   supposed to have a state that encourages people to

20   vote in the way that they choose to.

21           And if they choose to vote by mail, then

22   those ballots should be accessible to them.  They

23   should not have to identify themselves.

24   BY MR. HOLT:

25       Q.    So if we look back at those instances of

Sharon Austin
October 27, 2021

1    voter fraud that we discussed earlier, in 1993, in

2    1997, and in 2013, I guess 2012, all of those

3    instances involved situations where fraudulent

4    absentee ballot or vote-by-mail ballot applications

5    were submitted on behalf of somebody who is not the

6    person who claimed -- they claimed they were,

7    correct?

8         A.   Correct.

9         Q.   Okay.  So in your opinion, would this

10   provision of SB 90 stop something like that from

11   happening again?

12        A.   Well, I would say no.  And the reason I'd

13   say no is because it would stop people from

14   getting -- I guess if you don't have this

15   identification, you wouldn't be able to get the

16   ballot.

17             But that still would not -- I mean, as far

18   as fraud, if there's anything fraudulent going on

19   when the ballot is submitted, that's when it would

20   be found.  Not -- you should not stop people from

21   getting a ballot.  I think as far as people casting

22   a vote and it being fraudulent, that's when that

23   fraud will be detected.  But there's no legitimate

24   excuse for stopping someone from getting a

25   vote-by-mail ballot.

Sharon Austin
October 27, 2021

 1       Q.    Okay.  Can you please tell me any less

 2   restrictive alternatives that would serve the same

 3   interest the Legislature intended by this provision

 4   of SB 90?

 5             MR. MILLER:  Objection, form.

 6       A.    I think we first need to figure out what

 7   exactly did the Legislature intend.  Did they intend

 8   to disenfranchise voters, Black and Hispanic voters?

 9   That's the first thing that we don't really know the

10   answer to that question.

11             And as far as any alternative, I don't

12   have to think of an alternative.  All I know is that

13   as a citizen of the state of Florida, that I -- if I

14   choose, as a registered voter here in the state of

15   Florida, I should be able to gain access to a

16   vote-by-mail ballot without having to produce this

17   information.

18   BY MR. HOLT:

19       Q.    Okay.  So you're unaware of any less

20   restrictive means the Legislature could have used to

21   achieve this same goal of ensuring the person

22   requesting the absentee ballot is who they say they

23   are?

24             MR. MILLER:  Objection, form.

25       A.    I'm not a legislator.  So I really

Sharon Austin
October 27, 2021

1    don't -- I mean, that's not -- I'm a professor.

2    That's not my job, to try to figure out if people

3    are who they say they are.  All I know is as a voter

4    and as a private citizen, I have a right to vote by

5    mail, and I should have access to that ballot

6    without having to give my information.

7    BY MR. HOLT:

8         Q.   Well, you've acknowledged that there is an

9    interest in preventing fraud.  You've also

10   acknowledged that -- sorry.  Just completely lost my

11   train of thought.

12             You acknowledge that there is an interest

13   in preventing voter fraud, correct?

14        A.   Yes.

15        Q.   Okay.  So if the Legislature's goal was to

16   prevent voter fraud in this scenario, okay, and if

17   the way they did it on SB 90 was discriminatory in

18   your opinion, help me understand a way they could

19   have done it in a non-discriminatory way.

20             MR. MILLER:  Objection, form.

21        A.   I guess I'm confused, because I thought we

22   were here to just talk about my report.  And, I

23   mean, it sounds like you're asking me a question as

24   if I'm a legislator and I have to come up with a way

25   to eliminate fraud, and that's not -- I don't see

Sharon Austin
October 27, 2021

1  that as being my -- my job.

2          It's -- as a voter, as a citizen, it's not

3  my place to try to tell people how to prevent fraud.

4  It's just my -- it's my responsibility, if I choose

5  to vote, to go and pick up a ballot and use it.  And

6  that's all I'm supposed to do as a person -- as a

7  private citizen, not to try to inform people how --

8  if there's an alternative way to prevent voter

9  fraud.

10          I'm not a legislator.  That's not what I'm

11  here -- what I do.  I mean, I just think, according

12  to my report and according to my opinion, by denying

13  people of the ability -- by putting this barrier

14  there, which I refer to this in this provision as a

15  barrier, that that's discriminatory, and I think

16  it's targeted based on the State's history of voting

17  discrimination and voter suppression with the

18  blatant tactics, and the more subtle tactics of

19  recent years, I think this is something that's being

20  done in a way to disadvantage Black and Hispanic

21  voters by denying them, making it harder, placing

22  this obstacle there for them to get these

23  vote-by-mail ballots, when the information that I

24  have shown in the tables proves that in districts --

25  I mean that in counties with large Black and

Sharon Austin
October 27, 2021

Page 143

1    Hispanic populations, they voted by mail in large

2    numbers in 2020.

3            And now that is being taken -- it's

4    being -- it's making it harder for them to do that,

5    this provision.  And so that's why I think that is

6    discriminatory.  And I don't really think it's my

7    responsibility to come up with an alternative way to

8    combat voting fraud that was never even proven in

9    the first place.  I'm just here to tell you that

10   based on what I've studied and based on my opinion,

11   that this is placing a discriminatory barrier there

12   that's making it harder for Black and Hispanic

13   voters to take advantage of vote by -- voting by

14   mail, which is what they did in 2020.

15   BY MR. HOLT:

16       Q.   And I understand your position,

17   Dr. Austin.  But in your expert report, you took the

18   position that while there is a valid state interest

19   to prevent voter fraud, that was not present in this

20   situation with SB 90, I'm simply trying to explore

21   that with you.

22       A.   Okay.

23       Q.   Understand under -- if the Legislature has

24   a valid interest to prevent voter fraud, involving

25   mail-in ballots, how can they go about doing that in

Sharon Austin
October 27, 2021

```
 1    a way that is non-discriminatory, in your opinion?
 2    Is that possible, or is any type of regulation
 3    regarding -- absent a universal absentee ballot to
 4    everybody going to be discriminatory?
 5              MR. MILLER:  Objection, form.
 6         A.   Well, I think I already -- I feel like I'm
 7    repeating myself, but I think I've already said
 8    this.  As far as combating voter fraud, the best way
 9    to do that is to punish people and to deter them by
10    putting punishments there for people who commit
11    voting fraud.  And I don't think that that's what
12    this provision is doing.
13              This provision is disadvantaging a lot of
14    people, and it's preventing them from getting a
15    ballot.  And it's -- again, it's hypocrisy in the
16    sense that we value voting, we encourage people to
17    vote, and we encourage people to vote by mail here
18    in Florida.  And yet when Black and Hispanic people
19    started doing it, then, all of a sudden now, it's
20    being said that, oh, you have to produce this
21    information before you vote by mail, before we even
22    give you a ballot.
23              And I just don't -- I mean, if you -- of
24    course, you have to identify yourself when you cast
25    the vote.  But that should not prohibit you from
```

Page 145

1  getting access to the ballot.  Nothing should

2  prohibit that.

3  BY MR. HOLT:

4      **Q.   So explain to me, if this is a**

5  **vote-by-mail ballot, okay, how am I identifying**

6  **myself when I cast the ballot?**

7      A.   Well, when you cast the ballot, because I

8  usually vote by mail -- when you cast the ballot,

9  you sign your name and your signature is verified.

10  And so that's how it can be -- your identity can be

11  validated.

12      **Q.   So you're more comfortable with a**

13  **comparison of signatures as opposed to some personal**

14  **identifier to identify someone, an individual?**

15          MR. MILLER:  Objection, form.

16      A.   I'm more comfortable with letting people

17  have access to a ballot when they want one.  And

18  then once they cast that ballot, their identity will

19  be verified, when they cast the ballot.

20          But not to stop them from getting a

21  ballot.  That, to me, is discriminatory.

22  BY MR. HOLT:

23      **Q.   If they didn't vote by mail, how can this**

24  **voter also vote in person?**

25      A.   Yeah, but why should they have to vote in

Sharon Austin
October 27, 2021

1  person if they choose to vote by mail before

2  Election Day?

3       **Q.   I was just asking a question.**

4       A.   I know.  I'm just asking, and I'm just

5  saying people should make the choice for themselves

6  how they vote.  Or whether they vote.  But it should

7  not be -- the State should not deny them an access

8  to a ballot, is the point I'm trying to make.

9       **Q.   Are you familiar with how this provision**

10  **compares to similar provisions in other states?**

11       A.   No, not really.  I'm mostly just focused

12  on Florida for the report.

13       **Q.   If I were to tell you that Florida was on**

14  **the more lenient side when it comes to identifying**

15  **information that is required to request an**

16  **absentee -- a vote-by-mail ballot, would that**

17  **surprise you?**

18            MR. MILLER:  Objection, form.

19       A.   Would that surprise me?  I don't know if

20  it would or wouldn't.  But that's not the point.

21  The point is that people should not be denied a

22  ballot if they want one.

23  BY MR. HOLT:

24       **Q.   So is it your opinion that any State that**

25  **requires someone to identify themselves in order to**

Sharon Austin
October 27, 2021

Page 147

1    request an absentee ballot is doing so under -- for

2    discriminatory purpose?

3              MR. MILLER:  Objection, form.

4         A.   Are we here to talk about any state or are

5    we here to talk about Florida?

6    BY MR. HOLT:

7         Q.   I'm just trying to understand your

8    opinion, Dr. Austin.

9         A.   I'm just trying to understand your

10   question.  Are you asking me about my report on

11   Florida, or are you trying to ask me about any

12   state?  Because in my report, I focused on the state

13   of Florida.

14        Q.   I'm still talking about Florida compared

15   to the general requirements, as the courts have

16   held, the uniform burdens, the normal burdens of

17   voting.

18        A.   Okay.  Well, I mean, if I understand your

19   question correctly, if you're asking me to compare

20   Florida's, you know, restrictions on vote by mail --

21   getting access to vote-by-mail ballots compared to

22   other states.  And you're saying that Florida is

23   not -- are you saying in Florida is more lenient

24   than other states?  Is that what you're saying?

25        Q.   I am.  Yes.

Sharon Austin
October 27, 2021

 1      A.    Okay.

 2            MR. MILLER:  Objection to form.

 3            (Mr. Faruqui entered meeting.)

 4      A.    Well, I mean, to me, it makes no sense as

 5   to whether or not Florida is more lenient or not.

 6            The fact of the matter is if this is a

 7   discriminatory barrier, it doesn't matter if it's --

 8   it doesn't matter if Florida isn't as discriminatory

 9   as other places.  For example, during the Civil

10   Rights movement, Mississippi was thought to be the

11   worst place for a person of color to live.

12   Especially for an African American to live, before

13   the modern Civil Rights era.

14            And so you can argue, well, it was much

15   easier to live in Florida because maybe at least

16   some people voted here but nobody voted in

17   Mississippi.  But that still doesn't mean that

18   Florida should be able to discriminate.  Even if it

19   is more lenient here it, is not as severe here and

20   it's probably not as bad as in other states, that's

21   not the point.

22            The question is -- the question should be

23   is this a discriminatory barrier.  And so if it's a

24   discriminatory barrier, it doesn't matter if it's

25   not as discriminatory as what takes place in other

Sharon Austin
October 27, 2021

 1   states.  What matters is that this is a barrier that

 2   should not be there because discrimination should

 3   not be there.  Should not be present.

 4            (Marked for Identification is Exhibit 2.)

 5   BY MR. HOLT:

 6       **Q.   Okay.  I've slid Table 6 into the**

 7   **comment -- into the chat box.  Are you able to see**

 8   **that, Dr. Austin?**

 9       A.   Okay.  Let me see.  I think I have to save

10   these and then download them.

11            Okay.  Yeah, I see it.

12       **Q.   Okay.  What is this table titled?**

13       A.   Absentee Ballots Application Verification

14   Rules Across the United States.

15       **Q.   Okay.**

16            MR. HOLT:  And I'll state for the record,

17            this is Table 6 of defendant's expert report

18            from Dr. Kidd.  Are you able to --

19            MR. MILLER:  Broke up.

20            THE WITNESS:  You kind of broke up a

21            little.  Dr. -- what was the person?

22   BY MR. HOLT:

23       **Q.   Dr. Kidd.  Quentin Kidd.**

24       A.   Okay.  Well, I didn't really look at that

25   one closely, but I did receive a copy of it.

Sharon Austin
October 27, 2021

```
 1        Q.    Okay.  You did look at it, correct?
 2             MR. MILLER:  Objection.  Mischaracterizes
 3        the witness.
 4        A.    Yeah.  I wasn't asked to respond to it.
 5   BY MR. HOLT:
 6        Q.    Did you look at it?
 7        A.    I looked at it briefly.
 8        Q.    Okay.  Well, this is Table 6 to that
 9   report, and in looking at the category under which
10   Florida is, what is that section there?
11        A.    Information and eligibility checked
12   against voter registration records.
13        Q.    Okay.  And what is the one right beneath
14   that?
15        A.    Signature verification, in addition to
16   checking information and eligibility against voter
17   registration card.
18        Q.    Okay.  And the very last one there?
19        A.    Voters must qualify to vote absentee with
20   an acceptable excuse.
21        Q.    Okay.  Does Florida require an excuse to
22   vote absentee, or I guess to vote by mail?
23        A.    But again, I mean, my question is:  I was
24   not asked to respond to Professor Kidd's report, so
25   I don't understand why you're asking me questions
```

Sharon Austin
October 27, 2021

Page 151

1    about his report.

2        Q.   I'm just asking you a general question

3    right now, Dr. Austin.  Does Florida require an

4    excuse to vote by mail?

5            MR. MILLER:  Objection, form.

6        A.   I prefer not to talk about his report,

7    because I was not asked to respond to it.  And I

8    didn't read it in depth.

9    BY MR. HOLT:

10       Q.   Dr. Austin, I'm not asking you about

11   Dr. Kidd's report right now.

12       A.   Yes, you have.  You have a table from his

13   report.  This is a table from his report.

14       Q.   You can minimize that table while I ask

15   you this question, because you don't need it --

16       A.   I've already looked at it.

17       Q.   The question -- does Florida require you

18   to have an excuse to request a ballot to vote by

19   mail?  Again, this is not from his report so you're

20   not going to find the answer on his report.

21       A.   So are you saying --

22       Q.   The question about --

23       A.   I don't remember if this was included in

24   his report.  I thought you had said that this was a

25   table from his report.

Sharon Austin
October 27, 2021

1      Q.    Just forget that table, Dr. Austin.  I'm

2  asking you about --

3      A.    I've already looked at it, though.

4      Q.    Okay.  I'm asking about Florida's laws

5  generally.

6      A.    Okay.

7      Q.    Okay?  In order to request a ballot to

8  vote by mail, does a voter have to give an excuse to

9  the State to receive that ballot?

10      A.    I'll just say that I'm not really sure.

11      Q.    Okay.  Now, when the voting rights

12  amendment was amended in 1982 to include Section 2,

13  would you agree that there were very few states that

14  offered any absentee voting by mail at that time in

15  1982?

16      A.    Okay.  So --

17            MR. MILLER:  Mr. Holt, you were kind of

18       glitching again.

19            MR. HOLT:  Sorry, can you hear me?

20            MR. MILLER:  Must be my end.  Now I can,

21       yeah.

22  BY MR. HOLT:

23      Q.    Let me ask that question one more time.

24      A.    Okay.

25      Q.    When the voting rights amendment was

Sharon Austin
October 27, 2021

Page 153

1    amended in 1982 to include Section 2, as we know it

2    today, would you agree, Dr. Austin, that there were

3    very few states that offered any absentee voting by

4    mail at that time?

5         A.   I would say that you would be correct in

6    that.  There were very few states that allowed vote

7    by mail.

8         Q.   And that there were no states that allowed

9    for no-excuse mail-in ballot in 1982, correct?

10        A.   I would have to check my report again, but

11   I don't think I put the year that that first began.

12        Q.   Okay.  Now, let's move on to the

13   requirement of SB 90, that you need to request a

14   ballot every two years.  Okay?

15        A.   Okay.

16        Q.   What is the understanding of that

17   provision, Dr. Austin?

18        A.   My understanding is that it used to be

19   that you could request a mail ballot through the

20   next -- for the next four years.  And now you're

21   having to make more frequent requests, because you

22   now have to make a request every two years rather

23   than every four years.

24        Q.   Okay.

25             (An interruption took place.)

Sharon Austin
October 27, 2021

```
 1              MR. HOLT:  Sorry it wasn't me.  I don't
 2        know what that was.
 3              MR. MILLER:  I apologize.  Unfortunately,
 4        there's no way for me to turn off my cell phone
 5        on my computer, so -- I wish I knew how.  But
 6        there's no way, so...
 7              MR. HOLT:  Do you have a Mac?
 8              MR. MILLER:  No, it's a PC and it's --
 9              MR. HOLT:  Okay.
10              MR. MILLER:  It's a work thing.  I don't
11        know -- I don't know how to do it.  So...
12              MR. HOLT:  You're fine.
13              MR. MILLER:  This is not the first
14        deposition I've had to deal with this.  I've
15        asked and no one seems to be able to tell me
16        how.
17              MR. HOLT:  You're fine.
18  BY MR. HOLT:
19        Q.   So, Dr. Austin, help me understand how
20  having to request an absentee -- a vote-by-mail
21  ballot every two years as opposed to four years will
22  disenfranchise a Black or Hispanic voter.
23        A.   Okay.  I think it -- again, it places a
24  barrier there that was not there.  That hasn't been
25  proven to be necessary, is the argument I'm making.
```

 1        Q.    Okay.  Again, more of a policy argument

 2   that it just wasn't necessary?

 3        A.    Well, I think it's discriminatory in the

 4   sense that it wasn't necessary, and it's making it

 5   so that you have to make these requests more

 6   frequently.  And again, the emphasis is on putting a

 7   barrier there and making it difficult for Blacks and

 8   Hispanics to use something that they were using,

 9   that they have been using more frequently.

10        Q.    You would agree that regardless of race,

11   whether white, Black, Indian, you're all -- everyone

12   is going to have to request a ballot every two

13   years, correct?

14        A.    I would say to that question, everyone --

15   yes.  But it still is a discriminatory barrier.

16        Q.    So everyone, regardless of race, has the

17   opportunity to request a ballot?

18        A.    Well, I think what you're -- from my

19   reading of your question, what you're failing to

20   acknowledge is that everyone isn't the same.  I

21   mean, everyone isn't treated equally.  And that's

22   not the way it has ever been in the state of Florida

23   or in the United States, and so you could argue,

24   then, well, everyone has to do this, everyone has to

25   follow these provisions.

 1                 And, yes, you're right.  But the problem

 2    is that, finally, when people of color are making

 3    progress in doing something that the State has

 4    encouraged them to do, now, all of a sudden, there's

 5    a problem.  And now, all of a sudden, they're --

 6    it's like they're being told one thing one year and

 7    something completely different the next.

 8                 One year, you're being told, okay, we

 9    encourage you to vote by mail because that way,

10    you'll avoid all these problems.  And then people

11    start doing it, and now it's as if the Legislature

12    is saying, don't vote by mail, you have to give this

13    information before we even give you a ballot.  You

14    have to ask for these ballots more frequently than

15    before.

16                 And so, again, I think that's

17    discriminatory in the sense that even though

18    everybody has to meet this requirement, it's

19    something that's being done in response to the fact

20    that Black and Hispanic people took advantage of

21    this, and it's a part of a continuing pattern that's

22    been going on in Florida for many years.

23                 And so I hope that answers your question.

24         Q.   It kind of does.  Let's move on to another

25    question here.

1          In your opinion, what burdens -- again,

2     you've kind of already answered this -- but what

3     burdens befall a voter having to request a ballot

4     every two years as opposed to four years, that fall

5     outside of the ordinary burdens of voting?

6               MR. MILLER:  Objection, form.

7          A.   Well, I guess I'm just giving you my

8     opinion, and I would say just that -- I mean, it's

9     something that you would have to do more frequently,

10     and as a result, you might forget to.  And let's say

11     if you really want to vote by mail or if you're a

12     person who also -- is Black or Hispanic and is also

13     has some type of disability and you want to vote by

14     mail because it's hard for you to go to the polls

15     and you have to do this more frequently, what if you

16     forget?

17               Then does that mean you can't vote by

18     mail?  And that might discourage you from voting at

19     all.  So I would think that that's more than just an

20     ordinary burden.

21     BY MR. HOLT:

22          Q.   Any reason that a Black or Hispanic voter

23     would have a higher probability of forgetting to

24     fill out a vote-by-mail request, other than a white

25     person, for example?

Sharon Austin
October 27, 2021

1       A.   Well, I will say there's a high

2   probability they'll forget, but nevertheless, we can

3   talk about all the different things, but it still is

4   a barrier that should not be there.  I mean, voting

5   should be just a universal right, and there should

6   be no barriers there.  And, I mean, when I think

7   about the Voting Rights Act of 1965, the purpose of

8   it was to remove any type of restrictions.  And it's

9   been amended over the years, to make sure that the

10  right to vote was -- has been protected.

11           And so we can talk about whether there are

12  differences between Blacks and whites and Hispanics

13  or whatever, but nevertheless, this is something

14  again that has -- put in place that's going to place

15  a barrier there for something that Black and

16  Hispanic people have taken advantage of, and it's

17  going to make it harder for them to do so.

18           And so people would argue, well, it's

19  going to do that for white people too.  But if you

20  look at our history, as I pointed out in the report,

21  there was never any concerted effort to stop white

22  people from voting.  But there has been an effort

23  throughout the State's history to stop Black people

24  and Hispanic people from voting.

25           So it's hard to say, well, if white

Sharon Austin
October 27, 2021

1  people -- if they have to do the same thing, that's

2  not really the same, because their experience has --

3  is not the same as that of people of color.  So I

4  guess -- you know, even though you can argue that,

5  well, if this affects them, too, their group has

6  never really been the target of just purposeful

7  discrimination.  But African Americans and Latinos

8  have been.

9       Q.   And you believe that SB 90 is purposeful

10  discrimination?

11      A.   I would say that it looks like it is part

12  of a continuing -- of a continuance of backlash.

13  And that's what I've argued throughout the report.

14      Q.   Okay.  Help me quantify the burden that

15  Black and Hispanic voters face by having to request

16  a ballot every two years to be able to vote by mail;

17  how do we quantify that?  How will we determine the

18  level of disenfranchisement, in your opinion?

19      A.   Well, I don't know how we would quantify

20  or predict how many people this would impact, but I

21  mean, I think -- I'd be curious to see if in the --

22  if in the election, if there's a reduced number of

23  people voting by mail.

24           And I would predict that there would be.

25  And I think that in a state that's supposed to

Sharon Austin
October 27, 2021

1    value, you know, equality when it comes to voting

2    and everything else, we don't want to see a

3    reduction in the numbers of people voting -- of

4    Black and Hispanic people voting by mail.  When

5    these numbers had increased and when a substantial

6    number of them had done so in November 2020, if by

7    November 2020 or in the future, if those numbers are

8    reduced, regardless of whether I can quantify it or

9    not, that's not a good thing.

10              Because, again, you're depriving people of

11   a right to do something, and you're depriving people

12   of a certain right.

13        Q.   Is there a right to vote by mail?

14        A.   There's a right to a free, uninhibited

15   vote regardless of how you choose to do it.

16        Q.   Okay.  Is the State required to provide

17   you with what you feel is the best way to vote?

18        A.   The State is required to not place any

19   barriers there to stop me from voting in the way

20   that I choose to vote.

21        Q.   So outside of a universal vote-by-mail

22   ballot that is hand-delivered to you by the

23   Government and picked up by the Government with no

24   cost to you, what restriction can -- or what type of

25   law regarding the administration of elections can

Sharon Austin
October 27, 2021

1    the State provide and account for that in your

2    opinion would not be discriminatory?  Because they

3    all place some type of burden, do they not.

4              MR. MILLER:  Objection, form.

5         A.    I would say no.  They don't necessarily

6    place the -- not the types of burdens that this law

7    places.  And there's a difference between having

8    just -- as you talked about, just a small -- a small

9    burden that everybody deals with and a

10   discriminatory burden.  Those two -- those are

11   totally different things.

12   BY MR. HOLT:

13        Q.    I guess I'm having a hard time

14   understanding of why having to pay for a postage

15   stamp or having to walk half a mile longer would not

16   be discriminatory, but having to fill out a ballot

17   request for every two years as opposed to four is

18   discriminatory.  I just -- I'm having a hard time.

19        A.    Uh-huh.

20        Q.    Comparing -- applying your testimony here.

21        A.    Well --

22              MR. MILLER:  Objection to form.

23        A.    Because I think that the problem is that

24   you're comparing a postage stamp and having to walk

25   a certain distance to a polling place to not -- to

Page 162

1    being denied a ballot.  Those two things aren't the

2    same thing.

3              When you're denied access to a ballot,

4    that's discriminatory.  And when you're having to

5    have this barrier placed, that -- that you have to

6    apply for this ballot every two years when you're

7    used to applying every four years, that also is a

8    barrier.  Because, keep in mind, some people may not

9    even be aware of the change that's taken place.  And

10   you may think that, okay, I just have to apply for

11   this every four years.

12             You may not know that this law has made

13   this change and as a result, you may not apply for

14   the ballot in two years, and that means you can't

15   vote by mail.  And what if you have, you know, the

16   type of job that's such that you can't just take off

17   of work?  What if you work during the hours that the

18   polls are open and you can't vote during the early

19   voting period or on Election Day?  So then you've

20   lost your right to vote.

21             And that's discrimination.  That's not the

22   same as paying for a postage stamp and having to

23   walk a certain distance to the polls.

24   BY MR. HOLT:

25        Q.   Dr. Austin, there were a lot of "ifs" in

Sharon Austin
October 27, 2021

1    that hypothetical that you just stated.  So in your

2    opinion, the State is required to take all of those

3    "ifs" into consideration and ensure that that

4    hypothetical individual is able to vote in the

5    manner that they feel is most convenient for them,

6    and anything outside of that is discriminatory?

7              MR. MILLER:  Objection to form.

8         A.   No.  I'm saying that as -- if you're a

9    member of the legislature, you should want people to

10   vote.  If -- if for no other reason than you want

11   them to vote for you.  But you should want -- if you

12   are a person who has been elected to serve in an

13   office, then you should want to guarantee that

14   people have a right to vote as they see fit.

15             And it's hypocrisy for you to on one hand

16   in the legislature say, we want you to vote by mail,

17   we want you to participate and -- you know, by mail,

18   and then to later say, oh, well, we're going to make

19   these changes because of voting fraud that's never

20   really even been proven in recent years, and even

21   before.  You can argue even the things that you

22   mentioned were just isolated incidents, it is

23   unfortunate that they happen, but it still does not

24   justify -- I don't think the legislature has

25   actually justified the need for this law.

Sharon Austin
October 27, 2021

```
 1              And I think that the disadvantages
 2    outweigh the advantages.  If even one person or --
 3    you're asking me to quantify this -- but even if
 4    it's just a few people who are not voting by mail
 5    whereas they once preferred to do so, that's sort of
 6    like stepping back.  It's not going forward, it's
 7    going back.  Because we want to live in a society
 8    where we want to continue to encourage people to
 9    vote and to turn out, and to increase voting, not to
10    decrease it.
11              And so that's what -- that's the problem
12    that I have with the two provisions that you just
13    mentioned.
14    BY MR. HOLT:
15         Q.   Can you point to a provision of SB 90 --
16    you used the term that it denies voters the ballot.
17    Can you point to a provision of SB 90 that denies
18    minority voters the ballot?
19         A.   Well, the one that you just mentioned, the
20    one that requires that they provide a driver's
21    license number, state ID number, or the last four
22    digits of their Social Security number to request a
23    vote-by-mail ballot.
24              What if someone objects to that, for
25    whatever reason?  Then that person is going to be
```

Sharon Austin
October 27, 2021

Page 165

1    denied a ballot.

2        Q.   That individual should have a Social

3    Security number, he can -- individual can go to the

4    State and get a free state-issued ID; there is no

5    reason why he -- that individual would not be able

6    to get one of those required forms, correct?

7        A.   But that's not the point, though.  The

8    point isn't so much whether or not someone has these

9    numbers or these -- the required identifications.

10   The point is that if you want to vote by mail, you

11   should be able to get a ballot.  And you should not

12   be denied that ballot.

13            And if it's found that you are someone who

14   should not be voting for whatever reason, then --

15   then that will be determined at some point in the

16   future.  But you should not be denied a ballot.

17       Q.   So if you're a state like New York which

18   requires you to have an excuse to vote by mail,

19   being that I am unable to go to my polling place due

20   to a medical condition or some other manner that

21   takes me away from my polling place on Election Day,

22   and if I don't have an excuse but I want to vote by

23   mail, is that discriminatory?

24       A.   Can you say that again.

25            MR. MILLER:  Objection to form.

Sharon Austin
October 27, 2021

Page 166

 1   BY MR. HOLT:

 2        Q.   A state like New York or Delaware, that

 3   only allows for an absentee vote by mail by -- if

 4   you have an excuse, they don't just give them to

 5   anyone who wants them, okay?  Are those states

 6   discriminating against minorities by not having a

 7   no-excuse absentee ballot?

 8             MR. MILLER:  Objection, form.

 9        A.   I'd prefer to just talk about Florida than

10   to make comparisons to other states.

11   BY MR. HOLT:

12        Q.   Well, I'm trying to understand under what

13   scenario -- what type of law could Florida pass, in

14   your opinion, that would not be discriminatory while

15   still protecting the integrity of an election?

16             MR. MILLER:  Objection, form.

17   BY MR. HOLT:

18        Q.   And I have yet to be able to identify that

19   based on our discussion.

20        A.   Okay.

21             MR. MILLER:  Objection to form.

22        A.   Well, I guess, again, I'm not here to tell

23   them how to -- what type of law they need to enact,

24   but I'm just saying this -- we're just here to talk

25   about this law and whether or not they should have

Sharon Austin
October 27, 2021

Page 167

```
 1   enacted this law.  And I argue that they shouldn't
 2   have, for the reasons that I've already mentioned.
 3   BY MR. HOLT:
 4       Q.   You say you're not here to tell them what
 5   they should or shouldn't do, yet the rationale
 6   you've given is that you believe it wasn't
 7   necessary.  Aren't you telling the Legislature what
 8   you believe they should or shouldn't do by saying
 9   you don't believe it's necessary?
10            MR. MILLER:  Objection, form.
11       A.   I'm telling them that they shouldn't
12   discriminate.
13   BY MR. HOLT:
14       Q.   Do you have any evidence that they have?
15       A.   And that's the sad thing about this, is
16   that we won't be able to see the impact of this law
17   until the next election.  And the frightening thing
18   is that it's going to have a negative impact on
19   Black and Hispanic voters who are going to be
20   disfranchised.
21            And that's one of the things, if you are
22   someone who is in -- who has been trusted to be an
23   elected official, you ought not want that to happen.
24   So, I mean, we can argue, well, we really don't have
25   evidence of that now, but why do we want to wait
```

Sharon Austin
October 27, 2021

1   until someone is discriminated against?  Shouldn't

2   we get rid of this law or correct this law so that

3   that discrimination would not occur?

4       **Q.   And I would ask the reverse question:  Why**

5       **should we have to wait for an instance of absentee**

6       **or vote-by-mail voter fraud before a legislature can**

7       **take steps to prevent it?**

8           MR. MILLER:  Objection, form.

9       A.   Because it's not fair to -- or I think

10   it's not appropriate to put a law in place, because

11   you're predicting that something will happen and you

12   still have yet to produce any evidence of any

13   widespread fraudulent activity in recent years.

14   That's just --

15   BY MR. HOLT:

16      **Q.   Let's --**

17      A.   That's just like if you say I have a

18   suspicion that this teenage boy is going to grow up

19   to be a criminal, so why don't we just put him in

20   jail now because we predict that based on his

21   behavior, he's going to grow up to be a criminal.

22   You don't do that.

23           You wait for something to happen and then

24   you correct the problem.  You can't say you're

25   putting a law in place to try and prevent something

Sharon Austin
October 27, 2021

1    from happening when you've shown no evidence that

2    the problem even exists in the first place, at least

3    in recent years, and on a large statewide scale.

4        Q.    Is the 2013 congressional race is not

5    large enough and recent enough, in your opinion?

6        A.    That was 2013, it's eight years ago.

7        Q.    2012 --

8        A.    2012?

9        Q.    Uh-huh.

10        A.    Can you say that again?

11        Q.    Yeah.  The race was the 2012 race but the

12    criminal convictions were in 2013.

13        A.    Okay.  Well, it was a 2012 race, which was

14    nine years ago, and they're just now addressing it?

15        Q.    But the State's evidence -- you're using

16    the things that happened 100 years ago, when none of

17    these legislators were even alive, as evidence that

18    they're somehow now being discriminatory, but you're

19    saying the Legislature can't use evidence of voter

20    fraud that happened eight years ago as evidence of

21    voter fraud.  How does that work?

22        A.    Okay.  I'd be happy to explain that.

23              I'm using information from the 1800s going

24    way back to discrimination to talk about the legacy

25    of that.  And I didn't just talk about what happened

Sharon Austin
October 27, 2021

1    then and then start talking about 2020, 2021.  I

2    traced the history since the 1800s to modern day, to

3    show that there was continuous pattern of

4    discrimination that at first was more blatant and

5    legalized, and then in later years, even after the

6    Voting Rights Act and even after the changes to the

7    Florida Constitution in 1968, and even after the

8    changes that had taken place, there still is a

9    pattern of when Black people -- when Hispanic people

10   make progress, there still is this pattern of a

11   legislature engaging in a way to pass a law -- and

12   I'm not even saying all of these laws were

13   completely negative.  Because as I pointed out, some

14   of them even had positive aspects to them.

15              But nevertheless, some of these laws were

16   put in place as a way to try to stop

17   African Americans and Latinos from continuing to

18   make progress, and this is just a long line of

19   continuance of that.  So it's not like I'm just

20   talking about something that happened in the 1800s

21   before, of course, any of us were born, and the

22   way -- and trying to say that that's the environment

23   now.  It's different environment now.

24              And the difference is that it's more

25   subtle now, the type of discrimination, whereas

Sharon Austin
October 27, 2021

Page 171

 1    before, people would just come out and say things

 2    like what I have in the report, like, oh, we don't

 3    want our constitution to be "N-wordized," you know,

 4    and people would say that back then.

 5              People now, if they have any sense at

 6    least, won't say it publicly, but now it's a

 7    different type of discrimination taking place, at

 8    least that's my opinion.  And based on the things

 9    that I've read and the information that I have here,

10    I think that it's purposeful discrimination.  And

11    it's -- it's a long -- it's -- it's just a

12    continuation of a long pattern of behavior.

13         Q.   Okay.  So are you able to -- I'll ask this

14    question one more time -- help me understand if a --

15    the state legislature of Florida wants to be able to

16    identify and confirm the identity of someone voting

17    by mail and requesting a ballot before they send it

18    out to them, can you think of a less restrictive way

19    to do that than what they have done in SB 90?

20              MR. MILLER:  Objection, form.

21         A.   I can think of a way of -- I don't know if

22    it's less restrictive, but I can think of a way of

23    doing it which is -- I think I've already answered

24    this, but which is to make their -- make the

25    penalties more severe for people who engage in voter

Sharon Austin
October 27, 2021

1    fraud.

2    BY MR. HOLT:

3         Q.   You are aware that it already is a very

4    severe law to violate, correct?

5         A.   I'm aware of that.  But they can make it

6    even more severe, give people longer prison

7    sentences and things of that nature, rather than

8    trying to deprive people of vote-by-mail ballots.

9    That's not the right thing to do.

10        Q.   So you agree that it's a valid interest,

11   you would just go about it a different way; is that

12   correct?

13        A.   I would say it's a valid interest, if you

14   prove that the voter fraud was there.  And that was

15   not proven here.

16        Q.   If the United States Supreme Court has

17   said there is no requirement to establish the

18   difference of fraud before you can take steps to

19   prevent it --

20        A.   I didn't hear that.

21        Q.   If the United States --

22        A.   Can you say it again?

23        Q.   If the United States Supreme Court has

24   said there is not a requirement to show the

25   existence of voter fraud before a state can take

Sharon Austin
October 27, 2021

Page 173

1    steps to prevent it, how would you respond to that?

2              MR. MILLER:  Objection, form.

3        A.   I'm sorry, can you just read it one more

4    time?  I'm sorry.

5    BY MR. HOLT:

6        Q.   If the United States Supreme Court, in the

7    recent case of Brnovich v. DNC, has said that there

8    is no requirement that a state show the existence of

9    voter fraud before they can take steps to prevent

10   voter fraud from happening, what do you say to that?

11             MR. MILLER:  Objection, form.

12       A.   Well, I'm saying that I know that that's

13   the case out of Arizona.  And I didn't address that

14   in my report, but I would say that that's -- that's

15   not a conclusion I agree with.

16   BY MR. HOLT:

17       Q.   Okay.  Now, I want to talk about drop

18   boxes.

19       A.   Okay.

20       Q.   What is your understanding about what

21   SB 90 does to drop boxes in Florida?

22       A.   It says that they can only be used during

23   early voting hours, unless they're located at the

24   supervisor's office, and they must be physically

25   supervised.  So even that means if there's, like, a

Sharon Austin
October 27, 2021

1   camera or some type of video of surveillance, that's

2   not allowed.  There has to be actually a person

3   there to supervise them.

4          And then there also is a large fine if

5   you -- if there's not a person there supervising

6   them during voting hours.

7   **Q.   How is this different than what happened**

8   **in 2020 election practices?**

9          A.   I didn't point that out in the report, but

10  I think that -- I can tell you the problem that I

11  have with it, and the reason why I think it's

12  discriminatory.  But I didn't address whether -- how

13  this changed -- how this differed from the way it

14  was before.

15         But from --

16  **Q.   We'll get -- Doctor, let's get to -- let's**

17  **go back to the question that I asked here.**

18         A.   All right.

19  **Q.   If you don't mind.**

20         A.   All right.

21  **Q.   We'll get to those in just a second.**

22         A.   Okay.

23  **Q.   So your opinion, though, is that these**

24  **were passed -- this provision was passed in response**

25  **to 2020, correct?**

Sharon Austin
October 27, 2021

     1        A.   Right.

     2        Q.   So help me understand how SB 90's

     3   provisions pertaining to drop boxes are different.

     4        A.   Okay.

     5        Q.   Than 2020.

     6        A.   Okay.  I hope I'm not wrong, but based on

     7   what I've read -- and keep in mind, this was a long

     8   report and had a lot of information.  I hope I'm not

     9   getting my facts blurred.

    10             But my understanding is that with the drop

    11   boxes, that they could be left open and that they

    12   didn't have a set time.  They didn't have to be open

    13   during a certain number of hours.  And also, during

    14   2020, there was not a requirement that there

    15   physically be someone supervising the drop boxes.

    16   If there was -- even if there was some video

    17   surveillance, that was fine, but you didn't have to

    18   have a person that was actually standing there,

    19   watching the drop boxes.

    20        Q.   Okay.  And you said in your report that

    21   the State's supposed interest in this was to prevent

    22   voter fraud, and that you disagreed with that; is

    23   that correct?

    24        A.   Yes.

    25        Q.   How -- if the State's goal was to protect

Sharon Austin
October 27, 2021

1   the integrity of ballots in drop boxes, how else

2   would they be able to do that outside of the

3   provisions of SB 90?

4        A.   Again, you're asking me how they can --

5   they should be able to do this.  It's not my place

6   to say how they should be able to do this.  I was

7   just looking at what they did and explaining why I

8   think it's discriminatory.

9        Q.   Is there a requirement that only white

10  voters can use a drop box during certain hours?

11       A.   No.  But that's irrelevant.  The fact of

12  the matter is that this is, again, going to make it

13  harder for someone to drop -- to use the drop boxes

14  if they're not dropping them off during these early

15  voting hours.  And then also it's placing a burden

16  on even the workers, because they have to be there

17  to physically supervise these drop boxes, and if

18  not, they're facing a large fine.

19       Q.   You stated earlier that you were okay

20  increasing the fines and criminal penalties for

21  people who violate voter integrity provisions.  Why

22  do you appear not to be okay with this one?

23       A.   It's not the same thing.  Because you're

24  talking about voter fraud.  Of course, those people

25  should get a large fine, because they have committed

Sharon Austin
October 27, 2021

Page 177

1   a crime.  But I don't call this committing a crime.

2          If you are someone, and you work at a

3   place where a drop box is located, and if you -- if

4   you for whatever reason -- what if you have an

5   emergency?  And those of us who have children know

6   that sometimes, you know, things happen with your

7   children.  And what if you have to leave work and

8   you're not able to be there.  And if no one is there

9   to physically supervise the office and something

10  happens, and someone drops off something, then

11  you're facing this $25,000 fine.

12         That's the difference -- that's a big

13  difference between someone who has committed voter

14  fraud.

15       **Q.  You are aware that supervises of elections**

16  **have large staffs available to them to do this for**

17  **them, it's not one person, correct?**

18       A.  I understand that.

19           MR. MILLER:  Objection.

20       A.  But I don't care how large your staff is.

21  Sometimes things happen that are beyond your

22  control.

23  BY MR. HOLT:

24       Q.  Okay.  Now, in your opinion, Dr. Austin,

25  what burdens or harms are caused by this drop box

Sharon Austin
October 27, 2021

1    **provision of SB 90?**

2         A.   I would say, again, it's targeted -- it's

3    targeting people who chose to use these drop

4    boxes -- it's, first of all, targeting people who

5    voted early.  And as I've shown in my report, in the

6    two tables, and as I've mentioned, African Americans

7    and Latinos, significant percentages of them, voted

8    early.  And so it's making it harder for them to

9    vote early.  And it also is making it more difficult

10   for them to use these drop boxes.

11           So I would say it's discriminatory because

12   of that.

13        **Q.   How do you quantify that burden?**

14        A.   I wouldn't quantify it.  I would just say,

15   again, if there's any discriminatory barrier there,

16   that's what we should be concerned with.

17           It's not even about the actual numbers,

18   it's about the fact that this is something that's

19   not been proven to be necessary, and that's a

20   discriminatory barrier, because it's, again,

21   focusing on the thing that I focused on in the

22   report, African Americans and Latinos made progress

23   in using drop boxes and voting by mail and voting

24   during early voting periods and voting -- and yet,

25   now this is being put there as a way to make it

Sharon Austin
October 27, 2021

1   harder for them to do those things.

2           So it's not about quantifying it.  It's

3   the fact that, again, this is yet another

4   discriminatory barrier.

5       Q.   Are you aware that Florida is only -- is

6   one of only ten states that require the use of drop

7   boxes in the United States?

8       A.   No, I wasn't aware of that, but it still

9   doesn't change my opinion.  Because Florida has drop

10  boxes, and if you're going to have these drop boxes,

11  then you need to -- if you see that something is

12  working, why do you want to change it?  I guess is

13  my question.

14      Q.   Would you agree the Legislature has the

15  ability to make that opinion -- that decision for

16  themselves, of how elections are administered?

17      A.   They have the -- they have the right to

18  make that opinion for themselves, but they need to

19  think about the consequences of their decisions and

20  of their legislation.  And they need to think about

21  the impact of that legislation on the people that

22  they represent.

23      Q.   Can you provide me with any evidence or

24  anything you came across in your research that would

25  show the legislature was acting with discriminatory

Sharon Austin
October 27, 2021

1    **intent in passing this provision of SB 90?**

2         A.   I would say that as far as any statements

3    that were made, I don't think I refer to anything

4    specifically in the report, but I think you can make

5    an inference that this was designed to try to make

6    it harder for Black and Hispanic voters to vote

7    simply because that's what the Legislature has done

8    for many years.

9              And I think also you have to think about

10   in today's society, people are usually not foolish

11   enough to show their prejudices openly.  So we don't

12   really know what their overall intent is.  All I can

13   do is make inference based on -- based on the things

14   that I've read and the information that I've

15   studied.

16             But as far as any statements that were

17   made, I don't have evidence of that, because in

18   today's society, people are not open in expressing

19   their biases and prejudices as the way that they

20   were years ago.

21        Q.   Do you think it's fair to make inferences

22   of the current legislative body in Florida based on

23   past legislatures to which they were not a part of?

24        A.   I'll say yes because --

25        Q.   Why is that?

Sharon Austin
October 27, 2021

 1          A.   Because of the legacy of the past

 2    legislatures and the impact of their decisions, and

 3    the fact that in the past, they have made decisions

 4    that have led to discriminatory impacts on people of

 5    color.  They have shown a discriminatory intent, and

 6    sometimes in the past, of course, it's been more

 7    open.

 8               But I think that, nevertheless, you should

 9    judge the legislators today on the basis of what

10    they do in the same way that in the past they did

11    things, and in today's society, they might do things

12    differently.  But if there's any evidence of a

13    discriminatory intent, even though they weren't a

14    part of the legislatures in the past, if there's any

15    type of discrimination occurring today, they should

16    be -- they should be held accountable.  And they

17    should be judged on the basis of that.

18          Q.   Okay.  Now, in 1982, you would agree with

19    the statement that very few, if any, states allowed

20    for remote drop boxes to deposit ballots in,

21    correct?

22               MR. MILLER:  Objection to form.

23          A.   I would say probably so.

24    BY MR. HOLT:

25          Q.   Because we talked earlier about how very

Page 182

1    few, if any, states allowed for voting by mail.

2    That would go without saying that very few states,

3    if any, allowed anyone to deposit those ballots in a

4    remote drop box, correct?

5        A.    I would say -- I would say correct, but

6    also, the fact that the drop boxes are currently

7    there shows the progress that people -- that

8    legislators were trying to make in trying to

9    encourage more people to vote by giving them more

10   options.  So even though of course there weren't as

11   many drop boxes there, if any, in the state of

12   Florida in 1982, nevertheless, the fact that they

13   were put there in later years shows the intention of

14   the Legislature to get people to vote by giving them

15   more options and now those options are being taken

16   away.

17       Q.    What other reasons could the Legislature

18   have had to enact this drop box provision in SB 90,

19   aside from discrimination, as you've already stated?

20       A.    I would say -- well, I mean, I'm not

21   really sure.  I would think that they would -- they

22   might want to remove them if they had any evidence

23   of fraud.  But they -- in Florida, I don't think

24   that if there is any, that it was never indicated.

25       Q.    What if a drop box -- someone dropped a

Sharon Austin
October 27, 2021

```
 1   match into a drop box canister and destroyed all the

 2   ballots in that box; is that fair to the hundreds of

 3   ballots that were destroyed?

 4        A.   But has that ever happened?  I mean,

 5   because if you use that type of logic, then you also

 6   need to remove blue mailboxes.  Because what if

 7   someone -- a lot of people use a blue mail box to

 8   mail letters and someone drops a match it in it,

 9   sets the mail on fire, is that a reason to remove

10   the mailbox?

11        Q.   Perhaps it's a reason to monitor the

12   mailboxes to ensure no one drops matches in them,

13   not remove them.  Florida has not removed the drop

14   boxes.

15        A.   Okay.

16        Q.   They're just monitoring them.

17        A.   Would you need to monitor a mailbox by

18   having a person standing next to it?  Why can't you

19   just have a video camera there?  Because in this

20   provision, relying on remote video surveillance

21   isn't allowed.  So is somebody supposed to just

22   stand next to a mailbox 24 hours a day?

23        Q.   Would you be okay with this provision if

24   it were, if it allowed for video surveillance?

25        A.   I'm just looking at what it says.  It says
```

Sharon Austin
October 27, 2021

```
 1   that -- I mean that it doesn't allow remote video
 2   surveillance.  That it has to be a person physically
 3   watching these drop boxes.
 4        Q.   I understand.  But if it did allow for
 5   remote video surveillance, would that still be
 6   discriminatory?
 7        A.   But it doesn't, though.  I'm only talking
 8   about what the words -- what the language of the
 9   provision says.  Not necessarily if it did or if it
10   didn't do this or that, I'm just looking at the
11   language as it -- as it -- clearly as it is in the
12   provision.
13        Q.   Help me understand any least
14   restrictive -- less restrictive alternatives that
15   the State could have enacted if it wanted to ensure
16   drop boxes were secure and safe.
17        A.   Can you repeat that again?
18        Q.   Help me understand if you are aware of any
19   less restrictive alternatives the State could have
20   enacted if its goal was to secure and protect drop
21   boxes throughout Florida.
22        A.   Well, I don't know of any, because I'm not
23   trying to know of any.  I'm just saying -- I'm just
24   looking at this provision and looking at what it
25   does.
```

Sharon Austin
October 27, 2021

1    Q.    Okay.  Aside from depositing a ballot in a

2  drop box, how else can a Florida voter cast a

3  ballot?

4    A.    Well, of course you can -- you can put it

5  in the drop box.  You can mail it in.  You can vote

6  at the polls.

7    Q.    You could go early, the week before the

8  election; you could vote on Election Day, correct?

9    A.    Yeah.  And this is a law that's trying to

10  make it difficult to do many of those things.

11    Q.    Okay.

12       MR. HOLT:  Are we needing a break here?

13       I've got two more sections to go through,

14       probably about another hour.

15       THE WITNESS:  Yeah, I need to check on my

16       kids.

17       MR. FARUQUI:  Mary, I'm just letting you

18       know, I substituted in for Mr. Chorba on behalf

19       of the OAG.

20       THE STENOGRAPHER:  Got it.

21       (Recess from 2:54 p.m. to 3:01 p.m.)

22  BY MR. HOLT:

23    Q.    Okay.  Dr. Austin, just a few more things

24  on drop boxes.

25    A.    Okay.

Sharon Austin
October 27, 2021

Page 186

```
1        Q.   You had discussed about comparing drop
2   boxes to the blue mailboxes, remember that?
3        A.   Uh-huh.
4        Q.   Before our break?
5        A.   Okay.
6        Q.   You would you agree that the state of
7   Florida does not monitor or establish blue United
8   States Postal Service boxes, correct?
9        A.   I would agree that Florida doesn't.
10       Q.   The state of Florida is not responsible
11  for the placement or monitoring of United States
12  Postal Service depositories?
13       A.   I don't -- I really never even -- never
14  really thought about it.  So...
15       Q.   What is the full name of the agency of the
16  USPS?
17       A.   United States Postal Service.
18       Q.   So you would agree that it's the United
19  States or the Federal Government that monitors and
20  establishes blue mailboxes, not the state of
21  Florida, correct?
22       A.   I really don't know who monitors them.  So
23  I assume -- I don't really know.
24       Q.   Well, you used them as an example in
25  comparing them to drop boxes.  I'm simply trying to
```

Sharon Austin
October 27, 2021

1    establish that those are very different things.

2         A.   Okay.

3         Q.   And that the State, the state of Florida,

4    is responsible for monitoring drop boxes, the

5    Federal Government is responsible for monitoring

6    mail boxes; you would agree with that statement?

7         A.   I would assume.

8         Q.   Correct?

9         A.   I would assume.  I don't really know who

10   monitors mailboxes.

11        Q.   Okay.  And then you also -- in your

12   opinion, is a ballot that is deposited in a drop box

13   more valuable than, let's say, a credit card

14   solicitation deposited in the mailbox?

15             MR. MILLER:  Objection, form.

16        A.   I would say that a ballot is very

17   valuable.  And I would say also that if you think

18   about what's in the mailboxes, it's not just credit

19   card solicitations, it's a lot of really important

20   information.  But I would say, yes, ballots are very

21   important.

22   BY MR. HOLT:

23        Q.   And you would agree that the State has a

24   priority to ensure that those ballots stay safe and

25   secure, correct?

Sharon Austin
October 27, 2021

 1        A.   I would say yes, within reason.

 2        Q.   It's in nobody's interest if, No. 1, a

 3   bucket of fraudulent ballots were dumped in a drop

 4   box, or, two, somehow a drop box was stolen or

 5   destroyed, correct?

 6        A.   If that has happened, I would say that

 7   would be something that would really be very

 8   serious.

 9        Q.   Do you believe it's worthwhile to pass

10   measures to stop that from happening in the future,

11   or to wait 'til it happens to try to then have to

12   stop it?

13        A.   I would say it's important to make sure

14   the drop boxes are supervised within reason.  And I

15   just -- again, I don't see why this provision is

16   really necessary, other than to make things harder

17   for people to vote.  But it is -- I guess it's -- it

18   is important to monitor drop boxes within reason.

19        Q.   What is a less restrictive means that you

20   would view as nondiscriminatory to do this?

21        A.   Well, again, I'm not really sure because

22   I'm not -- that's not my charge, to try and come up

23   with that.  I think that the way --

24        Q.   Would you agree that --

25        A.   I would say that the way the drop boxes

Sharon Austin
October 27, 2021

```
 1   were used before here in Florida, I don't feel that

 2   there was anything wrong with the way they were

 3   being administered before, because I didn't hear

 4   about, you know, the rumors about fraudulent ballots

 5   that were made in other places.  Even in those

 6   places, it was never really ever proven there was

 7   any widespread fraud, but I don't remember hearing

 8   about those types of things happening here in

 9   Florida.

10           All I know is that here in Florida, is

11   that once -- from what I saw and from what my

12   research has shown, once Black and Hispanic people

13   started using these things, all of a sudden there

14   was a problem.  I think just the way that these drop

15   boxes and all the other things that we've talked

16   about, the way that it was working before seemed to

17   be working fine.  And I just don't see that there

18   was a need to try to safeguard about what could

19   happen in the future, because we didn't have any

20   evidence that there was a problem.

21           It just seemed like as soon as

22   African Americans and Latinos started taking

23   advantage of these things, all of a sudden, the

24   change needed to be made.  And that's just the part

25   that I just don't get.
```

Sharon Austin
October 27, 2021

1      Q.   Okay.  You would agree that as we

2   discussed previously, that after most elections, the

3   state legislature has enacted some election

4   provisions in response to things that happened in

5   the previous election, correct?

6      A.   Yes.  So they claimed, in response to

7   problems.  But also because they were making changes

8   as soon as people of color started taking advantage

9   of something, all of a sudden it needs to be

10   changed.  So to me, that seems to be the real

11   motivation for the legislation that's taken place.

12      Q.   Okay.  Would you agree that 2020 saw a

13   large increase in the use of drop boxes than

14   previous years?

15      A.   Well, I didn't include that in my report,

16   as far as whether people voted early or voted by

17   mail by using drop boxes, so I really -- I can't

18   tell if that's true or not.

19      Q.   Well, you've arrived at the opinion that

20   SB 90's supposed restriction of drop boxes is

21   discriminatory, so you, therefore, had to have

22   understood the use it was used prior to SB 90.

23      A.   Uh-huh.  Well, I think it's discriminatory

24   because, again, it's making it harder for people to

25   vote in a way that was convenient before.  But I

Sharon Austin
October 27, 2021

1    didn't actually count the number -- I couldn't find

2    any data that showed the number of people that

3    actually used a drop box when they voted.

4         Q.   So as we discussed earlier, you're not

5    able to quantify how this will disenfranchise any

6    voters?

7         A.   And as I said before, it's not about

8    whether I can quantify it, it's about the fact that

9    these are discriminatory barriers that should not be

10   there, in a state that says that it believes in --

11   it doesn't believe in voter suppression, it believes

12   in equality, it believes in one man, one vote,

13   believes in allowing people to have as many ways as

14   possible to vote, to making that process as

15   convenient as possible.

16              I think that this isn't necessary, and as

17   a result of them placing these barriers there, I

18   think it's discriminatory.

19        Q.   Okay.  Let's move on to the disclaimers

20   that third-party voter registration organizations

21   are required to provide under SB 90.

22        A.   Okay.

23        Q.   Okay?  What is your understanding of this

24   provision?

25        A.   Uh-huh.

```
 1              My understanding is that nonprofit

 2     organizations that are trying to register voters

 3     that have voter -- registration applications that

 4     are trying to get people to fill those applications

 5     out and to turn those applications in, that they now

 6     have -- this is mandatory, that they have to give a

 7     warning to these voters who are attempting to

 8     register, and they have to tell them that there's a

 9     chance that your application may not arrive in time

10     for you to vote.

11              And then also, they have to deliver the

12     completed registrations to the voter's county within

13     14 days.

14          Q.    Explain to me how this provision

15     disenfranchises voters.

16          A.    It disenfranchises them by -- I think it

17     discourages them from filling out an application

18     with these individuals.  Because if you're saying to

19     people that we have to -- we may not be able to turn

20     your application in on time, which means that you

21     won't be registered, which means that you won't be

22     able to participate in the upcoming election, that's

23     going to discourage someone from giving them the

24     application.

25              And so, again, that's placing a barrier
```

Sharon Austin
October 27, 2021

 1    there that's going to -- we're supposed to encourage

 2    people to register to vote because that's what we

 3    want.  We want as many people as possible to vote.

 4    But this is going to mean that a person might be

 5    hesitant of filling out an application and giving it

 6    to a representative from this organization if they

 7    don't think it's going to arrive on time.

 8         So, again, it's --

 9    Q.   You are --

10    A.   -- discouraging them from registering to

11    vote.

12    Q.   If you were contacted on the street by a

13    third-party voter -- voter registration

14    organization, wouldn't you want to know that there's

15    a possibility that your ballot will not arrive

16    before Election Day?

17    A.   Well, I think that you already would

18    probably know that, but that, again, would

19    discourage you from wanting to fill the application

20    out with these organizations.  And these are

21    organizations that really are serving a real

22    important role in trying to register as many people

23    as possible.  And many of them are really seeking to

24    register minority voters.

25         And so it's going to mean that if it's an

1    organization that primarily is trying to register

2    Black voters and Latino voters, that it's going to

3    make it so that Black and Latino people who are

4    willing -- who are wanting to register may not fill

5    out their application because they'll feel that, I

6    shouldn't waste my time with this because this

7    person already told me it may not arrive on time,

8    which means it probably won't arrive on time.  Which

9    means I won't be able to vote, so why even bother.

10            And that's not something that we want to

11   do, especially with young Black and Latino voters,

12   potential voters.  We want to try to encourage these

13   people to vote.

14            And this, again, is something that just --

15   it's not necessary.  I mean, there was a significant

16   number of young Black and Latino voters voting in

17   the last election, and so this is something, again,

18   I think was put in place because of that.  I think

19   once young Black and Latino voters feel they don't

20   fit the stereotype of being people that don't want

21   to vote, they actually did register.  They actually

22   did turn out and vote which was a good thing.

23   Regardless of who they voted for, it was a good

24   thing.

25            And now there's this mandatory disclaimer

Sharon Austin
October 27, 2021

1    warning to make it harder for these organizations to

2    do their job which is registering people to vote.

3    Again, I think it's discriminatory.  It's placing an

4    unnecessary barrier there.

5         **Q.   Okay.  If the State wanted to ensure that**

6    **you as a voter knew what your rights were, and that**

7    **there was a possibility that your ballot might not**

8    **arrive on time and that you had other alternatives**

9    **to request a ballot as opposed to going through the**

10   **voter registration organization, is that not a valid**

11   **state interest in trying to ensure a voter**

12   **understands its rights and where they can register**

13   **to vote?**

14        A.   But again, is that what the legislature is

15   trying to do?  Are they trying to get people to

16   understand that, or are they trying to discourage

17   making it harder for these organizations to register

18   Black and Latino voters?

19             And I would say that, again, this fits

20   into the pattern that I talked about throughout the

21   entire report, of -- of people putting this there

22   and making it harder for these organizations to

23   register Black and Hispanic people.

24        **Q.   Okay.  I understand that.  But my question**

25   **was:  You would agree that that is a legitimate**

Sharon Austin
October 27, 2021

Page 196

1   state interest?

2        A.   As far as --

3        Q.   **To notify voters of their rights**

4   **pertaining to voter registration.**

5             MR. MILLER:  Objection.

6   BY MR. HOLT:

7        Q.   **That is a valid state interest?**

8             MR. MILLER:  Objection, form.

9        A.   Is it a valid state interest to make sure

10  that people get this warning?  Is that what you're

11  asking?

12  BY MR. HOLT:

13       Q.   **To ensure that potential voters understand**

14  **their options and their rights as it pertains to**

15  **voter registration.  Is that a valid state interest?**

16       A.   Is that what this is doing, though?  Of

17  course you're --

18       Q.   **I'm not asking you what it's doing.  I'm**

19  **asking if it's a valid state interest.**

20       A.   Well, I'm not -- I'm talking about what

21  the language says here, with this disclaimer

22  warning.

23            But is it a valid state interest to inform

24  people about the -- you know, the risk that they

25  take when they fill out these applications, that

Sharon Austin
October 27, 2021

Page 197

```
 1    they may not arrive on time, is one question.  But

 2    is it a valid state interest to make it harder for

 3    nonprofit organizations to register Black and

 4    Hispanic voters?  It all depends on what the

 5    intention of the legislature was.

 6          And if you're --

 7     Q.   Do you have any --

 8     A.   If it's --

 9     Q.   Do you have any --

10     A.   If it's a case --

11          MR. MILLER:  Wait --

12     A.    If this is a case in which they -- the

13    legislature is making it harder for these

14    organizations to get people to fill out these

15    applications, to register Black and Hispanic voters,

16    that's not a legitimate state interest.  So it all

17    just depends on what their intention is.

18    BY MR. HOLT:

19     Q.   Do you have any evidence or indication

20    outside of past legislatures as to what the intent

21    of this SB 90 legislature was?

22     A.    I think, again, my report is arguing that

23    when people who are African American and Latino take

24    advantage of something that at one time was

25    encouraged, all of a sudden, the rules change.  And
```

Page 198

1  all of a sudden, this is something that was

2  working -- because, you know, throughout history, we

3  have said that we want everyone to register to vote,

4  to participate in voting.  We talked about in

5  Florida no-excuse voting and making all these

6  options available so that people would have no

7  excuse for not voting in some type of way.

8          We wanted organizations to be able to

9  register people from marginalized communities, from

10  African American and Latino communities, and that's

11  what they did.  And it worked successfully and

12  people voted.  And now we're saying, no, we want to

13  change this around to make it better.  Well, why was

14  there a need to make it better?  It seemed to be

15  working just fine.

16      Q.   Okay.  And this is despite the examples

17  that we discussed in Miami and Miami-Dade County in

18  1993 and 1997, the congressional race in 2012, where

19  there was rampant fraud associated with, No. 1,

20  voter registration forms.

21      A.   Uh-huh.

22      Q.   And, two, mail ballots.

23          There is -- there is ample evidence of

24  this happening multiple times.  You would agree that

25  that might have been what the Legislature was trying

```
 1   to do here, that there's a possibility the

 2   Legislature was trying to actually prevent that

 3   fraud from happening again?

 4             MR. MILLER:  Objection, form.

 5        A.   I don't think so.  Because, again, those

 6   are problems that happened in the past, and

 7   different laws were passed, and efforts were made to

 8   correct those problems.  And so, again, this was not

 9   necessary.

10             The provisions that I pointed out in SB 90

11   are just making it more difficult for people of

12   color to vote.  Placing barriers there that should

13   not be there.  There's no rationale for the

14   provisions I think that I've included in the report.

15   BY MR. HOLT:

16        Q.   So the Legislature, in your opinion,

17   should only be reactive as opposed to proactive in

18   preventing voter fraud; is that what I'm hearing?

19             MR. MILLER:  Objection, form.

20        A.   I'll just say the legislature should not

21   discriminate.

22   BY MR. HOLT:

23        Q.   You and I both agree with that.  I don't

24   think that's a controversial statement.  But I'm

25   simply asking if you believe the legislature should
```

Sharon Austin
October 27, 2021

Page 200

1    be proactive or reactive when addressing voter
2    fraud.
3            MR. MILLER:  Objection, form.
4        A.   Well, I'm not saying that.  I just think
5    that the legislature should encourage all people and
6    remove barriers so that all people can take
7    advantage of voting procedures that they encourage.
8    BY MR. HOLT:
9        Q.   Okay.  I'll ask the question one more
10   time.
11           Do you think a legislature, the Florida
12   Legislature, should be proactive in attempting to
13   prevent voter fraud, or they should only be reactive
14   once fraud has taken place?
15           MR. MILLER:  Objection, form.
16       A.   Well, now, that's a hard question to
17   answer, but I would say -- I would have to give it
18   more thought.  But I would say it just makes more
19   sense to be reactive when you see that there is a --
20   when there is a problem there.
21   BY MR. HOLT:
22       Q.   Okay.  Now, please help me quantify the
23   burden on minority voters that comes from
24   third-party voter registration organizations having
25   to provide this disclaimer.  How do we quantify this

Sharon Austin
October 27, 2021

Page 201

1    burden?

2        A.   Well, I mean, it would be difficult -- it

3    would be difficult to quantify.  I think you would

4    have to ask the organizations how many people they

5    registered and what they think the impact of this

6    provision would be.  It would be hard for me to

7    quantify because I'm not a part of any of these

8    organizations.

9        Q.   Are you aware of a provision in SB 90 that

10   outlines how these third-party organizations have to

11   provide this disclaimer?

12       A.   I'm mostly just focused on the provisions

13   that I -- that I found the most objectionable in the

14   report because, keep in mind, you know, the SB 90

15   was 48 pages, and although I read it, I focused just

16   on -- on these provisions, so I really only want to

17   speak to the provisions that I've included.

18       Q.   Okay.  I mean, only speaking about these

19   third-party voter registration organizations and the

20   disclaimer requirement, is there a provision in that

21   part of SB 90 that outlines how the disclaimers have

22   to be provided?

23       A.   Well, to be honest with you, I'm not

24   really aware of that.

25       Q.   Okay.  Now, can you think of any lesser

Sharon Austin
October 27, 2021

1    restrictive alternatives that would accomplish the

2    Legislature's goal here of ensuring that voters

3    understood their rights pertaining to absentee

4    ballots?

5        A.   I think that voters already understand

6    their rights pertaining to absentee ballots, and

7    that it's not necessary to have this mandatory

8    disclaimer warning, because I think the only purpose

9    of the warning is to -- again, to make it more

10   difficult for organizations that have a proven track

11   record of registering Black and Hispanic voters, to

12   make it hard for them to continue to do that, so I

13   don't think it was necessary for the Legislature to

14   do anything.

15       Q.   So if a voter already understood all of

16   this stuff, why would a third-party voter

17   registration organization telling them that -- these

18   things they already understood, discourage them from

19   filling out the application?

20       A.   Well, because -- I guess based on what I

21   even see on campus during -- before elections, when

22   I see a lot of student organizations trying to

23   register people to vote and get people to fill out

24   voter registration applications.

25           You know, you have a huge campus of 50,000

Sharon Austin
October 27, 2021

```
 1   students and you got people who are rushing to get
 2   to class and get to different places, and you're a
 3   member of these organizations and you're trying to
 4   get someone to fill out a voter registration
 5   application, and you have to speak quickly because
 6   if you don't, they'll walk right past you.  I mean,
 7   I'm assuming, because I -- you know, I didn't
 8   really -- I'm not a part of any of these
 9   organizations so I wouldn't know, but I would assume
10   that.
11           So if you are getting someone to try to
12   fill out an application and you have this mandatory
13   disclaimer that you have to tell them about, and I'm
14   assuming you probably have to read some type of
15   statement, the average student, from what I see on
16   campus, are going to walk right past you.  So that's
17   going to be one student or one person that might
18   have registered to vote that might choose not to
19   because you were so busy trying to explain a
20   disclaimer that they probably already are aware of,
21   that you aren't able to actually get them to fill
22   out the form.
23           So that's just one example of how it might
24   be a barrier.
25       Q.   Are you aware of any provision of SB 90
```

Sharon Austin
October 27, 2021

Page 204

1    that prohibits voter registration organizations from

2    providing this disclaimers in writing as opposed to

3    discussing it verbally?

4        A.   No, I'm not aware of it.  All I know is

5    that --

6        Q.   Are you aware of -- sorry.  Go ahead.

7        A.   I know that it just says that there's a

8    mandatory disclaimer warning.  But I didn't know

9    exactly the extent of how it's supposed to be

10   provided.

11       Q.   Is there anything that would prohibit

12   these third-party organizations from having a poster

13   that has the disclaimer that is behind a table where

14   they're registering voters?  Are you aware of any

15   provision that prohibits that?

16       A.   I'm not aware of a provision that

17   prohibits it.  But again, that still is going to

18   take time that -- so you're trying to get someone to

19   fill out an application, and if you're on a campus

20   or somewhere, or even if not on a campus, anywhere,

21   someone is rushing to get somewhere, they're not --

22   they have to stop to read the sign.  And it's,

23   again, unnecessary.

24       Q.   Okay.  So if I'm understanding your

25   opinion correctly, it's the extra time involved with

Sharon Austin
October 27, 2021

1    giving the disclaimer that leads to the potential

2    disenfranchisement of someone not registering to

3    vote?

4            MR. MILLER:  Objection, form.

5        A.    No, it's not the extra time, it's just the

6    fact that these provisions aren't necessary, and

7    they're making these -- giving -- these

8    organizations are going to have a harder time

9    registering people to vote.  And they've proven

10   their effectiveness in registering Black and

11   Hispanic voters in this last election cycle, and now

12   this is something that's going to make it harder for

13   them to register people.  And that's the point I'm

14   trying to make.

15   BY MR. HOLT:

16       Q.    Now, regarding the 1997 Miami mayoral

17   election, you said yourself that it was these

18   third-party voter registration organizations, I

19   think over 50 individuals were found guilty of voter

20   fraud associated with these type of absentee ballot

21   requests.  You mentioned that earlier.  Do you

22   remember that?

23       A.    I don't remember saying that it was 50

24   people involved.  I remember you telling me about --

25   specifically about what happened.  But I don't

Sharon Austin
October 27, 2021

1    remember saying that.

2         Q.   You stated that it was the third-party

3    voter registration organizations.  You had a name

4    for them, the Boleteros?

5         A.   Oh, yeah.

6         Q.   Something like that.

7         A.   Okay.

8         Q.   Do you remember saying that?

9         A.   I remember mentioning the Boleteros but I

10   don't remember saying a number of how many of them

11   there were.

12        Q.   So do you believe the State should monitor

13   or register or govern these third-party

14   organizations in any way in how they go about their

15   business?

16             MR. MILLER:  Objection, form.

17        A.   Well, I think -- to be honest with you, I

18   think these organizations already were doing an

19   effective job.  And there was no need for additional

20   monitoring.

21   BY MR. HOLT:

22        Q.   Okay.  Can you think of any lesser

23   restrictive alternatives that would allow the State

24   to achieve their goals that they were seeking with

25   this provision of SB 90.

Sharon Austin
October 27, 2021

```
 1        A.    So are you asking me -- you said any less
 2   restrictive goals or tactics?
 3        Q.    Alternatives.
 4        A.    Oh, alternatives.  Okay.
 5        Q.    Uh-huh.
 6        A.    Well, I would say the alternative would be
 7   to just leave things as they were, and to not have
 8   put this provision or any of these provisions there
 9   in the first place.  It seemed to be working just
10   fine.
11        Q.    So you would agree there are no lesser
12   restrictive alternatives, aside from leaving it the
13   same and not changing, from what you just stated?
14        A.    Yes.
15              MR. MILLER:  Objection to form.
16        A.    I would say that.
17   BY MR. HOLT:
18        Q.    Okay.  Now, aside from submitting a
19   registration application through one of these
20   third-party organizations, how else can a voter
21   submit an application to vote?
22        A.    Besides submitting through the
23   organization, how else can someone register to vote?
24        Q.    Yes.
25        A.    Submit -- okay.
```

Sharon Austin
October 27, 2021

Page 208

```
 1                    Well, there are -- you know, you can fill

 2      out -- there are other ways of doing it.  I mean,

 3      there are other ways of registering to vote.  You

 4      don't have to vote through an organization and fill

 5      out an application through an organization.  But,

 6      again, I don't think that's the point.  The point is

 7      that if these organizations are registering voters,

 8      and if they're succeeding in registering Black and

 9      Hispanic voters, then we should just leave them

10      alone, unless we have some evidence that they've

11      done something wrong.  And I didn't -- I just don't

12      see the evidence.

13           Q.   Okay.  So we should wait for a problem to

14      happen, again, like 1997, before taking proactive

15      steps to potentially stop that?

16           A.   I would say we should wait until we see

17      some evidence, until there's a problem.  And there

18      isn't any evidence, to my knowledge.

19           Q.   What if the third-party voter registration

20      organization doesn't timely deliver the ballots, the

21      applications, to the regular -- the office they need

22      to be delivered to, is that a problem?

23           A.   If it happens, it would be.  But has it

24      happened?  And I don't think that it has.

25           Q.   What it has happened?  Would that change
```

Sharon Austin
October 27, 2021

1    your opinion about this?

2         A.    It might, but then again, it might not.  I

3    mean, I'd have to know if it has happened.

4         Q.    Let's assume that it has happened; would

5    you feel that this would be justified?

6         A.    If it had happened, possibly on a large

7    scale in which you had a lot of organizations that

8    were collecting applications and just not turning

9    them in on time.  If this was a -- a widespread

10   problem on the part of a lot of organizations, then

11   something like this might be necessary.

12        Q.    Help me understand what a large scale

13   would be.  What if ten voters were unable to vote.

14   Is that a large enough scale?

15        A.    Well, again, I don't want to quantify the

16   numbers because, I mean, I think what I've said

17   before, it's not how many people were disadvantaged,

18   it's the fact that there's a discriminatory barrier.

19             So to answer your question, even if it's

20   just ten people, that would be problematic.  But I

21   don't know if that would justify a provision like

22   this.  I just think there should not be

23   discriminatory barriers there, that make it more

24   difficult for people of color to vote.

25        Q.    Okay.  You said repeatedly that you

Sharon Austin
October 27, 2021

```
 1    believe that if there was widespread evidence, you
 2    would feel these were justified and necessary, is
 3    the word that you used; is that correct?
 4        A.   Uh-huh.  I would say yes.
 5        Q.   Now -- and that's why I asked that
 6    question, of trying to understand what you mean by
 7    widespread sufficient to make it necessary.
 8        A.   Uh-huh.
 9        Q.   And every time I ask you that question,
10    you refuse to answer it.
11        A.   Okay.
12        Q.   So how many ballot applications, in your
13    mind, would have to not -- have been returned in
14    order for you to view a provision that requires
15    these types of notices?
16        A.   Okay.
17        Q.   To be -- to have this provision be
18    necessary, in your opinion, you said maybe ten,
19    maybe not.  What if we're doing it with 20 voters?
20        A.   Okay.
21             MR. MILLER:  Objection.
22    BY MR. HOLT:
23        Q.   Is that enough?
24             MR. MILLER:  Objection, form.  Please
25        don't mischaracterize the witness's testimony.
```

Sharon Austin
October 27, 2021

1      And please don't put words in her mouth.

2           MR. HOLT:  You can object to form.  I will

3      deal with that later.

4  BY MR. HOLT:

5      **Q.   So help me understand what you mean by**

6  **necessary.  What would make it necessary, using your**

7  **words?**

8      A.   Well, I mean, to be honest with you, I

9  can't really explain what would make it necessary.

10  I just am saying in my report, that there is a long

11  history of discrimination and that there have

12  been -- there's been backlash.

13           And it seems that whatever -- people who

14  are Black and people who are Hispanic, when they

15  take advantage of something, of things that are

16  encouraged, like the things that we had mentioned

17  today, and when Black and Hispanic people started to

18  do it, all of a sudden, oh, there's a problem, we

19  need to change it, we need to change the rules.

20           But there was never any evidence that it

21  wasn't working.  It was working for their benefit.

22  It was working in their favor, and all of a sudden,

23  now there has to be a need to change it.  And that's

24  just -- that's the issue.

25           So as far as quantifying things and coming

Sharon Austin
October 27, 2021

Page 212

 1   up with alternatives and what we can do -- or rather

 2   than this, I just think that as someone who teaches

 3   courses about discrimination, to someone who's

 4   studied discrimination, I just think that it's

 5   just -- we just should not have those discriminatory

 6   barriers there, period.

 7        **Q.   Okay.  Do you still stand by your**

 8   **testimony regarding this provision and the other**

 9   **provisions, that if there were examples of**

10   **widespread voter fraud on a statewide basis, that**

11   **these provisions of SB 90 would be necessary?**

12             MR. MILLER:  Objection, form.

13        A.   I think that's what some people believe.

14   I think that when they look at SB 90, it's not

15   necessary, simply because we've heard so many

16   allegations of voter fraud in the 2020 election, but

17   we didn't hear those allegations here.

18             So that's why SB 90 is viewed with

19   somewhat suspicion, because even though it said

20   there was voter fraud in Georgia and other places,

21   we didn't have those allegations here.  Our state

22   was the state that was sort of the model for other

23   states as to how an election should be run.  And

24   now, this has been put in place, and it's viewed

25   with suspicion and rightfully so.

Page 213

```
 1    BY MR. HOLT:
 2         Q.   Okay.  Do you understand what I mean by --
 3    when I use the term line warming as it pertains to
 4    SB 90?
 5         A.   No.
 6         Q.   You mention the rules surrounding the
 7    150-foot voter solicitation zone.
 8         A.   Okay.
 9         Q.   Do you see that part in your report?
10         A.   Okay.  Right.
11         Q.   It's commonly referred to as line warming.
12         A.   Okay.
13         Q.   What is your understanding of the voter
14    solicitation provision of SB 90?
15         A.   Okay.  Well, one of the things I want to
16    point out is that whenever -- you know, as someone
17    who has written several books and written articles,
18    no matter how much you proofread something, you're
19    always going to overlook something.
20              And so in this provision, this last part
21    on page 63, in that last bullet point, the third
22    one, where it says "and it extends the
23    no-solicitation zone to the 150 feet around drop
24    boxes" shouldn't have been there, that that was a
25    mistake.  So I realized it after we had already
```

Sharon Austin
October 27, 2021

Page 214

1   finished it, after I had already finished it.

2   But -- so that part should not be there.

3          So the way that I understand it is that it

4   defines solicitation -- yeah, defines solicitation

5   in the way that I have here, engaging in any

6   activity with the intent to influence or the effect

7   of influencing a voter.

8      **Q.   I appreciate you pointing that out**

9   **regarding drop boxes.  So it is not your opinion**

10  **that this no-solicitation zone applied to drop**

11  **boxes, correct?**

12     A.   Right.  I shouldn't have put that there.

13  It did -- it had the definition of solicitation,

14  so...

15     **Q.   Okay.  So how was this provision in SB 90**

16  **different from how it applied to the 2020 election?**

17     A.   Well, I think that with solicitation,

18  there have always been rules prohibiting people from

19  trying to influence voters at polling places or

20  trying to influence voters.

21          But I think that the problem is with the

22  way we interpret solicitation, is that in some cases

23  people who are campaign workers are there, and

24  they're not soliciting voters.  I mean, if you go to

25  any polling place during early voting or on

Sharon Austin
October 27, 2021

1    Election Day, you're going to see people standing

2    with signs and you're going to see people there

3    with -- supporting their candidate, and that type of

4    thing trying -- but I think with this, it's trying

5    to lead to the impression that some of these

6    campaign workers and organizations are doing

7    something that's inappropriate as far as trying to

8    encourage people to vote in a certain way.

9            But that's not -- I don't think that's

10   really what they're doing.  In many cases, they're

11   not trying to influence voters on Election Day.  I

12   think -- and so, really, as far as this definition

13   of solicitation, again, I don't think it was

14   necessary.  Because I don't think that anything

15   inappropriate was going on.

16       **Q.   Do you believe that campaigns and**

17   **organizations should be able to solicit votes within**

18   **150 feet of a ballot box?**

19       A.   Well, I mean, how -- I mean, I don't know

20   exactly how far 150 feet is, offhand, so... I don't

21   know how far a distance that is.

22       **Q.   And the joke is I'm a lawyer, not a**

23   **mathematician, so 150 feet is 150 feet.  So my**

24   **calculation here would be, you know, there's three**

25   **feet in a yard.  So football field, you know, as you**

Sharon Austin
October 27, 2021

Page 216

```
 1    look at that calculation there, so 150 divided by 3
 2    would be approximately 50 yards.  So half a football
 3    field.
 4         A.   Okay.
 5         Q.   Do you agree with that math?  I just kind
 6    of did it on the fly.  Approximately half a football
 7    field?
 8         A.   Yeah.  Okay.
 9         Q.   Do you believe that campaigns should be
10    able to approach people in line and solicit their
11    votes within half a football field?
12         A.   I don't think they should be able to
13    solicit people.  But again, I don't think that that
14    was something that was happening.
15              I mean, I guess, again, produce the
16    evidence that this was something that was actually
17    happening.  I mean, I don't think that campaign
18    workers were going up to people as they're standing
19    in line to vote and talking to them.  Because we
20    know that that's not appropriate.
21              So, again, I don't see that this
22    definition was necessary.  Because it's not telling
23    people something they don't already know.  You know
24    that you can't go to someone who's standing in line
25    to vote to try to tell them how to vote.  So this
```

Sharon Austin
October 27, 2021

Page 217

1    was not necessary.

2        Q.   So if you believe -- you know, outside of

3    your objection regarding the necessity of the

4    provision, if you believe that this type of behavior

5    should be prohibited, how will it discriminate

6    voters from voting by prohibiting behavior that you

7    believe should be prohibited, if that makes sense?

8            MR. MILLER:  Objection.

9        A.   Well, I think that -- well, I mean, I

10   think just with this provision, just combined with

11   the others, that there just was not shown to be a

12   need for this one, just like there was not a need

13   for any of the others.

14   BY MR. HOLT:

15       Q.   So if I understand what you're saying

16   correctly, and correct me if I don't, you don't --

17   your qualms with the line warming provision, no

18   solicitation provision, is not with the requirement

19   that someone cannot solicit, it's with the implicit

20   guilt that parties were soliciting and the need it

21   or it?

22       A.   Uh-huh.

23       Q.   And you feel that that was incorrect.

24   That there's some finger-pointing going on.  Is that

25   what your problem is?

Sharon Austin
October 27, 2021

```
 1        A.   Right.  I think that that was something
 2   that just wasn't necessary.  It wasn't necessary to
 3   define solicitation.  Because people already know
 4   about what you -- you can and can't do, when someone
 5   is waiting to vote.
 6        Q.   Okay.  Now, again, so help me understand,
 7   just for purposes of this analysis and your opinion
 8   here, do you believe there is any burden on a voter
 9   by this provision of SB 90?
10        A.   Well, I think that -- well, I think it's a
11   broad definition.  Because if you're someone and
12   you're trying to get someone to vote, I think the
13   way it's worded, where it says that you can't engage
14   in any activity with the intent or effect of
15   influencing a voter, I think I have a problem with
16   the language.
17        Q.   What problem do you have with the
18   language?
19        A.   Well, the problem I have is that the
20   language is so broad, that, what if you are not
21   trying to tell someone how to vote, if you're just
22   saying to them to vote.
23             I think some people could even encourage
24   this language in this definition as saying that you
25   can't tell people go vote.  And I don't see anything
```

Sharon Austin
October 27, 2021

1    wrong with that.  I think if you're telling people
2    "vote for my candidate," that's different than just
3    saying to someone "go and vote."  So I think the
4    language is too broad and it can be interpreted in
5    such a way that someone could be punished for just
6    telling someone to vote.
7         **Q.   Do you believe someone from a campaign**
8    **should be able to go up to someone in line within**
9    **150 feet of a polling location and tell them to go**
10   **vote?**
11        A.   Well, keep in mind that, you know, as far
12   as this part about the 150 feet, that that was
13   something that I admitted that I shouldn't have put
14   in there.
15        **Q.   Well, the 150 feet is there in regards to**
16   **polling locations.**
17        A.   Okay.
18        **Q.   It doesn't apply to drop boxes.**
19        A.   Okay.
20        **Q.   Well, I think it does, but the 150 feet is**
21   **there where there is not a uniform universal**
22   **prohibition on campaigning, it's a universal -- it's**
23   **a prohibition on soliciting votes within 150 feet of**
24   **a voting location.**
25        A.   Uh-huh.

Sharon Austin
October 27, 2021

1      Q.    Do you understand that?

2      A.    Well, I mean, if it's 150 feet, and if

3   that's about half the size of a football field, I

4   would think that that's not too close.  I mean, that

5   seems to be quite a distance away.

6      Q.    Okay.  So do you believe there is a burden

7   placed on a voter by someone not being able to

8   solicit their vote within 150 feet of the polling

9   location?

10          MR. MILLER:  Objection to form.

11     A.    Well, I really don't know.  I guess I'd

12   have to give that one more thought.

13   BY MR. HOLT:

14     Q.    So it probably goes without saying that

15   you wouldn't be able to quantify what that burden

16   is, correct?

17     A.    No.

18     Q.    Okay.  And can you -- if the State's goal

19   is to stop this type of behavior from happening, can

20   you think of any lesser restrictive ways that the

21   State could have done that?

22     A.    You mean just in respect to this

23   provision?

24     Q.    Yeah, regarding the 150 feet

25   no-solicitation zone.  Is there a less restrictive

Sharon Austin
October 27, 2021

1    way the State could have done that?

2         A.    I would say the State could have just left

3    things as they were before.

4         Q.    Okay.  So if I understand that correctly,

5    if the State was wanting to make some adjustments

6    and further enhance the protections of voters in

7    line, you're saying that there is no less

8    restrictive means to do that, aside from just

9    leaving it as it was?

10        A.    I think that the State -- I don't think

11   that was the goal of the State, was just to enhance

12   the voters' right to not be solicited, I just think

13   that this was just something that the Legislature

14   included this provision and included this broad

15   definition of solicitation simply because it was

16   trying to, again, discourage organizations from

17   mobilizing people and encouraging people to vote.

18        Q.    But you said yourself just a few minutes

19   ago that you didn't believe that people should be

20   approached by organizations and campaigns while

21   they're in line to vote.

22             MR. MILLER:  Objection.

23   BY MR. HOLT:

24        Q.    Correct?

25             MR. MILLER:  Objection, form.

Sharon Austin
October 27, 2021

```
 1        A.    I think I was saying that people should

 2   not be approached about the candidate.  But the way

 3   that this language is -- that -- the broadness of

 4   the language is saying that a campaign worker can't

 5   even tell you to vote.  And if that would be the

 6   case, then I would have a problem with it.

 7              Because if you're saying, okay, vote for

 8   my candidate for this position, that's one thing.

 9   But if you're saying, okay, go ahead and vote, I

10   can't see what's wrong with that.

11              MR. HOLT:  Okay.  I think that's all that

12         I have.  Does anyone else have any questions

13         for Dr. Austin?

14              MR. MILLER:  I have some redirect if no

15         one else has any questions.  Does anyone else

16         have any -- any other defendants have any

17         questions for Dr. Austin?  Speak now or forever

18         hold your peace.  All right.  I will take the

19         witness, then.

20              Go off the record for a couple of minutes

21         so that I can get my notes in order and make

22         this go a little quicker.  Is that okay,

23         Mr. Holt?

24              MR. HOLT:  Yeah, that's fine with me.

25
```

Page 223

 1                    CROSS-EXAMINATION

 2    BY MR. MILLER:

 3         Q.   Okay.  So, Dr. Austin, earlier in your

 4    deposition, Mr. Holt asked you some questions about

 5    the table from the ACLU report that you had

 6    reproduced on page 53 of your report.

 7         A.   Okay.

 8         Q.   Do you remember that?

 9         A.   Uh-huh.

10         Q.   And that was in paragraph 85 of your

11    report.  Do you see that?

12         A.   Okay.  Yeah, I have it.

13         Q.   You have your report there, right?

14         A.   Right.

15         Q.   Okay.  So in paragraph 85 of your report,

16    when you're talking about this table, you note that

17    this litigation took place in the context of

18    significant racial disparities and signature

19    matching rejections as Black and Hispanic voters had

20    considerably higher ballot rejections than did white

21    voters as the following data from the 2018 election

22    in Florida demonstrates.

23              Do you see that?

24         A.   Okay.  I see it.

25         Q.   So when you were -- in your report, is it

Sharon Austin
October 27, 2021

```
 1   fair to say that you inserted this table in there to

 2   talk about -- to provide some context about the

 3   litigation that you had been discussing a few

 4   paragraphs earlier; is that right?

 5        A.   Right.

 6        Q.   Right.

 7             So if we go to paragraph 81, for example,

 8   in your report.

 9        A.   Okay.

10        Q.   And here, you're talking about a lawsuit

11   called Democratic Executive Committee of Florida vs.

12   Detzner, do you see that?

13        A.   Okay.  I see it.

14        Q.   And if you continue through your report,

15   I'm not going to read your report into the record,

16   but you're talking about a litigation that was

17   brought against the then Secretary of State

18   regarding its signature matching practices, right?

19        A.   Right.

20        Q.   And in -- you have some of the quotes from

21   the district court's opinion, do you see that?

22        A.   Uh-huh.

23        Q.   And in that case, the Court found that

24   there were some legal issues with the manner in

25   which Florida had been handling signature matching,
```

Sharon Austin
October 27, 2021

```
 1    right?

 2         A.   Right.

 3         Q.   Right?

 4              And so when Mr. Holt was asking you

 5    earlier today about your use of 2018 data as applied

 6    to 2020, the reality is, is that you were using the

 7    2018 data to put context around litigation that the

 8    State lost regarding some of its voting practices;

 9    isn't that right?

10         A.   Right.

11         Q.   Thank you.

12              Now I want to ask you about some of that

13    data.

14         A.   Okay.

15              MR. MILLER:  And I've put in the chat a

16         document which is the document where this table

17         came from.  It should be Tab 1 and it's --

18         unfortunately it's got lots of color in it so

19         it's a large file but I'd like to have everyone

20         download that and I guess we can mark it as

21         Exhibit 3.

22              THE WITNESS:  I see 2.

23              (Marked for Identification is Exhibit 3.)

24    BY MR. MILLER:

25         Q.   So why don't you turn to page 20 of the
```

```
 1    PDF.  And this is the page that you found the table

 2    that you inserted in into your report, right?

 3         A.   Right.

 4         Q.   If you go -- and I don't want you to take

 5    my word for it, but if you go several -- two pages

 6    before that.

 7         A.   Uh-huh.

 8         Q.   There's a heading that says Analysis of

 9    Vote-By-Mail Ballots in the 2018 General Election.

10    Do you see that?

11         A.   Okay.  I do.

12         Q.   So the table that you reproduced in your

13    report, from page 20 of the ACLU report, is part of

14    Dr. Smith's and Ms. Baringer's portion of this

15    paper, correct.

16         A.   It is.

17         Q.   So if Mr. Holt or any of his colleagues

18    wanted to better understand the data that's in this

19    table, they could have asked Dr. Smith, who is also

20    an expert in this case, right?

21         A.   Right.

22         Q.   Right.

23              So later on in the report, I think we see

24    the full paper where this data is excised from.

25         A.   Okay.
```

Sharon Austin
October 27, 2021

```
 1        Q.    And it's on page 49.

 2        A.    Okay.

 3        Q.    I believe it's page 49.  I will confirm

 4   that, though.  Yes, page 49 of the PDF file.

 5              Do you see that?

 6        A.    Right.  I see it.

 7        Q.    Same authors.

 8        A.    Right.

 9        Q.    And if you go to -- two pages into this

10   report, think it's two pages in, it's on page 52 of

11   the report.

12        A.    Okay.

13        Q.    If you go to the first -- the second full

14   paragraph where the data that's -- you know, the

15   basis for the table that you put into your report

16   from the ACLU.

17        A.    Uh-huh.

18        Q.    Dr. Smith and his colleague state in this

19   report "Drawing on data from publicly available

20   files, we document the rejection rates of VBM

21   ballots in the 2018 general election as well as the

22   cure rates across counties."

23              Do you see that?

24        A.    I see it.

25        Q.    If Mr. Holt or his colleagues wanted to
```

Sharon Austin
October 27, 2021

```
 1    better understand what his publicly available data

 2    was, they could have asked Mr. Smith; is that right?

 3        A.   Yes, they could have.

 4        Q.   Now, let's go back to the table in your

 5    report.

 6        A.   Okay.

 7        Q.   And again, it's on page 53 of your report.

 8        A.   Okay.  I see it.

 9        Q.   And Mr. Holt was asking you about census

10    data versus other kinds of data when he was

11    questioning you earlier today.

12             Does the United States Census Bureau

13    collect data regarding rejected -- let me start

14    again.

15             Does the United States Census Bureau

16    collect data regarding rejection of mail ballots in

17    various counties in Florida?

18        A.   No, not that I know of.

19        Q.   And -- but it's true that the -- that --

20    well, let me ask you this.

21             And Mr. Holt was asking you a whole series

22    of questions earlier today about how on census

23    forms, folks filling out their census form, you

24    know, every ten years, they can check a race, one in

25    which you could be Black, and you can also check an
```

Sharon Austin
October 27, 2021

 1   ethnicity which might be some form of -- of Latino

 2   or other, right?

 3        A.   Right.

 4        Q.   Okay.  Is that the way the -- let me --

 5   I'm going to put another document into the chat.  I

 6   figured it out once.

 7             MR. MILLER:  So I put a new file into the

 8        chat.  It's labeled as Tab 2.

 9             THE WITNESS:  Okay.

10             MR. MILLER:  And I'd like to have this

11        marked as Exhibit 4 in this deposition.

12             (Marked for Identification is Exhibit 4.)

13   BY MR. MILLER:

14        Q.   Let me know when you've had a chance to

15   pull that.

16        A.   I see it.

17        Q.   So a Florida voter registration form, what

18   happens to be -- if you look on the top left hand

19   corner it says effective 2013.  Do you see that?

20        A.   Uh-huh.  I see it.

21        Q.   We pulled this from the Florida Secretary

22   of State's website.

23             And if you go down to the actual form that

24   voters fill out, towards the bottom, voters who are

25   filling out -- when registering to vote in Florida,

Sharon Austin
October 27, 2021

 1    in the middle there, it says "race, ethnicity, check

 2    only one."

 3              Do you see that?

 4        A.    I see it.

 5        Q.    And one of the choices is "Black, not of

 6    Hispanic origin"; do you see that?

 7        A.    I see it.

 8        Q.    And one of the choices is "Hispanic."  Do

 9    you see that?

10        A.    Yes.

11        Q.    Another one is "white not of Hispanic

12    origin"; do you see that?

13        A.    Yes.

14        Q.    Is a person who's registering to vote in

15    the state of Florida allowed to check both the

16    "Black" and "Hispanic" boxes here?

17        A.    No, you can only check one.

18        Q.    So Dr. Smith's data that you reproduced in

19    your report on page 53, that separates out Hispanic

20    voters and Black voters.  It's extremely likely, is

21    it not, that there's been no overlap between the

22    Black voter data and the Hispanic voters?

23              MR. HOLT:  Objection to form.

24              MR. MILLER:  Let me -- I'm going to start

25         again.

Sharon Austin
October 27, 2021

```
 1   BY MR. MILLER:
 2        Q.   In the table that you produced on page 53
 3   of your report, that calls out vote-by-mail
 4   rejection rates for Black, Hispanic, and white
 5   voters.
 6        A.   Uh-huh.
 7        Q.   Right?  There can't really be any overlap
 8   between the persons who had their ballots rejected,
 9   right, because the person who filled out their voter
10   registration form was only able to check one box,
11   right?
12        A.   Right.
13        Q.   So Mr. Holt's discussion this morning
14   talking about -- well, let me ask you this.  And I
15   think you alluded to this in your testimony earlier.
16             But -- so Mr. Holt's questioning earlier
17   today regarding mixing and matching of data, for
18   lack of a better word, what do you have to say about
19   that?
20        A.   I think that it didn't happen because, as
21   you just pointed out on the census form, you can't
22   check both Black and Hispanic.  You're considered to
23   be one or the other.  And so the possibility of
24   overlap is -- it's just not -- it doesn't -- it
25   probably just does not happen.
```

Sharon Austin
October 27, 2021

```
 1              MR. MILLER:  I have no further questions.
 2              MR. HOLT:  I just have some brief I guess
 3         cross, just to finish up a few of those things
 4         that were just asked.
 5                        REDIRECT EXAMINATION
 6    BY MR. HOLT:
 7         Q.   On page 50 of your report regarding the
 8    Detzner case, where Mr. Miller just referenced that
 9    the case involved signature matching, correct?
10         A.   Right.
11         Q.   Could you read -- actually, I'll just --
12    how did the Court view signature matching in that
13    case?
14         A.   Do you mean what was the ruling?
15         Q.   Yeah.  You would agree that the Court
16    struck down Florida's practice of signature
17    matching, correct?
18         A.   Right.
19         Q.   Yet, earlier, when we were discussing the
20    requirements of SB 90 to require some type of
21    identifying information, your testimony was, and I'm
22    paraphrasing, why do we need that information when
23    you can just verify signatures, correct?  Do you
24    remember saying that?
25         A.   I do, something to that effect.
```

Sharon Austin
October 27, 2021

Page 233

```
 1        Q.    So do you believe -- you cite this case to
 2   support your proposition, but yet, you say that you
 3   would rather have signature matching, which the
 4   Court has said is unreliable and questionable.
 5              Do you still stand by your earlier
 6   statement, that you would rather have signature
 7   matching confirming identity than personal
 8   identifiers, such as driver's license, last four
 9   digits of Social Security number, or Florida state
10   identification card?
11              MR. MILLER:  Objection to form.
12        A.    Yes, I still do stand by my statement,
13   that signature -- despite the ruling here, signature
14   matching, nevertheless, I think, is a good way to
15   identify someone.  And despite the problems that
16   were identified in this case.
17              And the reason is because there -- as I
18   pointed out in my testimony today, there always is
19   evidence of some type of fraudulent activity, but in
20   this case, when it was found there was a problem
21   with the signatures, that problem was discovered and
22   was corrected.  And so if by chance there is a
23   problem in the future, that problem would also be
24   identified and corrected.
25
```

Page 234

```
 1    BY MR. HOLT:

 2         Q.   Okay.  Thank you.

 3              Now, just with the voter registration form

 4    that was just provided -- I think it was marked as

 5    Exhibit 4; is that correct?

 6         A.   Are you asking me?

 7              MR. HOLT:  No, Mary, was that correct?

 8              THE STENOGRAPHER:  Yes.

 9    BY MR. HOLT:

10         Q.   You're aware that this -- Dr. Austin, you

11    had made a reference that you could only check one

12    box on the census form; you're aware this is a voter

13    registration form, correct?

14         A.   So are we talking about the Tab 2?

15         Q.   Yes.

16         A.   Okay.  Can you say your question again?

17         Q.   You had answered that you can only check

18    one box on a census form.

19         A.   Uh-huh.

20         Q.   You're aware that Tab 2, what's marked as

21    Exhibit 4, is not a census form.  This is a Florida

22    voter registration form, which is different than a

23    census form, correct?

24              MR. MILLER:  Objection, form.

25         A.   I would say yes.  But in looking at the
```

```
 1   table that's on page 53, that's from Dan Smith, his
 2   ACLU report from 2020, that -- and from what I can
 3   remember from that report, it classified people by
 4   race on the basis of what they checked on their
 5   voter registration form.
 6           And so I think the point that I was making
 7   is that you can only check one box on this form, so
 8   the possibility of a person who is Black and
 9   Hispanic having an overlap is -- it didn't happen.
10   Very unlikely that it did.
11   BY MR. HOLT:
12       Q.   I believe your earlier testimony to me was
13   you did not know how Dr. Smith classified race,
14   where he got his data from.  That's what you had
15   told me?
16           MR. MILLER:  Yeah, if you're going to --
17       you're going to have to pull the testimony up.
18       That's not fair.  Objection, form.
19       A.   Yeah, I would rather pull the testimony up
20   and...
21           MR. HOLT:  Okay.  Mary, are you able to
22       pull that testimony up regarding Dr. Smith's
23       ACLU report, when I asked her where he got --
24       if she knew where he got his data from?
25           (Discussion off the record.)
```

Sharon Austin
October 27, 2021

Page 236

```
 1   BY MR. HOLT:

 2        Q.   Now, just real quick, Dr. Austin, you had

 3   said that the primary source of race data in America

 4   is the United States Census, correct?

 5        A.   I believe so.

 6        Q.   And that's primarily the data that you

 7   relied on in forming your opinions in your report?

 8             MR. MILLER:  Objection to form.

 9        A.   I would say -- I would say that I did use

10   a lot of census data.

11   BY MR. HOLT:

12        Q.   Okay.  I mean, I would note opposing

13   counsel referenced my earlier testimony in your

14   responses without any objection, to which you had no

15   trouble recalling from several hours ago.  I'm not

16   asking any controversial questions here.

17             And you are aware, based on Exhibit 1 that

18   we looked at from the census website, is that the

19   census does view race and ethnicity as different

20   categories, correct?

21        A.   Right.

22        Q.   On the census form and census race data,

23   you can check two boxes, you can be Black and

24   Hispanic, correct?

25        A.   Well, I would need to look at the census
```

Sharon Austin
October 27, 2021

1   form again, but I would assume yes.  But I would

2   need to look at the form again.

3        Q.   Okay.

4             MR. HOLT:  Nothing further.

5             MR. MILLER:  Nothing further from me.  So

6        I think that means that we are finished.

7             THE STENOGRAPHER:  Mr. Holt, would you

8        like to order the transcript?

9             MR. HOLT:  Yes, please.  Three-day

10       expedite.

11            THE STENOGRAPHER:  Okay.  And, Mr. Miller,

12       would you like to order a copy?

13            MR. MILLER:  Yes, please.  And I'd like a

14       rough.

15            THE STENOGRAPHER:  Same time?

16            MR. MILLER:  Yes.

17            THE STENOGRAPHER:  Okay.  Mr. Holt, would

18       you like a rough as well?

19            MR. HOLT:  Please.

20            THE STENOGRAPHER:  No problem.

21            (Examination was concluded at 4:16 p.m.)

22

23

24

25

Sharon Austin
October 27, 2021

Page 238

```
1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF ALACHUA

5

6              I, MARYKAY HORVATH, RMR, CRR, FPR, Notary

7        Public, State of Florida, certify that SHARON

8        AUSTIN, PhD, remotely appeared before me on

9        October 27th, 2021, and was duly sworn.

10

11             Signed this 27th day of October 2021.

12

13

14

15        _____
          MARYKAY HORVATH, RMR, CRR, FPR
16        Notary Public, State of Florida
          My Commission No. GG 222824
17        Expires: 5/29/2022

18

19

20

21

22

23

24

25
```

Sharon Austin
October 27, 2021

1                    CERTIFICATE OF REPORTER

2

3

4    STATE OF FLORIDA

5    COUNTY OF ALACHUA

6

7              I, MARYKAY HORVATH, RMR, CRR, FPR, do

8    hereby certify that I was authorized to and did

9    stenographically report the foregoing deposition

10   via web conference of SHARON AUSTIN, PhD; that a

11   review of the transcript was not requested; and

12   that the transcript is a true record of my

13   stenographic notes.

14             I FURTHER CERTIFY that I am not a

15   relative, employee, attorney, or counsel of any

16   of the parties, nor am I a relative or employee

17   of any of the parties' attorney or counsel

18   connected with the action, nor am I financially

19   interested in the action.

20             Dated this 30th day of October 2021.

21

22

23   _____
     MARYKAY HORVATH, RMR, CRR, FPR

24

25

Sharon Austin
October 27, 2021

---

**Exhibits**

---

**Exhibit 001 Austin**
  45:1 46:14
  236:17

**Exhibit 002 Austin**
  149:4

**Exhibit 003 Austin**
  225:21,23

**Exhibit 004 Austin**
  229:11,12
  234:5,21

---

**$**

---

**$25,000**
  177:11

---

**-**

---

**--vote-by-mail**
  126:6

---

**1**

---

**1**
  44:22 45:1
  46:14 188:2
  198:19 225:17
**10**
  52:20
**100**
  124:5 130:19
  131:18,22
  169:16
**10:04**

6:1
**11**
  113:24 114:2
  117:23 118:1
**1118**
  91:25
**114.9**
  128:15 129:7
**115**
  131:5
**11:02**
  50:17
**11:11**
  50:17
**12**
  105:12
**12:22**
  103:4
**13**
  68:23
**1355**
  66:24
**14**
  66:25 192:13
**150**
  213:23
  215:18,20,23
  216:1 219:9,
  12,15,20,23
  220:2,8,24
**150-foot**
  213:7
**15th**
  87:2 116:24
**1800s**
  86:22 113:1
  169:23 170:2,
  20

**1860s**
  116:22
**1900**
  68:6
**1900s**
  67:20
**1960s**
  117:3
**1965**
  158:7
**1967**
  16:9,11 53:1
**1968**
  170:7
**1982**
  152:12,15
  153:1,9
  181:18 182:12
**1991**
  16:9,12
**1992**
  15:6
**1993**
  15:7 74:14
  76:15 78:17,
  20 125:1
  139:1 198:18
**1997**
  76:16 77:23
  78:18,20
  80:18 81:11
  125:1 139:2
  198:18 205:16
  208:14
**19th**
  117:1
**1:03**
  103:4

**1:44**
  136:13
**1:50**
  136:13
**1st**
  52:25

---

**2**

---

**2**
  92:19 118:9,
  22 119:9,11,
  13 126:1,25
  149:4 152:12
  153:1 225:22
  229:8
**2,500**
  82:8
**2.0**
  54:5,8 56:16
**20**
  210:19 225:25
  226:13
**2000**
  91:14,22
**2001**
  91:25
**2008**
  20:4
**2011**
  66:24
**2012**
  81:24 139:2
  169:7,8,11,13
  198:18
**2013**
  81:20 139:2
  169:4,6,12
  229:19

Sharon Austin
October 27, 2021

**2016**
104:17,22
105:11,12
106:5 111:9

**2018**
107:9,12
108:2,12
109:16,19
111:9,14
112:15,16,19,
20 113:2,8,16
117:5 118:22
223:21 225:5,
7 226:9
227:21

**2019**
117:5

**2020**
23:2 24:1
33:16 72:5,7
83:8,14 87:21
89:15 90:2
104:5,11,17,
23 105:11,13
106:5 107:20
108:1,3,12
109:3,8,18,19
111:10,19
112:15,17,19
113:2,10,16
117:6 118:9,
12,20,23
124:3 127:11
134:3 143:2,
14 160:6,7
170:1 174:8,
25 175:5,14
190:12 212:16
214:16 225:6

**2021**
61:20 67:25

78:23 81:12
125:2 170:1

**23**
51:2,6

**24**
52:21 183:22

**26th**
81:22

**2:54**
185:21

---
**3**
---

**3**
118:18,23
119:9,11,13
126:25 216:1
225:21,23

**3:01**
185:21

---
**4**
---

**4**
229:11,12

**48**
201:15

**49**
227:1,3,4

**49.9**
123:24 128:11
129:6 130:25
131:17

---
**5**
---

**5**
70:5 71:2

**50**
205:19,23

216:2 232:7

**50,000**
202:25

**52**
227:10

**53**
32:10 39:12,
17 45:5,10,19
107:5,15
109:25 111:19
114:16 120:2
223:6 228:7
230:19 231:2

**54**
54:14,18 77:5

**57**
118:10

**58**
122:14,22
123:21

**59**
124:15
129:14,18,21,
25 130:2,18,
24 132:7,9

---
**6**
---

**6**
70:8,11 71:2
149:6,17
150:8

**60**
118:18

**60.7**
123:23

**62**
60:18,22
132:11

**63**
213:21

**64**
23:23 104:7

**65**
104:2 123:24
128:12 129:7
131:1,18

**67**
113:25 114:4,
17 115:3,9

---
**7**
---

**75**
120:17

**78**
104:17 105:10

**785**
93:3

---
**8**
---

**81**
224:7

**85**
223:10,15

---
**9**
---

**9**
51:2,6

**90**
7:12 22:15,
18,25 23:25
24:8 54:4,10
55:1 56:6,8
60:7,9 64:5
67:3 70:3,6,
16,20 72:3,9
75:21,24 76:5

Sharon Austin
October 27, 2021

3

79:3 83:11,
15,19 84:5,21
85:1,20,23
86:18 90:7,
17,23 97:17
100:11 101:21
104:4 107:20
111:10 113:9,
15 115:14
117:20 119:4
132:13,19,24
133:14,19,22,
24 134:11,19
135:12 136:20
139:10 140:4
141:17 143:20
153:13 159:9
164:15,17
171:19 173:21
176:3 178:1
180:1 182:18
190:22 191:21
197:21 199:10
201:9,14,21
203:25 206:25
212:11,14,18
213:4,14
214:15 218:9
232:20

**90's**
175:2 190:20

**90s**
16:23

**91**
122:14,22
124:15 127:23
128:10

**94.6**
123:20

**95**
60:21

**99.9**
123:20

_____

**A**

**A-U-S-T-I-N**
7:17

**a.m.**
6:1 50:17

**ABD**
15:2

**ability**
6:6 11:23
12:10 142:13
179:15

**abortion**
96:22

**absent**
144:3

**absentee**
20:16,24
21:9,15,20,25
60:2 73:10
74:17 77:4
82:8 104:9
107:10,13
109:6,9,10
119:11 120:3,
24 121:21
126:20,22
139:4 140:22
144:3 146:16
147:1 149:13
150:19,22
152:14 153:3
154:20 166:3,
7 168:5
202:3,6
205:20

**academia**

112:10

**academic**
23:3 24:4,15,
16 48:21
49:15

**acceptable**
150:20

**access**
65:21 135:22
137:25 140:15
141:5 145:1,
17 146:7
147:21 162:3

**accessible**
135:21 137:4
138:1,22

**accomplish**
202:1

**account**
38:3,11 131:2
161:1

**accountable**
181:16

**accounts**
131:4

**accurate**
6:5 130:19

**accurately**
74:23

**accusing**
110:13 115:20

**achieve**
73:22 140:21
206:24

**acknowledge**
141:12 155:20

**acknowledged**
141:8,10

**ACLU**
31:3,15,23
32:6,23 33:5,
19 34:16,18,
23 35:3,11
39:5,19,24
45:5 49:24
107:6 109:25
111:19 114:16
120:2,15,17
223:5 226:13
227:16

**act**
16:8 81:7
158:7 170:6

**acting**
22:10 179:25

**actions**
64:11

**activities**
20:8

**activity**
73:1,13 81:3
168:13 214:6
218:14

**actual**
23:3 75:11
78:9 82:17,25
89:21 178:17
229:23

**addition**
150:15

**additional**
206:19

**address**
75:10 78:24
79:18 173:13
174:12

**addressed**

70:3 98:17
100:24

**addresses**
70:8 94:13

**addressing**
98:20 169:14
200:1

**adjust**
89:4,8,9

**adjustments**
91:11 221:5

**administered**
24:7 179:16
189:3

**administering**
20:14 23:4
24:21,24 25:1

**administration**
22:16,19 24:5
90:1,3 160:25

**administrative**
52:9

**admit**
117:18

**admitted**
15:4 219:13

**admittedly**
113:14

**advance**
134:19

**advantage**
86:3,9 87:8,
20 88:9,10
89:1,2 90:20
119:3,17
143:13 156:20
158:16 189:23
190:8 197:24
200:7 211:15

**advantages**
137:18 164:2

**advice**
11:13

**affect**
12:9,14

**affects**
75:22 159:5

**affirm**
6:4

**African**
15:11,23
16:10 17:1
29:6 35:10,16
36:7 43:16
71:9,10,11
85:15 86:3,8
87:2,7 88:7
92:10 93:15
124:2 126:12
137:20 138:3
148:12 159:7
170:17 178:6,
22 189:22
197:23 198:10

**Afro-cubans**
28:19 48:8

**Aftermath**
16:7

**agency**
186:15

**agenda**
95:13

**agree**
9:20 22:14,18
25:21 26:13
27:3,6,19,22,
23 28:9 29:1,
22 30:2

33:11,24
35:15 54:6,
17,20,22
67:15,16
68:20 70:15,
18 80:2 82:16
83:2 87:22
88:15 93:9,12
94:4,11,18
97:9,22 98:9
100:9 101:19
104:9 106:6
107:24 108:3,
6,13 109:24
113:24 115:7
121:16
128:20,23
129:17,24
130:2,17
131:11,17,21
132:5 134:14
152:13 153:2
155:10 172:10
173:15 179:14
181:18 186:6,
9,18 187:6,23
188:24 190:1,
12 195:25
198:24 199:23
207:11 216:5
232:15

**agreed**
37:13 39:22
83:20

**agreeing**
58:23

**ahead**
45:24 100:16
113:19 121:19
204:6 222:9

**airplane**
65:10

**Alaska**
43:17

**alcohol**
65:1

**aligned**
101:4

**alive**
169:17

**allegations**
82:24 212:16,
17,21

**allegedly**
135:11

**allowed**
16:22 153:6,8
174:2 181:19
182:1,3
183:21,24
230:15

**allowing**
191:13

**alluded**
231:15

**alternative**
140:11,12
142:8 143:7
207:6

**alternatives**
140:2 184:14,
19 195:8
202:1 206:23
207:3,4,12
212:1

**amended**
152:12 153:1
158:9

Sharon Austin
October 27, 2021

5

amendment
   87:2 116:24
   117:1 152:12,
   25

American
   15:22,23,24
   16:10 17:1
   29:6 43:16,17
   64:19 71:10,
   11 87:2,8
   88:7 92:10
   99:11 124:2
   126:12 148:12
   197:23 198:10

Americans
   71:10 85:16
   86:3,8 93:15
   137:20 159:7
   170:17 178:6,
   22 189:22

ample
   198:23

analysis
   34:22 35:20
   48:21 57:19
   91:6 108:4
   110:5 114:3
   120:21,25
   121:22 122:3
   218:7 226:8

analyzed
   75:5

anonymous
   54:10

answering
   64:16

answers
   9:19 41:21
   59:16 156:23

anticipate
   11:13

apologize
   19:21 110:14
   154:3

Appendix
   114:15

apples
   33:12,13,14

application
   133:1 136:19
   149:13 192:9,
   17,20,24
   193:5,19
   194:5 202:19
   203:5,12
   204:19
   207:19,21
   208:5

applications
   8:21 20:16,
   24,25 21:1,4,
   7,10 139:4
   192:3,4,5
   196:25 197:15
   202:24 208:21
   209:8 210:12

applied
   51:16 62:15,
   17 63:15
   88:6,20
   214:10,16
   225:5

applies
   87:25 88:16

apply
   87:23 162:6,
   10,13 219:18

applying
   161:20 162:7

approach
   216:10

approached
   221:20 222:2

approximately
   136:22 216:2,
   6

area
   75:21 81:18
   126:18

argue
   80:6,12 91:17
   92:12 96:4
   118:5 124:8,
   13 148:14
   155:23 158:18
   159:4 163:21
   167:1,24

argued
   159:13

arguing
   197:22

argument
   79:17 87:21
   91:20 106:18
   112:14 119:6
   124:18 154:25
   155:1

arguments
   11:3 90:11
   92:23

Arizona
   92:20 173:13

arrive
   78:9 116:14
   192:9 193:7,
   15 194:7,8
   195:8 197:1

arrived

14:7 16:14
   190:19

arriving
   82:1 85:19

articles
   213:17

Asian
   15:23 41:15
   43:17

asks
   26:24 27:20
   41:8

aspects
   84:10 92:7
   170:14

assessment
   27:7 83:20

assistance
   55:11 56:1

assisted
   21:24 22:2,5,
   8

assume
   8:6 10:13
   78:6 95:8
   98:19,22
   105:6,15
   138:10,12
   186:23 187:7,
   9 203:9 209:4

assuming
   53:17 75:1,5
   128:14 203:7,
   14

assumption
   35:6

assumptions
   108:20

attached
13:5

attempt
29:17 109:8
119:23 122:18

attempted
109:10

attempting
192:7 200:12

attorney
6:21 10:20
11:4,10 12:20
13:25 84:19
103:16

attorney's
11:13

attorneys
12:20,21
13:18,24
103:18,20,21

audible
9:19 135:6

audibly
9:21

August
15:7

Austin
6:10,15 7:16,
24 8:8 45:3
50:19 103:15
129:23 130:22
132:10 135:5,
10 136:17
143:17 147:8
149:8 151:3,
10 152:1
153:2,17
154:19 162:25
177:24 185:23

222:13,17
223:3

author
120:13

authors
227:7

average
203:15

avoid
156:10

avoided
137:11

aware
12:14 26:5,9,
23 31:6 74:6
114:15,20,21
121:20,24,25
138:2 162:9
172:3,5
177:15 179:5,
8 184:18
201:9,24
203:20,25
204:4,6,14,16

Awesome
7:18 8:20
9:25 12:18
13:16 14:20
17:3 52:5
103:25

B

bachelor's
14:12

back
46:14 86:21,
25 87:1
102:24,25
103:5 104:1

116:21,22,25
119:4 131:16
136:7,14
138:25 164:6,
7 169:24
171:4 174:17
228:4

background
14:6

backgrounds
28:10

backlash
23:1 24:1,9
71:7,12 86:6
104:4 119:16
159:12 211:12

backtrack
20:22

bad
46:1 51:24
148:20

ballot
20:16,24
53:19 55:7
56:10 58:6
59:1 60:3
61:13,16,23
62:1 63:14
64:22 65:14,
18,19,22 68:9
72:16 73:10
77:3,5,10
82:8 87:11,12
88:4 107:10,
13 109:6,9,11
115:9 117:24
119:11 120:3,
24 121:21
132:25 133:4,
21 134:9

135:15,23
138:15 139:4,
16,19,21,25
140:16,22
141:5 142:5
144:3,15,22
145:1,5,6,7,
8,17,18,19,21
146:8,16,22
147:1 151:18
152:7,9
153:9,14,19
154:21
155:12,17
156:13 157:3
159:16 160:22
161:16 162:1,
3,6,14
164:16,18,23
165:1,11,12,
16 166:7
171:17 185:1,
3 187:12,16
193:15 195:7,
9 205:20
210:12 215:18
223:20

ballots
21:15,20
74:18 76:3,4
77:4,14 87:10
92:2 120:20,
22 126:20,22
132:4 137:4,
25 138:22
142:23 143:25
147:21 149:13
156:14 172:8
176:1 181:20
182:3 183:2,3
187:20,24
188:3 189:4

Sharon Austin
October 27, 2021

7

198:22 202:4,
6 208:20
226:9 227:21
228:16 231:8

**banking**
19:11 20:9

**banking-type**
20:7

**barely**
39:10

**Baringer's**
226:14

**barrier**
59:16 137:3,
20 142:13,15
143:11 148:7,
23,24 149:1
154:24 155:7,
15 158:4,15
162:5,8
178:15,20
179:4 192:25
195:4 203:24
209:18

**barriers**
68:5 158:6
160:19 191:9,
17 199:12
200:6 209:23
212:6

**base**
77:1 113:14

**based**
24:3,14,16,
17,18,25
25:3,14 28:12
32:13 35:3,13
39:3 41:10,
12,21 45:20
49:21 69:7

71:1 76:18
85:22,24
91:13 95:2
109:3 112:14
115:18 116:15
118:1 133:9,
10,15,24
142:16 143:10
166:19 168:20
171:8 175:6
180:13,22
202:20

**basis**
30:18 66:8
124:23 181:9,
17 212:10
227:15

**bathroom**
11:19

**battle**
68:11

**befall**
157:3

**began**
6:1 15:8
119:22 153:11

**beginning**
23:9 60:18,21

**begins**
118:10,18

**behalf**
139:5 185:18

**behavior**
80:25 108:2,
11 111:15
112:17,25
115:19 117:25
125:16 168:21
171:12 217:4,
6 220:19

**behaviors**
112:15 113:16

**belabor**
50:2

**believes**
191:10,11,12,
13

**beneath**
150:13

**benefit**
79:11 211:21

**benefits**
79:10

**biased**
113:9 116:3

**biases**
180:19

**big**
177:12

**biggest**
74:5

**bill**
22:15,18
66:24 67:10

**biracial**
30:6

**bit**
42:3 63:4
135:25

**Black**
16:10,11,20,
23,24 23:1
24:1,9 25:20,
21 26:2 29:2,
6,7,10,16,17,
24 30:7,12
31:1 32:1,2,
15,17,20
33:18,20,22

34:8,12,13,
19,23,24,25
35:5,7,9,19,
21 36:6,8,10,
16,19,20,25
37:1,3,4,6,
18,20 38:20,
21,25 39:7,
19,23 40:2,3,
4,14,15,18,21
41:4,5,15,18,
19,20 43:16
45:6,8,14,15
46:3,22,24
47:1,7,12
48:1,11,23
49:1,8,9,12,
13,16 50:22
51:2,8,14
52:10 53:4,5,
8,10,16,18,23
55:5 57:9
66:7 71:8
80:10 84:14
85:18,25 87:4
91:18 99:15,
22,23 101:11
104:4,13,15
106:20 107:23
111:11 112:3
114:11 115:25
116:5,7,20,
21,22,25
117:2,4,11
118:12,14,25
119:2,16,21
122:7,8
123:12,16,20
124:5,16
125:17 126:1,
3 127:4,7,13,
18,25 136:18

138:3 140:8
142:20,25
143:12 144:18
154:22 155:11
156:20
157:12,22
158:15,23
159:15 160:4
167:19 170:9
180:6 189:12
194:2,3,11,
16,19 195:18,
23 197:3,15
202:11 205:10
208:8 211:14,
17 223:19
228:25 230:5,
16,20,22
231:4,22

**Blacks**
29:7 30:23
31:11 51:16,
18 53:12
71:13 155:7
158:12

**blatant**
86:25 142:18
170:4

**blood**
36:16

**blue**
183:6,7
186:2,7,20

**blurred**
175:9

**board**
18:24 104:10,
20

**body**
95:25 180:22

**bold**
44:10

**bolded**
43:10 44:8

**Boleteros**
73:8 206:4,9

**book**
76:21

**books**
213:17

**born**
36:13,15
170:21

**Boston**
18:25

**bother**
194:9

**bottom**
43:21,22
229:24

**bound**
130:14

**box**
38:19,20
40:3,5,15,16,
22,23 41:4,
17,24 42:7
43:25 45:15,
16 46:12,24
47:12,13,20
49:4,9 149:7
176:10 177:3,
25 182:4,18,
25 183:1,2,7
185:2,5
187:12 188:4
191:3 215:18
231:10

**boxes**

22:3,6 40:24
46:23 47:23
48:9,17 49:14
88:12,23
173:18,21
175:3,11,15,
19 176:1,13,
17 178:4,10,
23 179:7,10
181:20 182:6,
11 183:14
184:3,16,21
185:24 186:2,
8,25 187:4,6
188:14,18,25
189:15
190:13,17,20
213:24 214:9,
11 219:18
230:16

**boy**
168:18

**Braxley**
66:21

**break**
8:11 11:18,
19,21 12:4
50:6,9
103:15,23
106:25 135:25
136:5 185:12
186:4

**breakdown**
114:8,13

**breaking**
11:25

**briefly**
150:7

**Brnovich**
92:15 93:4

173:7

**broad**
28:24 218:11,
20 219:4
221:14

**broadness**
222:3

**broke**
19:19 149:19,
20

**Brothers**
14:12

**brought**
224:17

**bucket**
188:3

**bullet**
213:21

**burden**
58:2 59:7,14
61:2 135:13
136:18 157:20
159:14 161:3,
9,10 176:15
178:13 200:23
201:1 218:8
220:6,15

**burdens**
57:22 58:9,
16,20 60:11
61:1 135:10
147:16 157:1,
3,5 161:6
177:25

**burdensome**
60:24 63:5

**Bureau**
26:6,9,24
228:12,15

Bureau's
44:10

business
206:15

busy
22:9 203:19

---

C

calculated
120:19

calculation
215:24 216:1

call
8:5 36:12
177:1

called
10:22 11:1
15:2 42:6
56:25 224:11

calls
231:3

camera
8:14 174:1
183:19

campaign
18:25 20:3,15
214:23 215:6
216:17 219:7
222:4

campaigning
219:22

campaigns
17:12,14
18:9,15,20
19:7,12,14,25
20:20 215:16
216:9 221:20

campus

202:21,25
203:16
204:19,20

candidacy
15:4

candidate
77:19 80:19
215:3 219:2
222:2,8

canister
183:1

canvassing
19:10 20:9,23
21:20

card
150:17
187:13,19

cards
92:1

care
9:12 79:2
177:20

career
14:24 15:8

case
6:23 11:16
12:20,21
13:25 28:1
29:20 38:4
66:22 74:16
76:2 84:20
92:14,16,19
95:9,10 97:17
105:20,25
118:19 123:2
132:3 173:7,
13 197:10,12
222:6 224:23
226:20 232:8,
9,13

cases
17:8 47:17,19
48:7,10,13
53:9 57:14,15
80:8 83:23
91:22 94:15,
23 214:22
215:10

cast
53:18 55:7,10
56:10 65:14
68:9 76:3,4
77:4,15 132:4
144:24 145:6,
7,8,18,19
185:2

casting
62:1 139:21

categories
27:4 28:6,23
34:19 41:14
43:10,13,14
120:19

category
39:24 41:13
45:4,9,17,21
46:13 47:25
48:4,25 49:17
150:9

caught
73:14 74:11
75:15

caused
135:11,14
177:25

causing
80:22

CDPS
123:12

cell
154:4

census
26:6,9,10,15,
16,21,24
27:5,7,14,20,
24 29:2,11,13
37:9,13,17,23
38:18 40:21
41:1,11,12,22
42:7 43:3
44:10 48:23
110:22,23,24
228:9,12,15,
22,23 231:21

census'
42:10

census-
designated
123:13

census.gov
43:3

century
67:25

cetera
59:11

challenged
79:15

chance
36:18 62:3
192:9 229:14

change
86:7 112:14
162:9,13
179:9,12
189:24 197:25
198:13 208:25
211:19,23

changed

Sharon Austin
October 27, 2021

10

112:18 174:13
190:10

**changing**
111:11 113:15
207:13

**chapter**
76:22

**characterization**
54:17

**charge**
188:22

**chart**
32:9

**chat**
42:7 149:7
225:15 229:5,
8

**check**
38:19 40:15,
18,21,22
41:3,19 43:25
46:23,24
47:12,16,20
48:9,17 49:10
68:24 153:10
185:15
228:24,25
230:1,15,17
231:10,22

**checked**
31:18 38:20
40:3,4 41:24
43:24 45:15,
16 46:12,23
48:22 49:4,14
150:11

**checking**
150:16

**checks**
41:17

**chief**
82:6

**children**
177:5,7

**choice**
146:5

**choices**
230:5,8

**choose**
44:6 47:19
59:1 127:5
138:20,21
140:14 142:4
146:1 160:15,
20 203:18

**chooses**
55:23 69:5

**choosing**
115:17,21

**Chorba**
42:19,20
185:18

**chose**
47:22 75:9
121:8,14
122:2,4 127:6
178:3

**Christian**
14:11

**circumstances**
56:22 83:1

**cite**
31:3 34:15
57:13 111:2

**cited**
82:25 83:17
86:19 110:10

113:24 117:14

**citizen**
41:3 47:7
140:13 141:4
142:2,7

**citizens**
62:16 96:16
97:5,10

**city**
18:22

**Civil**
148:9,13

**claimed**
139:6 190:6

**clarify**
34:11

**class**
25:15 94:22
203:2

**classes**
15:18,20
27:14 96:8

**classifications**
39:2

**classified**
30:17 31:7,25
36:20 37:2
38:17,21

**classifies**
29:9 37:4

**classify**
49:21,22

**classifying**
29:12 33:20,
22

**clause**
52:22

**clauses**

52:13

**clear**
9:15 10:17
46:15 62:10
136:10

**close**
8:25 220:4

**closely**
93:13 101:4
149:25

**codes**
87:4

**colleague**
227:18

**colleagues**
13:22 226:17
227:25

**collect**
110:23
228:13,16

**collecting**
209:8

**collectors**
77:3,6,10

**Colombian**
28:22

**color**
54:24 59:10
99:7 148:11
156:2 159:3
181:5 190:8
199:12 209:24
225:18

**Columbia**
15:13

**column**
39:7,8,19,20

**columns**

Sharon Austin
October 27, 2021

11

45:7

**combat**
143:8

**combating**
144:8

**combination**
16:15

**combined**
126:9,12
127:10 128:7
217:10

**comfortable**
145:12,16

**comment**
78:1 105:17
106:10 149:7

**commit**
144:10

**committed**
74:10 176:25
177:13

**Committee**
224:11

**committing**
74:18 177:1

**commonly**
110:19 213:11

**communicate**
8:22 9:1,5

**communities**
57:5 123:17
198:9,10

**community**
123:20 124:4

**companion**
52:21

**comparatively**
62:21

**compare**
35:19 147:19

**compared**
30:12,23
33:19 147:14,
21

**compares**
146:10

**comparing**
33:2,9,12,25
34:22 161:20,
24 186:1,25

**comparison**
54:6 145:13

**comparisons**
166:10

**compelling**
111:23 123:14

**complaint**
105:19,21,23,
24 106:3,8,12

**completed**
192:12

**completely**
56:18 63:7
119:10 141:10
156:7 170:13

**comprehensive**
78:13

**computer**
8:22 154:5

**concept**
43:7,8 44:12,
13

**conception**
36:4

**concern**
61:19

**concerned**
48:20 96:10
178:16

**concerted**
158:21

**conclusion**
16:14 34:23
82:2 112:16
113:9 116:15
119:8 125:17
173:15

**conclusions**
24:3 75:4
78:10 82:23
108:7,11
110:17 111:16
115:18 123:7

**condition**
165:20

**conducted**
121:6

**confidence**
33:7

**confirm**
21:25 24:2
31:23,25
33:25 65:14
171:16 227:3

**confirmed**
65:20

**confused**
89:24 99:2
141:21

**Congress**
95:11,23

**congressional**
81:22 126:18
169:4 198:18

**Congressman**
82:5

**connected**
93:13

**consequences**
94:5,8 179:19

**conservative**
99:13

**considerably**
223:20

**consideration**
163:3

**considered**
25:10 30:19,
20,24 36:6,9
37:6 40:4,5
46:8 102:8
231:22

**considers**
46:2,4

**consisted**
118:5

**constant**
68:11

**constituents**
95:3

**constitution**
170:7 171:3

**constitutional**
80:3

**consult**
13:21 103:22

**contacted**
193:12

**context**
60:7,9 223:17
224:2 225:7

Sharon Austin
October 27, 2021

12

continually
89:25

continuance
159:12 170:19

continuation
171:12

continue
88:9,25 164:8
202:12 224:14

continuing
84:5 156:21
159:12 170:17

continuous
86:1,2 170:3

continuously
68:12

control
97:14 177:22

controlled
96:1

controversial
199:24

convenient
137:16 163:5
190:25 191:15

conversations
12:19

convictions
169:12

copy
23:11 149:25

corner
229:19

correct
17:5 22:20
23:5 24:6,15,
22 25:22
26:2,3,16

27:1,7 28:10
29:3,25 30:4,
8 31:4,16,19
32:2,24 33:12
34:1,9,13,16,
20 35:16,22
37:14 38:4
40:9,12,18,
22,23 41:5,9
46:17,21 47:1
49:25 50:1,23
51:4,8 56:4,
6,11 57:11,15
63:21 64:12
65:24 66:18
67:20 68:10,
21 69:8 74:9,
24 75:7
78:10,19
79:19 80:7
82:17 83:4,20
87:24 88:17
91:7 92:1
94:5,14,19
95:15 97:11,
15,22 100:6
101:22 104:6,
12 107:10,21
110:1 111:12
113:25 114:25
120:9 128:4,
22,25 129:8
131:7,19
137:18 139:7,
8 141:13
150:1 153:5,9
155:13 165:6
168:2,24
172:4,12
174:25 175:23
177:17 181:21
182:4,5 185:8

186:8,21
187:8,25
188:5 190:5
199:8 210:3
214:11 217:16
220:16 221:24
226:15 232:9,
17,23

corrected
79:24

correctly
63:19 64:13
147:19 204:25
217:16 221:4

cost
60:1 160:24

couched
70:6

council
18:22

counsel
12:3

count
49:2 191:1

counted
48:2,18

counties
78:18 113:25
114:2,7,11,
13,18 115:4,
9,17,18,21,25
116:7,13
117:23 118:2,
7,11,19 119:2
120:24 121:21
122:6,10
126:2,4
127:3,8,17
142:25 227:22
228:17

counting
30:13,21
31:12 32:24
35:20

countries
28:10

country
36:4,8,14,15,
19 37:2 64:20

county
33:18 81:18
120:21 192:12
198:17

couple
12:5 132:17
222:20

courses
16:2 212:3

coursework
15:4

court
10:24 57:15,
21 69:17
77:18 92:14,
23 96:24
103:6 172:16,
23 173:6
224:23
232:12,15

court's
224:21

courtroom
10:5

courtrooms
11:2

courts
57:10,21 77:7
134:14 147:15

created
  48:21 111:7
  112:3
credit
  187:13,18
creed
  59:10
crime
  177:1
criminal
  168:19,21
  169:12 176:20
cross
  16:3,4 232:3
CROSS-
EXAMINATION
  223:1
crossover
  26:1 39:22
Crow
  51:4,7,10,12,
  18 54:5,8,14,
  20,23 56:16,
  25 57:1,6
  61:21 68:1,10
  83:19 84:8,10
  90:4,10
  101:16
Cuban
  28:17
Cubans
  28:19
cure
  227:22
curious
  16:14 54:16
  159:21
current
  66:11 95:11

101:13,17
180:22
curtail
  119:23
cut
  107:5 109:24
  110:3 111:5
CV
  14:2 15:21
cycle
  205:11

———————

D

Dallin
  6:17,20
dangers
  122:19 123:1
Daniel
  120:12
data
  26:10,14,16,
  19 29:2,13
  30:16 32:6
  33:2,3,25
  34:1 35:19
  37:14,19,24
  38:4,12,16,22
  45:18 49:17
  100:22 105:1
  106:13 107:13
  108:2,12
  109:3,16,18,
  19 110:9,12,
  17,22,24
  111:14,18,23,
  25 112:16,20
  113:8 114:14,
  17,23,24
  115:8 118:9,

22 122:18
123:2,8,19
124:10 126:10
127:23 191:2
223:21 225:5,
7,13 226:18,
24 227:14,19
228:1,10,13,
16 230:18,22
231:17
date
  52:24,25
  53:3,5
dating
  87:1 116:21,
  22,25
daughter
  136:5
day
  56:4,8,22
  128:14 137:14
  146:2 162:19
  165:21 170:2
  183:22 185:8
  193:16 215:1,
  11
days
  57:10 66:25
  192:13
dead
  77:5
deal
  50:21 63:1
  154:14 211:3
dealing
  21:6
deals
  161:9
dealt

21:9
decided
  115:8
decision
  12:3,6 65:24
  179:15
decisions
  179:19 181:2,
  3
declared
  77:19 80:19
decrease
  164:10
defendant
  6:22
defendant's
  149:17
defendants
  6:22 222:16
define
  35:5,9 38:19
  43:15 57:25
  218:3
defined
  35:7
defines
  35:11 214:4
defining
  34:1,3
definition
  34:25 42:13
  43:6,9,12
  44:9 58:13
  214:13 215:12
  216:22
  218:11,24
  221:15
definitions

Sharon Austin
October 27, 2021

14

37:5

**degree**
14:12

**Delaware**
166:2

**deliver**
192:11 208:20

**delivered**
208:22

**democracy**
64:19 97:10
98:25

**Democrat**
96:13 99:4,8

**Democratic**
52:15 94:17
95:6,12,21
96:13 224:11

**Democratic-
controlled**
96:25

**Democrats**
93:15 94:24
96:1 99:14

**demographic**
33:17

**demographics**
28:13

**demonstrates**
223:22

**denied**
146:21 162:1,
3 165:1,12,16

**denies**
164:16,17

**Dennis**
66:21

**deny**
146:7

**denying**
142:12,21

**Department**
15:11

**depending**
40:6 58:2

**depends**
48:5,15 49:3,
20 197:4,17

**deposed**
7:23

**deposit**
181:20 182:3

**deposited**
187:12,14

**depositing**
185:1

**deposition**
8:18,23 12:22
17:5 154:14
223:4 229:11

**depositories**
186:12

**deprive**
172:8

**depriving**
160:10,11

**depth**
151:8

**descent**
35:10,16 36:7

**designed**
80:7 84:13
88:8 91:25
180:5

**desire**
71:16 73:20
102:6

**destroyed**
183:1,3 188:5

**detail**
14:5 57:25
60:8

**detected**
139:23

**deter**
74:9 144:9

**determine**
48:12 89:13
159:17

**determined**
75:5 165:15

**determines**
27:7 89:11

**deterrent**
74:5

**Detzner**
224:12 232:8

**development**
96:15

**differed**
174:13

**difference**
71:21 101:2
161:7 170:24
172:18
177:12,13

**differences**
37:23 38:1,6,
11 158:12

**differentiate**
29:18

**differentiates**

37:17

**differently**
51:16 181:12

**difficult**
54:25 55:3
57:8 71:15
80:11,17
85:25 87:10,
18,19 88:13
107:25 108:4,
7,13 109:20
137:24 155:7
178:9 185:10
199:11 201:2,
3 202:10
209:24

**dig**
7:10

**digits**
61:12 62:11
133:7 138:5
164:22

**DIRECT**
6:13

**directed**
57:8

**disability**
157:13

**disable**
9:4

**disadvantage**
79:12 80:10
92:11 93:21
142:20

**disadvantaged**
209:17

**disadvantages**
164:1

Sharon Austin
October 27, 2021

15

disadvantaging
144:13

disagree
65:23,25
71:3,5 77:12

disagreed
175:22

disclaimer
194:25 196:21
200:25
201:11,20
202:8 203:13,
20 204:8,13
205:1

disclaimers
191:19 201:21
204:2

discourage
91:18 157:18
192:23 193:19
195:16 202:18
221:16

discourages
192:17

discouraging
193:10

discovered
62:5

discriminate
100:10 148:18
167:12 199:21
217:5

discriminated
59:19 60:3,5
101:11 168:1

discriminating
117:10,25
166:6

discrimination
80:7 92:8,13
116:20 117:4,
17 142:17
149:2 159:7,
10 162:21
168:3 169:24
170:4,25
171:7,10
181:15 182:19
211:11 212:3,
4

discriminatory
58:17 59:15
60:11,22
62:22 63:18,
20 64:7,11,24
79:16 80:13
84:13 85:23
90:10 137:3
141:17 142:15
143:6,11
144:4 145:21
147:2 148:7,
8,23,24,25
155:3,15
156:17 161:2,
10,16,18
162:4 163:6
165:23 166:14
169:18 174:12
176:8 178:11,
15,20 179:4,
25 181:4,5,13
184:6 190:21,
23 191:9,18
195:3 209:18,
23 212:5

discuss
50:24,25 70:2
74:13 119:11

122:13

discussed
28:25 83:18
87:23 107:7
139:1 186:1
190:2 191:4
198:17

discusses
120:3,7

discussing
11:15 33:19
50:21 92:23
132:12 204:3
224:3 232:19

discussion
166:19 231:13

disenfranchise
66:7 140:8
154:22 191:5

disenfranchised
51:1,8 52:9
56:19 101:11

disenfranchisem
ent
50:22 159:18
205:2

disenfranchises
192:15,16

disfranchise
55:2

disfranchised
51:13 53:4
167:20

disparate
88:5

disparities
223:18

disputing
36:21

dissertation
15:3 16:6,16

distance
59:23,24
161:25 162:23
215:21 220:5

distances
63:2

distinct
117:3

distinction
94:1

district
81:22 224:21

districts
119:1 142:24

divided
216:1

DNC
92:15 173:7

Doctor
174:16

doctorate
14:19,22 15:7

document
42:6,18
225:16 227:20
229:5

documented
71:12 91:21

documents
13:12

donated
19:23

donations
19:12

door-to-door
19:10 20:9

double
30:13,21
31:12 32:24
35:20 48:2,18
49:2
download
149:10 225:20
downloading
42:14
dozen
57:14
dragged
42:6
dramatic
112:14
draw
107:25 108:11
111:15 122:18
125:16 126:15
drawing
123:7 227:19
drinks
11:20
drive
65:3,6
driver's
62:12,13
65:4,6 133:6
138:4,10,11
164:20
drop
22:2,5 36:16
88:12,23
173:17,21
175:3,10,15,
19 176:1,10,
13,17 177:3,
25 178:3,10,
23 179:6,9,10

181:20 182:4,
6,11,18,25
183:1,13
184:3,16,20
185:2,5,24
186:1,25
187:4,12
188:3,4,14,
18,25 189:14
190:13,17,20
191:3 213:23
214:9,10
219:18
dropped
182:25
dropping
176:14
drops
177:10 183:8,
12
due
11:11 74:17
85:4 111:9,10
113:15 136:18
165:19
duly
6:11
dumped
188:3

_____

E

earlier
38:2 139:1
176:19 181:25
191:4 205:21
223:3 224:4
225:5 228:11,
22 231:15,16
232:19

early
56:3,7,21
66:24 67:20
104:9 105:9,
12 118:11,15,
25 119:20
123:25 124:6,
16 125:18
126:7,14
127:9,14,25
128:12 131:4
162:18 173:23
176:14 178:5,
8,9,24 185:7
190:16 214:25
earned
14:16 15:7
easier
9:11 58:8
67:24 68:4,7
80:16 148:15
easily
135:21
echoing
52:1
economic
96:9,15
economy
96:11
education
14:17
educational
14:6
effect
51:11 53:22
67:18 120:23
214:6 218:14
232:25
effective

84:1,12
206:19 229:19
effectively
52:9
effectiveness
205:10
efficiency
22:9 72:6
83:9 89:19
90:16
efficient
79:19 91:1,3
efficiently
91:10
effort
58:5 158:21,
22
efforts
54:24 66:6
199:7
elect
84:16 93:22
97:10
elected
16:12,23
18:22 72:5
90:14,22
98:23 163:12
167:23
electing
93:25
election
33:16 53:19
56:4,8,22
72:5 73:9,17
74:14,17
75:14,20,23
76:9,10,16,23
77:17,19,24

80:18 81:23,
24 83:8,10
84:18 87:16
88:11 89:2,
15,18 90:2,5,
9,13,16 91:6,
7,11,12,14,23
104:12,22,23
107:9 127:11
128:14 131:24
134:3 137:14
146:2 159:22
162:19 165:21
166:15 167:17
174:8 185:8
190:3,5
192:22 193:16
194:17
205:11,17
212:16,23
214:16 215:1,
11 223:21
226:9 227:21

elections
16:9 20:14
22:16,19 23:4
24:6,7,22,24
25:2 72:22
73:11 78:17
79:22 81:5
85:3 87:14
91:10 94:4
125:1 134:15
160:25 177:15
179:16 190:2
202:21

eligibility
150:11,16

eliminate
141:25

emergency
177:5

emotional
19:8

emphasis
15:12,22
44:11 71:9
155:6

enact
80:15 166:23
182:18

enacted
167:1 184:15,
20 190:3

enacting
101:10

encourage
135:17 137:9
144:16,17
156:9 164:8
182:9 193:1
194:12 200:5,
7 215:8
218:23

encouraged
63:10 64:18
119:18,19
135:20 156:4
197:25 211:16

encouragement
19:16

encourages
138:19

encouraging
221:17

end
23:17 92:8
152:20

ended
92:9

engage
171:25 218:13

engaging
170:11 214:5

enhance
221:6,11

ensure
163:3 183:12
184:15 187:24
195:5,11
196:13

ensuring
140:21 202:2

enter
107:3

entered
77:6,11 148:3

entire
43:12 66:6
69:10,11
75:22 81:6,9
99:10 112:22,
24 115:22
116:18
119:14,25
128:6 195:21

entirety
117:12 119:9

entitled
16:7

environment
51:19 57:3
170:22,23

equality
160:1 191:12

equally
62:15,17

63:16 87:23,
25 88:6,16,20
155:21

equals
129:7 131:18

era
68:1,10
148:13

essentially
51:1,7

establish
52:19 96:4
172:17 186:7
187:1

established
83:25

establishes
186:20

ethnic
26:7,11,24
27:3,20

ethnicities
28:18

ethnicity
25:10,12,17,
24 27:8 28:3
30:18 31:7
37:10,11
38:20 40:9,
11,16,22
41:8,13,23
45:8,16 46:6,
16,25 47:10,
13 58:21 59:9
229:1 230:1

eventually
80:23

everything's
7:1

**evidence**
66:2,5 72:1,
2,8,14,15,21,
25 73:10,16,
17 75:25
76:12 81:2,4,
14 83:9,24
85:7 86:16
89:22 90:7
91:15,21
102:12,15
106:19 108:24
117:7 124:16,
21,22,25
125:2,15,17,
21 127:24
132:3 167:14,
25 168:12
169:1,15,17,
19,20 179:23
180:17 181:12
182:22 189:20
197:19 198:23
208:10,12,17,
18 210:1
211:20 216:16

**evolved**
91:7

**exact**
23:21 56:22
68:24 77:18

**EXAMINATION**
6:13 232:5

**examine**
78:8,9

**examined**
6:11 78:11

**examples**
51:21 60:15
62:24 63:7

79:21 81:11
82:16 83:12
198:16 212:9

**exams**
15:5

**Excellent**
6:20

**excised**
226:24

**excluded**
120:18 121:20

**excludes**
120:20

**excruciating**
14:4

**excuse**
45:25 86:12
139:24
150:20,21
151:4,18
152:8 165:18,
22 166:4
198:7

**Executive**
224:11

**exercise**
110:16

**exert**
58:5

**exhibit**
13:5 44:20
45:1 46:14
149:4 225:21,
23 229:11,12

**exhibits**
107:3

**existed**
79:20 114:24

**existence**
74:8 116:12
172:25 173:8

**exists**
169:2

**exit**
61:6

**experience**
7:9 17:11
20:13 23:4
24:4,5,15,16,
21,23 25:1,3
108:1 159:2

**experiences**
73:6

**expert**
7:11 11:15
17:8,10 29:19
31:24 32:9
50:21 51:3
57:13,20
85:13 104:2
121:9,14
122:3 143:17
149:17 226:20

**expert's**
110:17

**experts**
26:15,20

**explain**
13:3,19,20
52:20 84:8
108:2 116:11
125:15 126:22
128:17 130:4
145:4 169:22
192:14 203:19
211:9

**explaining**
176:7

**explore**
143:20

**expressing**
180:18

**extends**
213:22

**extensive**
24:17 71:12
72:8 117:16

**extensively**
78:1

**extent**
27:23 204:9

**external**
110:4

**extra**
9:12 132:4
204:25 205:5

**extremely**
123:22 124:19
230:20

**eye**
135:1

---

**F**

**face**
74:3 159:15

**facing**
176:18 177:11

**fact**
16:24,25 63:8
72:4 78:11
83:22 84:11
86:24 90:20
91:24 99:21
100:17 101:8
123:16 135:14
137:2 148:6

Sharon Austin
October 27, 2021

19

156:19 176:11
178:18 179:3
181:3 182:6,
12 191:8
205:6 209:18

**factors**
16:20 48:11

**facts**
74:23 77:12,
22 175:9

**faculty**
14:23 15:1

**failing**
155:19

**fair**
64:25 75:16
80:3,18,22
168:9 180:21
183:2 224:1

**fairer**
80:16

**fall**
15:6 28:24
45:18,21
157:4

**familiar**
13:11 74:14,
15 76:16,22
81:23 92:15
146:9

**family**
55:25

**FAQS**
42:7

**Faruqui**
148:3 185:17

**fast**
68:14 81:20

**favor**
97:6 211:22

**Federal**
186:19 187:5

**feedback**
51:24

**feel**
38:10 49:19
76:6 97:18
98:2,16 144:6
160:17 163:5
189:1 194:5,
19 209:5
210:2 217:23

**feet**
213:23
215:18,20,23,
25 219:9,12,
15,20,23
220:2,8,24

**felt**
79:5 100:18
122:10

**fewer**
120:19

**field**
215:25 216:3,
7,11 220:3

**Fifty-four**
77:10

**fighting**
68:12

**figure**
140:6 141:2

**figured**
229:6

**file**
225:19 227:4
229:7

**filed**
105:24

**files**
227:20

**fill**
20:24 21:4
157:24 161:16
192:4 193:19
194:4 196:25
197:14 202:23
203:4,12,21
204:19 208:1,
4 229:24

**filled**
21:1 77:3
231:9

**filling**
192:17 193:5
202:19 228:23
229:25

**finally**
12:8 156:2

**find**
59:2 84:19
109:10,13,20
114:14 122:6
123:11,19
124:11 151:20
191:1

**finding**
111:8

**findings**
16:13 23:8
33:7,9 77:6,
10

**fine**
6:19 8:12
9:17,24
10:11,14
11:24 12:7

44:17 52:4
74:4 103:11
106:17 107:2
113:6,20
120:11 121:17
125:12,14
130:23 134:24
154:12,17
174:4 175:17
176:18,25
177:11 189:17
198:15 207:10
222:24

**fines**
176:20

**finger-pointing**
217:24

**finish**
45:25 232:3

**finished**
15:3,5 214:1

**finishing**
15:3

**fire**
183:9

**first-hand**
23:4 24:4,21
25:1

**fit**
115:17 163:14
194:20

**fits**
195:19

**five-minute**
136:4

**flip**
77:17

**flipped**
77:18

Sharon Austin
October 27, 2021

20

**Florida**
14:25 15:15
24:11,18
28:8,12,15
50:23 62:16
67:17 68:16
69:5 72:9
73:3,7 74:7
75:6 76:14
78:14,19
79:14 81:23
82:3,24 83:3,
10 84:1 85:16
86:4 90:1
94:10 95:24
96:14 98:11
99:11 100:24
101:7,9,15,21
104:11,20
117:10,19,25
119:19 123:3
124:17,22
125:19 127:18
128:1,4 137:9
140:13,15
144:18
146:12,13
147:5,11,13,
14,22,23
148:5,8,15,18
150:10,21
151:3,17
155:22 156:22
166:9,13
170:7 171:15
173:21 179:5,
9 180:22
182:12,23
183:13 184:21
185:2 186:7,
9,10,21 187:3
189:1,9,10

198:5 200:11
223:22
224:11,25
228:17
229:17,21,25
230:15
**Florida's**
50:20 91:6,10
113:25 114:18
147:20 152:4
232:16
**fly**
216:6
**focus**
15:16,25
16:18 29:12
93:16 96:8,
18,19 99:5,24
116:9 119:7,
13,14 120:10
122:17 123:17
127:16
**focused**
16:9 104:13
146:11 147:12
178:21
201:12,15
**focusing**
24:10 113:1
117:15 123:1
178:21
**folks**
228:23
**follow**
11:12 155:25
**food**
11:20
**foolish**
180:10

**football**
215:25 216:2,
6,11 220:3
**forecast**
117:5
**forever**
222:17
**forget**
152:1 157:10,
16 158:2
**forgetting**
157:23
**forging**
74:17
**Forgive**
38:8
**form**
10:22,23,24
11:5 17:16,24
21:2,22
22:11,21
35:23 46:18
47:2 48:3,23
55:8 58:12
63:25 66:15
79:7 84:2
89:6 93:7
94:6 95:17
97:20,23
98:5,13 99:1
100:12,20
101:23 102:14
108:5,17
111:17 112:23
115:1 116:17
122:21 123:5
124:24 129:12
133:13 138:7
140:5,24
141:20 144:5

145:15 146:18
147:3 148:2
151:5 157:6
161:4,22
163:7 165:25
166:8,16,21
167:10 168:8
171:20 173:2,
11 181:22
187:15 196:8
199:4,19
200:3,15
203:22 205:4
206:16 207:15
210:24 211:2
212:12 220:10
221:25 228:23
229:1,17,23
230:23
231:10,21
**forming**
13:1 38:3
**forms**
165:6 198:20
228:23
**forward**
81:20 103:10
164:6
**found**
16:19 73:10,
25 75:16 77:2
80:21 104:14
124:9 139:20
165:13 201:13
205:19 224:23
226:1
**fraud**
70:8,9,11,17,
20 71:17,22,
23 72:2,8,11,
14,20,22

Sharon Austin
October 27, 2021

21

73:2,11,16,
17,19,21,23
74:3,7,9,10,
19 75:2,3,6,
9,11,14,18,
23,25 76:13
77:3,7,11,20
78:4,5,9,12,
13,19,24
79:6,18 80:20
81:7 82:2,7,
15,17,24
83:1,3,6,10,
16,18,23,24
84:1,4,12,20
85:5,7,8
86:13 89:16,
21 97:18
98:3,11,16,
21,24 100:4,
19,23 102:6
116:12,16
125:3 126:17,
20 132:3
134:15,20
139:1,18,23
141:9,13,16,
25 142:3,9
143:8,19,24
144:8,11
163:19 168:6
169:20,21
172:1,14,18,
25 173:9,10
175:22 176:24
177:14 182:23
189:7 198:19
199:3,18
200:2,13,14
205:20
212:10,16,20

**fraudulent**
62:4 72:16
73:1,13 81:3
139:3,18,22
168:13 188:3
189:4
**fraudulently**
76:3,4 77:16
82:8
**free**
160:14 165:4
**freely**
117:2
**frequent**
153:21
**frequently**
155:6,9
156:14 157:9,
15
**frightening**
167:17
**full**
7:14 120:17
186:15 226:24
227:13
**fully**
11:22 12:10,
15
**function**
8:9 9:5
**furthered**
97:15
**future**
81:1 160:7
165:16 188:10
189:19

----

**G**

----

**gain**
137:24 140:15
**Garcia's**
82:6
**gathered**
26:15,16 27:4
**gathering**
26:10 27:20
**gave**
58:13 62:25
**gender**
59:9
**general**
7:8,11 84:19
87:14,15
104:22,23
106:4,23
122:18 123:7
147:15 151:2
226:9 227:21
**generally**
22:15 34:8
50:20 77:23
85:10 106:6
152:5
**Georgia**
212:20
**give**
6:5 9:19 28:1
41:25 66:20
76:5 85:11
141:6 144:22
152:8 156:12,
13 166:4
172:6 192:6
200:17 220:12

**giving**
19:16 115:13
157:7 182:9,
14 192:23
193:5 205:1,7
**glad**
6:24
**glitching**
134:23 152:18
**globally**
27:16
**goal**
140:21 141:15
175:25 184:20
202:2 220:18
221:11
**goals**
206:24 207:2
**good**
6:15,16 50:15
69:25 80:5,14
92:6,7 98:12
103:2,10,12
110:8 160:9
194:22,23
**govern**
94:25 206:13
**government**
94:22 160:23
186:19 187:5
**governor**
84:19
**graduate**
16:1
**graduated**
14:10,11,14,
18
**graduation**
14:21

Sharon Austin
October 27, 2021

grand
77:1

grandfather
52:13,22
53:17,25

great
9:22 14:8
19:5 50:21
60:8 70:4

greatly
104:10

ground
8:2

group
85:18 120:21
159:5

groups
29:18 30:23
92:10

grow
168:18,21

guarantee
163:13

guaranteed
117:1

guess
12:1 14:9
27:25 48:12
55:23 79:10
91:14 93:17,
19 95:4 97:8
99:2 114:22
115:2,20
116:25 117:14
128:18 139:2,
14 141:21
150:22 157:7
159:4 161:13
166:22 179:12

188:17 202:20
216:15 220:11
225:20 232:2

guilt
77:6,11
217:20

guilty
73:14 74:1
80:21 82:14
205:19

guys
136:9

_____

H

half
59:17 62:20
161:15 216:2,
6,11 220:3

hand
6:3 82:10,12
90:25 163:15
229:18

hand-delivered
160:22

handling
224:25

happen
52:19 97:7
163:23 167:23
168:11,23
177:6,21
189:19 208:14
231:20,25

happened
73:3,5 74:20,
22 75:17
76:18,24
77:23 78:20
80:23 83:13,

14 106:6
108:8 109:1
125:4 169:16,
20,25 170:20
174:7 183:4
188:6 190:4
199:6 205:25
208:24,25
209:3,4,6

happening
81:15 86:2
139:11 169:1
173:10 188:10
189:8 198:24
199:3 216:14,
17 220:19

happy
11:19 123:10
169:22

hard
7:3 38:13
114:14 157:14
158:25
161:13,18
200:16 201:6
202:12

harder
56:9 58:7
84:14 86:14
88:8 93:21,22
142:21 143:4,
12 158:17
176:13 178:8
179:1 180:6
188:16 190:24
195:1,17,22
197:2,13
205:8,12

harm
135:14

harms
115:16 135:10
177:25

Hawaiian
43:18

HB
66:24

He'll
10:23

head
19:20 68:17
69:4

heading
226:8

headphones
7:20

hear
7:19 17:19
51:22 52:4
94:23 136:6,
9,12 152:19
172:20 189:3
212:17

heard
136:2 212:15

hearing
52:2 89:5
189:7 199:18

heartbeat
96:22

heavily
116:6 118:15
119:3,22

heavy
112:2 123:17

held
147:16 181:16

helped

20:17 79:6
137:16

**helping**
21:24

**heritage**
26:7,11

**hesitant**
193:5

**Hialeah**
74:14 75:14

**high**
14:9,10,11
53:11 123:22
124:3,5
126:13 127:8,
12 158:1

**higher**
122:7 157:23
223:20

**hired**
12:21 85:11,
12,14

**Hispanic**
23:1 24:1,9
25:8,9,10,16,
20,24 26:2,25
27:5,6,8,15,
21,25 28:14,
24 29:3,17,23
30:7,22 31:2
32:19,20
35:16,19,21
36:8,19,24
37:2 39:1,8,
20,23 40:3,5,
6,9,14,16,23
41:8,15,18,
19,20 43:8,19
44:5,13 45:6,
8,15,16 46:5,

22,24,25
47:10,13
48:1,14,23
49:1,8,9,12,
13,16 50:23
57:9 66:7
68:16 69:14,
18 71:8 73:8
80:10 84:15
85:18,25
91:19 99:15,
22,23 101:12
104:5,14,15
106:21 107:23
111:11 112:3
114:11 115:25
116:6,8,20
117:4 118:19,
25 119:2,16,
21 122:8
126:5 127:4,
7,13,19
136:18 138:3
140:8 142:20
143:1,12
144:18 154:22
156:20
157:12,22
158:16,24
159:15 160:4
167:19 170:9
180:6 189:12
195:23 197:4,
15 202:11
205:11 208:9
211:14,17
223:19 230:6,
8,11,16,19,22
231:4,22

**Hispanic/
latino/latina**
25:11

**Hispanics**
28:8,9 30:12
71:13 137:20
155:8 158:12

**history**
14:13 16:16,
17 24:11
50:20 66:6
71:7,12 85:14
99:11 101:7,
9,10,15
116:19 117:7,
10,16 137:10
142:16
158:20,23
170:2 198:2
211:11

**hold**
222:18

**Holt**
6:14,17,20
17:17,23
18:1,18 21:5,
23 22:13,23
36:1 42:17,
21,23 44:19,
23 45:2 46:20
47:6 48:19
50:11,13,15,
18 52:2,5,7
55:13 58:14
64:3 67:11
80:1 84:6
89:10 94:3,9
95:19 97:21
98:1,8,18
100:1,14
101:1 102:5,
17,19 103:2,
5,10,12,14
108:10 109:4

112:11 113:3
115:6 117:21
122:23 123:6
124:20 125:5
129:16 134:23
135:4 136:9,
12,14,16
138:24 140:18
141:7 143:15
145:3,22
146:23 147:6
149:5,16,22
150:5 151:9
152:17,19,22
154:1,7,9,12,
17,18 157:21
161:12 162:24
164:14 166:1,
11,17 167:3,
13 168:15
172:2 173:5,
16 177:23
181:24
185:12,22
187:22 196:6,
12 197:18
199:15,22
200:8,21
205:15 206:21
207:17 210:22
211:2,4 213:1
217:14 220:13
221:23
222:11,23,24
223:4 225:4
226:17 227:25
228:9,21
230:23 232:2,
6

**Holt's**
231:13,16

Sharon Austin
October 27, 2021

24

Holtzman
  6:21
home
  59:3
honest
  115:12 124:11
  136:25 201:23
  206:17 211:8
honing
  117:15
hope
  41:20 59:16
  64:16 73:7
  156:23 175:6,
  8
hour
  50:8 185:14
hours
  7:6 12:2,5
  102:21 162:17
  173:23 174:6
  175:13
  176:10,15
  183:22
house
  68:16 69:6,
  10,11 94:10,
  17 95:13,15,
  21 97:1,14
How's
  102:19
huge
  202:25
hundreds
  74:17 76:2
  183:2
hypocrisy
  64:17 144:15
  163:15

hypodescent
  37:7
hypothetical
  55:4 82:19,25
  83:3 100:4
  163:1,4
hypothetically
  98:19 100:18

_____

          I

ID
  61:12 62:12
  65:1 132:16
  133:6 136:19
  138:4,12
  164:21 165:4
identification
  45:1 61:24
  62:9 63:13
  65:11 133:20
  134:8 135:22
  139:15 149:4
  225:23 229:12
identifications
  165:9
identified
  39:4 40:1,6
identifier
  145:14
identifies
  45:8
identify
  61:17 62:7
  64:21 137:22
  138:15,23
  144:24 145:14
  146:25 166:18
  171:16

identifying
  64:7 88:3
  132:25 145:5
  146:14 232:21
identity
  21:25 65:14,
  20 145:10,18
  171:16
IDS
  64:6
ifs
  162:25 163:3
ignoring
  120:24
illegitimate
  71:23
illiteracy
  53:11
illiterate
  55:22
imagine
  7:5
impact
  85:17 88:5,6
  115:14 125:3
  159:20
  167:16,18
  179:21 181:2
  201:5
impacted
  136:23 138:18
impacts
  181:4
implicated
  82:7
implicit
  217:19
implied

61:1
important
  33:1,4,11,24
  37:16,22
  38:10,15
  94:19 97:19
  98:3 99:21
  100:19
  187:19,21
  188:13,18
  193:22
impossible
  51:17 53:14
  55:1
impression
  215:5
inaccurate
  108:16
inappropriate
  215:7,15
incidence
  89:16
incidents
  75:23 78:25
  163:22
include
  29:17 69:19
  74:21,25
  76:20 77:13,
  25 78:3 81:25
  114:7,23
  115:3,8,24
  121:8,14
  122:10 152:12
  153:1 190:15
included
  39:6,25 49:1
  111:23 114:3,
  9,10 118:8
  124:9,10,13

Sharon Austin
October 27, 2021

25

130:18 151:23
199:14 201:17
221:14

**includes**
32:16,20
113:24

**including**
29:6,8
111:24,25
112:4

**incomes**
63:3,5

**incorrect**
128:25 129:1,
6,11,18,21
130:1 132:6
217:23

**increase**
86:10 104:17
105:11,12
106:4,17,20
107:22 108:23
164:9 190:13

**increased**
104:10 160:5

**increases**
108:25

**increasing**
176:20

**Indian**
43:17 155:11

**indication**
197:19

**indicative**
115:19 117:24
126:20,21

**indiscernible**
135:24

**individual**
26:3 45:18
48:22 49:1
145:14 163:4
165:2,3,5

**individuals**
30:13,22
58:17 192:18
205:19

**inference**
95:5,8 127:2
180:5,13

**inferences**
108:1 109:2
122:19 126:16
180:21

**influence**
214:6,19,20
215:11

**influencing**
214:7 218:15

**inform**
142:7 196:23

**information**
27:20 61:14
65:21 66:10,
19,20 88:3
109:12,13
110:4 112:9
114:7 115:13,
24 118:23
123:11 126:9,
24 127:3
128:7 132:2,
6,17,25
136:19 140:17
141:6 142:23
144:21 146:15
150:11,16
156:13 169:23

171:9 175:8
180:14 187:20
232:21,22

**inserted**
224:1 226:2

**instance**
11:10 52:10
168:5

**instances**
74:6 75:6,11,
12 78:9 83:2
126:17 138:25
139:3

**instruction**
15:18

**instructs**
11:11 18:6

**integrity**
166:15 176:1,
21

**intend**
140:7

**intended**
140:3

**intent**
84:13 101:14,
17 180:1,12
181:5,13
197:20 214:6
218:14

**intention**
71:20 86:14,
18 182:13
197:5,17

**interest**
71:17,18
73:23 101:25
102:7 105:6
134:12,16,19

140:3 141:9,
12 143:18,24
172:10,13
175:21 188:2
195:11 196:1,
7,9,15,19,23
197:2,16

**interested**
37:9 120:1

**interests**
95:2 97:11,14
100:10,13
101:20,24

**internet/phone**
19:10

**interpret**
24:12 214:22

**interpreted**
219:4

**interrupt**
134:22

**interruption**
153:25

**intimidated**
59:4

**introduced**
66:18,20,23
67:9

**introducing**
67:3

**introductory**
16:2

**involved**
18:20 66:11
139:3 204:25
205:24 232:9

**involving**
143:24

Sharon Austin
October 27, 2021

26

irrelevant
  138:17 176:11

Islander
  43:18

isolated
  163:22

issue
  93:18 97:19
  98:3 99:6
  102:1,4 138:8
  211:24

issues
  96:9,17,18,20
  137:23 224:24

            J

jail
  74:4,18 82:6,
  13 168:20

January
  52:25

Jeffrey
  17:22

Jim
  51:4,7,10,12,
  18 54:5,8,14,
  20,23 56:16,
  25 57:1,6
  61:21 68:1,10
  83:19 84:8,10
  90:4,10
  101:16

job
  59:25 141:2
  142:1 162:16
  195:2 206:19

jobs
  96:11

Joe
  82:6

joining
  6:24

joke
  215:22

judge
  10:5 74:16
  181:9

judged
  181:17

jump
  104:1

jury
  77:1

justices
  69:17

justification
  72:24

justified
  76:6,8,11
  163:25 209:5
  210:2

justify
  72:9 75:24
  76:4 83:15
  84:20,23
  163:24 209:21

            K

key
  60:19

Kidd
  149:18,23

Kidd's
  150:24 151:11

kids
  185:16

kind
  7:3,6 8:2
  12:2 14:6,23
  15:18 16:2
  20:11,12
  29:12 34:2,4
  55:11,17
  78:16 92:11
  110:15 149:20
  152:17 156:24
  157:2 216:5

kinds
  228:10

knew
  154:5 195:6

knowledge
  24:17 25:4
  35:4,14 69:7
  208:18

Knoxville
  14:19

            L

label
  28:24

labeled
  229:8

lack
  231:18

language
  184:8,11
  196:21
  218:16,18,20,
  24 219:4
  222:3,4

large
  28:21 36:18
  106:16 138:2,
  16 142:25

  143:1 169:3,5
  174:4 176:18,
  25 177:16,20
  190:13 209:6,
  12,14 225:19

larger
  120:5 126:18

largest
  114:11 115:25
  116:7 118:12,
  19 119:1,2
  126:3,5
  127:4,6,18,19

lasted
  87:13

lasts
  87:12

late
  116:22

Latino
  15:23 25:14,
  16 26:25
  27:5,6,15,21,
  22 28:14
  29:24 73:8
  87:8 88:7
  92:10 126:13
  194:2,3,11,
  16,19 195:18
  197:23 198:10
  229:1

Latinos
  28:9 30:12,23
  85:16 86:8
  159:7 170:17
  178:7,22
  189:22

law
  54:13 76:1
  77:7 78:15

79:11 80:12,
14,15 86:11
87:25 91:24
96:23,24
125:3 160:25
161:6 162:12
163:25
166:13,23,25
167:1,16
168:2,10,25
170:11 172:4
185:9

laws
50:25 51:1,3,
4,7,10,12,19
52:9 78:23
79:1,5,8,13,
17,23 80:2
84:7,9 85:17
86:7,20 89:4,
8 90:3,9
91:6,14 92:6,
20 98:24
101:16 152:4
170:12,15
199:7

lawsuit
224:10

lawyer
57:11 215:22

lays
73:24

lead
63:16,17
64:11,23
215:5

leads
128:13 205:1

leave
177:7 207:7

208:9

leaving
207:12 221:9

led
90:9 101:21
181:4

left
15:10 175:11
221:2 229:18

legacy
169:24 181:1

legal
57:18 131:24
224:24

legalized
170:5

legislation
71:14 101:10
179:20,21
190:11

legislative
95:25 180:22

legislator
66:11 80:14
140:25 141:24
142:10

legislators
169:17 181:9
182:8

legislature
69:7 86:7
94:13 95:6
96:14 98:22
101:9,14,18,
21 102:7
126:17 140:3,
7,20 143:23
156:11 163:9,
16,24 167:7

168:6 169:19
170:11 171:15
179:14,25
180:7 182:14,
17 190:3
195:14 197:5,
13,21 198:25
199:2,16,20,
25 200:5,11,
12 202:13
221:13

Legislature's
86:17 92:25
141:15 202:2

legislatures
180:23 181:2,
14 197:20

legitimate
71:22 111:1
134:11,16
139:23 195:25
197:16

lengthy
13:6

lenient
146:14 147:23
148:5,19

lesser
201:25 206:22
207:11 220:20

letters
183:8

letting
145:16 185:17

level
16:1 57:19
159:18

libraries
137:7

license
61:11 62:12,
13 65:4,7
133:6 138:4,
11 164:21

licenses
138:10

likelihood
46:12

limiting
134:15,20

lines
58:3 98:15
137:12

list
13:6

listed
15:21 45:21
60:21 85:1
112:9

literacy
52:13,18,23
53:4,8,22,23,
24

litigation
223:17 224:3,
16 225:7

live
59:17,23
61:20 148:11,
12,15 164:7

lives
18:23

living
62:19

local
10:23

locate
109:8

Sharon Austin
October 27, 2021

28

located
  173:23 177:3
location
  22:10 59:18,
  20 219:9,24
  220:9
locations
  15:19 70:2
  219:16
logic
  183:5
logical
  95:5
long
  7:4 11:3 12:4
  33:5 39:14
  81:12 110:25
  111:1 130:14
  137:12 170:18
  171:11,12
  175:7 211:10
longer
  59:20 87:13
  161:15 172:6
looked
  13:9,14 16:8,
  15,17 27:12
  30:16 38:22
  39:2,6 41:11
  46:15 60:19
  109:22 115:22
  127:17 150:7
  151:16 152:3
loser
  77:20 80:19
lost
  141:10 162:20
  225:8
lot

9:20 11:14
13:10 26:22
33:7 48:11
117:7 137:11,
23 144:13
162:25 175:8
183:7 187:19
202:22 209:7,
10
lots
  225:18
Loud
  136:10
Louisville
  15:6,8,10
low
  120:24 121:21
lower
  63:5
lunch
  11:25 12:4
  102:20 103:23

——————

M

Mac
  154:7
machines
  16:19
made
  33:17 46:15
  51:17 63:25
  92:24 162:12
  178:22 180:3,
  17 181:3
  189:5,24
  199:7
mail
  55:24 56:21
  61:16 63:13

64:22 87:9,
10,12 88:13,
23 90:21
105:11 108:23
109:12 112:3
115:14
118:11,16,24
119:5,20
123:24 124:7
125:18 126:6,
13 127:9,13,
25 128:12
130:25 131:4
135:20
137:11,15,21
138:21 141:5
143:1,14
144:17,21
145:8,23
146:1 147:20
150:22 151:4,
19 152:8,14
153:4,7,19
156:9,12
157:11,14,18
159:16,23
160:4,13
162:15
163:16,17
164:4 165:10,
18,23 166:3
171:17 178:23
182:1 183:7,
8,9 185:5
187:6 190:17
198:22 228:16
mail-in
  124:16 143:25
  153:9
mailbox
  183:10,17,22

187:14
mailboxes
  183:6,12
  186:2,20
  187:10,18
main
  17:2 41:14
  61:8 111:8
  119:14
maintaining
  22:8
majority
  51:14 93:14
  94:11,14,17
  95:5 96:12,13
  97:13,17
  98:2,10
  123:19
make
  8:2 10:15,17
  11:8,21 12:3,
  6 22:24 23:2
  28:14 54:25
  55:2 57:7
  58:10 62:10
  63:2 71:13,15
  79:19 80:10,
  15,17 84:14
  86:14 87:17,
  19 88:8 91:11
  93:22 103:8
  108:7,19
  109:2 127:2
  135:7,20
  137:16 146:5,
  8 153:21,22
  155:5 158:9,
  17 163:18
  166:10
  170:10,18
  171:24 172:5

176:12 178:25
179:15,18
180:4,5,13,21
182:8 185:10
188:13,16
194:3 195:1
196:9 197:2
198:13,14
202:9,12
205:12,14
209:23 210:7
211:6,9 221:5
222:21

make-up
33:17 101:13

makes
10:10,16 11:9
56:9 58:13
85:24 88:12
92:12 148:4
200:18 217:7

making
67:24 68:3,6
106:18 114:6
119:7,14,25
120:6 124:2,
14 125:9,10
137:22,24
142:21 143:4,
12 154:25
155:4,7 156:2
178:8,9
190:7,24
191:14
195:17,22
197:13 198:5
199:11 205:7

man
191:12

mandatory
192:6 194:25

202:7 203:12
204:8

manner
163:5 165:20
224:24

marginalized
198:9

mark
225:20

marked
45:1 149:4
225:23
229:11,12

marks
70:13 75:10

Mary
44:19 185:17

Maryland
18:23

massive
107:19

master's
14:16

match
77:22 183:1,8

matches
183:12

matching
223:19
224:18,25
231:17 232:9,
12,17

materials
103:23

math
216:5

mathematician
215:23

matter
72:4 148:6,7,
8,24 176:12
213:18

matters
7:11 149:1

mayor
16:8,11,23

mayoral
74:14 75:13
76:16 77:24
80:18 205:16

mayors
16:10,20

meaning
136:21

means
58:1 63:3
93:6,11,20,23
140:20 162:14
173:25 188:19
192:20,21
194:8,9 221:8

meant
27:17 34:12
53:6

measures
83:18,25 84:3
188:10

media
19:17

medical
165:20

medication
12:9

meet
156:18

meeting
148:3

member
163:9 203:3

members
94:11,19

memory
32:5

Memphis
14:14,15,16
16:8,18

men
87:2 116:22

mention
52:14,17
99:18 213:6

mentioned
17:4 24:20
37:7 57:3
60:17 121:25
163:22
164:13,19
167:2 178:6
205:21 211:16

mentioning
92:17 206:9

messages
9:1

messaging
9:4

Mexican
28:21

Miami
75:21 76:16,
21,22 77:2,24
198:17 205:16

Miami-dade
198:17

Michigan
15:14

Sharon Austin
October 27, 2021

30

middle
42:13 230:1

mile
59:17 62:20
161:15

Miller
17:16,24
18:13 21:2,22
22:11,21
35:23 46:18
47:2 48:3
50:14 51:25
52:3 55:8
58:12 63:22,
25 66:15 79:7
84:2 89:6
93:7 94:6
95:17 97:20,
23 98:5,7,13
99:1 100:12,
20 101:23
102:13,22
103:3,6,8
108:5,17
111:17 112:23
115:1 116:17
122:21 123:5,
9 124:24
129:12 134:24
136:6,10
138:7 140:5,
24 141:20
144:5 145:15
146:18 147:3
148:2 149:19
150:2 151:5
152:17,20
154:3,8,10,13
157:6 161:4,
22 163:7
165:25 166:8,

16,21 167:10
168:8 171:20
173:2,11
177:19 181:22
187:15 196:5,
8 197:11
199:4,19
200:3,15
205:4 206:16
207:15
210:21,24
212:12 217:8
220:10
221:22,25
222:14 223:2
225:15,24
229:7,10,13
230:24 231:1
232:1,8

mind
14:5 18:19
162:8 174:19
175:7 201:14
210:13 219:11

mini
117:13

minimize
151:14

minor
14:13,17

minorities
60:12 68:8
166:6

minority
15:22 67:19
100:11 118:1
138:3 164:18
193:24 200:23

minute
41:25 51:23

minutes
50:11 102:24
221:18 222:20

mischaracterize
210:25

Mischaracterizes
150:2

mispronouncing
73:7

Mississippi
148:10,17

Missouri
15:13

mistake
213:25

mistaken
128:21

mix
16:3,4

mixing
231:17

mobilizing
221:17

model
212:22

modern
148:13 170:2

monitor
183:11,17
186:7 188:18
206:12

monitoring
183:16 186:11
187:4,5
206:20

monitors
186:19,22

187:10

morning
6:15,16
231:13

motivated
101:3

motivation
66:1 67:2,7
102:3,10
190:11

motivations
66:3,13
93:10,11,23

motives
92:25 93:1,2,
3

mouth
211:1

move
103:10 113:4,
20 122:13
153:12 156:24
191:19

movement
52:15 148:10

movies
11:3

multiple
29:14 70:2
198:24

mumbly
7:22

municipality
75:20 76:10

mute
8:9

**N**

N-WORDIZED
171:3

narrative
115:17 116:4
117:8

nationalities
28:14

Native
43:17

nature
172:7

necessarily
90:18 99:16,
17 161:5
184:9

necessity
217:3

needed
90:8,24
111:23 122:9,
10 189:24

needing
185:12

negative
66:3 167:18
170:13

neighbor
59:18 60:1,2

neighborhood
123:3 124:22
125:16,22,23
126:2,8,16,
19,21 127:1,
17,24 128:4,
5,11 132:4

no-excuse

63:11 153:9
166:7 198:5

no-solicitation
213:23 214:10
220:25

nobody's
188:2

nodding
9:22

nominated
69:9

non-
discriminatory
141:19 144:1

non-hispanic
27:25 29:7,16
31:11 32:1,17
34:12 37:18,
20 41:16

nondiscriminatory
188:20

nonexistent
78:4 100:5

nonprofit
18:10,14
192:1 197:3

nonprofits
17:12,14

normal
147:16

note
223:16

notes
68:13 222:21

notice
115:23

notices

210:15

notify
196:3

November
118:12,20,23
127:11 160:6,
7

nowadays
86:22

number
16:20 20:21
32:16 61:11,
12,13 62:6,11
64:7 68:25
76:5 77:18
85:6 104:18,
21 133:6,7
138:2,4,5,6,
16,17 159:22
160:6 164:21,
22 165:3
175:13 191:1,
2 194:16
206:10

numbers
23:16 109:9
126:13
128:19,21,24
129:4,10,13,
15,17,20,25
130:17,24
131:9 134:8
137:2 143:2
160:3,5,7
165:9 178:17
209:16

**O**

OAG
185:19

oath
10:2

Obama
18:25 20:3,
15,20

object
10:20 17:24
18:3 96:5
211:2

objected
17:23

objection
10:22,23 11:5
17:16 18:13
21:2,22
22:11,21
35:23 46:18
47:2 48:3
55:8 58:12
63:22,25
66:15 79:7
84:2 89:6
93:7 94:6
95:17 97:20,
23 98:5,13
99:1 100:12,
20 101:23
102:13 108:5,
17 111:17
112:23 115:1
116:17 117:20
123:5,9
124:24 129:12
138:7 140:5,
24 141:20
144:5 145:15
146:18 147:3
148:2 150:2
151:5 157:6
161:4,22
163:7 165:25

Sharon Austin
October 27, 2021

166:8,16,21
167:10 168:8
171:20 173:2,
11 177:19
181:22 187:15
196:5,8
199:4,19
200:3,15
205:4 206:16
207:15
210:21,24
212:12 217:3,
8 220:10
221:22,25
230:23

**objectionable**
92:4 201:13

**objections**
10:24,25
11:4,6,14

**objects**
164:24

**obstacle**
59:13 142:22

**obstacles**
55:2 57:7,8

**obvious**
38:14

**occasionally**
19:9

**occasions**
116:16

**occur**
72:11 168:3

**occurred**
71:8 74:7
78:19 83:1
104:17 108:25

**occurring**

74:9 78:25
80:25 181:15

**occurs**
30:4,5

**offered**
152:14 153:3

**offhand**
215:20

**office**
18:16 163:13
173:24 177:9
208:21

**offices**
137:7

**official**
167:23

**officials**
72:6 90:14,22

**offline**
102:23

**one-drop**
36:12,21,22
37:6

**online**
19:17

**open**
8:21 42:17
162:18
175:11,12
180:18 181:7

**opening**
21:20

**openly**
137:4 180:11

**opine**
36:22 85:12
92:21 125:10

**opinion**

13:2 57:18
71:24,25 76:5
84:17 85:11,
19 91:9
92:13,21 93:4
105:21 106:1
115:15 120:23
133:13
134:10,18
139:9 141:18
142:12 143:10
144:1 146:24
147:8 157:1,8
159:18 161:2
163:2 166:14
169:5 171:8
174:23 177:24
179:9,15,18
187:12 190:19
199:16 204:25
209:1 210:18
214:9 218:7
224:21

**opinions**
11:16 24:25
38:3

**opportunity**
56:11,19 68:8
88:15,21,25
155:17

**opposed**
9:22 75:10
109:18 145:13
154:21 157:4
161:17 195:9
199:17 204:2

**option**
44:6

**options**
53:18 54:1
55:6,20

182:10,15
196:14 198:6

**order**
22:9 52:19
58:18 61:24
65:5,13,16,17
72:11 73:22
75:4 76:6,7,
11 84:20 85:4
133:4,18
146:25 152:7
210:14 222:21

**ordered**
74:16

**ordinary**
57:22 58:2,9,
15,20 59:7,14
60:11,25
157:5,20

**organization**
35:14 193:6,
14 194:1
195:10 202:17
207:23 208:4,
5,20

**organizations**
18:10,14 31:6
191:20 192:2
193:20,21
195:1,17,22
197:3,14
198:8 200:24
201:4,8,10,19
202:10,22
203:3,9
204:1,12
205:8,18
206:3,14,18
207:20 208:7
209:7,10
215:6,17

Sharon Austin
October 27, 2021

33

221:16,20

**organized**
29:19

**orientation**
59:10

**origin**
43:8 44:13
230:6,12

**original**
110:5 126:10

**originally**
137:5

**outcome**
64:24 94:12

**outcomes**
63:18 89:14

**outlines**
201:10,21

**outweigh**
164:2

**overcounted**
36:18

**overlap**
29:23 230:21
231:7,24

**overlook**
213:19

**overturned**
81:6 85:4

**overwhelming**
51:14 93:14
123:19

**overwhelmingly**
124:4

---

**P**

**p.m.**

103:4 136:13
185:21

**Pacific**
43:18

**pages**
71:2 201:15
226:5 227:9,
10

**Pan**
15:11

**pandemic**
19:11,18
107:25 108:3,
8,9,21,24
109:3

**paper**
92:2 226:15,
24

**paragraph**
51:2,6 122:14
127:23 128:10
223:10,15
224:7 227:14

**paragraphs**
224:4

**parallel**
125:9,10

**paraphrasing**
232:22

**part**
24:10 29:7,16
31:11 32:1,16
34:12 37:18,
20 58:18 77:9
86:1,6 99:12
128:21 156:21
159:11 180:23
181:14 189:24
201:7,21

203:8 209:10
213:9,20
214:2 219:12
226:13

**participate**
137:11 163:17
192:22 198:4

**participated**
21:19 104:22
126:13

**participation**
124:6 126:7
127:9,12

**parties**
217:20

**partisan**
93:1,2,10
94:5,8 98:15
102:2

**partisans**
94:24

**partisanship**
93:12,17,20
99:5 101:4

**party**
93:23 94:19

**pass**
53:23,24
96:24 98:24
101:21 166:13
170:11 188:9

**passage**
66:12 84:21,
23 87:2
113:15

**passed**
56:6 79:23
86:21 91:25
96:23 100:11

107:20 111:10
174:24 199:7

**passing**
70:3,16,20
86:18 115:18
116:13 180:1

**past**
18:11 73:12
180:23 181:1,
3,6,10,14
197:20 199:6
203:6,16

**paste**
110:3

**pasted**
107:6 109:24
111:6

**pattern**
80:6 86:2
117:3 156:21
170:3,9,10
171:12 195:20

**pattern's**
112:18

**patterns**
107:19 111:9,
11

**pay**
62:21 161:14

**paying**
162:22

**pays**
59:25

**PC**
154:8

**PDF**
226:1 227:4

**peace**
222:18

**penalties**
171:25 176:20

**people**
20:23 21:3
25:15 27:14,
24 28:17,18,
19,20,21
29:8,23 30:6,
17 31:1 36:5,
7,18,24 37:1
38:17,23,24,
25 39:3 48:8
49:8 52:2
53:5,6,7,8,10
54:19,24 55:2
58:7 62:25
63:1,2,10
64:18,19
67:18,24 68:4
73:9,13,25
74:2,10,18
75:15 80:17,
21 86:5 87:19
88:25 89:12,
18,20 90:20
93:22,25 95:8
96:10 97:10,
13 98:15
99:7,14,15,
21,22 104:21
112:8 119:20
135:17,19,21
136:22 137:8,
10,21 138:9,
19 139:13,20,
21 141:2
142:3,7,13
144:9,10,14,
16,17,18
145:16 146:5,
21 148:16
156:2,10,20

158:16,18,19,
22,23,24
159:1,3,20,23
160:3,4,10,11
162:8 163:9,
14 164:4,8
170:9 171:1,
4,5,25 172:6,
8 176:21,24
178:3,4
179:21
180:10,18
181:4 182:7,
9,14 183:7
188:17 189:12
190:8,16,24
191:2,13
192:4,19
193:2,3,22
194:3,13,20
195:2,15,21,
23 196:10,24
197:14,23
198:6,9,12
199:11 200:5,
6 201:4
202:23 203:1
205:9,13,24
209:17,20,24
211:13,14,17
212:13
214:18,23
215:1,2,8
216:10,13,18,
23 218:3,23,
25 219:1
221:17,19
222:1

**perceive**
54:19

**percent**

104:17
105:10,12
123:20,23,24
124:5 128:11,
12,15 129:6,7
130:19,25
131:5,17,18,
22

**percentage**
105:5 118:14

**percentages**
127:6 178:7

**perceptions**
89:20

**perform**
52:19

**performed**
29:19 48:21

**period**
66:25 78:14
83:16 86:25
87:13 118:15
119:21 123:25
124:6 126:8
127:14 162:19
212:6

**periods**
99:10 178:24

**permits**
10:24

**person**
24:13 35:10,
15 36:8 40:1,
2,6 41:17,18,
19 45:20,22
46:2,4,8,10,
11,22 47:4,
16,17,18,19,
22,25 48:5,15
49:4,13,15,21

55:9,10,15,
16,21,22,23,
25 56:1 59:9
63:5 66:23
67:8 69:9
88:2 123:25
128:12 131:1
138:18 139:6
140:21 142:6
145:24 146:1
148:11 149:21
157:12,25
163:12 164:2,
25 174:2,5
175:18 177:17
183:18 184:2
193:4 194:7
203:17 230:14
231:9

**personal**
145:13

**persons**
231:8

**perspectives**
96:21

**pertaining**
98:24 107:9,
13 110:5
127:23 175:3
196:4 202:3,6

**pertains**
22:15,19
107:12 196:14
213:3

**Phd**
6:10 16:6

**phone**
8:25 9:3
20:7,9 154:4

Sharon Austin
October 27, 2021

35

photo
  65:11
physically
  173:24 175:15
  176:17 177:9
  184:2
pick
  142:5
picked
  160:23
place
  44:11 49:17
  54:24 62:20
  75:14 76:1
  78:13,24
  79:1,9,15
  84:4 85:6
  86:4,10 87:4
  90:17,22
  91:15,18
  93:20 97:7
  107:20 111:15
  125:1 142:3
  143:9 148:11,
  25 153:25
  158:14 160:18
  161:3,6,25
  162:9 165:19,
  21 168:10,25
  169:2 170:8,
  16 171:7
  176:5 177:3
  190:11 194:18
  200:14 207:9
  212:24 214:25
  223:17
placement
  186:11
places
  56:8 123:13

124:9 137:8
148:9 154:23
161:7 189:5,6
203:2 212:20
214:19
placing
  22:2 137:19
  142:21 143:11
  176:15 191:17
  192:25 195:3
  199:12
plagiarism
  110:13
plagiarized
  110:10
plagued
  77:2
plaintiffs
  105:25
plaintiffs'
  13:24
plan
  7:8 12:1
play
  48:11
point
  50:3 82:14
  87:9 112:20
  119:13,24
  120:5 123:15
  124:1,7,12,
  14,18 126:12
  135:19 138:13
  146:8,20,21
  148:21
  164:15,17
  165:7,8,10,15
  174:9 205:13
  208:6 213:16,
  21

pointed
  90:15 137:12
  158:20 170:13
  199:10 231:21
pointing
  83:12 214:8
policy
  65:23,25
  155:1
political
  14:13,17,19,
  22 15:17
  16:16,18
  17:12 50:20
  93:23
politics
  15:22,23
  16:17 24:18
  25:15 71:10
poll
  22:10 52:13
  55:11
polling
  22:9 58:4
  59:18,20
  62:20 161:25
  165:19,21
  214:19,25
  219:9,16
  220:8
polls
  55:6,16 56:1
  59:1 100:22
  157:14
  162:18,23
  185:6
population
  28:15 31:1
  127:18

populations
  114:12 116:1,
  8 118:12,20
  119:3 126:3,5
  127:4,19
  143:1
populous
  78:18
portion
  226:14
portions
  57:15
position
  14:23 15:1
  18:24 100:4,5
  143:16,18
  222:8
positive
  84:10 170:14
possibility
  74:4 137:13
  193:15 195:7
  199:1 231:23
possibly
  130:3,7,9,12
  131:7 209:6
post
  137:7
postage
  60:1 62:21
  161:14,24
  162:22
Postal
  186:8,12,17
poster
  204:12
postreconstruct
ion
  50:22

potential
194:12 196:13
205:1

potentially
208:15

practical
24:5

practically
51:17

practice
118:24 232:16

practices
118:25 174:8
224:18 225:8

praise
89:25 90:5,
14,19,25

praised
72:6 83:8
89:18 90:13,
15,19,22

pre
107:25

pre-pandemic
108:12

predecessor
54:10

predict
136:22
159:20,24
168:20

predicting
168:11

predominantly
123:12,16

prefer
151:6 166:9

preferred

84:16 93:25
164:5

prejudices
180:11,19

premise
112:13 113:14

premised
90:3 111:8

prepare
12:22 13:18

present
143:19 149:3

presented
128:8

presently
130:1

president
95:12,14

pretty
41:14 54:2
96:7

prevent
70:16,20
71:17 72:12,
17 73:20,23
74:2 79:6
93:24 141:16
142:3,8
143:19,24
168:7,25
172:19 173:1,
9 175:21
199:2 200:13

prevented
84:4

preventing
84:1,12 98:3
100:19 141:9,
13 144:14

199:18

prevention
71:22,23
83:18,25
98:11

previous
36:23 79:23
190:5,14

previously
28:25 39:12
79:23 89:4
190:2

primaries
52:11

primarily
15:25 17:2
48:20 70:19,
23 194:1

primary
26:13,19
37:14 52:14,
15,16

prior
83:19 190:22

priorities
95:2,6 96:6

priority
95:13 96:14
98:21 187:24

prison
172:6

private
141:4 142:7

privileged
10:25 11:12,
14

proactive
199:17 200:1,
12 208:14

probability
157:23 158:2

probable
30:3

problem
39:15 50:4
61:21 79:3
91:16 116:14
137:17 138:18
156:1,5
161:23 164:11
168:24 169:2
174:10
189:14,20
200:20
208:13,17,22
209:10 211:18
214:21 217:25
218:15,17,19
222:6

problematic
79:9 110:25
209:20

problems
7:20 79:19,24
80:8 91:21,23
92:1 114:5
137:12 156:10
190:7 199:6,8

procedures
119:5 124:17
125:18,22
128:1 200:7

proceed
10:8 11:5
12:1 18:7

proceedings
6:1 8:6 11:7

process
20:17 21:15

72:6 80:16
191:14

processing
21:11

produce
65:21 72:13
140:16 144:20
168:12 216:15

produced
66:5 67:1
72:7 231:2

professional
14:24

professor
25:4 121:2
141:1 150:24

professors
13:15 112:6

progress
71:13 156:3
170:10,18
178:22 182:7

prohibit
144:25 145:2
204:11

prohibited
16:20 217:5,7

prohibiting
214:18 217:6

prohibition
219:22,23

prohibits
204:1,15,17

Project
31:4 49:24

proof
86:16

proofread

213:18

protect
134:11 175:25
184:20

protected
158:10

protecting
166:15

protections
221:6

prove
112:20 126:12
127:11 172:14

proved
124:7,12

proven
84:24 91:15
143:8 154:25
163:20 172:15
178:19 189:6
202:10 205:9

proves
117:16 124:1,
18 142:24

provide
17:7 19:8
61:11,22,24
62:6,9 63:13
88:3 129:13
132:25 133:5
134:7 135:22
160:16 161:1
164:20 179:23
191:21 200:25
201:11 224:2

provided
14:3 82:17
110:8 117:7
129:10 201:22

204:10

providing
14:3 19:15
105:21 110:4
204:2

provision
64:6 65:17
66:4 73:24
132:24 133:2,
3,13 134:11,
18 135:11
136:19 139:10
140:3 142:14
143:5 144:12,
13 146:9
153:17
164:15,17
174:24 178:1
180:1 182:18
183:20,23
184:9,12,24
188:15 191:24
192:14 201:6,
9,20 203:25
204:15,16
206:25 207:8
209:21
210:14,17
212:8 213:14,
20 214:15
217:4,10,17,
18 218:9
220:23 221:14

provisions
60:8,10,17,
19,20 61:9
67:1,13,16,
17,21 68:2
73:21 84:25
87:11,23
88:20 132:13,

19 146:10
155:25 164:12
175:3 176:3,
21 190:4
199:10,14
201:12,16,17
205:6 207:8
212:9,11

publicly
171:6 227:19
228:1

Puerto
28:20

pull
42:1 106:25
229:15

pulled
42:10 43:2
229:21

punch
92:1

punish
144:9

punished
59:5 73:15
74:11,12
75:15 80:22
82:15 219:5

punishment
74:8

punishments
73:25 144:10

purchase
65:1

purchasing
63:3

purely
23:3

**purported**
70:9 75:3
78:5 82:19,24
83:4,6 100:5
115:10

**purpose**
70:16,19,21,
24 99:19
147:2 158:7
202:8

**purposeful**
92:13 159:6,9
171:10

**purposes**
218:7

**push**
117:8

**put**
20:20 46:3
54:24 59:13
68:18 71:14
75:2,9 76:1
78:5,21,24
79:8,15 80:9
82:20 86:9
87:4 90:17,21
91:15,17
121:23 123:18
127:1 131:24
133:19 153:11
158:14
168:10,19
170:16 178:25
182:13 185:4
194:18 207:8
211:1 212:24
214:12 219:13
225:7,15
227:15 229:5,
7

**putting**
55:1 88:22
142:13 144:10
155:6 168:25
195:21

---

**Q**

**qualify**
150:19

**qualities**
80:5 92:6

**quality**
33:6,8

**qualms**
217:17

**quantifies**
34:18

**quantify**
135:24 136:3,
17,21 159:14,
17,19 160:8
164:3 178:13,
14 191:5,8
200:22,25
201:3,7
209:15 220:15

**quantifying**
137:1 179:2
211:25

**Quentin**
149:23

**question**
10:12 11:6
18:2,8 19:22
20:19 26:8
28:2 37:21
38:8 40:16,17
41:1,7,21,23
45:13 46:7,16

53:20 59:16
64:1,16 67:6
73:16 77:21
93:19 98:7
102:9 113:7
137:1 140:10
141:23 146:3
147:10,19
148:22 150:23
151:2,15,17,
22 152:23
155:14,19
156:23,25
168:4 171:14
174:17 179:13
195:24 197:1
200:9,16
209:19 210:6,
9

**questioning**
33:8 228:11
231:16

**questions**
7:9 9:21 10:7
11:22 12:10,
16 13:23 18:3
20:12 26:24
27:4 40:20
45:17 53:13,
14 88:19
100:3 121:5,
15,18 125:7
132:18,20
135:6 150:25
222:12,15,17
223:4 228:22
232:1

**quicker**
222:22

**quickly**
203:5

**quotation**
70:13 75:10

**quote**
23:16,24 54:5
90:4 104:3,6

**quote/unquote**
36:6

**quoted**
54:10

**quotes**
70:6,7 75:3
78:5 224:20

**quoting**
22:25 23:15

---

**R**

**race**
25:9,13,18,21
26:6,10 28:3
29:2 30:18
31:7,14,16,25
32:13 36:4
37:10 38:19
39:3 40:11,21
41:1,13 42:7
43:7,11,15,20
44:6,12 45:8,
15 46:4,16,25
47:8,13
58:18,21 59:9
88:16 93:12,
17,24 101:3
102:1 104:11,
18 126:18
155:10,16
169:4,11,13
198:18 228:24
230:1

**races**

Sharon Austin
October 27, 2021

39

18:20 43:22
62:16 87:24

**racial**
33:10 40:17
66:3,12 93:2,
3,10,23
101:15,20
102:4 114:8,
13 120:21
223:18

**racially**
58:16 90:10
113:9

**raise**
6:2

**rampant**
198:19

**ran**
114:5

**rate**
53:11 123:23
124:6 127:8,
12

**rates**
32:11 33:20
107:10,13
109:6,9
111:20,21
115:5,10
117:24 119:12
120:3,18,25
121:22 122:7
126:6 227:20,
22 231:4

**rationale**
70:3 100:2
167:5 199:13

**reach**
75:4 110:17
119:8,10

**reached**
24:3 82:23

**reactive**
199:17 200:1,
13,19

**read**
12:23 23:24
43:5,10 44:2,
8 55:5,9,23
64:1 71:2
74:22 87:5
98:6,14
100:22
105:19,20,24
106:8 133:15,
17,18,22,24
151:8 171:9
173:3 175:7
180:14 201:15
203:14 204:22
224:15 232:11

**reading**
23:6 35:4,13
91:13 155:19

**real**
68:14 71:20
86:14 102:10
190:10 193:21

**reality**
116:5 117:18
225:6

**realize**
93:14

**realized**
213:25

**reason**
12:13 35:3
36:11 114:22
130:18 139:12
157:22 163:10

164:25 165:5,
14 174:11
177:4 183:9,
11 188:1,14,
18

**reasons**
65:24,25 71:6
115:8 167:2
182:17

**receive**
149:25 152:9

**recent**
76:21 81:2,3,
14 83:7 85:8
87:7 91:13
92:14 96:22
142:19 163:20
168:13 169:3,
5 173:7

**recently**
18:21 76:14
83:8

**recess**
50:17 103:4
136:13 185:21

**recognized**
134:15

**recollection**
41:22

**Reconstruction**
86:25 87:1

**record**
7:15 9:15
103:5,9
136:14 149:16
202:11 222:20
224:15

**record-high**
16:25

**recording**
8:6

**records**
150:12

**redirect**
222:14 232:5

**reduced**
66:24 159:22
160:8

**reduction**
160:3

**reelection**
20:4

**refer**
25:15 28:18
29:8 30:11
38:24,25
50:25 51:3
58:8 60:16
70:9,11 75:18
79:14 80:4
84:7,9 89:25
90:4 121:3
142:14 180:3

**reference**
31:24 32:6
46:14 92:25
127:22

**referenced**
13:1 34:16
39:10 52:10,
12 232:8

**referencing**
128:2,3,5

**referred**
25:21 30:22
45:11 54:4,9,
13 79:22
125:25 213:11

Sharon Austin
October 27, 2021

40

referring
25:8 30:10
31:10 34:25
37:19 38:23
39:3 51:6

refers
27:24

reform
70:6,7 86:12
89:17 91:4

reformed
90:24 91:2

reforming
86:13

reforms
89:22 91:14,
17

refresh
32:4

refuse
210:10

register
20:24 21:3
58:6 61:4
137:7 192:2,8
193:2,22,24
194:1,4,21
195:12,17,23
197:3,15
198:3,9
202:23 205:13
206:13 207:23

registered
123:21 140:14
192:21 201:5
203:18

registering
20:10 193:10
195:2 202:11

204:14 205:2,
9,10 208:3,7,
8 229:25
230:14

registration
21:4 124:3
150:12,17
191:20 192:3
193:13 195:10
196:4,15
198:20 200:24
201:19
202:17,24
203:4 204:1
205:18 206:3
207:19 208:19
229:17 231:10

registrations
192:12

regular
208:21

regulation
144:2

reinforces
82:14

rejected
120:20,22
228:13 231:8

rejection
32:11 33:20
107:10,13
109:6,9,11
111:20,21
115:5,10
117:24 119:12
120:3,25
121:21 122:7
227:20 228:16
231:4

rejections
223:19,20

relate
27:11

relative
52:24 53:2

reliable
110:11

reliance
115:14

relied
13:1,7 26:21
29:13 37:14
38:16 111:18
116:6 118:14

religion
59:10

rely
26:15,19
111:14
112:15,19
126:15,17

relying
37:23 38:4,15
110:16 118:21
183:20

remained
15:8

remember
54:7 68:18
69:20 81:13
92:17 106:8
134:5 137:6
151:23 186:2
189:7 205:22,
23,24 206:1,
8,9,10 223:8
232:24

remote

181:20 182:4
183:20 184:1,
5

remove
158:8 182:22
183:6,9,13
200:6

removed
183:13

removing
88:24

repeat
20:19 22:17
27:2 40:19
45:13 53:20
97:24 128:8
184:17

repeatedly
209:25

repeating
49:19 144:7

rephrase
10:9 34:6
135:7

report
7:11 11:15
12:23 13:6,9,
13,14 17:8,9,
10 22:25
23:18,20
25:2,3,8,20
26:20 27:11
29:5,19 30:11
31:4,24 32:3,
5,6,7,9,24
33:19 34:9,
15,16 35:4
39:5,7,12
45:6 50:21,24
51:3 52:17

54:8,14
57:13,15,20,
24 66:6,19
68:18,19
69:19 70:1
71:7 74:21
75:1,19 76:20
77:14,25
78:3,22 79:14
80:4 81:25
82:20,23
83:6,17 85:13
86:20 87:5,9
90:15 91:5,17
92:12,18
93:16 98:17
99:4,9,10,19,
20,24 100:3,6
101:8 102:25
103:24 104:2
107:5,18
109:14,25
111:4,19
112:1,24
114:16,17
115:11,12,13,
22 116:19
117:13 118:4,
10 119:9,15,
25 120:2,6,
13,15,17
121:4,8,9,10,
15,18,23
122:1,3,4,14
124:11
127:20,22
128:6,22
129:11,14,21
130:9,14,15,
24 131:16
132:7,12
134:5 135:19

137:10 141:22
142:12 143:17
146:12
147:10,12
149:17 150:9,
24 151:1,6,
11,13,19,20,
24,25 153:10
158:20 159:13
171:2 173:14
174:9 175:8,
20 178:5,22
180:4 190:15
195:21 197:22
199:14 201:14
211:10 213:9
223:5,6,11,
13,15,25
224:8,14,15
226:2,13,23
227:10,11,15,
19 228:5,7
230:19 231:3
232:7

**reporter**
103:6

**reports**
12:25 26:20
29:13 31:8
33:2,3,6,10
38:16,22
41:11 57:20
106:25 110:4,
6 128:3
133:12

**represent**
6:22 179:22

**representative**
94:1 97:9
193:6

**representatives**
84:16

**reproduce**
112:8

**reproduced**
223:6 226:12
230:18

**Republican**
94:11 95:14,
15,21 96:12
97:18 98:2,
10,20,22,23
99:8 100:18,
23

**Republicans**
94:14,25 95:7
96:3,5 99:3,
16

**request**
58:6,25
61:13,15,17
64:25 65:17
87:10 88:4
133:4,20
134:8,9
146:15 147:1
151:18 152:7
153:13,19,22
154:20
155:12,17
157:3,24
159:15 161:17
164:22 195:9

**requesting**
20:23 21:10
132:24 140:22
171:17

**requests**
20:21 82:9
153:21 155:5

205:21

**require**
64:21 150:21
151:3,17
179:6 232:20

**required**
134:3 146:15
160:16,18
163:2 165:6,9
191:21

**requirement**
62:8,15,17
153:13 156:18
172:17,24
173:8 175:14
176:9 201:20
217:18

**requirements**
51:13 61:6
147:15 232:20

**requires**
132:24
133:16,19
134:1 146:25
164:20 165:18
210:14

**rescheduling**
6:25

**research**
25:6 110:21
112:7 121:2,
3,6 122:11
179:24 189:12

**researcher**
110:20

**residents**
127:7

**resolution**
75:16

respect
220:22

respond
150:4,24
151:7 173:1

response
13:15 19:20,
22 156:19
174:24 190:4,
6

responses
12:24

responsibility
142:4 143:7

responsible
186:10 187:4,
5

restrict
67:3,4,9

restriction
160:24 190:20

restrictions
88:23 147:20
158:8

restrictive
68:5 140:2,20
171:18,22
184:14,19
188:19 202:1
206:23 207:2,
12 220:20,25
221:8

result
78:25 79:3
80:22 92:9
107:20 111:10
157:10 162:13
191:17

resulted

108:20

results
33:16

retain
27:10

retained
17:7

returned
210:13

reverse
168:4

review
12:25 13:7,12
85:20 106:7
128:19,23
129:2,3,15
130:15
133:11,12

reviewed
13:7 14:2

reviewing
57:20

Rican
28:20

rid
168:2

rightfully
212:25

rights
16:8 92:19
99:7,20
148:10,13
152:11,25
158:7 170:6
195:6,12
196:3,14
202:3,6

risk
196:24

role
193:22

roll
119:4

room
8:14,17

rough
20:21

roughly
57:14 74:19

route
55:20

routinely
57:22

rule
10:23 19:19
36:12,21,22
37:6,8

rules
8:2 51:16
149:14 197:25
211:19 213:6
214:18

ruling
232:14

rumors
189:4

run
18:16 20:4
91:10,12
212:23

running
16:11 18:24
90:5

rushing
203:1 204:21

---

S

S-H-A-R-O-N
7:16

sad
167:15

safe
49:5,6,7 71:2
184:16 187:24

safeguard
189:18

same-day-of-
election
131:2

save
149:9

SB
7:12 22:15,
18,25 23:25
24:8 54:4,10
55:1 56:6,8
60:7,9 64:5
67:3 70:3,6,
16,20 72:3,9
75:21,24 76:5
79:3 83:11,
15,19 84:5,21
85:1,20,23
86:18 90:7,
17,23 91:25
97:17 100:11
101:21 104:4
107:20 111:10
113:9,15
115:14 117:20
119:4 132:13,
19,24 133:14,
19,22,24
134:11,19
135:12 136:20

Sharon Austin
October 27, 2021

43

139:10 140:4
141:17 143:20
153:13 159:9
164:15,17
171:19 173:21
175:2 176:3
178:1 180:1
182:18
190:20,22
191:21 197:21
199:10 201:9,
14,21 203:25
206:25
212:11,14,18
213:4,14
214:15 218:9
232:20

**scale**
169:3 209:7,
12,14

**scenario**
97:3 130:5,
11,13 131:13
141:16 166:13

**scheme**
82:7

**school**
14:9,10,11
18:24

**schools**
15:21

**science**
14:13,17,19,
22 15:17
16:16

**screen**
42:15,22
44:15 105:4

**scroll**
43:1

**seconds**
9:14

**Secretary**
6:23 105:8
106:25 224:17
229:21

**section**
92:19 150:10
152:12 153:1

**sections**
185:13

**secure**
184:16,20
187:25

**securing**
22:5

**security**
22:9 61:12
62:11 133:7
138:6 164:22
165:3

**seek**
96:4

**seeking**
21:1 193:23
206:24

**sees**
48:5

**segues**
20:11

**select**
47:23

**selected**
116:13

**selective**
116:15 117:23

**selectively**
115:16,21

118:6 127:5

**send**
9:1 60:2
65:19 136:5
171:17

**senior**
16:5,6

**sense**
10:10,15,16
11:8,9 57:6
58:10,13
64:17 137:3
144:16 148:4
155:4 156:17
171:5 200:19
217:7

**sentence**
23:20 24:8
43:5 51:5
91:2 124:15

**sentences**
172:7

**Sentencing**
31:4 49:24

**separate**
41:7 43:7
44:12 45:7,17

**separates**
230:19

**series**
228:21

**serve**
83:24 140:2
163:12

**Service**
186:8,12,17

**serving**
193:21

**session**
94:13

**set**
175:12

**sets**
33:2,3,25
34:1 49:17
183:9

**Seventy-eight**
104:19

**severe**
115:10 132:3
148:19 171:25
172:4,6

**sexual**
59:10

**shaking**
9:22 19:20

**share**
42:1,15,21
105:3

**sharing**
44:14

**Sharon**
6:10 7:16
102:23

**shift**
107:19

**shifting**
111:9

**short**
7:2 59:22

**shorter**
59:24

**shortly**
67:13

**show**
72:1,21,25

Sharon Austin
October 27, 2021

44

80:6 100:22
112:2 115:9,
11 116:5
170:3 172:24
173:8 179:25
180:11

**showed**
53:16 105:10
111:20,25
126:25 191:2

**showing**
116:12 117:23

**shown**
142:24 169:1
178:5 181:5
189:12 217:11

**shows**
55:5,15,25
116:19 118:24
137:10 182:7,
13

**side**
94:16 146:14

**sign**
145:9 204:22

**signature**
62:2 145:9
150:15 223:18
224:18,25
232:9,12,16

**signatures**
145:13 232:23

**significant**
29:23 74:4
81:19 104:15
118:13 178:7
194:15 223:18

**signs**
215:2

**similar**
56:24 92:24
95:1 96:7
146:10

**simply**
11:4 19:25
33:9 49:12
59:23 110:15
113:8 114:23
117:22 143:20
180:7 186:25
199:25 212:15
221:15

**single**
123:2 124:21
125:16
126:16,19,21

**sir**
136:15

**site**
58:4

**sitting**
10:4

**situation**
58:3 76:9
143:20

**situations**
36:9 139:3

**size**
220:3

**sizeable**
126:6,7

**slaves**
53:6

**slid**
149:6

**small**
30:25 76:10
81:17 122:18

123:2 127:24
138:17 161:8

**Smith**
120:12,18
121:2,20
226:19 227:18
228:2

**Smith's**
226:14 230:18

**smooth**
90:9

**smoother**
91:12

**snapshot**
115:4

**social**
19:16 61:12
62:11 96:17,
18 133:7
138:5 164:22
165:2

**societal**
37:5

**society**
25:17 29:9
37:10 54:23
57:5 63:10
135:16 164:7
180:10,18
181:11

**solicit**
20:18 215:17
216:10,13
217:19 220:8

**solicitation**
187:14 213:7,
14 214:4,13,
17,22 215:13
217:18 218:3

221:15

**solicitations**
187:19

**solicited**
221:12

**soliciting**
214:24 217:20
219:23

**Solid**
99:12

**sort**
119:23 164:5
212:22

**sound**
74:19 77:8

**sounds**
35:21 50:15
88:18 103:2
141:23

**source**
26:14,19
37:14

**sources**
13:3,6,11
103:22 110:25
111:1 112:9
117:14

**south**
16:17 73:6
99:12

**southern**
99:14 101:8

**speak**
9:13 47:17
49:7,11
103:16,19
201:17 203:5
222:17

Sharon Austin
October 27, 2021

45

**Speaker**
  69:11,14

**speakers**
  68:15 69:5

**speaking**
  9:15 85:10
  100:18 201:18

**specialty**
  15:24

**specific**
  16:13 18:17,
  19 29:11
  132:12

**specifically**
  13:8 32:3
  42:12 109:5,
  15 121:5
  180:4 205:25

**specifics**
  7:10,12 67:13
  106:9

**spell**
  7:14

**spend**
  50:20

**split**
  16:24

**spoken**
  13:17

**staff**
  82:6 177:20

**staffs**
  177:16

**stamp**
  62:22 161:15,
  24 162:22

**stamps**
  63:4

**stand**
  56:15 183:22
  212:7

**standing**
  175:18 183:18
  215:1 216:18,
  24

**stands**
  123:12

**start**
  7:8 86:9
  103:12 132:12
  156:11 170:1
  228:13 230:24

**started**
  15:2,5 87:3
  144:19
  189:13,22
  190:8 211:17

**starts**
  122:14

**state**
  6:23 7:14
  14:14,16
  61:11 62:12
  65:15 67:17
  69:17 70:8,19
  71:6,18 72:5,
  9,10,13 73:20
  75:22 76:13
  78:14 79:14
  80:24 81:6,9
  83:25 85:16
  89:3,13,20,25
  90:13,22 91:5
  94:10,17
  97:1,14 98:10
  101:9 104:3
  107:1,19
  117:9,19

126:22 127:18
128:10 130:25
133:6 134:11,
16,19 135:17
137:5 138:4,
12,19 140:13,
14 143:18
146:7,24
147:4,12
149:16 152:9
155:22 156:3
159:25
160:16,18
161:1 163:2
164:21 165:4,
17 166:2
171:15 172:25
173:8 182:11
184:15,19
186:6,10,20
187:3,23
190:3 191:10
195:5,11
196:1,7,9,15,
19,23 197:2,
16 206:12,23
212:21,22
220:21 221:1,
2,5,10,11
224:17 225:8
227:18 230:15

**State's**
  70:2,15 71:16
  73:23 105:8
  142:16 158:23
  169:15
  175:21,25
  220:18 229:22

**state-issued**
  165:4

**stated**

26:6 36:23
38:2 70:2,15,
18,21 75:2
120:18 163:1
176:19 182:19
206:2 207:13

**statement**
  33:17 44:9
  92:25 97:22
  181:19 187:6
  199:24 203:15

**statements**
  22:24 23:2
  71:1 78:3
  180:2,16

**states**
  26:21 89:8
  146:10
  147:22,24
  148:20 149:1,
  14 152:13
  153:3,6,8
  155:23 166:5,
  10 172:16,21,
  23 173:6
  179:6,7
  181:19 182:1,
  2 186:8,11,
  17,19 212:23
  228:12,15

**statewide**
  72:1,22 81:4,
  19 84:18,20
  104:16 105:5
  115:19 116:14
  117:24 124:23
  125:3 127:5
  169:3 212:10

**stating**
  74:23

statistics
  30:11 105:9,
  10
statute
  71:22,23
  133:11,12,17
stay
  187:24
stayed
  15:9
stenographer
  6:2,8 8:4
  44:21,24
  103:7,13
  134:22 135:1
  136:2,15
  185:20
stepping
  164:6
steps
  72:12 80:25
  168:7 172:18
  173:1,9
  208:15
stereotype
  194:20
stolen
  188:4
stop
  44:14 80:25
  102:6 139:10,
  13,20 145:20
  158:21,23
  160:19 170:16
  188:10,12
  204:22 208:15
  220:19
stopping
  139:24

stops
  15:17
street
  193:12
strict
  73:25 74:8
strong
  124:14
struck
  232:16
student
  202:22
  203:15,17
students
  16:1 18:16,
  21,23 19:4,5,
  6 203:1
studied
  24:13 98:14
  143:10 180:15
  212:4
studies
  15:11 30:11,
  17 31:3,7
  128:2
study
  76:21 78:1
  82:1,4
stuff
  202:16
subgroups
  30:14
submit
  207:21,25
submitted
  139:5,19
submitting
  82:7 207:18,

22
subset
  122:18 123:2
subsets
  33:10 38:12
substantial
  106:19 107:22
  160:5
substantially
  112:19
substituted
  185:18
subtle
  86:23 87:18
  142:18 170:25
suburban
  18:24
succeeding
  208:8
successfully
  198:11
sudden
  63:12 87:3
  119:4,23
  144:19 156:4,
  5 189:13,23
  190:9 197:25
  198:1 211:18,
  22
sufficient
  210:7
suffrage
  24:11
summarizing
  64:5
summary
  23:8 77:12
supervise

174:3 176:17
  177:9
supervised
  173:25 188:14
supervises
  177:15
supervising
  174:5 175:15
supervisor's
  173:24
support
  19:8,15
  105:22 112:16
  113:9 116:4
supported
  123:15
supporting
  105:25 215:3
supposed
  79:18 80:14
  116:23 138:19
  142:6 159:25
  175:21 183:21
  190:20 193:1
  204:9
supposedly
  70:7
suppression
  142:17 191:11
Supreme
  57:21 69:17
  92:14 96:24
  172:16,23
  173:6
surprise
  69:13,22,23,
  24 82:9,11,12
  104:18,25
  146:17,19

surrounding
    213:6
surveillance
    174:1 175:17
    183:20,24
    184:2,5
survey
    100:22
suspicion
    66:9 67:8
    70:4 75:19
    83:12 168:18
    212:19,25
sustained
    78:13 116:19
    117:6
swear
    6:4
sweeping
    125:3
swing
    94:16
sworn
    6:11
system
    57:1 61:21
    90:23

                T

Tab
    225:17 229:8
table
    39:6,9 45:5,
    10,18 48:22
    107:6,11,14
    109:25 110:8
    111:4,18,24
    112:1,5
    113:23 114:16

117:16 118:3,
5,9,14,17,18,
22 119:7
120:6,11
121:4 123:18
125:24 126:1,
4 149:6,12,17
150:8 151:12,
13,14,25
152:1 204:13
223:5,16
224:1 225:16
226:1,12,19
227:15 228:4
231:2
tables
    109:11 111:6
    112:8 114:6,
    9,10 115:24
    116:9 118:7,
    22 119:9,11,
    13 126:11,25
    142:24 178:6
tactics
    86:22,24
    87:18 142:18
    207:2
takes
    75:14 130:22
    148:25 165:21
taking
    26:10 78:13
    86:9 171:7
    189:22 190:8
    208:14
talk
    19:3,9 50:19
    78:12 93:16
    94:22 96:8
    99:10 102:23
    106:24 137:23

141:22 147:4,
5 151:6
158:3,11
166:9,24
169:24,25
173:17 224:2
talked
    40:8 64:18
    90:16 93:17
    99:20 103:18
    104:3 132:16
    161:8 181:25
    189:15 195:20
    198:4
talking
    12:11 19:12,
    15 22:14 32:4
    39:9 47:22
    51:5 63:8
    75:21 83:7
    95:23,24
    96:13 105:2
    106:9,11,14,
    15,17,23
    112:25 117:6
    118:9 121:1
    147:14 170:1,
    20 176:24
    184:7 196:20
    216:19 223:16
    224:10,16
    231:14
talks
    106:3 118:11
    125:25 126:1
tallying
    105:9
target
    99:16 159:6
targeted

142:16 178:2
targeting
    178:3,4
taught
    15:18,20
taxes
    52:13
teach
    25:14
teaches
    212:2
teaching
    16:2
technical
    53:14
teenage
    168:18
telling
    71:19 167:7,
    11 202:17
    205:24 216:22
    219:1,6
ten
    67:4,9 120:19
    179:6 209:13,
    20 210:18
    228:24
tended
    80:9
tendency
    80:9
Tennessee
    14:18 137:6
term
    29:5 34:8
    39:19 43:13,
    19 54:8 57:22
    75:3 164:16

Sharon Austin
October 27, 2021

48

213:3

**terms**
25:17,19
27:15,17
43:20 49:16
102:20

**terror**
51:20 57:4

**test**
52:18,19,23
53:4,8,10,12,
23,24

**testified**
6:12

**testifying**
10:5

**testimony**
6:4 103:17
161:20 210:25
212:8 231:15
232:21

**tests**
52:13 53:22

**Texas**
96:23

**text**
9:1 85:20
136:5

**themself**
46:8

**thesis**
16:5,6

**thing**
56:23 69:25
84:22 86:13
98:12 140:9
154:10 156:6
159:1 160:9
162:2 167:15,

17 172:9
176:23 178:21
194:22,24
215:4 222:8

**things**
10:21 12:14
17:2 19:6
24:19 26:7,11
29:15 40:12
46:9,11 57:2
58:9 62:25
63:4 79:19
83:13 84:25
85:2 86:19
87:4,5,9,17
88:10,14
90:21 92:2,3
94:12,18,21
95:20 96:3
99:18 108:7
119:22 126:11
127:10 158:3
161:11 162:1
163:21 167:21
169:16 171:1,
8 172:7
177:6,21
179:1 180:13
181:11
185:10,23
187:1 188:16
189:8,13,15,
23 190:4
202:18 207:7
211:15,16,25
213:15 221:3
232:3

**thinking**
102:25

**thinks**
25:17

**third-party**
191:20 193:13
200:24
201:10,19
202:16 204:12
205:18 206:2,
13 207:20
208:19

**thought**
17:22 68:23
110:8 111:22
123:14
141:11,21
148:10 151:24
186:14 200:18
220:12

**thousands**
76:4

**til**
188:11

**time**
7:25 11:17
13:10 18:3
20:1 34:6
40:25 44:2,8
45:13 47:4
52:15 53:11
74:4 78:14
83:16 87:12,
14 90:8,11
99:11 105:6
152:14,23
153:4 161:13,
18 171:14
173:4 175:12
192:9,20
193:7 194:6,
7,8 195:8
197:1,24
200:10
204:18,25

205:5,8 209:9
210:9

**timely**
208:20

**times**
7:23 130:21
198:24

**timing**
7:3

**title**
32:5

**titled**
149:12

**today**
6:24 8:9
10:2,8,21
12:9,16
13:18,22
14:7,25 55:6
60:9 67:17,22
68:9 103:17
125:7 153:2
181:9,15
211:17 225:5
228:11,22
231:17

**today's**
12:22 57:5
180:10,18
181:11

**told**
49:21 54:2
69:21 82:5
104:16 131:8
156:6,8 194:7

**top**
43:1 68:17
69:4 229:18

**total**

Sharon Austin
October 27, 2021

49

128:13

**totally**
161:11

**traced**
170:2

**track**
202:10

**tradition**
33:6

**train**
141:11

**transportation**
59:2

**travel**
58:4 59:2,19
63:1

**treated**
155:21

**trip**
95:16 129:24

**trouble**
42:14

**true**
6:5 105:7
190:18 228:19

**trusted**
167:22

**truth**
71:19 117:9

**truthfully**
12:10,15

**turn**
9:6 67:25
154:4 164:9
192:5,19
194:22 225:25

**turning**
209:8

**turnout**
16:25 17:1
23:2 24:1,9
86:11 104:5,
10,14,15
106:4,20,21,
24 108:23
123:23 128:13
129:15 131:5,
22

**type**
9:20 12:9
15:17 19:6
20:7,25 24:4
33:16 58:5
59:13 62:6,9
64:6 65:11
71:14 72:14,
25 73:1,21
74:7 76:12
80:25 81:2
86:6,13 88:3
92:8 94:12
95:20 119:16
133:19 134:7,
8 144:2
157:13 158:8
160:24 161:3
162:16
166:13,23
170:25 171:7
174:1 181:15
183:5 198:7
203:14 205:20
215:3 217:4
220:19 232:20

**typed**
129:20

**types**
23:2 24:3
87:17 88:22

92:2 134:7
161:6 189:8
210:15

**typically**
10:21 11:2
37:2 41:17

**typo**
129:3,9,19,25
130:2,5,8,12
131:10,11,14
132:5,6,8

---

## U

**Uh-huh**
41:2 47:9
48:24 54:12
61:3 62:14
65:8 67:23
70:10,12 78:7
90:6 92:22
107:8 108:15
123:4 131:3
161:19 169:9
186:3 190:23
191:25 198:21
207:5 210:4,8
217:22 219:25
223:9 224:22
226:7 227:17
229:20 231:6

**unable**
89:3 165:19
209:13

**unaware**
114:24 115:2
140:19

**unclear**
10:8 34:2,4

**uncommon**

112:8,10

**understand**
10:1,6,19
12:11,16
27:16 28:5
37:19,23,25
38:5,6 39:16,
18 43:25 45:3
46:7 50:5
60:10 62:23
63:19 101:15
109:16,23
110:15 112:12
113:7 117:14,
23 120:5
125:8 127:15,
21 129:6
135:7 141:18
143:16,23
147:7,9,18
150:25 154:19
166:12 171:14
175:2 177:18
184:4,13,18
195:16,24
196:13 202:5
209:12 210:6
211:5 213:2
214:3 217:15
218:6 220:1
221:4 226:18
228:1

**understanding**
24:11,14
28:12 41:10,
12,22 45:20
59:8 61:7,15
64:12 76:18
77:1,23
85:22,24
122:5,8

132:23 133:2,
8,10,25
134:4,6
153:16,18
161:14 173:20
175:10 191:23
192:1 204:24
213:13

**understands**
195:12

**understood**
10:13 23:1,25
24:8,10 104:4
190:22 202:3,
15,18

**unfair**
59:14

**unfortunate**
76:9 163:23

**uniform**
147:16 219:21

**uninhibited**
59:12 99:23
160:14

**United**
26:21 149:14
155:23
172:16,21,23
173:6 179:7
186:7,11,17,
18 228:12,15

**universal**
144:3 158:5
160:21
219:21,22

**universities**
16:1

**university**
14:12,15,18,

25 15:5,10,
13,14,15
112:7

**unnamed**
83:17

**unnecessary**
63:21 64:8,23
195:4 204:23

**upcoming**
192:22

**uploaded**
107:11

**upper-level**
15:25

**usage**
112:2

**USPS**
186:16

**utilization**
124:16
125:18,21
127:25

**utilize**
119:22

_____

V

_____

**valedictorian**
14:10

**valid**
71:17 73:22
91:9 102:7
143:18,24
172:10,13
195:10 196:7,
9,15,19,23
197:2

**validated**
145:11

**valuable**
187:13,17

**variety**
15:20 28:10,
21

**VBM**
227:20

**verbally**
204:3

**verification**
149:13 150:15

**verified**
62:3 145:9,19

**verify**
232:23

**versus**
28:19 61:20
96:3 99:4,8
101:3 104:23
228:10

**video**
9:18 174:1
175:16
183:19,20,24
184:1,5

**view**
36:24 49:15
58:15 67:7
73:21 75:19
188:20 210:14
232:12

**viewed**
31:14,15 40:8
48:22 49:24
83:11 212:18,
24

**viewing**
49:15 66:8

**views**
26:6,10 37:10

**violate**
172:4 176:21

**Vogel**
6:21

**volunteer**
17:13 19:3

**volunteered**
17:15 18:11,
15,25 19:2
20:1,7

**vote**
16:25 20:16,
25 51:18
52:24 53:2,
16,25 54:1,3
55:1,3,10,17,
18,21,24
56:3,7,8,9,
14,19,21
57:2,4,7
58:6,19 59:1,
4,11,12 61:2,
4 63:10
64:18,19
67:18,24 68:4
71:15 73:10
80:11,17
84:15 86:1,5,
15 87:3 88:9,
13,23 90:20
99:15,24
105:11 112:2
115:14 116:23
117:2 118:24
119:4,20
127:9,13
135:20 137:8,
9,15,17,21
138:20,21

Sharon Austin
October 27, 2021

51

139:22 141:4
142:5 143:13
144:17,21,25
145:8,23,24,
25 146:1,6
147:20
150:19,22
151:4,18
152:8 153:6
156:9,12
157:11,13,17
158:10 159:16
160:13,15,17,
20 162:15,18,
20 163:4,10,
11,14,16
164:9 165:10,
18,22 166:3
178:9 180:6
182:9,14
185:5,8
188:17 190:25
191:12,14
192:10 193:2,
3,11 194:9,
13,21,22
195:2,13
198:3 199:12
202:23 203:18
205:3,9
207:21,23
208:3,4
209:13,24
215:8 216:19,
25 218:5,12,
21,22,25
219:2,3,6,10
220:8 221:17,
21 222:5,7,9
229:25 230:14

**vote-by-mail**
21:6,10,15

32:10 61:13,
16,23 65:18
104:23 105:10
111:21 115:4
116:6 119:5
133:1,4,20
134:9 135:15
138:14 139:4,
25 140:16
142:23 145:5
146:16 147:21
154:20 157:24
160:21 164:23
168:6 172:8
226:9 231:3

**voted**
21:25 53:17
123:24,25
128:12,14
130:25 131:1
143:1 148:16
178:5,7
190:16 191:3
194:23 198:12

**voter**
21:4 33:21,22
35:1,9 39:24,
25 41:3 45:6,
7,9 53:16,18,
24 54:1,11
55:5,6 70:8,
16,20 71:17
72:11 73:2,20
74:19 77:7
79:6 80:20
81:6 82:7,17
83:18 85:5
86:10 89:4
97:18 98:3,
11,16,20,24
99:6 100:4,

19,23 102:6
112:16
116:12,16
124:2,16
125:3,17
126:17 127:25
128:13 131:22
132:3 136:18
139:1 140:14
141:3,13,16
142:2,8,17
143:19,24
144:8 145:24
150:12,16
152:8 154:22
157:3,22
168:6 169:19,
21 171:25
172:14,25
173:9,10
175:22
176:21,24
177:13 185:2
191:11,20
192:3 193:13
195:6,10,11
196:4,15
198:20 199:18
200:1,13,24
201:19
202:15,16,24
203:4 204:1
205:18,19
206:3 207:20
208:19
212:10,16,20
213:7,13
214:7 218:8,
15 220:7
229:17 230:22
231:9

**voter's**
192:12

**voters**
17:1 20:10
21:25 25:20
32:15,19,21,
24 33:18
34:9,19,23,24
35:5,7,20,21
39:7,8,19,20
48:1 50:23
51:2,8,14,15
52:10 57:9
66:7 67:19
71:8,11 77:5
80:10 84:14,
15 85:18,25
87:8 88:7,16
91:19 92:10
97:18 98:2,
10,20,23
100:11,18,23
101:12 104:20
105:13 107:23
111:12 112:3
116:6,20,21
117:4,11
118:1,14
119:1,17,21
126:13 127:13
138:3 140:8
142:21 143:13
150:19 159:15
164:16,18
167:19 176:10
180:6 191:6
192:2,7,15
193:24 194:2,
11,12,16,19
195:18 196:3,
13 197:4,15
200:23 202:2,

Sharon Austin
October 27, 2021

52

5,11 204:14
205:11 208:7,
9 209:13
210:19
214:19,20,24
215:11 217:6
221:6 223:19,
21 229:24
230:20,22
231:5

**voters'**
221:12

**votes**
69:11 122:8
215:17 216:11
219:23

**voting**
16:7 24:17,18
26:14 54:25
57:23 58:2,9,
16 59:8 60:11
61:1 63:11
66:25 67:3,5,
9,17 77:2,11
85:15 91:19
92:19 93:25
99:7,20
105:9,12
106:4 107:19,
22 108:1,9,11
109:12 111:11
112:15,25
113:16 116:7
118:11,15,16,
25 119:21
123:17,25
124:6,7,17
125:18,22
126:1,8,14
127:9,14,25
131:2,4

142:16 143:8,
13 144:11,16
147:17
152:11,14,25
153:3 157:5,
18 158:4,7,
22,24 159:23
160:1,3,4,19
162:19 163:19
164:4,9
165:14 170:6
171:16 173:23
174:6 176:15
178:23,24
182:1 194:16
198:4,5,7
200:7 214:25
217:6 219:24
225:8

---

**W**

**W-R-I-G-H-T**
7:17

**wait**
9:13,14 51:23
72:11 81:5
167:25 168:5,
23 188:11
197:11
208:13,16

**waiting**
218:5

**walk**
14:6 161:15,
24 162:23
203:6,16

**wanted**
50:19 61:15
100:23 137:9
184:15 195:5

198:8 226:18
227:25

**wanting**
137:10 193:19
194:4 221:5

**warming**
213:3,11
217:17

**warning**
192:7 195:1
196:10,22
202:8,9 204:8

**waste**
194:6

**watching**
175:19 184:3

**ways**
29:14 51:15
79:16 80:5,6
94:24 191:13
208:2,3
220:20

**website**
42:11 44:11
105:9 229:22

**websites**
114:7

**week**
6:25 185:7

**weigh**
72:19

**whatnot**
101:16

**white**
27:25 28:19
41:14,16
43:16 52:14,
15 53:7 88:2
106:20 155:11

157:24
158:19,21,25
176:9 223:20
230:11 231:4

**white-only**
52:11

**whites**
51:17 158:12

**widespread**
72:1,8,20,22
76:12 77:3
78:12,19 81:3
82:2 83:23
84:4,19 85:8
168:13 189:7
209:9 210:1,7
212:10

**William**
42:20

**win**
16:21

**witness's**
210:25

**women**
116:25 117:1,
2

**word**
25:7 43:6
44:9 82:21,22
210:3 226:5
231:18

**worded**
218:13

**words**
120:20 184:8
211:1,7

**work**
7:12 10:10
12:5 19:5,17

Sharon Austin
October 27, 2021

53

50:13 52:18
154:10 162:17
169:21 177:2,
7

**worked**
52:21 53:15
112:7 198:11

**worker**
22:10 55:11
222:4

**workers**
73:9 176:16
214:23 215:6
216:18

**working**
17:12 19:14
56:2 179:12
189:16,17
198:2,15
207:9 211:21,
22

**works**
9:8 69:12
98:25

**worse**
135:3

**worst**
148:11

**worthwhile**
188:9

**Wright**
7:16

**write**
41:20 121:4,
10,12,18
124:10 130:13

**writing**
204:2

**written**
213:17

**wrong**
66:18,20 69:8
110:9,11
111:24 112:4
137:13 175:6
189:2 208:11
219:1 222:10

**wrote**
13:15 23:16
76:21 83:6

---

**Y**

**yard**
215:25

**yards**
216:2

**year**
77:2 83:15
153:11 156:6,
8

**years**
15:9 24:13
33:5 51:12
52:14 67:4,9
69:3,15 78:24
79:1,13 81:11
83:7 85:8
87:7,15 125:4
142:19
153:14,20,22,
23 154:21
155:13 156:22
157:4 158:9
159:16 161:17
162:6,7,11,14
163:20 168:13
169:3,6,14,
16,20 170:5

180:8,20
182:13 190:14
228:24

**yes-or-no**
28:2 37:21
38:14 56:12

**York**
96:25 97:4,5,
7 165:17
166:2

**young**
194:11,16,19

**yous**
87:23

---

**Z**

**zone**
213:7,23
214:10 220:25

**Zoom**
8:8 9:10


CAMERON AUSTIN
10/27/21
**1**
MaryKay Horvath CRR, RMR

# Race

**Sources:** U.S. Census Bureau, Population Estimates Program (PEP). Updated annually. Population and Housing Unit Estimates

U.S. Census Bureau, American Community Survey (ACS). Updated annually. American Community Survey

**About**

The Race estimates of the population are produced for the United States, states, and counties by the Population Esimates Program and the race estimates of the population are produced for Puerto Rico, muncipios (county-equivalents for Puerto Rico), places, zona urbanas and comunidades (place-equivalents for Puerto Rico), and minor civil divisions by the American Community Survey.

The U.S. Census Bureau collects race data in accordance with guidelines provided by the U.S. Office of Management and Budget (OMB), and these data are based on self-identification. The racial categories included in the census questionnaire generally reflect a social definition of race recognized in this country and not an attempt to define race biologically, anthropologically, or genetically. In addition, it is recognized that the categories of the race item include racial and national origin or sociocultural groups. People may choose to report more than one race to indicate their racial mixture, such as "American Indian" and "White." People who identify their origin as Hispanic, Latino, or Spanish may be of any race.

OMB requires that race data be collectd for a minimum of five groups: White, Black or African American, American Indian or Alaska Native, Asian, and Native Hawaiian or Other Pacific Islander. OMB permits the Census Bureau to also use a sixth category - Some Other Race. Respondents may report more than one race.

**The concept of race is separate from the concept of Hispanic origin.** Percentages for the various race categories add to 100 percent, and should not be combined with the percent Hispanic.

**Definition**

**White.** A person having origins in any of the original peoples of Europe, the Middle East, or North Africa. It includes people who indicate their race as "White" or report entries such as Irish, German, Italian, Lebanese, Arab, Moroccan, or Caucasian.

**Black or African American.** A person having origins in any of the Black racial groups of Africa. It includes people who indicate their race as "Black or African American," or report entries such as African American, Kenyan, Nigerian, or Haitian.

**American Indian and Alaska Native.** A person having origins in any of the original peoples of North and South America (including Central America) and who maintains tribal affiliation or community attachment. This category includes people who indicate their race as "American Indian or Alaska Native" or report entries such as Navajo, Blackfeet, Inupiat, Yup'ik, or Central American Indian groups or South American Indian groups.

**Asian.** A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam. This includes people who reported detailed Asian responses such as: "Asian Indian," "Chinese," "Filipino," "Korean," "Japanese," "Vietnamese," and "Other Asian" or provide other detailed Asian responses.

**Native Hawaiian and Other Pacific Islander.** A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands. It includes people who reported their race as "Fijian," "Guamanian or Chamorro," "Marshallese," "Native Hawaiian," "Samoan," "Tongan," and "Other Pacific Islander" or provide other detailed Pacific Islander responses.

**Two or more races.** People may choose to provide two or more races either by checking two or more race response check boxes, by providing multiple responses, or by some combination of check boxes and other responses. For data product purposes, "Two or More Races" refers to combinations of two or more of the following race categories: "White," "Black or African American," American Indian or Alaska Native," "Asian," Native Hawaiian or Other Pacific Islander," or "Some Other Race"

**Data users should be aware of methodology differences that may exist between different data sources.**

[Methodology for U.S. and Puerto Rico](Methodology for U.S. and Puerto Rico)

## Table 6: Absentee Ballot Application Verification Rules Across the United States

| | |
|---|---|
| **No absentee ballot application required (all-mail elections)** | Colorado, Hawaii, Oregon, Utah, Washington |
| **Minimal verification** | Alaska, District of Columbia, North Dakota, Vermont |
| **Information and eligibility checked against voter registration records** | **Florida**\*, Kansas, Maine, Maryland, Minnesota, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, South Dakota\*\*, Virginia, Wisconsin\*\*, Wyoming |
| **Signature verification in addition to checking information and eligibility against voter registration card** | Arizona, California, Georgia, Idaho, Iowa, Illinois, Michigan, Montana, New Jersey, Pennsylvania, Rhode Island |
| **Voters must 'qualify' to vote absentee with an acceptable excuse** | Alabama\*\*, Arkansas, Connecticut, Delaware, Indiana\*, Kentucky, Louisiana, Massachusetts, Mississippi, Missouri, New Hampshire, New York, South Carolina\*, Tennessee, Texas, West Virginia |

\*   Requires voter to provide driver's license number, state issued ID number, or last four of social security number.
\*\* Requires copy of photo identification and/or notarization accompany application.

SHARON AUSTIN
10/27/21
**2**
MaryKay Horvath CRR, RMR

# Let Florida Vote:

## Coronavirus is only the newest barrier to voting in Florida

Covid-19 has heightened awareness about the importance of easy, equitable voting access. While many of the struggles facing election administrators during this public health crisis seem unprecedented, they each represent an opportunity to refine local policies and practices to ensure every Floridian has the opportunity to vote – and to have that vote count.



**ACLU**
Florida

SHARON AUSTIN
10/27/21
**3**
MaryKay Horvath CRR, RMR

# Contents

Executive Summary ..................................................................................................... 5

Considerations in Assessing Local Election Administration .......................................... 8

Barriers to Voting ........................................................................................................ 12

Fair & Inclusive Vote by Mail ..................................................................................... 14

Early Voting Access ..................................................................................................... 23

Equity in Polling Places .............................................................................................. 28

Ensure Access for All .................................................................................................. 34

Resources .................................................................................................................... 38

   » Recent Developments in Election Administration Law ......................................... 39

   » Local Voting Rights Advocacy 101 ...................................................................... 42

   » Ensure Votes are Counted ..................................................................................... 43

   » Expand Early Voting ............................................................................................ 45

   » Ensure Equal Access to Polls ............................................................................... 47

Appendix ..................................................................................................................... 48

   » Dr. Daniel A. Smith & Anna Baringer, ACLU Florida: Report on Vote-by-Mail
      Ballots in the 2018 General Election ..................................................................... 49

   » State Table: How Floridians Vote ......................................................................... 70

   » County Tables: ...................................................................................................... 71

      » Voting Methods by County ............................................................................... 71

      » County Vote-by-Mail Performance .................................................................. 73

      » County Vote-by-Mail Age Disparities .............................................................. 75

      » County Vote-by-Mail Race Disparities ............................................................. 77

      » Early Voting Access by County ........................................................................ 79

      » Polling Place Accessibility by County .............................................................. 81

## Acknowledgements

The ACLU of Florida would like to acknowledge and thank several organizations and their staff including All Voting is Local, America Votes, Common Cause Florida, the League of Women Voters of Florida, Proxeme LLC, and ElectionSmith, LLC, who contributed data, information, analysis and editorial suggestions to this report, along with Diane Ward who provided design.

# Executive Summary

As Floridians, like the rest of the world, navigate living and working during a pandemic, a risk to our democracy has emerged – how will we vote?

In answering this dilemma, it is useful to ask, how have we voted? The reality is that voting access in Florida has long been inconsistent and inequitable. How easy it is to vote, and have your vote counted, has depended on your age, your race, where you live and how much free time you have. These factors will be exacerbated by the current public health crisis.

These inequities are not consistent with our core values, or with protection of the fundamental right to vote; every eligible American should have access to the ballot. Many of the solutions to improve voting access are not only possible in the current crisis – they are necessary.

As such, this report offers insight for supervisors of election and their staff as they navigate administering elections in a public health crisis. It highlights where others can assist. For voters who want to push their local election officials to do the right thing, guides and one-page summaries are included. An appendix is available for those looking for a deeper understanding of these issues.

This report presents background information and policy recommendations for establishing four pillars of equitable voting access: reliable

& fair vote by mail, early voting access, equity in polling locations and access for all. Fair and reliable vote by mail and early voting policies, especially critical to voting access during this pandemic, are key to ensuring equal access to the ballot box even in the best of times.

## Reliable & Fair Vote by Mail

Analysis from the 2016 and 2018 elections illustrates that voting by mail in Florida is neither reliable, nor fair. Tens of thousands of voters see their vote-by-mail ballots rejected each election because, in a lay person's opinion, they failed to replicate a signature they signed on a digital signature pad at the DMV years, even decades, ago. The Legislature attempted to improve this by allowing voters to "cure" rejected ballots by affidavit. Yet, in 2018, the **rejection rate of vote-by-mail ballots increased**.

Moreover, the risk of having a vote-by-mail ballot rejected is not equal. Whether a vote counts varies by age, race and county. Black voters, who are already more wary of voting by mail, see their mailed ballots rejected twice as often as their white neighbors. Young voters, between 18 and 21 years old, saw their mailed ballots rejected 2.5 times as often as other voters. Even uniformed service members stationed away from home, who have additional legal protections, saw their mailed ballots rejected more than three times as often as others voting by mail. While these disparities continued from 2016 to 2018, **rejection rates increased for every demographic**.

This is not acceptable. It is likely that vote by mail will be integral to elections until the risk of coronavirus subsides.

The state must provide signature matching software as a first step in signature matching analysis to reduce the number of false rejections. Every supervisor of elections must prioritize effectively administering vote-by-mail in a reliable and fair manner by taking the following steps:

» Invest in robust voter education programs to educate voters on vote by mail and signature requirements and to remind voters to mail their ballot.

» Provide prepaid postage vote-by-mail envelopes.

» Provide robust vote-by-mail ballot tracking to alert voters by email and/or text message when their ballot is received and when their attention is needed.

» Ensure a multi-step signature review process to minimize false rejections.

» Provide robust notification when ballots are rejected and allow for remote signature curing.

## Early Voting Access

Vote by mail is not enough. Some voters cannot vote by mail; based on past performance, some cannot trust that their vote would be counted. For these reasons, early voting will continue to be necessary to ensure voters can cast their ballots without enduring crowds, long lines, and schedule conflicts, especially with increased caregiver duties.

Counties vary dramatically in their approach to early voting. Under normal circumstances, this may make sense due to local demand, but it does not in the current public health crisis. Local supervisors of election must ensure that every Floridian who needs to vote in person can do so safely by taking the following steps:

» Make early voting available for the entire period allowed by Florida law at as many locations as can be staffed to reduce the potential for crowds. Early voting should be available at enough locations, for long enough, that the county has no more than 300 voters per hour of early voting.

» Ensure every early voting location has equitable hours.

» Follow the practices employed in grocery stores during this crisis: use plexiglass barriers to separate poll workers and voters, sanitize voting booths and check-in stations between voters, and provide masks and gloves for poll workers.

» Ensure SOE staff is accessible to voters by phone whenever early voting is open.

We can do this. The federal government has already given the state additional funding to administer elections safely during this time. Other states have already been conducting universal vote-by-mail elections with minimal rejections, while also offering accessible in-person voting. Florida counties and other states are already preparing to print vote-by-mail ballots for every registered voter and/or to hold extended early voting periods.

This pandemic is only highlighting the disparities in voter access in our state. Florida's election bureaucracies effectively block too many Floridians from voting. Voting is a fundamental right that we fought hard to secure for everyone. It should not be this hard. Florida policymakers are faced with a choice: take this opportunity to dismantle barriers to voting or do nothing and continue to be seen as a weak link in our democracy.

# Considerations in Assessing Local Election Administration

While state and federal law govern elections generally, many decisions happen at the local level. In Florida, these decisions largely lie with each county's supervisor of elections. Florida is a very diverse state, with stark differences in population, demographics, and resources. These differences should be considered in assessing local election administration.

## County Size

Past research has illustrated how differences in jurisdiction size can influence how election officials administer elections.[1] Voters in larger jurisdictions are more likely to cast provisional ballots and vote by mail than those in smaller jurisdictions. Likewise, larger jurisdictions have more issues managing poll workers.

Because of these demands and increased resources, election officials in larger jurisdictions are generally more open to innovations that reduce election day voting, such as early voting and vote-by-mail, than their counterparts in smaller jurisdictions.

Florida's diverse counties vary from small, rural communities to major metropolitan areas. The Florida State Association of Supervisors of

---

1   David C. Kimball & Brady Baybeck, Are All Jurisdictions Equal? Size Disparity in Election Administration, 12 (2) Election Law Journal 130 (2013).

Elections divides itself into three categories, as illustrated in the table below, that can be useful in comparing local election administration performance and are used throughout this report. Most of Florida's counties, 32, are categorized as 'Small,' yet the majority of Florida's voters, 83%, live in 'Large' counties with more than 200,000 registered voters.

| | Registered Voters | Counties | Percent of Voters |
|---|---|---|---|
| Small | Less than 75,000 | 32 | 5% |
| Mid-Size/Rural | Between 75,000 and 200,000 | 12 | 11% |
| Large | More than 200,000 | 12 | 83% |

## Supervisor of Elections – The Most Important Local Official You Need to Know

In Florida, each of our 67 counties has its own supervisor of elections (SOE) and that individual has a wide degree of discretion on issues governing elections and access to the polls. SOE's are responsible for conducting fair, honest and accurate elections and to assist Florida citizens to become better informed about voting and be prepared to participate in the electoral process. The public office of Supervisor of Elections holds significant power and vast influence in their jurisdictions over the conduct of voting. Supervisors make decisions daily about who gets to vote and participate in our civic life that impact thousands of individuals. In a real sense, these powers and responsibilities far exceed even the power of legislators and other local officials because of their immediate impact on all the residents of their respective counties.

## Hurricane Recovery & Vote Centers

In addition to the differences between small and large counties, some panhandle counties continue to struggle with the aftermath of 2018's Hurricane Michael. Gulf and Bay counties, for example, continue to rely on Super Voting Sites and face unique challenges in election administration.[2] The performance of these counties can help inform voting during other crises, such as the COVID-19 crisis.

Any voter in the county can vote at a Super Voting Site, often called 'Vote Centers.' While such centers could expand voting access, there is potential for abuse. An example is Bay County, where the site in a predominately Black community was open for fewer early voting hours.

---

2   Executive Order No. 19-262 (Nov. 25, 2019), available at https://www.flgov.com/wp-content/uploads/2019/11/EO-19-262.pdf

Read All Voting is Local's Report, "Vote Centers: Potential Benefits for Voters, but Standards and Protections Must be in Place" to learn more.

## SOE Voting Method Preferences

Counties tend to prioritize vote by mail or early voting – as participation in early voting increases, participation in vote by mail decreases, and vice versa. While the effect was not strong, for the 2018 General Election, as the portion of voters voting in person on election day in a county increased, overall turnout decreased. To ensure voting access for all, counties should continue to increase early and vote-by-mail access.

|  | County | Early Voting | Vote by Mail | Election Day |
|---|---|---|---|---|
|  | Polk | 22.0% | 32.4% | **45.6%** |
|  | Marion | 27.8% | 32.4% | **44.7%** |
|  | Palm Beach | 29.3% | 26.3% | **44.4%** |
|  | Leon | **39.8%** | 19.4% | 40.9% |
|  | Duval | **43.1%** | 16.9% | 40.0% |
|  | Pinellas | 12.5% | **54.9%** | 32.5% |
|  | Broward | **41.8%** | 26.7% | 31.5% |
|  | Collier | 32.1% | **37.9%** | 29.9% |
| Large | Lee | 23.1% | **50.9%** | 26.0% |
|  | Alachua | 35.2% | 27.1% | **37.7%** |
|  | Hernando | 21.0% | **41.5%** | 37.4% |
|  | St. Johns | **41.8%** | 22.7% | 35.6% |
|  | Flagler | **43.0%** | 27.4% | 29.5% |
| Mid-Size | Bay | **62.6%** | 18.4% | 18.9% |
|  | Glades | 16.9% | 23.8% | **59.3%** |
|  | Levy | 20.0% | 31.7% | **48.3%** |
|  | Monroe | 26.6% | 35.7% | **37.7%** |
|  | Jackson | **52.8%** | 21.9% | 25.4% |
| Small | Gulf | **56.1%** | 20.4% | 23.4% |

A stark example of this is **Pinellas County**, with 54.9% of votes sent by mail and only 12.5% cast early. This is due to policies and practices in the county.  While early voting is available for 12 hours a day for the entire period of early voting, there are only five early voting sites – one for every 133,366 voters, more than 3.5 times as dense as the state average of one per 36,180. Conversely, Pinellas County is a model for vote by mail (VBM) election administration.  Pinellas County only rejected

0.12 percent of VBM ballots, a tenth of the state average rejection rate of 1.2 percent. Pinellas County's ballot curing processes allowed initially rejected VBM ballots to be remedied in time to be counted. See the discussion of vote by mail on <mark>page 14</mark> to learn more.

Meanwhile, election day voting dominated in only four small counties: **Glades**, **Gilchrist**, **Holmes and Lafayette**. Of large counties, **Polk** (45.6%), **Marion** (44.7%) and **Palm Beach** (44.4%) saw the highest proportions of people voting in person on election day.



## How People Vote

The demographics of voters voting early, by mail and in person vary. In the 2018 General Election:

» White voters, especially white women, were the most likely to vote by mail – 34% of white voters voted by mail, compared to 22% of Black voters and 31% of Hispanic voters.

» Voting by mail begins to increase around age 50, with voters 65 years old or older the most likely to vote by mail – 46% voted by mail, compared to 21% of those younger than 44.

» Black voters were the most likely to vote early – 45% of Black voters cast their ballot early, compared to 31% of white voters and 32% of Hispanic voters.

» Participating in early voting did not have as significant a relationship with age, but voters between the ages of 45 and 64 were slightly more likely vote early at 36%, compared to 30% of older voters and 31-32% of younger voters.

» Hispanic voters were slightly more likely to vote at the polls on Election Day, 37% voted on Election Day, compared to 33% of Black voters and 35% of white voters.

» Voting at the polls on Election Day gradually becomes less likely as voters age – 48% of voters between 18 and 29 years old, and 47% of those between 30 and 44, voted at the polls, while only 24% of voters 65 and older did so.

# Barriers to Voting

Many of the trends in how people vote may be explained by predictable barriers to voting. Removing these barriers increases participation. Maintaining them amounts to voter suppression. More than half of those surveyed by the U.S. Census after the 2018 Election cited barriers that could be addressed through early voting and vote-by-mail (VBM) policies, such as schedule conflicts (27%), illnesses or disability (13%), out-of-town travel (9%) and transportation issues (3%).[3]

Indeed, 29% of VBM voters reported doing so because it was more convenient. Others cited travel conflicts (21%) or physical disabilities (18%).[4]

## Waiting To Vote

When they can get to the polls, wait times exceeding 30 minutes are the most common obstacle voters report, as reported by the 2016 Survey of the Performance of American Elections (SPAE), a nationwide survey.[5] Similarly, 11% of early voters cited long waits. Wait times are not universal – 42% of white voters reported no wait at all in 2016, compared to only 26% of Black and 29% of Hispanic voters. This unequal treatment

---

3   U.S. Census. Voting and Registration in the Election of November 2018, Table 10 (Apr. 2019), available at https://www.census.gov/topics/public-sector/voting/data/tables.html

4   *Id.*

5   Charles Stewart, 2016 Survey of the Performance of American Elections, Harvard Dataverse, V1 https://doi.org/10.7910/DVN/Y38VIQ at 16.



and heavy cost to vote has been associated with reduced voter participation in future elections.[6]

## Voter Confidence

Confidence that their vote will count is vital to ensuring continued voter participation. The way a voter casts their vote has been correlated with their confidence, with vote-by-mail voters having lower levels of confidence than their in-person voting peers.[7] The use of web-based ballot tracking tools, like those used in **Pinellas County**, can help boost confidence.

There is also a disparity in confidence rates by voters' race and political party. While 70% of white voters responding to the SPAE reported being very confident that their vote was counted in 2016, 50% of Black voters had that same confidence. **Fifteen percent of Black voters were not confident that their vote counted, compared to only 5% of white voters.** As to political party, voters tend to be more confident their vote counted when their party's candidate wins.

The findings of analyses of 2018 and 2016 vote-by-mail rejection rates illustrates that the fears of those voting by mail and voting while Black are justified. [8]

---

6   David Cottrell, Michael C. Herron, and Daniel A. Smith. Forthcoming. *Voting Lines, Equal Treatment, and Early Voting Check-in Times in Florida*, State Politics and Policy Quarterly.
7   SPAE, *supra* n. 4 at 28.
8   Dr. Daniel A. Smith & Anna Baringer, Analysis of Vote-By-Mail Ballots in the 2018 General Election, University of Florida (2020), discussed infra at 10.

# Fair & Inclusive Vote by Mail

"The whole signature thing needs to be totally reevaluated. There should not be all these untrained people—and you probably won't get trained people there, because trained persons know you don't compare one signature to another signature."

-Patricia Fisher, Board Certified Forensic Document Examiner

## Overview

Nearly a third of Floridians cast their ballots by mail instead of voting at the polls on Election Day. Any registered voter in Florida can vote by mail by requesting a vote by mail (VBM) ballot online and returning it by 7:00 pm on Election Day. In order to be counted, the voter's signature on the VBM ballot must match their signature on file. Often the signature the SOE office has on file is the voter's signature from the DMV. Such signatures are generally created using a digital signature pad and may be decades old. Handwriting changes over the years, as can names in the case of marriages or divorces.

Unfortunately, Florida rejects an excessive number of VBM ballots. Rejection rates increased in the 2018 General Election, despite the introduction of opportunities to cure rejected ballots. More than one out of every 100 VBM ballots was ultimately rejected – 32,176 ballots went uncounted. To put this into perspective, Florida's 2018 Gubernatorial race was decided by 32,463 votes.

Rejection rates also vary by jurisdiction, age and race. New legal requirements that prohibit rejected VBM ballots without finding a signature mismatch beyond a reasonable doubt should improve this, local supervisors of election must fully implement the law and local procedures to ensure every vote counts. See Analysis of Vote-by-Mail Ballots in the 2018 General Election at page 18 to learn more.

**FAIR & INCLUSIVE VOTE BY MAIL**

# LEGAL REQUIREMENTS

» Any registered voter can vote by mail.

» Voters must request VBM ballots at least 10 days before the election.

» Supervisors of election must mail VBM ballots between 40 and 33 days before the election, or within 2 business days of receiving the request if received later.

» A voter, and anyone they designate by filling out a form available online, may pick up their VBM ballot at the SOE's office. No doctor's note or other documentation can be required. On Election Day, a designee can pick up the voter's VBM ballot only if there is an emergency.

» VBM ballots must be received by the SOE by 7 pm on Election Day.

» VBM drop boxes must be placed at early voting sites and the supervisor of elections' office(s), and can be placed anywhere eligible to be used for early voting, so long as they are staffed by SOE staff or law enforcement.

» There are special protections for military and overseas voters.

## *Signature curing*

» Supervisors of election must match the voter's signature on the VBM ballot to their signature on record.

» VBM voters can update their signature on record until their VBM ballot is received.

» VBM Ballots can only be rejected for signature mismatch if the Canvassing Board finds that the VBM signature does not match the signature of record **beyond a reasonable doubt**.

» The SOE must notify a voter that their VBM ballot has been rejected as soon as practicable by either email, text message or telephone, in addition to first-class mail.

» Voters have until 5 pm the second day after the election to submit ID and a signature cure affidavit.

## Considerations

» Handwriting analysis is a profession, not a seminar. Professional analysts examine multiple handwriting samples made at similar times under similar circumstances. Yet in Florida, election officials are trained in seminars to compare a signature on a ballot to a single signature made years ago, often on a digital signature pad. This introduces a significant risk that legitimate votes will be rejected. Every effort must be made to ensure only those signatures that do not match beyond a reasonable doubt are rejected.

» Signature matching can only be as good as a county's cure process. Voters must be given a full and fair opportunity to correct signature mismatches in a timely manner. This requires adequate, swift notice by phone, email and/or text, so voters may exercise their right to correct their signature on file.

» All VBM ballots can be tracked online through local SOE websites, but they vary in capabilities.

» Vote by mail may not be accessible for all, so in-person voting, voter support, and drop-off facilities must be offered.

» Mandating voting by mail has been shown to decrease the odds of an individual voting by 13%, with larger impacts on Hispanic voters, possibly due to language barriers.[9]

» Mandating voting by mail seems to advantage resource rich voters – those who are older, more educated, and more interested. [10]

» Resources: What is the election administration budget? Is it being sufficiently prioritized?

## Recommendations

» Establish a multi-step signature verification process, incorporating signature verification software, to reduce the opportunity for unnecessary rejections.

» Provide voter education on the vote by mail process and signature matching requirements and invite voters to update their signatures.

» Provide postage paid VBM envelopes. At least nine counties do.

---

9   Elizabeth Bergman & Philip A. Yates, *Changing Election Methods: How Does Mandated Vote-By-Mail Affect Individual Registrants?* ELECTION LAW JOURNAL, Vol. 10, N. 2 (2011).

10  Adam J. Berinsky, Nancy Burns, & Michael W. Traugott, *Who Votes By Mail? A Dynamic Model of the Individual-level Consequences of Voting-By-Mail Systems,* Public Opinion Quarterly, 65, 178–197 (2001). *See also,* Nathan W. Monroe and Dari E. Sylvester, *Who Converts to Vote-By-Mail? Evidence from a Field Experiment,* ELECTION LAW JOURNAL, Vol. 10, N. 1, (2011).

&raquo; Send communications, such as reminders to return VBM ballots, by text or postcard, which has been found to increase turnout by as much as four percentage points.[11]

&raquo; Expand VBM ballot tracking to incorporate text and email notification.

&raquo; Allow signature mismatches to be cured remotely.

&raquo; Create a uniform, simple VBM return envelope in consultation with other supervisors of elections.

&raquo; Ensure all voter instructions are written at the seventh-grade level.

&raquo; Provide language assistance hotlines.

&raquo; Record why a VBM or provisional ballot was rejected.

## Lessons From All-Mail Voting States

Five states conduct all elections entirely by mail: Colorado, Hawaii, Oregon, Washington and Utah. Others, such as California, Nebraska and North Dakota, allow counties to offer all vote-by-mail elections. Some best practices that have emerged include:

&raquo; Provide both vote by mail and in-person voting.

&raquo; Universal distribution of VBM ballots (Colorado, Washington, some California counties)

&raquo; Prepaid postage on VBM ballots (16 states currently require local election officials to provide return postage.).

&raquo; Provide language assistance hotlines.

&raquo; Establish a multi-step signature verification process, incorporating signature verification software, to reduce the opportunity for unnecessary rejections.

### *Signature Verification*

One promising development is the use of signature matching software in the signature verification process. Handwriting analysis experts agree that comparing only two signatures is prone to mistake as so many variables impact our handwriting at any given moment. Mistakes are even more likely when the analysis is done with little training. With the addition of signature matching software, multiple signatures can be compared at once, leading to more accurate results. This also reduces the number of signatures people need to examine to those flagged by the software, which frees up resources to better train, or contract with, trained, handwriting analysts.

Denver uses this approach, first running mailed ballots through

---

11  Bergman & Yates, *supra* n. 12 at 122-123.

signature verification software that automatically matches between 30 to 45 percent of the signatures with existing records. A team of bipartisan election judges trained in signature verification then examines the remainder. If a mismatch is suspected, the ballot is flagged for examination by a second team. If the human reviewers agree that the signature doesn't match, the voter is notified by email or text immediately. The voter is also mailed a notice. Only 0.8 percent of Denver voters had a signature discrepancy that wasn't resolved, compared to Florida's 1.2% rejection rate.

## Analysis Of Vote-By-Mail Ballots in the 2018 General Election

Dr. Daniel A. Smith & Anna Baringer
*University of Florida*

*This is a summary. The full report is available at* [www.aclufl.org/publications/letfloridavote](www.aclufl.org/publications/letfloridavote)



Nearly one third of Floridians vote by mail. These voters are more likely to not have their vote count than those who vote in person. Despite implementing reforms to allow voters the opportunity to address any issues with their vote-by-mail (VBM) ballot,[12] the state rejected a higher percentage of VBM ballots in 2018 than in prior years. Ultimately, more than 32,000 voters mailed in their ballot in 2018, only to have their votes thrown out.

### *Demographics of Rejection*

VBM rejection rates varied considerably by age and race. Voters who are older and white were more than twice as likely to have their VBM ballots counted than younger voters or those of color. **Such disparities increased in 2018**.

> » The youngest cohort, 18 to 21 year olds, saw 5.4% of their VBM ballots rejected.

12 *See* ch. 2017-45, L.O.F., 2017 HB 105.

» Among the 133,000 first-time voters who decided to vote by mail, 4,137 (3.1%) did not have their vote counted.

» Although 18 to 29 year olds comprised only 2.1% of all those who voted by mail, they accounted for 9.2% of those whose VBM ballot was rejected.

» The 2018 VBM rejection rates varied from a low of 0.6% of ballots from those 65-104 years of age to 5.4% of ballots from 18-21 year olds.

» Rejection rates increased for every age cohort in 2018.

» Rejection rates varied by race, with 0.9% of VBM ballots cast by white voters rejected and 2% of ballots from voters of color rejected.

» Although voters of color cast less than 28% of VBM ballots, they accounted for 47% of rejected VBM ballots.

## *Voting Access by Geography*

The rejection rates of VBM ballots cast in the 2018 general election, as in the 2016 and 2012 general elections, varied considerably across the state's 67 counties.



Three counties, **Baker**, **Hamilton** and **Jefferson**, rejected no VBM ballots. Ten counties rejected more than 2% of the VBM ballots they received: **Alachua** (736 rejected ballots), **Bay** (373), **Broward** (5,471), **Miami-Dade** (6,404), **Gulf** (40), **Madison** (33), **Monroe** (357), **Seminole** (1,217), and **Volusia** (1,960).

**Percent Rejected**

- <0.5%
- 0.5%-1%
- 1%-1.5%
- 1.5%-2%
- 2%-2.5%
- 2.5%-3%
- >3%

Voters of color were more likely to have their VBM ballot rejected in nearly every county, but the size of that disparity varied. **Collier County** had the highest disparity between the VBM rejection rates of Black and white voters, with white VBM ballots more than six times as likely to be counted, while **Marion County** Hispanic voters saw their ballots rejected more than four times as often as their white neighbors.



**Vote by Mail Ballot Rejection Rates**

|          | County    | Black Voters | Hispanic Voters | White Voters | Overall Rate | Rejected Votes |
|----------|-----------|--------------|-----------------|--------------|--------------|----------------|
|          | Volusia   | 4.4%         | 5.0%            | 2.0%         | 2.4%         | 1,960          |
|          | Lee       | 2.1%         | 1.7%            | 0.7%         | 0.8%         | 1,262          |
|          | Collier   | 3.9%         | 1.4%            | 0.6%         | 0.7%         | 428            |
|          | Manatee   | 1.4%         | 1.4%            | 0.5%         | 0.9%         | 386            |
| Large    | Pasco     | 1.0%         | 1.3%            | 0.4%         | 0.5%         | 365            |
|          | Alachua   | 3.0%         | 4.3%            | 1.8%         | 2.3%         | 736            |
|          | Bay       | 4.6%         | 4.9%            | 2.8%         | 3.0%         | 373            |
| Mid-Size | Flagler   | 2.7%         | 3.5%            | 1.4%         | 1.7%         | 246            |
|          | Hernando  | 0.9%         | 1.0%            | 0.3%         | 0.4%         | 140            |
|          | Highlands | 2.3%         | 1.2%            | 0.5%         | 0.7%         | 79             |
| Small    | Madison   | 4.6%         | 0               | 1.9%         | 2.7%         | 33             |

Younger voters in nearly every county were more likely to have their VBM ballot rejected. Despite a statewide rejection rate of more than 5% for younger voters, every 18 to 21 year old voting by mail in **Baker**, **DeSoto**, **Gadsden**, **Glades**, **Hamilton**, **Hardee**, **Jackson**, **Jefferson**, **Marion**, **Nassau**, **Suwannee**, and **Union** counties had their vote counted

Highest rejection rates for 18 to 21 year olds voting by mail:

>> **Broward County** rejected more than 11% – more than 500 ballots rejected.

>> **Miami-Dade County** rejected more than 9% - nearly 600 ballots rejected.

>> **Alachua County** rejected 8%, more than three times higher than the county's overall VBM rejection rate of 2.3%.

In 43 counties, 18 to 21 year olds were more than 2.5 times as likely to have their VBM ballot rejected as others.

## *Rejection of Uniformed and Overseas Civilians*

The age and race disparities extend to VBM ballots returned by active duty service members, their families, and civilians living overseas, who enjoy ballot protections under the Uniformed and Overseas Civilian Absentee Voting Act of 1986 (UOCAVA). This law requires states to allow such voters to vote absentee.

> In the 2018 General Election, 59,478 UOCAVA voters returned their ballot; nearly 2,000 did not have their vote counted.

This is especially troubling as nearly half of registered UOCAVA voters held legal residence in Florida, California and Washington. Florida has the most UOCAVA voters, 146,343, with 65.6% uniformed service members.[13]

## *Ballot Delivery Timing and Rejection Rates*

Under federal law, states must mail ballots to UOCAVA voters no later than 45 days before a federal election.[14] Under Florida law, supervisors of elections (SOEs) must send a ballot within two business days of receiving a request.[15]

Despite these deadlines, it appears only 63.2% of UOCAVA voters who requested absentee ballots had their ballots delivered before September 22, 2018, 45 days before Election Day. While voters generally have to return their VBM ballot by Election Day to be counted, federal law allows UOCAVA up to 10 days after the election for their ballot to be received by the SOE. In the 2018 General Election, rejection rates for returned UOCAVA ballots fluctuated between 3 and 12 percent delivered fewer than 10 days before the election.

---

13  U.S. Election Assistance Commission, Election Administration and Voting Survey, 2018 Comprehensive Report (2018 EAVS Report), p. 86 (2019).

14  Military and Overseas Voter Empowerment Act (Move)

15  Fla. Stat. s. 101.62(4)(b).



Given the extra layer of federal VBM protections, it is surprising that UOCAVA ballots were rejected at more than double the rate than general VBM ballots

## *Best Practices: Curing Rejected VBM Ballots*

Pinellas County, under Supervisor of Elections Deborah Clark, has led the way on processing VBM ballots. The detailed records that her office provided on the VBM ballots it received in the 2018 general election, including VBM ballots her staff initially flagged as having a mismatched voter's certificate on the envelope, as well as mismatched VBM ballots that were successfully cured by voters, offers a window into the "best practices" that other SOEs could follow to help remedy problematic VBM ballots.

Pinellas County ultimately rejected only 288 of slightly more than 241,000 VBM ballots – that's 0.12 percent – a tenth of the statewide average rejection rate.

Initially, roughly 600 VBM ballots were flagged by staff for signature mismatches. Of those, the Pinellas County Canvassing Board accepted 338 VBM ballots (56.5%) without requiring voter action. Of the remaining ballots, 200 voters (33.4%) successfully cured their signatures by submitting proper ID and a signed affidavit. Only 60 of the VBM ballots (10%) were ultimately rejected for signature mismatch.

An additional 340 voters returned their VBM ballot with no signature at all. Of these, 178 (52.3%) cured the ballot with a signed affidavit.

Even with this multi-step signature matching and curing process, voters of color saw their VBM ballots ultimately rejected disproportionately. While 44.6% of white voters whose ballot had been flagged ultimately cured the deficiency and had their vote counted, only 30.7% of Black voters and 30.5% of Hispanic voters cured their ballot. Similarly, cure rates varied depending on age, with voters age 45 or older more likely to cure their ballot.

# Early Voting Access

## Overview

Nearly a third of Floridians cast their ballot early – before Election Day, at an early voting location rather than their assigned precinct voting site. This is higher than the national average of 22% and also increased more than 10 percentage points since the 2014 elections.

Each supervisor of election decides what early voting will look like in their county. Florida law requires a minimum of 8 hours a day for 8 days, but county Supervisors of Elections can offer it for up to 14 days and some offer up to 12 hours per day. Longer hours and more days give voters more opportunities to cast their ballot while juggling their other responsibilities.

> Early voting gives responsible Americans across the country the ability to have their voice heard, even if they can't make it to the polls on Election Day.

Supervisors of Election also get to choose how many early voting locations will be offered and where they will be in the county. There are state limits here too: they have to have at least as many locations as there were in the 2012 General Election, early voting has to be offered

at their office, and they have to use one of a list of specified location types, mostly public buildings. They each get one 'wildcard' location as well, in case a public building is not available. A restricted number of locations can lead to longer waits and travel times. Fewer locations also make choosing locations that are equally accessible by all of the county's voters more important – and more difficult.

**EARLY VOTING ACCESS**

# LEGAL REQUIREMENTS

» Must be offered at Supervisor of Election's main or branch office.

» Must be offered from 10 days before election through 3 days before election for 8 hours each day. May be offered from the 15th day before election though the 2nd day before election.

» May also be offered at a city hall, permanent public library facility, fairground, civic center, courthouse, county commission building, stadium, convention center, government-owned senior center, or government-owned community center.

» May be offered at a wildcard location in an area that doesn't have any of the required building types. Such wildcard locations must be geographically located to allow equal access and provide sufficient nonpermitted parking.

» Must be designated no later than 30th day before election

## Considerations

» Demand: How do early voting options and turnout compare to similar counties? What are wait times? Early voting has been growing in popularity, so if participation hasn't increased locally, ask why?

» Resources: What is the election administration budget? Is it being sufficiently prioritized?

## Recommendations

» Make early voting available for the entire period allowed by Florida law at as many locations as can be staffed to reduce the potential for crowds. Early voting should be available at enough locations, for long enough, that the county has no more than 300 voters per hour of early voting.

» Ensure early voting locations are accessible to all.

— Black voters are most likely to vote early (45% did so in the 2018 General Election), as are voters between 45 and 64 years old (36% in 2018 General). Neighborhoods and business districts reflecting these demographics should have early voting sites to ensure access.

— Use college campuses are early voting sites to promote youth participation.

» Prioritize keeping early voting open through the Sunday before the election.

» Ensure SOE staff is accessible to voters on the weekends during early voting period, either in the office or by phone.



## Early Voting Access in the 2018 General Election

The more election administrators can remove barriers and reduce the cost of voting, the more people can and will vote. Local SOEs vary in their approaches to early voting, with some prioritizing more locations, while others offer longer early voting periods or hours.

In the 2018 General Election, there were 367 early voting locations – an average of one for every 36,180 registered voters. Early voting was available for a total of 44,560 hours in the state – compared to the number of registered voters in Florida, that is 298 registered voters per hour of early voting. This varied substantially across the state. The availability of early voting was significantly correlated with the percentage of voters casting their ballots early: **as the number of registered voters per hour of early voting in the county increased, the percentage of voters casting their ballots early decreased**. This was especially true in larger counties.

Among larger counties, **Escambia County** offered early voting at nine locations for 13 days for a total of 1,170 hours – 182 registered voters per hour of available early voting. Yet, **Pinellas County** offered early

voting at only five locations for the full 14 days of early voting for a total of 840 hours – expecting to serve 794 registered voters for each hour of available early voting. The average number of registered voters per early voting hour in large counties was 372.

Mid-size counties averaged 267 registered voters per early voting hour, with the most early voting availability in **Sumter County**, which offered six locations for 12 days for a total of 648 hours – 149 registered voters per hour. **Hernando** and **Citrus** counties, on the other hand, offered early voting at a rate of 380 registered voters per hour.

| Taylor | Madison | | Pinellas | Orange |
|---|---|---|---|---|
| 12,142 | 11,840 | **Registered Voters** | 666,876 | 798,373 |
| 1 | 4 | **Early Voting Locations** | 5 | 16 |
| 13 | 8 | **Early Voting Days** | 14 | 14 |
| 156 | 266 | **Total Hours** | 840 | 2,240 |
| 28.5% | 42.9% | **Percent Early Votes** | 12.5% | 37.1% |
| **65.8%** | **67.3%** | **Turnout** | **65.9%** | **60%** |

Among their like-sized peer counties, two stand out in their approach to early voting. **Madison County** offered the highest density of early voting locations with its four early voting locations, one for each 2,960 registered voters. But it only offered early voting during the mandatory period and for limited hours. **Pinellas County**, on the other hand, offered five early voting locations for a population more than 50 times as large – meaning there is one early voting location in Pinellas County for every 133,366 registered voters. But its early voting locations were open from 7 am to 7 pm daily for the entire two-week period of early voting. The result is only 12.5% of those who voted in Pinellas County voted early. It is important to note that Pinellas County has emphasized vote-by-mail, with 50.4% of its 2018 General Election voters voting by mail.

Ultimately, what matters is that enough early voting is available that voters can vote without missing work or incurring unnecessary child-care expenses. The fact that Black voters are the one demographic most likely to vote early makes limiting early voting availability especially troubling. Our state, and nation, has a record of disenfranchising our Black neighbors that it has yet to remedy. Expansive early voting is a relatively small step that would effectively ensure our democracy benefits from participation of all our citizens.



## *Where Early Voting is Held*

Every Supervisor of Elections' main office must host early voting. Every county must also offer early voting at least as many locations as it did in the 2012 General Election.

In 2018, most of the state's 367 early voting locations were public libraries (145), followed by community centers (69), civic centers (21), city halls (15) and county commission buildings (13). In addition, 17 wild-card locations were used: (4) churches, (2) universities, a country club in **St. Johns County**, a **Madison County** fire department, a reception hall in **Lake County**, a skating rink in **Pasco County**, and a museum in **Polk County**.

# Equity in Polling Places

## Overview

While Florida law sets some limits and requirements, supervisors of elections ultimately decide where voting happens and have great influence on how many precincts a county has.

Supervisors of elections' decisions about where polling places are located and the number of precincts and polling places impact how many people, and who, votes on Election Day. Research has shown that voters are less likely to vote the further they must travel to their polling place, with estimates of 2%-5% reductions in turnout for every quarter mile increase. Factoring in other costs results in even higher rates of voter suppression.[16]

Reducing the number of polling locations likewise has been shown to reduce turnout, with one study finding a consolidation resulted in a 3% reduction.[17] What sort of location is used for voting also matters. Voting in churches has been shown to influence voter choice on same-sex marriage, anti-abortion and other referenda on social issues[18], while voting in schools seems to be related to increased support for school funding measures.[19]

---

16  Enrico Cantoni, *A Precinct Too Far: Turnout and Voting Costs*, AMERICAN ECONOMIC JOURNAL: APPLIED ECONOMICS, 12 (1): 61-85 (2020). *See also* John Gibson, et al, *Time to Vote?*, Public Choice, Vol. 156, No. 3/4 (2013).

17  Henry E. Brady & John E. McNulty, *Turning Out to Vote: The Costs of Finding and Getting to the Polling Place*, THE AMERICAN POLITICAL SCIENCE REVIEW 105:115-134 (2011).

18  Jordan P. LaBouff, Wade C. Rowatt, Megan K. Johnson, & Callie Finkle, *Differences in Attitudes towards Outgroups in Religious and Non-Religious Contexts in a Multi-National Sample: A Situational Context Priming Study*, INTERNATIONAL JOURNAL FOR THE PSYCHOLOGY OF RELIGION 22:1-9 (2012). PSYCHOLOGY OF RELIGION 22:1-9 (2012).

19  Jonah Berger, Marc Meredith & S. Christian Wheeler, *Contextual priming: Where people vote affects how they votes*, PNAS 105(26):8846-8849 (2008).

**EQUITY IN POLLING PLACES**

# LEGAL REQUIREMENTS

## Polling Places

» Public, tax-supported buildings must be available for use as polling places at request of supervisor of elections.

» Can only be moved more than 30 days before election.

» Must be within, or contiguous to, precinct.

» If a polling place is moved, notice must be mailed to each voter at least 14 days before the election. Public notice in the newspaper and on the supervisor of election website must be posted between 30 days and 7 days before the election.

## Precincts

» Board of county commissioners decides, upon recommendation and approval of local supervisor of elections.

» Must be contiguous and compact.

» Cannot be changed without consent of supervisor of elections and a majority of county commissioners.

## Recommendations

» Equitably balance the number of eligible voters in each precinct.

» Make sure there is an equitable number of voting machines and booths in each polling place.

» Make any decision to move or close a polling location transparently, with public notice and invitation for public comment.

» Prioritize the use of sites authorized for early voting.

» Choose centrally located polling places.

» Choose polling places that are easy to find and get in and out of quickly.

» Review wait times to identify overburdened or under-resourced precinct and polling locations.

» Replace polling places that require passing through gates and/or heightened security protocols not expected with voting.

» Prohibit polling places from posting propaganda near voting areas.

## Polling Place Equity in the 2018 General Election

### Where We Vote

In the 2018 General Election, most polling locations, 59%, were private buildings. More than a third were religious buildings. Only 41% of polling locations were public, with small counties using public buildings 45% of the time.

Ultimately, 40% of Florida voters are assigned to vote in religious buildings, with another 22% assigned to other private buildings. Voters must feel welcome and comfortable voting in these facilities. Local supervisors of elections must ensure that polling locations allow unencumbered public access and do not display propaganda in polling rooms that could influence or offend voters. They must also ensure public funds are not wasted on private facilities when public buildings are made available for voting by Florida law.



Ten large counties used religious sites for more than half their polling locations, with **Lee**, **Leon** and **Polk** counties relying on them most heavily. By contrast, only four large counties used public buildings for more than half their polling locations: **Osceola**, **Miami-Dade**, **Broward** and **Palm Beach**. **Pasco County** was the only large county that used private buildings more often than both religious and public buildings, while only 10% of **Miami-Dade's** polling locations were private, non-religious buildings.

Of the mid-size and rural counties, **Okaloosa**, **Hernando** and **Santa Rosa** counties relied heavily on religious locations. **Sumter**, **Flagler** and **Charlotte** counties used mostly public buildings.

Nearly half of the state's small counties used public buildings for polling locations at least half of the time. Notably, **Bradford County** was the only county in the state that did not use a public building as a polling location – 10 of its 14 polling locations were religious buildings.

Election administrators should examine local voter turnout trends and voter feedback to ensure the locations used for voting are accessible by all.



## Precinct Density

Previous research has identified disparities in the time voters wait to vote. One reason for longer waits can be that the precinct is too large – too many people are assigned to the same polling location. Such crowded facilities effectively suppress voting by increasing the cost of voting in the form of lost time, lost wages, and increased caregiver expenses. During the current pandemic, such crowds will further suppress voting as people weigh the risk of infection.

An average of 2,258 active registered voters were assigned to precincts in Florida during the 2018 General Election, with an average 500 votes cast at each precinct. Multiple precincts are sometimes assigned to the same polling place. Large counties assigned an average 2,232 registered people per polling location, while precincts in small counties averaged 1,467 active registered voters. Mid-size counties averaged the largest precinct size at 3,138.

> » In large counties, average precinct size varied from 1,182 registered voters per precinct in **Palm Beach County** to 3,796 per precinct in **Seminole County**.

> » In mid-size and rural counties, average precinct size varied from 2,082 per precinct in **Charlotte County** to 4,183 in **Hernando County**.

> » Small counties had the greatest variety, with a low of an average 522 registered voters per precinct in **Glades Count**y to a high of 4,453 per precinct in **Nassau County**.

The highest number of people assigned to a single polling place was the mid-sized **Indian River County**, where 13,415 registered voters were assigned to vote at the Intergeneration Recreation Center in Vero Beach. Ultimately, 3,139 voted on election day in the precinct, six times the state average. Within counties, there was much variety in precinct size.

| | **Average Precinct in County** | | | **Largest Precincts** | | |
|---|---|---|---|---|---|---|
| | County | Registered Voters | Election Day Voters | Location | Registered Voters | Election Day Voters |
| | Pasco | 3,200 | 796 | Heritage Springs Clubhouse | 8,974 | 2,385 |
| | Sarasota | 3,216 | 725 | Sarasota Baptist Church | 8,200 | 2,186 |
| | Brevard | 2,593 | 686 | Moose Lodge #2073 | 6,671 | 2,106 |
| | Escambia | 2,696 | 719 | Beulah Free Will Baptist Chrch | 6,869 | 2,099 |
| Large | Brevard | 2,593 | 686 | Veterans Memorial Complex | 10,436 | 2,077 |
| | Indian River | 3,151 | 705 | Intergenerational Rec. Center | 13,415 | 3,139 |
| | St. Johns | 4,068 | 1,017 | St. Francis in the Field | 10,411 | 2,728 |
| Mid-size | Santa Rosa | 3,228 | 825 | St. Sylvester's Catholic Chrch | 11,096 | 2,349 |
| | Walton | 2,393 | 648 | Good News U.M.C. | 8,433 | 2,190 |
| | Walton | 2,393 | 648 | Faith Assembly Church | 9,679 | 2,021 |
| Small | Highlands | 2,371 | 631 | Bible Fellowship Church | 5,655 | 1,453 |



Statewide, the impact of the precinct size on overall turnout in the 2018 General Election negligible, but precinct size did appear to have a significant impact in some counties. A simple linear regression was calculated, by county, to predict turnout based on the number of registered voters assigned to a precinct. For example, in **Lee County**, a

significant relationship (p<.001) could explain about 10% of the variation in turnout (r2=.100), with larger precincts having lower turnout rates. However, in several smaller counties, the reverse was often true, with larger precincts having higher turnout rates.

**Impact of Precinct Size on Turnout**

|          | County    | Pearson Coefficient | P-value | R2    |
|----------|-----------|--------------------|---------|-------|
|          | Lee       | -.317              | <.001   | .100  |
|          | Lake      | -.297              | .002    | .088  |
| Large    | Orange    | -.160              | .012    | .026  |
|          | Alachua   | -.312              | .012    | .097  |
|          | Charlotte | .271               | .027    | .073  |
| Mid-size | Sumter    | .484               | .012    | .235  |
|          | Lafayette | .935               | .019    | .874  |
|          | Madison   | -.842              | .001    | .709  |
| Small    | Franklin  | -.821              | .012    | .674  |

# Ensure Access for All

## Ballot Design

Several times over the last two decades, Florida has been in the headlines for ballot designs that thwarted voters' intent in close elections. While the Legislature has passed laws introducing some parameters and litigation has provided more, supervisors of elections should collaborate on basic, uniform design guidelines that are tested to ensure broad understandability.

### *Recommendations*

» Conduct focus groups to test ballot design and voter education materials to ensure they are understandable to diverse voters.

» Instructions should be printed across the top.

» All candidates for the same office should be listed on the same page and in the same column.

» Ensure sample ballots match actual ballots.

» Avoid all capital letters, centered text, small font sizes,

» Use sans-serif fonts, such as Arial, Helvetica, or Clearview ADA, and stick to one font.

» Write materials at the seventh grade level.

» Allow nonpartisan organizations to review ballots before printing.

## Accessibility

One in five voters has a disability. To ensure they can vote, Federal and state laws require voter registration and voting be accessible for people with disabilities:

» A voter can have anyone, other than the voter's employer or union, help them vote. The Supervisor of Elections must also provide staff to help. Getting help at the polls does require an extra form, but staff can assist filling out the necessary paperwork.

» Every polling location has to have a touch screen or other accessible device for marking ballots.

» When voting by mail, a voter can have anyone, aside from their employer or union, help them complete the ballot.

» Supervisors of Elections must offer supervised voting at assisted living facilities for groups of more than four at the request of the facility's administrator and can do so without a request.

» Polling places must be accessible. The federal VOTE program pro-vides grants to counties to help make polling places accessible.

## Breaking Language Barriers

Federal law requires all election material available in English also be available in Spanish throughout Florida. Several counties are also subject to the requirement for locally produced materials – according to a recent court case, 32 of Florida's counties must do so.[20]

The Florida Department of State is adopting rules requiring Spanish-language ballots and materials in every county. The ballot must also be available in other languages, as required by federal law or court order. Supervisors of election have discretion to offer other translations.[21]

### *Recommendations*

» Staff offices and/or polling locations with bilingual staff or volunteers.

» Provide language assistance hotlines.

» Provide signage, materials and forms in Spanish and other fre-quently spoken languages in the community.

» Work with community groups to ensure appropriate language voter education is available.

---

20  *Rivera Madera v. Lee*, 1:18-CV-152-MW/GRJ, 2019 WL 2077037 (N.D. Fla. May 10, 2019).

21  *See* Rules 1S-2.032 and 1S-2.034 F.A.C., available at www.flrules.org.



## Voting From Jail

Each election, there are a number of Floridians eligible to vote who are confined to jail. During the November 2018 General Election, more than 55,000 people were in Florida jails. Only 22% were in jail due to felony convictions.[22] More than half were awaiting trial – innocent until proven guilty. In some counties, more than 90% of their jail population was awaiting trial.

These Floridians are eligible to register to vote by mail but going through that process can be difficult.[23]

### *Recommendations*

» Visit the county jail regularly to ensure open communication and ease administration with jail administration.

» Visit the jail to pick up VBM ballots.

» Negotiate processes and policies with jail administrators to ensure voting access.

» Provide educational materials, signage, necessary forms, and postage-paid return envelopes for ballots including at an Election Information Kiosk within the jail.

### *Potential Allies & Resources*

**Voting in Jail: An Organizer's Toolkit**
www.acluohio.org/jailvoting

The ACLU of Ohio has published a toolkit to use in registration drives and advocacy.

---

22  Fla. Dept. of Corrections, *Florida County Detention Facilities Average Inmate Population*, November 2018.

23  Fla. Op. Atty. Gen., 075-187, July 3, 1975. *See also O'Brien v. Skinner*, 414 U.S. 524 (1974).

## Voting While Homeless

On an average day in January 2019, 28,591 Floridians were experiencing homelessness. Many are eligible to vote but face significant barriers. They may not have an address and assume that they cannot vote or register without one. They may not have access to transportation to their polling place.

### *Recommendations*

» Develop relationships with homeless shelters and service providers to ensure those experiencing homelessness have access to voter education and necessary forms.

» Ensure early voting and polling locations are placed in communities accessible to those experiencing homelessness who may not have personal transportation.

» Provide postage-paid return envelopes for vote-by-mail ballots and/or pick up ballots from shelters.

» Provide forms, flyers, signage and guides for distribution.

### *Potential Allies & Resources*

**National Coalition for the Homeless**
www.nationalhomeless.org

You Don't Need a Home to Vote Campaign promotes voter access for low income and homeless persons. It publishes resources to use in registration drives and advocacy.

# Resources



# Recent Developments in Election Administration Law

## Election Calendar

In 2018, the Florida Legislature pushed the primary election date back by one week to allow more time for election preparations. Primary elections are now held 11 weeks before general elections.[24]  Other dates, like qualifying periods and vote-by mail deadlines, have also changed.

## Ballot Design

The U.S. District Court of the Northern District of Florida ruled a law requiring candidates from the Governor's party be listed first on the ballot is unconstitutional.[25]  It is unclear how local supervisors of election will implement this. Some have suggested rotating the party order, while others have suggested listing candidates in alphabetical order.

In 2018, the Florida Legislature passed a law requiring ballot instructions be either centered across the top or in the leftmost column of the ballot and that all vote targets be ovals.[26]

---

24  Fla. Stat. § 100.061.

25  *Jacobson v. Lee*, 4:18CV262-MW/CAS, 2019 WL 6044035 (N.D. Fla. Nov. 15, 2019) (finding Fla. Stat. § 101.151(2)(a) unconstitutionally burdened First and Fourteenth Amendment rights).

26  Fla. Stat. § 101.151.

## Foreign Languages

The Florida Department of State is adopting rules requiring Spanish-language ballots and materials in every county following a court ruling requiring local supervisors of elections in 32 counties to produce local election materials in Spanish.[27] The ballot must also be available in other languages, as required by federal law or court order. Supervisors of elections have discretion to offer other translations.[28]

## Vote By Mail

In 2018, the Florida Legislature revised vote by mail by:

» Increasing the time available for processing VBM ballots from 15 days to 22 days before the election.

» Requiring drop boxes for VBM ballots at early voting sites and SOE main and branch offices and requiring VBM instructions include drop-off locations.

» Allowing voters to update their signature on file until a VBM ballot is received.

Significant changes were made to the signature match and cure process for both VBM and provisional ballots:

» VBM and provisional ballots may only be rejected if the Canvassing Board finds that the VBM signature does not match the signature of record **beyond a reasonable doubt**.

» The SOE must notify the voter **as soon as practicabl**e by first-class mail and by either email, text message or telephone.

» To have their vote counted, a voter whose ballot has been rejected for signature mismatch must submit identification and a **cure affidavit by 5 p.m. the second day after the election**.

See discussion of vote by mail at page 14 for more on current timelines and requirements.

## Early Voting On Campuses

In April 2020, the State agreed to fully allow early voting on university campuses under a settlement in a lawsuit brought by the League of Women Voters.[29]   Secretary of State Laurel M. Lee advised supervisors of elections that Florida law should be read to allow placing early voting sites on college campuses "consistent with the purpose of each county having a network … of early voting sites placed … to provide all voters … an equal opportunity to cast a ballot."[30]

---

27  *Rivera Madera v. Lee*, 1:18-CV-152-MW/GRJ, 2019 WL 2077037 (N.D. Fla. May 10, 2019).

28  *See* Rules 1S-2.032 and 1S-2.034 F.A.C., available at www.flrules.org.

29  Scott Powers, Early-voting lawsuit settled; elections supervisors can set-up early voting on college campuses, Florida Politics (April 3, 2020).

30  Fla. Secretary of State Laurel M Lee, Directive 2020-01 (April 2, 2020).



## Voting Technology

In 2018, the Florida Legislature required all votes be tabulated based on an electronic scan of a voter verifiable paper ballot. Because all voting equipment will need to meet the same accessibility requirements, voters with and without disabilities will now be using the same systems. Four counties, Glades, Jefferson, Miami-Dade and Palm Beach, were the only counties not already using compliant systems, and they have since adopted compliant systems.[31]

# LOCAL VOTING RIGHTS ADVOCACY 101

## WHY LOCAL

While national, or even state, voting rights issues get a lot of news coverage, many important decisions impacting your right to vote happen right in your community. Your Supervisor of Elections, who is an elected official, decides where you will vote, when you can vote early, who will help you on election day and how they will be trained, how your signature on your vote-by-mail ballot will be validated and just how much assistance you will able to get navigating the voting process. For some populations, such as the elderly, those with disabilities, college students and others who move often, those without a permanent address or those held in jail, these decisions can result in insurmountable obstacles.

## WHERE TO START

*While many specifics will depend on the practices and political climate in your county, this roadmap can shed some light on your path.*

**Step 1. Research.**
Use this report and other resources understand voting access and identify the issues most important to you and your community. Take some time to research how the issue plays out in your community and understand local relationships and stakeholders. Visit the Florida Department of State's Division of Elections website, https://dos. myflorida.com/elections, to find your local supervisor of election and their website, which should be a good starting place for your research.

**Step 2. Gather allies.**
It is important to build a coalition of allies who can meet regularly to plan your voting access advocacy campaign. Identify organizations working on civil rights, elections and similar issues, in your community, many of whom are identified in this report. Reach out to them and other sympathetic organizations that could help. Be sure to include faith leaders, business leaders, those with political connections or influence, and those impacted by existing barriers to voting in your working group.

**Step 3. Prioritize and plan.**
Within your working group, agree on a goal, strategy, and roles. What policy do you want adopted locally? Who is impacted by this policy? Who would oppose a change? What influence do people in your group, or their acquaintances, have with key policymakers and stakeholders?

**Step 4. Develop your message.**
Once your goal and path are set, develop a set of talking points to clearly convey your message to leaders, community members, and media. Partner organizations can help. Let these talking points guide your policy conversations to keep you focused on your goal.

**Step 5. Build local relationships.**
Schedule a meeting with your Supervisor of Elections to share your concerns and ask for the specific policy change(s). Be collaborative, but firm. Come with solutions but be open to their experience. You can also host a public forum, especially during election season, and ask the supervisor of elections, and any candidates, to attend. Be sure to invite local stakeholders, elected officials, community leaders, and media. Prepare questions ahead of time to highlight the importance of your policy goal. After each meeting or forum, regroup with your working group to plan the next round of advocacy.

**Step 6. Get your message out.**
Letters to the Editor, Editorials, news interviews and public forums are all great ways to engage and inform the public to grow support for your campaign.



# ENSURE VOTES ARE COUNTED



Florida law requires votes be counted unless canvassing boards are convinced beyond a reasonable doubt that the VBM signature does not match the signature of record. Very few ballots should be rejected under this standard. Handwriting analysis is a profession, not a workshop.

## Best Practices

### *Increase vote-by-mail participation*

» Include prepaid postage for VBM.

» Launch a public education campaign to educate voters on VBM requirements.

» Offer a voter assistance hotline.

» Pick up VBM ballots at post office on election day.

» Send reminders to those who have requested VBM ballots.

» Offer online VBM tracking tools that incorporate text or email notifications.

### *Reduce unnecessary rejections*

» Incorporate computer-based signature matching software to reduce unnecessary rejections.

» States that widely use vote-by-mail rely on computer-based signature matching and have very low reject rates.

» Have a second review of VBM ballots that have been flagged for signature mismatch to correct false rejections.

## 2020 KEY DATES

**PRIMARY**

**JULY 19**
LAST DAY TO MOVE POLLING LOCATION

**GENERAL**

**OCTOBER 4**
LAST DAY TO MOVE POLLING LOCATION DAY TO REQUEST VBM BALLOT

**AUGUST 20**
DEADLINE TO CURE SIGNATURE MISMATCHES OR PROVISIONAL BALLOTS

**GENERAL**

**SEPTEMBER 19**
UOCAVA BALLOTS SENT

**SEPTEMBER 24 – OCTOBER 1**
VBM BALLOTS SENT

**OCTOBER 12**
VBM CANVASSING BEGINS

**OCTOBER 24**
LAST DAY TO REQUEST VBM BALLOT

**NOVEMBER 5**
DEADLINE TO CURE SIGNATURE MISMATCHES OR PROVISIONAL BALLOTS

**ACLU** Florida



# Why?

» Rejected VBM ballots hurt us all. Voter confidence is vital to continued civic engagement, and voters who choose to vote by mail already have less confidence that their vote counted. Having their ballot rejected confirms their fears.

» Improves voting access for seniors, some disabled voters, and those with hectic schedules that make voting in person difficult.

— 25% of Floridians who didn't vote cited schedule conflicts as the main reason they didn't vote in 2018.
— 10% were out of town on election day.

» Reduces strain on Election Day resources, resulting in shorter lines and easing stress on election officials, volunteers and voters.

## But What About...



### No budget for that

Similar counties are finding a way to make this work. Vote-by-mail relieves pressure on polling places on Election Day, reducing the need for additional polling locations. Have you asked the commission for more funding? What can the community do to help?



### Personal Responsibility

Voting is a constitutional right, not a privilege. The State should do everything possible to make sure anyone who wants to vote, can vote, and can vote without paying the cost of missed work or additional childcare expenses.



# EXPAND EARLY VOTING



## Best Practices

» Ensure early voting locations are accessible to all.

  — Prioritize communities where voters are most likely to vote
    early, such as Black neighborhoods and business districts.
  — Use college campuses are early voting sites to promote
    youth participation.

» Offer enough early voting locations to prevent long wait times
  and offer non-business hours.

» Prioritize keeping early voting open through the Sunday be-
  fore the election.

  — Weekend voting has the highest use per hour, with Sunday
    being the highest.

» Ensure SOE staff is accessible to voters on the weekends
  during early voting period, either in the office or by phone.

Early voting gives responsible
Americans across the country the
ability to have their voice heard, even
if they can't make it to the polls on
Election Day.

### 2020 KEY DATES

#### PRIMARY

**JULY 19**
DEADLINE FOR SOE TO
DESIGNATE EARLY VOTING SITES

**AUGUST 3**
OPTIONAL EARLY VOTING PERIOD
BEGINS

**AUGUST 8 - AUGUST 15**
MANDATORY EARLY VOTING
PERIOD

**AUGUST 16**
OPTIONAL EARLY VOTING PERIOD

#### GENERAL

**OCTOBER 4**
DEADLINE FOR SOE TO
DESIGNATE EARLY VOTING SITES

**OCTOBER 19**
OPTIONAL EARLY VOTING PERIOD
BEGINS

**OCTOBER 24 - OCTOBER 31**
MANDATORY EARLY VOTING
PERIOD

**NOVEMBER 1**
OPTIONAL EARLY VOTING PERIOD





# Why?

- » Our democracy is stronger when every eligible voter can cast a vote.
- » Early voting makes voting more accessible for people for whom voting on election day is difficult.
  - — 25% of Floridians who didn't vote cited schedule conflicts as the main reason they didn't vote in 2018.
  - — 10% were out of town on election day.
- » Early voting relieves long lines on Election Day, easing stress on election officials, volunteers and voters.
- » Reduces the need for provisional ballots as voters can vote at any early voting location.
- » Early voting is increasing in popularity

## But What About...



### Staff needs a break

Other counties and businesses have learned to stagger workers in shifts so enough are available to cover new hours.



### No budget for that

Similar counties are finding a way to make this work. Early voting relieves pressure on polling places on Election Day, reducing the need for additional polling locations. Have you asked the commission for more funding? What can the community do to help?



### Sunday voting is anti-religious

Many churches have led the charge to increase access to the polls, organizing Souls to the Polls activities to encourage civic engagement. Jewish and Seventh-day Adventist voters celebrate the sabbath on Saturday.



### Personal Responsibility

Voting is a constitutional right, not a privilege. The State should do everything possible to make sure anyone who wants to vote, can vote, and can vote without paying the cost of missed work or additional childcare expenses.



# ENSURE EQUAL ACCESS TO POLLS



## Best Practices

» Ensure a transparent, highly publicized, decision to close or move any polling place.

» Prioritize the use of sites authorized for early voting.

» Choose polling places that are easy to find and get in and out of quickly.

» Replace polling places that require passing through gates and/or heightened security protocols not expected with voting.

» Review wait times to identify overburdened or under-resourced precinct and polling locations.

» Ensure precincts have similar voting populations and polling places are centrally located.

» Prohibit polling places from posting propaganda near the voting area.

### 2020 KEY DATES

**PRIMARY**

**JULY 19**
LAST DAY TO MOVE POLLING LOCATION

**GENERAL**

**OCTOBER 4**
LAST DAY TO MOVE POLLING LOCATION

## Why?

» Our democracy is stronger when every eligible voter can cast a vote.

» Every voter should have an equal opportunity to vote.

» Black voters, low-income voters and those living in more densely populated areas are more likely to wait, and wait longer, to vote.

## But What About...



**No budget for that**

Similar counties are finding a way to make this work. Early voting relieves pressure on polling places on Election Day, reducing the need for additional polling locations. Have you asked the commission for more funding? What can the community do to help?



# Appendix



Case 4:21-cv-00187-MW-MAF Document 83-2 Filed 01/10/22 Page 343 of 378

# ACLU Florida: Report on Vote-by-Mail Ballots in the 2018 General Election

**Dr. Daniel A. Smith & Anna Baringer**

*University of Florida*

## Summary

This report examines the rates of rejected vote-by-mail (VBM) ballots cast in Florida's 2018 General Election. It provides statewide VBM rejection rates cast by age cohorts, racial and ethnic groups, overseas (military and civilian) voters, domestic military voters, and first-time voters. It compares these rates across Florida's 67 counties. We find that younger voters, first-time voters, and voters from racial and ethnic minorities are much more likely to cast VBM ballots that are rejected by county Canvassing Boards. A high rate of overseas voters also have their VBM ballots rejected, particularly military voters stationed overseas, but also those stationed in the U.S. There exists substantial variation across the state's 67 counties in the rejection rates of VBM ballots, indicating a non-uniformity in the way VBM ballots are verified by SOEs and county Canvassing Boards. The report also finds continued problems with the processing of VBM ballots initially deemed invalid by SOEs due to a mismatched or missing signature on voter's certificate on the return envelope, but highlights the best practices employed by Pinellas County to allow voters to cure these ballots that are initially "rejected as illegal."

## Principal Findings

- In the 2018 general election, as in past elections, Florida voters were much more likely to have their vote tabulated and validated if they cast their ballot in person at an Early Voting site or at their assigned Election Day precinct than if they cast a mail ballot (commonly referred to as "Vote by Mail" (VBM) ballot or absentee ballot);

- Younger, first-time, and racial and ethnic minority voters, as well as overseas and military voters, who cast VBM ballots are all at least twice as likely as older and white voters to have their VBM ballot rejected in the 2018 general election;

- Despite changes in the ability of voters to 'cure' their rejected VBM ballots, the likelihood of younger and minority voters casting a mail ballot that was rejected increased in 2018 compared to 2016, while the rejection rate of VBM ballots cast by white voters decreased from 2016;

- There is continued variation in the rejection rates of VBM ballots cast across the state's 67 counties.

## Policy Recommendations

To ensure that all eligible voters have an equal access to the voting process and to have their VBM ballot processed, tabulated, and accepted as valid:

- There should be greater statewide uniformity and simplicity in the design of return VBM envelopes;

- There should be greater uniformity in the procedures and training of Supervisors of Elections (SOEs), their staff, and Canvassing Boards when processing, validating and, if necessary, allowing voters to cure their rejected VBM ballots;

- The Florida Secretary of State should provide a memorandum to SOEs with standardized procedures that county election officials must follow when notifying voters of a rejected VBM ballot and the cure process for missing and mismatched signatures;

- The Florida statewide voter history file (the FVRS database) should include information about why a voter's mail ballot was rejected, including whether it was rejected because it lacked a signature or the voter's signature was mismatched, and if the voter attempted to cure the VBM ballot if it was flagged as invalid, and if that cure was successful;

- The Florida Division of Elections should provide "best practices" guidelines, drawing on the procedures of counties with the lowest rejection and highest cure rates of VBM ballots.

## Voting by Mail in the Sunshine State

Vote-by-mail (VBM) ballots, also known as mail ballots and absentee ballots, have become a staple of Florida elections. Over 2.67 million Floridians, or 31.9% of all ballots cast in the 2018 general election, were VBM ballots. Yet, when compared to the rejection rates of ballots cast early in-person and on Election Day, voters who vote by mail in the Sunshine State are disproportionately more likely to have their ballot rejected by a county Canvassing Board. As this report documents, there is considerable heterogeneity in the rejection rate of VBM ballots in Florida, not only across the state's 67 counties, but equally importantly, within a counties across age groups, across racial and ethnic groups, among military and civilian overseas voters, and among first-time voters.

Compared to previous general elections, the statewide rejection rate of VBM ballots cast in Florida in 2018 was even higher than in the 2012 and 2016 presidential elections. In both the 2012 and 2016 presidential elections, the VBM rejection rate was roughly the same—1 percent of all VBM ballots cast were rejected. Despite changes in Florida law allowing voters to have more opportunities to "cure" their VBM ballots if they have a problem with the signature on the return envelope, the overall statewide rejection rate of the 2.67 million VBM ballots cast in the 2018 general election was 1.2 percent. This rejection rate excludes mail ballots that were received by local election officials after the 7:00pm Election Day cutoff time that domestic VBM ballots must arrive in the Supervisor's office.

Notwithstanding opportunities for voters to "cure" a missing or mismatched signature on a VBM return envelope in the 2018 general election, more than 1/100 VBM ballots cast in the 2018 contest were ultimately rejected by local elections officials, amounting to some 32,176 ballots that did not count in the election. Recall that incumbent U.S. Senator Bill Nelson lost to challenger, then Governor Rick Scott, by roughly 10,000 votes in the 2018 U.S. Senate race.

As in previous general elections the rejection rate of mail ballots differs considerably across age cohorts and racial and ethnic groups, as well as for military and civilian voters overseas and first-time voters. The rejection rate of VBM ballots also differs substantially across the state's 67 counties. Younger voters, first-time voters, as well as racial and ethnic minorities in Florida, are disproportionately more likely to cast VBM ballots that are "rejected as illegal" by county Canvassing Boards—but the rates are considerably higher in some counties than in others.

In addition, there is considerable variation from county to county in the process of allowing voters to correct rejected VBM ballots with a "Vote-by-Mail Ballot Cure" Affidavit. Without question, voters casting a VBM ballot that has a signature issue should be held accountable for their rejected VBM ballot. Voters who cast ballots by mail assume responsibility to follow instructions when filling out their ballots and returning their envelopes, just as county officials assume responsibility to make sure every valid VBM ballot is counted. Eligible voters should be responsible to make sure they cast a valid ballot, taking care to update their signature on file with their local election official and to follow instructions on how to complete the voter's certificate on the return envelope to avoid mistakes that might spoil their ballot. At the same time, county election officials who are entrusted with processing and validating VBM ballots have considerable discretion in processing and validating absentee ballots. As such, local election officials, need to be held accountable for ensuring that all voters have equal access to cast a mail ballot, have that mail ballot tabulated fairly, and foster a transparent process to make sure the validation (and possible curing) of mail ballots is fairly administered for all eligible voters.

Dr. Daniel A. Smith & Anna Baringer, ACLU Florida: Report on Vote-by-Mail Ballots in the 2018 General Election

When significant variation occurs across counties in the rate of rejected VBM ballots, especially among different groups of voters (for example, within categories of age, race/ethnicity, military, and overseas), it is important to investigate whether all county election officials are providing clear instructions on how to return a VBM ballot, and to ensure that VBM return envelopes are easy to complete. SOEs should also provide the necessary time and equal opportunity for voters to cure their VBM ballot if their signature on the return VBM envelope is missing or appears to be mismatched.

In this report, drawing on data from publicly available files, we document the rejection rates of VBM ballots in the 2018 general election, as well as the cure rates across counties.

## Why Might Rejection Rates of VBM Ballots Differ?

Why might validation rates of VBM ballots differ across age cohorts and racial/ethnic groups? It is a given that some voters will fail to follow instructions when filling out their ballot and return envelope. When mailing back their VBM ballots, some voters may fail to sign their name on the back of the official mailing envelope as it appears in the county's official voter registry. Absentee voters may disregard an affidavit or date that is required, or simply sign the return envelope incorrectly. Some VBM voters may neglect to sign the vote by mail ballot envelope at all.

It is certainly possible that the differential rates of rejected VBM ballots cast across demographic groups may be related to how SOEs process mail ballots, or how the state's 67 county canvassing boards interpret the voter's certificate signature and other information on VBM return envelopes. Regardless of whether the cause of rejected VBM ballots is voter error or less than adequate procedures established by local election administrators, in theory, the rate of rejected VBM ballots across demographic groups (e.g., age cohorts and racial/ethnic minorities, or first-time voters) should not differ substantially across counties. Even if there are correlations with age and race and ethnicity (such as education) that might lead to higher rates of rejected VBM ballots for some demographic groups, VBM rejection rates across demographic groups should be consistent across counties; that is, if equal standards are being applied by SOEs, their staff, and Canvassing Boards.

Furthermore, there should be comparable VBM cure rates across counties of ballots cast across age cohorts, racial and ethnic groups, and other groups of voters who have their VBM ballot initially rejected by a SOE or a Canvassing Board. In the 2018 general election, voters who neglected to sign the voter's certificate on the VBM envelope, or who signed the voter's certificate on the envelope but their signature did not match their signature in the registration books, all had an opportunity to cure their invalid ballot. Yet the rejection rates of VBM ballots were worse in 2018 than in 2016 or 2012.

**Rates of Rejected VBM Ballots Cast in the 2018 General Election by Age Cohort**

In the 2018 general election, a total of nearly 2.6 million Florida voters cast valid and invalid ballots. As Table 1 shows, however, compared to the 2012 and 2016 presidential elections (as shown in Table 2 and Table 3), a higher percentage of VBM ballots were rejected in the 2018 midterm election, despite the ability of voters to "cure" their VBM ballot if it was initially flagged as invalid by a county SOE. Based on calculations derived from statewide voter files following each election, in the 2012 and 2016 presidential elections, 1 percent of all VBM ballots were rejected by county Canvassing Boards. In 2018, the rate increased to 1.2 percent. More than 32,400 VBM ballots were rejected in 2018—more than in either of the previous two presidential elections, when roughly 27,700 (2016) and 23,900 (2012) VBM ballots were rejected, respectively.

The rejection rates of VBM ballots in all three general elections vary considerably across six age cohorts (18-21, 22-25, 26-29, 30-44, 45-64, 65-105), but in all three elections, younger voters were disproportionately more likely to have their mailed ballot rejected. In the 2018 general election, as Table 1 shows, the rate of rejected VBM ballots cast by the youngest cohort, 18-21 year-olds, was 5.4 percent, more than eight-times greater than that of the oldest cohort. Although 18-29 year-olds comprised only 2.1 percent of all voters who cast a VBM ballot in Florida in 2018, they accounted for 9.2 percent of all rejected VBM ballots in the midterm election.

It should be noted that the rejection rate among the state's youngest voters (18-21 year-olds) in the 2018 election was even higher than in the 2012 or 2016 elections, where 4.2 and 4.0 percent of ballots were not counted, respectively. Even amongst the oldest cohort, rejection was higher in 2018 at 0.64% of ballots "rejected as illegal," compared to only the 0.5 percent rejected in the 2016 and 2012 elections.

Among the approximately 133,000 first-time voters, 4,137 did not have their ballots counted, a rejection rate of 3.1 percent. First time voters accounted for 4.98 percent of the electorate in 2018, yet they accounted for 12.7 percent of the rejected ballots.

**Table 1**
Vote-by-Mail Ballots and Age, 2018 General Election

| Age | Accepted VBM | Rejected VBM | Total VBM | VBM Rejection Rate |
|---|---:|---:|---:|---:|
| 18-21 | 52,597 | 2,978 | 55,575 | 5.4 |
| 22-25 | 63,794 | 2,727 | 66,521 | 4.1 |
| 26-29 | 70,736 | 2,494 | 73,230 | 3.4 |
| 30-44 | 313,441 | 6,708 | 320,149 | 2.1 |
| 45-64 | 850,765 | 9,249 | 860,014 | 1.1 |
| 65-104 | 1,288,220 | 8,277 | 1,296,497 | 0.6 |
| Total | 2,639,553 | 32,433 | 2,671,986 | 1.2 |

**Table 2**
Vote-by-Mail Ballots and Age, 2016 General Election

| Age | Accepted VBM | Rejected VBM | Total VBM | VBM Rejection Rate |
|---|---:|---:|---:|---:|
| 18-21 | 71,374 | 2,984 | 74,358 | 4.0 |
| 22-25 | 82,667 | 2,980 | 85,647 | 3.5 |
| 26-29 | 93,736 | 2,883 | 96,619 | 2.8 |
| 30-44 | 312,904 | 5,030 | 317,934 | 1.7 |
| 45-64 | 793,996 | 5,897 | 799,893 | 0.8 |
| 65-104 | 1,015,405 | 5,088 | 1,020,493 | 0.5 |
| Total | 2,713,053 | 27,707 | 2,740,760 | 1.0 |

**Table 3**
Vote-by-Mail Ballots and Age, 2012 General Election

| Age | Accepted VBM | Rejected VBM | Total VBM | VBM Rejection Rate |
|---|---:|---:|---:|---:|
| 18-21 | 67,491 | 2,941 | 70,432 | 4.2 |
| 22-25 | 57,903 | 2,094 | 59,997 | 3.5 |
| 26-29 | 93,736 | 2,883 | 96,619 | 3.0 |
| 30-44 | 312,904 | 5,030 | 317,934 | 1.6 |
| 45-64 | 793,996 | 5,897 | 799,893 | 0.7 |
| 65-104 | 1,015,405 | 5,088 | 1,020,493 | 0.5 |
| Total | 2,341,435 | 23,933 | 2,365,368 | 1.0 |

**Rejected VBM Ballots by Racial and Ethnic Groups**

The differential patterns of rejected VBM ballots by age groups are as glaring as the rates of rejected mail ballots cast by racial and ethnic minorities.  In the 2018 general election, roughly 0.9 percent of all VBM ballots cast by white voters were "rejected as illegal" by local Canvassing Boards.  In contrast, 1.96 percent of VBM ballots cast by Black voters did not count; 2.05 percent of VBM ballots cast by Hispanics were rejected; and 2.06 percent of VBM ballots cast by voters of other racial or ethnic identities were "rejected as illegal."

In the 2018 election, the more than 240,000 Black voters who voted with mail ballots accounted for nearly 9.0 percent of all VBM ballots cast, but they made up 14.5 percent of all the VBM ballots that were rejected.  Over 356,000 Hispanics cast absentee mail ballots in the election, roughly 13.4 percent of all VBM ballots cast statewide, but Hispanic mail ballot voters accounted for 22.6 percent of all the VBM ballots that were not counted.  Voters of other racial and ethnic groups accounted for only 5.6 percent of all absentee mail ballots cast in the election, but they cast 9.4 percent of all the rejected ballots.  In contrast, in the 2018 general election, white voters cast nearly 1.9 million VBM ballots, 72.1 percent of all absentee mail ballots; yet, they were responsible for only 53.5 percent of those that were rejected by county canvassing boards.

Relatively speaking, VBM ballots cast by Black, Hispanic, and other racial and ethnic minorities were more than twice as likely to be rejected as VBM ballots cast by white absentee mail voters in 2018. As Table 4 and Table 6 display, the rejection rates of VBM ballots cast by racial and ethnic minorities cast in the 2018 general election were even higher than in the 2016 and 2012 General Elections.

**Table 4**
Vote-by-Mail Ballots by Race and Ethnicity, 2018 General Election

| Race/Ethnicity | Accepted VBM | Rejected VBM | Total VBM | VBM Rejection Rate |
|---|---|---|---|---|
| Black | 235,541 | 4,713 | 240,254 | 1.9 |
| Hispanic | 349,592 | 7,325 | 356,917 | 2.1 |
| White | 1,909,279 | 17,340 | 1,926,619 | 0.9 |
| Other | 145,141 | 3,055 | 148,196 | 2.1 |
| Total | 2,639,553 | 32,433 | 2,671,986 | 1.2 |

**Table 5**
Vote-by-Mail Ballots by Race and Ethnicity, 2016 General Election

| Race/Ethnicity | Accepted VBM | Rejected VBM | Total VBM | VBM Rejection Rate |
|---|---|---|---|---|
| Black | 240,094 | 4,683 | 244,777 | 1.9 |
| Hispanic | 375,345 | 6,696 | 382,041 | 1.8 |
| White | 1,950,770 | 13,558 | 1,964,328 | 0.7 |
| Other | 146,844 | 2,770 | 149,614 | 1.8 |
| Total | 2,713,053 | 27,707 | 2,740,760 | 1.0 |

**Table 6**
Vote-by-Mail Ballots by Race and Ethnicity, 2012 General Election

| Race/Ethnicity | Accepted VBM | Rejected VBM | Total VBM | VBM Rejection Rate |
|---|---|---|---|---|
| Black | 219,325 | 3,358 | 222,683 | 1.5 |
| Hispanic | 250,750 | 3,310 | 254,060 | 1.3 |
| White | 1,761,034 | 15,204 | 1,776,238 | 0.9 |
| Other | 110,326 | 2,061 | 112,387 | 1.8 |
| Total | 2,341,435 | 23,933 | 2,365,368 | 1.0 |

**Rejected VBM Ballots by County**

The rejection rates of VBM ballots cast in the 2018 general election, as in the 2016 and 2012 general elections, varied considerably across the state's 67 counties.  There are several possibilities for variable rejection rates of absentee ballots across local election administration jurisdictions. First, the design of the mail ballots themselves, or their return envelopes (including their physical layout and instructions), differ across counties.  Second, Supervisors of Elections, their staff, and county Canvassing Boards may have different processes in place when processing and validating the VBM ballots they receive.  Third, it is possible that voters across counties differ in their capacity to properly fill out and return their VBM ballots.

As noted above, in the 2018 general election, 1.21 percent of the more than 2.6 million VBM ballots cast—the votes of over 32,000 Floridians—were rejected as illegal.  However, the percentage of rejected VBM ballots across the 67 counties ranges from three counties with no rejected VBM ballots (Baker, Hamilton, and, Jefferson), to 10 counties that rejected more than 2 percent of all VBM ballots (Alachua, Bay, Broward, Miami-Dade, Gulf, Madison, Marion, Seminole, and Volusia). Figure 6 displays the percent of rejected VBM ballots in the 2018 general election across counties, with the inset map of Florida showing the geographic distribution of these rejected VBM ballots.

**Figure 1**
VBM Ballot Rejection Rate by County (2018)



Dr. Daniel A. Smith & Anna Baringer, ACLU Florida: Report on Vote-by-Mail Ballots in the 2018 General Election

**County Rejected VBM Ballot Rates by Racial and Ethnic Groups**

As the previous section reveals, there is considerable variation in the rejection rates of VBM ballots across the state 67 counties. When it comes to the casting of invalid VBM ballots, however, there is arguably even greater variation within counties when we break down rejected VBM ballots along racial and ethnic groups. Although only 0.9 percent of all VBM ballots cast by white voters were rejected in the 2018 election, 1.96 percent of VBM ballots cast by Black voters were rejected, and 2.05 percent of VBM ballots cast by Hispanic voters were rejected. Figure 2 reports the percentage of VBM ballots cast by Black voters that were rejected in the 2018 general election and Figure 3 reports the same for rejected VBM ballots cast by Hispanics in the mid-term election in those counties that had at least 10 rejected VBM ballots cast by Black and Hispanic voters, respectively.

Across that state's 67 counties, the VBM ballot rejection rates for Black voters range from highs of 4.6 percent in Bay and Madison counties, to 2.1 percent in Palm Beach county, to a low of 0.2 percent in Pinellas County, as shown in Figure 2. There was a similar wide range across the counties of rejected VBM rates for Hispanics casting a mail ballot, as depicted in Figure 3. In Volusia County, 5 percent of VBM ballots cast by Hispanic voters were rejected, followed by Bay County at 4.9 percent. Among the other counties that had at least 10 rejected VBM ballots cast by Hispanic voters, Pinellas again had the lowest rejection VBM ballot rate, just 0.2 percent.

In order to more easily visualize the sizeable disparity in the rates of rejected VBM ballots cast by Black and Hispanic voters across Florida's counties, Figure 4 and Figure 5 display the percentage of rejected VBM ballots cast by Black and Hispanic voters in a county, respectively, compared to the percentage of rejected VBM ballots cast by White voters in the county. In both plots, if the VBM ballot rejection rates were the same for White and Black (or Hispanic) voters, all the counties would fall along the diagonal 45 degree dashed lines. In both plots, the horizontal (x-axis) is the rejection rate of VBM ballots (from 0 percent to 5 percent) cast by White voters in a county. Along the vertical (y-axis) is the rejection rate of VBM ballots cast by Black voters (Figure 4) or Hispanic voters (Figure 5) in each county, respectively.

It is clear from both plots that the nearly every county falls above the 45 degree line, indicating that the VBM rejection rates for racial and ethnic minorities greatly exceeds that of White voters across Florida's counties. Among counties with at least 10 rejected VBM ballots cast by Black voters, the VBM rejection rate for Black voters ranges from a high of 4.6 percent in Bay County, to 2.9 percent in Miami-Dade County and 1.8 percent in Duval County, to a low of 0.2 percent in Pinellas County. There is a similar range of county rejection rates for Hispanic mail ballot voters, as shown in Figure 3. In Volusia County, for example, 5.0 percent of VBM ballots cast by Hispanic voters were rejected, followed by Bay County at 4.9 percent. Among the other counties that had at least 10 rejected VBM ballots cast by Hispanic voters, Pinellas again had the lowest rejection rate—only 0.2 percent of VBM ballots were rejected.

The persistent variance in the rate of rejected absentee mail ballots across Florida's 67 counties suggests at a minimum that the VBM ballot envelope design, the civic education efforts by SOEs, or evaluation standards used by county SOEs and their Canvassing Boards are not uniform across the state.

**Figure 2**
VBM Rejection Rate of Black Voters by County (2018)



Note: Excludes counties with less than 10 rejected VBM ballots cast by Black voters.

**Figure 3**
VBM Rejection Rate of Hispanic Voters by County (2018)

Note: Excludes counties with less than 10 rejected VBM ballots cast by Hispanic voters.

**Figure 4**
Percent of Rejected VBM Ballots Cast by White and Black Voters, by County (2018)



Note: Excludes counties with less than 10 rejected VBM ballots cast by Black voters.

**Figure 5**
Percent of Rejected VBM Ballots Cast by White and Hispanic Voters, by County (2018)



Note: Excludes counties with less than 10 rejected VBM ballots cast by Hispanic voters.

**County Rejected VBM Ballot Rates by Age**

Similar patterns of VBM rejection rates exist across counties in the when broken down by age cohorts. Although the statewide VBM rejection rate among 18-21 year-olds was over 5 percent in the 2018 general election——five times the statewide rate of all rejected mail ballots cast——in a dozen mainly smaller counties (Baker, DeSoto, Gadsden, Glades, Hamilton, Hardee, Jackson, Jefferson, Marion, Nassau, Suwannee, and Union) every VBM ballot cast by a voter in the youngest age cohort was accepted as valid.

In stark contrast, in Broward County, over 11 percent of VBM ballots cast by the youngest cohort of voters in the 2018 election were rejected as invalid by the Canvassing Board, amounting to more than 500 mail ballots that did not count in the election. In Miami-Dade County, over 9 percent of ballots cast by 18-21 year-olds, nearly 600 mail ballots, were rejected. Alachua County, home to Florida's flagship university, had VBM rejection rates of about 8 percent for the 18-21 age cohort, more than 3 times higher than the county's overall rejection rate of 2.3 percent. However, 43 other counties had even higher ratios of the youngest cohort rejection rate to the overall VBM rejection rate, including Liberty, Hendry, Indian River, and Highlands counties.

Figure 6 provides a breakdown of rejected VBM ballots across the five age categories. Again, it is important to put the raw number of rejected VBM ballots across the 67 counties in perspective. Overall in 2018, voters in the three youngest age cohorts accounted for a fraction of all the absentee ballots cast in the state. Of the more than 2.6 million VBM ballots cast statewide, voters in the three youngest age cohorts cast only 2.1 percent of all VBM ballots; yet, they accounted for 9.2 percent of all rejected VBM ballots cast statewide. In several counties, the proportion of all rejected VBM ballots was even higher for these youngest voters.

To better visualize the difference in the rejection rates of VBM ballots cast by younger and older voters, Figure 7 plots VBM ballot rejection rates by those under and over the age of 30 in a 45 degree plot. If VBM ballot rejection rates were equal for voters under 30 years old and 30 years-old and older, all 67 counties would align along the 45 degree dashed line in Figure 6. Along the horizontal (x-axis) is the rejection rate of VBM ballots (from 0 percent to 12.5 percent) cast by voters 30 and older in each county. Along the vertical (y-axis) is the rejection rate for the same range of VBM ballots cast by voters younger than 30 years old in each county. If absentee ballot rejection rates were the same in a county, all 67 counties would fall along the diagonal 45 degree.

As Figure 7 displays, however, there is an obvious pattern: younger voters in nearly every county have a considerably higher likelihood of having their VBM ballot rejected by a county's SOE and Canvassing Board in the 2018 general election than those 30 and older. In several counties, the VBM rejection rate of young voters is more than three times as great compared to older voters. In Broward County, for example, roughly 7 percent of mail ballots cast by voters under 30 were rejected, compared to less than 2.5 percent of those cast by voters 30 and over. The disparity is even higher in Lafayette, Monroe, Santa Rosa, Volusia, and Walton counties.

**Figure 6**
VBM Rejection Rate by County, by Age (2018)



**Figure 7**
VBM Rejection Rates by County, by Age (2018)



Dr. Daniel A. Smith & Anna Baringer, ACLU Florida: Report on Vote-by-Mail Ballots in the 2018 General Election

**Rejected VBM Ballots for Uniformed and Overseas Civilians**

The differential patterns of rejected VBM ballots are perhaps the most blatant when it comes to mail ballots cast by civilian overseas and military personnel. The Uniformed and Overseas Civilian Absentee Voting Act (UOCAVA) of 1986 provides ballot protections for civilian overseas, members of the uniformed service in active duty, and their dependents, allowing them to cast absentee ballots. According to Federal Voting Assistance Program, if active service members live outside their voting jurisdictions, they can vote absentee in all federal elections. In 2009, Congress passed the Military and Overseas Voter Empowerment Act (MOVE) to additionally require election offices to mail ballot to UOCAVA voters no later than 45 days before each federal election. Florida Statute 101.62 (4)(b) mandates that each SOE mail VBM ballots to voters who have requested a ballot within two business days of receiving the request. Given the laws governing absentee ballot mailing, we can safely assume that UOCAVA voters who submitted an absentee ballot request before the 47th day prior to an election should be sent a ballot 45 days before the election.

Using VBM data uploaded by SOEs on November 21, 2018, it appears that only 63.2 percent of UOCAVA voters with absentee ballot requests actually had their ballots delivered before September 22, 2018, 45 days before Election Day. Unlike other citizens who vote by mail, under federal law, UOCAVA voters are permitted up to 10 days after the election to have their VBM ballot received and processed by a local election office. As shown in Figure 8, between 3 and 12 percent of UOCAVA VBM ballots SOEs delivered 10 or fewer days before election day were rejected. As would be expected, UOCAVA ballot rejection rates are lower the further out from Election Day they were delivered to voters.

Given the various protections in place for overseas and uniformed personnel under UOCAVA, it is especially surprising that mail ballots returned by these voters are rejected at a rate higher than for voters overall in Florida. Roughly 3.2 percent of mail ballots cast by military and overseas voters–those covered under UOCAVA–were rejected by county Canvassing Boards, compared to 1.2 percent of mail ballots cast in 2018. The ballot rejection rate is higher regardless of civilian or military status. All overseas voters, civilian and uniformed, had 1.7 percent of their ballot rejected. This rejection rate is consistent whether or not the voter is a uniformed personnel or simply an overseas civilian.

Domestic military voters, however, have the highest rate of rejection of VBM ballots. As Table 7 shows, at 4.2 percent, the rejection rate in the 2018 election for VBM ballots cast by domestic military voters was higher than any rejection rate broken down by race or ethnicity. It is possible that some of these voters are not covered under UOCAVA, which only applies to voters who are members of the uniformed services on active duty, and because of their membership in the service, are absent from their voting jurisdiction. Even if the voters marked as members of the military are not in active service and therefore not protected under UOCAVA, this group's abnormally high ballot rejection rate is cause for concern.

**Figure 8**
UOCAVA VBM Rejection by Ballot Delivery (2018)



**Table 7**
Military/Overseas Vote-by-Mail Rejection, 2018 General Election

| Group | Accepted VBM | Rejected VBM | Total VBM | VBM Rejection Rate |
|---|---|---|---|---|
| All Overseas | 22,015 | 378 | 22,393 | 1.7 |
| Military Overseas | 3,443 | 61 | 3,504 | 1.7 |
| Civilian Overseas | 18,572 | 317 | 18,889 | 1.7 |
| Domestic Military | 35,540 | 1,545 | 37,085 | 4.2 |
| Military or Overseas | 57,555 | 1,923 | 59,478 | 3.2 |

## Curing Rejected "Missing" and "Mismatched" VBM Ballots

Although its offers information on voters casting VBM ballots deemed by county canvassing boards to be rejected as illegal, Florida's statewide voter file and vote history files do not detail *why* a VBM ballot is rejected. The data provided to the public from the FVRS does not provide any information about whether a VBM ballot was returned with no signature or a mismatched signature, or whether a voter casting a problematic VBM ballot tried-—and was eventually successful–at curing a VBM ballot initially flagged as invalid.

In order to get a sense of how well the VBM cure process works, it is important to examine the procedures SOEs put in place in the 2016 general election to handle VBM ballots with mismatched signatures. Unfortunately, there is no standalone record on how each of the 67 SOEs attempted to contact voters who cast VBM ballots prior to Election Day that were initially flagged as having a missing or mismatched signature on the envelope. Furthermore, there is no statewide database on how many voters who cast VBM ballots that had signature problems were actually contacted by SOEs, much less how many of these mail voters replied with an affidavit and proof of identification to cure their ballot. There is also no statewide database on the number of absentee mail voters who had their absentee ballot flagged for a signature problem who successfully cured their VBM ballot.

Due to the lack of a statewide protocols for cataloguing the processing of rejected VBM ballots in Florida, it is extremely difficult to obtain, much less systematically assess, how many voters cast VBM ballots that were initially flagged as having a missing or mismatched signature were ultimately rejected in the 2018 General Election, much less how many voters casting VBM ballots were able to cure their initially rejected VBM ballot. Despite public records requests, only 21 of the state's 67 SOEs responded to requests for data on the number of rejected and cured VBM ballots cast in the 2018 general election and the number of successful affidavits to cure a problematice VBM. It should be noted, too, that the data that were provided by the 21 counties had significantly varying details.

The analysis that follows examines the cure rates of VBM ballots initially rejected due to mismatched signatures in Pinellas County. Pinellas County, under Supervisor of Elections Deborah Clark, has led the way on processing VBM ballots. The detailed records that her office provided on the VBM ballots it received in the 2018 general election, including VBM ballots her staff initially flagged as having a mismatched voter's certificate on the envelope, as well as mismatched VBM ballots that were successfully cured by voters, offers a window into the "best practices" that other SOEs could follow to help remedy problematic VBM ballots.

## Curing Vote-by-Mail Ballots: Best Practices of Pinellas County

Pinellas County, led by SOE Deborah Clark, is the state's undisputed leader in voting by mail. Of those Pinellas County voters whose age on Election Day (according to the statewide voter file) was between 18 and 104 years old, slightly more than 241,000 voters cast VBM ballots in 2018. The county's Canvassing Board rejected only 288 of all VBM ballots, just 0.12 percent of the total, which was by far the lowest rejection rate of all counties with medium or large populations. Besides a simple VBM return envelope design, one of the reasons for Pinellas County's low rejection rate was the high cure rate of VBM ballots with signatures that were initially flagged as mismatched.

Ms. Clark's office initially identified roughly 600 VBM ballots that had signatures that appeared not to match those on file. Of those, 200 voters (33.4 percent) successfully cured their signatures by submitting proper ID and a signed affidavit. In addition, the county Canvassing Board accepted 338 VBM ballots (56.5 percent) that had initially questionable signatures without requiring the voter to submit an affidavit. The Canvassing Board rejected 60 of the VBM ballots initially screened by staff to have a mismatched signature (10.0 percent).

In the county, 340 voters returned a VBM ballot with no signature at all, as initially screened by staff. 178, or 52.3 percent of these, cured their ballot via an affidavit. It appears that the Canvassing Board accepted 35 VBM ballots (10.3 percent) that initially had no signature, although there is no record that it required the voters to submit an affidavit. The Pinellas County Canvassing Board rejected only 36.7 percent, or 128 ballots, of the VBM ballots initially screened by staff that had no signature on the return envelope.

The likelihood of having a ballot cured does depend on race. As Table 8 shows, White voters returned affidavits and had their vote-by-mail ballots accepted 44.6 percent of the time; in contrast, only 30.7 percent and 30.5 percent of Black and Hispanic voters, respectively, had their VBM ballots validated after initially being flagged. The cure rate is the lowest for people identifying with another race or ethnicity, at only 24.1 percent. Table 9 provides the breakdown of cure rate by age cohorts in Pinellas County.

Figure 9 reveals the relationship between the date on which the Pinellas County election office mails an affidavit to a voter with a problematic VBM ballot, and the number of affidavits returned. When affidavits are mailed further from the election, more are returned than not. When an affidavit is mailed out closer than a week to the election, more are not returned. The rate of affidavits being returned but not accepted again is very small, regardless of time of mailing.

**Conclusion**

In Florida, when it comes to voting a VBM ballot, voters–particularly those younger and those persons of color–have a much greater likelihood of having their absentee ballot rejected compared with older voters or White voters. Overseas and military voters are also more prone to having their VBM ballot rejected. If the rejection rates of VBM ballots were consistent across the state's 67 counties, one might chalk these disparities in VBM rejection rates up to the failings of younger voters and people of color to cast their absentee ballot properly. But the great disparities across the counties suggests that the onus of responsibility for absentee ballots to be validated in the Sunshine State also falls on county Supervisors of Elections and county Canvassing Boards.

It is well past time for uniform standards to be put into place in Florida, not only for the return envelope design of VBM ballots, but also for the processing of VBM ballots by SOEs and their staff, and the validating of signatures by the 67 Canvassing Boards. The cure process for VBM ballots with problematic signatures is now in place, but the standards by which counties are to issue and verify affidavits remains much to be desired.

**Figure 9**
VBM Affidavit Status, Pinellas (2018)



**Table 8**
Pinellas Vote-by-Mail Ballot Cures by Race and Ethnicity (2018)

| Age | Number Flagged | Cured | Cure Rate |
|---|---|---|---|
| Black | 31 | 101 | 30.69 |
| Hispanic | 18 | 59 | 30.51 |
| White | 312 | 699 | 44.64 |
| Other | 21 | 87 | 24.14 |
| Total | 946 | 382 | 40.38 |

**Table 9**
Pinellas Vote-by-Mail Ballot Cures by Age (2018)

| Age | Number Flagged | Cured | Cure Rate |
|---|---|---|---|
| 18-21 | 21 | 66 | 31.82 |
| 22-25 | 14 | 78 | 17.95 |
| 26-29 | 25 | 69 | 36.23 |
| 30-44 | 63 | 188 | 33.51 |
| 45-64 | 137 | 286 | 47.90 |
| 65-104 | 122 | 259 | 47.10 |
| Total | 946 | 382 | 40.38 |

Appendix B: State Table: How Floridians Vote

| Demographic | | Mailed | Early | Election Day |
|---|---|---|---|---|
| **Race** | American Indian or Alaskan Native | 32.0% | 30.1% | **37.9%** |
| | Asian Or Pacific Islander | **34.5%** | 32.0% | 33.5% |
| | Black, Not Hispanic | 21.9% | **44.9%** | 33.2% |
| | Hispanic | 31.4% | 31.6% | **37.0%** |
| | Multi-racial | 27.0% | 34.8% | **38.1%** |
| | Other | 28.5% | 35.0% | **36.5%** |
| | White, Not Hispanic | 34.1% | 30.5% | **35.4%** |
| | Unknown Race | 26.9% | 33.3% | 39.8% |
| **Age** | 18-21 | 20.4% | 32.6% | **47.1%** |
| | 22-25 | 22.5% | 30.0% | **47.5%** |
| | 26-29 | 21.6% | 29.6% | **48.7%** |
| | 30-44 | 21.4% | 31.8% | **46.8%** |
| | 45-65 | 27.6% | 35.9% | **36.5%** |
| | 65 or older | 45.6% | 30.1% | 24.3% |
| **Sex** | Female | 32.9% | 32.2% | **34.9%** |
| | Male | 30.2% | 33.7% | **36.1%** |
| | Unknown Gender | 44.8% | 52.8% | 2.3% |

## Notes

Figures calculated from analysis of Florida Voter File, January 2019 extract, 2018 General Election.

Appendix C: Voting Methods by County

## Large Counties

| County | Registered | Turnout | Voting Method | | |
|---|---|---|---|---|---|
| | | | Mailed | Early | Election Day |
| Brevard | 422,606 | 67.3% | 31.8% | 28.2% | 40.0% |
| Broward | 1,175,328 | 60.9% | 26.7% | 41.8% | 31.5% |
| Collier | 213,664 | 73.5% | 37.9% | 32.1% | 29.9% |
| Duval | 607,386 | 61.2% | 16.9% | 43.1% | 40.0% |
| Escambia | 212,987 | 64.6% | 26.5% | 29.9% | 43.6% |
| Hillsborough | 857,266 | 63.6% | 35.5% | 32.8% | 31.7% |
| Lake | 236,078 | 65.6% | 21.3% | 35.8% | 42.9% |
| Lee | 446,273 | 66.2% | 50.9% | 23.1% | 26.0% |
| Leon | 213,195 | 61.8% | 19.4% | 39.8% | 40.9% |
| Manatee | 245,088 | 64.3% | 41.9% | 21.0% | 37.2% |
| Marion | 243,088 | 56.9% | 27.5% | 27.8% | 44.7% |
| Miami-Dade | 1,428,856 | 53.7% | 33.2% | 37.1% | 29.7% |
| Orange | 798,373 | 60.0% | 29.3% | 37.1% | 33.7% |
| Osceola | 218,754 | 53.1% | 37.8% | 30.1% | 32.1% |
| Palm Beach | 933,572 | 63.9% | 26.3% | 29.3% | 44.4% |
| Pasco | 351,949 | 60.6% | 32.3% | 26.5% | 41.1% |
| Pinellas | 666,876 | 65.9% | 54.9% | 12.5% | 32.5% |
| Polk | 417,217 | 59.3% | 32.4% | 22.0% | 45.6% |
| Sarasota | 318,384 | 67.0% | 38.7% | 27.6% | 33.7% |
| Seminole | 303,668 | 66.2% | 27.7% | 39.5% | 32.8% |
| St. Lucie | 203,131 | 61.7% | 31.0% | 33.4% | 35.6% |
| Volusia | 382,408 | 60.4% | 34.5% | 27.5% | 38.0% |

## Mid-Size & Rural Counties

| County | Registered | Turnout | Voting Method | | |
|---|---|---|---|---|---|
| | | | Mailed | Early | Election Day |
| Alachua | 180,934 | 64.2% | 27.1% | 35.2% | 37.7% |
| Bay | 120,851 | 52.9% | 18.4% | 62.6% | 18.9% |
| Charlotte | 134,545 | 65.3% | 39.2% | 34.2% | 26.6% |
| Citrus | 109,388 | 65.4% | 36.2% | 28.2% | 35.5% |
| Clay | 153,119 | 61.4% | 21.5% | 39.8% | 38.7% |
| Flagler | 82,611 | 71.0% | 27.4% | 43.0% | 29.5% |
| Hernando | 133,853 | 67.8% | 41.5% | 21.0% | 37.4% |
| Indian River | 113,426 | 57.5% | 34.2% | 31.8% | 34.0% |
| Martin | 114,132 | 67.9% | 35.3% | 30.5% | 34.1% |
| Okaloosa | 135,563 | 62.5% | 21.9% | 37.4% | 40.7% |
| Santa Rosa | 132,357 | 57.6% | 19.7% | 35.8% | 44.4% |
| St. Johns | 187,125 | 70.4% | 22.7% | 41.8% | 35.6% |
| Sumter | 96,497 | 77.7% | 31.0% | 50.1% | 18.9% |

Appendix C: Voting Methods by County

## Small Counties

| County | Registered | Turnout | Voting Method | | |
|--------|-----------|---------|-------|-------|-------------|
| | | | Mailed | Early | Election Day |
| Baker | 15,108 | 70.2% | 15.9% | 43.8% | 40.3% |
| Bradford | 16,317 | 64.9% | 27.6% | 26.0% | 46.4% |
| Calhoun | 8,695 | 53.6% | 18.6% | 36.2% | 45.3% |
| Columbia | 40,375 | 62.0% | 23.1% | 42.2% | 34.8% |
| DeSoto | 16,735 | 60.6% | 23.8% | 32.6% | 43.6% |
| Dixie | 9,670 | 62.9% | 29.2% | 25.6% | 45.2% |
| Franklin | 7,783 | 68.5% | 28.1% | 32.8% | 39.1% |
| Gadsden | 29,450 | 63.2% | 17.6% | 42.8% | 39.7% |
| Gilchrist | 11,751 | 57.1% | 23.9% | 24.3% | 51.9% |
| Glades | 6,784 | 58.3% | 23.8% | 16.9% | 59.3% |
| Gulf | 10,198 | 59.4% | 20.4% | 56.1% | 23.4% |
| Hamilton | 7,727 | 52.8% | 26.0% | 26.3% | 47.7% |
| Hardee | 12,239 | 50.5% | 14.4% | 38.4% | 47.1% |
| Hendry | 17,773 | 60.8% | 19.7% | 41.6% | 38.7% |
| Highlands | 59,272 | 61.5% | 29.0% | 31.5% | 39.5% |
| Holmes | 10,751 | 66.1% | 25.6% | 24.3% | 50.2% |
| Jackson | 27,996 | 75.6% | 21.9% | 52.8% | 25.4% |
| Jefferson | 9,791 | 65.5% | 17.7% | 32.9% | 49.4% |
| Lafayette | 4,356 | 66.2% | 18.1% | 29.9% | 52.0% |
| Levy | 27,859 | 62.6% | 31.7% | 20.0% | 48.3% |
| Liberty | 4,374 | 64.8% | 16.0% | 34.5% | 49.5% |
| Madison | 11,840 | 67.3% | 15.4% | 42.9% | 41.7% |
| Monroe | 53,869 | 68.8% | 35.7% | 26.6% | 37.7% |
| Nassau | 66,798 | 65.6% | 25.0% | 39.3% | 35.7% |
| Okeechobee | 20,552 | 55.3% | 21.6% | 35.9% | 42.5% |
| Putnam | 47,218 | 60.0% | 20.6% | 33.1% | 46.3% |
| Suwannee | 25,813 | 62.1% | 25.2% | 28.9% | 45.8% |
| Taylor | 12,142 | 65.8% | 26.8% | 28.5% | 44.7% |
| Union | 7,396 | 66.3% | 18.0% | 33.1% | 48.9% |
| Wakulla | 20,810 | 68.8% | 20.6% | 37.1% | 42.3% |
| Walton | 50,263 | 60.8% | 19.9% | 35.6% | 44.5% |
| Washington | 15,817 | 57.7% | 22.9% | 30.9% | 46.1% |

## Notes

Bottom 25% in each size category highlighted for percent of votes mailed and cast early, while top 25% highlighted for percent of votes cast on election day. Percent of ballots cast calculated from Fla. Dept. of State, Division of Elections, 2018 General Election Reports: Early Voting and Vote by Mail Report and Official Results, Voter Turnout.

Appendix D: County Vote-By-Mail Performance

## Large Counties

| County | Mailed Ballots | Percent Mailed | Rejected Ballots | Rejection Rate |
|---|---|---|---|---|
| Brevard | 91,538 | 31.8% | 730 | 0.8 |
| Broward | 199,379 | 26.7% | 5,471 | 2.74 |
| Collier | 60,258 | 37.9% | 428 | 0.71 |
| Duval | 65,554 | 16.9% | 878 | 1.34 |
| Escambia | 35,362 | 26.5% | 580 | 1.64 |
| Hillsborough | 190,205 | 35.5% | 1,713 | 0.9 |
| Lake | 34,322 | 21.3% | 777 | 2.26 |
| Lee | 150,919 | 50.9% | 1,262 | 0.84 |
| Leon | 27,675 | 19.4% | 72 | 0.26 |
| Manatee | 70,644 | 41.9% | 386 | 0.55 |
| Marion | 43,617 | 27.5% | 86 | 0.2 |
| Miami-Dade | 276,123 | 33.2% | 6,404 | 2.32 |
| Orange | 141,079 | 29.3% | 1641 | 1.16 |
| Osceola | 45,472 | 37.8% | 482 | 1.06 |
| Palm Beach | 161,095 | 26.3% | 2193 | 1.36 |
| Pasco | 70,560 | 32.3% | 365 | 0.52 |
| Pinellas | 241,005 | 54.9% | 288 | 0.12 |
| Polk | 81,192 | 32.4% | 340 | 0.42 |
| Sarasota | 83,088 | 38.7% | 131 | 0.16 |
| Seminole | 57,796 | 27.7% | 1,217 | 2.11 |
| St. Lucie | 40,074 | 31.0% | 678 | 1.69 |
| Volusia | 81,546 | 34.5% | 1,960 | 2.4 |

## Mid-Size & Rural Counties

| County | Mailed Ballots | Percent Mailed | Rejected Ballots | Rejection Rate |
|---|---|---|---|---|
| Alachua | 32,121 | 27.1% | 736 | 2.29 |
| Bay | 12,306 | 18.4% | 373 | 3.03 |
| Charlotte | 34,954 | 39.2% | 155 | 0.44 |
| Citrus | 26,260 | 36.2% | 275 | 1.05 |
| Clay | 20,661 | 21.5% | 119 | 0.58 |
| Flagler | 14,830 | 27.4% | 246 | 1.66 |
| Hernando | 34,462 | 41.5% | 140 | 0.41 |
| Indian River | 25,931 | 34.2% | 140 | 0.54 |
| Martin | 28,030 | 35.3% | 67 | 0.24 |
| Okaloosa | 18,919 | 21.9% | 373 | 1.97 |
| Santa Rosa | 15,410 | 19.7% | 291 | 1.89 |
| St. Johns | 29,974 | 22.7% | 99 | 0.33 |
| Sumter | 23,736 | 31.0% | 157 | 0.66 |

Appendix D: County Vote-By-Mail Performance

## Small & Rural Counties

| County | Mailed Ballots | Percent Mailed | Rejected Ballots | Rejection Rate |
|---|---|---|---|---|
| Baker | 1,675 | 15.9% | 0 | 0 |
| Bradford | 2,946 | 27.6% | 17 | 0.58 |
| Calhoun | 849 | 18.6% | 13 | 1.53 |
| Columbia | 5,905 | 23.1% | 117 | 1.98 |
| DeSoto | 2,141 | 23.8% | 1 | 0.05 |
| Dixie | 1,749 | 29.2% | 22 | 1.26 |
| Franklin | 1,566 | 28.1% | 10 | 0.64 |
| Gadsden | 3,580 | 17.6% | 31 | 0.87 |
| Gilchrist | 1,790 | 23.9% | 24 | 1.34 |
| Glades | 929 | 23.8% | 4 | 0.43 |
| Gulf | 1,264 | 20.4% | 40 | 3.16 |
| Hamilton | 1,198 | 26.0% | 0 | 0 |
| Hardee | 937 | 14.4% | 3 | 0.32 |
| Hendry | 1,804 | 19.7% | 15 | 0.83 |
| Highlands | 11,892 | 29.0% | 79 | 0.66 |
| Holmes | 1,757 | 25.6% | 9 | 0.51 |
| Jackson | 3,534 | 21.9% | 7 | 0.2 |
| Jefferson | 1,309 | 17.7% | 0 | 0 |
| Lafayette | 537 | 18.1% | 11 | 2.05 |
| Levy | 5,549 | 31.7% | 62 | 1.12 |
| Liberty | 442 | 16.0% | 3 | 0.68 |
| Madison | 1,214 | 15.4% | 33 | 2.72 |
| Monroe | 13,531 | 35.7% | 357 | 2.64 |
| Nassau | 11,006 | 25.0% | 16 | 0.15 |
| Okeechobee | 2,457 | 21.6% | 30 | 1.22 |
| Putnam | 5,925 | 20.6% | 68 | 1.15 |
| Suwannee | 4,074 | 25.2% | 9 | 0.22 |
| Taylor | 2,150 | 26.8% | 15 | 0.7 |
| Union | 880 | 18.0% | 1 | 0.11 |
| Wakulla | 2,983 | 20.6% | 36 | 1.21 |
| Walton | 6,201 | 19.9% | 110 | 1.77 |
| Washington | 2,115 | 22.9% | 37 | 1.75 |

## Notes

Best performing counties highlighted in blue, with worst performing highlighting red. Percent of ballots cast calculated from Fla. Dept. of State, Division of Elections, 2018 General Election Reports: Early Voting and Vote by Mail Report and Official Results, Voter Turnout. Vote-by-mail analysis of Florida Voter File, January 2019, 2018 General Election, performed by Dr. Daniel A. Smith and Anna Baringer, *University of Florida*.

# Appendix E: County Vote-By-Mail Age Disparities

## Small Counties

| County | VBM Ballots Cast | | | | | | | Rejection Rate | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18-21 | 22-25 | 26-29 | 30-44 | 45-64 | 65+ | | 18-21 | 22-25 | 26-29 | 30-44 | 45-64 | 65+ |
| Baker | 41 | 38 | 38 | 224 | 548 | 786 | | - | - | - | - | - | - |
| Bradford | 58 | 62 | 71 | 336 | 934 | 1,485 | | - | - | - | - | - | - |
| Calhoun | 27 | 24 | 31 | 92 | 246 | 429 | | - | - | - | - | - | - |
| Columbia | 97 | 114 | 139 | 540 | 1,973 | 3,042 | | - | 8.77 | - | 2.96 | 2.23 | 1.18 |
| DeSoto | 28 | 37 | 47 | 151 | 565 | 1,313 | | - | - | - | - | - | - |
| Dixie | 26 | 20 | 31 | 166 | 581 | 925 | | - | - | - | - | - | 1.08 |
| Franklin | 21 | 30 | 27 | 100 | 483 | 905 | | - | - | - | - | - | - |
| Gadsden | 71 | 77 | 103 | 415 | 1,149 | 1,765 | | - | - | - | - | 1.04 | - |
| Gilchrist | 39 | 40 | 56 | 174 | 638 | 843 | | - | - | - | - | - | - |
| Glades | 20 | 23 | 19 | 67 | 274 | 526 | | - | - | - | - | - | - |
| Gulf | 24 | 18 | 26 | 100 | 402 | 694 | | - | - | - | - | 4.23 | 1.87 |
| Hamilton | 21 | 20 | 21 | 121 | 426 | 589 | | - | - | - | - | - | - |
| Hardee | 24 | 37 | 28 | 87 | 257 | 504 | | - | - | - | - | - | - |
| Hendry | 56 | 42 | 53 | 184 | 611 | 858 | | - | - | - | - | - | - |
| Highlands | 149 | 166 | 148 | 633 | 2,811 | 7,985 | | 6.71 | 6.02 | - | - | 0.82 | 0.28 |
| Holmes | 24 | 44 | 31 | 187 | 615 | 856 | | - | - | - | - | - | - |
| Jackson | 85 | 76 | 77 | 337 | 1,094 | 1,865 | | - | - | - | - | - | - |
| Jefferson | 29 | 36 | 35 | 122 | 405 | 682 | | - | - | - | - | - | - |
| Lafayette | 16 | 18 | 18 | 62 | 139 | 234 | | - | - | - | - | - | - |
| Levy | 74 | 97 | 112 | 458 | 1,821 | 2,987 | | - | - | - | 3.06 | 0.93 | 0.70 |
| Liberty | 15 | 11 | 11 | 59 | 134 | 212 | | - | - | - | - | - | - |
| Madison | 19 | 35 | 41 | 113 | 369 | 637 | | - | - | - | - | 2.71 | 2.04 |
| Monroe | 203 | 278 | 286 | 1,516 | 4,915 | 6,333 | | 9.36 | 7.19 | 11.54 | 5.01 | 1.95 | 1.78 |
| Nassau | 197 | 190 | 217 | 1,176 | 3,588 | 5,638 | | - | - | - | - | - | - |
| Okeechobee | 40 | 50 | 39 | 209 | 798 | 1,321 | | - | - | - | - | - | 0.91 |
| Putnam | 62 | 87 | 104 | 477 | 1,860 | 3,335 | | - | - | - | - | 1.18 | 0.69 |
| Suwannee | 78 | 74 | 79 | 314 | 1,267 | 2,262 | | - | - | - | - | - | - |
| Taylor | 26 | 51 | 54 | 177 | 734 | 1,108 | | - | - | - | - | - | - |
| Union | 18 | 30 | 35 | 135 | 315 | 347 | | - | - | - | - | - | - |
| Wakulla | 64 | 77 | 89 | 403 | 1,023 | 1,327 | | - | - | - | - | 1.08 | - |
| Walton | 124 | 108 | 108 | 633 | 2,195 | 3,033 | | 9.68 | - | - | 3.00 | 1.59 | 0.92 |
| Washington | 40 | 61 | 55 | 209 | 718 | 1,032 | | - | - | - | - | 1.81 | - |

## Notes

Rates not calculated for categories with fewer than 10 rejected ballots. Largest age disparities, comparing age group to all older voters, highlighted in red. Vote-by-mail analysis of Florida Voter File, January 2019, 2018 General Election, performed by Dr. Daniel A. Smith and Anna Baringer, *University of Florida.*

Appendix E: County Vote-By-Mail Age Disparities

## Large Counties

| County | VBM Ballots Cast | | | | | | Rejection Rate | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18-21 | 22-25 | 26-29 | 30-44 | 45-64 | 65+ | 18-21 | 22-25 | 26-29 | 30-44 | 45-64 | 65+ |
| Brevard | 1,664 | 1,845 | 2,094 | 8,710 | 30,860 | 46,365 | 4.39 | 3.52 | 2.15 | 1.76 | 0.70 | 0.39 |
| Broward | 5,676 | 6,450 | 6,708 | 28,630 | 71,076 | 80,839 | 10.34 | 6.50 | 5.59 | 3.42 | 2.33 | 1.80 |
| Collier | 1,022 | 952 | 869 | 3,684 | 15,575 | 38,156 | 6.87 | 4.41 | 2.65 | 1.52 | 0.65 | 0.38 |
| Duval | 1,541 | 1,957 | 2,475 | 10,263 | 21,594 | 27,724 | 7.07 | 4.24 | 3.52 | 2.75 | 0.98 | 0.38 |
| Escambia | 605 | 829 | 1,164 | 5,424 | 11,258 | 16,082 | 6.61 | 4.70 | 4.64 | 4.33 | 1.17 | 0.50 |
| Hillsborough | 4,729 | 6,125 | 7,102 | 32,693 | 68,356 | 71,200 | 4.72 | 3.04 | 2.59 | 1.36 | 0.63 | 0.34 |
| Lake | 550 | 612 | 663 | 3,035 | 9,733 | 19,729 | 7.82 | 7.19 | 6.64 | 4.48 | 2.38 | 1.41 |
| Lee | 1,809 | 2,186 | 2,370 | 12,023 | 44,894 | 87,637 | 4.26 | 4.39 | 2.95 | 2.21 | 0.83 | 0.43 |
| Leon | 1,135 | 1,621 | 1,586 | 4,599 | 7,930 | 10,804 | 0.70 | 0.62 | 0.76 | 0.30 | 0.16 | 0.14 |
| Manatee | 1,062 | 1,152 | 1,225 | 5,901 | 22,346 | 38,958 | 2.26 | 1.39 | 1.14 | 0.86 | 0.60 | 0.38 |
| Marion | 522 | 645 | 624 | 2,641 | 10,939 | 28,246 | - | 0.47 | 0.48 | 0.49 | 0.25 | 0.14 |
| Miami-Dade | 6,981 | 9,079 | 10,186 | 41,441 | 90,326 | 118,110 | 8.44 | 6.25 | 5.42 | 3.19 | 2.01 | 1.32 |
| Orange | 4,225 | 5,491 | 6,307 | 25,942 | 51,669 | 47,445 | 4.09 | 3.33 | 2.55 | 1.43 | 0.87 | 0.65 |
| Osceola | 1,194 | 1,410 | 1,569 | 7,514 | 17,649 | 16,136 | 1.34 | 2.13 | 1.72 | 1.17 | 1.06 | 0.83 |
| Palm Beach | 4,132 | 4,488 | 4,398 | 17,188 | 45,895 | 84,994 | 5.78 | 4.37 | 3.52 | 2.01 | 1.16 | 0.85 |
| Pasco | 1,146 | 1,244 | 1,419 | 8,114 | 23,194 | 35,443 | 3.32 | 2.89 | 1.41 | 0.91 | 0.40 | 0.29 |
| Pinellas | 3,754 | 4,993 | 5,957 | 27,473 | 86,956 | 111,872 | 0.69 | 0.38 | 0.44 | 0.19 | 0.10 | 0.07 |
| Polk | 1,304 | 1,482 | 1,834 | 8,409 | 25,251 | 42,912 | 2.45 | 1.48 | 1.58 | 0.78 | 0.42 | 0.20 |
| Sarasota | 1,203 | 1,146 | 1,173 | 4,956 | 20,707 | 53,903 | 0.42 | 1.22 | 0.60 | 0.54 | 0.15 | 0.09 |
| Seminole | 1,587 | 1,937 | 2,116 | 9,017 | 20,422 | 22,717 | 6.81 | 5.94 | 6.10 | 3.32 | 1.71 | 0.96 |
| St. Lucie | 625 | 701 | 795 | 3,969 | 12,308 | 21,676 | 6.56 | 5.42 | 5.53 | 3.43 | 1.90 | 0.85 |
| Volusia | 1,204 | 1,506 | 1,650 | 7,264 | 25,754 | 44,168 | 7.97 | 8.57 | 7.03 | 4.90 | 2.49 | 1.41 |

## Mid-Size & Rural Counties

| County | VBM Ballots Cast | | | | | | Rejection Rate | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18-21 | 22-25 | 26-29 | 30-44 | 45-64 | 65+ | 18-21 | 22-25 | 26-29 | 30-44 | 45-64 | 65+ |
| Alachua | 1,094 | 1,696 | 1,613 | 5,301 | 9,379 | 13,038 | 7.40 | 7.02 | 5.08 | 3.41 | 1.80 | 0.80 |
| Flagler | 214 | 249 | 312 | 1,585 | 3,948 | 5,998 | 7.48 | 7.63 | 6.41 | 5.11 | 3.17 | 1.87 |
| Citrus | 301 | 342 | 335 | 1,487 | 9,465 | 23,024 | 3.99 | 2.05 | 0.90 | 1.48 | 0.45 | 0.30 |
| Clay | 270 | 254 | 274 | 1,329 | 7,031 | 17,102 | 4.81 | 3.15 | 3.65 | 3.01 | 1.45 | 0.60 |
| Okaloosa | 530 | 485 | 506 | 2,661 | 7,407 | 9,072 | 3.58 | 2.06 | 2.37 | 0.98 | 0.31 | 0.32 |
| Bay | 197 | 227 | 221 | 1,006 | 4,208 | 8,971 | 7.61 | 11.14 | 5.43 | 5.67 | 1.81 | 0.68 |
| Santa Rosa | 489 | 565 | 591 | 2,710 | 10,534 | 19,573 | 2.45 | 1.95 | 1.86 | 0.70 | 0.45 | 0.20 |
| Charlotte | 419 | 441 | 390 | 1,684 | 6,821 | 16,176 | 6.44 | 3.40 | 3.08 | 1.31 | 0.35 | 0.25 |
| Hernando | 614 | 513 | 446 | 2,007 | 7,810 | 16,640 | 0.49 | 0.78 | 0.45 | 0.35 | 0.29 | 0.17 |
| Indian River | 415 | 475 | 681 | 3,819 | 5,988 | 7,541 | 6.99 | 5.26 | 4.26 | 3.67 | 1.72 | 0.62 |
| Martin | 377 | 393 | 552 | 2,871 | 5,236 | 5,981 | 11.14 | 8.91 | 4.35 | 3.59 | 1.15 | 0.45 |
| St. Johns | 1,110 | 872 | 712 | 4,305 | 9,905 | 13,070 | 1.35 | 0.80 | 1.40 | 0.53 | 0.19 | 0.19 |
| Sumter | 59 | 87 | 84 | 517 | 3,702 | 19,287 | 5.08 | 4.60 | 1.19 | 2.71 | 0.81 | 0.54 |

# Appendix F: County Vote-By-Mail Racial Disparities

## Large Counties

| County | VBM Ballots Cast | | | | Rejected Ballots | | | | Rejection Rate | | |
|--------|-------|----------|-------|-------|-------|----------|-------|-------|-------|----------|-------|
| | Black | Hispanic | White | Other | Black | Hispanic | White | Other | Black | Hispanic | White |
| Brevard | 5,788 | 3,895 | 77,591 | 4,264 | 72 | 60 | 526 | 72 | 1.24 | 1.54 | 0.68 |
| Broward | 38,453 | 34,345 | 110,170 | 16,411 | 1,098 | 1,076 | 2,683 | 614 | 2.86 | 3.13 | 2.44 |
| Collier | 790 | 2,940 | 54,787 | 1,741 | 31 | 41 | 339 | 17 | 3.92 | 1.39 | 0.62 |
| Duval | 12,046 | 2,622 | 46,276 | 4,610 | 220 | 40 | 509 | 109 | 1.83 | 1.53 | 1.10 |
| Escambia | 4,997 | 580 | 27,768 | 2,017 | 113 | 12 | 408 | 47 | 2.26 | 2.07 | 1.47 |
| Hillsborough | 21,763 | 23,956 | 130,802 | 13,684 | 286 | 293 | 926 | 208 | 1.31 | 1.22 | 0.71 |
| Lake | 2,315 | 2,045 | 28,352 | 1,610 | 80 | 89 | 538 | 70 | 3.46 | 4.35 | 1.90 |
| Lee | 4,362 | 7,445 | 133,899 | 5,213 | 92 | 127 | 975 | 68 | 2.11 | 1.71 | 0.73 |
| Leon | 6,011 | 845 | 19,302 | 1,517 | 24 | 7 | 35 | 6 | 0.40 | - | 0.18 |
| Manatee | 2,859 | 2,350 | 62,783 | 2,652 | 39 | 33 | 292 | 22 | 1.36 | 1.40 | 0.47 |
| Marion | 2,953 | 2,055 | 37,174 | 1,435 | 12 | 13 | 56 | 5 | 0.41 | 0.63 | 0.15 |
| Miami-Dade | 33,366 | 169,761 | 57,224 | 15,772 | 968 | 3,738 | 1,164 | 534 | 2.90 | 2.20 | 2.03 |
| Orange | 19,378 | 27,390 | 80,345 | 13,966 | 294 | 461 | 636 | 250 | 1.52 | 1.68 | 0.79 |
| Osceola | 3,270 | 17,307 | 21,611 | 3,284 | 53 | 248 | 129 | 52 | 1.62 | 1.43 | 0.60 |
| Palm Beach | 16,822 | 12,579 | 120,824 | 10,870 | 357 | 249 | 1,387 | 200 | 2.12 | 1.98 | 1.15 |
| Pasco | 2,605 | 4,394 | 60,145 | 3,416 | 25 | 58 | 255 | 27 | 0.96 | 1.32 | 0.42 |
| Pinellas | 15,055 | 8,158 | 206,227 | 11,565 | 32 | 18 | 213 | 25 | 0.21 | 0.22 | 0.10 |
| Polk | 7,654 | 6,366 | 63,483 | 3,689 | 55 | 59 | 184 | 42 | 0.72 | 0.93 | 0.29 |
| Sarasota | 1,571 | 1,817 | 75,924 | 3,776 | 8 | 6 | 104 | 13 | - | - | 0.14 |
| Seminole | 3,731 | 5,757 | 43,619 | 4,689 | 116 | 165 | 788 | 148 | 3.11 | 2.87 | 1.81 |
| St. Lucie | 5,275 | 2,833 | 30,095 | 1,871 | 106 | 76 | 450 | 46 | 2.01 | 2.68 | 1.50 |
| Volusia | 4,215 | 4,088 | 69,904 | 3,339 | 187 | 205 | 1,424 | 144 | 4.44 | 5.01 | 2.04 |

## Mid-Size & Rural Counties

| County | VBM Ballots Cast | | | | Rejected Ballots | | | | Rejection Rate | | |
|--------|-------|----------|-------|-------|-------|----------|-------|-------|-------|----------|-------|
| | Black | Hispanic | White | Other | Black | Hispanic | White | Other | Black | Hispanic | White |
| Alachua | 4,255 | 1,444 | 24,101 | 2,321 | 126 | 62 | 443 | 105 | 2.96 | 4.29 | 1.84 |
| Flagler | 1,058 | 656 | 12,286 | 830 | 29 | 23 | 170 | 24 | 2.74 | 3.51 | 1.38 |
| Citrus | 452 | 492 | 24,386 | 930 | 6 | 5 | 245 | 19 | - | - | 1.00 |
| Clay | 1,501 | 864 | 17,108 | 1,188 | 13 | 10 | 85 | 11 | 0.87 | 1.16 | 0.50 |
| Okaloosa | 1,248 | 554 | 15,794 | 1,323 | 34 | 19 | 277 | 43 | 2.72 | 3.43 | 1.75 |
| Bay | 1,008 | 205 | 10,576 | 517 | 46 | 10 | 292 | 25 | 4.56 | 4.88 | 2.76 |
| Santa Rosa | 643 | 324 | 13,640 | 803 | 16 | 12 | 240 | 23 | 2.49 | 3.70 | 1.76 |
| Charlotte | 967 | 765 | 32,066 | 1,156 | 9 | 10 | 130 | 6 | - | 1.31 | 0.41 |
| Hernando | 1,245 | 1,850 | 30,218 | 1,149 | 11 | 19 | 102 | 8 | 0.88 | 1.03 | 0.34 |
| Indian River | 990 | 773 | 23,254 | 914 | 8 | 4 | 121 | 7 | - | - | 0.52 |
| Martin | 627 | 719 | 25,944 | 740 | 3 | 4 | 56 | 4 | - | - | 0.22 |
| St. Johns | 1,140 | 866 | 26,585 | 1,383 | 5 | 5 | 83 | 6 | - | - | 0.31 |
| Sumter | 494 | 277 | 22,377 | 588 | 4 | 4 | 145 | 4 | - | - | 0.65 |

Appendix F: County Vote-By-Mail Racial Disparities

## Small Counties

| County | VBM Ballots Cast | | | | Rejected Ballots | | | | Rejection Rate | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Black | Hispanic | White | Other | Black | Hispanic | White | Other | Black | Hispanic | White |
| Baker | 140 | 7 | 1,487 | 41 | - | - | - | - | - | - | - |
| DeSoto | 148 | 88 | 1,875 | 30 | - | - | 1 | - | - | - | - |
| Franklin | 123 | 8 | 1,421 | 14 | 1 | - | 8 | 1 | - | - | - |
| Gadsden | 2,058 | 35 | 1,390 | 97 | 25 | 1 | 5 | - | 1.21 | - | - |
| Glades | 29 | 32 | 841 | 27 | - | - | 4 | - | - | - | - |
| Hamilton | 262 | 12 | 902 | 22 | - | - | - | - | - | - | - |
| Hardee | 42 | 82 | 788 | 25 | 1 | 2 | - | - | - | - | - |
| Hendry | 183 | 275 | 1,284 | 62 | 1 | 4 | 9 | 1 | - | - | - |
| Holmes | 21 | 7 | 1,691 | 38 | - | - | 9 | - | - | - | - |
| Jackson | 697 | 28 | 2,713 | 96 | 1 | - | 6 | - | - | - | - |
| Jefferson | 366 | 12 | 910 | 21 | - | - | - | - | - | - | - |
| Lafayette | 5 | 8 | 519 | 5 | 1 | - | 9 | 1 | - | - | - |
| Liberty | 40 | - | 391 | 11 | - | - | 3 | - | - | - | - |
| Suwannee | 277 | 51 | 3,653 | 93 | 1 | - | 8 | - | - | - | - |
| Union | 69 | 8 | 793 | 10 | - | - | - | - | - | - | - |
| Monroe | 296 | 1,299 | 11,467 | 69 | 7 | 28 | 311 | 11 | - | 2.16 | 2.71 |
| Highlands | 599 | 752 | 10,193 | 348 | 14 | 9 | 49 | 7 | 2.34 | - | 0.48 |
| Madison | 373 | 10 | 797 | 34 | 17 | - | 15 | 1 | 4.56 | - | 1.88 |
| Columbia | 688 | 128 | 4,931 | 158 | 23 | 5 | 85 | 4 | 3.34 | - | 1.72 |
| Bradford | 256 | 18 | 2,585 | 87 | - | - | 15 | 2 | - | - | 0.58 |
| Calhoun | 82 | 9 | 735 | 23 | 1 | 1 | 11 | - | - | - | 1.50 |
| Dixie | 38 | 7 | 1,664 | 40 | - | - | 22 | - | - | - | 1.32 |
| Gilchrist | 17 | 26 | 1,711 | 36 | 2 | 1 | 19 | 2 | - | - | 1.11 |
| Gulf | 140 | 5 | 1,095 | 24 | 6 | - | 32 | 2 | - | - | 2.92 |
| Levy | 245 | 115 | 5,072 | 117 | 5 | 1 | 55 | 1 | - | - | 1.08 |
| Nassau | 530 | 158 | 9,932 | 386 | 1 | - | 14 | 1 | - | - | 0.14 |
| Okeechobee | 109 | 139 | 2,132 | 77 | 3 | 5 | 22 | - | - | - | 1.03 |
| Putnam | 582 | 129 | 5,048 | 166 | 9 | 4 | 53 | 2 | - | - | 1.05 |
| Taylor | 285 | 13 | 1,804 | 48 | 3 | - | 12 | - | - | - | 0.67 |
| Wakulla | 271 | 37 | 2,604 | 71 | 7 | - | 25 | 4 | - | - | 0.96 |
| Walton | 171 | 89 | 5,716 | 225 | 3 | 3 | 97 | 7 | - | - | 1.70 |
| Washington | 205 | 13 | 1,835 | 62 | 3 | - | 30 | 4 | - | - | 1.63 |

## Notes

Largest racial disparities highlighted in red. Vote-by-mail analysis of Florida Voter File, January 2019, 2018 General Election, performed by Dr. Daniel A. Smith and Anna Baringer, *University of Florida.*

Appendix G: County Early Voting Access

## Large Counties

| County | Early Voting Access | | | | Early Voting Performance | |
|--------|-----------|------|-------------|-----------------|-------------|---------------|
|        | Locations | Days | Total Hours | Voters per Hour | Early Votes | Percent Early |
| Brevard | 9 | 8 | 666 | 635 | 80,050 | 28.2% |
| Broward | 21 | 14 | 3,528 | 333 | 299,154 | 41.8% |
| Collier | 9 | 10 | 810 | 264 | 50,483 | 32.1% |
| Duval | 20 | 14 | 2,250 | 270 | 164,682 | 43.1% |
| Escambia | 9 | 13 | 1,170 | 182 | 39,052 | 29.9% |
| Hillsborough | 20 | 14 | 3,360 | 255 | 172,818 | 32.8% |
| Lake | 10 | 13 | 1,040 | 227 | 55,972 | 35.8% |
| Lee | 10 | 13 | 1,040 | 429 | 67,760 | 23.1% |
| Leon | 9 | 14 | 1,008 | 212 | 56,121 | 39.8% |
| Manatee | 5 | 11 | 550 | 446 | 34,567 | 21.0% |
| Marion | 9 | 10 | 900 | 270 | 43,445 | 27.8% |
| Miami-Dade | 28 | 14 | 4,704 | 304 | 302,068 | 37.1% |
| Orange | 16 | 14 | 2,240 | 356 | 177,643 | 37.1% |
| Osceola | 6 | 10 | 600 | 365 | 34,936 | 30.1% |
| Palm Beach | 14 | 14 | 2,352 | 397 | 174,427 | 29.3% |
| Pasco | 11 | 11 | 1,452 | 242 | 56,634 | 26.5% |
| Pinellas | 5 | 14 | 840 | 794 | 54,988 | 12.5% |
| Polk | 9 | 11 | 891 | 468 | 54,412 | 22.0% |
| Sarasota | 6 | 13 | 780 | 408 | 58,903 | 27.6% |
| Seminole | 7 | 14 | 1,176 | 258 | 79,437 | 39.5% |
| St. Lucie | 5 | 14 | 560 | 363 | 41,887 | 33.4% |
| Volusia | 5 | 9 | 540 | 708 | 63,541 | 27.5% |

## Mid-Size & Rural Counties

| County | Early Voting Access | | | | Early Voting Performance | |
|--------|-----------|------|-------------|-----------------|-------------|---------------|
|        | Locations | Days | Total Hours | Voters per Hour | Early Votes | Percent Early |
| Alachua | 6 | 13 | 702 | 258 | 40,882 | 35.2% |
| Bay | 6 | 9 | 648 | 186 | 40,015 | 62.6% |
| Charlotte | 3 | 14 | 504 | 267 | 30,103 | 34.2% |
| Citrus | 4 | 9 | 288 | 380 | 20,181 | 28.2% |
| Clay | 6 | 9 | 540 | 284 | 37,410 | 39.8% |
| Flagler | 3 | 13 | 312 | 265 | 22,941 | 43.0% |
| Hernando | 4 | 11 | 352 | 380 | 17,137 | 21.0% |
| Indian River | 3 | 13 | 312 | 364 | 23,844 | 31.8% |
| Martin | 7 | 8 | 504 | 226 | 24,001 | 30.5% |
| Okaloosa | 5 | 13 | 650 | 209 | 31,660 | 37.4% |
| Santa Rosa | 4 | 13 | 520 | 255 | 27,316 | 35.8% |
| St. Johns | 7 | 11 | 770 | 243 | 55,011 | 41.8% |
| Sumter | 6 | 12 | 648 | 149 | 37,562 | 50.1% |

Appendix G: County Early Voting Access

## Small Counties

| County | Early Voting Access | | | | Early Voting Performance | |
|---|---|---|---|---|---|---|
| | Locations | Days | Total Hours | Voters per Hour | Early Votes | Percent Early |
| Baker | 1 | 10 | 100 | 151 | 4,646 | 43.8% |
| Bradford | 1 | 14 | 126 | 130 | 2,751 | 26.0% |
| Calhoun | 1 | 14 | 132 | 66 | 1,685 | 36.2% |
| Columbia | 2 | 8 | 144 | 280 | 10,565 | 42.2% |
| DeSoto | 1 | 13 | 104 | 161 | 2,936 | 32.6% |
| Dixie | 1 | 9 | 88 | 110 | 1,500 | 25.6% |
| Franklin | 2 | 9 | 180 | 43 | 1,811 | 32.8% |
| Gadsden | 4 | 14 | 488 | 60 | 8,622 | 42.8% |
| Gilchrist | 1 | 8 | 78 | 151 | 1,800 | 24.3% |
| Glades | 1 | 8 | 64 | 106 | 653 | 16.9% |
| Gulf | 2 | 9 | 216 | 47 | 3,339 | 56.1% |
| Hamilton | 1 | 8 | 64 | 121 | 1,207 | 26.3% |
| Hardee | 1 | 10 | 80 | 153 | 2,483 | 38.4% |
| Hendry | 2 | 13 | 228 | 78 | 3,729 | 41.6% |
| Highlands | 3 | 10 | 240 | 247 | 12,639 | 31.5% |
| Holmes | 1 | 8 | 71 | 151 | 1,662 | 24.3% |
| Jackson | 3 | 9 | 243 | 115 | 8,504 | 52.8% |
| Jefferson | 1 | 13 | 104 | 94 | 2,433 | 32.9% |
| Lafayette | 1 | 8 | 64 | 68 | 853 | 29.9% |
| Levy | 1 | 13 | 130 | 214 | 3,443 | 20.0% |
| Liberty | 1 | 13 | 104 | 42 | 945 | 34.5% |
| Madison | 4 | 8 | 266 | 45 | 3,295 | 42.9% |
| Monroe | 5 | 13 | 520 | 104 | 9,748 | 26.6% |
| Nassau | 4 | 9 | 288 | 232 | 17,210 | 39.3% |
| Okeechobee | 1 | 13 | 104 | 198 | 4,074 | 35.9% |
| Putnam | 3 | 10 | 270 | 175 | 9,373 | 33.1% |
| Suwannee | 3 | 9 | 216 | 120 | 4,635 | 28.9% |
| Taylor | 1 | 13 | 156 | 78 | 2,280 | 28.5% |
| Union | 1 | 8 | 78 | 95 | 1,623 | 33.1% |
| Wakulla | 1 | 8 | 80 | 260 | 5,303 | 37.1% |
| Walton | 4 | 8 | 256 | 196 | 10,889 | 35.6% |

## Notes

Best performing counties highlighted in blue, with worst performing highlighted in red. Early voting hours and locations from Fla. Dept. of State, Division of Elections, 2018 General Election Early Voting Locations and Times Report. Percent of ballots cast calculated from Fla. Dept. of State, Division of Elections, 2018 General Election Reports: Early Voting and Official Results, Voter Turnout.

Appendix H: County Polling Place Accessibility

## Large Counties

| County | Polling Location Type | | | | Precinct Size | |
|--------|-----------|---------|-----------|--------|---------|---------|
| | Precincts | Private | Religious | Public | Average | Largest |
| Brevard | 171 | 12% | 47% | 40% | 2,639 | 10,409 |
| Broward | 576 | 30% | 14% | 57% | 2,044 | 8,775 |
| Collier | 59 | 36% | 36% | 29% | 3,695 | 6,877 |
| Duval | 198 | 18% | 55% | 27% | 3,057 | 8,390 |
| Escambia | 79 | 22% | 52% | 27% | 2,700 | 6,879 |
| Hillsborough | 390 | 18% | 54% | 28% | 2,211 | 7,640 |
| Lake | 102 | 47% | 37% | 16% | 2,309 | 8,668 |
| Lee | 125 | 17% | 65% | 18% | 3,555 | 9,424 |
| Leon | 161 | 14% | 61% | 24% | 1,385 | 7,705 |
| Manatee | 70 | 36% | 50% | 14% | 3,501 | 7,626 |
| Marion | 125 | 39% | 41% | 20% | 1,943 | 5,334 |
| Miami-Dade | 783 | 10% | 21% | 68% | 1,876 | 7,473 |
| Orange | 247 | 24% | 52% | 24% | 3,250 | 6,840 |
| Osceola | 95 | 17% | 15% | 68% | 2,588 | 10,687 |
| Palm Beach | 872 | 28% | 22% | 50% | 1,185 | 3,808 |
| Pasco | 113 | 56% | 27% | 17% | 3,188 | 9,596 |
| Pinellas | 300 | 22% | 45% | 33% | 2,228 | 6,414 |
| Polk | 167 | 22% | 61% | 17% | 2,489 | 7,984 |
| Sarasota | 99 | 25% | 53% | 22% | 3,211 | 11,096 |
| Seminole | 80 | 15% | 59% | 26% | 3,796 | 7,940 |
| St. Lucie | 66 | 33% | 33% | 33% | 3,168 | 11,508 |
| Volusia | 125 | 14% | 48% | 38% | 3,048 | 6,391 |

## Mid-Size & Rural Counties

| County | Polling Location Type | | | | Precinct Size | |
|--------|-----------|---------|-----------|--------|---------|---------|
| | Precincts | Private | Religious | Public | Average | Largest |
| Alachua | 63 | 14% | 49% | 37% | 2,889 | 7,266 |
| Bay | 44 | 14% | 50% | 36% | 2,747 | 5,801 |
| Charlotte | 79 | 27% | 18% | 56% | 2,002 | 5,785 |
| Citrus | 31 | 42% | 39% | 19% | 3,554 | 8,710 |
| Clay | 47 | 30% | 47% | 23% | 3,247 | 8,597 |
| Flagler | 23 | 13% | 22% | 65% | 3,269 | 5,700 |
| Hernando | 39 | 31% | 62% | 8% | 4,167 | 8,646 |
| Indian River | 38 | 26% | 55% | 18% | 3,150 | 13,415 |
| Martin | 30 | 10% | 40% | 50% | 3,790 | 6,054 |
| Okaloosa | 52 | 15% | 69% | 15% | 2,609 | 9,038 |
| Santa Rosa | 41 | 12% | 56% | 32% | 3,225 | 11,413 |
| St. Johns | 46 | 20% | 39% | 41% | 4,045 | 10,411 |
| Sumter | 26 | 12% | 12% | 77% | 3,730 | 7,528 |

Appendix H: Polling Place Accessibility

## Small Counties

| County | Polling Location Type | | | | Precinct Size | |
|---|---|---|---|---|---|---|
| | Precincts | Private | Religious | Public | Average | Largest |
| Baker | 9 | 11% | 22% | 22% | 1,678 | 3,242 |
| Bradford | 14 | 29% | 71% | 0% | 1,165 | 1,754 |
| Calhoun | 11 | 36% | 0% | 64% | 588 | 1,411 |
| Columbia | 26 | 35% | 0% | 65% | 1,838 | 5,511 |
| DeSoto | 15 | 7% | 67% | 27% | 1,116 | 2,781 |
| Dixie | 10 | 30% | 0% | 60% | 969 | 2,697 |
| Franklin | 8 | 25% | 25% | 50% | 976 | 1,685 |
| Gadsden | 26 | 23% | 54% | 23% | 1,189 | 2,688 |
| Gilchrist | 10 | 10% | 0% | 90% | 1,171 | 1,722 |
| Glades | 13 | 15% | 0% | 85% | 524 | 1,280 |
| Gulf | 9 | 0% | 11% | 89% | 1,078 | 1,907 |
| Hamilton | 8 | 0% | 13% | 88% | 963 | 1,555 |
| Hardee | 12 | 8% | 50% | 42% | 1,019 | 2,223 |
| Hendry | 10 | 40% | 20% | 40% | 1,775 | 3,690 |
| Highlands | 26 | 35% | 31% | 35% | 2,381 | 5,709 |
| Holmes | 8 | 38% | 13% | 13% | 1,334 | 2,314 |
| Jackson | 14 | 29% | 21% | 50% | 1,994 | 3,401 |
| Jefferson | 15 | 27% | 60% | 13% | 631 | 1,035 |
| Lafayette | 5 | 0% | 0% | 100% | 864 | 1,100 |
| Levy | 13 | 15% | 31% | 38% | 2,143 | 3,510 |
| Liberty | 8 | 13% | 0% | 50% | 541 | 1,000 |
| Madison | 11 | 9% | 9% | 82% | 1,075 | 2,255 |
| Monroe | 34 | 35% | 24% | 41% | 1,613 | 3,103 |
| Nassau | 15 | 0% | 40% | 60% | 4,435 | 6,392 |
| Okeechobee | 11 | 36% | 45% | 18% | 1,843 | 3,357 |
| Putnam | 35 | 29% | 26% | 46% | 1,346 | 3,013 |
| Suwannee | 16 | 44% | 25% | 31% | 1,612 | 2,246 |
| Taylor | 14 | 7% | 21% | 71% | 857 | 1,368 |
| Union | 11 | 55% | 9% | 36% | 593 | 1,496 |
| Wakulla | 12 | 42% | 0% | 58% | 1,717 | 5,289 |
| Walton | 22 | 32% | 36% | 32% | 2,406 | 9,721 |
| Washington | 17 | 18% | 12% | 71% | 1,307 | 3,701 |

## Notes

Multiple precincts may vote at a shared polling place. Counties in the top 25% of their size category for largest precinct size highlighted in red.

Analysis of Fla. Voter File, January 2019, 2018 General Election, precinct addresses as published by the Fla. Dept. of State, Division of Elections and property parcel data from the Fla. Dept. of Revenue, performed by Proxeme, LLC.

# Florida Voter Registration Application
## Part 1 – Instructions (DS-DE 39, R1S-2.040, F.A.C.)(eff. 10/2013)

**To Register in Florida, you must be:**
- a U.S. citizen,
- a Florida resident,
- at least 18 years old (you may pre-register at 16 or 17, but cannot vote until you are 18).

If you have been convicted of a felony, or if a court has found you to be mentally incapacitated as to your right to vote, you cannot register or vote until your right to vote is restored.

**If you do not meet any ONE of these requirements, you are not eligible to register.**

### Questions?

Contact the Supervisor of Elections in your county:
dos.myflorida.com/elections/contacts/supervisor-of-elections
Visit the Florida Division of Elections' website at:
dos.myflorida.com/elections

**CRIMINAL OFFENSE:** It is a 3rd degree felony to submit false information. Maximum penalties are $5,000 and/or 5 years in prison.

**PUBLIC RECORD:** Once filed, all information including your phone number and email address are provided become public record except for the following which can only be used for voter registration purposes: your FL DL#, FL ID#, SSN, where you registered to vote, and whether you decline to register or to update your voter registration record at a voter registration agency. Your signature can be viewed but not copied. (Section 97.0585, Fla. Stat.)

**Where to Register:** You can register to vote by completing this application and delivering it in person or by mail to any supervisor of elections office, office that issues driver's licenses, or voter registration agency (public assistance offices, a center for independent living, offices serving persons with disabilities, public library, or armed forces recruitment office) of the Division of Elections. Mailing addresses are on page 2 of this form.

**Deadline to Register:** The deadline to register is 29 days before any election. You can update your registration record at any time, but for a Primary Election, party changes must be completed 29 days before that election. You will be contacted if your new application is incomplete, denied or a duplicate of an existing registration. Your Voter Information Card will be mailed to you once you are registered.

**Identification (ID) Requirements:** New applicants must provide a current and valid Florida driver's license number (FL DL#) or Florida identification card number (FL ID#). If you do not have a FL DL# or FL ID#, then you must provide the last four digits of your Social Security number (SSN). If you do not have any of these numbers, check "None." If you leave the field and box blank, your new registration may be denied. See section 97.053(6), Fla.Stat.

**Special ID requirements:** If you are registering by mail, have never voted in Florida, and have never been issued one of the ID numbers above, include one of the following with your application, or a later time before you vote: 1) A copy of an ID that shows your name and photo, (acceptable IDs–U.S. Passport, debt or credit card, military ID, student ID, retirement center ID, neighborhood association ID, or public assistance ID), or 2) A copy of an ID that shows your name and current residence address (acceptable documents–utility bill, bank statement, government check, paycheck, or other government document).

The special ID is not required if you are 65 or older, have a temporary or permanent physical disability, are a member of the active uniformed services or merchant marine who is absent from the county for active duty, or a spouse or dependent thereof, or are currently living outside the U.S. but otherwise eligible to vote in Florida.

**Political Party Affiliation:** Florida is a closed primary election state. In primary elections, registered voters can only vote for their registered party's candidates in a partisan election, regardless of party affiliation, can vote on any issue, nonpartisan race, and race where a candidate faces no opposition in the General Election. If you do not indicate your party affiliation, you will be registered with no party affiliation. For a list of political parties, visit the Division of Elections' website at: dos.myflorida.com/elections.

**Race/Ethnicity:** It is optional to list your race or ethnicity.

**Boxes:** Please check boxes ☒ where applicable.

## Florida Voter Registration Application
## Part 2 – Form (DS-DE #39, R1S-2.040, F.A.C.)(eff. 10/2013)

**Numbered rows 1 through 7 and 12 must be completed for a new registration.**

The downloadable/printable online form is available at: registertovoteflorida.gov

This is: ☐ New Registration ☐ Record Update/Change (e.g., Address, Party Affiliation, Name, Signature) ☐ Request to Replace Voter Information Card

**OFFICIAL USE ONLY**

FVRS No:

| 1 | Are you a citizen of the United States of America? | ☐ YES ☐ NO |

| 2 | ☐ I affirm that I am not a convicted felon, or if I am, my right to vote has been restored. |

| 3 | ☐ I affirm that I have not been adjudicated mentally incapacitated with respect to voting or, if I have, my right to vote has been restored. |

| 4 | Date of Birth (MM-DD-YYYY) |

| 5 | Florida Driver License (FL DL) or Florida identification (FL ID) Card Number | If no FL DL or FL ID, then provide: | Last 4 digits of Social Security Number | ☐ I have NONE of these numbers. |

| 6 | Last Name | First Name | Middle Name | Name Suffix (Jr., Sr., I, II, etc.) |

| 7 | Address Where You Live (legal residence-no P.O. Box) | Apt/Lot/Unit | City | County | Zip Code |

| 8 | Mailing Address (if different from above address) | Apt/Lot/Unit | City | State or Country | Zip Code |

| 9 | Address Where You Were Last Registered to Vote | Apt/Lot/Unit | City | State | Zip Code |

| 10 | Former Name (if name is changed) | Gender ☐ M ☐ F | State or Country of Birth | Telephone No. (optional) |

| 11 | ☐ Email me SAMPLE BALLOTS if option is available in my county. ☐ My email address is: (See Public Record Notice above) | Race/Ethnicity (Check only one) ☐ American Indian/Alaskan Native ☐ Asian/Pacific Islander ☐ Black, not of Hispanic Origin ☐ Hispanic ☐ White, not of Hispanic Origin ☐ Multi-racial ☐ Other: | Party Affiliation (Check only one. If left blank, you will be registered with no party affiliation) ☐ Florida Democratic Party ☐ Republican Party of Florida ☐ No party affiliation ☐ Minor party (print party name): | (Check only one if applicable) ☐ I am an active duty Uniformed Services or Merchant Marine member ☐ I am a spouse or a dependent of an active duty uniformed services or merchant marine member ☐ I am a U.S. citizen residing outside the U.S. | ☐ I will need assistance with voting. ☐ I am interested in becoming a poll worker. |

| 12 | **Oath:** I do solemnly swear (or affirm) that I will protect and defend the Constitution of the United States and the Constitution of the State of Florida, that I am qualified to register as an elector under the Constitution and laws of the State of Florida, and that all information provided in this application is true. | SIGN/MARK HERE → | SHARON AUSTIN 10/27/21 | Date |

Información en español: Sírvase llamar a la oficina del supervisor de elecciones de su condado si le interesa obtener este formulario en español

**Address your envelope to your County Supervisor of Elections.** (Rev 09/14/2020)

| | | | |
|---|---|---|---|
| | PO Box 901<br>Bunnell FL 32110-0901<br>Phone: 386-313-4170 | PO Box 457<br>Tavares FL 32778-0457<br>Phone: 352-343-9734 | PO Box 300<br>Dade City FL 33526-0300<br>Phone: 800-851-8754 |
| **Alachua**-Supervisor of Elections<br>515 N Main St Ste 300<br>Gainesville FL 32601-3348<br>Phone: 352-374-5252 | **Franklin**-Supervisor of Elections<br>47 Ave F<br>Apalachicola FL 32320-1723<br>Phone: 850-653-9520 | **Lee**-Supervisor of Elections<br>PO Box 2545<br>Fort Myers FL 33902-2545<br>Phone: 239-533-8683 | **Pinellas**-Supervisor of Elections<br>13001 Starkey Rd<br>Largo FL 33773-1416<br>Phone: 727-464-8683 |
| **Baker**-Supervisor of Elections<br>PO Box 505<br>Macclenny FL 32063-0505<br>Phone: 904-259-6339 | **Gadsden**-Supervisor of Elections<br>PO Box 186<br>Quincy FL 32353-0186<br>Phone: 850-627-9910 | **Leon**-Supervisor of Elections<br>PO Box 7357<br>Tallahassee FL 32314-7357<br>Phone: 850-606-8683 | **Polk**-Supervisor of Elections<br>PO Box 1460<br>Bartow FL 33831-1460<br>Phone: 863-534-5888 |
| **Bay**-Supervisor of Elections<br>830 W 11th St<br>Panama City FL 32401-2336<br>Phone: 850-784-6100 | **Gilchrist**-Supervisor of Elections<br>112 S Main St Rm 128<br>Trenton FL 32693-3260<br>Phone: 352-463-3194 | **Levy**-Supervisor of Elections<br>421 S Court St<br>Bronson FL 32621-6520<br>Phone: 352-486-5163 | **Putnam**-Supervisor of Elections<br>2509 Crill Ave Ste 900<br>Palatka FL 32177-4267<br>Phone: 386-329-0224 |
| **Bradford**-Supervisor of Elections<br>PO Box 58<br>Starke FL 32091-0058<br>Phone: 904-966-6266 | **Glades**-Supervisor of Elections<br>PO Box 668<br>Moore Haven FL 33471-0668<br>Phone: 863-946-6005 | **Liberty**-Supervisor of Elections<br>PO Box 597<br>Bristol FL 32321-0597<br>Phone: 850-643-5226 | **Santa Rosa**-Supervisor of Elections<br>6495 Caroline St Ste F<br>Milton FL 32570-4592<br>Phone: 850-983-1900 |
| **Brevard**-Supervisor of Elections<br>PO Box 410819<br>Melbourne FL 32941-0819<br>Phone: 321-633-2124 | **Gulf**-Supervisor of Elections<br>401 Long Ave<br>Port St Joe FL 32456-1707<br>Phone: 850-229-6117 | **Madison**-Supervisor of Elections<br>239 SW Pinckney St<br>Madison FL 32340-2470<br>Phone: 850-973-6507 | **Sarasota**-Supervisor of Elections<br>PO Box 4194<br>Sarasota FL 34230-4194<br>Phone: 941-861-8600 |
| **Broward**-Supervisor of Elections<br>PO Box 029001<br>Ft Lauderdale FL 33302-9001<br>Phone: 954-357-7050 | **Hamilton**-Supervisor of Elections<br>1153 US Hwy 41 NW Ste 1<br>Jasper FL 32052-5899<br>Phone: 386-792-1426 | **Manatee**-Supervisor of Elections<br>PO Box 1000<br>Bradenton FL 34206-1000<br>Phone: 941-741-3823 | **Seminole**-Supervisor of Elections<br>PO Box 1479<br>Sanford FL 32772-1479<br>Phone: 407-585-8683 |
| **Calhoun**-Supervisor of Elections<br>20859 Central Ave E Rm 117<br>Blountstown FL 32424-2266<br>Phone: 850-674-8568 | **Hardee**-Supervisor of Elections<br>311 N 6th Ave<br>Wauchula FL 33873-2319<br>Phone: 863-773-6061 | **Marion**-Supervisor of Elections<br>PO Box 289<br>Ocala FL 34478-0289<br>Phone: 352-620-3290 | **St. Johns**-Supervisor of Elections<br>4455 Ave A Ste 101<br>St Augustine FL 32095-5200<br>Phone: 904-823-2238 |
| **Charlotte**-Supervisor of Elections<br>226 Taylor St Unit 120<br>Punta Gorda FL 33950-4458<br>Phone: 941-833-5400 | **Hendry**-Supervisor of Elections<br>PO Box 174<br>LaBelle FL 33975-0174<br>Phone: 863-675-5230 | **Martin**-Supervisor of Elections<br>PO Box 1257<br>Stuart FL 34995-1257<br>Phone: 772-288-5637 | **St. Lucie**-Supervisor of Elections<br>4132 Okeechobee Rd<br>Ft Pierce FL 34947-5412<br>Phone: 772-462-1500 |
| **Citrus**-Supervisor of Elections<br>PO Box 1870<br>Lecanto FL 34460-1870<br>Phone: 352-564-7120 | **Hernando**-Supervisor of Elections<br>20 N Main St Rm 165<br>Brooksville FL 34601-2850<br>Phone: 352-754-4125 | **Miami-Dade**-Supervisor of Elections<br>PO Box 521550<br>Miami FL 33152-1550<br>Phone: 305-499-8363 | **Sumter**-Supervisor of Elections<br>7375 Powell Rd Ste 125<br>Wildwood FL 34785-4228<br>Phone: 352-569-1540 |
| **Clay**-Supervisor of Elections<br>PO Box 337<br>Green Cove Springs FL 32043-0337<br>Phone: 904-269-6350 | **Highlands**-Supervisor of Elections<br>PO Box 3448<br>Sebring FL 33871-3448<br>Phone: 863-402-6655 | **Monroe**-Supervisor of Elections<br>530 Whitehead St # 101<br>Key West FL 33040-6577<br>Phone: 305-292-3416 | **Suwanee**-Supervisor of Elections<br>302 Pine Ave SW<br>Live Oak FL 32064-2315<br>Phone: 386-362-2616 |
| **Collier**-Supervisor of Elections<br>3750 Enterprise Ave<br>Naples FL 34104-3659<br>Phone: 239-252-8683 | **Hillsborough**-Supervisor of Elections<br>2514 N Falkenburg Rd<br>Tampa FL 33619-0917<br>Phone: 813-744-5900 | **Nassau**-Supervisor of Elections<br>96135 Nassau Pl Ste 3<br>Yulee FL 32097-8699<br>Phone: 904-491-7500 | **Taylor**-Supervisor of Elections<br>PO Box 1060<br>Perry FL 32348-1060<br>Phone: 850-838-3515 |
| **Columbia**-Supervisor of Elections<br>971 W Duval St Ste 102<br>Lake City FL 32055-3709<br>Phone: 386-758-1026 | **Holmes**-Supervisor of Elections<br>201 N Oklahoma St Ste 102<br>Bonifay FL 32425-2243<br>Phone: 850-547-1107 | **Okaloosa**-Supervisor of Elections<br>302 N Wilson St Ste 102<br>Crestview FL 32536-3474<br>Phone: 850-689-5600 | **Union**-Supervisor of Elections<br>175 W Main St<br>Lake Butler FL 32054-1639<br>Phone: 386-496-2236 |
| **Desoto**-Supervisor of Elections<br>PO Box 89<br>Arcadia FL 34265-0089<br>Phone: 863-993-4871 | **Indian River**-Supervisor of Elections<br>4375 43rd Ave<br>Vero Beach FL 32967-1024<br>Phone: 772-226-4700 | **Okeechobee**-Supervisor of Elections<br>304 NW 2nd St Rm 144<br>Okeechobee FL 34972-4146<br>Phone: 863-763-4014 | **Volusia**-Supervisor of Elections<br>1750 South Woodland Blvd<br>DeLand FL 32720-7915<br>Phone: 386-736-5930 |
| **Dixie**-Supervisor of Elections<br>PO Box 2057<br>Cross City FL 32628-2057<br>Phone: 352-498-1216 | **Jackson**-Supervisor of Elections<br>PO Box 6046<br>Marianna FL 32447-6046<br>Phone: 850-482-9652 | **Orange**-Supervisor of Elections<br>PO Box 562001<br>Orlando FL 32856-2001<br>Phone: 407-836-2070 | **Wakulla**-Supervisor of Elections<br>PO Box 305<br>Crawfordville FL 32326-0305<br>Phone: 850-926-7575 |
| **Duval**-Supervisor of Elections<br>105 E Monroe St<br>Jacksonville FL 32202-3213<br>Phone: 904-630-1414 | **Jefferson**-Supervisor of Elections<br>380 W Dogwood St<br>Monticello FL 32344-1470<br>Phone: 850-997-3348 | **Osceola**-Supervisor of Elections<br>2509 E Irlo Bronson Memorial Hwy<br>Kissimmee FL 34744-4909<br>Phone: 407-742-6000 | **Walton**-Supervisor of Elections<br>571 US Hwy 90 E<br>DeFuniak Springs FL 32433-1374<br>Phone: 850-892-8112 |
| **Escambia**-Supervisor of Elections<br>PO Box 12601<br>Pensacola FL 32591-2601<br>Phone: 850-595-3900 | **Lafayette**-Supervisor of Elections<br>PO Box 76<br>Mayo FL 32066-0076<br>Phone: 386-294-1261 | **Palm Beach**-Supervisor of Elections<br>PO Box 22309<br>West Palm Beach FL 33416-2309<br>Phone: 561-656-6200 | **Washington**-Supervisor of Elections<br>1331 South Blvd Ste 900<br>Chipley FL 32428-2233<br>Phone: 850-638-6230 |