League of Women Voters of Florida, Inc.

vs.

Laurel Lee

---

Deposition of:

Michael McDonald, Ph.D.

---

October 29, 2021

*Vol 01*

---

# PHIPPS REPORTING

*Raising the Bar!*

Michael McDonald, Ph.D.
October 29, 2021

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

Case No.  4:21CV186-MW/MAF        4:21-cv-187
               4:21-cv-201                4:21-cv-242

LEAGUE OF WOMEN VOTERS OF FLORIDA,
et al.,

              Plaintiffs,

     v.

LAUREL M. LEE, Florida Secretary
of State, et al.,

              Defendants,

     and

NATIONAL REPUBLICAN SENATORIAL COMMITTEE, et al.,

              Intervenor-Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

REMOTE  ZOOM-RECORDED DEPOSITION OF MICHAEL McDONALD, Ph.D.

Volume 1 (Pages:  1-95)

Friday, October 29, 2021
10:02 a.m. - 12:26 p.m.

Location:  Via Web Conference

STENOGRAPHICALLY REPORTED VIA WEB BY:
Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR
Certified Realtime Reporter

Job No. 215108

Page 2

1   APPEARANCES:  (All parties appeared via Web conference)

2

ON BEHALF OF FLORIDA RISING TOGETHER:

3

        ARNOLD & PORTER KAYE SCHOLER, LLP
4       601 Massachusetts Avenue, Northwest
        Washington, D.C. 20001
5       202.942.5564
        BY:  Jeremy Karpatkin, Esquire
6       jeremy.karpatkin@arnoldporter.com

7                -and-

8       250 West 55th Street
        New York, New York 10019
9       212.836.7827
        BY:  Andrew R. Hirschel, Esquire
10      andrew.hirschel@arnoldporter.com

11

ON BEHALF OF FLORIDA STATE CONFERENCE OF THE NAACP:

12

        COVINGTON & BURLING, LLP
13      One City Center
        850 Tenth Street, Northwest
14      Washington, D.C. 20001
        202.652.5218
15      BY:  Cyrus Nasseri, Esquire
        cnasseri@cov.com

16

17   ON BEHALF OF HARRIET TUBMAN FREEDOM FIGHTERS, CORP and HEAD
     COUNT, INC.:

18

        FAIR ELECTIONS CENTER
19      1825 K Street Northwest
        Suite 450
20      Washington, DC 20006
        202.331.0114
21      BY:  Michelle Kanter Cohen, Esquire
        mkantercohen@fairelectionscenter.org

22

23

24

25

Michael McDonald, Ph.D.
October 29, 2021

Page 3

```
 1   APPEARANCES, Continued:

 2
     ON BEHALF OF THE ATTORNEY GENERAL:
 3
             OFFICE OF THE ATTORNEY GENERAL
 4           General Civil Litigation Division
             PL-01, The Capitol
 5           Tallahassee, Florida 32399
             850.414.3670
 6           BY: William Chorba, Esquire
             william.chorba@myfloridalegal.com
 7

 8   ON BEHALF OF ALACHUA COUNTY SUPERVISOR OF ELECTIONS:

 9           ALACHUA COUNTY ATTORNEY'S OFFICE
             12 Southeast First Street
10           Second Floor
             Gainesville, Florida 32601
11           352.374.5218
             BY:  Diana M. Johnson, Esquire
12           dmjohnson@alachuacounty.us

13
     ON BEHALF OF OKALOOSA COUNTY SUPERVISOR OF ELECTIONS:
14
             NABORS, GIBLIN & NICKERSON, P.A.
15           1500 Mahan Drive
             Suite 200
16           Tallahassee, Florida 32308
             850.224.4070
17           BY:  Gregory T. Stewart, Esquire
             gstewart@ngnlaw.com
18

19   ON BEHALF OF OKEECHOBEE COUNTY SUPERVISOR OF ELECTIONS,
     HOLMES COUNTY SUPERVISOR OF ELECTIONS, HENDRY COUNTY
20   SUPERVISOR OF ELECTIONS, GLADES COUNTY SUPERVISOR OF
     ELECTIONS, HARDEE COUNTY SUPERVISOR OF ELECTIONS, LEVY
21   COUNTY SUPERVISOR OF ELECTIONS, and OKEECHOBEE COUNTY
     SUPERVISOR OF ELECTIONS:
22
             HENDERSON, FRANKLIN, STARNES & HOLT, P.A.
23           1715 Monroe Street
             Fort Myers, Florida 33901
24           239.344.1598
             BY:  Robert V. White, Esquire
25           robert.white@henlaw.com
```

Michael McDonald, Ph.D.
October 29, 2021

Page 4

```
 1    APPEARANCES, Continued:

 2
      ON BEHALF OF FLAGLER COUNTY SUPERVISOR OF ELECTIONS,
 3    BREVARD COUNTY SUPERVISOR OF ELECTIONS, MADISON COUNTY
      SUPERVISOR OF ELECTIONS, GILCHRIST COUNTY SUPERVISOR OF
 4    ELECTIONS, and HIGHLANDS COUNTY SUPERVISOR OF ELECTIONS:

 5            ROPER, P.A.
              2707 East Jefferson Street
 6            Orlando, Florida 32803
              407.897.5150
 7            BY: John Janousek, Esquire
              jjanousek@roperpa.com
 8

 9    ON BEHALF OF THE INTERVENOR DEFENDANTS:

10            SHUTTS & BOWEN, LLP
              200 South Biscayne Boulevard
11            Suite 4100
              Miami, Florida 33131
12            305.347.7305
              BY:  Francis A. Zacherl, III, Esquire
13            faz@shutts.com

14

15

16

17

18

19

20

21

22

23

24

25
```

Michael McDonald, Ph.D.
October 29, 2021

Page 5

1                        I N D E X

2    Testimony of Michael McDonald, Ph.D.

3         Direct Examination By Mr. Zacherl           6
          Cross-Examination By Mr. Karpatkin          88
4         Redirect Examination By Mr. Zacherl         90
          Certificate of Oath                         92
5         Certificate of Reporter                     93
          Errata                                      94
6         Witness Review Letter                       95

7

8

9

10

11

12                        EXHIBITS

13   NO.                 DESCRIPTION              PAGE

14   Exhibit 1    Declaration of Michael McDonald     6

15   Exhibit 2    Curriculum vitae                    6

16   Exhibit 3    Declaration of Quentin Kidd, Ph.D.  6

17   Exhibit 4    Response and Supplemental           6
                  Declaration of Quentin Kidd
18
     Exhibit 5    Chapter 2021-11 Committee Substitute 87
19                for Committee Substitute for
                  Committee Substitute for Senate
20                Bill 90

21

22      (Stenographer's Note:  Exhibits sent to stenographer
     electronically.  A digital exhibit sticker was placed on
23   the documents that were marked during the proceeding and
                  retained by the stenographer.)
24

25

Michael McDonald, Ph.D.
October 29, 2021

Page 6

```
 1   Thereupon,

 2   The following Web proceedings began at 10:02 a.m.:

 3                      ~ ~ ~ ~ ~

 4              (Documents premarked as Exhibits 1 - 4

 5                      for identification)

 6        MS. KANTER COHEN:  For the record, we agreed that

 7      an objection from any of plaintiffs' counsel will

 8      apply to all the plaintiffs in this matter.

 9        THE STENOGRAPHER:  Will you raise your right hand,

10      please?

11        Do you solemnly swear or affirm that the testimony

12      you are about to give in the matter before you will be

13      the truth, the whole truth, and nothing but the truth?

14        THE WITNESS:  I do.

15   Thereupon,

16              MICHAEL McDONALD, Ph.D.,

17   having been duly sworn, was examined and testified as

18   follows:

19                   DIRECT EXAMINATION

20   BY MR. ZACHERL:

21   Q.   Good morning, Dr. McDonald.  My name is Frank

22   Zacherl.  I represent the intervenor defendants in this

23   case.  Happy Friday.  I know you said earlier you can hear

24   me okay.

25        I want to put on the record two things.  One, I
```

Michael McDonald, Ph.D.
October 29, 2021

1    agree with Michelle's statement about the objections, and

2    we probably should have done that a long time ago.  That's

3    very sensible.

4            Second, I have placed the four exhibits for this

5    deposition in the chat.  So there are -- there is

6    basically, Dr. McDonald, your report, your CV -- that's

7    Exhibit 1.  Your CV is Exhibit 2, Dr. Kidd's report that

8    you are commenting on is Exhibit 3, and then Exhibit 4 will

9    be Dr. Kidd's supplemental report, which I'm going to ask

10   you about in a minute.

11           MR. ZACHERL:  To the extent anybody has any issues

12       retrieving those, please let me know, but I put them

13       in the chat earlier this morning so we would be ready

14       to go.

15   BY MR. FRAZIER:

16       Q.   Dr. McDonald, do you have copies of those

17   documents?

18       A.   I am just going to download the ones that you have

19   provided so I have exactly the same ones that you have, so

20   if you will just bear with me for a minute, I have got to

21   save it to my computer.

22       Q.   Take your time.

23           While you are doing that, you may see some

24   underlining or comments in there.  I'm not tech savvy

25   enough to put a clean copy in the chat, so you can ignore

Michael McDonald, Ph.D.
October 29, 2021

```
 1    my comments.
 2            MR. KARPATKIN:  I'm not seeing them in the chat.
 3        Am I looking in the wrong place?
 4            MR. ZACHERL:  If you click on the Chat button at
 5        the bottom.
 6            MR. KARPATKIN:  Right.
 7            MR. ZACHERL:  And it should pop up.  On the
 8        right-hand side, you should get a, you know, kind of
 9        like a rectangle that has the four documents in there.
10            MR. STUART:  Frank, I'm not getting it either.
11            THE STENOGRAPHER:  Frank, I think you put them in
12        before everybody joined, so they won't see it.  You'll
13        need to put them in now that everybody's joined.  I
14        got them because I was on with you.
15            MR. ZACHERL:  Oh, the best-laid plans.  So we are
16        going to do this again.  Just stay with me for a
17        minute, folks.  Everything is an adventure when it
18        comes to me and the computer.
19            So the first one is up.
20            MR. KARPATKIN:  I'm seeing it, yep.
21            MR. ZACHERL:  Dr. McDonald's CV is the second one,
22        Dr. Kidd's report will be the third one, and
23        Dr. Kidd's supplemental will be the fourth one.
24            Sorry about that, everybody.  I learn something
25        new every day about this interface.
```

Michael McDonald, Ph.D.
October 29, 2021

```
 1   BY MR. ZACHERL:
 2       Q.   While everybody is downloading, let me go ahead
 3   and start asking you some questions, Dr. McDonald.
 4            The first thing is, just for the record, can you
 5   give us your full name and spell it for the court reporter,
 6   please.
 7       A.   My name is Michael McDonald, M-I-C-H-A-E-L, M-C
 8   capital D-O-N-A-L-D.
 9       Q.   Have you ever had your deposition taken before,
10   sir?
11       A.   Yes, I have.
12       Q.   Okay.  So you know the drill.  The two main things
13   from my perspective are, number one, I'm going to try to go
14   slow.  I would ask you to do the same thing.  In the
15   military they say slow is fast.  This is sort of the same
16   thing.  It will make a clean record, and we won't talk over
17   each other.
18            The second thing is please tell me if you don't
19   understand any of the questions that I ask you.  Okay?
20       A.   Yes, that's okay with me.
21       Q.   Okay.  The first thing, just to get some, you
22   know, some sort of 10,000-foot background, what did you do
23   to prepare for this deposition today, sir?
24       A.   I have reviewed the documents that you have shared
25   with me as a matter of this case, and I have followed some
```

Michael McDonald, Ph.D.
October 29, 2021

Page 10

1   of the links that were provided by Dr. Kidd in his

2   supplemental report, but I have not been able to do a

3   comprehensive review of all the information that he

4   provided.

5        Q.   Okay.  Did you do anything else to prepare?

6        A.   I did have meetings with my lawyers, so, yes, I

7   did that as well.

8        Q.   Anything else?

9        A.   No, that is all.

10       Q.   Did you speak to Dr. Mayer before this deposition

11  about your deposition?

12       A.   I have never spoken to Dr. Mayer about this case.

13       Q.   And then did you review either Dr. Mayer's depo

14  transcript or Dr. Kidd's deposition transcript?  He was

15  deposed yesterday.

16       A.   I have not reviewed either transcript.

17       Q.   Okay.  The good news is Dr. Kidd addressed a lot

18  of what I think you had in your report yesterday, which

19  will make this deposition shorter because I don't have to

20  address it with you since he has addressed it.  I just

21  wanted to see if you had seen that.

22            Besides the documents that you described, did you

23  review any other deposition transcripts or any other

24  evidence in the case?

25       A.   I have not.

Michael McDonald, Ph.D.
October 29, 2021

Page 11

```
1       Q.   Okay.  And then you just told me that you looked
2    at Dr. Kidd's supplemental report but you haven't had a
3    chance to verify all the citations; is that a fair summary?
4       A.   That's correct.
5       Q.   Okay.  I'm going to ask you about some of those
6    statements in his supplemental report today, and to the
7    extent you can't verify, you can just tell me that.  Okay?
8       A.   Yes.
9       Q.   Other than your initial report, which I have seen
10   and what we have marked as an exhibit here, have you
11   prepared any other reports for this matter?
12      A.   No, I have not.
13      Q.   And then the final question is, to save us a lot
14   of time, is your curriculum vitae, which I have attached as
15   Exhibit 2, more or less up to date?
16      A.   Yes, more or less up to date.  Since I filed it
17   two weeks ago, I started working on districting for the
18   City of Gainesville, but other than that there have been no
19   other changes.
20      Q.   Okay.  And is it fair to say that your CV gives us
21   an accurate and sounds like a pretty current summary of
22   your background, your education, your publications or
23   qualifications, et cetera?
24      A.   Yes.
25      Q.   Let's talk about Dr. Kidd for a minute.  Do you
```

Michael McDonald, Ph.D.
October 29, 2021

1    know Dr. Kidd personally?

2         A.   Yes, I do.

3         Q.   How is it that you know him?

4         A.   When I was at George Mason University, which is in

5    a suburb of the D.C. area in Virginia, he and I worked

6    together on a reform effort to reform redistricting in the

7    state of Virginia.  As a part of that reform effort, that

8    morphed into a work on a -- Governor McDonald, who is

9    Republican, a bipartisan, independent, redistricting

10   advisory committee.  I think I got the name right.  And so

11   we worked together on that commission, that advisory

12   commission, that Governor McDonald had created for

13   redistricting.  This would have been around 2011.

14        Q.   Was the initial George Mason contact that you

15   described also in that 2011 time frame?

16        A.   Yes.  It would have been sometime around there.

17   It could have been late 2010, but sometime around that

18   area.  Virginia has a very fast track on districting

19   compared to some other states, and so I would think that

20   our initial conversations would have been sometime late

21   2010.

22        Q.   Got it.  Okay.  Just to get an understanding, did

23   you-all work together or, I guess, collaborate on those two

24   projects that you mentioned?

25        A.   Yes, we did.

1      Q.   Rising out of those projects, did you have any

2 publications or any further research that you did together

3 that related to those two projects?

4      A.   No, I have never coauthored or worked on a paper

5 together with Dr. Kidd.

6      Q.   Okay.  When you worked together, did you meet him

7 in person or was it something where you did it over the

8 phone and online?

9      A.   Yes, we met in person.  There were in-person

10 meetings for the commission, and so there were a number of

11 opportunities for the two of us to talk face-to-face.

12     Q.   Other than those two projects, have you and

13 Dr. Kidd worked together on anything else?

14     A.   No, we have not.

15     Q.   Okay.  I don't believe this is the case, but I

16 just want to ask you, do you claim that Dr. Kidd is any

17 less qualified than you are to provide opinions in the

18 field of political science in this case?

19     A.   Any less than I am?  I am widely regarded as one

20 of the leading experts on elections in the country.  I

21 don't think that Dr. Kidd has raised to that same level in

22 terms of his national/international reputation.

23     Q.   Okay.  Do you believe that -- let me ask you this

24 way, do you believe that he is unqualified to render expert

25 opinions in this matter?

Michael McDonald, Ph.D.
October 29, 2021

Page 14

1      A.   Again, my personal belief would be that he should
2   be competent enough to render an expert report.
3      Q.   **Fair enough.  Fair enough.  And then one other**
4   **just sort of, you know, broad-brush question.  Is it**
5   **unusual in your field of political science, and I guess**
6   **election administration, for well-qualified experts to**
7   **disagree with one another on particular topics?**
8      A.   Yes, there are.  Certainly in the courtroom that I
9   have been involved with in several cases instances where
10  there have been disagreements, and I have seen those
11  disagreements lead to instances where an opposing expert
12  was found not credible by a Court.
13     Q.   **That was one of the questions I had for you, just**
14  **as sort of a general background.  Has any Court ever found**
15  **that you were unqualified to -- well, first of all, has any**
16  **Court ever accepted you as an expert?**
17     A.   Yes, I have been accepted numerous times.
18     Q.   **Has your opinion, to your knowledge, ever been**
19  **excluded in any of the matters in which you have been**
20  **involved in by a Court?**
21          MR. KARPATKIN:  Hold on.  I want to object as to
22       form.  Vagueness to the question.
23  BY MR. ZACHERL:
24     Q.   **I will rephrase.**
25          **Has any judge ever stricken your opinion?**

Michael McDonald, Ph.D.
October 29, 2021

```
 1     A.   Again, I'm not familiar enough with the legal

 2  terminology.  I don't think that my opinion has ever been

 3  stricken from the record, but, yes, so I don't believe

 4  that's the case.

 5     Q.   Has any judge ever refused to recognize you as an

 6  expert?

 7     A.   Has any judge refused to recognize me as an

 8  expert?  No.

 9     Q.   And then --

10     A.   Not to my knowledge.

11     Q.   Just to get a sense of it, has any judge ever

12  refused to consider any of your opinions, not necessarily,

13  you know, formally striking them, but just saying I'm not

14  going to consider these opinions, to your knowledge?

15     A.   Yes, that's happened.

16     Q.   Okay.  How many times would you say that's

17  happened in your career?

18     A.   Once with a three-court panel in South Carolina,

19  once with a dissenting opinion on a three-court --

20  three-judge panel in Virginia, and once with the state

21  Supreme Court in Ohio.

22     Q.   Okay.  Are those cases reflected on your

23  curriculum vitae, your CV?

24     A.   They are.

25     Q.   Okay.  Let's switch gears a little bit.  I'm going
```

Michael McDonald, Ph.D.
October 29, 2021

```
 1    to ask you some general questions about Dr. Kidd's report,
 2    and then I want to go through it with you and ask you some
 3    more specific questions.
 4         First generally, and I have read your report, and
 5    I appreciate you taking the time to put that together, it's
 6    very helpful.  One of the phrases in your report is
 7    "sleight of hand."  You basically said that Dr. Kidd
 8    employed sleight of hand in a portion of his analysis.  Do
 9    you stand by that characterization today?
10    A.   Yes, I do.
11    Q.   And can you give us an example of sleight of hand
12    that you believe was employed by Dr. Kidd?
13    A.   If you want to point to the passage in my report
14    so that we can have a discussion about that.
15    Q.   No problem.  Yeah, sure.  Let me see if I can find
16    it quickly here.
17         Where I see it is in Section 6 of your report,
18    which is on page 11.  You can tell me when you are there.
19    A.   Yes, I see that sentence.
20    Q.   Do you see where it says, "First, Dr. Kidd
21    performs a sleight of hand by restricting his opinion."
22         Do you see that?
23    A.   Yes.
24    Q.   Now, is this the only instance, in your view --
25    and this is why I was asking the question about examples.
```

Michael McDonald, Ph.D.
October 29, 2021

1    **Other than this example that you have discussed in your**

2    **report, are there any other examples that, in your opinion,**

3    **constitute Dr. Kidd performing sleight of hand?**

4         A.   Well, I am using here my objections to his -- or

5    I'm describing my objection to his restricting his analysis

6    to only certain states rather than looking more

7    comprehensively at 50 states.  And he does so in a way that

8    will often favor his opinion about Florida with respect to

9    other states because either he is ignoring some states that

10   may have more permissive laws or something of that nature

11   than what Florida has.

12            He does this more than once.  I'm just using

13   sleight of hand here to say that this really -- if you are

14   going to do an analysis of Florida in relation to other

15   states, you should do -- you should include all 50 states

16   rather than restricting your analysis and then saying that

17   how does Florida compare favorably or disfavorably to other

18   states within the more restricted states.

19            So I don't think this is the only time he does

20   this.  As I recall, here we are talking about third-party

21   ballot collection rules.  I think he does something similar

22   with the disclaimer rules where he -- and I'm just skimming

23   through.  So, you know, I'm just giving you a sense of

24   where this is happening, because it is happening in

25   multiple places within his report.  I'm trying to read

Michael McDonald, Ph.D.
October 29, 2021

1   through to make sure that I answer your question.

2       Q.   Take your time.  There is no rush.

3       A.   Yeah.

4       Q.   What I'm trying to get a sense of -- my next

5   question, just so you know, is going to be by sleight of

6   hand do you mean that -- are you essentially accusing

7   Dr. Kidd of intentionally attempting to deceive the readers

8   of his report?

9       A.   Yes, I am, actually, with that language, because

10  he is restricting his analysis and then coming to a

11  conclusion where, you know, at the beginning of his report

12  he is talking about -- I'm going to have to go to his

13  report now.

14      Q.   Take your time.  Like I said, that's the context.

15  That's why I'm asking you these questions.  But I do want

16  to hear everything you have to say.

17      A.   In his synopsis, for example, on page 4 and page 5

18  of his report, he talks about how, for example, Section --

19  well, why don't we do the one that we are looking at right

20  here.  Section D, "How do Florida's rules related to

21  third-party registrations spelled out in SB 90" -- so this

22  is on page 4, paragraph 6 -- "compared to other states?"

23           So here at the very beginning of his report, he is

24  not saying that he is going to restrict his analysis to

25  certain states.  He says he is going to look at all states.

Michael McDonald, Ph.D.
October 29, 2021

1    And then later on when he gets down into his report, he is

2    restricting his analysis to only certain states.  So that

3    seems inconsistent with what he was charged to do, what he

4    claims he was charged to do in his report at the outset.

5          It does -- it has the implication that he is

6    trying to shade his analysis in a way that is most

7    favorable to the defendants, so that is why I'm using that

8    word -- or that phrase, "sleight of hand."  I do think this

9    is intentional because it's clear that he has changed his

10   standard for how he is going to approach his analysis

11   within the report.

12   Q.   Fair enough.  Okay.  So, you know, this is all

13   about you giving me your opinion, so that's what we are

14   here to do.

15        Did you look at his supplemental declaration on

16   this point regarding voter registration and the absentee

17   voting rules?  Did you go through his supplemental report

18   on these points?  And if so, does that change your opinion

19   if you look at his supplemental report together with his

20   original report with regard to whether he is engaging in

21   sleight of hand?

22   A.   I have read this supplemental report.  Is there a

23   particular sentence that you wish to point me to that will

24   point out my understanding of what I just described to you

25   as somehow incorrect?  I'm willing to say that if that's

Case 4:21-cv-00184-MW-MAF Document 263-17 Filed 01/14/22 Page 21 of 252

1   the case.

2       Q.   Well, what I'm asking is, and I will ask it more

3   generally, after reviewing his supplemental report, do you

4   stand by your characterization of his opinions as sleight

5   of hand?  Let's ask it that way.

6       A.   Again, we are narrowly focused on the issue of him

7   restricting his analysis to certain states at various

8   points in his report rather than doing a full 50-state

9   comparison that he says that he is going to do at the

10  outset.

11          As I read his supplemental report, I have only had

12  two days to review it --

13      Q.   Right.

14      A.   -- so if there is something in there that I have

15  missed, I don't see it.  I don't see his explanation why it

16  was that he was selectively restricting his analysis when

17  he was doing -- when he was writing his report.

18      Q.   Okay.  We will go through -- we will go through it

19  in a little more detail, but it sounds like what you are

20  saying, as we sit here right now, you would stand by that

21  characterization even after reading his supplemental

22  report; is that accurate?

23      A.   I would.  Again, if you wish to point me to

24  some -- some response that he has to that criticism that I

25  had in his report, I would be happy to take a look at it.

Michael McDonald, Ph.D.
October 29, 2021

Page 21

```
 1    If I have missed it for some reason, I would be happy to
 2    take a look at it and make a reassessment of my criticism
 3    of Dr. Kidd.
 4         Q.   Okay.  Okay.  So let's -- we will go through his
 5    report, and I will do that.  I don't want to go too far out
 6    of sequence here.  At this point I just kind of want to get
 7    a general sense.
 8              There is another statement in your report where
 9    you describe errors in Dr. Kidd's analysis of the drop box
10    laws in various states.  Do you recall that section of your
11    report?
12         A.   I do.
13         Q.   And having read his supplemental report, do you
14    stand by your characterization that he made errors with
15    regard to the drop box -- his summary of the drop box laws
16    in the various states?
17         A.   Yes, I do.  I continue to believe that he is
18    misclassifying.  He has come up with a -- he has one
19    typology in his original report, and in the supplemental
20    report he has now introduced a fourth category.  He had
21    three categories in his original report, now he has an
22    additional fourth category as to whether or not drop boxes
23    are exclusively restricted within a state or if there is no
24    enabling legislation.
25              Even within that, and I have not been able to spot
```

Michael McDonald, Ph.D.
October 29, 2021

1    check all of his citations, some citations I have clicked

2    on them and I get a 404 file missing error, so whatever

3    citation he was providing is going to a dead website.  So

4    whoever compiled that did not do a good job of updating

5    that document by the time that this report was filed or the

6    supplemental report was filed.  So that's one problem.

7             The other problem is that I can clearly see that

8    whoever put that document together, if it was Dr. Kidd or

9    somebody else, I don't know, but whoever put that document

10   together also did not update for changes of laws that have

11   happened over the last year.

12            For example, when you look at Nevada's, following

13   Nevada's link, it is -- Nevada has adopted all mail ballot

14   elections.  They did that sometime around June of this

15   year, as I noted in my rebuttal report, and they changed

16   the law with respect to drop boxes.  So his classification

17   of Nevada is completely erroneous when you look at the

18   actual law as it currently stands.

19            So, yeah, he incorrectly classifies, he tries to

20   clean it up here.  But even there if you actually look at

21   the statutes, he is still making errors in his

22   classification.

23   Q.   Okay.  So I'm going to unpack a little bit of what

24   you said there.  It was quite a bit.  By the way, you

25   answered a bunch of my questions with that, so thank you.

Michael McDonald, Ph.D.
October 29, 2021

```
 1              But with regard to Nevada -- well, first of all,
 2    with regard to his classifications, I think he said in the
 3    supplemental report that the column stating that drop boxes
 4    are prohibited more accurately probably should have been
 5    titled no enabling legislation.  Is that your understanding
 6    of his characterization of that third column in his drop
 7    box table?
 8         A.   So just to be clear, in a deposition, I prefer
 9    actually looking at the statements that you have in the
10    report.  So could you please when you are asking these
11    questions, point to the specific points in his report so
12    that I can respond to them?
13         Q.   Well, let's take a look.  Do you have Dr. Kidd's
14    supplemental report in front of you?
15         A.   I do.  I just pulled it up, yes.
16         Q.   Okay.  And so if you go to the section of his
17    report, it's paragraph 8 on page 3.  Take a minute, you
18    know, and let me know when you are there.
19         A.   I'm there, yes.
20         Q.   And you can see where he says, "Additionally,
21    plaintiff's experts" -- one of whom I think is you he is
22    responding to -- "contend my analysis of drop box
23    availability is wrong because I did not consider states
24    that implemented public health exceptions."
25              Do you see that?
```

Michael McDonald, Ph.D.
October 29, 2021

Page 24

1     A.   Yes.

2     Q.   And then if you go down farther, in the last

3  sentence he says, "I also note that the third category on

4  Table 3 could be more accurately labeled No Enabling

5  Legislation rather than Prohibited as I have also noted in

6  the citations below."

7          Do you see that?

8     A.   I do.

9     Q.   And so would you agree with me that if you retitle

10  that third column in his drop box table No Enabling

11  Legislation as opposed to Prohibited, that the table would

12  be accurate?

13     A.   No, it would not.

14     Q.   And why not, sir?

15     A.   Because as I read through his prohibited no

16  enabling legislation, he is describing two different

17  classifications here.  There are some that he says are

18  prohibited explicitly in law, and then there are others

19  that have no enabling legislation.  So what he has really

20  done is he has created out of this one category which was

21  prohibited in which he now acknowledges wasn't actually

22  prohibited, there is really two classifications here.  One

23  is a really strictly prohibited and one is no enabling

24  legislation, and that no enabling legislation is -- in some

25  ways it's discretionary, so it really falls into the second

Michael McDonald, Ph.D.
October 29, 2021

Page 25

1   classification they have of allowed is his -- he has

2   Required, Allowed, Prohibited.  There is no explicit

3   prohibition, so states have their discretion or localities

4   have their discretion to provide drop boxes if they wish to

5   do so.

6           So that's -- you know, he would have needed to

7   look at the practice that is actually employed within those

8   states to understand whether or not as a practice local

9   election officials were providing drop boxes that would be

10  similar to how the states that are under his Allowed

11  category to provide drop boxes.

12      Q.   Are you able to point me to any of the states in

13  his column 3, the No Enabling Legislation/Prohibited

14  column, are you able to point me to any states where the

15  legislature has said that it's discretionary on whether you

16  can use drop boxes or not?

17      A.   Whether the legislature?

18      Q.   Yes.

19      A.   You mean the legislature?  So, I mean, a

20  legislature is a body of people.  Are you talking about the

21  leadership in the legislature has said this?

22      Q.   I'm talking about whether the legislature in a

23  statute in any of the states in that third column that we

24  are discussing has, you know -- you can take the word

25  "legislature" out.  I mean the statute.  Are there any

Michael McDonald, Ph.D.
October 29, 2021

1  statutes in that third column where the law specifically

2  states that it's discretionary on whether to use drop boxes

3  or not?

4      A.   Well, that's a really interesting distinction that

5  you are making about the law and if there is enabling

6  statutes, because in some cases, like in Ohio, as I was

7  following the court action there, and I have not followed

8  it in depth, so it's just my understanding --

9      Q.   Right.

10     A.   -- that the state Supreme Court said it's up to

11 the discretion of the Secretary of State of Ohio to

12 promulgate rules about the use of drop boxes in the state

13 even though there is no enabling legislation.  So as a

14 matter of law in the state of Ohio, you might come to the

15 conclusion that Ohio does have -- allowed use of drop boxes

16 while there is no enabling statute.

17          It's this sort of important distinction that you

18 need to -- if you are going to talk about how states vary

19 in their drop box usage, you need to understand those

20 nuances so that you can fully understand and appreciate the

21 differences between how states actually implement the use

22 of drop boxes across different states.

23     Q.   Well, okay.  But let me ask you my question again

24 because I think you might have gone a little farther than I

25 asked.

Page 27

```
 1              My question is, are any of the states in column 3,
 2    this No Enabling Legislation, states where the statutes in
 3    that state say that it's discretionary?
 4         A.   I have not done a thorough review of all the
 5    statutes, so I don't know if he is missing anything.
 6         Q.   Well --
 7         A.   I do know that Nevada is misclassified.  He is
 8    saying that it's prohibited, but there is actually enabling
 9    legislation.  So directly answering your question, I know
10    for sure that's Nevada.  If given time, I can go through
11    and look at all the states.  I may find other examples
12    other than Nevada in the link that he provided.
13              So it's a link that he provided and did not bother
14    to follow when he was compiling this document here where he
15    is trying to clean up the mess that he made in his first
16    report.
17         Q.   And so other than Nevada, are you able to point to
18    any other errors that you believe exist in that column 3
19    that he has now entitled No Enabling Legislation?
20         A.   Again, I have not had time to look at all of them.
21    But as another example, there is a link in Idaho, and it
22    goes to a dead link.  So I have not had time to look up
23    this explicit statute other than the link that he provided.
24    And I can't believe that within two weeks that Idaho
25    changed their website so that they were creating a dead
```

Michael McDonald, Ph.D.
October 29, 2021

```
 1   link there.  It's just sloppiness that's pervading this
 2   report where there should be very firm citations and then
 3   links where they are provided and some check by somebody to
 4   verify that the classifications are correct.  That just
 5   wasn't done in this report.
 6       Q.   Okay.  So I just want to make sure I understand
 7   your testimony.  Your testimony is that in Nevada there is
 8   a state statute that explicitly authorizes the use of drop
 9   boxes; is that your understanding?
10       A.   I was just reviewing it before we got on to this
11   call.  Nevada adopted vote-by-mail elections in June of
12   this year for all of their elections, and they adopted at
13   that time, as I was reading the law, explicit use of drop
14   boxes.
15       Q.   Okay.  Okay.  And then besides what you described,
16   are there any -- I mean, I understand your distinction
17   between, you know, the statutes themselves and then, you
18   know, the regulations that are promulgated by, you know,
19   the administrative side like the Supervisor of Elections or
20   Secretary of State or something like that.  I take your
21   point.
22           Other than that and what you described so far, are
23   there any other errors, and I know you said you haven't
24   reviewed the whole thing yet, but are there any other
25   errors that you can identify today in that column 3, No
```

Case 4:21-cv-00384-MW-MAF Document 263-17 Filed 01/14/22 Page 30 of 252

1    Enabling Legislation?

2       A.    It's not really my responsibility to go clean up

3    Dr. Kidd's report and fix every error that he has in it.  I

4    have checked some of them, and I have found the ones that I

5    have described to you.  I would reserve that upon further

6    investigation whether or not there are further errors that

7    are in that particular section of his report that we are

8    referencing at the moment.

9       Q.    Okay.  But right now you are unable to point to

10   any others, and you are saying it's just because you

11   haven't gone through the whole report with all the

12   citations; is that right?

13      A.    That's correct.  I have only had two days, and I

14   have had other responsibilities over those two days.

15      Q.    Understood.

16      A.    So I have had very limited time to take a look at

17   all of the citations that he is providing.

18      Q.    Okay.  In terms of his -- and, you know, I know

19   the scope of your engagement was not to necessarily render

20   opinions with regard to the conclusions that Dr. Kidd

21   reached, but do you have -- first of all, were you asked to

22   provide any opinions -- and you asked me to pull up the

23   document, so let's pull up the document.

24            In his original report --

25      A.    "His" being?

Michael McDonald, Ph.D.
October 29, 2021

1      Q.   Dr. Kidd, sorry.

2      A.   Okay.

3      Q.   If you look at Dr. Kidd's original report, there

4  is a section in the report where he summarizes his opinions

5  essentially.  And I believe it starts on page 4, Section 2,

6  called Synopsis.

7      A.   Yes, I am there.

8      Q.   Do you see that there?  Okay.

9           So in paragraph 6 he describes the questions that

10  he examined.  And then if you go to paragraph 7, he talks

11  about employing standard methods, and we will go back to

12  that.  And then in paragraph 3, I'm sorry, Roman numeral

13  III, Summary of Findings, he summarizes his findings.  Do

14  you see that there?

15     A.   Yes, I do.

16     Q.   Okay.  So were you asked to provide opinions on

17  whether you agree or disagree with the findings that he

18  made as opposed to his process?

19     A.   I was not.

20     Q.   Okay.  Having read through those opinions, are

21  there any that you -- well, are there any that you agree

22  with?  Let me ask you that.

23          MR. KARPATKIN:  Hold on.  Objection.  Is that

24      question related to his expert opinion?  Because let's

25      stick to what is within the four corners of his expert

Page 31

 1    report.

 2         MR. ZACHERL:  I think it's appropriate for me to

 3    ask him -- I am asking him his expert opinion, but I

 4    think it's appropriate for me to ask him since he has

 5    reviewed this and since he works in the same field and

 6    has collaborated with Dr. Kidd whether he agrees with

 7    any of Dr. Kidd's opinions.  So I will let the

 8    question stand.  If you want to instruct him not to

 9    answer, that's fine.

10         MR. KARPATKIN:  Just to clarify, are you asking

11    him for his expert opinion or his personal opinion?

12         MR. ZACHERL:  Well, right now I'm asking for his

13    expert opinion.  You have anticipated, Jeremy, that I

14    will probably then ask him if he doesn't have an

15    expert opinion whether he agrees personally or not.

16    My question right now is in his expert opinion as a

17    political scientist.

18    A.   I have not had an opportunity to do a full

19    analysis that was charged -- similar sort of analysis that

20    was charged to Dr. Kidd, so I would not feel comfortable at

21    this time rendering an opinion on the merits of his

22    analysis.

23    BY MR. ZACHERL:

24         Q.   So in other words, you wouldn't feel comfortable

25    stating whether you agree or disagree with any of his

Michael McDonald, Ph.D.
October 29, 2021

1    findings?

2        A.   That's correct, at this time I would not be

3    willing to do so.

4        Q.   Okay.  Fair enough.  Fair enough.

5             I think that -- I think we might -- I'm going

6    through some notes as we are talking here, because like I

7    said, we took Dr. Kidd yesterday, and he answered a lot of

8    this.

9             Let's go through your report, and you can pull

10   that up.  And while you are doing that, I just have some

11   general questions about the report.  Who drafted your

12   report?

13       A.   I did.

14       Q.   Did the attorneys who hired you provide you with

15   any input into the contents of the report?

16       A.   At stages they did help me, assist me, with

17   finding citations.

18       Q.   Any other input?

19            MR. KARPATKIN:  Hold on.  Hold on.  I want to

20        object here.  Questions that are related to

21        discussions between Professor McDonald and his counsel

22        are going to be privileged.

23            MR. ZACHERL:  Let me rephrase.  That's fair.

24   BY MR. ZACHERL:

25       Q.   What I'm really getting to is are there any

Michael McDonald, Ph.D.
October 29, 2021

     1    sections of the report that were drafted by the attorneys
     2    who hired you, sir, as opposed to you?
     3        A.    No.
     4        Q.    Okay.  And then the final question, just generally
     5    with regard to your report, you know, you've stated that
     6    you believe even after seeing the supplemental report that
     7    there are errors in Dr. Kidd's analysis.  Are there any
     8    errors in your report that you are aware of?
     9        A.    There could be.  There is a lot of material that I
    10    had to go through.  I tried my best, but I will own up to
    11    them if there are any errors.
    12        Q.    Okay.  Okay.  And then just generally with regard
    13    to errors -- you know, I come from a family of Ph.D.s, but
    14    I am the guy that went and made money.  I went to law
    15    school, right?  So I have had these conversations a hundred
    16    times with my siblings.  What I'm curious about in your
    17    view, is that is it possible to have errors in a report but
    18    still have the conclusions in the report, you know, being
    19    sound and reliable?
    20        A.    That's an excellent question.  And, you know, so
    21    I, of course, have done many of these lawsuits, and there
    22    have been errors in my reports.  When an opposing expert
    23    points out these errors, I will reassess my opinions based
    24    on the error that they have pointed out.  You know, if I
    25    come to a different conclusion, I would state that, or I

Michael McDonald, Ph.D.
October 29, 2021

Page 34

1   would explicitly state into my report I have considered

2   the, you know, this new information that was provided, I am

3   in error here, and here is -- does that substantively

4   affect my opinion.

5            It's notable that Dr. Kidd never does that in his

6   supplemental report.  He clearly, you know, confronted

7   with, for example, what he now acknowledges is an error in

8   the way in which he classified states with regard to drop

9   boxes.  It was incumbent upon him at that point to say

10  something, well, does this change my opinion at all or I

11  don't -- this doesn't change my opinion at all.

12           I will give you an example of this.  In Georgia, I

13  made a calculation error in an Excel spreadsheet.  I am

14  probably not the only one who has ever done that.

**15       Q.   Sure.**

16       A.   And the opposing expert pointed it out, but it

17  actually helped our side.  I was kind of surprised that the

18  opposing expert put it into his record.  So there I'm,

19  like, yes, of course, that's an error that we made, or I

20  made, not we, it's an error I made, and it doesn't change

21  my opinions.  If anything, it strengthens my opinion.

22           If that was the case with Dr. Kidd, if all my

23  criticism only strengthened his opinions, he should have

24  said so.  There is nothing in his supplemental report which

25  would indicate any of the issues that I'm pointing out at

Michael McDonald, Ph.D.
October 29, 2021

Page 35

 1   all affect his opinions.

 2       Q.   Okay.  And I think you have answered my question,

 3   but let me just make sure I get the question and answer.

 4           So is it fair to say that in your experience,

 5   sometimes errors in reports do affect the conclusions,

 6   sometimes errors in reports don't affect the conclusions,

 7   but either way, you would expect that if an expert was

 8   pointed to an error in his report, that expert ought to say

 9   whether or not it impacted his opinions; is that a fair

10   summary?

11       A.   Yes, that is a fair summary.

12       Q.   Okay.  All right.  Let's go and look at your

13   report now in more detail.  I want to go through it with

14   you, and recognizing it's a Friday, I don't want to keep

15   you all day.

16           So let's just start at the top.  If you see my

17   highlighting, as I said earlier, please ignore it.  I'm not

18   tech savvy enough to upload an unhighlighted document, so I

19   am not sure if it's in there or not.

20       A.   Just for the record, I don't see any highlighting

21   in the documents that you forwarded to me.

22       Q.   See that, even a blind squirrel finds a nut once

23   in a while.

24           I see your very impressive qualifications in the

25   first section, and it looks like you are being paid $450 an

Michael McDonald, Ph.D.
October 29, 2021

Page 36

1   hour for your work in this case; is that right?

2       A.   That is correct.

3       Q.   Have you tallied up how much time you have put in

4   so far?

5       A.   I have put in roughly 25 hours so far.

6       Q.   Okay.  And then, you know, you identify what your

7   assignment is, which is pretty narrow, just to review and

8   respond to Dr. Kidd's declaration; is that right?

9       A.   Yes, that's what I was charged to do.

10      Q.   Okay.  And then you summarized your conclusions in

11  the next few -- the next few -- I guess the next seven

12  paragraphs.  I'm going to -- I'm not going to hit every one

13  of these, but I have some questions on some of them.

14           So if you go to the last sentence in paragraph 1

15  where you say, "Dr. Kidd provides no rationale as to how

16  these extraneous provisions are relevant to inform his

17  opinions on issues at stake in this litigation."

18           Do you see that?

19      A.   Correct, yes.

20      Q.   Well, what I'm curious about is, you know, he

21  described in his deposition these processes that are,

22  according to him, used frequently by political scientists.

23  One of them was this typology analysis.  Are you familiar

24  with the typology analysis and can you describe for us what

25  it is, if you know what it is?

Michael McDonald, Ph.D.
October 29, 2021

Page 37

1    A.   Yes, I can.  But just to point out what's relevant

2    for this section here, this section in my report, he is

3    actually using a different methodology called process

4    tracing.  So I don't know if -- if you want me to go over

5    typology, it would be out of order from what we are talking

6    about right now.

7    **Q.   You are a bright guy.  My second question was**

8    **going to be about that.  Yeah, let's do it that way.  Tell**

9    **me about this process that you political scientists use,**

10   **and if you can describe it for the record, I would**

11   **appreciate it.**

12   A.   Right.  And just to be clear, I don't disagree

13   that he is using the methods of process tracing and

14   typology or classification.  It states that's very clear

15   what he is doing in his report.

16        I think Dr. Kidd misunderstands that my complaint

17   or my criticism of his report is that he is not producing

18   research in a way that's transparent and referable, so I

19   can't go back and figure out what it is that was going --

20   his thought processes that led him to his measurement,

21   which then led to his conclusions.

22        Recommendation is a very important component to

23   social sciences, and so it's really that where I have a

24   disagreement with him on his methods.  I don't have a

25   disagreement that he is using process tracing, for example,

Michael McDonald, Ph.D.
October 29, 2021

1    which is looking at a series of changes over time and

2    developing a historical narrative about what those changes

3    mean to some phenomenon that you are studying.  So that's a

4    very widely used method.

5            Doing classifications of states into different

6    categories is also very widely used.  When you get into,

7    especially into elections, though, it becomes deeply

8    challenging for many of the criticisms that I'm lining out

9    to Dr. Kidd because there are lots of nuances to these

10   laws, and sometimes you can lose some of the nuance, you

11   know, when you are doing the classification.

12           It's really that part -- again, to go back to it,

13   it's that measurement part at that point.  Some of these

14   laws have -- that he is studying when he is doing his

15   typology comparison, not the process tracing, that there

16   are multiple elements to what those laws are touching on in

17   election administration, and he is pulling out one or two

18   pieces to examine.  Okay?

19           He should explain why he is doing that, and then

20   if he is pulling out more than one piece, he needs to

21   explain, well, if he pulls out any piece, he needs to

22   explain the measurement that he has, how is he going about

23   measuring this data off that element.  And then if he has

24   two pieces, then it's incumbent upon him to not only talk

25   about how he is measuring both of those, but also the

Michael McDonald, Ph.D.
October 29, 2021

```
 1   relationship to one another.  Is one more important than
 2   the other?  Are they being weighted the same way?
 3          Essentially we start thinking about it that way.
 4   The other elements that he is disregarding, he is basically
 5   assigning zero weight to them and saying they are
 6   unimportant, they are irrelevant.
 7          So, again, it's this sort of weighting that you
 8   need to think about when you are coming up with an overall
 9   opinion.  Like, at one point in particular, he says
10   average.  Well, average is numeric in value, and he never
11   provides a numeric number, so it's kind of difficult to
12   understand what he means by an average state, like Florida
13   is an average state compared to other states, when I don't
14   even know what -- how Florida is in relationship to the
15   other states on the sort of measure that he wants to
16   develop for what he considers to be average.
17   Q.   Okay.  And so let me -- this may cut through a lot
18   of what I was going to ask you.  Let me see if I can
19   summarize.
20          So you would agree that process tracing and
21   typology are generally accepted methodologies within the
22   field of political science, but you take issue strongly
23   with the way in which he carried out those methodologies;
24   is that a fair summary?
25   A.   Yes, I agree that those are widely used methods.
```

Michael McDonald, Ph.D.
October 29, 2021

Page 40

1    I have used them myself in my own research.

2        Q.    Okay.

3        A.    That's not my complaint.  My complaint is focused

4    on the ability to replicate and reproduce independently the

5    research that he has produced for this report.  I have

6    written on that, too, in my career.  So it's a subject area

7    that we are not really talking about my qualifications

8    there with that respect in this case, but it's something

9    that I do write about.

10       Q.    Um-hm.

11       A.    What I find notable is that when -- after I have

12   levied this criticism of Dr. Kidd, because it's clear in my

13   rebuttal report that I'm making these criticisms, at no

14   point does he -- when he is talking about the methods, he

15   wants to say well, it's just about processing and

16   typologies, but he is ignoring that I'm saying I can't

17   reproduce your work.  And that's very fundamental to any

18   scientific endeavor to be able to reproduce work so that we

19   know whether or not there is truth to it.

20       Q.    Okay.  And let me ask you another question that

21   relates, I think, to what you are saying.  In the field of

22   political science, is there a distinction in the kinds of

23   analysis that you folks, political scientists, do between

24   qualitative analysis and quantitative analysis?  I guess

25   that's the first question.

Michael McDonald, Ph.D.
October 29, 2021

Page 41

1    A.   Can you restate that?  I didn't quite understand
2    what you are trying to get at.
3    **Q.   What I'm trying to get at, and I will ask you the**
4    **whole question, I didn't want to ask a compound question,**
5    **but what I'm trying to get at is can we explain the lack**
6    **of, you know, for example, arithmetic detail or numerical**
7    **detail in Dr. Kidd's report by characterizing his report as**
8    **qualitative rather than quantitative?**
9    A.   So I also teach research methods, so I'm
10   definitely aware of the differences between qualitative and
11   quantitative research.  So let's say that -- he wasn't
12   attempting to do quantitative research, so -- it was really
13   a misstatement for him to use the word something like
14   "average" --
15   **Q.   Okay.**
16   A.   -- in that sort of hypothetical.  He didn't even
17   embark upon this endeavor.
18        Still you need to explain at least something when
19   you are doing qualitative research as to what your measures
20   are and how if there are multiple measures that you are --
21   you know, elements of a particular law in this case that
22   you think are important to look at, what are they and why
23   are you disregarding others, and then what's the relative
24   importance to one another.
25        You know, to give a more concrete example in

1   Kidd's report where he fails to do this would be -- let me

2   go down to it.

**3        Q.   I'm pulling it up myself.**

4        A.   Table 4 on page 22.

**5        Q.   Okay.  Give me a second here.  Okay.  Table 4.**

**6   Got it.**

7        A.   All right.  So, again, I was not asked to

8   comprehensively review every classification that he made on

9   this particular table about third-party ballot collection

10  rules.

**11       Q.   Right.**

12       A.   But as you look at it and what I found interesting

13  when I was looking at it is that he has made these four

14  classifications, but then in some of the states, there are

15  parentheses after them.  At first I wasn't really even

16  clear what those were because it's not really described in

17  the table, so I had to do some additional inference from

18  the text what he was really talking about with the

19  parentheses.  Is that, like, a footnote?  Is it something

20  else?

21            It turns out for Florida he is talking about the

22  number of ballots.  So these parentheses are the number of

23  ballots that an individual is authorized under the law to

24  return on behalf of another person.  So here is a case

25  where it's not very clear, he is not explaining what these

Michael McDonald, Ph.D.
October 29, 2021

Page 43

1    parentheses are, these numbers inside the parentheses.

2         Then I have to understand well, so does it matter

3    that in Montana there is an acquaintance can return up to

4    six ballots, and in Florida anyone can return two ballots.

5    So qualitatively what's the difference there between an

6    acquaintance or anyone, and how does that -- does it matter

7    that there can be six or two ballots?  How does that affect

8    things?

9         I'm saying this particular example because it's in

10   my report.  And I would reserve the right to look through

11   all these much more deeply and try to understand this

12   particular nuance and why it was that he would want to say,

13   well, Florida is in this classification -- you know, what's

14   really the difference between Montana and Florida, because

15   there is two dimensions here that he is looking at.  One is

16   sort of the universe of people who can do ballot returns,

17   and then the other dimension is the number of ballots that

18   they can return.

19   **Q.   Right.**

20   A.   So how do those things interact with one another.

21   It's really incumbent upon him to explain his thought

22   process and reasoning as to why he decided to make these

23   classifications in the way in which he did when he is

24   forming his opinions.

25   **Q.   Okay.  So on this example, because actually I was**

1    going to use a different example to try to talk about this

2    qualitative versus quantitative, but this is a good one to

3    use.

4              To your point about the number of ballots that

5    somebody can return, when I read this table, I noted that

6    in the titles he puts in parentheses limits, and then when

7    he has each state, if there is a limit, he puts the number

8    of ballots in the parentheses for these states.  Do you see

9    that?

10   A.   Yes, I do.

11   Q.   Okay.  And so what you are saying essentially is

12   that's not clear enough.  He should have said the limits on

13   the number of ballots that could be returned or something

14   like that, right?

15   A.   That would have added much more clarity.  Instead

16   I had to look down into his text to figure out what context

17   he meant by limits.

18   Q.   Understood.  That's fair.  I hear what you are

19   saying.

20             Okay.  And then with regard to the categories or

21   the classifications, I'm paraphrasing, but in his

22   deposition he described in doing the classifications that

23   it's -- the difference between the classifications is more

24   important than the differences among the examples in the

25   particular categories.

Michael McDonald, Ph.D.
October 29, 2021

1         So, for example, it's more important that you have
2   distinction between voters only can return ballots and then
3   maybe some family member as opposed to the difference
4   between Alaska and Georgia within the Family Member column.
5   Do you understand what I mean?
6         MR. KARPATKIN:  Hold on.  I'm going to object a
7         moment here because you are characterizing deposition
8         testimony that Professor McDonald has not seen, he has
9         already testified he hasn't seen, and we have no way
10        of independently verifying for the purpose of this
11        deposition that you are accurately characterizing the
12        deposition testimony.  I would ask you to rephrase.
13        MR. ZACHERL:  No problem.  I can rephrase.
14   BY MR. ZACHERL:
15     Q.   Essentially what I'm getting to, Dr. McDonald, is,
16   you know, would you agree that when you are doing these
17   classifications, the more important distinctions are the
18   distinctions between the columns rather than the
19   distinctions between the entries in each column?
20     A.   So that's a choice that Dr. Kidd has made in this
21   report, and he needs to be more transparent about those
22   sorts of choices that he has made and explain why it is
23   that he believes that the classifications are more
24   important than this other component.  And if the other
25   component was unimportant to his opinion, he needs to say

Page 46

1    that.  But then it just opens the door, well, why didn't he

2    look at anything else?  If the number of ballots was

3    immaterial to his opinion, there are other nuances in these

4    laws, too --

5        Q.   Right.

6        A.   -- about, you know, exactly who it is that can

7    return the ballots.  So why -- what about that?

8            We can go down the road on different nuances like

9    those.  I have not had the time to comprehensively review

10   all the laws on that, but it's really incumbent upon him to

11   explain why it was that, here's this other thing, but I'm

12   not going to consider it for my opinion anyway.  I'm going

13   to discard all this other stuff, I'm not even going to look

14   at it and not even tell you about not looking at it.

15           I get that what he was trying to do was classify

16   states in these columns.

17       Q.   Right.

18       A.   Again, I will also reserve that there may be

19   errors there.

20       Q.   Right.

21       A.   He has to explain why he is doing that and why it

22   is that he is basing his opinion on that one element.

23       Q.   So -- okay.  Let me, again, try to summarize to

24   see if we can move past this.

25           You wouldn't take issue with his use of

Michael McDonald, Ph.D.
October 29, 2021

1    classifications and even not necessarily these particular

2    classifications, but what you are saying is you are unable

3    to evaluate the appropriateness of these classifications

4    given the lack of detail and the lack of explanations for

5    why he did it this way; is that a fair summary?

6         A.   To a certain extent, yes.  I mean, at this point

7    when I'm responding to his report, he hasn't even provided

8    the citations, so I couldn't go back and figure out, like,

9    were these even correct classifications.  I have still yet

10   to have the time to go back through and determine whether

11   or not these classifications are correct.

12        If I reviewed the -- all of the laws, I may come

13   to a different opinion as to how you might go about doing

14   this classification scheme that he has come up with.  Maybe

15   there is some other thing in there about the law that might

16   talk about inclusiveness of the number of people, the

17   universe of people who could return ballots.  That's just

18   an example.

19        I have not been able to do that, so -- again, I

20   was tasked here to criticize the report, not come up with,

21   you know -- rehabilitate his report by coming up with my

22   own classification schemes and render opinions about, you

23   know, doing my own reanalysis of his report.  I could never

24   even do the reanalysis at the very outset, so it was very

25   frustrating to read through this report in various sections

Page 48

1   because I simply couldn't even start to do the sorts of

2   things that I needed to do in order to reanalyze what it

3   was that he was -- his opinions, how I can get to the same

4   opinions as him, or at least understand his reasoning as to

5   how to get to those opinions.

6       Q.   Okay.  And then a couple of follow-up questions,

7   and I think we can move on from this topic.  But you said a

8   lot there, and I'm trying to ask a narrower question.

9            I mean, what I'm getting to is you are not taking

10  issue with his class -- his use of a classification scheme

11  to evaluate the third-party ballot collection rules in the

12  various states.  You are taking issue with how he went

13  about it because it's not -- there is not enough detail for

14  you to evaluate it, whether it's accurate; is that a fair

15  summary?

16      A.   Yes.  Using typologies, I do it all of the time,

17  lots of political scientists do it all the time.  That's

18  not the issue that's at stake.  It's how he arrived at the

19  typology, and he needs to be very transparent about -- "he"

20  being Dr. Kidd.  Dr. Kidd needs to be very transparent

21  about the steps that he took to reach that classification

22  and then explain why it was that he was making the

23  classification of the states in the way in which he was.

24      Q.   Okay.  And so then my next question is, and this

25  may go back to your point earlier that you just haven't had

Michael McDonald, Ph.D.
October 29, 2021

1    a chance to check all of the links, but in his supplemental
2    report, he does provide links for each of the -- each of
3    the law -- or each of the states that he lists and in each
4    of those four classifications that's on page 5 and 6 of his
5    report -- really 5 to 7 of his report.  But the fact that
6    he has provided these links, does that cure the problems
7    that you are identifying, or does that get him part of the
8    way there?
9            Like I said, I understand you haven't reviewed the
10   whole thing, but what is your view of this supplemental
11   report on this topic in terms of rehabilitating issues that
12   you identified?
13   A.   It's definitely helpful for him to have provided
14   the citations that he needed to provide.  So that is
15   useful.  But, again, I have not had the chance to actually
16   look at all of the laws, so I can't tell you if there are
17   errors still in there and if those errors in some way
18   fundamentally -- you know, at the very outset if he is
19   citing the wrong thing, then that would, you know, that
20   obviously would be an error.  But then I have to understand
21   how the whole typology works.  I couldn't even begin to
22   embark upon the reanalysis of his report because I didn't
23   even have the primary sources for this particular table.
24           I want to be clear on that, too.  Because another
25   part in the next table, Table 5, he is citing a website

Michael McDonald, Ph.D.
October 29, 2021

1   that was created, and it provides guidelines, suggestive

2   guidelines, to people.

**3**      Q.   Right.

4      A.   I looked at that site, and there are at least a

5   couple of states that look like, Alabama and Arkansas, I

6   didn't even see the -- any statutory language there that

7   was cited to.  And so I still think on this Table 5 he is

8   still being deficient in being transparent in the statutes.

9           I wish he would have done as he did with the other

10   sections and actually provided links or -- the links are

11   bad.  Give me the actual citation to the actual statute.  A

12   link is great to add on at the end to that, but, you know,

13   give me the legal cite so that if the citation -- if the

14   link doesn't work, I can still try to find it independently

15   and figure out what was the statute that he was actually

16   looking at.

**17**      Q.   Got it.  Okay.

**18**           Let's go back to your report, Dr. McDonald.  And

**19**   we were at the point in your report, it was at the end of

**20**   paragraph 1 of your summary which starts on page 3 and goes

**21**   over to page 4.  The last sentence is what I asked you

**22**   about, the one that starts off, "Dr. Kidd provides no

**23**   rationale."

**24**           Do you see that there?

25      A.   Yes, I do.

1    Q.   Okay.  So this is something that I'm just not

2    educated on, so I'm curious as to how the analysis is done.

3    But if you are -- if you are tasked with the responsibility

4    of analyzing changes to a particular state's election laws,

5    and you are going to use this, you know, this process

6    tracing where you go back historically to see what the law

7    was before, are you saying that it's improper for the

8    person doing the analysis to address aspects of the law

9    that are not at issue -- aspects of the historical law that

10   are not at issue in the new law?

11   A.   I mean, again, I'm not fully clear on the question

12   you are asking, so maybe if you could narrow it down a

13   little bit.

14   Q.   Well, what I'm getting to is you have said that he

15   has cited to historical provisions in the law that are not

16   at issue in the litigation over the new law.  Do you see

17   that there?

18   A.   Yes.

19   Q.   And so my question is, within the field of

20   political science as a part of the process of using this

21   process tracing methodology, I mean, the way I will ask it

22   is, isn't it fair sometimes to look at provisions in the

23   historical law even though they are not necessarily at

24   issue in a challenge over the new law?

25   A.   I see.  So I did read his supplemental report

Michael McDonald, Ph.D.
October 29, 2021

Page 52

1  where he noted that he was just specifically tasked by the

2  defendants' counsel to look at these two aspects of the

3  law, and that's the in-person early voting and mail ballot.

4  So he does this process tracing -- he was tasked to do

5  those two -- to review those two using process tracing.

6          What I'm noting is, all right -- maybe I'm being

7  overly critical of Dr. Kidd, then, because I say Dr. Kidd

8  at the top of page 4 in that first bullet point, I say,

9  "Dr. Kidd provides no rationale as to how these extreme

10 provisions are relevant to inform his opinions on issues at

11 stake in this litigation challenging SB 90."

**12      Q.   Right.**

13      A.   So he does not provide -- he does provide a

14 rationale.  His rationale is that defendants' counsel told

15 him to look at these two areas, so that's why he is looking

16 there.

17          What he has done, then, is provide his process

18 tracing for these two elements, and it was defendants'

19 counsel that decided we are going to look at these two

20 areas.  So that's his rationale.  And so should he have

21 looked -- I'm pointing out as a criticism that if we want

22 to think about -- make arguments about irrelevant pieces of

23 election administration and election law in Florida, we

24 will want to look at the whole system, not just to what

25 defendants' counsel has tasked Dr. Kidd to take a look at.

Michael McDonald, Ph.D.
October 29, 2021

Page 53

1     Q.   Okay.  Again, to summarize, what you are saying is

2     it's not necessarily a problem using process tracing

3     methodology to look at historical laws that are not at

4     issue in the new law, but that if the person doing the

5     analysis is going to mention those historical laws, they

6     need to give the rationale for why they are relevant; is

7     that your opinion?

8     A.   Well, again, it's relevant to form opinions about

9     issues at stake in the litigation challenging SB 90.  So

10    that's what I'm saying here is that we would want a

11    rationale as to why it was that one process -- one process

12    tracing of a law that is at stake and one that is not at

13    stake --

14    Q.   Um-hm.

15    A.   -- why if you are going to look at the not at

16    stake, why you would exclude other ones that are not at

17    stake in the litigation as well?

18         But, again, he is going back and just saying,

19    well, this is all I was tasked to do, so that's just what

20    I'm doing.

21         My larger criticism is really maybe not, you know,

22    his rationale as -- is one that's -- it really puts the

23    onus back on to the defendants' legal team as to why it was

24    that they wanted to look at only these two facets.  So

25    whatever your -- whatever your legal strategy is, that's

1    what he is following here.

2            I would think, though, that if you wanted to look

3    at everything -- of course, I'm just pointing out for the

4    Court that there are other elements that are being ignored

5    in Florida's laws when Dr. Kidd does this process tracing.

6        Q.   Okay.  Again, not to perseverate, but I want to

7    make sure I understand the science.  It's appropriate when

8    you are doing process tracing, generally it could be

9    appropriate to look at historical laws that are different

10   than those at issue in the litigation or whatever the

11   matter at hand is, but you are saying there has to be a

12   showing by the person doing the analysis as to why it's

13   relevant, and here you found the showing to be

14   insufficient; is that a fair summary?

15       A.   Now you are asking me a different question,

16   actually.  I was trying to --

17       Q.   Just so you know -- sorry.  Sorry to interrupt

18   you.  That's actually what I was trying to get to, so it's

19   probably just my bad questioning.  I just want to know

20   whether in the field of political science when you are

21   doing process tracing, is it appropriate to look at

22   historical laws that may not be at issue in the current

23   litigation in determining, you know, the impact of the new

24   laws?  That's really all I'm asking.

25       A.   Yeah, so you are asking a much more broader

Michael McDonald, Ph.D.
October 29, 2021

Page 55

 1    question is how we would go about doing this sort of work

 2    in social sciences generally or political science, if you

 3    want to think even more broadly than social sciences.  The

 4    answer to that is absolutely not.  There are whole books

 5    and debates that people have about what they think are the

 6    important elements to analyze in terms of doing any sort of

 7    tracing, historical tracing narrative of development,

 8    political development, or any social development, quite

 9    frankly.  And so people debate all the time, well, you look

10    here and you look here, but you didn't look over here.

11        Q.   Right.

12        A.   Or you look here and here, but that section here

13    was irrelevant to what you were looking at here.

14             Again, there are entire books written on this

15    stuff like about the development of democracies and other

16    things.  So as a matter of political science, we would be

17    having these debates, and there have been longstanding

18    debates over decades, about how we would go about doing

19    process tracing to understand how we see political

20    development, for example.

21             So, yeah, again, it's incumbent upon somebody to

22    explain why it was that we were looking at these two.  Why

23    were these two thought to be important?  Why were other

24    things not thought to be important?  And if Dr. Kidd just

25    wants to, you know, defend himself and say well, that's all

Page 56

```
 1    I was tasked to do was look at these two things, that's
 2    fine, he was just tasked to do those two things, but it
 3    doesn't really inform us about the overarching change in
 4    Florida's election laws because we are excluding certain
 5    elements from it, from this sort of historical analysis
 6    that Dr. Kidd is doing.
 7        Q.   Understood.  Okay.  And you have answered my
 8    question.  I appreciate that.  I didn't mean to go down the
 9    rabbit hole.
10            So separate question on this topic and then we
11    will move on.  When you are -- well, you know that in this
12    case, there are certain sections of Senate Bill 90 that are
13    being challenged, right?
14        A.   I'm generally aware, but I have to say I have not
15    read the entire Complaint because -- so I have only been
16    informed by the lawyers in discussions with them about what
17    elements that they are challenging, but I have not read the
18    entire text of the bill.
19        Q.   Yeah, I'm not going to ask you questions about the
20    specific challenges that are being made.  My question,
21    again, goes back to acceptable methodologies in political
22    science when you are trying to determine -- let's say in
23    this case they are challenging five provisions of Senate
24    Bill 90.  In determining the impact of those provisions on,
25    for example, voter turnout in future elections, would you
```

Michael McDonald, Ph.D.
October 29, 2021

```
 1    look at each law individually?  Would you look at the
 2    laws -- the aggregate effect of all the laws that are being
 3    challenged, or would you use some other methodology?
 4         MR. KARPATKIN:  Hold on.  I just to want put an
 5         objection on the record.  This is beyond the scope of
 6         his expert report.
 7         A.   So exactly what I was about to say.  I was not
 8    tasked to do this analysis, so you are asking me a
 9    hypothetical about how I would go about doing an analysis
10    of the effect of SB 90 on participation by the entire
11    state, you know, voters for the entire state and distinct
12    communities within the state.  So I haven't done that
13    analysis.
14         I have done similar analyses in other states in
15    litigation, and I have done that in my academic writing to
16    look at turnout effects or turnout groups, you know, very
17    specific communities, but I have not been tasked to do that
18    here.
19         So you might want to look at both, but in certain
20    instances, there may be certain communities that are being
21    disproportionately impacted by a particular law.  So
22    everyone has a right to vote.  So you want to look if there
23    is a disparate impact.  For example, in litigation I'm
24    involved with right now in Georgia, it's naturalized
25    citizens through a quirk in the whole database
```

Michael McDonald, Ph.D.
October 29, 2021

Page 58

 1   infrastructure that the Secretary of State has with the
 2   Department of Driver Services that leads to naturalized
 3   citizens being disenfranchised.  So there we are looking
 4   very narrowly at an affected population rather than looking
 5   at turnout rates for the whole, because the number of
 6   affected people are roughly 10,000 people.
 7          So it's not -- you wouldn't be able to determine,
 8   you know, was there an effect that was having an impact on
 9   a particular community if I was just looking at overall
10   turnout rates in Georgia, because the 10,000 people would
11   be lost and subsumed into the larger currents that happen
12   with all of the factors that go into turnout.
13          That's just one example.  I mean, I can go into
14   other examples where once we have, you know, detailed data
15   and, you know, individual-level data that we can get from
16   election officials that are found during discovery, you can
17   start answering that question, are there certain
18   communities.
19          Was it like in Kansas with a group of citizenship
20   requirement?  Was that military voters that were being
21   disenfranchised by that particular law?  And there we had a
22   judge that was an Army brat and knew that she could not
23   find her birth certificate anymore.  So that really
24   resonated with that particular judge, the arguments that we
25   were making about affected military populations.

Michael McDonald, Ph.D.
October 29, 2021

1          Again, I would imagine, although, again, I have

2    not been asked to do an analysis here, that overall we may

3    not be able to find effects on SB 90 on overall turnout.

4    But when we delve deeper into it, we are going to see that

5    there are certain communities being adversely affected.

6          Again, that it is my personal opinion.  That's not

7    any analysis I have done in opining about as an expert in

8    this report in this case.

9         Q.    Yeah, I think you have answered my question.

10   Really all I was getting to is whether from, you know, from

11   the perspective of acceptable methodologies in your field,

12   there is, you know, there is a way to go about evaluating

13   the impact so that you either look at the aggregate or you

14   look at the impact of individual sections, or, as you said,

15   the impact of individual sections on individual

16   communities.  It sounds like -- and all that is not my

17   question.

18         My question is, it sounds like what you are saying

19   is there is no one-size-fits-all methodology with regard to

20   looking at the impact of a group of laws on voting in that

21   state.  It depends on the circumstances and a lot of other

22   variables, and you haven't looked at that issue in this

23   case; is that a fair summary?

24        A.    So, yes, again, I have not been retained as an

25   expert to evaluate the potential effects, if any, changes

Michael McDonald, Ph.D.
October 29, 2021

```
 1   that SB 90 will have in Florida.  But I would say, you
 2   know, yes, there are multiple methods, but having that
 3   individual-level data generally tends to be a best prolific
 4   value because then we can really get under the hood and see
 5   what's going on with the process and how is this affecting
 6   the rights of individual voters to participate in
 7   elections.
 8        Q.   Got it.  I hear you.  I just was trying to
 9   understand the methodology.
10             So let's go to paragraph 3 of your report.  It's a
11   couple of paragraphs down there.  The second sentence you
12   say "This omission" --
13        A.   Can I interrupt?  We've been going for an hour and
14   half, can we take a break?
15             MR. ZACHERL:  It's 11:24.  How about if we come
16        back at 11:30?
17             THE WITNESS:  That's fine.
18             MR. ZACHERL:  Is that okay, Counsel, with you?
19             MR. KARPATKIN:  That's fine.
20             MR. ZACHERL:  So we will see you at 11:30.  Sorry
21        for not asking.  Thanks.
22             (Recessed at 11:25 a.m.)
23             (Resumed at 11:30 a.m.)
24   BY MR. ZACHERL:
25        Q.   Okay.  So Dr. McDonald, on paragraph 3 of your
```

Page 61

```
 1   report, which is on page 4, you have a sentence -- the
 2   second sentence of that paragraph says, "This omission is
 3   significant and implicitly means Dr. Kidd does not opine on
 4   any future effects that Senate Bill 90 may have."
 5           My question -- do you see that there?
 6      A.   Yes, I do.
 7      Q.   Okay.  My question for you is, were you asked to
 8   provide any opinions with regard to the future effect of
 9   SB 90?
10      A.   We have gone over that previously, but, no.  No, I
11   was not asked to do any analysis or render any opinions
12   about SB 90.  I was asked to evaluate Dr. Kidd's report.
13      Q.   Okay.  If we go to paragraph 4, it starts off
14   Dr. Kidd's narrative.  He says, "Narrative of recent
15   historical changes to Florida's mail balloting and
16   in-person voting laws fails to mention any negative effects
17   that may burden Florida voters."  And then you have, "or
18   any changes in Florida law that were not undertaken
19   voluntarily but that were the result of litigation."
20           Do you see that there?
21      A.   Yes, I do.
22      Q.   My question for you is why is it important when
23   you are doing this process tracing historical analysis
24   whether a law change was made as a result of litigation as
25   opposed to some other reason?  I mean, isn't the point to
```

Michael McDonald, Ph.D.
October 29, 2021

 1   see whether it's getting better or whether it's getting

 2   worse?

 3       A.   Well, can we look at Kidd's conclusions with

 4   respect to this?  Because -- I believe what I'm objecting

 5   to is that he has these rather broad conclusions about how

 6   Florida has changed its laws.

 7       Q.   Right.

 8       A.   Now I'm paraphrasing.  So I don't like doing the

 9   paraphrasing necessarily, but to assist in time, I will do

10   the paraphrasing.

11            He is saying that -- Florida has been very

12   generous and it's really done well.

13       Q.   Okay.

14       A.   But then he neglects to say, well, but there have

15   been moments in time where Florida hasn't been so good and

16   they have taken some steps backwards or they have been

17   forced to take a step forward under duress rather than

18   proactively take a step forward.

19            So I think to understand this sort of narrative

20   about a very forward-looking Florida, we also have to

21   understand there have been moments within the context of

22   the historical time frame that Dr. Kidd is looking at,

23   which does not go back to Jim Crow era, that there were --

24   you know, even within modern times there have been steps

25   taken back.

Michael McDonald, Ph.D.
October 29, 2021

Page 63

1          For example, on the usage of

2    Sunday-before-election-day early voting, which is when

3    African-Americans predominantly vote early in large

4    numbers.  And so to do what they call Souls to Polls voter

5    mobilization efforts.

6        **Q.   Right.**

7        A.   Florida specifically did away with that day.

8    Later they reinstated it, but that's the sort of thing

9    that's kind of important.  Because if we are going to paint

10   a picture that Florida is always moving forward, that's

11   different than a picture of well, Florida moves forward

12   sometimes, sometimes it takes a step back, sometimes it

13   takes a step forward because of litigation, and then we

14   have SB 90, and there is issues that are being challenged

15   in SB 90.

16          I can't really talk to the merits of those because

17   I wasn't asked as an expert to do that, but it's reasonable

18   to assume, then, that, you know, in the hypothetical that

19   plaintiffs prevail in some of the allegations and

20   complaints that they are making about SB 90, that, again, a

21   Court will intervene and force Florida to change its

22   direction in which it's going, and that would potentially

23   be in a negative direction, as it has done in the past.

24       **Q.   Well, let me try to be more focused in my**

25   **questioning, because I hear what you are saying.  What I'm**

1    asking, I mean, is this -- it sounds like, you know, you

2    are describing this kind of morality play, Florida bad, the

3    judge had to tell them what to do.

4            What my question is, are you trying to say that,

5    you know, Florida's changes are less favorable to voters

6    because some of them were made as a result of a judge's

7    order as opposed to a, you know, doing them voluntarily?

8    A.    Well, first, I have to object to the notion that

9    I'm saying Florida bad, because I don't believe it was the

10   case in any of the litigation that I'm citing that there

11   was intentional discrimination that a Court found.

12   Q.    Right.

13   A.    There is nothing about the motivations that were

14   involved with the State.  States sometimes enact laws.

15   Maybe they believe that they have a good rationale to do

16   so, but they are doing so without the knowledge or

17   understanding that a particular law will actually have an

18   impact on a particular community.  So that's, you know, the

19   first thing, I'm not saying Florida bad.

20   Q.    Okay.

21   A.    In terms of this overarching narrative about how

22   Florida has moved forward, there have been times when

23   this -- when we say Florida, we are not really

24   understanding the processes that resulted in how Florida

25   moved in a particular direction.

Michael McDonald, Ph.D.
October 29, 2021

1    Q.    Okay.

2    A.    Again, if we are thinking about process tracing, I

3    mean, there is a lot of that to it.  I mean, you want to

4    understand, like, how the French Revolution came about and

5    what were the causal factors that led to the French

6    Revolution, as, you know, one obscure example of where we

7    see process tracing.

8    Q.    True.

9    A.    So, you know, in terms of -- so just to say, like,

10   it's always moved in a nice direction, you know, not nice,

11   but it's always moved in a more expansive direction sort of

12   belays what's going on as to what's actually happening.

13   Then again, it could be, then, that -- again, hypothetical,

14   successful SB 90 we can see again a Court imposing a

15   particular remedy on the State that would be contrary to

16   the laws that have passed within the state.

17   Q.    I got it.  Okay.  You have answered my question.

18   I mean, I was just trying to get context for what you meant

19   when you pointed that out, so you have given that.  Thank

20   you.

21        Let's go down to paragraph 6 at the bottom of

22   page 4.  You have said, "To the extent I can externally

23   test the validity of Dr. Kidd's classification of states, I

24   find them inaccurate and otherwise wanting," and then you

25   have an example.

Michael McDonald, Ph.D.
October 29, 2021

Page 66

```
 1              You say, "For example, he misclassifies 19 states
 2    as not offering mail ballot return drop boxes when, in
 3    fact, those states did provide the drop boxes."
 4              I think we have covered this.  I don't want to
 5    replow this field again, but, I mean, now that he has done
 6    the supplemental report, you know, would you agree that
 7    what he was stating related only to the statutes in the
 8    state and not necessarily what happened in the last
 9    election cycle or administrative regulations?
10    A.   He was attempting to look only at the statutes.
11    So, again, he was narrowing his focus on the statutes.  I
12    have already pointed out previously, so we don't need again
13    to replow that field, if you will, that he is still
14    misclassifying some states, so we have got that going on.
15              And he has an inconsistent classification scheme,
16    so I still reserve quite a bit in my criticism in agreeing
17    with that characterization that he was attempting to try to
18    look at the statutes, and I don't think that that's
19    sufficient because you have to look at the administrative
20    procedures in the state.  We don't want to look necessarily
21    at those statutes just because the statute is silent, there
22    is no statutory enabling statutory language doesn't mean
23    the local election officials aren't actually doing the
24    things that you are studying.  I think if you are
25    classifying states in terms of their drop box usage, we
```

Page 67

1 want to look at that more broadly.

2          Again, if I look at his report, I don't think he

3 makes this distinction about, like, you know, when he is

4 drawing his conclusions that were his goal to look

5 explicitly at statutes.  I will look at it again.

6     Q.   When I read it just --

7     A.   Florida's use of drop boxes, it's page 4, 6(b).

8 How does Florida's use of drop boxes compare to use of drop

9 boxes by states across the country?

10    Q.   Right.

11    A.   And then there is a next section, which is, and

12 are the rules.  I mean, it's a compound sentence.  You can

13 see he was looking at the rules, but he has got two

14 questions there.  The first question is definitely not

15 answered by his analysis.  And if we look down at his

16 conclusions in that section, I think we are going to see

17 something similar that doesn't have --

18    Q.   It's in the next section, paragraph 10, on page 6,

19 I believe.

20    A.   Again, I'm rereading his report on this section.

21          (Witness reviewing document.)

22          Can you point me to that section you were just

23 looking at because I'm not finding it?

24    Q.   If you look at page 6, paragraph 10 at the bottom,

25 he talks about the fact -- I mean he does what I think you

Michael McDonald, Ph.D.
October 29, 2021

Page 68

```
 1  are saying he did, which he doesn't necessarily address
 2  that first question.  I think that's your point.
 3          If you read through this paragraph, he does
 4  address drop boxes here, though.
 5          MR. KARPATKIN:  Can I request that we give the
 6      witness time to read this section?
 7          MR. ZACHERL:  Yeah.  I'm trying to give context.
 8  BY MR. ZACHERL:
 9      Q.  Go ahead.  Take your time.
10      A.  (Witness reviewing document.)
11          So, again, it's muddied and, you know, I'm trying
12  to give him a fair reading again.  He is doing some of the
13  same criticisms I have had before where he is excluding
14  certain states in paragraph 10, and he is narrowing down
15  and he is saying, well, Florida only mandates.  He wants to
16  stick with mandates.
17          But if the practice was in another state that as
18  administrative rule they were providing them, it wasn't a
19  mandate, it's discretionary.  This goes to this other, you
20  know -- answering your question, yes, he can come back and
21  say, yes, I'm just looking at the laws.  I'm not looking at
22  the practices, I'm just looking at the laws --
23      Q.  Right.
24      A.  -- that's all I really care about.  But that
25  doesn't actually talk about how the law actually is being
```

Page 69

```
 1    implemented or what the administrative procedures are

 2    within the states.

 3           So I think if you wanted to understand drop box

 4    usage across the country, you would want to know something

 5    about the states where there is no enabling legislation but

 6    there might be an administrative rule or a Court

 7    interpretation or something that would say, yeah, drop

 8    boxes are allowed in our state.  Just because we don't have

 9    a law, local election officials are actually using drop

10    boxes.

11           So I -- there is one other thing about this.  I

12    feel like I have to do all this because I don't want my

13    criticisms to be taken out of context.

14      Q.   Sure.

15      A.   His classification scheme here is to talk about

16    discretion versus mandatory or required.  He wants to make

17    a distinction about discretion versus mandatory here, but

18    at a later stage when he is talking about, for example, the

19    disclaimers that third-party organizations have to do when

20    they are interacting with a registered voter, he lumps

21    together discretionary and mandatory language and says, oh,

22    well, consider these together.

23           So it's not only just, yes, he is looking at the

24    rules, his classification scheme is inconsistent,

25    internally inconsistent within his report.  But, yes, I
```

Michael McDonald, Ph.D.
October 29, 2021

Page 70

```
 1   would agree that his attempt here, if we don't fully look
 2   at what he was -- you know, what he says he was trying to
 3   do up on Section --
 4        Q.   Section 2, yeah.
 5        A.   -- Section 2(b), if he was disregarding that and
 6   only looking at the rules, then that's what he is doing.
 7   He is trying to look at the rules and he is not trying to
 8   really talk about how drop boxes are actually used across
 9   states.  So maybe that was just an inaccurate statement by
10   him in the report.
11        Q.   Now, just one more question on this drop box issue
12   and then I want to move on.
13             Is it your understanding that in the 2020 general
14   election cycle many jurisdictions used drop boxes for
15   public health reasons because of the pandemic?
16        A.   That's a good question, and I have not done the
17   analysis in order to render an opinion about that.  I just
18   know that they were used much more widely among some of the
19   states that Dr. Kidd says were not being -- have no
20   enabling legislation, whatever language you want to say.
21        Q.   Right.
22        A.   So I didn't think it was appropriate for him to
23   not class -- you know, to imply that somehow drop boxes
24   weren't being used in these other states when there could
25   be as a matter of administrative rules or court action that
```

Page 71
1  would say, yes, drop boxes can be used and actually are
2  used very widely within a particular state.
3       Q.   Got it.  Okay.  Let's move on through your report.
4  If you go to page 5, Dr. McDonald, and you go to your
5  Section 2, Inconsistent Scope of Analysis, tell me when you
6  are there.
7       A.   Yes, I am there.
8       Q.   Okay.  And then we go to the second full paragraph
9  which starts off, "Dr. Kidd inconsistently selects elements
10  of Florida's election administration."
11           Do you see that?
12       A.   Yes.
13       Q.   The last paragraph of that -- I'm sorry, the last
14  sentence of that paragraph says, "In-person early voting is
15  not a subject of plaintiffs' challenge to Senate Bill 90,
16  and Dr. Kidd offers no explanation as to why he chose to
17  examine this facet of Florida's voting laws over others."
18           Do you see that?
19       A.   It's actually two sentences, so, yes, I'm seeing
20  it, but there was no "and."
21       Q.   Sorry, you are right.  You are right.
22           Okay.  So the reason I'm pointing this out, is
23  this another example of what we talked about earlier,
24  without opening that up again, but another example of where
25  he has chosen to -- of where -- let me restate that.

Michael McDonald, Ph.D.
October 29, 2021

Page 72

1              Is this another example of where it's not
2    necessarily inappropriate within, you know, generally
3    accepted methodologies of political science to look at
4    parts of the historical voting laws that are not at issue
5    in the current challenge, but if he is going to do that, he
6    has to explain why he is doing it; is that accurate?
7         A.   His explanation here is that plaintiffs' counsel
8    directed him -- excuse me, defense counsel directed him to
9    look at these two areas.  So he is just saying this is why
10   I did it, I looked at these two areas because that's what I
11   was tasked to do.  That's fine.  Experts get tasked to do
12   things all the time.
13             I guess it's going to be incumbent upon the legal
14   arguments that the defense is going to make as to why these
15   two are relevant for their arguments that you wish to make.
16   But certainly Dr. Kidd, as I said before, maybe I'm being
17   unfair to him, he offers no explanation -- well, he does,
18   it's because he was tasked to do this, that's his
19   explanation.
20             Would I have looked more broadly?  Would other
21   people look more broadly?  Would they explain why it was
22   they were looking at these two elements and excluding
23   others?  I think so.  I think that if you are -- again, in
24   the process tracing literature, you explain why it is that
25   you are looking at certain aspects of historical change.

Page 73

1    So it's sort of lacking here.  It's just to say, well, my

2    lawyers told me to do it, so that's why I did it.  He did

3    it, so that's what he did.

4        Q.   So it's not, per se, improper to look at these

5    particular elements of Florida law, but if he is going to

6    do it, he ought to have an explanation that's rooted in the

7    science rather than in his assignment, the scope of his

8    assignment, for why he did it; is that a fair summary?

9        A.   I think so.  I think that's fair of the criticism

10   that I have here now, yes.

11       Q.   Got it.  Got it.  Okay.  Let's go down to the

12   bottom of that page.  The last full paragraph starts off "A

13   complete analogy of Florida's voting laws."

14            Do you see that?

15   A.   Yes.

16       Q.   And then you give an example, "He does not give

17   historical analysis of voter registration laws."  And then

18   you say, "Florida's voter registration deadline of 28 days

19   prior to an election ranks Florida among the least

20   convenient of preelection voter registration deadlines in

21   the country."

22            My first question is, you know, when you give this

23   example, aren't you doing the same thing you are accusing

24   him of doing, which is cherry picking things that are

25   favorable to the analysis?

Michael McDonald, Ph.D.
October 29, 2021

Page 74

```
 1      A.   No.  All I'm doing is providing a critique of his
 2  report.  I'm pointing out here is an element that he didn't
 3  look at, and if he looked at it -- you know, I will give
 4  him the opportunity to look at it himself if he wishes to
 5  do so and render an opinion.  But if he looked at it, he
 6  may come to an opinion that Florida is not as, you know,
 7  forward looking as some other states because many other
 8  states have adopted election-day registration or, you know,
 9  registration deadlines that are less than the 30 days that
10  are allowed under federal law, much less than the 28.
11          So, you know, that's -- I'm just pointing out that
12  I have not done actually the analysis, although I have
13  published independently on voter registration laws across
14  the country.  So I'm really going upon that knowledge that
15  I have from an article called, Portable Registration, it's
16  on my CV, that was about how Florida sits relative to other
17  states in the country.  Again, I am not trying to render an
18  opinion here.  I want to be clear on that, too.
19      Q.   Right.
20      A.   I'm trying to say you might want to look here, and
21  you might come to a different conclusion about Florida's
22  forward-looking laws if you look here, but it wasn't an
23  area that he looked at.
24      Q.   Okay.  Understood.
25          Let's go to Section 3 of your report, which is on
```

Michael McDonald, Ph.D.
October 29, 2021

1    page 6.

2        A.    I'm there.

3        Q.    Okay.  And the first paragraph you say, "Dr. Kidd

4    previously notes that Florida's rules for mail balloting

5    evolved from a very restrictive process to a much less

6    restrictive process."

7             Do you see that there?

8        A.   Yes, I do.

9        Q.   Do you agree with that statement?

10       A.    I'm not rendering an opinion about and not going

11   to come to an agreement or disagreement.  I have not done

12   my own independent analysis, comprehensive analysis, of

13   Florida's laws.  So that was not what I was tasked to do by

14   the defense -- excuse me, the plaintiffs' counsel.

15       Q.    Is the same thing true with regard to the next

16   statement that you quote, "The evolution of in-person

17   voting from a relatively supervised process -- in-person

18   early voting evolving from a relatively supervised process

19   for voters who are unable to vote on election day to one

20   oriented around one for convenience of voters."

21            On that statement are you able to agree or

22   disagree?

23       A.    I am unable to because I have not -- I was not

24   tasked to do that, and so I have not been able to do an

25   independent analysis.

Michael McDonald, Ph.D.
October 29, 2021

```
 1        Q.   Fair enough.  Okay.

 2             Let's go to page 7.  Actually, I think we have

 3    covered this.  I was going to ask you about the last

 4    section in paragraph A where you talk about his failure to

 5    consider the evolution of election laws that were adopted

 6    pursuant to court orders, but I think we covered that.

 7             I guess one question I do have on this point,

 8    would you agree that the measure of whether the law -- the

 9    voting laws in a particular state have improved over time

10    is the impact on how easy it is for voters to cast their

11    ballots?

12             MR. KARPATKIN:  I'm going to object.  Asked and

13        answered, and we have already established that

14        Professor McDonald did not conduct an impact analysis.

15             MR. ZACHERL:  That's fair.

16    BY MR. ZACHERL:

17        Q.   You can answer the question, sir, if you have a

18    view.

19        A.   So can you restate that, because I also found a

20    compound statement in there, so I'm trying to understand

21    what it is you are trying to get at.

22        Q.   Well, what I was trying to get at was -- this goes

23    back to this whole morality play thing I was asking you

24    about earlier.  I was trying to understand your opinion.

25    Were you saying that it's just important to point out
```

1  Florida bad because judges had to order Florida to do
2  things in the past, or were you saying something else?  And
3  you have answered that.
4       The only part left really is why we would look
5  historically.  My question is, in the field of political
6  science, do you look historically using this process
7  tracing method because you are trying to determine, you
8  know, whether a law has improved access to voting for
9  voters in a particular state?
10      MR. KARPATKIN:  Same objection; asked and
11   answered.
12  A.  Yeah, I mean, in a way this is a deficiency that I
13  didn't note in the report because you are asking me a
14  question how did he arrive at the conclusion that there has
15  been -- these changes culminated in this greater
16  convenience.
17  BY MR. ZACHERL:
18  Q.  Right.
19  A.  There is never a measure of what convenience is,
20  so it's more of an impression and opinion that he has
21  rather than one that's based on any sort of analysis of,
22  like, what's the change of the law and how did that affect
23  overall turnout.
24      So I think, you know, lots of people have looked
25  at this.  And I will tell you, the literature is very

Michael McDonald, Ph.D.
October 29, 2021

1    conflicted on what the effects of a particular law are on

2    turnout.  Again, I think a lot of the conflict has to do

3    with a lot of nuances.  And so in the context of which

4    elections you are talking about and which voters that are

5    being benefitted or burdened by a particular law and the

6    weighting of those sorts of things.

7         So I would say this sort of thing, it gets

8    complicated to try to come to these sorts of conclusions

9    that Dr. Kidd makes within this report in that sort of

10   context of being devoid of any real sort of, you know,

11   statistical or quantitative analysis.  It's purely a

12   qualitative analysis that he is doing of the change to the

13   laws in Florida.

14   Q.   Okay.  Now we are going to skip over, to

15   everyone's relief, a significant number of the pages in

16   your report because they all sort of make the same point.

17        If you go to page 16 of your report, you know, you

18   have discussed several issues to this point, which I'm not

19   going to go into detail on, but what you have said I think

20   at the end is sort of what I took -- this end of

21   paragraph -- Section 8 is what I took to be your overall

22   criticism of his report.  My question is going to be that.

23        So if you look at the last paragraph on 16 which

24   wraps over to page 17, it starts off, "It is thus

25   impossible for me using Dr. Kidd's classification and

Page 79

1    measurement scheme to determine to what degree in terms of

2    burden Florida's requirements are largely average."

3              You mentioned this earlier.  Do you see that?

4    A.   Yes, I do.

5    Q.   And then you go on in that same paragraph at the

6    end to say, "Dr. Kidd devises no number that allows me to

7    compute the average burden to voters across states, much

8    less how Florida deviates from it for all Florida voters or

9    specific Florida communities."

10             Do you see that?

11   A.   Yes, I do.

12   Q.   My question is when I read those sentences, I

13   said, okay, I get it.  I mean, what you are essentially

14   criticizing is he hasn't provided you as someone trying to

15   understand the points he is making with enough detail for

16   you to evaluate the reliability of his conclusions.  I

17   mean, is that a fair summary of your opinions here?

18   A.   Taking a step back, again, I don't have a problem

19   with process tracing, I don't have a problem with typology.

20   Q.   Right.

21   A.   It's really the ability to reproduce.  In this

22   particular case, it frustrated me that he is using the word

23   "average," but he is also excluding certain states.  And so

24   I can't go back and reanalyze his findings by including

25   states that he excluded and try to understand, like, where

Michael McDonald, Ph.D.
October 29, 2021

Page 80

```
 1   does Florida sit relative to all the states if I -- rather
 2   than looking at the subset of states that he is restricting
 3   his analysis to.
 4          That's where I, you know, really honed in on the
 5   word "average" here because, you know, average has a
 6   specific quantitative connotation to it, and it really
 7   illustrated, I think for me, the failings that he has
 8   throughout his report of selectively looking at particular
 9   states and then coming to conclusions, and it's just
10   impossible.  Even internally you can't, or I can't
11   necessarily, define what he is actually doing in terms of
12   his classification scheme.  And because I can't define it,
13   I can't look at, well, since he has excluded some states,
14   what happens when I add these other states in.  I can't
15   even do that.
16          So that's -- this is, I guess, the section of my
17   report where I became very frustrated seeing this multiple
18   times through his report that he was not providing the
19   information I needed in order to fairly critique his
20   report.
21      Q.   Well, I find it useful just because it seemed
22   like -- and I think it sounds like you agree, it seems like
23   this was an overall frustration that you had with his
24   entire report, which is why I asked the question.
25          So we just have -- I only have a couple more
```

Michael McDonald, Ph.D.
October 29, 2021

Page 81

```
 1    questions here.  If you go to page 17, Section 10,
 2    Electioneering Provisions, and you --
 3        A.   Yes, I'm there.
 4        Q.   Okay.  So the third sentence in the first
 5    paragraph says, "Missing from his analysis is Senate Bill
 6    90's restriction on line warming activities by
 7    organizations and individuals to provide assistance," and
 8    then you go on to say, "by providing seating or water in a
 9    nonpartisan matter."
10             Do you see that?
11        A.   Yes, I do.
12        Q.   And then in the next sentence -- on the next page,
13    and for some reason, at least my copy of the PDF, maybe
14    because it was the signature page, it came out different.
15    But, yeah, if you go to --
16        A.   That's the reason why.
17        Q.   -- one, two, three, if you go to the third full
18    sentence -- I'm sorry.  The third sentence you start off by
19    saying, "The examples he cites from these different states
20    all prohibit promoting or influencing voters," and then you
21    say, "but are not nearly as onerous as the Florida
22    restrictions which also bars nonpartisan line warming
23    activities intended to encourage voters to stay on line to
24    vote such as providing water, food, chairs, umbrellas."
25             Do you see that?
```

Michael McDonald, Ph.D.
October 29, 2021

```
1        A.   Yes, I do.
2        Q.   Now, both of those sentences that I read to you, I
3   have read Senate Bill 90, and I don't see where it
4   explicitly bans things like providing water, food, chairs,
5   or umbrellas.  Have you seen those -- that language within
6   the text of Senate Bill 90?
7        A.   Can we bring it up?
8        Q.   I think I probably have a copy of it somewhere.
9   Give me 30 seconds.  This is always dangerous when you ask
10  me on the cuff to do something like this.  Let me see if I
11  can find it.  Hold on.
12            It might be.  Give me another 30 seconds here.
13  I'm going to go ahead and use this copy, and you guys can
14  tell me if you --
15            MR. KARPATKIN:  Are you sharing it on your screen?
16            MR. ZACHERL:  I'm going to put it in the chat.
17       I'm going to put it in the chat.  I find that's easier
18       for everyone because you can scroll on it yourself
19       when I do that.  Let me put it up there.  Senate
20       Bill 90.
21  BY MR. ZACHERL:
22       Q.   Tell me if you can open that.  Again, where I'm
23  going with this, both for counsel and the witness, is I'm
24  trying to see if there is specific language in Senate
25  Bill 90 that I missed on these, you know, handing out water
```

Michael McDonald, Ph.D.
October 29, 2021

Page 83

 1   and food and those sorts of things we are talking about.
 2   Take your time reading it, there is no rush, but that's
 3   what I want to know.
 4        A.   Is there a particular portion that you want me to
 5   look at?
 6        Q.   No, because my perspective -- I looked at the
 7   whole thing, and I didn't see anything in there that was
 8   specific to handing out water or handing out food or
 9   anything like that.  You have said that it was an explicit
10   section.  That's why I'm asking.
11             MR. KARPATKIN:  I am going to object.  Couple
12        things here.  First, I don't know what document you
13        just shared.  It's entitled SB 90 Challenge
14        Provisions, so we need a little bit more foundation
15        before we are going to accept this as an exhibit.
16             MR. ZACHERL:  Well, just so you know, this is my
17        copy.  Okay?  So I called it Challenge Provisions and
18        I highlighted in the document some of the provisions.
19        I can tell you that -- you can see it's printed right
20        out of the laws of Florida, and it is the entirety of
21        Senate Bill 90.
22             MR. KARPATKIN:  Okay.
23             MR. ZACHERL:  So, you know, that's why that says
24        that.  It's just me.
25

Michael McDonald, Ph.D.
October 29, 2021

Page 84

1    BY MR. ZACHERL:

2        Q.   But, again, my question is, and it may be it's not

3    in there, but my question is, is there anywhere in Senate

4    Bill 90 where, as you have said, you know, they were -- the

5    legislature was explicit in, you know, prohibiting these

6    activities such as water -- providing water, food, chairs,

7    or umbrellas?  That's where I'm challenged.

8            MR. KARPATKIN:  I just want to object on one

9        point.  I don't believe that Professor McDonald

10       anywhere in his report uses the word "explicit" in

11       reference to this section.  That was your word, not

12       his.

13           MR. ZACHERL:  Let me look.  Hold on.  You may be

14       right.

15           You are right, he doesn't use the word "explicit."

16       What he says, "that are not nearly as onerous as the

17       Florida restrictions which also bars even nonpartisan

18       line warming activities intended to encourage voters

19       to stay on line such as providing water, food, chairs,

20       umbrellas."

21           You are right, he doesn't use the word "explicit."

22   BY MR. ZACHERL:

23       Q.   My question is, does the text of Senate Bill 90

24   actually say that it bars these specific activities,

25   because I didn't see it in there.  Like I said, maybe I

Michael McDonald, Ph.D.
October 29, 2021

Page 85

1    missed it.  That's why I'm asking the question.

2         A.   (Witness reviewing document.)

3              My understanding of the plaintiffs' challenge

4    here, so it's just my understanding, is that the phrase in

5    SB 90 which I have cited -- so, fortunately, we actually

6    have the citation -- Section 102.031.  So if we can go to

7    the -- I don't know if you can find it faster than I can.

8    I'm scanning through to try to get to that.  I'm at 97.

9         Q.   Let me see if I can find it.  Hold on.  102.031.

10   It's actually highlighted in the exhibit.  It's on page 24.

11        A.   Twenty-four.  Okay.  Great.  Thank you.

12             (Witness reviewing document.)

13             It says Section B, "For the purpose of this

14   subsection, the terms 'solicit' or 'solicitation' shall

15   include, but not be limited to, seeking or attempting to

16   seek any vote, fact, opinion, or contribution; distributing

17   or attempting to distribute any political or campaign

18   material, leaflet, or handout; conducting a poll except as

19   specified in this paragraph; seeking or attempting to seek

20   a signature on any petition; selling or attempting to sell

21   any item; and engaging in any activity with the intent to

22   influence or effect of influencing a voter."

23             As I understand -- I'm not a lawyer.

24        Q.   Right.  Right.

25        A.   So this is, you know, my understanding is that the

Michael McDonald, Ph.D.
October 29, 2021

Page 86

1    effects may be construed that any interaction that a
2    volunteer may have with someone who is standing in line
3    could influence a voter.  So it's that even though there
4    was no intent, there was an intent to provide a bottle of
5    water to keep somebody in line, that it may have the effect
6    of keeping them in line, and, thus, may affect -- it may
7    make organizations reticent to participate in these sorts
8    of what I have called line-warming activities.
9         Q.   Okay.  I got it.  I'm going to be an old, you
10   know, get off my lawn man and say that, you know, your use
11   of the word "reticent" there is -- everyone is using it
12   that way now.  As an English major, the word is
13   "reluctant."
14        A.   Reluctant.
15        Q.   People use it all the time that way, and it's just
16   funny.  It's a new way of using the word there, and they
17   have to change it.
18             MR. ZACHERL:  I don't have any other questions,
19        Dr. McDonald.  It's very nice to meet you by Zoom.  I
20        appreciate all the time you put in and your indulging
21        my awkward questioning and phrasing.
22             I don't know that we are finished, though.  We
23        might have other folks on the line that might want to
24        ask you questions, so I will leave it to the group at
25        that point.

Michael McDonald, Ph.D.
October 29, 2021

Page 87

```
 1        THE STENOGRAPHER:  Before we continue, did you
 2   want to mark SB 90 as Exhibit 5 or were you using it
 3   as demonstrative only?
 4        MR. ZACHERL:  We will mark this.  That's fine.
 5            (Document marked as Exhibit 5
 6                For identification.)
 7        MR. ZACHERL:  Let me poll, does anybody on the
 8   line have any questions?  Or Mr. Karpatkin, do you
 9   have any questions?
10        MR. KARPATKIN:  I wanted to first see if anyone on
11   the defendants' side has a question, then I would ask
12   for a quick break to review whether or not we have any
13   questions on redirect.
14        MR. ZACHERL:  Okay.
15        THE WITNESS:  I have bored everyone to death.
16        MR. ZACHERL:  You have been so complete with your
17   answers.
18        THE WITNESS:  This is like my students, you know,
19   you ask and they never respond when you ask a question
20   to the audience.
21        MR. KARPATKIN:  If there are no other questions
22   from defendants, can I suggest we go off the record
23   for ten minutes and reconvene?
24        MR. ZACHERL:  Sure.  It's 12:12.  How about if we
25   come back at 12:20.  Is that okay?
```

Michael McDonald, Ph.D.
October 29, 2021

Page 88

```
 1              MR. KARPATKIN:  That's fine.
 2              MR. ZACHERL:  We will see you at 12:20.  Thank
 3         you.
 4              (Recessed at 12:12 p.m.)
 5              (Resumed at 12:21 p.m.)
 6              MR. KARPATKIN:  Professor McDonald, I just wanted
 7         to cover one or two things, and then I think we can be
 8         done.
 9                        CROSS-EXAMINATION
10    BY MR. KARPATKIN:
11         Q.   Can I direct you to paragraph 10 of Professor
12    Kidd's report?
13              MR. ZACHERL:  You are talking about the original
14         report, Jeremy?
15              MR. KARPATKIN:  Yes, the original report,
16         paragraph 10.  It's on page 6 and 7.
17              MR. ZACHERL:  Okay.
18         A.   I am there.
19    BY MR. KARPATKIN:
20         Q.   Can you look at the last sentence of paragraph 10
21    that starts on page 6 and goes into page 7?
22         A.   I am there.
23         Q.   Okay.  Can you read that sentence, please?
24         A.   "In short, when you consider that a majority of
25    27 states and the District of Columbia explicitly prohibit
```

Michael McDonald, Ph.D.
October 29, 2021

Page 89

```
 1   the use of drop boxes, Florida stands among a small group
 2   of states that require them to be widely available."
 3       Q.   Based on your review of Dr. Kidd's report and his
 4   supplemental report, did you believe that Dr. Kidd
 5   adequately justifies or supports that statement?
 6       A.   No, I do not.
 7       Q.   Okay.  I want to now go to your report, page 12.
 8       A.   Yes, I'm there.
 9       Q.   In the middle paragraph, in the first sentence,
10   you describe Dr. Kidd's report as, "inconsistent with
11   standard methods used by political scientists and social
12   scientists when conducting a comparative analysis of laws
13   and rules across time and states regarding the
14   administration of elections."
15           After reviewing Dr. Kidd's report and his
16   supplemental report, do you continue to agree with that
17   statement?
18       A.   Yes, that continues to be my opinion.
19           MR. KARPATKIN:  I have nothing further.  I want to
20       ask my co-counsel if they have anything further.
21           MR. NASSERI:  Nothing for me.
22           MS. KANTER COHEN:  I don't have anything.  Thank
23       you.
24           MR. KARPATKIN:  Nothing further from plaintiffs.
25           MR. ZACHERL:  Okay.  So I just have one follow-up,
```

Page 90

1       Jeremy.

2                    REDIRECT EXAMINATION

3    BY MR. ZACHERL:

4       Q.   Dr. McDonald, the sentence that was just read to

5    you that his classification and measurement scheme is

6    inconsistent with these standard methods in your field,

7    when he -- when I asked you earlier about his methodology,

8    you said that there is nothing wrong with using

9    methodologies of process tracing and typology.  Your issue

10   was with how he went about undertaking those methodologies.

11   Do you recall that?

12      A.   Yes.

13      Q.   Okay.  And so I'm just trying to understand this

14   sentence.  I'm actually glad your counsel pointed it out.

15           When you say his opaque classification and

16   measurement scheme, are you referring to the way in which

17   he attempts to do the process tracing and typology

18   analysis?

19      A.   Yes, it's his approach.  It's not that those

20   aren't valid approaches, it's the inability for me to

21   replicate the work that he did.  That's my -- that is not a

22   standard method.  It is important to be able to replicate

23   work in any field, not just the social sciences.

24      Q.   Understood.

25           MR. ZACHERL:  I don't have any further questions,

Michael McDonald, Ph.D.
October 29, 2021

Page 91

1    sir.  Thank you again for all the time today.

2        Jeremy, will he be a read?

3        MR. KARPATKIN:  I'm sorry?

4        MR. ZACHERL:  Will he read the transcript or will

5    he waive reading?

6        MR. KARPATKIN:  No, he is going to read.  He is

7    going to read the transcript.

8        MR. ZACHERL:  That's what I thought.

9        I will order it, Tamra.  Just standard, I guess

10   whatever your standard is.

11       THE STENOGRAPHER:  Ten business days.

12       MR. ZACHERL:  Great.  If we need something sooner,

13   I will let you know by email.

14       MR. KARPATKIN:  We would like a rough.

15       THE STENOGRAPHER:  You want a rough, correct?  I

16   will have it to you by tomorrow morning.

17       MR. ZACHERL:  If you are going to send that out,

18   if you can copy me as well.

19       THE STENOGRAPHER:  Of course.

20       MR. ZACHERL:  Thank you.  Have a good weekend.

21       MR. KARPATKIN:  Thank you.

22       (Thereupon, the proceedings were concluded

23               at 12:26 p.m.)

24

25

Michael McDonald, Ph.D.
October 29, 2021

Page 92

1                              CERTIFICATE OF OATH

2

3    STATE OF FLORIDA        )

4    COUNTY OF BROWARD       )

5

6

7              I, Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR,

8    Notary Public, State of Florida, certify that Michael

9    McDonald, Ph.D. remotely appeared before me on the 29th day

10   of October, 2021, and was duly sworn.

11

12             WITNESS my hand and official seal this 4th day of

13   November, 2021.

14

15

16

17   _____

18            Tamra K. Piderit
     Florida Professional Reporter
     Registered Professional Reporter
19   Registered Merit Reporter
     Registered Diplomate Reporter
20   Certified Realtime Reporter
     Notary Public, State of Florida
21   My Commission #GG 915608
     Expires January 19, 2024

22

23

24

25

Page 93

1                    CERTIFICATE OF REPORTER

2

3     STATE OF FLORIDA        )

4     COUNTY OF BROWARD       )

5

6               I, Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR,

7     do hereby certify that I was authorized to and did

8     stenographically report the foregoing Web deposition of

9     Michael McDonald, Ph.D., that a review of the transcript,

10    pages 1 through 91 was requested; and that the transcript

11    is a true record of my stenographic notes.

12               I further certify that I am not a relative,

13    employee, attorney or counsel of any of the parties, nor am

14    I a relative or employee of any of the parties' attorneys

15    or counsel connected with the action, nor am I financially

16    interested in the action.

17               DATED this 4th day of November, 2021.

18

19

20

21               _____
                       Tamra K. Piderit
22               Florida Professional Reporter
                 Registered Professional Reporter
                 Registered Merit Reporter
23               Registered Diplomate Reporter
                 Certified Realtime Reporter

24

25

Michael McDonald, Ph.D.
October 29, 2021

Page 94

```
 1                    ERRATA SHEET

 2            DO NOT WRITE ON THE TRANSCRIPT
              ENTER CHANGES ON THIS PAGE
 3
              Re:  League of Women Voters
 4                        v.
              Laurel Lee, et al.
 5                4:21-cv-186-MW-MAF
              Michael McDonald, Ph.D.
 6                 October 29, 2021

 7   Page     Line              Change              Reason

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20
     Under penalties of perjury, I declare that I have read the
21   foregoing document and that the facts stated in it are
     true.
22

23   _____             _____
       Date                      Michael McDonald, Ph.D.
24

25   Job No. 215108
```

Page 95

1                    WITNESS REVIEW LETTER

2   November 4, 2021

3   Michael McDonald, Ph.D.
    c/o Jeremy Karpatkin, Esquire
4   Arnold & Porter Kaye Scholer

5   VIA EMAIL:  Jeremy.karpatkin@arnoldporter.com

6   RE:  League of Women Voters v. Laurel Lee, et al.

7   Please take notice that on the 29th day of October, 2021,
    you gave your deposition in the above cause.  At that time
8   you did not waive your signature.

9   The above-addressed attorney has ordered a copy of this
    transcript and will make arrangements with you to read
10  their copy.  Please execute the Errata Sheet, which can be
    found at the back of the transcript, and have it returned
11  to us for distribution to all parties.

12  If you do not read and sign the deposition within thirty
    (30) days, the original, which has already been forwarded
13  to the ordering attorney, may be filed with the Clerk of
    the Court.

14
    If you wish to waive your signature now, please sign your
15  name to the blank at the bottom of this letter and return
    to the address listed below.

16
    Sincerely

17

18

19  Tamra K. Piderit, FPR, RPR, RMR, RDR, CRR
    Phipps Reporting, Inc.
20  1551 Forum Place, Suite 200-E
    West Palm Beach, FL 33401
21
    I do hereby waive my signature.
22


23
    _____
24     Michael McDonald, Ph.D.

25  Job No. 215108

---

**Exhibits**

**Exhibit 001 McD
onald**
  5:14 7:7

**Exhibit 002 McD
onald**
  5:15 7:7
  11:15

**Exhibit 003 McD
onald**
  5:16 7:8

**Exhibit 004 McD
onald**
  5:17 7:8

**Exhibit 005 McD
onald**
  5:18 87:2,5

---

**$**

**$450**
  35:25

---

**1**

**1**
  6:4 7:7 36:14
  50:20

**10**
  67:18,24
  68:14 81:1
  88:11,16,20

**10,000**
  58:6,10

**10,000-foot**
  9:22

**102.031**
  85:6,9

**10:02**
  6:2

**11**
  16:18

**11:24**
  60:15

**11:25**
  60:22

**11:30**
  60:16,20,23

**12**
  89:7

**12:12**
  87:24 88:4

**12:20**
  87:25 88:2

**12:21**
  88:5

**12:26**
  91:23

**16**
  78:17,23

**17**
  78:24 81:1

**19**
  66:1

---

**2**

**2**
  7:7 11:15
  30:5 70:4
  71:5

**2(b)**
  70:5

**2010**
  12:17,21

**2011**

**12:13,15**

**2020**
  70:13

**22**
  42:4

**24**
  85:10

**25**
  36:5

**27**
  88:25

**28**
  73:18 74:10

---

**3**

**3**
  7:8 23:17
  24:4 25:13
  27:1,18 28:25
  30:12 50:20
  60:10,25
  74:25

**30**
  74:9 82:9,12

---

**4**

**4**
  6:4 7:8
  18:17,22 30:5
  42:4,5 50:21
  52:8 61:1,13
  65:22 67:7

**404**
  22:2

---

**5**

**5**

**18:17 49:4,5,
25 50:7 71:4
87:2,5**

**50**
  17:7,15

**50-state**
  20:8

---

**6**

**6**
  16:17 18:22
  30:9 49:4
  65:21 67:18,
  24 75:1
  88:16,21

**6(b)**
  67:7

---

**7**

**7**
  30:10 49:5
  76:2 88:16,21

---

**8**

**8**
  23:17 78:21

---

**9**

**90**
  18:21 52:11
  53:9 56:12,24
  57:10 59:3
  60:1 61:4,9,
  12 63:14,15,
  20 65:14
  71:15 82:3,6,
  20,25 83:13,
  21 84:4,23

85:5 87:2

**90's**
81:6

**97**
85:8

_____

**A**

_____

**a.m.**
6:2 60:22,23

**ability**
40:4 79:21

**absentee**
19:16

**absolutely**
55:4

**academic**
57:15

**accept**
83:15

**acceptable**
56:21 59:11

**accepted**
14:16,17
39:21 72:3

**access**
77:8

**accurate**
11:21 20:22
24:12 48:14
72:6

**accurately**
23:4 24:4
45:11

**accusing**
18:6 73:23

**acknowledges**
24:21 34:7

**acquaintance**
43:3,6

**action**
26:7 70:25

**activities**
81:6,23 84:6,
18,24 86:8

**activity**
85:21

**actual**
22:18 50:11

**add**
50:12 80:14

**added**
44:15

**additional**
21:22 42:17

**Additionally**
23:20

**address**
10:20 51:8
68:1,4

**addressed**
10:17,20

**adequately**
89:5

**administration**
14:6 38:17
52:23 71:10
89:14

**administrative**
28:19 66:9,19
68:18 69:1,6
70:25

**adopted**
22:13 28:11,
12 74:8 76:5

**adventure**

8:17

**adversely**
59:5

**advisory**
12:10,11

**affect**
34:4 35:1,5,6
43:7 77:22
86:6

**affected**
58:4,6,25
59:5

**affecting**
60:5

**affirm**
6:11

**African-
americans**
63:3

**aggregate**
57:2 59:13

**agree**
7:1 24:9
30:17,21
31:25 39:20,
25 45:16 66:6
70:1 75:9,21
76:8 80:22
89:16

**agreed**
6:6

**agreeing**
66:16

**agreement**
75:11

**agrees**
31:6,15

**ahead**

9:2 68:9
82:13

**Alabama**
50:5

**Alaska**
45:4

**allegations**
63:19

**allowed**
25:1,2,10
26:15 69:8
74:10

**analogy**
73:13

**analyses**
57:14

**analysis**
16:8 17:5,14,
16 18:10,24
19:2,6,10
20:7,16 21:9
23:22 31:19,
22 33:7
36:23,24
40:23,24
51:2,8 53:5
54:12 56:5
57:8,9,13
59:2,7 61:11,
23 67:15
70:17 71:5
73:17,25
74:12 75:12,
25 76:14
77:21 78:11,
12 80:3 81:5
89:12 90:18

**analyze**
55:6

Michael McDonald, Ph.D.
October 29, 2021

3

analyzing
51:4

answering
27:9 58:17
68:20

answers
87:17

anticipated
31:13

anymore
58:23

apply
6:8

approach
19:10 90:19

approaches
90:20

appropriateness
47:3

area
12:5,18 40:6
74:23

areas
52:15,20
72:9,10

arguments
52:22 58:24
72:14,15

arithmetic
41:6

Arkansas
50:5

Army
58:22

arrive
77:14

arrived
48:18

article
74:15

aspects
51:8,9 52:2
72:25

assigning
39:5

assignment
36:7 73:7,8

assist
32:16 62:9

assistance
81:7

assume
63:18

attached
11:14

attempt
70:1

attempting
18:7 41:12
66:10,17
85:15,17,19,
20

attempts
90:17

attorneys
32:14 33:1

audience
87:20

authorized
42:23

authorizes
28:8

availability
23:23

average
39:10,12,13,

16 41:14
79:2,7,23
80:5

aware
33:8 41:10
56:14

awkward
86:21

——————————

B

back
30:11 37:19
38:12 47:8,10
48:25 50:18
51:6 53:18,23
56:21 60:16
62:23,25
63:12 68:20
76:23 79:18,
24 87:25

background
9:22 11:22
14:14

backwards
62:16

bad
50:11 54:19
64:2,9,19
77:1

ballot
17:21 22:13
42:9 43:16
48:11 52:3
66:2

balloting
61:15 75:4

ballots
42:22,23
43:4,7,17

44:4,8,13
45:2 46:2,7
47:17 76:11

bans
82:4

bars
81:22 84:17,
24

based
33:23 77:21
89:3

basically
7:6 16:7 39:4

basing
46:22

bear
7:20

began
6:2

begin
49:21

beginning
18:11,23

behalf
42:24

belays
65:12

belief
14:1

believes
45:23

benefitted
78:5

best-laid
8:15

bill
56:12,18,24
61:4 71:15

Michael McDonald, Ph.D.
October 29, 2021

4

81:5 82:3,6,
20,25 83:21
84:4,23

**bipartisan**
12:9

**birth**
58:23

**bit**
15:25 22:23,
24 51:13
66:16 83:14

**blind**
35:22

**body**
25:20

**books**
55:4,14

**bored**
87:15

**bother**
27:13

**bottle**
86:4

**bottom**
8:5 65:21
67:24 73:12

**box**
21:9,15 23:7,
22 24:10
26:19 66:25
69:3 70:11

**boxes**
21:22 22:16
23:3 25:4,9,
11,16 26:2,
12,15,22
28:9,14 34:9
66:2,3 67:7,
8,9 68:4

69:8,10 70:8,
14,23 71:1
89:1

**brat**
58:22

**break**
60:14 87:12

**bright**
37:7

**bring**
82:7

**broad**
62:5

**broad-brush**
14:4

**broader**
54:25

**broadly**
55:3 67:1
72:20,21

**bullet**
52:8

**bunch**
22:25

**burden**
61:17 79:2,7

**burdened**
78:5

**business**
91:11

**button**
8:4

---
**C**
---

**calculation**
34:13

**call**

28:11 63:4

**called**
30:6 37:3
74:15 83:17
86:8

**campaign**
85:17

**capital**
9:8

**care**
68:24

**career**
15:17 40:6

**Carolina**
15:18

**carried**
39:23

**case**
6:23 9:25
10:12,24
13:15,18 15:4
20:1 34:22
36:1 40:8
41:21 42:24
56:12,23
59:8,23 64:10
79:22

**cases**
14:9 15:22
26:6

**cast**
76:10

**categories**
21:21 38:6
44:20,25

**category**
21:20,22
24:3,20 25:11

**causal**
65:5

**certificate**
58:23

**cetera**
11:23

**chairs**
81:24 82:4
84:6,19

**challenge**
51:24 71:15
72:5 83:13,17
85:3

**challenged**
56:13 57:3
63:14 84:7

**challenges**
56:20

**challenging**
38:8 52:11
53:9 56:17,23

**chance**
11:3 49:1,15

**change**
19:18 34:10,
11,20 56:3
61:24 63:21
72:25 77:22
78:12 86:17

**changed**
19:9 22:15
27:25 62:6

**characterizatio
n**
16:9 20:4,21
21:14 23:6
66:17

**characterizing**
41:7 45:7,11

Michael McDonald, Ph.D.
October 29, 2021

5

charged
19:3,4 31:19,
20 36:9

chat
7:5,13,25
8:2,4 82:16,
17

check
22:1 28:3
49:1

checked
29:4

cherry
73:24

choice
45:20

choices
45:22

chose
71:16

chosen
71:25

circumstances
59:21

citation
22:3 50:11,13
85:6

citations
11:3 22:1
24:6 28:2
29:12,17
32:17 47:8
49:14

cite
50:13

cited
50:7 51:15
85:5

cites
81:19

citing
49:19,25
64:10

citizens
57:25 58:3

citizenship
58:19

City
11:18

claim
13:16

claims
19:4

clarify
31:10

clarity
44:15

class
48:10 70:23

classification
22:16,22 25:1
37:14 38:11
42:8 43:13
47:14,22
48:10,21,23
65:23 66:15
69:15,24
78:25 80:12
90:5,15

classifications
23:2 24:17,22
28:4 38:5
42:14 43:23
44:21,22,23
45:17,23
47:1,2,3,9,11
49:4

classified
34:8

classifies
22:19

classify
46:15

classifying
66:25

clean
7:25 9:16
22:20 27:15
29:2

clear
19:9 23:8
37:12,14
40:12 42:16,
25 44:12
49:24 51:11
74:18

click
8:4

clicked
22:1

co-counsel
89:20

coauthored
13:4

COHEN
6:6 89:22

collaborate
12:23

collaborated
31:6

collection
17:21 42:9
48:11

Columbia
88:25

column
23:3,6 24:10
25:13,14,23
26:1 27:1,18
28:25 45:4,19

columns
45:18 46:16

comfortable
31:20,24

commenting
7:8

comments
7:24 8:1

commission
12:11,12
13:10

committee
12:10

communities
57:12,17,20
58:18 59:5,16
79:9

community
58:9 64:18

comparative
89:12

compare
17:17 67:8

compared
12:19 18:22
39:13

comparison
20:9 38:15

competent
14:2

compiled
22:4

compiling

27:14

**complaint**
37:16 40:3
56:15

**complaints**
63:20

**complete**
73:13 87:16

**completely**
22:17

**complicated**
78:8

**component**
37:22 45:24,
25

**compound**
41:4 67:12
76:20

**comprehensive**
10:3 75:12

**comprehensively**
17:7 42:8
46:9

**compute**
79:7

**computer**
7:21 8:18

**concluded**
91:22

**conclusion**
18:11 26:15
33:25 74:21
77:14

**conclusions**
29:20 33:18
35:5,6 36:10
37:21 62:3,5
67:4,16 78:8

79:16 80:9

**concrete**
41:25

**conduct**
76:14

**conducting**
85:18 89:12

**conflict**
78:2

**conflicted**
78:1

**confronted**
34:6

**connotation**
80:6

**considered**
34:1

**considers**
39:16

**constitute**
17:3

**construed**
86:1

**contact**
12:14

**contend**
23:22

**contents**
32:15

**context**
18:14 44:16
62:21 65:18
68:7 69:13
78:3,10

**continue**
21:17 87:1
89:16

**continues**
89:18

**contrary**
65:15

**contribution**
85:16

**convenience**
75:20 77:16,
19

**convenient**
73:20

**conversations**
12:20 33:15

**copies**
7:16

**copy**
7:25 81:13
82:8,13 83:17
91:18

**corners**
30:25

**correct**
11:4 28:4
29:13 32:2
36:2,19 47:9,
11 91:15

**counsel**
6:7 32:21
52:2,14,19,25
60:18 72:7,8
75:14 82:23
90:14

**country**
13:20 67:9
69:4 73:21
74:14,17

**couple**
48:6 50:5
60:11 80:25

83:11

**court**
9:5 14:12,14,
16,20 15:21
26:7,10 54:4
63:21 64:11
65:14 69:6
70:25 76:6

**courtroom**
14:8

**cover**
88:7

**covered**
66:4 76:3,6

**created**
12:12 24:20
50:1

**creating**
27:25

**credible**
14:12

**critical**
52:7

**criticism**
20:24 21:2
34:23 37:17
40:12 52:21
53:21 66:16
73:9 78:22

**criticisms**
38:8 40:13
68:13 69:13

**criticize**
47:20

**criticizing**
79:14

**critique**
74:1 80:19

Michael McDonald, Ph.D.
October 29, 2021

7

CROSS-
EXAMINATION
88:9

Crow
62:23

cuff
82:10

culminated
77:15

cure
49:6

curious
33:16 36:20
51:2

current
11:21 54:22
72:5

currents
58:11

curriculum
11:14 15:23

cut
39:17

CV
7:6,7 8:21
11:20 15:23
74:16

cycle
66:9 70:14

———————————

D

D-O-N-A-L-D
9:8

D.C.
12:5

dangerous
82:9

data
38:23 58:14,
15 60:3

database
57:25

date
11:15,16

day
8:25 35:15
63:7 75:19

days
20:12 29:13,
14 73:18 74:9
91:11

dead
22:3 27:22,25

deadline
73:18

deadlines
73:20 74:9

death
87:15

debate
55:9

debates
55:5,17,18

decades
55:18

deceive
18:7

decided
43:22 52:19

declaration
19:15 36:8

deeper
59:4

deeply
38:7 43:11

defend
55:25

defendants
6:22 19:7
87:22

defendants'
52:2,14,18,25
53:23 87:11

defense
72:8,14 75:14

deficiency
77:12

deficient
50:8

define
80:11,12

degree
79:1

delve
59:4

democracies
55:15

demonstrative
87:3

Department
58:2

depends
59:21

depo
10:13

deposed
10:15

deposition
7:5 9:9,23
10:10,11,14,
19,23 23:8
36:21 44:22
45:7,11,12

depth
26:8

describe
21:9 36:24
37:10 89:10

describes
30:9

describing
17:5 24:16
64:2

detail
20:19 35:13
41:6,7 47:4
48:13 78:19
79:15

detailed
58:14

determine
47:10 56:22
58:7 77:7
79:1

determining
54:23 56:24

develop
39:16

developing
38:2

development
55:7,8,15,20

deviates
79:8

devises
79:6

devoid
78:10

difference
43:5,14 44:23
45:3

Michael McDonald, Ph.D.
October 29, 2021

8

differences
  26:21 41:10
  44:24
difficult
  39:11
dimension
  43:17
dimensions
  43:15
direct
  6:19 88:11
directed
  72:8
direction
  63:22,23
  64:25 65:10,
  11
directly
  27:9
disagree
  14:7 30:17
  31:25 37:12
  75:22
disagreement
  37:24,25
  75:11
disagreements
  14:10,11
discard
  46:13
disclaimer
  17:22
disclaimers
  69:19
discovery
  58:16
discretion
  25:3,4 26:11

69:16,17
discretionary
  24:25 25:15
  26:2 27:3
  68:19 69:21
discrimination
  64:11
discussed
  17:1 78:18
discussing
  25:24
discussion
  16:14
discussions
  32:21 56:16
disenfranchised
  58:3,21
disfavorably
  17:17
disparate
  57:23
disproportionat
ely
  57:21
disregarding
  39:4 41:23
  70:5
dissenting
  15:19
distinct
  57:11
distinction
  26:4,17 28:16
  40:22 45:2
  67:3 69:17
distinctions
  45:17,18,19

distribute
  85:17
distributing
  85:16
District
  88:25
districting
  11:17 12:18
document
  22:5,8,9
  27:14 29:23
  35:18 67:21
  68:10 83:12,
  18 85:2,12
  87:5
documents
  6:4 7:17 8:9
  9:24 10:22
  35:21
door
  46:1
download
  7:18
downloading
  9:2
drafted
  32:11 33:1
drawing
  67:4
drill
  9:12
Driver
  58:2
drop
  21:9,15,22
  22:16 23:3,6,
  22 24:10
  25:4,9,11,16
  26:2,12,15,

19,22 28:8,13
  34:8 66:2,3,
  25 67:7,8
  68:4 69:3,7,9
  70:8,11,14,23
  71:1 89:1
duly
  6:17
duress
  62:17

_____

E

earlier
  6:23 7:13
  35:17 48:25
  71:23 76:24
  79:3 90:7
early
  52:3 63:2,3
  71:14 75:18
easier
  82:17
easy
  76:10
educated
  51:2
education
  11:22
effect
  57:2,10 58:8
  61:8 85:22
  86:5
effects
  57:16 59:3,25
  61:4,16 78:1
  86:1
effort
  12:6,7

**efforts**
 63:5
**election**
 14:6 25:9
 38:17 51:4
 52:23 56:4
 58:16 66:9,23
 69:9 70:14
 71:10 73:19
 75:19 76:5
**election-day**
 74:8
**Electioneering**
 81:2
**elections**
 13:20 22:14
 28:11,12,19
 38:7 56:25
 60:7 78:4
 89:14
**element**
 38:23 46:22
 74:2
**elements**
 38:16 39:4
 41:21 52:18
 54:4 55:6
 56:5,17 71:9
 72:22 73:5
**email**
 91:13
**embark**
 41:17 49:22
**employed**
 16:8,12 25:7
**employing**
 30:11
**enabling**
 21:24 23:5

24:4,10,16,
 19,23,24
 25:13 26:5,
 13,16 27:2,8,
 19 29:1 66:22
 69:5 70:20
**enact**
 64:14
**encourage**
 81:23 84:18
**end**
 50:12,19
 78:20 79:6
**endeavor**
 40:18 41:17
**engagement**
 29:19
**engaging**
 19:20 85:21
**English**
 86:12
**entire**
 55:14 56:15,
 18 57:10,11
 80:24
**entirety**
 83:20
**entitled**
 27:19 83:13
**entries**
 45:19
**era**
 62:23
**erroneous**
 22:17
**error**
 22:2 29:3
 33:24 34:3,7,

13,19,20 35:8
 49:20
**errors**
 21:9,14 22:21
 27:18 28:23,
 25 29:6 33:7,
 8,11,13,17,
 22,23 35:5,6
 46:19 49:17
**essentially**
 18:6 30:5
 39:3 44:11
 45:15 79:13
**established**
 76:13
**evaluate**
 47:3 48:11,14
 59:25 61:12
 79:16
**evaluating**
 59:12
**everybody's**
 8:13
**everyone's**
 78:15
**evidence**
 10:24
**evolution**
 75:16 76:5
**evolved**
 75:5
**evolving**
 75:18
**EXAMINATION**
 6:19 90:2
**examine**
 38:18 71:17
**examined**

6:17 30:10
**examples**
 16:25 17:2
 27:11 44:24
 58:14 81:19
**Excel**
 34:13
**excellent**
 33:20
**exceptions**
 23:24
**exclude**
 53:16
**excluded**
 14:19 79:25
 80:13
**excluding**
 56:4 68:13
 72:22 79:23
**exclusively**
 21:23
**excuse**
 72:8 75:14
**exhibit**
 7:7,8 11:10,
 15 83:15
 85:10 87:2,5
**exhibits**
 6:4 7:4
**exist**
 27:18
**expansive**
 65:11
**expect**
 35:7
**experience**
 35:4

Michael McDonald, Ph.D.
October 29, 2021
10

**expert**
13:24 14:2,
11,16 15:6,8
30:24,25
31:3,11,13,
15,16 33:22
34:16,18
35:7,8 57:6
59:7,25 63:17

**experts**
13:20 14:6
23:21 72:11

**explain**
38:19,21,22
41:5,18 43:21
45:22 46:11,
21 48:22
55:22 72:6,
21,24

**explaining**
42:25

**explanation**
20:15 71:16
72:7,17,19
73:6

**explanations**
47:4

**explicit**
25:2 27:23
28:13 83:9
84:5,10,15,21

**explicitly**
24:18 28:8
34:1 67:5
82:4 88:25

**extent**
7:11 11:7
47:6 65:22

**externally**
65:22

**extraneous**
36:16

**extreme**
52:9

---

**F**

**face-to-face**
13:11

**facet**
71:17

**facets**
53:24

**fact**
49:5 66:3
67:25 85:16

**factors**
58:12 65:5

**failings**
80:7

**fails**
42:1 61:16

**failure**
76:4

**fair**
11:3,20 14:3
19:12 32:4,23
35:4,9,11
39:24 44:18
47:5 48:14
51:22 54:14
59:23 68:12
73:8,9 76:1,
15 79:17

**fairly**
80:19

**falls**
24:25

**familiar**

15:1 36:23

**family**
33:13 45:3,4

**farther**
24:2 26:24

**fast**
9:15 12:18

**faster**
85:7

**favor**
17:8

**favorable**
19:7 64:5
73:25

**favorably**
17:17

**federal**
74:10

**feel**
31:20,24
69:12

**field**
13:18 14:5
31:5 39:22
40:21 51:19
54:20 59:11
66:5,13 77:5
90:6,23

**figure**
37:19 44:16
47:8 50:15

**file**
22:2

**filed**
11:16 22:5,6

**final**
11:13 33:4

**find**

16:15 27:11
40:11 50:14
58:23 59:3
65:24 80:21
82:11,17
85:7,9

**finding**
32:17 67:23

**findings**
30:13,17 32:1
79:24

**finds**
35:22

**fine**
31:9 56:2
60:17,19
72:11 87:4
88:1

**finished**
86:22

**firm**
28:2

**fix**
29:3

**Florida**
17:8,11,14,17
39:12,14
42:21 43:4,
13,14 52:23
60:1 61:17,18
62:6,11,15,20
63:7,10,11,21
64:2,9,19,22,
23,24 68:15
73:5,19 74:6,
16 77:1 78:13
79:8,9 80:1
81:21 83:20
84:17 89:1

**Florida's**
18:20 54:5
56:4 61:15
64:5 67:7,8
71:10,17
73:13,18
74:21 75:4,13
79:2

**focus**
66:11

**focused**
20:6 40:3
63:24

**folks**
8:17 40:23
86:23

**follow**
27:14

**follow-up**
48:6 89:25

**food**
81:24 82:4
83:1,8 84:6,
19

**footnote**
42:19

**force**
63:21

**forced**
62:17

**form**
14:22 53:8

**formally**
15:13

**forming**
43:24

**fortunately**
85:5

**forward**
62:17,18
63:10,11,13
64:22 74:7

**forward-looking**
62:20 74:22

**forwarded**
35:21

**found**
14:12,14 29:4
42:12 54:13
58:16 64:11
76:19

**foundation**
83:14

**fourth**
8:23 21:20,22

**frame**
12:15 62:22

**Frank**
6:21 8:10,11

**frankly**
55:9

**FRAZIER**
7:15

**French**
65:4,5

**frequently**
36:22

**Friday**
6:23 35:14

**front**
23:14

**frustrated**
79:22 80:17

**frustrating**
47:25

**frustration**
80:23

**full**
9:5 20:8
31:18 71:8
73:12 81:17

**fully**
26:20 51:11
70:1

**fundamental**
40:17

**fundamentally**
49:18

**funny**
86:16

**future**
56:25 61:4,8

---

**G**

**Gainesville**
11:18

**gears**
15:25

**general**
14:14 16:1
21:7 32:11
70:13

**generally**
16:4 20:3
33:4,12 39:21
54:8 55:2
56:14 60:3
72:2

**generous**
62:12

**George**
12:4,14

**Georgia**

34:12 45:4
57:24 58:10

**give**
6:12 9:5
16:11 34:12
41:25 42:5
50:11,13 53:6
68:5,7,12
73:16,22 74:3
82:9,12

**giving**
17:23 19:13

**glad**
90:14

**goal**
67:4

**good**
6:21 10:17
22:4 44:2
62:15 64:15
70:16 91:20

**Governor**
12:8,12

**great**
50:12 85:11
91:12

**greater**
77:15

**group**
58:19 59:20
86:24 89:1

**groups**
57:16

**guess**
12:23 14:5
36:11 40:24
72:13 76:7
80:16 91:9

Michael McDonald, Ph.D.
October 29, 2021

12

guidelines
  50:1,2
guy
  33:14 37:7
guys
  82:13

_____

**H**
_____

half
  60:14
hand
  6:9 16:7,8,
  11,21 17:3,13
  18:6 19:8,21
  20:5 54:11
handing
  82:25 83:8
handout
  85:18
happen
  58:11
happened
  15:15,17
  22:11 66:8
happening
  17:24 65:12
happy
  6:23 20:25
  21:1
health
  23:24 70:15
hear
  6:23 18:16
  44:18 60:8
  63:25
helped
  34:17

helpful
  16:6 49:13
highlighted
  83:18 85:10
highlighting
  35:17,20
hired
  32:14 33:2
historical
  38:2 51:9,15,
  23 53:3,5
  54:9,22 55:7
  56:5 61:15,23
  62:22 72:4,25
  73:17
historically
  51:6 77:5,6
hit
  36:12
Hold
  14:21 30:23
  32:19 45:6
  57:4 82:11
  84:13 85:9
hole
  56:9
honed
  80:4
hood
  60:4
hour
  36:1 60:13
hours
  36:5
hundred
  33:15
hypothetical
  41:16 57:9

63:18 65:13

_____

**I**
_____

Idaho
  27:21,24
identification
  6:5 87:6
identified
  49:12
identify
  28:25 36:6
identifying
  49:7
ignore
  7:25 35:17
ignoring
  17:9 40:16
III
  30:13
illustrated
  80:7
imagine
  59:1
immaterial
  46:3
impact
  54:23 56:24
  57:23 58:8
  59:13,14,15,
  20 64:18
  76:10,14
impacted
  35:9 57:21
implement
  26:21
implemented
  23:24 69:1

implication
  19:5
implicitly
  61:3
imply
  70:23
importance
  41:24
important
  26:17 37:22
  39:1 41:22
  44:24 45:1,
  17,24 55:6,
  23,24 61:22
  63:9 76:25
  90:22
imposing
  65:14
impossible
  78:25 80:10
impression
  77:20
impressive
  35:24
improper
  51:7 73:4
improved
  76:9 77:8
in-person
  13:9 52:3
  61:16 71:14
  75:16,17
inability
  90:20
inaccurate
  65:24 70:9
inappropriate
  72:2

include
17:15 85:15

including
79:24

inclusiveness
47:16

inconsistent
19:3 66:15
69:24,25 71:5
89:10 90:6

inconsistently
71:9

incorrect
19:25

incorrectly
22:19

incumbent
34:9 38:24
43:21 46:10
55:21 72:13

independent
12:9 75:12,25

independently
40:4 45:10
50:14 74:13

individual
42:23 59:14,
15 60:6

individual-
level
58:15 60:3

individually
57:1

individuals
81:7

indulging
86:20

inference

42:17

influence
85:22 86:3

influencing
81:20 85:22

inform
36:16 52:10
56:3

information
10:3 34:2
80:19

informed
56:16

infrastructure
58:1

initial
11:9 12:14,20

input
32:15,18

inside
43:1

instance
16:24

instances
14:9,11 57:20

instruct
31:8

insufficient
54:14

intended
81:23 84:18

intent
85:21 86:4

intentional
19:9 64:11

intentionally
18:7

interact
43:20

interacting
69:20

interaction
86:1

interesting
26:4 42:12

interface
8:25

internally
69:25 80:10

interpretation
69:7

interrupt
54:17 60:13

intervene
63:21

intervenor
6:22

introduced
21:20

investigation
29:6

involved
14:9,20 57:24
64:14

irrelevant
39:6 52:22
55:13

issue
20:6 39:22
46:25 48:10,
12,18 51:9,
10,16,24 53:4
54:10,22
59:22 70:11
72:4 90:9

issues
7:11 34:25
36:17 49:11
52:10 53:9
63:14 78:18

item
85:21

---

**J**

Jeremy
31:13 88:14
90:1 91:2

Jim
62:23

job
22:4

joined
8:12,13

judge
14:25 15:5,7,
11 58:22,24
64:3

judge's
64:6

judges
77:1

June
22:14 28:11

jurisdictions
70:14

justifies
89:5

---

**K**

Kansas
58:19

KANTER

6:6 89:22

**Karpatkin**
8:2,6,20
14:21 30:23
31:10 32:19
45:6 57:4
60:19 68:5
76:12 77:10
82:15 83:11,
22 84:8 87:8,
10,21 88:1,6,
10,15,19
89:19,24
91:3,6,14,21

**keeping**
86:6

**Kidd**
10:1,17 11:25
12:1 13:5,13,
16,21 16:7,
12,20 17:3
18:7 21:3
22:8 29:20
30:1 31:6,20
32:7 34:5,22
36:15 37:16
38:9 40:12
45:20 48:20
50:22 52:7,9,
25 54:5 55:24
56:6 61:3
62:22 70:19
71:9,16 72:16
75:3 78:9
79:6 89:4

**Kidd's**
7:7,9 8:22,23
10:14 11:2
16:1 21:9
23:13 29:3
30:3 31:7

33:7 36:8
41:7 42:1
61:12,14 62:3
65:23 78:25
88:12 89:3,
10,15

**kind**
8:8 21:6
34:17 39:11
63:9 64:2

**kinds**
40:22

**knew**
58:22

**knowledge**
14:18 15:10,
14 64:16
74:14

---

**L**

---

**labeled**
24:4

**lack**
41:5 47:4

**lacking**
73:1

**language**
18:9 50:6
66:22 69:21
70:20 82:5,24

**large**
63:3

**largely**
79:2

**larger**
53:21 58:11

**late**
12:17,20

**law**
22:16,18
24:18 26:1,5,
14 28:13
33:14 41:21
42:23 47:15
49:3 51:6,8,
9,10,15,16,
23,24 52:3,23
53:4,12 57:1,
21 58:21
61:18,24
64:17 68:25
69:9 73:5
74:10 76:8
77:8,22 78:1,
5

**lawn**
86:10

**laws**
17:10 21:10,
15 22:10
38:10,14,16
46:4,10 47:12
49:16 51:4
53:3,5 54:5,
9,22,24 56:4
57:2 59:20
61:16 62:6
64:14 65:16
68:21,22
71:17 72:4
73:13,17
74:13,22
75:13 76:5,9
78:13 83:20
89:12

**lawsuits**
33:21

**lawyer**
85:23

**lawyers**
10:6 56:16
73:2

**lead**
14:11

**leadership**
25:21

**leading**
13:20

**leads**
58:2

**leaflet**
85:18

**learn**
8:24

**leave**
86:24

**led**
37:20,21 65:5

**left**
77:4

**legal**
15:1 50:13
53:23,25
72:13

**legislation**
21:24 23:5
24:5,11,16,
19,24 26:13
27:2,9,19
29:1 69:5
70:20

**Legislation/
prohibited**
25:13

**legislature**
25:15,17,19,
20,21,22,25
84:5

Michael McDonald, Ph.D.
October 29, 2021

15

**level**
  13:21
**levied**
  40:12
**limit**
  44:7
**limited**
  29:16 85:15
**limits**
  44:6,12,17
**line-warming**
  86:8
**lining**
  38:8
**link**
  22:13 27:12,
  13,21,22,23
  28:1 50:12,14
**links**
  10:1 28:3
  49:1,2,6
  50:10
**lists**
  49:3
**literature**
  72:24 77:25
**litigation**
  36:17 51:16
  52:11 53:9,17
  54:10,23
  57:15,23
  61:19,24
  63:13 64:10
**local**
  25:8 66:23
  69:9
**localities**
  25:3

**long**
  7:2
**longstanding**
  55:17
**looked**
  11:1 50:4
  52:21 59:22
  72:10,20
  74:3,5,23
  77:24 83:6
**lose**
  38:10
**lost**
  58:11
**lot**
  10:17 11:13
  32:7 33:9
  39:17 48:8
  59:21 65:3
  78:2,3
**lots**
  38:9 48:17
  77:24
**lumps**
  69:20

---

**M**

**M-C**
  9:7
**M-I-C-H-A-E-L**
  9:7
**made**
  21:14 27:15
  30:18 33:14
  34:13,19,20
  42:8,13
  45:20,22
  56:20 61:24
  64:6

**mail**
  22:13 52:3
  61:15 66:2
  75:4
**main**
  9:12
**major**
  86:12
**majority**
  88:24
**make**
  9:16 10:19
  18:1 21:2
  28:6 35:3
  43:22 52:22
  54:7 69:16
  72:14,15
  78:16 86:7
**makes**
  67:3 78:9
**making**
  22:21 26:5
  40:13 48:22
  58:25 63:20
  79:15
**man**
  86:10
**mandate**
  68:19
**mandates**
  68:15,16
**mandatory**
  69:16,17,21
**mark**
  87:2,4
**marked**
  11:10 87:5
**Mason**
  12:4,14

**material**
  33:9 85:18
**matter**
  6:8,12 9:25
  11:11 13:25
  26:14 43:2,6
  54:11 55:16
  70:25 81:9
**matters**
  14:19
**Mayer**
  10:10,12
**Mayer's**
  10:13
**Mcdonald**
  6:16,21 7:6,
  16 9:3,7
  12:8,12 32:21
  45:8,15 50:18
  60:25 71:4
  76:14 84:9
  86:19 88:6
  90:4
**Mcdonald's**
  8:21
**means**
  39:12 61:3
**meant**
  44:17 65:18
**measure**
  39:15 76:8
  77:19
**measurement**
  37:20 38:13,
  22 79:1 90:5,
  16
**measures**
  41:19,20

measuring
  38:23,25
meet
  13:6 86:19
meetings
  10:6 13:10
member
  45:3,4
mention
  53:5 61:16
mentioned
  12:24 79:3
merits
  31:21 63:16
mess
  27:15
met
  13:9
method
  38:4 77:7
  90:22
methodologies
  39:21,23
  56:21 59:11
  72:3 90:9,10
methodology
  37:3 51:21
  53:3 57:3
  59:19 60:9
  90:7
methods
  30:11 37:13,
  24 39:25
  40:14 41:9
  60:2 89:11
  90:6
Michael
  6:16 9:7

Michelle's
  7:1
middle
  89:9
military
  9:15 58:20,25
minute
  7:10,20 8:17
  11:25 23:17
minutes
  87:23
misclassified
  27:7
misclassifies
  66:1
misclassifying
  21:18 66:14
missed
  20:15 21:1
  82:25 85:1
missing
  22:2 27:5
  81:5
misstatement
  41:13
misunderstands
  37:16
mobilization
  63:5
modern
  62:24
moment
  29:8 45:7
moments
  62:15,21
money
  33:14

Montana
  43:3,14
morality
  64:2 76:23
morning
  6:21 7:13
  91:16
morphed
  12:8
motivations
  64:13
move
  46:24 48:7
  56:11 70:12
  71:3
moved
  64:22,25
  65:10,11
moves
  63:11
moving
  63:10
muddied
  68:11
multiple
  17:25 38:16
  41:20 60:2
  80:17

———————————

          **N**

narrative
  38:2 55:7
  61:14 62:19
  64:21
narrow
  36:7 51:12
narrower
  48:8

narrowing
  66:11 68:14
narrowly
  20:6 58:4
NASSERI
  89:21
national/
international
  13:22
naturalized
  57:24 58:2
nature
  17:10
necessarily
  15:12 29:19
  47:1 51:23
  53:2 62:9
  66:8,20 68:1
  72:2 80:11
needed
  25:6 48:2
  49:14 80:19
negative
  61:16 63:23
neglects
  62:14
Nevada
  22:13,17 23:1
  27:7,10,12,17
  28:7,11
Nevada's
  22:12,13
news
  10:17
nice
  65:10 86:19
nonpartisan
  81:9,22 84:17

notable
  34:5 40:11
note
  24:3 77:13
noted
  22:15 24:5
  44:5 52:1
notes
  32:6 75:4
noting
  52:6
notion
  64:8
nuance
  38:10 43:12
nuances
  26:20 38:9
  46:3,8 78:3
number
  9:13 13:10
  39:11 42:22
  43:17 44:4,7,
  13 46:2 47:16
  58:5 78:15
  79:6
numbers
  43:1 63:4
numeral
  30:12
numeric
  39:10,11
numerical
  41:6
numerous
  14:17
nut
  35:22

_____

**O**
_____

object
  14:21 32:20
  45:6 64:8
  76:12 83:11
  84:8
objecting
  62:4
objection
  6:7 17:5
  30:23 57:5
  77:10
objections
  7:1 17:4
obscure
  65:6
offering
  66:2
offers
  71:16 72:17
officials
  25:9 58:16
  66:23 69:9
Ohio
  15:21 26:6,
  11,14,15
omission
  60:12 61:2
one-size-fits-
all
  59:19
onerous
  81:21 84:16
online
  13:8
onus
  53:23

opaque
  90:15
open
  82:22
opening
  71:24
opens
  46:1
opine
  61:3
opining
  59:7
opinion
  14:18,25
  15:2,19 16:21
  17:2,8 19:13,
  18 30:24
  31:3,11,13,
  15,16,21
  34:4,10,11,21
  39:9 45:25
  46:3,12,22
  47:13 53:7
  59:6 70:17
  74:5,6,18
  75:10 76:24
  77:20 85:16
  89:18
opinions
  13:17,25
  15:12,14 20:4
  29:20,22
  30:4,16,20
  31:7 33:23
  34:21,23
  35:1,9 36:17
  43:24 47:22
  48:3,4,5
  52:10 53:8
  61:8,11 79:17

opportunities
  13:11
opportunity
  31:18 74:4
opposed
  24:11 30:18
  33:2 45:3
  61:25 64:7
opposing
  14:11 33:22
  34:16,18
order
  37:5 48:2
  64:7 70:17
  77:1 80:19
  91:9
orders
  76:6
organizations
  69:19 81:7
  86:7
oriented
  75:20
original
  19:20 21:19,
  21 29:24 30:3
  88:13,15
outset
  19:4 20:10
  47:24 49:18
overarching
  56:3 64:21
overly
  52:7

_____

**P**
_____

p.m.
  88:4,5 91:23

Michael McDonald, Ph.D.
October 29, 2021

18

pages
  78:15
paid
  35:25
paint
  63:9
pandemic
  70:15
panel
  15:18,20
paper
  13:4
paragraph
  18:22 23:17
  30:9,10,12
  36:14 50:20
  60:10,25
  61:2,13 65:21
  67:18,24
  68:3,14 71:8,
  13,14 73:12
  75:3 76:4
  78:21,23 79:5
  81:5 85:19
  88:11,16,20
  89:9
paragraphs
  36:12 60:11
paraphrasing
  44:21 62:8,9,
  10
parentheses
  42:15,19,22
  43:1 44:6,8
part
  12:7 38:12,13
  49:7,25 51:20
  77:4
participate

participation
  57:10
parts
  72:4
passage
  16:13
passed
  65:16
past
  46:24 63:23
  77:2
PDF
  81:13
people
  25:20 43:16
  47:16,17 50:2
  55:5,9 58:6,
  10 72:21
  77:24 86:15
performing
  17:3
performs
  16:21
permissive
  17:10
perseverate
  54:6
person
  13:7,9 42:24
  51:8 53:4
  54:12
personal
  14:1 31:11
  59:6
personally
  12:1 31:15
perspective

9:13 59:11
83:6
pervading
  28:1
petition
  85:20
Ph.d.
  6:16
Ph.d.s
  33:13
phenomenon
  38:3
phone
  13:8
phrase
  19:8 85:4
phrases
  16:6
phrasing
  86:21
picking
  73:24
picture
  63:10,11
piece
  38:20,21
pieces
  38:18,24
  52:22
place
  8:3
places
  17:25
plaintiff's
  23:21
plaintiffs
  6:8 63:19
  89:24

plaintiffs'
  6:7 71:15
  72:7 75:14
  85:3
plans
  8:15
play
  64:2 76:23
point
  16:13 19:16,
  23,24 20:23
  21:6 23:11
  25:12,14
  27:17 28:21
  29:9 34:9
  37:1 38:13
  39:9 40:14
  44:4 47:6
  48:25 50:19
  52:8 61:25
  67:22 68:2
  76:7,25
  78:16,18 84:9
  86:25
pointed
  33:24 34:16
  35:8 65:19
  66:12 90:14
pointing
  34:25 52:21
  54:3 71:22
  74:2,11
points
  19:18 20:8
  23:11 33:23
  79:15
political
  13:18 14:5
  31:17 36:22
  37:9 39:22

40:22,23
48:17 51:20
54:20 55:2,8,
16,19 56:21
72:3 77:5
85:17 89:11

poll
85:18 87:7

Polls
63:4

pop
8:7

population
58:4

populations
58:25

Portable
74:15

portion
16:8 83:4

potential
59:25

potentially
63:22

practice
25:7,8 68:17

practices
68:22

predominantly
63:3

preelection
73:20

prefer
23:8

premarked
6:4

prepare
9:23 10:5

prepared
11:11

pretty
11:21 36:7

prevail
63:19

previously
61:10 66:12
75:4

primary
49:23

printed
83:19

prior
73:19

privileged
32:22

proactively
62:18

problem
16:15 22:6,7
45:13 53:2
79:18,19

problems
49:6

procedures
66:20 69:1

proceedings
6:2 91:22

process
30:18 37:3,9,
13,25 38:15
39:20 43:22
51:5,20,21
52:4,5,17
53:2,11 54:5,
8,21 55:19
60:5 61:23
65:2,7 72:24

processes
36:21 37:20
64:24

processing
40:15

produced
40:5

producing
37:17

Professor
32:21 45:8
76:14 84:9
88:6,11

prohibit
81:20 88:25

prohibited
23:4 24:5,11,
15,18,21,22,
23 25:2 27:8

prohibiting
84:5

prohibition
25:3

projects
12:24 13:1,3,
12

prolific
60:3

promoting
81:20

promulgate
26:12

promulgated
28:18

provide

75:5,6,17,18
77:6 79:19
90:9,17

provided
7:19 10:1,4
27:12,13,23
28:3 34:2
47:7 49:6,13
50:10 79:14

providing
22:3 25:9
29:17 68:18
74:1 80:18
81:8,24 82:4
84:6,19

provisions
36:16 51:15,
22 52:10
56:23,24 81:2
83:14,17,18

public
23:24 70:15

publications
11:22 13:2

published
74:13

pull
29:22,23 32:9

pulled
23:15

pulling
38:17,20 42:3

pulls
38:21

purely
78:11

13:17 25:4,11
29:22 30:16
32:14 49:2,14
52:13,17 61:8
66:3 81:7
86:4

purpose
  45:10 85:13

pursuant
  76:6

put
  6:25 7:12,25
  8:11,13 16:5
  22:8,9 34:18
  36:3,5 57:4
  82:16,17,19
  86:20

puts
  44:6,7 53:22

—————————

                Q

qualifications
  11:23 35:24
  40:7

qualified
  13:17

qualitative
  40:24 41:8,
  10,19 44:2
  78:12

qualitatively
  43:5

quantitative
  40:24 41:8,
  11,12 44:2
  78:11 80:6

question
  11:13 14:4,22
  16:25 18:1,5
  26:23 27:1,9
  30:24 31:8,16
  33:4,20 35:2,
  3 37:7 40:20,
  25 41:4 48:8,
  24 51:11,19

54:15 55:1
56:8,10,20
58:17 59:9,
17,18 61:5,7,
22 64:4 65:17
67:14 68:2,20
70:11,16
73:22 76:7,17
77:5,14 78:22
79:12 80:24
84:2,3,23
85:1 87:11,19

questioning
  54:19 63:25
  86:21

questions
  9:3,19 14:13
  16:1,3 18:15
  22:25 23:11
  30:9 32:11,20
  36:13 48:6
  56:19 67:14
  81:1 86:18,24
  87:8,9,13,21
  90:25

quick
  87:12

quickly
  16:16

quirk
  57:25

quote
  75:16

—————————

                R

rabbit
  56:9

raise
  6:9

raised
  13:21

ranks
  73:19

rates
  58:5,10

rationale
  36:15 50:23
  52:9,14,20
  53:6,11,22
  64:15

reach
  48:21

reached
  29:21

read
  16:4 17:25
  19:22 20:11
  21:13 24:15
  30:20 44:5
  47:25 51:25
  56:15,17 67:6
  68:3,6 79:12
  82:2,3 88:23
  90:4 91:2,4,
  6,7

readers
  18:7

reading
  20:21 28:13
  68:12 83:2
  91:5

ready
  7:13

real
  78:10

reanalysis
  47:23,24
  49:22

reanalyze
  48:2 79:24

reason
  21:1 61:25
  71:22 81:13,
  16

reasonable
  63:17

reasoning
  43:22 48:4

reasons
  70:15

reassess
  33:23

reassessment
  21:2

rebuttal
  22:15 40:13

recall
  17:20 21:10
  90:11

recent
  61:14

recessed
  60:22 88:4

recognize
  15:5,7

recognizing
  35:14

Recommendation
  37:22

reconvene
  87:23

record
  6:6,25 9:4,16
  15:3 34:18
  35:20 37:10
  57:5 87:22

rectangle
8:9

redirect
87:13 90:2

redistricting
12:6,9,13

referable
37:18

reference
84:11

referencing
29:8

referring
90:16

reflected
15:22

reform
12:6,7

refused
15:5,7,12

regard
19:20 21:15
23:1,2 29:20
33:5,12 34:8
44:20 59:19
61:8 75:15

regarded
13:19

registered
69:20

registration
19:16 73:17,
18,20 74:8,9,
13,15

registrations
18:21

regulations
28:18 66:9

rehabilitate
47:21

rehabilitating
49:11

reinstated
63:8

related
13:3 18:20
30:24 32:20
66:7

relates
40:21

relation
17:14

relationship
39:1,14

relative
41:23 74:16
80:1

relevant
36:16 37:1
52:10 53:6,8
54:13 72:15

reliability
79:16

reliable
33:19

relief
78:15

reluctant
86:13,14

remedy
65:15

render
13:24 14:2
29:19 47:22
61:11 70:17
74:5,17

rendering
31:21 75:10

rephrase
14:24 32:23
45:12,13

replicate
40:4 90:21,22

replow
66:5,13

report
7:6,7,9 8:22
10:2,18 11:2,
6,9 14:2
16:1,4,6,13,
17 17:2,25
18:8,11,13,
18,23 19:1,4,
11,17,19,20,
22 20:3,8,11,
17,22,25
21:5,8,11,13,
19,20,21
22:5,6,15
23:3,10,11,
14,17 27:16
28:2,5 29:3,
7,11,24 30:3,
4 31:1 32:9,
11,12,15
33:1,5,6,8,
17,18 34:1,6,
24 35:8,13
37:2,15,17
40:5,13 41:7
42:1 43:10
45:21 47:7,
20,21,23,25
49:2,5,11,22
50:18,19
51:25 57:6
59:8 60:10

61:1,12 66:6
67:2,20 69:25
70:10 71:3
74:2,25 77:13
78:9,16,17,22
80:8,17,18,
20,24 84:10
88:12,14,15
89:3,4,7,10,
15,16

reporter
9:5

reports
11:11 33:22
35:5,6

represent
6:22

reproduce
40:4,17,18
79:21

Republican
12:9

reputation
13:22

request
68:5

require
89:2

required
25:2 69:16

requirement
58:20

requirements
79:2

rereading
67:20

research
13:2 37:18
40:1,5 41:9,

Michael McDonald, Ph.D.
October 29, 2021

22

11,12,19

**reserve**
29:5 43:10
46:18 66:16

**resonated**
58:24

**respect**
17:8 22:16
40:8 62:4

**respond**
23:12 36:8
87:19

**responding**
23:22 47:7

**response**
20:24

**responsibilities**
29:14

**responsibility**
29:2 51:3

**restate**
41:1 71:25
76:19

**restrict**
18:24

**restricted**
17:18 21:23

**restricting**
16:21 17:5,16
18:10 19:2
20:7,16 80:2

**restriction**
81:6

**restrictions**
81:22 84:17

**restrictive**
75:5,6

**result**
61:19,24 64:6

**resulted**
64:24

**resumed**
60:23 88:5

**retained**
59:24

**reticent**
86:7,11

**retitle**
24:9

**retrieving**
7:12

**return**
42:24 43:3,4,
18 44:5 45:2
46:7 47:17
66:2

**returned**
44:13

**returns**
43:16

**review**
10:3,13,23
20:12 27:4
36:7 42:8
46:9 52:5
87:12 89:3

**reviewed**
9:24 10:16
28:24 31:5
47:12 49:9

**reviewing**
20:3 28:10
67:21 68:10
85:2,12 89:15

**Revolution**
65:4,6

**right-hand**
8:8

**rights**
60:6

**Rising**
13:1

**road**
46:8

**Roman**
30:12

**rooted**
73:6

**rough**
91:14,15

**roughly**
36:5 58:6

**rule**
68:18 69:6

**rules**
17:21,22
18:20 19:17
26:12 42:10
48:11 67:12,
13 69:24
70:6,7,25
75:4 89:13

**rush**
18:2 83:2

_____

S

_____

**save**
7:21 11:13

**savvy**
7:24 35:18

**SB**
18:21 52:11
53:9 57:10
59:3 60:1

61:9,12
63:14,15,20
65:14 83:13
85:5 87:2

**scanning**
85:8

**scheme**
47:14 48:10
66:15 69:15,
24 79:1 80:12
90:5,16

**schemes**
47:22

**school**
33:15

**science**
13:18 14:5
39:22 40:22
51:20 54:7,20
55:2,16 56:22
72:3 73:7
77:6

**sciences**
37:23 55:2,3
90:23

**scientific**
40:18

**scientist**
31:17

**scientists**
36:22 37:9
40:23 48:17
89:11,12

**scope**
29:19 57:5
71:5 73:7

**screen**
82:15

Michael McDonald, Ph.D.
October 29, 2021

23

scroll
    82:18
seating
    81:8
seconds
    82:9,12
Secretary
    26:11 28:20
    58:1
section
    16:17 18:18,
    20 21:10
    23:16 29:7
    30:4,5 35:25
    37:2 55:12
    67:11,16,18,
    20,22 68:6
    70:3,4,5 71:5
    74:25 76:4
    78:21 80:16
    81:1 83:10
    84:11 85:6,13
sections
    33:1 47:25
    50:10 56:12
    59:14,15
seek
    85:16,19
seeking
    85:15,19
selectively
    20:16 80:8
selects
    71:9
sell
    85:20
selling
    85:20

Senate
    56:12,23 61:4
    71:15 81:5
    82:3,6,19,24
    83:21 84:3,23
send
    91:17
sense
    15:11 17:23
    18:4 21:7
sentence
    16:19 19:23
    24:3 36:14
    50:21 60:11
    61:1,2 67:12
    71:14 81:4,
    12,18 88:20,
    23 89:9 90:4,
    14
sentences
    71:19 79:12
    82:2
separate
    56:10
sequence
    21:6
series
    38:1
Services
    58:2
shade
    19:6
shared
    9:24 83:13
sharing
    82:15
short
    88:24

shorter
    10:19
showing
    54:12,13
siblings
    33:16
side
    8:8 28:19
    34:17 87:11
signature
    81:14 85:20
significant
    61:3 78:15
silent
    66:21
similar
    17:21 25:10
    31:19 57:14
    67:17
simply
    48:1
sir
    9:10,23 24:14
    33:2 76:17
    91:1
sit
    20:20 80:1
site
    50:4
sits
    74:16
skimming
    17:22
skip
    78:14
sleight
    16:7,8,11,21
    17:3,13 18:5

19:8,21 20:4
sloppiness
    28:1
slow
    9:14,15
small
    89:1
social
    37:23 55:2,3,
    8 89:11 90:23
solemnly
    6:11
solicit
    85:14
solicitation
    85:14
sooner
    91:12
sort
    9:15,22 14:4,
    14 26:17
    31:19 39:7,15
    41:16 43:16
    55:1,6 56:5
    62:19 63:8
    65:11 73:1
    77:21 78:7,9,
    10,16,20
sorts
    45:22 48:1
    78:6,8 83:1
    86:7
Souls
    63:4
sound
    33:19
sounds
    11:21 20:19
    59:16,18 64:1

80:22

**sources**
49:23

**South**
15:18

**speak**
10:10

**specific**
16:3 23:11
56:20 57:17
79:9 80:6
82:24 83:8
84:24

**specifically**
26:1 52:1
63:7

**spell**
9:5

**spelled**
18:21

**spoken**
10:12

**spot**
21:25

**spreadsheet**
34:13

**squirrel**
35:22

**stage**
69:18

**stages**
32:16

**stake**
36:17 48:18
52:11 53:9,
12,13,16,17

**stand**
16:9 20:4,20

21:14 31:8

**standard**
19:10 30:11
89:11 90:6,22
91:9,10

**standing**
86:2

**stands**
22:18 89:1

**start**
9:3 35:16
39:3 48:1
58:17 81:18

**started**
11:17

**starts**
30:5 50:20,22
61:13 71:9
73:12 78:24
88:21

**state**
12:7 15:20
21:23 26:10,
11,12,14 27:3
28:8,20 33:25
34:1 39:12,13
44:7 57:11,12
58:1 59:21
64:14 65:15,
16 66:8,20
68:17 69:8
71:2 76:9
77:9

**state's**
51:4

**stated**
33:5

**statement**
7:1 21:8 70:9

75:9,16,21
76:20 89:5,17

**statements**
11:6 23:9

**states**
12:19 17:6,7,
9,15,18
18:22,25 19:2
20:7 21:10,16
23:23 25:3,8,
10,12,14,23
26:2,18,21,22
27:1,2,11
34:8 37:14
38:5 39:13,15
42:14 44:8
46:16 48:12,
23 49:3 50:5
57:14 64:14
65:23 66:1,3,
14,25 67:9
68:14 69:2,5
70:9,19,24
74:7,8,17
79:7,23,25
80:1,2,9,13,
14 81:19
88:25 89:2,13

**stating**
23:3 31:25
66:7

**statistical**
78:11

**statute**
25:23,25
26:16 27:23
28:8 50:11,15
66:21

**statutes**
22:21 26:1,6

27:2,5 28:17
50:8 66:7,10,
11,18,21 67:5

**statutory**
50:6 66:22

**stay**
8:16 81:23
84:19

**STENOGRAPHER**
6:9 8:11 87:1
91:11,15,19

**step**
62:17,18
63:12,13
79:18

**steps**
48:21 62:16,
24

**stick**
30:25 68:16

**strategy**
53:25

**strengthened**
34:23

**strengthens**
34:21

**stricken**
14:25 15:3

**strictly**
24:23

**striking**
15:13

**strongly**
39:22

**STUART**
8:10

**students**
87:18

studying
38:3,14 66:24

stuff
46:13 55:15

subject
40:6 71:15

subsection
85:14

subset
80:2

substantively
34:3

subsumed
58:11

suburb
12:5

successful
65:14

sufficient
66:19

suggest
87:22

suggestive
50:1

summarize
39:19 46:23
53:1

summarized
36:10

summarizes
30:4,13

summary
11:3,21 21:15
30:13 35:10,
11 39:24 47:5
48:15 50:20
54:14 59:23
73:8 79:17

Sunday-before-
election-day
63:2

supervised
75:17,18

Supervisor
28:19

supplemental
7:9 8:23 10:2
11:2,6 19:15,
17,19,22
20:3,11,21
21:13,19 22:6
23:3,14 33:6
34:6,24 49:1,
10 51:25 66:6
89:4,16

supports
89:5

Supreme
15:21 26:10

surprised
34:17

swear
6:11

switch
15:25

sworn
6:17

synopsis
18:17 30:6

system
52:24

___

T

table
23:7 24:4,10,
11 42:4,5,9,

17 44:5
49:23,25 50:7

takes
63:12,13

taking
16:5 48:9,12
79:18

talk
9:16 11:25
13:11 26:18
38:24 44:1
47:16 63:16
68:25 69:15
70:8 76:4

talked
71:23

talking
17:20 18:12
25:20,22 32:6
37:5 40:7,14
42:18,21
69:18 78:4
83:1 88:13

talks
18:18 30:10
67:25

tallied
36:3

Tamra
91:9

tasked
47:20 51:3
52:1,4,25
53:19 56:1,2
57:8,17
72:11,18
75:13,24

teach
41:9

team
53:23

tech
7:24 35:18

ten
87:23 91:11

terminology
15:2

terms
13:22 29:18
49:11 55:6
64:21 65:9
66:25 79:1
80:11 85:14

test
65:23

testified
6:17 45:9

testimony
6:11 28:7
45:8,12

text
42:18 44:16
56:18 82:6
84:23

thing
9:4,14,16,18,
21 28:24
46:11 47:15
49:10,19 63:8
64:19 69:11
73:23 75:15
76:23 78:7
83:7

things
6:25 9:12
43:8,20 48:2
55:16,24
56:1,2 66:24

Michael McDonald, Ph.D.
October 29, 2021

26

72:12 73:24
77:2 78:6
82:4 83:1,12
88:7

**thinking**
39:3 65:2

**third-party**
17:20 18:21
42:9 48:11
69:19

**thought**
37:20 43:21
55:23,24 91:8

**three-court**
15:18,19

**three-judge**
15:20

**time**
7:2,22 11:14
12:15 16:5
17:19 18:2,14
22:5 27:10,
20,22 28:13
29:16 31:21
32:2 36:3
38:1 46:9
47:10 48:16,
17 55:9 62:9,
15,22 68:6,9
72:12 76:9
83:2 86:15,20
89:13 91:1

**times**
14:17 15:16
33:16 62:24
64:22 80:18

**titled**
23:5

**titles**
44:6

**today**
9:23 11:6
16:9 28:25
91:1

**told**
11:1 52:14
73:2

**tomorrow**
91:16

**top**
35:16 52:8

**topic**
48:7 49:11
56:10

**topics**
14:7

**touching**
38:16

**tracing**
37:4,13,25
38:15 39:20
51:6,21 52:4,
5,18 53:2,12
54:5,8,21
55:7,19 61:23
65:2,7 72:24
77:7 79:19
90:9,17

**track**
12:18

**transcript**
10:14,16
91:4,7

**transcripts**
10:23

**transparent**
37:18 45:21
48:19,20 50:8

**true**
65:8 75:15

**truth**
6:13 40:19

**turnout**
56:25 57:16
58:5,10,12
59:3 77:23
78:2

**turns**
42:21

**Twenty-four**
85:11

**typologies**
40:16 48:16

**typology**
21:19 36:23,
24 37:5,14
38:15 39:21
48:19 49:21
79:19 90:9,17

___

**U**

**Um-hm**
40:10 53:14

**umbrellas**
81:24 82:5
84:7,20

**unable**
29:9 47:2
75:19,23

**underlining**
7:24

**understand**
9:19 25:8
26:19,20
28:6,16 39:12
41:1 43:2,11
45:5 48:4

49:9,20 54:7
55:19 60:9
62:19,21 65:4
69:3 76:20,24
79:15,25
85:23 90:13

**understanding**
12:22 19:24
23:5 26:8
28:9 64:17,24
70:13 85:3,4,
25

**Understood**
29:15 44:18
56:7 74:24
90:24

**undertaken**
61:18

**undertaking**
90:10

**unfair**
72:17

**unhighlighted**
35:18

**unimportant**
39:6 45:25

**universe**
43:16 47:17

**University**
12:4

**unpack**
22:23

**unqualified**
13:24 14:15

**unusual**
14:5

**update**
22:10

Michael McDonald, Ph.D.
October 29, 2021

27

updating
  22:4
upload
  35:18
usage
  26:19 63:1
  66:25 69:4

**V**

Vagueness
  14:22
valid
  90:20
validity
  65:23
variables
  59:22
vary
  26:18
verify
  11:3,7 28:4
verifying
  45:10
versus
  44:2 69:16,17
view
  16:24 33:17
  49:10 76:18
Virginia
  12:5,7,18
  15:20
vitae
  11:14 15:23
voluntarily
  61:19 64:7
volunteer
  86:2

vote
  57:22 63:3
  75:19 81:24
  85:16
vote-by-mail
  28:11
voter
  19:16 56:25
  63:4 69:20
  73:17,18,20
  74:13 85:22
  86:3
voters
  45:2 57:11
  58:20 60:6
  61:17 64:5
  75:19,20
  76:10 77:9
  78:4 79:7,8
  81:20,23
  84:18
voting
  19:17 52:3
  59:20 61:16
  63:2 71:14,17
  72:4 73:13
  75:17,18 76:9
  77:8

**W**

waive
  91:5
wanted
  10:21 53:24
  54:2 69:3
  87:10 88:6
wanting
  65:24
warming

  81:6,22 84:18
water
  81:8,24 82:4,
  25 83:8 84:6,
  19 86:5
ways
  24:25
Web
  6:2
website
  22:3 27:25
  49:25
weekend
  91:20
weeks
  11:17 27:24
weight
  39:5
weighted
  39:2
weighting
  39:7 78:6
well-qualified
  14:6
widely
  13:19 38:4,6
  39:25 70:18
  71:2 89:2
wishes
  74:4
word
  19:8 25:24
  41:13 79:22
  80:5 84:10,
  11,15,21
  86:11,12,16
words
  31:24

work
  12:8,23 36:1
  40:17,18
  50:14 55:1
  90:21,23
worked
  12:5,11 13:4,
  6,13
working
  11:17
works
  31:5 49:21
worse
  62:2
wraps
  78:24
write
  40:9
writing
  20:17 57:15
written
  40:6 55:14
wrong
  8:3 23:23
  49:19 90:8

**Y**

year
  22:11,15
  28:12
yesterday
  10:15,18 32:7
you-all
  12:23

**Z**

Zacherl

Michael McDonald, Ph.D.
October 29, 2021                                                                 28



```
6:20,22 7:11
8:4,7,15,21
9:1 14:23
31:2,12,23
32:23,24
45:13,14
60:15,18,20,
24 68:7,8
76:15,16
77:17 82:16,
21 83:16,23
84:1,13,22
86:18 87:4,7,
14,16,24
88:2,13,17
89:25 90:3,25
91:4,8,12,17,
20
```

**Zoom**
```
86:19
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

| | |
|---|---|
| FLORIDA RISING TOGETHER, FAITH IN FLORIDA, UNIDOSUS, EQUAL GROUND EDUCATION FUND, HISPANIC FEDERATION, PODER LATINX, HAITIAN NEIGHBORHOOD CENTER SANT LA, and MI FAMILIA VOTA EDUCATION FUND, | Case No. 4:21-cv-201-MW-MJF |
| FLORIDA STATE CONFERENCE OF BRANCHES AND YOUTH UNITS OF THE NAACP, DISABILITY RIGHTS FLORIDA, and COMMON CAUSE, | Case No. 4:21-cv-187-AW-MAF |
| HARRIET TUBMAN FREEDOM FIGHTERS, CORP. et al., | Case No. 4:21-cv-242-MW-MJF |
| Plaintiffs, | |
| v. | |
| LAUREL M. LEE, in her official capacity as the Secretary of State of Florida, et al. | |
| Defendants. | |

1



M. McDonald
10/29/21

**EX. 1**

T. Piderit

# DECLARATION OF MICHAEL MCDONALD

I am Dr. Michael P. McDonald, Professor of Political Science at the University of Florida. I have a Ph.D. in Political Science from University of California, San Diego and a B.S. in Economics from California Institute of Technology.

I have consulted with numerous governments and media organizations. In the course of my election work, I consulted for the United States Election Assistance Commission, the Department of Defense's Federal Voting Assistance Program, the Colorado Secretary of State, the Virginia Division of Elections, the Arizona Independent Redistricting Commission, the New Jersey State Legislative Redistricting Commission, the New Jersey Congressional Redistricting Commission, Virginia Governor McDonnell's Independent Bipartisan Advisory Redistricting Commission, the California Assembly, the media's National Exit Poll organization, the Associated Press, ABC News, and NBC News.

I have an extensive publishing record regarding elections. I am widely known for producing what are considered the authoritative United States turnout rates for those eligible to vote.[1] Within the sphere of election administration, I recently devised a methodology to audit the assignment of registered voters to districts, which is the subject of my consulting work for the Colorado Secretary of State and the Virginia Division of Elections. I serve on an advisory board for the National States Geographic Information Council to assist other state governments with similar audits.[2] I recently published a study of the reliability of information found in Florida's voter registration database,[3] which builds upon earlier work I

---

[1] Michael P. McDonald and Samuel Popkin. 2001. "The Myth of the Vanishing Voter." *American Political Science Review* 95(4): 963-74. I continue to disseminate turnout rates on www.electproject.org.

[2] Brian Amos and Michael P. McDonald. 2020. "A Method to Audit the Assignment of Voters to Districts." *Political Analysis* 28(3): 356-71.

[3] Enrijeta Shino, Michael Martinez, Michael P. McDonald, and Daniel Smith. 2020. "Verifying Voter Registration Records: Part of Special Symposium on Election Sciences." *American Politics Research* 48(6): 677-81.

conducted on the reliability of voter file data[4] and the matching of voter registration records.[5]

I have been involved as an expert witness in numerous election related cases. Within the past four years, I provided deposition and trial testimony for plaintiffs in an ongoing case challenging Georgia's voter registration matching procedures[6] and a case challenging Georgia's voter registration purging practices.[7]

Please see my curriculum vitae (attached) for more information.

I am receiving $450 per hour for my work in this matter. My compensation is not contingent upon the contents of this report.

## 1. Summary

I have been asked by plaintiffs' counsel to review and respond to a declaration from Dr. Quentin Kidd submitted on behalf of the Florida Secretary of State and the Florida Attorney General, in which he renders several opinions related to Senate Bill 90 (hereafter SB 90).

A summary of my responses are as follows:

1. Throughout his report, Dr. Kidd inconsistently chooses elements of the Florida election code to analyze. At times, he analyzes aspects of Florida's election administration that are not a component of SB 90. For example, Dr. Kidd provides a recent history of in-person early voting, which is not challenged in this case. In another example, Dr. Kidd compares Florida's

---

[4] Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.
[5] Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22.
[6] *Georgia Coalition for the Peoples' Agenda, Inc. et al.* v. Brad Raffensperger. Case No. 1:18-cv-04727-ELR (N.D. Ga.) (I testified or provided testimony three times in this ongoing litigation. Some challenged elements involving Georgia's exact match policy were resolved by a settlement with the Secretary of State's office and revised statutes enacted by Georgia's state government.)
[7] *Fair Fight Action, Inc. et al.* v. *Brad Raffensperger*. No. 1:18-CV-5391-SCJ (N.D. Ga.) (An element of this case was resolved by the Georgia Secretary of State restoring approximately 22,000 registered voters.)

third-party registration rules to other states on a number of facets, but among those he reviews, plaintiffs are only challenging Florida's disclaimer requirement and delivery restrictions. Dr. Kidd provides no rationale as to how these extraneous provisions are relevant to inform his opinions on the issues at stake in this litigation challenging SB 90.

2. Dr. Kidd at times omits elements of SB 90 from his comparative analyses. For example, Dr. Kidd does not review state laws on drop boxes to assess whether any states impose a comparable $25,000 penalty on Supervisors of Elections who seek to use drop boxes outside of the restrictions imposed by SB 90.[8]

3. Dr. Kidd omits recent history, including the passage of SB 90, entirely from his narrative of historical changes to Florida's mail balloting and in-person voting laws since 1995. This omission is significant, and implicitly means Dr. Kidd does not opine on any future effect that SB 90 may have.

4. Dr. Kidd's narrative of recent historical changes to Florida's mail balloting and in-person voting laws fails to mention any negative effects that may burden Florida voters, or any changes in Florida law that were not undertaken voluntarily but that were the result of litigation.

5. Dr. Kidd cites no authority supporting his classification of states' voting laws with respect to drop box usage, third-party ballot collection rules, third-party voter registration rules, absentee ballot application verification rules, no excuse absentee voting rules, and electioneering provisions. By repeatedly employing opaque classification and measurement schemes, Dr. Kidd does not follow "standard methods used by political scientists and social scientists when conducting a comparative analysis of laws and rules across time and states regarding the administration of elections" (Kidd, p. 5). As a consequence, he does not permit me to fairly evaluate and critique his methods. Since he provides no description of his methodology, I am unable to reanalyze his work to ascertain if I can reproduce his results.

6. To the extent that I can externally test the validity of Dr. Kidd's classifications of states, I find them inaccurate and otherwise wanting. For example, he misclassifies nineteen states as not offering mail ballot return drop boxes, when in fact those states did provide drop boxes in the 2020 presidential election.

---

[8] SB 90 Section 28; F.S. §101.69(3).

7. Dr. Kidd employs inconsistent classification schemes to the favor of the defendants. For example, when categorizing states on their drop box usage, he distinguishes states that require drop boxes from those that allow localities the discretion to provide them. When categorizing states with voter registration notification laws, he does not distinguish Florida's mandatory disclaimer from states with permissive guidelines for third-party organizations.

## 2. Inconsistent Scope of Analysis

Generally, Dr. Kidd's analysis is two-pronged.

1. In the first prong of his declaration, Dr. Kidd analyzes changes to Florida's in-person early voting and mail balloting laws since 1995.
2. In the second prong, Dr. Kidd compares current Florida election laws with other states' laws, with respect to the use of mail ballot return drop boxes, mail ballot voter assistance, third-party registration activities, mail ballot verification, mail ballot requests, and polling place electioneering activities.

Dr. Kidd inconsistently selects elements of Florida's election administration for his analysis of Florida's recent history of election laws. He assesses only in-person early voting and mail ballot laws in recent decades. In-person early voting is not a subject of plaintiffs' challenge to SB 90. Dr. Kidd offers no explanation as to why he chose to examine this facet of Florida's voting laws over others.

Dr. Kidd provides no similar recent historical analysis of legal changes in other states. It is thus impossible to assess from Dr. Kidd's analysis whether or not Florida is a leader or laggard in modernization of election administration in the two areas he chooses to analyze.

A complete analysis of Florida's voting laws, if included in Dr. Kidd's analysis, might cast the defendants in a less favorable light. For example, Dr. Kidd provides no historical analysis of Florida's voter registration laws. Florida's voter registration deadline of 28 days prior to an election ranks Florida's among the least convenient of pre-election voter registration deadlines in the country.[9]

---

[9] For a compilation of states' voter registration deadlines by the National Conference of State Legislatures, see: https://www.ncsl.org/research/elections-and-campaigns/voter-registration-deadlines.aspx

Dr. Kidd's Table 1 (p. 10) and Table 2 (p. 14) are titled "Changes to Florida's…Voting Rules Since 1995." However, an analysis of SB 90 is missing from these sections of his report.

Moreover, Dr. Kidd provides no similar recent historical analysis of all SB 90 provisions that are later subjects of his report, namely Florida's mail ballot collection rules, third-party registration activities, absentee ballot application verification rules, and polling place electioneering activities.

## 3. Lack of a Balanced Historical Analysis

Dr. Kidd approvingly notes that Florida's rules for mail balloting evolved "from a very restrictive process to a much less restrictive process" (Kidd p. 9). Similarly, he notes how in-person early voting evolved "from a relatively supervised process for voters who were unable to vote on election day to one oriented around convenience for voters" (Kidd p. 13).

Dr. Kidd's selective historical narratives of Florida's in-person early voting and mail balloting laws are framed only in positive terms to describe how Florida's government has enacted new laws with respect to in-person early voting and mail balloting. A balanced analysis would include policy changes that had a negative effect on minority and student communities or that courts imposed upon Florida.[10]

These omissions are important in light of the fact that Dr. Kidd's selective historical analysis does not continue to the present, stopping short of the enactment of SB 90. He renders no opinion as to whether SB 90 enhances or impairs the participation for Florida's voters in the electoral process.

### A. Mail Balloting

In Dr. Kidd's chronology of Florida's "Absentee Voting Rules" (Table 1, p. 10), Dr. Kidd omits from Table 1 a 2019 law[11] that codified a 2018 preliminary injunction requiring the state to allow voters to cure a mismatched signature on an

---

[10] *See, e.g.*, *Florida v. United States*, 885 F. Supp. 2d 299 (D.D.C. 2012) (regarding changes to early voting that disproportionately impacted minority voters).

[11] 2019 Fla. Sess. Law 2019-162 (codified at F.S. 101.68(4)(b), (2021)).

absentee ballot return envelope. In his preliminary injunction order on this matter, a district federal court ruled:[12]

> The precise issue in this case is whether Florida's law that allows county election officials to reject vote-by-mail and provisional ballots for mismatched signatures—with no standards, an illusory process to cure, and no process to challenge the rejection—passes constitutional muster. The answer is simple. It does not.

By omitting a law that was passed in response to a federal court injunction, Dr. Kidd fails to consider evolution of Florida's election laws that may not have otherwise been adopted absent a federal court order.

### B. In-Person Early Voting

Dr. Kidd's analysis of in-person early voting – which is not a subject of plaintiffs' challenges – provides an anodyne narrative of some changes to mask adverse effects on minority and youth communities.

In 2011, Florida reduced the number of in-person early voting days permitted from up to 14 days to 8 days, while changing the number of hours offered from 8 to 12 hours. Dr. Kidd (p. 15) approvingly notes how, "[t]his change in the early voting hours requirement amounted to an increase in the available time for early voting on weekends."

Dr. Kidd fails to acknowledge that the state's policy specifically discontinued in-person early voting on the Sunday before the election. He does so by framing his discussion of the allowed in-person early voting days relative to the number of days before an election, without addressing the specific days of the week impacted (Kidd pp. 14-15).[13]

---

[12] Democratic Executive Committee of Florida v. Detzner, 347 F.Supp.3d 1017 (2018) at 6.

[13] Dr. Kidd's Table 2 (p.14) notes, "…but supervisor of elections has discretion to offer it on the 15th, 14th, 13th, 12th, 11th, or 2nd day before election." Likewise in the body of his report Dr. Kidd (p. 15) notes, "…stipulated an early voting period from the 15th day before an election to the 2nd day before an election (fourteen days of early voting)."

The Sunday prior to Election Day is when African-American communities typically conduct "Souls to Polls" voter mobilization drives. A recent article by Drs. Herron and Smith demonstrates that Florida's 2011 change had the following effects:[14]

> [R]acial/ethnic minorities, registered Democrats, and those without party affiliation had significant early voting participation drops and that voters who cast ballots on the final Sunday in 2008 were disproportionately unlikely to cast a valid ballot in 2012. Florida's decision to truncate early voting may have diminished participation rates of those already least likely to vote.

Florida in a 2013 law reinstated local Florida Supervisors of Elections' discretion to offer in-person early voting on the Sunday prior to the election and other days, as Dr. Kidd (pp. 15-16) obliquely notes. He provides no analysis of to what extent Supervisors of Elections exercised their discretion. Did any Supervisor of Elections offer in-person early voting on the Sunday prior to an election? If so, how many?

Dr. Kidd fails to analyze administrative rulemaking by the Florida government which implemented the state's in-person early voting rules. For example, in 2018, the Florida League of Women Voters challenged a 2014 Florida administrative rule that found college facilities did not meet the definition of a "government-owned community center."[15] A federal district court overturned this interpretation of Florida's law, noting that "[t]hrowing up roadblocks in front of younger voters does not remotely serve the public interest."[16]

A balanced reading of Florida's in-person early voting laws is that while the state has expanded in-person early voting options, Florida has at times – legislatively or administratively – adopted measures that disproportionately impacted certain groups, such as communities of color or college students.

---

[14] Michael C. Herron and Daniel A. Smith. 2014. "Race, Party, and the Consequences of Restricting Early Voting in Florida in the 2012 General Election." *Political Research Quarterly* 67(3): 646-665.

[15] Florida Department of State, Division of Elections. 2017. ''Voting Activity by Ballot Type for 2016 General Election.''

[16] See: *League of Women Voters of Florida, Inc., et al.* v. *Detzner*, 314 F. Supp. 3d 1205, (N.D. Fla. 2018), available at: www.leagle.com/decision/infdco20180725987.

8

### 4. Dr. Kidd's Comparative Analysis is Inconsistent and Biased in Favor of the State

Dr. Kidd inconsistently classifies Florida's laws and compares them to other states' laws and policies in a manner that makes Florida appear more favorable than warranted.

For example, when analyzing drop boxes, Dr. Kidd (Table 3, p. 19) uses as his analytic framework a comparison between whether a state requires a voting method or merely allows a voting method. Dr. Kidd classifies Florida as one of ten states that require election officials to provide drop boxes for voters to return mail ballots. Dr. Kidd classifies fourteen states where election officials are allowed, at their discretion, to provide drop boxes.

By contrast, in analyzing disclaimers that third-party voter registration efforts are required to provide voters, Dr. Kidd (Table 5, p. 26) changes his methodology. He lumps together all states with any rules in any way related to disclaimers, without distinguishing between states that require disclaimers and states that do not. Dr. Kidd classifies Florida as one of eight states with "some notice/disclaimer rules." For example, Dr. Kidd's placement of Virginia and Florida in the same classification is deceptive, as Virginia's law is not a mandate for third-party organizations to provide similar disclaimers as Florida to people they interact with. Rather, Virginia's law applies to *government officials* instructing individuals or groups they provide voter registration applications to.[17] With respect to information provided to applicants, Virginia's training guide clearly describes only *best practices* for third-party groups conducting voter registration drives, not requirements that may place individuals or groups into legal jeopardy for failing to provide information.[18]

Thus, when Dr. Kidd analyzes drop boxes, he chooses to differentiate between required and discretionary practices, to opine "If the use of drop boxes is

---

[17] Va. Code. § 24.2-416.6.
https://law.lis.virginia.gov/vacode/title24.2/chapter4/section24.2-416.6/
[18] See: https://www.elections.virginia.gov/media/formswarehouse/veris-voter-registration/voterregistrationdrives/2021-Guidelines-for-Voter-Registration-Drives-[Final]-(1).pdf (Note, Dr. Kidd's report provides a defunct link).

9

considered an expansion of voting rights, then Florida is among the minority of states (10 of 51, or about 20%)" (Kidd p. 20).

In contrast, when Dr. Kidd analyzes third-party voter registration notice requirements, he does not differentiate between required and discretionary policies, and thereby opines, "disclaimer requirements are not unique among states that require them and certainly not as proscriptive as several of them" (Kidd p. 29). Dr. Kidd's analysis is therefore unpersuasive and unreliable.

## 5. Drop Box Classification Errors from an Unknown Data Source

At places in his report, Dr. Kidd provides precise citations to state laws and policies he discusses. However, Dr. Kidd provides no citation as to the authority he used to classify states' mail ballot drop box return laws and the table of comparative state laws found in his report. A reader must take as a matter of faith that Dr. Kidd correctly classifies each state's laws and policies.

Dr. Kidd's classification of states' mail ballot return drop boxes is wanting. Mail ballot drop boxes were a high-profile issue in the 2020 election, with extensive court action regarding their usage. For example, Dr. Kidd classifies Ohio as prohibiting drop boxes; however, all Ohio election offices had drop boxes in the 2020 general election, and there was a legal battle over expanding their use.[19] Dr. Kidd classifies Texas as prohibiting drop boxes, yet there was extensive court action that eventually allowed drop boxes, but restricted them to election offices.[20] Dr. Kidd cites Virginia as a state comparable to Florida, but neglects to mention that Virginia does not have a $25,000 penalty imposed on local election officials who seek to provide drop boxes beyond the limitations imposed by SB 90.[21]

---

[19] Julie Carr Smyth. "Dispute over Ohio drop box limit ends as advocates drop suit." *Associated Press*. Oct. 23, 2020. Available at: https://apnews.com/article/election-2020-donald-trump-columbus-cincinnati-lawsuits-e2bcbb042c0704a94dd7c95f8b26b932
[20] Jolie McCullough. "Texas counties will be allowed only one drop-off location for mail-in ballots, state Supreme Court rules." *Texas Tribune*. Oct. 27, 2020. Available at: https://www.texastribune.org/2020/10/27/texas-voting-elections-mail-in-drop-off/
[21] See SB 90, Section 28; F.S. §101.69(3) (2021); compare to Va. Code Ann. §24.2-707.1 (no penalty provisions).

10

Dr. Kidd can easily discover which states use mail ballot return drop boxes. FiveThirtyEight and other news and advocacy organizations provided informational websites listing mail ballot policies for all the states, including if drop boxes are permitted and including links to states' lookup tools for voters to find their nearest drop box location.[22] In all, based on the information collected by FiveThirtyEight, Dr. Kidd misclassifies the following nineteen states as prohibiting drop boxes, when in at least some – if not all –local election officials in these states provided them: Alaska, Connecticut, Delaware, District of Columbia, Idaho, Kansas, Louisiana, Maine, Nevada, New Hampshire, New York, North Carolina, North Dakota, Ohio, Rhode Island, South Dakota, Texas, Wisconsin, and Wyoming.

Dr. Kidd's classification of states' drop box laws is fatally flawed and his analysis is therefore unreliable.

## 6. Third-party Ballot Collection Rules

Dr. Kidd provides no authority for the classifications set forth in his Table 4, "Third-Party Ballot Collection Rules" (p.22). Table 4 appears to be largely consistent with information provided by the National Conference of State Legislatures.[23] Dr. Kidd's analysis concludes, "However, among those forty-one states that impose some regulation, Florida is less restrictive than over half" (Kidd, p. 23).

There are two problems with Dr. Kidd's analysis.

First, Dr. Kidd performs a sleight of hand by restricting his opinion to only those states that "impose some regulation" and thereby omits from his analysis the most permissive states that impose no regulation.

Second, Dr. Kidd does not provide a measure of how to score the restrictiveness of states' third-party ballot collection rules. He notes two elements that might reasonably be inferred to inform his measurement of restrictiveness: who may

---

[22] See: https://projects.fivethirtyeight.com/how-to-vote-2020/

[23] See: https://www.ncsl.org/research/elections-and-campaigns/vopp-table-10-who-can-collect-and-return-an-absentee-ballot-other-than-the-voter.aspx

return a mail ballot and the number that they may return.[24] Dr. Kidd does not explain how he weighs these two elements against each other, or how he quantifies who is allowed to return a ballot. For example, Dr. Kidd codes Montana's exception for an "acquaintance" as a "limit" on par with other states that restrict ballot return to immediate family members (Kidd Table 4, p. 22).[25] Dr. Kidd does not explain how he accounts for the fact that his scoring of his measurement for Montana allows a voter to return up to six ballots, provided they are from another voter in an exempt category (e.g., family member, member of same household or acquaintance),[26] but Florida allows anyone to return up to two ballots in addition to those of a family member.[27] These nuanced differences among state laws demonstrate the unreliability of Dr. Kidd's simplistic analysis in Table 4. Moreover, Dr. Kidd does not address the specific change in Florida law implemented by SB 90: expanding the scope of the restriction on returning ballots from prohibitions on returning a ballot for "pecuniary gain" to restrictions on returning ballots, generally. Thus, Dr. Kidd provides no insight as to how Florida compares to other states on a specific issue at stake in this litigation.

Dr. Kidd's opaque classification and measurement scheme is inconsistent with "standard methods used by political scientists and social scientists when conducting a comparative analysis of laws and rules across time and states regarding the administration of elections" (Kidd, p. 5). He does not permit me to fairly evaluate and critique his methods. He does not permit me to reanalyze or reproduce his work by including all states in a similar analysis, rather than focusing only on those that impose one restriction.

Dr. Kidd also provides no analysis of the disparate burdens Florida's third-party mail ballot collection laws may impose upon certain communities. For example, he provides no analyses of how SB 90 may affect how home-bound or disabled people will participate in elections.

_____

[24] For example, Dr. Kidd writes (p.21), "By comparison, SB 90's ballot collection provision allows anyone to return up to two completed absentee ballots in addition to their own. The law also allows a person to collect and return any number of their immediate family member's ballots, and expands the definition of immediate family member to include a grandchild."

[25] See: Mont. Code Ann. §13-35-703; for the latter, see, for example, Massachusetts M.C.L.A. 168.764a, which limits ballot return to family members or persons residing in a household.

[26] *See* Mont. Code Ann. §13-35-703

[27] F.S. § 104.0616(2)

12

## 7. Third-Party Voter Registration Rules

Dr. Kidd's analysis of third-party ballot collection rules encapsulated in his Table 5 (p. 26) does not address plaintiffs' challenges to SB 90 as to where or when third-parties must return voter registrations and any fines they may incur for delivering registration forms elsewhere. Dr. Kidd's Table 5 does include one aspect of plaintiffs' challenge: the disclaimer third-party organizations are legally required to provide to people they interact with.

Dr. Kidd's analysis includes several third-party registration rules that plaintiffs are not challenging, such as if third-party volunteers must be officially recognized (deputized) by the state, if they must be trained, reporting requirements, return deadlines, and pay allowed. Dr. Kidd does not explain how these rules inform his opinion of the third-party voter registration rules in SB 90 that plaintiffs are challenging.

The one SB 90 rule that plaintiffs are challenging and that Dr. Kidd addresses in (Table 5, p. 26) is "some notice/disclaimer rules."

Dr. Kidd's classification employs a deceptive usage of the word "some." As Dr. Kidd acknowledges in his report, the notifications prescribed by other states are in many cases guidelines, not mandates. Virginia's instructions to voter registration groups cited by Kidd are "best practices" for individuals and groups conducting voter registration drives,[28] and not statutory mandates.[29] Even these best practices do not include anything like the mandatory disclaimer found in SB 90. For Alabama the "guidelines" cited by Kidd describe the duties of voter registration officials and not third-party organizations;[30] and for Arkansas, Kidd cites to "recommendations", but does not identify any statutory requirements for notice or

---

[28] See: https://www.elections.virginia.gov/media/formswarehouse/veris-voter-registration/voterregistrationdrives/2021-Guidelines-for-Voter-Registration-Drives-[Final]-(1).pdf

[29] Virginia law does not require a disclaimer of any kind, and only requires third-party registrants to provide a receipt to the registrant with the name of the organization, the date it received the application, and the phone number of the registration official to confirm the registration. *See* Va. Code Ann. 24.2-418.1(A).

[30] See: https://www.sos.alabama.gov/sites/default/files/voter-pdfs/VoterDriveGuidelines.pdf

disclaimer to voters by third-party organizations. Dr. Kidd completely misrepresents Iowa's law, which references mail ballot request forms, not voter registration applications.[31] In any case, Iowa law contains no requirement for disclaimers.[32] For California, Kidd also cites guidelines, glossing over the fact that the only disclaimer required under California law is to inform voters that they may be entitled to "confidential voter status."[33]

Dr. Kidd in his report neglects an analysis of two states listed as having some notice/disclaimer rules: Colorado and Georgia. For completeness, I include them here.

Colorado has mandatory training for voter registration drive organizers, but only requires a specific notice to voters for registrations collected 22 days or fewer prior to an election. Colorado does not permit persons registering by a third-party organization within 22 days of an election to vote in that election. Colorado's notice thus provides prospective registrants voters with guidance on how to avail themselves of same-day and online registration options that will permit them to vote.[34]

Georgia is the only state, other than Florida, that requires voter registration organizations and individuals to provide specific information to persons they interact with (beyond a receipt for the registration). A distinction between Georgia and Florida is that Georgia does not require disclaimer language similar to the language in SB 90 (warning prospective registrants that "the organization might not deliver the application…in less than 14 days or before registration closes").[35] This language may reasonably cause a prospective registrant concern and thereby deter them from interacting further with a voter registration effort. In contrast, Georgia only requires organizations to inform registrants that they are not registered to vote until they receive notice from their county election official, and

---

[31] See: https://sos.iowa.gov/elections/pdf/absenteeballotapprec.pdf
[32] *See* Iowa Code § 48A.22.
[33] *See* Cal. Elec. Code § 2157(4).
[34] CO Rev Stat § 1-2-701 & 1-2-702 (2016).
[35] FL. Statutes § 97.0575 (3)(a) (2021).

that if they do not receive such notice in two weeks they should check with their county officials.[36]

Thus, Florida and Georgia are differentiated from other states in that they are the only two that require third-party voter registration notices/disclaimers to all prospective registrants, and Florida is the only state that requires an organization or individual to affirmatively assert to a prospective registrant that the organization or individual may fail to deliver their registration on time.

## 8. Absentee Ballot Application Verification

With respect to SB 90's requirement to provide identification in applying for an absentee ballot, Dr. Kidd again provides no authority for his classification and is opaque about the classification and measurement scheme he uses in Table 6 of his report. As a result, I am unable to fairly evaluate and critique his methods. He does not permit me to reanalyze his work or reproduce his results by including all states in a similar analysis, rather than focusing only on those that impose some restriction.

Dr. Kidd brushes away any number of classification choices. For example, what does it mean for a state to have "minimal" requirements? How do states check a ballot request against a voter registration record? What degree of discretion do local election officials have in curing deficiencies they identify when verifying information on a voter registration record? What does Dr. Kidd mean when he categorizes states as "[i]nformation and eligibility checked against voter registration records" (Table 6, p. 31)?

Some of Dr. Kidd's classifications are clearly incorrect. For example, he says that Vermont voters must request a ballot each election, but the state adopted all-mail ballot elections.[37]

---

[36] Ga Comp. R. & Regs. r. 183-1-6-.02(6). Georgia also provides a template written handout to assist organizations with compliance, whereas Florida is vague as to the specific language and method in which organizations need to provide the disclaimer/disclosure. See:
http://sos.ga.gov/admin/files/Required_Voter_Registration_Notices_Handout.pdf
[37] See: https://vtdigger.org/2021/06/07/scott-signs-bill-expanding-vote-by-mail-in-general-elections/

15

Even a cursory review demonstrates further flaws in Dr. Kidd's grouping of states. Dr. Kidd identifies Florida, along with 14 other states (Kansas, Maine, Maryland, Minnesota, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, South Dakota, Virginia, Wisconsin and Wyoming) as states with "Information and eligibility checked against voter registration records" (Table 6). Dr. Kidd offers no insights as to what these criteria are, or how the criteria used by other states compare to Florida. For example, Kansas, Maine, Nebraska, Nevada, Ohio, Oklahoma, South Dakota, Virginia and Wisconsin all allow voters multiple alternative ways to confirm their identity beyond the limited forms necessary under SB 90.[38] Maryland and New Mexico's identification requirements apply only to persons accessing online portals, not paper applications.[39] Even Minnesota, which requires that the identification information be verified, does not require that the information provided by the voter match the information the voter used to register to vote.[40] It appears that Florida may be the only state requiring this "two-key" authentication method.

Furthermore, Dr. Kidd provides no analysis of the disparate burdens Florida's mail ballot application verification laws may impose upon certain individuals, for example, those without a state drivers' license or state issued ID number, or those whose voter records do not include such a number.

It is thus impossible for me, using Kidd's classification and measurement scheme, to determine to what degree, "[i]n terms of burden, Florida's requirements are largely *average*" (p. 32, emphasis added). Moreover, it is impossible to determine

---

[38] *See* https://www.vote.org/voter-id-laws/#kansas (Kansas); Me. Rev. Stat. Ann. Tit. 21-A; §753-A (Maine); Neb. Rev. Stat. § 32-939(1), see also: https://sos.nebraska.gov/elections/voter-forms (Nebraska, which includes absentee ballots as a form of early voting); Nevada Rev. Stat. §293.2725(1)-2(b) (Nevada); Ohio Rev. Code §3509.03(B)(5) (Ohio); https://oklahoma.gov/content/dam/ok/en/elections/absentee-ballots/absentee-ballot-application-012020.pdf (Oklahoma); S.D. Codified Laws §§ 12-18-6.1 & 12-18-6.2 (South Dakota); Va. Code Ann. §24.2-701(C) (Virginia); Wis Stat. § 6.87, see also https://greenbaywi.gov/DocumentCenter/View/1670/Absentee-Application-PDF?bidId= (Wisconsin); Wyo. Stat. Ann. §22-9-104 (Wyoming).

[39] *See* Md. Code Ann. Elec. Law § 9-305 (Maryland – ID requirements apply to absentee ballot on-line requests only); and N.M. Stat. §1-6-4(B-C), see also: https://www.bernco.gov/clerk/wp-content/uploads/sites/46/2021/08/Absentee-Voting-Application-2021.pdf (New Mexico).

[40] Minn. Stat. § 203B.04(a).

how Dr. Kidd reaches that conclusion, since his report is bereft of any specific analysis of burden. Dr. Kidd devises no number that allows me to compute the average "burden" to voters across states, much less how Florida deviates from it for all Florida voters or specific Florida communities.

## 9. No Excuse absentee voting rules

Dr. Kidd again moves the goalposts in Florida's favor when analyzing states' absentee ballot request rules, by explicitly removing states "short of no-excuse permanent absentee or all-mail voting" (p. 35) from his analysis.

Plaintiffs are challenging only SB 90's change to the duration of a mail ballot request, not who may request a mail ballot (which is unaffected by SB 90). Dr. Kidd does not explain his justification as to why he considers who may request a mail ballot to be relevant to his analysis. Moreover, Dr. Kidd also does not analyze how the frequency of requesting an absentee ballot interacts with verification procedures. A voter who must repeatedly request a mail ballot will be repeatedly subjected to verification procedures, thus imposing further administrative obstacles to voting.

Because Dr. Kidd evaluates simultaneously two different aspects of Florida's absentee voting laws, I cannot fairly evaluate the correctness of Dr. Kidd's opinion that Florida is "…the most lenient among the thirty-eight states that impose some restrictions on who can request an absentee ballot *and* for how long" (p. 33, emphasis added).

Here, as elsewhere in his report, if Dr. Kidd wishes to evaluate aspects of SB 90 that are not among plaintiffs' allegations, it is incumbent upon him to explain clearly the relevance of these facets.

## 10. Electioneering Provisions

In Section XI and Table 8 of his report, Dr. Kidd provides an anodyne description of states' laws regarding electioneering outside of polling locations. The sole basis of his comparison is how far outside a polling location electioneering is prohibited. Missing from his analysis is SB 90's restriction on line-warming activities by organizations and individuals to provide assistance to persons – such as disabled and the elderly – standing in line by providing seating or water in a nonpartisan manner, free of electioneering.

17

SB 90 extended the pre-existing ban on activities near to polling places to also prohibit "engaging in any activity with the intent to influence or effect of influencing a voter."[41] None of the examples of other states' regulation of voting line activity cited by Dr. Kidd are as broad as Florida's. The examples he cites from Arizona, Maine, Massachusetts, Michigan and Montana all prohibit promoting or influencing a voter to vote for a particular candidate, party, or ballot question,[42] but are not nearly as onerous as the Florida restriction which also bars even non-partisan line-warming activities intended to encourage voters to stay on line to vote, such as providing water, food, chairs or umbrellas. Even the Wisconsin law cited by Kidd is limited to activity "intended to influence voting",[43] and does not reach to activity that has "the effect of influencing a voter" even without such intent.

I declare that the foregoing is true and correct. Executed this 13th day of October, 2021, in Alachua County, Florida.

_Michael McDonald_

Michael McDonald

---

[41] SB 90, Section 29; F.S. § 102.031(4)(b).

[42] *See* Ariz Rev. Stat. Ann. §16-515(A) (Arizona); Maine Rev. Stat. Ann. Tit.21-A §682(2) (Maine); Mass. Gen. Laws ch. 54 §65 (Massachusetts); Mich. Comp. Laws §168.744 (Michigan); and Mont. Code Ann. §13-35-211 (Montana).

[43] Wis. Stat. § 12.03.

# Dr. Michael P. McDonald

Professor, University of Florida
Department of Political Science
222 Anderson Hall
P.O. Box 117325
Gainesville, FL 32611

Office:      352-273-2371
Fax:         352-392-8127
Email:       michael.mcdonald@ufl.edu

## Education

Post-Doctoral Fellow. Harvard University. August 1998 – August 1999.
Ph.D. Political Science. University of California, San Diego. February, 1999.
BS Economics. California Institute of Technology. June, 1989.

## Awards

University of Florida Term Professorship. 2019-2020.

Brown Democracy Medal, McCourtney Institute for Democracy at Penn State University. 2018.
    Positive impact on democracy for the Public Mapping Project.

Tides Pizzigati Prize. 2013. Public interest software for DistrictBuilder.

Strata Innovation Award. 2012. Data Used for Social Impact for DistrictBuilder.

American Political Science Association, Information and Technology Politics Section. 2012.
    Software of the Year for DistrictBuilder.

*Politico*. 2011. Top Ten Political Innovations for DistrictBuilder.

GovFresh. 2011. 2nd Place, Best Use of Open Source for DistrictBuilder.

Virginia Senate. 2010. Commendation for Virginia Redistricting Competition.

American Political Science Association, Information and Technology Politics Section. 2009.
    Software of the Year for BARD.



M. McDonald
10/29/21

**EX. 2**

T. Piderit

# Publications

### Books

Michael P. McDonald. Under Contract. *From Pandemic to Insurrection: Voting in the 2020 Presidential Election*. Berlin, Germany: De Gruyter.

Michael P. McDonald. Under Contract. *The Art of Voting*. New York, NY: Oxford University Press.

Michael P. McDonald and Micah Altman. 2018. *The Public Mapping Project: How Public Participation Can Revolutionize Redistricting*. Ithaca, NY: Cornell University Press.

Michael P. McDonald and John Samples, eds. 2006. *The Marketplace of Democracy: Electoral Competition and American Politics*. Washington DC: Brookings Press.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2003. *Numerical Issues in Statistical Computing for the Social Scientist*. Hoboken, NJ: Wiley and Sons.

### Peer-Reviewed Articles

Matthew DeBell, Jon A. Krosnick, Katie Gera, David Yeager, and Michael McDonald. 2020. "The Turnout Gap in Surveys: Explanations and Solutions." *Sociological Methods and Research* 49(4):1133-1162. doi:10.1177/0049124118769085.

Brian Amos and Michael P. McDonald. 2020. "A Method to Audit the Assignment of Voters to Districts." *Political Analysis* 28(3): 356-71.

Enrijeta Shino, Michael Martinez, Michael P. McDonald, and Daniel Smith. 2020. "Verifying Voter Registration Records: Part of Special Symposium on Election Sciences." *American Politics Research* 48(6): 677-81.

Tyler Culberson, Suzanne Robbins, and Michael P. McDonald. 2019. "Small Donors in Congressional Elections." *American Politics Research* 47(5): 970-99.

Micah Altman and Michael P. McDonald. 2017. "Redistricting by Formula: The Case of Ohio." *American Politics Research* 46(1): 103-31.

Micah Altman, Eric Magar, Michael P. McDonald, and Alejandro Trelles. 2017. "Measuring Partisan Bias in a Multi-Party Setting: the Case of Mexico." *Political Geography* 57(1): 1-12.

Brian Amos, Michael P. McDonald, and Russell Watkins. 2017. "When Boundaries Collide: Constructing a Database of Election and Census Data." *Public Opinion Quarterly* 81(S1): 385-400.

2

Trelles, Alejandro, Micah Altman, Eric Magar, and Michael P. McDonald. 2016. "Datos abiertos, transparencia y redistritación en México." *Política y Gobierno* 23(2): 331-364.

Michael P. McDonald. 2014. "Calculating Presidential Vote for Legislative Districts." *State Politics and Policy Quarterly* 14(2): 196-204.

Micah Altman and Michael P. McDonald. 2014. "Public Participation GIS: The Case of Redistricting." *Proceedings of the 47th Annual Hawaii International Conference on System Sciences*, Computer Society Press.

Michael P. McDonald and Caroline Tolbert. 2012. "Perceptions vs. Actual Exposure to Electoral Competition and Political Participation." *Public Opinion Quarterly* 76(3): 538-54.

Michael P. McDonald and Matthew Thornburg. 2012. "Interview Mode Effects: The Case of Supplementing Exit Polls with Early Voter Phone Surveys." *Public Opinion Quarterly* 76(2): 326-63.

Micah Altman and Michael P. McDonald. 2011. "BARD: Better Automated Redistricting." *Journal of Statistical Software* 42(5): 1-28.

Michael P. McDonald. 2011. "The 2010 Election: Signs and Portents for Redistricting." *PS: Political Science and Politics* 44(2): 311-15.

Richard Engstrom and Michael P. McDonald. 2011. "The Political Scientist as Expert Witness." *PS: Political Science and Politics* 44(2): 285-89.

Michael P. McDonald. 2008. "Portable Voter Registration." *Political Behavior* 30(4): 491–501.

Michael P. McDonald and Justin Levitt. 2008. "Seeing Double Voting: An Extension of the Birthday Problem." *Election Law Journal* 7(2): 111-22.

Michael P. McDonald. 2007. "The True Electorate: A Cross-Validation of Voter File and Election Poll Demographics." *Public Opinion Quarterly* 71(4): 588-602.

Michael P. McDonald. 2007. "Regulating Redistricting." *PS: Political Science and Politics* 40(4): 675-9.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2007. "Accuracy: Tools for Accurate and Reliable Statistical Computing." *Journal of Statistical Software* 21(1).

David Lublin and Michael P. McDonald. 2006. "Is It Time to Draw the Line? The Impact of Redistricting on Competition in State House Elections." *Election Law Journal* 5(2): 144-57.

Michael P. McDonald. 2006. "Drawing the Line on District Competition." *PS: Political Science and Politics* 39(1): 91-94.

Michael P. McDonald. 2006. "Re-Drawing the Line on District Competition." *PS: Political Science and Politics* 39(1): 99-102.

Micah Altman, Karin MacDonald, and Michael P. McDonald. 2005. "From Crayons to Computers: The Evolution of Computer Use in Redistricting." *Social Science Computing Review* 23(2): 334-46.

Michael P. McDonald. 2004. "A Comparative Analysis of U.S. State Redistricting Institutions." *State Politics and Policy Quarterly* 4(4): 371-96.

Michael P. McDonald. 2003. "On the Over-Report Bias of the National Election Study." *Political Analysis* 11(2): 180-86.

Micah Altman and Michael P. McDonald. 2003. "Replication with Attention to Numerical Accuracy." *Political Analysis* 11(3): 302-7.

Michael P. McDonald. 2002. "The Turnout Rate among Eligible Voters for U.S. States, 1980-2000." *State Politics and Policy Quarterly* 2(2): 199-212.

Michael P. McDonald and Samuel Popkin. 2001. "The Myth of the Vanishing Voter." *American Political Science Review* 95(4): 963-74. Reprinted 2006 in *Classic Ideas and Current Issues in American Government*, Bose and DiIulio, eds.

Micah Altman and Michael P. McDonald. 2001. "Choosing Reliable Statistical Software." *PS: Political Science and Politics*. 43(3): 681-7.

Bernard Grofman, William Koetzel, Michael P. McDonald, and Thomas Brunell. 2000. "A New Look at Ticket Splitting: The Comparative Midpoints Model." *Journal of Politics* 62(1): 24-50.

Samuel Kernell and Michael P. McDonald. 1999. "Congress and America's Political Development: Political Strategy and the Transformation of the Post Office from Patronage to Service." *American Journal of Political Science* 43(3): 792-811.

*Law Review Articles*

Michael P. McDonald. 2019-2020. "The Predominance Test: A Judicially Manageable Compactness Standard for Redistricting." *Yale Law Review*, *Forum* 129.

Micah Altman and Michael P. McDonald. 2013. "A Half-Century of Virginia Redistricting Battles: Shifting from Rural Malapportionment to Voting Rights and Participation." *University of Richmond Law Review* 47: 771-831.

Micah Altman and Michael P. McDonald. 2012. "Redistricting Principles for the 21st Century." *Case Western Law Review* 62(4): 1179-1204.

Michael P. McDonald and Matthew Thornburg. 2010. "Registering the Youth: Preregistration Programs." *New York University Journal of Legislation and Public Policy* 13(3): 551-72.

Micah Altman and Michael P. McDonald. 2010. "The Promise and Perils of Computers in Redistricting." *Duke J. Constitutional Law and Public Policy* 5: 69-112.

Justin Levitt and Michael P. McDonald. 2007. "Taking the 'Re' out of Redistricting: State Constitutional Provisions on Redistricting Timing." *Georgetown Law Review* 95(4): 1247-86.

### *Peer-Reviewed Book Chapters*

Michael P. McDonald. 2014. "Contextual Income Inequality and Political Behavior." in *Political Trust and Disenchantment with Politics: Comparative Perspectives from around the Globe*, Christina Eder, Ingvill Mochmann, Markus Quandt eds. Leiden, Netherlands: Brill Publishers.

Michael P. McDonald. 2010. "Income Inequality and Participation in the United States." in *United in Diversity? Comparing Social Models in European and America*, Jens Alber and Neil Gilbert, eds. New York, NY: Oxford University Press.

Michael P. McDonald. 2008. "Redistricting and the Decline of Competitive Congressional Districts." in *Mobilizing Democracy: A Comparative Perspective on Institutional Barriers and Political Obstacles*, Margaret Levi, James Johnson, Jack Knight, and Susan Stokes, eds. New York, NY: Russell Sage Publications.

Michael P. McDonald. 2008. "Reforming Redistricting." in *Democracy in the States: Experiments in Elections Reform*, Bruce Cain, Todd Donovan, and Caroline Tolbert, eds. Washington, DC: Brookings Press.

Michael P. McDonald. 2006. "Who's Covered?  Section 4 Coverage Formula and Bailout" in *The Future of the Voting Rights Act*, David Epstein, Richard H. Pildes, Rodolfo O. de la Garza, and Sharyn O'Halloran, eds.  New York, NY: Russell Sage Publications.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2004. "A Comparison of the Numerical Properties of EI Methods" in *Ecological Inference: New Methods and Strategies*, Gary King, Ori Rosen, and Martin Tanner, eds.  New York, NY: Cambridge University Press.

### *Non-Peer-Reviewed Book Chapters*

Michael P. McDonald. 2020. "Redistricting and Differential Privacy." In *2020 Census Data Products: Data Needs and Privacy Considerations: Proceedings of a Workshop*. Washington, DC: The National Academies Press. https://doi.org/10.17226/25978.

Michael P. McDonald. 2018. "Challenges and Opportunities in Collecting Election Administration Data" in *The Palgrave Handbook of Survey Research*, David L. Vannette and Jon A. Krosnick, eds. New York, NY: Palgrave MacMillan.

Michael P. McDonald. 2018. "History and Promise and Blending Survey Data with Government Records on Turnout" in *The Palgrave Handbook of Survey Research*, David L. Vannette and Jon A. Krosnick, eds. New York, NY: Palgrave MacMillan.

Micah Altman and Michael P. McDonald. 2015. "Redistricting and Polarization" in *American Gridlock: The Sources, Character, and Impact of Political Polarization*, James Thurber and Antonie Yoshinaka, eds. Cambridge.

Micah Altman and Michael P. McDonald. 2015. "Florida Congressional Redistricting." *Jigsaw Politics in the Sunshine State*, Seth McKee, ed. Gainesville, FL: University Press of Florida.

Michael P. McDonald. 2013. "State Legislative Districting." *Guide to State Politics and Policy*, Richard Niemi and Joshua Dyck, eds. Washington, DC: CQ Press.

Michael P. McDonald. 2013. "Democracy in American Elections" in *Imperfect Democracies: The Democracy Deficit in Canada and the United States*, Richard Simeon and Patti Lenard, eds. Vancouver, BC: University of British Columbia Press.

Micah Altman and Michael P. McDonald. 2012. "Technology for Public Participation in Redistricting" in *Redistricting in the West*, Gary Moncrief, ed. Lanham, MD: Lexington Press.

Michael P. McDonald and Thomas Schaller. 2011. "Voter Mobilization in the 2008 Presidential Election" in *The Change Election: Money, Mobilization and Persuasion in the 2008 Federal Elections*, David Magleby, ed. Philadelphia, PA: Temple University Press. (previously published as a Pew Charitable Trusts monograph).

Michael P. McDonald. 2011. "Congressional Redistricting" in *Oxford Handbook of Congress*, Frances Lee and Eric Schickler, eds. Cambridge, UK: Oxford University Press.

Michael P. McDonald. 2011. "Voter Turnout: Eligibility Has Its Benefits" in *Controversies in Voting Behavior*, 2nd Edition, Richard G. Niemi, Herbert F. Weisberg, and David Kimball, eds. Washington, DC: CQ Press.

Michael P. McDonald. 2010. "In Support of Non-Partisan Redistricting." in *Debating Reform: Conflicting Perspectives on How to Mend American Government and Politics*, Richard Ellis and Mike Nelson, eds. Washington, DC: Congressional Quarterly Press.

Michael P. McDonald. 2010. "American Voter Turnout in Historical Perspective." in *Oxford Handbook of American Elections and Political Behavior*, Jan Leighley, ed. Cambridge, UK: Oxford University Press.

Michael P. McDonald. 2009. "Mechanical Effects of Duverger's Law in the USA." in *Duverger's Law of Plurality Voting: The Logic of Party Competition in Canada, India, the United Kingdom and the United States*, Bernard Grofman, André Blais and Shaun Bowler, eds. New York, NY: Springer.

Michael P. McDonald. 2008. "United States Redistricting: A Comparative Look at the 50 States." in *Redistricting in Comparative Perspective*, Lisa Handley and Bernard Grofman, eds. Oxford, U.K.: Oxford University Press.

Michael P. McDonald and Matthew Thornburg. 2008. "State and Local Redistricting" in *Political Encyclopedia of U.S. States and Regions*, Donald Haider-Markel, ed. New York, NY: MTM Publishing.

Michael P. McDonald. 2006. "Redistricting and District Competition" in *The Marketplace of Democracy*, Michael P. McDonald and John Samples, eds. Washington, DC: Brookings Press.

Micah Altman, Karin Mac Donald, and Michael P. McDonald. 2005. "Pushbutton Gerrymanders? How Computing Has Changed Redistricting" in *Party Lines: Competition, Partisanship and Congressional Redistricting*, Bruce Cain and Thomas Mann, eds. Washington, DC: Brookings Press.

Bruce Cain, Karin Mac Donald, and Michael P. McDonald. 2005. "From Equality to Fairness: The Path of Political Reform Since Baker v Carr" in *Party Lines: Competition, Partisanship and Congressional Redistricting*, Bruce Cain and Thomas Mann, eds. Washington, DC: Brookings Press.

Michael P. McDonald. 2005. "Validity, Data Sources" in *Encyclopedia of Social Measurement, Vol. 3.* Kimberly Kempf-Leonard, ed. San Deigo, CA: Elsevier Inc.

Michael P. McDonald. 2005. "Reporting Bias" in *Polling in America: An Encyclopedia of Public Opinion*. Benjamin Radcliff and Samuel Best, eds. Westport, CT: Greenwood Press.

### *Other Non-Peer Reviewed Academic Publications (Book Reviews, Invited Articles, etc.)*

Michael P. McDonald and Thessalia Merivaki. 2015. "Voter Participation in Presidential Nomination Contests." *The Forum* 13(4).

Michael P. McDonald. 2011. "Redistricting Developments of the Last Decade—and What's on the Table in This One." *Election Law Journal* 10(3): 313-318.

Michael P. McDonald and Chrisopher Z. Mooney. 2011. "'Pracademics': Mixing an Academic Career with Practical Politics." *PS: Political Science and Politics* 44(2): 251-53.

Michael P. McDonald. 2011. "Voter Turnout in the 2010 Midterm Election." *The Forum* 8(4).

Michael P. McDonald. 2011. "*Redistricting: The Most Political Activity in America* by Charles S. Bullock III (book review)." *American Review of Politics* (Fall 2010/Spring 2011).

Michael P. McDonald. 2009. "'A Magnificent Catastrophe' Retold by Edward Larson (book review)." *The Election Law Journal* 8(3): 234-47.

Michael P. McDonald. 2008. "The Return of the Voter: Voter Turnout in the 2008 Presidential Election." *The Forum* 6(4).

Michael P. McDonald. 2006. "American Voter Turnout: An Institutional Perspective by David Hill (book review)." *Political Science Quarterly* 121(3): 516-7.

Michael P. McDonald. 2006. "Rocking the House: Competition and Turnout in the 2006 Midterm Election." *The Forum* 4(3).

Micah Altman and Michael P. McDonald. 2006. "How to Set a Random Clock (Remarks on Earnest 2006)." *PS: Political Science and Politics* 39(4): 795.

Michael P. McDonald. 2004. "Up, Up, and Away!  Turnout in the 2004 Presidential Election." *The Forum* 2(4).

Michael P. McDonald. 2004. "Drawing the Line on the 2004 Congressional Elections." *Legislative Studies Section Newsletter* (Fall): 14-18.

Michael P. McDonald. 2004. "2001: A Redistricting Odyssey." *State Politics and Policy* Quarterly 4(4): 369-370.

Micah Altman and Michael P. McDonald. 1999. "Resources for Testing and Enhancement of Statistical Software" in *The Political Methodologist* 9(1).

Michael P. McDonald. 1999. "Representational Theories of the Polarization of the House of Representatives" in *Legislative Studies Section Newsletter, Extension of Remarks* 22(2): 8-10.

Michael P. McDonald. 2003. "California Recall Voting: Nuggets of California Gold for Political Behavior." The *Forum* 1(4).

### *Reports*

Michael P. McDonald. 2009. "Voter Preregistration Programs." Fairfax, VA: George Mason University.

Michael P. McDonald. 2009. *Midwest Mapping Project*. Fairfax, VA: George Mason University.

Michael P. McDonald and Matthew Thornburg. 2008. "The 2008 Virginia Election Administration Survey." Fairfax, VA: George Mason University.

Kimball Brace and Michael P. McDonald. 2005. "Report to the Election Assistance Commission on the Election Day Survey."  Sept. 27, 2005.

### *Opinion Editorials*

Michael P. McDonald. 2020. "Trump and polarization drove record turnout. So did mail voting, which should be universal." *USA Today*. Online: Nov. 4, 2020. Print: Nov. 6, 2020, p. 7A.

Michael P. McDonald. 2020. "Record-setting early votes helped Democrats pinpoint others likely to support Biden." *Washington Post*. Nov. 3, 2020.

Michael P. McDonald. 2020. "Trump Will Drive Extraordinary Voter Turnout in 2020—If States Can Get It Together." *Newsweek*. May 20, 2020.

Michael P. McDonald. 2019. "Let 16-year-olds vote for L.A. school board." *Los Angeles Times*. May 8, 2019.

Michael P. McDonald. 2018. "I agree with Donald Trump, we should have voter ID. Here's how and why." *USA Today*. Jan. 15, 2018.

Michael P. McDonald. 2017. "The Russians are hacking. Luckily the Trump voter fraud commission isn't in charge." *USA Today*. Sept. 23, 2017.

Michael P. McDonald. 2016. "Better Hope the Election is Not Close." *USA Today*. Nov. 2, 2016.

Michael P. McDonald. 2016. "Blame Government for Voting Crisis." *USA Today*. March 24, 2016.

Michael P. McDonald, Peter Licari and Lia Merivaki. 2015. "The Big Cost of Using Big Data in Elections." *The Washington Post*. Oct. 18, 2015.

Michael P. McDonald 2013. "Truths and Uncertainties that Surround the 2014 Midterms." *The Hill*. November 5, 2013.

Michael P. McDonald. 2011. "The Shape of Things to Come: New Software May Help the Public Have a Crucial Redrawing of Voting Districts." *Sojouners*. April 2011: 11-12.

Micah Altman and Michael P. McDonald. 2011. "Computers: Redistricting Super Hero or Evil Mastermind?" *Campaigns and Elections Magazine*. January 2011.

Michael P. McDonald. 2010. "Who Voted in 2010, and Why It Matters for 2012." *AOL News*. Nov. 4, 2010.

Michael P. McDonald and Seth McKee. "The Revenge of the Moderates." *The Politico*. Oct. 10, 2010.

Michael P. McDonald and Micah Altman. 2010. "Pulling Back the Curtain on Redistricting." *The Washington Post*. July 9, 2010.

Michael P. McDonald. 2008. "This May Be the Election of the Century." *The Politico*. Sept. 9, 2008.

Michael P. McDonald. 2008. "Super Tuesday Turned into a Super Flop." *Roll Call*. Feb. 11, 2008.

Michael P. McDonald. 2006. "5 Myths About Turning Out the Vote." *The Washington Post*. Oct. 29, 2006, p. B3.

Michael P. McDonald. 2006. "Supreme Court Lets the Politicians Run Wild." *Roll Call*. June 29, 2006.

Michael P. McDonald. 2006. "Re-Redistricting Redux." *The American Prospect*. March 6, 2006.

Michael P. McDonald and Kimball Brace. "EAC Survey Sheds Light on Election Administration." *Roll Call*. Oct. 27, 2005.

Michael P. McDonald. 2004. "The Numbers Prove that 2004 May Signal More Voter Interest." *Milwaukee Journal Sentinel*. Milwaukee, WI.

Michael P. McDonald. 2004. "Democracy in America?" *La Vanguardia*. Barcelona, Spain.

Michael P. McDonald. 2003. "Enhancing Democracy in Virginia." *Connection Newspapers*. March 24.

Michael P. McDonald. 2001. "Piecing Together the Illinois Redistricting Puzzle." *Illinois Issues*. March, 2001.

Samuel Popkin and Michael P. McDonald. 2000. "Turnout's Not as Bad as You Think." *The Washington Post*. Nov. 5: B-1.

Samuel Popkin and Michael P. McDonald. 1998. "Who Votes? A Comparison of NES, CPS, and VNS Polls." *Democratic Leadership Council Bluebook*. Sept., 1998.

***Software Packages***

Micah Altman, Michael P. McDonald, and Azavea. 2012. "DistrictBuilder." Open source software to enable public participation in redistricting. Source code available at Github. Project website, http://www.districtbuilder.org.

Micah Altman and Michael P. McDonald. 2007. "BARD: Better Automated Redistricting." R package available through CRAN. Source code available at Sourceforge.

Micah Altman, Jeff Gill, and Michael P. McDonald. 2004. "Accuracy: Tools for testing and improving accuracy of statistical results." R package available through CRAN.

# Grants and Contracts

Rejected Mail Ballots. ($4,720). Andrew Goodman Foundation. Analysis of rejected mail ballots within selected states during the 2020 general election.

Election Data Administrative Data Research Facility. ($843,000) Alfred P. Sloan Foundation grant to collect precinct election results and boundary data and to upgrade DistrictBuilder software.

Virginia Election Data. ($6,500) Produced election data for *The Washington Post*'s 2019 Virginia state elections coverage.

Audit of Assignment of Virginia Registered Voters to Districts. ($154,000). Work for the Virginia Department of Elections to audit the assignment of registered voters to districts.

National Voter File. ($125,000) Alfred P. Sloan Foundation grant to pilot the collection of a national voter file for academic and non-partisan purposes.

Pilot Study for Election Data Administrative Data Research Facility. ($125,000) Alfred P. Sloan Foundation grant to collect precinct election results and boundary data and to upgrade DistrictBuilder software.

Improving Integrity of Voter File Addresses. ($20,000) Colorado Secretary of State support to develop methods to improve voter file addresses.

Fabricating Precinct Boundaries. ($17,000). MIT Election Science and Data Lab support to explore fabricating precinct boundaries from geocoded voter files.

UF Informatics Post-Doc Top-Off Award. 2017. ($16,000). Funding from the UF Informatics Institute to provide additional post-doc funding in support of Hewlett Foundation grant.

U.S. Election Project. 2016. ($50,000). Hewlett Foundation support for U.S. Election Project Activities.

UF Informatics Institute Seed Fund Award. 2016. ($48,000). Project funded by the UF Informatics Institute to explore the reliability of Florida's voter registration file.

Election Forum. 2016. ($20,000). Project funded by the Pew Charitable Trusts for an election forum held at the University of Florida.

Survey of Voter File Accessibility. 2016. ($1,650). Contract from the Institute for Money in State Politics to survey costs and accessibility of states' voter files.

Florida Election Reform. 2015. ($13,000). Project funded by Democracy Fund for an election reform forum held in Tallahassee, FL. Pew Charitable Trusts independently provided travel support for some speakers.

New York Redistricting. 2011. ($379,000). Project funded by the Sloan Foundation to provide for public redistricting in New York and continued software development.

Citizen Redistricting Education, Software Supplemental. 2011. ($50,000). Project funded by Joyce Foundation to provide continued redistricting software development for use by advocacy groups in six Midwestern states.

11

National Redistricting Reform Coordination. 2009-10. ($100,000). With Thomas Mann and Norman Ornstein. Project funded by Joyce Foundation to support coordination of national redistricting reform efforts by the Brookings Institution and the American Enterprise Institute.

Citizen Mapping Project. 2009-10. ($124,000 & $98,000). With Micah Altman, Thomas Mann, and Norman Ornstein. Project funded by the Alfred P. Sloan Foundation. An award to George Mason University enables development of software that, essentially, permits on-line redistricting through commonly used internet mapping programs. A second award to the Brookings Institution and American Enterprise Institute provides organizational support, including the convening of an advisory board.

Citizen Redistricting Education. 2010. ($104,000). Project funded by the Joyce Foundation. Provides for redistricting education forums in five Midwestern state capitals in 2010 and other continuing education efforts.

Pre-Registration Programs. 2008-9. ($86,000). Project funded by the Pew Charitable Trusts' Make Voting Work Initiative to examine pre-registration programs (voter registration for persons under age 18) in Florida and Hawaii.

Sound Redistricting Reform. 2006-9. ($405,000). Project funded by the Joyce Foundation, conducted jointly with the Brennan Center for Justice at NYU to investigate impacts of redistricting reform in Midwestern states.

Electoral Competition Project. 2005-6. ($200,000) Project funded by The Armstrong Foundation, the Carnegie Corporation of New York, the JEHT Foundation, The Joyce Foundation, The Kerr Foundation, Inc., and anonymous donors. Jointly conducted by the Brookings Institution and Cato Institute to investigate the state of electoral competition in the United States.

George Mason University Provost Summer Research Grant. 2004. ($5,000).

ICPSR Data Document Initiative. 1999. Awarded beta test grant. Member, advisory committee on creation of electronic codebook standards.

# Academic Experience

*Courses Taught:* Election Data Science (graduate and undergraduate), Election Law, Public Opinion and Voting Behavior, Parties and Campaigns (graduate and undergraduate), Comparative Electoral Institutions, Introduction to American Politics, American Politics Graduate Field Seminar, Congress, Legislative Politics, Research Methods (undergraduate), Advanced Research Methods (graduate), Freshman Seminar: Topics in Race and Gender Policies, and Legislative Staff Internship Program.

University of Florida

12

- Professor. June 2020 – Present.
- Associate Professor. August 2014 – June 2020.

George Mason University

- Associate Professor. May 2007 – May, 2014.
- Assistant Professor. Aug 2002 – May, 2007.

The Brookings Institution

- Non-Resident Senior Fellow. January 2006 – June 2016.
- Visiting Fellow.  June 2004 – December 2006.

University of Illinois, Springfield. Assistant Professor. Aug 2000 – June 2002.
   Joint appointment in Political Studies Department and Legislative Studies Center.

Vanderbilt University. Assistant Professor. Aug 1999 – Aug 2000.

Harvard-MIT Data Center. Post-Doctoral Research Fellow. Sept. 1998 – Aug 1999.
   Developed Virtual Data Center, a web-based data sharing system for academics.  Maintained
   Record of American Democracy (U.S. precinct-level election data).

University of California-San Diego

- Assistant to the Director for University of California, Washington DC program. Sept
  1997 – June 1998.
- Instructor for research methods seminar for UCSD Washington interns.
- Visiting Assistant Professor. Spring Quarter 1997.
- Visiting Assistant Professor. Summer Session, Aug 1996 and Aug 1997.
- Teaching Assistant/Grader. Aug 1991 – March 1997.

# Professional Service

*National Academy of Sciences,* Member, Program Committee for "Workshop on 2020 Census
Data Products: Data Needs and Privacy Considerations." 2019-present.
*Non-Profit Voter Engagement Network,* Member, Advisory Board.  2007 – present.
*National States Geographic Information Council - Geo-Enabled Elections,* Member, Circle of
Advisors. 2018 – present.
*Election Sciences Conference-in-a-conference at the 207 Southern Political Science Association
Conference.* Organizer. 2016.
*Overseas Vote Foundation*, Member, Advisory Board.  2005 – 2013.
*National Capital Area Political Science Association,* Member, Council, 2010 – 2012.
*State Politics and Policy Quarterly*, Editorial Board Member 2004-2011.
*Virginia Public Access Project*, Member, Board of Directors.  2004 – 2006.
*Fairfax County School Board Adult and Community Education Advisory Committee,*

Member. 2004 – 2005.
*State Politics and Policy Quarterly*, Guest Editor. Dec 2004 issue.

# Related Professional Experience

<u>Media Consultant</u>

- Edison Media Research/Mitofsky International. Nov. 2020; Nov. 2018; Nov. 2004; Nov. 2006; Feb. 2008; Nov. 2008. Worked national exit polling organization's Decision Desk.
- Associated Press. Nov. 2016 and Nov. 2010. Worked Decision Desk.
- ABC News. Nov. 2002. Worked Decision Desk.
- NBC News. Aug 1996. Analyzed polls during the Republican National Convention.

<u>Redistricting/Elections Consultant.</u>

- Expert Witness. 2018-2021. *Georgia Coalition for the Peoples' Agenda, Inc. et. al v. Kemp*. No. 1:18-cv-04727-ELR (N.D. Ga.).
- Expert Witness. *League of Women Voters of South Carolina v. Marci Andino*. Case No. 2:20-cv-03537-JMC (South Carolina).
- Expert Witness. 2020. *Georgia Association of Latino Elected Officials* v. *Gwinnett County Board of Registration and Elections*. No. 1:20-cv-1587-WMR (N.D. Ga.).
- Expert Witness. 2019. *Fair Fight Action, Inc. et al. v. Brad Raffensperger* No. 1:18-CV-5391-SCJ (N.D. Ga.).
- Consultant. 2019. Virginia Division of Elections. Audited the assignment of registered voters to districts.
- Expert Witness. 2018. *Martin v. Kemp*. Civil Action No. 1:18-cv-04776-LMM.
- Expert Witness. 2018. *Georgia Coalition for the Peoples' Agenda, Inc. v. Kemp*. Civil Action No. 1:18-cv-04727-ELR.
- Expert Witness. 2018. *Common Cause Indiana v. Lawson*. Case No. 1:17-cv-3936-TWP-MPB (Indiana).
- Expert Witness. 2017-18. *Benisek v. Lamone*. Case No. 13-cv-3233 (Maryland).
- Expert Witness. 2016-2017. *Vesilind v. Virginia State Board of Elections*. Case No. CL15003886 (Virginia).
- Expert Witness. 2016-2017. *Fish v. Kobach*. Case No. 2:16-cv-02105 (Kansas).
- Expert Witness. 2016. *Arizona Libertarian Party v. Reagan*. Case No.: 2:16-cv-01019-DGC (Arizona).
- Expert Witness. 2016. *Georgia State Conf. of the NAACP, et al. v. Brian* Kemp. Case No. 2:16-cv-00219-WCO (Georgia).
- Consultant. Federal Voting Assistance Program. 2014-2015. Analyzed voting experience of military and overseas voters.
- Expert Witness. 2013-2014. *Page v. Virginia State Board of Elections*. No. 3:13-cv-678 (E.D.VA).
- Expert Witness. 2013-2014. *Delgado v. Galvin*. (D. MA).
- Beaumont Independent School District. 2013. Prepared response to DOJ data request.

- Federal Voting Assistance Program. 2012-13. Analyzed voting experience of military and overseas voters.
- Gerson Lehrman Group. 2012. Provided election analysis to corporate clients.
- Expert Witness. 2011-2012. *Backus* v. *South Carolina*. No. 3:11-cv-03120 (D.S.C.).
- Expert Witness. 2012. *Wilson* v. *Kasich*. No. 2012-0019 (Ohio Sup. Ct.).
- Consulting Expert. 2011-2012. Bondurant, Mixson, and Elmore, LLP. (Review of Georgia's state legislative and congressional redistricting Section 5 submission).
- Consultant. 2012. New Jersey Congressional Redistricting Commission.
- Expert Witness. 2011. *Perez v. Texas*. No. 5:11-cv-00360 (W.D. Tex.).
- Expert Witness. 2011. *Wilson v. Fallin*. No. O-109652 (Okla. Sup. Ct.).
- Consultant. 2011. United States Federal Voting Assistance Program.
- Consultant. 2011. Virginia Governor's Independent Bipartisan Advisory Redistricting Commission.
- Consultant. 2011. New Jersey State Legislative Redistricting Commission.
- Expert Witness. 2010. *Healey v. State, et al.* C.A. No. 10-316--S (USDC-RI).
- Research Triangle Institute. 2008-2009. Consultant for Election Assistance Commission, 2008 Election Day Survey.
- U.S. State Department. 2008. Briefed visiting foreign nationals on U.S. elections.
- Expert Witness. 2008. *League of Women Voters of Florida v. Browning* (08-21243-CV-ALTONAGA/BROWN)
- Pew Center for the States. 2007. Consultant for Trends to Watch project.
- Expert Witness. 2007. *Washington Association of Churches v. Reed* (CV06-0726).
- Electoral Assistance Commission. 2005. Analyzed election administration surveys.
- Arizona Independent Redistricting Commission. 2001-2003. Consultant.
- Expert Witness. 2003. *Minority Coalition for Fair Redistricting, et al. v. Arizona Independent Redistricting Commission* CV2002-004380 (2003).
- Expert Witness. 2003. *Rodriguez v. Pataki* 308 F. Supp. 2d 346 (S.D.N.Y 2004).
- Consulting Expert. 2002. *O'Lear v. Miller* No. 222 F. Supp. 2d 850 (E.D. Mich.).
- Expert Witness. 2001-2002. *In Re 2001 Redistricting Cases* (Case No. S-10504).
- Expert Witness. 2001. *United States v. Upper San Gabriel Valley Municipal Water District* (C.D. Cal. 2000).
- California State Assembly. 1991. Consultant.
- Pactech Data and Research. Research Associate. Aug 1989 - June 1991.

Campaign/Political Consultant.

- Ron Christian for Virginia State Senate. June – November, 2003.
- Theresa Martinez for Virginia House of Delegates. May, 2003.
- Senior Consultant. California State Assembly. Nov. – Dec 1998.
- California Assembly Democrats. June – November 1998.
- Susan Davis & Howard Wayne for CA State Assembly '96. 1996.
- Intern. June – Sept 1995. UC-San Diego, Science and Technology Policy and Projects.

Polling Consultant.

- Hickman-Brown.  July, 2000.  Analyzed national and state level exit and CPS polls for use in various campaigns. Analyzed surveys for congressional, state, and local political campaigns.
- Decision Research. Aug 1994 – Dec 1994. Conducted and analyzes surveys for congressional and statewide campaigns.
- Speaker Jose de Venecia of the Philippines. Feb, 1997.
- Joong-Ang Ilbo/RAND. Oct, 1996. Analyzed survey of Korean attitudes on national security issues.
- UCSD.  Nov. 1991. Conducted and analyzed survey of student attitudes.

## DECLARATION OF QUENTIN KIDD, PH.D.

## I. INTRODUCTION

Pursuant to 28 U.S.C. § 1746, I, Dr. Quentin Kidd, declare under penalty of perjury that the following declaration is true and correct:

1.      My name is Quentin Kidd, and I am a tenured professor of political science and dean of the college of social sciences at Christopher Newport University in Newport News, Virginia. I also serve as the Academic Director of the Wason Center for Public Policy. I have been a faculty member at Christopher Newport for 24 years. I have a Ph.D. in Political Science from Texas Tech University and a MA and BA from the University of Arkansas.

2.      I am an expert in American politics, specifically in the areas of political behavior, voting behavior, electoral politics, racial politics, Southern politics, and Virginia politics, having published academic research in all subject areas. I have authored, co-authored or edited five books and over 30 peer reviewed studies and book chapters, and funded research reports, including several on political participation across the south in the context of changes in voting laws and election administration. My scholarship, detailed in a copy of my cv which is attached hereto, has been published by the top university presses and top disciplinary peer-reviewed journals and has been widely cited by scholars across multiple disciplines. I have also conducted nearly 100 survey research projects focusing on public policy and public opinion in Virginia, Georgia, Florida, Texas,



M. McDonald
10/29/21

**EX. 3**

T. Piderit

and nationally. I teach courses in American politics, political behavior, political campaigns and elections, and research methods and quantitative analysis.

3.     I have written many op-eds in newspapers and magazines ranging from the New York Times and Washington Post to the Los Angeles Times. I have provided expert analysis and opinion regarding local, state, and national politics, elections, and public policy to newspapers, magazines, websites, radio, and television programs and outlets in the United States, the United Kingdom, Canada, Ireland, France, Germany, Holland, Italy, Columbia, Turkey, and Qatar, Saudi Arabia.

4.     I serve or have served on numerous public boards and commissions including the (Virginia) Governor's Commission on National and Community Service, the Hampton Roads Center for Civic Engagement, the (Virginia) Independent Bipartisan Advisory Commission on Redistricting, the 2019 Commemorative Steering Committee (Virginia), and the Governance/Funding Working Group of Hampton Roads Transit.

5.     In the last four years, I have provided prior expert testimony in *Holloway v. City of Virginia Beach*, No. 2:18-cv-00069, *Jabbour v. Merrill*, No. 1:20-cv-00034-JB-N, *People First of Alabama v. Merrill*, No 2:20-cv-00619-AKK, *Clark v. Edward*, No 20-cv-308-SDD-RLB and *Power Coalition v. Edward*, No. 20-cv-283-SDD-RLB, *Harding v. Edwards*, No 3:20-cv-00495-SDD-RLB, and *Thompson v. Merrill*, No 2:15-cv-783-ECM-SMD. The State of Florida has engaged me to provide expert analysis on several issues related to *League of Women Voters of Florida, Inc. et al. v. Lee et al.*, case number 4:21-CV-186 and consolidated cases 4:21-CV-242, 4:21-CV-187 and 4:21-CV-201. I am receiving $350 per hour for work assisting the State of

2

Florida in these matters. My compensation is not contingent on either the results of my analysis nor the contents of this report.

3

## II. SYNOPSIS

6.    I have been asked by counsel for the State of Florida to conduct analysis and form expert opinions on several issues related to Senate Bill 90 (SB90 from here forward). Specifically, I have examined the following questions:

A.    How have Florida's early voting and vote-by-mail (specifically the excuse and notary/witness requirement) rules changed since the 1980s and what would be the impact of these changes on the ease of voting.

B. How does Florida's use of drop boxes compare to use of drop boxes by states across the country, and are the rules governing the use of drop boxes in Florida as spelled out in SB90 Section 29 comparable to the rules of other states that use drop boxes.

C. How do Florida's rules related to ballot collection spelled out in SB90 Section 32 compare to other states related to who is able to assist a voter by collecting and returning their ballot and how many voters a third party can assist.

D. How do Florida's rules related to third party voter registration spelled out in SB90 Section 7 compare to other states related to compensation, deadlines for returning forms, oversight of organizations conducting registration drives, training, and official volunteer systems.

E. How do Florida's rules related to absentee ballot application verification spelled out in SB90 Section 24 compare to other states related to voter identification verification requirements.

F. How do Florida's rules related to the frequency with which a voter must register for an absentee ballot spelled out SB90 Section 24 compare to other states' rules.

4

G. How do Florida's rules related to 'electioneering' activities around the physical location of polling places while voters are casting ballots spelled out in SB90 Section 29 compare to other states' rules.

7.      In this report I employ standard methods used by political scientists and social scientists when conducting a comparative analysis of laws and rules across time and states regarding the administration of elections. I state clearly the issues being examined in each section. I rely on primary sources where possible (mostly the laws of the particular states) and where needed on secondary sources to analyze the questions. My focus in this report is analyzing changes in Florida's rules as it relates to early voting and vote by mail, and comparing the rules of the fifty states and the District of Columbia as it relates to the several questions outlined above. My goal is to consider changes in Florida's rules and place these changes into a national context.

5

## III. SUMMARY OF FINDINGS

8.      This analysis shows that when it comes to early voting and vote by mail rules the net impact of changes in law over time has been to make voting easier and more accessible. In the context of the six areas of comparative analysis, Florida is at worst consistent with the average restriction or regulation across the country or at best a leader in terms of providing access to voting opportunities.


9.      When it comes to changes in **early voting** and **vote by mail** rules in Florida since the 1980s, the net impact of the changes has been to make voting easier. Florida law has changed over time from restrictions related to needing an excuse to vote early and needing a notary or witness to no excuse and no witness requirements. Early voting has gone from non-existent to up to two-weeks since it was first instituted in 1998.


10.      When it comes to the new rules in SB90 governing the placement and supervision of secure drop boxes for the return of vote-by-mail ballots, Florida is among only ten states that require **drop boxes** to be available to voters. If you exclude three of the ten states that conduct all of their elections early and by mail (Colorado, Oregon, and Washington), Florida is among only seven states that, while they have no-excuse early voting, still orient their elections in a traditional election-day voting fashion and require the wide-spread availability of drop boxes. If you further exclude Nebraska, which limits the availability of drop boxes to rural counties with populations of 10,000 or less, Florida stands as only one of six states to require the wide-spread availability of drop boxes that doesn't already conduct elections exclusively by mail over a period of multiple weeks. In short, when you consider that a majority of twenty-seven states and

6

the District of Columbia explicitly prohibit the use of drop boxes, Florida stands among a small group of states that requires them to be widely available.

11.     When it comes **third-party ballot collection** rules in SB90, Florida stands among the vast majority of states that impose some regulations and restrictions on the number of ballots that an individual can collect and return (ten states have minimal or no restrictions). Among the forty-one states and the District of Columbia that impose some regulations, Florida is less restrictive than over half, by imposing a limit on unrelated individuals to collect and return up to two ballots and allowing immediate family to collect and return an unlimited number of ballots (while also expanding the definition of immediate family to include a grandchild).

12.     When it comes to **third-party voter registration** rules in SB90, Florida's rules are generally consistent with the vast majority of states that impose requirements on third party voter registration organizations. Florida's deadlines, penalties, and other requirements related to pay are the norm. Florida's fourteen-day deadline for returning completed registration forms is longer than the average (which is ten-days), and Florida's notice and disclaimer requirements are not unique among states that require them and certainly not as proscriptive as several of them.

13.     When it comes to **absentee ballot application verification** rules in SB90, Florida's requirements are largely average. The burden to qualify to vote absentee (as is the case in sixteen states) is certainly greater than Florida's no excuse requirement. The burden of having to provide a witness signature (as is the case in two states) is certainly greater than Florida's requirement that does not include a witness signature. The burden of requiring a copy of a photo

7

identification (as is the case in four states) is certainly greater than Florida's requirement that does not include submitting a copy of a photo identification. In fact, Florida stands in a group of states that simply require that information and eligibility be checked against voter registration records. Only four states (other than the states that conduct all or mostly all-mail elections) have verification checks that are less strenuous.

14.     When it comes to the **frequency of requesting an absentee ballot** rules in SB90, the two-year no-excuse absentee voting rule makes Florida the most lenient state among the thirty-eight states that regulate absentee voting in some way short of no-excuse permanent absentee or all-mail voting.

15.     When it comes to the **electioneering (voter solicitation)** rules in SB90, Florida's regulations and restrictions mirror the vast majority of state rules across the country in prohibiting electioneering with the purpose of influencing voters within a certain space or zone around the polling location.

16.     In sum, in none of the six areas of SB90 examined in this report comparing Florida with the other states of the Union is Florida outside of the norm at worst, and in several of the areas examined here Florida's rules and regulations place the state among the more accessible from a comparative perspective when it comes to voting and access to voting resources. And in the context of early voting and vote by mail, changes in Florida law over the last several decades have made voting fundamentally easier.

8

## IV. CHANGES IN FLORIDA'S ABSENTEE VOTING RULES HAVE MADE VOTING USING THIS METHOD EASIER IN THE LAST SEVERAL DECADES

17.     The rules around absentee voting (or vote by mail) in Florida have changed substantially since the mid-1990s. The rules have evolved, as Table 1 shows, from a very restrictive process to a much less restrictive process. Prior to 1996 a voter casting an absentee ballot had to qualify under a specific list of excuses and have the envelope containing their ballot notarized or witnessed by two people. Today no qualification excuse is required to cast an absentee ballot, and a voter simply certifies they are registered to vote in Florida and will not vote more than once.

18.     In order to vote an absentee ballot in Florida prior to 1996, a voter had to qualify with one of the following excuses: 1) be unable to vote without assistance; 2) not physically be home in the precinct during the hours of voting; 3) be an election official working at a precinct other than their own; 4) have a religious reason for being unable to attend the polling location on the day of the election; 5) have changed residence to another location in Florida but not in time to change the location of their registration; or 6) have changed residence to another state but not in time to change the location of their registration. In addition to qualifying with one of the six excuses, voters had to sign the security envelope in the presence of a notary or two witnesses eighteen years or older.[1]

---

[1] Florida Statutes Title IX Section 101.64(1), 1995.

9

19.     The 1996 statute dropped the qualification requirements, asking voters to swear or affirm that they were qualified electors and were unable to attend the polls on election day (no specific reason was required to be listed) and would not vote more than once. The witness requirement was reduced to one witness eighteen years or older who provided their signature and address.[2]

## Table 1: Changes to Florida's Absentee Voting Rules Since 1995

| | |
|---|---|
| **Rule in 1995 and prior** | Voter certified they are unable to attend the polls on election day under 1 of 6 excuses. Envelope requires voter signature and witness by a notary or two witnesses eighteen years or older. |
| **Rule changed in 1996** | Voter certified they are unable to attend the polls on election day (for any reason). Envelope requires voter signature and one witness eighteen years or older. |
| **Rule changed in 1998** | Voter certified they are unable to attend the polls on election day under 1 of 7 excuses. Envelope requires voter signature, last four of voter's SSN, and witness by a notary or another registered voter (limit five witnesses by any single registered voter). |
| **Rule changed in 2001** | Voter certified they are qualified and registered to vote in Florida and will vote only once. Envelope requires voter signature and one witness eighteen years or older. |
| **Rule changed in 2004** | Voter certified they are qualified and registered to vote in Florida and will vote only once. Envelope requires voters signature only. |

---

[2] Florida Statutes Title IX Section 101.64(1), 1996.

Following a high-profile voter fraud case in Miami, much of it involving absentee ballots, the legislature attempted to tighten the rules around absentee voting.[3] Statutes from 1998 to 2000 required voters to qualify with one of seven excuses, the six prior excuses and a seventh that allowed anyone unable to attend the polls on election day for any reason to vote absentee (essentially, combining the pre-1996 qualification rules and the 1996 any-reason rule). In addition to qualifying with one of the seven excuses, voters had to sign the security envelope in the presence of a notary or one witness who was a registered voter in Florida. No one registered voter could witness more than five ballots for the same election.[4]

20.     The tightened rules around absentee voting from 1998 to 2000 were struck down by the U.S. Justice Department, and so the Florida Legislature revised them in 2001. The 2001 statute dropped any requirement to qualify to vote absentee (no excuse required), and only required voters to certify that they were a qualified and registered voter in Florida and that they would not vote more than one ballot in that election, signed in the presence of one witness who was eighteen years or older who provided their signature and address.[5]

21.     In 2004 Florida dropped the witness requirement and required voters to certify (by signing and dating the outer envelope) that they were a qualified and registered voter in Florida and that they would not vote more than one ballot in a given election.[6]

---

[3] Scott Hiaasen, "Absentee ballots: easy to cast, open to fraud," *Miami Herald*, Oct. 12, 2002, P. A1.
[4] Florida Statutes Title IX Section 101.64(1), 1998-2000.
[5] Florida Statutes Title IX Section 101.64(1), 2001.
[6] Florida Statutes Title IX Section 101.64(1), 2004.

11

22.      In 2019 the statute changed in a minor way in that the voter's certificate asked for an email address, home telephone number, and mobile telephone number in addition to the signature requirement and date.[7]

23.      The net effect of the changes to the rules around absentee voting (or vote by mail) in Florida since the mid-1990s has been an easing of the burden in two important ways. First, the rules have evolved from a relatively restrictive process whereby a voter had to qualify under a specific and bounded list of excuses. Second, the rules have evolved away from having the outer envelope which contained the voter's ballot notarized or witness by two people to one whereby a voter certifies they are registered to vote in Florida and will not vote more than once. The current policy under SB90 retains the ease and accessibility of absentee voting.

---

[7] Florida Statutes Title IX Section 101.64(1), 2019.

## V. CHANGES IN FLORIDA'S EARLY VOTING RULES HAVE MADE VOTING USING THIS METHOD EASIER IN THE LAST SEVERAL DECADES

24.     The option to vote early in-person did not exist in Florida in a codified way prior to 1998.[8] The rules around early voting have evolved, as Table 2 shows, from a relatively supervised process for voters who were unable to vote on election day to one oriented around convenience for voters while giving elections administrators the flexibility to expand the number of days as needed.

25.     What we now call early voting in Florida was first statutorily created in 1998, and called 'Voting absentee ballots in person' rather than early voting.[9] The statute read in part: "…any qualified and registered elector who is unable to attend the polls on election day may pick up and vote an absentee ballot in person at the office of, and under the supervision of, the supervisor of elections."[10] The 1998 statute essentially codified what had been an informal practice on the part of some county elections supervisors.

26.     In 2004 the legislature standardized the rules around what was now called 'early voting', by requiring elections supervisors to allow voters to vote early in the main or branch office of the supervisor. The law also allowed supervisors to designate other sites such as city hall or a public library as early voting sites so long as they were geographically located such that all voters had

---

[8] Leon County Supervisor of Elections Ion Sancho reportedly first brought early voting to any locality in Florida informally in 1994. See Jennifer Portman, "Elections Bill Heads to Gov. Scott for Signature," *Tallahassee Democrat*, May 4, 2013, P. A1.
[9] Florida Statutes Title IX Section 101.657, 1998.
[10] Id.

13

equal opportunity to use them. An early voting period was also stipulated, from the 15th day

before an election and ending on the day before an election. The law required early voting sites

be open eight hours per weekday and an aggregate of eight hours per weekend.[11]

## Table 2: Changes to Florida's Early Voting Rules Since 1995

| | |
|---|---|
| **Rule created in 1998** | At discretion of supervisor of election of locality, voter who is unable to attend polls on election day allowed to pick up and vote an absentee ballot under supervision. Proof of identification required. No dates or window of voting specified, and no hours of voting specified. |
| **Rule changed in 2004** | Process of early voting standardized and mandated. Allows voters to vote early at designated full-service facility of supervisor of elections in locality. Mandated 15-day early voting window (from 15th day before election to day before election). Mandated early voting be provided for 8-hours per week day and an aggregate of 8-hours on each weekend. |
| **Rule changed in 2005** | Mandated 14-day early voting window (window goes from 15th day before election to 2nd day before election). Added requirement that early voting sites be open no sooner than 7 a.m. and close no later than 7 p.m. |
| **Rule changed in 2011** | Mandated 8-day early voting window (window goes from 10th day before election to 3rd day before election), and expanded the hours of early voting to no less than 6 and no more than 12 each day at every voting site. |
| **Rule changed in 2013** | Mandated 8-day early voting window (window goes from 10th day before election to 3rd day before election), but supervisor of elections has discretion to offer it on the 15th, 14th, 13th, 12th, 11th, or 2nd day before election. |

27.     The next year in 2005 the legislature revised the early voting law in mostly minor yet

important ways designed to ensure equity in access. The law required early voting locations to be

---

[11] Florida Statutes Title IX Section 101.657, 2004.

14

declared no later than 30 days prior to an election, required that all early voting locations be opened the same days and same hours, and stipulated an early voting period from the 15th day before an election to the 2nd day before an election (fourteen days of early voting). The law required early voting sites be open no earlier than 7 a.m. and close no later than 7 p.m. The law also gave guidance for elections other than general elections (such as municipal elections and special district elections). Finally, the law stipulated that elections supervisors had to make available the number of early votes cast on a daily basis. Incidentally, the first sentence of the statute changed as well, beginning with "As a convenience to the voter…".[12]

28.     In 2011 the number of early voting days was changed to eight days, beginning on the 10th day before an election that contained state or federal offices and ending on the 3rd day before the election. The number of early voting hours required was changed to between six and twelve each day (including weekends) at each early voting site. This change in the early voting hours requirement amounted to an increase in the available time for early voting on weekends.[13]

29.     In 2013, the most recent year in which the rules have changed, the mandated eight day early voting window from the 10th day to the 3rd day before the election was retained, but additional early voting days were allowed at the discretion of elections supervisors. The statute reads, in part:

> "Early voting shall begin on the 10th day before an election that contains state or federal races and end on the 3rd day before the election, and shall be provided for no less than 8 hours and no more than 12 hours per day at each site during the applicable period. In addition, early voting may be offered at the discretion of the supervisor of elections on

---

[12] Florida Statutes Title IX Section 101.657, 2005.
[13] Florida Statutes Title IX Section 101.657, 2011.

the 15th, 14th, 13th, 12th, 11th, or 2nd day before an election that contains state or federal races for at least 8 hours per day, but not more than 12 hours per day."[14]

30.    The net effect of the changes to the rules around early voting in Florida since the early 1980s has been an increased convenience and thus an easing of the burden because the process has been codified and regulated such that it is predictable and standardized across the state. Prior to 1998, some elections administrators allowed early voting and many did not. In 2004 early voting was mandated, and as of 2013 the rules include a mandatory eight days with an additional six days at the discretion of elections supervisors.

---

[14] Florida Statutes Title IX Section 101.657, 2013.

16

## VI. SB90 MANDATES THE USE OF DROP BOXES, MAKING FLORIDA AMONG A SMALL MINORITY OF STATES TO REQUIRE THEM

31.     The rules around the use of drop boxes vary from state-to-state, but generally orient around three questions: does a state allow them, does a state mandate them, and does a state prohibit them. The standardized and mandatory process of early voting by Florida is the result of legislation that took effect in 2004.[15] That legislation did not, however, include provisions for the use of drop boxes. In 2019 Florida enacted limited use of drop boxes, which were first used in the 2020 election cycle. The law required secure drop boxes to be placed at the main offices of the supervisor and at each early voting location. The law also allowed for secure drop boxes to be placed at other locations that served as early voting sites so long as the sites were staffed during the early voting hours by an employee or law enforcement officer.[16]


32.     The 2019 law establishing the use of drop boxes did not define the term 'secure', but in describing where drop boxes were required to be located (main office of the supervisor, each branch office of the supervisor, and at early voting sites) and where they could optionally be placed (any other site that would otherwise qualify as an early voting site under S.101.657(1) so long as this other location was staffed), it is clear that the legislature considered the presence of staff or security personnel to be an integral element of security.


33.     Senate Bill 90's drop box provisions essentially tighten and clarify the rules around the use of drop boxes by more clearly defining and describing what the legislature meant by 'secure'. For instance, while SB90 requires drop boxes to be geographically located to ensure

---

[15] The Florida Senate Interim Report 2011-118.
[16] Chpt. 2019-162, Laws of Fla. (2019).

17

that all voters have an equal opportunity to cast a ballot, it also requires their locations to be set at least 30 days before an election and only allows those locations to be changed to comply with the law.[17] The law requires that drop boxes be continuously monitored by an election worker during normal early voting hours.[18] The law also requires that drop boxes be emptied each day and the ballots collected secured.[19] Finally, the law imposes a civil penalty of $25,000 on election supervisors for non-compliance.[20] These security concerns were very real, driven in part by reports of voter drop boxes being vandalized during the 2020 presidential election.[21]

34. A fundamental question related to these drop box rules is whether the security provisions are outside of the norm nationally. By any objective measure from a comparative perspective Florida's drop box provisions make it one of a minority of states on the progressive end of the voter-access continuum.

35. Senate Bill 90 makes Florida one of only ten states to **require** the use of drop boxes.[22] Senate Bill 90 says "The supervisor shall allow an elector who has received a vote-by-mail ballot to physically return a vote-by-mail ballot to the supervisor by placing the return mail envelope containing his or her marked ballot in a secure drop box."[23] As Table 3 shows, the other nine

---

[17] Chpt. 2021-11, Laws of Florida at 23 (2021).
[18] Id.
[19] Id.
[20] Id.
[21] See for example: https://www.usatoday.com/story/news/nation/2020/10/20/ballot-drop-box-set-fire-california-100-ballots-damaged/5992101002/, https://www.washingtonpost.com/local/va-politics/mailboxes-broken-into-in-central-virginia-sparking-worries-about-missing-absentee-ballots/2020/10/05/39b3ded8-0744-11eb-a166-dc429b380d10_story.html, https://foxbaltimore.com/news/local/election-security-concerns-after-week-of-reported-issues, https://www.newsbreak.com/news/2351137285828/voting-drop-box-vandalized-in-ontario,
[22] Nebraska requires counties with populations of less than 10,000 to maintain at least one secure drop box starting at least 10 days before the election.
[23] Chpt. 2021-11, Laws of Florida at 23 (2021).

18

states (excluding Nebraska) that require the use of drop boxes are: Washington, Oregon,

Colorado, Nebraska, New Jersey, Maryland, Kentucky, Georgia, and Virginia.

## Table 3: Use of Drop Boxes Across the United States

| Required | Allowed | Prohibited |
|---|---|---|
| Washington** | California | Alabama |
| Oregon** | Montana | Alaska |
| Colorado** | Utah | Arkansas |
| New Jersey | Arizona | Connecticut |
| Maryland | New Mexico | Delaware |
| Kentucky | Minnesota | Idaho |
| Georgia | Iowa | Kansas |
| Virginia | Illinois | Louisiana |
| **Florida** | Michigan | Maine |
| Nebraska* | Indiana | Mississippi |
| | Pennsylvania | Missouri |
| | Vermont | Nevada |
| | Massachusetts | New Hampshire |
| | Hawaii | New York |
| | | North Carolina |
| | | North Dakota |
| | | Ohio |
| | | Oklahoma |
| | | Rhode Island |
| | | South Carolina |
| | | South Dakota |
| | | Tennessee |
| | | Texas |
| | | District of Columbia |
| | | Wisconsin |
| | | Wyoming |
| | | West Virginia |

\* Required only in counties with population of 10,000 or fewer.
\*\* All elections are mail-only, with no in-person voting.

19

36.     A comparison with Virginia's law related to drop boxes is instructive here because both Florida's and Virginia's legislatures passed laws related to the administration of elections in 2021, including requiring the use of drop boxes. A June 8, 2021 article in the *New York Times* described Virginia as becoming a "voting rights bastion" as a result of its new law.[24] The new Virginia law requires drop boxes for the first time in the state's history. Drop boxes are required to be located at the general registrar's office and at satellite offices in operation for an election. The law requires drop boxes to be accessible, secured, and ballots to be collected daily.[25]

37.     While the Florida and Virginia provisions related to drop boxes are not mirror images of one another, they are largely similar, and given that both states have moved in the direction of expanding a voter's ability to deliver their ballots via drop boxes since 2019 (or 2021), both could arguably be described as progressive reforms.

38.     As Table 1 shows, fourteen states allow ballot drop boxes but do not require them, which means voters in those states do not have the same codified access to drop boxes as voters do in Florida. In fact, in many of these states drop boxes are used in jurisdictions at the discretion of elected officials or election administrators. Over half of all states and the District of Columbia (twenty-seven) prohibit the use of drop boxes. If the use of drop boxes is considered an expansion of voting rights, then Florida is among the minority of states (10 of 51, or about 20%) that guarantees access to drop boxes.

---

[24] "Virginia, The Old Confederacy's Heart, Becomes a Voting Rights Bastion", New York Times April 2, 2021 (updated June 8, 2021) at https://www.nytimes.com/2021/04/02/us/politics/virginia-voting-rights-northam.html
[25] Chpt. 522, Laws of Virginia (2021).

## VII. SB90's THIRD PARTY BALLOT COLLECTION RULES MAKE FLORIDA ONE AMONG THE VAST MAJORITY OF STATES THAT IMPOSE SOME REGULATION, BUT LESS RESTRICTIVE THAN OVER HALF OF STATES THAT HAVE RESTRICTIONS

39.     The rules around ballot collection vary from state-to-state, but generally are oriented

around two areas: defining who can assist a voter by collecting and returning their ballot and

defining how many voters a third party can assist. The baseline acceptable limits that may be

placed upon the practice of ballot collecting was established by the United States Supreme

Court's July 2021 decision in *Brnovich v. Democratic National Committee*, which upheld

Arizona's law limiting the practice to only someone in a close relationship with the voter

(family, caregiver, etc.) who is able to return the ballot.[26]

40.     By comparison, SB90s ballot collection provision allows <u>anyone</u> to return up to two

completed absentee ballots in addition to their own.[27] The law also allows a person to collect and

return any number of their immediate family member's ballots, and expands the definition of

immediate family member to include a grandchild.[28]

41.     As Table 4 shows, Florida is among forty-one states and the District of Columbia that

imposes some regulations or restrictions on ballot collection, and certainly does not rank among

the most restrictive of this group. For instance, four states (Alabama, Oklahoma, Pennsylvania,

and Tennessee) only allow voters themselves to return ballots.[29] Seventeen states emphasize the

---

[26] See https://www.supremecourt.gov/opinions/20pdf/19-1257diff_khlo.pdf.
[27] Chpt. 2021-11, Laws of Florida at 27 (2021).
[28] Id.
[29] Oklahoma does exempt spouses from any restrictions (26 Okl. Stat. Ann. § 14-108, 108.1).

21

## Table 4: Third-Party Ballot Collection Rules Across the United States

| Only voters may return ballots | Emphasis on voter with some exceptions for family, officials, or defined associate (limits) | Third parties may collect / return ballots (limits) | No restrictions specified / minimal restrictions |
|---|---|---|---|
| Alabama | Alaska | Arkansas (2) | Hawaii |
| Oklahoma[1] | Arizona | California | Idaho |
| Pennsylvania | Connecticut | Colorado (10) | Mississippi |
| Tennessee | District of Columbia | Delaware | New York |
| | Georgia (10) | **Florida (2)** | Rhode Island |
| | Indiana | Illinois | Utah |
| | Massachusetts | Iowa | Vermont |
| | Michigan | Kansas | Washington |
| | Missouri | Kentucky | Wisconsin |
| | Montana (6) | Louisiana (1) | Wyoming |
| | Nevada | Maine (5) | |
| | New Hampshire | Maryland | |
| | New Mexico | Minnesota (3) | |
| | North Carolina | Nebraska (2) | |
| | Ohio | New Jersey (3) | |
| | Texas | North Dakota | |
| | Virginia | Oregon | |
| | | South Carolina | |
| | | South Dakota | |
| | | West Virginia (2) | |

[1] Spouses may also return ballots

responsibility of the voter in returning their own ballot, but allow for limited ballot collection by close family (the definition of close family varies), government officials, or defined associates (such as caregivers or someone living in the same household as the voter).[30] In addition to family, Indiana also allows the voter's attorney to qualify.[31] Two states that impose familial or defined associate limits also impose a limit on the total number of ballots that any one individual

[30] Arizona, Georgia, Louisiana, Massachusetts, Michigan, Missouri, Nevada, New Hampshire, New Mexico, North Carolina, Ohio, and Texas.
[31] See Ind. Code 3-11-10-1.

22

may return. Georgia limits the total number of ballots any individual may return to ten, and Montana limits the number to six.

42.     Florida is among a group of twenty states that allow third parties to collect and return ballots, and impose varying conditions on those third parties. For instance, nine of those states impose limits on the number of ballots that can be collected ranging from one (Louisiana) to ten (Colorado).[32] The remaining eleven states of this group of twenty that allow third parties to collect and return ballots impose few if any limits on the number of ballots that can be collected but to varying degrees impose other minimal regulations and restrictions. Finally, ten states have no codified regulations or restrictions on who can collect and return absentee ballots other than the voters themselves.

43.     Florida under SB90 is among the vast majority of states that impose some regulations and restrictions on the number of ballots that an individual can collect and return. However, among those forty-one states that impose some regulation, Florida is less restrictive than over half. Florida's limit is two in addition to the voter's own, but there is no limit placed on the number of additional ballots that an individual can return from immediate family members. Additionally, SB90 expanded the definition of immediate family to include a grandchild.[33]

---

[32] Maine limits the number of absentee ballots that can be issued to a third party until at least one of these ballots (21-A M.R.S.A § 753-B). South Dakota requires the third party to notify election officials if they are acting as an agent for more than one voter (S.D. Codified Laws § 12-19-2.2).
[33] Chpt. 2021-11, Laws of Florida at 27 (2021).

## VIII. SB90's THIRD PARTY VOTER REGISTRATION RULES ARE GENERALLY CONSISTENT WITH THE VAST MAJORITY OF STATES THAT IMPOSE REQUIREMENTS ON THIRD PARTY VOTER REGISTRATION ORGANIZATIONS

44.     Rules governing third party registration efforts vary across the United States, but generally address issues such as compensation for volunteers participating in registration drives, deadlines for returning registration forms, registration organizations conducting drives, training for volunteers and organization, and whether or not a state has an official volunteer system in place.[34]

45.     Table 5 summarizes the third-party registration rules across the United States. Florida is among twelve states to require third party voter registration organizations to register with the state, although the individuals who are volunteering with the organization are not deputized as volunteer registrars by Florida as they are in some other states (such as Texas).

46.     The majority of states, including Florida, do not require training either for the organization or the individuals conducting voter registration drives. The most stringent state regarding training is Colorado, which requires voter registration drive organizers to complete training and take a test, and to also train all of their volunteers.[35] Illinois requires training for volunteers who want to become deputy registrars, while Delaware requires training for volunteers who wish to register voters using the Delaware state registration form but not the federal form.[36]

---

[34] See https://nationalvoterregistrationday.org for an overview of each state's rules.
[35] See https://www.sos.state.co.us/pubs/rule_making/CurrentRules/8CCR1505-1/Rule14.pdf.
[36] See https://nationalvoterregistrationday.org/toolkit-for-individuals/rules-for-voter-registration-drives/.

47.     While every state and the District of Columbia allows third party registration drives to pay volunteers, none allow payment to be tied to the number of registrations collected. The vast majority of states (36) have a return deadline for voter registration by third party registration drives other than the normal registration deadline, including Florida. These non-standardized return deadlines are triggered by the moment a voter registration is collected by a third party, ranging from "immediate" (Connecticut) to up to thirty-days (Louisiana and Hawaii). Florida's fourteen-day return deadline is longer than the average return deadline among states that have them, which is ten-days.

48.     At least seven states have a notice or disclaimer requirement or recommendation either codified or in the rules for how third-party organizations are allowed to conduct registration drives. Under SB90, Florida requires a third-party voter registration organization to inform the applicant that they may not deliver the application sooner than the 14-day return deadline (mentioned above), and to inform the applicant of their options to either return their application in-person sooner or to register online.[37] It is important to note, SB90 does not mandate a precise script but rather requires a basic set of factual information be provided. This approach is consistent with the practice of other states that have such rules, but is also less stringent than some. For example, Georgia requires third party organizations to display a poster at registration sites or hand voters a form with information about their rights and expectations regarding registering to vote, including that they can register in alternative ways.[38]

---

[37] Chpt. 2021-11, Law of Fla. At 8 (2021).
[38] See required handout at:
https://sos.ga.gov/admin/uploads/Required_Voter_Registration_Notices_Handout.pdf.

## Table 5: Third Party Voter Registration Rules Across the United States

| | Yes | No | Notes |
|---|---|---|---|
| **Has official volunteer (deputy registrar) system** | 8 | 40* | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Delaware requires registration for the Delaware application but not the federal application.<br>* Registration is required in Florida, but volunteers are not deputized registrars.<br>* Registration for deputized registrars is available but not required in Illinois. |
| **Requires training** | 9 | 39* | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Delaware requires training for the Delaware application but not the federal application.<br>* Illinois requires training for volunteers who wish to be deputized registrars.<br>* Colorado requires volunteers to be trained and pass a test. |
| **Organizational registration or reporting required** | 12* | 36 | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Kansas requires reporting for groups requesting more than 25 registration forms.<br>* Missouri requires registration for paid registration solicitors. |
| **Return deadline other than normal registration deadline** | 36* | 12 | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Average return deadline for states that have one is 10-days.<br>* Connecticut's return deadline is "immediately" upon completion of application. |
| **Pay allowed** | 48* | 0 | * New Hampshire and Wyoming do not allow third party registration; North Dakota does not have voter registration requirements.<br>* Delaware allows for paid registration solicitors of the federal application but not for the Delaware application.<br>* No state allows payment based upon the number of applications collected. |
| **States with some notice/disclaimer rules** | | | Alabama, Arkansas, California, Colorado, Georgia, Florida, Iowa, Virginia |

* Denotes which group Florida is in for each topic.
Note: Wisconsin third-party registration rules require registrants to provide a proof-of-residence document to the volunteer registering them. This requirement makes any third-party registrations efforts nearly impossible as few people carry photo copies of required documents.

26

49.     In its *2021 Guidelines for Conducting Voter Registration Drives*, the Virginia

Department of Elections tells third party organizations and representatives under the section

titled 'Rules of the Road: Best Practices Overview': "When approaching individuals, introduce

yourself and the organization you represent, explain your purpose, the qualifications to vote in

Virginia, and whether or not you will deliver the completed application for the applicant. You

should inform voters that Virginia has online voter registration and address update available on

the ELECT website for those with a Virginia driver's license or DMV ID card. This information

will be helpful to an applicant who wishes to ensure their application is delivered in real time

directly to their local voter registration office."[39]


50.     The state of California guidelines requires third party organizations and individuals to

acknowledge they understand the rules, among them that if they mail a voter registration card to

someone unsolicited that they must also include a letter telling the recipient that they can

disregard the card.[40]


51.     Under the 'Frequent Questions' section of its *Voter Drive Guide*, Alabama provides the

following information is for applicants: "Just because the citizen turned in a voter registration

application does not necessarily mean he/she is registered to vote. Once the application has been

processed by the citizen's local Board of Registrars, he/she should receive an acknowledgement

from the Registrars indicating the status of his/her application. This acknowledgement will

usually be a voter information card confirming that he/she is registered to vote. However, if the

---

[39] https://www.elections.virginia.gov/media/formswarehouse/veris-voter-
registration/voterregistrationdrives/2021-Guidelines-for-Voter-Registration-Drives-[Final]-(1).pdf.
[40] https://elections.cdn.sos.ca.gov/guides/guide-to-vr-drives.pdf.

application was incomplete, the citizen may receive a letter requesting additional information to complete his/her application. If the citizen is unsure about the status of his/her application, the citizen should call his/her local Board of Registrars or visit alabamavotes.gov."[41]

52.     In its guide *Conducting a Voter Registration Drive*, Arkansas recommends third party organizations should "Thank individuals for applying and advise them that they are not fully registered until their applications are processed by the county clerk. Applicants should call the county clerk's office if they have not received certification of registration in two weeks (same info on back of voter application)."[42]

53.     Iowa requires individuals and groups collecting absentee ballot request forms to use an official (proscribed by the Secretary of State) absentee ballot request form with receipt. The receipt portion of the form must be given to the applicant upon completion of the form, and it contains a notice to the applicant about the potential partisan activities of the organizer and what the requirements are for turning in their application.[43]

54.     In sum, Florida's rules under SB90 regarding third party registration are generally consistent with the vast majority of states that impose requirements on third party voter registration organizations. Florida's deadlines, penalties, and other requirements related to pay are the norm. Florida's fourteen-day deadline for returning completed registration forms is

---

[41] https://www.sos.alabama.gov/sites/default/files/voter-pdfs/VoterDriveGuidelines.pdf.
[42] https://www.sos.arkansas.gov/uploads/elections/voter_drive.pdf.
[43] https://sos.iowa.gov/elections/pdf/absenteeballotapprec.pdf.

longer than the average, and Florida's notice and disclaimer requirements are not unique among states that require them and certainly not as proscriptive as several of them.

## IX. SB90's REQUIRMENTS REGARDING ABSENTEE BALLOT APPLICATION VERIFICATION PLACES NO MORE THAN AN AVERAGE BURDEN ON VOTERS

55.     The absentee ballot application verification rules vary from state-to-state, ranging from no verification because the state does not require it to states that require voters to qualify to vote absentee and further provide copies of photo identification and/or notarization to accompany the application.

56.     As Table 6 shows, Florida is one among twenty-six states that check a voters information against voter registration records to determine eligibility to vote absentee. Nine states either have no requirements because they conduct all-mail elections or minimal verification requirements. Seventeen states require voters to qualify to vote absentee with an acceptable excuse.

57.     Of the twenty-six states that check a voter's information against voter registration records, eleven require voters to sign the application and then verify the signature against the signature on the registration record. The other fifteen states, including Florida, predominantly rely on other information in the application to verify eligibility, including driver's license numbers or other identification numbers.

58.     Two of the twenty-five states that check voter information against registration records require applicants to include a copy of a photo identification (South Dakota and Wisconsin). Four of the twenty-five states, including Florida, require applicants to include on their applications either their state driver's license number, state-issued identification number, or last four of their social security number (Minnesota, Georgia, and Montana in addition to Florida).

30

## Table 6: Absentee Ballot Application Verification Rules Across the United States

| No absentee ballot application required (all-mail elections) | Colorado, Hawaii, Oregon, Utah, Washington |
|---|---|
| Minimal verification | Alaska, District of Columbia, North Dakota, Vermont |
| Information and eligibility checked against voter registration records | **Florida**\*, Kansas, Maine, Maryland, Minnesota, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oklahoma, South Dakota\*\*, Virginia, Wisconsin\*\*, Wyoming |
| Signature verification in addition to checking information and eligibility against voter registration card | Arizona, California, Georgia, Idaho, Iowa, Illinois, Michigan, Montana, New Jersey, Pennsylvania, Rhode Island |
| Voters must 'qualify' to vote absentee with an acceptable excuse | Alabama\*\*, Arkansas, Connecticut, Delaware, Indiana\*, Kentucky, Louisiana, Massachusetts, Mississippi, Missouri, New Hampshire, New York, South Carolina\*, Tennessee, Texas, West Virginia |

\*   Requires voter to provide driver's license number, state issued ID number, or last four of social security number.
\*\* Requires copy of photo identification and/or notarization accompany application.

59.    Of the sixteen states that require voters to qualify to vote absentee, Indiana also requires the applicant to include either their driver's license number, state-issued identification number, or last four of their social security number. Alabama requires applicants to include a copy of photo identification and a signature of a notary or witness.

31

60.     In terms of burden, Florida's requirements are largely average. The burden to qualify to vote absentee (as is the case in sixteen states) is certainly greater than Florida's no excuse requirement. The burden of having to provide a witness signature (as is the case in two states) is certainly greater than Florida's requirement that does not include a witness signature. The burden of requiring a copy of a photo identification (as is the case in four states) is certainly greater than Florida's requirement that does not include submitting a copy of a photo identification. In fact, Florida stands in a group of states that simply require that information and eligibility be checked against voter registration records. Only four states (other than the states that conduct all or mostly all-mail elections) have verification checks that are less strenuous.

## X. SB90's NO-EXCUSE ABSENTEE VOTING RULE MAKES FLORIDA THE MOST LENIENT STATE AMONG THOSE WHO REGULATE ABSENTEE VOTING

61.　　Rules related to how often voters must request an absentee ballot vary across the country ranging from no-excuse permanent absentee voting to voters being required to qualify and request an absentee ballot each election. Florida has no-excuse absentee voting, and its rule under SB90 that voters have to request an absentee ballot only once for all elections through the end of the calendar year of the next regularly scheduled general election makes it the most lenient among the thirty-eight states that impose some restrictions on who can request an absentee ballot and for how long.[44]

62.　　As Table 7 shows, thirteen states and the District of Columbia have some form of no-excuse permanent absentee voting, which means voters have to request an absentee ballot only once or all voters are automatically mailed a ballot each election.[45] Four states have no-excuse time-limited absentee voting, with Florida's time-limit being the longest of those. In addition to its 1-year time-limit, Alaska allows voters who are deemed to live in remote areas where they do not have reasonable access to a polling location to be placed on a permanent absentee voter list. Eleven states allow citizens with permanent disabilities or seniors above a certain age to be placed on permanent absentee voting lists, and four other states have time-limited absentee voting lists for citizens who are permanently disabled, sick, absent from the state for a certain period of time that includes the election, or seniors above certain ages.

---

[44] Chpt. 2021-11, Laws of Fla. at 18-21 (2021).
[45] An up-to-date summary of every state's rules can be found at:
https://tracker.votingrightslab.org/issues/21AbsenteeVtg#Q.

Finally, nineteen states have rules that require voters to request an absentee ballot for each election in which they wish to vote absentee. In several of these states, voters also have to qualify to vote absentee with an acceptable excuse. In five of these states (Massachusetts, Michigan, Minnesota, Missouri, and Pennsylvania) voters can be placed on a permanent list to receive the application to vote absentee, but not the ballot itself.

## Table 7: Absentee Ballot Requesting Rules Across the United States

| | |
|---|---|
| **No excuse permanent absentee voting or all-mail elections** | Arizona, California, Colorado, District of Columbia, Hawaii, Illinois (2022), Maryland, Montana, New Jersey, Nevada, Oregon, Utah, Washington |
| **No excuse time-limited absentee voting** | Alaska (1-year)**, **Florida** (up to nearly 2-years), South Dakota (1-year), Virginia (1-year) |
| **Permanent absentee voting for disability / seniors only** | Alabama, Connecticut, Delaware, Kansas, Louisiana, Mississippi, New York, Rhode Island, Tennessee, West Virginia, Wisconsin |
| **Time-limited absentee voting for disability / seniors only** | Georgia (election cycle - disabled or elderly), North Carolina (1-year - sick or disabled), Oklahoma (1-year - absent or disabled), Texas (1-year, elderly or disabled) |
| **No provision / must request each election** | Arkansas, Idaho, Indiana, Iowa, Kentucky, Maine, Massachusetts*, Michigan*, Minnesota*, Missouri*, Nebraska, New Hampshire, New Mexico, North Dakota, Ohio, Pennsylvania*, South Carolina, Vermont, Wyoming, |

\*   Voters can be placed on a permanent list to receive the application for an absentee ballot, but not the ballot itself.
\*\* Alaska allows voters who are deemed to live in remote areas where they do not have reasonable access to a polling place to be placed on a permanent absentee voter list.

34

63.     The no-excuse absentee voting rule under SB90 makes Florida the most lenient state among the thirty-eight states that regulate absentee voting in some way short of no-excuse permanent absentee or all-mail voting.

35

## XI. SB90's ELECTIONEERING PROVISIONS MIRROR THE VAST MAJORITY OF STATE RULES THAT PROHIBIT ELECTIONEERING THAT IS AIMED AT INFLUENCING VOTERS WITHIN A DEFINED SPACE AROUND A POLLING LOCATION

64. Every state regulates political activities around the physical location of polling places while voters are casting ballots, otherwise known as electioneering. These rules generally regulate what activities are or are not allowed within a certain space or zone around the polling location. Florida's regulations defined in SB90 are consistent with the vast majority of state's rules.

65. As Table 8 shows, the electioneering-free zones mandated by the various states range from within the physical space of the building in which voting is taking place to as wide as 300 yards (the equivalent of two football fields) away from the building. Florida's zone of 150 feet places it among the majority of states (twenty-seven) that impose electioneering-free zones of between 100-150 feet.

66. Prior to the enactment of SB90, Florida prohibited among other things seeking votes, and/or contributions, distributing political or campaign materials, conducting polls, seeking signatures on petitions, or attempting to sell anything.[46] Restrictions of these sorts, while they may vary in their specificity and detail, are almost universal across states. Florida added to these prohibitions in SB90 "and engaging in any activity with the intent to influence or effect of influencing a voter."[47]

---

[46] Chpt. 2021-11, Laws of Florida at 24-25 (2021).
[47] Id., at 25.

36

## Table 8: Electioneering Rules Across the United States

| | |
|---|---|
| **Prohibited within building** | New Hampshire, Vermont, Washington |
| **Prohibited between 10-75 feet of building** | Alabama, Arizona, Connecticut, Delaware, Indiana, Missouri, North Carolina, Pennsylvania, Rhode Island, Virginia, Washington, D.C. |
| **Prohibited between 100-150 feet of building** | Arkansas, California, Colorado, **Florida**, Georgia, Idaho, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nevada, New Jersey, New Mexico, New York, North Dakota, Ohio, Oregon, South Dakota, Tennessee, Texas, Utah, West Virginia, Wisconsin |
| **Prohibited between 200-250 feet of building** | Alaska, Hawaii, Kansas, Maine, Nebraska, South Carolina |
| **Prohibited 300 feet or greater from building** | Iowa, Louisiana (300 yards), Oklahoma, Wyoming |

67.     This broader language is also not uncommon, and is included in almost every state's rules governing electioneering. For instance:

- Wisconsin's law says in part: "'Electioneering' is defined as any activity which is intended to influence voting at an election."[48]

- Arizona's law says in part: "'Electioneering' occurs when a person knowingly, intentionally, and verbally expresses support for, or opposition to, a candidate or

---

[48] Wis. Stat. § 12.03 (2013)

37

ballot measure on the ballot in that election, or a political party with one or more candidates who appear on the ballot in that election, in order to induce or compel another person to vote in a particular manner or to refrain from voting."[49]

- Maine's law says in part: "On public property within **250 feet** of the entrance to the voting place as well as within the voting place itself, a person may not influence another person's decision regarding a candidate or question that is on the ballot for the election that day; or attempt to influence another person's decision regarding a candidate or question that is on the ballot for the election that day."[50]

- Massachusetts' law says in part: "no person shall solicit votes for or against, or otherwise promote or oppose, any person or political party or position on a ballot question, to be voted on at the current election. No campaign material intended to influence the vote of a voter in the ongoing election, including campaign literature, buttons, signs, and ballot stickers, may be posted, exhibited, circulated, or distributed in the polling place, in the building where it is located, on the building walls, on the premises where the building stands, or within 150 feet of an entrance door to the building."[51]

- Michigan's law says in part: "A person shall not persuade or endeavor to persuade a person to vote for or against any particular candidate or party ticket or for or against any ballot question that is being voted on at the election."[52]

---

[49] Ariz. Rev. Stat. § 16-515 (2021).
[50] Me. Stat. tit. 21-A, §682 (2019).
[51] Mass. Gen. Laws ch. 54, § 65 (2021).
[52] Mich. Comp. Laws §§ 168.744, 168.744a (2021).

- Montana's law says, in part: "A person may not aid or promote the success or defeat of any candidate or ballot issue to be voted upon at the election."[53]

68. In sum, Florida's electioneering provisions in SB90 mirror the vast majority of state rules that prohibit electioneering that is attempting to influence voters within a certain space or zone around the polling location.

---

[53] Mont. Code Ann. § 13-35-211 (2021).

## XII. CONCLUSION

69.     The simple conclusion of this analysis is the following: early voting and absentee voting in Florida has become easier and more convenient over time. Additionally, the rules in SB90 governing drop boxes, third-party ballot collection, third-party voter registration, absentee ballot application verification, frequency of requesting an absentee ballot, and voter solicitation at the polling location when compared with the other states' and the District of Columbia's rules show in none of the six areas is Florida outside of the norm. In several of the areas Florida's rules and regulations place the state among the more accessible from a comparative perspective when it comes to voting and access to voting resources.

70.     Specially, to reiterate the findings of this analysis:

- The net impact of changes in **early voting** and **vote by mail** rules in Florida since the 1980s has been to make voting easier. Florida law has changed over time from restrictions related to needing an excuse to vote early and needing a notary or witness to no excuse and no witness requirements. Early voting has gone from non-existent to up to two-weeks since it was first instituted in 1998.

- Florida stands among a small group of states that require **drop boxes** to be widely available to voters.

- When it comes **third-party ballot collection**, Florida stands among the vast majority of states that impose some regulations and restrictions on the number of ballots that an individual can collect and return, but is less restrictive than over half.

40

- Florida's **third-party voter registration** rules are generally consistent with the vast majority of states that impose requirements on third party voter registration organizations.

- Florida's **absentee ballot application verification** requirements are largely average.

- Florida's two-year no-excuse absentee voting rule related to the **frequency of requesting an absentee ballot** makes it the most lenient state among the thirty-eight states that regulate absentee voting in some way short of no-excuse permanent absentee or all-mail voting.

- Florida's **electioneering (voter solicitation)** regulations and restrictions mirror the vast majority of state rules across the country in prohibiting electioneering that is attempting to influence voters with a certain space or zone around the polling location.

I reserve the right to supplement this report in light of additional facts, testimony, and/or materials that may come to my attention.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 29th day of September, 2021.

_____

Quentin Kidd, Ph.D.

# QUENTIN KIDD
## CURRICULUM VITAE

### CURRENT:

Dean of the College of Social Sciences and Founding Director of the Judy Ford Wason Center for Public Policy at Christopher Newport University.

### FORMAL EDUCATION:

Ph.D.          Political Science, Texas Tech University, 1998.
M.A.           Political Science, University of Arkansas, 1993.
B.A.           Political Science, University of Arkansas, 1991.

### CONTINUING EDUCATION:

Management & Leadership in Education, Harvard University, 2018.
Council of Colleges of Arts and Sciences New Deans Workshop, 2016.

### ACADEMIC APPOINTMENTS:

Professor of Political Science, Christopher Newport University, 2012-present
Associate Professor of Political Science, Christopher Newport University, 2003-2012
Assistant Professor of Political Science, Christopher Newport University, 1997-2003

### ADMINISTRATIVE MANAGEMENT AND LEADERSHIP:

Dean of College of Social Sciences, 2017-present

Leadership Responsibilities: Responsible for the overall organization, administration, personnel management, fiscal management and coordination of academic programs and instructional activities of the College, comprising half of all graduates, nearly 80 full-time faculty, around 35 part-time faculty, 9 staff, and a budget of approximately $8.5 million.

Accomplishments:

- Fundraising: Negotiated and secured $1,000,000 matching endowed gift ($2,000,000 total) to support scholarships for students in the College.
- Strategic Planning: Oversaw the first strategic plan in the College's history.
- Fundraising: Played a central role in the fundraising and establishment of an endowed professorship ($500,000+) in Jewish studies.
- Research: Initiated the first of what is planned to be an annual national survey on leadership values and attitudes. The study is designed to be a highlight study for the Department of Leadership and American Studies (annual budget of $35,000).
- Fundraising for Research: Raised initial $50,000 research startup funds from private industry to established the Center for Education Policy and Research within the College.
- Administrative Work: Successfully completed the first outside chair search in the history of the College in the Department of Economics.
- Faculty Life: Initiated a junior faculty (pre-tenure) research incubator as a format to encourage and support junior faculty research.

43

- Faculty Life: Began a series of faculty socials (three per semester) as a way to bring faculty together in a social and non-working setting.
- Research: Initiated discussion with faculty in Sociology, Psychology, Communication, and Political Science about establishing an interdisciplinary research program in health-related fields.
- Curricular: Initiated a discussion with department chairs on the "just right major", and whether our curriculum in the social sciences includes enough courses that teach analytics skills (such as programming or data analytics) that students will need on the job market.
- Facilities: Initiated the redesign and construction of facilities in the College to allow for better utilization of space.

Vice Provost for Undergraduate Education, 2014-2017

Leadership Responsibilities: As senior vice provost, served as a member of the senior academic leadership team responsible for working collaboratively with other senior administrators and faculty on strategic academic planning and implementation of the University's academic vision and mission.

Accomplishments:
- Worked closely with University provost to develop the academic affairs budget (just above $50 million)
- Conducted provost-level interviews of candidates for faculty positions and negotiated offers when Provost was unavailable.
- Provided management and oversight of annual evaluation calendar and process for all 285 University faculty.
- Provided management and oversight of faculty tenure and review process.
- Served as administrative coordinator for the various faculty curriculum review and oversight committees.
- Collaborated with other University leadership on compliance with Commission on Colleges of the Southern Association of Colleges and Schools (SACCOC) requirements.
- Worked with Faculty Senate on University initiatives and University Handbook changes.
- Responsible for policy and administrative oversight of the following units: Honors Program, Center for Community Engagement, Center for Effective Teaching, and Study Abroad and International Programs.
  - Oversaw implementation of new Christopher Newport study center at the University of Glasgow and exchange program with Beijing Normal University.
  - Negotiated exchange programs between Christopher Newport and Tsinghua University and Shanghai University of Political Science and Law in China, and Kozminski University in Poland.
  - Oversaw expansion of Study Abroad office staff and doubling of number of students studying abroad from approximately 200 to 400 per year.
- Served as Christopher Newport's liaison to State Council of Higher Education for Virginia (SCHEV) Provost-level Academic Affairs and Planning committee.
- Served as University Ombudsman.
- Served on Christopher Newport's SACSCOC reaccreditation leadership team.

- Participated in fundraising activities in support of University's comprehensive campaign "Defining Significance" (raised $67 million).

Chair, Department of Government and Public Affairs, 2008-2014

Leadership Responsibilities: Responsible for the overall organization, administration, fiscal management and coordination of academic programs and instructional activities of the department of 400 majors, 13 full-time, 10 part-time faculty, 1 staff and a budget of just over $50,000.

Accomplishments:
- Hired 7 new faculty (5 tenure track and 2 lecturers) in the Department, including dramatically broadening the diversity profile of faculty.
- Evaluated faculty for pre-tenure, tenure, post-tenure, and promotion review.
- Conducted annual reviews of all full-time faculty for merit purposes.
- Regularly evaluated teaching performance of part-time and adjunct faculty.
- Led Department through major curriculum evaluation and program redesign.
- Initiated Departmental and academic major program evaluation.
- Developed schedule of classes and dynamically adjusted schedule during enrollment to eliminate student-scheduling problems.

Founding Director, Judy Ford Wason Center for Public Policy, 2007-Present

Leadership Responsibilities: Initiated the original concept of and fundraising for the establishment of the Wason Center for Public Policy. To date have raised ≈$2.2 million in private donations, including ≈$600,000 in endowments, to support the Wason Center.

Accomplishments:
- Grew the Wason Center from a one-person operation to a 3-staff and 100-student operation.
- Opened a 24-station fully-operational survey research laboratory on campus.
- Awarded ≈$400,000 in grants and contracts to conduct research on public policy topics ranging from quality of life and transportation to fish and wildlife surveys.

## FUNDRAISING AND GRANTS:

- Actively participated in many aspects of advancement as part of Christopher Newport's first comprehensive campaign, *Defining Significance* (total of $67 million raised), including initiating the fundraising for an endowed Professorship in Jewish Studies ($500,000+) and participated in direct fundraising for gifts and endowed scholarships for study abroad and other programs and scholarships.
- Secured a $1,000,000 matching endowed gift ($2,000,000 total) to support scholarships in the College of Social Sciences.
- Participated in the fundraising discussions that resulted in the lead gift to establish the Reiff Center for the Study of Human Rights and Conflict Resolution (to date Center endowed at ≈$1 million).

- Lead the fundraising ($50,000) to establish the Center for Education Research and Policy in the College of Social Sciences.
- Lead all fundraising, and grant and contract awards, related to the Wason Center for Public Policy (to date ≈$2.6 million).

## AREAS OF RESEARCH INTEREST:

Civic Participation, Political Behavior, and Political Change.

## PUBLICATIONS:

Books (5):

2012 *The Rational Southerner: Black Mobilization, Republican Growth and the Partisan Transformation of the American South*. Oxford University Press. (co-authored with MV Hood III and Irwin L. Morris).
- Nominated for the **V.O. Key Award** for outstanding book on Southern Politics, the **Ralph Bunch Award** for best scholarly work exploring the phenomenon of ethnic and cultural pluralism, and the **Leon D. Epstein Award** for research on political organizations and parties.
- Soft cover edition 2014

2012 *A Simple Guide to SPSS® for Political Science*. Belmont, CA: Wadsworth (textbook co-authored with Lee Kirkpatrick)

2011 *Civic Participation in America*. New York: Palgrave Macmillan
- Soft cover edition 2013

2000 *American Government: Readings from Across Society*. New York: Longman. (Editor)

1999 *Government and Politics in Virginia: The Old Dominion at the 21$^{st}$ Century*. Needham Heights, MA: Simon & Schuster. (Editor)

Refereed Journal Articles and Book Chapters (22):
   Double-blind Reviewed Articles on Politics (12):

2020 "Switching Sides but Still Fighting the Civil War in Southern Politics," in *Politics, Groups, and Identities* (Summer 2020 publication), (Christopher A. Cooper, M.V. Hood III, Scott Huffmon, H. Gibbs Knotts, and Seth C. McKee, co-authors).

2019 "Ready for Hillary: Sexism in the Evaluations of the 2016 Presidential Candidates," in *The Forum* 17(2): 295-313, (Rachel Bitecofer and Michelle Barnello, co-authors).

2015 "Tea Leaves and Southern Politics: Explaining Tea Party Support Among Southern Republicans" in *Social Science Quarterly* 96: 96-112, (M.V. Hood III and Irwin L. Morris, co-authors).

2015 "Race and the Tea Party in the Old Dominion: Split-Ticket Voting in the 2013 Virginia Elections" in *PS: Political Science and Politics* 48: 107-114, (M.V. Hood III and Irwin L. Morris, co-authors).

2008 "Two Sides of the Same Coin? Employing Granger Causality Tests in a Time Series Cross-Section Framework" in *Political Analysis* 16:324-344, (M.V. Hood III and Irwin L. Morris, co-authors).

2008 "The Real (lack of) Difference Between Republicans and Democrats: A Computer Word Score Analysis of Party Platforms, 1996-2004" in *PS: Political Science and Politics* 41:519-525.

2007 "Black Voters, Black Candidates, and Social Issues: Does Party Identification Matter?"

*Social Science Quarterly*, 88: 165-176, (Herman Diggs, Mehreen Farooq, and Megan Murray, three student co-authors).

2003 "A Report on the Reintroduction of the Elephas maximus in the Southern United States: Explaining the Rise of Republican State Parties, 1960-2000." *American Politics Research* 31: 1-34, (M.V. Hood III and Irwin L. Morris, co-authors).

2001 "The Key Issue: Constituency Effects and Senatorial Roll Call Voting on Civil Rights." *Legislative Studies Quarterly* 26: 599-621, (M.V. Hood III and Irwin L. Morris, co-authors).

1999 "Of Byrd[s] and Bumpers: Using Democratic Senators to Analyze Political Change in the South, 1960-1995." *American Journal of Political Science* 43: 465-487, (M.V. Hood III and Irwin L. Morris, co-authors).

1997 "More on Postmaterial Values and the Environment." *Social Science Quarterly* 78: 36-43, (Aie-Rie Lee, co-author).

1997 "Postmaterial Values and the Environment: A Critique and Reappraisal." *Social Science Quarterly* 78: 1-15 (Aie-Rie Lee, co-author).

Double-blind Reviewed Articles on the Discipline and the Scholarship of Teaching (3):

2006 "Civic and Political Leadership Education." *Academic Exchange Quarterly*, 10: 77-81, (R. Marc Johnson, Sean O'Brien, and Thomas Shields, co-authors).

1999 "Texas Graduate Programs in Political Science: A Research Note." *Texas Journal of Political Studies* 21: 65-71, (Nelson C. Dometrius, M.V. Hood III, and Kurt A. Shirkey, co-authors).

1998 "Bugs in the NRC's Doctoral Program Evaluation Data: From Mites to Hissing Cockroaches." *PS: Political Science & Politics* 31:829-835, (Nelson C. Dometrius, M.V. Hood III, and Kurt A Shirkey, co-authors).

Peer Reviewed Book Chapters (7):

2012 "Partisan Change in the American South: From Radical Fringe to Conservative Mainstream." In *Oxford Handbook of Southern Politics*, Charles S. Bullock, III and Mark J. Rozell, editors. New York: Oxford University Press. (M.V. Hood III and Irwin Morris, co-authors).

2011 "The Rintroduction of Elephas Maximus to the Southern United States: The Rise of Republican State Parties (Updated)." In *Controversies in Voting Behavior, 5th ed.* Richard Niemi, Herbert Weisberg and David Kimball, eds. Washington, DC: Congressional Quarterly. (M.V. Hood III and Irwin Morris, co-authors).

*2004  How It Happened! The 2004 Race for the White House as Reported by The New York Times*. New York: Longman. (A supplement with commentary bound in all 2004 editions of Longman's *American Government: Continuity and Change*.)

1999 "Virginia's Governor: Curator of the Political Museum Piece." In Quentin Kidd, ed., *Government and Politics in Virginia: The Old Dominion at the 21st Century*. Needham Heights, MA: Simon & Schuster (Laura Van Assendelft, co-author).

1999 "The General Assembly: Coping with Change and Tradition." In Quentin Kidd, ed. *Government and Politics in Virginia: The Old Dominion at the 21st Century*. Needham Heights, MA: Simon & Schuster (Connie Jorgensen, co-author).

1997 "Environmental Policy in Texas: Opportunities and Challenges for the 21st Century." In Mark Somma, ed., *Texas Policy and Politics*. Needham Heights, MA: Simon & Schuster

(Evan J. Ringquist, co-author).
1997 "Black Gold and Texas Tea: The Energy Industry in Texas." In Mark Somma, Ed., *Texas Policy and Politics*. Needham Heights, MA: Simon & Schuster (Evan J. Ringquist, co-author).


Research Reports (14)                                                    * Grant Funded
2019, "Feasibility Study of Retirement Savings Programs for Virginia." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*
2018, "Understanding Hampton Roads: A Snapshot of What We Care About." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*
2017, "Public Opinion & Environmental Policy in the Commonwealth." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Rachel Bitecofer & Katelyn Hoisington.*
2016, "The Cost of Retiring in Virginia." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Jia Yu.*
2015, "Virginia Millennials Come of Age." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Tom Kramer & Sarah Miller.
2015, "Commonwealth of Contrasts: A Political Typology of the Virginia Electorate." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Tom Kramer and Sarah Miller.
2014, "Envision Hampton Roads." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia, with Chris Bonney.*
2014, "Results of the 2013-2014 Virginia Hunter Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*
2014, "Results of the 2013-2014 Virginia Trapper Harvest Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*
2014, "Results of the 2013-2014 Virginia Waterfowl Hunter Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*
2014, "South Hampton Roads Midtown and Downtown Tunnels Tolls Survey." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*
2013, "Offshore Wind Energy: Regulations and Market Distortions in the EU and US." Christopher Newport University, Newport News Virginia, with Thomas Hall.*
2013, "A Report on the Views of Newport News Residents of the Virginia Living Museum and the City's Arts and Cultural Attractions." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*
2010, "The Present and Future of Transportation in Hampton Roads." Wason Center for Public Policy, Christopher Newport University, Newport News, Virginia.*


Invited, Commissioned, and other Non-refereed Essays and Chapters (14):
2017, "How to win elections under Trump? Democrats may have figured it out." November 10. *The Washington Post*, B1, with Rachel Bitecofer.
2016, "Students Are Inconsistent Voters for a Reason." *New York Times*. March 22, 2016. http://www.nytimes.com/roomfordebate/2016/03/22/do-college-students-votes-really-matter-in-an-election.
2015, "Afterword." In *Mark Warner the Dealmaker: From Business Success to the Business of Governing*, Will Payne, Mt. Pleasant, SC: The History Press.

2014, "Virginia's Ethics Rules for Public Officials: The Need for Reform" *The Virginia News Letter* Vol. 90 (1), with Meyrem Baer.

2014, "Bob and Maureen McDonnell: Middle Class in the Governor's Mansion." January 23. *The Washington Post*, B1.

2012, "Accessible Redistricting," *Virginia Issues & Answers* 17 (Winter): 10-11.

2010, "Civic Engagement: A Topic as Old as Jefferson and as New as Today," *Choice* 47(May).

2008, "The Purpling of Virginia." *Richmond Times-Dispatch*, E-1

2007, "Mitt Romney." *San Diego Union-Tribune*, G1.

2007 "Love Lost? Byrd-era Values and Suburban Virginia Voters." *New Dominion* 1(3): 67-71.

2004 "The Virginia GOP's Responsibility Gap." April 4. *The Washington Post*, B1.

2003 "What We Don't Hear May Be Bad For Our Democracy." October 12. Newport News *Daily Press*, K1.

2003 "The Failed Transportation Tax: A Simple Message From Voters?" *The Virginia News Letter* Vol. 79 (1).

1996 "Verification/Replication: A Graduate Student's Perspective." *PS: Political Science & Politics* 29(3):415.


Encyclopedic Entrees (8):

1996 "The Cold War" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Carl B. Albert" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Thomas S. Foley" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Franklin Pierce" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Henry T. Rainey" in George Kurian, ed., *Encyclopedia of the Democratic Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "The Cold War" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Frederick H. Gillett" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk, NY: M.E. Sharpe, Inc.

1996 "Thomas B. Reed" in George Kurian, ed., *Encyclopedia of the Republican Party*. Armonk, NY: M.E. Sharpe, Inc.


Other Non-refereed publications (1):

2001 *LongmanParticipate.com* – content author for Simulation and Comparative sections.


Book Reviews (19):

*2007 Devolution and Black State Legislators,* by Tyson King-Meadows and Thomas F. Schaller. *Perspectives on Politics 5(4): 829-830.*

*2007 A New Kind of Engagement?,* by Cliff Zukin, et al. *Choice* 45 (March).

*2007 Common Ground: Committee Politics in the U.S. House of Representatives,* by John Baughman. *Choice* 45 (March).

*2006 Politics in the New South,* edited by Charles E. Menified and Stephen D. Shaffer. *Choice* 44 (March).

*2005 Senate Procedures and Practices,* by Martin B. Gold. *Choice* 43 (June).

*2005 Counting Votes: Lessons From the 2000 Presidential Election in Florida,* edited by Robert P. Watson. Choice 42 (January).

*2003 Congress and Defense Spending: The Distributive Politics of Military Procurement*, by Barry S. Rundquist and Thomas M. Carsey. Choice 41 (September).

*2002 Change and Continuity in the 2000 Elections*, by Paul R. Abramson, John H. Aldrich, and David W. Rohde. Choice 40 (September).

*2002 Government and Politics in Tennessee,* by William Lyons, John m. Scheb, and Billy Stair. Choice 39 (June), 2002.

*2001 Partisan Linkages in Southern Politics: Elites, Voters, and Identifiers*, by Michael A. Maggiotto and Gary D. Wekkin. Choice 38 (February).

*2001 Realignment and Party Revival: Understanding American Electoral Politics at the Turn of the Twenty-first Century*, by Arthur Paulson. Choice 38 (January).

*2000 Before the Vote: Forecasting American National Elections*, by James E. Campbell and James C. Garand, eds. Choice 37 (June).

*2000 Methods and Models A Guide to the Empirical Analysis of Formal Models in Political Science*, by Rebecca B. Morton. Choice 37 (March).

*2000 Assessing the New Federalism State Database*. Web Site. Choice 37 (January).

*1999 Opensecrets*. Web Site. Choice 36 (Special Supplement III) p. 182.

*1999 Short of the Glory: The Fall and Redemption of Edward F. Prichard Jr.,* by Tracy Campbell. *Choice* 36 (March).

*1999 Tennessee Government and Politics: Democracy in the Volunteer State*, by John R. Vile and Mark Byrnes, eds. *Choice* 36 (February).

*1999 Center for Responsive Politics*. Web Site. *Choice* 36 (February).

*1995 On The Make: The Rise of Bill Clinton*, by Meredith L. Oakley. *Texas Journal of Political Studies* 17(Spring/Summer): 84.


**WORK IN PROGRESS:**

"License to Drive" – in the early stages of a book-length study examining the evolution of the driver's license from a sheet of paper giving permission to operate a modernized vehicle in the early 1900s to effectively a national identification card containing federally mandated biometric information today.


**PAPERS AND ACTIVITIES AT PROFESSIONAL MEETINGS (most recent 10 of 45):**

"Polarized Politics and Evaluation Criteria for Supreme Court Nominees: Lessons from the Gorsuch Nomination." (with Rachel Bitecofer and Rich Vining). Presented at the Annual Meeting of the American Political Science Association, August 2018.

"Polarized Politics and Evaluation Criteria for Supreme Court Nominees: Lessons from the Gorsuch Nomination." (with Rachel Bitecofer and Rich Vining). Paper presented at the Annual Meeting of the Western Political Science Association, April 2018.

"It's Not the Message: Partisan Cues in a Polarized Era." (with Rachel Bitecofer). Paper presented at the Annual Meeting of the Southern Political Science Association, January 2018.

"Seeing is Believing: The Role of Geographic Proximity in Mitigating Partisan Attitudes Toward Environmental Issues." (with Rachel Bitecofer and Andrew Kirkpatrick). Paper presented at the Annual Meeting of the Southern Political Science Association, January 2018.

"Ready for Hillary: Sexism in the Evaluations of the 2016 Presidential Candidates." (with Rachel

Bitecofer and Michelle Barnello). Paper presented at the Annual Midwest Political Science Association Conference, April 2017.

"Electoral Implications of Racial Resentment in the South (and Beyond): The Case of Clinton v. Trump" (with M.V. Hood and Irwin L. Morris). Paper presented at the Annual Meeting of the American Political Science Association, Philadelphia, PA, September 1-4, 2016.

"Candidate Race and Perceptions of Candidate Ideology: The Tea Party, Racial Resentment, and the 2014 Elections in the Palmetto State" (with M.V. Hood and Irwin L. Morris). Paper presented at the Citadel Symposium on Southern Politics. Charleston, SC, March 3-4, 2016.

"Racial Resentment and the Tea Party: Taking Regional Differences Seriously" (with M.V. Hood and Irwin L. Morris). Poster presented at the Annual Meeting of the American Political Science Association, Chicago, IL, September 2-5, 2015.

"Millennial Civic Engagement" (with students Sarah Miller and Dagney Palmer). Poster presented at the Annual Meeting of the Midwest Political Science Association, Chicago, IL, April 7-10, 2015.

"Race and the Tea Party in the Palmetto State: Tim Scott, Nikki Haley, Bakari Sellers and the 2014 Elections in South Carolina" (with M.V. Hood and Irwin L. Morris). Paper presented at the Annual Meeting of the Southern Political Science Association Meeting, New Orleans, LA, January 15-17, 2015.

## SURVEY RESEARCH AND SURVEYS CONDUCTED:

Conducted nearly 100 regional, statewide, and national surveys focusing on politics and public policy topics for public consumption, media organizations, and research.

## DETAILS ON GRANTS FOR RESEARCH ($\approx$$365,000):

Hampton Roads Transportation Planning Organization ($15,978) to conduct a survey of users of the Capital to Capital bike trail in Williamsburg, Virginia, 2019.

Hampton Roads Community Foundation ($25,000) to conduct a regional forward-looking quality of life survey in Hampton Roads, Virginia, 2018.

AARP Work and Save Study #CNT0009935 ($50,000) to conduct an economic analysis of the cost of establishing a work and save program in Virginia, 2018.

AARP Retirement Study #CNT0006626 ($8,000) to conduct an economic analysis of the projected cost to live in retirement in Virginia over the next 10 years, 2016.

Virginia Environmental Endowment Grant #16-15 ($13,500) to conduct a statewide survey of Virginia residents on environmental attitudes, 2016.

Hampton Roads Planning District Commission ($29,000) to conduct a region-wide survey focusing on public policy values and preferences, 2015.

Virginia Department of Game and Inland Fisheries ($79,000) to conduct surveys of hunters and trappers in Virginia, 2014.

Dominion Resources Renewable Portfolio Standards Research and Development Partnership ($50,000) for "Overview of Offshore Wind Energy in the United States and the European Union (Tom Hall, Co-Principle Investigator), 2012.

Hampton Roads Transportation Planning Organization ($40,000) to conduct focus groups in Hampton Roads on transportation, 2010.

Virginia Environmental Endowment Grant #08-11 ($40,000) to conduct the Virginia Environmental Attitudes Survey, 2009, 2010, and 2011.

Faculty Research Grant ($1, 945) from Christopher Newport University for "Words as

Data: Determining the Ideological Position of Political Parties from Convention
Acceptance Speeches", 2004.
Faculty Research Grant ($1,750) from Christopher Newport University for "Race as an
Issue in Southern Gubernatorial Races: 1950-2000", 2001.

## EXPERT WITNESS

*Holloway v. City of Virginia Beach*, No. 2:18-cv-00069 (2019)
*Jabbour v. Merrill*, No. 1:20-cv-00034-JB-N (2020)
*People First of Alabama v. Merrill*, No 2:20-cv-00619-AKK (2020)
*Clark v. Edward*, No 20-cv-308-SDD-RLB and *Power Coalition v. Edward*, No. 20-cv-283-
SDD-RLB (2020)
*Harding v. Edwards*, No 3:20-cv-00495-SDD-RLB (2020)
*Thompson v. Merrill*, No 2:15-cv-783-ECM-SMD (2020)

## TEACHING AREAS OF INTEREST/SPECIALIZATION (undergraduate):

American Politics:     American Politics, Political Behavior, Virginia Politics, Political Parties,
                       Political Campaigns and Elections, and Virginia Government and Politics.
Methodology:           Methods of Social Science Research, Quantitative Analysis

## TEACHING AND RELATED EXPERIENCE:

Courses Taught:
GOVT 100 Political Thought and Society, Christopher Newport University.
GOVT 101 Power and Politics in America, Christopher Newport University.
GOVT 202 State and Local Politics, Christopher Newport University.
GOVT 351 Methods and Tools of Social Science Research, Christopher Newport University.
GOVT 352 Research Methods and Quantitative Analysis, Christopher Newport University.
GOVT 363 Judicial Process, Christopher Newport University.
GOVT 354 Political Campaigns and Elections, Christopher Newport University.
GOVT 333 Legislative Politics, Christopher Newport University.
GOVT 344 The Presidency, Christopher Newport University.
GOVT 454 American Political Behavior, Christopher Newport University.
GOVT 552 Advanced Quantitative Analysis (graduate), Christopher Newport University.
HONR 490 Problems in the Modern World, Christopher Newport University.
HONR 335: The Good Society, CNU study abroad course at Harris Manchester College,
University of Oxford.

## ACTIVITIES AND SERVICES:

To Community:
Board Member, **United Jewish Community of the Virginia Peninsula**, 2020 to present
        (Newport News, Virginia)
Board Member, **Riverside Regional Health System Foundation**, 2019 to present (Newport
        News, Virginia)
Committee member, **757 Recovery & Resilience Action Framework Committee**, Hampton
        Roads Alliance, 2019 to present (Norfolk, Virginia)
Member, **Governance/Funding Working Group of Hampton Roads Transit**, 2019 to present
        (Norfolk, Virginia).
Board Member, **Rodef Sholom Temple**, 2019 to present (Newport News, Virginia).

Committee member, **Logistics Committee of the 2019 Commemoration Steering Committee**, 2016 to present (Virginia statewide).

Advisor, **Independent Bipartisan Advisory Commission on Redistricting** (appointed by Governor Bob McDonnell, the commission's job was to propose new redistricting maps to the Governor and General Assembly), January 2011 to April 2011 (Virginia statewide).

Board Member, **Hampton Roads Center for Civic Engagement** (a non-partisan organization to promote greater citizen participation in politics and public policy in Hampton Roads, Virginia), 2007 to 2012 (Hampton Roads regional).

Board Member, **Blogs United** (a non-partisan organization to promote ethical behavior in the pursuit of citizen participation in the political process), 2008 to 2015 (Virginia statewide).

Appointed to (elect chair January 2005) the **Governor's Commission on National and Community Service**, April 2002 (appointed by Governor Mark Warner and reappointed 2003, 2004, and 2005) (statewide).

Faculty Chair, College Leaders Program of the Sorensen Institute at The University of Virginia, 1999-2016.

Invited speaker, approximately four dozen invited talks per year, locally to statewide and Washington D.C.

Guest and/or quoted in various local, regional, national and international radio and television on topics related to elections, politics, and public policy.

To Department & University:

University Budget Advisory Committee, Christopher Newport, 2010-2014 & 2017 to present.

Chair, Luter School of Business Dean Search Committee, Christopher Newport University, 2015.

Chair, Provost Search Committee, Christopher Newport, 2014.

Chair, Liberal Learning Core Curriculum Task Force, Christopher Newport, 2011-2012.

Chair, Department of Government, Christopher Newport, 2008-2014.

Member, American Studies Development Committee, Christopher Newport, 2005-2006.

Coordinator, Prestigious Scholarships Mentoring Program, Christopher Newport, 2003-present.

Co-Chair, Faculty Council on Liberal Learning, Christopher Newport, 2004-2006.

Senator, Faculty Senate of Christopher Newport, 2000-2006 (member of Executive Committee 2002-2003 and 2005-2006, Secretary 2003-2004 academic year).

Co-Chair, Task Force on Curriculum and Academic Life, Christopher Newport, 2002-2004.

Dean William Parks Colloquia, Christopher Newport, fall 2000-spring 2004 (Chair 2001-2004).

Member, Undergraduate Degrees Committee, Christopher Newport, 1998-2002.

Member, Committee for the Library of the 21st Century, Christopher Newport, 2001-2002.

Member, General Education Council, Christopher Newport, 1999-2002.

Member, Online Faculty Advisory Committee, Christopher Newport, 1999-2001.

Member, Student Assessment Committee, Christopher Newport, 1999-2000.

Member, International Studies Committee, Christopher Newport, 1998-2000.

Served as member of over three dozen search committees at Christopher Newport.

To Discipline:

Served on Executive Committee of the Undergraduate Education Division of the American Political Science Association, 2004-2013 [Treasurer, 2007-2013].

Served on Annual Meetings Committee of the American Political Science Association, 2006-2008.

Book Review Editor, *Journal of Political Science Education*, Fall 2005-2012.

Division Chair for the Undergraduate Education Division of the 2005 American Political Science Association Annual Meeting, Washington, D.C., September 1-4, 2005.

Grader, American Government Advanced Placement exam, Summers 2002 and 2004.

Book and web page reviewer for *Choice*, 1998-2011.

Manuscript reviewer for *Legislative Studies Quarterly*, *Social Science Quarterly*, *American Journal of Political Science, American Politics Quarterly*, and the *Journal of Politics*, October 1996 to present.

## RECENT PROFESSIONAL MEMBERSHIPS:

Council of Colleges of Arts and Sciences, American Conference of Academic Deans, American, Southern, Southwestern, and Midwestern Political Science Associations, American Association of Public Opinion Researchers, Virginia Association of Political Scientists.

## AWARDS AND HONORS:

*Outstanding Faculty Award,* State Council of Higher Education for Virginia, 2014 (extremely competitive statewide)

*Annual Faculty Award for Excellence in Scholarship*, Christopher Newport University, 2013 (given annually by the University Provost – nominated by faculty committee).

*Dr. Wolfgang Pindur Award for Service in Academia and Practice*, 2013 (given annually by the Hampton Roads chapter of the American Society of Public Administration).

*Alumni Society Award for Excellence in Teaching and Mentoring*, Christopher Newport University, 2008 (annually awarded to one member of the faculty – nominated by chair or dean and selected by panel of alumni).

*Professor of the Year*, Christopher Newport University, 2002-2003, 2003-2004, 2005-2006 (annual award to one member of the faculty - nominated and selected by students).

Honored by the American Political Science Association at its annual meeting in 2002, 2003, and 2006 for teaching.

# Response and Supplemental Declaration of Quentin Kidd

1. This is a response to the supplemental and rebuttal expert reports to my original declaration submitted on 29 September, 2021.


2. In this response and supplemental declaration I:

- Respond to the contention that I do not use standard methods of political science and social science. In particular I briefly describe the methods of process tracing and typology analysis;

- Briefly respond to the criticism that I did not include historical context, contemporary debate, effects, or motives in my analysis. I explain that my task was narrowly assigned and focused on those specific questions outlined, and it was to this task that I stayed narrowly focused;

- Briefly respond to the criticism that I did not categorize states accurately that had allowed the use of Dropboxes under temporary public health measures. I explain that my focus was on categorizing state's Dropbox rules according to their permanent laws, not their temporary public health measures. I also note that the third category on Table 3 could be more accurately labeled 'no enabling legislation'; and

- Briefly respond to the criticism that I did not include citations for all statutes used to develop typologies by providing those citations.



M. McDonald
10/29/21

**EX. 4**

T. Piderit

1

# Standard Methods

3. Plaintiff's experts contend that I do not employ standard methods used by political scientists and social scientists in my report. This is simply wrong.

4. In examining changes to Florida's absentee voting rules and early voting rules, I employ a very simple method of descriptive within-case process tracing.[1] I focus very narrowly on these two statutes and the evolution of their wording from the mid-1990s to present. Tracking status changes of laws over time, whether focusing descriptively and narrowly on the text of the statute (such as what I do in sections IV and V of my report) or also including analysis of the political and social conditions is a common method in the social sciences. My narrow focus was driven by the questions I was tasked with addressing.

5. In sections IV through XI of my report, where I compare parts of SB90 with the other fifty states and the District of Columbia, I employ a well-established analytic tool in the social sciences called Typologies. Typologies, commonly defined as organized systems of types, have a long history in the social sciences. Among the best-known works, for instance, include Weber's (1978) distinction among traditional, charismatic, and rational authority and Carmines and Stimpson's (1980) distinctions among no-issue, easy-issue, hard-issue, and constrained-issue voters.[2]

---

[1] See David Collier (2011) "Understanding Process Tracing," *PS: Political Science and Politics* 44 (4): 823-830 for a broad description of the method.
[2] See Max Weber (1978) *Economy and Society*, Berkeley: University of California Press and Edward G. Carmines and James A. Stimson (1980) "The Two Faces of Issue Voting," *American Political Science Review* 74:78-91.

6. Simply put, process tracing and typologies are well-established methods of qualitative political science and social science research.

# Context

7. Plaintiff's experts criticize my report for not providing historical context, contemporary debate, effects, or motives. My task was narrowly assigned and focused on those specific questions outlined in section II of my declaration, and it is on those questions that my report is focused. I was not asked to, nor did I conduct, any analysis beyond those specific questions.

8. Additionally, plaintiff's experts contend my analysis of Dropbox availability is wrong because I did not consider states that implemented public health exceptions related to the COVID-19 pandemic in my analysis. Again, my task was to examine the permanent laws as they related to Dropbox usage and not the temporary public health exceptions. I recognize that many states provided temporary exceptions due to the COVID-19 pandemic. I also note that the third category on Table 3 could be more accurately labeled 'no enabling legislation' rather than 'prohibited', as I've also noted in the citations below.

# Citations

9. Plaintiff's experts criticized the lack of individual source citations for every state's code for every table in the typology analysis. Thus, individual source citations to those individual code

---

Another very well-known study that relies on the method of typologies is Robert A. Dahl's (1971) *Polyarchy: Participation and Opposition*, New Haven: Yale University Press.

sections analyzed in my original report are included below (embedded links should be available for most of these):

## Use of drop boxes (Table 3):

Required:
Colorado: Colo. Rev. Stat. § 1-5-102.9 (2020).
Florida: Fla. Stat. §101.69 (2020).
Georgia: SB 202 (2021),
Kentucky: https://apps.legislature.ky.gov/law/statutes/statute.aspx?id=51650. See also: HB 574 (2021).
Maryland: MD SB 683 (2021).
Nebraska: Neb. Rev. Stat. § 32-960 (2020).
New Jersey: N.J. Stat. Ann. § 19:63-16.1 (2021).
Oregon: Or. Rev. Stat. § 254.470 (2019).
Virginia: Ch. 522 of 2021 Laws (SB 1245).
Washington: Wash. Rev. Code § 29A.40.170 (2020).

Allowed:
Arizona: Ariz. Rev. Stat. §§ 16-548, 16-550, 16-579, 16-584 (2021). Also see: Arizona Secretary of State, Elections Procedures Manual (2019).
California: Cal. Elec. Code §§ 3025, 20132, 20133, 20134, 20135, 20136, 20137 (2021).
Hawaii: Haw. Rev. Stat. § 11-109; § 11-1, § 11-B, § 11-I.
Illinois: 10 Ill. Comp. Stat. 5 / 1-1 (2020) (as amended by Public Act 102-0001).
Indiana: Ind. Code § 3-11-10-24. See also: SB 398 (2021).
Iowa: Iowa Code § 53.17 (2021). See also: IA SF 413 (2021).
Massachusetts: Election Advisory #20-01: Regarding Return of Ballots via Secured Drop Box (Aug. 17, 2020).
Michigan: Mich. Comp. Laws § 168.761d (2020).
Minnesota: Minn. R. 8210.3000 Subp. 9 (2016).
Montana: Mont. Code Ann. § 13-19-307 (2011).
New Mexico: N. M. Stat. §1978, § 1-6-9 (2021).
Pennsylvania: Pennsylvania Department of State, Absentee and Mail-in Ballot Return Guidance.
Utah: Utah Code Ann. § 20A-3a-204 (2020).
Vermont: Vt. Stat. Ann. tit. 17, § 2506 (2021).

Prohibited (No Enabling Legislation):
Alabama: No enabling statute.
Alaska: No enabling statute.
Arkansas: No enabling statute.
Connecticut: No enabling statute.
Delaware: No enabling statute.
Idaho: No enabling statute – see:
https://legislature.idaho.gov/statutesrules/idstat/title34/t34ch10/sect34-

1005/#:~:text=34%2D1005.,Return%20of%20absentee%20ballot.&text=He%20shall%20safely%20keep%20and,central%20count%20ballot%20processing%20center.
Kansas: No enabling statute.
Louisiana: No enabling statute.
Maine: No enabling statute – see: https://www.mainelegislature.org/legis/statutes/21-a/title21-Asec754-A.html.
Mississippi: No enabling statute.
Missouri: No enabling statute.
Nevada: Prohibited except when a state of emergency (affected election) is in effect – see: https://www.leg.state.nv.us/nrs/nrs-293.html#NRS293Sec8861.
New Hampshire: No enabling statute.
New York: No enabling statute – see: https://www.nysenate.gov/legislation/laws/ELN/8-412.
North Carolina: No enabling statute.
North Dakota: No enabling statute.
Ohio: No enabling statute.
Oklahoma: No enabling statute.
Rhode Island: No enabling statute.
South Carolina: No enabling statute.
South Dakota: No enabling statute.
Tennessee: No enabling statute.
Texas: No enabling statute.
District of Columbia: No enabling statute.
Wisconsin: No enabling statute – see: https://docs.legis.wisconsin.gov/statutes/statutes/6/iv/855.
Wyoming: No enabling statute.
West Virginia: No enabling statute.

## Third-Party Ballot Collection Rules (Table 4):

Only voters may return ballots:
Alabama: https://codes.findlaw.com/al/title-17-elections/al-code-sect-17-11-9.html.
Oklahoma: https://oksenate.gov/sites/default/files/2019-12/os26.pdf (at page 136).
Pennsylvania: https://codes.findlaw.com/pa/title-25-ps-elections-electoral-districts/pa-st-sect-25-3146-6.html.
Tennessee: https://codes.findlaw.com/tn/title-2-elections/tn-code-sect-2-6-202.html.

Emphasis on voter with some exceptions for family, officials, or defined associates (limits):
Alaska: https://law.justia.com/codes/alaska/2011/title15/chapter15-20/sec-15-20-072/ and https://law.justia.com/codes/alaska/2011/title15/chapter15-20/sec-15-20-081/.
Arizona: https://www.azleg.gov/ars/16/01005.htm.
Connecticut: https://cga.ct.gov/current/pub/chap_145.htm#sec_9-140b.
District of Columbia: https://casetext.com/regulation/district-of-columbia-administrative-code/title-3-elections-and-ethics/chapter-3-7-election-procedures/rule-3-722-emergency-absentee-ballots.
Georgia: https://codes.findlaw.com/ga/title-21-elections/ga-code-sect-21-2-385.html.
Indiana: https://codes.findlaw.com/in/title-3-elections/in-code-sect-3-11-10-1.html.

Massachusetts:
https://malegislature.gov/Laws/GeneralLaws/PartI/TitleVIII/Chapter54/Section92.
Michigan:
http://www.legislature.mi.gov/(S(kcyssdemm33nf2gynuc4zayv))/mileg.aspx?page=GetMCLDocument&objectname=mcl-168-764a.
Missouri: https://revisor.mo.gov/main/OneSection.aspx?section=115.291&bid=48335.
Montana: https://leg.mt.gov/bills/mca/title_0130/chapter_0350/part_0070/section_0030/0130-0350-0070-0030.html.
Nevada: https://www.leg.state.nv.us/nrs/nrs-293.html#NRS293Sec353.
New Hampshire: http://www.gencourt.state.nh.us/rsa/html/LXIII/657/657-17.htm.
New Mexico: https://nmml.org/wp-content/uploads/2011/08/2019-Election-Code-Searchable-PDF-by-NM-Clerks-v1.pdf (at page 80).
North Carolina: https://www.ncsbe.gov/voting/vote-mail/faq-voting-mail-2021#may-another-person-return-my-absentee-ballot-for-me.
Ohio: https://codes.ohio.gov/ohio-revised-code/section-3509.05.
Texas: https://codes.findlaw.com/tx/election-code/elec-sect-86-006.html.
Virginia: https://law.lis.virginia.gov/vacode/title24.2/chapter7/section24.2-705/.

Third parties may collect/return ballots (limits):
Arkansas: https://codes.findlaw.com/ar/title-7-elections/ar-code-sect-7-5-403.html.
California: https://california.public.law/codes/ca_elec_code_section_3017.
Colorado: https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-7-5-107.html.
Delaware: https://law.justia.com/codes/delaware/2019/title-15/chapter-55/section-5507/.
Florida: Florida Statutes Title IX Section 101.051, 2021
Illinois:  https://ilga.gov/legislation/ilcs/documents/001000050K19-5.htm and
https://ilga.gov/legislation/ilcs/documents/001000050K19-6.htm
Iowa: https://www.legis.iowa.gov/DOCS/IACODE/2001/53/17.html.
Kansas: https://codes.findlaw.com/ks/chapter-25-elections/ks-st-sect-25-1128.html.
Kentucky: https://apps.legislature.ky.gov/law/statutes/statute.aspx?id=51651.
Louisiana: https://law.justia.com/codes/louisiana/2016/code-revisedstatutes/title-18/rs-18-1308/.
Maine: https://www.mainelegislature.org/legis/statutes/21-A/title21-Asec753-B.html.
Maryland: https://codes.findlaw.com/md/election-law/md-code-elec-law-sect-9-307.html.
Minnesota: https://www.revisor.mn.gov/statutes/cite/203B.08.
Nebraska: https://nebraskalegislature.gov/laws/statutes.php?statute=32-943.
New Jersey: https://nj.gov/state/dos-statutes-elections-19-60-63.shtml#ele_19_63_9 and
https://nj.gov/state/dos-statutes-elections-19-60-63.shtml#ele_19_63_16.
North Dakota: https://www.legis.nd.gov/cencode/t16-1c07.pdf#nameddest=16p1-07-07.
Oregon:  https://oregon.public.law/statutes/ors_254.470 and
https://oregon.public.law/statutes/ors_260.695.
South Carolina: https://www.scstatehouse.gov/code/t07c015.php (at 385)
South Dakota: https://sdlegislature.gov/Statutes/Codified_Laws/2040881 and
https://sdlegislature.gov/Statutes/Codified_Laws/2040894.
West Virginia: https://code.wvlegislature.gov/3-3-5/.

No restrictions specified / minimal restrictions
Hawaii: No restrictions in statutes.

Idaho: No restrictions in statutes.
Mississippi: No restrictions in statutes.
New York: No restrictions in statutes.
Rhode Island: http://webserver.rilin.state.ri.us/Statutes/TITLE17/17-20/17-20-23.HTM.
Utah: No restrictions in statutes.
Vermont: No restrictions in statutes.
Washington: No restrictions in statutes.
Wisconsin: No restrictions in statutes.
Wyoming: No restrictions in statutes.

## Third-Party Voter Registration Rules (Table 5):

Source data for Table 5, as indicated in footnotes 34 and 36 of my original report, comes from nationalvoterregistrationday.org, which has available a fact sheet for each state related to, in part, third-party voter registration rules.

## Absentee Ballot Application Verification Rules (Table 6):

No absentee ballot application required (all-mail elections):
Colorado: https://leg.colorado.gov/sites/default/files/images/olls/crs2020-title-01.pdf (at 416).
Hawaii: https://law.justia.com/codes/hawaii/2019/title-2/chapter-15/section-15-2/.
Oregon: https://www.oregonlegislature.gov/bills_laws/ors/ors253.html.
Utah: https://le.utah.gov/xcode/Title20A/Chapter3A/20A-3a-S202.html#:~:text=Conducting%20election%20by%20mail.,-(1)&text=Except%20as%20otherwise%20provided%20for,in%20accordance%20with%20this%20section.&text=maintain%20the%20signatures%20on%20file%20in%20the%20election%20officer's%20office.
Washington: https://app.leg.wa.gov/rcw/default.aspx?cite=29A.40.010.

Minimal verification:
Alaska: https://www.elections.alaska.gov/doc/prpsa/APPENDIX_D-1.pdf.
District of Columbia: https://www.dcregs.dc.gov/Common/DCMR/SectionList.aspx?SectionNumber=3-720.
North Dakota: https://www.legis.nd.gov/cencode/t16-1c07.pdf#nameddest=16p1-07-12.
Vermont: https://legislature.vermont.gov/statutes/section/17/051/02542.

Information and eligibility checked against voter registration records:
Florida: http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&Search_String=&URL=0100-0199/0101/Sections/0101.65.html.
Kansas: https://www.ksrevisor.org/statutes/chapters/ch25/025_011_0022.html.
Maine: https://www.mainelegislature.org/legis/statutes/21-A/title21-Asec754-A.html and https://www.mainelegislature.org/legis/statutes/21-A/title21-Asec756.html.
Maryland: https://codes.findlaw.com/md/election-law/md-code-elec-law-sect-9-310.html.
Minnesota: https://www.revisor.mn.gov/statutes/cite/203B.07.
Nebraska: https://nebraskalegislature.gov/laws/statutes.php?statute=32-947.

Nevada: https://www.leg.state.nv.us/nrs/nrs-293.html#NRS293Sec325.
New Mexico: https://nmml.org/wp-content/uploads/2011/08/2019-Election-Code-Searchable-PDF-by-NM-Clerks-v1.pdf (at 13, 156, 157, and 161).
North Carolina:
https://www.ncleg.gov/EnactedLegislation/Statutes/PDF/BySection/Chapter_163/GS_163-231.pdf.
Ohio: https://codes.ohio.gov/ohio-revised-code/section-3509.03.
Oklahoma: https://oksenate.gov/sites/default/files/2019-12/os26.pdf (at 135).
South Dakota: https://sdlegislature.gov/Statutes/Codified_Laws/2040897.
Virginia: https://law.lis.virginia.gov/vacode/title24.2/chapter7/section24.2-706/ and
https://law.lis.virginia.gov/vacode/title24.2/chapter7/section24.2-707/.
Wisconsin: https://docs.legis.wisconsin.gov/statutes/statutes/6/iv/87.
Wyoming: https://wyoleg.gov/statutes/compress/title22.pdf (9-121 at 76)


Signature verification in addition to checking information and eligibility against voter registration card:
Arizona:
https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/16/00547.htm,
https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/16/00550.htm, and
https://www.azleg.gov/viewdocument/?docName=https://www.azleg.gov/ars/16/00552.htm.
California:
https://leginfo.legislature.ca.gov/faces/codes_displaySection.xhtml?lawCode=ELEC&sectionNum=3019.
Georgia: https://codes.findlaw.com/ga/title-21-elections/ga-code-sect-21-2-385.html.
Idaho: https://legislature.idaho.gov/statutesrules/idstat/title34/t34ch10/sect34-1005/.
Iowa: https://www.legis.iowa.gov/DOCS/ACO/IC/LINC/Section.53.16.pdf and
https://www.legis.iowa.gov/DOCS/ACO/IC/LINC/Section.53.18.pdf.
Illinois: https://www.ilga.gov/legislation/ilcs/documents/001000050K19-8.htm.
Michigan:
http://www.legislature.mi.gov/(S(ylc3mvwwj2jii5gp2t0rji0b))/mileg.aspx?page=GetObject&objectname=mcl-168-761.
Montana: https://leg.mt.gov/bills/mca/title_0130/chapter_0130/part_0020/section_0130/0130-0130-0020-0130.html.
New Jersey: https://nj.gov/state/dos-statutes-elections-19-60-63.shtml#ele_19_63_17.
Pennsylvania: https://codes.findlaw.com/pa/title-25-ps-elections-electoral-districts/pa-st-sect-25-3146-6.html.
Rhode Island: http://webserver.rilin.state.ri.us/BillText20/SenateText20/S2475.htm.


Voters must 'qualify' to vote absentee with an acceptable excuse:
Alabama: https://codes.findlaw.com/al/title-17-elections/al-code-sect-17-11-4.html,
https://codes.findlaw.com/al/title-17-elections/al-code-sect-17-9-30.html, and
https://codes.findlaw.com/al/title-17-elections/al-code-sect-17-11-7.html.
Arkansas: https://codes.findlaw.com/ar/title-7-elections/ar-code-sect-7-5-409.html.
Connecticut: https://cga.ct.gov/current/pub/chap_145.htm#sec_9-135.
Delaware: https://delcode.delaware.gov/title15/c055/index.html.
Indiana: https://codes.findlaw.com/in/title-3-elections/in-code-sect-3-11-10-24.html.

Kentucky: https://apps.legislature.ky.gov/law/statutes/statute.aspx?id=51649.
Louisiana: http://legis.la.gov/legis/Law.aspx?d=81337.
Massachusetts:
https://malegislature.gov/Laws/GeneralLaws/PartI/TitleVIII/Chapter54/Section92 and
https://malegislature.gov/Laws/GeneralLaws/PartI/TitleVIII/Chapter54/Section94.
Mississippi: https://codes.findlaw.com/ms/title-23-elections/ms-code-sect-23-15-673.html.
Missouri:
https://revisor.mo.gov/main/OneSection.aspx?section=115.277#:~:text=Missouri%20Revisor%2
0of%20Statutes%20%2D%20Revised%20Statutes%20of%20Missouri%2C%20RSMo%20Secti
on%20115.277&text=(7)%20For%20an%20election%20that,acute%20respiratory%20syndrome
%20coronavirus%202..
New Hampshire: http://www.gencourt.state.nh.us/rsa/html/lxiii/657/657-mrg.htm.
New York: https://www.nysenate.gov/legislation/laws/ELN/8-410 and
https://www.nysenate.gov/legislation/laws/ELN/8-412.
South Carolina: https://www.scstatehouse.gov/code/t07c007.php (at 15-380)
Tennessee: https://codes.findlaw.com/tn/title-2-elections/tn-code-sect-2-6-201.html.
Texas: https://statutes.capitol.texas.gov/Docs/EL/htm/EL.82.htm.
West Virginia: https://codes.findlaw.com/wv/chapter-3-elections/wv-code-sect-3-3-1.html.


## Absentee Ballot Requesting Rules (Table 7):

No excuse permanent absentee voting for all-mail elections:
Arizona: https://www.azleg.gov/ars/16/00544.htm.
California: https://codes.findlaw.com/ca/elections-code/elec-sect-3201.html.
Colorado: https://codes.findlaw.com/co/title-1-elections/co-rev-st-sect-1-7-5-104.html.
District of Columbia: https://www.dcboe.org/dcboe/media/PDFFiles/Absentee-Request-Form-
and-Information-10262020_b.pdf.
Hawaii: https://law.justia.com/codes/hawaii/2019/title-2/chapter-11/section-11-101/.
Illinois: https://www.ilga.gov/legislation/ilcs/documents/072000050K19-
2.htm#:~:text=(a)%20A%20person%20commits%20possession,property%2C%20or%20any%20
part%20thereof%2C.
Maryland: https://casetext.com/statute/code-of-maryland/article-election-law/title-9-
voting/subtitle-3-absentee-voting/section-9-3111-permanent-absentee-ballot-status.
Montana: https://leg.mt.gov/bills/mca/title_0130/chapter_0130/part_0020/section_0120/0130-
0130-0020-0120.html.
New Jersey: https://nj.gov/state/dos-statutes-elections-19-60-63.shtml#ele_19_63_3.
Nevada: https://www.leg.state.nv.us/nrs/nrs-293.html#NRS293Sec3165.
Oregon: https://law.justia.com/codes/oregon/2019/volume-06/chapter-253/section-253-065/.
Utah: https://le.utah.gov/xcode/Title20A/Chapter3A/20A-3a-
S202.html#:~:text=Conducting%20election%20by%20mail.,-
(1)&text=Except%20as%20otherwise%20provided%20for,in%20accordance%20with%20this%
20section..
Washington: https://app.leg.wa.gov/rcw/default.aspx?cite=29A.40.010.

No excuse time-limited absentee voting:

Alaska: https://casetext.com/regulation/alaska-administrative-code/title-6-governors-office/part-1-elections/chapter-25-administration-of-elections/article-3-absentee-and-questioned-voting/section-6-aac-25650-permanent-absentee-voter.
Florida: http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0100-0199/0101/Sections/0101.62.html.
South Dakota: https://sdlegislature.gov/Statutes/Codified_Laws/2040879.
Virginia: https://law.lis.virginia.gov/vacode/title24.2/chapter7/section24.2-703.1/.

Permanent absentee voting for disability / seniors only:
Alabama: http://alisondb.legislature.state.al.us/alison/CodeOfAlabama/1975/17-11-3.1.htm.
Connecticut: https://cga.ct.gov/current/pub/chap_145.htm#sec_9-140e.
Delaware: https://delcode.delaware.gov/title15/c055/index.html.
Kansas: https://www.ksrevisor.org/statutes/chapters/ch25/025_011_0022.html.
Louisiana: https://www.sos.la.gov/ElectionsAndVoting/PublishedDocuments/ElectionCode.pdf (at 244-247).
Mississippi: https://codes.findlaw.com/ms/title-23-elections/ms-code-sect-23-15-629.html.
New York: https://www.nysenate.gov/legislation/laws/ELN/8-400.
Rhode Island: http://webserver.rilin.state.ri.us/Statutes/TITLE17/17-20/INDEX.HTM.
Tennessee: https://codes.findlaw.com/tn/title-2-elections/tn-code-sect-2-6-201.html.
West Virginia:
http://www.wvlegislature.gov/wvcode/code.cfm?chap=3&art=3#:~:text=%C2%A73%2D3%2D2b.,the%20special%20absentee%20voting%20list..
Wisconsin: https://docs.legis.wisconsin.gov/statutes/statutes/6/iv/86/2/a.


Time-limited absentee voting for disability / seniors only:
Georgia: https://codes.findlaw.com/ga/title-21-elections/ga-code-sect-21-2-381.html.
North Carolina:
https://www.ncleg.gov/EnactedLegislation/Statutes/PDF/BySection/Chapter_163/GS_163-226.pdf.
Oklahoma: http://okrules.elaws.us/oac/230:30-5-8.2.
Texas: https://codes.findlaw.com/tx/election-code/elec-sect-86-0015.html.

No provision / must request each election:
Arkansas: https://codes.findlaw.com/ar/title-7-elections/ar-code-sect-7-5-405.html.
Idaho: https://legislature.idaho.gov/statutesrules/idstat/title34/t34ch10/sect34-1002/.
Indiana: https://codes.findlaw.com/in/title-3-elections/in-code-sect-3-11-4-2.html.
Iowa: No provision.
Kentucky: https://casetext.com/statute/kentucky-revised-statutes/title-10-elections/chapter-117-regulation-of-elections/disabled-and-absent-voters/section-117085-application-for-mail-in-absentee-ballot-and-federal-in-person-provisional-absentee-voting-absentee-ballot-for-medical-emergencies-in-person-absentee-voting-in-the-clerks-office-supervision-of-and-challengers-for-absentee-voting-form-of-ballot-voters-proof-of-identification-or-voter-affirmation-cancellation-of-absentee-ballot-disclosure-of-information.
Maine: https://www.mainelegislature.org/legis/statutes/21-A/title21-Asec753-A.html and https://www.mainelegislature.org/legis/statutes/21-A/title21-Asec753-B.html.

Massachusetts: https://malegislature.gov/laws/generallaws/parti/titleviii/chapter54/section86.
Michigan: https://www.michigan.gov/documents/sos/AVApp_535884_7.pdf.
Minnesota: https://www.revisor.mn.gov/statutes/cite/203B.04.
Missouri: https://revisor.mo.gov/main/OneSection.aspx?section=115.284.
Nebraska: https://nebraskalegislature.gov/laws/statutes.php?statute=32-941#:~:text=Early%20voting%3B%20written%20request%20for%20ballot%3B%20procedure.&text=A%20registered%20voter%20may%20use,the%20person%20is%20not%20registered..
New Hampshire: http://www.gencourt.state.nh.us/rsa/html/lxiii/657/657-mrg.htm.
New Mexico: https://law.justia.com/codes/new-mexico/2020/chapter-1/article-6/section-1-6-4/.
North Dakota: https://www.legis.nd.gov/cencode/t16-1c07.pdf#namedest=16p1-07-06.
Ohio: https://codes.ohio.gov/ohio-revised-code/section-3509.03.
Pennsylvania: https://codes.findlaw.com/pa/title-25-ps-elections-electoral-districts/pa-st-sect-25-3146-2.html and https://codes.findlaw.com/pa/title-25-ps-elections-electoral-districts/pa-st-sect-25-3150-12.html.
South Carolina: https://www.scstatehouse.gov/code/t07c015.php.
Vermont: https://codes.findlaw.com/vt/title-17-elections/vt-st-tit-17-sect-2532.html.
Wyoming: https://wyoleg.gov/statutes/compress/title22.pdf (at 70).

## Electioneering Rules (Table 8):

Prohibited within building:
New Hampshire: http://www.gencourt.state.nh.us/rsa/html/lxiii/659/659-43.htm.
Vermont: https://legislature.vermont.gov/statutes/section/17/051/02508.
Washington: https://app.leg.wa.gov/rcw/default.aspx?cite=29A.84&full=true#29A.84.510.

Prohibited between 10-75 feet of building:
Alabama: http://alisondb.legislature.state.al.us/alison/codeofalabama/1975/17-5-2.htm and http://alisondb.legislature.state.al.us/alison/codeofalabama/1975/17-9-50.htm.
Arizona: https://www.azleg.gov/ars/16/00515.htm.
Connecticut: https://www.cga.ct.gov/current/pub/chap_146.htm#sec_9-236.
Delaware: https://delcode.delaware.gov/title15/c049/sc02/index.html.
Indiana: https://codes.findlaw.com/in/title-3-elections/in-code-sect-3-11-10-26-3.html.
Missouri: https://revisor.mo.gov/main/OneSection.aspx?section=115.637.
North Carolina:
https://www.ncleg.gov/EnactedLegislation/Statutes/PDF/BySection/Chapter_163/GS_163-166.4.pdf.
Pennsylvania: https://casetext.com/statute/pennsylvania-statutes/statutes-unconsolidated/title-25-ps-elections-electoral-districts/chapter-14-election-code/article-xii-preparation-for-and-conduct-of-primaries-and-elections/section-3060-regulations-in-force-at-polling-places.
Rhode Island: http://webserver.rilin.state.ri.us/Statutes/TITLE17/17-19/17-19-49.HTM.
Virginia: https://law.lis.virginia.gov/vacode/24.2-604/.
Washington, D.C.: https://www.dmlp.org/sites/citmedialaw.org/files/DC%20Electioneering.pdf.

Prohibited between 100-150 feet of building:

Arkansas: https://codes.findlaw.com/ar/title-7-elections/ar-code-sect-7-1-103.html.

California:
https://leginfo.legislature.ca.gov/faces/codes_displayText.xhtml?lawCode=ELEC&division=18.&title=&part=&chapter=4.&article=7.

Colorado: https://www.sos.state.co.us/pubs/info_center/laws/Title1/Title1.pdf (at 404).

Florida: http://www.leg.state.fl.us/statutes/index.cfm?App_mode=Display_Statute&URL=0100-0199/0102/Sections/0102.031.html.

Georgia: https://codes.findlaw.com/ga/title-21-elections/ga-code-sect-21-2-414.html and https://legiscan.com/GA/text/SB202/2021.

Idaho: https://legislature.idaho.gov/statutesrules/idstat/title18/t18ch23/sect18-2318/.

Illinois: https://www.ilga.gov/legislation/ilcs/fulltext.asp?DocName=001000050K17-29#:~:text=(a)%20No%20judge%20of%20election,of%20the%20property%20of%20that.

Kentucky: https://apps.legislature.ky.gov/law/statutes/statute.aspx?id=51667.

Maryland: https://codes.findlaw.com/md/election-law/md-code-elec-law-sect-16-206.html.

Massachusetts:
https://malegislature.gov/Laws/GeneralLaws/PartI/TitleVIII/Chapter54/Section65.

Michigan:
http://www.legislature.mi.gov/(S(oqaayeq2mitdyk44kcuryvt1))/mileg.aspx?page=getobject&objectName=mcl-168-744.

Minnesota: https://www.revisor.mn.gov/statutes/cite/204C.06.

Mississippi: https://codes.findlaw.com/ms/title-23-elections/ms-code-sect-23-15-895.html.

Montana: https://leg.mt.gov/bills/mca/title_0130/chapter_0350/part_0020/section_0110/0130-0350-0020-0110.html.

Nevada: https://www.leg.state.nv.us/nrs/nrs-293.html#NRS293Sec740.

New Jersey: https://nj.gov/state/dos-statutes-elections-19-31-39.shtml#ele_19_34_15.

New Mexico: https://nmml.org/wp-content/uploads/2011/08/2019-Election-Code-Searchable-PDF-by-NM-Clerks-v1.pdf (at 253).

New York: https://www.nysenate.gov/legislation/laws/ELN/8-104.

North Dakota: https://www.legis.nd.gov/cencode/t16-1c01.pdf.

Ohio: https://codes.ohio.gov/ohio-revised-code/section-3501.35.

Oregon: https://www.oregonlegislature.gov/bills_laws/ors/ors260.html (at 260.695)

South Dakota: https://sdlegislature.gov/Statutes/Codified_Laws/2040825

Tennessee: https://codes.findlaw.com/tn/title-2-elections/tn-code-sect-2-7-111.html.

Texas: https://statutes.capitol.texas.gov/Docs/EL/htm/EL.61.htm.

Utah: https://le.utah.gov/xcode/Title20A/Chapter3A/20A-3a-S501.html.

West Virginia: https://codes.findlaw.com/wv/chapter-3-elections/wv-code-sect-3-9-9.html.

Wisconsin: https://docs.legis.wisconsin.gov/statutes/statutes/12/03.

Prohibited between 200-250 feet of building:

Alaska: http://www.akleg.gov/basis/statutes.asp#15.15.170.

Hawaii: https://casetext.com/statute/hawaii-revised-statutes/division-1-government/title-2-elections/chapter-11-elections-generally/part-ix-voting-procedures/section-11-132-two-hundred-foot-radius.

Kansas: https://www.ksrevisor.org/statutes/chapters/ch25/025_024_0030.html.

Maine: https://www.mainelegislature.org/legis/statutes/21-a/title21-Asec682.html.

Nebraska: https://nebraskalegislature.gov/laws/statutes.php?statute=32-1524.
South Carolina: https://www.scstatehouse.gov/code/t07c025.php.

Prohibited 300 feet or greater from building:
Iowa: https://www.legis.iowa.gov/docs/code/39A.4.pdf.
Louisiana: http://www.legis.la.gov/legis/Law.aspx?d=81431.
Oklahoma: https://oksenate.gov/sites/default/files/2019-12/os26.pdf (at 82).
Wyoming: https://wyoleg.gov/statutes/compress/title22.pdf (at 187).


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.


Executed this 27th day of October, 2021.


_____

Quentin Kidd, Ph.D.

**EX. 5**

T. Piderit

CHAPTER 2021-11

## Committee Substitute for Committee Substitute for Committee Substitute for Senate Bill No. 90

An act relating to elections; creating s. 97.029, F.S.; prohibiting certain persons from settling certain actions, consenting to conditions, or agreeing to certain orders in certain circumstances; requiring certain persons to make certain legal challenges and move to dismiss or otherwise terminate a court's jurisdiction in certain circumstances; creating s. 97.0291, F.S.; prohibiting certain agencies and state and local officials from soliciting, accepting, or otherwise using private funds for election-related expenses; providing for construction; amending s. 97.052, F.S.; revising requirements for the uniform statewide voter registration application; amending s. 97.0525, F.S.; requiring the Division of Elections to maintain a website for the online voter registration system; providing additional requirements for a biennial comprehensive risk assessment of the online voter registration system; amending s. 97.053, F.S.; revising requirements governing the acceptance of voter registration applications; amending s. 97.057, F.S.; requiring the Department of Highway Safety and Motor Vehicles to assist the Department of State in identifying certain residence address changes; requiring the Department of State to report such changes to supervisors of elections; amending s. 97.0575, F.S.; revising requirements governing third-party voter registration organizations; providing applicability; revising circumstances under which a third-party voter registration organization is subject to fines for violations regarding the delivery of voter registration applications; revising requirements for division rules governing third-party voter registration organizations; amending s. 97.0585, F.S.; deleting an exemption from public records requirements for information related to a voter registration applicant's or voter's prior felony conviction and his or her restoration of voting rights to conform to changes made by the act; amending s. 97.1031, F.S.; revising information that an elector must provide to a supervisor of elections when the elector changes his or her residence address, party affiliation, or name; amending s. 98.0981, F.S.; providing that certain ballot types or precinct subtotals may not be reported in precinct-level election results; requiring supervisors of elections to make certain data available on their websites and transmit such data to the division; requiring the division to create and maintain a certain dashboard; amending s. 99.012, F.S.; removing provisions relating to the method of filling a vacancy created by an officer's resignation to qualify as a candidate for another public office; amending s. 99.021, F.S.; revising the oath for candidates seeking to qualify for nomination as a candidate of a political party; requiring a person seeking to qualify for office as a candidate with no party affiliation to subscribe to an oath or affirmation that he or she is registered without party affiliation and has not been a registered member of a political party for a specified timeframe; amending ss. 99.061 and 99.063, F.S.; conforming provisions to changes made by the

1

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

act; amending s. 100.111, F.S.; revising the method of filling a vacancy in nomination for a political party; amending s. 101.051, F.S.; prohibiting certain solicitation of voters at drop box locations; increasing the no-solicitation zone surrounding a drop box location or the entrance of a polling place or an early voting site wherein certain activities are prohibited; conforming a provision; amending s. 101.131, F.S.; revising requirements for poll watcher identification badges; amending s. 101.545, F.S.; requiring ballots, forms, and election materials to be retained for a specified minimum timeframe following an election; amending s. 101.5605, F.S.; revising the timeframe within which the Department of State must approve or disapprove a voting system submitted for certification; amending s. 101.5614, F.S.; revising requirements for making true duplicate copies of vote-by-mail ballots under certain circumstances; requiring that an observer of the duplication of ballots be provided certain allowances; requiring that the duplication process take place in the presence of a canvassing board member; requiring a canvassing board to make certain determinations; amending s. 101.572, F.S.; requiring that voter certificates be open for public inspection; providing certain persons with reasonable access to ballot materials; requiring a supervisor to publish notice of such access; amending s. 101.591, F.S.; revising the timeframe and requirements for the voting systems audit report submitted to the department; amending s. 101.595, F.S.; requiring a specified report regarding overvotes and undervotes to be submitted with the voting systems audit report; revising the date by which the department must submit the report to the Governor and Legislature; amending s. 101.62, F.S.; limiting the duration of requests for vote-by-mail ballots to all elections through the end of the calendar year of the next regularly scheduled general election; requiring certain vote-by-mail ballot requests to include additional identifying information regarding the requesting elector; requiring supervisors of elections to record whether a voter's certificate on a vote-by-mail ballot has a mismatched signature; revising the definition of the term "immediate family" to conform to changes made by the act; prohibiting counties, municipalities, and state agencies from sending vote-by-mail ballots to voters absent a request; specifying applicability of the act to outstanding vote-by-mail ballot requests; amending s. 101.64, F.S.; revising requirements for vote-by-mail ballot mailing envelopes and secrecy envelopes; amending s. 101.68, F.S.; specifying that the supervisor may not use any knowledge of a voter's party affiliation during the signature comparison process; authorizing the canvassing of vote-by-mail ballots upon the completion of the public preelection testing of automatic tabulating equipment; revising duties of the canvassing board with respect to protests; amending s. 101.69, F.S.; revising requirements governing the placement and supervision of secure drop boxes for the return of vote-by-mail ballots; requiring the supervisor to designate drop box locations in advance of an election; prohibiting changes in drop box locations for an election after their initial designation; specifying requirements regarding the retrieval of vote-by-mail ballots returned in a drop box; providing that the supervisor is subject to a civil penalty for certain violations regarding drop boxes; amending s. 102.031,

2

CODING: Words stricken are deletions; words underlined are additions.

F.S.; prohibiting certain solicitation activities within a specified area surrounding a drop box; expanding the definition of "solicit" and "solicitation"; providing for construction; restricting certain persons from prohibiting the solicitation of voters by a candidate or a candidate's designee outside of the no-solicitation zone; creating s. 102.072, F.S.; requiring the supervisor of elections to post and update on his or her website vote-by-mail ballot data at specified intervals; amending s. 102.141, F.S.; requiring the names of canvassing board members be published on the supervisor's website before the tabulation of any vote-by-mail ballots in an election; authorizing each political party and candidate to have one watcher at canvassing board meetings within a distance that allows him or her to directly observe proceedings; requiring additional information be included in public notices of canvassing board meetings; amending s. 104.0616, F.S.; revising the definition of "immediate family"; prohibiting any person from distributing, ordering, requesting, collecting, delivering, or otherwise physically possessing more than two vote-by-mail ballots of other electors per election, not including immediate family members; providing exceptions; providing a penalty; providing an effective date.

Be It Enacted by the Legislature of the State of Florida:

Section 1.   Section 97.029, Florida Statutes, is created to read:

97.029   Civil actions challenging the validity of election laws.—

(1)   In a civil action challenging the validity of a provision of the Florida Election Code in which a state or county agency or officer is a party in state or federal court, the officer, agent, official, or attorney who represents or is acting on behalf of such agency or officer may not settle such action, consent to any condition, or agree to any order in connection therewith if the settlement, condition, or order nullifies, suspends, or is in conflict with any provision of the Florida Election Code, unless:

(a)   At the time settlement negotiations have begun in earnest, written notification is given to the President of the Senate, the Speaker of the House of Representatives, and the Attorney General.

(b)   Any proposed settlement, consent decree, or order that is proposed or received and would nullify, suspend, or conflict with any provision of the Florida Election Code is promptly reported in writing to the President of the Senate, the Speaker of the House of Representatives, and the Attorney General.

(c)   At least 10 days before the date a settlement or presettlement agreement or order is to be made final, written notification is given to the President of the Senate, the Speaker of the House of Representatives, and the Attorney General.

3
CODING: Words ~~stricken~~ are deletions; words underlined are additions.

(2)   If any notification required by this section is precluded by federal law, federal regulation, court order, or court rule, the officer, agent, official, or attorney representing such agency or officer, or the Attorney General, shall challenge the constitutionality of such preclusion in the civil suit affected and give prompt notice thereof to the President of the Senate, the Speaker of the House of Representatives, and the Attorney General.

(3)   If, after a court has entered an order or judgment that nullifies or suspends, or orders or justifies official action that is in conflict with, a provision of the Florida Election Code, the Legislature amends the general law to remove the invalidity or unenforceability, the officer, agent, official, or attorney who represents or is acting on behalf of the agency or officer bound by such order or judgment must promptly after such amendment of the general law move to dismiss or otherwise terminate any ongoing jurisdiction of such case.

Section 2.   Section 97.0291, Florida Statutes, is created to read:

97.0291   Prohibition on use of private funds for election-related expenses. No agency or state or local official responsible for conducting elections, including, but not limited to, a supervisor of elections, may solicit, accept, use, or dispose of any donation in the form of money, grants, property, or personal services from an individual or a nongovernmental entity for the purpose of funding election-related expenses or voter education, voter outreach, or registration programs. This section does not prohibit the donation and acceptance of space to be used for a polling room or an early voting site.

Section 3.   Paragraph (t) of subsection (2) of section 97.052, Florida Statutes, is amended to read:

97.052   Uniform statewide voter registration application.—

(2)   The uniform statewide voter registration application must be designed to elicit the following information from the applicant:

(t)1.   Whether the applicant has ~~never~~ been convicted of a felony and, if convicted, has had his or her voting rights restored by including the statement "I affirm that I am not a convicted felon or, if I am, my right to vote has been restored ~~I have never been convicted of a felony~~." and providing a box for the applicant to check to affirm the statement.

~~2.   Whether the applicant has been convicted of a felony, and if convicted, has had his or her civil rights restored through executive clemency, by including the statement "If I have been convicted of a felony, I affirm my voting rights have been restored by the Board of Executive Clemency." and providing a box for the applicant to check to affirm the statement.~~

~~3.   Whether the applicant has been convicted of a felony and, if convicted, has had his or her voting rights restored pursuant s. 4, Art. VI of the State Constitution, by including the statement "If I have been convicted of a felony,~~

4
CODING: Words ~~stricken~~ are deletions; words underlined are additions.

I affirm my voting rights have been restored pursuant to s. 4, Art. VI of the State Constitution upon the completion of all terms of my sentence, including parole or probation." and providing a box for the applicant to check to affirm the statement.

Section 4.   Subsections (1) and (2) and paragraph (b) of subsection (3) of section 97.0525, Florida Statutes, are amended to read:

97.0525   Online voter registration.—

(1)   Beginning October 1, 2017, An applicant may submit an online voter registration application using the procedures set forth in this section.

(2)   The division shall establish and maintain a secure Internet website that safeguards an applicant's information to ensure data integrity and permits an applicant to:

(a)   Submit a voter registration application, including first-time voter registration applications and updates to current voter registration records.

(b)   Submit information necessary to establish an applicant's eligibility to vote, pursuant to s. 97.041, which includes the information required for the uniform statewide voter registration application pursuant to s. 97.052(2).

(c)   Swear to the oath required pursuant to s. 97.051.

(3)

(b)   The division shall conduct a comprehensive risk assessment of the online voter registration system before making the system publicly available and every 2 years thereafter. The comprehensive risk assessment must comply with the risk assessment methodology developed by the Department of Management Services for identifying security risks, determining the magnitude of such risks, and identifying areas that require safeguards. In addition, the comprehensive risk assessment must incorporate all of the following:

1.   Load testing and stress testing to ensure that the online voter registration system has sufficient capacity to accommodate foreseeable use, including during periods of high volume of website users in the week immediately preceding the book-closing deadline for an election.

2.   Screening of computers and networks used to support the online voter registration system for malware and other vulnerabilities.

3.   Evaluation of database infrastructure, including software and operating systems, in order to fortify defenses against cyberattacks.

4.   Identification of any anticipated threats to the security and integrity of data collected, maintained, received, or transmitted by the online voter registration system.

5

CODING: Words stricken are deletions; words underlined are additions.

Section 5.   Paragraph (a) of subsection (5) and subsection (6) of section 97.053, Florida Statutes, are amended to read:

97.053   Acceptance of voter registration applications.—

(5)(a)   A voter registration application is complete if it contains the following information necessary to establish the applicant's eligibility pursuant to s. 97.041, including:

1.   The applicant's name.

2.   The applicant's address of legal residence, including a distinguishing apartment, suite, lot, room, or dormitory room number or other identifier, if appropriate. Failure to include a distinguishing apartment, suite, lot, room, or dormitory room or other identifier on a voter registration application does not impact a voter's eligibility to register to vote or cast a ballot, and such an omission may not serve as the basis for a challenge to a voter's eligibility or reason to not count a ballot.

3.   The applicant's date of birth.

4.   A mark in the checkbox affirming that the applicant is a citizen of the United States.

5.a.   The applicant's current and valid Florida driver license number or the identification number from a Florida identification card issued under s. 322.051, or

b.   If the applicant has not been issued a current and valid Florida driver license or a Florida identification card, the last four digits of the applicant's social security number.

In case an applicant has not been issued a current and valid Florida driver license, Florida identification card, or social security number, the applicant shall affirm this fact in the manner prescribed in the uniform statewide voter registration application.

6.   A mark in the ~~applicable~~ checkbox affirming that the applicant has not been convicted of a felony or that, if convicted, ~~has had his or her civil rights restored through executive clemency, or~~ has had his or her voting rights restored ~~pursuant to s. 4, Art. VI of the State Constitution~~.

7.   A mark in the checkbox affirming that the applicant has not been adjudicated mentally incapacitated with respect to voting or that, if so adjudicated, has had his or her right to vote restored.

8.   The original signature or a digital signature transmitted by the Department of Highway Safety and Motor Vehicles of the applicant swearing or affirming under the penalty for false swearing pursuant to s. 104.011 that the information contained in the registration application is true

6

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

and subscribing to the oath required by s. 3, Art. VI of the State Constitution and s. 97.051.

(6)   A voter registration application, including an application with a change in name, address, or party affiliation, may be accepted as valid only after the department has verified the authenticity or nonexistence of the driver license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant. If a completed voter registration application has been received by the book-closing deadline but the driver license number, the Florida identification card number, or the last four digits of the social security number provided by the applicant cannot be verified, the applicant shall be notified that the number cannot be verified and that the applicant must provide evidence to the supervisor sufficient to verify the authenticity of the applicant's driver license number, Florida identification card number, or last four digits of the social security number. If the applicant provides the necessary evidence, the supervisor shall place the applicant's name on the registration rolls as an active voter. If the applicant has not provided the necessary evidence or the number has not otherwise been verified prior to the applicant presenting himself or herself to vote, the applicant shall be provided a provisional ballot. The provisional ballot shall be counted only if the number is verified by the end of the canvassing period or if the applicant presents evidence to the supervisor of elections sufficient to verify the authenticity of the applicant's driver license number, Florida identification card number, or last four digits of the social security number no later than 5 p.m. of the second day following the election.

Section 6.   Subsection (13) is added to section 97.057, Florida Statutes, to read:

97.057   Voter registration by the Department of Highway Safety and Motor Vehicles.—

(13)   The Department of Highway Safety and Motor Vehicles must assist the Department of State in regularly identifying changes in residence address on the driver license or identification card of a voter. The Department of State must report each such change to the appropriate supervisor of elections who must change the voter's registration records in accordance with s. 98.065(4).

Section 7.   Paragraphs (c) and (d) of subsection (1), paragraph (a) of subsection (3), and subsection (5) of section 97.0575, Florida Statutes, are amended to read:

97.0575   Third-party voter registrations.—

(1)   Before engaging in any voter registration activities, a third-party voter registration organization must register and provide to the division, in an electronic format, the following information:

CODING: Words stricken are deletions; words underlined are additions.

(c)   The names, permanent addresses, and temporary addresses, if any, of each registration agent registering persons to vote in this state on behalf of the organization. <u>This paragraph does not apply to persons who only solicit applications and do not collect or handle voter registration applications.</u>

~~(d)   A sworn statement from each registration agent employed by or volunteering for the organization stating that the agent will obey all state laws and rules regarding the registration of voters. Such statement must be on a form containing notice of applicable penalties for false registration.~~

(3)(a)   A third-party voter registration organization that collects voter registration applications serves as a fiduciary to the applicant, ensuring that any voter registration application entrusted to the organization, irrespective of party affiliation, race, ethnicity, or gender, <u>must</u> ~~shall~~ be promptly delivered to the division or the supervisor of elections <u>in the county in which the applicant resides</u> within <u>14 days after completed by the applicant, but not after registration closes for the next ensuing election. A third-party voter registration organization must notify the applicant at the time the application is collected that the organization might not deliver the application to the division or the supervisor of elections in the county in which the applicant resides in less than 14 days or before registration closes for the next ensuing election and must advise the applicant that he or she may deliver the application in person or by mail. The third-party voter registration organization must also inform the applicant how to register online with the division and how to determine whether the application has been delivered</u> ~~48 hours after the applicant completes it or the next business day if the appropriate office is closed for that 48-hour period~~. If a voter registration application collected by any third-party voter registration organization is not promptly delivered to the division or supervisor of elections <u>in the county in which the applicant resides</u>, the third-party voter registration organization is liable for the following fines:

1.   A fine in the amount of $50 for each application received by the division or the supervisor of elections <u>in the county in which the applicant resides</u> more than <u>14 days</u> ~~48 hours~~ after the applicant delivered the completed voter registration application to the third-party voter registration organization or any person, entity, or agent acting on its behalf ~~or the next business day, if the office is closed~~. A fine in the amount of $250 for each application received if the third-party voter registration organization or person, entity, or agency acting on its behalf acted willfully.

2.   A fine in the amount of $100 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, before book closing for any given election for federal or state office and received by the division or the supervisor of elections <u>in the county in which the applicant resides</u> after the book-closing deadline for such election. A fine in the amount of $500 for each application received if the third-party registration organization or person, entity, or agency acting on its behalf acted willfully.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

3.   A fine in the amount of $500 for each application collected by a third-party voter registration organization or any person, entity, or agent acting on its behalf, which is not submitted to the division or supervisor of elections in the county in which the applicant resides. A fine in the amount of $1,000 for any application not submitted if the third-party voter registration organization or person, entity, or agency acting on its behalf acted willfully.

The aggregate fine pursuant to this paragraph which may be assessed against a third-party voter registration organization, including affiliate organizations, for violations committed in a calendar year is $1,000.

(5)   The division shall adopt by rule a form to elicit specific information concerning the facts and circumstances from a person who claims to have been registered to vote by a third-party voter registration organization but who does not appear as an active voter on the voter registration rolls. The division shall also adopt rules to ensure the integrity of the registration process, including controls to ensure that all completed forms are promptly delivered to the division or a supervisor in the county in which the applicant resides rules requiring third-party voter registration organizations to account for all state and federal registration forms used by their registration agents. Such rules may require an organization to provide organization and form specific identification information on each form as determined by the department as needed to assist in the accounting of state and federal registration forms.

Section 8.   Paragraphs (d), (e), and (f) of subsection (1) of section 97.0585, Florida Statutes, are amended to read:

97.0585   Public records exemption; information regarding voters and voter registration; confidentiality.—

(1)   The following information held by an agency, as defined in s. 119.011, and obtained for the purpose of voter registration is confidential and exempt from s. 119.07(1) and s. 24(a), Art. I of the State Constitution and may be used only for purposes of voter registration:

(d)   Information related to a voter registration applicant's or voter's prior felony conviction and whether such person has had his or her voting rights restored by the Board of Executive Clemency or pursuant to s. 4, Art. VI of the State Constitution.

(e)   All information concerning preregistered voter registration applicants who are 16 or 17 years of age. This paragraph is

(f)   Paragraphs (d) and (e) are subject to the Open Government Sunset Review Act in accordance with s. 119.15 and shall stand repealed on October 2, 2024, unless reviewed and saved from repeal through reenactment by the Legislature.

Section 9.   Section 97.1031, Florida Statutes, is amended to read:

CODING: Words stricken are deletions; words underlined are additions.

97.1031　Notice of change of residence, change of name, or change of party affiliation.—

(1)(a)　When an elector changes his or her residence address, the elector must notify the supervisor of elections. Except as provided in paragraph (b), an address change must be submitted using a voter registration application.

(b)　If the address change is within the state and notice is provided to the supervisor of elections of the county where the elector has moved, the elector may do so by:

1.　Contacting the supervisor of elections via telephone or electronic means, in which case the elector must provide his or her date of birth <u>and the last four digits of his or her social security number, his or her Florida driver license number, or his or her Florida identification card number, whichever may be verified in the supervisor's records</u>; or

2.　Submitting the change on a voter registration application or other signed written notice.

(2)　When an elector seeks to change party affiliation, the elector shall notify his or her supervisor of elections or other voter registration official by <u>submitting a voter registration application</u> <s>using a signed written notice that contains the elector's date of birth or voter registration number</s>. When an elector changes his or her name by marriage or other legal process, the elector shall notify his or her supervisor of elections or other voter registration official by <u>submitting a voter registration application</u> <s>using a signed written notice that contains the elector's date of birth or voter's registration number</s>.

(3)　The voter registration official shall make the necessary changes in the elector's records as soon as practical upon receipt of such notice of a change of address of legal residence, name, or party affiliation. The supervisor of elections shall issue the new voter information card.

Section 10.　Present subsections (4) and (5) of section 98.0981, Florida Statutes, are redesignated as subsections (5) and (6), respectively, a new subsection (4) is added to that section, and paragraph (a) of subsection (2) of that section is amended, to read:

98.0981　Reports; voting history; statewide voter registration system information; precinct-level election results; book closing statistics<u>; live turnout data</u>.—

(2)　PRECINCT-LEVEL ELECTION RESULTS.—

(a)　Within 30 days after certification by the Elections Canvassing Commission of a presidential preference primary election, special election, primary election, or general election, the supervisors of elections shall collect and submit to the department precinct-level election results for the election in a uniform electronic format specified by paragraph (c). The precinct-level

CODING: Words <s>stricken</s> are deletions; words <u>underlined</u> are additions.

election results shall be compiled separately for the primary or special primary election that preceded the general or special general election, respectively. The results shall specifically include for each precinct the total of all ballots cast for each candidate or nominee to fill a national, state, county, or district office or proposed constitutional amendment, with subtotals for each candidate and ballot type. However, ballot type or precinct subtotals in a race or question having fewer than 30 voters voting on the ballot type or in the precinct may not be reported in precinct results, ~~unless fewer than 30 voters voted a ballot type~~. "All ballots cast" means ballots cast by voters who cast a ballot whether at a precinct location, by vote-by-mail ballot including overseas vote-by-mail ballots, during the early voting period, or by provisional ballot.

(4) LIVE TURNOUT DATA.—On election day, each supervisor of elections shall make live voter turnout data, updated at least once per hour, available on his or her website. Each supervisor shall transmit the live voter turnout data to the division, which must create and maintain a real-time statewide turnout dashboard that is available for viewing by the public on the division's website as the data becomes available.

Section 11. Paragraph (f) of subsection (3) and paragraph (g) of subsection (4) of section 99.012, Florida Statutes, are amended to read:

99.012 Restrictions on individuals qualifying for public office.—

(3)

(f)~~1. With regard to an elective office, the resignation creates a vacancy in office to be filled by election. Persons may qualify as candidates for nomination and election as if the public officer's term were otherwise scheduled to expire.~~

~~2. With regard to an elective charter county office or elective municipal office, the vacancy created by the officer's resignation may be filled for that portion of the officer's unexpired term in a manner provided by the respective charter.~~ The office is deemed vacant upon the effective date of the resignation submitted by the official in his or her letter of resignation.

(4)

(g) ~~Notwithstanding the provisions of any special act to the contrary, with regard to an elective office, the resignation creates a vacancy in office to be filled by election, thereby authorizing persons to qualify as candidates for nomination and election as if the officer's term were otherwise scheduled to expire. With regard to an elective charter county office or elective municipal office, the vacancy created by the officer's resignation may be filled for that portion of the officer's unexpired term in a manner provided by the respective charter.~~ The office is deemed vacant upon the effective date of the resignation submitted by the official in his or her letter of resignation.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 12.   Present paragraph (c) of subsection (1) of section 99.021, Florida Statutes, is redesignated as paragraph (d), a new paragraph (c) is added to that subsection, and paragraph (b) of that subsection is amended, to read:

99.021   Form of candidate oath.—

(1)

(b)   In addition, any person seeking to qualify for nomination as a candidate of any political party shall, at the time of subscribing to the oath or affirmation, state in writing:

1.   The party of which the person is a member.

2.   That the person has ~~not~~ been a registered member of the ~~any other~~ political party <u>for which he or she is seeking nomination as a candidate</u> for 365 days before the beginning of qualifying preceding the general election for which the person seeks to qualify.

3.   That the person has paid the assessment levied against him or her, if any, as a candidate for said office by the executive committee of the party of which he or she is a member.

<u>(c)   In addition, any person seeking to qualify for office as a candidate with no party affiliation shall, at the time of subscribing to the oath or affirmation, state in writing that he or she is registered without any party affiliation and that he or she has not been a registered member of any political party for 365 days before the beginning of qualifying preceding the general election for which the person seeks to qualify.</u>

Section 13.   Paragraph (a) of subsection (7) of section 99.061, Florida Statutes, is amended to read:

99.061   Method of qualifying for nomination or election to federal, state, county, or district office.—

(7)(a)   In order for a candidate to be qualified, the following items must be received by the filing officer by the end of the qualifying period:

1.   A properly executed check drawn upon the candidate's campaign account payable to the person or entity as prescribed by the filing officer in an amount not less than the fee required by s. 99.092, unless the candidate obtained the required number of signatures on petitions pursuant to s. 99.095. The filing fee for a special district candidate is not required to be drawn upon the candidate's campaign account. If a candidate's check is returned by the bank for any reason, the filing officer shall immediately notify the candidate and the candidate shall have until the end of qualifying to pay the fee with a cashier's check purchased from funds of the campaign account. Failure to pay the fee as provided in this subparagraph shall disqualify the candidate.

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

2. The candidate's oath required by s. 99.021, which must contain the name of the candidate as it is to appear on the ballot; the office sought, including the district or group number if applicable; and the signature of the candidate, which must be verified under oath or affirmation pursuant to s. 92.525(1)(a).

3. If the office sought is partisan, the written statement of political party affiliation required by s. 99.021(1)(b); or if the candidate is running without party affiliation for a partisan office, the written statement required by s. 99.021(1)(c).

4. The completed form for the appointment of campaign treasurer and designation of campaign depository, as required by s. 106.021.

5. The full and public disclosure or statement of financial interests required by subsection (5). A public officer who has filed the full and public disclosure or statement of financial interests with the Commission on Ethics or the supervisor of elections prior to qualifying for office may file a copy of that disclosure at the time of qualifying.

Section 14. Paragraph (b) of subsection (2) of section 99.063, Florida Statutes, is amended to read:

99.063 Candidates for Governor and Lieutenant Governor.—

(2) No later than 5 p.m. of the 9th day following the primary election, each designated candidate for Lieutenant Governor shall file with the Department of State:

(b) If the office sought is partisan, the written statement of political party affiliation required by s. 99.021(1)(b); or if the office sought is without party affiliation, the written statement required by s. 99.021(1)(c).

Section 15. Paragraph (a) of subsection (3) of section 100.111, Florida Statutes, is amended to read:

100.111 Filling vacancy.—

(3)(a) In the event that death, resignation, withdrawal, or removal should cause a party to have a vacancy in nomination which leaves no candidate for an office from such party, the filing officer before whom the candidate qualified shall notify the chair of the state and county political party executive committee of such party and:

1. If the vacancy in nomination is for a statewide office, the state party chair shall, within 5 days, call a meeting of his or her executive board to consider designation of a nominee to fill the vacancy.

2. If the vacancy in nomination is for the office of United States Representative, state senator, state representative, state attorney, or public defender, the state party chair shall notify the appropriate county chair or

~~chairs and~~, within 5 days, ~~the appropriate county chair or chairs shall~~ call a meeting of the <u>state executive committee members residing</u> ~~members of the executive committee~~ in the affected county or counties to consider designation of a nominee to fill the vacancy.

3.   If the vacancy in nomination is for a county office, the state party chair shall notify the appropriate county chair and, within 5 days, the appropriate county chair shall call a meeting of his or her executive committee to consider designation of a nominee to fill the vacancy.

The name of any person so designated shall be submitted to the filing officer before whom the candidate qualified within 7 days after notice to the chair in order that the person designated may have his or her name on the ballot of the ensuing general election. If the name of the new nominee is submitted after the certification of results of the preceding primary election, however, the ballots shall not be changed and the former party nominee's name will appear on the ballot. Any ballots cast for the former party nominee will be counted for the person designated by the political party to replace the former party nominee. If there is no opposition to the party nominee, the person designated by the political party to replace the former party nominee will be elected to office at the general election.

Section 16.   Subsections (2) and (5) of section 101.051, Florida Statutes, are amended to read:

101.051   Electors seeking assistance in casting ballots; oath to be executed; forms to be furnished.—

(2)   It is unlawful for any person to be in the voting booth with any elector except as provided in subsection (1). A person at a polling place<u>, a drop box location,</u> or <u>an</u> early voting site, or within <u>150</u> ~~100~~ feet of <u>a drop box location or</u> the entrance of a polling place or <u>an</u> early voting site, may not solicit any elector in an effort to provide assistance to vote pursuant to subsection (1). Any person who violates this subsection commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or s. 775.083.

(5)   If an elector needing assistance requests that a person other than an election official provide him or her with assistance in voting, the clerk or one of the inspectors shall require the person providing assistance to take the following oath:

DECLARATION TO PROVIDE ASSISTANCE

State of Florida

County of ......

Date ......

CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Precinct ......

I, …(Print name)…, have been requested by …(print name of elector needing assistance)… to provide him or her with assistance to vote. I swear or affirm that I am not the employer, an agent of the employer, or an officer or agent of the union of the voter and that I have not solicited this voter at the polling place, <u>drop box location,</u> or early voting site or within <u>150</u> ~~100~~ feet of such locations in an effort to provide assistance.

…(Signature of assistor)…

Sworn and subscribed to before me this ...... day of ......, …(year)….

…(Signature of Official Administering Oath)…

Section 17.   Subsection (5) of section 101.131, Florida Statutes, is amended to read:

101.131   Watchers at polls.—

(5)   The supervisor of elections shall provide to each designated poll watcher <u>an</u>, ~~no later than 7 days before early voting begins, a poll watcher~~ identification badge <u>which</u> ~~that~~ identifies the poll watcher by name. Each poll watcher must wear his or her identification badge while <u>performing his or her duties</u> ~~in the polling room or early voting area~~.

Section 18.   Section 101.545, Florida Statutes, is amended to read:

101.545   Retention and destruction of certain election materials.—All ballots, forms, and other election materials shall be retained in the custody of the supervisor of elections <u>for a minimum of 22 months after an election and</u> in accordance with the schedule approved by the Division of Library and Information Services of the Department of State. All unused ballots, forms, and other election materials may, with the approval of the Department of State, be destroyed by the supervisor after the election for which such ballots, forms, or other election materials were to be used.

Section 19.   Paragraph (d) of subsection (2) of section 101.5605, Florida Statutes, is amended to read:

101.5605   Examination and approval of equipment.—

(2)

(d)   The Department of State shall approve or disapprove any voting system submitted to it within <u>120</u> ~~90~~ days after the date of its initial submission.

15
CODING: Words ~~stricken~~ are deletions; words <u>underlined</u> are additions.

Section 20.   Paragraph (a) of subsection (4) of section 101.5614, Florida Statutes, is amended to read:

101.5614   Canvass of returns.—

(4)(a)   If any vote-by-mail ballot is physically damaged so that it cannot properly be counted by the voting system's automatic tabulating equipment, a true duplicate copy shall be made of the damaged ballot <u>in an open and accessible room</u> in the presence of witnesses and substituted for the damaged ballot. Likewise, a duplicate ballot shall be made of a vote-by-mail ballot containing an overvoted race <u>if there is a clear indication on the ballot that the voter has made a definite choice in the overvoted race or ballot measure. A duplicate</u> <s>or a marked vote-by-mail ballot in which every race is undervoted which</s> shall include all valid votes as determined by the canvassing board based on rules adopted by the division pursuant to s. 102.166(4). <u>A duplicate may be made of a ballot containing an undervoted race or ballot measure if there is a clear indication on the ballot that the voter has made a definite choice in the undervoted race or ballot measure. A duplicate may not include a vote if the voter's intent in such race or on such measure is not clear.</u> Upon request, a physically present candidate, a political party official, a political committee official, or an authorized designee thereof, must be allowed to observe the duplication of ballots. <u>The observer must be allowed to observe the duplication of ballots in such a way that the observer is able to see the markings on each ballot and the duplication taking place.</u> All duplicate ballots <u>must</u> <s>shall</s> be clearly labeled "duplicate," bear a serial number which shall be recorded on the defective ballot, and be counted in lieu of the defective ballot. <u>The duplication of ballots must happen in the presence of at least one canvassing board member.</u> After a ballot has been duplicated, the defective ballot shall be placed in an envelope provided for that purpose, and the duplicate ballot shall be tallied with the other ballots for that precinct. <u>If any observer makes a reasonable objection to a duplicate of a ballot, the ballot must be presented to the canvassing board for a determination of the validity of the duplicate. The canvassing board must document the serial number of the ballot in the canvassing board's minutes. The canvassing board must decide whether the duplication is valid. If the duplicate ballot is determined to be valid, the duplicate ballot must be counted. If the duplicate ballot is determined to be invalid, the duplicate ballot must be rejected and a proper duplicate ballot must be made and counted in lieu of the original.</u>

Section 21.   Section 101.572, Florida Statutes, is amended to read:

101.572   Public inspection of ballots.—

<u>(1)</u>   The official ballots and ballot cards received from election boards and removed from vote-by-mail ballot mailing envelopes <u>and voter certificates on such mailing envelopes</u> shall be open for public inspection or examination while in the custody of the supervisor of elections or the county canvassing board at any reasonable time, under reasonable conditions; however, no persons other than the supervisor of elections or his or her employees or the

16

county canvassing board shall handle any official ballot or ballot card. If the ballots are being examined prior to the end of the contest period in s. 102.168, the supervisor of elections shall make a reasonable effort to notify all candidates whose names appear on such ballots or ballot cards by telephone or otherwise of the time and place of the inspection or examination. All such candidates, or their representatives, shall be allowed to be present during the inspection or examination.

(2)   A candidate, a political party official, or a political committee official, or an authorized designee thereof, shall be granted reasonable access upon request to review or inspect ballot materials before canvassing or tabulation, including voter certificates on vote-by-mail envelopes, cure affidavits, corresponding comparison signatures, duplicate ballots, and corresponding originals. Before the supervisor begins comparing signatures on vote-by-mail voter certificates, the supervisor must publish notice of the access to be provided under this section, which may be access to the documents or images thereof, and the method of requesting such access. During such review, no person granted access for review may make any copy of a signature.

Section 22.   Subsection (5) of section 101.591, Florida Statutes, is amended to read:

101.591   Voting system audit.—

(5)   By December 15 of each general election year Within 15 days after completion of the audit, the county canvassing board or the board responsible for certifying the election shall provide a report with the results of the audit to the Department of State in a standard format as prescribed by the department. The report must be consolidated into one report with the overvote and undervote report required under s. 101.595(1). The report shall contain, but is not limited to, the following items:

(a)   The overall accuracy of audit.

(b)   A description of any problems or discrepancies encountered.

(c)   The likely cause of such problems or discrepancies.

(d)   Recommended corrective action with respect to avoiding or mitigating such circumstances in future elections.

Section 23.   Subsections (1) and (3) of section 101.595, Florida Statutes, are amended to read:

101.595   Analysis and reports of voting problems.—

(1)   No later than December 15 of each general election year, the supervisor of elections in each county shall report to the Department of State the total number of overvotes and undervotes in the "President and Vice President" or "Governor and Lieutenant Governor" race that appears first on the ballot or, if neither appears, the first race appearing on the ballot

17

pursuant to s. 101.151(2), along with the likely reasons for such overvotes and undervotes and other information as may be useful in evaluating the performance of the voting system and identifying problems with ballot design and instructions which may have contributed to voter confusion. <u>This report must be consolidated into one report with the audit report required under s. 101.591(5).</u>

(3)  The Department of State shall submit the report to the Governor, the President of the Senate, and the Speaker of the House of Representatives by <u>February 15</u> <s>January 31</s> of each year following a general election.

Section 24.  Paragraphs (a) and (b) of subsection (1), subsection (3), and paragraph (c) of subsection (4) of section 101.62, Florida Statutes, are amended, and subsection (7) is added to that section, to read:

101.62  Request for vote-by-mail ballots.—

(1)(a)  The supervisor shall accept a request for a vote-by-mail ballot from an elector in person or in writing. One request <u>is</u> <s>shall be</s> deemed sufficient to receive a vote-by-mail ballot for all elections through the end of the calendar year of the <u>next</u> <s>second ensuing</s> regularly scheduled general election, unless the elector or the elector's designee indicates at the time the request is made the elections <u>within such period</u> for which the elector desires to receive a vote-by-mail ballot. Such request may be considered canceled when any first-class mail sent by the supervisor to the elector is returned as undeliverable.

(b)  The supervisor may accept a written<u>, an in-person,</u> or <u>a</u> telephonic request for a vote-by-mail ballot to be mailed to an elector's address on file in the Florida Voter Registration System from the elector, or, if directly instructed by the elector, a member of the elector's immediate family, or the elector's legal guardian. <u>If an in-person or a telephonic request is made, the elector must provide the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records.</u><s>;</s> If the ballot is requested to be mailed to an address other than the elector's address on file in the Florida Voter Registration System, the request must be made in writing. <u>A written request must be</u> <s>and</s> signed by the elector <u>and include the elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number</u>. However, an absent uniformed service voter or an overseas voter seeking a vote-by-mail ballot is not required to submit a signed, written request for a vote-by-mail ballot that is being mailed to an address other than the elector's address on file in the Florida Voter Registration System. For purposes of this section, the term "immediate family" has the same meaning as specified in paragraph (4)(c). The person making the request must disclose:

1.  The name of the elector for whom the ballot is requested.

CODING: Words <s>stricken</s> are deletions; words <u>underlined</u> are additions.

2. The elector's address.

3. The elector's date of birth.

4. The elector's Florida driver license number, the elector's Florida identification card number, or the last four digits of the elector's social security number, whichever may be verified in the supervisor's records.

5. The requester's name.

6.5. The requester's address.

7.6. The requester's driver license number, the requester's identification card number, or the last four digits of the requester's social security number, if available.

8.7. The requester's relationship to the elector.

9.8. The requester's signature (written requests only).

(3) For each request for a vote-by-mail ballot received, the supervisor shall record: the date the request was made; the identity of the voter's designee making the request, if any; the Florida driver license number, Florida identification card number, or last four digits of the social security number of the elector provided with a written request;, the date the vote-by-mail ballot was delivered to the voter or the voter's designee or the date the vote-by-mail ballot was delivered to the post office or other carrier; the address to which the ballot was mailed or the identity of the voter's designee to whom the ballot was delivered;, the date the ballot was received by the supervisor;, the absence of the voter's signature on the voter's certificate, if applicable; whether the voter's certificate contains a signature that does not match the elector's signature in the registration books or precinct register;, and such other information he or she may deem necessary. This information shall be provided in electronic format as provided by division rule adopted by the division. The information shall be updated and made available no later than 8 a.m. of each day, including weekends, beginning 60 days before the primary until 15 days after the general election and shall be contemporaneously provided to the division. This information shall be confidential and exempt from s. 119.07(1) and shall be made available to or reproduced only for the voter requesting the ballot, a canvassing board, an election official, a political party or official thereof, a candidate who has filed qualification papers and is opposed in an upcoming election, and registered political committees for political purposes only.

(4)

(c) The supervisor shall provide a vote-by-mail ballot to each elector by whom a request for that ballot has been made by one of the following means:

CODING: Words stricken are deletions; words underlined are additions.

1. By nonforwardable, return-if-undeliverable mail to the elector's current mailing address on file with the supervisor or any other address the elector specifies in the request.

2. By forwardable mail, e-mail, or facsimile machine transmission to absent uniformed services voters and overseas voters. The absent uniformed services voter or overseas voter may designate in the vote-by-mail ballot request the preferred method of transmission. If the voter does not designate the method of transmission, the vote-by-mail ballot shall be mailed.

3. By personal delivery before 7 p.m. on election day to the elector, upon presentation of the identification required in s. 101.043.

4. By delivery to a designee on election day or up to 9 days before prior to the day of an election. Any elector may designate in writing a person to pick up the ballot for the elector; however, the person designated may not pick up more than two vote-by-mail ballots per election, other than the designee's own ballot, except that additional ballots may be picked up for members of the designee's immediate family. For purposes of this section, "immediate family" means the designee's spouse or the parent, child, grandparent, grandchild, or sibling of the designee or of the designee's spouse. The designee shall provide to the supervisor the written authorization by the elector and a picture identification of the designee and must complete an affidavit. The designee shall state in the affidavit that the designee is authorized by the elector to pick up that ballot and shall indicate if the elector is a member of the designee's immediate family and, if so, the relationship. The department shall prescribe the form of the affidavit. If the supervisor is satisfied that the designee is authorized to pick up the ballot and that the signature of the elector on the written authorization matches the signature of the elector on file, the supervisor shall give the ballot to that designee for delivery to the elector.

5. Except as provided in s. 101.655, the supervisor may not deliver a vote-by-mail ballot to an elector or an elector's immediate family member on the day of the election unless there is an emergency, to the extent that the elector will be unable to go to his or her assigned polling place. If a vote-by-mail ballot is delivered, the elector or his or her designee shall execute an affidavit affirming to the facts which allow for delivery of the vote-by-mail ballot. The department shall adopt a rule providing for the form of the affidavit.

(7) Except as expressly authorized for voters having a disability under s. 101.662, for overseas voters under s. 101.697, or for local referenda under ss. 101.6102 and 101.6103, a county, municipality, or state agency may not send a vote-by-mail ballot to a voter unless the voter has requested a vote-by-mail ballot in the manner authorized under this section.

Section 25. Notwithstanding the amendments made to s. 101.62(1)(a), Florida Statutes, by this act, an existing vote-by-mail ballot request

CODING: Words stricken are deletions; words underlined are additions.

submitted before the effective date of this act is deemed sufficient for elections held through the end of the 2022 calendar year.

Section 26.    Subsection (1) of section 101.64, Florida Statutes, is amended to read:

101.64    Delivery of vote-by-mail ballots; envelopes; form.—

(1)(a)    The supervisor shall enclose with each vote-by-mail ballot two envelopes: a secrecy envelope, into which the absent elector shall enclose his or her marked ballot; and a mailing envelope, into which the absent elector shall then place the secrecy envelope, which shall be addressed to the supervisor and also bear on the back side a certificate in substantially the following form:

Note: Please Read Instructions Carefully Before
Marking Ballot and Completing Voter's Certificate.

VOTER'S CERTIFICATE

I, ......, do solemnly swear or affirm that I am a qualified and registered voter of ...... County, Florida, and that I have not and will not vote more than one ballot in this election. I understand that if I commit or attempt to commit any fraud in connection with voting, vote a fraudulent ballot, or vote more than once in an election, I can be convicted of a felony of the third degree and fined up to $5,000 and/or imprisoned for up to 5 years. I also understand that failure to sign this certificate will invalidate my ballot.

…(Date)…                                                …(Voter's Signature)…

…(E-Mail Address)…                      …(Home Telephone Number)…

                                        …(Mobile Telephone Number)…

(b)    Each return mailing envelope must bear the absent elector's name and any encoded mark used by the supervisor's office.

(c)    A mailing envelope or secrecy envelope may not bear any indication of the political affiliation of an absent elector.

Section 27.    Subsections (1) and (2) of section 101.68, Florida Statutes, are amended to read:

101.68    Canvassing of vote-by-mail ballot.—

(1)    The supervisor of the county where the absent elector resides shall receive the voted ballot, at which time the supervisor shall compare the signature of the elector on the voter's certificate with the signature of the elector in the registration books or the precinct register to determine

21

2of252

whether the elector is duly registered in the county and <u>must</u> <s>may</s> record on the elector's registration <u>record</u> <s>certificate</s> that the elector has voted. <u>During the signature comparison process, the supervisor may not use any knowledge of the political affiliation of the voter whose signature is subject to verification.</u> An elector who dies after casting a vote-by-mail ballot but on or before election day shall remain listed in the registration books until the results have been certified for the election in which the ballot was cast. The supervisor shall safely keep the ballot unopened in his or her office until the county canvassing board canvasses the vote. Except as provided in subsection (4), after a vote-by-mail ballot is received by the supervisor, the ballot is deemed to have been cast, and changes or additions may not be made to the voter's certificate.

(2)(a)  The county canvassing board may begin the canvassing of vote-by-mail ballots <u>upon the completion of the public testing of automatic tabulating equipment pursuant to s. 101.5612(2)</u> <s>at 7 a.m. on the 22nd day before the election</s>, but <u>must begin such canvassing by no</u> <s>not</s> later than noon on the day following the election. <s>In addition, for any county using electronic tabulating equipment, the processing of vote-by-mail ballots through such tabulating equipment may begin at 7 a.m. on the 22nd day before the election.</s> However, notwithstanding any such authorization to begin canvassing or otherwise processing vote-by-mail ballots early, no result shall be released until after the closing of the polls in that county on election day. Any supervisor, deputy supervisor, canvassing board member, election board member, or election employee who releases the results of a canvassing or processing of vote-by-mail ballots prior to the closing of the polls in that county on election day commits a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.

(b)  To ensure that all vote-by-mail ballots to be counted by the canvassing board are accounted for, the canvassing board shall compare the number of ballots in its possession with the number of requests for ballots received to be counted according to the supervisor's file or list.

(c)1.  The canvassing board must, if the supervisor has not already done so, compare the signature of the elector on the voter's certificate or on the vote-by-mail ballot cure affidavit as provided in subsection (4) with the signature of the elector in the registration books or the precinct register to see that the elector is duly registered in the county and to determine the legality of that vote-by-mail ballot. A vote-by-mail ballot may only be counted if:

a.  The signature on the voter's certificate or the cure affidavit matches the elector's signature in the registration books or precinct register; however, in the case of a cure affidavit, the supporting identification listed in subsection (4) must also confirm the identity of the elector; or

b.  The cure affidavit contains a signature that does not match the elector's signature in the registration books or precinct register, but the

CODING: Words <s>stricken</s> are deletions; words <u>underlined</u> are additions.

elector has submitted a current and valid Tier 1 identification pursuant to subsection (4) which confirms the identity of the elector.

For purposes of this subparagraph, any canvassing board finding that an elector's signatures do not match must be by majority vote and beyond a reasonable doubt.

2.  The ballot of an elector who casts a vote-by-mail ballot shall be counted even if the elector dies on or before election day, as long as, before the death of the voter, the ballot was postmarked by the United States Postal Service, date-stamped with a verifiable tracking number by a common carrier, or already in the possession of the supervisor.

3.  A vote-by-mail ballot is not considered illegal if the signature of the elector does not cross the seal of the mailing envelope.

4.  If any elector or candidate present believes that a vote-by-mail ballot is illegal due to a defect apparent on the voter's certificate or the cure affidavit, he or she may, at any time before the ballot is removed from the envelope, file with the canvassing board a protest against the canvass of that ballot, specifying the precinct, the voter's certificate or the cure affidavit the ballot, and the reason he or she believes the ballot to be illegal. A challenge based upon a defect in the voter's certificate or cure affidavit may not be accepted after the ballot has been removed from the mailing envelope.

5.  If the canvassing board determines that a ballot is illegal, a member of the board must, without opening the envelope, mark across the face of the envelope: "rejected as illegal." The cure affidavit, if applicable, the envelope, and the ballot therein shall be preserved in the manner that official ballots are preserved.

(d)  The canvassing board shall record the ballot upon the proper record, unless the ballot has been previously recorded by the supervisor. The mailing envelopes shall be opened and the secrecy envelopes shall be mixed so as to make it impossible to determine which secrecy envelope came out of which signed mailing envelope; however, in any county in which an electronic or electromechanical voting system is used, the ballots may be sorted by ballot styles and the mailing envelopes may be opened and the secrecy envelopes mixed separately for each ballot style. The votes on vote-by-mail ballots shall be included in the total vote of the county.

Section 28.  Subsection (2) of section 101.69, Florida Statutes, is amended, and subsection (3) is added to that section, to read:

101.69  Voting in person; return of vote-by-mail ballot.—

(2)(a)  The supervisor shall allow an elector who has received a vote-by-mail ballot to physically return a voted vote-by-mail ballot to the supervisor by placing the return mail envelope containing his or her marked ballot in a secure drop box. Secure drop boxes shall be placed at the main office of the supervisor, at each permanent branch office of the supervisor, and at each

early voting site. Secure drop boxes may also be placed at any other site that would otherwise qualify as an early voting site under s. 101.657(1). Drop boxes must be geographically located so as to provide all voters in the county with an equal opportunity to cast a ballot, insofar as is practicable. Except for secure drop boxes at an office of the supervisor, a secure drop box may only be used; provided, however, that any such site must be staffed during the county's early voting hours of operation and must be monitored in person by an employee of the supervisor's office. A secure drop box at an office of the supervisor must be continuously monitored in person by an employee of the supervisor's office when the drop box is accessible for deposit of ballots or a sworn law enforcement officer.

(b)   A supervisor shall designate each drop box site at least 30 days before an election. The supervisor shall provide the address of each drop box location to the division at least 30 days before an election. After a drop box location has been designated, it may not be moved or changed except as approved by the division to correct a violation of this subsection.

(c)1.   On each day of early voting, all drop boxes must be emptied at the end of early voting hours and all ballots retrieved from the drop boxes must be returned to the supervisor's office.

2.   For drop boxes located at an office of the supervisor, all ballots must be retrieved before the drop box is no longer monitored by an employee of the supervisor.

3.   Employees of the supervisor must comply with procedures for the chain of custody of ballots as required by s. 101.015(4).

(3)   If any drop box is left accessible for ballot receipt other than as authorized by this section, the supervisor is subject to a civil penalty of $25,000. The division is authorized to enforce this provision.

Section 29.   Paragraphs (a), (b), and (e) of subsection (4) of section 102.031, Florida Statutes, are amended to read:

102.031   Maintenance of good order at polls; authorities; persons allowed in polling rooms and early voting areas; unlawful solicitation of voters.—

(4)(a)   No person, political committee, or other group or organization may solicit voters inside the polling place or within 150 feet of a drop box or the entrance to any polling place, a polling room where the polling place is also a polling room, an early voting site, or an office of the supervisor where vote-by-mail ballots are requested and printed on demand for the convenience of electors who appear in person to request them. Before the opening of a drop box location, a the polling place, or an early voting site, the clerk or supervisor shall designate the no-solicitation zone and mark the boundaries.

(b)   For the purpose of this subsection, the terms "solicit" or "solicitation" shall include, but not be limited to, seeking or attempting to seek any vote, fact, opinion, or contribution; distributing or attempting to distribute any

24

CODING: Words stricken are deletions; words underlined are additions.

political or campaign material, leaflet, or handout; conducting a poll except as specified in this paragraph; seeking or attempting to seek a signature on any petition; and selling or attempting to sell any item; and engaging in any activity with the intent to influence or effect of influencing a voter. The terms "solicit" or "solicitation" may not be construed to prohibit an employee of, or a volunteer with, the supervisor from providing nonpartisan assistance to voters within the no-solicitation zone such as, but not limited to, giving items to voters, or to prohibit exit polling.

(e) The owner, operator, or lessee of the property on which a polling place or an early voting site is located, or an agent or employee thereof, may not prohibit the solicitation of voters by a candidate or a candidate's designee outside of the no-solicitation zone during polling hours.

Section 30. Section 102.072, Florida Statutes, is created to read:

102.072 Vote-by-mail count reporting.—Beginning at 7:00 p.m. election day, the supervisor must, at least once every hour while actively counting, post on his or her website the number of vote-by-mail ballots that have been received and the number of vote-by-mail ballots that remain uncounted.

Section 31. Subsection (1) and paragraphs (a) and (b) of subsection (2) of section 102.141, Florida Statutes, are amended to read:

102.141 County canvassing board; duties.—

(1) The county canvassing board shall be composed of the supervisor of elections; a county court judge, who shall act as chair; and the chair of the board of county commissioners. The names of the canvassing board members must be published on the supervisor's website upon completion of the logic and accuracy test. Alternate canvassing board members must be appointed pursuant to paragraph (e). In the event any member of the county canvassing board is unable to serve, is a candidate who has opposition in the election being canvassed, or is an active participant in the campaign or candidacy of any candidate who has opposition in the election being canvassed, such member shall be replaced as follows:

(a) If no county court judge is able to serve or if all are disqualified, the chief judge of the judicial circuit in which the county is located shall appoint as a substitute member a qualified elector of the county who is not a candidate with opposition in the election being canvassed and who is not an active participant in the campaign or candidacy of any candidate with opposition in the election being canvassed. In such event, the members of the county canvassing board shall meet and elect a chair.

(b) If the supervisor of elections is unable to serve or is disqualified, the chair of the board of county commissioners shall appoint as a substitute member a member of the board of county commissioners who is not a candidate with opposition in the election being canvassed and who is not an active participant in the campaign or candidacy of any candidate with

CODING: Words stricken are deletions; words underlined are additions.

opposition in the election being canvassed. The supervisor, however, shall act in an advisory capacity to the canvassing board.

(c)   If the chair of the board of county commissioners is unable to serve or is disqualified, the board of county commissioners shall appoint as a substitute member one of its members who is not a candidate with opposition in the election being canvassed and who is not an active participant in the campaign or candidacy of any candidate with opposition in the election being canvassed.

(d)   If a substitute member or alternate member cannot be appointed as provided elsewhere in this subsection, or in the event of a vacancy in such office, the chief judge of the judicial circuit in which the county is located shall appoint as a substitute member or alternate member a qualified elector of the county who is not a candidate with opposition in the election being canvassed and who is not an active participant in the campaign or candidacy of any candidate with opposition in the election being canvassed.

(e)1.   The chief judge of the judicial circuit in which the county is located shall appoint a county court judge as an alternate member of the county canvassing board or, if each county court judge is unable to serve or is disqualified, shall appoint an alternate member who is qualified to serve as a substitute member under paragraph (a).

2.   The chair of the board of county commissioners shall appoint a member of the board of county commissioners as an alternate member of the county canvassing board or, if each member of the board of county commissioners is unable to serve or is disqualified, shall appoint an alternate member who is qualified to serve as a substitute member under paragraph (d).

3.   If a member of the county canvassing board is unable to participate in a meeting of the board, the chair of the county canvassing board or his or her designee shall designate which alternate member will serve as a member of the board in the place of the member who is unable to participate at that meeting.

4.   If not serving as one of the three members of the county canvassing board, an alternate member may be present, observe, and communicate with the three members constituting the county canvassing board, but may not vote in the board's decisions or determinations.

(2)(a)   The county canvassing board shall meet in a building accessible to the public in the county where the election occurred at a time and place to be designated by the supervisor to publicly canvass the absent electors' ballots as provided for in s. 101.68 and provisional ballots as provided by ss. 101.048, 101.049, and 101.6925. During each meeting of the county canvassing board, each political party and each candidate may have one watcher able to view directly or on a display screen ballots being examined for signature matching and other processes. Provisional ballots cast

CODING: Words stricken are deletions; words underlined are additions.

pursuant to s. 101.049 shall be canvassed in a manner that votes for candidates and issues on those ballots can be segregated from other votes. As soon as the absent electors' ballots and the provisional ballots are canvassed, the board shall proceed to publicly canvass the vote given each candidate, nominee, constitutional amendment, or other measure submitted to the electorate of the county, as shown by the returns then on file in the office of the supervisor.

(b)   Public notice of the canvassing board members, alternates, time, and place at which the county canvassing board shall meet to canvass the absent electors' ballots and provisional ballots must be given at least 48 hours prior thereto by publication on the supervisor's website and published in one or more newspapers of general circulation in the county or, if there is no newspaper of general circulation in the county, by posting such notice in at least four conspicuous places in the county. The time given in the notice as to the convening of the meeting of the county canvassing board must be specific and may not be a time period during which the board may meet.

Section 32.   Section 104.0616, Florida Statutes, is amended to read:

104.0616   Vote-by-mail ballots and voting; violations.—

(1)   For purposes of this section, the term "immediate family" means a person's spouse or the parent, child, grandparent, grandchild, or sibling of the person or the person's spouse.

(2)   Any person who distributes, orders, requests, collects, delivers provides or offers to provide, and any person who accepts, a pecuniary or other benefit in exchange for distributing, ordering, requesting, collecting, delivering, or otherwise physically possesses possessing more than two vote-by-mail ballots per election in addition to his or her own ballot or a ballot belonging to an immediate family member, except as provided in ss. 101.6105-101.694, including supervised voting at assisted living facilities and nursing home facilities as authorized under s. 101.655, commits a misdemeanor of the first degree, punishable as provided in s. 775.082 or, s. 775.083, or s. 775.084.

Section 33.   This act shall take effect upon becoming a law.

Approved by the Governor May 6, 2021.

Filed in Office Secretary of State May 6, 2021.

CODING: Words stricken are deletions; words underlined are additions.