# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

SHARON WRIGHT AUSTIN, et al

     VS                   USDC NO.  1:21-cv-00184-MW-GRJ

                                    USCA NO. _____

UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, et al

## TRANSMITTAL OF NOTICE OF APPEAL

       The following documents are hereby transmitted to the Clerk, U. S. Court of Appeals. The Certified copy of the appeal notice, docket entries, judgment/opinion/order appealed from are enclosed.

First Appeal Notice.
The appellate docket fee paid.  Date paid: 2-9-2022 – Receipt# 1-4314
Court Reporter(s): Megan Hague, Judy Martin

Please acknowledge receipt on the enclosed copy of this transmittal to: GAINESVILLE DIVISION

                                 JESSICA J. LYUBLANOVITS,
                                 CLERK OF COURT

                                 s/ KELLI MALU
                                 By: Kelli Malu
                                 Deputy Clerk
                                 401 SE 1st Avenue, Ste 243
February 9, 2022                   Gainesville, Florida 32601

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

SHARON WRIGHT AUSTIN,
MICHAEL MCDONALD, DANIEL
A. SMITH, JEFFREY GOLDHAGEN,
TERESA J. REID, and KENNETH B.
NUNN,

        *Plaintiffs,*

        v.

Case No.: 1:21-cv-00184-MW-GRJ

UNIVERSITY OF FLORIDA
BOARD OF TRUSTEES, the public
body corporate acting for and behalf of
the University of Florida, W. KENT
FUCHS, in his official capacity as
President of the University of Florida,
JOSEPH GLOVER, in his official
capacity as Provost of the University of
Florida, and LAURA ROSENBURY,
in her official capacity as Dean of the
Fredric G. Levin College of Law,

        *Defendants.*

## DEFENDANTS' NOTICE OF APPEAL

Pursuant to 28 U.S.C. § 1292(a)(1) and Rule 4(a)(1) of the Federal Rules of

Appellate Procedure, Defendants—University of Florida Board of Trustees, W. Kent

Fuchs, Joseph Glover, and Laura Rosenbury—hereby give notice of their appeal to

the United States Court of Appeals for the Eleventh Circuit from the order entered

by the district court on January 21, 2022, granting the Plaintiffs' motion for a preliminary injunction and preliminarily enjoining the Defendants. *See* Preliminary Injunction (Doc. 65), attached hereto as Exhibit 1.

Respectfully submitted,

*/s/ H. Christopher Bartolomucci*
H. Christopher Bartolomucci
Brian J. Field*
Kenneth A. Klukowski
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
(202) 787-1060
cbartolomucci@schaerr-jaffe.com
bfield@schaerr-jaffe.com
kklukowski@schaerr-jaffe.com
*Admitted *pro hac vice*

*Counsel for Defendants-Appellants*
*University of Florida Board of Trustees,*
*W. Kent Fuchs, Joseph Glover, and*
*Laura Rosenbury*

Dated:  February 8, 2022

2

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

SHARON WRIGHT AUSTIN,
et al.,

  *Plaintiffs*,

v.          **Case No.: 1:21cv184-MW/GRJ**

UNIVERSITY OF FLORIDA BOARD
OF TRUSTEES, et al.,

  *Defendants*.
_____/

## PRELIMINARY INJUNCTION

For more than twenty years, an imposing, eight-meter-tall statue stood on the University of Hong Kong's campus. Commemorating the 1989 Tiananmen Square Massacre victims, the statue—known as the Pillar of Shame—was "a towering entanglement of human suffering cast in bronze, copper and concrete."[1] Its base said simply: "The old cannot kill the young forever."

In December 2021, however, the University decided to remove the statue. A statement explaining the decision declared simply that removing the statue was in

---

[1] Kris Cheng, *The Pillar of Shame: The History of Hong Kong's Harrowing Tribute to the Tiananmen Massacre Victims*, HONG KONG FREE PRESS (May 5, 2018), https://tinyurl.com/59fn3y9n.

"the best interest of the University."[2] In many ways, the Pillar's demise was emblematic of the demise of academic freedom in Hong Kong.

Hong Kong has long had an excellent university system—the University of Hong Kong, for example, is ranked 76th globally. By comparison, the University of Florida is ranked 99th. In 2010, Hong Kong's universities also received an "A" ranking in academic freedom.[3] But now, they have a "D" rating.

"One reason for this is self-censorship."[4] Much of the pressure on students and professors comes not from Beijing, but from university administrators. For example, one professor who has spent over twenty years at a Hong Kong university remarked that "it is a very, very peculiar and interesting thing, because it is not as if the body that is eroding academic freedom is outside the university. It is not a foreign body."[5] "Many reports tell of outspoken academics being denied tenure, refused promotions or [being] unable to get their contracts renewed."[6] Despite the obvious nature of this repression, one professor complained, "[t]hey never say its political."[7]

---

[2] Edmond Ng & Jessie Pang, *Hong Kong University Dismantles, Removes Tiananmen Statue*, REUTERS (Dec. 23, 2021), https://tinyurl.com/2dzabvr6.

[3] *Academics in Hong Kong Suffer Curbs on Their Freedoms*, ECONOMIST (Jul. 24, 2021), https://tinyurl.com/2p8atnxy.

[4] ECONOMIST, *supra* note 3.

[5] Ng & Pang, *supra* note 2.

[6] ECONOMIST, *supra* note 3.

[7] *Id.*

The presidents of Hong Kong's top universities also signed a letter supporting Beijing's repressive new national security law, which requires "higher education institutions to incorporate national security education into their curriculum."[8] Such courses "outline the national security law's 66 articles, detailing how they might be breached, while stressing the need for greater patriotism and national Chinese identity."[9] And many faculty members, "recounting how they had dedicated their professional lives to [their] university[,] . . . now feel abandoned."[10] Remarking that "[i]t is upsetting to be part of an institution proactively participating in stifling dissent," one unnamed professor explained that "she and many colleagues are looking for jobs in other countries."[11]

Some might say, "that's China, it could never happen here." But Plaintiffs contend it already has.[12] In an apparent act of *vorauseilender Gehorsam*,[13] they say, UF has bowed to perceived pressure from Florida's political leaders and has

---

[8] Jessie Pang & Sara Cheng, *Exclusive-New Hong Kong University Classes Set Out Dangers of Breaking Security Law*, REUTERS (Nov. 5, 2021), https://tinyurl.com/227pu732.

[9] Peng & Cheng, *supra* note 8.

[10] Ng & Pang, *supra* note 2.

[11] ECONOMIST, *supra* note 3.

[12] If those in UF's administration find this comparison upsetting, the solution is simple. Stop acting like your contemporaries in Hong Kong.

[13] Meaning "pre-emptive subservience" or "anticipatory obedience." *Vorauseilender Gehorsam*, TURENG https://tinyurl.com/4c29a4zs (last visited Jan. 18, 2022).

3

sanctioned the unconstitutional suppression of ideas out of favor with Florida's

ruling party.[14] Declaring such activities a conflict of interest, UF has repeatedly

blocked professors from providing expert testimony against the State in cases

implicating hot-button political issues. Then, facing a storm of criticism, UF

"revised" its conflicts policy. Plaintiffs now bring a First Amendment claim,

contending that the "revised" policy suffers from the same constitutional infirmity;

namely, it does not disclaim UF's "interest" in aligning faculty speech with the ruling

party's political preferences. For similar reasons, Plaintiffs argue that UF's policy

addressing when law professors may sign *amicus* briefs is also unconstitutional.

Plaintiffs move for a preliminary injunction barring UF from applying its policy to

future requests to serve as expert witnesses and sign on to *amicus* briefs, arguing that

the policy continues to violate the First Amendment rights of all faculty.

This Court held a telephonic hearing on Plaintiffs' motion on January 7 and

14, 2022. For the reasons set out below, Plaintiffs' motion, ECF No. 30, is

**GRANTED in part.**

I

"In understanding what is going on around us, context matters." *Fort*

*Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1237 (11th

---

[14] The Court notes here that this case is about UF, *not* Florida's government. There is no evidence before this Court that any representative of Florida's government has directed UF to take any of the actions it has taken in this case.

4

Cir. 2018). This case is no exception. Because it is impossible to understand the

issues this case presents without knowing the context in which those issues arose,

this Court first places this case in its broader context.[15]

_____

[15] It is also worth pausing to discuss this case's procedural history. As a matter of course, this Court strives to decide issues on the merits. *See Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1332 (11th Cir. 2014) ("[W]e have a strong preference for deciding cases on the merits . . . whenever reasonably possible."). In accordance with that preference, this Court has afforded Defendants every chance to make their case.

For one, at the first hearing, Defendants' counsel made the dubious assertion that he had no idea that this case implicated the Supreme Court's test from *Pickering* and its progeny. For the uninitiated, that is roughly equivalent to an attorney in an abortion case feigning surprise in response to a question about *Roe v. Wade* and its progeny. Even so, this Court permitted Defendants to file additional briefing and continued the hearing. Defendants' supplemental brief, however, added nothing. Rather, Defendants simply described *Pickering* and asserted it did not apply here because some courts view *Pickering* as applicable only to *post hoc* restrictions on public employees' speech. Defendants chose not to answer the question raised by their own briefing—namely, what standard applies in *this* case and *how* does it apply.

It was in this context that this Court held its second hearing. Rather than discuss *Pickering*—the point of the hearing—Defendants' counsel announced right off the bat that "newly discovered facts" had been uncovered that would upend this whole case; namely, that some Plaintiffs began acting as experts before receiving UF approval. But these facts were hardly newfound. To say these facts were already in the public record understates the matter. The facts Defendants raised were on the record in the case that is central to this dispute. Just ten minutes of review would have uncovered them. Indeed, Defendants did not even have to dig—these were surface-level facts on the face of the record that could be located through a cursory search of the same filing system that Defendants' counsel uses to file documents with this Court. That is why this Court admonished Defendants' counsel at the hearing on January 14th. But even then, this Court allowed Defendants to supplement the record, and allowed Defendants as much time as they needed to make their arguments about *Pickering*'s application to this case. Because this Court had already allowed them to do so, however, this Court did limit Defendants' presentation by prohibiting them from continuing to argue that it should permit them to supplement the record. Instead, this Court encouraged Defendants to address the merits of Plaintiffs' claims. Defendants accepted this invitation as it related to the *amicus* brief issue. But they did not try to argue why their policy as it relates to the expert witness issue survives constitutional review.

The mischief associated with Defendants' conduct is twofold. The first is an issue of candor. It is simply not credible to claim that Defendants did not know *Pickering* was at issue or that Defendants could not have discovered the timing of Plaintiffs' participation as experts. Rather than feign ignorance, counsel need only ask to file additional briefing or supplement the record.

5

A

Located in Gainesville, Florida, and boasting around 57,841 students, the University of Florida is Florida's oldest university.[16] Most also consider UF Florida's "flagship" university. The U.S. News and World Report ranks UF the 28th best university in the nation and the 5th best public university. Perhaps best known for the invention of Gatorade, UF has also produced Nobel prize winners, astronauts, politicians, generals, artists, Olympians, and a good number of federal judges.

---

Indeed, this Court allowed Defendants to do both. The second issue is practical. This Court could never rule on Plaintiffs' motion if, at every hearing, Defendants seek additional time to raise issues that could and should have been briefed before the hearing. To be sure, facts that are genuinely new or undiscoverable after exercising reasonable diligence or new case law may merit additional filings, but Defendants' issues were neither.

Finally, Defendants' presentation at the January 14th hearing centered on accusing Plaintiffs Austin, Smith, and McDonald of lying to and misleading this Court on the timing of their expert witness work in relation to their UFOLIO requests to do such work. This Court finds Defense counsel's argument disingenuous. Defendants' accusation is not borne out by the facts because the timeline of events is self-evident from the record. Plaintiffs Austin, Smith, and McDonald began their expert witness work before UF denied their requests, as reflected by their reports and declarations, which either predate (in Austin's case), postdate (in Smith's case), or are contemporaneous with (in McDonald's case) the dates of their UFOLIO denial notices. This Court was aware of these dates based on its own review of the record. This Court also considered the evidence Defendants filed to supplement the record after the January 14th hearing with specific attention paid to the dates on the reports, declarations, and depositions, and the contents of the depositions. Considering the facts, and not just the accusations before it, this Court finds that no Plaintiff has lied to or misled the Court about their conduct here or the facts giving rise to their claims.

[16] Though FSU also claims that title. *See* Barry Klein, *FSU's Age Change: History or One-upmanship?*, TAMPA BAY TIMES (Sep. 27, 2005), https://tinyurl.com/bdenhsvh.

6

B

Plaintiffs are six UF professors. Plaintiffs Austin, McDonald, and Smith are political science professors, Plaintiff Goldhagen is a professor of pediatrics, and Plaintiffs Nunn and Reid are law professors.

Plaintiffs have long served as expert witnesses in lawsuits relating to their fields of expertise. *See, e.g.*, ECF No. 30-1 ¶ 4 (statement by Plaintiff Nunn that UF has encouraged faculty "to engage with the public on important issues through . . . litigation"); ECF No. 30-2 ¶ 3 (identical statement from Plaintiff Reid); ECF No. 30-3 ¶ 2 (statement by Plaintiff Goldhagen that he "served as an expert witness in litigation relating to lead poisoning of children"); *see also Ga. Coalition for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1263 (N.D. Ga. 2018) (citing declaration by Plaintiff McDonald); *Brown v. Detzner*, 895 F. Supp. 2d 1236, 1251 (M.D. Fla. 2012) (citing declaration by Plaintiff Smith); *League of Women Voters of Fla. v. Browning*, 575 F. Supp. 2d 1298, 1308 (S.D. Fla. 2008) (citing declaration by Plaintiff McDonald). In fact, UF has historically encouraged such activity. *See* ECF No. 30-6 ¶ 4 (statement by Plaintiff Smith that "in my annual performance reviews, the University has praised my research and advocacy on voting rights").

Defendants are UF's administrators. The Board of Trustees is UF's public body corporate, Defendant Fuchs is UF's president, Defendant Glover is UF's provost, and Defendant Rosenbury is the dean of UF's law school.

7

C

"UF's quest to become a top-10 public research institution officially began in 2013."[17] That year, the Florida Legislature created the preeminent state research universities program. § 1001.7065, Fla. Stat. (2013). Under the program, a state research university that met 11 of 12 statutory benchmarks qualified as a "preeminent state research university." *Id.* § 1001.7065(3). The law further required each preeminent university to "submit to the Board of Governors a 5-year benchmark plan with target ranking on key performance metrics for national excellence." *Id.* § 1001.7065(6). If a university later met its benchmark plan, it received "an amount specified in the General Appropriations Act"—$15 million dollars. *Id.*

At the preeminence program's inception, UF met all 12 benchmarks. And in late 2013, then-UF president Bernie Machen announced UF's five-year plan, an initiative called "UF Rising."[18] Under the plan, UF sought to hire up to 100 new faculty and create 107 endowed faculty chairs and professorships. In 2013, UF was ranked the 14th best public university in the country. By 2018, it ranked 8th.

---

[17] Steve Orlando, *UF Rises to No. 8 in U.S. News List of Best Public Universities*, U. FLA. NEWS (Sept. 10, 2018), https://tinyurl.com/2p8ks3tw.

[18] *UF's Plan for Preeminence Gets Final Go-ahead from State*, U. FLA. NEWS (Nov. 21, 2013), https://tinyurl.com/26ub9s63; *see also UF Rising*, UNIV. OF FLA. (Nov. 21, 2013), https://tinyurl.com/mtzehxz8.

Similarly, between 2013 and 2017, UF jumped from 50th to 30th among all universities in the United States—a stunning success by any measure.

UF officials know that UF's relationship with Florida's government has been key to that success. As the Chairman of UF's Board of Trustees recently said, "[w]e had fought so hard over the years to get funding so our faculty could have raises, so our students could have good housing, so our employees' families could have day care." ECF No. 45-4 at 15. "Think of everything we've been able to accomplish during the past five years" he continued, listing achievements, "[t]hese things were all made possible through the support of our state leaders." *Id.* at 15–16.

UF officials also know that conflict with Florida's government can jeopardize UF's success. In a September 2021 address to the Faculty Senate, President Fuchs warned that criticism of the State of Florida's COVID-19 response would "fracture the relationship between the university and the state government . . . ultimately leading to a diminished or inability to impact future policies or decisions affecting the university." Kent Fuchs, President, Univ. of Fla., President's Report to University of Florida Faculty Senate (Sept. 23, 2021), at 2, https://tinyurl.com/3enua4kj.

In 2020, the Florida Legislature again took interest in the state university system, passing legislation requiring every state university to implement policies that, "[a]t a minimum, . . . require employees engaged in the design, conduct, or reporting of research to disclose and receive a determination that outside activity or

financial interest does not affect the integrity of the state university." § 1012.977(1), Fla. Stat. In response, UF adopted a "Conflicts of Commitment and Conflicts of Interest" policy to ensure that professors' activities do "not conflict, or appear to conflict, with their professional obligations to" UF. ECF No. 31-2 at 3.

The policy governs two types of conflicts. A conflict of commitment "occurs when a University Employee engages in an Outside Activity, either paid or unpaid, that could interfere with their professional obligations to the University." *Id.* Put another way, an activity presents a conflict of commitment when it takes too much time away from a professor's university duties. On the other hand, a conflict of interest "occurs when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgement or obligations to the University." *Id.*

To prevent both types of conflict, the policy requires professors to report all outside activities—"any paid or unpaid activity undertaken by an Employee outside of the University which could create an actual or apparent" conflict—through UF's Online Interest Organizer (UFOLIO). *Id.* at 4. Relevant here, the policy requires professors to disclose any time they "serve or . . . are seeking approval to serve as an expert witness . . . in a legal matter like a lawsuit" or when they "provide or are seeking approval to provide paid or unpaid professional services to an outside entity and the professional services relate to [their] UF expertise." *Id.* at 9.

10

Because parties often retain Plaintiffs to testify as expert witnesses, it was hardly surprising when attorneys for various voting-rights groups challenging SB 90, a recently passed package of changes to Florida's election laws,[19] asked Austin, McDonald, and Smith to serve as expert witnesses. In accordance with the conflicts policy, all three Plaintiffs disclosed their activity using the UFOLIO system. ECF No. 30-4 ¶ 8; ECF No. 30-5 ¶ 7; ECF No. 30-6 ¶ 7.

Before they received approval, Plaintiffs began work in their capacity as testifying experts. For example, Professor Smith attested that he did not hesitate to say yes to the voting-rights groups' request, given UF's previous support for his expert work. ECF No. 30-6 ¶ 5. Professor Smith did not expect UF to deny his request to participate as an expert because, according to Smith, "[t]he University has *never* objected to my prior work as an expert witness." *Id.* ¶ 4 (emphasis added). "To the contrary, in [his] annual performance reviews, the University has praised [Professor Smith's] research and advocacy on voting rights, calling it both impactful and important for our colleagues, students, and the citizens of Florida." *Id.*

---

[19] A brief description of SB 90 is helpful. Passed in the wake of the 2020 election, SB 90 was a key component of the DeSantis Administration's legislative agenda. The Governor signed the bill to great fanfare at a "Fox exclusive" appearance on the Fox News Channel's *Fox & Friends* program. Broadly, SB 90 limits who can return absentee ballots, how often voters must request absentee ballots, how supervisors of election can offer absentee ballot drop boxes, how voter registration groups may collect and return voter registration applications, and how third parties can interact with those waiting to vote. A host of parties have sued in this Court alleging that SB 90 violates the First, Fourteenth, and Fifteenth Amendments, the Voting Rights Act, and the Americans with Disabilities Act.

Despite unwavering past support for such work, in July 2021, UF denied Smith's request. The denial explained that "[o]utside activities that may pose a conflict to the executive branch of the state of Florida create a conflict for the University of Florida."

Despite the denial, Smith prepared an expert report, dated September 1, 2021. *See* ECF No. 61-2. Austin also prepared an expert report, dated September 1, 2021, but this was *before* UF denied her permission to provide expert witness testimony. *See* ECF No. 61-1.[20]

**UFOLIO Disclosure Disapproved**

| | |
|---|---|
| **Disclosure:** | DOI00013593 |
| **Discloser:** | Daniel Smith |
| **Department:** | LS-POLITICAL SCIENCE |
| **Entity:** | Demos & Perkins Coie |
| **Disclosure Type:** | Legal Consulting |

David Richardson reviewed the above referenced disclosure and **disapproved** this request for the following reasons:

**Comments:** Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a conflict for the University of Florida.

Click here  to access the disclosure.

ECF No. 31-10 at 2 (excerpt from Smith's denial notice).

_____

[20] Based on this record, not all the political science professors were similarly situated in the timing of their reports in relation to the timeline of their outside activity request denials. *See* note 15, *supra*. What is unmistakable, though, is that each of these professors presumed their requests would be approved while they were preparing their expert reports. Relatedly, this Court has reviewed the election case depositions filed to supplement the record on January 14, 2022 and finds nobody questioned the political science professors about what they would do moving forward.

In October, Austin and McDonald received denials similar to Smith's. ECF No. 31-15 at 2 (denying Plaintiff Austin's request because, "[a]s UF is a state actor, litigation against the state is adverse to UF's interests"); ECF No. 31-14 at 2 (denying McDonald's request for the same reason). Around the same time, UF also sent Smith a second denial notice. ECF No. 31-13 at 2.

Shortly after UF issued its October denials, Smith prepared a supplemental and rebuttal expert report, dated October 13, 2021. ECF No. 61-4. McDonald likewise provided an expert declaration, dated October 13, 2021—the same day he received notice that he was denied permission to testify as an expert. ECF No. 61-3. A few days later, Plaintiffs Austin, Smith, and McDonald sat for depositions. *See* ECF Nos. 61-5, 61-6, and 61-7.

And through at least October and into November 2021, Austin, Smith, and McDonald attempted to reverse their denials through negotiations with the University. *See* ECF No. 30-4 ¶ 10 (noting that in the weeks following October 15th, Professor Austin's "counsel sent a number of letters to the University pointing out that the University's Policy violated [her] and [her] colleague's rights and asking the University to reverse its disapproval decisions"); ECF No. 30-5 ¶ 9 (same); ECF No. 30-6 ¶ 9 (same).

During this time, the dispute boiled over in spectacular fashion. In one of the cases challenging SB 90, the Executive Office of the Governor moved to quash a

subpoena the plaintiffs had served on it. *See* ECF No. 220, *in* Case No. 4:21cv201

(N.D. Fla. 2021). Among topics the plaintiffs sought to explore, said the Governor's

office, was communications, if any, about expert witnesses in the case between the

Governor's office and UF. *See id.* at 4. In their response to the motion to quash, the

plaintiffs defended that request, explaining that "during the week of October 10,

2021, . . . Plaintiffs' counsel learned for the first time that the University of Florida

has advised one of Plaintiffs' experts . . . and subsequently two others . . . that they

were not authorized to serve as experts." ECF No. 231 at 11, *in* Case No. 4:21cv201.

The same day the voting-rights plaintiffs responded, the *New York Times* published

an article titled *Florida Bars State Professors from Testifying in Voting Rights

Case.*[21]

The next day, UF issued a statement addressing the controversy, asserting that

UF "has a long track record of supporting free speech and our faculty's academic

freedom" and that UF did not "deny" Austin, Smith, and McDonald's "First

Amendment rights," but "denied requests of these full-time employees to undertake

outside paid work that is adverse to the university's interests as a state of Florida

institution." ECF No. 31-16 at 2.

---

[21] Michael Wines, *Florida Bars State Professors from Testifying in Voting Rights Case*,
N.Y. TIMES (Oct. 29, 2021), https://tinyurl.com/mr3a85bp.

The day after was also busy. UF's accrediting body announced it was investigating the dispute.[22] Plus, Fuchs and Glover changed course, issuing a statement explaining that "if the professors wish to testify pro bono on their own time without using university resources, they are free to do so." ECF No. 31-17 at 3. In the same statement, Fuchs and Glover also announced the creation of a "task force" to "review the university's conflict of interest policy and examine it for consistency and fidelity." *Id.* Finally, UF's general counsel emailed Plaintiffs' attorneys, explaining that Austin, McDonald, and Smith "maintain the ability to engage in the activities identified in their disclosures if done on their personal time, in their personal capacity, without the use of any University resources and without compensation." ECF No. 31-18 at 2.

---

[22] *See* Ana Ceballos & Mary Ellen Klas, *UF's Ban on Professors Testifying Against State to Be Investigated, Accreditor Says*, MIAMI HERALD (Nov. 1, 2021), https://tinyurl.com/2p83s3mb.

Two days later, new articles emerged. In them, Plaintiff Goldhagen alleged

that, in August 2021, he had sought permission to participate "in cases involving

masking and children," but was denied permission. ECF No. 23-1 at 216. In denying

Goldhagen's request, UF offered a similar rationale to its later denials of the political

science professors' requests. Although the rationale was the same, Goldhagen's

request was different in one key respect. He had sought to testify for free.

**UFOLIO Disclosure Disapproved**

| | |
|---|---|
| **Disclosure:** | <u>DOI00017218</u> |
| **Discloser:** | Jeffrey Goldhagen |
| **Department:** | JX-PEDIATRICS-JACKSONVILLE |
| **Entity:** | Gallagher & Associates Law Firm, P.A |
| **Disclosure Type:** | Legal Consulting |

Gary Wimsett reviewed the above referenced disclosure and disapproved this request.

**Comments:** Dr. Goldhagen.

I am not able to approve this activity.

Outside activities that may pose a conflict of interest to the executive branch of the State of Florida create a
conflict for the University of Florida.

Thank you,
Gary Wimsett
Assistant VP, Conflicts of Interest
Office of the Provost

ECF No. 31-11 at 2 (excerpt from Goldhagen's denial notice).

At the same time, news outlets also began to report that, in August 2020,

Defendant Rosenbury had prevented four law professors—including Plaintiffs Nunn

and Reid—from identifying themselves as UF professors in an *amicus* brief

supporting a lawsuit challenging a law that narrowed the reach of a constitutional amendment restoring felons' voting rights in Florida.[23]

In an email exchange with Nunn, Rosenbury explained that signing the *amicus* brief was "a potential conflict of interest because the *amicus* brief will be filed in an action against the state." ECF No. 31-4 at 2.[24] And, in approving Reid's request through the UFOLIO system, UF's Assistant Vice President for Conflicts of Interest Gary Wimsett wrote that Reid could sign the brief, but that she was "not permitted to use any UF marks, logos or other identifiers . . . and [that she] shall not imply or otherwise suggest any official affiliation with UF." ECF No. 31-5 at 2. Both Nunn and Reid signed the brief, as did the other two UF professors. Of the 93 professors that signed, only these four UF professors did not name their university. *See* ECF No. 31-8.

---

[23] *See* Ana Ceballos & Mary Ellen Klas, *UF Restricted Five More Professors in Cases Against the State*, TAMPA BAY TIMES (Nov. 2, 2021), https://tinyurl.com/553ufkvm; *see also Jones v. DeSantis*, 975 F.3d 1016 (11th Cir. 2020).

[24] Before Dean Rosenbury acted on Professor Nunn's request to sign on to the *amicus* brief in July 2020, Governor DeSantis, a defendant in the case, had made his views clear, accusing the plaintiffs of "attempting to use the court process to re-write the scope and original intent of the amendment." Lawrence Mower, *Gov. DeSantis Appeals Judge's Order in Amendment 4 Lawsuit*, TAMPA BAY TIMES (Nov. 19, 2019), https://tinyurl.com/4r9hwsxm.

Two days after these revelations—with its outside-payment-based rationale no longer tenable—UF again reversed course, approving Austin, McDonald, and Smith's requests in their entirety, explaining that "[t]he previous institutional decision is reversed per President Fuchs' directive on November 5, 2021." Without explanation, and almost three months after its initial denial, UF also changed Goldhagen's request to "approved." ECF No. 31-9 at 2.[25]

**UFOLIO Review Complete - Approved**

| | |
|---|---|
| **Disclosure:** | DOI00013593 |
| **Discloser:** | Daniel Smith |
| **Department:** | LS-POLITICAL SCIENCE |
| **Entity:** | Demos & Perkins Coie |
| **Disclosure Type:** | Legal Consulting |

Gary Wimsett has approved the above referenced disclosure.

Please review the comments below (if any).

Comments: The previous institutional decision is reversed per President Fuchs' directive on November 5, 2021.

Gary Wimsett
Assistant Vice President, Conflicts of Interest

ECF No. 31-22 (excerpt from Smith's approval notice).

The same day, Austin, McDonald, and Smith filed this lawsuit. ECF No. 1. On November 15, 2021, Plaintiffs filed an amended complaint, adding Goldhagen, Nunn, and Reid as plaintiffs. ECF No. 19.

---

[25] Given that the case was decided by early September, UF's after-the-fact reversal was largely performative. *See* Ana Ceballos & Mary Ellen Klas, *Judge Finalizes Ruling Upholding School Mask Mandates; State Expected to Appeal*, MIAMI HERALD (Sep. 2, 2021), https://tinyurl.com/2p8ucn46.

On November 22, 2021, Fuchs's "task force" issued its final report. ECF No. 23-1 at 219–23. The next day, Fuchs announced that he had "approved" the Task Force's recommendations. *Id.* at 225. Most relevant here, the recommendations establish (1) a "strong presumption" that UF will allow professors to serve as experts in litigation involving the State, (2) that UF can only overcome that presumption "when clear and convincing evidence establishes that such testimony would conflict with an important and particularized interest of the university," and (3) an appeals process. *Id.* at 221–22. Addressing the changes in an interview, Fuchs explained that, under the new policy, denials would be rare and that "it needs to be an unusual circumstance where there would really be harm to the university if a person can't participate in the outside activity." ECF No. 31-35 at 2. Ten days after Fuchs approved the changes, Plaintiffs moved for a preliminary injunction. ECF No. 30.

Only days after Plaintiffs filed that motion, UF's Faculty Senate issued a Report on the state of academic freedom at the University. The Report noted "palpable reticence and even fear on the part of faculty to speak up" on hot button issues. ECF No. 45-5 at 3. The report also stated that "[t]here was grave concern about retaliation and a sense that anyone who objected to the state of affairs might lose his or her job or be punished in some way." *Id.*

For example, the Report referenced a meeting at which Associate Provost Chris Hass allegedly stated, "that [the] University administration was under pressure

to avoid doing anything that might provoke the legislature or governor to take a dim view of the University" and that "the jobs of top administrators, including President Fuchs and Provost Glover, were at risk if the university moved forward with any activities out of favor with the current state governing party." *Id.* at 20.

And, the Report said, there was a "[c]oncern that denials for outside activities were tied to questions of race and ethnicity," that UF "employees were told verbally not to criticize the Governor of Florida or UF policies related to Covid-19 in media interactions," and that "websites were required to be changed, that course syllabi had to be restructured, and that use of the terms 'critical' and 'race' could not appear together in the same sentence or document." *Id.* at 21–22.[26] Indeed, the Report noted, UF had asked professors to "delay or alter[]" "[c]urricular proposals" because "such content" apparently "conflicted with a position taken by political actors or factions within the State government." *Id.* at 23. In this atmosphere of fear, "faculty who had not been specifically asked to alter their research agendas or curricular content[,] but who were concerned that their work may put them at odds with political actors[,] . . . were unsure how to proceed." *Id.* at 23. In short, the "world-class institution" that Floridians had "paid so much to create" was at risk. *Id.* at 26.

---

[26] A development that some Florida legislators have publicly praised. For example, Senator Joe Gruters, directly addressing allegations of censorship at UF, remarked that he was "heartened to see universities act proactively to get this garbage out of our state." Ana Ceballos, *Critical Race Theory Becomes Flash Point for GOP, UF Heading into Legislative Session*, MIAMI HERALD (Dec. 1, 2021), https://tinyurl.com/jr7dkjk3.

The Faculty Senate Report also included the public remarks of UF's Chairman of the Board of Trustees. The Chairman made these remarks at a meeting that occurred three days before the Report's release. ECF No. 45-5 at 258–74 (attaching remarks from December 3, 2021 meeting of the UF Board of Trustees to Report dated December 6, 2021). The Chairman gave his December 3rd remarks *after* UF reversed course on Professors Austin, Smith, and McDonald's requests to participate in the election case—indeed, the very same day their expert reports were filed on the public record in that case and the same day Plaintiffs moved for a preliminary injunction in this case. Chairman Hosseini's remarks made plain that UF was beholden to the Florida Legislature and that it would not permit its faculty to continue offending lawmakers in Tallahassee by "advocat[ing] personal political viewpoints to the exclusion of others." *Id.* at 268. According to Chairman Hosseini, "[i]t must stop, and it WILL stop." *Id.* at 270.

Against this backdrop, this Court must determine whether Plaintiffs are entitled to a preliminary injunction.

## II

This Court tackles the *amicus* brief issue upfront, before diving into the core issues. This Court separates the *amicus* issue from the "core" issues because both parties have litigated the *amicus* issue as a bit of an afterthought. After careful

21

consideration, this Court declines to enjoin Defendants from enforcing UF's *amicus* policy.

For the purposes of its analysis this Court separates the *amicus* issue into two sub-issues: (1) whether UF's *amicus* policy is an unconstitutional prior restraint and (2) whether UF's policy is unconstitutional because it diminishes the impact of professors' speech by prohibiting professors from affiliating themselves with UF in *amicus* briefs. This Court addresses these sub-issues in turn.

Under the first sub-issue, the primary concern is that the *amicus* policy operates as a standardless prior restraint that permits viewpoint discrimination against professors who wish to sign on to *amicus* briefs in litigation involving the State. To determine whether that is so, this Court must consider both the policy's text in addition to the actual application of that policy. *See Bloedorn v. Grube*, 631 F.3d 1218, 1237 (11th Cir. 2011) (noting that, when analyzing unbridled discretion claims, courts should consider "the actual policies and practices employed by the University, not just the policy's text"). Here, as distinguished from the expert witness policy discussed in greater detail below, the record reflects that UF's policy—if there is any separate policy—for signing on to *amicus* briefs allows professors to sign on to such briefs as a matter of course, notwithstanding the fact that professors must still submit requests for approval through the UFOLIO system. On the other hand, the record shows that Defendants have applied their expert

22

witness policy to repeatedly deny professors permission to testify in litigation involving the State of Florida. Further development of the record might show that Defendants have applied the *amicus* policy in a similar fashion to their expert witness policy. But at this juncture, Plaintiffs have not met their burden to demonstrate entitlement to injunctive relief on this issue.

The second sub-issue is whether UF's policy is unconstitutional because it diminishes the impact of professors' speech by prohibiting professors from affiliating themselves with UF in *amicus* briefs. For two reasons, this Court declines to enjoin the *amicus* policy on this basis.

*First*, the record is unclear on what the *amicus* policy even is. Is it found within the conflicts policy? Is it a figment of Dean Rosenbury's imagination? This Court cannot say. And at the end of the day, the burden is ultimately on Plaintiffs to establish their entitlement to a preliminary injunction. *See Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) ("When moving the court for a preliminary injunction, plaintiffs bear the burdens of production and persuasion."). This Court offered to allow the parties to conduct discovery. So Plaintiffs could have developed the record on this issue. But they did not, and so they are stuck with the record they have.

*Second*, this Court harbors grave concerns that this diminished-impact issue is moot. Were the policy simply unclear, this Court might have issued a preliminary

injunction, lest an institutional defendant evade judicial review by keeping its policy incomprehensibly vague. Yet here UF has since made clear what its policy is not. UF provided its general counsel's affidavit, which affirmatively states that the policy on signing *amicus* briefs permits professors to list their UF affiliation for identification purposes only, and thus does not require professors to drop their titles and academic affiliation entirely. *See* ECF No. 44 ¶¶ 3–4.

At the January 14th hearing, Plaintiffs' counsel agreed that, assuming UF permits professors to sign *amicus* briefs and list their affiliation with UF while not purporting to speak on UF's behalf, there would be no First Amendment concern with respect to whether UF's policy diminishes the impact of professors' speech by prohibiting professors from affiliating themselves with UF in *amicus* briefs. Here, Plaintiffs must establish that they are entitled to the relief requested as to the "*amicus* policy." However, based on the record before this Court, Plaintiffs have not met their burden to demonstrate that their claim as to this sub-issue is justiciable.

In sum, considering UF's prior application of its *amicus* policy, coupled with the muddled record and the mootness concerns discussed above, Plaintiffs have not shown that they are likely to succeed on the merits of their claim as it relates to UF's *amicus* policy. Their motion is therefore due to be **DENIED in part** as it relates to the *amicus* policy.

III

This Court begins its discussion of the balance of Plaintiffs' claims with justiciability.[27] "Justiciability doctrine serves two purposes: (1) it aims to prevent the judiciary from infringing on the powers of the executive and legislative branches, and (2) it seeks to ensure that the judiciary considers only those matters presented in an adversarial context." *Strickland v. Alexander*, 772 F.3d 876, 882 (11th Cir. 2014) (citation omitted). It's composed of "three strands"—standing, ripeness, and mootness. *Id.* Defendants' arguments implicate all three strands. They assert this case is not justiciable because (1) Plaintiffs have not suffered an injury, (2) this case is not ripe, and (3) this case is moot. This Court addresses each argument in turn. And because this is one of those cases in which injury and ripeness merge, this Court addresses injury and ripeness together under the umbrella of injury.

A

First, injury. On this point, Defendants make four arguments—namely, (1) Defendants claim there is no "certainly impending" risk that UF will deny another request to testify under its policy; (2) Defendants urge this Court to disbelieve Plaintiffs' claims of self-censorship and chilled speech based on some Plaintiffs' past conduct; (3) Defendants argue that, because the policy is "brand new" and no

---

[27] This Court incorporates by reference its analysis in its amended order denying Defendants' motion to dismiss. ECF No. 47.

Plaintiff has sought approval to serve as an expert witness since its enactment, Plaintiffs' claims are not ripe; and (4) Defendants assert that the policy does not chill Plaintiffs' speech because professors whose requests are denied are not "punished."

1

Starting with Defendants' assertion that there is no "certainly impending" risk that UF will deny another request to testify, this argument fails because it supposes that the only cognizable injury for Article III purposes is an outright denial of a request to testify. In short, Defendants would have this Court hold that pre-enforcement review is available only under the very narrowest of circumstances—when Plaintiffs have made a request but before it is denied. Though the law of standing is evolving in this Circuit, that has never been and is not the law. Holding otherwise would work a sea change in the law of standing. Contrary to Defendants' assertions, Plaintiffs have alleged two cognizable injuries: (1) self-censorship and (2) the existence of a standardless prior restraint. This Court discusses each in turn.

Plaintiffs suffer the Article III injury of self-censorship if they can show they reasonably fear that UF's conflicts policy will be enforced against them, which thus chills their speech. *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998). So this Court must determine not, as Defendants argue, whether another denial is imminent, but whether Plaintiffs' chill is reasonable. To do so, this Court asks whether Plaintiffs intend "to engage in a course of conduct arguably affected with a

constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 573 U.S. 149, 159 (2014).

Plaintiffs' expert testimony is imbued with a constitutional interest. Testifying in a public proceeding on matters of great public concern lies at the First Amendment's heart. Plaintiffs also intend to testify in the future. Unless you are David Hume, to predict what will happen in the future, you look to the past. And not counting the litigation that triggered this case, Smith, for example, has testified as an expert in at least six voting-rights cases. ECF No. 30-6 at 2 n.1. It is thus reasonable to infer that he will seek to testify in controversial cases—as voting cases always are—in the future. The same goes for the remaining Plaintiffs.

The main question then, is whether there is a credible threat that UF will enforce its policy to prevent Plaintiffs from testifying as experts against the State. As explained below, there is.

2

In the First Amendment context, the credible threat analysis is "quite forgiving," lest free speech be chilled before the policy is enforced. *Wilson*, 132 F.3d at 1428; *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). For a threat of enforcement to be credible, Plaintiffs only need to have a fear that is neither fanciful nor speculative. Because the issues overlap, this Court addresses both whether

Plaintiffs' fear is reasonable and Defendants' claim that UF's policy must not chill Plaintiffs Austin, McDonald, and Smith because they continued to work as experts in the face of the denials that triggered this lawsuit.[28] *See* ECF No. 61. The problem with Defendants' backward-looking argument is that it confuses what has happened—which is not this lawsuit's subject—and what will happen.

For years, UF *encouraged* Plaintiffs to serve as expert witnesses, even if Plaintiffs took positions that would irritate Florida's government. *See* ECF No. 30-5 ¶ 2 ("Until recently, the University seemed to encourage [testifying as an expert for voting-rights plaintiffs], even discussing [such activities] during my annual performance reviews."); ECF No. 30-6 ¶ 4 (same). Given that UF had consistently approved Plaintiffs' requests to serve as experts, it is hardly surprising that Austin, McDonald, and Smith began working on their expert reports presuming that UF would approve their requests. *See* ECF No. 45-5 at 11 (stating that, for many years, "the decision to permit . . . outside activity was usually pro forma and permissive"); ECF No. 30-6 ¶¶ 5–7 (explaining that "[g]iven the University's past support," Smith agreed to testify and began working on his report *before* making a UFOLIO submission).

And even after UF denied their requests, Plaintiffs continued to work. Again, this is hardly surprising given that Plaintiffs' lawyers were negotiating with UF to

---

[28] At times, Defendants have made a similar argument about Goldhagen.

reverse their disapproval at the time. *See* ECF No. 30-4 ¶ 10 ("[M]y counsel sent a number of letters to the University … asking the University to reverse its disapproval decisions."); ECF No. 30-5 ¶ 9 (same); ECF No. 30-6 ¶ 9 (same). Indeed, Plaintiffs' conviction that UF would approve their requests was eventually borne out. After much handwringing, UF *did* approve their requests. *See, e.g.*, ECF No. 31-22 (explaining that "[t]he previous institutional decision is reversed per President Fuchs' directive").

Yet the question here is not whether UF's policy chilled Plaintiffs *then*; the question is whether UF's policy chills Plaintiffs *now*. Considering everything that has happened between UF's initial denials and this case, I credit Plaintiffs' evidence that they are self-censoring because of UF's policy, and I find that their chilled speech stems from their reasonable fears that the policy will be enforced against them moving forward.

Despite approving Plaintiffs' request to testify in the election cases, UF has drawn a line in the sand. It has steadfastly maintained that it may reject Plaintiffs' requests to testify based on the viewpoint expressed in Plaintiffs' testimony. *See* ECF No. 43 at 22–23 (claiming that "it is not clear [Plaintiffs] ha[ve] a First Amendment right [to testify against the state of Florida] while working for UF"). And UF's "revised" policy not only fails to constrain Defendants' discretion, but also contains an explicit carveout allowing viewpoint discrimination when Defendants decide an

issue is important enough. Three examples show just how determined UF is to retain its unlimited discretion.

*First*, consider the costs UF is willing to bear to maintain its power to discriminate based on viewpoint. It is willing to suffer threats to its accreditation, congressional inquiries, unrelenting bad press, an all-but-certain hit to its rankings, and the substantial monetary cost of hiring an experienced D.C. firm to defend its policy. The only thing UF will not do, it seems, is amend its policy to make clear that it will never consider viewpoint in denying a request to testify.

*Second*, consider the way UF has addressed Plaintiffs—some of its most senior and respected faculty—throughout this dispute.[29] UF has compared Plaintiffs to moonlighters, ECF No. 43 at 30, "robbers," *id.* at 23, traitors, *id.* (accusing Plaintiffs of feeding UF to a gator), political hacks, ECF No. 45-4 at 12, and—in counsel's most recent performance—disobedient liars.[30] Not only that, but the highest ranking UF official has all but promised to enforce the policy in the way

---

[29] Typically, the "acts or omissions of" a party's lawyer, as their "freely selected agent," are attributable to the party. "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent." *Link v. Wabash R. Co.*, 370 U.S. 626, 633–34 (1962). Thus, an attorney's statement is binding when "made within the scope of the attorney's authority and without contradiction by the client." *Associação Brasileira de Medicina de Grupo v. Stryker Corp.*, 891 F.3d 615, 621 (6th Cir. 2018). Both requirements are met here.

[30] This Court cannot help noting the sad irony that UF touts its strong "presumption" favoring speech with one breath and with the other condemns Plaintiffs as liars with unclean hands for having the audacity to presume that UF would approve their requests to speak.

Plaintiffs fear. *Cf. Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1204 (11th Cir. 2021) (requiring, outside the First Amendment context, that plaintiffs "show that they've been threatened with prosecution . . . by either the [defendants] or [someone] under [their] control"). Just a month ago, Chairman Hosseini specifically addressed the dispute at the heart of this case. ECF No. 45-4 at 2–3, 17. Echoing UF's rhetoric, Chairman Hosseini decried professors "taking second jobs," "using their positions of authority to improperly advocate personal political viewpoints," and "misusing their positions." *See id.* at 12, 18.[31] "Let me tell you," he said, "our legislators are not going to put up with the wasting of state money and resources, and neither is this board." *Id.* at 14.

*Third*, and finally, UF's own Faculty Senate concluded, among other things, that, within UF's faculty, "[t]here was grave concern about retaliation," that "faculty often engaged in self-censorship," and that UF's administration is "under pressure to avoid doing anything that might provoke the legislature or governor to take a dim view of the University." ECF No. 45-5 at 3, 20.[32]

---

[31] Aside from turning a blind eye to the Chairman's language condemning professors who "advocate personal political viewpoints," and warning that neither the Legislature nor UF would tolerate such conduct, Defendants have suggested that the Chairman was speaking only of those not doing their jobs—which is a separate issue. In doing so, Defendants ask this Court to ignore Chairman Hosseini's use of the disjunctive when he condemned those who "waste [tax] dollars by . . . misusing their positions *or* aren't doing the jobs they were hired and committed to do." ECF No. 45-4 at 18 (emphasis added).

[32] Three points about the Faculty Senate Report:

Given the above, it is not unreasonable, *moving forward*, for Plaintiffs to believe that UF will use its policy to squelch their speech; it is unreasonable for them to believe that it will not. Plaintiffs' assumptions moving forward have justifiably changed based on the bright line position UF has taken asserting its absolute discretion to deny expert witness requests based on content or viewpoint. In short, I credit Plaintiffs' fears that UF will enforce its policy to deny Plaintiffs' requests to participate in litigation involving the State, and I find that they are self-censoring as a result of those fears. Moreover, I conclude these fears are reasonable. I thus conclude that Plaintiffs are suffering the ongoing injury of self-censorship as a result of the challenged policy.

---

*First*, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (internal quotation marks and citation omitted). This Court relies on the Faculty Senate Report given the character and objectives of this injunctive proceeding; namely, determining whether UF's policy—on its face—violates the First Amendment, and relatedly whether there is a reasonable fear of enforcement of this policy in violation of the Constitution such that Plaintiffs have suffered the constitutional injury of self-censorship.

*Second*, Defendants' counsel suggested at the hearing on January 7th that this Court should not place stock in the "faculty union reports" in the record. ECF No. 55 at 84. Presumably he refers to the Faculty Senate Ad Hoc Committee on Academic Freedom Report. In so arguing, he dismisses his own clients' records. The report was produced by the UF Faculty Senate and is published on UF's website. http://senate.ufl.edu/.

*Third*, the contents of the Faculty Senate Report are corroborated by other reliable evidence, including Chairman Hosseini's own comments to the Board of Trustees in December 2021, Plaintiffs' affidavits, and the history of this case since its inception.

3

Besides self-censorship, the existence of an unlawful prior restraint also satisfies the injury requirement. On this point, Defendants argue that because the policy is "brand new," and no Plaintiff has sought approval to serve as an expert witness since its enactment, Plaintiffs' claims are not ripe. For two reasons, Defendants are mistaken.

*First*, one need not seek approval to speak to have standing to challenge, on First Amendment grounds, a policy reserving unbridled discretion for the decision maker. "In the area of freedom of expression, it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, . . . whether or not he applied for a license." *Freedman v. Maryland*, 380 U.S. 51, 56 (1965). Indeed, Chief Judge Pryor has noted that when a plaintiff has applied for a permit in the past and intends to apply for a permit in the future, whether an administrator has yet to exercise their unbridled discretion to deny the permit is "immaterial because it is the *existence, not the imposition*, of standardless requirements that causes [the] injury." *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1275 (11th Cir. 2006) (emphasis added).

*Second*, nothing about this policy is new. Although adorned with the trappings of a fair and balanced rule, the "revised" policy merely codifies what UF has been doing all along. Defendants claim that the "strong presumption" in favor of allowing

33

professors to serve as experts in litigation involving the state changes everything. ECF No. 55 at 83. Yet they fail to address the reality that there has always been a presumption that faculty and staff would participate in litigation. Plaintiffs have long served as expert witnesses in lawsuits and UF has encouraged them to do so. *See, e.g.*, ECF No. 30-6 ¶ 4 (statement by Plaintiff Smith that "in my annual performance reviews, the University has praised my research and advocacy on voting rights"). That the policy still reserves UF the right to prohibit testimony contrary to its interests provides more evidence that the "revised" policy is nothing new. The policy does not explain what "an important and particularized interest of the university" might be. Nor has UF disavowed its "old" policy, or pronounced that it would not prohibit faculty from participating in litigation against the State moving forward. What remains is a dolled-up version of the same old conflict-of-interest policy used to deny Plaintiffs' previous requests to serve as expert witnesses. In short, the policy *has* been applied to Plaintiffs. And even if it had not been applied, Plaintiffs are injured by the policy's very existence.

4

Finally, turning to the balance of Defendants' arguments, Defendants claim that Plaintiffs' subjectively-felt chill is not reasonable because professors whose requests are denied are not "punished." ECF No. 55 at 82. But to be chilled, a plaintiff need not fear punishment; they must fear *enforcement*. Faculty and staff

34

who reasonably fear a denial are less likely to try to participate in litigation against the State. Rather than spend time and resources engaging with litigators and preparing requests—which they reasonably believe will be denied—faculty may choose to engage in myriad other activities, be it research, spending time with their families, or working on expert reports for litigation outside of Florida. Plus, UF's hostility toward expert testimony adverse to the State of Florida dissuades litigants from asking UF faculty for help, further limiting the opportunities available to professors to testify about matters of public concern. So no, nobody has been fired—yet—for seeking to participate in litigation against the State. But there is a tangible harm.

In sum, this Court finds that Plaintiffs have suffered injury through self-censorship and through the existence of an impermissible prior restraint.

B

That leaves mootness. This section addresses only whether Plaintiffs' claim challenging the policy for providing expert witness testimony is moot—in other words, whether the "revisions" to UF's conflicts policy moot this case. Again, Defendants point to the "new policy requirements applying a heightened evidentiary standard and a strong presumption in favor of permitting faculty and staff to testify as expert witnesses in litigation against the state." To be sure, a policy that repeals

35

or materially alters a challenged policy ordinarily renders a lawsuit moot, but UF's "revised" policy does no such thing.[33]

The "revised" policy continues to permit UF to do that which Plaintiffs assert is unconstitutional; namely, to deny Plaintiffs—indeed, all faculty and staff—the opportunity to participate in litigation against the State of Florida because of the content or viewpoint of their testimony. For one, the "revised" policy does not materially alter the standard by which UF can decide expert witness requests, nor has UF repudiated the premise that it may reject a professor's request to participate in litigation because their testimony may draw the ire of Florida's decision makers, ultimately affecting UF's bottom line. Nor do the "revisions" set a time limit within which UF must decide a request to testify, allowing UF, Plaintiffs say, to run out the clock on any request. These are the features that Plaintiffs contend violate the Constitution. Because the "revised" policy retains the features Plaintiffs challenge, it harms Plaintiffs in the same fundamental way as the "old" policy.

Further suggesting that this case remains live, UF has not committed to ceasing the activity that first gave rise to this action. Plaintiffs have invited Defendants to moot this case by affirming that they "will never rely as an interest on

---

[33] Of course, there are exceptions. *See, e.g., State of Fla. v. Dep't of Health & Human Servs.*, 19 F.4th 1271, 1280–81 (11th Cir. 2021) (discussing "capable-of-repetition-yet-evading-review exception to mootness"); *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267–68 (11th Cir. 2020) (citations omitted) (discussing "voluntary cessation" exception to mootness).

the reactions of legislators or others, other political actors, to [Plaintiffs'] speech as a basis for suppressing it." ECF No. 55 at 51. But UF has refused to disclaim reliance on the reactions of political actors as a basis to suppress its faculty and staff's speech.

This Court recognizes that, under the right circumstances, UF, as a governmental entity, would deserve a presumption that it is unlikely to resume its illegal activities. The problem is that the presumption goes only to those who have "professed commitment to changed ways." *Keohane*, 952 F.3d at 1267–68 (citations omitted). When, as here, the government entity has made no commitment to change and the policy still permits the very thing that Plaintiffs assert was unconstitutional before its revisions, a "revised" policy does not moot the controversy. For these reasons, and those discussed in this Court's order denying the motion to dismiss, Plaintiffs' claims related to providing expert testimony are justiciable. Having so concluded, this Court proceeds to the merits of Plaintiffs' claims.

IV

A district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). Although a "preliminary injunction

37

is an extraordinary and drastic remedy," it should still be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). None of these elements, however, is controlling. This Court must consider the elements jointly, and a strong showing on one element may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

### A

This Court begins with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because failure here obviates the need to "consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citing *Pittman v. Cole*, 267 F.3d 1269, 1292 (11th Cir. 2001)). On the merits, Plaintiffs argue that UF's policy violates the First Amendment for two reasons; namely, because (1) the policy is an unconstitutional prior restraint on speech, and (2) the policy is overbroad.[34] This Court addresses each of these arguments in turn below.

---

[34] Of course, Plaintiffs have sued Defendants in their official capacities as state actors subject to the First Amendment as applied to the States through the Fourteenth Amendment's Due Process Clause. *Frazier ex rel. Frazier v. Winn*, 535 F.3d 1279, 1284 n.4 (11th Cir. 2008) ("As we have noted, the First Amendment's prohibition on laws abridging the freedom of speech applies to state governments through the Fourteenth Amendment." (citation omitted)).

But first, this Court takes this moment to state explicitly what Defendants refused to concede at the hearing in this case: Plaintiffs have a First Amendment right to testify about topics related to their expertise in litigation against the State of Florida, and just because such testimony relates to their expertise—which is itself related to their work as public university professors—does not mean that it falls outside the First Amendment's reach. Defendants, instead, took the remarkable position in their brief that "it is not clear [that Plaintiffs] had a First Amendment right to do this while working for UF." ECF No. 43 at 22–23. Citing no other "support" for this proposition aside from a snippet of Justice Scalia's dissent in *Rankin v. McPherson*, 483 U.S. 378 (1987), Defendants denigrated their own professors as being no better than two-faced mercenaries when they seek to testify as experts in their field in cases challenging Florida law. And during the hearing on Plaintiffs' motion, when questioned directly on this point, Defendants sought only to minimize this position by dismissing it as merely an introduction to their rebuttal of Plaintiffs' arguments for a preliminary injunction. Once again—says UF—nothing to see here. But lest there be any confusion, the Supreme Court has rejected Defendants' remarkable position. *See Lane v. Franks*, 573 U.S. 228, 240 (2014) ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue

39

is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").[35] With that said, this Court turns to the merits of Plaintiffs' claims, starting with their theory that the policy is an unconstitutional prior restraint on protected speech.

1

"[A]ny system of prior restraint" bears "a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990). Plaintiffs assert that UF's policy is an unconstitutional prior restraint on speech because (a) it vests UF with unbridled discretion in deciding whether to permit faculty and staff to testify as expert witnesses in litigation involving the State, (b) it places no time limit on UF's decision making while allowing for content-based discrimination, and (c) UF has failed to justify its restraint on speech under *Pickering* and its progeny. This Court takes each theory in turn, beginning with whether the policy grants UF unbridled discretion to suppress speech.

---

[35] Justice Thomas, in his concurrence, emphasized that some public employees, like police officers, crime scene technicians, and lab analysts, ordinarily provide testimony "pursuant to" their job duties and therefore speak as public employees rather than private citizens. 573 U.S. at 247 (Thomas, J., concurring). He noted that the Court left the constitutional questions raised by such scenarios for another day. *Id.* So too here—the question is not whether a professor's testimony about events that occurred in the classroom on Tuesday is properly considered citizen speech rather than employee speech. The question is whether faculty who wish to speak, outside their ordinary job duties, on topics related to their expertise—which relates to their public employment as university professors—are protected by the First Amendment. The answer is yes.

40

a

"[T]wo evils that will not be tolerated in [prior restraint] schemes," are placing

unbridled discretion in the hands of the government decision makers and failing to

place a time limit on the government decision maker to grant permission to speak.

*Id.* at 225–26. Without question, " 'a law subjecting the exercise of First Amendment

freedoms to the prior restraint of a license' must contain 'narrow, objective, and

definite standards to guide the licensing authority.' " *Forsyth Cnty. v. Nationalist*

*Movement*, 505 U.S. 123, 131 (1992) (quoting *Shuttlesworth v. City of Birmingham*,

394 U.S. 147, 150–51 (1969)). These standards are necessary to mitigate "the danger

of censorship and of abridgment of our precious First Amendment freedoms." *Id.*

(quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)). Plaintiffs assert

that unbridled discretion is baked into UF's policy, rendering the policy

unconstitutional. This Court agrees and concludes that Plaintiffs are substantially

likely to succeed on the merits of this claim.

The Supreme Court has long held that "when a licensing statute allegedly

vests unbridled discretion in a government official over whether to permit or deny

expressive activity, one who is subject to the law may challenge it facially without

the necessity of first applying for, and being denied, a license." *City of Lakewood v.*

*Plain Dealer Pub. Co.*, 486 U.S. 750, 755–56 (1988). "At the root of this long line

of precedent is the time-tested knowledge that in the area of free expression a

41

licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Id.* at 757. That is exactly what Plaintiffs allege has occurred and will continue to occur under UF's policy on conflicts of interest.

To start, UF's policy amounts to a prior restraint on speech because it prevents faculty and staff from speaking unless they apply for approval through the UFOLIO system and UF approves their request. In other words, UF's policy allows it to silence speech before it happens. *See Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017). The policy—including the Task Force recommendations—requires faculty and staff to disclose expert witness and legal consulting work through the UFOLIO system prior to engaging in such activity, thereby allowing UF to determine whether the activity conflicts with UF's interests. ECF No. 44-1 at 4–5. Failure to comply with this disclosure requirement—or the failure to abide by UF's denial of approval to engage in proposed activity—is subject to administrative or disciplinary action, including termination of employment. *Id.* at 6.

Next, this Court must determine "the purpose behind the regulation." *Bloedorn*, 631 F.3d at 1236 (citation omitted). "And, 'as a general rule, laws that by their terms distinguish between favored speech from disfavored speech on the basis of the ideas or views expressed are content based.' " *Id.* UF's asserted purpose

42

behind its policy is to "serve important public and university interests," including "encourag[ing] its Faculty and Staff to engage in activities supporting their professional growth, creating new knowledge and ideas, and furthering the University's mission of excellence in education, research, and service." ECF No. 43 at 30. More generally, UF says, enforcing a policy on conflicts of interest and conflicts of commitment ensures that UF employees fulfill their "obligation to commit their primary professional time and intellectual energy to the University and maintain the highest ethical and professional standards." *Id.*[36]

In addition, courts should consider "the actual policies and practices employed by the University, not just the policy's text," when analyzing a claim of unbridled discretion. *Bloedorn*, 631 F.3d at 1237 (citations omitted). UF's actual policies and practices reinforce this Court's conclusion that it has operated and will continue to operate with unbridled discretion when denying faculty and staff requests to testify as expert witnesses in litigation involving the State. As explained above, although UF adopted the Task Force's recommendations, this does not make this policy new or different from the policy in place before November 23, 2021. And the record shows that UF has denied multiple requests to testify in litigation challenging state

---

[36] As Plaintiffs have made abundantly clear, they are not challenging the conflict of commitment policy so long as Defendants apply it in a content- and viewpoint-neutral way. ECF No. 60 at 14.

laws or policies and offered shifting and inconsistent explanations for such denials—always implicating the "University's interests"—as UF saw fit.

To start, UF first determined that litigation against the State or "the executive branch" of the State was adverse to UF even when the legal issues presented in the litigation did not directly implicate or involve UF in any meaningful way. *See, e.g.*, ECF No. 30-3 (Dr. Goldhagen's affidavit stating that he was denied permission to participate in litigation challenging an executive order precluding school districts from enacting mask mandates when asked to testify "about the impact of COVID-19 on the pediatric population and the health benefits of requiring students to wear masks in schools to prevent the spread of SARS-Cov-2"); ECF No. 30-4 (Professor Austin's affidavit stating that she was first denied permission to participate in litigation challenging new election law when asked to testify about "the history of voting discrimination against minority groups and the impact of vote-by-mail measures on minority groups"); ECF No. 31-15 (Austin denial stating that "UF will deny its employees' requests to engage in outside activities when it determines the activities are adverse to its interests. As UF is a state actor, litigation against the state is adverse to UF's interests.").

When forced to address the issue due to "[r]ecent news reports . . . indicat[ing] that the University of Florida denied requests of some faculty members to participate in a lawsuit over the state of Florida's new election laws," UF changed course and

stated that it "denied requests of these full-time employees to undertake outside paid work that is adverse to the university's interests as a state of Florida institution." ECF No. 31-16. Defendants Fuchs and Glover amended this justification a day later to add that "if the professors wish to testify pro bono on their own time without using university resources, they are free to do so." ECF No. 31-17. UF doubled down on this new "interest"—prohibiting professors from having "a second income stream beyond their service to the University"—in an email from UF's General Counsel, Ryan Fuller, to Plaintiffs' counsel. ECF No. 31-18.[37] (Of course, UF could not base its denial of Dr. Goldhagen's request to testify in a legal case involving COVID-19 and school children because his services were offered for free.)

Finally, when the onslaught of bad press refused to ebb, UF—specifically, President Fuchs—suddenly realized that the professors' testimony in the election case *no longer presented any conflict to the University's interests at all. See* ECF No. 31-21 at 3 ("I have also asked UF's Conflicts of Interest Office to reverse the decisions on recent requests by UF employees to serve as expert witnesses in litigation in which the state of Florida is a party and to approve the requests

---

[37] This rationale—preventing professors from having a "second income stream beyond their service to the University"—raises its own constitutional questions that this Court need not address now. *See, e.g., United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 464–77 (1995). Moreover, UF's own policy on what may or may not be a conflict of interest or outside activity already contemplates that faculty and staff might have a permissible "second income stream beyond their service to the University" that poses no problem for the University. *See* ECF No. 44-1 at 5 (requiring disclosure of outside research funding, royalties, licensing, and copyright income, and paid professional services to an outside entity and which relate to one's "UF expertise").

regardless of personal compensation, assuming the activity is on their own time without using university resources."). Rather than showing that UF has "specifically drawn reasonable and definite standards, and applied those standards consistently, indicating a 'well-established practice,' " *Bloedorn*, 631 F.3d at 1237, the record shows that UF has taken an amorphous and inconsistent approach to applying its conflict-of-interest policy with respect to expert testimony and legal consulting.

Indeed, UF has applied the policy so inconsistently that in one day the need to do damage control for bad press can nullify the "challenging the State of Florida" conflict. Plus, UF has taken the inconsistent position that while professors have a "strong presumption" in their favor to speak, they should not presume they are allowed to speak and begin preparing expert reports while any UFOLIO request remains pending. UF's defense on this point is too clever by half.

It does not surprise this Court that UF has a practice of applying its policy in an inconsistent way, because the text of the policy vests UF with unbridled discretion. The policy states that faculty and staff are presumptively permitted to serve as expert witnesses in litigation involving the State of Florida *unless* "clear and convincing evidence establishes that such testimony would conflict with an *important and particularized interest of the university*, which the university must set forth in writing." ECF No. 31-29 at 5 (emphasis added). The reason set out in writing must include more than some conclusory assertion of conflict or fear of harm

46

resulting from a conflict. *Id.* But the policy does not limit the universe of "important and particularized interests" that UF can assert in denying a professor's request to testify as an expert.

In its papers, UF asserts its discretion is guided by its policy's definition of "conflict of interest," ECF No. 43 at 24, which is "when a University Employee's financial, professional, commercial or personal interests or activities outside of the University affects, or appears to affect, their professional judgment or obligation to the University," ECF No. 44-1 at 2. But UF's policy—both pre-Task Force and post-Task Force—already identified "Expert Witness/Legal Consulting" as a potential conflict of interest and required disclosure of such work. ECF No. 44-1 at 5. Pre-Task Force, if UF determined "in its sole discretion" that such expert testimony or legal consulting interfered with, or reasonably appeared to interfere with, the professor's obligations to the University, the professor could not participate in such activity. *Id.* at 3–4. Post-Task Force, UF now must determine whether such testimony "would conflict with an important and particularized interest of the university." ECF No. 31-29 at 5. Under either iteration of UF's policy, UF's determination is left entirely within its discretion. So UF's reliance on the definition of "conflict of interest" as some "narrow, definite, and objective standard" that guides its decision making is simply a red herring.

47

In addition, at the hearing, UF argued that the Task Force's codified procedural requirements—"the heavy burden, the clear and convincing evidence standard, the strong presumption"—impose restraints upon UF's discretion that save the policy from Plaintiffs' constitutional challenge. Not so. The policy restates "a strong presumption that the university will approve faculty or staff requests to testify as expert witnesses, in their capacities as private citizens, in all litigation in which the state of Florida is a party." ECF No. 31-29 at 4. But UF can overcome this presumption when it proves by clear and convincing evidence "that such testimony would conflict with an important and particularized interest of the university, which the university must set forth and explain in writing." *Id.* at 5. Accordingly, the policy targets protected speech—testimony—for censorship if UF decides that the speech conflicts with a yet unidentified university interest. UF must still explain what its interest is in writing and articulate something beyond the conclusory. But UF's pick of interests is in no way limited by the policy. *See Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1362 (11th Cir. 1999) (noting that none of the nine identified criteria the zoning board must consider in deciding whether to grant an exception is precise or objective and stating that "[a]ll of them—individually and collectively—empower the zoning board to covertly discriminate against adult entertainment establishments under the guise of general 'compatibility' or 'environmental' considerations"). In short, UF has retained for itself unbridled

48

discretion to determine whether a given professor's testimony offends its interests in some way and has doubled down on its position that this standardless standard is perfectly fine.

To be clear, the focus here is not whether there are now some procedural hoops that UF must jump through before denying a professor's request to testify as an expert witness in litigation involving the State. The question is whether the decision to deny such a request is guided by "narrow, objective, and definite standards" when UF determines that such a request poses a conflict of interest. *See Shuttlesworth*, 394 U.S. at 150–51. In other words, what standards or criteria, if any, guide UF's discretion when deciding what amounts to "an important and particularized interest of the university?" Quite frankly, there are none.

On the policy's face, no "narrow, objective, and definite standards" limit UF's discretion in deciding what amounts to "an important and particularized interest of the University." At the hearing, UF argued that an undefined "particularized interest" is enough under the case law to save UF's policy from Plaintiffs' challenge and offered no elaboration as to what any particular interest may be. UF urged this Court to consider instead how "extremely bridled" the University is when deciding on a professor's request to testify—citing its *heavy burden* in overcoming the *strong presumption* that the professor can testify. But these procedures are toothless when UF gets to base its decision on whatever interest it identifies in the moment.

49

What good is the presumption of innocence and burden of proof beyond a reasonable doubt in a criminal bench trial if the judge's factfinding is not guided by a "narrow, objective, and definite" standard—i.e., the elements of the crime? A criminal defendant is (1) presumed innocent, (2) protected by the highest burden of proof under the law, and (3) entitled to have the federal judge articulate her findings of fact in writing. *See* Fed. R. Crim. P. 23(c). But, if the court operates with the same unbridled discretion as UF, none of these protections cabin the court's discretion to decide after the fact what actions are or are not a crime. In other words, such meaningful protections lose all meaning when a decision maker is free to choose its own standard to apply to the decision before it. Accordingly, what work does UF's policy's presumption and evidentiary burden do if UF gets to choose from its unlimited universe of potential interests to justify its suppression of speech? Requiring only strong evidence of some unidentified "important and particularized interest" does not amount to a "narrow, objective, and definite standard." In fact, it is the opposite—a broad, subjective, and indefinite metric that changes with each professor's request.

To be clear, UF has had ample opportunity to limit its discretion to salvage its constitutionally infirm policy. Defendants could have (and still can) amend the policy to state that UF will not rely on political considerations to deny an outside activity request. Indeed, Defendants have shown that they are fully capable of such

explicit clarification because they have done just that with their *amicus* brief policy. But Defendants have made no attempt to clarify that they will not consider political considerations or viewpoint in applying UF's conflict-of-interest policy to expert witness testimony and legal consulting in litigation involving the State. The procedural requirements Defendants cited at the hearing are merely a smokescreen to distract from what remains on the face of and baked into UF's policy. UF is no less unbridled in its choice of interests—including political blow-back or potentially offending the ruling party in Tallahassee—than it was before its task force convened.

b

Turning back to the policy, Plaintiffs also challenge its lack of a time limit for UF to grant or deny a professor's UFOLIO request. *City of Lakewood* addressed the same concern. There, the Supreme Court noted that the availability of judicial review offered cold comfort when review came only *after* the City's decision to deny a permit. 486 U.S. at 771. Noting that the ordinance at issue did not set a time limit to act on permit requests, the Supreme Court warned that "an application could languish indefinitely before the Council, with the Newspaper's only judicial remedy being a petition for mandamus." *Id.* Likewise, here, UF imposes on itself no requirement to act with "reasonable dispatch" on faculty or staff requests to testify as expert witnesses or otherwise offer legal consulting in cases involving the State of Florida. That UF has not dragged its heels in granting or denying past requests is

51

no reason to assume that it will not run out the clock in the future. Indeed, the Supreme Court rejected a similar argument in *City of Lakewood*. *Id.* at 770 ("This presumes the mayor will act in good faith and *adhere to standards absent from the ordinance's face*. But this is the very presumption that the doctrine forbidding unbridled discretion disallows." (emphasis added)).

The Eleventh Circuit has emphasized that the lack of time limits is not *per se* unconstitutional if the permitting scheme is content-neutral. *See Granite State Outdoor Advert., Inc. v. City of St. Petersburg*, 348 F.3d 1278, 1281 (11th Cir. 2003). "The government's objective in regulating speech is the controlling consideration." *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). In other words, "if the government's reasons for regulating speech have nothing to do with content, the regulation is content-neutral." *Id.* UF's objective in regulating expert testimony is to determine whether "such testimony would conflict with an important and particularized interest of the university." ECF No. 31-29. Rather than having nothing to do with content, UF's objective is rooted in the substance of what the requester wishes to testify about.

Moreover, UF is determined *not* to engage in only some "cursory examination" or mere peek at the content of the requester's speech when deciding whether it poses a conflict to UF's unidentified interests. *Cf. Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 808 (11th Cir. 2020) ("That University officials must

52

perform a 'cursory examination' of a professor's speech content—which is at most what the Policy requires to assess whether an activity qualifies as a professional practice—does not transform the reporting requirement into a content-based regulation."). Instead, UF has imposed on itself a heavy burden to justify the suppression of speech, which can be overcome only by clear and convincing evidence and a written explanation of why exactly a requester's testimony would conflict with UF's unidentified interests. By its own terms, UF's analysis demands a detailed review of the content of such testimony to determine whether it conflicts with any number of unidentified interests in the vast universe of possibilities from which UF can choose.

In sum, there is no time limit in which UF must decide a professor's UFOLIO request and the policy does not preclude UF from inquiring into the content or viewpoint of the proposed testimony. Instead, implicit in the policy is content-based criteria which renders the lack of any time limit in deciding such requests unconstitutional. *See Barrett*, 872 F.3d at 1228–29. In short, UF's policy violates the First Amendment as a prior restraint that grants UF unbridled discretion to suppress protected speech.

53

c

Even if UF's policy could survive Plaintiffs' unbridled discretion challenge, it still violates the First Amendment because it allows UF to bar professors from speaking based on the viewpoint of their speech.

As noted above, UF's conflict-of-interest policy contains a presumption that faculty and staff can serve as expert witnesses in cases involving the State. ECF No. 23-1 at 221. That presumption applies "regardless of the viewpoint of the faculty or staff member's testimony . . . [or whether the] faculty or staff member is compensated for such testimony." *Id.*

Of course, a "presumption" implies that in some cases UF *can* deny professors' requests to testify. *See Presumption*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A presumption shifts the burden of production or persuasion to the opposing party, who can attempt to overcome the presumption."). And here the policy allows UF to overcome the presumption favoring approval when "clear and convincing evidence establishes that [a professors'] testimony would conflict with an important and particularized interest of the university." ECF No. 23-1 at 221–22. Accordingly, the policy permits UF to base a denial on the proposed testimony's viewpoint if UF decides in its unlimited discretion that the testimony contravenes UF's interests.

To begin, it is beyond cavil that the State could not prohibit a private citizen from offering expert witness testimony in a case involving the State, whether based on the viewpoint of the testimony or not, under the theory that allowing the testimony harms the State's interests. But "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004). The question then is whether there is something unique about the relationship between UF as an employer and its professors as employees that permits UF to restrict their speech in this way.

Public employees retain their First Amendment rights; "[a]fter all, public employees do not renounce their citizenship when they accept employment." *Franks*, 573 U.S. at 236. That said, the State, as an employer, has an interest in "controlling the operation of its workplaces." *Id.* To balance these countervailing interests, this Court must apply the test established in *Pickering v. Board of Education*, 391 U.S. 563 (1968), and its progeny.

Under *Pickering*, this Court asks two questions. First, did the employee (a) speak "as a citizen" (b) "on a matter of public concern"? *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Second, if answer to the first question is yes, did "the relevant government entity ha[ve] an adequate justification for treating the employee differently from any other member of the general public"? *Id.*

Defendants all but concede that Plaintiffs speak as citizens on matters of public concern. Rather than make any argument to the contrary, Defendants say only—and truthfully—that "[t]he *Pickering* doctrine recognizes that some limits on a public employee's speech *as a private citizen on matters of public concern* are necessary, proper, and constitutional." ECF No. 58 at 7 (emphasis added). But even if Defendants did not concede the issue, Plaintiffs still speak as private citizens on matters of public concern.

To decide whether a public employee speaks as a citizen, courts ask whether the employee's speech "owes its existence to [the] employee's professional responsibilities." *Garcetti*, 547 U.S. at 421–22. In *Franks*, the Supreme Court explained that it does not matter whether an employee's speech "concerns information acquired by virtue of his public employment." 573 U.S. at 240. Instead, the "critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties." *Id.* Relevant here, the Supreme Court has described "[s]worn testimony in judicial proceedings" as the "quintessential example of speech as a citizen." *Id.* at 238.

In this case, Plaintiffs speak as private citizens. Indeed, UF's UFOLIO disclosure form *requires* Plaintiffs to attest that they are speaking as private citizens, as shown below.

> **I affirm that the attorney with whom I will be working understands that my engagement in this activity is in my capacity as a private citizen and not as an employee of the University of Florida.**
> ☑

ECF No. 31-12 (excerpt from Smith's UFOLIO disclosure).

Clearly then, UF has disclaimed any argument that Plaintiffs speak on behalf of UF as its employees when they serve as expert witnesses. But even if the disclosure's wording did not control, as noted above, because "[a]nyone who testifies in court bears an obligation, to the court and society at large, to tell the truth," in-court testimony is "quintessential" speech as a citizen. *Franks*, 573 U.S. at 238. And *Franks* forecloses the argument that, because expert testimony concerns the expertise that Plaintiffs have developed through their work at UF, their speech as expert witnesses is not their own. *Id.* at 228 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."). In short, Plaintiffs' speech as expert witnesses is speech by private citizens.

As for whether Plaintiffs seek to speak on issues of public concern, this Court must ask whether their speech can "be fairly considered as relating to any matter of

political, social, or other concern to the community, or . . . is a subject of legitimate

news interest; that is, a subject of general interest and of value and concern to the

public." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up). Sworn testimony

is especially likely to be of public concern. *See Franks*, 573 U.S. at 241. On the other

hand, speech is typically not of public concern when it involves a private employee

grievance. *See Connick v. Myers*, 461 U.S. 138, 154 (1983) (stating that the First

Amendment does not "constitutionalize . . . employee grievance[s]"). To distinguish

between speech that interests the public and mere grievances, this Court must

consider "the content, form, and context" of Plaintiffs' statements. *Id.* at 147–48.

Without question, Plaintiffs' speech touches on matters of public concern.

First, "[t]he content of academic inquiry involves matters of political and social

concern because 'academic freedom is of transcendent value to all of us and not

merely to the teachers concerned.' " *Urofsky v. Gilmore*, 216 F.3d 401, 428 (4th Cir.

2000) (Wilkinson, J., concurring) (quoting *Keyishian v. Bd. of Regents*, 385 U.S.

589, 603 (1967)). Indeed, "[a]cademic inquiry is necessary to informed political

debate." *Id.* at 428.

The context and form of Plaintiffs' speech also shows that Plaintiffs speak on

matters of public concern. As this Court already noted, sworn testimony is usually

of public concern. *See Franks*, 573 U.S. at 241 (explaining that "the form and context

of . . . sworn testimony in a judicial proceeding . . . fortify th[e] conclusion" that the

speech at issue is of public concern); *see also Swartzwelder v. McNeilly*, 297 F.3d 228, 238 (3d Cir. 2002) (Alito, J.) ("[C]ourt testimony, whether compelled or voluntary, is always a matter of public concern.").

In short, Plaintiffs' research—touching on some of the most pressing political, social, and scientific questions of our day—is of public concern. And it becomes doubly so when that research is presented to the public in a judicial proceeding. Plaintiffs' testimony as expert witnesses is speech by private citizens on matters of public concern.

But that is not the end of the inquiry. "[I]f [the] employee speaks as a citizen on a matter of public concern, the next question is whether the government had 'an adequate justification for treating the employee differently from any other member of the public' based on the government's needs as an employer." *Franks*, 573 U.S. at 242 (quoting *Garcetti*, 547 U.S. at 418). Put another way, *Pickering* calls on this Court to balance Plaintiffs' interest in speaking, and the public's interest in hearing their speech, against UF's interest in subjecting Plaintiffs' speech to its conflicts policy.

Before this Court turns to that balancing, however, a brief aside about the nature of this Court's inquiry is necessary. In *United States v. National Treasury Employees Union*, the Supreme Court addressed a federal law that prohibited nearly all federal employees from taking many types of outside work. 513 U.S. 454 (1995)

("*NTEU*"). The Court reasoned that the case before it was different from the mine-run *Pickering* case because, "[u]nlike *Pickering* and its progeny, th[e] case d[id] not involve a *post hoc* analysis of one employee's speech and its impact on that employee's public responsibilities." *Id.* at 466–67. So the Court stated that the government's "burden [was] greater . . . . The Government must show that the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expression's 'necessary impact on the actual operation' of the Government." *Id.* at 468 (quoting *Pickering*, 391 U.S. at 571).

Most courts have read *NTEU* as setting out an alternative test to *Pickering*—or, perhaps more accurately, a "modified *Pickering* analysis." *Amalgamated Transit Union v. Port Auth.*, 513 F. Supp. 3d 593, 611 (W.D. Pa. 2021); *see also, e.g., Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) ("While we have sometimes looked to *Pickering* in considering general rules that affect broad categories of employees, we have acknowledged that the standard *Pickering* analysis requires modification [when addressing prior restraints]."); *Crue v. Aiken*, 370 F.3d 668, 678 (7th Cir. 2004); *McNeilly*, 297 F.3d at 237; *Latino Officers Ass'n, N.Y., Inc. v. City of New York*, 196 F.3d 458, 463–65 (2d Cir. 1999). These cases hold "that *Pickering* applies to speech which has already taken place, for which the public employer seeks to punish the speaker," while "*NTEU* applies

when a prior restraint is placed on employee speech." *Crue*, 370 F.3d at 678. When

*NTEU* applies, they say, "the government has a greater burden." *Id.*;[38] *see also Janus*,

138 S. Ct. at 2472 ("[T]he government must shoulder a correspondingly heavier

burden and is entitled to considerably less deference in its assessment that a predicted

harm justifies a particular impingement on First Amendment rights." (cleaned up)).

Though the Eleventh Circuit has implied that *NTEU* applies to prior restraints,

*see Davis v. Phenix City*, 296 F. App'x 759 (11th Cir. 2008), because Defendants

cannot satisfy even the most lenient *Pickering* analysis, this Court need not decide

which test applies here.[39]

Turning to *Pickering*, this Court must consider whether UF's "interest in the

effective and efficient fulfillment of its responsibilities to the public" outweigh

---

[38] Defendants suggest that *Pickering* does not apply because "*Pickering* cases most commonly arise in the context of an individual public employee who alleges that she has been discharged or otherwise suffered adverse employment action in retaliation for speech protected by the First Amendment." ECF No. 58 at 4. Of course, the alterative to *Pickering* is *NTEU*, which several courts have held applies in *ex ante* situations such as this. Are Defendants arguing that *NTEU*'s more stringent test applies here? *See Janus*, 138 S. Ct. at 2472 ("The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis."). This Court cannot tell, although Plaintiffs squarely raised the issue and this Court discussed the matter at the hearing, Defendants—despite being given the chance to file additional briefing—do not even address it.

[39] It is also possible that *Pickering* and *NTEU* do not set out distinct tests. Rather, both are consistent applications of *Pickering*. Accepting that, under *Pickering*, the government's burden turns on how severely the government's activity restricts speech, *NTEU* and *Pickering* are consistent. For example, while any constitutional violation is serious, impinging on one employee's rights, as in *Pickering*, is less serious than impinging on the rights of almost every federal employee in the country, as in *NTEU*. Because the policy here fails under any standard, this Court need not reach this issue.

Plaintiffs' interest in speaking. *Connick*, 461 U.S. at 150. In doing so, this Court may consider whether Plaintiffs' speech would "impair[] discipline by superiors or harmony among co-workers, ha[ve] a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impede[] the performance of the speaker's duties or interfere[] with the regular operation of the enterprise." *Rankin*, 483 U.S. at 388. And this Court must also keep in mind that "a stronger showing of government interests may be necessary if the employee's speech more substantially involves matters of public concern." *Franks*, 573 U.S. at 242 (cleaned up) (quoting *Connick*, 461 U.S. at 152). Finally, this Court is mindful of Justice Alito's warning that "[n]othing in the *Pickering* line of cases requires us to uphold every speech restriction the government imposes as an employer." *Janus*, 138 S. Ct. at 2478.

Here, as in *Franks*, Defendants' "side of the *Pickering* scale is entirely empty." *Franks*, 573 U.S. at 242. To support their policy, Defendants merely regurgitate the case law recognizing the above interests as legitimate, and add that, without its conflicts policy, "UF will be left with no ability to regulate such activities, regardless of their effect on UF's mission as a public university." ECF No. 58 at 8.

It's worth pausing to note just how shocking Defendants' position is. Defendants all but recognize that Plaintiffs are speaking in their private capacity on

matters of public concern.[40] Yet Defendants claim the right to restrict that speech if they determine—in their unlimited discretion—that the viewpoint expressed in Plaintiffs' speech would harm an ill-defined "interest" of the University. And what are UF's interests? Why must Defendants regulate Plaintiffs' speech? How does Plaintiffs' speech prevent the efficient delivery of government services, impair discipline, workplace harmony, or employer confidence? Despite being given not one, not two, but *four* chances to articulate either in writing or at oral argument how Plaintiffs' speech disrupts UF's mission, Defendants cannot or will not say.[41]

UF "cannot justify broad restrictions on First Amendment rights by supposition alone." *Harman v. City of New York*, 140 F.3d 111, 123 (2d Cir. 1998). Indeed, UF must "make a substantial showing that [Plaintiffs'] speech is, in fact, likely to be disruptive before it may be punished." *Waters v. Churchill*, 511 U.S. 661, 674 (1994). UF does not just fail to make that showing, it doesn't even try.

---

[40] While Defendants bill the Task Force's added requirements as a positive, in truth, they make the policy *more* pernicious. What Defendants have effectively said is that Plaintiffs can speak unless their testimony is so controversial, or so offensive to the wrong people, that it could threaten UF's interests. What Defendants have done, then, is create an exception to the policy's "protections" that applies to speech situated in the First Amendment's heartland.

[41] Defendants first had the chance to address the issue in their initial briefing. But they did not. Defendants then had the opportunity to address the issue at the first hearing. Instead, they claimed to not know that *Pickering* applied to this case. This Court then gave Defendants *another* chance to brief the issue. But what Defendants submitted was hardly a brief. Sure, it had words, citations, etc.—all of the trappings of a brief. Yet it was utterly devoid of meaningful content. Finally, Defendants had a fourth chance to discuss the issue at the second hearing. Defendants, however, quickly announced that they had said everything they wanted to say about *Pickering* in their brief—i.e., nothing.

On the other side of the scale, Plaintiffs' interest in speaking weighs heavy. First, Plaintiffs seek to speak on matters touching on the very heart of the First Amendment. As Justice Jackson famously wrote, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Plus, "[t]here is some argument that expression related to academic scholarship . . . implicates additional constitutional interests that are not fully accounted for by [the Supreme] Court's customary employee-speech jurisprudence." *Garcetti*, 547 U.S. at 425. In other words, Plaintiffs' speech, by its very nature, may merit additional judicial solicitude. Indeed, "[t]he essentiality of freedom in the community of American universities is almost self-evident." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957); *see also Keyishian*, 385 U.S. at 603 ([A]cademic freedom . . . . is . . . a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.").

And lest we forget, "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Roe*, 543 U.S. at 82. Plaintiffs' speech, as experts in their respective fields, is of great importance to the public. *Urofsky*, 216 F.3d at 435 (Wilkinson, J., concurring) ("Those who have worked to acquire expertise within their given fields can aid

popular representatives in reaching decisions and in shaping an informed response to rapid change."). Plaintiffs' speech informs public debate, policy, and popular culture. "Particularly in the social sciences," in which most Plaintiffs specialize, "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy*, 354 U.S. at 250. That is especially so here, where Plaintiffs seek to offer their knowledge to aid the judicial system in resolving complex issues of great public importance. Our society would be immeasurably poorer without Plaintiffs' speech.

In sum, Defendants' side of the scale sits empty; Plaintiffs' overflows. Under *Pickering* and its progeny, Defendants' conflicts policy is unconstitutional.[42]

2

Plaintiffs also argue that the policy is unconstitutionally overbroad. Given the policy's myriad constitutional infirmities already discussed above, this Court need not reach this issue.

---

[42] On top of violating Plaintiffs' right to speak, the policy may very well implicate Plaintiffs' right to associate. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984) (explaining that "[t]he Constitution guarantees" the "right to associate for the purpose of engaging in those activities protected by the First Amendment"). But no party has addressed the issue, and so this Court does not reach it.

B

The remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiffs' claims. On balance, these factors warrant granting Plaintiffs' motion for preliminary injunction.

First, irreparable injury. This Court can only grant Plaintiffs' motion for injunctive relief if "irreparable injury will be suffered unless the injunction issues." *Siegel*, 234 F.3d at 1176. Further, because "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights," the injury must be "imminent." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

Plaintiffs argue that they face an ongoing and irreparable injury to their First Amendment rights "from the continued existence of the Policy, which has already been applied to stifle their speech and testimony." ECF No. 30 at 32–33. In response, Defendants argue (1) that there is no ongoing injury because Plaintiffs' requests were ultimately approved, (2) that Plaintiffs have not shown an "imminent likelihood" that their First Amendment rights will be violated under the "significantly revised," "much relaxed" new policy, (3) that Plaintiffs' one-month delay between commencing this case and moving for a preliminary injunction reveals "that Plaintiffs are not facing irreparably injury," and (4) that Plaintiffs upend the purpose of a preliminary injunction in asking "this Court to change, not maintain, the status

quo by enjoining Defendants from enforcing the revised policy." ECF No. 43 at 7–13.

Defendants' first and second arguments can be dispensed with together. As discussed above, Plaintiffs have shown a First Amendment injury at the hands of Defendants' policy. Plaintiffs have shown that their speech is being chilled by the policy. That Defendants ultimately granted Plaintiffs' requests does not ameliorate the constitutional injury because Plaintiffs' injury is ongoing. Further, Defendants' cosmetic revisions fail to extinguish the policy's First Amendment infirmities. While the policy now codifies "a strong presumption in favor of permitting faculty members to work as paid experts against the State," ECF No. 43 at 8, it does not limit the University's discretion in reviewing requests or set time limits for such reviews. Thus, the revised policy retains the very features that Plaintiffs challenge and continues to chill Plaintiffs' speech just like the original policy before it got its facelift. The Eleventh Circuit has "repeatedly held that harms to speech rights 'for even minimal periods of time, unquestionably constitute[] irreparable injury' supporting preliminary relief." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (alteration in original) (quoting *Fla. Businessmen for Free Enter. v. City of Hollywood*, 648 F.2d 956, 958 (5th Cir. Unit B June 1981)). Accordingly, this Court concludes that Plaintiffs are suffering an irreparably injury.

Plaintiffs' alleged delay in moving for a preliminary injunction does not change this conclusion. Plaintiffs moved for a preliminary injunction only one month after suing—and ten days after Defendants revised their policy. ECF No. 30. "[T]he very idea of a *preliminary* injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights before a case can be resolved on its merits," and "[a] delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm." *Wreal*, 840 F.3d at 1248. A one-month delay, however, is akin to no delay. Indeed, against Defendants' suggestion, this Court does not find that Plaintiffs "dilly-dallied" at all. ECF No. 43 at 16. The day Plaintiffs sued, Defendants formed a task force to "study" the policy, thus signaling to Plaintiffs that the policy may change. ECF No. 51 at 13 n.7. Plaintiffs, understandably so, waited to move for a preliminary injunction until Defendants rendered a final decision on the policy. *Id.* And once the revisions were adopted, it took Plaintiffs less than two weeks to file their motion. Accordingly, this Court determines that Plaintiffs have not unduly delayed in seeking a preliminary injunction.

Finally, Defendants' status quo argument does not change this Court's conclusion that Plaintiffs have established an irreparable injury. Defendants argue that Plaintiffs' motion should be denied because they seek to "alter, not preserve, the status quo." ECF No. 43 at 12. True, as Defendants state, "[t]he chief function of a

68

preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Powers v. Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) (quoting *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)). But, "[i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (citations omitted). "The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo." *Id.*

Plaintiffs seek to restore the status quo that existed before Defendants implemented the subject policy. ECF No. 51 at 8 n.5. Thus, as the policy causes Plaintiffs irreparable injury, Plaintiffs move for a return "to the last uncontested status quo between the parties." *Canal Auth.*, 489 F.2d at 576. If this Court declined to restore the status quo, as Defendants suggest, Plaintiffs would suffer further irreparable harm. Accordingly, this Court concludes that Plaintiffs have established irreparable injury.

The final two factors for a preliminary injunction—damage to the opposing party and the public interest—are consolidated when the injunction is to be issued against the government. *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir.

69

2020); *Scott*, 612 F.3d at 1280 ("When the state is a party, the third and fourth [preliminary injunction] considerations are largely the same.").

Defendants fail to define "an important and particularized interest of the University," or articulate the mischief the conflict-of-interest policy is designed to avoid. ECF No. 55 at 62–63. Because Defendants cannot articulate the interest their policy serves, they cannot articulate what harm would befall UF should an injunction issue. And to the extent Defendants claim an interest in preventing faculty and staff from "moonlighting" and putting their obligations to UF on the backburner— overextending themselves with outside employment—the conflicts of commitment policy remains in place to prevent such harm.

Furthermore, the public and the State have no interest in enforcing a likely unconstitutional policy. *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1290 (11th Cir. 2013) ("[T]he public has no interest in the enforcement of what is very likely an unconstitutional statute."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("As noted, even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the city has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance.").

Considering that Defendants do not articulate any harm resulting from an injunction, and the State and public's lack of interest in enforcing a policy that is likely unconstitutional, this Court concludes that the final two factors weigh in favor of granting a preliminary injunction.

V

Having determined a preliminary injunction is warranted, this Court next addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test closely tracks that for a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner v. Scott*, 999 F. Supp. 2d 1278, 1292 (N.D. Fla. 2014) (Hinkle, J.) (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendants have every right to appeal, and this Court sees no reason to delay Defendants in

71

seeking an appeal by requiring them to file a motion to stay with this Court. *See* Fed. R. Civ. P. 62(d).

VI

The Supreme Court of the United States has long regarded teachers, from the primary grades to the university level, as critical to a healthy democracy. Indeed, Justice Frankfurter referred to our teachers as "the priests of our democracy." *Wieman v. Updegraf*, 344 U.S. 183, 196 (1957) (Frankfurter, J., concurring). As noted above, Plaintiffs' academic inquiry "is necessary to informed political debate" and "is of transcendent value to all of us and not merely to the teachers concerned." *Urofsky*, 216 F.3d at 428 (Wilkinson, J., concurring). When such critical inquiry is stifled, democracy suffers.

To illustrate this point, this Court turns to the delightful Danish folktale about the Emperor and his new clothes, a suit created by thieving weavers that would be invisible to those who were unfit for the job they held. The Emperor's lords—fearing the loss of their jobs and the Emperor's good graces—enabled the charade by praising the Emperor's fine suit and "assisting" their lord in lifting his invisible train. This fear of appearing unfit for one's position spread to all within the Emperor's sphere—stifling the sense of "open-mindedness and critical inquiry" that makes for responsible citizens—until the day a young boy spoke truthfully of that which everyone else pretended not to see.

72

Here, fortunately, democracy does not depend upon a lone child to challenge the "emperors" of our time. Instead, this nation's "priests of democracy,"—its learned professors—guide us in our pursuit of truth and informed citizenship. Yet, when several UF professors were called to speak truthfully on topics related to their expertise in cases challenging the State, their requests to speak truthfully and critically in courts of law were denied in an all-too-familiar display of anticipatory obedience.[43] It was not until the wider world caught on to what was happening that the muzzle was lifted. Now Plaintiffs challenge the policy that would permit UF to continue silencing its faculty and staff.

Because the First Amendment protects those who wish to speak truthfully and critically of that which others pretend not to see,

**IT IS ORDERED:**

1. Plaintiffs' motion for preliminary injunction, ECF No. 30, is **GRANTED in part** and **DENIED in part**. The motion is **DENIED** with respect to Plaintiffs' challenge to the *amicus* brief policy. The motion is **GRANTED** with respect

---

[43] This Court is not making any credibility determinations as it relates to the evidence that Plaintiffs Austin, Smith, and McDonald provided in the related election case. That case is set for a bench trial in less than two weeks, and it is during that proceeding when this Court will be tasked with making such determinations. Instead, this Court notes that nowhere in this record have Defendants asserted that the substance of Plaintiffs expert witness testimony has ever been or would be anything but truthful. Instead, Defendants have made the separate and patently false claim that Plaintiffs attempted to mislead this Court about the underlying facts giving rise to this case. As discussed above, this Court rejects the argument based on the record before it.

to the conflict-of-interests policy on providing expert witness testimony or legal consulting in litigation involving the State of Florida.

2. Defendants must take no steps to enforce its conflict-of-interests policy with respect to faculty and staff requests to engage as expert witnesses or provide legal consulting in litigation involving the State of Florida until otherwise ordered. This preliminary injunction binds Defendants University of Florida Board of Trustees, Fuchs, Glover, Rosenbury, and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise. This preliminary injunction leaves in place Defendants' conflict-of-commitment policy, which may still be applied to requests to testify as expert witnesses or to do legal consulting.

3. This injunction is effective immediately, without the posting of security, but Defendants may seek an order requiring the posting of security.

**SO ORDERED on January 21, 2022.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**

74

Query    Reports    Utilities    Help

APPEAL,MEDIATION

# U.S. District Court
## Northern District of Florida (Gainesville)
## CIVIL DOCKET FOR CASE #: 1:21-cv-00184-MW-GRJ

AUSTIN et al v. UNIVERSITY OF FLORIDA
BOARD OF TRUSTEES et al
Assigned to: CHIEF JUDGE MARK E WALKER
Referred to: MAGISTRATE JUDGE GARY R
JONES
Cause: 42:1983 Civil Rights Act

Date Filed: 11/05/2021
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights:
Other
Jurisdiction: Federal Question

**Plaintiff**

**SHARON WRIGHT AUSTIN**            represented by  **LAURA ANN GROSS**
DONNELLY & GROSS PA -
GAINESVILLE FL
2421 NW 41ST ST
STE A-1
GAINESVILLE, FL 32605
352-374-4001
Fax: 352-374-4046
Email:
laura@donnellygross.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXANDRA P SWAIN**
DEBEVOISE & PLIMPTON LLP
- NEW YORK NY
919 THIRD AVE
NEW YORK, NY 10022
212-909-6000
Email: apswain@debevoise.com
*ATTORNEY TO BE NOTICED*

**DAVID ANDREW O'NEIL**
DEBEVOISE & PLIMPTON LLP
- WASHINGTON DC
801 PENNSYLVANIA AVENUE

NW
SUITE 500
WASHINGTON, DC 20004
202-383-8000
Email: daoneil@debevoise.com
*ATTORNEY TO BE NOTICED*

**JAIME MICHELLE
FREILICH-FRIED**
DEBEVOISE & PLIMPTON LLP
- NEW YORK NY
919 THIRD AVE
NEW YORK, NY 10022
212-909-6000
Email: jmfried@debevoise.com
*ATTORNEY TO BE NOTICED*

**KATHARINE MCGRATH
WITTEMAN**
DEBEVOISE & PLIMPTON LLP
- NEW YORK NY
919 THIRD AVE
NEW YORK, NY 10022
212-909-6000
Email:
kwitteman@debevoise.com
*ATTORNEY TO BE NOTICED*

**MORGAN AMANDA DAVIS**
DEBEVOISE & PLIMPTON LLP
- NEW YORK NY
919 THIRD AVE
NEW YORK, NY 10022
212-909-6000
Email: mdavis@debevoise.com
*ATTORNEY TO BE NOTICED*

**SAMUEL JACK ROSH**
DEBEVOISE & PLIMPTON LLP
- NEW YORK NY
919 THIRD AVE
NEW YORK, NY 10022
212-909-6000

Email: sjrosh@debevoise.com
*ATTORNEY TO BE NOTICED*

**SOREN OWEN SCHWAB**
DEBEVOISE & PLIMPTON LLP
- NEW YORK NY
919 THIRD AVE
NEW YORK, NY 10022
212-909-6000
Email:
sschwab@debevoise.com
*ATTORNEY TO BE NOTICED*

**PAUL ANDREW DONNELLY**
DONNELLY & GROSS PA -
GAINESVILLE FL
2421 NW 41ST ST
STE A-1
GAINESVILLE, FL 32605
352-374-4001
Fax: 352-374-4046
Email:
paul@donnellygross.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MICHAEL MCDONALD**          represented by **LAURA ANN GROSS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXANDRA P SWAIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID ANDREW O'NEIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAIME MICHELLE
FREILICH-FRIED**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHARINE MCGRATH
WITTEMAN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**MORGAN AMANDA DAVIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SAMUEL JACK ROSH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SOREN OWEN SCHWAB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PAUL ANDREW DONNELLY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**DANIEL A SMITH**                represented by **LAURA ANN GROSS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXANDRA P SWAIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DAVID ANDREW O'NEIL**
(See above for address)
*ATTORNEY TO BE NOTICED*

**JAIME MICHELLE
FREILICH-FRIED**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KATHARINE MCGRATH
WITTEMAN**

(See above for address)
*ATTORNEY TO BE NOTICED*

**MORGAN AMANDA DAVIS**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SAMUEL JACK ROSH**
(See above for address)
*ATTORNEY TO BE NOTICED*

**SOREN OWEN SCHWAB**
(See above for address)
*ATTORNEY TO BE NOTICED*

**PAUL ANDREW DONNELLY**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**JEFFREY GOLDHAGEN**            represented by **DAVID ANDREW O'NEIL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAIME MICHELLE
FREILICH-FRIED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KATHARINE MCGRATH
WITTEMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA ANN GROSS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MORGAN AMANDA DAVIS**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PAUL ANDREW DONNELLY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SAMUEL JACK ROSH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SOREN OWEN SCHWAB**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXANDRA P SWAIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**TERESA J REID**                  represented by  **DAVID ANDREW O'NEIL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAIME MICHELLE
FREILICH-FRIED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KATHARINE MCGRATH
WITTEMAN**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**LAURA ANN GROSS**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MORGAN AMANDA DAVIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PAUL ANDREW DONNELLY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SAMUEL JACK ROSH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SOREN OWEN SCHWAB**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXANDRA P SWAIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**
**KENNETH B NUNN**          represented by **DAVID ANDREW O'NEIL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**JAIME MICHELLE**
**FREILICH-FRIED**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**KATHARINE MCGRATH**
**WITTEMAN**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**LAURA ANN GROSS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MORGAN AMANDA DAVIS**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PAUL ANDREW DONNELLY**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SAMUEL JACK ROSH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**SOREN OWEN SCHWAB**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEXANDRA P SWAIN**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**UNIVERSITY OF FLORIDA**
**BOARD OF TRUSTEES**
*THE PUBLIC BODY*
*CORPORATE ACTING FOR*
*AND ON BEHALF OF THE*
*UNIVERSITY OF FLORIDA*

represented by **BRIAN J FIELD**
SCHAERR JAFFE LLP -
WASHINGTON DC
1717 K STREET NW
SUITE 900
WASHINGTON, DC 20006
202-787-1060
Email: bfield@schaerr-
jaffe.com

*ATTORNEY TO BE NOTICED*

**H CHRISTOPHER
BARTOLOMUCCI**
SCHAERR JAFFE LLP -
WASHINGTON DC
1717 K STREET NW
SUITE 900
WASHINGTON, DC 20006
202-787-1060
Fax: 202-776-0136
Email: cbartolomucci@schaerr-
jaffe.com
*ATTORNEY TO BE NOTICED*

**KENNETH ALAN
KLUKOWSKI**
SCHAERR JAFFE LLP -
WASHINGTON DC
1717 K STREET NW
SUITE 900
WASHINGTON, DC 20006
202-787-1060
Fax: 202-776-0136
Email: kklukowski@schaerr-
jaffe.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**W KENT FUCHS**
*IN HIS OFFICIAL CAPACITY
AS PRESIDENT OF THE
UNIVERSITY OF FLORIDA*

represented by **BRIAN J FIELD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H CHRISTOPHER
BARTOLOMUCCI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KENNETH ALAN
KLUKOWSKI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**JOSEPH GLOVER**
*IN HIS OFFICIAL CAPACITY*
*AS PROVOST OF THE*
*UNIVERISTY OF FLORIDA*

represented by **BRIAN J FIELD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H CHRISTOPHER**
**BARTOLOMUCCI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KENNETH ALAN**
**KLUKOWSKI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**LAURA ROSENBURY**
*IN HER OFFICIAL CAPACITY*
*AS DEAN OF THE FREDRIC G*
*LEVIN COLLEGE OF LAW*

represented by **BRIAN J FIELD**
(See above for address)
*ATTORNEY TO BE NOTICED*

**H CHRISTOPHER**
**BARTOLOMUCCI**
(See above for address)
*ATTORNEY TO BE NOTICED*

**KENNETH ALAN**
**KLUKOWSKI**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/05/2021 | 1 | COMPLAINT against All Plaintiffs ( Filing fee $ 402 receipt number AFLNDC-6532595.), filed by Sharon Wright Austin, Daniel A. Smith, Michael McDonald. (Attachments: # 1 Civil Cover Sheet Civil Cover Sheet, # 2 Summons, # 3 Notice of Related Case) (DONNELLY, PAUL) (Entered: 11/05/2021) |
| 11/08/2021 | 2 | CIVIL COVER SHEET. (kdm) (Entered: 11/08/2021) |
| 11/08/2021 | 3 | Summons Issued as to UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (kdm) (Entered: 11/08/2021) |

| 11/08/2021 | 4 | NOTICE *of Filing Summonses* by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH (Attachments: # 1 Summons - Fuchs, # 2 Summons - Glover) (DONNELLY, PAUL) (Entered: 11/08/2021) |
|---|---|---|
| 11/08/2021 | 5 | NOTICE *of Related Case* by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH (DONNELLY, PAUL) (Entered: 11/08/2021) |
| 11/08/2021 | 6 | Summons Issued as to JOSEPH GLOVER and W KENT FUCHS (attachment 1) (kdm) Modified on 11/12/2021 (tss) (Entered: 11/08/2021) |
| 11/12/2021 | 7 | MOTION to Appear Pro Hac Vice by David ONeil.( Filing fee $ 208 receipt number AFLNDC-6542133.) by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH. (Attachments: # 1 Certificate of Good Standing) (O'NEIL, DAVID) (Entered: 11/12/2021) |
| 11/12/2021 | 8 | MOTION to Appear Pro Hac Vice by Soren Schwab.( Filing fee $ 208 receipt number AFLNDC-6542162.) by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH. (Attachments: # 1 Certificate of Good Standing) (SCHWAB, SOREN) (Entered: 11/12/2021) |
| 11/12/2021 | 9 | ORDER ADMITTING DAVID A O'NEIL PRO HAC VICE re 7 MOTION to Appear Pro Hac Vice by David O'Neil signed by CHIEF JUDGE MARK E WALKER on 1/12/21. (bkp) (Entered: 11/12/2021) |
| 11/12/2021 | 10 | MOTION to Appear Pro Hac Vice by Jaime Freilich-Fried.( Filing fee $ 208 receipt number AFLNDC-6542207.) by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH. (Attachments: # 1 Certificate of Good Standing) (FREILICH-FRIED, JAIME) (Entered: 11/12/2021) |
| 11/12/2021 | 11 | MOTION to Appear Pro Hac Vice by Katharine Witteman.( Filing fee $ 208 receipt number AFLNDC-6542291.) by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH. (Attachments: # 1 Certificate of Good Standing) (WITTEMAN, KATHARINE) (Entered: 11/12/2021) |
| 11/12/2021 | 12 | MOTION to Appear Pro Hac Vice by Samuel Rosh.( Filing fee $ 208 receipt number AFLNDC-6542390.) by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH. (Attachments: # 1 Certificate of Good Standing) (ROSH, SAMUEL) (Entered: 11/12/2021) |

| 11/12/2021 | 13 | ORDER ADMITTING JAIME FREILICH-FRIED PRO HAC VICE re 10 MOTION to Appear Pro Hac Vice by Jaime Freilich-Fried Signed by CHIEF JUDGE MARK E WALKER on 11/12/21. (bkp) (Entered: 11/12/2021) |
|---|---|---|
| 11/12/2021 | 14 | ORDER ADMITTING SAMUEL ROSH PRO HAC VICE re 12 MOTION to Appear Pro Hac Vice by Samuel Rosh signed by CHIEF JUDGE MARK E WALKER on 11/12/21. (bkp) (Entered: 11/12/2021) |
| 11/12/2021 | 15 | ORDER ADMITTING SOREN SCHWAB PRO HAC VICE re 8 MOTION to Appear Pro Hac Vice by Soren Schwab signed by CHIEF JUDGE MARK E WALKER on 11/12/21. (bkp) (Entered: 11/12/2021) |
| 11/12/2021 | 16 | MOTION to Appear Pro Hac Vice by Morgan Davis.( Filing fee $ 208 receipt number AFLNDC-6542573.) by SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH. (Attachments: # 1 Certificate of Good Standing) (DAVIS, MORGAN) (Entered: 11/12/2021) |
| 11/12/2021 | 17 | ORDER ADMITTING KATHARINE WITTEMAN PRO HAC VICE re 11 MOTION to Appear Pro Hac Vice by Katharine Witteman signed by CHIEF JUDGE MARK E WALKER on 11/12/21. (bkp) (Entered: 11/12/2021) |
| 11/12/2021 | 18 | ORDER ADMITTING MORGAN DAVIS PRO HAC VICE; granting 16 Motion to Appear Pro Hac Vice. (Appointed MORGAN AMANDA DAVIS for SHARON WRIGHT AUSTIN, MICHAEL MCDONALD, DANIEL A SMITH). Signed by CHIEF JUDGE MARK E WALKER on 11/12/2021. (kdm) (Entered: 11/15/2021) |
| 11/15/2021 | 19 | AMENDED COMPLAINT *to include new Plaintiffs Jeffrey Goldhagen, Teresa J. Reid, and Kenneth B. Nunn and include new Defendant Laura Rosenbury, in her official capacity as Dean of the Fredric G. Levin College of Law* against W KENT FUCHS, JOSEPH GLOVER, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES, filed by SHARON WRIGHT AUSTIN, DANIEL A SMITH, MICHAEL MCDONALD. (O'NEIL, DAVID) (Entered: 11/15/2021) |
| 11/17/2021 | 20 | NOTICE *OF SUMMONS TO LAURA ROSENBURY* by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH re 19 Amended Complaint, |

(O'NEIL, DAVID) (Entered: 11/17/2021)

| | | |
|---|---|---|
| 11/17/2021 | 21 | Summons Issued as to LAURA ROSENBURY. (kdm) (Entered: 11/17/2021) |
| 12/01/2021 | 22 | NOTICE of Appearance by H CHRISTOPHER BARTOLOMUCCI on behalf of All Defendants (BARTOLOMUCCI, H) (Entered: 12/01/2021) |
| 12/01/2021 | 23 | MOTION to Dismiss for Lack of Jurisdiction ( (Internal deadline for referral to judge if response not filed earlier: **12/15/2021).**), MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (Attachments: # 1 Affidavit of Ryan Fuller with Supporting Exhibits) (BARTOLOMUCCI, H) (Entered: 12/01/2021) |
| 12/01/2021 | 24 | MOTION to Appear Pro Hac Vice by Alexandra P. Swain.( Filing fee $ 208 receipt number AFLNDC-6569145.) by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (SWAIN, ALEXANDRA) (Entered: 12/01/2021) |
| 12/02/2021 | 25 | INITIAL SCHEDULING ORDER. Signed by CHIEF JUDGE MARK E WALKER on 12/2/2021. Status Report due by **1/2/2022** and every 30 days thereafter. Rule 26 Meeting Report due by **1/18/2022**. Discovery due by **4/1/2022**. (kdm) (Entered: 12/02/2021) |
| 12/02/2021 | 26 | ORDER ADMITTING ALEXANDRA P. SWAIN PRO HAC VICE; granting 24 Motion to Appear Pro Hac Vice (Appointed ALEXANDRA P SWAIN for SHARON WRIGHT AUSTIN,JEFFREY GOLDHAGEN, MICHAEL MCDONALD,KENNETH B NUNN,TERESA J REID, LAURA ROSENBURY,DANIEL A SMITH). Signed by CHIEF JUDGE MARK E WALKER on 12/2/2021. (kdm) (Entered: 12/02/2021) |
| 12/03/2021 | 27 | SUMMONS Returned Executed by DANIEL A SMITH, MICHAEL MCDONALD, JEFFREY GOLDHAGEN, SHARON WRIGHT AUSTIN, TERESA J REID, KENNETH B NUNN. W KENT FUCHS served on 11/16/2021, answer due 12/7/2021. (O'NEIL, DAVID) (Entered: 12/03/2021) |

12/03/2021    28    SUMMONS Returned Executed by DANIEL A SMITH, MICHAEL MCDONALD, JEFFREY GOLDHAGEN, SHARON WRIGHT AUSTIN, TERESA J REID, KENNETH B NUNN. JOSEPH GLOVER served on 11/16/2021, answer due 12/7/2021. (O'NEIL, DAVID) (Entered: 12/03/2021)

12/03/2021    29    SUMMONS Returned Executed by DANIEL A SMITH, MICHAEL MCDONALD, JEFFREY GOLDHAGEN, SHARON WRIGHT AUSTIN, TERESA J REID, KENNETH B NUNN. UNIVERSITY OF FLORIDA BOARD OF TRUSTEES served on 11/16/2021, answer due 12/7/2021. (O'NEIL, DAVID) (Entered: 12/03/2021)

12/03/2021    30    MOTION for Preliminary Injunction by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (Attachments: # 1 Declaration of Kenneth B. Nunn, # 2 Declaration of Teresa J. Reid, # 3 Declaration of Jeffrey Goldhagen, # 4 Declaration of Sharon Wright Austin, # 5 Declaration of Michael McDonald, # 6 Declaration of Daniel A. Smith) (O'NEIL, DAVID) (Entered: 12/03/2021)

12/03/2021    31    AFFIDAVIT in Support re 30 MOTION for Preliminary Injunction filed by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (Attachments: # 1 Exhibit 1 2.10 Rosenbury Email to Faculty, # 2 Exhibit 2 7.1 UF Conflicts Policy, # 3 Exhibit 3 7.1 Prof Nunn Email to Colleagues, # 4 Exhibit 4 7.10 Email Exchange between Rosenbury and Faculty, # 5 Exhibit 5 7.12 Prof Reid UFOLIO Notification, # 6 Exhibit 6 7.14 Prof Nunn UFOLIO Disclosure, # 7 Exhibit 7 7.14 Prof Nunn UFOLIO Notification, # 8 Exhibit 8 8.11 Amicus Brief, # 9 Exhibit 9 6.4 Prof Smith UFOLIO Disclosure, # 10 Exhibit 10 7.7 Prof Smith UFOLIO Notification, # 11 Exhibit 11 8.12 Prof Goldhagen UFOLIO Disclosure, # 12 Exhibit 12 10.4 Prof Smith UFOLIO Notification, # 13 Exhibit 13 10.11 Prof Smith UFOLIO Notification, # 14 Exhibit 14 10.13 Prof McDonald UFOLIO Notification, # 15 Exhibit 15 10.15 Prof Austin UFOLIO Notification, # 16 Exhibit 16 10.30 UF Statement, # 17 Exhibit 17 11.1 UF Statement, # 18 Exhibit 18 11.1 OGC Email, # 19 Exhibit 19 11.3 Quinn Email to Colleagues, # 20 Exhibit 20 11.5 Prof McDonald UFOLIO Disclosure and Notification, # 21 Exhibit 21 11.5 UF Statement, # 22 Exhibit 22 11.5 Prof Smith June UFOLIO

Notification, # <u>23</u> Exhibit 23 11.5 Prof Smith October UFOLIO Notification, # <u>24</u> Exhibit 24 8.12 Prof Smith Annual Evaluation, # <u>25</u> Exhibit 25 7.13 Prof Nunn Email to Colleagues, # <u>26</u> Exhibit 26 11.5 Prof Goldhagen UFOLIO Disclosure and Notification, # <u>27</u> Exhibit 27 11.8 Email Exchange between Prof Nunn and Quinn, # <u>28</u> Exhibit 28 11.16 Miami Herald Article, # <u>29</u> Exhibit 29 11.22 Task Force Final Report, # <u>30</u> Exhibit 30 11.23 UF Statement, # <u>31</u> Exhibit 31 11.23 SACSOC Special Report, # <u>32</u> Exhibit 32 11.23 Gainesville Sun Article, # <u>33</u> Exhibit 33 UF Mission Statement, # <u>34</u> Exhibit 34 11.2 FL Congressional Delegation Letter, # <u>35</u> Exhibit 35 11.29 WCJB Article, # <u>36</u> Exhibit 36 10.12 Richardson Email to Prof Smith) (DAVIS, MORGAN) (Entered: 12/03/2021)

| | | |
|---|---|---|
| 12/03/2021 | | Set Deadlines as to <u>30</u> MOTION for Preliminary Injunction . (Internal deadline for referral to judge if response not filed earlier: **12/17/2021**). (bkp) (Entered: 12/06/2021) |
| 12/06/2021 | <u>32</u> | ORDER SETTING CONFERENCE SCHEDULE - The attorneys for both parties must confer prior to the TELEPHONIC scheduling conference. The Clerk shall set this matter for an expedited telephonic scheduling conference on Friday, December 10, 2021, at 12:30 p.m. (ET) signed by CHIEF JUDGE MARK E WALKER on 12/6/21.( Telephonic Status Conference set for **12/10/2021 12:30 PM** in U.S. Courthouse Gainesville before CHIEF JUDGE MARK E WALKER.) (bkp) (Entered: 12/06/2021) |
| 12/06/2021 | 33 | NOTICE OF TELEPHONIC HEARING: Telephonic Scheduling Conference set for **12/10/2021 12:30 PM** before CHIEF JUDGE MARK E WALKER. |

ALL PARTIES are directed to call the AT&T Conference Line (see below)

Conference Call Information

You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when

you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is comprised by these devices.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 12/06/2021)

12/09/2021   34   MOTION to Appear Pro Hac Vice by Brian J. Field.( Filing fee $ 208 receipt number AFLNDC-6579597.) by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (Attachments: # 1 Exhibit Certificate of Good Standing) (FIELD, BRIAN) (Entered: 12/09/2021)

12/09/2021   35   ORDER ADMITTING BRIAN J. FIELD PRO HAC VICE; granting 34 Motion to Appear Pro Hac Vice (Appointed BRIAN J FIELD for W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES). Signed by CHIEF JUDGE MARK E WALKER on 12/9/2021. (kdm) (Entered: 12/09/2021)

12/09/2021   36   NOTICE OF RESCHEDULED TELEPHONIC HEARING: Telephonic Scheduling Conference reset for **12/13/2021 02:30 PM** before CHIEF JUDGE MARK E WALKER.

ALL PARTIES are directed to call the AT&T Conference Line (see below)

Conference Call Information

You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is comprised by these devices.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 12/09/2021)

| 12/10/2021 | <u>37</u> | Joint MOTION to Extend Time by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (Attachments: # <u>1</u> Text of Proposed Order) (O'NEIL, DAVID) (Entered: 12/10/2021) |
|---|---|---|
| 12/10/2021 | <u>38</u> | ORDER ACKNOWLEDGING ECF NO. <u>37</u> AND SETTING DEADLINES. (Plaintiffs' deadline to file their response in opposition to Defendants' motion to dismiss is extended to on or before Friday **12/17/2021).**, Defendants must file their response in opposition to Plaintiffs' motion for preliminary injunction on or before Friday **12/17/2021**). Signed by CHIEF JUDGE MARK E WALKER on 12/10/2021. (kdm) (Entered: 12/13/2021) |
| 12/13/2021 | <u>39</u> | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Scheduling Conference held on 12/13/2021. Parties discuss case status, briefing and hearing schedule for <u>30</u> Motion for Preliminary Injunction. Ruling by Court: <u>30</u> Motion for Preliminary Injunction and <u>24</u> Motion to Dismiss to have same briefing schedule: Responses due by **12/17/2021**. Replies due by **5:30 pm on 1/5/2022**. Oral argument re: <u>30</u> Motion for Preliminary Injunction set for 1/7/22 at 9:30 am. (Court Reporter Megan Hague). (vkm) (Entered: 12/14/2021) |
| 12/13/2021 | 40 | NOTICE OF HEARING RE: <u>30</u> MOTION for Preliminary Injunction: Oral Argument set for **1/7/2022 09:30 AM** before CHIEF JUDGE MARK E WALKER. United States Courthouse, **Courtroom 5 West,** 111 North Adams St., Tallahassee, Florida 32301. |
| | | Per Administrative Order, to protect the health and safety of all occupants, **all persons who enter any courthouse within the Northern District of Florida are required to wear face masks or other face coverings that cover the person's nose and mouth while in any public or common area within the facility.** |
| | | **Face masks are required in Courtroom 5 West.** |
| | | NOTE: If you or any party, witness or attorney in this matter has a disability that requires special accommodation, such as, a hearing impairment that requires a sign language interpreter or a wheelchair restriction that requires ramp |

access, please contact Victoria Milton McGee at 850-521-3510 in the Clerk's Office at least one week prior to the hearing (or as soon as possible) so arrangements can be made.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 12/14/2021)

| 12/17/2021 | 41 | SUMMONS Returned Executed by DANIEL A SMITH, MICHAEL MCDONALD, JEFFREY GOLDHAGEN, SHARON WRIGHT AUSTIN, TERESA J REID, KENNETH B NUNN. LAURA ROSENBURY served on 11/30/2021, answer due 12/21/2021. (O'NEIL, DAVID) (Entered: 12/17/2021) |
|---|---|---|
| 12/17/2021 | 42 | MEMORANDUM in Opposition re 23 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM / *Plaintiffs' Brief in Opposition to Defendants' Motion to Dismiss* filed by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (O'NEIL, DAVID) (Entered: 12/17/2021) |
| 12/17/2021 | 43 | MEMORANDUM in Opposition re 30 MOTION for Preliminary Injunction filed by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (BARTOLOMUCCI, H) (Entered: 12/17/2021) |
| 12/17/2021 | 44 | AFFIDAVIT in Opposition re 30 MOTION for Preliminary Injunction filed by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (Attachments: # 1 Exhibit 1:UF Conflicts of Interest Policy, # 2 Exhibit 2: Emails, # 3 Exhibit 3: UFOLIO Nunn approval notice, # 4 Exhibit 4: UFOLIO Reid approval notice, # 5 Exhibit 5:Appellees' Br. Hoover v. Morales) (BARTOLOMUCCI, H) (Entered: 12/17/2021) |
| 12/17/2021 | 45 | AFFIDAVIT in Opposition re 23 MOTION to Dismiss for Lack of Jurisdiction MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM / *Declaration of Morgan A. Davis in Opposition to Defendants' Motion to Dismiss* by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (Attachments: # 1 Exhibit A - 4.22 UFOLIO Review Guidance, # 2 Exhibit B - 11.2 Chronicle Article, # 3 Exhibit C - 12.3 Chronicle Article, # 4 Exhibit D - 12.3 BOT |

Chairman Remarks, # 5 Exhibit E - 12.6 UF Faculty Senate Report, # 6 Exhibit F - 11.15 Miami Herald Article, # 7 Exhibit G - 12.9 Tampa Bay Article, # 8 Exhibit H - UFOLIO Review Process Flowchart, # 9 Exhibit I - 12.16 UFOLIO Review Process Flowchart Addendum) (DAVIS, MORGAN) (Entered: 12/17/2021)

01/03/2022   46   ORDER DENYING 23 MOTION TO DISMISS. Signed by CHIEF JUDGE MARK E WALKER on 1/3/2022. (kdm) (Entered: 01/03/2022)

01/03/2022        ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 25 INITIAL Scheduling Order - Status Report due by 1/2/2022. (***None filed to date.***) (kdm) (Entered: 01/03/2022)

01/03/2022        RESet Deadline per 25 INITIAL SCHEDULING ORDER: Joint Status Report due by 2/2/2022. (kdm) (Entered: 01/03/2022)

01/03/2022   47   AMENDED ORDER DENYING 23 MOTION TO DISMISS. Signed by CHIEF JUDGE MARK E WALKER on 1/3/2022. (kdm) (Entered: 01/03/2022)

01/03/2022   48   STATUS REPORT *JOINT STATUS REPORT* by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (O'NEIL, DAVID) (Entered: 01/03/2022)

01/03/2022   49   NOTICE OF TELEPHONIC HEARING RE: 30 MOTION for Preliminary Injunction: Telephonic Oral Argument set for **1/7/2022 09:30 AM** before CHIEF JUDGE MARK E WALKER.

ALL PARTIES are directed to call the AT&T Conference Line (see below)

Conference Call Information

You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when

you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is comprised by these devices.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 01/03/2022)

01/05/2022  50  ORDER REQUIRING SUPPLEMENTAL NOTICE re 44 Affidavit in Opposition. (By the close of business tomorrow **1/6/2022** Defendants are ordered to file a supplemental notice accompanied by record evidence setting out the specific subject matter on which Plaintiff McDonald is consulting). Signed by CHIEF JUDGE MARK E WALKER on 1/5/2022. (kdm) (Entered: 01/05/2022)

01/05/2022  51  REPLY to Response to Motion re 30 MOTION for Preliminary Injunction filed by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (O'NEIL, DAVID) (Entered: 01/05/2022)

01/06/2022  52  NOTICE *Supplemental per Court Order* by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES re 50 Order,, Set Deadlines/Hearings, (Attachments: # 1 Exhibit A:McDonald UFOLIO) (BARTOLOMUCCI, H) (Entered: 01/06/2022)

01/07/2022  53  Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Oral Argument held on 1/7/2022 re 30 MOTION for Preliminary Injunction. Defendants to file supplemental brief on or before **1/12/2022.** Plaintiffs to file response on or before **1/13/2022.** Telephonic oral argument resumes on 1/14/2022 at 2:00 p.m. (Court Reporter Megan Hague). (vkm) (Entered: 01/07/2022)

01/07/2022  54  NOTICE OF TELEPHONIC HEARING RE: 30 MOTION for Preliminary Injunction: Telephonic Oral Argument resumes **1/14/2022 at 02:00 PM** before CHIEF JUDGE MARK E WALKER.

ALL PARTIES are directed to call the AT&T Conference Line (see below)

Conference Call Information

You may dial into the conference call up to five minutes before start time. Call in number: **888-684-8852** When prompted for an access code, enter: **3853136#** If you are asked to join as the host, just ignore and wait until you are asked for a security code. When asked for a security code, enter: **4565#** Say your name, when prompted. You are now in the conference call. Remember to mute your phone when you are not speaking. **The Court asks that counsel NOT use cell phones or speaker phones** during the call as the quality of the audio connection is comprised by these devices.

s/ Victoria Milton McGee
Courtroom Deputy Clerk (vkm) (Entered: 01/07/2022)

| | | |
|---|---|---|
| 01/08/2022 | 55 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Telephonic Preliminary Injunction Motion Proceedings held on 1/7/2022, before Judge Mark E. Walker. Court Reporter/Transcriber Megan A. Hague, Telephone number 850-443-9797. |

> *Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.*

Redaction Request due **1/18/2022**. Release of Transcript Restriction set for **4/15/2022**. (mah) (Entered: 01/08/2022)

| | | |
|---|---|---|
| 01/11/2022 | 56 | MOTION for Extension of Time to File Answer re 1 Complaint, by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (Attachments: # 1 Text of Proposed Order) (BARTOLOMUCCI, H) (Entered: 01/11/2022) |
| 01/12/2022 | 57 | ORDER GRANTING 56 EXTENSION. (Defendants must file their answer on or before **2/1/2022**). Signed by CHIEF JUDGE MARK E WALKER on 1/12/2022. (kdm) (Entered: 01/12/2022) |
| 01/12/2022 | 58 | RESPONSE in Opposition re 30 MOTION for Preliminary Injunction *Supplemental Brief per 1-7-22 Order* filed by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (BARTOLOMUCCI, H) (Entered: 01/12/2022) |

| 01/12/2022 | 59 | NOTICE of Appearance by KENNETH ALAN KLUKOWSKI on behalf of All Defendants (KLUKOWSKI, KENNETH) (Entered: 01/12/2022) |
| 01/13/2022 | 60 | REPLY to Response to Motion re 30 MOTION for Preliminary Injunction */SUPPLEMENTAL*, MEMORANDUM in Support filed by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH. (Attachments: # 1 Affidavit /Second Declaration of Jeffrey Goldhagen) (O'NEIL, DAVID) (Entered: 01/13/2022) |
| 01/14/2022 | 61 | NOTICE *of Filing as per Order of 1-14-21* by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES re 30 MOTION for Preliminary Injunction (Attachments: # 1 Exhibit 1:Expert Report S Austin 9-1-21, # 2 Exhibit 2:Expert Report D Smith 9-1-21, # 3 Exhibit 3:Expert Decl M McDonald 10-13-21, # 4 Exhibit 4:Suppl & Rebuttal Expert Rep D Smith 10-13-21, # 5 Exhibit 5:Transcript of Deposition D Smith 10-25-21, # 6 Exhibit 6:Transcript of Deposition S Austin 10-27-21, # 7 Exhibit 7:Transcript of Deposition M McDonald 10-29-21) (BARTOLOMUCCI, H) (Entered: 01/14/2022) |
| 01/14/2022 | 64 | Minute Entry for proceedings held before CHIEF JUDGE MARK E WALKER: Telephonic Preliminary Injunction Oral Argument held on 1/14/2022. Argument continues regarding 30 Plaintiffs' Motion for Preliminary Injunction. Ruling by Court: Defendants to supplement the record, as directed by the Court, by **5:00 pm on 1/14/2022**, with expert reports and depositions. Order to follow (Court Reporter Judy Martin). (vkm) (Entered: 01/20/2022) |
| 01/18/2022 | 62 | REPORT of Rule 26(f) Planning Meeting. (O'NEIL, DAVID) (Entered: 01/18/2022) |
| 01/19/2022 | | ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 62 Report of Rule 26(f) Planning Meeting. (kdm) (Entered: 01/19/2022) |
| 01/19/2022 | 63 | SCHEDULING AND MEDIATION ORDER Re: 62 Report of Rule 26(f) Planning Meeting. (Discovery due by **8/1/2022.**, Dispositive Motions to be filed by **8/22/2022.**, Mediation Report due by **9/12/2022**. Bench Trial set for **11/7/2022** |

**08:30 AM** in U.S. Courthouse Gainesville before CHIEF JUDGE MARK E WALKER.) Case referred to mediation. Signed by CHIEF JUDGE MARK E WALKER on 1/19/2022. (kdm) (Entered: 01/19/2022)

01/21/2022    65    PRELIMINARY INJUNCTION. Plaintiffs' motion for preliminary injunction, ECF No. 30 , is GRANTED in part and DENIED in part. Signed by CHIEF JUDGE MARK E WALKER on 1/21/2022. (kjw) (Entered: 01/21/2022)

01/25/2022    66    RULE 26 Disclosures by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (BARTOLOMUCCI, H) (Entered: 01/25/2022)

01/26/2022    67    **\*\*\*DISREGARD ENTERED IN ERROR\*\*\* --** DISCOVERY ADVISORY: Re 66 Rule 26 Disclosures - Counsels attention is directed to Federal Rule of Civil Procedure 5(d), which prohibits the filing of discovery materials (including notices of deposition, deposition transcripts, interrogatories and interrogatory responses and notices thereof, production requests and responses and notices thereof, and admissions requests and responses and notices thereof) unless and until needed for consideration of pending motions by the court. This advisory serves as notice that no further discovery materials should be filed and all discovery posting options have been removed from CMECF. (kdm) Modified on 1/26/2022 to add text (kdm). (Entered: 01/26/2022)

02/01/2022    68    ANSWER to 19 Amended Complaint, by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. (BARTOLOMUCCI, H) (Entered: 02/01/2022)

02/02/2022      ACTION REQUIRED BY DISTRICT JUDGE: Chambers of CHIEF JUDGE MARK E WALKER notified that action is needed Re: 25 INITIAL SCHEDULING ORDER: Joint Status Report due by 2/2/2022. (\*\*\*None filed to date.\*\*\*) (kdm) (Entered: 02/02/2022)

02/02/2022      RESet Deadline per 25 INITIAL SCHEDULING ORDER: Joint Status Report due by **3/2/2022**. (kdm) (Entered: 02/02/2022)

02/02/2022    69    STATUS REPORT / *Joint Status Report* by SHARON WRIGHT AUSTIN, JEFFREY GOLDHAGEN, MICHAEL MCDONALD, KENNETH B NUNN, TERESA J REID, DANIEL A SMITH.

(O'NEIL, DAVID) (Entered: 02/02/2022)

02/08/2022    <u>70</u>    NOTICE OF APPEAL as to <u>65</u> Preliminary Injunction by W KENT FUCHS, JOSEPH GLOVER, LAURA ROSENBURY, UNIVERSITY OF FLORIDA BOARD OF TRUSTEES. ( (Filing fee $ 505.) (Attachments: # <u>1</u> Exhibit 1:Preliminary Injunction 1-21-22) (BARTOLOMUCCI, H) (Entered: 02/08/2022)